FILED

1

NOV 2 1 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK



1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TEXAS
2                   AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                      ) Austin, Texas
                             )
5   GARY PAUL KARR          ) May 15, 2000

6                   VOLUME 2 of 12
7                 TRIAL ON THE MERITS
            BEFORE THE HONORABLE SAM SPARKS
8
    APPEARANCES:
9
    For the United States:      Mr. Gerald C. Carruth
10                              Mr. Daniel H. Mills
                                Assistant U.S. Attorneys
11                              816 Congress Avenue, Ste. 1000
                                Austin, Texas 78701
12

13

14

    For the Defendant:          Mr. Thomas W. Mills, Jr.
15                              Ms. Christi N. Williams
                                Mills & Presby
16                              5910 North Central Expressway,
                                Ste. 900
17                              Dallas, Texas 75206-5141

18

19
    Court Reporter:             Lily Iva Reznik, RPR, CRR
20                              United States Courthouse
                                200 West 8th Street
21                              Austin, Texas 78701
                                Ph: (512)916-5564
22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

                    LILY I. REZNIK
              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF TEXAS (AUSTIN)

ORIGINAL

96



2

1                         I N D E X

2                                                    Page

3    Jury Voir Dire                                  22

4    Government's Opening Statements                 92

5    Defendant's Opening Statements                  121

6    Proceedings Adjourned                           133

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE CLERK:  The Court calls case No. A 99-CR-274,

2     United States of America vs. Gary Paul Karr.

3          MR. CARRUTH:  Gerald Carruth and Dan Mills for the

4     United States; we're ready.

5          THE COURT:  Mr. Pitman.

6          MR. CARRUTH:  I'm sorry.  Mr. Pitman will be here

7     during the jury selection, your Honor.  He won't be presenting

8     or crossing any witnesses.

9          MR. T. MILLS:  For the defense, Tom Mills, Christi

10     Williams; we're ready.

11          THE COURT:  I have several things that y'all have

12     filed over the weekend, first, a subpoena, to subpoena the

13     custodian records of the Warren Inn in San Antonio --

14          MR. T. MILLS:  Yes, sir.

15          THE COURT:  -- from August to December.  And, Mr.

16     Mills, you have great faith that a small motel is going to

17     have a lot of records on the date of trial.  I have no

18     objections to the subpoena, but you're going to get a subpoena

19     -- have you made rearrangements for any of these records?

20          MR. T. MILLS:  They've refused to cooperate with us.

21     We've attempted to interview them on three occasions.  I've

22     been down there once with Ms. Williams and our investigator on

23     two occasions.  During the time that the -- we are continuing

24     to get new material as recently as yesterday from the

25     government.  We're working as diligently as we can.

1        We recently learned that during the period of time

2   that the three people were allegedly being held captive, that

3   there was maintenance work done on the frame of the door, and

4   that the maintenance worker likely saw what was happening

5   inside, or at least had to have the door open to do the work.

6   And we're trying to track down that person's name as well as

7   any other maintenance work that may have been done during that

8   period of time, and I don't know if they have those records.

9        THE COURT:  Well, isn't it a little broad in August 1

10  to December 31, every single person that's ever been under

11  Rule 11?

12       MR. T. MILLS:  Well, we could narrow it down.

13       THE COURT:  Well, I'm just asking as a practical

14  matter.  First off, I don't have a Marshal that's going to

15  serve this.  My Marshals are busy.  I've got 4,000 people in

16  39 jails in the Western District, and I've had all of your

17  other subpoenas issued, but today, I don't have a Marshal.  So

18  however you're going to serve it, that's your business.

19       But secondly, I got this I just call my lawyer and get

20  a motion to quash too broad.  They're going to come in with a

21  motion to quash too broad, I'm going to grant it.  It's too

22  broad.  So it's an exercise of futility.  If you want to get a

23  good description on a good subpoena, I'll consider it.  But

24  I'm not going to consider that one.  It's too broad.  Six

25  months, all runners in a single room in a case where we've got

5

1   a lot of publicity involved.  No telling who's been in that

2   room.

3          MR. T. MILLS:  Just for the Court's understanding,

4   it's not a single room.

5          THE COURT:  It says Room 11.

6          MR. T. MILLS:  I know.  It's called Room 11.  You open

7   the door, it says Room 11, but it's a two-bedroom kitchen

8   living room, TV room, it's a suite.

9          THE COURT:  Do you have any idea how many people

10  rented it from August to December?

11         MR. T. MILLS:  No, sir, but it's typically rented by

12  the week.  So it's not like a typical motel room that has a

13  new renter every day, but I will redraft it.

14         THE COURT:  All right.  Well, get it specific enough

15  to be returnable, and I will sign it.  All right.  Then, I've

16  got the voir dire question, whether or not any prospective

17  juror has any preconceived ideas on whether or not these three

18  alleged victims are either deceased or not deceased, and I

19  will cover that in my voir dire.

20         Then, I have the first in limine, list of objections.

21  The Clerk has just given me, I think, the statement that

22  you're referring to.  Objecting to statement sentence 1, 2, 4,

23  7 and 8 on a, quote, voluntary statement of the defendant,

24  Karr, and I assume this is the statement.  All right.

25         MR. T. MILLS:  The defense doesn't object to the

6

1    prosecutor making the statement that Mr. Karr has been in

2    prison, but this statement and other testimony that goes

3    beyond that as far as details of convictions and lengths of

4    time we're objecting to.

5         THE COURT:  Okay.  So these five sentences in the

6    statement, do they all relate to specific convictions?

7         MR. T. MILLS:  I believe they more relate to having

8    spent a long period of time incarcerated.  They are pursuant

9    to one or two convictions that happened in the 1970s.

10        MR. CARRUTH:  May I respond, your Honor?

11        THE COURT:  Well, let me read the four sentences.  You

12   object to the sentence, during the prior years I make David

13   Waters file in an honor dorm in prison?

14        MR. T. MILLS:  Yes, sir.

15        THE COURT:  Well, that objection's overruled.

16        MR. T. MILLS:  We just don't think there was any part

17   of the conspiracy that was happening during that --

18        THE COURT:  I don't have any idea one way or the

19   other.  I haven't heard any evidence.  I'm going to knock out

20   the sentence he kept to himself and I kept to myself and he

21   learned to trust me.  Is that one of the objections?

22        MR. T. MILLS:  It was not intended to be objected to.

23   If I had known that it was --

24        THE COURT:  And I stayed in touch through phone calls,

25   postcards and letters.  All right.  Mr. Carruth.

1    MR. CARRUTH:  Your Honor, the government is aware of

2  absolutely no legal authority to selectively delete portions

3  of the voluntary statement to which the defendant has not

4  sought to suppress this back to do so -- in fact, when the

5  pretrial detention hearing was held in this case before

6  Magistrate Judge Capelle, he, at his suggestion, states into

7  evidence and made it a part of the public record.  It would be

8  misleading to the jury to delete certain parts of the

9  statement because it is Mr. Karr's voluntary statement.  It

10  was found to be voluntary by the same United States District

11  Judge.

12    THE COURT:  Voluntary statements can have inadmissible

13  evidence in it, and when it is tendered, a party can object to

14  it notwithstanding the past record.

15    MR. CARRUTH:  Well, I'm urging to the Court that I'm

16  representing to the Court this will be one of the last pieces

17  of evidence offered by the government.  So by the time the

18  statement is offered, this Court would have heard the evidence

19  in the case.

20    THE COURT:  All right.  Well, I'll carry this motion,

21  but in carrying it, I don't want you referring to it until

22  it's offered.  Then, approach the bench.

23    MR. CARRUTH:  Thank you, your Honor.

24    THE COURT:  All right.

25    MR. CARRUTH:  Any others or those to which he objects?

 1          THE COURT:  Well, I suspect the only thing that is to

 2     those four sentences that he's objecting to.  But I think it's

 3     going to be covered in some of the other -- you've got a copy

 4     of this, have you not?

 5          MR. CARRUTH:  I do, your Honor.

 6          THE COURT:  All right.  The defendant objects to the

 7     prosecutor eliciting testimony or stating that the defendant

 8     was in prison for either kidnapping or robbery, if he was.

 9     All right.  I love lawyers that live in the imaginary world of

10     perfect.  All right.

11          MR. CARRUTH:  Rule 404B of the Federal Rules of

12     Evidence clearly provides for the admission of the testimony

13     because we are in the kidnapping and robbery case and the

14     conviction is timely, and so if it may become admissible for

15     that purpose, which we would certainly approach the bench for

16     our decision as to permissibility, we believe it may come into

17     evidence.

18          THE COURT:  All right.  Just approach the bench before

19     you get into it.  Conversations -- telephone records or

20     testimony of telephone conversations between the Defendant

21     Karr and anyone else prior to Karr's release from jail in the

22     spring of '95 on an expectation of privacy.  What are we

23     talking about?

24          MR. CARRUTH:  Well, we're talking about several

25     collect calls Mr. Karr made to Mr. Waters' residence while he

1   was being incarcerated, and at that time, the evidence is

2   going to show that they were talking about this plan, this

3   scheme, this conspiracy on some of those conversations, Mr.

4   Karr's -- excuse me.  Mr. Waters' then girlfriend talked to

5   Mr. Karr on the phone.

6           THE COURT:  All right.  There's no recording of it.

7           MR. CARRUTH:  There's only one recording that we have

8   to offer, and that was made when he was incarcerated in

9   Detroit during the past year, not when he was incarcerated in

10  Illinois.

11          THE COURT:  Mr. Mills, you're objecting to the fact

12  that there were conversations, the fact that there were

13  telephone conversations between the Defendant Karr and the

14  Waters number?  Is that what you're objecting to?

15          MR. T. MILLS:  Well, I'm specifically objecting to the

16  substance of the conversations if I worded it.  That's how I

17  intended to be objecting.

18          THE COURT:  Well, I don't know what the substance is,

19  so I will overrule the motion in limine.  You may make your

20  objections at the time of the tender.  Paragraph 4, evidence

21  of guns found in the apartment at the time of arrest March of

22  '99, on the grounds that has previously been suppressed by a

23  federal judge in Michigan.  Very persuasive.  What are we

24  talking about here?

25          MR. CARRUTH:  We're talking about two loaded handguns,

1  a .22 caliber that was determined had been stolen during a

2  home invasion robbery in Indianapolis, Indiana in July of

3  1998.

4  THE COURT:  What relevance?

5  MR. CARRUTH:  I don't know that it has any relevance

6  to this case and we will not seek to offer it, your Honor, but

7  in Mr. Karr's statement and, I think, probably their defense

8  is going to be that he was afraid of Mr. Waters and that's why

9  he had these guns.  And we believe the evidence is going to

10 show that during the course of their association, Mr. Waters

11 has provided Mr. Karr several firearms.

12 And, also, in a statement, he specifically mentions

13 I've got this gun because I was afraid of Mr. Waters.  But we

14 will not seek to offer the firearms themselves, your Honor.

15 THE COURT:  Well, he's more interested in evidence

16 that he had guns in March of '99 at the time of his arrest.

17 Other than his voluntary statement, approach the bench before

18 you attempt to get into it.

19 MR. CARRUTH:  Yes, your Honor.

20 THE COURT:  Extraneous offenses concerning conduct in

21 Indianapolis, Indiana and in California.

22 MR. T. MILLS:  Pertaining to what Mr. Carruth has

23 mentioned, not formally charged, but he says that there's

24 evidence of robberies committed by -- either committed or

25 planned by Mr. Karr and Mr. Waters.

1    THE COURT:  Well --

2    MR. CARRUTH:  That's true.  There is such evidence,

3    and should it become admissible, we would approach the bench

4    and seek its admission under 404B Rules of Evidence.

5    THE COURT:  All right.  Well, I'll grant the motion in

6    limine, and, counsel, approach before we get into conduct in

7    Indianapolis, Indiana and California relating to proposed

8    robberies.  Jason Cross, inherently unreliable.  I've sure

9    crossed a lot of people in my lifetime who were inherently

10   unreliable.  It was sometimes the jury believed it and

11   sometimes they didn't.  I don't know --

12   MR. T. MILLS:  Your Honor, he's a prison inmate who

13   purports that Mr. Karr made incriminating statements to him.

14   The file that I've gotten from the public record in Michigan

15   so far indicates that he has his -- got his lawyer to submit

16   psychoneurological evidence of his behavior problems, and

17   additionally --

18   THE COURT:  What does that mean?  A lot of people in

19   prison have a little problem.  I mean --

20   MR. T. MILLS:  Well, severe problems, severe

21   neurological problems.

22   THE COURT:  Are you taking the position he is not

23   competent as a witness?

24   MR. T. MILLS:  I'm raising that as an issue, yes.  I

25   believe that there was -- I believe, however, that his plea of

1    guilty was accepted, and a diminished capacity reduction in

2    points were made.  So it may not be such that it goes to

3    competence.

4            THE COURT:  So what do you want?

5            MR. T. MILLS:  Well, I'd like to be able to -- if I

6    have -- if I can get additional evidence, I'd like to be able

7    to question prior to his testimony before the jury to see if I

8    do have evidence that approaches incompetence.

9            THE COURT:  Well, you'll know what evidence you have

10   before you question him.

11           MR. T. MILLS:  Yes, sir.

12           THE COURT:  What you want is a deposition before he

13   testifies.

14           MR. T. MILLS:  Not quite.

15           THE COURT:  Well, it's what you want.  Same thing with

16   Morris and Chase.

17           MR. T. MILLS:  Additionally, on these three witnesses,

18   my law office has been contacted by a fourth prison inmate,

19   another prison inmate who says that Mr. Cross, through his

20   family, hired a private investigator to do research on the

21   missing O'Hair Murray family, got that research, gave it to

22   Mr. Cross, who then pretended to the FBI or IRS agent that he

23   had learned this information from Mr. Karr.  That would, of

24   course, be fraud upon the government as well as the Court.

25           If we can continue -- we are on -- trying to develop

1    that evidence, and I will bring it to the attention of Mr.

2    Carruth if I do and make a motion to the Court if it is

3    appropriate.

4         THE COURT:  All right.  When are Cross, Morris and

5    Chase scheduled to --

6         MR. CARRUTH:  They will also be toward the end of

7    trial, your Honor.

8         THE COURT:  All right.  Well, I'll carry those.

9         MR. CARRUTH:  And might I respond briefly to some of

10   these allegations or --

11        THE COURT:  Well, I've --

12        MR. CARRUTH:  -- the Court's ruled, but I just want

13   the Court to know two things.  I think that the evidence will

14   show Mr. Cross at some point in his life sustained a head

15   injury that required some type of -- you know, it was an

16   organic injury.  And I found, also, that the evidence is going

17   to show that he began making very detailed, handwritten notes

18   which he provided to the investigators about his conversations

19   with Mr. Karr while incarcerated together, long before this

20   letter was retained from him, even before the search warrant

21   affidavit from the search of Mr. Waters' residence was

22   unsealed.

23        So counsel's story I'm hearing for the first time this

24   morning notwithstanding my request for specific discovery that

25   he's claiming this whole thing was concocted.  I'm hearing it

1    for the first time with the Court, and I'm sure that's not

2    what the evidence is going to show.

3          THE COURT:  All right.  Anything else?

4          MR. T. MILLS:  There is one other thing else, your

5    Honor.  Yesterday, we were given a copy of some material from

6    the Austin Police Department file.  The date in the very top

7    left-hand corner was May 10th, 2000, and the Austin Police

8    Department is supposed to come back to us on Wednesday of this

9    week to see what we're going to get.

10         But this was some material from their file that the

11    prosecution was trying to obtain as early as May 10th in that

12    it gives some specific information about people's names and

13    cities and countries where these people had reported that they

14    had seen the three missing O'Hair Murrays and another city,

15    two ministers at a convention reporting that they saw Ms.

16    O'Hair.

17         Rather than me try to do an international

18    investigation during trial with limited resources, we would

19    like the prosecution to present us with the follow-up on those

20    reports that has been done.  It may be that these people were

21    interviewed, and it turned out that they were wrong.

22         But anything that's been done to follow up on these

23    specific sightings -- and we could give the exact cities and

24    countries and names, although they have them.  They gave the

25    information to us.  It would help us if we got some follow-up

1    if we think we're entitled to that under Brady.

2         MR. CARRUTH:  The report to which he relates that

3    we've seen -- that I've seen is a report relating to the

4    recovery of Robin O'Hair's automobile in the airport in

5    Austin.  We subsequently investigated and found out that it

6    was actually discovered by the airport police.  And I'd like

7    to remind to the Court that we do not have and have not had

8    the missing person's file from the Austin Police Department.

9    They're not under our control.

10        The record will reflect that any file in 1998, we had

11   a sit-down meeting with state and federal investigators and

12   specifically invited the Austin Police Department to join in

13   our investigation and they declined.  They continued to treat

14   it as a missing person's case.  After the evidence, we believe

15   that it was otherwise.  So he's asking for records that we've

16   never had and the Austin Police Department --

17        THE COURT:  He says he obtained it from you.

18        MR. CARRUTH:  He did.  He did and we just gave it to

19   him yesterday, and what that report relates to is the finding

20   of the automobile.

21        MR. T. MILLS:  It's not at all --

22        MR. CARRUTH:  I have one page of that report.

23        THE COURT:  Well, do you have it?

24        MR. T. MILLS:  Yes, sir.

25        THE COURT:  Why don't you show it to Mr. Carruth?

1      MR. T. MILLS:  Yes, sir.  I'm not at all referring to

2   a finding of an automobile.

3      MR. CARRUTH:  Well, I've never seen that report.

4      MS. WILLIAMS:  This is the report that you gave us

5   yesterday.

6      MR. CARRUTH:  Well, my agents gave it to you.  We have

7   thousands of documents in the file, but I don't think there's

8   going to be any -- our first witness or second witness will

9   testify there's been several reported sightings of the

10  O'Hairs.  I don't think that's an admission.

11     THE COURT:  Well, let's try to narrow it to some

12  degree.  Is this an Austin Police Department report?

13     MS. WILLIAMS:  Your Honor, this is what appears to be

14  a printout of all of the investigative narratives entered onto

15  a computer by Austin Police Department detectives

16  investigating the missing person's report.  On several

17  occasions, there are indications that they've gotten tips from

18  Interpol on sightings of the Murray O'Hairs.

19     The report additionally indicates that there was

20  continuing contact between the Austin Police Department and

21  Donna Cowling of the FBI and Ed Martin of the Internal Revenue

22  Service throughout this missing person's report.

23     So it would be our position that the government has a

24  duty to seek out more information, if such exists, about these

25  sightings of the Murray O'Hairs under Brady.

1        THE COURT:  Well, the Travis County and city of Austin

2   materials are to be pursuant to your subpoena, delivered and

3   the continuing objections at 1:30 on Wednesday.  So it may

4   well be that that will be resolved.  I doubt it.  Nothing

5   seems to resolved in this case.

6        I feel confident that the United States Attorney's

7   Office will provide and has provided any Brady material.  If

8   that is not the case and it's brought to my attention, I will

9   deal with it heavily.  But it does trouble me, and I know

10  we've got a lot of material here that troubles me where you

11  get this material.  And Mr. Carruth states in court that he's

12  never seen the document before.

13       But we've got a jury waiting.  I'm going to select the

14  jury, and we'll handle this as we go.  Hopefully, it will be

15  resolved Wednesday.

16       MS. WILLIAMS:  Thank you, your Honor.

17       THE COURT:  Where are we on the jury?

18       THE CLERK:  They need a few more minutes.

19       MR. CARRUTH:  We have one more brief matter, your

20  Honor.  As indicated to the Court Friday, we filed this

21  morning a motion in limine regarding certain photographs that

22  may be deemed obscene or pornographic.

23       THE COURT:  I have not -- let's see.  I have not --

24       MR. CARRUTH:  It was filed along our requested jury

25  instructions and our exhibit list this morning, about 8:00.

1    THE COURT:  Okay.  Well, Ms. Sims, would you go see if

2    the Clerk's Office will give me my copies --

3        THE CLERK:  Yes.

4        THE COURT:  -- and find out who had them.  It's my

5    understanding, Mr. Carruth, that the pictures are in your

6    exclusive possession.

7        MR. CARRUTH:  The pictures came out of the search

8    warrant of Waters' residence pursuant to an earlier

9    instruction of this court.  They were shown to defense

10   attorney, but I have them in my exclusive possession.

