FILED

NOV 2 1 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
          DEPUTY CLERK

1

1      IN THE UNITED STATES DISTRICT COURT
2        FOR THE WESTERN DISTRICT OF TEXAS
                AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                       ) Austin, Texas
                             )
5   GARY PAUL KARR           ) May 16, 2000

6                   VOLUME 3 of 12
7                 TRIAL ON THE MERITS
           BEFORE THE HONORABLE SAM SPARKS

8   APPEARANCES:

9
    For the United States:      Mr. Gerald C. Carruth
10                              Mr. Daniel H. Mills
                                Assistant U.S. Attorneys
11                              816 Congress Avenue, Ste. 1000
                                Austin, Texas 78701
12

13

14
    For the Defendant:         Mr. Thomas W. Mills, Jr.
15                             Ms. Christi N. Williams
                               Mills & Presby
16                             5910 North Central Expressway,
                               Ste. 900
17                             Dallas, Texas 75206-5141

18

19
    Court Reporter:           Lily Iva Reznik, RPR, CRR
20                            United States Courthouse
                              200 West 8th Street
21                            Austin, Texas 78701
                              Ph: (512)916-5564
22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.



LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

ORIGINAL

97

| | I N D E X | | | |
|---|---|---|---|---|
| | Direct | Cross | Redirect | Recross |
| **Witnesses:** | | | | |
| Ellen Johnson | 8 | 71 | 99 | 104 |
| Craig Alan Etter | 105 | 131 | 147 | |
| Sonnie Barron Ayers | 149 | | | |
| Arnold L. Via | 155 | 162 | | |
| Conrad Goeringer | 166 | 184 | 198,204 | 203,205 |
| Henry Morgan | 206 | 209 | | |
| Denise Michelle Cushman | 210 | 227 | 238 | |
| Orrin Spike Tyson | 240 | | | |

| | Page |
|---|---|
| Proceedings Adjourned | 277 |

*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS  (AUSTIN)*

```
 1                        E X H I B I T S

 2                                    Offered        Admitted

 3  Government's

 4  #W1-A1 Sec. Of State Document        14             14

 5  #WA-1A Dpt. Of Treasury Document     70             70

 6  #W1B-1 to #1B-5 Passport Documents   40             41

 7  #W1C-1 Library Storage Invoice       68             68

 8  #W1C-2 Midtown Storage Records      173            173

 9  #W1 & #W2 Passports                  39             39

10  #W1-1 & #W1-2 Signature Cards        49             49

11  #W1-4 to #W1-8 USA, Inc. Records     53             53

12  #W1-9 to #W1-11 Wire Transfer        65             65

13  #W1-13 to #W1-20 Checks              52             52

14  #W1-21 to #W1-25 New Zealand Funds   55             55

15  #W1-27 New Zealand Account Balance   65             65

16  #W1-28 Nat West Printout             61             64

17  #W1-30 Check                         50             50

18  #W1-31 Bell Atlantic Records         58             58

19  #W1-33 Secretary's Report            10             10

20  #W1-34 to 37 Articles of Incorporation 10           10

21  #W1-40 1995 Letter                   69             70

22  #W1-44 Letter                       264            264

23  #W1-46 & #W1-47 MCI Records          58             58

24  #W1-55 Video Cassette Tape           16             18

25
```

| | | Offered | Admitted |
|---|---|---|---|
| | E X H I B I T S (Continued) | | |

Government's

| | Offered | Admitted |
|---|---|---|
| #W1-56A Madalyn DPS Photo | 71 | 71 |
| #W1-56B Robin DPS Photo | 71 | 71 |
| #W1-56C John Garth DPS Photo | 71 | 71 |
| #W1-57 IRS Form 990 | 56 | 56 |
| #W1-58 Bank One Statement | 61 | 64 |
| #W1-60 Bank One Statement | 61 | 64 |
| #W1-61 & #W1-62 Check | 42 | 42 |
| #W1-63 Bank One Statement | 60 | 63 |
| #W1-64 Check | 42 | 42 |
| #W1-65 Check | 44 | 44 |
| #W1-66 Check | 43 | 43 |
| #W1-67 to #W1-72 Checks | 45 | 45 |
| #W1-73 Check | 46 | 46 |
| #W1-74 Comerica Bank Statement | 61 | 64 |
| #W1-75 Check | 47 | 47 |
| #W1-76  Check | 45 | 45 |
| #W1-77 & #W1-78 Checks | 47 | 47 |
| #W1-79 to #W1-84 Bank Records | 61 | 64 |
| #W2-1 & #W2-2 Fed Ex Air Bills | 36 | 36 |
| #W3-1 & #W3-2 Travel Records | 151 | 151 |
| #W4-1 Postcard | 119 | 119 |

|  | | Offered | Admitted |
|---|---|---|---|
| | E X H I B I T S (Continued) | | |
| **Government's** | | | |
| #W4-2 to #W4-5 Firm Business Records | | 106 | 107 |
| #W4-7 to #W4-8 Firm Business Records | | 106 | 107 |
| #W4-10 Firm Business Record | | 106 | 107 |
| #W4-13 to #W4-16 Firm Business Records | | 106 | 107 |
| #W4-18 to #W4-20 Firm Business Records | | 106 | 107 |
| #W4-24 Firm Business Record | | 106 | 107 |
| #W4A-5 Firm Business Record | | 106 | 107 |
| #W4A-10 Firm Business Record | | 106 | 107 |
| #W5-12 Van Rental Receipt | | 261 | 261 |
| #W5-24 Check | | 262 | 262 |
| #W6-2 Letter | | 225 | 225 |
| #W8-1A & #W8-1B Photos | | 158 | 159 |
| #W8-2 & #W8-3 Letters | | 160 | 160 |
| #W9-1 Atheist Newsletter | | 208 | 208 |
| #W48-3 Wire Transfer | | 53 | 54 |
| | | | |
| **Defendant's** | | | |
| #EJ-1 9-7-95 Letter | | 88 | 88 |

1        THE COURT:  All right, counsel.  Anything before we
2   bring in the jury?
3        MR. CARRUTH:  Nothing from the government, your Honor.
4        MR. T. MILLS:  No, sir.
5        THE COURT:  All right.
6   (Jury present.)
7        THE COURT:  Good morning, members of the jury.  Since
8   we last met last afternoon, has anybody attempted to talk to
9   you about this case?
10       THE JURORS:  No.
11       THE COURT:  Have you talked to anybody about the case?
12       THE JURORS:  No.
13       THE COURT:  And have you learned anything at all about
14   the case outside the presence of one another and this
15   courtroom?
16       THE JURORS:  No.
17       THE COURT:  Show negative responses to all questions
18   by all jurors.
19       Members of the jury, I noticed yesterday, when you
20   were leaving, that there were a couple of camera people out
21   here.  And, of course, we live in a free society.  People can
22   go wherever they want, but nobody bothers jurors in my
23   jurisdiction.  I'm not suggesting anybody's going to bother
24   you, but if anybody, as you go to and from the courthouse or
25   go about your daily activities on the weekends, if anybody

1   stops and asks you about anything, newspaper, photographer or

2   anything, just try to remember what that person looks like if

3   he bothers you or interrupts you.  Describe him to Mr. Mace,

4   and I will take care of it.

5          After this trial is over, you can decide what you want

6   to do one way or the other about who you want to talk to, but

7   during the trial, you're going to have to do it kind of in

8   partnership with me.  And I don't want you out there being

9   questioned by anybody in the media.  They should know better,

10  but after yesterday, I can see that they don't, and I will

11  stop it in the tracks.

12         All right.  Mr. Carruth, you may call your first

13  witness.

14         MR. CARRUTH:  At this time, United States calls Ellen

15  Johnson.

16         THE COURT:  Come forward, please.  This is Mrs. Sims.

17  She's going to administer an oath to you.

18     (Witness was sworn.)

19         THE COURT:  You need to walk around this column,

20  please, ma'am, and have a seat right up here in this blue

21  chair.  Be kind enough to tell us your full name and spell

22  your last name.

23         THE WITNESS:  Sure.  My name is Ellen Johnson.  That's

24  J-O-H-N-S-O-N.

25         THE COURT:  You may proceed.

*Johnson - Direct*

1        MR. CARRUTH:  Thank you, your Honor.

2     ELLEN JOHNSON, called by the Government, duly sworn.

3                  DIRECT EXAMINATION

4  BY MR. CARRUTH:

5  Q.  Where do you currently reside, ma'am?

6  A.  I live in New Jersey in Rockaway Township.

7  Q.  And how long have you resided in the state of New Jersey?

8  A.  All my life.

9  Q.  What is your current business or occupation?

10  A.  I'm the president of American Atheists.

11  Q.  And does the American Atheists umbrella encompass several

12  other corporate entities?

13  A.  Yes, it does.

14  Q.  Could you please detail those for the members of the jury?

15  A.  Sure.  The Charles E. Stevens American Atheist Library and

16  Archives, Incorporated, Society of Separationists, or SOS,

17  Incorporated, United Secularists of America, Incorporated, or

18  U.S.A. American Atheists GHQ, or General Headquarters,

19  Incorporated.

20  Q.  And do you also do business as the American Atheist Press?

21  A.  Yes, it's a D/B/A of the library.

22  Q.  Okay.  And prior to you succeeding to the office of

23  president, which you now hold -- and by the way, when did you

24  become president of all these organizations?

25  A.  In December of 1995.

Johnson - Direct

1   Q.  Who preceded you immediately as president of these

2   organizations?

3   A.  Jon Garth Murray.

4   Q.  Who was the original founder or incorporator of these

5   corporations?

6   A.  One of them was Madalyn Murray O'Hair.

7   Q.  All right.  And did Robin Murray O'Hair hold any office on

8   the board, or otherwise, of these organizations during her

9   lifetime?

10  A.  Yes, I believe that she was on the board or an officer of

11  the corporations.  Which capacity, I don't recall.

12  Q.  Okay.

13  A.  And she was the editor of the American Atheist Press.

14  Q.  Okay.  In connection with this investigation, have you

15  supplied the investigators with copies of certain corporate

16  records from your files?

17  A.  Yes, I have.

18  Q.  May I approach the bench, your Honor?  I'm sorry, may I

19  approach the witness?

20       THE COURT:  This courtroom is yours, counsel.  You

21  don't need my permission to move around in it except if you

22  try to get in the jury box.

23       MR. CARRUTH:  Thank you.

24  Q.  (BY MR. CARRUTH) Ms. Johnson, I'm asking you to examine

25  what's been marked as Government's Exhibit W-133, W-134,

*Johnson - Direct*

1  W-135, W-136 and W-137.  Do you recognize those documents,

2  ma'am?

3  A.  Yes, I do, Mr. Carruth.

4  Q.  And are those documents or copies of documents that you,

5  yourself, provided in this case to the investigators when you

6  were questioned a couple of years ago?

7  A.  Yes, sir.

8  Q.  And do those purport to be records of incorporation of the

9  various organizations or some of the organizations you've

10  previously described showing the list of officers and

11  directors and incorporators?

12  A.  Yes, they do.

13  Q.  At this time, we would offer those for the record, your

14  Honor.

15        MR. T. MILLS:  No objection.

16        THE COURT:  W-133, 134, 135, 136, 137 are admitted.

17        MR. CARRUTH:  Request permission to display them to

18  the jury through the overhead projector.

19        THE COURT:  Go ahead.

20        MR. CARRUTH:  Thank you.

21  Q.  (BY MR. CARRUTH) Ms. Johnson, we're going to put these up

22  on the screen, one at a time, and ask you to describe what

23  they are, please, if we could get it to function.  We're going

24  to require some technical assistance, and we'll go on and try

25  to get that later.

*Johnson - Direct*

1          Ms. Johnson, when did you first meet Madalyn Murray
2   O'Hair?
3   A.   In 1979.
4   Q.   And can you describe briefly for the jury the
5   circumstances and location in which you met her?
6   A.   I believe it was at the -- I know it was at the convention
7   -- I think it was a Michigan Annual National Convention of
8   American Atheists.
9   Q.   And how many conventions does the Atheist Organization
10  have at this time?
11  A.   We just held our 26th Annual.
12  Q.   And are you also broken up into regional chapters or
13  otherwise?
14  A.   No, we don't have chapters, we have affiliates.  We used
15  to have chapters prior to the disappearance.
16  Q.   Okay.  So prior to '95, 1995, there were various chapters?
17  A.   Yes, there were.
18  Q.   And can you give the jury members and the Court an
19  approximation of what the membership of the American Atheist
20  Organization was prior to the disappearance of Madalyn Murray
21  O'Hair and her children?
22  A.   I don't recall.  I wasn't really -- we didn't see those
23  kinds of figures.  It was in the thousands.
24  Q.   Okay.  And was it in states other than Texas?
25  A.   Yes, all across the country.  We're a nationwide

1    organization.

2    Q.   Okay.   So you do business in other states?   How about in

3    foreign countries?

4    A.   Yes, actually, we do.

5    Q.   Okay.   And I think now we've got our audiovisual equipment

6    up and running, and we're displaying on the screen an exhibit

7    that's been introduced as Government Exhibit W1-33.   Can you

8    please describe what that purports to portray for the jury?

9    A.   It's the secretary's report for one of our board meetings.

10   Q.   Okay.

11   A.   I can't see the year.

12   Q.   Okay.

13   A.   1987?

14   Q.   Okay.   And does that document list the current officers of

15   the organization?

16   A.   No, it does not.

17   Q.   Well, now, I want you to look carefully.   It says, "To

18   whom it may concern:   On this date, the following officers

19   were elected."   Can you see that from that distance?

20   A.   It that current to date?

21   Q.   As of the date?

22   A.   As of that date.

23   Q.   Yes, who were the officers on that date?

24   A.   Jon Garth Murray.

25   Q.   What was his title?

1   A.   President.

2   Q.   Okay.  Go ahead.

3   A.   Vice-president was myself.

4   Q.   Okay.

5   A.   The secretary was Robin Murray O'Hair.  The treasurer was

6   Madalyn Murray O'Hair, and the chief financial officer was

7   Steven Thorn.

8   Q.   And who were the members of the board of directors?

9   A.   Jon Murray, Robin Murray O'Hair, Chris Tosontacus, Steven

10  Thorn, Madalyn O'Hair, and myself, Ellen Johnson.

11  Q.   All right.  Would you please put up W-134?  Do you

12  recognize that document, ma'am, as being a copy of Articles of

13  Incorporation of the Secretary of State of the State of Texas?

14  A.   Yes, I do.

15  Q.   What does that show, ma'am?

16  A.   That's a little fuzzy.  Those are something -- when it was

17  incorporated.

18  Q.   Okay.

19  A.   And where.

20  Q.   And can you --

21  A.   And who are the incorporators?

22  Q.   Okay.  Can you read the names of the incorporators?

23  A.   Yes, the president, Jon Murray, secretary, Robin Murray

24  O'Hair, director was Arnold Via, and the director was Henry

25  Schmuck, who is now Henry Morgan.

Johnson - Direct

1   Q.  Okay.  I want to show you what has been marked for

2   identification as Government's Exhibit W1-A1, and ask you if

3   you can examine that and tell us whether or not it's a

4   certified copy under seal of the Secretary of the State of

5   Texas.

6   A.  Yes, it is.

7   Q.  And that contains some of the same documents that we've

8   been displaying on the screen?

9   A.  Yes, it does.

10  Q.  And what corporate entity does that document relate to?

11  A.  It says American Atheists, Incorporated.

12  Q.  All right.  At this time, your Honor, we would offer

13  Government's Exhibit W1-A1.

14       MR. T. MILLS:   No objection.

15       THE COURT:  It is received.

16  Q.  (BY MR. CARRUTH) Now, in addition to being incorporated in

17  the State of Texas, was your organization also incorporated in

18  other states including the states of New Jersey and California

19  at that time?

20  A.  United Secularists of America?

21  Q.  Yes.

22  A.  Yes, sir.

23  Q.  Okay.  And you said a while ago that you did business in

24  numerous states and foreign countries.  What type of business

25  was the American Atheist Organization engaged in?

*Johnson - Direct*

1   A.   We were -- we sold books and products.  We distributed a

2   cable access television show.  We are a membership

3   organization.  We solicited donations and memberships.  We

4   sold a national newsletter, which people could subscribe to.

5   We had a -- at that time, well, a little bit before the

6   disappearance, a monthly magazine.  It's now a quarterly

7   magazine.  So we were quite active in all 50 states.

8   Q.   Did any of your funds come from wills and bequests by

9   members and supporters of the groups or the organizations?

10  A.   Yes, sir, that, too.

11  Q.   And who was responsible for soliciting those, if you will?

12  A.   The organization in general.  It was advertised.  It was

13  visited through our publications and the officers solicited.

14  Q.   Did the officers and directors of the organization

15  frequently travel in interstate commerce from one state to

16  another and move and distribute moneys, goods and commodities

17  in interstate and foreign commerce?

18  A.   Yes, sir.

19  Q.   And you've already told us about the annual convention?

20  A.   Yes, sir.

21  Q.   And did -- from time to time, did members of the

22  organization, particularly the O'Hairs, give lectures to

23  public groups, and so forth?

24  A.   Yes, frequently.

25  Q.   And that was in addition to the television programs that

Johnson - Direct

1   were produced on a regular basis, correct?

2   A.   That's correct.

3   Q.   And distributed throughout the United States?

4   A.   Yes.

5   Q.   Now, after the disappearance of the O'Hairs in 1995, did

6   the income or revenue of the organization significantly

7   decline?

8   A.   Yes, it did.

9   Q.   Could you please tell us in what respect?

10  A.   There was a -- everything ceased publication.  We couldn't

11  operate.  We did not know how to operate the business, the

12  organization.  People were -- did not know what -- our members

13  and supporters did not know what was going on, so they stopped

14  sending in donations.

15       Everything just kind of came to a halt.  It was very

16  difficult financially.

17  Q.   So would it be a fair statement, ma'am, that the

18  disappearance of the O'Hairs had an adverse impact on your

19  organization financially?

20  A.   Yes, it would.

21  Q.   Ms. Johnson, during the course of this investigation, did

22  you provide us with a videotape of one of the last known

23  public appearances of Madalyn Murray O'Hair, her son, Jon

24  Garth Murray, and her daughter, Robin Murray O'Hair?

25  A.   Yes, I did.

*Johnson - Direct*

1   Q.  I'm handing you what's been marked for identification as

2   Government's Exhibit W1-55.  Would you examine that, please,

3   and tell me if you've ever seen it before?

4   A.  Yes, I've seen it before.

5   Q.  What is that exhibit?

6   A.  It's an exhibit of a speech that Jon and Dr. O'Hair gave

7   together at the University of Texas.

8   Q.  And was that -- I believe it was at the University in

9   Houston, was it not?

10  A.  Was it?

11  Q.  South Texas?

12  A.  South Texas School of Law.

13  Q.  Yes, ma'am, I believe that's in Houston?

14  A.  Okay.

15  Q.  Someone in New Jersey may not be familiar, but it is in

16  Houston?

17  A.  And I believe it's indicated on the video.  South Texas --

18  I don't have my glasses on.  That's my problem.  College --

19  Q.  Okay.

20  A.  -- of Law, 1995.

21  Q.  And that was during the summer of 1995; is that correct?

22  A.  I think so.

23  Q.  We would offer that Exhibit, W1-55, your Honor.

24          MR. T. MILLS:  What year was it?

25          MR. CARRUTH:  1995.

*Johnson - Direct*

1      MR. T. MILLS:  No objection.

2      THE COURT:  Government W1-55 admitted.

3      MR. CARRUTH:  With the Court's permission, we'd like

4  to play about five minutes for the jury so they could see it.

5  It's about two hours in length.  And then, they could have it

6  for deliberations if they desire to view it further.

7      THE COURT:  You may.

8    (Videotape played.)

9      MS. O'HAIR:  "It is religious.  There isn't a liberal

10  in the United States who will say so.  Well, and finally,

11  accidently, I bumped into the issue" --

12     MR. CARRUTH:  Please play it there.

13   (Video played.)

14     MS. MURRAY-O'HAIR: "Under the First Amendment to the

15  Constitution, but because prayer is insane and children should

16  not be taught to pray.  It doesn't help them with anything.

17  However, I had no recourse, then, to go in under an

18  establishment clause suit and I didn't.  But had there been no

19  Constitution, I would have gone after the prayer anyway.

20     No one else wanted to be involved, and I don't think

21  anybody had either the brains, the guts, or the heart, so I

22  went after it.  And for the past 32 years, I have been

23  introducing atheism to America and America to atheism.  I'm 76

24  years old now, and I'm not about to stop.  I'm a little

25  unsteady on my feet, and the fact is, though, that I am no

*Johnson - Direct*

1    longer alone.

2           My son, Jon Garth Murray, is taking it over.  He is

3    the president of American Atheists.  And I am going to deliver

4    him -- you into his capable hands.  And after he's all done

5    with everything, I have a daughter, Robin Murray O'Hair, who

6    is ten years younger than Jon, who is going to be perfectly

7    willing to take on every one after him.

8           Thank you very much."

9           MR. MURRAY: "Well, I'm Jon Murray, as you've been

10   told, and I have been the acting president of American

11   Atheists, an organization founded by my mother, Madalyn

12   O'Hair, in 1963.  Since about April of 1986, I was reared as a

13   second-generation atheist, which makes me an anomaly even

14   among atheists, and there aren't very many of us.  I grew up

15   in a predominantly Roman Catholic Baltimore, Maryland, and

16   organizing atheism began for me back in about 1959, at age

17   five.  So I've been at it a long time.

18          When my older brother at the time, William, then age

19   14, decided that it was hypocritical for him as, also, a

20   person raised in an atheist home to be forced to participate

21   in mandatory bible reading and prayer recitation, that is, of

22   the lord's prayer, specifically, in the Baltimore public

23   schools.

24          My mother set out on a course of what -- she didn't

25   know it was called this at the time, I don't think, of

*Johnson - Direct*

1   exhausting administrative remedies, which meant running the

2   gauntlet of all of the school board.  Finally, that didn't

3   work and obtaining counsel, and rather poor counsel it was,

4   too, a suit was filed against the Baltimore School Board over

5   their mandatory requirement for saying of that prayer.

6        That cause wound its way through the court system, and

7   a decision was handed down by the Supreme Court of the United

8   States on June the 17th of 1963, when I was eight years old.

9   That decision and the four years of living hell -- and that's

10  the only way I could describe it -- that my family had been

11  subjected to by the kind of Christian and chiefly Catholic

12  population of Baltimore, Maryland changed my life forever.

13       At the end of 1963, I turned nine years old, just

14  about a week before President Kennedy was shot in Dallas,

15  Texas.  I recall standing in line with my mother and my

16  brother at that time, all night long, for twelve, maybe

17  fourteen hours up in a kind of a rainy, as I recall, and cold

18  Washington, D.C.

19       The crowd past President Kennedy's coffin lying there

20  in state in the (inaudible) of the Capitol of the United

21  States.  That was an end for me, too, that night, even as my

22  life was just beginning, because it was an end to a life of

23  normalcy.

24       From that, a very eventful year of 1963, we saw Martin

25  Luther King proclaim his dream of Lincoln Memorial and saw the

1   end to religious ceremonies in public schools across the

2   United States, at least an official end to them, and the

3   slaying of a president.  I was cast in the mold of an atheist

4   organizer, even at that young stage of life, and an activist

5   atheist for the rest of my life.

6        I wasn't to be known as a "Leave It To Beaver" type

7   kid at all.  I was going to be different.  Following that

8   landmark decision, which was <u>Murray vs. Curlett</u>,

9   C-U-R-L-E-T-T, the cite is 374, U.S. 203, for all of you law

10  students, and I urge you to go and look it up and read it.

11       At the year that it was handed down in terms of word

12  count, it was the longest decision ever rendered by the United

13  States Supreme Court.  There have been longer ones since, but

14  it was the longest ones in terms of the total number of words.

15       My mother, after that decision, was immediately

16  unemployable in the United States as not just an atheist

17  anymore, but the atheist.  As a matter of fact, something

18  called Fact magazine, which is no longer published at that

19  time, headlined her a very famous article that was entitled

20  The Most Hated Woman in America.

21       Well, to my very great pleasure, she's retained that

22  title to this day, and I'm damned proud of it and I hope she

23  continues with that title.  So she became what we further

24  ourselves as essentially as a professional atheist and set out

25  to try to affect change in our culture based on the

*Johnson - Direct*

1  perspective of a life-style without religion, or life-style

2  without superstition, as we put it.

3      The first organization she founded, starting out in

4  1963, was something called Other Americans, Inc.  You say

5  well, how did she get that name?  Well, at the time in the

6  '50s, there was an organization called Protestants and Other

7  Americans for the Separation of Church and State.  And she

8  knew that she wasn't Protestant, so she figured that she must

9  be one of those other Americans they were talking about.  So

10 she borrowed the name Other Americans for the first

11 organization and incorporated it in Baltimore, Maryland.

12     Later, that organization changed its name, some years

13 down the road, to Society of Separationists, Inc., meaning

14 those people who want separation of state and church, and

15 notice the juxtaposition of words.  When everything we do and

16 everything we write, we always refer to it as separation of

17 state and church, not church and state, because we feel the

18 state is the more important partner of the two.

19     Of course, we're often asked whether or not we're a

20 divorced counseling organization with that separationists

21 name, but that's not it.  It's Separationists Church.  And

22 finally, in about the mid-1970s, Society of Separationists,

23 Inc. started doing business as D/B/A, American Atheists, and

24 then, finally, American --  an entity called American

25 Atheists, Inc., later on, was incorporated to take the place

23

*Johnson - Direct*

1    of Society of Separatists.

2         Later, she also founded an American Atheist Library

3    and Archives, which now houses in Austin, Texas, the world's

4    largest collection of books and other materials into sent --

5    in dissent to religion.  There used to be two others.  One of

6    them was in Leningrad, in the heretofore Soviet Union, and the

7    other one was the Theosophical Society Library, founded by an

8    atheist gone mad, Anhi Pussant (phonetic), in Madras, India.

9         And I don't know what happened to that Madras library.

10   I was there about, what, ten or 15 years ago.  And I don't

11   know if it's still there, but I'm quite sure, probably, that

12   the religionists now occupying the Soviet Union in droves have

13   looted that Leningrad library by now.  But I don't know, I

14   haven't been to the Soviet Union in about four or five or six

15   years, something like that.

16        Also, there was founded an American Atheist Press

17   dedicated to providing a forum for those in dissent to

18   religion to be able to speak about that dissent in an

19   uncensored way.  American Atheists publish a monthly journal

20   of atheist news and thought, a magazine for about 27 years,

21   established -- we established a network of about 45 some-odd

22   local chapters of our organization in many states, and

23   chapters that lasted for a little bit over 20 years.

24        We sponsored the National American Atheist radio

25   series that was on in about 100-and-some radio stations around

*Johnson - Direct*

1    the country, and that lasted for about eight years until most

2    of those stations turned to music and chiefly rock format, and

3    dropped a lot of their talk, which is just now staging a

4    come-back.

5           We've held 27 national annual conventions in the

6    ballpark of about 500 people or so at each one in various

7    cities around the country.  And we are now in our 15th year of

8    production of a weekly American Atheist forum series of

9    programs for cable television, which can be seen right now in

10   130 major cities and serves 9.3 million homes here in the

11   United States.

12          We publish a monthly newsletter.  We sponsor a

13   computer bulletin board out of Austin, Texas, for many of you

14   who are into that.  I can give you the number at the

15   question-and-answer period.  We publish a catalog of over 150

16   paperback titles, and we provide information on atheist

17   positions to the media and institutions such as the one we're

18   speaking in front of here today.

19          American Atheists was founded basically to fight for

20   two things in the United States, and one is the complete and

21   an absolute separation of state and church.  And again, if

22   you'll note the order of the words.  We have been laboring for

23   a Jeffersonian concept of state/church separation.  That is

24   not just to give lip service to it and documents the two

25   actually have a separation.

25

*Johnson - Direct*

1      And number two, we established American Atheists to

2  fight for the civil rights of persons who call themselves

3  atheists, or the civil right to allow people to call

4  themselves atheists openly in the public.  These two causes

5  were to be taken on in the founding of the organization and

6  have been taken on from a perspective that is unique to

7  atheists and that is that religion is essentially what we call

8  myth information.

9      That is, that there is no God, there is no hell, there

10  is no heaven, there are no he, she, it or them, whatever you

11  want to call the deity to answer prayers.  We do not oppose

12  and did not oppose prayers in the public school because of any

13  kind of denominational or establishment cause-type concerns,

14  actually, but because prayer, as a human act, is irrational.

15      Children should be taught the value, rather, in school

16  of self-determination, what we call inner direction, logic and

17  the scientific method, and not to whine before an imaginary

18  deity to get what they want.  That's not good education.

19      Prayer basically is talking to yourself.  Only that,

20  nothing more.  And that act, we feel, is so singularly stupid

21  that those who do it find the comfort in carrying it out in

22  groups or, should I say, perhaps congregations is a better

23  word."

24      (End of videotape.)

25  Q.  (BY MR. CARRUTH)  Okay.  Ms. Johnson, did you notice

*Johnson - Direct*

1   whether or not Mr. Jon Murray was wearing a watch in that

2   presentation?

3   A.   Yes, I saw him wearing a watch.

4   Q.   And have you ever seen him wearing that watch before?

5   A.   I didn't see it that closely, but it looks like the one

6   that I know -- he's only had one watch since I've ever known

7   him.

8   Q.   And what type of watch was that, if you know?

9   A.   The one that I know that he had was a Rolex watch.

10  Q.   Thank you, ma'am.  Now, Ms. Johnson, when the O'Hairs

11  first disappeared, when did you become aware or suspicious

12  that something might be out of the ordinary?

13  A.   Another -- my colleague, Conrad Goeringer, called me to

14  say --

15          MR. T. MILLS:  Excuse me.  Object to hearsay.

16  Q.   (BY MR. CARRUTH) Without going into what was said, could

17  you tell us what point in time?

18  A.   We couldn't get in touch with them on the phone.  Nobody

19  answered the phones when we called.

20  Q.   Did you call the American Atheist Organization here in

21  Austin?

22  A.   Yes.

23  Q.   And for the record, their headquarters at that time was

24  located here on Cameron Road; is that correct?

25  A.   That's right.

*Johnson - Direct*

1   Q.   Did the O'Hairs live on a house in Greystone?

2   A.   Yes, and we called their house, as well.

3   Q.   And did they all live together?

4   A.   Yes, they did.

5   Q.   To your knowledge, had Jon or Robin ever married?

6   A.   No, they have never married.

7   Q.   And what else did the O'Hairs do together?

8   A.   They do together?

9   Q.   Uh-huh.

10  A.   Travel together, worked.  They had separate

11  responsibilities at the headquarters.  They worked together

12  and they traveled, lived together in their home.

13  Q.   Pretty close-knit family in your opinion?

14  A.   Very loving, very close-knit family, looked after each

15  other.

16  Q.   And even though they had a -- at least Ms. O'Hair could be

17  rather rough-talking at times, how did they relate to one

18  another as family members, as mother to daughter and son and

19  granddaughter?

20  A.   As a mother, myself, she was a very loving mother, very

21  concerned about her children.  You could see the way she, you

22  know, said something nice about her son when she introduced

23  them.  Loved them dearly, loved her children, loved Robin

24  enough to adopt her when she needed to be adopted.  And the

25  children felt the same of their mother.  Jon would travel.  He

*Johnson - Direct*

1    would buy Robin a souvenir, take a souvenir back to her.

2         Robin would make sure Madalyn watched her diet, did

3    their cooking.  They liked to cook.  Made sure because Madalyn

4    O'Hair was diabetic.  She would leave the office, usually

5    first to go home and cook the meals.  And then, Jon and

6    Madalyn always worked late.  And then, when they came home,

7    Robin would have dinner ready.

8         Just, you know, warm, wonderful caring people.  I

9    loved them dearly.

10   Q.  To your knowledge, did they have any pets?

11   A.  Yes, dogs.

12   Q.  Do you know how many dogs they had?

13   A.  About three or four.

14   Q.  And how did they relate to their dogs?

15   A.  Like people who love dogs love their pets did.  You know,

16   they played with them, they cared for them.  I think they took

17   in -- I don't know, I think they had one that needed a home,

18   and I think that was Gannon or something, I don't remember,

19   but they loved their pets, took good care of them.

20   Q.  At what point in time are you talking about when you were

21   unable to contact the O'Hairs by phone either at home or at

22   the office?

23   A.  When was that?

24   Q.  Yes, ma'am, if you can recall.

25   A.  End of October, beginning of September in 1995.

*Johnson - Direct*

1    Q.  Okay.  Now, was there a particular event planned in New

2    York for early in October 1995, which, to your knowledge, the

3    O'Hairs had planned, in fact, looked forward to attending?

4    A.  Yes, it was a picketing of the Pope in New York City.

5    Q.  Okay.  And what did that involve, ma'am?

6    A.  There were several venues.  There was supposed to be a

7    picket in New Jersey.  We were going to be at the United

8    Nations Central Park, and I forget the other venue.  We were

9    going to have a board meeting.

10   Q.  Okay.  You're talking about the Atheist Organization?

11   A.  That's correct.

12   Q.  And were you planning to be in attendance?

13   A.  Yes, I was helping to organize it.

14   Q.  And how about Madalyn, Jon and Robin, were they supposed

15   to go?

16   A.  Yes, they had their rooms reserved and airline tickets

17   reserved.

18   Q.  Can you tell us when was the last time you saw Jon Garth

19   Murray in person?

20   A.  Yes, he came up to New Jersey in July, I think it was,

21   July or late June of 1995.

22   Q.  And what was his purpose in going to New Jersey in June or

23   July 1995?

24   A.  We went in the morning to Fairly Dickinson University in

25   New Jersey to conduct a workshop on hatred and intolerance

1  towards atheists, for prejudice reduction summer camp for high

2  school students.  We did that in the morning, and we drove

3  over to New York City to check out the hotel where we were all

4  going to stay, people coming to join us and check out how we

5  would walk to the United Nations and how we would get to all

6  the various venues.  We spent the day together.

7  Q.  All right.  And during that time, without going into

8  specifically what was said, what was his usual demeanor, or

9  what was his demeanor on that occasion?

10  A.  Fine, normal, it was great.

11  Q.  And did he say anything to you without specifying what

12  about, you know, taking any leave or vacations, or going out

13  of the country, or anything of that nature?

14  A.  No, I don't know if this was before or after their

15  vacation.  This was before their vacation?  They were going to

16  go on vacation.

17  Q.  Do you know where they were planning to go?

18  A.  Virginia.

19  Q.  Okay.

20  A.  He was definitely looking forward to a vacation.

21  Q.  Okay.  And who would they have been visiting in Virginia,

22  if you know?

23  A.  Arnold Via.

24  Q.  And is he also a board member of the American Atheist

25  Organization?

*Johnson - Direct*

1   A.   I think he was at the time, but they were also going to go

2   sight-seeing together the battlefields.

3   Q.   Was Jon interested in Civil War history?

4   A.   They were interested in all kinds of history, but yes, I

5   think they wanted to go see the battlefield.

6   Q.   Do you know or do you have any independent knowledge of

7   whether or not they actually went on that vacation?

8   A.   Yes, they did go.

9   Q.   And that was prior to their disappearance?

10  A.   Yes, sir.

11  Q.   Okay.  Now, after you were unable to locate them following

12  their disappearance in the fall of 1995, what action, if any,

13  did you take to attempt to locate them?

14  A.   Everything.  Everything.  I just spent hours and hours and

15  days and days and lots of money, lots of time.  We could be

16  here for a long time just detailing all of the things that we

17  did to try and locate them.

18  Q.   Well, we're here, so let's do that.

19  A.   Okay.  The first thing that we did when we were at the

20  hotel was the board of directors --

21  Q.   Let's clarify this.  You were at the hotel, when was this?

22  A.   At the Pope picket.  We were all, you know, there at the

23  board of directors.

24  Q.   The early part of October of '95?

25  A.   I think so.

Johnson - Direct

1   Q.  And the O'Hairs had failed to appear?

2   A.  That's correct.  They had failed to appear.  We called

3   their hotel to see if they checked in to see what happened.

4   We called -- well, we congregated in one of the hotel rooms to

5   say what's going on, what do you think is going on, did

6   anybody hear anything.  And we started talking, asking

7   questions of people who showed up at the Pope picket, other

8   people who were -- who had known the O'Hairs.

9           And did you hear anything?  Did you hear anything?

10  And then, that was what happened then.  Shall I continue what

11  happened when I got home?

12  Q.  Please do.

13  A.  I personally, myself, I started phoning everybody I knew

14  in the organization that I could get a phone number for to see

15  if they had heard from the O'Hairs.  That's the initial thing

16  I did.  "Do you know anything?  Did you talk to them?"  Then,

17  we -- in the office, we got everything we could, papers, phone

18  numbers, personal phone books, business cards.  I started

19  calling every time I saw a phone number on a scratch pad of

20  paper, I called it.  Who are you?  Who or why did they have

21  this phone number?

22          I went to a note pad and I kind of took a pencil.  You

23  know how you go over to see if there was, you know, a sheet of

24  paper ripped off, and there was an indentation underneath.  We

25  checked the typewriter to see if we could pull a ribbon off a

*Johnson - Direct*

1  typewriter to see if there was anything written on it, because

2  they left typewritten notes, and see if they had typed

3  anything.