11       THE COURT:  To your knowledge, there are no copies, so

12   nobody can present them except you.  But you're asking for no

13   reference at this time?

14       MR. CARRUTH:  Yes, sir.  Asking that he be instructed

15   to approach the bench if, in fact, there's any way --

16       THE COURT:  All right.  Well, let me see the pictures.

17       MR. CARRUTH:  May I approach the bench?

18       THE COURT:  Yes, sir.  Who are the people?  Who is,

19   quote, Dewayne?

20       MR. CARRUTH:  That is the husband of the witness, your

21   Honor.

22       MR. CARRUTH:  I believe it's Dewayne.

23       THE COURT:  Okay.  Let the record reflect I've

24   reviewed the pictures.  What is the position of the defendant?

25       MR. T. MILLS:  The defense believes that when the

1   young lady testifies, that she was deathly afraid of David

2   Waters and believed that he was a villain, a murderer, that it

3   is inconsistent with that for her to be continuing to live in

4   his apartment with him, having activities with other people --

5        THE COURT:  Well, what connection did Waters have with

6   these pictures?

7        MR. T. MILLS:  It's just that it's his apartment.

8        THE COURT:  Just because she was doing all this stuff

9   in his apartment?

10       MR. T. MILLS:  Right.

11       THE COURT:  Grant the motion in limine.  Approach the

12  bench if you want to get into it.  Don't get into it before.

13  I have four sons.  I just hesitate to think what happened in

14  my house on occasion when I wasn't there.

15       All right.  Government's motion in limine will be

16  granted.  All right, counsel.  You folks -- y'all don't have

17  to stand up, but I don't want you intermingling with the

18  jurors.  I've got an extraordinary large number of jurors.

19  The overwhelming majority will be screaming to get out of

20  here.

21       So what I want you to do is take the last two rows

22  over here to my right and your left.  That ought to

23  accommodate you best we can, and hopefully, we will be able to

24  accommodate you and keep you there during the jury selection.

25       I don't want anybody screaming, taking off their ties

1   and shouting, that type of thing.  No chuckling, no laughing

2   except when the jury panel laughs.  And if you're too quick,

3   you get out.  Okay.  But make yourself comfortable best you

4   can.  As you probably are aware, I intend to try this case

5   down on the first floor where seating is limited.  But you can

6   see in that courtroom, and I always feel like I'm in a dungeon

7   here.

8          All right.  We are just awaiting the jury.  So help me

9   now when I announce to them we have scheduled these cases for

10  three weeks, I want to be sure we're going to be through in

11  that three weeks because traditionally in June, people are

12  going to be on their vacations with their children.  The last

13  week of this trial, children will be home, not in school.  Mr.

14  Carruth.

15         MR. CARRUTH:  Your Honor, we pointed this out to the

16  Court early on when the case was set and indicated a

17  reluctance because of the holiday weekend.  We asked for three

18  weeks, which is 15 days, and we ended up, I think, getting

19  eleven days.  We have two four-day weeks and then, a three-day

20  week.  So that's not three or four weeks.  And we will make

21  every effort, your Honor, to expedite the trial, but there are

22  numerous witnesses.

23         THE COURT:  I intend to go Tuesday through Friday.

24         MR. CARRUTH:  You told us Tuesday through Thursday is

25  what you indicated, your Honor.  We have a Friday docket, I

1    believe.

2         THE COURT:  It just depends, but if I can get that

3    case to the jury, if that's where it's going to go, that's

4    what I'd like to do on --

5         MR. CARRUTH:  We have asked Mr. Mills for a written

6    stipulation on many of the witnesses who are just custodian of

7    the records we're having to bring in because they have not

8    signed a written stipulation we presented to them two weeks

9    ago.

10        THE COURT:  He indicated that wasn't going to be a

11   problem.  Are you going to be taking authenticity objections?

12        MR. T. MILLS:  We wrote Mr. Carruth a letter.

13        THE COURT:  Yes or no, because if you are, I tell the

14   jury.  You're hearing all of these cases because the lawyers

15   will not stipulate to authenticity.  It is a constitutional

16   right they have, but they are wasting your time and mine.

17        MR. T. MILLS:  We have agreed to stipulate to many --

18   I would say as many as a dozen.

19        MS. WILLIAMS:  More than that.

20        MR. T. MILLS:  All right.

21        MR. CARRUTH:  But there are probably about 30 of them.

22        THE COURT:  Well, you know, I can't help that.  Take

23   too much time with this jury, I will not hesitate to tell the

24   jury who is taking time, although I don't think anybody needs

25   my assistance in that.

1      MR. T. MILLS:  With regard to the length of the trial,

2  Judge, we are going to have several days of defense evidence,

3  and if we're -- I just don't know what to do if the government

4  could call witnesses until the end of the three-week period.

5      THE COURT:  I guess you'll just call your witnesses

6  after the end of three weeks.

7      MR. CARRUTH:  Yes, sir.

8      THE COURT:  What I'm hearing is that there's a

9  possibility it could go over three weeks.  Both of you

10  understand the consequences on the jurors.  Seems to me that

11  you should be interested in trying to get the best jury that

12  you can.  But I just have this hunch that y'all are prolonging

13  this trial for every purpose.

14      All right.  Recess till the jury.

15    (Recess.)

16  JURY VOIR DIRE

17      THE COURT:  Welcome, ladies and gentlemen, to the

18  United States District Court for the Western District of

19  Texas.  How many of you are from outside of Travis County?

20  And how many of you were surprised to get our invitation?  You

21  may put your hands down.

22      The Western District of Texas is the largest federal

23  district in the United States.  It also has the heaviest

24  docket of any district in the United States.  It runs from

25  Austin to San Antonio to Del Rio, all the way to El Paso, back

1   through Midland, Odessa, and then, coming back into Waco,

2   almost 600 miles from any courthouse.

3        And the law requires that we draw our jury panels

4   proportionately to the population, and the population in the

5   federal government is the voter registration from each of the

6   counties.  So that's why many of you got up early this morning

7   and joined, hopefully, a nice clear morning to drive to Austin

8   and be welcomed.

9        Each of you have been qualified to be jurors in the

10   United States District Court, but the process we're about to

11   start will be to see if you are qualified to serve as a juror

12   in this case.  The procedure, for those of you who have never

13   been through the procedure before, is fairly simple.  It's

14   kind of like musical chairs for a while.

15        We are very high-tech here in Austin.  All of your

16   names have been placed into a computer.  Show them our

17   computer.  And from that computer, 35 names will be drawn.

18   Mr. Mace, who is at my right and to most of your left, is in

19   charge of the courtroom, and he will show you where to sit.

20   Thirty-five people will be called up here.  That's what we

21   call the jury panel.  But that doesn't mean the rest of you

22   can go home or go to sleep because, then, we will attempt to

23   qualify from that number 15 to be the jurors in this case.

24        Now, many of you probably have been listening and

25   seeing over in Louisiana, they just completed a trial seven

1    months for the former governor.  The good news is that the

2    case that I'm selecting today is not going to take seven

3    months, but it is going to take four weeks.  Four weeks and

4    there are no economic excuses that can be utilized.  We all

5    have them.

6         It is going to be an interesting case, but it also is

7    going to be one where we need people who understand that this

8    is the base point of our democracy, and that is that we have

9    jurors who will make a determination in this case.  It is a

10   criminal case.

11        And we are looking for jurors who follow this

12   definition, who can stand up here on your oath -- you've

13   already taken the oath, so everybody is under oath -- and

14   state to the parties and to me that I will listen to the

15   evidence in this case, I will put away whatever life

16   experiences that generally influence me, and I will follow the

17   Court's instructions, and I will make a determination in this

18   case based solely on the evidence that I hear following the

19   instructions of the Court after deliberating with my fellow

20   jurors.

21        The point is in the United States and our jury system,

22   we're the only ones in the world with an unlimited jury trial.

23   The point is that the jurors who are selected in this case

24   will hear every single word of testimony together, they will

25   be able to review every single document, picture, or whatever

1    is admitted into evidence together, and they will deliberate,

2    that is, discuss that evidence after all of it is in, and come

3    to a verdict based solely upon what they have observed

4    together.

5         So what's in the newspapers, what's in the television,

6    what's in conversations at home, that's all immaterial.  And

7    there are some restrictions about what you are to do in the

8    event you're selected to be a juror in this case, which I will

9    go over with you.  But, basically, that's what we are looking

10   for.

11        Now, some people under oath might not be qualified to

12   be jurors in this case.  I usually tell you that, for example,

13   my father was a football player at the University of Texas.  I

14   went to the University of Texas, also, on an athletic

15   scholarship, and if called upon to be the umpire at a Texas A

16   & M/Texas game, I don't think I'll be -- and I will have to

17   say that I have some problem with that even though two of my

18   daughter-in-laws are graduates of A & M.

19        But now -- and let me give you another example.  There

20   are some people who, for whatever reason, have a genuine

21   belief that marihuana ought to be legalized, but at the

22   present time, it not legalized, and those same people can be

23   called upon to be a juror in that case and under their oath,

24   even though their own feelings might be different, they follow

25   the law and follow the legal instructions when evaluating the

```
 1   evidence.  And that's what we have here today.

 2        So please remember, we will try to be as efficient as

 3   possible.  If you have any questions, do not hesitate to get

 4   Melissa or Mr. Mace, who you will now meet, or speak up.  I

 5   will be trying to ask questions today basically for "Yes" and

 6   "No" answers.  And after you have given a "Yes" or "No"

 7   answer, I might be calling you up at another time to ask you a

 8   little bit more about different things.

 9        The lawyers in federal court do not ask questions.  I

10   ask the questions, and we'll be qualifying a jury.  So listen

11   carefully.  There are no awards for the first person called.

12   Those of you who go and play bingo and win all the time,

13   you're going to be called, so you mine as well get ready.

14   Those of you, like myself, who have never won a bingo game may

15   not be called.  But when your name is called, if you'll come

16   up, please, and Mr. Mace will seat you.

17        MS. HAJDA:  Juror No. 152, Susanna Medrano.

18        THE COURT:  Just play like we're in court.

19        MS. HAJDA:  Juror No. 44, Ronnie Senkel, Juror No.

20   341, Jeffrey Babcock, No. 301, Robert Sahlen, No. 233, Jeffrey

21   Sloan, No. 192, Terry Olguin, No. 289, Kenny Sisk, No. 89,

22   Kenneth Ittigson, No. 293, Blake Patterson, No. 161, Kathryn

23   Hartsell, No. 285, Ernestina Paiz, No. 288, Connie Brown, No.

24   41, Dinorah Martinez-Anders, No. 239, Tom Hurt, No. 134, Mark

25   Wilkerson, No. 190, Lewis Goodley, No. 165, Dayton Grumbles,
```

1   No. 182, Gloria Mislinski, No. 133, William Brunton, No. 328

2   Betty Joyner, No. 6, Steven Klein, No. 338, Donald Scott, No.

3   197, Darron Fleming, No. 344, Patrick Rhode, No. 205, Hector

4   Rodriguez, No. 72, Tamika Trotman -- Ms. Trotman is absent

5   today; don't count that one.  Cheryl Copeland, No. 64, No.

6   232, David Lapotin, No. 366, Dick Schieffer, No. 149, Virginia

7   Garcia, No. 13, David Laurie, No. 230, Charles Peters, No.

8   294, Kelley Ruud, No. 193, David Braley, No. 179, Clarke

9   Parris, and No. 355, Pat Gainer.

10          THE COURT:  Y'all kind of move together, kind of like

11  church, move together and we'll try to get as many people

12  seated as possible.

13          Ladies and gentlemen of the jury panel, though it may

14  look like it, I'm not 18 years old and I'm not very naive.  I

15  know that all of you are sitting down there saying, you know,

16  I hope I get on this jury that's going to last for four weeks.

17  We try our best to be as efficient as we can in the

18  administration of justice.

19          I have hopes that this case will be over in three

20  weeks.  I don't have much hope that it's going to be over less

21  than that.  But I don't believe in telling somebody something

22  when I think the probability is otherwise and the case could

23  last as long as four weeks.

24          Now, is there anybody in your number who wishes to

25  give me a reason that you can't serve?  Now, first, let me

1    tell you that economic reasons are not going to be acceptable

2    because everybody has that.  Everybody, to some degree, is

3    responsible for duties, teaching school, grades.  I know that.

4    I know it is an imposition to serve on a jury.  But in my

5    lifetime, since 1963, I've been involved in this process, and

6    for those of you who have served on juries, you're probably

7    aware that it is more important than this.

8         But I'll be glad to listen to any of you who feel, for

9    whatever reason, that you would not be able to be a juror in

10   this case for that period of time.  And I ask you to call upon

11   your own conscience before you stand up.  And I may or may not

12   allow some of you off.  It just depends.

13        For example, anybody has somebody who's ill, going to

14   have surgery, children with parents, that type of thing,

15   that's something that's scheduled and probably have no way of

16   knowing that you were going to be called up here for a

17   possible three- to four-week trial.

18        So we try to iron these out, but that is why we have a

19   large number of people.  So I'll start with the front row.  Is

20   there any of you on this front row who feel that you just

21   simply, because of some imposing problem, would not be a juror

22   in this case?  Yes, ma'am.  Now, when you stand, if you will,

23   tell me your name and number, because the Court Reporter,

24   right down here, has to record both.

25        If you can't remember your number, Melissa will give

```
 1    it to you free.  Second one costs you a quarter.
 2              THE JUROR:  Oh, okay.  My name is Kathryn Hartsell.
 3    I'm Juror No. 161.  I have a twelve-year-old daughter that I
 4    have a conflict being on a trial for four weeks in the account
 5    that she has band camp that I just found out about last week
 6    for a two-week period.  And we have -- she has a doctor
 7    appointment that I've got scheduled for next week.
 8              I'm afraid that I would not be totally impartial in
 9    being in a trial that length of time.  I have to take my
10    daughter to and from band camp, and the hours are from 9:00 to
11    11:45 during the day.  She has to be there.
12              THE COURT:  All right.  Have a seat for a second.  Let
13    me tell you, also.  This is my error.  When I say three, four
14    weeks of trial, let me tell you what that means in the federal
15    court.  That means -- and it won't help this lady, but that
16    means Monday through Thursday.  Everybody will have Friday off
17    for everything that you need to do, unfortunately.
18              That is going to go to -- first two weeks will be
19    Monday through Thursday.  Because there is a holiday on the
20    29th, that week will be Tuesday through Friday.  And I'm
21    hopeful that we'll be through by then.
22              But I also am a practical person, and I think there's
23    a possibility of going into that first week in June.  All
24    right.  Now, you had nobody else at home that can do this?
25              THE JUROR:  My husband works full-time and travels 90
```

1    percent of the time, so no.

2            THE COURT:  All right.  Just have a seat.  And, I'm

3    sorry, your name again?

4            THE JUROR:  It's Kathryn Hartsell.

5            THE COURT:  Hartsell.  All right.  Anybody else on the

6    front row?  Yes, ma'am.

7            THE JUROR:  Ernestina Paiz, and I have a six-year-old

8    granddaughter in my care which I drive to and from school, and

9    I was just wondering, you know, it's kind of hard.  My husband

10   works all the time, and I've kind of, you know, am the primary

11   caretaker of her.  So I don't know if you will excuse me.

12           THE COURT:  Do you have anybody else there at the

13   home?

14           THE JUROR:  I have an 18-year-old daughter, but she

15   works.

16           THE COURT:  Your name?

17           THE JUROR:  Ernestina Paiz, 285.  Uh-huh, No. 285.

18           THE COURT:  All right.  Have a seat.  Anybody on the

19   second row?  Yes, ma'am.

20           THE JUROR:  My name is Betty Joyner, No. 328.  I'm a

21   precalculus teacher.  We're going into the end of the year.

22   We have two major tests coming up that I have to prepare my

23   children for.  AISD does not have subs who can do my job.  If

24   I'm not there, it just won't get done.

25           THE COURT:  We all have our views of AISD.  I'm a

1    graduate of that.  What school do you teach?

2          THE JUROR:  I teach at Bowie High School.  As you

3    know, we're going into finals.  It's just this would be a real

4    -- really a great hardship on my students.

5          THE COURT:  All right.  Ms. Joyner, thank you.

6    Anybody else on the second row?  Don't all of you sprain your

7    wrists.  All right.  Let's start with you.

8          THE JUROR:  Yes, sir.  My name's Mark Wilkerson, Juror

9    134, and I'm actually on vacation this week and next week.

10         THE COURT:  Congratulations.  This is your annual

11   vacation?

12         THE JUROR:  Yes.

13         THE COURT:  Well, why didn't you follow the

14   instructions and --

15         THE JUROR:  I didn't get a letter on time, sir.

16         THE COURT:  Okay.  Mr. Wilkerson, have a seat.  Next,

17   please, on that row.  Yes, sir.

18         THE JUROR:  My name is William Brunton, Juror 133.

19   I'm just self-employed and would not be compensated for that

20   time frame.

21         THE COURT:  That's true and I know that, and there's a

22   lot of people here -- tell me a little bit about your

23   business, sir.

24         THE JUROR:  I'm a Sprint PCS reseller, and basically,

25   I have an office downtown that won't be run unless I'm there.

1   I'm responsible for 14 --

2          THE COURT:  You don't have anybody else at that

3   office?

4          THE JUROR:  Just basically is myself in the office.

5          THE COURT:  Your name?

6          THE JUROR:  William Brunton.

7          THE COURT:  All right.  Mr. Brunton.  All right.

8   Anybody?  Yes, sir.

9          THE JUROR:  My name is Darron Fleming, Juror No. 197.

10  I'm currently scheduled to be out of town Thursday and Friday

11  of this week on business-related travel, and the week of June

12  the 5th for business travel, as well.

13         THE COURT:  Okay.  Have you cleared that through the

14  Clerk's Office?

15         THE JUROR:  I have not.  I have documentation.  I can

16  send in for that.

17         THE COURT:  Well, if you had sent in the

18  documentation, just like Mr. Wilkerson, you wouldn't be here.

19  Since you are here, you know, it's costing the taxpayers 40

20  bucks plus expenses for you to tell me the information that

21  you could have -- see, I'm not trying to jump on you.  Other

22  people have done this, but the problem is if you just follow

23  the instructions -- I keep an entire staff and they do nothing

24  but work the jurors.

25         THE JUROR:  Yes, your Honor, this travel came up for

1    schedule last week.

2          THE COURT:  All right.  Have a seat.  Anybody else on

3    the second row?  Or the third row?  Start with you, sir.

4          THE JUROR:  David Lapotin; I'm 232.  I actually

5    received the letter excusing me from the 16th to the 19th,

6    which is the remainder of this week and, also, June 5th to

7    June 9th.

8          THE COURT:  I don't know if I can hear.  What is your

9    name?

10         THE JUROR:  Lapotin,  L-A-P-O-T-I-N.

11         MS. HAJDA:  I missed one.

12         THE COURT:  Well, we don't have enough Marshals to

13   take Melissa to jail, but that's where she would be.  Yes,

14   sir.

15         THE JUROR:  Juror No. 366, Dick Schieffer.

16         THE COURT:  Yes, Mr. Schieffer.

17         THE JUROR:  I'm an independent rancher, and I have

18   about 200 head of livestock that I need to make sure that they

19   have water every day.  I've got some sick livestock that I

20   give shots to every day.