4       We went through every single sheet of paper in that

5  building and that was extensive.  We got --

6  Q.  Excuse me, again.  For clarification, you say "that

7  building."  A while ago, you were talking about being in New

8  York.  Then, you returned to New Jersey.  Did you end up in

9  Austin?

10  A.  Yes, I made several trips.  I live in New Jersey, but I

11  made several trips to Austin, Texas to the office building.

12  And one of the employees at that time was -- had access to the

13  building.

14  Q.  Okay.

15  A.  And we went in and I somehow -- I don't know how we got

16  the actual cellular phone records.  Jon Murray was using his

17  cellular phone.  We got the cellular phone records, and I

18  called every single phone number on that cell phone.

19  Q.  And do you recall particularly where any of those phone

20  numbers were listed to?

21  A.  Yes, at San Antonio primarily.

22  Q.  Okay.  Now --

23  A.  We sent people to San Antonio to scout out the area

24  because we pinpointed where phone calls were.  So we kind of

25  figured they must be -- you know, if they're still here in

*Johnson - Direct*

1    this general area.

2    Q.  Okay.  And had you had occasion to speak with any of the

3    O'Hairs during the time they were in San Antonio?

4    A.  Yes, I did.

5    Q.  And how did you make contact with them?

6    A.  We called John's cell phone.

7    Q.  Okay.  And who answered when you called?

8    A.  Madalyn Murray O'Hair answered first, I believe.

9    Q.  Okay.  And did you subsequently call back?

10   A.  Yes, I did.

11   Q.  And who answered on that occasion?

12   A.  A gentleman who I did not know who it was.

13   Q.  A male voice answered the phone?

14   A.  Yes.

15   Q.  And did he give a name?

16   A.  He said this is --

17          MR. T. MILLS:  Excuse me.  I object to hearsay.

18          MR. CARRUTH:  We'll withdraw the question, your Honor.

19   Q.  (BY MR. CARRUTH) Did you ever have a conversation to speak

20   with Robin O'Hair while she was in San Antonio, Texas?

21   A.  Yes, I did.

22   Q.  And what do you recall Robin O'Hair telling you the last

23   time that you spoke with her over that cell phone?

24          MR. T. MILLS:  I object to hearsay.

25          MR. CARRUTH:  We're offering under Rule 8033 of the

1  Federal Rules of Evidence as evidence of a state of mind or

2  emotional state of a witness who is unavailable.

3      THE COURT:  Members of the jury, I'm going to allow

4  this testimony not for the truth of what is stated, but as

5  information that this lady received so that you can evaluate

6  what she did or what she didn't do.  You may proceed.

7  Q.  (BY MR. CARRUTH) Thank you.  Can you tell the jury what

8  Robin O'Hair's last words to you were?

9  A.  The very last words she -- that I remember her saying to

10  me were, "I know you'll do the right thing."

11  Q.  Did you have any idea what she meant by that statement?

12  A.  I'd like to think it's everything I've done since she said

13  those words.

14  Q.  And do you feel you did everything in your power to try to

15  find them?

16  A.  Absolutely, yes.

17  Q.  And you were unsuccessful?

18  A.  Yes.

19  Q.  Now, during the time they had been in San Antonio, did you

20  have occasion to send any money to Jon Murray?

21  A.  Yes, I did.

22  Q.  And what form or fashion were those funds transmitted?

23  A.  I sent him a personal check, and it was a Fed Ex envelope.

24  Q.  Okay.  I'm showing you what's been marked for

25  identification purposes as Government's Exhibit W2-1 and W2-2.

*Johnson - Direct*

1    And I'll ask you if you recognize those documents, please.

2    A.   Yes, I recognize them.

3    Q.   Are those photocopies of the Fed Ex air bills that you

4    sent to Jon Murray in San Antonio, Texas in September of 1995?

5    A.   Yes, they are.

6    Q.   We would offer those exhibits, your Honor, at this time.

7           MR. T. MILLS:  No objection.

8           THE COURT:  They're received.

9           MR. CARRUTH:  Okay.  Would you display those for the

10   jury?

11   Q.   (BY MR. CARRUTH) How had you obtained the address to know

12   where to send these documents or this money?

13   A.   Jon gave it to me.

14   Q.   Okay.  And was it a post office box or a residential

15   address, or do you know now what kind of address it was?

16   A.   We found out early on, when we were at the -- that hotel

17   room in New York City it was a Mailboxes, Et cetera.

18   Q.   Okay.  A commercial mailbox place?

19   A.   That's right.

20   Q.   Okay.  And had Jon requested that you send him money, or

21   did you just do it out of the goodness of your heart?

22   A.   No.  I did it out of the goodness of my heart.

23   Q.   And do you recall how much money you sent him on that

24   occasion?

25   A.   I personally sent him a check for a thousand dollars.

*Johnson - Direct*

1   Q.  Why did you do that, Ms. Johnson?

2   A.  They said they were on a business trip and they were away

3   for a while and they were not back at the office, and I

4   figured they needed some money to eat out and they weren't

5   cooking and --

6   Q.  The Fed Ex bill being displayed on the screen, which has

7   been admitted as W2-1, do you recognize that, ma'am?

8   A.  Yes, I do.

9   Q.  And can you read the date up in the upper left-hand

10  corner?

11  A.  September 16th of 1995.

12  Q.  Okay.  And it's addressed to Mr. Jon Murray, 728 Bandera

13  Road, in San Antonio, Texas, correct?

14  A.  Correct.

15  Q.  Okay.  And the other bill, Fed Ex bill, can you read the

16  date on that?

17  A.  September 19th, 1995.

18  Q.  And what did that Fed Ex package contain?

19  A.  Two checks, I believe, two blank checks, corporate checks.

20  Q.  Blank checks?

21  A.  Yes, sir.

22  Q.  Why did you send blank checks through the mail?

23  A.  Well, Jon asked me to.

24  Q.  Okay.  Did you initially resist that request?

25  A.  Yes.  I said, "No, I will not."

*Johnson - Direct*

1  Q.  And why was that?

2  A.  I remember my words specifically.  I said, "I take my job

3  very seriously.  I have no idea," I said, "if there's a gun to

4  your head or not."

5  Q.  But you found it to send them anyway?

6  A.  Yes, circumstances seemed to have changed.  He said,

7  "That's okay."  He said, "That's okay.  I understand."

8  Q.  "That's okay"?

9  A.  "I understand."  When I said that, I think he appreciated

10  what I said.

11  Q.  Okay.  But you later sent two checks?

12  A.  Yes, I did.

13  Q.  And did you ever determine from your examination of the

14  organizations bank records where either or both -- or either

15  one or both of those checks was subsequently cashed?

16  A.  Yes, I did find out that they were -- it was.

17  Q.  And do you recall for what amounts?

18  A.  $12,000.  Jon wrote a check out to cash for $12,000.

19  Q.  And what about the second check, ma'am?

20  A.  I don't recall.

21  Q.  Okay.  Let me see if we can find some records to refresh

22  your memory.  We'll have to get that to you in just a moment,

23  ma'am.  But let's right now get back to the -- what you did

24  when you came to Austin.

25  A.  Sure.

*Johnson - Direct*

1  Q.  You said you searched or went through their office and

2  went through their home.  What did you observe in their home?

3  A.  There were so many things left there.  It didn't look like

4  they had packed up to go anywhere.  It looked like they left

5  in a hurry.  Madalyn's medicine was there and her wheelchair

6  was there.  Their personal belongings were there and, you

7  know, family things were there.  No evidence of what happened

8  to them, that's for sure.

9  Q.  And during the search of their home and office, did you

10  find their passports?

11  A.  Yes, I did, and I brought them back home with me.

12  Q.  And you subsequently provided them to us; is that correct?

13  A.  Yes, I did.

14  Q.  Show you what's been marked for identification as

15  Government's Exhibit W1-32.  I'd ask you to examine the

16  contents of that and see if you can identify them, please.

17  A.  Oh, yes, these are the ones.

18  Q.  We'd offer Government's W-1, W-2, your Honor.

19       MR. T. MILLS:  No objection.

20       THE COURT:  Be received.

21  Q.  (BY MR. CARRUTH) Before I take them back, do you have a

22  passport, ma'am?

23  A.  Yes, I do.

24  Q.  And do you know for what period of time the passport is

25  issued by the United States Department of State?

Johnson - Direct

1   A.   Ten years.

2   Q.   And can you look on those passports, please, and tell me

3   the date they were issued and the date they were due to

4   expire?

5   A.   Dr. O'Hair's was issued in 1986, and it was due to expire

6   on April of 1996.  Each one, Mr. Carruth?

7   Q.   Please.

8   A.   Jon Murray's was issued in April of 1986, and it was due

9   to expire in April of 1996.  Ms. Murray O'Hair's was issued in

10  June of 1986, and it was due to expire in June of 1996.

11  Q.   All right.  And what do you use your passport for, Ms.

12  Johnson?

13  A.   Vacation.

14  Q.   When you travel outside the United States?

15  A.   That's correct.

16       MR. CARRUTH:  Your Honor, at this time, the United

17  States would seek to offer certified documents under seal of

18  the United States Department of State -- Secretary of State,

19  Madalyn Albright, marked W1B-1, W1B-2, W1B-3, W1B-4, W1B-5.

20  Each of these documents reflect the original applications of

21  those three passports and the fact that they were never

22  renewed.  That there was no record of any finding in the

23  records of the Secretary of State that subsequent to the

24  expiration of those passports any other passports were applied

25  for by these three individuals.

Johnson - Direct

1     MR. T. MILLS:  No objection.

2     THE COURT:  They're received.

3   Q.  (BY MR. CARRUTH) Did you subsequently receive the bank

4   records and cancelled checks that Jon had written after you

5   took over?

6   A.  Personal or corporate?  Corporate?

7   Q.  Corporate, yes, ma'am.

8   A.  Yes, sir.

9   Q.  And did you find among those any evidence that he had made

10  any payments of a significant nature prior to leaving Austin?

11  A.  Yes, he made payments.  He conducted business as usual.

12  Q.  Okay.  Let me show you, ma'am, what's been marked -- show

13  you, ma'am, what's been marked for identification as

14  Government's Exhibit W1-61 and W1-62, and ask you whether or

15  not you recognize those as documents you previously provided

16  to us?

17  A.  Yes, I provided these to you.

18  Q.  And do those purport to be cancelled checks signed by Jon

19  Garth Murray?

20  A.  Yes, they are.

21  Q.  And what is the date of the issuance of the checks?

22  A.  One is August 29th, 1995.

23  Q.  And the other?

24  A.  August 31st, 1995.

25  Q.  We'd offer Government's W1-61 and W1-62, your Honor.

*Johnson - Direct*

1          MR. T. MILLS:  No objection.

2          THE COURT:  They are received.

3  Q.  (BY MR. CARRUTH) Now that they are in evidence, can you

4  please tell the jury the amount of the checks and to whom

5  they're payable?

6  A.  They are both payable to cash.  The first one of August

7  29th is made out for $9,000, and the second one is made out

8  for $6,500.

9  Q.  Ms. Johnson, I earlier asked you a question whether or not

10 there was any evidence you found that Mr. Murray had paid his

11 bills prior to departing, and I want to show you some exhibits

12 here.  Here's W1-64.  Do you recognize that, ma'am?

13 A.  Yes, I do.

14 Q.  And could you give us the date of that check?

15 A.  August the 23rd of 1995.

16 Q.  All right.  We would offer Government's Exhibit W1-64 at

17 this time.

18          MR. T. MILLS:  No objection.

19          THE COURT:  Received.

20 Q.  (BY MR. CARRUTH) Now that that exhibit is in evidence, can

21 you tell us to whom it is payable in the lower left-hand

22 corner of the check, what it's payable for?

23 A.  Paid to Diners Club bill for lodging to go attend the Pope

24 picket in 1995.

25 Q.  Now, let me show you what's been marked for identification

*Johnson - Direct*

1    as Government's W1-66.

2    A.   Okay.

3    Q.   Do you recognize that, ma'am?

4    A.   Yes, I do.

5    Q.   What is that exhibit?

6    A.   It's a check, dated August 23rd, 1995.

7    Q.   Okay.  We would -- signed by Jon Murray?

8    A.   Correct.

9    Q.   We would offer W1-66 at this time.

10        MR. T. MILLS:  No objection.

11        THE COURT:  Received.

12   Q.   (BY MR. CARRUTH) Now that that it's in evidence, would you

13   please tell the Court and jury to whom it's payable, for what

14   it's payable for?

15   A.   To Four Seasons Travel Agency for airline tickets for Dr.

16   Madalyn O'Hair and Robin Murray O'Hair to attend the New York

17   City picket.

18   Q.   Dated August 23rd of 1995?

19   A.   Yes, sir.

20   Q.   So Mr. Murray had paid for his travel in advance; is that

21   correct?

22   A.   Yes, he did.

23   Q.   I'd like to show you what's been marked for identification

24   as Government's Exhibit W1-65.  Do you recognize that as being

25   one of Mr. Murray's cancelled checks?

Johnson - Direct

1    A.  Yes, I do.

2    Q.  And what is the date of that check?

3    A.  August the 23rd of 1995.

4    Q.  We'd offer at this time Government's Exhibit W1-65.

5         MR. T. MILLS:  No objection.

6         THE COURT:  It's received.

7    Q.  (BY MR. CARRUTH) Now that that is in evidence, ma'am,

8    would you please tell the jury to whom it's payable and what

9    date it was issued?

10   A.  It's a one-year subscription to U.S.A. Today for -- what's

11   your second question?

12   Q.  And the date, I'm sorry.

13   A.  Yes, on August the 23rd, 1995.

14   Q.  And so about a week before disappearing, Mr. Murray

15   renewed his subscription for one year to U.S.A. Today; is that

16   correct?

17   A.  Yeah, he did.

18   Q.  Now, would you also take a look at various bills paid

19   during that same time period, marked Government's Exhibits

20   W1-67, W1-68, W1-69 and W1-70, W1-71 and W1-72.

21   A.  Uh-huh, yes.

22   Q.  Do you recognize those as cancelled checks signed by Jon

23   Murray during this same time period?

24   A.  Yes, I do.

25   Q.  We would offer those exhibits into evidence, your Honor.

*Johnson - Direct*

1        MR. T. MILLS:  No objection.

2        THE COURT:  Received.

3   Q.  (BY MR. CARRUTH) And now that they are in evidence, would

4   you just please recite for the jury the date of the check and

5   to whom it was payable?

6   A.  On August the 23rd of 1995, he paid the Phillips 66

7   Company for motor fuel.  He paid, on August the 23rd of 1995,

8   Diamond Shamrock for gasoline, gas bill for the car.  And

9   August 23rd of 1995, Research Pest Control was paid.  On

10  August the 23rd, 1995, Paper Plus Company for paper was

11  purchased, the bill was paid.  On August 23rd of 1995, he paid

12  the bill for United Parcel Service.  And on August the 23rd of

13  1995, he paid the Unisource, Inc. Company for paper purchased.

14  Q.  Thank you, ma'am.  And here's one more I'd like to show

15  you, marked W1-76.  Do you recognize that as the check drawn

16  on, yet, another account by Mr. Murray during the same time

17  period?

18  A.  Yes.

19  Q.  We'd offer Government's W1-76, your Honor.

20        MR. T. MILLS:  No objection.

21        THE COURT:  Received.

22  Q.  (BY MR. CARRUTH) And now that that exhibit is in evidence,

23  would you please tell the jury on what account it's drawn, and

24  to whom it's paid, and what the date of the check was?

25  A.  It was drawn on the American Atheist, Incorporated

*Johnson - Direct*

1   account.  It was written on August the 26th and payable to

2   Orin Tyson, an employee.

3   Q.  And Mr. Tyson was working for the Murray O'Hairs at that

4   time, or for the organization?

5   A.  The organization.

6   Q.  Thank you.  I'd like to show you what's been marked as

7   Government's Exhibit W1-73, and ask you whether or not you

8   recognize that cancelled check?

9   A.  Yes, I recognize it.

10  Q.  And we would offer -- is that signed by Jon Garth Murray

11  and issued during the same time period we've been talking

12  about?

13  A.  It is.

14  Q.  Offer W1-73.

15        MR. T. MILLS:  No objection.

16        THE COURT:  It's received.

17  Q.  (BY MR. CARRUTH) Now that that exhibit is in evidence,

18  would you please tell us the date and amount of the check and

19  to whom it's payable?

20  A.  The date is August the 30th of 1995, payable to cash for

21  $2,000.

22  Q.  And that was after they disappeared, wasn't it, or after

23  they left the Austin --

24  A.  That's correct.

25  Q.  Now, while the O'Hairs were in Austin, do you know of your

*Johnson - Direct*

1  own personal knowledge by reviewing the records whether or not

2  they continued to take care of business and pay certain

3  accounts?

4  A.  Yes, they did continue to take care of business.  It was

5  business as usual.

6       MR. T. MILLS:  Excuse me.  I'm just -- the time period

7  of that?

8       MR. CARRUTH:  While they were in San Antonio.

9  Q.  (BY MR. CARRUTH) Show you what's been marked for

10  identification as Government's Exhibit W-175, W-177 and W-178.

11  Do you recognize those as being cancelled checked or copies of

12  cancelled checks, signed by Jon Murray, drawn on the American

13  Atheist account?

14  A.  Yes, I do.

15  Q.  We would offer at this time Government's Exhibit W1-75,

16  W1-77 and W1-78.

17       MR. T. MILLS:  No objection.

18       THE COURT:  Received.

19  Q.  (BY MR. CARRUTH) And now that those are in evidence, would

20  you please tell the members of the jury and the Court the

21  dates of the checks and to whom they're payable?

22  A.  On September the 16th of 1995, Jon Garth Murray made a

23  check out to Orin Tyson for -- payable for $650.  On August

24  the 20th of 1995, Jon Garth Murray made a check out to "C," as

25  in Charles, "V," as in Victor, "A," as in apple, "B" as in

*Johnson - Direct*

1    boy, CVAB, to pay for the atheist -- American Atheist

2    television cable TV form fee in California to be on the air

3    out there.

4          And on September 8th of 1995, he paid the utility

5    bills for the headquarters for $2,000.

6    Q.  And was that payable to the city of Austin?

7    A.  That's correct, City of Austin Utilities.

8    Q.  And it was estimated, so was that an advance payment?

9    A.  He was paying the utility bill in advance.

10   Q.  Now, during the time that the O'Hairs were in San Antonio,

11   to your knowledge, and you had communications with them,

12   without going in specifically what was said, did you have

13   occasion to establish or open any new bank accounts for Mr.

14   Murray in New Jersey?

15   A.  Yes, I did.

16   Q.  And can you tell the members of the jury and the Court

17   briefly about those accounts?

18   A.  It was for United Secularists of America, Incorporated,

19   one of the corporations of American Atheists.

20   Q.  And what was your purpose, if any, in opening those

21   accounts?

22   A.  Funds were coming in from New Zealand.  We had a trust

23   fund.  It's like an endowment for the organization, and

24   members donated, solicited to donate general memberships or

25   asked to donate money to this, and wills.  The Murray O'Hairs

Johnson - Direct

1   put all kinds of wills directly into this.  And the money was

2   put into the United Secularists of America account in New

3   Zealand because they had good interest rates, and the interest

4   off of that, we were trying to get a large amount of money

5   within -- be used to pay the salaries of the people who worked

6   at the headquarters.

7   Q.  All right.  You mentioned that there were accounts --

8   moneys coming in from New Zealand, so it was no secret that

9   the O'Hairs had funds on deposit in New Zealand?

10  A.  No, not to anyone.

11  Q.  And in whose name were those accounts opened, ma'am?

12  A.  Jon Garth Murray was the signatory, I was a signatory.  I

13  was on the board of United Secularists of America, and, I

14  think, Robin Murray O'Hair.

15  Q.  Show you what's been marked for identification as

16  Government's Exhibit W1-1 and W1-2, and ask you if you

17  recognize those as being photocopies of signature cards on the

18  account you just describe?

19  A.  They are.  I do.

20  Q.  Offer Government's 1-1 and W1-2.

21       MR. T. MILLS:  No objection.

22       THE COURT:  Received.

23  Q.  (BY MR. CARRUTH) And could you please tell the members of

24  the jury the name of the bank and location of the bank, if you

25  know, where those accounts were opened?

*Johnson - Direct*

1    A.   It was at that time called a National Westminster Bank in

2    New Jersey in Boonton, New Jersey.

3    Q.   And is that close to where you were living at that time?

4    A.   Yes.

5    Q.   And did the bank subsequently change its name?

6    A.   Yes, it did.

7    Q.   And to what --

8    A.   It is now the Fleet Bank.

9    Q.   Earlier in our -- in your testimony, you had told us about

10   a check that you had sent to Jon Garth Murray that was blank,

11   and that you sent it to him in San Antonio to Mailboxes, Et

12   Cetera, and you later saw it had been cashed for 12,000?

13   A.   That's correct.

14   Q.   I show you what's been marked for identification as

15   Government's Exhibit 1-30, ma'am, and ask you if you recognize

16   that as a copy of the check?

17   A.   Yes, I do.

18   Q.   Does it bear Mr. Murray's signature?

19   A.   It does.

20   Q.   We'd offer Government's W1-30, your Honor.

21        MR. T. MILLS:   No objection.

22        THE COURT:   Received.

23   Q.   (BY MR. CARRUTH) And what is the date that that check was

24   cashed and to whom was it made payable?

25   A.   It was made payable to cash on September the 22nd of 1995.

1  Q.  And that was drawn on that new account that you had just

2  opened, wasn't it, in Parsippany, New Jersey?

3  A.  Yes.

4  Q.  Now, there was a second check, I believe, that you sent to

5  Mr. Murray?

6  A.  Yes, I did send him two checks.

7  Q.  Ms. Johnson, at some point, while the O'Hairs were in San

8  Antonio during the month of September of 1995, did you

9  subsequently determine through your examination of the bank

10  records a rather significant wire transfer had been received

11  from that New Zealand account into the account in New Jersey?

12  A.  Yes, I did.

13  Q.  And how did you determine that, if you did?

14  A.  I saw the wire transfer notice from the bank.

15  Q.  Okay.

16      MR. T. MILLS:  We do not have any objection to the

17  admissibility of all of these bank records if he wants to do

18  it at a different way.

19  Q.  (BY MR. CARRUTH) Ms. Johnson, I show you what's been

20  marked for identification as Government's Exhibit 113, W-114,

21  Government 115, W-116, W-117, W-118, W-119 and W-120.  Do you

22  recognize any or all of those documents, ma'am?

23  A.  I recognize all of them.

24  Q.  And what do they relate to, ma'am?

25  A.  Money being transferred from New Zealand into these U.S.A.

*Johnson - Direct*

1  accounts in Boonton.

2  Q.  We would offer those exhibits, marked W-113 through W-120

3  inclusive, your Honor.

4        THE COURT:  They're received.

5        MR. CARRUTH:  Thank you.

6  Q.  (BY MR. CARRUTH) And can you tell to whom or the date of

7  that wire transfer, ma'am, from those documents?

8  A.  There are different dates, counselor.

9  Q.  Okay.  Please clarify that.

10  A.  September 12th, money came in.

11  Q.  We're talking about 1995?

12  A.  Yeah, 1995.  These are all in 1995.  September 15th, money

13  came in.  This is a debit.  Money came in on September 15th.

14  Money came in on September 12th.  Money came in on September

15  15th.  Money came in on September 12th.  Money came in on

16  October 19th.

17  Q.  All right.  Please look now, if you would, at what's been

18  marked for identification, as Government's Exhibit W1-4, W1-5,

19  W1-6, W1-7 and W1-8.  Do you recognize those exhibits as being

20  statements of that account at the Norwest Bank in Parsippany,

21  New Jersey, during the relevant time period?

22  A.  Yes, I do.

23  Q.  And do those records also reflect that 600,000 plus wire

24  transfer?

25  A.  Not in this group.

*Johnson - Direct*

1  Q.  What do those records reflect, ma'am?  What time period?

2  A.  September 29th or October 31st, September 6th through

3  October 29th, 1995, October through November of 1995, June

4  through July of 1995, and May through June of 1995.

5  Q.  And so, those would be records of that account prior to

6  and subsequent to the transfer of the 600,000; is that

7  correct?

8  A.  That's correct.

9  Q.  By that time, the 600,000 had already been moved out of

10  that bank to San Antonio, Texas; is that correct?

11  A.  Yes.

12  Q.  We'd offer Government's Exhibits W1-4 through W1-8

13  inclusive.

14        MR. T. MILLS:  No objection.

15        THE COURT:  Received.

16  Q.  (BY MR. CARRUTH) Showing you now, Ms. Johnson, what's been

17  marked for identification as W, looks like, 48-3.  Do you

18  recognize that, ma'am, what it reflects?

19  A.  Yes, I do.

20  Q.  What does it relate to, please, ma'am?

21  A.  Wire transfer of $600,000.  I'm not sure which way it's

22  going.  It's a little more difficult to read.

23  Q.  Let me offer it, first.  I would like to offer

24  Government's Exhibit W48-3.

25        MR. T. MILLS:  No objection.

Johnson - Direct

1        THE COURT:   Received.

2   A.   I see.   Right --

3   Q.   (BY MR. CARRUTH) Okay.

4   A.   -- going into this account.

5   Q.   Okay.   Please tell the Court and the members of the jury

6   to whom those funds were transferred from the Nat West Bank in

7   Parsippany, New Jersey?

8   A.   Yes.   To Corey Ticknor's Fine Jewelry Store.

9   Q.   And where is that located, if you know?

10  A.   I do know it's in San Antonio, Texas.

11  Q.   And can you tell the date of that wire transfer?

12  A.   Yes, September 22nd of 1995.

13  Q.   Now, Ms. Johnson, you earlier told us that the Atheist

14  Organization and United Secularists had certain funds on

15  deposit in New Zealand; is that correct?

16  A.   Yes, I did.

17  Q.   Let me show you what's been marked for identification as

18  Government's Exhibit W1-21, W1-22, W1-23, W1-24 and W1-25.   Do

19  you recognize those, ma'am?

20  A.   I recognize all of them.

21  Q.   Do they relate to the funds on deposit in New Zealand for

22  your organization?

23  A.   Yes, they do.

24  Q.   We would offer at this time, your Honor, Government's

25  Exhibits W1-21 through W1-25 inclusive.

*Johnson - Direct*

1    MR. T. MILLS:  No objection.

2    THE COURT:  Received.

3  Q.  (BY MR. CARRUTH) To your knowledge, ma'am, or at least

4  when you took over as president in December of 1995, could you

5  tell us how many bank accounts the organization had -- your

6  organization had?

7  A.  Many.  One or each corporation, at least.

8  Q.  Okay.

9  A.  The accounts that were in New Zealand.

10  Q.  Okay.

11  A.  One account in Canada.

12  Q.  Okay.

13  A.  It's all I can recall, and the ones in New Jersey.

14  Q.  And the others were domestic bank accounts.  By that I

15  mean they were in the United States?

16  A.  That's correct.

17  Q.  Okay.  Now, did you have an occasion, when you took over

18  the organization, to determine whether or not any money was

19  missing from any of those other accounts?

20  A.  Yes.

21  Q.  And what did you determine?

22  A.  About -- you mean the $600,000.  I noticed that this was

23  missing.

24  Q.  Okay.  When it came time to file that -- an April 15th

25  report that we all dread with the Internal Revenue Service, I

Johnson - Direct

1   assume that your organization had to report that loss; is that

2   correct?

3   A.  Absolutely.

4   Q.  Do you have the --

5   A.  Yes, sir.

6   Q.  I'm showing you, ma'am, what's been marked for

7   identification as Government Exhibit W1-57.  Would you please

8   remove that from the envelope and examine it?

9   A.  I'm familiar with it.

10  Q.  And is that an IRS Form 990, return of organization exempt

11  from income tax for the tax year 1995?

12  A.  For United Secularists of America, correct, it is.

13  Q.  We'd offer at this time Government's W1-57.

14        MR. T. MILLS:  No objection.

15        THE COURT:  Received.

16  Q.  (BY MR. CARRUTH) Now, on page 7 of that return, there is a

17  statement reflecting a loss to the organization; is that

18  right?

19  A.  Yes, it is.

20  Q.  Could you please read that short paragraph into the record

21  for the jury?

22  A.  Yes, we report to the IRS that, quote, the $612,000 shown

23  as a decrease in net assets or fund balance represents the

24  value of the United Secularists of America's assets believed

25  to be in the possession of Jon Murray, former secretary.  The

57

*Johnson - Direct*

1  whereabouts of Jon Murray and these assets have not been known

2  since September 1995 and is not known to the organization at

3  this time.

4       At such time, when United Secularists of America

5  locates Jon Murray or otherwise obtains additional

6  information, such information will be fully reported in

7  subsequent or amended returns, end quote.

8  Q.  Thank you, ma'am.  Now, at that point in time, when you

9  had filed your tax return in 1996-1995 tax year, did you have

10  any idea whatsoever what had become of the Murray O'Hairs?

11  A.  No, sir, not at all.

12  Q.  You mentioned earlier that you had sent someone to San

13  Antonio, and who would that have been?

14  A.  Orin Spike Tyson, and a friend with him.

15  Q.  Okay.  And do you know what they found, if anything?

16  A.  Nothing.

17  Q.  Now, at some point after the disappearance of the Murray

18  O'Hairs, did you or someone in your organization have an

19  occasion to receive the phone records for the cellular phone

20  that Jon Murray had been using?

21  A.  Yes, we did.

22  Q.  And that account, I guess, had to be paid; is that

23  correct?

24  A.  His personal phone records?

25  Q.  Uh-huh.

*Johnson - Direct*

1  A.  No, we couldn't pay that.  That's private.

2  Q.  But what about -- was the cell phone personal or was it --

3  A.  It was -- it was -- I think it was personal.

4  Q.  But you received those records, correct?

5  A.  Yes.

6  Q.  Let me refresh your memory by showing you what's been

7  marked for identification as Government's Exhibit W1-46 and

8  W1-47.  Are those phone records from MCI for that cellular

9  phone?

10  A.  Yes, they are.

11  Q.  For the time period in question?

12  A.  Yes, they are.

13  Q.  Okay.  And let me show you W1-31, which is phone records

14  from Bell Atlantic for that occasion.  That's your phone; is

15  that correct?

16  A.  That's my phone bill.

17  Q.  We'd offer Government's W1-31, W1-46 and W1-47.

18      MR. T. MILLS:  We have no objection.

19      THE COURT:  They're received.

20  Q.  (BY MR. CARRUTH) Now, could you look at your phone

21  records, first, W1-31 and give us an approximation of how many

22  calls you've made to -- during that time period trying to

23  locate the O'Hairs?

24      MR. T. MILLS:  Which time period?

25      MR. CARRUTH:  That is the time period of September

*Johnson - Direct*

1    1995.

2    A.  These are --

3    Q.  (BY MR. CARRUTH) That is the September 16th phone bill; is

4    that correct?  You might have to take it out and look in the

5    back.

6    A.  Yes, that's correct.  Dozens and dozens and dozens and

7    dozens.  I know that.

8    Q.  We'll let the jury examine it, if they desire to do so,

9    but there were numerous phone calls on here reflecting calls

10   by you all over the country and San Antonio, Texas --

11        MR. T. MILLS:  Object to leading.

12        THE COURT:  Okay.

13   Q.  (BY MR. CARRUTH) Let me rephrase.  Take a look at W1-46

14   and W1-47, the cellular phone records of Mr. Murray.

15   A.  Yes.

16   Q.  Are those few or many in number?

17   A.  Many in number.

18   Q.  Thank you.  May we approach the bench with counsel?

19        THE COURT:  Sure.

20     (At the Bench, on the record.)

21        MR. CARRUTH:  I anticipate we're going to keep on her

22   for a while.  Is there any point you want to give the jury a

23   break or when do you normally -- 10:15?

24        THE COURT:  I usually give it at 10:00.

25        MR. CARRUTH:  I think she's going to be on for quite a

60

*Johnson - Direct*

1   while.

2         THE COURT:  It won't bother me.

3         MR. CARRUTH:  I just didn't -- I thought you might

4   think we were fixing to finish up.

5         THE COURT:  No.

6         MR. CARRUTH:  Okay.  I didn't want to impose on the

7   Court or counsel.

8   Q.  (BY MR. CARRUTH) Ms. Johnson, did you ever know an

9   employee of the Atheist Organization by the name of David

10  Waters?

11  A.  I've never met him, no.  I know of him.

12  Q.  Okay.  And your knowledge of him would obviously have been

13  obtained through someone else, correct?

14  A.  Correct.

15  Q.  Do you know a Certified Public Accountant here in Austin

16  by the name of Walley or Wallace Highland, or Helin?

17  A.  Yes, I know Mr. Helin.

18  Q.  What was he, if anything, to the organization?

19  A.  He was our accountant.

20  Q.  Okay.  And do you know whether or not Mr. Murray had an

21  appointment with him during the time frame that we're talking

22  about in the fall of '99?

23  A.  Yes, Mr. Helin was one of those people that I initially

24  called and he said, "Funny you should call.  I had an

25  appointment with Jon Murray and he never showed up."

Johnson – Direct

1    Q.  I'm sorry, I said the fall of '99, and I meant '95.  Mr.

2    Murray never appeared for that; is that correct?

3    A.  Correct.

4    Q.  Okay.  To your knowledge, did the organization have an

5    account at the Comerica Bank or BankOne, either here in

6    Austin?

7    A.  Both of them.

8    Q.  Okay.  I want to show you some records, please, ma'am,

9    bank records of your organization's accounts.  Here's W1-60,

10   W1-63, W1-74, W1-58, W1-79, W1-80, W1-81, W1-82, W1-83, W1-84

11   and W1-28.  I believe that's a reference, the CPA you just

12   referred to.

13   A.  Yes, I recognize these.

14   Q.  Are those all records that were provided by you under your

15   direction that relate to bank accounts and BankOne and

16   Comerica Bank, here in Austin, Texas, for the Atheist

17   Organizations?

18   A.  Yes, they are.

19   Q.  We would offer at this time Government's Exhibits W1-60,

20   W1-63, W1-74, W1-58, W1-79, W1-80, W1-81, W1-82, W1-83, W1-84

21   and W1-28.

22        THE COURT:  Members of the jury, I'm going to give you

23   a morning break.  You're not confined to the courthouse.  You

24   can step outside if you wish.  Use the facilities.  Be ready

25   to come back in twelve minutes.

*Johnson - Direct*

1       (Jury not present.)

2       THE COURT:  Counsel, looks to me like we could get a

3   along a lot quicker if we -- first of all, you only have to

4   stand if you have an objection.  I'll wait just a short period

5   of time, and if there's no objection, I will admit it.  And

6   then, if you want to object, just correct me, and I'll listen

7   to the -- because there's no point in you jumping up and down.

8   And looks like there's not going to be a whole lot of

9   objection to all of this.  We could move on a lot quicker

10  pace, it looks to me like, if we pre-admit.

11      But you decide what you wish.  The jury has already

12  started asking questions, why is it taking so long to get all

13  of these things in, and why did you start off with 78 instead

14  of 1, and I'll explain that to them right now.  But if we can

15  pre-admit to save time, I put that job on you during the noon

16  hour.

17      (Recess.)

18      THE COURT:  Bring the jury in.

19      MR. T. MILLS:  I do not know of any of these exhibits

20  that I'm aware of that we have any objections to through Ms.

21  Johnson.

22      THE COURT:  Well, you're competent lawyers.  Mr.

23  Carruth knows what he wants to do, but I just want to do it as

24  efficiently as we can.

25      MR. CARRUTH:  We had offered certain exhibits and I

Johnson - Direct

1   think they wanted to examine them.  May we read them again for

2   the record?

3          THE COURT:  No, you don't need to read them.  I've got

4   them down.  Are there any objections to them?  Okay.  Then,

5   I'll take care of them.

6          MR. CARRUTH:  All right.  Then, they'll be admitted?

7          THE COURT:  Well, I'm going to admit them in front of

8   the jury.

9       (Jury present.)

10         THE COURT:  Members of the jury, Ms. Sims is my

11  Courtroom Deputy Clerk and been with me a long time.  Most

12  people don't stay with me long.  And her job, along with mine,

13  is we keep a count of the exhibits as they come in.  Y'all

14  don't have to worry about that.  Don't worry about all these

15  numbers.  That's our job.  We do it all the time.

16         It's going to be a zillion exhibits in this case.  And

17  the lawyers at the end of the case, when you still have your

18  notebooks, will tell you which ones they think are the most

19  important, and you can jot them down.  I'm not saying don't

20  jot them down, but let me just make a suggestion.

21         You remember back when you were in school and you

22  heard something in the classroom and you would make that note,

23  and then, you look back up and wondered what happened the last

24  20 seconds?  That happens a lot.  We know from very scientific

25  observations and experiences in the '50s that a jury of six or

*Johnson - Direct*

1    more people in a trial that takes ten days retains 90 percent

2    of everything that goes on in the courtroom, not just the

3    evidence, but the way people look, who comes in, who goes out

4    and that type of thing.

5         Collectively, y'all are going to remember everything.

6    So my suggestion is just take a little note every once in a

7    while if you want to remember something or remember somebody's

8    name.  Listen to the evidence.  It's far more important than

9    taking of the notes.  But don't worry about the numbers of the

10   exhibits or what's going to come into evidence.

11        All of the exhibits that are going to come into

12   evidence you will have available during the deliberations, and

13   you will have been told by the parties which ones they rely on

14   so that you don't have to worry about.  All of the exhibits

15   that don't get admitted you won't have anyway, so don't worry

16   about it.