21         THE COURT:  Whereabouts do you ranch?

22         THE JUROR:  Marble Falls, 58 miles from here.

23         THE COURT:  Was when I was growing up, too.

24         THE COURT:  Thank you.  Next?

25         THE JUROR:  Juror No. 13, Dave Laurie.  I'm an

```
 1    independent contractor and would not be compensated for this
 2    period of time either.
 3              THE COURT:  Okay.  And your name again, please?
 4              THE JUROR:  David Laurie.
 5              THE COURT:  Mr. Laurie, most of everybody here is not
 6    going to be compensated for that period of time.  Yes, except
 7    the government is a little bit better than Civil Service.  I'm
 8    sorry.  If you'll stand, please.  No, no, not Mr. Laurie, the
 9    gentlemen next to you.
10              THE JUROR:  Charles Peters, 230, juror number.  I'm a
11    diabetic and I have good days and bad days, and some of my bad
12    days are really bad.
13              THE COURT:  Are you on shots or pills?
14              THE JUROR:  Pills, sir, Type II.
15              THE COURT:  Anybody else on the third row?  Yes, sir.
16              THE JUROR:  My name is Clark Parris, Juror 179, and
17    I'm working for the U.S. Census Bureau, and I have a very
18    heavy case load over the next two months.  And currently,
19    like, this week, I need to catch the remaining U.T. students
20    before they leave because they're not counted at their home,
21    but they're counted at the university.
22              THE COURT:  Anybody else that I missed?
23              THE JUROR:  Your Honor --
24              THE COURT:  Yes, sir.
25              THE JUROR:  -- Patrick Rhode, Juror No. 344.  I wonder
```

```
 1    if I can speak in private.
 2            THE COURT:  Yes, that's a right that you have sort of
 3    in private.  It's not really in private.  Every lawyer is
 4    going to come up here, but you can come forward, please.
 5        (At the Bench, on the record.)
 6            THE JUROR:  I'm sorry.  I work for Governor Bush as
 7    part of his campaign staff.  I'm required to do a lot of
 8    travel.  I don't know for certain if I will be asked to do
 9    that sort of travel, but I do an awful lot of it.  I can't say
10    for certain what I'll be doing over the next couple of weeks,
11    but that is a conflict.
12            THE COURT:  Okay.
13            THE JUROR:  And, also, my wife is a very high profile
14    anchor in Austin with --
15            MS. WILLIAMS:  What?
16            THE JUROR:  My wife is Leslie Rhode with KXAN
17    Television, and I just want to bring that up.
18            THE COURT:  I won't get into that kind of thing.
19            THE JUROR:  I didn't know if now was the time or not,
20    but I did want to bring that up.
21            THE COURT:  Okay.  Thank you.
22            THE JUROR:  Thank you very much.
23            THE COURT:  Anybody else?  All right.  Ms. Hartsell,
24    Paiz and Joyner, y'all are excused now from this case.  And
25    because of the seating arrangement, I'm going to excuse you
```

1    till 1:30 today.  1:30, please be back in the jury room

2    because there are three other judges that might be able to use

3    your services.  So y'all may be excused.  Mr. Wilkerson,

4    Bunton and Fleming, y'all may be excused.

5         THE JUROR:  What was the second name?

6         THE JUROR:  Bunton.  Mr. Lapotin, you are already

7    excused.  And my apologies for you even being here.  I'll take

8    that up later with Melissa.  Mr. Schieffer, you may be

9    excused.  Mr. Peters, you may be excused.  The rest of you get

10   to tough it out with me.  And by the way, I have four sons,

11   seven grandchildren.  I've been in this job almost ten years.

12        Anything -- you can't cuss me out of what I haven't

13   been cussed out before.  It's America, you can do anything you

14   want, just don't let me hear you.

15        All right.  Well, let me tell you while the lawyers

16   and the Clerk are making up their records, as your name is

17   called, they will call your names in their forms.  It's too

18   many people to memorize everybody that comes up, so we're

19   going to have to give them just a second or two to make sure

20   they have the appropriate people.  And then, we're going to

21   call others of you up.

22        MS. HAJDA:  Juror No. 241, Nanci Wilson, replacing No.

23   161, Kathryn Hartsell.

24        THE COURT:  Ms. Wilson, I'm not going to ask you if

25   you're dying to be here the next several weeks, but can you be

1    here?

2           THE JUROR:  The only thing that I've scheduled is an

3    out-of-town trip on the 30th through the first of June, which

4    is three weeks away.

5           THE COURT:  Well --

6           THE JUROR:  Maybe work on Fridays --

7           THE COURT:  The 30th, we're not going to work.

8           THE JUROR:  Pardon?  But it's the 30th through the 4th

9    that I'll also be gone.

10          THE COURT:  30th of May is on a --

11          THE JUROR:  Tuesday.

12          THE COURT:  I anticipate that we will work the 30th,

13   31st, the 1st, and the 2nd of that week.

14          THE JUROR:  What if we work on Fridays in between?

15          THE COURT:  The difficulty is it is so difficult for

16   people to do this type of service.  And in federal court, we

17   could go for months.  I've gone three and a half months in a

18   trial, and people just need some time.  So I never make a

19   juror come five full days on -- what type of trip is it?  Just

20   a vacation?

21          THE JUROR:  No.  It's a business conference and

22   meetings.

23          THE COURT:  All right.  I'll let you stay on.  Don't

24   think I'm getting easy, ladies and gentlemen.  If you think

25   this isn't hard, you're wrong, because I know that anybody

1    selected to be a juror on this case, no matter how dedicated

2    an American you are, it's a hardship.  There's no question

3    about that.  But there's not anybody in the courtroom that

4    doesn't know that.

5         All right.  Call the next name.

6         MS. HAJDA:  Juror No. 363, Heather Taylor, replacing

7    No. 241, Nanci Wilson.

8         THE COURT:  Ms. Taylor, how about you?

9         THE JUROR:  May I speak to you in private?

10        THE COURT:  Yes, ma'am, you may.

11      (At the Bench, on the record.)

12        THE JUROR:  I would be honored to serve.  I'm

13   pregnant.  I just don't know about the emotional strain I can

14   handle.  And today, I have a sonogram scheduled.

15        THE COURT:  I'm going to let you go.

16        THE JUROR:  Thank you.

17        MS. HAJDA:  Juror No. 250, Merry Walker, replacing No.

18   363, Heather Taylor.

19        THE COURT:  Ms. Walker, how about you?

20        THE JUROR:  Fine, I guess.

21        THE COURT:  I'll accept that.  Call the next name.

22        MS. HAJDA:  Juror No. 318, Teresa Roy, replacing No.

23   285, Ernestina Paiz.

24        THE COURT:  Ms. Roy, how about you?

25        THE JUROR:  Okay.

1          THE COURT:  Thank you.  Good, Melissa, you're on a

2    roll.

3          MS. HAJDA:  Juror No. 35, Glenn Chiappe, replacing No.

4    134, Mark Wilkerson.

5          THE COURT:  Mr. Chiappe, how about yourself?

6          THE JUROR:  Well, your Honor, it's not only economic

7    factors involved here, but my job requires frequent out of

8    town.  I'm out of town this Wednesday in San Antonio for

9    meetings that are planned, and I greet guests from out of

10   town.  I pick some up at the airport.  Tomorrow's the same.  I

11   pick some up at the airport at 6:00.  We'll have seminars set

12   up at Seeman's Corporation that's been set up for over four

13   weeks.

14         THE COURT:  All right.  I'm sorry, your name again?

15         THE JUROR:  Glenn Chiappe, Juror No. 35.

16         THE COURT:  Put Mr. Chiappe down for the middle of the

17   summer.  Give him plenty of notice.  I'll let you off this

18   time.  I'm going to give you some time where you can have less

19   out-of-town guests, and you can tell them when not to come.

20         THE JUROR:  Sure, we could block that time in the

21   future, sir.

22         THE COURT:  All right.  No. 245, John Donovan,

23   replacing No. 134, Mark Wilkerson.  Mr. Donovan, how are you

24   doing today?

25         THE JUROR:  I'm fine, sir.

```
1            THE COURT:  Good.  We'll suffice that to be a
2    conversation.
3            MS. HAJDA:  Juror No. 87, Marcos Gonzales, replacing
4    No. 133, William Brunton.
5            THE COURT:  Mr. Gonzales, how are you for the next
6    several weeks?
7            THE JUROR:  I've got something going on June 14th.
8            THE COURT:  We'll have you through.  You're going to
9    make that June 14th.
10           THE JUROR:  All right.
11           MS. HAJDA:  Juror No. 56, Avelina Castilleja,
12    replacing No. 328, Betty Joyner.
13           THE COURT:  Ma'am, how are you doing?
14           THE JUROR:  All right.
15           THE COURT:  Okay.
16           THE JUROR:  I can reschedule what I can have.
17           THE COURT:  I appreciate that.
18           MS. HAJDA:  Juror No. 273, Shirley Carter, replacing
19    No. 197, Darron Fleming.
20           THE COURT:  Ms. Carter, how about you?
21           THE JUROR:  The doctor has just decided to induce my
22    son's wife Thursday morning, and I need to keep the other
23    children.
24           THE COURT:  You may have your seat back.
25           MS. HAJDA:  No. 157, Christopher Bittick, replacing
```

```
 1   No. 273, Shirley Carter.

 2        THE COURT:  Mr. Bittick, how about your schedule?

 3        THE JUROR:  All right.

 4        THE COURT:  Good.

 5        MS. HAJDA:  Juror No. 99, Rosie Amaro, replacing No.

 6   232, David Lapotin.

 7        THE COURT:  Are you all right?

 8        THE JUROR:  (Moving head up and down.)

 9        THE COURT:  Got a seat waiting for you.

10        MS. HAJDA:  Juror No. 191, Rose Powley, replacing No.

11   366, Dick Schieffer.

12        THE COURT:  Ms. Powley, how about you?

13        THE JUROR:  I'm fine.

14        THE COURT:  Good.  You're ahead of most of us.

15        MS. HAJDA:  Juror No. 71, Gary Leasman, replacing No.

16   230, Charles Peters.

17        THE COURT:  Mr. Leasman, how about you, sir?

18        THE JUROR:  Fine.

19        THE COURT:  All right.  Counsel up.  No, no.  Got

20   everything down?

21        THE JUROR:  (Moving head up and down.)

22        THE COURT:  All right.  All right, members of the jury

23   panel.  As I told you, this is going to be a criminal case in

24   the United States District Court.  A criminal prosecution is

25   the responsibility of what we call the United States
```

1  Attorney's Office.  And today, we have Mr. Gerald Carruth, Mr.

2  Dan Mills, Mr. Robert Pitman of the United States Attorney's

3  Office here.  They are the three gentlemen who just stood up.

4          Is there anybody on the panel who knows any of those

5  people?  Is there anybody on the panel who think you may know

6  anybody in the United States Attorney's Office here in the

7  Western District of Texas whether it be in Austin or

8  elsewhere?  Yes, sir.

9          THE JUROR:  I was a news reporter in San Antonio for

10  an extensive time.

11          THE COURT:  I'm going to have to get your name and

12  number.

13          THE JUROR:  I'm sorry.  Kenny Sisk, 289.

14          THE COURT:  All right.

15          THE JUROR:  And I was UPI and AP during the Judge Wood

16  trial and covered numerous cases in the San Antonio Federal

17  Courts.

18          THE COURT:  The fact that some of those folks may

19  still be around, would that influence you in any way, shape or

20  form?

21          THE JUROR:  I don't think so.

22          THE COURT:  Let me tell you the "I don't think so" is

23  kind of like a horseshoe.  I don't like to get that from folks

24  that do not know.

25          THE JUROR:  No, sir, I don't think so.  Yes, sir.

1     THE JUROR:  Yes, your Honor.  Parris, Juror 179.  And

2  I'm not adverse to doing my civic duty, but I gave you, I

3  thought, my most cogent argument for not participating on this

4  jury.  But I do have one other argument I would like to

5  present and that is that my son is graduating from high school

6  -- from Bowie High School next week.

7     And my mother, who is 82 and somewhat infirm, is

8  coming down here on Monday, and I need to pick her up at the

9  airport and spend a lot of time with her.  There's no one else

10  around because my wife also teaches at Bowie High School, and

11  I need to spend time with her during the day.  And I would be

12  glad to be on your next jury once -- whenever one comes up.

13     THE COURT:  All right.  I'm going to let you step

14  back.  I want you back here at 1:30 today.  1:30 today, we've

15  got several other juries you might be selected on the next

16  couple of weeks and --

17     THE JUROR:  Thank you, your Honor.

18     THE COURT:  Don't thank me because I'm not happy about

19  it.  All right.  Just call another name.

20     MS. HAJDA:  Juror No. 158, David Boxley, replacing No.

21  179, Clark Parris.

22     THE COURT:  Mr. Boxley --

23     THE JUROR:  Yes, sir.

24     THE COURT:  -- how is your schedule?

25     THE JUROR:  It's okay.

1        THE COURT:  Mr. Boxley, do you know anybody in the
2   U.S. Attorney's Office?
3        THE JUROR:  No, sir.
4        THE COURT:  Now, the defendant in this case is Mr.
5   Gary Paul Karr.  Mr. Karr, if you'll stand.  He is represented
6   by Mr. Thomas Mills and Christie Williams.  Anybody else at
7   your table, Mr. Mills, if you would introduce?
8        MR. T. MILLS:  Yes, Mr. Harvey Jury, J-U-R-Y.
9        THE COURT:  All right.  Y'all may be seated.  Anybody
10  on the panel know any of these folks?  I'm going to ask, in a
11  minute, if you have ever heard of these folks.  And we're
12  going to go into questions like that in a minute, but right
13  now, what I'm going to ask is the United States Attorney to
14  take the lectern and to read the indictment that is pending in
15  this case.

16        And before he starts reading the indictment, let me
17  tell you what an indictment is.  Those of you that had civics,
18  like I did in Austin High School in the AISD, knows that an
19  indictment is a pleading from a grand jury that simply says
20  that there is a criminal charge.  Once the indictment is filed
21  and the criminal charge is filed, there is no significance to
22  the indictment.

23        It is no evidence of guilt or wrongdoing.  It simply
24  tells me what this case is about.  It tells the defendant and
25  his counsel what this case is about, and by exclusion, it

     1   tells us what it's not about.  It's simply the charges in this

     2   case.

     3        Now, is there anybody on the panel who doesn't

     4   understand that?  Who does not understand that it's not

     5   evidence of any wrongdoing at all the fact that there's an

     6   indictment in this case?  If you do not understand that, raise

     7   your hand, and I'll be glad to explain.  All right.  You may

     8   proceed.

     9        MR. CARRUTH:  Thank you, your Honor.  This is a case

    10   of The United States of America vs. Gary Paul Karr.  The grand

    11   jury for the United States District Court for the Western

    12   District of Texas charges in Count 1 that beginning in or

    13   about April 1995 and continuing until in or about October

    14   1995, in the Western District of Texas and elsewhere, the

    15   defendant, Gary Paul Karr, aided and abetted by other persons,

    16   did knowingly and willfully combine, conspire, confederate and

    17   agree with other persons to unlawfully seize, confine,

    18   inveigle, decoy, kidnap, abduct and carry away and hold for

    19   ransom or reward and financial gain Madelyn Murray O'Hair,

    20   John Garth Murray and Robin Murray O'Hair with intent to

    21   willfully transport one or more of the said victims in

    22   interstate commerce contrary to the federal law.

    23        Pursuant to and in furtherance of the conspiracy, the

    24   following overt acts, among others, were committed by the

    25   defendant in the Western District of Texas and elsewhere:  No.

1, in or about May 1995, the defendant traveled from the state of Illinois to Austin, Texas.  Two, in or about August 1995, the defendant traveled from the state of Florida to Austin, Texas.  Three, on or about August 26, 1995, the defendant rented a 1995 Ford Windstar van in Austin, Texas.  Four, on or about August 27th, 1995, the defendant drove a Porsche automobile belonging to Robin Murray O'Hair to the Robert Mueller Airport in Austin, Texas and abandoned this vehicle in an airport parking lot.

Five, on or about August 28th, 1995, the defendant aided and abetted another person in renting an apartment at the Warren Inn Village in San Antonio, Texas.  Six, on or about September 21, 1995, the defendant traveled with John Garth Murray from San Antonio, Texas to the state of New Jersey, and returned to San Antonio, Texas with Murray on or about September 22, 1995.

Seven, on or about September 27th, 1995, the defendant rented a 1995 Ford cargo van in Austin, Texas.  Eight, on or about September 29, 1995, the defendant followed John Garth Murray to the Frost National Bank in San Antonio, Texas, where Murray received gold coins valued at approximately $500,000.

Nine, on or about October 2, 1995, the defendant rented a 1995 Ford cargo van in Austin, Texas.  Ten, on or about October 3, 1995, the defendant rented a room at the Four Seasons Hotel in Austin, Texas.  Eleven, on or about October

1  4, 1995, the defendant traveled with another person from

2  Austin, Texas to the state of Florida.  And twelve, on or

3  about October 8, 1995, the defendant traveled with another

4  person from New Port Richey, Florida to Naples, Florida, all

5  in violation of the federal law.

6       In Count 2, the grand jury alleges that at all times

7  material to this indictment, American Atheist, Incorporated,

8  doing business as American Atheist Press and United

9  Separatists of America, Incorporated, were corporations

10 engaged in interstate commercial activities in the states of

11 California, New York, Texas -- excuse me, New Jersey rather

12 than New York, California, New Jersey and elsewhere.

13      Madelyn Murray O'Hair, John Garth Murray and Robin

14 Murray O'Hair were incorporators, officers and/or directors of

15 the said corporations involved in interstate travel and the

16 movement and distribution of money, goods and commodities in

17 interstate and foreign commerce.

18      Beginning in or about April 1995 and continuing until

19 in or about October 1995, in the Western District of Texas and

20 elsewhere, the defendant, Gary Paul Karr, aided and abetted by

21 other persons, did knowingly and willfully combine, conspire,

22 confederate and agree with other persons to commit robbery and

23 extortion, and did threaten and commit physical violence to

24 Madelyn Murray O'Hair, John Garth Murray and Robin Murray

25 O'Hair in furtherance of the conspiratorial plan and purpose

1  to commit robbery and extortion by knowingly and unlawfully

2  taking and obtaining personal property valued in excess of

3  $500,000 including but not limited to United States currency,

4  gold coins, motor vehicles, watches and other jewelry from the

5  person and in the presence of Madelyn Murray O'Hair, John

6  Garth Murray and Robin Murray O'Hair, against their will by

7  means of actual and threatened force, violence and fear of

8  injury, immediate and future, to the said victims.

9       And by obtaining such property from Madelyn Murray

10  O'Hair, John Garth Murray and Robin Murray O'Hair, with their

11  consent, induced by wrongful use of actual and threatened

12  force, violence and fear, and the natural and probable

13  consequences of these unlawful acts by the conspirators would

14  be to obstruct, delay and affect commerce and the movement of

15  articles and commodities including money and other property in

16  commerce.

17       Pursuant to and in furtherance of the conspiracy, the

18  overt acts alleged in Count 1 of this indictment, which are

19  incorporated herein by reference, among others, were committed

20  by the defendant in the Western District of Texas and

21  elsewhere, all in violation of the federal law.

22       The grand jury charges in Count 3 that beginning in or

23  about April 1995 and continuing until in or about October of

24  1995, in the Western District of Texas and elsewhere, the

25  defendant, Gary Paul Karr, aided and abetted by other persons,

did knowingly travel in interstate commerce between the

Western District of Texas, the state of Florida, the state of

Illinois, and the state of New Jersey, and did knowingly use

other facilities in interstate commerce including interstate

telecommunications and financial transactions affecting

interstate commerce to commit a crime of violence, that is,

kidnapping and robbery, resulting in the death of another

person to further the unlawful activity of extortion contrary

to and in violation of the federal law.

The grand jury charges in Count 4 that beginning in or

about April 1995 and continuing until in or about October of

1995, in the Western District of Texas and elsewhere, the

defendant, Gary Paul Karr, aided and abetted by other persons,

did willfully combine, conspire, confederate and agree with

other persons to knowingly engage in a monetary transaction in

criminally derived property of a value greater than $10,000,

derived from a specified unlawful activity; that is, the

defendant conspired and agreed with other persons to knowingly

aid, abet, counsel, command, induce, procure and willfully

cause John Garth Murray to travel in interstate commerce

between the Western District of Texas and the state of New

Jersey for the purpose of facilitating a monetary transaction,

namely, the transfer in and affecting interstate and foreign

commerce of approximately $600,000 in funds belonging to the

United Secularists of America, Incorporated, and the exchange

1    of said funds for gold coins valued at approximately $600,000

2    by, through and to a financial institution, as defined by

3    federal law, in which funds were derived from the specified

4    unlawful activity of kidnapping, robbery and extortion,

5    contrary to and in violation of the federal law.

6        The grand jury charges in Count 5 that in or about

7    October 1995, in the Western District of Texas and elsewhere,

8    the defendant, Gary Paul Karr, aided and abetted by other

9    persons, did knowingly transport in interstate commerce from

10   the Western District of Texas to the state of Florida and

11   elsewhere goods, wares, merchandise and other property valued

12   in excess of $5,000 including but not limited to money,

13   clothing, watches and other jewelry, knowing the same had been

14   stolen, converted and taken by fraud in violation of the

15   federal law.