17        All right.  You may proceed.

18        MR. CARRUTH:  Thank you.

19        THE COURT:  Well, for the record, Exhibits W1-60, 63,

20   74, 58, 79, 80, 81, 82, 83, 84 and 28 are admitted.

21        MR. CARRUTH:  Thank you, your Honor.

22   Q.  (BY MR. CARRUTH) Ms. Johnson, just briefly, I'm going to

23   show you a few more bank records here.  W1-9, W1-10, W1-11,

24   which relate to that $600,000 wire transfer; is that correct?

25   A.  That's correct.

65

*Johnson - Direct*

1    Q.  And earlier, we had talked about the account balance

2    before and after the wire transfer, and these documents relate

3    to that time period?

4    A.  That's correct.

5    Q.  We would offer W1-9 through 11, inclusively, your Honor.

6          THE COURT:  Those are received.

7    Q.  (BY MR. CARRUTH) And finally, W1-27 relates to the 1995

8    account balance in the New Zealand account, does it not, in

9    New Zealand?

10   A.  Yes, it does.

11   Q.  We offer W1-27.

12         THE COURT:  Received.

13         MR. CARRUTH:  Thank you.

14   Q.  (BY MR. CARRUTH) Now, I want you to think back to the time

15   prior to the disappearance of the O'Hairs and tell me whether

16   or not you were ever aware of their involvement in something

17   called the Truth Seekers lawsuit.

18   A.  Yes, I'm aware of it.  They were involved in the Truth

19   Seeker lawsuit.

20   Q.  And can you tell us where that lawsuit was held?

21   A.  San Diego, California.

22   Q.  And can you tell us briefly, in summary fashion, what that

23   lawsuit was about, if you know?

24   A.  Yes, I do.  It's very complicated and it's stretched over

25   many years, and there was a man named James Herby Johnson, who

1   lived in California, an old guy in his 80s, dying of cancer,

2   and he was at that time -- I think he was, like, the president

3   of a publication called the Truth Seeker, which is a free

4   thought atheist-type of publication, very old publication, a

5   lot of history to it.

6       Dr. Madalyn Murray O'Hair, along with some old-timers,

7   had stock in the Truth Seeker Corporation, and as stockholders

8   -- while Madalyn saw -- she got a copy of his will and she saw

9   that his will -- in his will, he bequeathed the corporation to

10  religious people, a religion man who worked at a bank -- a

11  Methodist man who worked at a bank.

12      And she also had evidence that he was commingling

13  funds, that is, the funds from the Truth Seeker Organization

14  with his own personal funds.  So as she and the other

15  shareholders went, I think, into court to demand information

16  on this commingling of funds.

17      He turned around and countersued her and all of the

18  various atheist corporations of which the corporations have

19  nothing to do with this.  We had no knowledge of this.  And

20  James Herby Johnson's attorney just filed -- threw everything

21  at us, you know, malicious prosecution, Rico, everything.

22      And we prevailed in court before a jury and a judge.

23  It was very long and very damaging to us, and -- but they

24  stuck it out, Madalyn did with the shareholders, and prevailed

25  in court.

*Johnson - Direct*

1   Q.  Okay.  In fact, there were two trials, I believe; is that

2   correct?  Two jury trials?

3   A.  That's correct.

4   Q.  And was there some concern during that period that if the

5   Truth Seekers trial was unfavorable to the O'Hairs and their

6   organization, that they might lose some of their very valuable

7   assets?

8   A.  That's correct.  The Judge -- one of the first judges was

9   perceived -- perceived to be very hostile.

10  Q.  Let's not demean any judges, please, ma'am.

11  A.  All right.  Perceived.

12  Q.  At any rate, there was some concern in the organization

13  about --

14  A.  We would lose.

15  Q.  -- and what was one of the most valuable assets that the

16  organization had?

17  A.  Our library.

18  Q.  Okay.  And was that a unique library, the only one of its

19  kind in the United States?

20  A.  Yes, as was said on the videotape, it is.

21  Q.  Do you know of any plans to move that library out of

22  Austin, Texas to another location during the time that Truth

23  Seeker lawsuit was in progress?

24  A.  I knew that it was put in storage at that time.

25  Q.  Okay.  And after you took over the organization, did you

*Johnson - Direct*

1    have occasion to maintain that storage of that library and pay

2    the bills?

3    A.   Yes, I did.

4    Q.   And where was it stored?

5    A.   At that time, it was in Kansas City, Missouri.

6    Q.   Okay.  I'm going to show you what's been marked as W1C-1,

7    and ask you if you recognize your signature on that document,

8    and if so, is that a payment or invoice for the storage of

9    that library that was made after you became president of the

10   organization?

11   A.   It is my signature, and it's a signature authorization to

12   access the storage facility.

13   Q.   Okay.  So it was no secret that the library was there

14   among the association's members; is that correct?

15   A.   No, it wasn't at all.

16   Q.   To your knowledge, was this moved -- taken during the time

17   that David Waters was employed at the Atheist Organization?

18   A.   It was.

19   Q.   We'd offer that Exhibit W1C-1.

20          THE COURT:  Received.

21          MR. CARRUTH:  Thank you.

22   Q.   (BY MR. CARRUTH) Now, we mentioned David Waters.  Even

23   though you may not have personally known him, were you aware

24   that he was an employee of the organization?

25   A.   Oh, yes.

*Johnson - Direct*

1   Q.  And at one time was the business manager?

2   A.  Yes, he was.

3   Q.  And I believe his services were terminated after some

4   allegations of theft or misappropriation of moneys; is that

5   correct?

6   A.  That's correct.

7   Q.  And did Madalyn Murray O'Hair express any anger or

8   dissatisfaction over Mr. Waters' performance while he had been

9   in her employ?

10  A.  I had no knowledge of that.

11  Q.  Did she not write you a letter in 1995 expressing her

12  disapproval of Mr. Waters?

13  A.  To that, yes, that is correct.

14  Q.  Show you what's been marked as Government's Exhibit W1-40

15  for identification, and ask you if you recognize that

16  document?

17  A.  Yes, I recognize this.

18  Q.  Is that a letter from Dr. O'Hair, dated 1995, to you and

19  other board members?

20  A.  Correct, it is.

21  Q.  And it's concerning the misconduct or alleged misconduct

22  of Mr. Waters, is it not?

23  A.  Criminal conduct.

24  Q.  We'd offer Government's W1-40 for the record.

25          THE COURT:  Received.

*Johnson - Direct*

1    MR. CARRUTH:  Thank you.

2   A.  I misunderstood your earlier question.  May I make a

3   comment?

4   Q.  (BY MR. CARRUTH) Which question was that, ma'am?

5   A.  I thought you were talking about his performance on the

6   job, not what he did as an employee.  That's why I said I had

7   no knowledge of that.  I thought you meant was he an employee.

8   Q.  Would it be a fair statement to say he took advantage of

9   his job --

10    MR. T. MILLS:  Object to leading.

11   Q.  (BY MR. CARRUTH) We'll clarify that later with another

12   witness.  Let me show you two more exhibits and we're through

13   -- or two more groups of exhibits.  You testified earlier that

14   your organization was incorporated in the state of New Jersey.

15   I show you what's been marked as Government's Exhibit W1A-1A,

16   a certified document under seal of the Treasurer of the

17   Department of Treasury, state of New Jersey, relating to the

18   corporate entity of the United Secularists of America.  Do you

19   recognize that document?

20   A.  Yes, I do.

21   Q.  We'd offer Government's W1-A1A for the record.

22    THE COURT:  It's received.

23   Q.  (BY MR. CARRUTH) Thank you.  And finally, I'm going to ask

24   you to identify through certified copies of the Texas

25   Department of Public Safety, driver's license section, the

*Johnson - Cross*

1   last known driver's license photos of Madalyn Murray O'Hair,

2   marked W1-56A, Robin Murray O'Hair, marked W1-56B, and Jon

3   Garth Murray, marked W1-56C.  Do you recognize those?

4   A.  Yes, I do.

5   Q.  And are those the three Murray O'Hairs we've been talking

6   about for the last two hours?

7   A.  They are.

8   Q.  We would offer those exhibits at this time, your Honor.

9           THE COURT:  156A, B and C are admitted.

10          MR. CARRUTH:  Thank you.  And we'd pass the witness,

11   your Honor.

12          MR. T. MILLS:  May it please the Court.

13          THE COURT:  Yes, sir.

14                      CROSS-EXAMINATION

15   BY MR. MILLS:

16   Q.  Ms. Johnson, my name is Tom Mills, and I represent Gary

17   Paul Karr in this matter.  I wanted to ask you some questions

18   about the topics that Mr. Carruth went over with you.  We have

19   not spoken before, have we?

20   A.  No, we have not.

21   Q.  Or communicated in writing?

22   A.  No, we have not.

23   Q.  All right.  Regarding this lawsuit with the Truth Seekers

24   or the person who owned the Truth Seekers, did you -- what was

25   your office in the corporate organizations during the time

*Johnson - Cross*

1  that the library was packed up?

2  A.  I really don't recall.  I was on the board of directors of

3  a couple of the corporations --

4  Q.  All right.

5  A.  -- I can tell you.

6  Q.  But you understood that there was a fear that if the -- if

7  there was a judgment, a monetary judgment against one of the

8  atheist societies that they could try to get assets of the

9  Atheist Society such as the very, very valuable library?

10  A.  Yes, that's correct.

11  Q.  All right.  And so you were aware of a general decision to

12  move it, I assume, especially since you took care of the

13  storage place in Kansas City?

14  A.  Not because of that.  What I knew was that the library was

15  put in storage at that time because of the anticipated selling

16  of our office building.  We had been trying to sell the

17  building.  We couldn't sell it during the Truth Seeker trial.

18  We were not allowed to sell the assets, but that's what I

19  understood at that time why the library was in storage.

20  Q.  Well, when was it and from whom did you learn that it was

21  being moved because of the fear by Ms. O'Hair that a judgment

22  might cause the seizure of the library assets?

23  A.  It was Dr. Madalyn Murray O'Hair, Jon Garth Murray and

24  Robin.  It was the three of them, after the disappearance, and

25  I went through all of the records and documents in the

*Johnson - Cross*

1   building, I saw documents and letters indicating that, you

2   know, that was a concern.

3   Q.  All right.  So from information you got, you realized or

4   you formed the belief that they were going to hide assets from

5   the potential judgment creditor?

6   A.  I was not aware that they were going to do anything

7   illegal, hide assets.  I think that's --

8   Q.  From what you understand of it, what is legal about hiding

9   and secreting assets?

10  A.  I think they were just going to get it into a safe place.

11  Q.  Safe from the Truth Seekers?

12  A.  Just safe from whatever.

13  Q.  Uh-huh.  Where had it been previously?

14  A.  Pardon me?

15  Q.  The library?

16  A.  It was in the headquarters they put in storage.  I think

17  it was Dallas, Texas, some of it.  I don't know.  I'm not

18  clear on that.

19  Q.  Okay.

20  A.  All I know for a fact is that part of it is still in

21  Kansas City, Missouri.

22  Q.  You didn't understand that it was unsafe when it was being

23  stored in the headquarters, though, did you?

24  A.  Not really at that time, no --

25  Q.  All right.

Johnson - Cross

1   A.   -- I don't know.

2   Q.   You knew Ms. O'Hair from 1977?

3   A.   '79.

4   Q.   '79.  And you've referred to her several times as Dr.

5   O'Hair.  I know you know more about her than I do.  What was

6   she a doctor of?  What is she a doctor of if she's still

7   alive?

8   A.   Pardon me?  That's two -- what was your two points?

9   Something about her being alive?

10  Q.   What doctorate or medical doctor, or Ph.D. or what is it

11  she has that entitles her to be called "doctor"?

12  A.   I believe it's a law degree and I think that because she

13  wouldn't -- something about God being on the actual degree or

14  something, she never could get it, or something have to do

15  with religious test or oath or something on it she actually

16  didn't receive it.

17  Q.   So when people such as lawyers in this courtroom receive a

18  juris doctorate degree, I guess Dr. Carruth, Dr. Williams and

19  the same way that you use the term Dr. O'Hair, because we're

20  lawyers, we've got a law degree?

21  A.   I don't know.  I think she has something else, as well.

22  Psychiatric social work, she has a degree in that.

23  Q.   But not a Ph.D., is it?

24  A.   I don't know.

25  Q.   All right.  Did she like to be -- encourage people to call

*Johnson - Cross*

1   her "doctor"?

2   A.  No, not particularly.

3   Q.  What exactly did the different Atheist Organizations

4   promote in terms of their goal?

5   A.  They're not necessarily -- they didn't necessarily

6   promote.  If you want to know what the various entities

7   represented.

8   Q.  Well, let me try to ask a better question.  We saw the

9   movie with Ms. O'Hair and Jon Murray saying things like prayer

10  is insane, there is no God and religion is a myth.  If we just

11  stop with those three things, are those basic principles of

12  the Atheist Societies?

13  A.  Well, we don't say religion is a myth because religion

14  isn't a myth.  Religion exists, it's not a myth, so that's

15  inaccurate.

16  Q.  You heard him say --

17  A.  Well, no.  We promote the philosophical -- the basic

18  philosophy of materialism, the ancient Greek philosophy of

19  materialism, state/church separation as in the First Amendment

20  establishment clauses, civil liberties for people who are

21  non-believers, atheists, free thinkers, various names.

22  Q.  On that TV film, video film, Ms. O'Hair seemed to be very

23  energetic and enthusiastic in expressing her belief, didn't

24  she?

25  A.  You only saw five minutes, but yes, she is very energetic

Johnson - Cross

1   and enthusiastic, as most people are who like what they do.

2   Q.   And that was filmed in 1995, wasn't it?

3   A.   Yes.

4   Q.   She was rough-talking, Ms. O'Hair?

5   A.   Not to me.

6   Q.   You knew that she had a reputation of frequently cursing,

7   though, didn't she?

8   A.   I know that the media liked to report her that way and

9   ignore her other side.

10   Q.   You wouldn't go so far as to say you never heard her use

11   foul language, though, would you?

12   A.   No.

13   Q.   And she was smart?

14   A.   Very.

15   Q.   Clever?

16   A.   Sort of.

17   Q.   Sometimes secretive about what she was doing?

18   A.   Yes.

19   Q.   Could be deceptive if it fit her purposes?

20   A.   I don't know that.

21   Q.   Intentionally disliked the Internal Revenue Service?

22   A.   Not in general.  Did not like the way she was treated at

23   times.

24   Q.   When they audited her or tried to --

25   A.   When they were unfair.

*Johnson - Cross*

1   Q.  When they were unfair.  It was no secret that there was

2   money in the bank, or trust accounts, or securities in New

3   Zealand, was there?

4   A.  No, it was no secret.

5   Q.  And before 1995, for how long were you aware that there

6   were hundreds of thousands of dollars in New Zealand?

7   A.  Years probably.

8   Q.  Several?

9   A.  Several.

10  Q.  All right.  And it was also not a secret that Ms. O'Hair

11  and Jon and Robin had discussed leaving the United States,

12  possibly even going to New Zealand, correct?

13  A.  No, that's not correct.

14  Q.  What about it is incorrect?

15  A.  I have never heard them discuss that.

16  Q.  All right.  Had you heard, then -- if I take out the

17  country New Zealand, had you heard them discuss going to

18  another country?

19  A.  Never.

20  Q.  All right.  Does that shock you for me to ask that

21  question as though you haven't heard other people express

22  that?

23  A.  No, it doesn't shock me.

24  Q.  Because if you haven't heard it, you have heard other

25  people express that, haven't you?

*Johnson - Cross*

1   A.   Yeah.

2   Q.   All right.  They traveled extensively, the three of them,

3   didn't they?

4   A.   Yes.

5   Q.   They went to Moscow to book fairs?

6   A.   Uh-huh.

7   Q.   Other Eastern European countries that they were interested

8   in?

9   A.   They vacationed around the world.

10  Q.   All right.  Including Eastern European countries?

11  A.   I don't know which ones, maybe.

12  Q.   All right.  You are aware of them traveling several times

13  to Russia?

14  A.   To book fairs.

15  Q.   Right.

16  A.   Uh-huh.

17  Q.   Nothing improper about that --

18  A.   No.

19  Q.   -- correct?  All right.  Let me ask you about the

20  picketing the Pope.

21  A.   Uh-huh.

22  Q.   What exactly -- I understand you've testified it was very

23  surprising to you that they didn't show up to picket the Pope.

24  A.   Uh-huh.

25  Q.   And what was to be done?  What is it when you picket the

*Johnson - Cross*

1  Pope?

2  A.  You basically hold up picket signs and you stand where

3  they tell you to stand, and you hand out leaflets why you

4  object to disagree with the policies of the Vatican.

5  Q.  Uh-huh.  And the goal was to send the Pope back home?

6  A.  No, absolutely not.

7  Q.  Stop Catholicism?

8  A.  Well, not -- no.  Educate the people, educate people in

9  our position.

10  Q.  Uh-huh.  Educate people, including children, who might

11  have to pray at school improperly, correct?

12  A.  I don't know what that has to do with the -- this.  That's

13  not -- what do children have to do with the Pope picket and

14  praying?  You mean at the Pope picket?  Trying to educate

15  little children?

16  Q.  I guess whoever would be there to get your leaflets.

17  A.  We didn't hand them to children.  We really wanted to talk

18  to just adults.

19  Q.  All right.  And was the goal to encourage people to be

20  rational, materialistic atheists, and not be insane prayers?

21  A.  People who are prayers are not insane.  That's not my

22  position.  I don't agree with that statement, no.  The

23  position was not -- if you wanted more information on the

24  organization, you could contact us from what was on our

25  leaflets, but it was not about spreading materialism or the

*Johnson - Cross*

1    philosophy of atheism at the Pope picket, just like the

2    pro-choice groups were there and the gay rights groups were

3    there.  We were there to say we disagree with the Catholic

4    Church on these issues.  We think there are certain violations

5    of state/church separation taking place, or whatever, and that

6    was five years ago.

7    Q.  Uh-huh.

8    A.  But I could -- oh, I can't now.

9    Q.  All right.  Mr. Withers, was he the attorney or one of the

10   attorneys for the Truth Seekers?

11   A.  Yes, he was the attorney.

12   Q.  All right.  And from your testimony, it seems that he must

13   have been pretty aggressive in terms of his tactics?

14   A.  Yes, as I recall.

15   Q.  Is that a fair characterization?

16   A.  That's fair.

17   Q.  And wasn't he constantly trying to find hidden assets that

18   may or may not have existed, but he believed they did?

19   A.  That's correct.

20   Q.  Incidentally, at the American Atheist Headquarters, that

21   was the one here in Austin, wasn't it?

22   A.  Uh-huh, Cameron Road.

23   Q.  All right.  If a wealthy person who was interested in

24   promoting atheism wanted to deed some property to help the

25   cause, or sign over a stock or a bond, those financial

*Johnson - Cross*

1   instruments frequently are -- I guess, would normally go to

2   the Atheist Headquarters?

3   A.   Yeah.

4   Q.   Okay.  And if somebody wanted to make something as small

5   as a $50 cash donation, it would normally --

6   A.   Yes.

7   Q.   -- go there?  And it's my understanding that mail that was

8   addressed to Ms. O'Hair went directly to Ms. O'Hair.  Do you

9   know that?

10  A.   I have no idea what happened when the mail was opened at

11  the headquarters.

12  Q.   Okay.  Then, you have no idea if there were formal,

13  informal, or nonexistent methods of accounting for assets that

14  were sent there, do you?

15  A.   I have no idea about what happened with the accounting and

16  the assets.

17  Q.   All right.

18  A.   To who?  Accounting to who, Mr. Mills?

19  Q.   Well, I would assume that if a donor sent money or assets

20  to the atheists -- American Atheists, that that would, in

21  theory, be an asset of the organization as opposed to Madalyn?

22  A.   Of course.

23  Q.   All right.

24  A.   Some people sometimes would send a check made out to

25  Madalyn or Jon.  I've even received one myself, you know.  You

1   know, they just love her and they love Jon and they do that.

2   We don't want them to do that, but they do it.  And those

3   checks are signed over to the organization.

4        But, you know, if a donation is made and it is not

5   posted, the donor will call up and say, "I didn't get this

6   back," or you could see how it was signed on the back.  So

7   that's pretty much a check on how things are taken care of.

8   You sent cash, that was not smart.

9   Q.  But it happened.

10  A.  There's no check on it, I guess.

11  Q.  Right.  There was no formal audit done every year, for

12  example, by an independent accounting firm, was there?

13  A.  Well, no.  We had the IRS do that every year.

14  Q.  All right.  And they usually came up with a conclusion

15  that was disagreed with somehow the organization owed some

16  money again, right?

17  A.  Not usually.  You used the word "usually."  I don't think

18  that usually.  I think there was an issue at one point in

19  time, because at one point in time, the Murray O'Hairs didn't

20  have a professional accounting firm.  They did their 990s

21  themselves, and they made mistakes like everybody does.

22  Q.  Right.

23  A.  That's all it was.

24  Q.  Just to make sure I get my question answered, there was

25  not a formal yearly, quarterly, or semiannual audit done by an

Johnson - Cross

1   independent accounting firm of the organizations, was there?

2   A.  No, not that I know.

3   Q.  That $600,000 that was moved from New Zealand to the bank

4   in New Jersey by Jon Murray, whose money was that?

5   A.  The organization, the corporation United Secularists of

6   America.

7   Q.  All right.  So he didn't have any authority to back gold

8   coins with that, did he?

9   A.  Yes, he did.  He was entitled to do that.

10  Q.  Okay.  He didn't have any entitlement to use the gold

11  coins or part of them for his own use, did he?

12  A.  No, he did not.  Did he?

13  Q.  That's what the trial's about, isn't it?

14  A.  Okay.

15  Q.  When you first went to the home where the three people

16  lived, I believe you said that you saw that some of Ms.

17  O'Hair's medicine was there.  Is that -- did I write that down

18  correctly?

19  A.  Yes, you did.

20  Q.  She injected insulin daily, didn't she?

21  A.  Yes, she did.

22  Q.  You don't know -- and you talked to her during the month

23  after she left the home, didn't you?

24  A.  I don't know if it was a month after she left.  It was

25  early on.

Johnson - Cross

1   Q.   Okay.   During the next month is what I really mean.

2   A.   Yes.

3   Q.   All right.   And she didn't ever say, "I don't have my

4   medicine," did she, to you?

5   A.   I talked to her for one minute.

6   Q.   All right.   During that period of time, do you know

7   whether or not she had other medicine than the medicine that

8   she had at the house?

9   A.   I do now know that medicine was purchased.

10  Q.   All right.   But during that month, you did not know, did

11  you?

12  A.   No.

13  Q.   All right.   Now, she did not -- how much of the time that

14  she was awake did she use a wheelchair?

15  A.   I never spent time with her all the -- I lived in New

16  Jersey.

17  Q.   All right.

18  A.   When she was with me, she used a wheelchair a lot --

19  Q.   All right.

20  A.   -- or a walker.

21  Q.   All right.   So when you saw a wheelchair at her home, did

22  that cause you to wonder how many wheelchairs she owned?

23  A.   No, did not.

24  Q.   Do you know -- did you know at that time how many she

25  owned?

Johnson - Cross

1    A.   I only saw one.

2    Q.   Do you know how many she owned?

3    A.   No.

4    Q.   Do you know how many walkers she owned?

5    A.   No.

6    Q.   Did you see her walker at her house?

7    A.   I don't recall.

8    Q.   You don't recall having seen it, do you?

9    A.   No.

10   Q.   When you talked with Jon Garth Murray during the 30-day

11   period after they left their home and business, from only his

12   tone of voice -- I'm not asking you about the words he spoke,

13   from only his tone of voice -- nothing caused you to call the

14   police or other law enforcement agency, did it?

15   A.   His tone was different.  It changed throughout that

16   period; it was not the same.

17   Q.   It was not the same at the end of the 30-day period as it

18   was at the beginning, correct?

19   A.   Yes.

20   Q.   All right.  At the beginning of the 30-day period, did you

21   call any law enforcement agency and report a possible problem?

22   A.   No.

23   Q.   At the end of the 30-day period, or into October or

24   mid-October, did you call any law enforcement agency and

25   report a potential problem with Jon Murray?

*Johnson - Cross*

1    A.   I tried.

2    Q.   You tried.  Which law enforcement agency?

3    A.   Texas Police Department.

4    Q.   And where do you find the Texas Police Department?

5    A.   I got the phone number from Spike Tyson, or I just called

6    information --

7    Q.   All right.

8    A.   -- that I recall.

9    Q.   All right.  For the -- a certain branch of police?

10   A.   I don't recall, Mr. Mills.  It was five years ago.

11   Q.   All right.  You don't recall what city you called?

12   A.   Austin.

13   Q.   Austin?  Are you saying that as a guess or as an answer?

14   A.   As an answer.

15   Q.   All right.  You believe that you called the Austin Police?

16   A.   I did call the Austin Police.  I spoke with a woman.

17   Q.   All right.  So your phone records would show a call to the

18   Austin Police?

19   A.   (Moving head up and down.)

20   Q.   They're in evidence, right?

21   A.   Should.

22   Q.   All right.  You do not possibly know what the three O'Hair

23   Murrays would have been feeling emotionally during that 30-day

24   period if they were about to flee the United States and the

25   Internal Revenue Service?  You couldn't know that having never

*Johnson - Cross*

1   seen that happen with them before, correct?

2   A.  I don't understand what you're saying.  I'm sorry.

3   Q.  Did it enter your mind during that 30-day period that they

4   might be leaving Austin?

5   A.  They did -- they were in San Antonio, I know that.

6   Q.  Did it -- did you form -- have a thought that they might

7   be leaving Texas?

8   A.  No, not at all.

9   Q.  All right.  You believe that they were doing a business

10  deal in San Antonio, correct?

11  A.  Something like that.

12  Q.  Did you see a sign -- not really a sign, but a letter that

13  was put on the door of the American Atheist building saying

14  that they were leaving?

15  A.  It said -- I don't know what it said.  You want to read me

16  what it says?

17  Q.  I don't have it in front of me, but in general, did you --

18  A.  We'll be back.  We're just going to be away for a short

19  period of time.  Carry on as usual.

20  Q.  All right.  Did they use the phrase "business as usual"?

21  I know you used that phrase earlier.

22  A.  I don't recall.

23  Q.  All right.

24  A.  It's just my phrase.

25  Q.  Without stating what this is, did you see that during this

*Johnson - Cross*

1  30-day period?

2  A.  Yes, I think I did.  Must have been faxed to me, probably.

3  Q.  Does that appear to be a Xerox copy of it?

4  A.  Yes, faxed to me.

5  Q.  We would offer Defendant's Exhibit EJ-1.

6        MR. CARRUTH:  No objection.

7        THE COURT:  EJ?

8        MR. T. MILLS:  Ellen Johnson 1.

9        THE COURT:  It's received.

10  Q.  (BY MR. MILLS) Do you remember who faxed you this

11  document?

12  A.  Could only have been Mr. Tyson.  He was the only one who

13  was in the building.

14        MR. T. MILLS:  Sorry, Judge, I'll just read it.

15  Q.  (BY MR. MILLS) Would you tell, again, who Spike Tyson was

16  in the organization?

17  A.  An employee.

18  Q.  All right.  And when you saw this letter, did you see that

19  it was dated September 7th, 1995?

20  A.  Yes.

21  Q.  And did this letter, at the bottom, have Jon Garth

22  Murray's signature on it?

23  A.  Yes, I believe so.

24  Q.  And having known -- you've known him for a long time, I

25  suppose?

Johnson - Cross

1    A.   Yes, I have.

2    Q.   All right.  And do you have any reason to think that this

3    is not his signature?

4    A.   No.

5    Q.   All right.  And due to the absence of the Murray O'Hairs,

6    you need to be given some instructions to be carried out at

7    the General Headquarters until they return.  It is doubtful

8    that we will -- shall be able to return to Austin prior to

9    9-15.  Therefore, he encloses a check for Mr. Tyson's pay.  He

10   encloses a key to the headquarters along with his burglar

11   alarm code.  He instructs Mr. Tyson to get keys to pick up

12   mail to see if the -- Alfred, who was running the printing

13   presses, have left ink on the rollers, to reset the answering

14   machines, pick up the repaired dicta phone machine, and take

15   other actions that would basically indicate that there was

16   going to be business as usual continue; isn't that correct?

17   A.   Yes.

18   Q.   All right.  And that was on September the 5th, I believe,

19   1995?

20   A.   It was the 7th.

21   Q.   Was it the 7th?  All right.  Now, two days before

22   September the 5th -- September the 7th, 1995, on September the

23   5th, 1995, it appears from Government's Exhibit W1-2 and W1-1

24   that Robin Murray O'Hair, president of the United Secularists

25   of America, and Jon Garth Murray, secretary, Jon G. Murray,

*Johnson - Cross*

1   United Secularists of America, Inc., signed two signature

2   cards at National Westminster Bank, New Jersey; is that

3   correct?

4   A.  Yes, it is.

5   Q.  And where is National Westminster Bank, New Jersey?

6   A.  In Boonton.

7   Q.  Boonton?

8   A.  Boonton.

9   Q.  All right.  Is that near where you live?

10  A.  Yes, it is.

11  Q.  All right.  Did you see Robin Murray O'Hair or Jon Garth

12  Murray on September the 5th, 1995?

13  A.  No, sir, no.

14  Q.  Well, when you were frantically trying to find where they

15  were, did anybody say, well, there are some signature cards

16  that make it appear that they signed these signature cards on

17  September the 5th, 1995?  Was that -- did anyone ever bring

18  that to your attention?

19  A.  No.  They probably would not have even known about those

20  cards, but those cards were probably obviously mailed to Texas

21  to be signed --

22  Q.  That would mean --

23  A.  -- and mailed back.

24  Q.  -- that would be your speculation.

25  A.  No.  I had to send them because I had to get them.  I

*Johnson - Cross*

1    opened the accounts with them.

2    Q.  Well, then, tell me when were they signed.

3    A.  When?

4    Q.  When?

5    A.  Aren't there signatures and the date on there?

6    Q.  September the 5th, 1995.

7    A.  Okay.

8    Q.  All right.  Did you send those to Jon and Robin to get

9    them to sign them?

10   A.  Yes.

11   Q.  All right.  And did they mail them back to you?

12   A.  Yeah, probably.

13   Q.  So during this time that they're supposed to be kidnapped,

14   they're sending these signature cards back to you in New

15   Jersey?

16   A.  At that time, we had no knowledge of any kidnapping,

17   remember?  At that time, it was -- we're doing business.

18   Everything is as usual.  Everything's fine.  And clearly, if

19   you're doing, you know, banking, why would you bother even to

20   be involved in banking if you're just going to disappear?  So

21   everything just seemed to be business as usual.  It all makes

22   sense.

23   Q.  Uh-huh.  Well, of course, if you're going to disappear and

24   didn't want people to know you were going to disappear --

25   A.  Then you wouldn't give them your address to send your

Johnson - Cross

1    cards, signature cards.

2    Q.  You mean the post office box?

3    A.  I guess that's where I sent them at that time.

4    Q.  Okay.  So they really didn't give them their address, did

5    they, ma'am?  They gave them a mailbox anonymous?

6    A.  Tells you kind of where you are.

7    Q.  Yes.  And from that, I guess you were not able to find

8    them?

9    A.  No.  We knew generally where they were.

10   Q.  Well, generally where were they?

11   A.  San Antonio, near Fredericksburg Road, Bandera where the

12   Mailboxes, Et Cetera was, where they were making phone calls

13   from.  But this was all taking -- you know, the information

14   was coming slowly.  We were gaining more and more information

15   over a period of weeks.

16   Q.  All right.  The Atheist Organizations that existed in

17   1995, do they still exist?

18   A.  Yes, we did not dissolve any of the corporations.

19   Q.  All right.  Do they still -- do they still provide

20   information to the public and to their members and to the

21   media about areas of interest to atheists?

22   A.  Yes, except for AAGHQ, it's an inactive organization.

23   Q.  All right.  And the organization still -- do they still

24   sell products?

25   A.  Yes, they do.

Johnson - Cross

1   Q.  Print booklets, print leaflets?

2   A.  We have started to put everything back together.

3   Q.  All right.  Well, it's been about five years?

4   A.  Uh-huh.  Well, it hasn't been put back together for five

5   years.  It's only been several years that things have really

6   gotten back together.

7   Q.  Did she proudly call herself the most hated woman in

8   America?

9   A.  That's what the media says.  And the media likes to repeat

10  what the other media says.  And nobody bothers to ask us or to

11  ask her.

12  Q.  Well, they asked Jon.

13  A.  All these years, I have never heard her say that.  Well,

14  Jon didn't say -- you know, she didn't say that on the video.

15  I've never heard her say that.  In fact, that was like Life

16  magazine.  I think I have the original Life magazine from the

17  office where it says that, but I never heard her say that.

18  Q.  You just heard her son say that?

19  A.  Here?

20  Q.  Yes.

21  A.  That's the only time I've heard that in all these years.

22  Not at any speech, not in any TV shows, not in anything

23  written down.  I might have missed it, but I never heard it

24  because the media likes to say what associates hate with

25  Madalyn, hate with Madalyn, and that's why they perpetuate

*Johnson - Cross*

1    that.

2    Q.  Well, you know, someone, as I understood your testimony,

3    found it necessary to have workshops on hatred reduction.  Did

4    you testify about that earlier?

5    A.  Yes, it was a prejudice reduction workshop.  It's the

6    Matty Feldman multicultural summer camp, and they're prejudice

7    reduction workshops and we did a workshop on hatred and

8    intolerance towards atheists.

9    Q.  All right.  You mean you found that some people who claim

10   to be religious people harbored hatred toward atheists?

11   A.  And intolerance.

12   Q.  All right.

13   A.  Misunderstanding.

14   Q.  All right.  Incidentally, that's on this business as usual

15   that I was asking you about earlier when you heard Robin say

16   during this 30-day period of alleged kidnapping, I want you to

17   do the right thing.

18   A.  "I hope you'll do the right thing" -- or "I know you'll do

19   the right thing."

20   Q.  All right.  "I know you'll do the right thing."  You

21   interpreted that to mean continuing to help run the business

22   and carry on, correct?

23   A.  I didn't interpret it, counselor.  I really don't know

24   what she was thinking at that time.  She was distraught.

25   Q.  Well, you answered it for Mr. -- Dr. Carruth by saying --

1  excuse me.  I'll get it out -- that you believed that you have

2  done what she wanted by carrying on the organization.

3  A.  I like to think that that's what she would have wanted me

4  to do and that's what she had in mind.  I have no knowledge of

5  what she actually meant.  She was totally distraught.

6  Q.  During that period of time, you were aware -- or are you

7  aware that without going into the exact communications that

8  Jon Garth Murray contacted the CPA several times to reschedule

9  appointments, correct?

10  A.  I didn't know that.

11  Q.  All right.  To your recollection, when did you first see

12  that $600,000 had been transferred from New Zealand to New

13  Jersey to San Antonio, Texas?

14  A.  The end of 1995.

15  Q.  You did not attach anything to that that caused you to

16  report that fact to the police, did you?

17  A.  No, because I didn't know what was going on.

18  Q.  Right.  And it was just as consistent with what was going

19  on was that Jon Garth Murray may have some explanation of why

20  he has the money?

21  A.  Right.  Everything seemed to be normal at that time, and

22  there was no reason to think he shouldn't have that money.

23  Q.  Right.

24  A.  At that time, it was perfectly all right for him to have

25  that money.

Johnson - Cross

1   Q.  All right.  You do not know how many bank accounts in what

2   states or countries were in existence that the Madalyn O'Hair

3   Murrays have signature power on.  You did not know those facts

4   before August the 27th, 1995, did you?

5   A.  No.

6   Q.  Did you know about an account in Switzerland?

7   A.  I know no account in Switzerland at any time.

8   Q.  The house where they lived was owned by which atheist

9   corporation?

10  A.  Their house is not owned by a corporation.  It is owned by

11  the Murray O'Hairs.  The corporation cannot own people's

12  houses.

13  Q.  Okay.  Did any of the corporations own any of the

14  automobiles?

15  A.  Not -- I don't have any knowledge of that.  There was --

16  because that's -- that would be their personal -- they

17  shouldn't.  If the corporations owned the automobiles -- I

18  think they owned -- not the Murray O'Hairs' automobiles.

19  There was a little red piece of junk, horrible, horrible

20  thing, must have been at least ten years old, that was like

21  the corporate automobile to go get the mail.  That's the only

22  one we know of.  You wouldn't want to ride in it.

23  Q.  Did the corporations pay for the maid service at the house

24  and at the office?

25  A.  I think if there was a -- I don't know.

Johnson - Cross

1   Q.  Okay.  Well, if we were to go to this date, say,

2   hypothetically, August the 27th, 1995, who was -- if there was

3   one, the person that was the financial manager and -- in that

4   atheist -- American Atheist building -- who was the

5   financial --

6   A.  Jon Murray handled the finances.

7   Q.  Jon Murray.

8   A.  Paid the bills.

9   Q.  All right.

10  A.  Ordered the products.

11  Q.  And that must mean that -- well, strike that.  From your

12  knowledge of Jon Murray, he certainly had the ability to take

13  over that kind of job, didn't he?

14  A.  He didn't take it -- in 1986?  After he became president?

15  Q.  Well, I was actually asking about when he managed the

16  money that came in and the assets that came in.  I don't know

17  when that started.  When did that start?