16       And this is a true bill of indictment, signed by the

17   foreperson of the grand jury, to the United States District

18   Court of this Austin Division of the Western District of

19   Texas.

20       THE COURT:  All right.  Of the criminal charges that

21   are charged in this case of which Mr. Karr has pleaded not

22   guilty.  Mr. Karr pleads not guilty, of course, that ensures

23   that under our Constitution, there is to be a trial, and

24   that's what we are about today.

25       First off, I've had the indictment read to you so that

1    you know what the charges are and, importantly, by exclusion,

2    you know what the charges are not.  Mr. Karr is not going to

3    be on trial for anything other than these specific charges

4    that counsel has just read to you.

5         First, when a person pleads not guilty under the

6    Constitution of the United States, that puts the government on

7    notice that the government in this particular instance, the

8    United States Attorney's Office, has the duty of backing up

9    and presenting evidence on these charges.  In the United

10    States, a defendant, when charged by a criminal charge, has no

11    duty whatsoever to present any evidence, has no duty

12    whatsoever to testify, has no duty whatsoever to participate

13    in the trial other than be present.

14         And, importantly, the reverse of that coin is called

15    the presumption of innocence.  Anybody in our country who is

16    ever charged with a crime is presumed to be innocent.  That

17    presumption is at the very heart of our democracy and at the

18    very heart of our jurisprudence.  So is there anybody on the

19    panel -- if so, just raise your hand, I'll be glad to explain

20    it -- that does not understand -- first, the indictment is no

21    evidence of anything -- secondly, in a criminal case, only the

22    prosecution has the burden of presenting evidence; and third,

23    that the defendant -- at this very moment, each of you under

24    our Constitution, must presume that the defendant, Mr. Karr,

25    to be innocent.

1          First, is there anybody on panel that does not

2     understand that?  Second, is there anybody on the panel who

3     cannot represent to these parties and to me that you are doing

4     that and will do that at this time and, that is, require the

5     government to produce evidence and nobody else, and presume

6     Mr. Karr at this point in the procedure to be innocent?

7          If you cannot make that representation under your

8     oath, please raise your hand at this point.  All right.  Now,

9     anybody on the panel personally know Madelyn Murray O'Hair,

10    John Garth Murray, or Robin Murray O'Hair?  I'm not talking

11    about knowing of them.  Did anybody know them personally?  All

12    right.

13         THE JUROR:  Your Honor, Kenny Sisk, Juror 289, as a

14    news reporter, I did cover their news conference here in

15    Austin approximately 18 to 20 years ago, but I didn't know

16    them, like, socially or anything like that.

17         THE COURT:  All right.  Anybody that's lived in this

18    area probably has known of this family for a long period of

19    time, just like this gentleman here.  And, of course, as he's

20    already indicated, they were frequently in the news and are

21    frequently in the news.

22         Now, is there anybody on the panel who, from whatever

23    -- I guess I ought to just ask this question:  How many of you

24    have either read about or heard about these folks in the

25    media?  Okay.  Now, how many of you have heard about or read

1    about this case -- this case in the media?  Okay.  Well, I'm

2    surprised there are a couple of them that haven't.

3          The next series of questions I've got to ask you go to

4    the heart of jury service, and that is can you -- and can

5    these folks rely upon you and can I rely upon you to be guided

6    only by the evidence that you hear in trial and not anything

7    that you've read, which may or may not be accurate, anything

8    that you've seen on TV or not, anything that you may or may

9    not know?

10         So let's ask it this way:  Is there anybody who had so

11   much information about the allegations that you've heard in

12   this indictment and the subject matter of this case that

13   you've already made an opinion one way or the other?  An

14   opinion that these folks are no longer with us, or with us, or

15   that they are bad or good, or that they were nine feet tall or

16   anything else?

17         Any kind of opinion that you've made with regard to

18   these three people?  All right.  I'm going to ask the opposite

19   question and ask you for a show of hands, and that is, can

20   each of you, by saying yes, by showing your hand, can

21   represent to these parties that you will listen to the

22   evidence in this case and that you hold no solid opinion at

23   all about any of the issues in this case so that you can

24   listen to the evidence and make your judgment only upon the

25   evidence that you hear in the trial?  If you can do that,

1  raise your hand.

2          All right.  If you cannot, raise your hand.  All

3  right.  I have one lady in the back.  And, I'm sorry, your

4  name again, please, ma'am?

5          THE JUROR:  I'm Juror 149, Virginia Garcia.

6          THE COURT:  Okay.  Ms. Garcia, I'm going to let you

7  step back.  Thank you very much.

8          MS. HAJDA:  Juror No. 280, Ryan Kozielski, replacing

9  No. 149, Virginia Garcia.

10         THE COURT:  You could probably have a better handle

11  pronouncing your name than she.

12         THE JUROR:  Kozielski.

13         THE COURT:  How about your schedule?

14         THE JUROR:  I have jury duty this Thursday.

15         THE COURT:  Get you out of that just like that.

16  That's the weakest one I've ever heard.  Have a seat.  You

17  understand, sir, that an indictment is no evidence of guilt or

18  any wrongdoing?

19         THE JUROR:  Right.

20         THE COURT:  Are you able at this point to tell these

21  folks -- I'll let you get a seat so you don't fall down.

22         THE JUROR:  I do have one thing to say.  I do know a

23  U.S. Attorney.

24         THE COURT:  All right.  Who?

25         THE JUROR:  Steven Bass.

```
 1          THE COURT:  All right.  Where does he -- does he live

 2   in Austin?

 3          THE JUROR:  Yeah, I think so.

 4          THE COURT:  Okay.

 5          THE JUROR:  I have a working rapport with him.  I work

 6   for the Trustee's Office --

 7          MR. CARRUTH:  He's a civil attorney in our office,

 8   your Honor.

 9          THE COURT:  All right.  Mr. Bass is not going to have

10   anything to do with this case.  He's a --

11          THE JUROR:  All right.

12          THE COURT:  -- a civil lawyer.  I prefer to say he's a

13   lawyer in civil matters.  I've never met many civil lawyers.

14   The fact that he's not going to participate in this case at

15   all, that won't influence you one way or the other, will it?

16          THE JUROR:  No, not at all.

17          THE COURT:  Have a seat.  Now, it is a -- also

18   well-known fact that Madelyn Murray O'Hair was an atheist and

19   publicly said that she was an atheist and was associated with

20   American Atheists, Incorporated that did business as American

21   Atheist Press and United Secularists of America.

22          Now, first, is there anybody on the panel who did

23   business or is a member of either of those organizations?  Is

24   there anybody on the panel who has such an idea or opinion

25   about this lady, or the two other, her son and granddaughter,
```

1  because of her publicly held beliefs, that feel that you just

2  couldn't possibly do what I've already asked you to do and

3  that is, base your judgment solely on the evidence?

4       In other words, the fact that she is or was not, or is

5  or was not an atheist, or is or was not in these

6  organizations, if you'll listen to the evidence and you'll

7  make your mind up only on what you hear in the trial with

8  regard to these specific criminal charges, is there anybody

9  who cannot do that, let me see your hand now, please.

10      One of the most difficult questions I think that I'm

11  required by law to ask people who are going to be on a jury

12  sounds so simple, and that is will each of you represent to me

13  on your oath that you will follow my legal instructions?  Now,

14  I've never had 35 people leap up, yell "No," and then, walk

15  out.  But it is so important in the trial of our cases that

16  people follow the legal instructions.

17      These parties will rely upon it.  Any appellate court

18  will rely upon it.  And, of course, I rely upon it.  You can

19  get a group of lawyers in a room, the best lawyers you can

20  find, and they will have different views on what the law is or

21  should be in many areas.  We all see that on the television

22  and that type of thing all the time.

23      A lot of us are easy to criticize what the law is or

24  should be.  But in this case, when you take your oath as a

25  juror in this case, you'll be required to follow the written

1   and oral instructions that I give you.  I will give you

2   written instructions in this case.  I can't give them to you

3   now because I haven't heard the evidence.  I'll be hearing the

4   evidence with you.  And then, I will give you written

5   instructions on what the law is.

6          Now, is there anybody, for whatever reason, cannot

7   make the commitment that you will follow the legal

8   instructions as given to you during and at the end of this

9   case?  If so, please raise your hand if you cannot make that

10  commitment.

11         Now, is there anybody who thinks that you are familiar

12  with any of the facts in this case?  There are several things

13  that I need to ask, and I'm not trying to pry, but in every

14  criminal case, they have to be asked of the jury panel.  So I

15  don't give any apologies.  One of them is, have you ever been

16  victims of a crime?  Any victim of crime from robbery to house

17  break-ins, vandalism on the car, more serious matters?  And

18  I'm going to get to that in a minute.

19         The other question is, have you ever been arrested or

20  charged with a crime?  And because those are personal

21  questions and I'm asking you not only about you but your

22  spouse, your children, and since I have a bunch of

23  grandchildren, I'll go ahead with grandchildren, too.

24         But I'll answer it first.  I've been arrested four

25  times in my life, three times by federal judges for having a

```
 1    sharp mouth.  On two of those occasions, I was not guilty.

 2    I've been blessed with four sons.  I've had that wonderful

 3    experience of getting up at 2:00 in the morning and going and

 4    getting one out of the jailhouse.

 5          And I have had everything in my years as a judge from

 6    horrendous crimes to -- I remember one lady, who was 84 years

 7    old, raised her hand and she was arrested for climbing under a

 8    fence to sit in the wildflowers to protest some nuclear thing

 9    that went on.  So we've probably heard everything, but if you

10    want and feel more comfortable answering the questions in

11    pseudo privacy, as you see, you could come up.

12          All right.  Let's take the front row first.  Anybody

13    in your family or immediate family been victims of a crime?

14    And we'll start with -- yes, ma'am, if you'll tell us your

15    name and number.

16          THE JUROR:  Susanna Medrano.  I think my number's 152.

17    Burglary of a habitation.

18          THE COURT:  About how long ago?

19          THE JUROR:  About five years ago.

20          THE COURT:  All right.  Yes, sir.

21          THE JUROR:  I'd like to approach the bench.

22          THE COURT:  You may.  Lawyers may please come up.

23       (At the Bench, on the record.)

24          THE JUROR:  My name is Ronny Senkel, Juror No. 44.  I

25    have an uncle that was murdered in Austin, Texas.
```

1    THE COURT:  About how long ago?

2    THE JUROR:  It's been about three years ago and --

3    THE COURT:  Obviously, you have feelings about that

4  one way or the other.  Let me just ask you a couple of

5  questions.  Did you participate in any way in the trial?

6    THE JUROR:  No.  It was my mother's brother and she

7  has two other brothers that was able to go and be there during

8  the trial, and so forth, and I don't know all the complete

9  details.  I do know that there was some -- one of the people

10  that was being prosecuted was a son to one of the law firms in

11  Houston.

12    THE COURT:  That experience, as unpleasant as it had

13  to be, can you represent to these people that you can put that

14  experience in the closet in your house and not be influenced

15  by it, as you sit here, and listen to the evidence in this

16  case?

17    THE JUROR:  That's a whole separate deal than this

18  case.

19    THE COURT:  All right.  Thank you.

20    THE JUROR:  One other thing, your Honor.  You had a

21  second question.  Had anyone ever been convicted.  My mother

22  and a sister that has been to the penitentiary.

23    THE COURT:  All right.  For what reasons?

24    THE JUROR:  Drugs.

25    THE COURT:  About how long ago?

1      THE JUROR:  Probably been about six, seven years ago.

2      THE COURT:  I need to ask you the same question.

3  Those experiences, as unpleasant as they have been, can you

4  put those aside?

5      THE JUROR:  I believe so.

6      THE COURT:  Thank you.  All right.  Next on the line

7  here.  Anybody the victim of a crime?  Yes, sir.

8      THE JUROR:  Your Honor, I had car broken into a couple

9  of times, or attempted break-ins.

10      THE COURT:  Name and number?

11      THE JUROR:  Oh, 301, Mr. Sahlen, Robert Sahlen.

12      THE COURT:  When you get my age, you're not supposed

13  to remember your name, but you are supposed to remember.  When

14  was the last time?

15      THE JUROR:  Probably eight or ten years ago.  And my

16  wife had some burglaries with her former ex-husband in Dallas.

17  That's been probably ten or twelve years ago, also.

18      THE COURT:  Thank you.  Yes, sir.

19      THE JUROR:  Jeff Sloan, 233.  I was robbed at gunpoint

20  approximately 28 years ago.

21      THE COURT:  Did you participate in any trial

22  thereafter?

23      THE JUROR:  No, they were never caught.  I had a car

24  broken into probably about 28 years ago.  And my son was

25  arrested for DUI about a year ago.  I don't know the results

```
 1   of that.  His biological father handled it.
 2            THE COURT:  All right.  Thank you very much, sir.
 3            THE JUROR:  Can I approach the bench?
 4            THE COURT:  You may.
 5        (At the Bench, on the record.)
 6            THE JUROR:  Terry 192 -- Terry Olguin.  I was taken
 7   away from my father for molesting me.
 8            THE COURT:  As terrible as that has to be, can you
 9   represent to me and these parties that you will put that
10   experience aside and not be --
11            THE JUROR:  Yes.
12            THE COURT:  Okay.  Thank you, ma'am.  Next?
13            THE JUROR:  Kenneth Sisk, 289.  My apartment was
14   broken into about eight months ago.
15            THE COURT:  All right.
16            THE JUROR:  Blake Patterson, 293, burglary of my
17   house.
18            THE COURT:  About how long ago?
19            THE JUROR:  Oh, probably eight years ago.
20            THE COURT:  Okay, sir.  Thank you.  Anybody else?
21   Yes, ma'am.
22            THE JUROR:  Teresa Roy, 318, burglary of a van,
23   robbery about four years ago.
24            THE COURT:  All right.  Did you end up having to
25   participate in any trial or anything?
```

```
1              THE JUROR:  No, sir.

2              THE COURT:  All right.  I have everybody on the front

3    row?  We'll start with the second.  Yes, sir.

4              THE JUROR:  Tom Hurt, No. 239.  I had a car stolen

5    about ten years ago.

6              THE COURT:  Okay.

7              THE JUROR:  Dayton Grumbles, Juror 265.  I had a

8    robbery committed against me a couple of times about 25 years

9    ago.

10             THE COURT:  All right, sir.

11             THE JUROR:  I need to approach.

12             THE COURT:  Just come right up.

13         (At the Bench, on the record.)

14             THE JUROR:  Gloria Mislinski, it's 182.  About ten

15   years ago, when I was in college, I got a DUI.

16             THE COURT:  Okay.  And that experience, as unpleasant

17   as it is, could you represent to these parties that you will

18   not be influenced by whatever that experience --

19             THE JUROR:  Yeah, I just didn't want anybody else to

20   know.

21             THE COURT:  Okay.  Yes, ma'am.

22             THE JUROR:  Can I approach the bench?

23             THE COURT:  You bet.  Come on up.

24         (At the Bench, on the record.)

25             THE JUROR:  I had a DWI.
```

1          THE COURT:  Need your name and number.

2          THE JUROR:  Marcos Gonzales, 87, DWI about eight years

3    ago.

4          THE COURT:  Okay.  Did anything that had to do with

5    this -- can you represent to these people that they will not

6    be influenced by it?

7          THE JUROR:  Yeah.

8          THE COURT:  Okay.  Yes, ma'am.

9          THE JUROR:  No. 56, my husband was arrested and

10   indicted for DWI.

11         THE COURT:  Okay.  About how long ago?

12         THE JUROR:  About a year and -- less than -- less than

13   a year and a half.

14         THE COURT:  All right.  Thank you.  Anybody else?

15   Yes.

16         THE JUROR:  Donald Scott, No. 338.  I had a car broken

17   into about 30 years ago and a lawn mower stolen about five

18   years ago.

19         THE COURT:  Did you ever get the lawn mower back?

20         THE JUROR:  No, sure didn't.

21         THE COURT:  Know the answer about the car.  Anybody

22   else on 2?  Third row?  Yes, sir.

23         THE JUROR:  Hector Rodriguez, 205, burglary of an

24   apartment about 22 years ago.

25         THE COURT:  Okay.  Mr. Rodriguez.  Yes, ma'am.

1        THE JUROR:  May I approach the bench?

2        THE COURT:  Yes, ma'am.

3     (At the Bench, on the record.)

4        THE COURT:  I need your name and number.

5        THE JUROR:  Cheryl Copeland, Juror No. 64.  My friend

6  was arrested for burglary of a habitation and he got deferred

7  adjudication.  And my husband has been arrested for DWI and,

8  also, on drug charges, amphetamines.  He has been on probation

9  a couple of months now.

10        THE COURT:  Those experiences, ma'am, as unpleasant as

11  they have to be, can you represent to me and these parties

12  that you will put those in the closet at home and not be

13  influenced by them if you are to be a juror in this case,

14  judging only from the evidence that you hear?

15        THE JUROR:  I would say yes.

16        THE COURT:  Okay.  Thank you, ma'am.  Third row.  Yes,

17  ma'am.

18        THE JUROR:  I was mugged and had my purse stolen about

19  17 years ago.

20        THE COURT:  Okay.  Thank you.

21        THE JUROR:  May I approach the bench?

22        THE COURT:  You may.

23     (At the Bench, on the record.)

24        THE COURT:  I need your name and number, please.

25        THE JUROR:  Juror 280, Kozielski.  I was arrested for

1  DWI and went to trial the following summer and found not

2  guilty.

3      THE COURT:  All right.  Those experiences, being

4  arrested and being charged, can you put those aside and not be

5  influenced if you're to be a juror in this case?

6      THE JUROR:  Yes, sir.

7      THE COURT:  Thanks.  Anybody else?  Yes, sir.

8      THE JUROR:  May I approach, your Honor?

9      THE COURT:  Yes.

10     (At the Bench, on the record.)

11     THE JUROR:  David Laurie, Juror 13.

12     THE COURT:  Okay.

13     THE JUROR:  My cousin Andrew was killed in a

14  hit-and-run by a school bus about six months ago, and the

15  driver of that bus is still pending, as well I had a PI about

16  two or three years ago.

17     THE COURT:  The fact that you've had these

18  experiences, can you represent to these parties that you

19  cannot be influenced by those experiences at all and listen

20  and make your judgment only on the evidence that you hear in

21  trial?

22     THE JUROR:  Yes, I can.

23     THE COURT:  All right.  Anybody else on the third row?

24  Yes, sir.

25     THE JUROR:  Gary Leasman, 71.  I had a family

1    disturbance about a year ago.  Everything was dropped.

2         THE COURT:  That experience, can you represent, will

3    not influence you in this case if you are to be a juror?  You

4    could judge only on what you hear and see during the trial and

5    that experience will not influence you?

6         THE JUROR:  It won't influence me.

7         THE COURT:  Thank you, sir.  Anybody else on the third

8    row?  All right.  Have I gotten everybody now whose members of

9    the family have either been victims of crime or charged with a

10   crime?

11        THE JUROR:  I'm sorry, I thought you were just

12   asking --

13        THE COURT:  I've split.  Let's go to the other one.

14        THE JUROR:  289, I was convicted of DWI in 1987 in

15   Cameron County jury trial.  And my son has been pretty much a

16   bad actor.  He's been in about every jail from here to South

17   Padre Island for various things.

18        THE COURT:  One day we're going to have to call him,

19   trade stories.  Thank you.  Anybody else?  Yes.

20        THE JUROR:  My name is Dayton Grumbles, Juror 165.  I

21   said 265 a while ago.  But anyway, I've been arrested for game

22   violation, and my son's been arrested for different things.

23   He's out of jail now anyway.

24        THE COURT:  All right.  About how long ago was it when

25   you were arrested?

1          THE JUROR:  It was about 30 years ago.  It was --

2     well, '63, so it would be 37 years ago.

3          THE COURT:  Long time ago.  I can remember 1963.  Yes,

4     ma'am.

5          THE JUROR:  I'm Juror 64, Cheryl Copeland.  I did

6     mention our business had been broken in twice in the last

7     couple of years.

8          THE COURT:  Okay.  Thank you.  Anybody else need to

9     respond?  Yes, sir.

10         THE JUROR:  May I approach the bench?

11      (At the Bench, on the record.)

12         THE JUROR:  David Braley, Juror 193.

13         THE COURT:  Sure.

14         THE JUROR:  My father was arrested about 15 years ago,

15    and the trial was held in this courtroom.  It completely

16    ruined his life, his career, and I really don't think I could

17    really serve as a juror.