18  A.  I don't understand.

19  Q.  All right.  Let me just go to 1995.  Did you believe that

20  he had the capability to be a smart, independent-minded

21  president of the organization?

22  A.  I sure did.

23  Q.  All right.  Was he just some pansy that took orders from

24  his mother?

25  A.  They worked together.  They didn't order each other to do

*Johnson - Cross*

1    anything.

2    Q.  All right.  So he wasn't just a milk toast who took -- did

3    anything his mother would say, was he?

4    A.  No.

5    Q.  He spoke his own mind?

6    A.  Yeah, you heard the tape.

7    Q.  Yes.

8    A.  They're honest people, truthful people, so yes.

9    Q.  All right.  Now, have you heard that they hid assets from

10   creditors other than the Truth Seekers?

11   A.  They did not hide any assets.  Assets were never hidden.

12   And I have no knowledge of them ever, at any time, hiding any

13   assets, not even a nickel, from anybody.

14   Q.  Have you heard that they sometimes in their lives traveled

15   under false identities?

16   A.  I think Madalyn was in the hospital when she might have

17   used a different name when she was sick with heart problems.

18   That's the only thing I know of.  That's possible -- I think

19   so.  I could have heard that.  But traveling under false

20   identity, I can't imagine why.

21   Q.  Can you -- have you heard, in forming your opinion that

22   they were truthful, honest people, that they sometimes

23   possessed false identification in their lives?

24   A.  No.

25   Q.  So you know nothing about their lives that would cause you

Johnson - Redirect

1    to say that they were anything but completely honest,

2    above-board people?

3    A.  That's correct.

4    Q.  That's all the questions that I have.

5                    RE-DIRECT EXAMINATION

6    BY MR. CARRUTH:

7    Q.  Counsel asked you about the tone of the voices of Jon and

8    Robin when you spoke with them during that month in San

9    Antonio.  And you said in response to counsel's question that

10   Robin sounded totally distraught.  Could you please elaborate

11   on that for the jury?

12   A.  She couldn't talk.  She didn't hear a word I was saying.

13   It was not like Robin.  There were three -- the Murray O'Hairs

14   were three different personalities.  Robin was always cool and

15   calm and collected.  She never in all the years I've known

16   her --

17           MR. T. MILLS:  Excuse me.  I object to it being

18   nonresponsive.

19           MR. CARRUTH:  I'm asking her to explain what she meant

20   by distraught, your Honor.

21           THE COURT:  You may answer.

22   A.  She was always calm, always, never lost it.  I was talking

23   to her on the phone.  I don't remember exactly what we were

24   talking about.  She wasn't answering.  She wasn't responding.

25   "What's going on?", I'm saying.  "What's wrong?"  "Nothing."

*Johnson - Redirect*

1   I was so upset, and something was terribly wrong.  The words

2   -- all I remember her saying was, "I know you'll do the right

3   thing."

4          But, you know, the way she said it was horrible,

5   horrible, and I had to call Conrad, our other -- my colleague

6   in New Jersey, and say --

7          MR. T. MILLS:  We object to nonresponsive.

8          THE COURT:  Let's wait for a question.  Just answer

9   the question.

10  Q.  (BY MR. CARRUTH) It was very out-of-character for Robin in

11  your opinion?

12  A.  Absolutely.

13  Q.  Counsel also asked you about the automobiles.  Did you

14  know what type of automobiles the O'Hairs owned when they

15  disappeared in 1995?

16  A.  The only automobiles that I know of or ever knew of was

17  Robin had an old Porsche and Jon had an old Mercedes.

18  Q.  And how did Jon feel about that Mercedes?

19  A.  He loved his car.  He loved it.  It was a well-made car,

20  and he loved it and took care of it.  And I think he just had

21  it tuned up before, like, the disappearance.  He really loved

22  his car.  He didn't have much in life, but he had a nice car.

23  Q.  Counsel also asked you about the $600,000 transfer that

24  you later found out had been made.  Now, you weren't aware of

25  it at the time, were you, ma'am?

1    A.   At the time that it was made, I didn't know that that had

2    happened.

3    Q.   In fact, did you subsequently learn that Mr. Murray

4    traveled personally to New Jersey to facilitate that wire

5    transfer?

6    A.   Only recently.  After all these years that I know he

7    actually came up to New Jersey to do that.

8    Q.   Now, how far is that bank from where you live?

9    A.   A couple of miles.

10   Q.   And he never called or came by?

11   A.   No.  Unusual.

12   Q.   Did you find that strange?

13   A.   Yes.  If he was in Pennsylvania or New York, he would have

14   called or said something, but to be right in the same town,

15   oh, sure.

16   Q.   And, in fact, you testified, I believe earlier, that when

17   he came there in June or July, that you and he traveled

18   together to New York?

19   A.   Yeah, he had stayed right in the area.

20   Q.   Did you subsequently determine where Mr. Murray stayed

21   when he went to New Jersey in September of 1995?

22   A.   Yes.

23   Q.   And where was that?

24   A.   Right in the next town over, called Parsippany, at the

25   Tara Hotel.

*Johnson - Redirect*

Q.   And was there anything unusual about that choice of logic?

A.   Well, it looks like -- from what it looks like, it looks like a castle.  It's the Sheraton Tower, looks like a fortress.  You can't mistake it.

Q.   Where did he normally travel?

A.   I usually put him up right across the highway in the Embassy Suites, which is right across the highway which is where the Sheraton is, but I can't imagine why he would go to the expense of the Sheraton.

Q.   Do you know anyone by the name of Conrad Johnson?

A.   No, I don't.

Q.   Have you ever heard that name before?

A.   Yes, I do.

Q.   In what context?

A.   Going through the records after the disappearance, I looked at an American Express bill for Jon Murray, and it showed that he -- someone had purchased two airline tickets to Newark, New Jersey.

Q.   From Texas?

A.   Correct.  And at the time of the transfer, I think that was.

Q.   You're talking about the transfer of the money, the $600?

A.   Yeah.

Q.   Okay.

A.   And the one name was for Jon Garth Murray.  The other

1   person traveling was -- the name was Conrad Johnson.  I knew

2   immediately that that was fake.  That was a fraudulent name.

3   My colleague who lives in New Jersey, who was one of our head

4   writers, his name is Conrad Goeringer, and my name is Ellen

5   Johnson.  So I said, okay, somebody made this name up, Conrad

6   Johnson.  And who would know our names?  Jon, so I guess he

7   made that name up.  So who is this mysterious person he's

8   traveling with and why?

9   Q.  And did you make any inquiry of the airlines to determine

10  who Conrad Johnson was?

11  A.  Yeah, I called the airlines because they have video

12  cameras, and I thought, well, you know, this was a couple of

13  -- at least a year later.  Do you have videotapes of people

14  walking through your airport because I have a friend who's

15  missing, and they said no, we only save them for, like, up to

16  three or four months or something.  I tried that.

17  Q.  Did you determine during that same time period that that

18  was prior to the time the airlines required photo IDs to board

19  a plane?

20  A.  Right.  It was, like, Thanksgiving after that

21  disappearance, there was some kind of a bombing somewhere, and

22  there were new federal laws I just found out, which -- since

23  that time, that's when you had to have a photo ID with you

24  when you go to an airport.  That's when it started.  So this

25  person, Conrad Johnson, didn't have to have ID.

*Johnson - Redirect*

1    MR. T. MILLS:  Objection to the narrative testimony.

2    Q.  (BY MR. CARRUTH) What I'm asking you now is based on your

3    own personal knowledge and not what you've subsequently read

4    or heard in some other source.

5    A.  Yes.

6    Q.  Did you personally ever determine who Mr. Conrad Johnson,

7    mysterious traveler, with Jon was?

8    A.  No, we don't know.

9    Q.  Pass the witness.

10                      RE-CROSS EXAMINATION

11   BY MR. T. MILLS:

12   Q.  Isn't it true that trying to decide and understand why

13   Robin had a certain tone of voice, observing that Jon loved

14   his Mercedes and finding out that while you usually booked him

15   at the Embassy Suites, he stayed at a Sheraton Hotel, trying

16   to determine the meaning, if there was any, of those things

17   would depend on what was happening in Robin's life, what was

18   happening in John's life, what was happening in Robin's life.

19   None of those facts did you know, correct?

20   A.  I didn't know what was happening, but those things were

21   significant to me.

22   Q.  Yes.  Thank you.

23          MR. CARRUTH:  Nothing further, your Honor.  May the

24   witness be excused?

25          THE COURT:  Counsel, may the witness be excused?

Etter - Direct

1    MR. T. MILLS:  Yes.

2    THE COURT:  You may be excused, ma'am.  Call your next

3    witness.

4    MR. D. MILLS:  Let me go get him, your Honor.

5    THE COURT:  Come forward, please.  This is Mrs. Sims.

6    She's going to administer an oath to you.

7    (Witness was sworn.)

8    THE COURT:  Come around this column, please, sir, and

9    have a seat.  Tell us, please, sir, your full name and spell

10   your last.

11   THE WITNESS:  Craig Alan Etter.  Last name is

12   E-T-T-E-R.

13   CRAIG ALAN ETTER, called by the Government, duly sworn.

14                      DIRECT EXAMINATION

15   BY MR. D. MILLS:

16   Q.  Where do you reside, sir, and where are you employed?

17   A.  I reside in Vienna, Virginia, and I am an attorney with

18   the law firm of Greenberg & Traurig.

19   Q.  And what is the principal area of law that you practice?

20   A.  The principal area of law that I practice is tax law.

21   Q.  And can you give the jury the benefit of your educational

22   experience and some of your work background that preceded your

23   current employment, please?

24   A.  Yes.  I graduated -- undergraduate from Dupar University

25   in 1979.  I worked for Arthur Anderson, and obtained my CPA in

Etter - Direct

1    1980.  In 1980, I began law school and graduated from Indiana

2    University School of Law in 1983.  At that point in time, I

3    went to work for the Internal Revenue Service as a trial

4    attorney.  And I worked for the Internal Revenue Service up

5    through August of 1989.

6            At that point, I left the government, went to work for

7    a private law firm in Washington, D.C. by the name of

8    Ginsburg, Feldman & Bress.

9    Q.  You and I met for the first time last evening; is that

10   correct?

11   A.  Yes.

12   Q.  You came to my office and we visited, maybe, an hour or

13   so; is that correct?

14   A.  Yes.

15   Q.  And you and I looked at some documents that you have in

16   front of you; is that correct?

17   A.  Yes.

18   Q.  And I would ask you if you can look at those documents,

19   W4-2, W4-3, W4-4, W4-5, W4-7, W4-8, W4-10, W4-13, W4-14,

20   W4-15, W4-16, W4-18, W4-19, W4-20, W4-24 and W4A-5 and W4A-10?

21   A.  Yes.

22   Q.  And you're familiar with those records, correct?

23   A.  Yes, I am.

24   Q.  And those are a part of your business records of the law

25   firm that you work for; is that correct?

*Etter - Direct*

1    A.  Yes.

2    Q.  So you have personal knowledge of the contents of those

3    documents, do you not?

4    A.  Yes, I do.

5    Q.  We'd offer those, your Honor, and they've previously been

6    shown to defense counsel.

7          MS. WILLIAMS:  No objection.

8          THE COURT:  All right.  They're received.

9    Q.  (BY MR. D. MILLS) In your law practice, did you come in

10   contact with a person by the name of Madalyn Murray O'Hair,

11   Jon Garth Murray and Robin O'Hair?

12   A.  Yes, I did.

13   Q.  And can you tell the jury when that was you came into

14   contact with them and what capacity, please?

15   A.  I first was contacted by Madalyn O'Hair, Jon Murray and

16   Robin Murray O'Hair in the spring of 1991.  At that point in

17   time, I began representing them in a matter with the Internal

18   Revenue Service.

19   Q.  Can you tell the jury, please, the nature of the matter

20   that you were representing them for?

21   A.  Yes.  At the time, I represented the Atheist Organizations

22   that they worked for in connection with an audit by the IRS of

23   those organizations, as well as I began representing the

24   individuals in individual audits against each of them by the

25   Internal Revenue Service.

*Etter - Direct*

1  Q.  And what was the nature of the Internal Revenue Service's

2  inquiry, dispute, whatever -- however you wish to characterize

3  it?

4  A.  Into the organizations?

5  Q.  Yes.  Tell us about the organizations and then, tell us

6  individually, too, if you don't mind.

7  A.  Yes.  The IRS was investigating the organizations to

8  determine whether there was any inurement or private benefit

9  to Madalyn O'Hair, Jon Garth Murray and Robin Murray O'Hair

10  sufficient to warrant a revocation of the exempt status of

11  those organizations.

12  Q.  And this was in 1991?

13  A.  This was -- the investigation had actually begun before

14  that, but I began representing them in the spring of 1991.

15  Q.  And so what about the individual matters?

16  A.  They were related individual audits for the three of them

17  by the Internal Revenue Service, which is the -- and on the

18  individual side.  If the Internal Revenue Service determined

19  that there was inurement or private benefit on behalf of any

20  one of the three individuals, then the IRS would assess

21  additional tax against them for their personal years.

22  Q.  So the issue with the organizations was whether they were

23  going to keep their tax exempt status; is that correct?

24  A.  That's correct.

25  Q.  And the issue with the individuals was whether they had

Etter - Direct

1   some tax liability?

2   A.   That's correct, although I would add that, potentially,

3   there could be tax liability at the organization over the

4   lawsuit.

5   Q.   Do you recall the amounts of money that related to the

6   individuals when you initially started, what was the amount of

7   money being claimed owed by the IRS?

8   A.   The IRS was claiming that Jon Murray owed $750,000 in

9   taxes for the years 1986, '87 and '88.  They claimed a similar

10  amount with respect to Robin Murray -- Robin for those three

11  years, also.

12  Q.   And for Madalyn?

13  A.   For Madalyn, they had not completely done their

14  investigation.  At that point in time, the audit was still

15  going on Madalyn O'Hair, and there had been no proposed

16  assessment at that time.

17  Q.   What is the significance, if any, that you can tell us in

18  having the tax exempt status or having it revoked?  What would

19  that cause to happen?

20  A.   That causes the organization to have to treat their Form

21  990 as a taxable return such as any corporation; therefore,

22  you would take the money that comes in as revenues, deduct any

23  sort of appropriate business expenses and whatever resulted

24  with the taxing corporation as any other corporation.

25  Q.   So over the years, did you have frequent -- what was your

*Etter - Direct*

1   amount of contact with Madalyn, Jon O'Hair, and Robin?

2   A.   Personal contact, in person, I would see them, roughly,

3   maybe, three, four times a year.  In terms of contact by

4   letter or telephone, that was almost on a daily basis.

5   Q.   Did they make up a large part of your practice?

6   A.   At that point in time, for those particular cases, took a

7   large amount of my time.

8   Q.   Did there come a time in 1995 when you, through your work

9   effort on their behalf, had come close to reaching some type

10  of settlement with the Internal Revenue Service?

11  A.   Yes.  I had worked out an agreement with the Internal

12  Revenue Service that essentially allowed the organizations to

13  retain their exempt status.  There would not be a revocation,

14  and in exchange for that, the Internal Revenue Service would

15  charge each of the -- each of these organizations a penalty

16  for filing inaccurate returns.

17  Q.   The amount of the penalty for the organizations was going

18  to be what?

19  A.   For the Charles E. Stevens American Atheist Library, it

20  was determined that there were three years of returns that

21  potentially had errors on them.  So it was going to be a

22  $15,000 penalty for the library.  For Society of

23  Separationists, it was determined that there was 15 years, and

24  at $5,000 per year was a proposed penalty of $75,000.

25          MR. D. MILLS:  Your Honor, did I offer those exhibits

Etter - Direct

1    earlier?  You admitted them in.

2            THE COURT:  They're admitted.

3            MR. D. MILLS:  All right.  Thank you.

4    Q.  (BY MR. D. MILLS) Would you refer to W4-2 and tell the

5    jury what that is and how this relates to the settlement that

6    was going on that you negotiated with the Internal Revenue

7    Service?

8    A.  May I take it out of the --

9    Q.  Yes, you sure may.  That is a letter from the Society of

10   Separationists to you, is that correct, dated April 19th,

11   1995?

12   A.  This is a letter from the Society of Separationists,

13   addressed to me, April 19th, 1995.  At this point in time, we

14   were trying to accomplish the final details of the settlement

15   with each of these organizations.  At that time, the big

16   question that we had was the -- there were really two

17   questions:  Number one, where the money was going to come from

18   to pay the $75,000 penalty for Society of Separationists.  And

19   there's also some concern about the closing agreement that we

20   had entered -- we had proposed to the IRS in finding the board

21   members to serve on the new board.

22   Q.  Would you explain to the jury, when you talk about a

23   closing agreement with this issue of new board members, what

24   you're talking about briefly?

25   A.  Yes.  There's an agreement that you enter into with the

*Etter - Direct*

1    IRS that explains what you will do in the future to make sure

2    that you're in full compliance with the Internal Revenue laws.

3    The Internal Revenue Service was very much interested in

4    making sure that there was new elements of kind of internal

5    control over the organization such as appointing a board that

6    had a majority of outside members, in other words, that if,

7    for instance, Jon or Robin were on the board, they required

8    that there be additional board members such that the outside

9    board members would have a majority vote on the board.

10          These types of provisions for future compliance were a

11   part of the overall settlement that we worked out with the

12   IRS.

13   Q.   And that's what this letter is referencing?

14   A.   Yes, this letter, she's mentioning --

15   Q.   She being?

16   A.   This is from Madalyn O'Hair.

17   Q.   And you recognize that to be her signature; is that

18   correct?

19   A.   Yes, I do.

20   Q.   All right.

21   A.   She's talking about board members and she was always

22   explaining what board members still remain that potentially

23   could participate in the future on the board.  But at that

24   point in time, there was also a concern as to the money and

25   where they were going to come up with the money for Society of

1   Separationists to pay the $75,000, and this letter discusses

2   that.

3   Q.  Okay.  So he put that up.  And then, I ask you to look at

4   W4-3 and ask if it is a letter from the Society of

5   Separationists to you, dated 5-24 of 1995?

6   A.  I'm sorry.  4-3?

7   Q.  4-3, yes, sir.  Hopefully they're in order.

8   A.  Yes, this is a letter, given to me, dated May 24th, 1995,

9   and this one is from Jon Murray.

10  Q.  And the purpose of that letter and how it relates to the

11  tax matters that you've been discussing?

12  A.  Jon was explaining to me that one of their board members,

13  Don Sanders, had been admitted to the Houston Hospital and

14  that he was in bad shape.  It also mentions that another board

15  member had died of a heart attack on Easter, April 16th.  It

16  also discusses the possibility of obtaining a loan for the

17  money to pay the IRS to finally resolve the Society of

18  Separationists audit.

19  Q.  That had been some type of an issue about obtaining a loan

20  to pay the IRS previously?

21  A.  Yes.  The national office of the IRS had asked that we

22  make any efforts possible to see if we could borrow the money

23  from banks.  Jon was the one that actually contacted the

24  banks.  Jon Murray contacted each of the banks and tried to

25  obtain this loan.  And it mentions the loans here -- I'm

*Etter - Direct*

1  sorry.  Actually, Madalyn O'Hair contacted the banks, and they

2  had contacted Bank of America, BankOne, Bank United and

3  Comerica Bank, and they're explaining to me what each of those

4  banks said.

5  Q.  Okay.  And then, look at the next exhibit, W4-4, and tell

6  the jury what that is and the date and what the purpose of

7  that letter is.

8  A.  This is a letter that I drafted on June 27th, 1995 that I

9  faxed to Robert Kolbe, who was the individual that was

10  handling the IRS audit of the organizations.

11  Q.  When you say handling, he was representing the IRS is what

12  you mean by that?

13  A.  Yes, he was representing the IRS.

14  Q.  And what was the purpose of that letter?

15  A.  The purpose of this letter was to follow up on some

16  telephone conversations that I had had with him concerning the

17  Society of Separationists' payment of the proposed settlement

18  amount.  I was explaining to him that the Society of

19  Separationists had contacted four different banks to try to

20  obtain the funds, but had been unsuccessful.

21       I also suggested in this letter that we try to figure

22  out some alternative way of satisfying the IRS allegations.

23  And I explained to him in this letter that there was a

24  parcelled property in Illinois that perhaps the organization

25  could provide the government with some security interest to

*Etter - Direct*

1    pay the IRS at the point in time when the property was sold.

2    Q.   Okay.  Now, look at W4-5 and tell the jury the date of

3    that document and what that document demonstrates or

4    references.

5    A.   This is a document that was generated by the accounting

6    personnel in the law firm I was working in at that point in

7    time.  It had attached to it a list of all the escrow account

8    balances under Society of Separationists, which was the one

9    that I was handling at the time.  I had an escrow account,

10   $15,000, that had been paid from Charles E. Stevens American

11   Atheist Library to our law firm to put in escrow so we could

12   satisfy the penalty that the IRS was requesting Charles E.

13   Stevens.

14   Q.   I believe it was your earlier testimony the amount of

15   penalty was, in fact, $15,000 for the library; is that

16   correct?

17   A.   Yes.

18   Q.   So you had the funds to pay that?

19   A.   I had the full amount of the funds to pay that liability.

20   Q.   Okay.  Now, look at W4-7, and tell the jury what that is

21   and the date of that document, please.

22   A.   This is a letter from me to Madalyn O'Hair, Jon Murray and

23   Robin Murray O'Hair, dated July 17th, 1995.  This letter

24   explains to them that I had spoken to Bob Kolbe about the

25   penalties that they wanted to assess against the Society of

*Etter - Direct*

1  Separationists; and it also explains that he had requested

2  certain information about the Illinois property, which I had

3  proposed that the IRS take a lien against to satisfy the

4  liability.

5       It identifies the specific information that Mr. Kolbe

6  wanted on the property.

7  Q.  So this is the $70,000 amount due relative to the Atheist

8  Organizations; is that correct?

9  A.  Yes, it is.

10 Q.  And earlier, you said it was 15 years of penalty at 5,000

11 a year for filing the false returns.  Could it have been 14

12 years and $70,000 instead of 75?

13 A.  At one point in time, the IRS had spoken about 15 years

14 and 75,000.  By this point in time, they were only seeking

15 70,000.

16 Q.  So, basically, 14 years of what they consider to have

17 false returns were the 5,000 --

18 A.  Inaccurate returns.

19 Q.  Okay.  I shouldn't use the word "false" because I know

20 that means something to you, but basically inaccuracy; is that

21 correct?

22 A.  Right.

23 Q.  And so you're characterizing what they're proposing, and

24 you sent that to the O'Hairs?

25 A.  Yes, I did.

117

*Etter - Direct*

1    Q.  And did you receive a response that is, in fact,

2    Government's Exhibit W4-8 to your letter of 7-17 of 1995?

3    A.  Yes, I received a letter, dated July 19th, 1995, from

4    Madalyn O'Hair.  And in this letter, she goes through a

5    response to the request for information on the Illinois

6    property.

7    Q.  And is there an enumeration number four in that letter?

8    A.  Yes, sir, there is.

9    Q.  And what is the -- what is proposed by Ms. O'Hair in

10   enumeration No. 4?

11   A.  Explains the details regarding the escrow agreement would

12   need to be worked out between our law firm and the IRS.

13   Q.  Are the terms worked out in that letter?

14   A.  Right.

15   Q.  That's the word Mrs. O'Hair used?

16   A.  Yes.

17   Q.  And is this -- this is in reference to what, that needs to

18   be worked out according to her?

19   A.  To secure the IRS liability with Society of

20   Separationists' interest in the property.

21   Q.  Does she authorize you to accept the $70,000 penalty, if

22   you will, in that letter?

23   A.  Yes, she does.

24   Q.  All right.  Now, would you look at Exhibit W4-10, and tell

25   us what that is.

*Etter - Direct*

1   A.   This is a letter, dated July 20th, 1995, addressed to me

2   from Madalyn O'Hair.  At this point in time, Ms. O'Hair wrote

3   me to let me know that they were planning a vacation in early

4   August.  She wanted to make sure that there wouldn't be any

5   mistake, you know, from the IRS's standpoint as to, you know,

6   where they were going and what they were doing.  You know,

7   they were certainly going on vacation, that they would be

8   back.  For me to continue as I had on the settlement.

9   Q.   And the date of that was the 20th of July; is that

10  correct?

11  A.   Yes.

12  Q.   And it referenced they might come by to see you?

13  A.   Yes, we will call you and hope to stop and see you.

14  Q.   Okay.  I'll ask you if you can identify what's marked as

15  Government's W4-1?

16  A.   Yes, this is a postcard that I received from the Murray

17  O'Hairs.  It was in Madalyn O'Hair's handwriting.  She's

18  telling me that they did arrive in Virginia and that this

19  postcard was proof of that.  They were nosing about, no

20  schedules, no deadlines, just gawking, paying entrance fees.

21  Q.   And you made that part of your business records and kept

22  it in your files; is that correct?

23  A.   Yes, I did.

24  Q.   We'd offer that document, your Honor.

25           THE COURT:  What is the number again?

*Etter – Direct*

1        MR. D. MILLS:  W4-1.

2        THE COURT:  It's received.

3    Q.  (BY MR. D. MILLS) Does it have a postmark on it?

4    A.  Yes, it does.  It's postmarked from Lackey, Virginia,

5    dated August 7th, 1995.

6    Q.  Now, would you look at Exhibit W4-13.  I'm sorry.  13.  If

7    I said 14, I'm sorry.  13, first.

8    A.  This is a letter, dated July 26th, 1995, addressed to me

9    and was from Madalyn O'Hair.

10   Q.  And what does it reference?

11   A.  This is a letter following up on the proposed $70,000

12   penalty by the IRS.  She had discussed that with Jon and

13   Robin.

14   Q.  Does she characterize the IRS in the letter in any way to

15   you?

16   A.  Yes.  She says as a result of the conversation with Jon

17   and Robin, she only had one thing to say, and it was, "We had

18   better stop whining about it being unfair and hope the IRS is

19   too dumb to ever find out about it."

20   Q.  In your dealings with Ms. O'Hair, did you come to form an

21   opinion about her like or dislike of the Internal Revenue

22   Service?

23   A.  Yes.  She only held the IRS in contempt.

24   Q.  Did you form an opinion about whether she was afraid or

25   scared of the Internal Revenue Service?

*Etter - Direct*

1   A.  She was not in any way afraid of the Internal Revenue

2   Service.

3   Q.  How would you characterize her in terms of her personality

4   as being a passivist, combative, argumentative, something?

5   Describe her nature.  How would you characterize her when it

6   came to dealing with the IRS?

7   A.  She was very combative.  She, like I said, simply held the

8   IRS and most of their agents in contempt and didn't have very

9   high regards for any of them.

10  Q.  Are you aware of a request from the IRS to Ms. O'Hair for

11  some documents and her response in a letter that would

12  demonstrate her disregard or contempt, if you will, for the

13  Internal Revenue Service?

14  A.  Yes.  The IRS sent Madalyn O'Hair an information document

15  request.

16  Q.  And that would be what, if you'd explain to the jury?

17  A.  This is a request, typical request that the IRS give to

18  taxpayers requesting specific itemized records that they would

19  like to see, and she received this response, and before

20  sending a copy to me, she addressed the letter back to the

21  agent, I think at that point in time was Sherrie Vance.

22  Q.  And what did the text of the letter say, the full text of

23  the letter?

24  A.  The full text was just two words.

25  Q.  And that was?

*Etter - Direct*

1   A.  "Fuck you."

2   Q.  Signed by?

3   A.  Madalyn O'Hair.

4   Q.  Did she put her signature on the bottom of that?

5   A.  Yes.

6   Q.  Okay.  Now, would you look at Exhibit W4-14?

7   A.  14, I think I'm missing.

8   Q.  Is it missing?  All right.  Is 15 the next one, then?

9   A.  Yes.

10  Q.  Okay.  Look at 15, then.  I'm sorry.  And tell the jury

11  what that is, please, sir.

12  A.  This is a letter, dated August 1st, 1995, addressed to me.

13  This is from Jon Murray.  This letter is a letter that he was

14  sending me for my information.  It was going through various

15  situations with current board members for the organizations,

16  and it had as attachments letters to them.

17  Q.  Did it have some issue about whether a estate money could

18  be used to settle $70,000?

19  A.  Yes.  I'm sorry.  This was to various trusts, or what have

20  you, from people who are deceased.  And Jon was questioning

21  whether or not any money that subsequently came in from any of

22  these particular trusts that had been bequested to the Society

23  of Separationists could be used to pay the $70,000 in

24  penalties.

25  Q.  Okay.  Continuing efforts to settle with the IRS, was that

*Etter – Direct*

1  how you would characterize that letter?

2  A.  Yes.

3  Q.  And then, W -- go ahead.

4  A.  At that point in time, they were really just trying to

5  figure out how to come up with the money and concerned that

6  the IRS would not be satisfied with simply a lien on the

7  Illinois property pending the sale.

8  Q.  And then, W4-16, tell the jury what that is, please.

9  A.  This is a letter, dated August 18th, 1995, to me from Jon.

10  This is a letter where he's explaining to me that one board

11  member, Henry Schmuck, had resigned from the board of

12  directors.  And that there was another board member, Martin

13  Baird, who had advised Jon that he could no longer afford to

14  attend the meetings, the board meetings.

15       And this letter was sent to me, just to keep me

16  advised in terms of finalizing the details with the IRS

17  settlement.

18  Q.  And the IRS was the one that was requiring some additional

19  board members; is that correct?

20  A.  Right, they were requiring, again, a majority of board

21  members that were outside of Jon and Robin.

22  Q.  From the -- when we started back with the April 19th

23  letter and we've come now to an August 18th, '95 letter,

24  during this period of time, characterize how, if you would,

25  your conversations with Jon Murray in terms of was he short?

*Etter - Direct*

1    Was he willing to talk?  Was he brief?  Was he terse?  In this

2    time frame, I mean, did he elaborate or was he real short,

3    didn't want to talk about it, or what was the tone of the

4    negotiation that you had with him?

5    A.  He was the tone that they had used, you know, up until

6    that time, you know, always with me.  They always were willing

7    to spend the time to talk about it, to try to resolve the

8    matter with the IRS.  It was a very -- you know, the tone was

9    very interested in getting the matter resolved.

10   Q.  Now, I'll ask you to look at the next -- probably the last

11   document, which is W4-18.  It's not the last one, but sorry.

12   A.  This is a letter, dated October 3rd, 1995, that I sent to

13   Jon Murray.

14   Q.  And does it reference a phone call that you had with him

15   in the tenor or in the body of that letter?

16   A.  Yes.  It references a phone call that I had with him the

17   prior Wednesday.

18   Q.  And the date of your letter is October 3rd, 1995; is that

19   correct?

20   A.  Yes, it is.

21   Q.  And did you and I determine from your reference in the

22   letter last night that when you say, "last Wednesday," that

23   would have been September 27th, 1995?  Do you recall looking

24   at a calendar and determining that?

25   A.  Yes.

Etter - Direct

1    Q.  So you had a phone call with Mr. Murray on the 27th of

2    September; is that correct?

3    A.  Yes, I did.

4    Q.  And where was it that you called and what number did you

5    locate him with when you made phone contact with him?

6    A.  I first tried to call him, you know, at the office and at

7    their home, and when I didn't get a hold of them, I called him

8    on his cell phone number.

9    Q.  And what was the purpose of your phone call?

10   A.  I was trying to get them to give me the final pieces of

11   information I needed to try to resolve, finish up the IRS

12   matters.

13   Q.  And did you notice anything different in his tone during

14   this phone conversation relative to all the other

15   conversations you had with Mr. Murray previously regarding

16   this matter?

17   A.  Yes.

18   Q.  Would you tell the jury what the differences were and how

19   you -- what opinions you came to form about that, if any?

20   A.  Jon answered the phone.  He was very agitated, did not

21   want to talk to me, did not want to discuss the IRS matter at

22   all.  He put me off by saying that he would have Madalyn call

23   me the next day, and that he couldn't discuss it.

24   Q.  And never had that behavior previously when you dealt with

25   him regarding the IRS matters?

Etter - Direct

1   A.  No.  This was a matter that was important to them.  They

2   wanted to get it resolved.  He didn't get on the phone ever

3   and, you know, act agitated by having to talk about it.

4   Q.  Okay.

5        THE COURT:  Mark your place, counsel.  Members of the

6   jury, I'm going to give you your lunch break.  I'd like to

7   start promptly at 1:30.  So please be back in the jury room a

8   little bit before 1:25.  Enjoy your lunch.  Remember the

9   instructions:  Don't talk to anybody or let anybody talk to

10  you about the case.  Have a nice lunch.

11       (Jury not present.)

12       THE COURT:  Mr. Etter, I don't run a bar.  When you

13  come back this afternoon, you either dress like a lawyer or

14  you go get a new shirt that fits and have that tie straight.

15  Do you understand?

16       THE WITNESS:  Yes, sir.

17       THE COURT:  All right.  This is a federal court.

18  Recess till 1:30.

19       (Lunch recess.)

20       THE COURT:  Anything before -- counsel, before we

21  bring in the jury?

22       MR. CARRUTH:  No, your Honor.

23       MR. T. MILLS:   No, sir.

24       (Jury present.)

25       THE COURT:  Okay.  Members of the jury, during the

*Etter - Direct*

1    noon hour, did anyone attempt to talk to any of you about this

2    case?

3           THE JURORS:  No.

4           THE COURT:  Did you talk to anybody about this case?

5           THE JURORS:  No.

6           THE COURT:  See how good you're getting?  Almost like

7    a choir.  And have you learned anything at all about this case

8    outside the presence of each other and this courtroom?

9           THE JURORS:  No.

10          THE COURT:  All right.  Show negative responses to all

11   questions by all jurors.  You may take your seat, sir.  Mr.

12   Etter, you're still under oath, sir.  You may proceed.

13          MR. D. MILLS:   Thank you, sir.

14   Q.  (BY MR. D. MILLS) Mr. Etter, would you now look at

15   Government's Exhibit W4-19, and can you tell the jury what

16   that is and the date, if it has a date on it, please?

17   A.  Yes.  This is a letter, dated September 25th, 1995,

18   addressed to me.  It's from the appeals officer that was

19   handling the individual cases relating to Madalyn O'Hair, Jon

20   Murray and Robin Murray O'Hair.

21   Q.  And for the benefit of the jury, explain if there is a

22   significance of the letter from an appeals officer, what

23   position he has, he or she has with the IRS relative to making

24   settlements.

25   A.  Yes.  The Appeals Office is an office where you attempt to

*Etter - Direct*

1    settle a case without having to try it to court.  At this

2    point in time, the cases relating to Jon and Robin at this

3    particular point in time, we had reached a basis for

4    settlement, and this letter -- by this letter, the appeals

5    officer was transmitting computations of those settlement with

6    each of these individuals.

7    Q.  And originally, I believe you said the amount was in

8    excess of 700,000 for both Robin O'Hair and Jon Garth Murray;

9    is that correct?

10   A.  Yes.

11   Q.  And what did you negotiate it down to, basically, for each

12   of the prospective persons, Robin and Jon?

13   A.  With respect to Robin Murray O'Hair, the years before the

14   tax court, we had negotiated it down to -- it was right around

15   $8,000 for all three.

16   Q.  And for Jon?

17   A.  With respect to Jon, the tax liability was negotiated down

18   to about 28,000, I believe.  It was just under 30,000.

19   Q.  Okay.  Would you look at Government's W4-20, and tell the

20   jury what that is, please?

21   A.  This is a letter from me to Robert Kolbe.  He is the

22   individual that was handling the case against the

23   organizations at that point in time.  This is a letter stating

24   that the Society of Separationists was prepared to finalize

25   the closing agreement or the settlement documents with him.

*Etter - Direct*

1         And it also explains in this letter that the --

2    Madalyn O'Hair, Jon Murray and Robin Murray O'Hair had been

3    trying to, you know, arrange for a loan to pay these bounties,

4    but had been unsuccessful in doing so.  It explains the banks

5    that they contacted that they were unable to secure a loan

6    for.

7         And then, it goes on to, again, suggest an alternative

8    to an outright cash payment, which was to give the IRS some

9    security interest in a property that was owned, in part, by

10   the Society of Separationists.

11   Q.  And did you state the date of that letter?  If you did, I

12   didn't hear you.  I'm sorry.

13   A.  The date of this letter is October 12th, 1995.

14   Q.  Okay.  And now, would you look at W4-24?  Tell the jury

15   what that is and the significance of it, too.

16   A.  These documents were drafts of an order of dismissal and

17   decision to be presented to the tax court in the cases of

18   Robin Murray O'Hair and Jon Murray.  They were prepared by

19   John McDougal, the attorney representing the Internal Revenue

20   Service, and sent to me to edit and send back to him.

21   Q.  They're a draft of a settlement agreement is what they

22   are?

23   A.  Yes.

24   Q.  And do they reflect the amounts that the IRS is willing to

25   settle with Robin and Jon?

Etter - Direct

1    A.   Yes.  For Robin, they reflect agreed tax deficiencies for

2    the years 1986, '87 and '88 in the amounts of $2,322, $2,109,

3    and $2,786 for each of those years respectively.

4    Q.   And for Jon?

5    A.   For Jon, the document reflects the settlement for

6    additional taxes for '86, '87 and '88 in the amounts of

7    $12,575, $8,201, and $7,043 for each of these years

8    respectively.

9    Q.   And does that have a date that you can indicate when that

10   document was generated or approximate time that document was

11   generated?