18         THE COURT:  All right.

19         THE JUROR:  I know we sat in here for --

20         THE COURT:  It's immaterial, this courtroom.  This is

21    not my courtroom.  This case is not going to be tried in this

22    courtroom -- I mean, it will be tried in my courtroom down on

23    1, but the point is --

24         THE JUROR:  Just a federal jury.

25         THE COURT:  Okay.

1        THE JUROR:  I have animosity against the federal for

2   what -- I won't be able to sit on a jury.  It's just

3   completely ruined his career, and I'm very contemptuous.

4        THE COURT:  Well, that's exactly what you're under

5   oath to be.  So let me make sure that I have this down now.

6   The experience that you had with the federal prosecution of

7   your father, you do not believe you'll be able to set it aside

8   and you think it would influence you if you're to be a juror

9   in this case?

10        THE JUROR:  Very definitely so, yes.

11        THE COURT:  Let me have your name and number, again,

12   please.

13        THE JUROR:  David Braley, B-R-A-L-E-Y, No. 193.

14        THE COURT:  All right.  Mr. Braley, thank you, sir.

15        THE JUROR:  Thank you.  Sit down?

16        THE COURT:  Yes.  You may take your seat out here.

17        THE JUROR:  I forgot something.  My car was broken

18   into, my ATM stolen and money taken out of my bank.

19        THE COURT:  Okay.  Yes, sir.

20        THE JUROR:  Yes, sir, my name's David Boxley, and my

21   oldest son was arrested for possession of drugs.

22        THE COURT:  About how long ago, approximately?

23        THE JUROR:  About five years ago.

24        THE COURT:  Anybody else?  No wildflowers at a nuclear

25   plant?  All right.  For those of you who have been up here,

1    I've asked you a couple of questions.  Those of you who have

2    not been up here, I need to ask you a couple of questions.

3    The record will reflect your answers.

4         Is there anybody on the panel who cannot represent to

5    the parties in this lawsuit, the government, and Mr. Karr, and

6    to me that those experiences, while certainly not pleasant and

7    sometimes very bad, that you can put those experiences aside

8    and judge this case only on the evidence that you hear in

9    trial?  If you cannot do that, let me see your hand now.

10        All right.  Thank you.  If you'll call one for Mr.

11   Braley.  I'm excusing Mr. Braley.

12        MS. HAJDA:  Juror No. 128, Jane Bronikowski, replacing

13   No. 193, David Braley.

14        THE COURT:  Just goes to show you, no one's safe.  Ms.

15   Bronikowski, let me ask you a couple of questions.  Just come

16   up here.  First off, how about the schedule?

17        THE JUROR:  I do have a doctor's appointment in June.

18   I cannot verify the date, but I know it may be the first week.

19        THE COURT:  Okay.  Other than -- what type of -- I

20   don't mean to be pushy.

21        THE JUROR:  Dental appointment.

22        THE COURT:  We'll get you out for that.  You have been

23   hearing my questions.

24        THE JUROR:  Yes.

25        THE COURT:  You understand the indictment is no

1    evidence of guilt.

2            THE JUROR:  Yes, sir.

3            THE COURT:  The fact that we are dealing with the

4    O'Hairs or the Murrays, will that influence you or can you

5    represent to these parties that you will make up your mind

6    solely on what you hear in trial?

7            THE JUROR:  Well, I mean, I could be fair.

8            THE COURT:  In what sense, ma'am?

9            THE JUROR:  Religion.

10           THE COURT:  Well, you're going to have to explain that

11   to me.

12           THE JUROR:  Didn't it involve in being a Christian?

13           THE COURT:  All right.  Well, I'll let you go back.

14   You could go back, but don't talk to anybody.

15           THE JUROR:  Okay.

16           THE COURT:  All right.

17           THE JUROR:  Thank you.

18           MS. HAJDA:  Juror No. 8, Susan Williams, replacing No.

19   128, Jane Bronikowski.

20           THE COURT:  Ms. Williams how about your schedule?

21           THE JUROR:  I have some old stuff, old skeletons.  I

22   was arrested as a teenager for shoplifting.

23           THE COURT:  Well, I will forgive you.  Let me ask you

24   a few questions.

25           THE JUROR:  My husband's son had alcohol and drug

1  stuff, like, 20 years ago.

2       THE COURT:  The question I asked about the Madalyn

3  Murray O'Hair --

4       THE JUROR:  I've lived in Austin all my life.  I know

5  of her.  I think I saw her one time at Coa-coa's, but I've

6  never met her.

7       THE COURT:  Would you be able to listen to the

8  evidence and make your mind up only on the evidence that you

9  hear?

10      THE JUROR:  Yes.

11      THE COURT:  Okay.

12      MR. CARRUTH:  Your Honor, I did not hear.  I don't

13  think Mr. Mills heard that.

14      THE COURT:  When she was a teenager, she was arrested

15  for shoplifting.  In that case, I forgave her.

16      THE JUROR:  When I was a teenager.  I was never

17  informed with the formal Miranda sufficient to -- I don't know

18  if I was charged or not.

19      THE COURT:  Let me ask you this:  Do you understand

20  that the defendant is presumed to be innocent?

21      THE JUROR:  Yes.

22      THE COURT:  You can make that presumption?

23      THE JUROR:  Yes, of course.

24      THE COURT:  You could have a seat.  Anybody on the

25  panel ever had the really refreshing and rewarding experience

1   of going to law school? Yes, sir. See, there are some people

2   that have had that experience. Mr. Rodriguez, if you'll tell

3   us your name.

4           THE JUROR: Hector Rodriguez, Juror 205. I graduated

5   from that fine law school down the hall in 1987.

6           THE COURT: Do you practice law?

7           THE JUROR: I do.

8           THE COURT: And what capacity?

9           THE JUROR: Primarily in the insurance field. I'm an

10   insurance lawyer and consultant.

11           THE COURT: Thank you. The only question I have to

12   ask you is notwithstanding the fact that you may think I'm

13   wrong, will you follow my legal instructions?

14           THE JUROR: Yes, sir.

15           THE COURT: Thank you. Anybody else either went to

16   law school or works for a legal entity of any nature from a

17   sheriff to a law firm to the Attorney General of the United

18   States, Supreme Court of the United States, anything like

19   that? Yes, sir.

20           THE JUROR: Juror No. 280, Ryan Kozielski. I work as

21   a trustee to the Federal Bankruptcy Court. He's privately

22   contracted out, but --

23           THE COURT: He's appointed by the bankruptcy?

24           THE JUROR: That is correct.

25           THE COURT: I like to think they work for me, but I

1   don't know.  I get to the point I just hope they don't make

2   mistakes and I'm fooled.  Thanks.  Anybody else work for any

3   legal entity?  Yes, ma'am.

4          THE JUROR:  Susanna Medrano, Juror No. 152.  I work

5   for eight criminal defense attorneys.  I'm a runner.

6          THE COURT:  Are you fast?

7          THE JUROR:  Very fast.

8          THE COURT:  Tell us the --

9          THE JUROR:  The names?  David Fannin, David Reynolds,

10  Ira Davis, Ian Inglis, Erik Goodman, Ken Anschutz.

11         THE COURT:  I got an invitation.  Mr. Fannin is

12  getting married.

13         THE JUROR:  Right.  He already got married last night.

14         THE COURT:  The fact you know lawyers, would that

15  influence you in this case?

16         THE JUROR:  Huh-uh.

17         THE COURT:  Anybody else?  How many of you -- I love

18  this one, so I'll answer it, too.  The question is how many of

19  you have ever had a run-in, a real dispute with the federal

20  government?  I had a gentleman once stood up and said he had

21  been audited eight years in a row.  It turned out he worked

22  for the IRS.

23         How many have ever had a dispute with the federal

24  government where it's the Internal Revenue Service,

25  Immigration, Justice Department, EEOC, any of that stuff?

```
 1    Anybody have any personal disputes with the government?  Yes,
 2    sir.
 3            THE JUROR:  Routine audit.
 4            THE COURT:  Just an audit.  About how long ago?
 5            THE JUROR:  About nine years ago.
 6            THE COURT:  Can you forget it?
 7            THE JUROR:  Yes, sir.
 8            THE COURT:  Okay.
 9            THE JUROR:  Routine audit.
10            THE COURT:  Can you forget it?
11            THE JUROR:  Sure.
12            THE COURT:  About how long ago?
13            THE JUROR:  I think about five years ago.
14            THE JUROR:  Same thing.
15            THE COURT:  Okay.  Would it influence you in any way?
16            THE COURT SECURITY OFFICER:  Your Honor, he needs his
17    name and number.
18            THE JUROR:  Robert Sahlen, 301.
19            THE JUROR:  Dayton Grumbles, 165.
20            THE COURT:  And I had one other.  I --
21            THE JUROR:  Scott Donald, 338.
22            THE COURT:  All right.  Now, I'd like for you to look
23    around just at each other.  Is there anybody on this panel
24    that knew one another before you came here today?  Okay.  That
25    occurs rarely --
```

1            THE JUROR:  Someone looks familiar to me.

2            THE COURT:  I don't think it's going to influence you

3    one way or the other, but at least y'all might have seen each

4    other before.  Now, I'm really curious.  Does anybody work for

5    one another, or that type of thing, have any influence over

6    you?

7            All right.  I'll have the lawyers up here.

8        (At the Bench, on the record.)

9            THE COURT:  Do you have any further questions?

10           MR. CARRUTH:  No, your Honor.  We're satisfied.

11           MR. T. MILLS:  No, your Honor.

12           THE COURT:  Okay.  Have a seat.  All right.  Members

13   of the jury panel, check and make sure you know which chair

14   you're in.  I'm going to give you a 30-minute break.  So that

15   will take us back here at 12:20, if my eyes are correct.

16   12:20.  When you go out, for those of you who smoke, it's just

17   like high school, you've got to go in high school in the front

18   yard, but the security people will probably run over you

19   getting out there.

20           Those of you talk about anything but this case.  Don't

21   talk about this case so that when you come back, you can

22   answer the questions about not talking to anybody about this

23   case.  You could talk about anything else.  Take a 30-minute

24   break.  For everybody's benefit, I anticipate being through at

25   about 12:30, 12:35 so that you can kind of know what you're

1    going to do.

2          Those of you, back over here, that haven't been called

3    today or have been called and excused, you may sit anywhere

4    when you come back, but come back.  I'm short of Marshals.  By

5    the time they run you down, arrest you, put you in jail and

6    come back, I won't have any Marshals.  So please come back,

7    sit anywhere, but I do need y'all to be seated at the same

8    chair.  We're in recess till 12:20.

9       (Recess.)

10          THE COURT:  All right.  Let's let the record start.

11   And if the government would read into the record their

12   peremptory challenges, please.

13          MR. CARRUTH:  Susanna Medrano, No. 152, Robert Sahlen,

14   No. 301, Kenny Sisk, No. 289, Kenneth Ittigson, No. 89, Teresa

15   Roy, No. 318, Marcos Gonzales, No. 87, and the alternate

16   strike is David Laurie, No. 13.

17          THE COURT:  All right.  Any objections, exceptions or

18   Batson challenges to any of the peremptories of the

19   government?

20          MR. T. MILLS:  No, sir.

21          THE COURT:  All right.  If the defendant will read

22   their peremptories into the record, please.

23          MR. T. MILLS:  I just have their last names here,

24   Juror Senkel, S-E-N-K-E-L --

25          MS. WILLIAMS:  -- that's Juror No. 44.

1        MR. T. MILLS:  Walker, Merry Walker.

2        MS. WILLIAMS:  Juror 250.

3        MR. T. MILLS:  Brown, Juror --

4        MS. WILLIAMS:  Juror 288.

5        THE COURT:  Y'all don't want Mr. Brown?  You want him

6   to go around the country for Governor Bush?

7        MR. T. MILLS:  Be fine.  Martinez-Anders.

8        MS. WILLIAMS:  Juror 41.

9        MR. T. MILLS:  Donovan.

10        MS. WILLIAMS:  245.

11        MR. T. MILLS:  Grumbles.

12        MS. WILLIAMS:  165.

13        MR. T. MILLS:  Klein.

14        MS. WILLIAMS:  6.

15        MR. T. MILLS:  Rhode.

16        MS. WILLIAMS:  344.

17        MR. T. MILLS:  Powley.

18        MS. WILLIAMS:  191.

19        MS. WILLIAMS:  Kozielski, 280.

20        MR. T. MILLS:  The alternates are Ruud --

21        MS. WILLIAMS:  294.

22        MR. T. MILLS:  Gainer.

23        MS. WILLIAMS:  355.

24        THE COURT:  Any objections, exceptions or Batson?

25        MR. CARRUTH:  No, your Honor.

```
 1          THE COURT:  Ms. Sims, if you'll read the jury

 2  selected, please.

 3          THE CLERK:  Juror No. 341, Jeffrey Babcock, Juror No.

 4  233, Jeffrey Sloan, Juror No. 192, Terry Olguin, Juror No.

 5  293, Blake Patterson, Juror No. 239, Tom Hurt, Juror No. 190,

 6  Lewis Goodley, Juror No. 182, Gloria Mislinski, Juror No. 56,

 7  Avelina Castilleja, Juror No. 338, Donald Scott, Juror No.

 8  157, Christopher Bittick, Juror No. 205, Hector Rodriguez,

 9  Juror No. 64, Cheryl Copeland, Juror No. 99, Rosie Amaro,

10  Juror No. 71, Gary Leasman, and Juror No. 8, Susan Williams.

11  The last three are alternates.

12          THE COURT:  For a total of?

13          THE CLERK:  Fifteen.

14          THE COURT:  The government only used one peremptory.

15          THE CLERK:  They have one for them.

16          THE COURT:  So there's one?

17          THE CLERK:  Yeah.

18          MS. WILLIAMS:  I'm sorry.  What happened to Juror No.

19  -- okay.  I see.

20          THE COURT:  Is the jury acceptable to the prosecution?

21          MR. CARRUTH:  It is, your Honor.

22          THE COURT:  And to the defense?

23          MR. T. MILLS:  Yes, sir.

24          THE COURT:  Let's go off the record.

25      (Off the record.)
```

1      THE COURT:  I'm going to go select the jury.  I'm

2  going to put them in Mr. Mace's care and bring them back at

3  ten of 3:00.  Is that all right?  Opening statements at 3:00.

4  Okay.

5      MR. CARRUTH:  There was one thing that happened.  We

6  didn't bring it up, but maybe we should bring it up.

7  Ordinarily, when we're selecting the jury, the government and

8  sometimes the defense are asked to read a list of their

9  witnesses to see if either prospective venire persons know

10  them.  That was not done in this case.  It's my fault for not

11  calling it to the Court's attention.

12      THE COURT:  Well, over 100-something witnesses.

13      MR. CARRUTH:  There are -- and many of them are from

14  out of state and they may not know, but we need to get

15  something on the record from the defense.

16      THE COURT:  I asked each of you if either one of you

17  had any additional questions, and I assumed that -- I kind of

18  tentatively made that decision and outside y'all.  If you

19  wanted to read them, we could read them, but I agree with both

20  of you that there's not much good about that.

21      All right.  We'll select the jury and recess till ten

22  till 3:00.

23      (Jury panel present.)

24      THE COURT:  Ladies and gentlemen, I'm going to have

25  Mrs. Sims, the Clerk, read the names of those selected as

1    jurors.  If your name is selected, simply stand where you are.

2         THE CLERK:  Juror No. 341, Jeffrey Babcock, Juror No.

3    233, Jeffrey Sloan, Juror No. 192, Terry Olguin, Juror No.

4    293, Blake Patterson, Juror No. 239, Tom Hurt, Juror No. 190,

5    Luis Goodley, Juror No. 182, Gloria Mislinski, Juror No. 56,

6    Avelina Castilleja, Juror No. 338, Donald Scott, Juror No.

7    157, Christopher Bittick, Juror No. 205, Hector Rodriguez,

8    Juror No. 64, Cheryl Copeland, Juror No. 99, Rosie Amaro,

9    Juror No. 71, Gary Leasman, and Juror No. 8, Susan Williams.

10        THE COURT:  Ladies and gentlemen, you have been

11   selected to be the jurors in this case.  I'm going to put you

12   in the custody of Mr. Mace, who's going to show you where to

13   go.  We have special doors and everything for jurors.  We'll

14   be trying this case downstairs in the courtroom, on the first

15   floor, but Mr. Mace will show you the jury room and where to

16   go and come.

17        I'd like for you to be ready at about a quarter to

18   3:00.  I'm going to release you till a quarter to 3:00 with

19   only one instruction, and that is go see anything you want.

20   The Capitol is gorgeous.  It's been redone.  Perhaps some days

21   they do that, I think, but do not talk about this case.

22        I'll be asking you three questions at the beginning of

23   any session of court:  Have you talked to anybody about this

24   case?  Have you permitted anybody to talk to you about the

25   case?  Have you learned anything about the case outside the

1   presence of each other and this courtroom?  I need for you to

2   be able to say under your oaths "No" to those questions.

3        So if you're going to go eat lunch together, that's

4   fine, just don't talk about this case.  Quarter of 3:00.  Mr.

5   Mace will show you where to go.  All right.  Just follow him.

6        THE JUROR:  Your Honor, can we tell people we've been

7   selected?

8        THE COURT:  You may.  Get all they can about you, but

9   just don't talk about the case.

10       All right.  Members of the jury panel, I'm going to

11  thank you for your patience in this case.  Where else can you

12  come and see democracy in action?  A lawyer is selected as a

13  juror and a gentleman by the name of Hurt on crutches.  Life

14  has its funny quirks.  Now, for those of you sitting there in

15  great disappointment, Judge Austin is going to be available at

16  1:30.  He's going to cool his heels till 2:00.

17       I'm going to give y'all till 2:00 to eat lunch.  Those

18  of you -- I think his case is going to be a very interesting

19  case.  It involves some very interesting things.  It's going

20  to go to trial next week, so I'm going to leave you in charge

21  with Melissa, who's already screwed up already once today, so

22  she'll be perfect the rest of the day to get from your number

23  approximately 40 people to come back.

24       The rest of you are going to be released.  But I do

25  want to impress upon you the importance of what we've done

1  today.  Many of you, I think, are probably relieved.  Many

2  people who have been selected on that jury feel that they have

3  had a hardship put on them.  But if you'll look around, you'll

4  see your own investment.  This jury panel cost the taxpayers

5  -- Melissa, how many do we have?

6          MS. HAJDA:  202.

7          THE COURT:  I don't even want to tell you how much it

8  cost, but it's important.  And when you get the urge not to

9  come, I want you to remember that you could have been on this

10 jury, you might be on another jury.  Call Melissa, follow the

11 instructions.  We didn't want any more jurors than we have

12 need of.  And you don't want to be down here when it's not

13 going to be beneficial to the administration of justice.

14         This is a new panel.  Y'all are going to be here for a

15 couple of months.  I hope we get to see you again.  We have

16 four judges who try cases.  We're able to try cases in the

17 Austin Division within ten months of their filing because

18 jurors come from our 16 counties that do service.  We try to

19 be as efficient as we can.  We try to be as polite as we can.

20         But it's tough business.  And it is -- both in

21 criminal and civil cases to come down here and serve on a jury

22 is a privilege for living in this country.  It's not a cost,

23 it's a privilege, and I appreciate your being here.  We're in

24 recess until 2:45.

25     (Recess.)

1    THE COURT:  All right, counsel.  Before I bring in the

2    jury, does anyone wish to invoke the Rule?

3    MR. T. MILLS:  The defense does, your Honor.

4    THE COURT:  Government will name their representative,

5    please.

6    MR. CARRUTH:  Your Honor, we have two case agents,

7    Donna Cowling from the FBI, and Ed Martin from the Internal

8    Revenue Service.

9    THE COURT:  Both are going to testify?

10    MR. CARRUTH:  They're going to be summary witnesses

11    toward the end, your Honor.  They both work with different

12    sets of witnesses in this case.  We would like for them to be

13    exempt from the Rule.

14    THE COURT:  Any objection to the two representatives?

15    MR. T. MILLS:  Well, I may need favors from Mr.

16    Carruth sometime along the line.

17    THE COURT:  I'm not interested in y'all's favors.  Do

18    you have any objections?

19    MR. T. MILLS:  No, sir.

20    THE COURT:  All right.  Counsel, I'm not going to

21    limit y'all on opening statement.  You both asked for an hour,

22    you could have whatever you wish.  Anybody nods off, they go

23    to sleep, it's time to hush.  All right.  Anything else before

24    we bring in the jury?