12   A.   Yes.  This document was sent to me, it appears, by fax, on

13   April 16th, 1996.

14   Q.   Okay.  And then, look at W4A-5 and W4A-10, I believe, are

15   certified copies of court documents.  I believe it's the tax

16   court; is that correct?

17   A.   Yes.

18   Q.   And tell us what W4A-5 is and W4A-10.

19   A.   W4A-5 is a certified copy of the order of dismissal and

20   decision that was ultimately entered by the Judge on September

21   3rd, 1996 for Jon Murray, reflecting the same settlement for

22   tax figures that was in the draft we just went through.

23   Q.   Okay.  And W4A-10?  And while you're looking at that,

24   what's the date, while you're looking at that, W4A-5?  What's

25   the date indicated?

Etter - Direct

1   A.   Entry date by the Court is September 3rd, 1996.

2   Q.   Okay.  And now, W4A-10?

3   A.   This is the order of dismissal and decision in the case of

4   Robin Murray for the tax years 1986, '87 and '88, again, for

5   the same amounts that we had -- were reflected in the draft

6   order of dismissal that I mentioned earlier.  And this order

7   was entered by the tax court on September 3rd, 1996.

8   Q.   Since you've been practicing law, how many clients would

9   you say you have dealt with?  A hundred?  Five-hundred?  Do

10  you have some notion or idea about how many people or entities

11  that you've represented?

12  A.   Haven't ever kept count, but I would say approximately 300

13  to 500.

14  Q.   Three to 500?

15  A.   Yes.

16  Q.   Have you come in your dealings with these clients to judge

17  their integrity and their forthrightness with you?

18  A.   Yes.

19  Q.   And how would you characterize the O'Hairs' integrity and

20  candor with you relative to your other clients?

21       MS. WILLIAMS:  Your Honor, I object to this question

22  as speculative, and this witness doesn't have the proper basis

23  to answer the question.

24       MR. D. MILLS:  Your Honor, they have interjected the

25  fact that the O'Hairs were deceitful and dishonest, and I

Etter - Cross

1  think he could give his lay opinion based upon what he's found

2  from his experience with them as to whether they were truthful

3  and candid in discussing matters with him.

4          THE COURT:  Objection is sustained.

5          MR. D. MILLS:  Pass the witness.

6                    CROSS-EXAMINATION

7  BY MS. WILLIAMS:

8  Q.  Mr. Etter, my name is Christi Williams.  We've never met;

9  is that correct?

10  A.  That's correct.

11  Q.  Earlier in your direct examination, you mention briefly to

12  the members of the jury that there were several disputes that

13  the O'Hair family, as well as the Atheist Corporations, had

14  with the Internal Revenue Service; correct?

15  A.  There were a number of cases open, yes.

16  Q.  We didn't get to really hear any details of those.  One,

17  you mentioned, inaccurate reports by the Society of

18  Separationists.  Could you give the jury an idea of what you

19  meant by that?

20  A.  Yes.  The 990s, which is the tax return that's prepared by

21  the Society of Separationists, it's submitted annually.  Those

22  returns, at times throughout the years, were prepared by

23  bookkeepers and others that had worked for the O'Hairs.  In

24  terms of the accuracies of the IRS was concerned about was --

25  there were, at times, certain property holdings of the

132

*Etter - Cross*

1    organization that were not listed on the returns.

2    Q.  For example, fairly frequently, members of an Atheist

3    Organization would die and leave in their will a piece of

4    property to the Society of Separationists, for example; is

5    that correct?

6    A.  Property or moneys?

7    Q.  Property or money or some item of value.  They would leave

8    that to the Society of Separationists.

9    A.  Yes.

10   Q.  And during these years, I think you said 14, would that be

11   correct?

12   A.  Yes.

13   Q.  The O'Hairs or someone working for them had failed to

14   disclose those amounts of money or pieces of property to the

15   Internal Revenue Service?

16   A.  Not with respect to the bequests that I'm familiar with.

17   Q.  Properties?

18   A.  Yeah, the property transactions that the IRS was concerned

19   about was property that the organizations have purchased from

20   Madalyn O'Hair back in the 1970s.

21   Q.  And over a period of four years, those had been

22   inaccurately reported to the Internal Revenue Service, or so

23   they claim?

24   A.  Yes.

25   Q.  The second dispute that I recall you testifying about was

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

Etter - Cross

1    an amount of $750,000 that the Internal Revenue Service

2    claimed that Jon Murray and Robin O'Hair owed them.

3    A.   Yes.

4    Q.   What did that have to do with it?

5    A.   Those amounts involved the tax years 1986, '87 and 1988.

6    The IRS claimed that there were, for example, bearer bonds

7    that the IRS claimed that these individuals had taken from the

8    organizations.  They claimed that there was a tax due for the

9    use of vehicles which the organization, the IRS claimed,

10   purchased.

11        There was tax claimed with respect to the services of

12   Ms. Zula Shelby, who worked for the organization.  There were

13   a number of items, really, for both individuals.

14   Q.   Can you think of any more?

15   A.   No, I can't.

16   Q.   Would these items that you've listed for the jury go under

17   the category that you mentioned earlier of a private benefit

18   to a person from a tax exempt corporation?

19   A.   As alleged by the IRS.

20   Q.   That was the claim?

21   A.   That was the IRS's claim.

22   Q.   All right.  And I'm not familiar with bearer bonds.  Can

23   you explain to me, and to the members of the jury, what those

24   are?

25   A.   Yeah.  Bearer bonds are bonds that are held by the owner,

*Etter - Cross*

1   and it's almost like holding money.  They're, you know, fully

2   negotiable, and it's just like money would be -- you clip off

3   the little interest coupons and send them in and receive

4   interest on the bonds.

5   Q.  And would those bearer bonds be items that were also

6   bequeathed or given to the corporation by some member or

7   someone who supported their cause?

8   A.  I don't recall the source of the bearer bonds.

9   Q.  I'm sorry.  I'm have having a little trouble hearing you.

10  A.  I do not recall the source of the bearer bonds.

11  Q.  You don't recall who had given them or who they were given

12  to?

13  A.  As I recall, they were given to the organizations by an

14  entity from Ohio.

15  Q.  An entity, does that include a person?

16  A.  No, it was not a person, but I don't recall the entity,

17  the name of the entity or type.

18  Q.  Was it the claim of the IRS that Jon and Robin had used

19  these bonds for personal expenses?

20  A.  The claim was that they had taken the bonds.

21  Q.  Taken them, and the IRS just didn't know where they were?

22  A.  (Moving head up and down.)

23  Q.  The services of this woman, would those be housekeeping

24  services?

25  A.  The woman, Zula Shelby, worked for the organizations and

1   cleaned the Atheist Center.  On occasion, she went over and

2   prepared dinner and did things at the residence of Madalyn

3   O'Hair, Jon Robin.  Typically, if a foreign dignitary was

4   coming in, an atheist dignitary that was coming in and

5   speaking in Austin, or if they were going to be on the

6   television program that they produced, they would put the

7   individual up at their house to save on the expense of a

8   hotel.

9        And she would, you know, come over and clean the rooms

10  and fixed it up and do that type of thing.  And the IRS

11  claimed that, you know, that they viewed this as personal

12  services to the individuals.

13  Q.  Additionally, there were some vehicles which the IRS

14  claimed, as I understand it, were purchased by the

15  corporation, but used by Jon and Robin for personal errands,

16  getting back and forth to work, those type of things, correct?

17  A.  Yes.

18  Q.  Do I understand correctly?

19  A.  Yes.

20  Q.  What sorts of automobiles were those?

21  A.  The automobile that I think was the subject with respect

22  to Jon was a Mercedes, and the automobile, I think, of Robin's

23  was a Porsche.

24  Q.  Later -- well, there were other items that the IRS put

25  under the category personal gain from corporate assets, but

Etter - Cross

1 you can't remember what they are; is that fair?

2 A.  That's correct.  I can't specifically.  I believe there

3 were others, but I don't specifically remember what they were.

4 Q.  And basically, they would be in this same category, items

5 that the IRS believed were bought with corporate funds but

6 were used by Jon and Robin for their own personal life?

7 A.  That would be the claim of the IRS, yes.

8 Q.  You've testified that you were able to get the IRS to

9 settle with Jon for $28,000?

10 A.  Yes.

11 Q.  With Robin, for $8,000?

12 A.  Yes.

13 Q.  With the Charles E. Stevens Library for $15,000?

14 A.  Yes.

15 Q.  And for the Society of Separationists for $70,000?

16 A.  I have to just caveat this.  That was the settlement at

17 the time that they disappeared.

18 Q.  The negotiation had reached that point?

19 A.  At the time they disappeared.

20 Q.  What year was the home of the O'Hairs' auction?  Do you

21 remember?

22 A.  I was not involved in the auction.

23 Q.  Do you have any knowledge how the proceeds from that home

24 and how the sale of the personal effects were divided up with

25 regard to the IRS among Jon, Robin, the Society of

Etter - Cross

1  Separationists?

2         MR. D. MILLS:  Your Honor, I object.  He answered he

3  didn't have any knowledge of it, and it's clearly beyond the

4  scope of my direct, too, the auctioning of the house at some

5  subsequent time.  And he did say he didn't have any knowledge

6  of this process.

7         MS. WILLIAMS:  Just if you know was my question.

8         THE COURT:  He testified he doesn't.

9         MS. WILLIAMS:  All right.

10 Q.  (BY MS. WILLIAMS)  Who paid your bills?

11 A.  The individuals paid the bills relating to the individual

12 cases, and the organizations paid the bills relating to the

13 organization cases.

14 Q.  When you got a letter from Jon or from Madalyn, some of

15 these exhibits that have been admitted, you made some attempt

16 to separate your time out that you spent 30 minutes of reading

17 that letter that belonged to Jon, some amount of time to

18 Robin, and so on?

19 A.  Yes, there was an effort on my part to make sure that we

20 did separate out what time was attributable to the individual

21 cases and what time was attributable to the organizations.

22 Q.  And when your bills were paid, did you take steps to make

23 sure that the checks that you were receiving -- received were

24 John's checks for John's bills, Robin's checks for Robin's

25 bills, the Society of Separationists for their bills, and et

Etter - Cross

1  cetera?

2  A.  Typically, the checks would come in to me or my partner,

3  and we did look at the checks.  Robin, as I recall, did not

4  necessarily pay her bills.  Jon sometimes paid hers, also.

5  All of the checks are paid there -- bills on individual cases

6  came from one and two individuals, but the bills for the

7  organizations were paid with organization checks.

8  Q.  You remember what bank that was that the organization

9  used?

10  A.  I don't really recall which bank.  Sometimes they would be

11  on, maybe, cashier's checks.  Often it was a bank account, but

12  I don't recall which bank it was.

13  Q.  We're looking at the exhibit that lists the bank accounts.

14  I believe there's one in front of you.  Would that help

15  refresh your recollection, or do you just have no recall?

16  A.  I don't have any recall right now.

17  Q.  And in the case of the cashier's check, you wouldn't know

18  whether -- where that money came from, correct?

19  A.  That is correct.

20  Q.  During 1995, you had represented these four entities, Jon,

21  Robin, the Society of Separationists and the library for

22  several years?

23  A.  Yes.

24  Q.  Since 1991, I believe was your testimony?

25  A.  Yes.

Etter - Cross

1   Q.  And during that -- during 1995, this case was coming to a
2   head.  There was some resolution that hadn't been there
3   before?
4   A.  We were at, really, the final stages of the case.
5   Q.  And, in fact, it had taken so long that at some point, the
6   Internal Revenue Service wrote to you or communicated with you
7   and asked you to waive the statute of limitations because it
8   had taken so long?
9   A.  Yes.
10  Q.  And you did that?
11  A.  Yes.
12  Q.  All that was left was for the O'Hairs and these other two
13  entities to come up with the money to pay the IRS?
14  A.  That really isn't all that was left.  I mean, that was
15  part of it.  With respect to the organization, that was a
16  concern.  With respect to the individuals, the IRS, at least
17  as far as I was concerned, at that point in time, once we
18  resolved the case, it would go through the normal process at
19  the IRS, and the individuals would be billed and then, they
20  would pay on that assessment.
21  Q.  But with regard to the Society of Separationists, they had
22  to come up with $70,000?
23  A.  The national office of the IRS wanted to have a payment of
24  the 70,000 upon the final execution of the closing agreement.
25  Q.  And that was part of the settlement.  That was part of the

Etter - Cross

1    -- what you were trying on behalf of this corporation to give

2    to the IRS in exchange for them not revoking the nonprofit

3    status of the corporation?

4    A.   I was trying to find a way to satisfy the IRS, and it was,

5    at that point in time, difficult for the Society of

6    Separationists to come up with the full amount at that time.

7    So I was trying to arrange some other form of security to

8    satisfy the IRS.

9    Q.   With regard to the library, you had received, at some

10   point in time, $15,000.  That was in escrow.  That was not an

11   issue at this point, correct?

12   A.   That is correct.

13   Q.   Do you recall whether or not you got that payment during

14   1994, during the Truth Seeker trial?

15   A.   I don't recall the exact date of receiving it.

16   Q.   I believe on the exhibit that's admitted, the person in

17   your firm who wrote to you indicating that this money was in

18   escrow indicated that it had been there for a while.

19   A.   Okay.

20   Q.   Would you like to refer back to the exhibit?  I can tell

21   you which one it is.

22        MR. D. MILLS:  W4-5.

23        MS. WILLIAMS:  Thank you, Mr. Mills.

24   A.   Yes, it does refer.  It says that -- it says that some of

25   these balances are very -- I believe the amount was over --

Etter - Cross

1   Q.   (BY MS. WILLIAMS) I'm sorry?

2   A.   It does say that some of these balances that are attached

3   are very old.

4   Q.   You were aware, were you not, of the Truth Seeker trial?

5   A.   Yes, I was aware of it.

6   Q.   You knew that the family traveled to California to attend

7   the trial, and there were actually two trials.  You were aware

8   of all that?

9   A.   I was kept aware of --

10  Q.   Apprised.  And was it prior to this Truth Seeker trial

11  that you received $15,000 to put in escrow for the library?

12  A.   I don't recall the specific date that I received this

13  $15,000.

14  Q.   But we know that in 1995, it had been there for some time,

15  according to your firm's records?

16  A.   According to this, it says some of the balances.  It

17  doesn't say all of the balances.  I frankly can't tell you.  I

18  don't recall how long it had been at that time.

19  Q.   Would it be fair to say that Ms. O'Hair was unhappy about

20  paying the IRS any money?

21  A.   Mrs. O'Hair thought the IRS was wrong and that they had no

22  right to collect the money that they were collecting.

23  Q.   And, therefore, didn't really want to pay them?

24  A.   Well, what point in time?

25  Q.   Ever?  Was it ever her idea that she wanted to pay the

Etter - Cross

1    IRS?

2    A.   During the summer of 1995, Madalyn O'Hair had come to the

3    point -- and I discussed this with her -- that she realized

4    that the tax returns -- there were errors in them.  She didn't

5    feel as I did at the time that it justified a $5,000 per-year

6    penalty.  But at that point in time, she recognized that, you

7    know, that was the way to settle with the IRS.  And I think

8    she agreed upon my recommendation that that was probably the

9    best deal that they were going to get.

10   Q.   And that would be when she wrote you the letter, Exhibit

11   W4-13 --

12   A.   Yes.

13   Q.   -- where she says in the second paragraph in one of our

14   very recent conversations, you said that Kolbe -- and that's

15   the IRS prosecutor, for lack of a better word.

16   A.   The individual handling the exemptor position cases.

17   Q.   Had shown your tax returns going back to the 1970s and

18   that we had, indeed, not given total information certainly in

19   respect to real estate.

20   A.   Right.

21   Q.   So at that point, Ms. O'Hair realized that if the IRS

22   continued to dig, they would, in fact, find other inaccuracies

23   that they didn't know about at this point, or that they hadn't

24   come after them for?

25   A.   No, I don't necessarily think that that's --

Etter - Cross

1   Q.  Let me refer you to the bottom of page 1, where it says,

2   "We'd better stop whining about it being unfair and hope that

3   the IRS is too dumb to ever find out."

4   A.  The IRS had come up with a number of things during its

5   investigation of the organizations and brought up a number of

6   different things, one of which I can remember the late '70s

7   relating to the divorce between Madalyn O'Hair and Richard.  I

8   took this comment and this letter to mean, you know, they're

9   just going to keep digging, and they're going to bring up

10  other stuff, and we're going to have to just explain other

11  stuff to them.

12  Q.  And there might be things there, but we don't want them to

13  find out about it.

14  A.  Well, I think they felt they had been picked and probed

15  pretty much to the full extent of the law.

16  Q.  But those were, in fact, her actual words?

17  A.  Yes.

18  Q.  As your correspondence indicates, Jon and Madalyn O'Hair

19  were -- seemed to be trying to find this money to satisfy the

20  IRS.  They, at least, told you that they went to several banks

21  and tried to borrow the money?

22  A.  Yes.

23  Q.  And they had some property that had been bequeathed to the

24  organization.  They were exploring, trying to somehow use that

25  as collateral?

Etter - Cross

1   A.  Yes.

2   Q.  And at some point, there was some talk about the board of

3   directors of American Atheists somehow co-signing or signing

4   for them to get a loan?

5   A.  Not co-signing, no.

6   Q.  I can't think of the right word, so help me.

7   A.  At that point in time, the concern with the board of

8   directors was the IRS was demanding that there be -- I don't

9   know if this is the exact number but just say, for instance,

10  five members on the board so that there wouldn't be any -- no

11  more than two of these three, in other words, Jon and Robin,

12  on the board, and then, three outsiders, or some combination,

13  so that the outside directors would have a majority of the

14  board.

15       And the concern was finding enough members that were

16  willing to serve on the board and would be appropriate persons

17  to serve on the board.

18  Q.  In which case, the Murray O'Hair family would lose some of

19  their power on the board of directors.  They had a voting

20  majority at that point, correct?

21  A.  At that point in time, they did have a majority vote.

22  Q.  And if two of them were removed, that would no longer be

23  the case?

24  A.  If two of them were removed?

25  Q.  As voting members, or if more people were at it.

Etter - Cross

1    A.  The only discussions that I had with the IRS was adding

2    more.  There was really not a discussion with taking Jon or

3    Robin off.

4    Q.  Isn't it true there was also some concern about the IRS

5    targeting others of the Atheist Corporations?

6    A.  I'm not sure that I understand what you mean by targeting.

7    Q.  Well, if the Society of Separationists couldn't come up

8    with $70,000, that the IRS might try to get that $70,000 in

9    some way out of one of the other Atheist Corporations?

10   A.  That was not a concern of mine at that point in time.

11   Q.  Do you know whether or not it was a concern of the board

12   of directors or of the O'Hair family?

13   A.  Not to my knowledge.

14   Q.  Did you know that the United Secularists had an account in

15   New Zealand?

16   A.  Yes, that money had been placed there some years before

17   that because the interest rate in the particular bank they put

18   it in New Zealand had a high interest rate, and it was also

19   those accounts and the money was reflected on the Form 990s

20   that U.S.A. prepared.  And I reviewed all the 990s usually

21   during this period of time before they were sent to the IRS.

22   Q.  So you were also -- you also served as tax counsel for

23   other of the Atheist Corporations?

24   A.  Yes.

25   Q.  So you knew the amount of the balance?

*Etter - Cross*

1   A.  Yes.

2   Q.  Let me go back to the board members just briefly.  There

3   was supposed to be a board meeting in October when some

4   atheists were going to picket the Pope, correct?

5   A.  Yes.

6   Q.  And one of the items of discussion was going to be what to

7   do about this IRS insistence about the board of directors?

8   A.  It would not surprise me if that was on the agenda.  I

9   don't recall what the agenda was.

10  Q.  And in your correspondence with Jon or Madalyn Murray, you

11  knew that there was some definite changeover in the board of

12  directors to two board members died early in 1995?

13  A.  Yes.

14  Q.  Later, in 1995, as evidenced by a letter to you in

15  mid-August, Henry Schmuck was not going to serve on the board

16  of directors?

17  A.  That's what was related to me by Jon.

18  Q.  And a Mr. Baird?

19  A.  Yes.

20  Q.  And Mr. Casey?

21  A.  I believe so.

22  Q.  And, in fact, after the O'Hairs visited Mr. Via, they

23  found out that he, too, was not going to serve on the board of

24  directors?

25  A.  That I don't recall.

Etter - Redirect

1  Q.  He -- let me refer you back to W4-16, the fourth

2  paragraph:  "During our travels in Virginia, we stopped at the

3  home of Arnold Via for physical reasons."  He's off the board

4  permanently as of now, also?

5  A.  Yes.

6  Q.  And these were board members who had been around for, to

7  your knowledge, years and years and years, long-standing

8  members of the board who had a relationship with Ms. O'Hair?

9  A.  Who had a relationship with the organizations, yes.

10  Q.  Did you know -- you knew that Don C. had died a member of

11  the board?

12  A.  Yes.

13  Q.  Did you know that he bequeathed $100,000 to the

14  organization?

15  A.  To which organization?

16  Q.  Did you know it was deposited in the Comerica Bank

17  account?

18  A.  No, I did not.

19  Q.  I don't have anything further.

20        THE COURT:  Any further questions?

21        MR. D. MILLS:  Yes, your Honor.

22              RE-DIRECT EXAMINATION

23  BY MR. D. MILLS:

24  Q.  Ms. Williams was asking you about Mrs. O'Hair's mindset

25  relative to one of the documents with the time period in the

*Etter - Redirect*

1  fall was '95.  Do you recall that line of questioning about

2  Mrs. O'Hair not wanting to pay money?

3  A.  Yes.

4  Q.  From your observations, would you say that her mindset was

5  one that she was ready to settle with the IRS?  Was that your

6  observation?

7  A.  At that point in time, in August of '95, the three of

8  them, including Madalyn O'Hair, were ready to settle with the

9  IRS.  The issue was really how to make the payment for the

10  Society of Separationists or could that be secured in some

11  other way and not paid immediately upon settlement.

12  Q.  The issue with the bearer bonds that was inquired about,

13  was that issue resolved with the IRS, also?

14  A.  Yes.  I personally sat with the agent and we went through

15  every one of the bearer bonds and the coupons on the interest,

16  and they were all there.  So the IRS just dropped that issue

17  altogether.

18  Q.  So based upon your personal knowledge of this ongoing

19  negotiation with the Internal Revenue Service, there would be

20  no reason for Ms. O'Hair to leave the country to avoid dealing

21  with the IRS, would there?

22  A.  No.  She -- the case was at a point where it was not -- it

23  would not be a reason for, you know, them or anyone else to

24  leave the country or, you know, run away from their errors.

25  Furthermore, you know, Madalyn O'Hair and Jon and Robin, that

Ayers - Direct

1  would have been completely out of their character.  They did

2  not run from their adversaries.

3  Q.  Thank you.  That's all I have, your Honor.

4       MS. WILLIAMS:  I don't have anything further, your

5  Honor.

6       THE COURT:  Do you wish this witness be excused, Mr.

7  Mills?

8       MR. D. MILLS:  Yes, your Honor.

9       MS. WILLIAMS:  No objection.

10      THE COURT:  You may be excused.

11      MR. D. MILLS:  Sonnie Ayers.

12      THE COURT:  Come up, please.  Mrs. Sims is going to

13  administer an oath to you.

14    (Witness was sworn.)

15      THE COURT:  Now, you need to walk around this column

16  up here, have a seat in the blue chair.  If you'll tell us,

17  please, ma'am, your full name and spell your last.

18      THE WITNESS:  Sonnie Barron Ayers, A-Y-E-R-S.

19      THE COURT:  All right.  Proceed.

20   SONNY BARRON AYERS, called by the Government, duly sworn.

21                   DIRECT EXAMINATION

22  BY MR. D. MILLS:

23  Q.  Where do you live, ma'am, and how are you employed?

24  A.  I live in Austin, Texas.  I'm employed as a travel agent.

25  Q.  And do you have your own travel agency?

*Ayers - Direct*

1   A.  I do.

2   Q.  How long have you owned that?

3   A.  Six years.

4   Q.  Are you familiar with Madalyn Murray O'Hair and Robin

5   O'Hair and Jon Garth Murray?

6   A.  I am.

7   Q.  Tell the jury how it is you're familiar with those people.

8   A.  We did the travel for them and for the American Atheists

9   Association.

10   Q.  And when did your business relationship begin with them?

11   A.  They were already clients when I bought the agency, so in

12   '94.

13   Q.  Did you have a lot of contact with them in terms of their

14   traveling a lot and call you a lot?

15   A.  Yes, I was -- they didn't travel weekly, but they did

16   travel quite a bit.

17   Q.  So you're familiar with them when they call on the

18   telephone and talk to you?

19   A.  With Jon.

20   Q.  With Jon, okay.

21   A.  Yes.

22   Q.  If you look in front of you, there's a document that's

23   labeled W3-1 and W3-2.  And without talking about them when I

24   ask you if you've seen those documents before?

25   A.  Yes.

*Ayers - Direct*

1  Q.  And are those documents, the W3-1 and W3-2, copy of your

2  business records relating to travels by the O'Hairs?

3  A.  They are.

4  Q.  We'd offer W3-1 and W3-2, your Honor.

5       THE COURT:  Received.

6  Q.  (BY MR. D. MILLS) Can you tell the jury what W3-1

7  contains, the documents in there, and the dates that are on

8  the items of travel that are scheduled, please, and who the

9  travel is for?

10 A.  Yes.  The documents are invoices and copies of tickets,

11 and copy of a check.  They are invoices for travel of Jon

12 Murray.

13 Q.  And where was Jon Murray traveling to and what time frame?

14 A.  Newark, and he was to leave on -- originally on May 4th,

15 and then, there was a change; he changed the travel date to

16 June.

17 Q.  And do you know the purpose of that trip?

18 A.  Yes, it was to -- reconnaissance trip for picket the Pope,

19 really, that he was sponsoring.

20 Q.  And did you have some further business -- the Atheist

21 Organization using your travel agency for the purpose of

22 picketing the Pope later that year?

23 A.  Yes.  Jon put our name and phone number on a flyer that

24 went out to a large number of people, and we got calls from

25 different people.

*Ayers - Direct*

1   Q.  And did Jon personally place that order for those tickets?

2   Is that correct?

3   A.  Yes, it is.

4   Q.  And there is a check in that envelope in W3-1 from the

5   Atheist Organization; is that correct?  Which one was it?

6   A.  Which check number?

7   Q.  Yeah, the check.  Who was the check drawn on, what

8   account?

9   A.  It was drawn on BankOne on American Atheist General

10  Headquarters account.

11  Q.  And in the folio of the check, does it describe what the

12  ticket is for?

13  A.  It does.

14  Q.  And it says, please?

15  A.  Austin, New York City, Pope Picket Reconnaissance.

16  Q.  Did Mr. Murray tell you about going for reconnaissance?

17  A.  Yes, he discussed it.

18  Q.  Would you relate to the jury what it was he told you about

19  his reconnaissance?

20  A.  Just that it was -- he was -- that this was a big event,

21  and he was very animated about it and was going up to check

22  out the hotel and some other things.

23  Q.  And would you look at W3-2 and tell the jury what that

24  contains relative tickets for travel, who was traveling, where

25  they were going, and the day of the travel?

*Ayers - Direct*

1    A.  Okay.  These are, again, invoices, copies of tickets,

2    copies of checks and copy of exchange notices and new tickets.

3    The tickets are for Madalyn O'Hair and Robin O'Hair, and it is

4    also to go to New York.

5    Q.  And what time frame is the travel scheduled?

6    A.  October 5th through the 8th.  This was the ticket for the

7    picket the Pope rally.

8    Q.  So the people were coming sometime in that time frame.  Is

9    that what you remember?

10   A.  Yes.

11   Q.  And it's for both individuals, Robin and Madalyn?

12   A.  It is.

13   Q.  Not for Jon?

14   A.  Not for Jon.

15   Q.  Okay.  And you say there was a ticket change; is that

16   correct?

17   A.  Yes.

18   Q.  And when did the ticket change and who caused the ticket

19   change, if you could tell, from the record that you have?

20   A.  With the ticket, the exchange notice was actually done on

21   September the 26th, and it was done by our office as a

22   schedule change.  It was a notification to us from the airline

23   that they had changed flight numbers and flight times.  So we

24   had to reissue the tickets.

25   Q.  And how do you know it was the airlines that caused the

*Ayers - Direct*

1  change?

2  A.  Well, the number ways primarily, though, because we noted

3  it on the exchange form.

4  Q.  So you made some notation there?

5  A.  Yes.

6  Q.  And does one of those tickets have an incorrect date

7  saying that the travel was '96 instead of '95?

8  A.  Well, the ticket does not have an incorrect date, the

9  exchange notice does, but the ticket is dated correctly in

10  '95.  That was, apparently, just an agent oversight.

11  Q.  Okay.  That's all I have, your Honor.

12       MR. T. MILLS:  No questions.

13       THE COURT:  May this witness be excused?

14       MR. D. MILLS:  Yes, your Honor.

15       MR. T. MILLS:  Yes, your Honor.

16       THE COURT:  You may be excused.

17       MR. CARRUTH:  United States calls Arnold Via to the

18  stand.

19       THE COURT:  Come up, please, sir.  Just come straight

20  up over here.  This is Mrs. Sims.  She's going to administer

21  an oath to you.

22    (Witness was sworn.)

23       THE COURT:  If you'll come right across here, please,

24  sir, and walk around that column and have a seat.  If you'll

25  tell us, please, your full name and spell your last.

*Via - Direct*

1          THE WITNESS:  My name is Arnold L. Via, V-I-A.

2      ARNOLD L. VIA, called by the Government, duly sworn.

3                    DIRECT EXAMINATION

4  BY MR. CARRUTH:

5  Q.  Mr. Via, please tell the Court and members of the jury

6  where you live.

7  A.  I leave in Grottoes, Virginia.  That's G-R-O-T-T-O-E-S,

8  small town in Central Shine Valley.

9  Q.  Were you living in that area back in 1995?

10  A.  I've been there for 73 years.

11  Q.  All right, sir.  And during their lifetime, did you know

12  Madalyn Murray O'Hair, Jon Garth Murray and Robin Murray

13  O'Hair?

14  A.  I've known them for 25 years --

15  Q.  And --

16  A.  -- yes, sir.

17  Q.  -- when is the last time that you saw any or all of these

18  individuals?

19  A.  August 11th of 1995.

20  Q.  And what was that occasion, Mr. Via?

21  A.  They were just in my home.

22  Q.  And were they on business or vacation travel at that time,

23  or do you know?

24  A.  If I'm allowed to elaborate, they had planned a vacation

25  in Virginia, and visiting my home was on the agenda.  I'm

*Via - Direct*

1   going to refer to Dr. Madalyn O'Hair as Madalyn and past

2   tense.  Sorry about that.  And Jon, her son, had visited my

3   home many times.  And one of the issues that came up at my

4   home was preparing a retirement home or a nursing home for

5   Madalyn when she was 80 years old, when at the time she was

6   77.

7   Q.  Did she discuss any plans with you to move or relocate

8   from the Austin, Texas area, where she was living?

9   A.  Yes.  We spent --

10       MR. T. MILLS:  Excuse me just a moment, Mr. Via.  I

11  object to hearsay.

12       THE COURT:  The question, as asked, the objection is

13  overruled.

14  A.  I didn't understand what he said.

15       THE COURT:  Well, listen very carefully to the

16  question and just answer the question.

17       THE WITNESS:  Okay.  I asked if I could elaborate and

18  nobody --

19  Q.  (BY MR. CARRUTH) During her visit, sir, in August of 1995

20  with you in Virginia, did Madalyn O'Hair discuss any plans to

21  relocate from the Austin, Texas area, where she was then

22  living?

23  A.  Yes, we certainly did.  I am a board member of the

24  American Atheist Organization, and we held a board meeting at

25  my home and discussed plans to move the entire Atheist

Via - Direct

1    Headquarters to Richmond, Virginia.  She had visited Richmond

2    and toured Richmond, Virginia.  She liked the location, and it

3    would give me an opportunity to perform duties as the

4    vice-president of the organization.

5            And I was willing to help them financially move, if it

6    was necessary.  And we definitely made long-range plans.

7    Q.  And you mentioned earlier something about Madalyn O'Hair

8    looking for retirement or planning for retirement?

9    A.  Jon, more so, was -- collaborated with me to retire

10   Madalyn when she was 80, and he needed a safe place.  As he

11   said in my home, it's safe in the country --

12           MR. T. MILLS:  Excuse me, Judge.  I understand if -- I

13   would request that it be in a question and answer form rather

14   than a narrative, and I object to that.

15           THE COURT:  The objection of nonresponsiveness is

16   sustained.

17           MR. T. MILLS:  Thank you, sir.

18   Q.  (BY MR. CARRUTH) Do you live in a rather rural, secluded

19   area?

20   A.  Yes, I live in the Central Shine, sort of the Blue Ridge

21   Mountains.

22   Q.  How close is your nearest neighbor?

23   A.  Four or five blocks.

24   Q.  It's out in the country?

25   A.  Right, in the country, definitely, yes.

*Via - Direct*

1    Q.    And Ms. O'Hair told you she was going to retire at age 80?

2    A.    No, she didn't tell me she will retire at 80.  Jon and I

3    discussed it to take her out of the stress and out of the

4    organization to retire her when she was 80 years old because

5    it was getting too much for her at her age and her health.

6    Q.    Now, during the time that the O'Hairs visited in your

7    home, that August of '95, did you have occasion to take any

8    photographs?

9    A.    Yes, I did, I had a Polaroid camera.

10   Q.    Let me show you, sir, what's been marked for

11   identification as Government's Exhibit W8-1A and W8-1B, and I

12   believe you provided those photographs to us, did you not,

13   sir?

14   A.    Yes, I did.

15   Q.    And do you recognize those as fairly and accurately

16   portraying the O'Hairs as they appeared the last time you saw

17   them alive?

18   A.    Very friendly, cheerful.

19   Q.    Yes, sir.

20   A.    Witty.

21   Q.    Did you take those photographs yourself?

22   A.    I did.

23   Q.    We would offer Government's Exhibit W8-1A and W8-1B for

24   the record.

25        MR. T. MILLS:  No objection.

*Via - Direct*

1    THE COURT:  They're received.

2    Q.  (BY MR. CARRUTH) And so, these are photographs showing the

3    last time you saw any of the O'Hairs?

4    A.  When they lived in August of 1995, yes, sir.

5    Q.  Now, you mentioned, also, Mr. Via, that you had been a

6    board member prior to or during 1995 of the American Atheist

7    Organization; is that correct?

8    A.  Yes, sir.

9    Q.  And in that profession or in that capacity, did you

10   frequently correspond with the Atheist General Headquarters

11   here in Austin?

12   A.  Certainly.

13   Q.  And Mr. Murray, Jon Murray, who was then serving as

14   president.  I'm going to show you, sir, what's been marked for

15   identification as Government's Exhibit W8-2 and W8-3, and ask

16   if you can identify those for us, sir, without going into what

17   they are at this time.  Do you recognize them?

18   A.  Yes, I definitely do recognize it.

19   Q.  Is W8-2 a copy of a letter that you received from Jon

20   Murray in July of 1995?

21   A.  It certainly is, absolutely.

22   Q.  And is W8-3 another notification that you received from

23   Jon Murray of a board meeting scheduled for the fall of 1995?

24   A.  Right, I recognize both letters.

25   Q.  And we would offer those at this time, your Honor, W8-2

*Via - Direct*

1    and 3.

2         MR. T. MILLS:  No objection.

3         THE COURT:  They're received.

4    Q.  (BY MR. CARRUTH) And now that these are in evidence, sir,

5    could you briefly summarize for the jury, first, the letter,

6    dated, what, July?

7    A.  July the 7th.

8    Q.  1995, and explain to us, if you would, without reading the

9    whole thing, just could you kind of summarize what that letter

10   is about?

11   A.  Well, over the years, I have accumulated a lot of article

12   magazines and letters to the editor in my so-called Virginia

13   Atheist Center at my home, and I have asked Jon if he would

14   like to have these for the archives at the library.

15   Q.  All right, sir.

16   A.  And we had planned the Pope's picket in the United Nations

17   on October -- I think, October the 5th of 1995, and since Jon

18   had wrote me a letter he was unable to pay me $5,000 for my

19   collection that he would come by my home out on the way to New

20   York October the 5th, and I would join them and Spike Tyson

21   and the van and go to New York for the picket.  And they went

22   through my home and picked up all my literature and take it to

23   the Atheist Library in Austin, Texas.  That was the letter of

24   July the 7th.

25   Q.  All right.  And what about the other letter that's

Via - Direct

1    referencing the fall of 1995 board meeting?

2    A.   Yes.  As you know, it was sent to the members of the

3    board, which I was a member of the board at the time of it,

4    and the vice-president of the organization.  And the board

5    meeting was set for New York City in October through the

6    picket of the Pope's visit.

7    Q.   Were you planning on attending that meeting, sir?

8    A.   Pardon?

9    Q.   Were you attending on -- planning on attending the board

10   meeting?

11   A.   Absolutely.

12   Q.   Did you, in fact, attend it?

13   A.   Absolutely.

14   Q.   And were the O'Hairs there?

15   A.   Were they there?

16   Q.   Were the O'Hairs at the picket the Pope meeting?

17   A.   Yes.

18   Q.   They were?

19   A.   Not at this October meeting.

20   Q.   Yes, that's what I was referring to.

21   A.   No, I'm sorry, I didn't understand you.

22   Q.   I'm sorry.

23   A.   They was allegedly disappeared September the 5th,

24   according to the press.