25    MR. CARRUTH:  No, your Honor.

1        MR. T. MILLS:  Later, during the day or trial, we're

2   going to have our investigator named Al Teel that we would

3   like exempt from the Rule, also.

4        MR. CARRUTH:  No objection.

5        THE COURT:  All right.  Other than that, I don't know

6   who's going to be a witness, so I'll rely on counsel.  If

7   anybody comes in unobtrusively, slip off and tell them to go

8   out, and then, also, be sure and get the witnesses the

9   instructions that they're not to talk to one another about

10   their testimony.  My instruction is that they can talk to the

11   lawyers if they wish, but it's America, they can decide who

12   they want to talk to.

13        Bring the jury in.

14     (Jury present.)

15        THE COURT:  Members of the jury, the last thing I told

16   you, I guess, this afternoon, was that on the opening of every

17   court session in the morning and in the afternoon hour, I'll

18   be asking you three questions.  Those are very simple

19   questions.  They are:  Have you talked to anybody about this

20   case?  Have you permitted anybody to talk to you about the

21   case?  And have you learned anything at all about the case

22   outside the presence of one another and this courtroom?

23        You'll be answering under oath, of course, and it's

24   very important to be able to say "No" to those questions

25   because they guarantee a fair trial.  That is one of our

1    constitutional guarantees that you will not talk to anybody.

2    When you go home, your family's going to drive you crazy

3    because they're going to know you're on this case and they're

4    going to want to talk to you about the case, but you're just

5    going to have to tell them the truth, that you heard down at

6    the courthouse that Sparks is either half or mostly crazy and

7    you just better follow his instructions because you don't know

8    or nobody else knows what he's going to do.

9         You'll have plenty of time later on to talk with your

10   family members, but the reason for that is that somebody might

11   say something that might influence you and nobody else has

12   heard it, and I want you to decide this case on what you hear

13   in the courtroom.

14        You will get very good at answering those questions.

15   You'll almost sound like a choir because you have to sound --

16   you have to make oral answers.  So let's start off.  Remember

17   you're under oath.  Have you talked to anybody about this

18   case?

19        THE JURORS:  No.

20        THE COURT:  Has anybody talked to you about this case?

21        THE JURORS:  No.

22        THE COURT:  And have you learned anything at all about

23   the case outside the presence of one another and this

24   courtroom?

25        THE JURORS:  No.

1    THE COURT:  All right.  Let the court record reflect

2    negative responses to all questions by all jurors.  Now, if

3    you'll stand, please, raise your right hand, you're going to

4    be sworn to be the jury in this case.

5    THE CLERK:  Do you and each of you solemnly swear or

6    affirm that in the trial of the case of the United States of

7    America vs. Gary Paul Karr that you will a true verdict render

8    according to the law and the evidence?

9    (Affirmative responses given.)

10   THE COURT:  All right.  You may be seated.  Now, with

11   the taking of that oath, you become judges in this case.  And

12   you are the judge of the facts.  Under our law, the judge --

13   that is my role -- is to decide, one, what evidence that you

14   should consider in rendering a verdict, what evidence that you

15   should not consider in rendering a verdict, and at the end of

16   the case, to give you written instructions which I am required

17   to read to you orally, but I also give them to you in writing

18   that will guide you in your deliberations.

19   Your judgment and your responsibility is to determine

20   the facts.  In a criminal case, it is whether or not the

21   defendant is guilty.  The government is required to convince

22   each person on the jury of guilt from the evidence beyond any

23   reasonable doubt.  And I'll give you instructions on that.

24   But that doesn't take a rocket scientist to know what

25   reasonable doubt is.

1    I will give you full instructions during the trial.

2    I'll give you instructions at the end of the trial, but the

3    government has the burden of proof of presenting the evidence,

4    and Mr. Karr is entitled, as you've already sworn to uphold,

5    he's entitled to a presumption of innocence and that innocence

6    does not go away throughout the trial.  It does not go away

7    while you deliberate.

8    And only if all twelve jurors who will ultimately end

9    up of your number 15 deliberating this case, each individually

10   and all collectively in a unanimous decision, find beyond any

11   reasonable doubt from the evidence that Mr. Karr is guilty can

12   he be found guilty under our system of justice.

13   No matter what I say during the trial, it's going to

14   be a long trial.  No matter how I look.  Right now, I have the

15   flu.  You might think that I'm this sour all the time, but I

16   went and got a shot during the noon hour, and I'm doing a

17   little bit better, says the doctor.  Of course, he don't feel

18   like I do.

19   The truth of the matter is I do a lot of things up

20   here.  So don't look at me and see if what I think or what do

21   you think I think.  That is your job with regard to the

22   evidence.  That is your responsibility, it is not mine.

23   Now, what is the evidence?  The evidence is the sworn

24   answers by witnesses to questions, not the lawyers' questions,

25   not the lawyers' statements, but the sworn answers.  What the

1   lawyers are going to say in a minute in opening statement is

2   very important.  They know what the evidence is going to be in

3   this case.  And they're going to tell you what they believe

4   the evidence is going to be and the significance of that

5   evidence so that you can look out for it.

6        But what they say is not evidence.  You're not to base

7   your verdict in any way, shape or form on what the lawyer

8   says.  You must and should consider what the lawyers say in

9   your construction and interpretation of the evidence.  But

10  when it comes down to the end of the case, it is what you

11  think the evidence was and it is what you think the evidence

12  means that's determinative in your judgment.

13        Now, evidence can be testimony.  It can be documents.

14  It can be stipulations.  A stipulation is simply an agreement

15  rather than bringing somebody in with a calendar.  The lawyers

16  could agree that I could instruct you that it's Monday.

17  There's no dispute about the fact that it's Monday.  And that

18  will be evidence that you can count on in a stipulation.

19        In this case, just like all other case, there's going

20  to be objections during the trial of the case.  When a lawyer

21  gets up to object, don't think that lawyer is trying to hide

22  something.  The lawyer is trying to bring to my attention that

23  he or she feels that that evidence is something that you

24  should or should not consider.

25        They have an obligation both to their client and to

1  me, as the judge of this case, to bring those to my attention.

2  If I sustain the objection, you won't hear it.  If I overrule

3  the objection, you will hear the evidence.  But even if I

4  overrule the objection, don't think that evidence is any more

5  important than anything else.

6       Don't try to figure out this case in the beginning.

7  Keep an open mind.  Wait until you've heard all of the

8  evidence, and then, you can deliberate and decide what you

9  believe the factual outcome ought to be in this particular

10 case.

11      Now, because this case is going to last more than two

12 weeks, I'm advised -- I've had Mr. Mace give each of you a

13 notebook -- I'm going to allow notes to be taken in this case.

14 I rarely let notes to be taken in the case, but because of the

15 number of witnesses and the number of issues that might be

16 present, I'm going to let you take notes.

17      Now, each day, write your name on the -- on your pad

18 and each day, when you leave, give it to Mr. Mace, and he'll

19 make sure that your notebook is ready for you the next day.

20 We don't take the notebooks home.  And at the end of the case,

21 or during the case, don't compare your notebook to anybody

22 else.  That's just your information to remind you of certain

23 things.  When you consider the evidence, what you remember is

24 going to be a lot more important than what you've put in that

25 book, but you have the right to do that.

1          And at the end of the trial, we collect those

2   notebooks.  It becomes what we call part of the record.  So

3   don't write any ugly things down about me.  Just write what

4   you think should be in on the case.

5          You're going to get lots of breaks.  You're going to

6   get noon breaks.  You're going to get at least one and two

7   breaks every afternoon.  It's going to be tempting for you to

8   come in and talk about what you've seen.  But the law is that

9   you should not.  The law is talk about anything that you wish,

10  but save your comments until you've heard all of the evidence

11  when you talk about the case.

12         The reason for that is, of course, obvious.  Now, I

13  anticipate because half the people out here in this courtroom

14  are attached to the media.  I anticipate there's going to be

15  news stories.  There's going to be television stories

16  throughout the duration of this trial.  If you're at home and

17  one of them comes on the television, just get up and go get

18  another glass of coffee, or tea, or water.  Don't listen to it

19  so that you can answer those questions "No" when I ask them to

20  you at the beginning.

21         Save the papers, if you wish, but don't read any of

22  the articles.  I don't mean ill will to anybody, but I've been

23  trying cases a long time, and it's sometimes not unusual for

24  me to read about a case and think, well, that's an unusual

25  case, I wonder what it's about, and find out it's the case

1    that I'm trying.

2         So things may not happen in the courtroom that you

3    don't need to know about.  Do not listen to any of the media

4    or do not read any of the articles on the case.  In just a

5    minute, I'm going to let the lawyers make what they call an

6    opening statement.  As I've said, it's very important because

7    they're going to tell you generally a little picture or a menu

8    of what the trial is going to be.

9         When they are through with that, then the government

10   will start to present their witnesses, but I'm going to wait,

11   and we're going to start that in the morning because both

12   sides have indicated they believe the opening statements will

13   be around an hour, and so it will be a little late to start

14   the witnesses.

15        And then, we'll start with the first witness tomorrow.

16   The prosecutor will put the witness on and ask the questions

17   of the witness.  Then, the defense will have the right to ask

18   questions, and then, the prosecutor will have the right to ask

19   questions until we've gone through all of the prosecution's

20   witnesses.

21        At that point in time, the defendant, if they -- if he

22   wishes, may present evidence, but he makes that decision later

23   on or, actually, his lawyers will probably make that decision

24   later on, depending upon a lot of factors, many of which you

25   and I will be aware of in the courtroom, and many of which you

1    and I will not be aware of that goes on outside of the case.

2         The Rule has been invoked in this case, which means

3    that the witnesses will not hear each other's testimony and

4    are not allowed to discuss with each other their testimony.

5    So you won't be seeing any witnesses in the courtroom.

6    Generally, that's how we will proceed on the case.  It is my

7    usual hour from 8:30 in the morning to 6:00.  8:30 -- now, how

8    many people -- anybody live over 50 miles away?  Yes, ma'am,

9    where are you living?

10        THE JUROR:  I live in Brady.

11        THE COURT:  So you're from Brady, you're a good ways

12   away.  You're going to have to make a decision if you're going

13   to stay here or not, and as soon as I know, I will know how to

14   do that.  If it's convenient, we try to start at 8:30.  And

15   nobody can get out of downtown Austin at 5:00.  I have found

16   that if we stay till almost 6:00, you get home about the same

17   time, and we get a little extra testimony in a long trial.

18   That's what we're going to try to be doing.

19        So those are my opening statements.  If you have any

20   questions at any time, Mr. Mace is in charge of your security,

21   and he's in charge of your attendance.  Get his number and

22   pass on any questions that you might have to me.

23        Mr. Carruth, you have the lectern.

24   GOVERNMENT'S OPENING STATEMENTS

25        MR. CARRUTH:  Thank you, your Honor.  May it please

1  the Court.

2  Counsel for Mr. Karr, members of the jury, during the

3  next several days or perhaps the next few weeks, you're going

4  to hear testimony regarding three individuals who were

5  long-time residents of Austin, Texas.  At the time of their

6  mysterious disappearance in 1995, Madalyn Murray O'Hair, her

7  son, Jon Garth Murray, and her granddaughter and legally

8  adopted daughter, Robin Murray O'Hair, were very actively

9  involved in the American atheist movement, which was at that

10  time headquartered here out on Cameron Road, in the north part

11  of Austin.

12  And you're going to hear evidence that the Atheist

13  Organization was very heavily involved in commercial

14  interstate activities.  By that I mean to say they did

15  business not only here in Austin, Texas but in nearly all the

16  other states of this country and in some foreign countries.

17  They raised much of their money.  They were tax exempt

18  corporations under the Internal Revenue Code or non-profit

19  corporations, rather than tax exempt, and they raised funds

20  from donations and people who would die and leave their wills

21  or leave money and their estate to them, and they would invest

22  these funds in trusts.

23  And they also promoted their organizational activities

24  and beliefs through broadcast on public television stations,

25  including the local station here in Austin, and others in over

     1    100 television stations.  I think it was 140 some-odd

     2    throughout the United States.  The O'Hairs traveled

     3    extensively, gave lectures, attended at least two conventions

     4    a year of the Atheist Organization, which was comprised of

     5    different chapters in different areas of the country, in fact,

     6    different countries in the world.

     7         Very much so involved in interstate and foreign

     8    commerce.  And at the time of their disappearance, Madalyn

     9    O'Hair was about 76 years old.  She had some health

    10    conditions.  She suffered from diabetes and a heart condition,

    11    which required her to take regular medication.  She was -- her

    12    ambulatory movement were restricted because of surgeries she

    13    had in her life, and she had to move about either using a

    14    walker or a cane and, in some cases, a wheelchair.

    15         Her son, Jon Garth Murray, who was about 40 years of

    16    age at the time of the disappearance, was sort of a momma's

    17    boy, lived with his mother, never been married, and he was

    18    pretty much dependent upon Madalyn.  Even though he

    19    technically held the title of president of the Atheist

    20    Organizations at that time, after Madalyn had been the founder

    21    and she got on into her senior years, her son took over as the

    22    CEO, so to speak.

    23         Robin O'Hair, some say, was the younger version of

    24    Madalyn.  She was about 30 years old at the time of their

    25    disappearance, and she had been born to the union of Madalyn's

1    oldest son, William Murray, who I think you may hear from in

2    this trial, and who left the atheist movement many years ago

3    and became a Christian evangelist.

4         And he and his then wife had a son, Robin O'Hair, and

5    once the marriage terminated, Robin was officially adopted by

6    her grandmother, Madalyn O'Hair, and continued to live with

7    her throughout her lifetime.  And you're going to hear

8    evidence that the O'Hairs were a very close-knit family.  They

9    all lived together in a residence over on Greystone here in

10   West Austin.

11        They worked together.  They ate together.  They

12   vacationed together.  Everywhere they went together.  They

13   traveled together.  They came, drove to work and back home

14   together.  They were almost co-dependent upon one another.

15   And during those times, you're going to hear testimony from

16   their former employees and coworkers at the American Atheist

17   General Headquarters, who will tell you that the O'Hairs loved

18   their dogs.

19        They had three pet dogs that they kept at their home,

20   and on many occasions they brought those dogs to work with

21   them.  If the dogs needed any type of treatment, they called

22   the vet.  And whenever they were scheduled to go out of town,

23   they always were meticulous about getting a vet or someone to

24   board their dogs for them because they loved those dogs

25   dearly.

1        They also loved their fine automobiles.  Robin had a

2   Porsche automobile that she drove.  Jon had a Mercedes Benz.

3   And Madalyn had earlier owned another -- a Mercedes, but

4   because of her advancing age and health problems, she had just

5   about quit driving by the time of her disappearance in '95.

6        And one day, in about August 28th of 1995, the

7   employees of the American Atheist General Headquarters, out on

8   Cameron Road, showed up to find a note on the front door of

9   the business that said the Murray O'Hairs have been called out

10   of town suddenly on an emergency and they expected to return

11   about the middle of the month, about the 15th of September,

12   1995.

13        Now, this seems strange to some folks, but they knew

14   that the O'Hairs were also kind of idiosyncratic people, and

15   they often left the country and traveled together even outside

16   the United States; they had vacations together.  And so

17   everybody thought, well, they'll be back, and they didn't

18   worry about them too much.

19        And then, September 15th came and went, and they still

20   didn't return.  And then, one of their employees, who you'll

21   hear from, Orin Spike Tyson, he received a letter from Jon

22   Murray.  And in this letter, it contained a list of the dozen

23   or more instructions on what they should do to continue the

24   operation of the Atheist Organization and how to meet the

25   payroll, and so forth and so on, paying the bills and making

1  sure that the television programs were distributed, and so

2  forth.

3       And it was business as usual.  And there was a cell

4  phone number.  Jon Murray used to carry his own cellular

5  telephone.  And frequently during the month of September that

6  year, 1995, several of the Atheist Organization had telephone

7  conversations with Jon Murray O'Hair and the other O'Hairs

8  over that cellular telephone, but they were very secretive

9  about what they were doing and where they were.

10      And all of a sudden, at the end of that month, about

11  the 29th of September, the telephone calls stopped, and any

12  attempts to call on the cellular phone went unanswered, and

13  that turned out to be the same day that another unusual event

14  occurred as it was reconstructed by investigators.

15      On that same day, Jon Murray accepted delivery of

16  $500,000 in gold coins at the Frost National Bank in Northwest

17  San Antonio, from a gold coin or precious metal dealer named

18  Corey Ticknor, who I anticipate you may hear from in this

19  case.  And Mr. Ticknor had apparently been contacted earlier

20  by Mr. Murray, and they made arrangements to purchase,

21  actually, $600,000 in gold coins.  But because the gold was

22  being shipped in lots, it did not all arrive at the same time.

23      And after the other $100,000 came in the following

24  Monday morning, Mr. Ticknor's going to tell you that he tried

25  to call Jon Murray's cell phone number time and again without

1   success.  And the other $100,000 in gold remained unclaimed

2   for a period of time until it was later returned to the

3   Atheist Organization.

4        Well, what brought the federal government into this

5   case because after they disappeared, the atheist folks really

6   got concerned when the Murray O'Hairs failed to show up for a

7   visit of Pope John Paul in New York.  They were going to

8   picket or protest the Pope.  And they had already made these

9   travel arrangements before leaving unexpectedly.  They had

10  purchased reserved airline tickets and made hotel reservations

11  to go to New York, they and several of the members of their

12  Atheist Organization.

13       They were very excited about this.  It was to be a big

14  event in the atheist group's activities.  And so the atheist

15  members, the board members and coworkers and employees became

16  quite concerned when the O'Hairs failed to appear for that

17  event and that occasion because that was something they were

18  looking forward to.

19       And the atheists themselves then initiated some sort

20  of an investigation and called various chapters that they have

21  in different parts of the country and around the world and

22  tried to locate unsuccessfully the O'Hairs.  And, again,

23  nobody was sure where they had gone or why they had left.

24       And then, when it came time to report to the Internal

25  Revenue Service about what their assets and liabilities,

1   income, and so forth, had been for that tax year, the IRS

2   received a form indicating that the Atheist Organization was

3   showing the loss of about $660,000, or approximately, and that

4   these funds were unaccounted for, and that they were last

5   known to be in the possession of Jon Garth Murray, who was the

6   president of the organization at that time.

7          Now, after the O'Hairs disappeared and failed to

8   return by the end of the year, the Atheist Board of Directors

9   got together in about December of '95 and elected new officers

10  to replace the O'Hairs.  And they elected Ellen Johnston --

11  Johnson who resided in Boonton, New Jersey, and she will be

12  the first witness, I anticipate, you will hear from tomorrow,

13  when we start the trial, and she will tell you about her

14  transition to the presidency of the organization and what

15  happened and how the organization lost money as a result of

16  the sudden departure of the O'Hairs.

17         Their sales and their books and pamphlets dropped,

18  their fundraising activities dropped, they lost membership,

19  and as well as losing their television station, networks.  And

20  this is important because one of the elements the government

21  must prove to you in this case is to show that the acts or acts

22  of the defendant and/or any unnamed or unindicted

23  coconspirators affected interstate commerce.

24         And one way of showing that, as I anticipate Judge

25  Sparks may tell you, is to show any affect or depletion of

1   assets.   And so it's important to know that as a result of the

2   disappearance of the O'Hairs, wherever they went and for

3   whatever reason and whoever caused it, it was financial loss,

4   it resulted in a financial loss to the Atheist Organization.

5          And you'll hear that testimony from Ellen Johnson.

6   And once the IRS became aware, then, that there was $660,000

7   missing, they initiated an investigation, what we normally

8   call a money laundering investigation, assuming perhaps the

9   O'Hairs had absconded with this money, which, in truth,

10  belonged to the Atheist Organization.

11         And the investigation determined that the money used

12  to purchase the gold coins in San Antonio was actually

13  transferred through a bank in New Jersey, which had received a

14  wire transfer of funds from a trust account in New Zealand,

15  known as the Guardian Trust.   And this was a trust that had

16  been founded by the atheists, particularly by Jon Murray,

17  sometime before.

18         Because you see, just prior to their disappearance,

19  the O'Hairs had been involved in a civil Rico lawsuit out in

20  San Diego, California, known as the Truth Seekers trial, and

21  this was a dispute among the Atheist Organization,

22  headquartered here in Austin, and the Truth Seekers

23  organization out in California over who should receive the

24  proceeds of a particular will or estate.