25   Q.   Once again, listen carefully.  It's your testimony they

1   did or did not appear in October of 1995 at that board meeting

2   in New York, held after the picket of the Pope?

3   A.  Did not.

4   Q.  Okay.  And in those letters, sir, it appears that Mr. Jon

5   Murray was going to drive up with Spike Tyson and pick you up

6   in a van, and y'all were going to drive on to New York, and on

7   the way back, you were going to pick up your library and bring

8   it back to Austin?

9   A.  That is right.

10  Q.  And do you know how Robin and Madalyn were planning to

11  attend the picket the Pope meeting?

12  A.  Flying.

13  Q.  They were going to fly out of Austin?

14  A.  In from Austin.

15  Q.  Pass the witness.

16  A.  And have several hotel rooms.

                    CROSS-EXAMINATION

18  BY MR. T. MILLS:

19  Q.  Just a few questions, Mr. Via.  Can you hear me?

20  A.  Yes, sir.

21  Q.  All right.  You and I spoke in the hall.  Do you remember

22  that?

23  A.  Yes, sir.

24  Q.  All right.  My name's Tom Mills.

25  A.  I didn't know who you were.

Via - Cross

1  Q.  I understand.  I recognized you.  You're distinctive

2  looking.

3  A.  You didn't tell me you was Mr. Mills.

4  Q.  Yes, sir.

5  A.  All right, sir.

6  Q.  How long have you had your beard?

7  A.  Well, off and on, for probably 30 years.

8  Q.  Plan to trim it?

9  A.  Not until there's a woman president in the Whitehouse.

10        THE COURT:  Let's get on with this trial.

11  Q.  (BY MR. MILLS) Yes, sir.  In the photographs, Ms. O'Hair

12  looked like she was enjoying herself while she visited you.

13  A.  Can I say absolutely?  She did enjoy her visit with me

14  tremendously.  I have invited a nice swing for her to sit in

15  under the maple tree, when she retired, with the sun flipping

16  through the leaves.  I extended a deck for her purpose in the

17  swing.  And she loved my home.  She thought it was very

18  charming.  And I consider Madalyn O'Hair as my second mother.

19  Q.  How old are you, sir?

20  A.  I'm 75.

21  Q.  All right.  From the pictures, she looked like she was

22  feeling all right.

23  A.  As far as I know, she was.  We had a nice day.  We went

24  across the valley for lunch.  She and Robin had homemade

25  vegetable soup and a grilled cheese sandwich.  Jon and I had

1  the roast turkey sandwich at a redneck place in Harrisonburg,

2  and I didn't see anything out of the ordinary with Madalyn.

3  No more than had been five years before.

4  Q.  Right.  And you think that at that point, did she make you

5  believe that she was going to picket the Pope?

6  A.  Absolutely.  It was one of the --

7  Q.  High points?

8  A.  -- it was a duty, she felt.

9  Q.  A duty?

10  A.  Yes, absolutely.

11  Q.  And tell me and the jury, if you will, what was the goal

12  of picketing the Pope?

13  A.  Pardon?

14  Q.  What was the point of picketing the Pope?

15  A.  Well, this wasn't the first time.  They had picketed him

16  before.

17  Q.  Oh?

18  A.  In Chicago, on his first visit, and several other cities,

19  on his second visit, Miami, I think, and then, Colorado.

20  Several places where there was atheists that had picketed the

21  Pope.

22  Q.  Why?

23  A.  Well, because I can't speak for Madalyn or her political

24  reasons, which I think most of it was because of his --

25  personally, I don't know how to answer that from my end, but I

*Via - Cross*

1  was willing to picket with her because I think that he had no

2  business in this country, as far as I'm concerned, as a

3  religious leader in a country that has separation of state and

4  church.  So I was willing to go on the picket line for the

5  First Amendment of the Constitution.

6  Q.  All right.  Thank you, sir.  That's all the questions I

7  have.

8  A.  Yes, sir.

9       MR. CARRUTH:  Nothing further, your Honor.  May Mr.

10 Via be excused to return to Virginia?

11      THE COURT:  I expect so.  What about you?

12      MR. T. MILLS:  Yes.

13      THE COURT:  You may be excused.  Call your next

14 witness.

15      MR. CARRUTH:  We call Conrad Goeringer, your Honor.

16      THE COURT:  Come forward, please.  This is Mrs. Sims.

17 She's going to administer the oath to you.

18   (Witness was sworn.)

19      THE COURT:  Come around here, please, sir.  Have to

20 walk all the way around this column to get to the witness

21 chair.  If you'll tell us your full name and spell your last

22 name.

23      THE WITNESS:  My name is Conrad Goeringer,

24 G-O-E-R-I-N-G-E-R.

25   CONRAD GOERINGER, called by the Government, duly sworn.

*Goeringer - Direct*

DIRECT EXAMINATION

BY MR. CARRUTH:

Q.  Where do you reside?

A.  Ocean City, New Jersey.

Q.  And prior to that time, have you ever lived in the Tucson

or Phoenix, Arizona area?

A.  Yes, sir, I lived there for 27 years.

Q.  Okay.  What was your business in the past or what do you

do?  Are you retired or --

A.  I work as the director of American Atheists Online

Services, and I'm an associate editor for the American Atheist

Newsletter and magazine.

Q.  Did you ever own a bookstore or an antique book business

or something?

A.  Yes, sir, I was in the antiquarian book business from 1984

to 1994.

Q.  And that was in Arizona?

A.  Yes, sir.

Q.  Was it Phoenix or Tucson?

A.  Tucson.

Q.  All right, sir.  When did you first become associated or

involved with the American Atheist Organization?

A.  Sometime in the late '70s, around '78, '79.

Q.  Is that when you first met Madalyn Murray O'Hair?

A.  Yes, around that time.

*Goeringer - Direct*

1  Q.  Okay.  What do your duties consist of or what did they

2  consist of, back in 1995, with respect to the American Atheist

3  Organization?

4  A.  I helped Robin Murray start an electronic service that

5  included a -- an electronic bulletin board and an e-mail

6  newsletter that evolved into AA news.  And my job consisted of

7  writing stories and commentary for the magazine and for this

8  electronic newsletter.

9  Q.  Can you tell us where this newsletter was published or

10 produced?

11 A.  The newsletter, the printed edition was printed at that

12 time in Austin, Texas, and the electronic version of it is --

13 lives as e-mail, electronic mail.

14 Q.  And copies of that newsletter, these are the paper copy or

15 the electronic copy transmitted in interstate commerce to

16 other states in the United States?

17 A.  Yes, sir.

18 Q.  And, possibly, other foreign countries?

19 A.  Yes, sir, to paid subscribers of the newsletter as well as

20 individuals requested to be put on the AA News Service.

21 Q.  And can you give us an approximation of how many

22 subscribers you had back in 1995, prior to the disappearance

23 of the Murray O'Hairs?

24 A.  At that time, I believe that it was built up to somewhere

25 in the vicinity of 3 or 400 on the electronic newsletter.  And

1   there were probably 3500 to 5,000 copies printed and

2   distributed of the newsletter, and, I would assume,

3   approximately the same for the magazine.

4   Q.  Okay.  Now, I believe there was a newsletter published and

5   a bulletin was published.  Could you distinguish between those

6   for us, sir?

7   A.  The newsletter was a general comment and information about

8   political issues and state/church separation issues.  And

9   then, there was a wraparound, which I believe was blue, that

10  was either put into the newsletter or around it that was

11  considered for the membership.

12  Q.  Okay.  Now, did there come a time in or about the summer

13  of 1993 when you had occasion to travel to Austin, Texas from

14  Tucson, Arizona at the request of Madalyn O'Hair?

15  A.  Yes, sir.

16  Q.  And can you tell the members of the jury what your purpose

17  in coming to Austin on that occasion was?

18  A.  I was asked to go down to -- or come down here to Austin

19  in order to facilitate packing away some of the rarer items

20  that had been accumulated in the Charles E. Stevens Library,

21  and this included books, ephemeral, which is bound or even

22  unbound paper material, things like pamphlets, tracks,

23  newsletters, rarer items, things of that nature that were part

24  of the library.

25          And my limited expertise in the rare book business

1   allowed me to make a few suggestions about how this material

2   should be packed and stored for conservancy purposes.

3   Q.   And did any of the individual employees or staff of the

4   American Atheist Headquarters, here in Austin, assist you in

5   boxing up and packing away these library materials?

6   A.   I was in charge pretty much of packing away the -- what I

7   judge to be the rarer items, but there were people that were

8   packing other parts of the library away or were sealing boxes,

9   doing that sort of work, yes.

10   Q.   And was anybody cataloging or making an index of these

11   books in the library that would be --

12   A.   Yes, sir.

13   Q.   And who would that have been?

14   A.   Part of the time, it was being done by Robin Murray

15   O'Hair, and then, it was taken over by David Waters.

16   Q.   And how was this index or catalog being prepared and

17   maintained?

18   A.   The title of the book and the author of the book were

19   entered into a computer, and these books came off the shelf.

20   And the idea was that each box of books would be labeled with

21   a number, and inside the box were -- or was a list of the

22   contents of that box, and then, a duplicate copy was to be

23   stored on the computer.

24        And the box was given a number, and the idea was to

25   try as best we could to pack the library so that the contents

Goeringer - Direct

1    were packed sequentially, meaning that the library -- the

2    shelves could then be set up in another location, and the

3    books could be taken out of the proper boxes and then, put on

4    the shelves generally in the same area so that you wouldn't

5    just be unpacking random books and putting them -- you know,

6    have to go through the alphabetization and re-assemble the

7    library from scratch.  The contents were organized in the box.

8    Q.  And approximately how long did it take you to pack up this

9    entire library?

10   A.  I wasn't there for the packing of the entire library, but

11   my stent that covered what I think were the bulk of the really

12   rarer items took approximately five to six days.

13   Q.  Could you estimate for us the number of total volumes in

14   that library in 1995 or 1993, when you were packing it up --

15   excuse me?

16   A.  In the whole library, there were probably somewhere around

17   40 to 50,000 hardback items, and then, there were, maybe --

18   there could have been another 150,000 what are called pieces.

19   And a piece might be an individual magazine or an individual

20   pamphlet or newsletter, or in some cases, we have rare sign

21   letters from famous individuals.  I believe we had a Lincoln.

22   We certainly had an enormous collection of Robert Ingersoll,

23   Joseph Louis, Joseph McCabe.  We had signed manuscripts and

24   books.

25   Q.  And I believe you told us it took approximately 600 boxes

1    that were filled to take the library; is that correct?

2    A.  Well, that's roughly my count from what I sort of recall

3    that we shipped during the period of time that I was there.

4    Q.  Just --

5    A.  There were more books --

6    Q.  -- that's just during the five days you worked on the

7    project, correct?

8    A.  Yes.

9    Q.  Okay.  And can you tell us, if you know, sir, why the

10   library was being packed up?

11   A.  There were several reasons, and one was that they were --

12   the O'Hairs had the building up for sale and were somewhat

13   optimistic about the possibility of selling it and realizing,

14   wisely, I think, how long it takes to pack up a library and a

15   facility like they have that have an enormous quantity of

16   files and books and archive material and all of the other

17   things that were around the building, they wanted that packed

18   up so that if they had to vacate the building as part of a

19   sale within, say, a 30- to 90-day period, they wouldn't have

20   to run around to start that process from scratch, because they

21   would have to pack it up, they would have to find particular

22   facilities in which to put it.  That would include

23   climate-controlled facilities for the books with the rare

24   manuscripts.

25          And they wanted to have that project in the tube, so

Goeringer - Direct

1  to speak, so when and if the building sold that they wouldn't

2  have to rush around in the last 30 days to be out as part of

3  the sale agreement.

4  Q.  And do you know when and where, or if so, the library was

5  moved from Austin, Texas?

6  A.  Yes.

7  Q.  And where would that have been moved to?

8  A.  The library -- the part of the library that I packed and

9  moved, I helped Jon Murray move it were a climate control

10  facility which was in Houston.

11  Q.  Okay.  And you said part of it.

12  A.  Yeah.

13  Q.  Was any or all of the library subsequently moved to a

14  place in Kansas City?

15  A.  Yes.

16  Q.  Midtown Self-storage in Kansas City?

17  A.  I believe that is the one.  I believe it was a few months

18  before that.

19  Q.  Let me show you, Mr. Goeringer, what's been marked for

20  identification as Government's Exhibit W1C-2, and I'll ask you

21  if you recognize your name on that document --

22  A.  Yes.

23  Q.  -- as being the person to contact in case of an emergency?

24  A.  Yes.

25  Q.  Does that have to do with the storage of those volumes

*Goeringer - Direct*

1    from the Atheist Library in Kansas City?

2    A.   Yes, sir.

3    Q.   We'd offer Government's Exhibit W1C-2, your Honor.

4         MR. T. MILLS:   No objection.

5         THE COURT:   Received.

6    Q.   (BY MR. CARRUTH) Now, as an officer in the organization

7    and very active, apparently, at that time, were you aware of

8    any concern by the O'Hairs or any of them regarding a pending

9    civil lawsuit in San Diego, California, known as the Truth

10   Seekers lawsuit?

11   A.   Yes.

12   Q.   What can you tell us, briefly, about that case?

13   A.   Madalyn O'Hair knew a man by the name of James Herby

14   Johnson, who had sort of inherited a publication and book

15   operation that had been called the Truth Seeker, and it was

16   nearly a century old.  And the Truth Seeker had built, up over

17   the years, a huge trust fund of contributions that, I believe,

18   was worth somewhere around $26 to $27 million.  It fell into

19   the hands of James Herby Johnson.  And Johnson, before he died

20   or as a result of his death -- or I just forget the exact

21   sequence of event, but this money ended up in the hands of a

22   trustee who was openly an Episcopalian.  Another individual

23   connected in the Truth Seeker was a member of the Church of

24   Jesus Christ of Latter-Day Saints.

25         And Mrs. O'Hair felt that it was inappropriate for all

*Goeringer - Direct*

1   of this history and money and the resources that the Truth

2   Seeker had to have been taken over by these people.  She had

3   stock certificates that had been given to Herby.  I believe it

4   was Charles Smith, who was associated with the Truth Seeker

5   before James Herby Johnson.

6          In addition, there was another man who had the stock

7   certificates -- I'm sorry.

8   Q.  That's all right.

9   A.  He died.  He died just a few years ago.  But together,

10   they decided that as stock owners of that corporation that

11   they would contest the transfer of those resources to -- his

12   name was Laurence True, and the woman, I believe, was named

13   Bonnie Lang.

14          And this matter ended up in court, and through a

15   complex series of legal developments, the Truth Seekers

16   countersued, and there was a long, prolonged court battle over

17   that that I believe ended up -- there was a trial and, maybe,

18   two appeals, and the O'Hairs were acquitted in all of those

19   three legal actions.

20   Q.  Do you have any reason to believe that the O'Hairs were

21   concerned that if they lost that lawsuit that Roy Withers, the

22   attorney for the Truth Seekers, might make some effort to

23   seize their assets, including their library?

24   A.  Yes, there was concern about that.

25   Q.  But, in fact, that never came to pass, did it?

*Goeringer - Direct*

1   A.   No.

2   Q.   You also said you understood they were attempting to sell

3   their building here in Austin?

4   A.   Yes.

5   Q.   And did you know whether or not they were intending on

6   relocating the Atheist Headquarters elsewhere outside of

7   Austin, Texas?

8   A.   Yes, they intended to do that as far as I know.

9   Q.   And do you know where they intended to move?

10  A.   Not precisely, no.

11  Q.   Okay.  Now, when did you first become aware that the

12  O'Hairs were missing or something was amiss?

13  A.   Can I go back to the previous question you asked?

14  Q.   Yes, sir.

15  A.   Would you repeat that?

16  Q.   I was asking you if you knew where the O'Hairs intended to

17  move their Atheist Headquarters from if they left Austin?

18  A.   I'm not aware of them making any sort of a final decision,

19  but they were in the process of considering a number of

20  different locations.  And this included Oregon and the Pacific

21  Northwest area.  It included the area around Washington, D.C.,

22  Baltimore, Ohio and New Jersey.  And they had me and a couple

23  of other people looking for very specific pieces of property,

24  which is what I did in New Jersey.

25  Q.   And were you successful in locating such a piece of

*Goeringer - Direct*

1    property?

2    A.   I located a competent real estate broker who was going to

3    show several pieces of property to Jon Murray.

4    Q.   To your knowledge, did the O'Hairs ever talk about moving

5    to New Zealand?

6    A.   Yes.

7    Q.   And when was that, sir, if you could put it in a time

8    frame?

9    A.   There were two periods of time when this came up as a

10   topic of conversation.  The first was in the early 1980s, when

11   Madalyn O'Hair was very concerned about the possible

12   ramifications following the election of Ronald Reagan.  And

13   later, there was concern about the possibility of something

14   happening and -- with the Truth Seeker trial.

15   Q.   Okay.  And to your knowledge, what plans or steps, if any,

16   did Jon or anyone else take to check out New Zealand and its

17   suitability for a place to move the organization and the

18   library, and so forth?

19   A.   My understanding is that he traveled to New Zealand, and

20   while meeting with people down there from the New Zealand

21   atheist and secularists groups, discussed and looked into the

22   possibility.

23   Q.   Okay.  And to your knowledge, was such plan ever

24   finalized?  Do you have any reason to believe it was?

25   A.   No, I don't think -- no.

*Goeringer - Direct*

1   Q.   And why not?

2   A.   My sense is that it existed as sort of a back-pocket plan,

3   almost a fantasy, but it was something that they never really

4   seriously intended to do.

5   Q.   Well, sir, do you have any knowledge that they had

6   deposited a large amount of money in New Zealand bank

7   accounts?

8   A.   Yes, I do.

9   Q.   And can you tell us what their purpose in doing that was,

10  if you know?

11  A.   The money.  We set up a trust fund, and the idea behind

12  the trust fund was that people would make a loan or a

13  contribution, and once it was built up to a sufficient level,

14  the organization would have the sort of nest egg.  And Jon

15  Murray looked all over the country, and he looked overseas for

16  financial instruments that would yield a fair amount of money,

17  and he found it in New Zealand.

18       And at the time, we were getting ten to 11 percent,

19  which isn't a lot now, but back then, it was a lot.  It was

20  better than what you were getting with a lot of other

21  financial instruments and certainly safer than the stock

22  market.  And they didn't want to invest in the stock market or

23  anything like that.

24  Q.   Now, the jury has heard testimony in this trial that Jon

25  Murray had and used a cellular phone.  Can you shed any light

*Goeringer - Direct*

1    on how he came to have that cellular phone?

2    A.   I gave him the cellular phone, and it was one of the old

3    -- what they call brick models when cell phones first came

4    out.  It was one of these big ones with an antenna on it.

5    Q.   A gray phone?

6    A.   Right.  And I used it for about a year, and I just didn't

7    see enough of a use for it, and my girlfriend didn't like me

8    hauling it around all the time, so I got rid of it and I

9    thought that maybe they could use it, so I shipped it down to

10   Jon.

11   Q.   Okay.  And to your knowledge, he did use it; is that

12   right?

13   A.   He did use it, yes.

14   Q.   And let me direct your attention, sir, to late August of

15   1995 or early September 1995.  Had you been making an attempt

16   to contact Jon Garth Murray, Madalyn Murray O'Hair or Robin

17   O'Hair?

18   A.   Yes, I tried e-mail, I tried phoning them at their private

19   residence.  I had the phone number for that.  And I tried

20   numerous times reaching them at the building over on Cameron.

21   Q.   And with regard to this e-mail, sir, was there some

22   urgency or sensitivity about this e-mail that needed to be

23   responded to immediately?

24   A.   Well, when you're a writer, I guess you think that all of

25   your e-mail is important.  I thought it was important because

Goeringer – Direct

1    I was working on stories at the time, and we were publishing

2    this electronic newsletter in a timely fashion.

3    Q.  All right.

4    A.  And I was shipping these stories down, and I just didn't

5    hear anything back on them.

6    Q.  All right.  And did you become concerned or alarmed at

7    that point?

8    A.  I became concerned when -- I mean, they had come back from

9    a vacation and there was no answer at the center, and that's

10   sort of unusual.  I mean, you have an operation going.  You

11   have an organization that's operating out of this building,

12   and one of them would be there or an employee would be there,

13   and it was just unusual to call up several times in the course

14   of a day and no one answers the phone.

15   Q.  After you had no luck contacting the O'Hairs at their

16   home, office, or by e-mail, did you think about the cellular

17   phone?

18   A.  Yes.

19   Q.  And did you make an attempt to call the number for the

20   cellular phone?

21   A.  You bet, I did.

22   Q.  And who answered the phone?

23   A.  I'm reasonably certain that the first time I called, a

24   male voice answered the phone that was not Jon Garth Murray.

25   Q.  All right.  Sir, that was to be my next question.  You're

Goeringer - Direct

1    certain it was not John Garth Murray?

2    A.   That's correct.

3    Q.   And you had spoken to him many times?

4    A.   Yes, I knew his voice.

5    Q.   All right.  Did you ask to speak to Jon Murray?

6    A.   Yes.

7    Q.   And were you successful in speaking to him on that

8    occasion?

9    A.   Yes.

10   Q.   And without going into specifically to what he was saying

11   to you at that time, as a result of that conversation, what,

12   if anything, did you do?

13   A.   You mean what did I ask him --

14   Q.   Well, you can say what you asked him but not necessarily

15   what he responded.  Did you have a general understanding where

16   he was after that conversation?

17   A.   I asked him what was going on, and I explained that there

18   was no answer at their residence or their offices and that was

19   just so unusual.  I mean, they always kept in touch, even when

20   they were on vacations, they kept in touch with somebody; they

21   sent cards.  And I said, "What's going on?"

22   Q.   And did you ever speak to Madalyn Murray O'Hair on that

23   occasion?

24   A.   I didn't speak to her, but I heard her in the background.

25   I asked Jon if -- what's going on, and he -- do you want to

Goeringer - Direct

1  know what he said?

2  Q.  Well, not at this point, sir.  Did you call back a second

3  time and speak to Robin Murray O'Hair?

4  A.  Yes, I did.

5  Q.  And did she sound normal or --

6  A.  No.

7  Q.  How did Robin Murray O'Hair sound on that occasion?

8  A.  Robin sounded very flustered and very upset, and there was

9  something -- I was left with the definite impression that

10 there was something wrong and something unusual was going on,

11 something that was not right.

12 Q.  And did you specifically ask her anything?

13 A.  Yes, I said, "Is everything all right?  Is there something

14 -- should I come down there?  Is there something that is

15 wrong?  Is something wrong?"  And she responded in a very

16 cryptic way, saying something to the effect of --

17     MR. T. MILLS:  Excuse me.  Object to the hearsay.

18     MR. CARRUTH:  And I'll offer under 8033, your Honor,

19 as a present sense impression of the state of mind of the

20 declarant, who is unavailable.

21     THE COURT:  Objection is sustained.  This is being

22 offered for the truth of the matter.  If you'll rephrase your

23 question.

24     MR. CARRUTH:  All right.

25 Q.  (BY MR. CARRUTH) So after that conversation, did you get a

*Goeringer - Direct*

1  feeling that something was not right?

2  A.  Yes, I did.

3  Q.  Okay.  And you told us that David Waters assisted in

4  cataloging the library, using the computer at the Atheist

5  Headquarters; is that correct?

6  A.  Yes, sir.

7  Q.  So he would have been aware of the impending move of the

8  library in your opinion?

9  A.  He was helping to pack it, yes, sir.

10 Q.  Did you learn subsequently that the computer, which

11 contained the index that that library was stolen from the

12 American Atheist Headquarters here in Austin, Texas?

13 A.  Yes, I did.

14 Q.  And do you know who took it?

15 A.  No, I don't.

16 Q.  Knowing what you do about the O'Hairs and knowing what you

17 do about David Waters, is there any way in your opinion the

18 O'Hairs would have ever sought his help in trying to move out

19 of town?

20     MR. T. MILLS:  Excuse me, I object on the grounds that

21 there aren't specific facts available for him to form a lay

22 opinion on this matter.

23     THE COURT:  Well, that objection's overruled.  You may

24 answer the question.

25 A.  Could you repeat it once more?

*Goeringer - Direct*

1    Q.  (BY MR. CARRUTH) Yes, sir.  Knowing what you do about the

2    Murray O'Hairs and knowing what you do about David Waters, is

3    there any way that the O'Hairs would have solicited or

4    contacted --

5    A.  No.

6    Q.  -- or -- well, let me ask my question, first -- asked

7    David Waters to assist them in leaving Austin?

8           MR. T. MILLS:  I object.  Speculation.

9           THE COURT:  Sustain the objection.

10          MR. CARRUTH:  Then, I'll pass the witness.

11          THE COURT:  I'm going to give a little afternoon

12   break.

13          MR. T. MILLS:  Yes, sir.

14          THE COURT:  Fifteen minutes.  You're not confined to

15   the building, but be ready to come back in 15 minutes.

16   Remember the instructions.

17     (Recess.)

18          THE COURT:  Whoever did this is very good.  I didn't

19   mean for it to be torn up, but I do not wish any public

20   disclosures about these jurors.  They are volunteers here in

21   the sense of doing their duties.  So I would appreciate no

22   personally identifiable information being -- getting out with

23   regard to the jurors.  All right.

24          You remain under oath, sir.  You may proceed.

25     (Jury present.)

1      CROSS-EXAMINATION

2    BY MR. T. MILLS:

3    Q.   Is your name -- would you tell me your last name again?

4    A.   Goeringer.

5    Q.   Mr. Goeringer --

6    A.   Right.

7    Q.   -- in 1993, there were some assets in addition to the

8    library that were being sold.  Do you have knowledge of that?

9    A.   Yes.

10   Q.   All right.  Now, was the Truth Seekers lawsuit going on at

11   the latter part of '93?

12   A.   I believe so.

13   Q.   All right.  Your home in 1993 was where?

14   A.   Tucson, Arizona.

15   Q.   All right.  And you had some expertise in how to pack up

16   rare documents and manuscripts and books, correct?

17   A.   I like to think that I had a little, yes, at least in the

18   storage or in conservancy of them.

19   Q.   Well, I don't know if you're just being modest, but you

20   probably had more expertise in that area than Ms. O'Hair and

21   Jon, Robin, the other people here.  You'd admit to that,

22   wouldn't you?

23   A.   I'm not sure of that.

24   Q.   All right.  Well, in any case, do you happen to know why

25   -- what the logistics was for the library to be sent to

1  Houston prior to being sent to Kansas City?  Why not just

2  straight to Kansas City, if you know?

3  A.  I know only about the search which I helped conduct for

4  facilities that would be amenable to the storage of a library

5  of that type, which is trying to find what are called

6  climate-controlled facilities where there's a temperature

7  range and the books are stored so they wouldn't have water

8  damage or something like that.  I mean, we don't want to put

9  things like that in just a regular storage locker like you put

10  other things.

11  Q.  All right.  I just didn't know if you had knowledge about

12  why did it go to Houston first.  Why did the library go to

13  Houston first?

14  A.  I don't know if the entire library didn't go to Houston as

15  far as I know.

16  Q.  All right.

17  A.  These storage facilities, they could only rent so much

18  space, and when those were filled up, which was pretty easy to

19  do if you're stacking these things only three or four boxes

20  high, you fill those facilities up pretty fast.

21  Q.  All right.  It was during this period of time that Mrs.

22  O'Hair's, not John's, but her Mercedes was sold, correct?

23  A.  Want to run that by me once more?

24  Q.  At the same period of time that you were here in Austin,

25  helping with the library packing, Ms. O'Hair's Mercedes was

1   sold, wasn't it?

2   A.   Ms. O'Hair?

3   Q.   Madalyn Murray O'Hair's Mercedes.

4   A.   Mercedes, I don't know anything about that.

5   Q.   All right.   Do you know anything about the family -- I

6   don't know, the specific owner -- art work being sold?

7   A.   No.   I know they had art work that had been hanging on --

8   like you'd walk into an office, and there would be a picture

9   of a nature scene.   And I think -- I could be wrong, but I

10  think that even one of those was reproduced on the covers of

11  one of the magazine, but I'm not sure.

12  Q.   All right.   But you did not see activity indicating that

13  they were being sold.

14  A.   No, I didn't.

15  Q.   All right.   You were aware that in the fall, specifically

16  the latter part of November 1993, that Jon was coordinating

17  with Don Sanders, who lived in Houston, and you regarding

18  finding some of this adequate climate-controlled rental space?

19  A.   I could be really wrong on the time frame here, but it

20  occurs to me that a lot of that work was done by me prior to

21  -- I think I was down there helping to pack and move part of

22  that library, it seems, around July or August, because it was

23  pretty hot and humid.

24  Q.   All right.

25  A.   And before then, I'm reasonably certain that it was before

*Goeringer - Cross*

1   then that Jon and I had talked about how do you store a

2   library, where could you store it, how do you pack it, and the

3   idea of climate-controlled facilities came up.  And he asked

4   me -- he said, will you try to find places that have

5   climate-controlled facilities that are big enough to store a

6   library of this size?  And I looked.  I tried to find places

7   like that.

8   Q.  Well, isn't it true that perhaps because of the Truth

9   Seekers might be getting ready to get a judgment adverse to an

10  atheist group, that there was some degree of secrecy of

11  communication between you and Jon and Don Sanders about moving

12  these assets?

13  A.  It wasn't my understanding that that was the reason for --

14  specifically for any kind of what you would refer to as

15  secrecy.  I think the, in my opinion, the overarching concern

16  is that you have this collection of some pretty rare

17  materials, and you don't want that being broadcast.  And one

18  of the considerations that I used in looking for a -- storage

19  locations was that it would have things like security cameras

20  and locks, and that it would have a reasonably high level of

21  security because theft of these materials -- I know people

22  don't believe this, but rare books are stolen and they are --

23  you know, there is a market in the theft of rare books.  And

24  we didn't want this library stolen.

25  Q.  Well, was the library insured?

*Goeringer - Cross*

1    A.  I don't know.

2    Q.  All right.  Well, there were passwords that were used to

3    communicate between you and Don Sanders and Jon, were there

4    not?

5    A.  No, I'm not sure what you're -- what do you mean,

6    passwords?

7    Q.  Well, the letter that I showed you at the break where I

8    asked you if you were familiar with this subject matter, and

9    you said you hadn't seen it but that you were familiar with

10   the subject matter, it mentions passwords.  So I'm just asking

11   you if you recall the use of passwords.

12   A.  I'd have to look at that again, but maybe -- I mean, there

13   were pass codes that you would punch in.  When we went and

14   deposited these books in the climate-controlled facility down

15   in Houston, there was some kind of a key pad, and he had the

16   security code for which you punch in and then, the gate would

17   open.

18   Q.  All right.  May I show you this document?

19   A.  Yeah, sure.

20   Q.  It's not in evidence, but just see if it refreshes your

21   recollection about this.  The references to passwords are down

22   here, and maybe it's on a different subject.

23   A.  Okay.  I had a beeper and there are beeper codes, like, if

24   you call somebody and you want them to get back to you right

25   away, it was 911.  If it was something important, we just came

*Goeringer - Cross*

1   up with this thing about 666, and I knew that I should call

2   Jon at his office.

3   Q.  All right.

4   A.  I think that's what that's about.

5   Q.  All right.  And his code word or his beeper word was?

6   A.  I don't even remember.

7   Q.  All right.

8   A.  But I remember there was something like that.  I had a

9   beeper.  It was one of these -- you couldn't respond.  You had

10  to go to a telephone, and if somebody wanted me very quickly,

11  they'd punch in their number and 911, or they'd punch in the

12  number they were at, that sort of thing.

13  Q.  All right.

14  A.  And I guess if it was that number 666, I would call John's

15  office.

16  Q.  Well, whose password is indicated on refreshing your

17  recollection was Satan?  Who was that?

18  A.  That could have been me.  I don't know.  I don't remember.

19  Q.  All right.  Have you used that as a code word in other

20  situations?

21  A.  It's not my e-mail address, no.

22  Q.  All right.

23  A.  No.  I mean, it was a pager beeper.  It was a beeper code.

24  You called somebody.  That's --

25  Q.  All right.  My understanding is that -- is it your

1  understanding that Ms. O'Hair's motivation and Jon and Robin's

2  motivation in moving the library was to hide the library

3  assets in case the Truth Seekers won?

4  A.  No.

5  Q.  It's my understanding that the index of the books in the

6  collection were on a computer?

7  A.  Yes.

8  Q.  And is it your understanding that that's the only place,

9  to your knowledge, that there was an index of these books?

10  A.  No.

11  Q.  Where was another index?

12  A.  In each box of books, I believe a sheet was printed out,

13  and we put that on top of the books after they were sealed in

14  popcorn and a plastic bag, and then, on top of that was the

15  list of books that were supposed to be in that box.

16  Q.  All right.

17  A.  And that was so that you could re-assemble the library,

18  and you'd have a general sense of what was in each box.

19  Q.  All right.  But at the headquarters, other than on the

20  computer, there was no list of the books to your knowledge?

21  A.  Not that I know of, no, sir.

22  Q.  All right.  And the computer either disappeared or was

23  stolen at some point in time, correct?

24  A.  That's my understanding, yes.

25  Q.  Which, among other things, meant there went the list of

*Goeringer - Cross*

1  the books, correct?

2  A.  That list that was on the computer, yes.

3  Q.  All right.  And is it -- do you have a -- an understanding

4  of the approximate value of the library?

5  A.  I had heard different figures.

6  Q.  What's the range?

7  A.  Millions.

8  Q.  All right.

9  A.  Millions of dollars.

10  Q.  All right.  Are you still active in Atheist Organizations?

11  A.  Yes, sir.

12  Q.  Do you know where the library is now?

13  A.  Yes, sir.

14  Q.  Is it in Kansas City?

15  A.  Part of it, I believe, is in Kansas City.

16  Q.  And part of it is where?

17  A.  Some of it is somewhere in a storage facility here in

18  Austin because we simply haven't been able to move it.  And

19  the rest is overflowing from rooms and corridors in our new

20  building up in New Jersey.

21  Q.  All right.  And when was, to your knowledge, the last time

22  that an inventory was taken to see if all the books are

23  present, these millions of dollars of books, if there has been

24  any?

25  A.  We don't -- you mean if all the original books are in

*Goeringer - Cross*

1  their boxes?

2  Q.  Well, however -- if the complete set of books exist or if

3  you missed --

4  A.  Maybe I can answer it this way.  After the O'Hairs

5  disappeared, after we didn't hear from them, there was a time

6  when, I believe, Ellen told me that she instructed Spike to go

7  -- Spike Tyson to go and open up some of the books or to go to

8  this building here in Austin and to make sure that the book --

9  is the library still there if something happened, also, to the

10  library.

11       And it is my understanding that he went and found

12  boxes of books, and he opened several of the boxes and they

13  were there.  Boxes were then, last year, when we -- last

14  January of '99, when we started moving material up from Austin

15  to a temporary facility in New Jersey, I went through some of

16  the boxes.  I opened them just to see what was in there, and

17  the books were in there.

18  Q.  All right.  Is this a correct statement?  See if I can ask

19  it specifically enough for you to give me a "Yes" or "No"

20  answer.  To your knowledge, since the O'Hairs have

21  disappeared, voluntarily or involuntarily, there has not been

22  a complete audit and examination to see if all the books are

23  there; is that correct?

24  A.  That's correct.

25  Q.  All right.  Now, the building that was the American

1  Atheist Headquarters, is that the building that I understand

2  was up for sale in 1994?

3  A.  It was the Headquarters Building over on Cameron, yes.

4  Q.  And the general idea was that Ms. O'Hair, who was getting

5  on up in years, her health wasn't bad yet, but generally, it

6  might be time to relocate the headquarters with the new

7  leader; was that the thought?

8  A.  No.

9  Q.  Well, the headquarters were going to be relocated after

10  the building was sold, correct?

11  A.  Yes.

12  Q.  Did it -- was it your understanding that Ms. O'Hair would

13  follow that and continue to be the grandame of the atheist

14  movement at the new headquarters?

15  A.  Yes.

16  Q.  All right.  Were you aware of legal or accounting

17  skirmishes or audits over the years that Ms. O'Hair and the

18  Atheist Organizations had with the IRS?

19  A.  Yes, I was.

20  Q.  And were you aware that the IRS was not Ms. O'Hair's

21  favorite organization?

22  A.  Yes.

23  Q.  She did it sometimes discuss it in entire four-letter

24  word-type language by Ms. O'Hair?

25  A.  I would say that would be a fair description, yes.

*Goeringer - Cross*

1   Q.  Correct or not, did Ms. O'Hair perceive that she was being

2   -- she and atheists were being harassed?

3   A.  Yes.

4   Q.  And over what period of time, as best you could recall,

5   was there talk about the three, Madalyn, Jon and Robin,

6   possibly moving to New Zealand?

7   A.  The first mention that I heard of, maybe, relocating to

8   New Zealand came up in conversation in the late '70s.

9   Q.  All right.  And did it resurface periodically in the '80s

10  and early '90s?

11  A.  Yes.

12  Q.  Now, you mentioned that there were some better -- perhaps

13  better interest rates on investments in New Zealand.  Did you

14  actually make inquiry into that or do you know if that's

15  correct or not?

16  A.  I'm pretty sure that was correct because membership board

17  meetings during the convention and at board meetings, the

18  accountant in New Zealand was discussed, and we batted around

19  different ideas of what sorts of different financial

20  instruments could be used.