25         And the O'Hairs were very fearful that they might lose

1    that lawsuit, and that if they did lose, they would lose the

2    assets of their organization, including the Charles E. Stevens

3    American Atheist Library and Archive, which was considered one

4    of the organization's most valuable assets.  Reportedly, it

5    was the only -- largest and only library of its kind in

6    existence in the United States.

7           And it had been built up by Madalyn O'Hair and her

8    organization over the years.  And the O'Hairs, I think you'll

9    hear, were very book-oriented people, and this library was

10   their pride and joy.  And before they left, they had made

11   arrangements, some months before they left, to pack this

12   library up and to ship it out of Austin so that it could not

13   be seized in the event the Truth Seekers trial were lost.

14          Well, in fact, they did not lose the Truth Seekers

15   trial.  But along about this same time, a man by the name of

16   David Waters came to work at the Atheist Organization, and he

17   originally started as a typesetter by answering an ad in the

18   paper.

19          And when the current office manager left in about

20   December of 1993, Mr. Waters was promoted to office manager.

21   And as the office manager, he had keys to the building.  He

22   had access to the safe and Jon Murray's office, which you'll

23   hear was rarely locked.  And he had more of a free reign.  And

24   it was during this time, we believe the evidence will show,

25   that Mr. Waters learned of these overseas accounts, including

1    the Guardian Trust funds on deposit in New Zealand.

2         And it was also during this same period of time while

3    the O'Hairs were out of town during the Truth Seekers trial --

4    in fact, I think there were two separate trials that resulted

5    from that.  On one occasion, they returned and they learned

6    that the computer had been stolen along with the hard drive.

7    And this was significant because the hard drive contained the

8    only inventory in existence of the contents of the American

9    Atheist Library that was being boxed up and put into storage

10   for safekeeping.

11        And Mr. Waters, during his employment with the Atheist

12   Organization, had been one of the individuals responsible for

13   inputting that data into that computer.  And now, the computer

14   was gone, and it appeared it may have been an inside job.  And

15   then, later on the next year, there was also a second theft of

16   property that involved about 60 or 70,000 worth of bonds that

17   were taken from the safe in John's office.

18        And, again, this appeared to have been an inside job.

19   And then, again, when the O'Hairs were out of town and left

20   Mr. Waters in charge -- and I think you're going to hear

21   evidence that not only did he have the keys to their office,

22   but he was also entrusted with the keys to their home and the

23   alarm code to their home.

24        And, apparently, during this time, while the O'Hairs

25   were out of town, Mr. Waters helped himself to some of the

1   funds at the Atheist Organization to the tune of $54,000 and

2   change, and, of course, his employment was thereafter

3   terminated.

4        And Ms. O'Hair particularly was very upset about this,

5   so upset, indeed, that she requested the local officials seek

6   prosecution of Mr. Waters for this theft.  And she also wrote

7   a very blistering report in her newsletter, which came out

8   every month from the Atheist Organization to all of their

9   members, about what a bad guy David Waters was and how he had

10  ripped them off, and so forth and so on, and how they were

11  fearful of him.

12       And so it was in this period of time, then, just a few

13  months after that, that following Mr. Waters' being finally

14  prosecuted for that alleged theft, that the O'Hairs sort of

15  started making plans to say, maybe we need to get out of town,

16  you know, we're not getting any help here out of the local

17  officials and people are turning their backs on us.

18       And as far back as '93, when the Truth Seekers lawsuit

19  was going on, I think you're going to hear evidence that they

20  did inquire at least into the possibility of moving their

21  organization to New Zealand, because New Zealand is a very

22  secular country, and atheists apparently felt safe in New

23  Zealand.

24       And I believe you'll hear evidence that Jon Murray

25  O'Hair, actually himself, made one or more trips to New

1    Zealand and looked into establishing residence over there, and

2    put these funds on deposit in this bank.  And there was some

3    discussion about moving to New Zealand.  And I think you're

4    going to hear evidence that this was one of the things Mr.

5    Waters found out about, and he was employed as their office

6    manager.

7         Not only did he know where their assets were, but he

8    knew of their discussions and plans to leave the country and

9    move to New Zealand if they lost that case, or if the Internal

10   Revenue Service came down too hard on them and they needed to

11   get out of the country.

12        And so armed with that information, we believe the

13   evidence is going to show that Mr. Waters concocted a scheme

14   to deprive the O'Hairs of their money and to make it appear to

15   their friends, associates and to government authorities that

16   they had fled the country in order to avoid the IRS, and we

17   think that this plan was executed and carried out by Mr.

18   Waters and others.

19        Now, we're not trying Mr. Waters in this case, and I

20   anticipate Judge Sparks will instruct you at the end of the

21   trial that we're only trying Mr. Karr, but we do have in the

22   indictment that was read to you this morning the phrase "other

23   persons."

24        And in law, that's what we call unindicted or unnamed

25   coconspirators.  And even though we're to consider -- or you

1    are to consider the guilt or innocence of Mr. Karr, I

2    anticipate Judge Sparks would also instruct you that you may

3    consider the acts, words and deeds of any alleged

4    coconspirators if you believe that Mr. Karr knowingly and

5    intentionally became a part of the conspiracy, that is, with

6    Mr. Waters and others.

7         So you're going to hear a lot in this case about Mr.

8    Waters, even though he's not on trial today.  You're also

9    going to hear about a man by the name of Danny Fry.  Now,

10   Danny Fry was another former friend of Mr. Waters' as was Mr.

11   Karr.  Mr. Waters and Mr. Karr had met years before in

12   Illinois and apparently maintained a friendship and kept in

13   touch over the years, as had Mr. Waters and Mr. Fry met and

14   became acquainted or associates when Mr. Waters was living in

15   Florida.

16        And during the summer of 1995, Mr. Karr comes to visit

17   Mr. Waters in Austin, Texas.  And the first time he comes

18   here, he flies here out of Chicago.  And the second time, a

19   few months later, he comes in again, and he makes several

20   trips to Texas, both by air and by driving his own vehicle.

21   And along about this same time, in the summer of '95, you're

22   going to hear evidence that Danny Fry also comes from Florida

23   to Texas.

24        Now we have Mr. Fry, Mr. Waters, and Mr. Karr, all

25   residing together in Mr. Waters' apartment, which he shares

1   with his live-in girlfriend at that time, a lady by the name

2   of Patti Jo Steffens, who I anticipate you're going to hear

3   from during this trial.

4           And then, according to what Ms. Steffens will tell

5   you, at some point, these three men leave.  She doesn't see

6   them around.  They're gone for almost a month.  Oh, they come

7   and go and they may call.  And Mr. Waters gives her money in

8   cash.  Now, he was unemployed at the time before he left.  And

9   on one occasion, he gave her $5,000 in cash.  On another

10  occasion, he gave her $10,000 in cash -- I'm sorry, 11,000 for

11  a total of 16,000.

12          She used some of the funds to go buy a pickup truck to

13  get around in because Mr. Waters had taken his car when he

14  left.  And she really didn't know what Mr. Waters and the

15  others were up to during that month that they were gone.  She

16  just knows she didn't see him, that they were gone more than

17  they were home.

18          And when they did come in, they looked very tired,

19  like they had been working at something very hard.  And so

20  even though she suspected something might have been going on,

21  she had no direct or personal knowledge of any wrongdoing by

22  anybody.

23          And so things rocked along there until one day, toward

24  the end of September of 1995, Mr. Karr and Mr. Fry and Mr.

25  Waters all returned to Mr. Waters' apartment in Austin that he

1    was sharing with Patti Jo Steffens, and they seemed pretty

2    tired.  And Mr. Karr and Mr. Waters seemed to be getting

3    along, but Mr. Fry did not seem to be part of the group

4    anymore.  He looked kind of depressed.

5        And Mr. Fry had a reputation as a fella, kind of like

6    to have a drink every now and then and, and he was just kind

7    of out of it.  He was looking tired.  And I think you're going

8    to hear testimony that he had conversations back and forth

9    with his family in Florida, and he was looking forward to

10   getting out of here and going back to Florida.

11       Patti Jo Steffens agreed to help pack up his

12   belongings and see him on his way.  And she left to run an

13   errand and she came back, and the three men were gone again

14   and they were gone overnight.  And when she came back -- or

15   when they came back, Mr. Karr and Mr. Waters came back alone

16   and she said, "Where Mr. Fry?"  And they said, "Oh, he took

17   off with some guy."

18       But she noticed that some of his belongings were still

19   inside the apartment and she thought this rather strange.  And

20   that same weekend, she also happened to observe in a shopping

21   bag in her apartment -- I believe in the kitchen -- three

22   pairs of bloody tennis shoes.  Three pairs of tennis shoes

23   that had what appeared to be blood stains on the soles and on

24   the top.  And when she started to ask about this, Mr. Waters

25   advised her to forget it and not look in the bag.

1     And after that, she never saw the tennis shoes again.

2   They were gone.  And so now, we're down to two, Mr. Karr, and

3   Mr. Waters.  And all of a sudden, they have a lot of money in

4   their possession.  During the month of September, while they

5   were gone most of the time, Mr. Waters, the evidence will

6   show, purchased a Cadillac Eldorado, in San Antonio, for

7   $13,000 cash.

8     On one occasion, he brought it back to Austin.  It was

9   during the Pecan Street Festival of that year.  And those of

10  you who know, we have the Pecan Street Festival in the fall

11  and in the spring.  This was about the last week in September.

12  And Patti Jo Steffens had occasion to use that Cadillac and to

13  put something in the trunk.

14     And when she opened the trunk, she saw what appeared

15  to be a new orange-handled bow saw along with an old, beat-up

16  shovel, longhandle shovel.  And she thought this rather

17  strange because he had just purchased this car, Mr. Waters in

18  San Antonio over the week or so before.  And all of a sudden,

19  he's got a bow saw, and they don't have a garden in this

20  apartment where they live, and she thought that was rather

21  strange.

22     And she kept seeing these things happen, but she

23  didn't really put two and two together until sometime later,

24  as she will tell you.  Well, the next thing that happened is

25  Mr. Karr makes arrangements for his ex-wife to fly in here, to

1    Austin, and he and Charlene Karr, his ex-wife, and David

2    Waters and Patti Jo Steffens go check into the Four Seasons

3    Hotel, down here in South Austin, and they have a real good

4    time.

5            And during that same time or prior to that, Ms.

6    Steffens had been asked by Mr. Waters to rent a storage unit

7    out on Burnet Road, near the Poodle Dog Lounge, where she had

8    worked her way as a bartender, worked her way through the

9    University of Texas, while she was living with Mr. Waters.

10           And she had rented this storage unit and given the

11   keys to Mr. Waters.  And he said, "I'm going to put some gold

12   in that storage unit.  I'm going to put some gold coins."  And

13   later on, he had given Ms. Patti Jo Steffens one of the gold

14   coins, which she later pawned at a local pawn shop here in

15   Austin, and you'll hear evidence to that effect.

16           Anyway, this day that they go to check in to the Four

17   Seasons Hotel -- and we've determined that to be October the

18   3rd, 1995 -- based on the hotel records, Ms. Steffens receives

19   a very frantic call from Mr. Waters and said, "Go to the

20   storage unit and the gold or the bag is gone."  And sure

21   enough, she goes out there and there's nothing in there; it

22   was empty.

23           And I think she believed that she was going to get

24   blamed by Mr. Waters for having taken the gold.  And she was

25   wanting to assure him that that had not been the case.  And so

1   then, they go to the Four Seasons the next morning.  Mr. Karr

2   and his ex-wife leave in a car to drive back to Florida.

3        And before he leaves, Mr. Waters gives him three Rolex

4   watches:  One men's, like, Presidential, blue face Rolex

5   watch, and two ladies' silver and gold Rolex watches, and

6   says, "Here, take these and get rid of them.  The O'Hairs

7   don't want them anymore."

8        And so, Mr. Karr dutifully takes these watches back to

9   Florida and disposes of them, sells them, and gives or sells

10  one to his sister, Sidney Karr, in the Chicago area.  And

11  you'll hear evidence about a search warrant that was executed

12  at Sidney Karr's residence.  And although she claims to have

13  lost the watch, there was other evidence found that indicates

14  the watch was in her possession including a copy of her will,

15  where she had willed it to her daughter, a photograph of her

16  wearing what appears to be a Rolex watch, and a jewelry

17  receipt where she had had it repaired and had an estimate or

18  had it appraised.

19       And I think you're going to hear evidence that one of

20  those watches went to Sidney Karr.  And you're going to hear

21  evidence from a local jeweller, here in Austin, who was quite

22  familiar with the Rolex watches that the O'Hairs owned because

23  they had had them repaired and cleaned and worked on.

24       And she's going to tell you that the value of those

25  three watches was in excess of $5,000, which is a jurisdiction

1  element that the defense -- or, excuse me, that the government

2  must meet in establishing the offense of interstate

3  transportation of stolen property.

4          And the investigation of this matter rocked along for

5  quite a while.  And what -- about a year after they

6  disappeared, Ms. Murray's surviving son, William J. Murray,

7  the evangelist, filed a missing person's report with the

8  Austin Police Department, and apparently went into the local

9  probate court and attempted to get a guardianship or

10  receivership appointed to take over the estate or the property

11  of his missing family members.

12          And the probate court apparently appointed some local

13  attorneys to handle that, and you'll either hear from them or

14  see some of the records, certified documents, that they did

15  because their job was to collect the assets, you know, and try

16  to pay the bills and do whatever receivers and guardians do,

17  administering an estate.

18          And so you're also going to hear evidence from the tax

19  attorney for the O'Hairs, who was attempting to negotiate a

20  settlement with the IRS in advance of their lien.  And you're

21  going to be hearing a lot of records in this case, and we hope

22  that -- it's going to be long, but if you'll bear it out, I

23  think you'll find it to be a very interesting puzzle that you

24  could hopefully get the pieces put together for us.

25          But what changed the complexity of this case from just

1   some atheists that disappeared and money laundering of

2   $600,000 was that in late or early last year, 1999, the

3   results of DNA analysis were conducted on a body, which had

4   been laying in the morgue in Dallas County, unidentified for

5   over three years, because its head and hands were missing.

6          And this body had been found in the afternoon of

7   October the 2nd, 1995, on the banks of the Trinity River in

8   eastern Dallas County, near the town of Seagoville.

9          And through DNA analysis conducted several years after

10  the fact, it turned out that this gentleman whose remains were

11  found up there in this mutilated condition was the same Danny

12  Fry from Florida who had been here with Mr. Karr and Mr.

13  Waters during the summer of 1995 and who turned up missing

14  just a day or two after the O'Hairs were last heard from.

15         And so, at that point, the focus of the investigation

16  shifted, and it was determined that Mr. Karr had, in fact,

17  been here in Texas that time.  That he had rented three vans

18  from Capps Van Rental here in Austin.  That the rental of

19  these vans coincided with what appeared to be movement of the

20  O'Hairs from Austin to San Antonio in the first case and,

21  later, from San Antonio back to Austin, where a second storage

22  unit was rented at the behest of Mr. Waters by another

23  unindicted coconspirator that you'll hear about named Gerald

24  -- known as Chico Osborne.

25         Now, at the time this was all going on, Mr. Osborne

1   lived up near Lake Tawakoni, just east of Dallas, a few miles

2   from where the mutilated body of Danny Fry was discovered on

3   October 2nd, 1995.  And the evidence will show that Mr.

4   Osborne came to Austin and rented a storage unit for David

5   Waters.

6       And you're going to hear evidence that at some point

7   in time, the manager of that storage unit observed about three

8   middle-aged men, a couple of trucks and some barrels, and he's

9   going to tell you that he was concerned about these barrels

10  because people might store hazardous waste in a storage

11  locker, and he could get in trouble with the city or the state

12  or the federal government.

13      So he was very concerned about what might be in those

14  blue barrels that he described, but he never saw them again.

15  And then, when the news of Mr. Fry's body being identified

16  shortly after that, Ms. Patti Jo Steffens, the young lady who

17  had lived with Mr. Waters, came forward and called the FBI and

18  wanted to report her knowledge of what she had learned during

19  the years she had been with Mr. Waters and had been associated

20  with Mr. Fry and Mr. Karr.

21      Because when Mr. -- she learned that Mr. Fry was dead,

22  she began to put two and two together and think that maybe she

23  had some information that the police might use or perhaps she,

24  herself, could be charged for what's called misprision of a

25  felony, and that is knowing about a crime and covering it up

1  or not reporting it, or maybe an accessory after the fact.

2       So she contacted an attorney who contacted our office,

3  and we offered her what's known in law as use immunity, which

4  means that as long as she was truthful and told what she knew,

5  that the evidence could not be used against her.  Not to say

6  she couldn't be prosecuted indifferently on evidence already

7  known to the government or to the state, but that anything she

8  told investigators would not be used against her.

9       And so with that agreement in hand, Ms. Patti Jo

10  Steffens, who at that time was Steffens-Chavez, because she

11  had married, she began to relay a very strange tale of the

12  coming and going of Mr. Waters, Mr. Fry, and Mr. Karr during

13  the summer of 1995.  And I think you're going to find her to

14  be a very interesting witness.

15       And the investigators also determined that when this

16  room was rented for 30 days in San Antonio at a place called

17  the Warren Inn Village, which, incidentally, Mr. Waters and

18  Ms. Steffens had lived there a short time before they moved to

19  Austin in the early '90s.

20       And when that room was rented, it was represented by

21  Mr. Karr, the defendant in this case, and Mr. Waters, because

22  they had to show a copy of their driver's licenses, which the

23  clerk made a photocopy of.  So we could pretty much trace

24  their movements through the van rental records, the hotel

25  rental records, the credit card records and the phone tolls

1    during that period of time.

2          Now, in addition, you're also going to hear evidence

3    that the Mercedes Benz that Jon Murray drove was sold by

4    someone posing to be Jon Murray, right here at the Warren Inn

5    in San Antonio, during that September of 1995 for $15,000,

6    which was about $5,000 below book value.  I think you're also

7    going to hear evidence that in addition to those vehicles,

8    we've already said that the Porsche was left at the airport,

9    and it was discovered out there by the airport police where it

10   had been left in a parking lot and was later impounded.

11         And so, there was that vehicle, and then, there was

12   the Cadillac that David Waters had purchased for $13,000 cash.

13   You're also going to hear evidence that during this same time

14   period, the month they were in San Antonio, that Jon Murray

15   went to a diamond dealer in San Antonio and purchased an

16   almost flawless solitaire diamond for $6,600 and change.

17         And you're going to hear evidence that sometime

18   subsequent to these events occurring, Mr. Karr had that

19   diamond.  That Mr. Waters sent it to him and asked him to sell

20   it, and, in fact, he did sell it for $3500.  And after holding

21   out a little for himself, he sent the money back to Mr.

22   Waters.  And we have that diamond, and the jeweller who sold

23   it to Jon Murray back in 1995 is going to come in here and

24   testify that that appears to be the same stone because it was

25   such a flawless solitaire.

1       So we have the watches, we have the diamond, and in
2  addition, we can account for about $95,000 of funds that were
3  raised from various accounts that Jon Murray had, various
4  credit cards, various bank accounts.  And in addition to the
5  half million dollars in gold, we can show that there was about
6  $90,000 in funds that were raised during that month that the
7  O'Hairs were believed to be in San Antonio.

8       And so, I think that's significant because if you
9  follow the money, you can pretty much figure out what happened
10 in this case.  Now, just a little bit about the gold.  The
11 gold coins were stolen from the storage unit on Burnet Road on
12 or about October the 3rd, 1995, the same day that O.J. Simpson
13 was found not guilty in California.

14      And there were three burglars from San Antonio who had
15 a master key to a Master padlock, and it would fit most kinds
16 of Master padlocks.  And they had used this successfully in
17 San Antonio in going around to bus stations and other places
18 where there were public lockers, and they apparently decided
19 to branch out and come to Austin.

20      And they went to this storage facility, and it
21 pretends to be quite fortuitously -- they happened to get in
22 the storage unit and found this bag, which they didn't know
23 what it contained, but the bag in the storage unit that was
24 very heavy, and they took this thing out and put it in the
25 trunk of the car without ever really knowing what it was.

1        And they drove around and opened the trunk and saw

2   what they had, and they went to a book store and got a book on

3   coins and found out that each of these gold coins they had --

4   they weighed about between 75 and 100 pounds, but each one of

5   these was valued at about 350 to $400.