21       And the only thing that could probably beat it at that

22  time -- and you have to understand that this was before what

23  the economy is today -- you couldn't really put money in the

24  stock market and get a bigger return without taking a very

25  high risk.  And it was the consensus, and I think Jon was

*Goeringer - Cross*

1  right, that for getting ten percent or so back then on a

2  secure investment, that was pretty good.

3        The only way you could beat it was if you would, like,

4  buy real estate and fix up a place and resell it, and we

5  didn't have the time to do that.  So that was -- it was a

6  safe, secure investment, and we all knew about it.

7  Q.  Was it your recollection that in 1995 that the New Zealand

8  government stock was earning about eight percent?

9  A.  It was in that area.  It was somewhere -- he said it was

10 -- I think it varied, but it was around 8, 10, sometimes even

11 higher, but it was in that ballpark.  And the reason they

12 liked that was it was secure.  It was sort of the equivalent,

13 I guess you'd call, of a blue chip.

14 Q.  It was as secure, I suppose, as the New Zealand government

15 if it was New Zealand government stock, correct?

16 A.  It was a government bond, so I guess that makes it the

17 equivalent of a government stock, yes.

18 Q.  What I'm interested in is whether you specifically made

19 inquiry about what the interest rate was there as opposed to

20 other places, if you specifically, yourself?

21 A.  I looked -- I remember looking into something concerning

22 the stock market at the time and averages, but I mean, this

23 was -- I just don't remember specifics.  The consensus was

24 when we would discuss this -- I mean, when you weighed the

25 pros and cons about it that in terms of it being a relatively

Goeringer - Cross

1    secure return on your money over a long period of time, that

2    this was probably the most prudent thing to do.

3    Q.   But didn't you -- and I'm not saying it was a mistake,

4    don't know.  Didn't you rely largely on what Jon said?  He had

5    been there.

6    A.   Right.  I don't think that was the case at the board

7    meetings, no, because we debated back and forth, and we asked

8    him a great many questions about the options of what could be

9    done with that money.  There was a lot of discussion about

10   that, and a lot of ideas were floated.

11   Q.   I asked you if you recalled anything about the sale of

12   Madalyn's Mercedes, and you said you did not.  Do you recall

13   Ms. O'Hair having a car back then?

14   A.   The only thing I remember about her car --

15   Q.   Yes.

16   A.   -- this is Madalyn Murray O'Hair -- is that somebody had

17   willed the organization, at one time, a Cadillac or two

18   Cadillacs, and that was the only car, as far as I know, that

19   she had.  Jon had a Mercedes and Robin had a Porsche.

20   Q.   All right.  During the 30-day, approximately, period of

21   September 1995, wasn't it during that period that you used the

22   cell phone number to talk with Jon Murray?

23   A.   Yes, sir --

24   Q.   Okay.

25   A.   -- around then.  It could have been late August.  I think

1   it was September.

2   Q.  And isn't it true that when you talked with him, he seemed

3   to be extremely upbeat and positive?

4   A.  At the first conversation, yes.

5   Q.  And was it in the first conversation that you made inquiry

6   about Madalyn, and you heard in the background her saying

7   words?

8   A.  Yes, sir.  She said --

9   Q.  Hold on a second.

10  A.  Okay.

11  Q.  When the O'Hairs -- I use that collectively, Madalyn, Jon

12  and Robin -- discussed moving out of the United States, did

13  they -- did you know any specific plans about -- details about

14  how they would do it if they did it?

15  A.  They never collectively discussed moving out of the United

16  States to me.

17  Q.  Because of that -- go ahead.

18  A.  It came up as a matter of conversation once at a board

19  meeting, and Jon sort of kicked it around, and Robin thought

20  the idea was preposterous.

21  Q.  All right.  Incidentally, when you talked to Robin during

22  the 30-day period -- and I'm just using that as the September

23  1995 -- instead of being upbeat, she was not; isn't that

24  correct?  She was not upbeat at all?

25  A.  She sounded distressed.

1   Q.  All right.  When it was kicked around, the general idea

2   about moving to New Zealand and just as a concept, you got the

3   impression that Robin thought it was preposterous, did she

4   seem to be distressed about even talking about it?

5   A.  She said it was preposterous.

6   Q.  All right.  That's all the questions I have.

7                    RE-DIRECT EXAMINATION

8   BY MR. CARRUTH:

9   Q.  Well, your Honor, counsel again asked the witness about

10  this conversation with Robin Murray O'Hair and testified that

11  she was distressed.  And I would like to re-urge not for the

12  truth of the matter stated, but just to show what it was she

13  said during this period that she was distressed in order to

14  show her state of mind or emotional state at the time he had

15  his last conversation with her in San Antonio.

16          I would respectfully re-urge a request to re-offer

17  that testimony.

18          MR. T. MILLS:  I tried very carefully just to limit my

19  question and his answer to the motion, and I believe that he

20  testified about that, so I would object to it.

21          THE COURT:  The objection is hearsay and the objection

22  is good.

23  Q.  (BY MR. CARRUTH) Now, counsel asked you about -- or showed

24  you some document that was not in evidence and ask you about

25  some code name Satan; is that correct?

*Goeringer - Redirect*

1   A.   Right.

2   Q.   Have you ever heard of a manuscript prepared by David

3   Waters by that name?

4   A.   Only read about it in the newspaper.

5   Q.   Do you know a man named Jack Jones in New Zealand?

6   A.   Yes.

7   Q.   Show you, sir, what's been marked for identification as

8   Government's Exhibit No. W7-1, on the letterhead of the United

9   Secularists of America.  Would you take that out, please --

10  it's a three-page letter -- and see whose signature appears at

11  the bottom.

12  A.   Looks like the signature of Jon Garth Murray.

13  Q.   And does that letter relate to the investments in New

14  Zealand that counsel asked you about on cross-examination

15  earlier?

16  A.   I'd have to read it.

17  Q.   Okay.  Please take a few minutes and read it.

18  A.   Okay.

19  Q.   Does that letter discuss the investments that the American

20  Atheists had in New Zealand?

21  A.   It discusses investments that --

22  Q.   The secularists.  United Secularists of America had in New

23  Zealand?

24  A.   Yes, sir.

25  Q.   All right, sir.  We'd offer, your Honor, for what's been

*Goeringer - Redirect*

1   marked W7-1.  Tender to counsel.

2        MR. T. MILLS:   We would object to the offer of W7-1

3   on the grounds of it being hearsay of communication between a

4   man named Jack Jones and Jon Murray.

5        MR. CARRUTH:  We offer as business records of the

6   United Secularists of America, your Honor, as all the other

7   exhibits that have been going in.

8        THE COURT:  There's no evidence that it is a business

9   record.  If you wish to offer it as a business record, you can

10  do so at the appropriate time.  And the objection is good.  It

11  is hearsay.

12        MR. CARRUTH:  Thank you.

13  Q.  (BY MR. CARRUTH) You mentioned, a while ago, that -- in

14  response to questions by Mr. Mills that no accounting or

15  inventory has been made, since the O'Hairs disappeared, of the

16  Atheist Library; is that correct?

17  A.  As he described in the accounting, yes.

18  Q.  To your knowledge?

19  A.  Yes.

20  Q.  When did you arrive in Austin, Texas for this trial?

21  A.  Yesterday.

22  Q.  And did you come to my office, the Office of the United

23  States Attorney, just about a block and a half away from here?

24  A.  Yes, I did.

25  Q.  And meet with myself and these agents?

1   A.   Yes, sir.

2   Q.   And while you were there, did you have occasion to examine

3   any books that you determined came from the American Atheist

4   Library?

5   A.   Yes, sir.

6   Q.   As a rare book dealer, can you describe those books for

7   the jury?

8   A.   One was a catalog of an exhibition.  It's a traveling

9   exhibition of torture instruments used during The Inquisition,

10  and this catalog describes the various artifacts in it.  And

11  the exhibit has toured all over Europe.  And Madalyn O'Hair

12  was interested in bringing this exhibition to the United

13  States.

14          The other one was a large quatro-size book,

15  hard-bound, and cheesy leather binding, but it was in French,

16  and it was -- both of these, I believe, have the book plate or

17  identification from our library, which is known as the Charles

18  E. Stevens American Atheists Library and Archives.  They were

19  signed by Madalyn Murray O'Hair.  I believe that's her

20  signature, and that those were books associated with her and

21  the library.

22  Q.   And based upon your own personal knowledge, can you give

23  this jury any explanation of why those books from the Atheist

24  Library would be in the possession of David Waters?

25  A.   I have no idea how he might have ended up with them.

*Goeringer - Redirect*

1    Q.  And you --

2    A.  They belong in the library as far as I know.

3    Q.  You mentioned earlier that Mr. Waters had participated in

4    helping to create the index on computer --

5    A.  Yes.

6    Q.  -- here in Austin.  And I believe in response to counsel's

7    question, you stated that in addition to the master index,

8    which was maintained by computer, in each of the 600, or so,

9    boxes you packed was an index or invoice of what was contained

10   in that box alone.  Would that be a fair statement?

11   A.  Yes, sir.

12   Q.  But to your knowledge, there was only one master list of

13   all the books, and that was on that computer that David Waters

14   was inputting, is that correct, to your knowledge?

15   A.  It was stored on a tape that was inserted into the

16   computer.

17   Q.  Okay.

18   A.  Yes.  I don't believe it was on the hard drive, but I

19   could be wrong.  I don't know.

20   Q.  And to your knowledge, that master list was subsequently

21   stolen from the American Atheist Headquarters; is that right?

22   A.  The computer was stolen, and presumably with it the list,

23   yes.

24   Q.  And that was at the time that David Waters worked there?

25   A.  Yes, I believe so.

Goeringer - Recross

1   Q.  Pass the witness.

2                    RE-CROSS EXAMINATION

3   BY MR. T. MILLS:

4   Q.  This book that -- did I understand that Ms. O'Hair was

5   interested in Americans getting to see a book about European

6   torture instruments?

7   A.  No.  She was -- the book was an exhibition catalog about

8   the exhibition, and she spoke of wanting to bring the

9   exhibition to this country.  It was an exhibit -- the

10  exhibition has been around Europe.  There have been write-ups

11  on it.  It's a known exhibition.

12  Q.  All right.  And are torture instruments of particular

13  interest to atheists?

14  A.  They were torture instruments used by the -- I believe the

15  whole Spanish Inquisition.

16  Q.  Oh.

17  A.  And that was the interest there.

18  Q.  All right.

19  A.  We're not into S & M, no.

20  Q.  All right.  Did -- do I understand that you really do know

21  with certainty that a book that you saw at the U.S. Attorney's

22  Office about torture instruments was a part of the Atheist

23  Library?

24  A.  Yes.

25  Q.  Do you happen to know if that catalog was part of the

*Goeringer – Redirect*

1   library as opposed to -- and maybe you do because of the

2   signature.  Did I understand that?  Do you know if the book

3   you saw came out of the library or if it's another copy?

4   A.  I believe it had the library plate or a library stamp on

5   it.

6   Q.  All right.  Well, you said, "as far as I know," and I

7   didn't know what qualifying meaning you meant to that.

8   A.  It was signed that one or both of these books had her

9   signature in them, and it looked like her signature.

10   Q.  All right.  But you don't remember if that was the book

11   that had her signature in it.  You saw two books?

12   A.  Right.  I believe that both of them had the signature and

13   a book plate or some sort of a device marking them as being

14   associated with the Charles E. Stevens American Atheists

15   Library and Archives.

16   Q.  Thank you, sir.

17                    RE-DIRECT EXAMINATION

18   BY MR. CARRUTH:

19   Q.  Do you also recall locating one or more business cards

20   inside either of those books yesterday?

21   A.  Yes, I do.

22   Q.  And can you tell the jury whose name appeared on those

23   business cards?

24   A.  Robin Murray O'Hair.

25   Q.  Thank you, sir.  No further questions.

RE-CROSS EXAMINATION

BY MR. T. MILLS:

Q.  Do you know what country and city that Ms. O'Hair had seen

the exhibit in Europe?

A.  I don't know if they had seen the exhibit in Europe.

Q.  Thank you.

        MR. CARRUTH:  Nothing further, your Honor.  May the

witness be excused?

        MR. T. MILLS:  Yes, sir.

        THE COURT:  You may be excused.  Call your next

witness.

        MR. CARRUTH:  Thank you, your Honor.  We call Mr.

Henry Morton.

        THE COURT:  This is Mrs. Sims.  She's going to

administer an oath to you, sir.

    (Witness was sworn.)

        THE COURT:  You need to walk around this column,

please, sir.  Just walk around over here.  Have a seat in that

blue chair.

        THE WITNESS:  Excuse me, your Honor.  I'm hard of

hearing.

        THE COURT:  Have a seat.

        THE WITNESS:  Thank you.

        THE COURT:  Now, if you'll tell us your full name,

please, sir, and spell your last.

*Morgan - Direct*

1      THE WITNESS:  Henry Morgan.

2      THE COURT:  Spell your last name.

3      THE WITNESS:  M-O-R-G-A-N.

4    HENRY MORGAN, called by the Government, duly sworn.

5                    DIRECT EXAMINATION

6  BY MR. CARRUTH:

7  Q.  Mr. Morgan, are you also or were you previously known as

8  Henry Schmuck?

9  A.  Yes.

10  Q.  I believe your name appears as Henry Schmuck on corporate

11  documents of the Atheist Organization?

12  A.  Yes.

13  Q.  And are you now or have you ever been a board member of

14  the Atheist Organization?

15  A.  Yes, I am a board member now.

16  Q.  And I certainly, sir, do not mean to embarrass you by this

17  next question, but --

18  A.  You're going too fast.

19  Q.  I'm sorry.  I certainly don't mean to embarrass you, but

20  would you mind telling the members of the jury why it was you

21  changed your name from Henry Schmuck to Henry Morgan?

22  A.  Well, if you have any Jewish friends call you a Schmuck

23  and see what they say.  It's a derogatory term.  I really

24  don't want to explain what it is, but ask a Jewish what it is

25  in Jewish slang.

*Morgan - Direct*

1   Q.  I believe you told me yesterday that after your father

2   passed away, you changed your name?

3   A.  He died in '93, and I couldn't do it till he died, no way.

4   And I worked on my mother, so I finally got it changed in

5   1999.

6   Q.  All right, sir.  But you had previously been known as

7   Henry Schmuck?

8   A.  Yes.

9   Q.  And in that capacity, you were one of the directors of the

10   American Atheist Organization?

11   A.  Yes.

12   Q.  And in that regard, sir, did you receive and maintain

13   copies of all the American Atheist Newsletters which were

14   published, I believe, on a monthly basis?

15   A.  I think I probably got every one.  I might be missing one

16   here or there, but I probably have every one.

17   Q.  And do you recall being visited by this gentleman seated

18   over here, Special Agent Ed Martin of the Internal Revenue

19   Service, Criminal Investigation Division, on April 15th, 1999?

20   A.  Yes.

21   Q.  And that was at your home, which is where?

22   A.  Yes.

23   Q.  Where was your home then?

24   A.  33635 Somerset, Westland, Michigan.

25   Q.  All right, sir.  And there in Michigan, did you give Agent

*Morgan - Direct*

1  Martin a copy of the newsletter of the American Atheist -- the

2  American Atheist Newsletter for July 1995, which is labelled

3  Volume 34, No. 7?

4  A.  That's the Insider Newsletter.

5  Q.  Sir?

6  A.  Insider Newsletter.

7  Q.  No, sir.  The American Atheist Newsletter?

8  A.  Yes.

9  Q.  You provided that to Mr. Martin?

10  A.  Yes, I did.

11  Q.  At this time, Mr. Morgan, I'm showing you what's been

12  marked for identification as Government Exhibit W9-1.  Would

13  you please take that, if necessary, take it out of the packing

14  and look at it and make sure that's the same newsletter we're

15  talking about?

16  A.  Yes, that's it.

17  Q.  And was there anything particularly unusual about that

18  newsletter?  Well, before you answer that, let me offer it,

19  sir.  For the record, the government offers Government Exhibit

20  W9-1.

21          THE COURT:  Received.

22  Q.  (BY MR. CARRUTH) Thank you.  Now that that letter is --

23  newsletter is in evidence, sir, could you tell the members of

24  the jury what its significance is, if any?

25  A.  Well, this is like one of our employees, ex-office

*Morgan - Cross*

1    manager, David Waters, and his --

2    Q.  Was it voluntary or was it complimentary of Mr. Waters?

3    A.  No, it was not complimentary of Mr. Waters.

4    Q.  Sort of derogatory?

5    A.  Very derogatory.  We had no use for him, and they were

6    actually quite afraid of this man.

7    Q.  They were afraid of him?

8    A.  Absolutely.  They stated that to me personally on numerous

9    occasions.

10   Q.  Did the newsletter reflect that they were so afraid of him

11   that they applied for a restraining order or protective order?

12   A.  They most certainly did, yes, sir.

13   Q.  And does it also reflect when that was denied, they built

14   a $6,000 security fence around the American Atheist

15   Headquarters?

16   A.  Yes.

17   Q.  Now, that was an inside newsletter for members only?

18   A.  Right, yeah.

19   Q.  Okay.  Thank you, sir.  Pass the witness.

20                      CROSS-EXAMINATION

21   BY MR. T. MILLS:

22   Q.  Mr. Waters was the individual that was blamed for theft

23   from the American Atheist Organization, wasn't he?

24   A.  Yes.

25   Q.  That's all the questions I have.

1          MR. CARRUTH:  Nothing further, your Honor.  May the

2    witness be excused?

3          THE COURT:  Counsel?  You may be excused, sir.  Call

4    your next witness.

5          MR. CARRUTH:  Government calls Denise Cushman.

6          THE COURT:  Stand right there, please.

7       (Witness was sworn.)

8          THE COURT:  Come across, please.  Walk around this

9    column and have a seat.  We need for you to tell us your full

10   name, and spell your last name.

11         THE WITNESS:  Denise Michelle Cushman, C-U-S-H-M-A-N.

12   DENISE MICHELLE CUSHMAN, called by the Government, duly sworn.

13                       DIRECT EXAMINATION

14   BY MR. CARRUTH:

15   Q.  Where do you reside, Ms. Cushman?

16   A.  At 3103 Wells Branch Parkway, Apartment 1421, Austin,

17   Texas.

18   Q.  And what is your current business or occupation?

19   A.  I work at Del Computers as an assistant.

20   Q.  Okay.  Previously, did you have an occasion to work as the

21   office manager for the American Atheist General Headquarters,

22   located on Cameron Road, here in Austin, Texas?

23   A.  Yes, I did.

24   Q.  And during what period of time were you employed in that

25   capacity by the Atheist Organization?

1   A.   From February of '93 to December of '93.

2   Q.   And prior to going to work there, had you been a member of

3   the organization or a volunteer?

4   A.   Yes, both.

5   Q.   And at that time, the then office manager resigned and you

6   were asked to replace her; is that right?

7   A.   That's correct.

8   Q.   And what did your duties as office manager involve?

9   A.   Bulk mailings, payroll preparation, entering

10  subscriptions, confidential matters and general errands.

11  Q.   Do you have a general idea how many subscriptions you had

12  to keep up with when you were mailing out these newsletters?

13  A.   Yes, roughly, there were over 12,000 American -- or within

14  the United States and roughly, 2,000 foreign subscriptions.

15  Q.   And these were sent bulk mail through the United States

16  mails?

17  A.   That's correct.

18  Q.   Did you have a postage meter in the office?

19  A.   Yes, we did.

20  Q.   Okay.  Now, who, besides yourself, had any responsibility

21  with the mailing out the various newsletters and publications?

22  A.   That was all mine; I did it every time.

23  Q.   So that was more or less a full-time job?

24  A.   Yes.

25  Q.   And these were mailed out on a monthly basis; is that

*Cushman - Direct*

1   correct?

2   A.   Yes.

3   Q.   Okay.   During this same period of time that you were

4   employed there, from February to December of 1993, were the

5   O'Hairs ever called out of town for any kind of lawsuit in San

6   Diego, California?

7   A.   Yes, that happened in November of '93.

8   Q.   And do you remember the nature of this lawsuit?

9   A.   It was the Truth Seeker lawsuit.

10  Q.   Okay.   And when they left town, who was left with the

11  responsibility of running the operation of the American -- or

12  Atheist General Headquarters here in Austin?

13  A.   I was left with that responsibility.

14  Q.   And in that regard, did you have keys to the offices?

15  A.   Yes, I had -- I always had a key to the office and, also,

16  at that time, they gave me a key to their home.

17  Q.   Okay.   Did you have access to the safe in Jon Murray's

18  office?

19  A.   Yes.

20  Q.   What was kept in that safe, if you know?

21  A.   There was money, bonds, jewelry and, also, wills.

22  Q.   Did there come a time during your employment when a

23  decision was made to pack up and move the Charles E. Stevens

24  American Atheist Library and Archives?

25  A.   Yes.

1    Q.  And did Conrad Goeringer come in from out of town to

2    assist with those duties?

3    A.  Yes, he did.

4    Q.  And did you have any personal involvement in packing up

5    the library?

6    A.  Yes, I was asked to come back and help route the books to

7    get them boxed up in a timely manner.

8    Q.  Now, was a man named David Waters working there at that

9    time?

10   A.  Yes.

11   Q.  Did Mr. Waters have any involvement, to your knowledge, in

12   packing up or cataloging the library?

13   A.  Yes, he was inputting the books in the computers before we

14   were wrapping the books.

15   Q.  To your knowledge, how many indexes or lists of the books

16   were maintained, the inventory?

17   A.  The only list that I know of is on -- was on that

18   computer.

19   Q.  And was that on the hard drive or on a disk, if you know?

20   A.  It was on the hard drive.

21   Q.  Okay.  Was that computer subsequently stolen from the

22   offices of the American Atheist General Headquarters?

23   A.  Yes, it was stolen the Friday after Thanksgiving in '93

24   or, actually, I'm sorry, the week before that.

25   Q.  And was it ever recovered by the police?

*Cushman - Direct*

1    A.   No.

2    Q.   Was that theft reported, to your knowledge, to the Austin

3    Police Department?

4    A.   Yes, it was.   I was at the headquarters when the Police

5    Office was present taking the report.

6    Q.   At the same time the computer was stolen, along with its

7    library inventory, were there also other matters that were

8    stolen, including paintings and books?

9    A.   The paintings and the books were cataloged with the other

10   books from the Charles E. Stevens Library and Archives.

11   Q.   Okay.   Was there subsequently another theft in the offices

12   of the American Atheist General Headquarters?

13   A.   Yes, it happened after I left.

14   Q.   Okay.

15   A.   The employment bearer bonds were stolen in January of '94.

16   Q.   From the safe?

17   A.   From the safe.

18   Q.   And was that at a time when the O'Hairs were out of town?

19   A.   No.   They were in town during that.

20   Q.   Okay.   After you left, in December of '93, do you know who

21   replaced you as the office manager for the American Atheist

22   General Headquarters?

23   A.   Yes, David Waters did.

24   Q.   And as office manager, do you know whether Mr. Waters had

25   keys and other access not only to the office, to the safe, but

*Cushman - Direct*

1   the home of the O'Hairs?

2   A.   I don't know about the home or the safe, but I know that

3   when I left, he received my key, and I gave that to him.

4   Q.   Okay.   And while he was there, these bonds were stolen

5   from the safe?

6   A.   Yes.

7   Q.   After you left?

8   A.   Yes.

9   Q.   And to your knowledge, was this the second theft reported

10  to the Austin Police Department?

11  A.   That I don't know.

12  Q.   Okay.   Did you ever have a conversation with David Waters

13  after the theft of these bonds?

14  A.   Yes.

15  Q.   Did Mr. Waters ever say anything to you regarding what

16  type of bonds these were or what was required to negotiate

17  them?

18  A.   Yes, he told me --

19       MR. T. MILLS:   Excuse me.   Objection, hearsay.

20       THE COURT:   You can answer that question "Yes" or "No"

21  as to whether or not you had a conversation, but you cannot

22  indicate what was said.

23  A.   Yes, I had a conversation with him.

24  Q.   (BY MR. CARRUTH) Okay.   Now, you and Mr. Waters were

25  friends; would that be a fair statement?

*Cushman - Direct*

1   A.  Yes.

2   Q.  As a result of your business relationship?

3   A.  Yes.

4   Q.  Did you ever visit in his home?

5   A.  Yes.

6   Q.  And has he ever visited in your home?

7   A.  No.

8   Q.  Did you ever go out to dinner with Mr. Waters and his

9   girlfriend, Patti Jo Steffens?

10  A.  Yes.

11  Q.  And was anyone else present on these occasions or this

12  occasion?

13  A.  On the occasion with Patti, Patti Jo Steffens and David

14  Waters, David Travis, and my former husband, Randolph Cushman,

15  was also present.

16  Q.  And for the record, were your former husband and Mr. -- or

17  Mr. Travis, either one associated with the Atheist

18  Organization?

19  A.  Yes.

20  Q.  Okay.  Do you recall the topic of discussion at this

21  dinner that the four or five of you had together?

22  A.  Well, we were discussing what --

23       MR. CARRUTH:  Just a minute.  I believe there's an

24  objection.

25       MR. T. MILLS:  I was going to.  Could you tell me,

*Cushman - Direct*

1   again, about the time frame of this conversation?

2   Q.  (BY MR. CARRUTH) Tell us when this dinner out was had.

3   A.  This happened later in 1995.  It would have been the fall

4   of '95.

5   Q.  Was it after the O'Hairs had mysteriously disappeared?

6   A.  Yes.

7   Q.  Can you tell us what the topic of discussion at this

8   dinner meeting was?

9   A.  We were trying to figure out what exactly happened to the

10  O'Hairs given -- on the information that we knew of them

11  looking towards losing --

12  Q.  You were speculating?

13  A.  Yeah, we were speculating.

14  Q.  And no one pretended to know for sure what had happened to

15  them?

16  A.  That's correct.

17  Q.  Did you ever hear during this same time frame or prior to

18  Mr. Waters making any derogatory comments about Madalyn Murray

19  O'Hair?

20  A.  Yes, I did.

21  Q.  And what do you recall him saying about Mrs. O'Hair?

22          MR. T. MILLS:  Excuse me.  Objection to hearsay.

23          THE COURT:  Objection's good.  Sustained.

24  Q.  (BY MR. CARRUTH) Okay.  So was it in derogatory terms, or

25  was it something that she would be proud to hear him say?

*Cushman - Direct*

1   A.  No.  It was derogatory.

2   Q.  Okay.  How did you feel about Mr. Waters?

3   A.  I felt uneasy about him.  I was never in the room with him

4   by myself because he did make me feel uncomfortable at times.

5   Q.  Now, there's previously been introduced into evidence a

6   copy of the American Atheist Newsletter for July 1995.  Have

7   you seen that before?

8   A.  Yes, I have.

9   Q.  And did you receive that as a member of the Atheist

10  Organization?

11  A.  Yes, I did.

12  Q.  Because you continued your membership even after you left

13  their employment, did you not?

14  A.  That's correct.

15  Q.  Okay.  And this letter, I understand, newsletter was sent

16  only to members of the organization.

17  A.  That's correct.

18  Q.  And did you read it?

19  A.  Yes, I did.

20  Q.  And did it say some unkind things about Mr. Waters?

21  A.  Yes, it did.

22  Q.  And was this after the theft of the bonds from the office

23  and after the theft of the computer?

24  A.  That's correct.

25  Q.  And was there later a theft of more than $54,000 from the

*Cushman - Direct*

1  office in checks?

2  A.  Yes.

3  Q.  And was Mr. Waters' employment terminated about that same

4  time?

5  A.  Yes.

6  Q.  Now, tell us a little bit about the O'Hairs' habits, as

7  you observed them, during 1993, when you worked as their

8  office manager.

9  A.  They did everything together.  They came in in the

10  morning.  Their usual routine would be to come in, have

11  breakfast around 10:00, and then, they go to work.  They'd go

12  to lunch together.  They'd leave at the same time.  They'd

13  have dinner together.  They even went on a cruise to Alaska

14  together, in September of '93, just before the trial.

15  Q.  And by the trial, you're referring to the Truth Seeker?

16  A.  Truth Seeker trial.

17  Q.  To your knowledge, did the O'Hairs own any pets?

18  A.  Yes, they had three dogs.

19  Q.  And could you observe or did you observe their mannerisms

20  and behavior toward these animals?

21  A.  The dogs were members of the family in every sense.  They

22  did everything for the dogs.

23  Q.  And did they bring the dogs to work on occasion?

24  A.  Yes, one dog they brought to the office every day, and

25  that was Robin's dog.

1   Q.   And if the dogs needed veterinary care, did they tend to

2   that?

3   A.   Yes, they did.

4   Q.   Would it surprise you that the O'Hairs would suddenly

5   leave town and not make arrangements for the care of their

6   animals?

7   A.   Very much so.

8   Q.   Where was David Waters living at the time he was employed

9   as the office manager?

10  A.   I believe he had an apartment off of Lamar.

11  Q.   Okay.  Can you describe the demeanor of the O'Hairs the

12  last time you saw them alive?  How did they generally behave

13  in your presence?

14  A.   The same as normal.  I mean, they attended their business.

15  They had a lot, in my opinion, to look forward to.  There was

16  a lot of stuff going on.  They were preparing for the next

17  Truth Seeker trial and --

18  Q.   Well, of the three, Madalyn, Jon and Robin, who was the

19  leader of the group?

20  A.   It was Madalyn.

21  Q.   And would you say that Jon had the necessary leadership

22  qualities or the same leadership qualities that Madalyn had?

23  A.   No.  He relied on Madalyn for a lot of guidance.

24  Q.   What about Robin?

25  A.   Robin was a junior Madalyn.  She relied on Madalyn for a

*Cushman - Direct*

1   lot of guidance and --

2   Q.   Did you ever have an occasion to see a dispute or a verbal

3   confrontation in the office between either Robin and Madalyn,

4   or Jon and Madalyn, or any combination thereof?

5   A.   Yes, I did.

6   Q.   And who would normally win those arguments?

7   A.   Madalyn.

8   Q.   And what would Robin do when she became upset?  Was she an

9   emotional person in your opinion?

10  A.   Yes, she was.  She would often either cry or storm off to

11  her office and slam the door where she would stay.

12  Q.   Okay.  Would you agree that the O'Hairs were somewhat

13  codependent upon one another?

14  A.   Yes.

15  Q.   Without Madalyn Murray O'Hair, could Jon be steamrolled

16  into making a decision?

17  A.   Yes.

18  Q.   What do you base that upon?

19  A.   His lack of leadership skills and I would describe him as

20  a momma's boy; he relied on her for everything.

21  Q.   He didn't make decisions on his own?

22  A.   No.

23  Q.   He relied on his momma?

24  A.   Yes.

25  Q.   In your opinion, would Jon Garth Murray do anything for

*Cushman - Direct*

1   his mother or his sister Robin?

2   A.  Yes.

3   Q.  If Mr. Murray were to get into a fight or flight

4   situation, how would he react based upon your observations of

5   him?

6        MR. T. MILLS:  Excuse me, Judge.  I object to

7   speculation on that.  It's too vague.

8        THE COURT:  Sustain the objection.

9   Q.  (BY MR. CARRUTH) Who was the fighter in the family of

10  these three?

11  A.  Madalyn.

12  Q.  And what would Robin attempt to do if presented with a

13  difficult situation?

14  A.  She would look to Madalyn for guidance.  I think that she,

15  at times, witnessed -- she would fall apart, especially in

16  arguments.

17  Q.  Were you aware of whether or not Madalyn O'Hair had any

18  medical conditions which required her to take daily

19  medication?

20  A.  Yes, I was.

21  Q.  What can you tell us about that, please, ma'am?

22  A.  She had diabetes and heart condition, and she kept insulin

23  in her refrigerator, and also had heart pills at the office in

24  one of the cupboards.

25  Q.  And were you and the other employees instructed about this

Cushman - Direct

1   medication in the event the need should arise for her to have

2   to take it?

3   A.   Yes.

4   Q.   What were you told?

5   A.   We were told exactly where it was at and how to dispense

6   it.

7   Q.   Who accepted the responsibility to see that Madalyn would

8   take her medicine when needed?

9   A.   Robin was.

10   Q.   So she was very caring of her mother?

11   A.   Yes.

12   Q.   Or grandmother, actually?

13   A.   She would go to points of telling Madalyn that it was time

14   to take her medicine.

15   Q.   Okay.  Did Madalyn Murray O'Hair often or frequently

16   around the office use foul language that offended you and the

17   other employees?

18   A.   Yes.

19   Q.   Did you ever know anyone to at whom Madalyn got -- and

20   these are your words, not mine -- pissed off at at how she

21   would treat them subsequent to that?

22   A.   She would basically not let them back into her life.  Once

23   you pissed Madalyn off, there was no getting back in her good

24   graces.

25   Q.   Was Madalyn pissed off at David Waters prior to her

*Cushman - Direct*

1   disappearance?

2   A.   Yes.

3   Q.   Would she have looked to him to be a bodyguard?

4   A.   No.

5   Q.   How did Jon feel about his Mercedes Benz?

6   A.   He liked his Mercedes.

7   Q.   Had he recently had it tuned up, to your knowledge?

8   A.   That I do not know.

9   Q.   Okay.  Did Madalyn also have a gold Mercedes Benz?

10  A.   Yes, she did.  She sold it.

11  Q.   And why did she sell it, if you know?

12  A.   The organization needed the extra money.

13  Q.   Do you recall what type of jewelry the O'Hairs normally

14  wore to work?

15  A.   I remember Madalyn had a diamond ring that she wore on her

16  left hand.  As far as the other jewelry, I'm not -- did not

17  notice it.

18  Q.   Okay.  Did you ever visit in their home?

19  A.   Yes, I did.

20  Q.   And were they normally neat and clean people in their

21  home?

22  A.   Yes.

23  Q.   Show you what's been marked for identification as

24  Government's Exhibit W6-2, Ms. Cushman, and ask you to take a

25  look at that and tell us if you recognize it.

*Cushman - Direct*

1    A.   Yes, I do.

2    Q.   And was that a document prepared by you?

3    A.   Yes, it was.

4    Q.   And did it concern the disappearance of the O'Hairs?

5    A.   Yes.

6    Q.   And to whom was that document addressed?

7    A.   To David Waters.

8    Q.   Offer Government's Exhibit W6-2, please, for the record.

9         MR. T. MILLS:  I don't think he means by that for the

10   record purposes, because I'm just not familiar with that

11   phrase, but I don't have any objection.  But it's being

12   offered for all purposes?

13        THE COURT:  It's being offered as an exhibit.

14        MR. T. MILLS:  No objection.

15        THE COURT:  It's received.

16   Q.   (BY MR. CARRUTH) And does this conversation -- or does

17   this letter detail conversations you have had with the Murray

18   O'Hair family members?

19   A.   Yes.

20   Q.   And what was the occasion for you having sent this letter

21   to David Waters?

22   A.   David had asked me to prepare discussions that I had and

23   incidents with the Murray O'Hairs during my employment with

24   them.

25   Q.   And did you ever know or did you ever understand that

Cushman - Direct

1   David Waters was preparing a manuscript, hoping to publish a
2   book about the O'Hairs?
3   A.  Yes.
4   Q.  And do you know if that's why he asked you for this
5   information?
6   A.  Yes.
7   Q.  And there at the bottom and up at the top, there appears
8   to be some handwriting.  Do you recognize the handwriting on
9   that document?
10  A.  At the bottom, I recognize it being my own.  At the top, I
11  do not.
12  Q.  Okay.  Are you familiar with David Waters' handwriting?
13  A.  I don't know if that's David's handwriting or not.
14  Q.  All right.  Thank you.
15       MR. T. MILLS:  Your Honor, we believe that the writing
16  at the bottom was Mr. Waters' handwriting, could be
17  recognized.  In light of that testimony, we'd ask that that
18  portion of the document not be introduced into evidence.
19       THE COURT:  It's already admitted into evidence
20  without objection.
21       MR. T. MILLS:  Well, I know, but I didn't object
22  because Mr. Carruth said that the witness would identify this
23  as being Mr. Waters' handwriting, and so I thought it was
24  admissible.
25       MR. CARRUTH:  She said it was her handwriting, and

*Cushman - Cross*

1   this is the one that's believed to be Mr. Waters'.

2   A.   That's correct.

3          MR. T. MILLS:   I'm mistaken.

4          MR. CARRUTH:   Pass the witness.

5                    CROSS-EXAMINATION

6   BY MR. T. MILLS:

7   Q.   As kind of a shorthand, if I was to ask you a question and

8   refer to Madalyn, Jon and Robin as the three, would that be

9   all right?

10  A.   Yes.

11  Q.   All right.   What were the circumstances that you know of

12  regarding the sale of Madalyn Murray O'Hair's gold Mercedes?

13  A.   Madalyn had told me that they were selling it to help the

14  organization with the legal fees for the Truth Seeker case.

15  Q.   And what was the timing of the sale of the Mercedes?

16  A.   Don't know the exact time period, but I know it was when I

17  was employed with Murray O'Hairs.

18  Q.   And that would include the fall of 1993?

19  A.   That's correct.

20  Q.   So that would include the time that she was concerned that

21  the Truth Seekers might get a judgment against the

22  organization and try to seize the assets, correct?

23  A.   That's true.

24  Q.   You do not know what happened to the proceeds from the

25  sale of the gold Mercedes, do you?

*Cushman - Cross*

1  A.  No, I do not.

2  Q.  You do not know even if they went into the organization's

3  account?