6        And you're going to hear evidence that these three

7   young men gave these coins to their -- various of their

8   friends in San Antonio and asked them to sell them, take them

9   in to a dealer because you can't trace them.  They don't have

10  serial numbers on them, like money, paper money.  And if

11  anybody said anything, to just say that this was inheritance

12  from my grandfather.

13       And it took those boys almost 18 months to spend that

14  money.  They went to Las Vegas, they bought cars, they bought

15  guns, they bought jewelry, they treated everybody.  And one of

16  these gave his girlfriend a little pendant that we have, just

17  only one of the gold coins that had been recovered.  And

18  you'll see that in evidence before the trial is over because

19  she saved that pendant.

20       And I think you're also going to hear evidence that as

21  a result of information provided by Patti Jo Steffens, if

22  investigators were able to establish what we call probable

23  cause or reasonable grounds to believe that a crime had been

24  committed, and that evidence of that crime may be found if

25  they could obtain a search warrant for Mr. Waters' apartment

1  here in Austin, Texas.

2  And they executed that search warrant on March -- back

3  in March of '95 -- excuse me, March of '99, last year.  I

4  believe it was the 23rd -- 24th, excuse me.  I think it was

5  David Waters' birthday, if I'm not mistaken, and they found a

6  lot of incriminating evidence.  They found that orange handle

7  bow saw.  They found a lot of stuff you're going to hear

8  about.  And they also located, in Peoria, Illinois, Mr.

9  Waters' brother.  And they found a couple of sets of

10 handcuffs, some switch blade knives, and a couple of guns, and

11 some ammunition that all tied back to that apartment.

12 In fact, you're going to hear evidence from Ms.

13 Steffens that she was with David Waters on one occasion when

14 he bought a pair of these handcuffs at McBride's on Lamar.

15 She described them very succinctly, one linked and one hinged.

16 She said Mr. Waters usually kept these handcuffs in the sock

17 drawer in their apartment.  And during the month of September,

18 when they were all gone, she noticed that the handcuffs were

19 also gone.

20 And she also said that Mr. David Waters had a Nine

21 Millimeter Browning automatic pistol, which he used to like to

22 take out to a local gun range.  And you'll see photographs in

23 the family photo album of Mr. Waters shooting that very

24 pistol.

25 And so, it all begin to fit together.  And it weaved a

1    chain of circumstantial evidence that pointed to the

2    involvement and the guilt of these three men in the abduction

3    of the O'Hairs for financial gain in the disposing of their

4    remains.

5         And when Mr. Karr was visited by investigators, he was

6    residing at that time up in Michigan, and Mr. Karr was very

7    cooperative with the investigators.  He provided them a

8    written statement, and he admitted that he knew Mr. Waters.

9    And he stated that he had been hired by Mr. Waters as a

10   bodyguard to help the O'Hairs flee the country to avoid the

11   IRS.

12        And that he took orders from Mr. Waters, and Mr.

13   Waters rewarded him financially.  And he also admitted renting

14   the three vans, but he did it at the behest of David Waters.

15   And he gave Mr. Waters the key, and he was not about to

16   involve himself in any criminal activity.  He was just there

17   to serve as a bodyguard and try to make a little money.

18        And he also admitted that at some point in time, he

19   learned -- he believed, or Mr. Waters insinuated or told him

20   that he had killed the O'Hairs.  And again, Mr. Karr was very

21   cooperative and provided a map, a hand-drawn map to the

22   investigators that led the investigators to a ranch located in

23   southern Real County, out near Camp Wood, where about 30

24   federal and state investigators spent a three-day Easter

25   weekend last year searching for the remains of the O'Hairs,

1    which is where Mr. Karr said he thought they were buried or
2    where David Waters had buried them.
3           Because he, Mr. Karr, said that after he returned home
4    to Florida, that Mr. Waters had called and told him he needed
5    to come back to Texas.  He was concerned because of heavy
6    rains in the area that the barrels or the bodies might have
7    been floating or resurfacing, and they wanted to make sure
8    they were securely tucked away.
9           And that he was afraid of Mr. Waters and afraid not to
10   do what Mr. Waters said or Mr. Waters could harm him the way
11   that he had done the O'Hairs.  And so I think you're going to
12   see, ladies and gentlemen, that this is a tale that involves
13   not only financial greed on the part of the participants, but,
14   also, revenge particularly on the part of Mr. Waters of who
15   after the O'Hairs got him prosecuted and wrote that very
16   bitter article about him in the newsletter that he became
17   obsessed with separating them from their money and doing them
18   harm.
19          And based upon that testimony and that evidence that
20   you're going to hear from that witness stand in the next few
21   weeks, the government is going to ask you, at the conclusion
22   of this trial, to return a verdict of guilty as to Mr. Karr on
23   all counts of the indictment.  And I thank you for your time
24   and attention.
25          THE COURT:  Mr. Mills.

1  DEFENDANT'S OPENING STATEMENTS

2        MR. T. MILLS:  May it please the Court.  Mr. Carruth,

3  Mr. Mills, and members of the prosecution team.

4        Thank you for taking this duty on as the Judge

5  discussed with you.  We know that you didn't have a choice

6  when you got the postcard or the communication in the mail,

7  but we do appreciate it, and we will do our best to keep the

8  evidence moving and to keep it from being bogged down.

9        The defense, which consists of myself, Tom Mills, and

10 my law partner, Christie Williams -- and we're aided by a law

11 student, Allison Holland -- are working for Mr. Gary Paul Karr

12 in this case, and because of the way that the procedure works,

13 we won't really get to put on evidence for a couple of weeks.

14 We get to cross-examine as his Honor mentioned.  And if we can

15 elicit testimony through cross-examination, that's beneficial

16 to Mr. Karr, then, of course, we will try to do so.

17       There is a professor of evidence who has described

18 cross-examination, at least if it's done well, as being the

19 greatest engine for the search for truth in Western

20 civilization has produced.  And we'll try to be effective in

21 our use, as I know all the attorneys will.

22       The evidence is going to show that Mr. Karr has been

23 to prison.  And if that caused each of you individually to

24 vote him guilty of any crime, we could shortcut the trial by

25 about three or four weeks.  Now, of course, we all know that

1    there are millions, if not tens of millions of people who have

2    been to prison before, and it is, of course, not logical to

3    blame any one person for any crime that may have been

4    committed because of that fact.

5        I want to discuss with you some of the evidence that

6    the prosecution is going to bring to you and, hopefully, some

7    of the evidence that we're going to bring to you through

8    cross-examination and through calling witnesses.  We do have

9    subpoena power.  We, of course, have to find people to

10   subpoena them, but we have time to do that.

11       There are three potential pieces of evidence or items

12   of evidence that Mr. Carruth did not mention to you as

13   bringing to you, and that would be the dead bodies of Madalyn

14   O'Hair, or Jon, or Robin, and that is going to be something

15   that y'all will have to decide on in terms of importance.

16       Mr. Karr is indicted in several counts for conspiring

17   with other people to kidnap these three people, to extort

18   money from them, to use interstate commerce to defraud them of

19   money, and it's called money laundering, to cause their death

20   through his actions.  And various witnesses will be offering

21   testimony about, maybe, all of these counts or one specific

22   count as the case proceeds.

23       There is nothing that his Honor will instruct you on,

24   I anticipate, that says that you are not to use common sense.

25   There are many, many pieces of evidence in this case.  I don't

1    know that I have counted them.  In fact, I know that I have

2    not.  But I know that there are many, many pieces -- items of

3    evidence.

4            Even though I have more gray hair than I would prefer,

5    I have the blessing of having a young daughter, and I was

6    talking with her a week or two ago about one of these

7    connect-the-dots books.  I'm sure you've seen them before.

8    Children, grandchildren, they've been around forever.

9            And the general theory is that you connect one to two

10   to three, and after you do that, there's a completed picture.

11   And the problem in this case is that the evidence does not

12   always go from one to two to three.  We might have item of

13   evidence No. 1, and we might next have item of evidence No. 5,

14   and then, No. 11 instead of 6.

15           And so the problem in terms of coming to a conclusion

16   of what happened in this case beyond a reasonable doubt is

17   that the lawyers who are naturally -- and this is the way it's

18   supposed to be -- advocates for their side of the case

19   describe what they believe is a reasonable deduction from the

20   evidence.

21           And I might take the dots, and I might connect them in

22   such a way to where I end up with a kind of a

23   primitive-looking canvas with a flower on it, and I may say

24   this evidence concludes that what we are talking about here is

25   a certain conclusion.

1        Now, in discussing the case that Mr. Carruth has

2   outlined for you, the prosecution has a very different theory

3   of the conclusion using the same items, the same numbers than

4   the defense does, and it's going to be up to you to decide

5   whether or not by connecting between the numbers we end up

6   with a lizard.  Down here are the lizard's foot.  But you see,

7   all of this is drawn without being connected to an item of

8   evidence.  This is what we believe the evidence must be or

9   what the prosecution believes the evidence must be.

10        Sometimes in your experience, you may have heard this

11   or you may have thought it.  It's actually a scientific rule,

12   but it is very tight-fitting with common sense, and that is

13   the simplest of competing theories is preferred to the more

14   complex explanation.

15        In other words, let me refer to some of the evidence

16   that Mr. Carruth has discussed with you just in the last few

17   minutes.  He mentioned a gun, he mentioned a shovel, and he

18   mentioned a saw.  Well, of course, I don't know if we had a

19   show of hands here how many people would have a shovel, but I

20   would guess that a lot of people would have.

21        I don't know how many of us would have a saw, but I

22   could guess that a number of people might.  Now, in addition,

23   there may be no evidence in this case that a gun was used.  In

24   other words, we don't have any bodies.  And poor Mr. Fry, I

25   don't know if he got shot in the head or not, but we don't

1    have a head.

2          So I don't know of any evidence in this case that a

3    gun was used.  I don't know of any evidence that a saw was

4    used.  I don't know of any evidence that a shovel was used.

5    In the period of time 1994 and 1995, there came into a

6    collision two very, very strong-willed, strange people, and

7    those two people were Madalyn Murray O'Hair and David Waters.

8          We know a lot about Ms. O'Hair not only from just the

9    investigation of this case but, also, from her son, William,

10   who has written extensively about their family growing up.

11   And we know that Ms. O'Hair was extremely smart, extremely

12   clever.  She manipulated and motivated people by lying as she

13   wanted to.

14         She responded to problems in her life by leaving the

15   country frequently, by traveling with false identification,

16   including passports and drive's licenses, by having other

17   members of her family do the same.  And for years, while she

18   was the grand matriarch of the atheist community of the world,

19   and especially the United States, she controlled her mail.

20   And by controlling her mail, she controlled who knew what

21   assets the atheist community, located here in Austin, was

22   getting.

23         People donated land to the atheist community.  They

24   sent stocks and bonds and money, which is their right, but

25   there were not independent audits done.  She talked for years

1   openly to people in the atheist community and outside of the

2   atheist community about wanting to leave the United States

3   with money that she had sent offshore.

4        The defense contends that there is no evidence of

5   where all the money went.  She was in constant disputes, she

6   and her son, Jon, and her daughter, Robin, with the Internal

7   Revenue Service about whether or not they personally or the

8   organizations owed money, significant money.

9        Now, it may be that the simplest explanation of what

10  happened to Madalyn, Jon and Robin is that she did with them

11  exactly what she said she was going to do for years, that she

12  left to flee the Internal Revenue Service.  That she had money

13  in Europe, or in Australia, or New Zealand.  We know what the

14  evidence will show of hundreds of thousands of dollars

15  transferred from New Zealand.

16       But the evidence will not show a full accounting of

17  all of the other assets.  In July of 1995, Ms. O'Hair caused

18  to be published in an atheist newspaper, an article being very

19  critical of David Waters, and talking about the fact that he

20  had a criminal record, and it would be a logical deduction

21  that Mr. Waters was angry about it.

22       I believe that Ms. Steffens will testify that she --

23  that he was angry about it.  But it's also a logical deduction

24  that it is as consistent with the evidence as anything else in

25  this case that he went to Ms. O'Hair and said, "I know about

1    you, lady, I know about your money laundering techniques."

2         "And the timing is right for your family to do exactly

3    what you've said that you wanted to do for years.  You've got

4    the money stashed away.  Some of the money can be wired back

5    here.  Purchase gold coins with them.  I'll take some.  I'm

6    going to have my friends, including Gary Karr, help get your

7    things liquidated, have your dogs that you love so much taken

8    to the veterinarian, because you can't take dogs like that

9    through customs, have to leave your poor Porsche behind,

10   Robin, but after that, you're fleeing the United States if you

11   -- as you have said you would do for years."

12        "You're fleeing a very -- an organization that has

13   caused others to be fearful, the Internal Revenue Service,

14   because they could not only try to put you in jail for tax

15   evasion, but they can seize your assets and everything else

16   you've got."

17        She was experienced in trying to hide assets during

18   the civil suit with an organization called the Truth Seekers.

19   She had shipped away her valuable library to Kansas City just

20   to hide assets.  Well, that's a fraudulent transfer of assets,

21   but she's not above that because that was how she lived.

22        During September 1995, Mr. Karr was in Dallas

23   periodically.  Periodically, he was in Florida, where he

24   worked, where his ex-wife lived, and sometimes he did things

25   that would aid Mr. Waters in accomplishing his job with the

1   O'Hair Murrays, that is, helping them liquidate their assets

2   and leave town.

3       Now, is an action that Gary Karr took one of

4   innocence?  He arrived and he was the only one with a credit

5   card.  Ah-ha, we have evidence to show that the prosecution

6   shows that he rented a room.  Well, is that incriminating or

7   because of the fact that he was the only one with a credit

8   card, is that just a lizard's foot that sounds incriminating

9   but not when you really pare away the fluff from the hard

10  fact?

11      Ah-ha, he rented a van.  If you rent a van, that must

12  mean you know that a dead body's going to be put in it.

13  Really?  How about that you're going to move belongings?  How

14  about, you know, what they wanted to rent it for, but Mr.

15  Waters asked him to rent a van.  Mr. Waters motivated Patti Jo

16  Steffens sometimes, his girlfriend during part of these events

17  through fear, it is said, through lying to her about what his

18  activities were.

19      And the prosecution wants you to accept that.  It may

20  be true.  The defense says that the evidence is just as

21  compelling that Mr. Waters motivated Mr. Karr through lying to

22  him about what might have been going on and through fear.  For

23  example, part of the evidence in this case, the defense

24  contends from the prosecution, is internally inconsistent, and

25  let me tell you what I mean.

1          The prosecution, apparently, is going to be presenting

2     evidence that there were some blue barrels near a storage

3     space, and that back in '95, a man was interviewed in 1999,

4     and he said, you know, Mr. IRS Agent, or Ms. FBI Agent, I

5     remember that four years ago, I saw a couple of pickup trucks

6     and some blue barrels, and here's the description of the men:

7     They were white men, brown hair and about five-nine or ten.

8          Well, that must be Gary Karr.  And not only that, if

9     there were blue barrels involved, that must mean by definition

10    that these three missing people must have been put in the

11    barrels and sealed up and buried.  But wait, that's not the

12    case because their next bit of evidence is that Mr. Waters

13    told Mr. Karr, which he did, don't know if it's the truth --

14    that there might be hands or feet sticking out of the ground

15    somewhere in the Hill Country.  Better cover it up with dirt.

16         Well, that is factually inconsistent if they're in

17    sealed barrels, if they are, then -- and buried, which nobody

18    knows, then they wouldn't be sticking out of the ground.

19    They're riding several horses at the same time.  They are

20    going to be presenting evidence.  And, in fact, Mr. Karr is

21    formally indicted for kidnapping over 30 days.  What did he do

22    to kidnap this family?

23         Well, he got in the taxi cab with Jon, who was about

24    six inches taller than him and about 122 pounds heavier than

25    him, and flew to New Jersey.  Jon had opportunities at every

1    place along the way to talk to the police, to call the FBI, to

2    call the United States Marshal, to call Mr. Carruth, to call

3    anybody in the entire world, but he didn't.

4           A week before that, Jon went to Frost Bank in San

5    Antonio, and because of the fact that he was picking up gold

6    coins, the coin dealer who was meeting him there had a private

7    police -- San Antonio policeman off-duty -- not private.

8    Off-duty policeman.  And they went into a conference room with

9    a camera, and the policeman had on his uniform and a radio on

10   his belt and a gun.

11          And Mr. Jon Murray sits down and the coin dealer says

12   that he acted calm as a cucumber.  He took the coins out and

13   fondled them and looked at them lovingly and wasn't nervous

14   and wasn't sweating.  Well, here's another interesting point

15   of the prosecution's case.  The indictment accuses Mr. Karr of

16   either kidnapping these three people by force, or not

17   kidnapping them by force but tricking them into not running

18   away.

19          Well, which is it?  You're going to have to decide the

20   evidence at the end of the case to see if we're looking at

21   something that's a hard-core fact that you know what it means

22   or a fantasy lizard's foot that's just drawn in by

23   speculation.

24          The prosecution has devoted, I'm sure, appropriately

25   so, a massive amount of resources and money on this case.  I

1  do not believe the evidence is going to indicate that their

2  forces were used to follow up on people who claim to have seen

3  alive, in specific cities in Europe, the O'Hairs, the O'Hair

4  Murrays.  Responsible people, not people out of a psychiatric

5  ward, not people on drugs from Amsterdam, but business people.

6      I don't know, yet, what these people's interviews will

7  be, but I believe the evidence is going to show that it has

8  not been followed up.  We do not know what books and records

9  Mr. Waters had access to in the home of Madalyn Murray O'Hair,

10  but we do know that he had access to their keys and to their

11  alarm code.

12      We will listen with interest to the attorneys who

13  testify, if they do, about the accounting of the money of the

14  estate of the individuals to find out if it is known by any

15  one person the -- all of the assets that were controlled by

16  Ms. O'Hair.  If you follow the money, you're told by Mr.

17  Carruth, fine lawyer, you can pretty much tell what happened

18  in this case.

19      I just want to end by reminding you of the burden of

20  proof and the standard of proof.  The government gets to start

21  and end.  It's their job to prove it.  And the standard is not

22  do you pretty much know; it's do you know beyond a reasonable

23  doubt.

24      And we will be presenting evidence as succinctly as we

25  can to help you solve the questions in this case and greatly

1    appreciate your attention.  Thank you.

2            THE COURT:  Ladies and gentlemen of the jury, you'll

3    never know exactly what is going to be happening in federal

4    court.  I thought I would be selecting a second jury today,

5    but fortunately, Judge Austin took that responsibility away

6    from me because of the way I feel.

7            I've told the lawyers they wanted to know how far

8    we're going to go, so I said we're going to go through opening

9    statement today.  So I will not impose upon them further work

10   today.  Now, Ms. Copeland, I like to start at 8:30, but if

11   that's a problem for you --

12           THE JUROR:  That's fine.  I think I'm staying here.

13           THE COURT:  All right.  I'd like for you to be here

14   about 8:25 or earlier.  Mr. Mace will be here if you'd like to

15   get up early and get here.  He'll have a little coffee and

16   everything ready for you, but I'd like to start promptly at

17   8:30 with the evidence in the case.

18           Please remember the instructions.  Don't talk to

19   anybody about the case.  Be in a position where you can

20   testify yourselves under oath that you have not talked to

21   anybody, let anybody talk to you, or know anything about the

22   case.  I promise you and I think you can see from the lawyers

23   statements we're going to have plenty of evidence to solve

24   this case.

25           Okay.  All rise for the jury.

1      (Jury not present.)

2           THE COURT:  Counsel, both of you have motions in

3  limine.  You have a motion in limine about criminal background

4  about your client and yet, on opening statement, Mr. Mills,

5  you said he'd been in the penitentiary.  I'm not making any

6  statement -- you don't have to stand.  I'm just saying that if

7  I make a ruling on one side on a motion in limine, I'm not

8  going to let that side use that ruling in the interest of not

9  being fair.

10           So just think about these things as you prepare your

11  cases today.  Now, anything further from the prosecution?

12           MR. CARRUTH:  No, your Honor.

13           THE COURT:  Mr. Mills, anything further?

14           MR. T. MILLS:  No, sir.

15           THE COURT:  All right.  You are to be here at 8:25 in

16  the morning for an 8:30 start.

17      (Proceedings adjourned.)

18

19

20

21

22

23

24

25