4  A.  No, I do not.

5  Q.  It is correct that Ms. O'Hair kept medicine at the office

6  as well as at her home?

7  A.  Yes.

8  Q.  Did she also keep a walker at the office?

9  A.  Yes.

10  Q.  Was she sometimes able to walk without the benefit of a

11  walker or a wheelchair?

12  A.  Yes.  She also used a cane quite a bit while she was

13  walking.  She was not using a walker.

14  Q.  All right.  The three ate together frequently, almost all

15  the time, correct?

16  A.  Yes.

17  Q.  Lived together?

18  A.  Yes.

19  Q.  Traveled together?

20  A.  Yes.

21  Q.  Traveled together on business as well as vacationed

22  together?

23  A.  Yes.

24  Q.  Their social life, largely, to your knowledge, consisted

25  of them doing things together, correct?

Cushman - Cross

1    A.   That's correct.

2    Q.   They shopped together?

3    A.   As far as I know, yes.

4    Q.   You said that their home was usually neat.  There was a

5    home -- house cleaner that frequently, periodically and

6    regularly cleaned their house, wasn't there?

7    A.   That's correct.

8    Q.   I'm not meaning to be rude, but isn't it true that the

9    three did not regularly bathe or shower?

10   A.   That's correct.

11   Q.   They had an odor, a body odor together?

12   A.   That's correct.

13   Q.   Do you know if David Waters, after the July 1995

14   newsletter that was critical of him, confronted Ms. O'Hair

15   with his knowledge of her laundering money in New Zealand or

16   elsewhere?

17   A.   I have no knowledge of that.

18   Q.   All right.  What about the sale of art?  Is it true that

19   in the fall and winter of 1993, when the Truth Seekers

20   judgment was possibly looming, that some art objects were

21   sold?

22   A.   I wasn't aware they were sold.  I was told that they were

23   being packed up with the contents of the library.

24   Q.   Okay.  Isn't it true that, to your knowledge, that the

25   library and the art was being moved to protect it from

*Cushman - Cross*

1  seizure, if it happened, from the Truth Seekers?

2  A.  That's correct.

3  Q.  Did you ever state or ask the question, "Is that lawful to

4  hide assets?"

5  A.  No, I did not.

6  Q.  Did the thought cross your mind?

7  A.  Yes, it did.

8  Q.  When you were the officer manager, when the mail arrived,

9  was mail that was addressed to Madalyn Murray O'Hair opened by

10  you or someone else or given to Ms. O'Hair for opening?

11  A.  That I don't know because I did not open the mail or get

12  the mail.  And there was an accountant that also served as a

13  mail person and opened mail.  So I don't know what the

14  procedure was there.

15  Q.  There was an accountant that served as a mail person in

16  that office?

17  A.  Yes.

18  Q.  Who was that?

19  A.  It was Becky -- I can't remember her last name.  And then,

20  when she left to go back to school, David Travis took over

21  that responsibility.

22  Q.  And do you know whether or not -- I have not met Becky.

23  Do you know whether or not either one of those people opened

24  the mail that was addressed to Ms. O'Hair?

25  A.  I have no knowledge of that.

Cushman - Cross

1    Q.  It's my understanding that the safe that was in Jon

2    Murray's office wasn't kept locked.  Do you know if that was

3    correct -- if that's right or not?

4    A.  That's correct.

5    Q.  And yet, did you say that there was sometimes cash,

6    jewelry and bonds kept in the safe?

7    A.  Yes.

8    Q.  When was it that the computer was no longer at the

9    business, at the Atheist Headquarters?

10   A.  In November of '93.

11   Q.  All right.  You do not know for sure, of your own personal

12   knowledge, that it was stolen as opposed to taken by someone

13   without your knowledge, do you?

14   A.  No.

15   Q.  Do you know, from being the office manager, where other

16   than Alaska, Russia and New Zealand that the three, or any of

17   them individually, traveled on vacation or business outside of

18   the United States?  And I realize Alaska is in the United

19   States.

20   A.  Just to various atheist conventions.

21   Q.  Do you know of any outside the United States?

22   A.  No, not outside.

23   Q.  All right.  Well, do you -- to your knowledge, what was

24   Ms. O'Hair's income, if any?

25   A.  I remember her telling me at one time, the only income she

*Cushman - Cross*

1   had was her Social Security.  She took no income from the

2   organization.

3   Q.  To your knowledge, was Jon an official employee of some

4   Atheist Organization?

5   A.  Yes.

6   Q.  Was Robin?

7   A.  Yes.

8   Q.  And do you know what their income was?

9   A.  No, I do not.

10  Q.  When they went on vacations, do you know if they paid for

11  it personally or if an Atheist Organization paid for it?

12  A.  I do not know.

13  Q.  If Madalyn was the leader, isn't it also true that Jon had

14  enough leadership qualities to be made president of one or

15  more of the atheist corporations?

16  A.  He was made president, yes, but he always referred to his

17  mother for guidance.

18  Q.  Did you ever -- were you ever aware of Jon being

19  criticized for not being -- doing an adequate job as

20  president?

21  A.  Yes.

22  Q.  By who?

23  A.  Madalyn and Robin, they would both tell him that.

24  Q.  The family dynamics were such that Jon generally got

25  criticism from the two women in his family on many subjects,

Cushman - Cross

1   though; isn't that correct?

2   A.   Yes.

3   Q.   He was a big -- how many corporations was he an officer

4   in, do you know?

5   A.   I can't recall.

6   Q.   You testified that you felt uneasy about being with Mr.

7   Waters.   Were you alone with him in his apartment?

8   A.   No.   Patti Jo was there, as well.

9   Q.   That was his girlfriend?

10  A.   Yes.

11  Q.   They lived together there, to your knowledge?

12  A.   Yes.

13  Q.   In the communication that you made to David Waters, do you

14  have that before you?

15  A.   No, I do not.

16  Q.   All right.   May I borrow that exhibit?   I think I made a

17  mistake earlier.   To your knowledge and based upon your memory

18  of the writing, are the three lines at the bottom, are they

19  written -- does it appear to be David Waters' handwriting?

20  A.   No.   The three lines at the bottom is my handwriting.   I

21  remember writing that.

22  Q.   All right.

23  A.   The numbers alongside are not my handwriting nor is the

24  writing at the top.

25  Q.   All right.

1  A.  Or on No. 13, where it says, "manila envelope," that is

2  not my writing.

3  Q.  All right.  Is it true that Ms. O'Hair instructed you to

4  lie on more than one occasion about business events?

5  A.  Not that I recall.  The only time she had asked me to lie

6  was in regards to the Truth Seeker case if I was called to

7  testify.

8  Q.  And subject would be about where the assets and you were

9  to -- I'm not saying that you would have done this, but you

10  were to say, "I don't know," or --

11  A.  She was to -- she asked me to deny all knowledge of there

12  being a Charles E. Stevens Library and Archives.

13  Q.  All right.  A multi-million-dollar library you were asked

14  by her to lie about?

15  A.  That's correct.

16  Q.  That did not shock you that she asked you to do that, did

17  it?

18  A.  Frankly, it did, yes.

19  Q.  All right.  Did it shock you because you knew that because

20  you were insulted that she would think that you would lie

21  under oath?

22  A.  Yes, and I was surprised by her integrity to ask me to do

23  that.

24  Q.  All right.  That made a significant impression upon you as

25  to her lack of integrity, then, didn't it?

1   A.   That's correct.

2   Q.   You were also instructed not to go into the financial room

3   at the American Atheist Building, weren't you?

4   A.   That's correct.   That happened when Jon had gone to New

5   Zealand back in August of '93.

6   Q.   And your understanding was that there must have been some

7   financial records going on there that you were not to see,

8   correct?

9   A.   There were faxes that would be coming in that I was not to

10   see.

11   Q.   Do you have -- Robin being a little Madalyn -- I don't

12   remember if those were your words -- but did Robin, when she

13   was not emotional and crying, have as foul a mouth as her

14   mother?

15   A.   Yes.

16   Q.   Cuss like a sailor come to mind?

17   A.   Yes.

18   Q.   Were you instructed to shred -- at some point, to shred

19   financial documents?

20   A.   I don't recall being asked to do that, no.

21   Q.   Did Ms. O'Hair attempt to hide the fact from some

22   employees that she was boxing up and shipping out library

23   books?

24   A.   Yes.

25   Q.   Did you have an understanding that the three were going to

*Cushman - Cross*

1  -- were considering seriously going to New Zealand and

2  starting the Atheist Headquarters in New Zealand?

3  A.  Yes.

4  Q.  Did you have an understanding that the three had great

5  disrespect, but fear, of the IRS?

6  A.  Yes.

7  Q.  They perceived, rightly or wrongly, that they were being

8  harassed by the IRS, didn't they?

9  A.  Madalyn expressed that on more than one occasion.

10 Q.  In addition to New Zealand, did they also discuss

11 possibility of relocating to another state within the United

12 States?

13 A.  I don't recall that, no.

14 Q.  Did Jon ask you to take $5,000 and keep it in cash in case

15 the three needed to flee?

16 A.  Yes.

17 Q.  And do you think of the word "fleeing" meaning leaving

18 unexpectedly and quickly?

19 A.  Yes.

20 Q.  From your knowledge, did the O'Hairs -- did the three or

21 perhaps just Madalyn have the belief, rightly or wrongly, that

22 there was not an extradition treaty between the United States

23 and New Zealand?

24 A.  That's what I was told by Madalyn, yes.

25 Q.  An extradition, to your understanding, means that if

*Cushman - Cross*

1  you're wanted for a crime in the United States and you're in a

2  country that there's no extradition treaty, the United States

3  officials can't bring you back, correct?

4  A.  That's correct.

5  Q.  How well did you know Don Sanders?

6  A.  Only in passing, talked to him occasionally on the

7  telephone, talked to him in person when he came to the office.

8  Q.  Was he active in Atheist Organizations?

9  A.  Yes, he was.

10  Q.  Did he die of AIDS?

11  A.  Yes, he did.

12  Q.  Did he leave $100,000 to Madalyn?

13  A.  I don't know that.

14  Q.  Do you know if he left any money to Madalyn or the -- any

15  Atheist Organizations?

16  A.  I have no knowledge of that.

17  Q.  Did you see him ever in Austin?

18  A.  Yes.

19  Q.  Did you ever see him involved with packing art work?

20  A.  I never saw him pack art work, no.

21  Q.  Did you see him in any way working with art work?

22  A.  No.

23  Q.  Do you have knowledge if he hid or disposed of art work

24  that belonged to the three or one of the Atheist

25  Organizations?

Cushman - Redirect

1    A.   I don't have knowledge of that.

2    Q.   Without saying anything about the contents of these, would

3    you mind looking at these and seeing if you ever received any

4    of these at one of the -- at the atheist -- American Atheist

5    office?

6         THE COURT:  Members of the jury, I'm going to give you

7    a ten-minute break.  Ten minutes.  You'll have time to use the

8    facilities.

9        (Recess.)

10        THE COURT:  Mr. Carruth, he's going to pass the

11   witness.  Do you have any further questions?

12        MR. CARRUTH:  I have a few brief redirect, your Honor.

13        THE COURT:  All right.

14        MR. T. MILLS:  I'll pass the witness.

15                    RE-DIRECT EXAMINATION

16   BY MR. CARRUTH:

17   Q.   Ms. Cushman, Mr. Mills asked you earlier on

18   cross-examination whether the packing of the library was being

19   hidden from some of the employees at the American Atheist

20   Organization.  I believe you agreed with him that they were?

21   A.   That's correct.

22   Q.   However, it's my understanding, and correct me if I'm

23   wrong, that David Waters was aware of the packing of the

24   library?

25   A.   That's correct.

Cushman – Redirect

1   Q.  And, in fact, he was inputting the information on the

2   computer, correct?

3   A.  That's correct.

4   Q.  And, likewise, with regards to the plans to move to New

5   Zealand -- and by the way, according to the Government's

6   Exhibit W7-751 that was admitted earlier that you wrote to

7   David Waters, these statements of that Mr. Mills had you

8   testify about were made back in 1993, some two years before

9   the O'Hairs disappeared, is that not true, when the Truth

10  Seeker suit was in progress?

11  A.  That's correct.

12  Q.  And although there may have been some discussions in 1993

13  about moving to New Zealand of which David Waters would have

14  had knowledge, correct?

15  A.  Yes.

16  Q.  That once they won the Truth Seekers lawsuit, there was no

17  need to flee to New Zealand for that reason, was there?

18  A.  That's correct.

19  Q.  Pass the witness.

20       MR. T. MILLS:  No questions.

21       THE COURT:  May this witness be excused?

22       MR. CARRUTH:  Yes, your Honor.

23       THE COURT:  You may be excused.  You may call your

24  next witness.

25       MR. CARRUTH:  United States calls Orin Spike Tyson.

*Tyson - Direct*

1    THE COURT:  Stop right there.  This is Mrs. Sims.

2  She's going to administer an oath to you.

3    (Witness was sworn.)

4    THE COURT:  If you'll come around this column right

5  here, please, sir.  Step up on the witness chair.  If you'll

6  tell us your full name, please, sir, and spell your last.

7    THE WITNESS:  My name is Orin Ronald Tyson.  Last name

8  is spelled T-Y-S-O-N.  And I'm called Spike.

9    THE COURT:  You may proceed.

10   ORRIN RONALD TYSON, called by the Government, duly sworn.

11                  DIRECT EXAMINATION

12  BY MR. CARRUTH:

13  Q.  Mr. Tyson, where do you currently reside?

14  A.  I reside in Morrice, Michigan.

15  Q.  And how long have you lived at this address?

16  A.  I've lived there for roughly a year and a half.

17  Q.  Are you a Michigan native originally?

18  A.  Yes, I am.  I'm from the Greater Lansing, Michigan area.

19  Q.  All right, sir.  Have you served your country with

20  distinction in the Vietnam War?

21  A.  I have Purple Hearts, Brown Stars, Cross of Gallantry,

22  Presidential Unit Citation.  I guess you could say I served

23  with distinction.

24  Q.  In 1967, did you enter the United States Army?

25  A.  Yes, sir, I entered it in December of 1967.  I left in

*Tyson - Direct*

1   April of 1972.

2   Q.  And when were you -- oh, you were discharged in '72.  And

3   what was your rank upon discharge?

4   A.  I was an E-5.

5   Q.  And for those non-military folks, that would be a

6   sergeant?

7   A.  That's a sergeant, yes, sir.

8   Q.  Okay.  And you were trained in mechanics?

9   A.  Yes, I was trained in automotive and tank maintenance.

10  Also, demolition work, weapons repair.

11  Q.  And did you work on experimental bridge project?

12  A.  Yes, sir, 1971, it was around September '71, I went to

13  work for the Army Corp of Engineers, working up on

14  experimental bridge project in Washington.

15  Q.  Were you twice honored with the honor of Purple Heart --

16  A.  Yes, I was.

17  Q.  -- for being wounded in action?

18  A.  Yes.

19  Q.  And were you disabled from an enemy mine?

20  A.  Yes, sir, I do have problems from that.

21  Q.  And you still walk with a limp because of that?

22  A.  Yes, I do.

23  Q.  Now, Mr. Tyson, you are a member, and have you been for

24  several years, of the Atheist Organization?

25  A.  Yes, sir, I've been a member of the American Atheist

Tyson - Direct

1    since, roughly, 1982.

2    Q.   And yet, you're a Vietnam combat veteran?

3    A.   Yes, sir.

4    Q.   And it's frequently been said that there are no atheists

5    in foxholes.  Have you heard that statement?

6    A.   Yes, I hear it a lot.  I am a true combat wounded foxhole

7    atheist.

8    Q.   All right, sir.  And, in fact, when Ms. O'Hair, at one

9    time, asked you to head up a branch of the Atheist

10   Organization, known as the Atheist Veterans Organization?

11   A.   That's correct.  Roughly 1992, I was asked to take over

12   the organization.  We started in 1988 because of a comment by

13   then Vice-president George Bush.

14   Q.   Following the Challenger disaster in 1986, did you have

15   occasion to work on an escape system for the NASA Space

16   Shuttle?

17   A.   Yes, sir.  Actually watched the Challenger go up and come

18   back down, down in Florida, and I, later on, was working in

19   Tucson, Arizona and I worked on part of the escape system.

20   Q.   Were you living in Tucson, Arizona at that time?

21   A.   Yes, I was.

22   Q.   Is that where you were introduced to the Atheist

23   Organization?

24   A.   Yes, I was.

25   Q.   Did you know a man named Conrad Goeringer?

*Tyson - Direct*

1  A.  Yes, I first met Conrad in, roughly, 1980.

2  Q.  Did you subsequently have occasion to meet Madalyn Murray

3  O'Hair?

4  A.  Yes, 1982 was the first time I met Madalyn O'Hair.  She

5  had come into town for the purposes of arguing against the

6  City Council having prayers.

7  Q.  Okay.  And were you a member of the organization at that

8  time, or did you join shortly thereafter?

9  A.  I joined very shortly thereafter that.

10  Q.  And did you subsequently become the director of the Tucson

11  Chapter in 1989?

12  A.  That is correct, I did.

13  Q.  And subsequent in your career with the Atheist

14  Organization, did you move to Austin, Texas?

15  A.  Yes, sir, I did.  I moved here in January of '93,

16  technically was here at that point in time.

17  Q.  And what were your duties and responsibilities with the

18  Atheist Organization in Austin, Texas in 1993 and thereafter?

19  A.  We had a weekly cable TV show, which you could see on

20  approximately 140 cable systems throughout the country.  My

21  job was to edit the tapes, the raw tapes, duplicate them and

22  send them out to the various stations.

23  Q.  And did you have any background or college courses in

24  media arts?

25  A.  Yes, sir, I got that starting in 1989 at PEMA Community

*Tyson - Direct*

1   College, and was working on my degree at the time when I went

2   to work for the atheists.

3   Q.  And how long did you work for the American Atheist General

4   Headquarters, here in Austin?

5   A.  I worked up until 1999, February of '99.  We had already

6   moved it to New Jersey at that point in time.

7   Q.  And then, it was moved to Boonton, I believe, in December

8   sometime in 1998; is that correct?

9   A.  December 31st, yes.

10  Q.  Okay.  During that move, were you responsible for the

11  storage of any equipment, records or files in any of the

12  warehouses, either in Austin or elsewhere, after the office

13  was -- when the office was being closed and you were

14  physically moving all the office equipment and files, and so

15  forth?  What was your role in that, sir?

16  A.  Part of my role was to help find facilities to store them,

17  be in charge of the actual boxing up of the files and moving

18  them into the storage facilities.

19  Q.  Did the movement of any of those files or boxes include

20  any portions of the Atheist Library, the Charles E. Stevens

21  Library?

22  A.  Yes, sir, it did.

23  Q.  To your knowledge, are portions of that library still

24  stored in various warehouses in Austin and elsewhere?

25  A.  As far as I know, part of it is still here.

Tyson - Direct

1    Q.  All right, sir.  Now, were you and Madalyn Murray O'Hair

2    -- in addition to being an employer-employee relationship,

3    were you close, personal friends?

4    A.  We had a rather unique relationship.  Not only were we

5    boss and employee, we were coworkers, and we were very good

6    friends.  We had gone out a number of times for dinner

7    together.  We -- because of our experiences, hers during World

8    War II and mine in Vietnam, we were very close in many ways.

9    Q.  And Mrs. O'Hair was, herself, a veteran of World War II;

10   is that correct?

11   A.  That is correct.

12   Q.  And do you know whether or not she received VA benefits?

13   A.  Yes, she did.  I can't remember exactly why.  I don't

14   remember the exact condition.  I believe it was for diabetes.

15   Q.  Now, did Mrs. O'Hair -- and I mean Madalyn Murray O'Hair

16   -- ever refer to you as the son she wish she had?

17   A.  On a couple of occasions, yes, she had.  More than one

18   occasion, in front of other people, and once, even in front of

19   her own son.

20   Q.  And do you know why she would make such a statement, even

21   in the presence of her own son, Jon Garth Murray?

22   A.  I am a little unusual than most atheists in that I have

23   never had a belief in a God in any way, shape, form or manner.

24   Most people have a background, a belief in a God.  And they

25   get older, after the scientific knowledge gets into them, they

Tyson - Direct

1  learn that, basically, it's just nonsense, and I didn't have

2  that problem.  I was brought up, although in a religious

3  family, I was never religious in any way.

4  Q.  So you're a first-generation atheist?

5  A.  Yes.

6  Q.  All right, sir.  And were you and Jon Murray about the

7  same age during his lifetime?

8  A.  Jon Murray, I think, is seven years younger than I.

9  Q.  Okay.  But he was the boss, correct?

10  A.  He was the boss, yes.

11  Q.  And Madalyn was the boss?

12  A.  No way out of that.

13  Q.  Now, you told us in your statement that you acted as

14  Madalyn O'Hair's personal bodyguard at five conventions of the

15  American Atheist Organization.

16  A.  That's correct, I did.  Starting, I believe, the first one

17  was in 1989.

18  Q.  And what do you mean by bodyguard?  What did those duties

19  entail?

20  A.  Being with her quite often, watching her back, so to

21  speak.  There was actually a picture of us in Newsweek

22  magazine where I'm right there, standing behind her.

23  Q.  You say you were a bodyguard.  Did you carry a firearm or

24  other weapon?

25  A.  I did not carry a firearm, no.

Tyson - Direct

1  Q.  Just because of your physical strength?

2  A.  Most people don't want to mess with somebody my size, and

3  I am also quite well-trained.

4  Q.  All right, sir.  And at these five conventions, do you

5  recall where they were held in the United States?

6  A.  Let's see.  We were in Denver, Phoenix, Arizona, Florida,

7  here in Austin, off the top of my head.

8  Q.  Okay.

9  A.  And Sacramento, California.

10  Q.  And how did you relate and get along with Jon Garth Murray

11  and Robin Murray O'Hair?

12  A.  Jon and I had sort of an unusual relationship because he

13  sort of sometimes thought of me as a rival.

14  Q.  Sibling rival?

15  A.  Sort of like that, yes.

16  Q.  Okay.

17  A.  Robin and I have -- very early on had become close

18  friends.

19  Q.  Okay.

20  A.  And, in fact, there was a rumor about us for quite a while

21  in the atheist community, totally unfounded.

22  Q.  Was there ever a sexual relationship between you,

23  yourself, and Robin O'Hair?

24  A.  No, there was not.

25  Q.  Notwithstanding rumors to the contrary?

*Tyson - Direct*

1  A.  That's true.

2  Q.  To your knowledge, did Robin O'Hair have a boyfriend

3  during the time you knew her?

4  A.  No.  She was friendly with a number of men, but she was

5  never -- never had a boyfriend.

6  Q.  And how about Jon?  Did he have any lady friends during

7  the time you knew him?

8  A.  I only know of one female friend and that was in the early

9  -- about 1990, 1991, but I had never met her.

10  Q.  And the O'Hairs lived and worked with their mother,

11  Madalyn, correct?

12  A.  Oh, yes.

13  Q.  And were they a very tight-knit family?

14  A.  That's saying it pretty loosely, yeah, they were real

15  tight.

16  Q.  How would you say it, sir?

17  A.  It was like one person most of the time.  They were always

18  together.  They went out together.  They literally went to bed

19  at the same time.  They got up at the same time.  If one

20  wanted to go on vacation, they all went.

21  Q.  Were they dependent upon each other in their various

22  familial activities?

23  A.  The term codependency would be a very good term applied to

24  the three O'Hairs.  They were very dependent upon each other.

25  Q.  And would one of them, in your opinion, do anything to

Tyson - Direct

1   help the other two out?

2   A.   Quite often, oh, yes.

3   Q.   So if any one of them was in danger, the others might not

4   take any action that would jeopardize them; is that correct?

5   A.   I think that's a very fair assessment, yes.

6   Q.   Now, this television program that you were responsible for

7   taping and distributing to the 140 public television stations,

8   where was that taped or filmed?

9   A.   That was taped up in the north side of Austin on -- off

10  MoPac.

11  Q.   And was it a studio there?

12  A.   It's a studio, cable company owns it.  I really don't

13  remember the name of the cable company.

14  Q.   And how many programs, if you know, sir, were filmed each

15  month for distribution to the 140 cable television stations?

16  A.   As a rule, we film four of them at a time.  Sometimes a

17  fifth or even a sixth, but normally four.

18  Q.   And they were mailed out, all four, at once or just

19  weekly, on a weekly basis?

20  A.   We normally sent them out four at a time.  The reason for

21  that is it's a lot cheaper in postage.

22  Q.   Okay.  Now, were you compensated for these television

23  programs, or did you have to pay the stations to air them for

24  you?

25  A.   Well, we give out -- when we had 140 stations, I believe

Tyson - Direct

1   there were twelve that we actually had to pay to have it put

2   on.  The rest were free.  There were certain rules and

3   regulations we had to go through.

4   Q.  And for what purpose were these programs normally

5   intended?

6   A.  Information commented out to the public.

7   Q.  So they also helped to increasing the membership rolls?

8   A.  Yes, it did.

9   Q.  And after the O'Hairs disappeared, what happened to those

10  140 cable stations that were receiving the broadcast four

11  times a month?

12  A.  It pretty much dried up very quickly.  I kept it going as

13  best I could as an individual running the organization.  We

14  dried up -- we were down to, I think, 52 stations, sometime

15  about a year later.

16  Q.  As a result of that, do you have in your knowledge whether

17  the membership of the American Atheist suffered?

18  A.  Oh, most assuredly, it did.

19  Q.  And did the donations and wills and bequests decline after

20  the disappearance of the O'Hairs?

21  A.  It dropped like a rock.

22  Q.  And would you say that the organization was in dire

23  financial straits as a result of their disappearance?

24  A.  That's putting it mildly, yes.

25  Q.  Notwithstanding the missing $600,000 in gold coins?

*Tyson - Direct*

1    A.   That's correct.

2    Q.   Now, when you arrived at the Atheist Headquarters in 1993,

3    did you meet a man by the name of David Waters?

4    A.   Yes, sir.   David Waters was the office manager at that

5    time.

6    Q.   And did he have keys to the office and keys to the alarm

7    code to the O'Hairs' residence?

8    A.   Yes, he did.

9    Q.   And did he have access to the safe in Jon Murray's office?

10   A.   If he had keys to the building, he would have access to

11   the safe, yes, sir.

12   Q.   It's been reported, sir, that that safe could not be

13   locked; is that true or false?

14   A.   That is quite true.   It is true.

15   Q.   And did you make any effort to purchase two new safes for

16   the office?

17   A.   Yes, when I took over, I bought two small safes.   And the

18   reason for that that you have two is you don't put all your

19   eggs in one basket.

20   Q.   And were you aware, sir -- or maybe it occurred during

21   your employment there -- of a theft or two from that safe,

22   reported theft?

23   A.   Yes, it did occur to me.   And I talked with Robin -- I

24   mean, Madalyn and Jon on at least two occasions I could think

25   of about that.

*Tyson - Direct*

1  Q.  Were you there when those thefts occurred?

2  A.  No.  I had arrived just after it.

3  Q.  Okay.  But that was a common knowledge around the office,

4  was it not?

5  A.  Yes.  Are you talking about the safe being --

6  Q.  The bonds and --

7  A.  Yeah.

8  Q.  -- things in the safe.

9  A.  You mean they were missing?

10  Q.  Yes.

11  A.  Yes.

12  Q.  And was it ever determined who took those bonds?

13  A.  I don't think it was actually determined.

14  Q.  Do you know a man by the name of Dick Hogan?

15  A.  Yes, I do.

16  Q.  Who is Mr. Hogan or Richard Hogan?

17  A.  Dick Hogan, I believe at this moment in time, is our state

18  representative for American Atheists.

19  Q.  And to your knowledge, after the bonds were stolen from

20  the headquarters, was Mr. Hogan negotiating with anyone in

21  particular in an attempt to buy back the bonds?

22  A.  Yes, he was --

23       MR. T. MILLS:  Excuse me, Judge.  Object to hearsay

24  unless he has personal knowledge of observing this.

25       MR. CARRUTH:  I'm just asking him now, your Honor, if

*Tyson - Direct*

1    he has --

2           THE COURT:  You may answer the question.

3    A.   I do know in my discussions with Dick Hogan that he was

4    negotiating to do that.

5    Q.   (BY MR. CARRUTH) And with whom was he negotiating to buy

6    back the missing bonds?

7    A.   David Waters.

8    Q.   Now, was there a distinction between Madalyn Murray

9    O'Hair's personal library and the Charles Stevens Library, or

10   were they one in the same?

11   A.   She had a number of books at the house.  I don't know if

12   you would call that her personal library, but the Charles

13   Stevens Library could be considered hers.

14   Q.   Okay.  She had originated and built it up over the years?

15   A.   Oh, yes.

16   Q.   Was she quite proud of it?

17   A.   Immensely.

18   Q.   Was Madalyn a book person?

19   A.   Yes, all three were.

20   Q.   Based upon your being so close to them, do you believe

21   they would ever have left the country without taking that

22   library with them?

23          MR. T. MILLS:  I object.  Speculation.

24          THE COURT:  Sustain the objection.

25   Q.   (BY MR. CARRUTH) The library was quite valuable, was it

*Tyson - Direct*

1   not, sir?

2   A.  Most assuredly, it was very valuable.

3   Q.  It was the only one of its kind and existence in the

4   country, is that right, sir?

5   A.  There were only two in the world.  That was the one.

6   Q.  And do you know how the index of that library or

7   cataloging of the volumes in the library were maintained?

8   A.  They had bought a computer system for that purpose

9   somewhere around 1982.  That was before I got there, but I

10  knew that they had done that, and they had put everything on

11  the computer.

12  Q.  On the hard drive of the computer as opposed to a disk?

13  A.  Yes, the volume of data would be way too much for a disk

14  that time period.

15  Q.  And can you tell us, if you know, what happened to that

16  computer containing the only master list of the inventory of

17  the Charles E. Stevens Library?

18  A.  The computer was stolen.  I believe it was around

19  September of '92.

20  Q.  In addition to the books that were inventoried on the

21  computer, to your knowledge, was there any inventory of

22  paintings and other valuable items of property belonging to

23  the O'Hairs and/or their Atheist Organization?

24  A.  The library had on it roughly some 50,000 to 60,000 books

25  and 100,000 pamphlets.

Tyson - Direct

1   Q.   And so when that was stolen, everything was --

2   A.   All the data was gone.

3   Q.   -- deleted?  Now, during the course of your employment

4   here at the Austin Atheist Office, did you ever become aware

5   of a plan or discussion by any of the O'Hairs to move to New

6   Zealand?

7   A.   Well, we all talk about moving to someplace a little bit

8   better, and New Zealand had been talked about by others, yes.

9   Q.   Why would New Zealand be attractive to an atheist?

10  A.   It's approximately 40 percent atheist.  The laws, rules

11  and regulations there are very nice as far as an atheist is

12  concerned.

13  Q.   Are there other countries, like Japan and Australia, that

14  are also primarily secular in nature?

15  A.   They are secular but nowhere near as much as New Zealand.

16  It is the most secular country in the world.

17  Q.   Okay.  During this time that you heard the discussion or

18  talk about moving to New Zealand, was this during the time

19  that the Truth Seekers trial was in progress in San Diego,

20  California?

21  A.   Well, considering the Truth Seeker trial started way back

22  in the late '80s, yes, it would be.  But first time I'd ever

23  heard of New Zealand was, I don't know, was '90, I guess.

24  Q.   Okay.

25  A.   But it was in conversation just in passing more or less.

1  Q.  Okay.  And was there concern by the O'Hairs -- and you

2  were close to them -- about what might happen if they should

3  be unsuccessful in the Truth Seeker trial?

4  A.  There was concern what would happen.  The Truth Seeker

5  trial, if it went against us, would have decimated the

6  organization.

7  Q.  Had they been unsuccessful?

8  A.  That is quite correct.

9  Q.  But, in fact, the O'Hairs were successful in that trial,

10  were they not?

11  A.  Eventually, that's true.

12  Q.  And there was no need, then, to go to New Zealand for that

13  reason?

14  A.  I would agree with you there.

15  Q.  If their intent was to take their assets and leave to

16  avoid an unfavorable judgment?

17  A.  That's right.  There's no doubt that if the Truth Seeker

18  would have gotten a hold of the library, it would have gotten

19  destroyed.

20  Q.  Kind of like Hitler burning the books when he took over?

21  A.  Really, if you get into history, you'll find out that

22  Hitler actually burned a lot of atheist books.

23  Q.  Burned a lot of bibles, too?

24  A.  Certainly.  You also have to remember he was also Roman

25  Catholic, too.

*Tyson - Direct*

1    THE COURT:  Let's get back to this lawsuit.

2    Q.  (BY MR. CARRUTH) Now, did Conrad Goeringer ever travel to

3    Austin during 1993 to assist with the packing or packaging for

4    storage of the American Atheist Library?

5    A.  Yes, he did go to Tucson or to Austin, but I don't

6    remember exactly when he was there.

7    Q.  Was it during the time period that you were there?

8    A.  Not for packing up of the books, no.

9    Q.  Were the books already packed and shipped when you arrived

10   or do you know?

11   A.  They were already out the door.

12   Q.  And were you aware of any plan or intent to sell the

13   building here, the headquarters?

14   A.  There had been talk about doing that for a number of years

15   to get out of Austin.

16   Q.  Okay.  And where else, besides New Zealand, had they

17   talked about relocating, if you know?

18   A.  Well, there had been discussions about going up to

19   Washington, state of Washington, also, out to New Jersey area.

20   Q.  Okay.  Now, after the O'Hairs disappeared, on or about

21   October the 10th in 1995, at the request of the board of

22   directors, did you have occasion personally to review the

23   contents of the warehouses and change the names of the people

24   authorized to have access to them?

25   A.  Yes, I did.  I went out to where the -- where it was

Tyson - Direct

1   stored and changed all the names on there.  I also confirmed

2   that everything was there.

3   Q.  And why was that done, sir, if you know?

4   A.  Well, it was twofold:  Number one, we didn't know what

5   happened to the O'Hairs at that point in time.  We had to

6   check on the library to secure it.  Should somebody try and

7   get the library, we wanted to make sure that we had some

8   secure items in place to stop that.

9   Q.  Now, when the O'Hairs left Austin, Texas in 1994 to go to

10  San Diego for the Truth Seekers trial, who did they leave in

11  charge of the office?

12  A.  They left David Waters in charge.

13  Q.  And he was at that time their office manager?

14  A.  That's correct.

15  Q.  And did they give him the keys to their house and their

16  alarm system in addition to the keys to the office?

17  A.  That is correct.

18  Q.  And during that week, had you gone to New Jersey to store

19  some master videotapes?

20  A.  Yes, I did.  We had packed up all the master videotapes of

21  the atheist show.  There was 670 some-odd of them in three

22  quarter-inch format, and they were loaded in the van, and I

23  went from here up to New Jersey.  We stored them up there.

24  Q.  And did you then return to Austin?

25  A.  Yes, I did.

*Tyson - Direct*

1   Q.   And did you see or have any contact with David Waters when

2   you returned to Austin, Texas?

3   A.   Yes, I did.  And it was one of the strange things.  He was

4   actually quite mad when I arrived that I did.

5   Q.   Where did you encounter Mr. Waters?

6   A.   At the office building.

7   Q.   And what was he doing there?

8   A.   He was just doing his job as far as I could tell.

9   Q.   Okay.  Why was he angry with you returning to Austin, if

10  you know?

11  A.   I don't know.  I never understood it at that point in

12  time.

13  Q.   And did you determine that the O'Hairs had driven to Las

14  Vegas, Nevada from San Diego to relax for a few days before

15  returning home?

16  A.   I didn't know that until they had contacted me when I was

17  in Tucson, Arizona.

18  Q.   Okay.  When you arrived at the office in Austin, Texas,

19  did you find a voice message on the phone recorder?

20  A.   No, sir, I did not find that voice message.  I had arrived

21  -- it's a little complicated here.  I had gone from Austin,

22  Texas to Tucson, Arizona.  While they were in California, I

23  had learned of the voice message and everything from Jon via

24  the telephone while I was in Tucson.

25  Q.   So to your knowledge, then, did the O'Hairs, upon your

Tyson - Direct

1    returning to Austin, Texas, find a voice message from David

2    Waters?

3    A.  Yes, they did.

4    Q.  And as a result of that, he was no longer the office

5    manager, he resigned; is that not true?

6    A.  I would say that's the correct way to put that, yes.  He

7    did definitely resign from that message.

8    Q.  And to your knowledge, did the O'Hairs find any funds

9    missing when they returned from that trip?

10   A.  Yes, they did.  They found a number of accounts had

11   literally been cleaned out.

12   Q.  And do you know the total amount of the loss?

13   A.  It was roughly $55,000.

14   Q.  And to your knowledge, was anybody subsequently charged or

15   prosecuted for the theft of those funds?

16   A.  Yes, David Waters was.

17   Q.  Did you become aware that shortly after that, Madalyn

18   O'Hair, in the Atheist Newsletter, wrote an article that was

19   somewhat unfavorable towards Mr. Waters?

20   A.  I believe that was in the July newsletter, 1995.

21   Q.  Okay.  Who was Sharon Summers?

22   A.  Sharon Summers was a volunteer at the office.  She worked

23   there, roughly, 20 to 40 hours a week.

24   Q.  Okay.  When did you first become aware, Mr. Tyson, that

25   the O'Hairs had disappeared from the Austin, Texas office?