FILED

1

NOV 2 1 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                  DEPUTY CLERK

1        IN THE UNITED STATES DISTRICT COURT
2     FOR THE WESTERN DISTRICT OF TEXAS
                AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                       ) Austin, Texas
                             )
5   GARY PAUL KARR           ) May 17, 2000

6
                    VOLUME 4 of 12
7               TRIAL ON THE MERITS
         BEFORE THE HONORABLE SAM SPARKS
8
    APPEARANCES:
9
    For the United States:      Mr. Gerald C. Carruth
10                               Mr. Daniel H. Mills
                                 Assistant U.S. Attorneys
11                               816 Congress Avenue, Ste. 1000
                                 Austin, Texas 78701
12

13

14
    For the Defendant:          Mr. Thomas W. Mills, Jr.
15                               Ms. Christi N. Williams
                                 Mills & Presby
16                               5910 North Central Expressway,
                                 Ste. 900
17                               Dallas, Texas 75206-5141

18

19
    Court Reporter:             Lily Iva Reznik, RPR, CRR
20                               United States Courthouse
                                 200 West 8th Street
21                               Austin, Texas 78701
                                 Ph: (512)916-5564
22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.



            LILY I. REZNIK
      UNITED STATES DISTRICT COURT         ORIGINAL
    WESTERN DISTRICT OF TEXAS (AUSTIN)

98

1                              I N D E X

2                    Direct     Cross     Redirect      Recross
   Witnesses:
3  Orin Ronald Tyson     7        13         27

4  Pattie Jo Steffens   29       152        194

5  Lisa Jones          197

6  Willis Albarado     214       226        230

7  Cynthia K. Simon    232       240

8  Gretchen Roufa      242       246        247

9  Samuel Sykes Houston 248

10

11

12                                                      Page

13 Proceedings Adjourned                                269

14

15

16

17

18

19

20

21

22

23

24

25

| | E X H I B I T S | Offered | Admitted |
|---|---|---|---|
| **Government's** | | | |
| #W10-1 Southwestern Bell Records | | 139 | 139 |
| #W11-A1 Hotel Receipt | | 88 | 88 |
| #W11C-1 CCPS Records | | 141 | 141 |
| #W11-1 to #W11-4 Photos | | 29 | 30 |
| #W11-6 Photo | | 70 | 70 |
| #W11-8 Weapons Photo | | 42 | 46 |
| #W11-11 and #W11-12 Weapons Photos | | 42 | 46 |
| #W11-13 Waters Photo | | 32 | 32 |
| #W11-14 Photo | | 51 | 51 |
| #W11-51 to #W11-54 Central Park Photos | | 48 | 48 |
| #W12-1 Pawn Receipt | | 74 | 74 |
| #W13-1 Jones Phone Records | | 202 | 202 |
| #W20-1 Photo | | 225 | 225 |
| #W21-2 Vehicle Title History | | 260 | 260 |
| #W25-16 Warren Inn Photo | | 32 | 33 |
| #W26-1 Aerial Photos | | 265 | 265 |
| #W27-1 Animal Hospital Records | | 204 | 205 |
| #W54-1 Rental Unit Contract | | 68 | 68 |
| #W55-4 Photo | | 92 | 92 |
| #W57-2 Coins Picture | | 96 | 96 |
| #W77-31 & #W77-32 T-shirts | | 78 | 78 |
| #W77-50 A,B & C Fanny Packs | | 59 | 59 |

4

| | | Offered | Admitted |
|---|---|---|---|
| E X H I B I T S (Continued) | | | |

**Government's**

| | Offered | Admitted |
|---|---|---|
| #W79-7 Browning Nine-Millimeter | 60 | 61 |
| #W80-1 Karr Map | 263 | 263 |
| #W86-1 A & B Aerial Photos | 265 | 265 |

**Defendant's**

| | Offered | Admitted |
|---|---|---|
| #PS-1 & PS-2 Immunity Agreements | 154 | 154 |

```
 1          THE COURT:  All right, counsel.  Anything before we
 2   bring in the jury?
 3          MR. CARRUTH:  Nothing from the government, your Honor.
 4          MR. T. MILLS:  No, sir.
 5          THE COURT:  Bring in the jury.  So the record will
 6   know, this is Mr. Hawkins from the city of Austin.  So this is
 7   the subpoena from the Police Department?
 8          MR. HAWKINS:  Yes, your Honor.
 9          THE COURT:  You have complied?
10          MR. HAWKINS:  That is correct.
11       (Jury present.)
12          THE COURT:  First, happy birthday.
13          THE JUROR:  Thank you, your Honor.
14          THE COURT:  I think it is just a truism in life, Mr.
15   Rodriguez, that I'm advised that it's your birthday, and you,
16   being a lawyer, you had to bring your own cake.  I frequently
17   have people on my juries from Brenham, and they frequently
18   either work at or -- work at Blue Bell and they continue to
19   bring in Blue Bell products.  And then, I have many people
20   from generally the Brenham down to Elgin and back across the
21   area, and in the multi-week cases, they bring in food.
22          And you can smell that food for blocks and everybody's
23   envious of the picnics that the juries bring.  So, in any
24   event, my Security Officer tells me that some of you are
25   concerned because no matter where you go, when you turn on the
```

1   radio or the television, all of a sudden, you get a glimpse of

2   this trial.  Let me go over that with you again.

3       When I ask you the questions, have you heard anything

4   about it, permitted anybody to speak to you or speak about

5   this trial to anyone, what I'm really asking you is have you

6   heard anything that influences you at all?  You can't just

7   turn your mind off to anything that all of a sudden pops up on

8   the television screen and I understand that.

9       But if there's something occurs during any of the

10  publicity either in the newspapers or otherwise through the

11  media that concerns you in any way that you think it should be

12  brought to my attention, don't hesitate to tell Mr. Mace, and

13  he will bring it to my attention.

14      But I understand well that you can be driving down --

15  but I don't understand that you would be driving 35.  I can

16  understand you could be sitting on 35, listening to the radio,

17  and something comes on, and I just ask you to turn it off.

18  But you might hear something in the interim, but that's the

19  point.

20      Now, since we last met, has anybody talked to you

21  about this case?

22      THE JURORS:  No.

23      THE COURT:  Have you talked to anybody about the case?

24      THE JURORS:  No.

25      THE COURT:  And have you learned anything at all

*Tyson - Direct (Resumed)*

1   significant about this case outside the presence of each other

2   and this courtroom?

3           THE JURORS:  No.

4           THE COURT:  All right.  Thank you.  Indicate all

5   answers by all jurors to all questions.  All right, sir.  You

6   remain under oath, Mr. Tyson.  And I believe you have the

7   lectern, sir.

8                    DIRECT EXAMINATION (Resumed)

9   BY MR. CARRUTH:

10  Q.  Thank you, your Honor.  Mr. Tyson, we were talking

11  yesterday about the disappearance of the O'Hairs and the

12  actions you took, and so forth, and I believe that was

13  precipitated, at least in part, by their favor to show up for

14  a picket the Pope plan in early October of 1995; is that

15  correct?

16  A.  That's correct.  They were supposed to be there on October

17  the 3rd, I believe it is, and they had not shown up.

18  Q.  And you, yourself, had made any plans to attend that

19  particular rally, or meeting, or board meeting?

20  A.  There was going to be a board meeting at the same time.

21  Yes, I was planning on being there.  We were going to take all

22  of the video equipment with us in the van and drive up there.

23  Jon and I were going to do that.  The two ladies, Madalyn and

24  Robin, were to fly up.

25  Q.  And was there any discussion about, on the way back,

_Tyson - Direct (Resumed)_

1  picking up some library materials from Mr. Via in Virginia?

2  A.  Not that I know of, no.

3  Q.  Okay.

4  A.  I was not privy to that.

5  Q.  Okay.  But you did know that the Murray O'Hairs had prior

6  to their disappearance or just a few -- week or two prior had

7  been to see Mr. Via in Virginia?

8  A.  They told me about that after they returned that they had

9  seen Arnold down there and passed on hellos to both of us.

10  Q.  Okay.  So you became alarmed, then, even though your last

11  phone call, I believe you told us about yesterday with Mr.

12  Murray on the cell phone?

13  A.  Yes.

14  Q.  And after that, you had no more contact.

15  A.  There was no more contact.  I did become somewhat alarmed,

16  but there wasn't much at that moment I could do.

17  Q.  Did you make it to New York for the board meeting in

18  October?

19  A.  No, sir, I did not.

20  Q.  Okay.  After the board met and expressed concern, were you

21  instructed by any board members to take any affirmative action

22  in attempt to locate the O'Hairs?

23  A.  Yes, I was.  I was asked to do the best I could to find

24  them.

25  Q.  Okay.  And what did you do to discharge that obligation?

*Tyson – Direct (Resumed)*

1   A.  Well, I knew from the letter that was sent to me by Jon
2   Murray that they were -- that was sent in the northwest part
3   of San Antonio.  Also, there was a P.O. Box to a Mailboxes, Et
4   Cetera, which is also in that part.
5   Q.  Did you go to San Antonio?
6   A.  Yes, sir, I did, on approximately the 6th.
7   Q.  Of October?
8   A.  Yes, sir.
9   Q.  And what did you do in San Antonio, if anything?
10  A.  The first thing I did was to check all of the hospitals.
11  That area has a number of hospitals there which includes the
12  VA Hospital.
13  Q.  And was any -- were any of the O'Hairs entitled to receive
14  Veterans benefits to your knowledge?
15  A.  Yes, Madalyn was.
16  Q.  Okay.  So you checked the VA Hospital?
17  A.  Yes, sir.  There are also a couple of small private
18  hospitals there.  There were no Madalyn Murray O'Hair at any
19  of the hospitals.  No Madalyn Maze at the hospital.  I did,
20  however, find an M. Bible at the hospital.  Madalyn
21  occasionally used that as an alias.
22  Q.  And she had, in fact, been married a time or two before,
23  had she not?
24  A.  Yes, she had.
25  Q.  And do you know what her maiden name might have been?

Tyson - Direct (Resumed)

1    A.  Back of my mind is -- I do believe her maiden name is

2    Maze.

3    Q.  Okay.  And did you check to see who this M. Bible was in

4    the hospital?

5    A.  Yes.  Definitely was not Madalyn.

6    Q.  Okay.  What other efforts, if any, did you make in San

7    Antonio to attempt to locate the O'Hairs?

8    A.  It was my second trip down there when I took some

9    photographs.  I went to various hotels in the area, shown

10   photographs.

11   Q.  Photographs of whom, sir?

12   A.  Of Madalyn, Jon.

13   Q.  Okay.

14   A.  I did not have a photograph of Robin at that time.

15   Q.  Did you find anyone in the San Antonio area who could

16   identify them as having seen them recently in that area?

17   A.  No, I did not.

18   Q.  Did you meet a man named Corey Ticknor?

19   A.  Not at that time, no, I didn't.

20   Q.  Did you subsequently return to San Antonio after receiving

21   additional information?

22   A.  Additional information at which time I would have seen

23   Corey Ticknor was about two months later.

24   Q.  Okay.  And did you locate him through -- tell us how you

25   located him.

*Tyson - Direct (Resumed)*

1  A.  We located him through the cell phone records that Jon

2  Murray had on the cell phone.

3  Q.  Okay.  Did you also locate a particular pharmacy in San

4  Antonio?

5  A.  Yes, it's -- I can't remember the name of the street down

6  there, but, yes.

7  Q.  And was it in the same northwest quadrant of San Antonio?

8  A.  Yes, it was.

9  Q.  And how did you locate the pharmacy?

10  A.  Through the cell phone records.

11  Q.  Was there more than one call made to that pharmacy?

12  A.  I don't remember, sir.

13  Q.  Okay.  So did you take your pictures to the pharmacy or to

14  Corey's Jewelry that you've been showing around earlier?

15  A.  By the time I had already found out about those locations,

16  that was months later, and I did not do that.

17  Q.  All right, sir.  Now, the Atheist Organization has members

18  worldwide, does it not, sir?

19  A.  Yes, sir, we do.

20  Q.  Did you make any effort to contact your fellow atheists in

21  other countries?

22  A.  Yes, sir, I did.  There was indications that they may have

23  tried to go to -- specifically to New Zealand.  We made calls

24  down there to a number of our members.

25  Q.  All right, sir.

Tyson - Direct (Resumed)

1   A.   I also had contacted others because at about two months

2   after the disappearance, we started getting reports of

3   sightings of Madalyn.

4   Q.   Okay.  Did you get any reported sightings of Madalyn in

5   the company of any celebrities?

6   A.   Yes, as a matter of fact, it was one of the funnier

7   sightings of Madalyn.  She was seen in Las Vegas dancing with

8   Elvis.

9   Q.   Now, Jon Murray was rather fond of that Mercedes Benz, was

10  he not, sir?

11  A.   Yes.

12  Q.   And to your knowledge, had he recently had any automotive

13  work done prior to his disappearance?

14  A.   Yes, the muffler system was fixed roughly a week before

15  they disappeared.  Also, I believe at that time was when he

16  had the bullet hole fixed in it.

17  Q.   Okay.  Now, there was a point in time where you, yourself,

18  decided to move into the O'Hair residence on Greystone; is

19  that correct?

20  A.   That's correct.

21  Q.   And can you tell the jury why you did that?

22  A.   I had been pressured at that time -- we're talking about

23  February of '96.  And I had been pressured for quite some time

24  to move in there to take care of the house by the attorneys,

25  by the board members, and everyone else.  I had decided to

*Tyson - Cross*

1    finally move in when the local newspaper had printed a story

2    about the house.

3          The electricity had just been turned off that morning.

4    The house was empty.  All the effects were still in it, and it

5    was ripe for picking for any burglar.  At that point in time,

6    it was definitely time to move in.

7    Q.  Okay.  And during what period of time did you continue to

8    reside in the Greystone residence?

9    A.  Up until the time that the IRS took the house.

10   Q.  You told us yesterday that you were acquainted by a man

11   named David Waters, who was the former office manager of the

12   O'Hairs; is this correct?

13   A.  That is correct.

14   Q.  Did you ever see Mr. Waters wearing a fanny pack at the

15   office of the American Atheist Headquarters in Austin, Texas?

16   A.  Yes, I did.

17   Q.  Do you know what he had in that fanny pack?

18   A.  No, sir, I have no idea.

19   Q.  Pass the witness.

20                   CROSS-EXAMINATION

21   BY MR. T. MILLS:

22   Q.  On that last subject about the fanny pack, you're talking

23   about a little carrier -- carrying case that snaps around a

24   person's waist?

25   A.  Yes, it was a form of it.  There's about a dozen different

Tyson - Cross

1    types.

2    Q.  And there's nothing sinister that's attached to somebody

3    having a fanny pack around their waist, is there, in your

4    mind?

5    A.  Not in our society, no.  It's quite common.

6    Q.  Right.  If you weren't in a courtroom setting and saw

7    someone wearing a fanny pack, you wouldn't automatically

8    assume that the only reason would be to carry a gun in it, for

9    example?

10   A.  Oh, absolutely not.  You can use them for a number of

11   reasons.  I have three of them.

12   Q.  Okay.  What's the story on the bullet hole that got fixed?

13   Why did he happen to have a bullet hole in his car?

14   A.  I have no idea.  It was first noticed, roughly, a month

15   before they come up missing, a month and a half.  It was

16   approximately a .22 caliber.

17   Q.  He first noticed it or you first noticed it?

18   A.  Jon showed it to me.

19   Q.  Okay.

20   A.  It was very obviously a bullet hole.  I've seen enough of

21   them.

22   Q.  Well, I'm not questioning.

23   A.  Okay.

24   Q.  When you saw the interior of the office and the interior

25   of the home after -- in September, when Madalyn, Jon and Robin

1    were not around Austin, do you remember if the paintings were

2    still hanging on the walls where they normally were if they

3    were gone?

4    A.   You mean in their house, the paintings on the wall?

5    Q.   Yes.

6    A.   They had removed the paintings on the walls previously,

7    most of them.  It was before I arrived here in '92.

8    Q.   In '93, did you say?

9    A.   Yes, sir, most were already gone.

10   Q.   So for the last '95, '94 paintings that you understood had

11   once been in their home were elsewhere?

12   A.   I had seen them, yes.  I had seen them on the wall and

13   they were not there.

14   Q.   All right.  To your knowledge, did Ms. O'Hair periodically

15   use people, including yourself, as what would be called

16   bodyguards?

17   A.   Occasionally at the conventions, we had others, yes.

18   Conrad Goeringer was used here in Austin.  There was a retired

19   police officer from New York that was also used.

20   Q.   All right.  And she needed a bodyguard because she was the

21   most hated woman in America and people might assault her?

22   A.   People did assault her, yes.

23   Q.   Because of, to your knowledge, her spreading her atheist

24   beliefs?

25   A.   Well, the reason they assaulted was their reasons.  I

16

*Tyson - Cross*

1  wouldn't know.

2  Q.  All right.  Were you working with the Athiest Organization

3  when the library was packed up to hide it from possible

4  seizure by the Truth Seekers folks?

5  A.  It was packed up before I arrived.

6  Q.  All right.  Now, in addition to the last name Bible, what

7  knowledge do you have about other aliases that O'Hair used?

8  A.  Well, she used, obviously, Maze, Murray and O'Hair, Murray

9  O'Hair.

10  Q.  To your knowledge, did she have identification in

11  different names besides her real name?

12  A.  Not that would be current.  I saw her dog tags which have

13  Maze on it.

14  Q.  And she used aliases because?

15  A.  It's common knowledge most celebrities use aliases

16  whenever they travel.  It's much safer for them.

17  Q.  And if she traveled by plane, she would necessarily have

18  to have some photo ID, right?

19  A.  That's correct.

20  Q.  And you know that she had the ability to get a photo ID in

21  some other name, correct?

22  A.  I wouldn't have any idea whether she could do that or not.

23  Q.  Well, if she traveled, she's a celebrity, you have to show

24  your ID?

25  A.  That was current.  That was not current at the time they

Tyson - Cross

1  were missing.

2  Q.  All right.  As a matter of fact, when they were missing,

3  the rules requiring the ticket agents to look at your driver's

4  license or some other kind of formal photo ID was not the law,

5  was it?

6  A.  The law was changed, I believe it was October the 1st,

7  when it had changed into had to show ID.

8  Q.  October the 1st, '95?

9  A.  That is correct.

10  Q.  So September '95, the law was not in effect?

11  A.  That is correct.

12  Q.  Jon had gone so far as to line up a pharmacy to buy his

13  mother's medicine in New Zealand, hadn't he?

14  A.  I don't know he lined it up.  He had checked into it,

15  obviously.  We do have records of that.

16  Q.  You've seen records?

17  A.  Yes, sir.

18  Q.  And the pharmacy was not far from Parnell Village in New

19  Zealand, where he had looked for possibly living; isn't that

20  correct?

21  A.  I don't know his physical location.

22  Q.  Have you previously stated that the pharmacy was not far

23  from Parnell Village in an interview with law enforcement?

24  A.  I don't remember stating that.

25  Q.  You personally believed that the O'Hairs, Murrays were

*Tyson - Cross*

1  seriously considering leaving for New Zealand in the fall of

2  1995, didn't you?

3  A.  I think that they were planning that, yes.

4  Q.  All right.  You knew that they had looked into the

5  immigration laws of New Zealand, didn't you?

6  A.  I didn't know it at that time, but I do now.

7  Q.  Did you know at that time that they had looked into the

8  extradition laws of -- treaties between the United States and

9  New Zealand?

10  A.  I must ask, sir, what time are we discussing?  I don't

11  want to get confused.

12  Q.  Prior to September 1, 1995.

13  A.  I had no idea whether they did or not at that time.

14  Q.  Jon had New Zealand citizenship documents in his office

15  that you had seen; isn't that correct?

16  A.  He had citizenship documents for New Zealand?  No, I had

17  not seen any citizenship documents.

18  Q.  Citizenship questionnaires?

19  A.  Yes.

20  Q.  That's different from the citizenship document in your

21  mind?

22  A.  Oh, most assuredly.

23  Q.  All right.  He had gotten the three passports and a

24  college transcript of Robin's work at graduation from college

25  in preparing to apply for New Zealand citizenship, hadn't he?

Tyson - Cross

1   A.  I know that he had gotten a hold of the birth certificate

2   for Robin and a couple of other documents, which was on his

3   desk previous to them coming up missing.

4   Q.  As of September the 1st, 1995, do you know whether or not

5   Mr. Jon Murray had obtained New Zealand citizenship?

6   A.  No, I don't know.

7   Q.  How frequently, in general, did you see the three in, say,

8   August of 1995?

9   A.  Let's see, they were gone for the first two weeks.  I saw

10  them for the last two weeks virtually every day.

11  Q.  In the last part of July, did you see them virtually every

12  day?

13  A.  I don't know what date they left, but they left late July.

14  Q.  To visit with, among other people, I assume, Mr. Via?

15  A.  That's what Mr. Via had told me, yes.

16  Q.  And is it true that when the three left on that trip, they

17  left unannounced?

18  A.  Oh, yes.

19  Q.  As in one day they're gone?

20  A.  Literally.

21  Q.  You were familiar enough with their writing -- and I'm not

22  trying to say that you don't, but I'm just asking you that

23  when you saw the document with saying we're leaving, et

24  cetera, signed Jon G. Murray, you believe and have the

25  knowledge to believe that it was Robin who signed his name,

*Tyson - Cross*

1    correct?

2    A.   That is correct.  And, in fact, we discussed at sort of

3    breakfast that the employees had that day --

4    Q.   All right.

5    A.   -- and all of us agreed.

6    Q.   You believe that you would recognize John's signature?

7    A.   Most of the time, I can pretty easily, yes.  It's a rather

8    unique signature.

9    Q.   All right.  And you believe that you would recognize Robin

10   writing his name?

11   A.   Yes, just a slight difference in them.

12   Q.   All right.  And is it correct that Madalyn encouraged them

13   to practice signing each other's names?

14   A.   They were encouraged, as was I, to sign their name

15   constantly, every day.  Everybody used a piece of paper, you'd

16   pull it out and start at the top, and when you finished at the

17   bottom, okay, that was enough practice for the day.

18   Q.   Almost every day?

19   A.   Yeah.

20   Q.   Sir?

21   A.   Yes.

22   Q.   You would get a piece of paper and practice signing John's

23   name?

24   A.   No.  I practiced my name, sir.

25   Q.   Okay.

Tyson - Cross

1    A.  We all practiced -- Madalyn was sort of a freak about it.

2    She preferred people to have extremely good-looking

3    signatures.

4    Q.  But including Robin practicing signing John's?

5    A.  They did actually do that.  They practiced each other's,

6    yes.

7    Q.  All right.  If Madalyn was a cleanliness freak --

8    A.  No, she wasn't.  Jon was.

9    Q.  Jon was.  If Jon was, is it correct that -- maybe this is

10   just a different kind of issue -- but is it correct that

11   generally, they did not bathe or shower daily?

12   A.  Excuse me?  I'm not too sure I understand your question.

13   Q.  Well, to your knowledge, either from what was said or from

14   their body odor, did they not shower or bathe daily?

15   A.  I can say from personal experience the, what, seven, eight

16   times I stayed overnight there, they had taken showers each

17   and every time.

18   Q.  All right.  And you know enough about John's sleeping

19   habits to know that he slept in pajamas and under the covers?

20   A.  Yes.

21   Q.  After they were no longer in town, when you were in her

22   house, you noticed that her walker was not there, correct?

23   A.  That is correct.

24   Q.  You noticed that their three traveling suitcases, one for

25   each for quick trips, were not there, didn't you?

Tyson - Cross

1   A.   That's also correct.

2   Q.   You know that -- not sure that I can draw it, but kind of

3   a rough facsimile that in the O'Hair Murray garage hung a red

4   bow saw, correct?

5   A.   There was a bow saw in there on the right-hand side as you

6   walk in.

7   Q.   Something with kind of an elliptical handle?

8   A.   Yeah.

9   Q.   And there were shovels or a shovel, other gardening

10  equipment at the office, correct?

11  A.   Oh, yes.

12  Q.   Do you attach anything sinister about possessing a bow

13  saw?

14  A.   No.  I have three of them.

15  Q.   And you don't use them for sawing bodies up after

16  murdering people, do you?

17  A.   Well, I don't, no.

18  Q.   All right.  Now, Ms. O'Hair did not socialize as in have a

19  boyfriend or significant other during the time you knew her,

20  did she?

21  A.   No, she did not.

22  Q.   And Jon did not have a boyfriend or a girlfriend to your

23  knowledge, did he?

24  A.   He definitely did not have a girlfriend.

25  Q.   Do you know if he had a male friend?

*Tyson - Cross*

1   A.   You mean a sexual partner?

2   Q.   Yes.

3   A.   No.

4   Q.   All right.  And Robin, did Robin have a boyfriend?

5   A.   No.

6   Q.   And not a female --

7   A.   No.  They were all straight.

8   Q.   But they never did go out, like, date, whatever it's

9   called when you're my age?

10   A.   Not in the way that you and I use the word, no.

11   Q.   All right.  The list of the 13 or so things to do to keep

12   business as usual going on, did that appear to be signed by

13   Jon?

14   A.   Yes.

15   Q.   All right.  And did the O'Hair Murrays take a typewriter

16   with them when they left?

17   A.   I would have no idea.

18   Q.   Did they have any typewriters in the business?

19   A.   In the office?

20   Q.   Yeah.

21   A.   Oh, yeah, quite a few of them.

22   Q.   Okay.  And I'm distinguishing that from a computer that

23   prints out.

24   A.   Yes.

25   Q.   They had computers, but they also had typewriters?

*Tyson - Cross*

1   A.  That is correct.

2   Q.  And you don't know if there was one less or two less after

3   they left, do you?

4   A.  Well, I didn't notice any missing.  Since I used most of

5   them, I would have noticed it.

6   Q.  All right.  Now, do I understand that after David Waters

7   was fired that he no longer -- that his keys were taken from

8   him?

9   A.  I'm under that impression, yes.  I don't know for sure.

10  Q.  And are you under the impression that whatever kind of

11  security code that Ms. O'Hair had at her house was changed so

12  that he would not know her security code?

13  A.  She had never told me.  I would assume that, but it's only

14  an assumption.

15  Q.  During the 30 days or so of September, you talked to Jon

16  how many times?

17  A.  Oh, gee, starting around about the 11th is when I started

18  talking to him via the cell phone, and I had quite a number;

19  I'd say about 40 times.

20  Q.  Forty?

21  A.  Yes.

22  Q.  In any of those times, did he say words to the effect

23  "help"?

24  A.  No, he did not in terms of -- if you want to put it in a

25  life-threatening situation, no.

*Tyson - Cross*

1    Q.   "Call the police"?

2    A.   No.

3    Q.   "I'm being kidnapped"?

4    A.   No.

5    Q.   You've testified that -- from your knowledge of these

6    three people that if the three of them were in a danger

7    situation that Jon would not do something to -- I don't know

8    if these are your exact words -- but to harm the others?

9    A.   I think Jon could be held hostage pretty easily by

10   threatening the two ladies.

11   Q.   All right.  Do you think that Madalyn could be held

12   hostage pretty easily by threatening Jon and Robin?

13   A.   Not by threatening Jon, but by threatening Robin, yes.

14   Q.   Okay.  And Robin could be held hostage by saying, "Don't

15   run away or something will happen to your other family

16   members"?

17   A.   It wouldn't be too hard to hold Robin hostage.  She was

18   not street-wise or anything of that nature.

19   Q.   All right.  Now, you're aware during this 30-day period,

20   Mr. -- Jon flew to New Jersey?

21   A.   We found out about it later, yes.

22   Q.   And conducted other business for the Atheist Organizations

23   by cell phone during that month?

24   A.   I'm not too sure exactly what you mean by other business.

25   Q.   Well, when you talked to him 40 or so times, was it about

1   making business decisions?

2   A.   Sometimes it was.   Sometimes it was do they want to be

3   involved in this, that, or the other thing, or what else do

4   they want me to do.

5   Q.   Okay.  Was Jon of reasonable intelligence?

6   A.   He was quite intelligent.

7   Q.   All right.  Would he, for example, have the intelligence

8   enough to walk into the office of the FBI or the IRS and say,

9   "I need some help; my mother and sister are being held

10  hostage.  What can you do because I don't want to cause them

11  to get harmed"?

12  A.   All three of the O'Hairs were members of MENSA, as I am,

13  so yes, we are intelligent, but you're asking me could someone

14  be held in such a ways that they could be estopped from going

15  into an office like that, I think Jon could be, yes.

16  Q.   Being a member of MENSA, if you would have the

17  intelligence enough to go to law enforcement and say, "My

18  family's been held hostage, can you bust in and save them,"

19  you'd have that much intelligence being a MENSA member,

20  wouldn't you?

21  A.   I also have a different background than Jon and Robin and

22  Madalyn.  I would -- because I know that the kidnappers would

23  kill me, and I would obviously go to the police.

24  Q.   Because you know what?

25  A.   The kidnappers would obviously kill me.

*Tyson - Redirect*

1  Q.  What was the date, to your knowledge, that the IRS seized

2  the house?

3  A.  Oh, gee, that was in April of '97, I believe.

4  Q.  So a year and a half after they had not been seen, the IRS

5  was still involved in their life by seizing their house?

6  A.  Yes.

7  Q.  That's all the questions I have.  Thank you.

8              RE-DIRECT EXAMINATION

9  BY MR. CARRUTH:

10  Q.  Mr. Tyson, counsel asked you about a red bow saw that you

11  observed in the O'Hairs' garage, I believe.  Was that a new or

12  an old bow saw, to your knowledge?

13  A.  I recollect it was older, but I really couldn't tell.

14  Q.  And he also asked you about some shovels that they may

15  have had at home or at the office.  Did the O'Hairs have a

16  gardener?

17  A.  Well, they had a gardening service for a while, but they

18  did have -- do their own work.  Robin was a gardener of her

19  own right.

20  Q.  And they kept up a yard.

21  A.  Oh, yes.

22  Q.  And what about at the office?  Was there a garden or a

23  yard to keep up there?

24  A.  Yes, there was.

25  Q.  And who is Mr. Alvarado?

Tyson – Redirect

1  A.   Albarado -- Willis Albarado is the volunteer that comes in
2  about once a week to take care of the inside, all of the
3  plants, all the plants on the inside of the building.
4  Q.   If they wanted to trim trees or weed the garden, they
5  would have use for these garden instruments, correct?
6  A.   Certainly.
7  Q.   Can you offer any explanation why someone who lived in a
8  second-story apartment in downtown Austin, without a yard or
9  garden to keep up, would have a need for a bow saw or a
10  shovel?
11  A.   Rather large bonsai plant, maybe.  No, I don't.
12  Q.   Counsel also asked you about the keys that Mr. Waters had,
13  and had you agreed with him that Mr. Waters turned them in
14  when he left the employment?
15  A.   I think -- I would have assumed that he did, yes.
16  Q.   To your knowledge, can keys be duplicated, both house keys
17  and car keys and other types of keys?
18  A.   I worked as a locksmith, yes, it can be done.
19  Q.   I believe that's all.  Thank you, sir.
20          MR. T. MILLS:  No further questions.
21          THE COURT:  May this witness be excused?
22          MR. CARRUTH:  Yes, your Honor.
23          MR. T. MILLS:  Yes, your Honor.
24          THE COURT:  You may be excused, sir.  You may call
25  your next witness.

*Steffens - Direct*

1          MR. CARRUTH:  Patti Jo Steffens.

2      (Witness was sworn.)

3          THE COURT:  Come up around here, please, ma'am.  Walk

4  around this column and have a seat, right there in the blue

5  chair.  If you'll give us your full name and spell your last,

6  please.

7          THE WITNESS:  It's Patti Jo Steffens, S-T-E-F-F-E-N-S.

8          THE COURT:  You may proceed.

9      PATTI JO STEFFENS, called by the Government, duly sworn.

10                      DIRECT EXAMINATION

11  BY MR. CARRUTH:

12  Q.  Ms. Steffens, I'm going to show you what's been marked for

13  identification purposes as Government Exhibit W11-1, W11-2,

14  W11-3 and W11-4.  Would you take a look at those photographs,

15  please, and tell me if you recognize the individuals depicted

16  therein.

17  A.  Yes, I do recognize them.

18  Q.  Between the time frame of April 1995 and October of 1995,

19  have you seen or did you see any or all of those individuals

20  at your residence here in Austin, Texas?

21  A.  Yes.

22  Q.  Any or all of them?

23  A.  All of them at one point or another.

24  Q.  At this time, your Honor, we would offer Government's

25  Exhibit W11-1, W11-2, W11-3 and W11-4.

*Steffens - Direct*

1          MR. T. MILLS:  No objection.

2          THE COURT:  They're received.

3   Q.  (BY MR. CARRUTH) Now that these are in evidence, please,

4   ma'am, would you hold them up, one at a time, beginning with

5   Government's W11-1, 2, 3 and 4, so the jury may see them, and

6   identify the men depicted in those photographs.

7   A.  This is David Rolland Waters.  This is Gary Paul Karr.

8   And this is Danny Fry.  And this is Gerald Chico Osborne.

9   Q.  Ms. Steffens, are you personally acquainted with those

10  four individuals you just identified?

11  A.  Yes, I am.

12  Q.  Do you know the defendant in this case, Mr. Gary Paul

13  Karr?

14  A.  Yes.

15  Q.  Do you see him in the courtroom today?

16  A.  Yes.

17  Q.  Could you please identify him for the record and tell the

18  Court and jury what type of clothes he's wearing.

19  A.  Well, he's seated at that table, and he's wearing a white

20  shirt, pattern red tie, and sort of a tan jacket.

21  Q.  May the record reflect that the witness has identified the

22  defendant, Mr. Gary Paul Karr?

23          THE COURT:  So reflected.

24          MR. CARRUTH:  Thank you.

25  Q.  (BY MR. CARRUTH) Does Mr. Karr appear the same today as he

*Jones - Direct*

1   did the last time you saw him?

2   A.  Well, he's a lot chunkier and doesn't have a mustache.

3   Q.  Okay.  Let's talk about Mr. Waters.  How long have you

4   known David Rolland Waters?

5   A.  Well, I first met him in late summer of 1991.

6   Q.  And where was that, please, ma'am?

7   A.  In Peoria, Illinois.

8   Q.  And did you and Mr. Waters at that time begin a

9   relationship and start living together?

10  A.  Well, we began a relationship, yes, then we made a

11  determination to -- well, he asked me if I wanted to move to

12  Texas, and I said yes.  And I was then a student, and so I

13  discontinued my registration and packed my car and went to San

14  Antonio with David.

15  Q.  And you were a student where, ma'am?

16  A.  At Bradley University.

17  Q.  What were you studying at that time?

18  A.  Well, I had 19 hours to go on a bachelor's degree in

19  English with a double major, English and history and a Spanish

20  minor.

21  Q.  Okay.  And you gave that up to travel to Texas with Mr.

22  Waters?

23  A.  Yes, I did.  I thought I would transfer to University of

24  Texas.

25  Q.  And you said you traveled to San Antonio, Texas?

*Jones - Direct*

1   A.  Yes.

2   Q.  And where did you and Mr. Waters reside when you traveled

3   to San Antonio, Texas?

4   A.  Well, we took an apartment at the Warren Inn.

5   Q.  Ms. Steffens, let me show you, first, what's been marked

6   for identification purposes as Government's Exhibit W11-13,

7   and ask if you recognize that photograph?

8   A.  Yes.

9   Q.  Did you take that photograph?

10  A.  I believe I did.

11  Q.  Okay.  And does that depict David Waters?

12  A.  Uh-huh.

13  Q.  In San Antonio at the Warren Inn?

14  A.  Yes.

15  Q.  We'd offer Government's Exhibit W11-13.

16       MR. T. MILLS:  No objection.

17       THE COURT:  Received.

18  Q.  (BY MR. CARRUTH) Now, Ms. Steffens, I would like for you

19  to look at a poster board here with a collage of color

20  photographs, seven in number, marked for identification as

21  W25-16.  Do you recognize the building and grounds depicted in

22  that photograph?

23  A.  Yes, that's the Warren Inn.

24  Q.  We would offer this exhibit, your Honor, W25-16.

25       MR. T. MILLS:  No objection.

*Jones - Direct*

1        THE COURT:  Received.

2   Q.  (BY MR. CARRUTH) Now, the Warren Inn is actually known as

3   the Warren Inn Village, is it not, because it has short-term

4   and long-term rentals?

5   A.  Uh-huh.

6   Q.  You can get a hotel room for the night or you could stay

7   there for a month or a year?

8   A.  Correct.

9   Q.  How long did you and Mr. David Waters stay at the Warren

10  Inn?

11  A.  Almost exactly a year.

12  Q.  And when you left the Warren Inn with Mr. Waters, where

13  did you move to?

14  A.  We moved to Central Park Apartments in Austin.

15  Q.  And that is located on North Lamar Boulevard?

16  A.  Yeah, 6008 North Lamar.  We lived on 308, first, and moved

17  to 219.

18  Q.  That's an upstairs apartment?

19  A.  Both of them are, yeah.

20  Q.  And during -- how long did you reside with Mr. Waters at

21  Central Park West?

22  A.  From '92 until '98 or 7.

23  Q.  Okay.  And during the time you lived there, did y'all have

24  a yard or garden that you had to maintain?

25  A.  No.

*Jones - Direct*

1  Q.  How well did you know Mr. Waters when you moved in to live

2  with him?

3       MR. T. MILLS:  When?

4  A.  Well --

5       MR. T. MILLS:  Excuse me.  When?

6       MR. CARRUTH:  When she first started living with him,

7  I guess, in '90, '91.

8  A.  '91.

9  Q.  (BY MR. CARRUTH) What did you know about him, about his

10  background, if anything?

11  A.  Well, I was well-acquainted with his family, so I knew of

12  him that when he was a teen --

13       MR. T. MILLS:  Excuse me, Judge.  I object to her

14  testifying about specifics of a criminal record of Mr. Waters

15  on the ground of relevancy.

16       MR. CARRUTH:  Well, I'm not sure that was what she was

17  going to testify to, your Honor.

18       THE COURT:  Members of the jury, I'm going to put you

19  in the jury room for a few minutes.

20     (Jury not present.)

21       THE COURT:  Where are we going, Mr. Carruth?

22  Q.  (BY MR. CARRUTH) Well, by way of background, before you

23  started living with Mr. Waters, you had dated his brother,

24  Ron, in Peoria, had you not?

25  A.  Uh-huh, yes.

*Jones - Direct*

1  Q.  Although Ron is his legal name, you know him as another

2  name, do you not?  What is that?

3  A.  Yes, as everyone knew him as Jeff Hunt.

4  Q.  Okay.  Now, were Ron Waters and his brother, David Waters,

5  very close?

6  A.  No.

7  Q.  And do you have any notion or explanation as to why they

8  were not close?

9  A.  Well, David had spent most of his adult life in -- much of

10  his adult life in the penitentiary, so that was one reason.

11  An additional reason is that David was abusive.

12  Q.  To whom?

13  A.  Well, to his family.

14  Q.  Did that include his mother?

15  A.  Yes, that included his mother, but if you knew his mother,

16  that would be almost understandable.  But his brother, you

17  know, he was -- had no reason to abuse him, but he did.  I

18  mean, he beat him up very badly.

19  Q.  And was Mr. David Waters' brother, Ron, younger or older

20  than he?

21  A.  He was younger.  In fact, he was a half-brother, just to

22  be perfectly specific.

23  Q.  So they shared the same mother but had a different

24  father --

25  A.  Correct.

*Jones - Direct*

1  Q.  -- is that correct?  So you became aware a little bit

2  about the family history of the Waters family during the time

3  you dated, first, one brother and then, moved in with the

4  other brother?

5  A.  Yes.

6  Q.  Did you ever meet their mother?

7  A.  Yes.

8  Q.  Was the mother living at that time in Peoria, Illinois?

9  A.  In a surrounding town, you know, a small town nearby, but

10  yes.

11  Q.  Okay.  Did David Waters ever go visit his mother with you?

12  A.  Once.

13  Q.  And was that a pleasant visit to your knowledge?

14  A.  It was relatively pleasant.

15  Q.  During the time that you resided with Mr. Waters in San

16  Antonio and Austin, did he frequently call or correspond with

17  his mother?

18  A.  Not frequently.

19  Q.  And how about his brother, Ron, or Jeff, as you knew him?

20  A.  He telephoned him more frequently than his mother, but I

21  mean, I would say it was probably not monthly or, you know --

22  definitely not weekly.  Maybe monthly or every other month.

23  Q.  During the years that you resided with Mr. David Waters,

24  did you and he ever make trips or travel from Austin, Texas to

25  Peoria, Illinois to visit any members of his family?

*Jones - Direct*

1   A.  Well, not specifically visit members of his family.  More

2   to visit my family.  And then, he would, of course, visit with

3   his family while we were there.

4   Q.  Okay.  I guess I'm referring specifically to a trip you

5   took around Christmas of -- in the mid '90s.

6   A.  Well, yes.  He probably took advantage of me visiting my

7   family to visit with his brother, yes, so he did have contact

8   with him at that time, yes.

9   Q.  Were there other times, to your knowledge, that he

10  traveled alone either by bus or other means of transportation

11  to go to Peoria, Illinois?

12  A.  Yes.

13  Q.  Did you ever know -- your Honor, that's about all I intend

14  to offer as far as the family background to show the

15  relationship between Mr. Waters and his brother and mother.

16          THE COURT:  The objection is relevance.  What is the

17  relevance?

18          MR. CARRUTH:  The relevance, your Honor, is that we're

19  going to assume indicating that much of the evidence that was

20  used in the crime alleged in the indictment was concealed at

21  the residence of Ron Waters, in Peoria, and later, turned over

22  to law enforcement officers.  And she will identify much of

23  that, and I just wanted to establish the background of these

24  two brothers and their mother.

25          THE COURT:  Any further --

*Jones - Direct*

1          MR. T. MILLS:  Well, I don't suppose that is that

2   prejudicial if it is relevant.  I was concerned that she was

3   going to testify about the adult criminal record and that sort

4   of thing, which I would object to as part of the background,

5   or even juvenile criminal record, whatever she was -- I

6   thought she was about to say.

7          MR. CARRUTH:  I don't think she has personal knowledge

8   of that.

9          THE COURT:  Yeah, well, whether you do or you do not,

10  don't go into the criminal record without lifting up a red

11  flag, okay?

12         THE WITNESS:  Okay.

13         THE COURT:  All right.  Bring the jury in.

14         MR. CARRUTH:  Would it be permissible for her to

15  testify that she knew he had been incarcerated?

16         THE COURT:  I've heard that testimony.  Counsel has

17  not made objection to it that he's spent a substantial time in

18  the penitentiary.

19         MR. CARRUTH:  Thank you.

20         THE COURT:  I don't think anybody questions that.  I

21  think everybody knows that within the city limits of Austin.

22  All right.

23     (Jury present.)

24         THE COURT:  Mr. Carruth, you may continue.

25         MR. CARRUTH:  Thank you, your Honor.

Jones - Direct

1  Q.  (BY MR. CARRUTH) Ms. Steffens, I was asking you to tell

2  the jury briefly what you knew about the family background of

3  Mr. Waters, particularly, did he have a brother in Peoria,

4  Illinois?

5  A.  Yes, he did.

6  Q.  And what was that brother's name or is that brother's

7  name?

8  A.  It's legally Ron Waters.

9  Q.  And is he also known as another name by his friends?

10  A.  He was also known as Jeff Hunt.

11  Q.  Okay.

12  A.  And that was through no fault of his own.  It wasn't an

13  alias intended for deception.  It was simply that's what his

14  mother told him his name was when he was born.

15  Q.  Actually, he and Mr. David Waters were stepbrothers, were

16  they not?

17  A.  Half brothers.

18  Q.  I'm sorry.  They shared the same mother, but they had

19  different fathers?

20  A.  That's correct.

21  Q.  And was Ron Waters, the brother in Peoria, younger or

22  older than Mr. David Waters?

23  A.  He was younger.

24  Q.  And before you started living with Mr. David Waters in

25  1990 or '91, had you previously dated Mr. Ron Waters, his

Jones - Direct

1    brother, in Peoria, Illinois?

2    A.   Yes.

3    Q.   And you had met their mother, had you not?

4    A.   Yes.

5    Q.   Now, can you tell the members of the jury, if you know,

6    what the relationship was between Mr. David Waters and Mr. Ron

7    Waters, his brother in Peoria?

8    A.   Well, the relationship between the brothers was, at best,

9    tenuous.   There was -- I would say there was a great deal of

10   fear on the part of Ron Waters toward David Waters.

11   Q.   And why would Mr. Ron Waters have any reason to fear Mr.

12   David Waters, if you know?

13   A.   Because he has perpetrated acts of violence towards Ron

14   Waters, towards his mother, and has exhibited violence in the

15   past.

16   Q.   During the time that you and Mr. David Waters resided

17   together in San Antonio and Austin, did you ever take trips to

18   Peoria, Illinois, and if so, for what purpose?

19   A.   Yes, we did take trips to Peoria.   My family lived there.

20   His family lived there.   Primarily, I would say it would be to

21   visit my family during holidays, but, of course, he would

22   spend time with his family during that time.

23   Q.   And, of course, would you spend time with his family at

24   that time or not?   Did you ever see Ron Waters or David

25   Waters' mother after you were living with him?

Jones - Direct

1   A.  Well, not so much, I mean, but yes, we visited.  I believe

2   there was at least one time that we visited Ron's house

3   together.

4   Q.  To your knowledge, Ms. Steffens, during the seven or eight

5   years you resided with Mr. Waters, here in Austin and San

6   Antonio, did he maintain regular contact with his family in

7   Peoria either by e-mail, or writing letters, or calling them

8   on the phone?

9   A.  Well, yes, he maintained contact with especially his

10  brother by telephone, and he would -- he did contact his

11  mother from time to time.

12  Q.  Okay.  During the time you lived with him, did you learn

13  or determine whether or not Mr. David Waters had an affinity

14  for firearms?

15  A.  Yes.

16  Q.  Did he own any firearms?

17  A.  Well, technically, I owned firearms because he could not,

18  but yes, he did own -- he did, in fact, purchase a Browning

19  Nine Millimeter from someone.

20  Q.  Okay.

21  A.  And I had purchased, ostensibly in my name but for him, a

22  Browning Nine Millimeter, and, also, for myself, a Reuger

23  .357.

24  Q.  Okay.  Were there any other firearms in the residence you

25  shared with Mr. Waters on North Lamar?

42

*Jones - Direct*

1    A.  Yes, there was a Jennings that I think was a .380.

2    Q.  Okay.  Ms. Steffens, I want you to take a look at some

3    more photographs, if you would, please.  One is marked

4    Government Exhibit W11-7, W11-8, W11-9, W11-10, W11-11 and

5    W11-12.  Do you recognize any or all of these photographs?

6    A.  Yes, I took all of those photographs.

7    Q.  You took all of those photographs.  Was that during the

8    time you and Mr. Waters resided together here in Austin,

9    Texas?

10   A.  Yes.

11   Q.  And is that -- are those photographs of Mr. Waters in his

12   various firearms?

13   A.  Yes.

14   Q.  We would offer Government's Exhibit W11-7, W11-8, W11-9,

15   W11-10, W11-11 and W11-12.

16        MR. T. MILLS:  We object to the relevance of

17   photographs of him with firearms unless they are either within

18   the April '95 to October '95 conspiracy time or relevant to

19   the conspiracy alleged.  Just between '92 and '98 --

20        MR. CARRUTH:  Would the Court like to see them?

21   They're very relevant, in fact --

22        THE COURT:  I have no time whatsoever specified yet --

23        MR. CARRUTH:  To specify?

24        THE COURT:  -- when these pictures were taken.

25        MR. CARRUTH:  All right.  In one of them, he's wearing

*Jones - Direct*

1   a shirt for the Pecan Street Festival of 1994, so it had to be

2   subsequent to that.

3          MR. T. MILLS:  And we would prefer to have evidence of

4   that from the witness if that's the case.

5          THE COURT:  The objection is sustained at this point

6   in time.

7          MR. CARRUTH:  Thank you, your Honor.

8   Q.  (BY MR. CARRUTH) Were any or all of those photographs

9   taken subsequent to 1994, to your knowledge?

10  A.  Yes, they were.

11  Q.  We would re-offer the photographs, your Honor.

12         MR. T. MILLS:  May I ask the witness a question or two

13  on voir dire?

14         THE COURT:  You may.

15                  VOIR DIRE EXAMINATION

16  BY MR. T. MILLS:

17  Q.  Were the photographs all taken at the exact same day?

18  A.  No.

19  Q.  Okay.  Were they -- they were taken after 1994?

20  A.  Yes.

21  Q.  Were they all taken in the same year?

22  A.  I am not sure.

23  Q.  What years do those photographs cover, please?

24  A.  Well, at the least, '94 and '95.

25  Q.  And at the most?

44

*Jones - Direct*

1   A.  '96, but that is just -- that is not logical.  Actually,

2   let me correct that.  It couldn't be '96.  It had to be late

3   '94, at the forefront, but most likely '95.

4   Q.  Do you know which pictures, which year?

5   A.  The pictures at the firing range, I would say, had to have

6   been taken in '95.

7        MR. T. MILLS:  We withdraw our objection to the

8   photograph at the firing range.

9        MR. CARRUTH:  And we're offering all of them, your

10  Honor.

11       THE COURT:  All right.  I'll have counsel up here.

12     (At the Bench, on the record.)

13       MR. CARRUTH:  This is the same gun that he's shooting

14  at the fire range, Browning Nine Millimeter.

15       THE COURT:  As far as I recall, your name's not on the

16  witness list.  Now, let's get down to brass taxes.  I've got

17  no objection to which exhibit?

18       MR. T. MILLS:  Your Honor, at the firing range.  So it

19  looks like there are three of those, 12, 11 and 8.

20       MR. CARRUTH:  That's the same -- you can tell by

21  looking at it.

22       THE COURT:  Yeah, you may be able.  So no objection as

23  to 12, 11 or 8; they're admitted.

24       MR. CARRUTH:  All right, sir.

25       THE COURT:  Without objection.  All right.  The

45

*Jones - Direct*

1    objection to 7, 9 --

2         MR. CARRUTH:  9 and 10.

3         THE COURT:  -- is relevance.  Tell me what the

4    relevance is.

5         MR. CARRUTH:  The relevance is, your Honor, this is

6    the same firearm.  This is a different firearm with a

7    Blackmire grip.  She's described several --

8         THE COURT:  Relevance to the criminal --

9         MR. CARRUTH:  The relevance is we believe the evidence

10   is going to show from testimony of the inmates that firearms

11   were used to shoot and kill the O'Hairs before their bodies

12   were dismembered.  The firearms were concealed by David

13   Waters.  That his gun had the barrel removed when he took it

14   to Ron Waters' house in Peoria.  The only reason they remove

15   the barrel of a perfectly good gun is to conceal ballistics

16   tests.

17        When we searched Mr. Waters' apartment March of last

18   year, he had 119 rounds of handgun ammunition, a .357, Nine

19   Millimeter and .380 caliber.  And she's testified they owned

20   all those guns when she lived with him in '94 and '95.  She's

21   also going to testify that all three of these individuals wore

22   fanny packs.  The gun will fit in a fanny pack.

23        THE COURT:  Well, that's fine, and other than showing

24   that Mr. Waters had these guns, liked to be pictured like Roy

25   Rogers, and I don't know -- the relevance you believe is that

*Jones - Direct*

1   you are going to be able to show that after the disappearance,

2   Waters sent the gun to his brother with the barrel removed so

3   nothing could be traced.

4        MR. CARRUTH:  He actually took the gun -- sent it up

5   there and then, later, went up there, around Christmas, and

6   removed the barrel himself along with the handcuffs and the

7   knives and other instruments that we believe were used in the

8   crime.  They were all recovered together.

9        THE COURT:  What else do you proffer at this point

10  that he shot these people with these guns?

11       MR. CARRUTH:  One of the inmates is going to testify

12  about shooting the -- Danny Fry around the O'Hairs.  And we

13  believe that the reason for removing the barrel is -- if you'd

14  like, we'll withdraw and hold them until that time if we think

15  we can connect it up.

16       THE COURT:  At the present time, I don't think there's

17  relevance.  I'll sustain the objection.

18       MR. CARRUTH:  Okay.  With that objection, these are

19  in.

20       THE COURT:  Yes.

21       MR. CARRUTH:  Thank you.

22       THE COURT:  Exhibits W11-8, W11-11 and W11-12 are

23  admitted.  The others are sustained at this time.

24  Q.  (BY MR. CARRUTH) Now, Ms. Steffens, with respect to those

25  photographs that have been admitted, W11-11, 12 and 8, those

*Albarado - Direct*

1   appear to have been taken on the same date and at the same

2   location; is that correct?

3   A.   That's correct.

4   Q.   And that was at a firing range here locally?

5   A.   Uh-huh.

6   Q.   Do you know where that firing range is located?

7   A.   Well, it's out past Hamilton Pool somewhere.  It's out in

8   the Hill Country.

9   Q.   Okay.  And in each of these photographs, is Mr. Waters

10  wearing a T-shirt?

11  A.   Yes.

12  Q.   Is that T-shirt commemorative of any particular event that

13  occurs here in Austin, Texas?

14  A.   The Pecan Street Festival.

15  Q.   And in each of those, he's shown with what caliber weapon?

16  A.   I would say that's the Nine Millimeter Browning.

17  Q.   Okay.  Did y'all frequently go to the firing range to fire

18  the pistol?

19  A.   Well, not frequently, but from time to time.

20  Q.   Now, you mentioned that during the summer or fall of 1995

21  that one or more of these individuals, as you have described,

22  were at your apartment with you and Mr. Waters; is that

23  correct?

24  A.   Correct.

25  Q.   Ms. Steffens, I'd like you to take a look at what's been

Albarado - Direct

1   marked for identification as Government Exhibit W11-51,

2   W11-52, W11-53 and W11-54.  Do you recognize any or all of

3   those photographs?

4   A.   Yes.

5   Q.   In fact, is this you depicted in the photograph W11-54?

6   A.   Yes, it is.

7   Q.   Can you tell us, if you know, when those photographs were

8   taken and where they were taken?

9   A.   Well, they were taken at the pool at Central Park in late

10  August.

11  Q.   Of what year?

12  A.   Of '95.

13  Q.   And that was the Central Park Apartments here in Austin,

14  Texas that you shared with David Waters?

15  A.   That's correct.

16  Q.   And in addition to yourself, are any of the previously

17  identified individuals depicted in those photographs?

18  A.   Well --

19  Q.   Well, without naming them at this point.

20  A.   Yes.

21  Q.   We'd offer at this point W11-51, 2, 3, and 4.

22          MR. T. MILLS:  No objection.

23          THE COURT:  Be received.

24  Q.   (BY MR. CARRUTH) Now, would you take those, one at a time,

25  and read the exhibit number and hold them up so the jury may

*Albarado - Direct*

1    see them and tell them what it depicts?

2    A.   Tell them what?

3    Q.   Tell them what is shown or portrayed in the photograph.

4    Identify the people in the photograph, please.

5    A.   Well, this is W11-53, and this is Danny Fry and this is my

6    friend Judy's son.

7    Q.   And Judy, for the record, is the ex-sister-in-law of Mr.

8    David Waters?

9    A.   That's correct.

10   Q.   Who was visiting you when some of these men were visiting

11   at your apartment --

12          MR. T. MILLS:  Excuse me.  Object to leading.

13          THE COURT:  It is leading.

14          MR. CARRUTH:  I will withdraw.

15   Q.   (BY MR. CARRUTH) Tell the Court, then, and the jury who

16   the woman you described as Judy in the photograph is.

17   A.   Well, the mother of this child is Judy Hunt.  She is the

18   former wife of David's brother, in other words, his former

19   sister-in-law, but she and I were friends.

20   Q.   And she was visiting you in August of '95.  Is that your

21   testimony?

22   A.   Yes, she visited for, I believe, a week in August of 1995.

23   In fact, these are her photographs.  She took these

24   photographs.

25   Q.   And in addition to Ms. Judy Hunt and her son, who else was

*Albarado - Direct*

1  residing in the apartment on Lamar Boulevard with you and Mr.

2  Waters at that time, or staying with you?

3  A.  Danny Fry had been staying for about a month, and Gary

4  Karr was also visiting.

5  Q.  Okay.  And where had he been staying or sleeping when he

6  was visiting?

7  A.  In our apartment, he was staying --

8  Q.  Mr. Karr, the defendant in this case?

9  A.  Yes.

10  Q.  Okay.  Were he and Mr. David Waters old friends, to your

11  knowledge?

12  A.  Gary?

13  Q.  Yes.

14  A.  Yes.  They had --

15  Q.  That's good enough.  Would you please continue identifying

16  the rest of the photographs?

17  A.  Okay.  This is W11-52, this is also Danny Fry and Jordan

18  Hunt.  W11-51 is also Danny Fry and Jordan.  And W11-54

19  depicts the arm of Danny Fry, myself, Gary Karr and Jordan.

20  Q.  Thank you, ma'am.  Show you now, ma'am, what's been marked

21  for identification as Government's Exhibit W11-14, and ask you

22  if you recognize that photograph?

23  A.  Yes, I do.

24  Q.  And does that -- are you depicted in that photograph?

25  A.  Yes.

*Albarado - Direct*

1   Q.   Along with Mr. Waters and another individual?

2   A.   Yes.

3   Q.   We would offer W11-14 at this time, your Honor.

4        MR. T. MILLS:  No objection.

5        THE COURT:  Received.

6   Q.   (BY MR. CARRUTH) Now that that photograph is in evidence,

7   please tell the jury who's depicted in there with you and Mr.

8   Waters.

9   A.   That's Gerald Chico Osborne and his wife, Margaret.

10  Q.   And where were they residing at that time, if you know?

11  A.   Fort Worth.

12  Q.   Had David Waters and Chico Osborne, likewise, been

13  long-time friends?

14  A.   Yes.

15  Q.   Do you know whether they worked together in South Texas?

16  A.   Yes.

17  Q.   In what capacity?

18  A.   David did some sort of administrative work for Wetherbee

19  Engineering, and he got Chico a job there, I believe.  But

20  they also did some sort of offshore stuff.

21  Q.   And did Mr. Waters know these other individuals from

22  Peoria, Illinois to your knowledge?

23  A.   Chico?

24  Q.   Yes.

25  A.   Yes, Chico was from Peoria.

Albarado - Direct

1  Q.  Okay.  What was the relationship between Mr. Chico Osborne

2  and Mr. David Waters, to your knowledge?

3  A.  Well, they were very close.  I would call them very close

4  friends.

5  Q.  Did they ever visit -- Mr. Osborne and his wife ever visit

6  in your home or to your home?

7  A.  Chico visited in San Antonio.  And I think he came once in

8  Austin on a day trip with Margaret and the kids.

9  Q.  And did you and Mr. David Waters ever travel to the

10  Dallas/Fort Worth area to visit Mr. Osborne and his wife?

11  A.  Yes, that photograph actually was taken in Fort Worth.

12  Q.  Okay.  What about Mr. Karr?  Did you ever visit with Mr.

13  Karr and his former wife or girlfriend?

14  A.  Yes.

15  Q.  All right.  Who is Charlene Karr?

16  A.  Well, that's Gary's -- and I don't know if it was an

17  ex-wife or an actual wife, but they had been married at some

18  point.

19  Q.  Did you ever meet Charlene Karr?

20  A.  Yes.

21  Q.  Where did you meet her?

22  A.  In Florida.

23  Q.  And did you ever see her in Austin, Texas during October

24  of 1995?

25  A.  Yes.

*Albarado – Direct*

1  Q.  And what was her purpose in coming to Austin, Texas at

2  that time, if you know?

3  A.  Well, she was meeting Gary, and they were going to drive

4  back to Florida together.

5  Q.  And do you know where she spent the night that evening?

6  A.  At the Four Seasons.

7  Q.  Here in Austin?

8  A.  Here in Austin.

9  Q.  And where did you and Mr. Waters spend that evening?

10  A.  At the Four Seasons here in Austin.

11  Q.  Okay.  Did you have any room service, or massage, or any

12  other extravagance?

13  A.  Well, we did have room service and I had a massage, a salt

14  glow, and paraffin on my hands and feet.

15  Q.  And who paid for that evening at the Four Seasons, if you

16  know?

17  A.  Well, David paid for us and Gary paid for them.

18  Q.  And did he pay in cash or by credit card?

19  A.  Well, I believe David paid in cash.

20  Q.  Now, this celebratory evening at the Four Seasons, did

21  that follow a long period of time during which any or all of

22  these individuals were frequently gone from Austin, Texas, to

23  your knowledge?

24  A.  Yes.

25  Q.  And do you know where they were during that time or what

54

*Albarado - Direct*

1   they were doing?

2   A.  Well, I didn't then.

3   Q.  Well, just what did you know then?

4   A.  Well, then, I know that basically after that pool party

5   that we had and a cook-out, the three gentlemen left and Judy

6   was still there, and they left as though they were just, you

7   know, going down the street to the store or whatever, but they

8   didn't come back.

9   Q.  For how long a time did they not come back?

10  A.  Well, they didn't come back for a general period of 30

11  days, though David, separately and also with Gary, came back

12  from time to time to Austin.

13  Q.  And during that time frame, that 30 days that they were

14  out of town except for periodic visits, did Mr. Waters ever

15  provide you with any cash to pay the bills or for any other

16  reason?

17  A.  Well, yes, he did.

18  Q.  And was Mr. Waters employed during this time frame?

19  A.  No, he wasn't.

20  Q.  Were you paying the rent on the apartment?

21  A.  Yes, I was.

22  Q.  You had a job?

23  A.  Uh-huh.

24  Q.  And where were you working?

25  A.  I was working then at the Poodle Dog Lounge.

1   Q.  And what capacity?

2   A.  I was a bartender, day bartender.

3   Q.  And at the same time that you were working at the Poodle

4   Dog Lounge, did you conclude your degree work at the

5   University of Texas?

6   A.  During that summer, I had one class at ACC, which I

7   transferred back to U.T.  But in December of '96, I received

8   my degree from U.T.

9   Q.  And that degree was in?

10  A.  It was bachelor of arts in English.

11  Q.  From University of Texas at Austin?

12  A.  Correct.

13  Q.  And Mr. Waters was not employed during that period of

14  time, during the time of the 30 days that he was gone?

15  A.  No.

16  Q.  And yet, he provided you money.  How much money?

17  A.  Well, he mailed me an envelope that contained about

18  $5,000.  And then, later in the month, he left -- he came to

19  Austin, actually, at some point, and I believe I was at work,

20  and he left me an envelope in my bedside stand that contained

21  $11,000.

22  Q.  So that's a total of $16,000 in cash you got from Mr.

23  Waters, who was unemployed during that month?

24  A.  That's right.

25  Q.  And did he offer any explanation or did you wonder where

*Albarado - Direct*

1   the money came from?

2   A.   Yes, I did, wondered where the money came from.

3   Q.   Did you make inquiry of Mr. Waters?

4   A.   Well, I asked him -- I think one time he said laughingly

5   to let me know that it was tongue and cheek that he was

6   gambling.

7   Q.   Okay.  And did you request for Mr. Waters' permission to

8   use any of these funds to purchase transportation, a new

9   vehicle or a used vehicle?

10   A.   Yes, I did.

11   Q.   And what type of vehicle did you purchase?

12   A.   Well, it was a -- I think it's an '85 Sierra short-bed

13   pickup truck.  GMC Sierra, that was -- you know, looks like an

14   old truck that was in really excellent condition.

15   Q.   Did that truck have a standard or automatic transmission?

16   A.   It had a standard.

17   Q.   And to your knowledge, did Mr. David Waters know how to

18   drive a vehicle with a standard transmission?

19   A.   No.

20   Q.   Was there a subsequent occasion after you purchased that

21   truck that Mr. Waters asked to borrow it from you?

22   A.   Yes.

23   Q.   What did he say on that occasion?

24   A.   Well, he said just to give him the keys and he was going

25   to leave the Camaro, and that I should not come out to the

*Albarado - Direct*

1   parking lot.

2   Q.  Was there anyone else with him that you could see at that

3   time?

4   A.  No.

5   Q.  Now, you mentioned a Camaro.  Do you know where Mr. Waters

6   obtained that Camaro?

7   A.  Yes, he obtained that Camaro in Peoria, Illinois, just

8   before we left.

9   Q.  And did he buy it or steal it?

10  A.  He stole it.

11  Q.  And did he -- well, how did he steal it, if you know?

12  A.  He --

13          MR. T. MILLS:  Excuse me.  Object to relevance.

14          MR. CARRUTH:  May we have sidebar?

15          THE COURT:  Yes.

16      (At the Bench, on the record.)

17          MR. CARRUTH:  Mr. Mills raised the issue a while ago

18  about David Waters' keys, and Mr. Tyson testified that he was

19  a locksmith, he knew keys could be duplicated.  I intend to

20  show, if the Court will permit, that Mr. Waters stole this car

21  by taking it for the test drive, duplicated the ignition key,

22  stealing it thereafter.  I think it's relevant in light of the

23  key testimony.

24          THE COURT:  Any objection?

25          MR. T. MILLS:  Lack of relevance to this conspiracy.

*Albarado - Direct*

1        THE COURT:  The objection's sustained.  Mr. Carruth,

2   let me interrupt you.  I'm going to give you your morning

3   break.  Try to be ready to come back in 15 minutes.  You're

4   not confined to the building.  You can go out for a little

5   fresh air, but be ready to come back in about 15 minutes.

6       (Recess.)

7        THE COURT:  You may continue, Mr. Carruth.

8        MR. CARRUTH:  Thank you, your Honor.

9   Q.  (BY MR. CARRUTH) Ms. Steffens, you've indicated that

10  during the approximately 30-day time period -- and I assume

11  that's going to be late August or September, we're talking

12  about, in 1995; is that correct?

13  A.  That is correct.

14  Q.  That Mr. Waters and Mr. Karr, Mr. Fry, the others were out

15  of town, to your knowledge?

16  A.  To my knowledge, they were just -- yes.

17  Q.  Did you ever see any or all of these individuals wearing

18  fanny packs?

19  A.  Yes.

20  Q.  Which of the three or four individuals did you see wearing

21  fanny packs?

22  A.  Gary, Danny and David.

23  Q.  Show you, Ms. Steffens, what's been marked for

24  identification as Government's Exhibit W77-50A, Government

25  W77-50B and W77-50C.  Do you recognize any or all of those?

*Albarado - Cross*

1   A.  Well, I recognize all of them.

2   Q.  Okay.  Where have you seen those before?

3   A.  Well, in the possession of the three men previously named.

4   Q.  Okay.  And were they also at a time stored in your

5   apartment that you shared with Mr. Waters after this event was

6   over?

7   A.  Yes.

8   Q.  We'd offer at this time Government's Exhibit W77-50A,

9   W77-50B, and W77-50C.

10          MR. T. MILLS:  No objection.

11          THE COURT:  Received.

12  Q.  (BY MR. CARRUTH) Ms. Steffens, I'd like for you now to

13  look at what's been marked Government's Exhibit W79-7 for

14  identification.  Tell me if you've ever seen this firearm in

15  this case.

16  A.  Well, this does appear to be the Browning that David and I

17  had.

18  Q.  And is that the same photograph, if you can tell, depicted

19  in the photographs at the firearm range or the same firearm in

20  W11-11 and W11-12?

21  A.  It appears to be.

22  Q.  And do you know what was done with that gun after it left

23  your apartment in Austin, Texas for the last time?

24  A.  Well, I believe it -- well, it was sent to his brother.

25  Q.  And that would be?

*Albarado - Cross*

```
 1   A.  Ron Waters.

 2   Q.  And where does Mr. Waters reside?

 3   A.  Peoria, Illinois.

 4   Q.  And was there a time that you and Mr. Waters traveled

 5   together from Austin, Texas to Peoria, Illinois to the

 6   residence of Mr. Ron Waters?

 7   A.  Yes.

 8   Q.  And during that visit, to your knowledge, did Mr. David

 9   Waters do anything to alter that gun in any way?

10   A.  Well, he took the inside barrel piece out.

11   Q.  And are you familiar with firearms?

12   A.  Kind of.

13   Q.  Could you check that weapon and tell me whether or not the

14   barrel is missing?

15   A.  Well, it appears to be.

16   Q.  Okay.

17   A.  Because it's a piece that fits inside that.

18   Q.  We would offer at this time, your Honor, W79-7.

19        MR. T. MILLS:  May I ask the witness one question

20   about identification, your Honor?

21        THE COURT:  You may.

22                    VOIR DIRE EXAMINATION

23   BY MR. T. MILLS:

24   Q.  Ms. Steffens, other than the fact that you can see that

25   this is a Nine Millimeter and that it is a Browning, is there
```

*Albarado - Cross*

1   any way for you to know if this is the exact gun that was

2   possessed by David Waters in 1995?

3   A.  Well, I would say that for one thing, I mean, I checked

4   the side because the other one was in a pawn shop, and it had

5   -- I believe it was left there, actually.  So I don't know if

6   that answers your question.  But I guess not unless I knew the

7   serial number or something, but it appears to be the same one.

8   Q.  Well, I don't object to it being offered as an example of

9   a Nine Millimeter Browning.

10          THE COURT:  It's being offered as an exhibit.  Do you

11   have an objection to it being offered as an exhibit?

12          MR. T. MILLS:  I will object on the grounds that there

13   is not a proper predicate that it was the gun that was

14   possessed by David Waters.

15          MR. CARRUTH:  I believe that goes to weight rather

16   than admissibility, and it will be connected with an

17   out-of-season officer.

18          THE COURT:  Well, the witness testified that in her

19   presence to her knowledge, the barrel was removed.  This one

20   has a barrel removed.  I will overrule the objection made to

21   the exhibit, and W79-7 will be admitted to be substituted by

22   an appropriate photograph at an appropriate time.

23          MR. CARRUTH:  Thank you, your Honor.

24

25                    DIRECT EXAMINATION (Resumed)

*Albarado - Cross*

BY MR. CARRUTH:

Q.   We can see that there clearly is no barrel in that gun; is that correct?

A.   That's correct.

Q.   It's been removed?

A.   That's correct.

Q.   Let's just take that out for demonstration purposes.  What I want you to do, Ms. Steffens, is to take this gun and see if you can fit it into any or all of the fanny packs which have been introduced in evidence before you if we can get the slide back on here.  Let me get my gunman here to do this.

          I'm going to place a rubber band here, Ms. Steffens, because without the barrel, it's hard to take the slide back.  I want you to take the gun, one at a time, and see if you can place it inside any or all of those fanny packs.

A.   It appears to fit neatly in the black one.

Q.   Can you identify the black one by its exhibit number, please?

A.   W77-50A.

Q.   All right.

A.   Did on the blue one.

Q.   The number of the blue one?

A.   W77-50C.  And also fits in W77-50B.

Q.   Thank you, ma'am.  Now, you testified in your earlier testimony that in addition to that Browning Nine Millimeter,

*Albarado - Redirect*

1  there were other firearms in the house which you described, I

2  believe, as a Jennings .380 caliber semiautomatic pistol, and,

3  I believe, a Reuger .357 Magnum.  And how long a barrel did

4  that Magnum have on it?

5  A.  The .357 was a snub-nosed.

6  Q.  In fact, I believe it's depicted in one of these

7  photographs previously admitted, is it not, laying on the

8  shooting bench?

9  A.  That's right.  It's a hammerless, snub-nosed, sort of a

10 polished --

11 Q.  I'm directing your attention to W11-12, which is the

12 photograph of Mr. Waters, holding with both hands in a firing

13 position, the Browning Nine Millimeter, and I ask you to look

14 over here to his left on the shooting table and ask you if you

15 can identify that chrome-plated gun with what appears to be

16 Blackmire grips or plastic grips?

17 A.  Yeah, that's mine.

18 Q.  That's the Reuger .357?

19 A.  Uh-huh.

20 Q.  And can you state for the record whether or not that

21 firearm, as well as the .380, are larger or smaller guns than

22 the Nine Millimeter Browning?

23 A.  The Reuger?  Whether the Reuger is the smaller?

24 Q.  The Reuger and the Jennings .380.

25 A.  Oh, yes, they're both smaller than the Browning, yeah.

*Albarado - Redirect*

1   Q.  And so if the Browning Nine Millimeter will fit in all

2   three of those fanny packs, is it not reasonable to conclude

3   that the other two guns would, likewise, fit in those fanny

4   packs?

5   A.  Yes.

6   Q.  Now, in addition to the $16,000 in cash which Mr. Waters

7   sent to you during that 30-day period that they were missing

8   from the Lamar Street apartment, did he ever send or show you

9   any jewelry subsequent to the end of the event?

10  A.  Yes.

11  Q.  And what type of jewelry?

12  A.  Well, I had a -- let's see.  It was a watch with, like,

13  Rhinestones on it, a matching gemstone ring, a tennis bracelet

14  that was really long, so it might have been an ankle bracelet.

15  I think another ring of some kind.

16  Q.  Okay.  In addition to those items of jewelry just

17  described, to your knowledge, during the time frame that Mr.

18  Waters was away from your apartment in September of 1995, to

19  your knowledge, did he purchase an automobile?

20  A.  Yes.

21  Q.  And what type of automobile did he purchase?

22  A.  It was a white Cadillac Eldorado.

23  Q.  Okay.  And had you ever seen that Cadillac Eldorado before

24  he left for this 30-day period of time?

25  A.  No.

*Simon - Direct*

1    Q.   Did he tell you how he came to acquire that car when he

2    didn't have a job?

3    A.   Well, no, not really.

4    Q.   Did you ever have occasion to drive that Cadillac during

5    September of 1995?

6    A.   Yes.

7    Q.   And for what purpose?

8    A.   He had taken the -- he came and substituted that car for

9    the Camaro.

10   Q.   Okay.  And this was in one of his many going and comings

11   during the month of September?

12   A.   Yes.

13   Q.   Did you have occasion to look in the trunk of that

14   automobile, that white Cadillac?

15   A.   Yes.

16   Q.   And what occasioned you to open the trunk?

17   A.   Well, I had purchased some items at the Pecan Street

18   Festival and to -- had gotten, like, a chair for my mom, and

19   opened the trunk, and I saw a couple of things in there that

20   were disturbing.

21   Q.   Kinds of things that one might not expect to find in a car

22   normally that has just been recently purchased?

23   A.   Yeah, I mean, the car was -- I mean, the trunk was clean

24   and empty except for these two items.

25   Q.   Could you describe these two items for the jury?

Simon - Direct

1   A.   Well, one was a shovel and another was a bow saw.

2   Q.   Now, did the bow saw appear to be new or used?

3   A.   It appeared to be new.

4   Q.   And do you recall the color?

5   A.   Orange.

6   Q.   And did the shovel appear to be new or used?

7   A.   It didn't appear to be brand new.

8   Q.   And was it a spade or a longhandled shovel, or how would

9   you describe it?

10  A.   Longhandled digging shovel.

11  Q.   I show you, first, Ms. Steffens, what's been marked for

12  identification as W77-38, and ask you if you can identify that

13  item for me, ma'am?

14  A.   This appears to be the bow saw that was in the trunk of

15  the Cadillac.

16  Q.   And what about W79-8?

17  A.   Well, that's the same type, at least, of shovel.

18  Q.   Thank you.  Did you say anything to Mr. Waters or inquire

19  about why these tools were in the back of that Cadillac he

20  just recently purchased?

21  A.   No.

22  Q.   Did he ever tell you where he purchased the Cadillac or

23  how he paid for it?

24  A.   No, he didn't.  He just said he got a good deal on it, and

25  he had to jump on it before Gary took it.

*Simon - Direct*

1  Q.  Now, during the 30-day time frame that these individuals

2  left, do you know what mode of transportation they were using?

3  A.  Well, part of the time the Camaro.

4  Q.  Okay.  That was Mr. Waters' Camaro that you previously

5  testified --

6  A.  Yes.

7  Q.  -- was acquired earlier?

8  A.  Yes.

9  Q.  And did any of the other men have any type of mode of

10  transportation, to your knowledge?

11  A.  Well, Gary had -- you know, I know he had a jeep of some

12  -- that he used.

13  Q.  Uh-huh.  Do you ever remember him getting a telephone call

14  from a Capps Rent-a-Van here in Austin?

15  A.  Yes.

16  Q.  And who were they inquiring about?

17  A.  Well, they left a message that Gary Karr should return the

18  van.

19  Q.  Okay.  During this same time frame, did Mr. Waters ever

20  ask you to rent a storage unit?

21  A.  Yes.

22  Q.  And did Mr. Waters tell you for what purpose he wanted you

23  to rent this storage unit?

24  A.  Not at the time that he asked me to rent it.

25  Q.  And did you, in fact, sign a contract for the lease or

Simon - Direct

1  rental of a storage unit here in Austin, Texas at the request

2  of Mr. Waters?

3  A.  Yes, I did.

4  Q.  And I'm showing you what's been marked for identification

5  as Government's Exhibit W54-1, and I'll ask you to remove that

6  from the envelope and examine its contents, please, ma'am.

7  Does that appear in any way familiar to you, ma'am?

8  A.  Well, yes, this is the contract that I signed when I

9  rented the unit.

10 Q.  Does it have your signature on it anywhere, your name or

11 address?

12 A.  Yes, it has my signature --

13 Q.  Okay.

14 A.  -- in two places.

15 Q.  We would offer at this time Government's Exhibit No.

16 W54-1.

17         MR. T. MILLS:  No objection.

18         THE COURT:  Received.

19 Q.  (BY MR. CARRUTH) And now that this is in evidence, would

20 you please tell the jury where the storage unit was located

21 and what the terms of the rental were?  In other words, was it

22 a long-term rental, and so forth?

23 A.  Well, the storage units are the ones across from the bar

24 that I worked, which is the Burnet Road Storage, and I think I

25 paid for a month or two in advance, but it wasn't a -- a

*Simon - Direct*

1   month, I guess, in advance.

2   Q.  Now, storage units come in several different sizes, do

3   they not?

4   A.  Yes.

5   Q.  Relatively speaking, would this be a small, medium or

6   large-size storage unit, if you know?

7   A.  Small.

8   Q.  And when you say small, about the size of this witness box

9   in dimensions?

10  A.  Yeah, about the size of a home closet.

11  Q.  A home closet.  And did you have to purchase or rent a

12  lock to put on that storage unit, or did they provide you with

13  a lock?

14  A.  No.  I had to purchase a lock, and I purchased a lock at

15  H.E.B. on Burnet Road.

16  Q.  And to your knowledge, was that a Master Lock?

17  A.  Yes.

18  Q.  With a long shank?

19  A.  Yeah, it was a long shank that passed through.

20  Q.  And did Mr. Waters tell you why he wanted -- or what he

21  intended to put in that storage unit?

22  A.  At that point or at a later date?

23  Q.  At any time?

24  A.  At a later date, he did say that he was going to put a

25  suitcase with a half a million dollars in gold coins in that

*Simon - Direct*

1  locker.

2  Q.  Now I'm showing you what's been marked for identification

3  now as Government's Exhibit W11-6, which is a collage of six

4  photographs, and I'll ask you if you recognize that as being

5  the particular storage locker that you rented at the Burnet

6  Self-storage that you previously identified from the rental

7  contract?

8  A.  Yeah.

9  Q.  And in the lower right-hand corner, I believe there's a

10  photograph of the Poodle Dog Lounge where you worked; is that

11  correct?

12  A.  Yes.

13  Q.  And this storage unit, as you can see from the picture at

14  the top, is directly across from the street from the Poodle

15  Dog Lounge?

16  A.  It is.

17  Q.  We would offer Government's W11-6, your Honor.

18      MR. T. MILLS:  No objection.

19      THE COURT:  Received.

20  Q.  (BY MR. CARRUTH) And this is various pictures of the

21  storage unit and this one's 1640.  Does that correspond to the

22  one that you rented and placed the padlock upon?

23  A.  Yes, it is.

24  Q.  And Mr. Waters told you, at a subsequent time, he was

25  going to put half a million dollars in gold coins in that

*Simon - Direct*

1  storage unit; is that correct?

2  A.  That's correct.

3  Q.  What did you do to the keys to the padlock that you

4  purchased for that storage unit?

5  A.  I gave them to David.

6  Q.  And when is the next occasion, if any, that you had to

7  return to that storage unit for any purpose?

8  A.  Well, on the same day of the day that we stayed at the

9  Four Seasons, David called me.  I was at home at the apartment

10 alone -- I was taking a shower, actually.  David called me and

11 frantically said that I should go over to the storage unit

12 because it was empty, that he had gone there and the lock was

13 off, it was standing open, that it was empty and he wanted me

14 to go over and see if, you know, if I had -- maybe hadn't paid

15 the rent on it.

16 Q.  Were you fearful that David Waters might think you had --

17 A.  Yeah.

18        MR. T. MILLS:  Objection to leading.

19 Q.  (BY MR. CARRUTH) Well, why were you concerned?  I

20 noticed --

21 A.  Well, I was concerned because he told me that he had put a

22 half a million dollars in gold coins in there, and it was

23 empty.

24 Q.  Did you have any reason at that time to be fearful of Mr.

25 Waters?

*Simon - Direct*

```
 1   A.  Well, yeah.
 2   Q.  Had he ever assaulted you or caused physical injury to you
 3   at any time prior to that when you lived together?
 4   A.  Yes.  But anyway, he said to get over to the unit, and so
 5   I went in -- well, first -- he called me from the Poodle Dog.
 6   And so I met him at the parking lot of the Poodle Dog, and he
 7   said -- he went over there, the unit was empty, and then, I
 8   should go over there and ask him what was going on.  You know,
 9   maybe tell them that it was some precious items of my father's
10   that were in there and did they confiscate them or something.
11        So I went over there and inquired, and they said,
12   well, you know, when the man made his rounds, the lock was on
13   and there was no disturbance noted.  But I looked in the unit
14   and it was standing open and it was empty.
15   Q.  But Mr. Waters had a key to that unit, did he not?
16   A.  Yes, he did.
17   Q.  And so he could have unlocked it and left the door open
18   before he called you, couldn't he?
19   A.  Right, which was my assumption when he disappeared for
20   several hours and didn't call me back and say, what did you
21   find out, or anything that you would think would be
22   reasonable.
23   Q.  And let me make sure that we understand your testimony.
24   Mr. Waters asked you to inquire of the management of the
25   storage facility whether there had been a reported break-in or
```

Simon - Cross

1  if anything had been taken out, you know, by the management

2  company; is that correct?

3  A.  Right, that is correct.

4  Q.  And you learned that that was not the case, correct?

5  A.  That's not the case according to the management.

6  Q.  Okay.  Now, did -- you mentioned gold coins.  Did David

7  Waters, after the 30-day absence, ever give you one or more

8  gold coins?

9  A.  He gave me a gold coin.

10  Q.  And can you tell the members of the jury if you know what

11  type of coin that was?

12  A.  Well, I don't know the technical name for it, but it was,

13  you know, the lady in the flowing dress.

14  Q.  Did it have an American eagle on the back or on the front?

15  A.  I guess that's what it was.

16  Q.  And what did you do with that gold coin that Mr. Waters

17  gave you?

18  A.  Well, I tried to hang on to it for a while, but

19  eventually, I put it in the pawn shop.

20  Q.  And was that a pawn shop here in Austin, Texas?

21  A.  Doc Holiday.

22  Q.  Ms. Steffens, I'm going to ask you to take a look at

23  what's been marked for identification as Government Exhibit

24  W12-1, and ask if you recognize that as a photocopy of a pawn

25  ticket signed by yourself for Doc Holiday's, here in Austin,

*Simon - Cross*

1   on North Lamar?

2   A.   Yes.

3   Q.   We'd offer Government's Exhibit W12-1, your Honor.

4        MR. T. MILLS:   No objection.

5        THE COURT:   Received.

6   Q.   (BY MR. CARRUTH) And does that pawn ticket reflect the

7   subject of what was pawned?

8   A.   Yes.

9   Q.   What does it say?

10  A.   It says coin, one-ounce something, dollar, 1993, and then,

11  it gives the grams of weight, which it looks like 33.8.

12  Q.   So a one-ounce gold coin was pawned by you on what date,

13  ma'am, according to that?

14  A.   September 17th of '96.

15  Q.   And did you ever reclaim that gold coin from the pawn

16  shop?

17  A.   No.

18  Q.   You mentioned earlier in your testimony that there was

19  another Nine Millimeter that was also in the pawn shop.  Can

20  you briefly explain that for us, ma'am?

21  A.   Well, David had purchased a -- aside from the one that I

22  purchased, David purchased a basically identical Nine

23  Millimeter from what he described as an off-duty police

24  officer, and that was put in the pawn shop, also --

25  Q.   Okay.

*Roufa - Direct*

1    A.   -- at various times.

2    Q.   Okay.  And were any other items of property pawned by you

3    subsequent to the event that occurred in September of 1995

4    besides the gold coin and one of the guns?

5    A.   Well, I pawned personal items.  David also had me pawn a

6    man's gold and stainless Rolex watch band.

7    Q.   And that was subsequent to the event of September the

8    1995?

9    A.   I believe so.

10   Q.   During this time frame, you've told us that Mr. Waters

11   gave you $16,000 in cash and bought a Cadillac.  Did any of

12   the other individuals that you've mentioned, Mr. Karr, Mr.

13   Osborne, or Mr. Fry give you any money or funds to wire

14   transfer for them?

15   A.   Well, Gary asked me to wire transfer --

16   Q.   Excuse me, but could you use his last name, Mr. --

17   A.   Mr. Karr did ask me to wire transfer a sum of money for

18   him.

19   Q.   And that's Mr. Karr, the defendant here, correct?

20   A.   Yes.

21   Q.   And to whom did he want this money wire transferred?

22   A.   I believe it was to his daughter.

23   Q.   Okay.  And do you know would that be Crystal Karr?

24   A.   That sounds right.

25   Q.   And do you know -- do you recall where she was living?

*Roufa - Direct*

1   A.   San Diego.

2   Q.   Okay.  Let me show you two exhibits marked W41-2 and W41-3

3   and 4.  And if you need to, take those out and look at them,

4   please, ma'am, and see if that refreshes your memory regarding

5   any of the wire transfers during this time period we're

6   talking about.

7   A.   Well, this appears to be when they transferred from the

8   H.E.B. on Burnet Road, which was near my work.  Well, now,

9   this -- this was to pay off a car that had been repossessed

10  that we had purchased when we were in San Antonio.

11  Q.   And did those records help refresh your memory regarding

12  any wire transfers that you sent during the relevant time

13  period?

14  A.   Yes.

15  Q.   And one of those was a wire transfer from Mr. Karr, the

16  defendant?

17  A.   That's correct.

18  Q.   And to whom was that wire transfer sent again?

19  A.   Crystal Karr.

20  Q.   And what was the amount of money sent?

21  A.   $2,092.95.  The 92.95 may have been a fee, but it was

22  $2,000 principal.

23  Q.   Now, to your knowledge, was Mr. Karr employed in Austin,

24  Texas, or elsewhere, during the month of September 1995 and

25  prior to that when he was staying at your apartment in August

*Roufa - Direct*

1    1995?

2    A.  Well, before he came, I was under the impression he was

3    employed while he was in Austin.  He wasn't working.

4    Q.  Okay.  Well, what did the fellas do when they hung out at

5    your apartment if none of them were working?

6    A.  Well, they played video games.

7    Q.  But none of the men had a job?

8    A.  Right.

9    Q.  Mr. Fry didn't have a job?

10   A.  No.

11   Q.  Mr. Karr didn't have a job?

12   A.  No.

13   Q.  Mr. Waters didn't have a job?

14   A.  No.

15   Q.  And how about Mr. Osborne?  Did he have a job to your

16   knowledge?

17   A.  I don't think he had a job either.

18   Q.  And what was the date of that wire transfer of $2,000 to

19   Charlene Karr?

20   A.  10-2 of '95.

21   Q.  October the 2nd of 1995?

22   A.  Yes.

23   Q.  Ms. Steffens, I'm showing you now what's been marked for

24   identification as Government's Exhibit W7-31 and W7-32, and

25   I'll ask if you've ever seen either of those items before?

*Roufa - Direct*

1    A.   Yes.

2    Q.   I'm sorry, 77, I'm told, is the exhibit number.

3    A.   77.

4    Q.   W77-31 and W77-32.  Where have you seen those items before

5    and when did you last see them?  Or when did you first see

6    them, I should say?

7    A.   Well, Danny had made friends with -- Danny Fry had made

8    friends with a woman that owned the Reel and Graphics, and she

9    had given Danny some, you know, like, misprinted T-shirts and

10   things, and this is a T-shirt that Danny owned.

11   Q.   And do you recognize those torn pieces of a T-shirt --

12   A.   Yeah.

13   Q.   -- as having been associated in any way with Mr. Danny Fry

14   during his lifetime?

15   A.   Yeah, Danny Fry owned that T-shirt, and he was wearing it

16   at the last time I saw him.  And then, subsequent to that,

17   David Waters was cutting it up into little pieces in our

18   apartment, and he used it to polish his shoes and clean his

19   glasses.

20   Q.   We would offer, your Honor, what's marked as Government's

21   Exhibit W77-31 and 32.

22         MR. T. MILLS:  No objection.

23         THE COURT:  Received.

24   Q.   (BY MR. CARRUTH) Would you take those out of the plastic

25   cover and hold them up for the jury to see, please, because

1   they're quite distinctive, are they not?

2   A.   Yeah, sort of a caricature of Texas.  Just spots of

3   interest.  Both of them?

4   Q.   Please, ma'am.  Now, the one you're holding up now appears

5   to have shoe polish or some substance on it; is that correct?

6   A.   Yeah.

7   Q.   And the last time you saw Danny Fry, he was wearing that

8   T-shirt?

9   A.   Yes.

10  Q.   Can you tell us about the last time you saw Danny Fry?

11  A.   Well --

12  Q.   We saw the pictures earlier of him swimming in the pool

13  with the child.  Was that before or after the 30-day absence

14  in September?

15  A.   Well, that was before.  That was, like, the last day that

16  they were in Austin.

17  Q.   Okay.

18  A.   Approximately, or a couple of days.  And when I saw Danny

19  again, they were all three at the apartment.

20  Q.   Now, please identify them for the record when you say "all

21  three."

22  A.   David Waters, Gary Karr and Danny Fry.

23  Q.   And how were they relating to one another on that

24  occasion?

25  A.   Well, Danny looked like he didn't feel good at all.  He

*Roufa - Redirect*

 1   was really down.  And Gary was just Gary.  And David seemed

 2   very business-like, and, you know, David and Gary, I had the

 3   impression they were okay with each other.  But David said

 4   something, which I don't recall what he said, but I just

 5   remember his tone of voice was, you know, very hateful toward

 6   Danny.

 7        And anyway, it was the last day that my mom was there.

 8   And she and I went to breakfast -- well, see, I don't recall

 9   the precise chronology of the situation, but somehow we went

10   to breakfast, and it so happened that David, Danny and Gary

11   were there eating breakfast, quite by coincidence, and it was

12   before I was to take my mom to the airport.

13        And so we all ate breakfast together -- well, David

14   sat at our table, and Gary and Danny sat at another table.  We

15   ate breakfast, and I think that Gary paid for it all.  And I

16   took my mom to get her some perfume, and I took her to the

17   airport.

18        We came back to the house.  Again, Danny had -- he had

19   seemed like he was sick and he laid down on the couch, which

20   was like a Futon, and I covered him up with a blanket, and he

21   closed his eyes and he just kind of smiled.  And I left to do

22   some errand, and I came back and he was --

23   Q.  He was what, ma'am?

24   A.  Well, he was sitting on our little veranda thing out

25   front.

Houston - Direct

1    Q.   At any point during that time period, did he ask you to

2    pack his luggage for him, or did you agree to do that?

3    A.   Yes, he had asked me to pack up his stuff, and I had the

4    impression he was going back to his home.

5    Q.   And his home was where, ma'am?

6    A.   Florida.

7    Q.   Okay.  Do you know where in Florida?

8    A.   Actually, no, not offhand.

9    Q.   Okay.  And he had been staying with you for how long a

10   period of time?

11   A.   Well, that would have made two months.

12   Q.   He came in July?

13   A.   He came in July.  He stayed about a month and Gary came

14   about, maybe, midway into Danny's visit, and they were just

15   all there at the apartment.

16   Q.   Okay.

17   A.   And so then, they were all gone for 30 days, and then,

18   when I saw them again, as I said, Danny seemed like he was

19   really sick and down.  He seemed very, very down.

20   Q.   And did Mr. Waters and Mr. Karr appear to be getting along

21   at that point?

22   A.   Yeah, they seemed to be getting along just fine.  Danny

23   definitely seemed like the odd man out.  And so anyway --

24   Q.   Did you pack Mr. Fry's belongings in anticipation of his

25   departure?

*Houston - Direct*

1   A.   Yes, I did.  I packed his stuff very, very neatly.  And he

2   had purchased some stuff because he was just crazy about his

3   daughter.

4   Q.   How old was his daughter, ma'am, do you know?

5   A.   I think 16.  Maybe, 16 or something.  He talked about her

6   all the time.

7   Q.   And to your knowledge, had he maintained contact with his

8   family by telephone during the time he was staying at your

9   house?

10  A.   Yes.  Yeah, he was always, always on the phone, always.

11  The man just never stopped talking.

12  Q.   Did he mention anything about his daughter celebrating a

13  birthday?

14  A.   He did say that it was her birthday and he was going to

15  have to call her or something, and he had -- he had gotten

16  some things for her, you know, like, I think he had gotten a

17  couple of T-shirts from Freeland's and a souvenir cup of

18  Texas.

19          So anyway, I packed his stuff, and David had given him

20  a bunch of old shoes of his.  And I packed his stuff and he

21  had more stuff than when he came.  And he had asked me to

22  throw away a couple of things.  So anyway, I did this.  I

23  packed all his stuff very neatly, and he had all these extra

24  shoes and stuff.  So I put those in, like, cold food bags,

25  like paper bags with handles.

*Houston - Direct*

1      And so his stuff was packed.  And I came back from --

2   maybe it was from taking mom to the airport, and he was

3   sitting on the front -- you know, we had a little cubby in

4   front of our apartment door.  We had chairs out there.  And he

5   was sitting out there and he looked so -- just, you know, just

6   really horror-stricken, like something was just waiting upon

7   him.

8      You know, this guy is, like, just super bubbly,

9   extremely bulliant, you know, just always happy, always

10  talking.  You know, and he just looked like it was just the

11  worst.  It just filled me with the worst feeling.  So anyway,

12  I asked -- I was going to go to the store, and I asked him if

13  he needed anything from the store.

14      And so I left.  He said no.  And I asked him if he

15  just wanted to ride along.  Then, he said no.  So anyway, I

16  went to the store, and I came back and nobody was there.

17  Q.  All three of the men were gone when you returned from the

18  store?

19  A.  Yeah.

20  Q.  Were Danny Fry's belongings still in the apartment?

21  A.  No.  Well, yes and no.  I mean, his stuff was like it had

22  been thrown away.

23  Q.  Ransacked, gone through?

24  A.  Well, not just gone through, but like there was a garbage

25  bag with some of his stuff in it.  His suitcase was empty.

*Houston - Direct*

1   Q.  How about his souvenir mugs that he had purchased?

2   A.  The souvenir mug was sitting on a bookshelf.  I went into

3   the room.  I was just, like, drawn into that room and I looked

4   and I just looked at his stuff, and I thought, oh, no.

5   Q.  Did you have a bad feeling at that moment, ma'am?

6   A.  The worst.  I mean, I knew he wouldn't leave and leave,

7   like, his daughter's birthday gifts behind.

8   Q.  Do you need a moment to regain your composure?

9   A.  Yes.

10  Q.  Could we have a brief recess, your Honor?

11  A.  Well, no.  It's okay.

12  Q.  Ms. Steffens, when was the next time you had occasion to

13  see Mr. David Waters or Mr. Gary Karr after the event you've

14  just described?

15  A.  Well, I walked out of the apartment because I just -- I

16  felt so oppressed, and it's like they were coming back.  I

17  walked out toward the mailboxes, which is, you know, down the

18  stairs and out toward the parking lot.  And I saw -- you know,

19  they were, like, coming back from, like, toward the dumpster.

20  And --

21  Q.  Had they been gone for a period of time, like, overnight

22  or day or --

23  A.  Well, sometimes -- yeah, I mean -- yeah, I think they were

24  gone.  After I saw the stuff was gone, they had been gone

25  overnight.  I mean, they were gone so much sometimes it's hard

*Houston - Direct*

1    for me to get it straight.  They were -- they had been gone

2    overnight the night before.  But the next time I saw them,

3    they were walking back from the -- and I don't know if it was

4    right then.  They were walking back from the dumpster, sort of

5    ha, ha, laughing, cheerful, they were very clear of.

6    Q.  And did you hear Mr. Karr make any comments to Mr. Waters

7    regarding a map?

8    A.  Yeah, he said, you know, he was teasing him about not

9    being able to read a map.

10   Q.  Mr. Karr was teasing Mr. Waters about not being able to

11   read a map?

12   A.  Yeah.

13   Q.  At that time, did you notice any wounds, marks or bruises

14   on the arms of either Mr. Waters or Mr. Karr?

15   A.  David had a short-sleeve black shirt on, and his arms were

16   covered with fingerprint bruises, fingerprint, deep

17   fingerprint bruises.  And I said, "What happened to you?"  And

18   he said, "Oh, just boys horse playing."

19   Q.  And did you ask him what happened to Mr. Fry?

20   A.  Yeah, he said he left with some guy.

21   Q.  You never saw Mr. Fry again?

22   A.  No.  I handed him his empty suitcase, and I said, "What's

23   this?  Get this out of here."  And I said to Gary -- I said,

24   "Is this your cup?"  He said, "No, it wasn't."  He said, "No."

25   I said, "Get this stuff out of here."

*Houston - Direct*

1   Q.  How long did Mr. Karr remain at the Austin apartment with

2   you and Mr. Waters after Mr. Fry disappeared?

3   A.  Well, he didn't -- it's like they went back to Florida

4   after we stayed at the Four Seasons.

5   Q.  This is the overnight stay that you've just described

6   where Charlene Karr came down with Mr. -- to stay with Mr.

7   Karr and you stayed with Mr. Waters at the Four Seasons Hotel?

8   A.  Right.

9   Q.  And paid for it in cash?

10  A.  David did anyway.

11  Q.  Okay.  And when was the next time after Mr. Karr and

12  Charlene Karr left Austin to drive back to Florida that you

13  had an occasion to see either one of them again?

14  A.  Mr. Karr, you mean?

15  Q.  Uh-huh.

16  A.  Well, it doesn't seem like it was very long.  It seemed

17  like when he came back almost immediately.

18  Q.  Okay.  Within a matter of days?

19  A.  It seems like it.

20  Q.  Okay.  Now, did you know that Mr. Danny Fry had a brother

21  living in Florida?

22  A.  I think I had a vague sense that he had a relative there,

23  yeah.

24  Q.  Did you ever receive any phone calls from the Fry family

25  inquiring about why Mr. Karr had not returned home?

*Houston - Direct*

1    A.   Mr. Fry?

2    Q.   Mr. Fry.  I'm sorry.  From the Fry family.

3    A.   Yeah.  I mean, his daughter called, his girlfriend called.

4    And I didn't speak to the brother, but I know at some point

5    later, the brother called several times.

6    Q.   Who spoke with the brother?

7    A.   David.

8    Q.   Mr. Waters?

9    A.   Yes.  You know, I didn't -- wouldn't take their calls

10   after that because, you know, I couldn't, in good conscience,

11   keep telling his daughter that he had gone to Mexico and left

12   her behind.

13   Q.   It upset you, then, as it does now; is that correct, Ms.

14   Steffens?

15   A.   (Moving head up and down.) Very much.

16   Q.   During this same period of time, did you and Mr. Waters

17   have an occasion to travel together by motor vehicle from

18   Austin, Texas to Florida to visit with Mr. Karr?

19   A.   Yes.

20   Q.   And approximately how long after the event you've

21   described when Mr. Fry disappeared would that have been, to

22   your knowledge?  Let me see if I could refresh your memory

23   with Government's Exhibit W11A-1.  Do you recognize your

24   signature on that exhibit, please, ma'am?

25   A.   Yes.

*Houston - Direct*

1    Q.  And is that a hotel receipt that you signed, charged for

2    on your credit card?

3    A.  Actually, we paid cash, and it was a receipt where we

4    stayed in New Orleans on the way back from Florida.

5    Q.  But you signed that.  That is your signature?

6    A.  Yes.

7    Q.  We would offer at this time Government's Exhibit W11A-1.

8         MR. T. MILLS:  Let me have it.  No objection.

9         THE COURT:  Received.

10   Q.  (BY MR. CARRUTH) Now that this exhibit is in evidence,

11   take it out and look at the second page, please, ma'am, and

12   describe for the jury what that exhibit is about.

13   A.  Describe what it's about?

14   Q.  Uh-huh.

15   A.  Well, we went to Florida.

16   Q.  Well, it's a hotel receipt.

17   A.  This is a hotel receipt.

18   Q.  Does it tell when you checked into the hotel and when you

19   checked out?

20   A.  Well, on 10-10-95, we checked in.  On 10-11-95, the next

21   day, we checked out.

22   Q.  And that was going or coming?

23   A.  This was returning.

24   Q.  Returning to Florida?

25   A.  To Texas from Florida.

*Houston - Direct*

1   Q.  And approximately how long, if you know, had you and Mr.

2   Waters stayed in Florida visiting Mr. Karr and Charlene Karr?

3   A.  Just two or three days.

4   Q.  Okay.  And during that time that you were in Florida, did

5   Mr. Karr and Mr. Waters ever leave for a period of several

6   hours?

7   A.  Yes.

8   Q.  And do you know where they went during that time?

9   A.  No, I mean, he didn't tell me.

10  Q.  Do you know where New Port Richey, Florida is located?

11  A.  Well, vaguely.

12  Q.  Okay.

13  A.  I mean, that's where we were, I think.

14  Q.  That's where Mr. Karr was staying at that time, New Port

15  Richey?

16  A.  I believe so, yes.

17  Q.  And have you ever been to Naples, Florida?

18  A.  No.

19  Q.  Do you know anyone who lived at that time in Naples,

20  Florida?

21  A.  Well, I know David formerly lived there, and it's possible

22  that that's where Danny lived, but I'm not sure.

23  Q.  In fact, isn't that where Mr. Waters met Mr. Fry?

24  A.  Yes.

25  Q.  He lived in Florida at an earlier time?  And so Mr. Waters

*Houston - Direct*

1   and Mr. Fry -- excuse me.  Mr. Waters and Mr. Karr were gone

2   and left you and Charlene Karr in New Port Richey?

3   A.  Yeah, actually, Charlene was working.

4   Q.  Okay.

5   A.  And that particular day, I was supposed to pick her up

6   from work when she got off work, and so it was just me alone.

7   So I sort of just drove up and down, you know, the strip and

8   sort of saw the sights, and then, I picked her up.

9   Q.  Now, what type of car were you in, ma'am?

10  A.  We were driving the Cadillac, the Cadillac that David had

11  purchased.

12  Q.  And so, if Mr. Waters left with Mr. Karr, who was driving,

13  if you know?

14  A.  Gary.

15  Q.  Gary being Mr. Karr?

16  A.  Mr. Karr was driving.

17  Q.  And what mode of transportation was he using, if you know?

18  A.  Like a little jeep.

19  Q.  Okay.  So Mr. Waters and Mr. Karr left in Mr. Karr's jeep

20  and were gone for how long, to your knowledge?

21  A.  Hours.

22  Q.  Several hours?

23  A.  Yeah.

24  Q.  Do you know how far it is from New Port Richey to Naples,

25  Florida?

*Houston - Direct*

1    A.   No, I don't.  Probably not that far.

2    Q.   Okay.  And did they tell you when they returned where they

3    had been during those several hours they had been away?

4    A.   No.

5    Q.   Did you inquire?

6    A.   No.

7    Q.   Did David Waters or Gary Karr ever tell you where they had

8    been during the 30 days that they were absent from your

9    apartment in Austin?

10   A.   No.

11   Q.   Did you inquire?

12   A.   Well, not really.  I mean, David didn't really tell me

13   stuff.  He thought I was a coward when it came to crime.

14   Q.   Okay.  Now, let me ask you this:  Did there come a time

15   after the men returned from being gone from Austin in

16   September 1995 when you were accompanied or asked to drive Mr.

17   David Waters to a storage unit, here in Austin, other than the

18   storage unit you just described in which the gold was stolen?

19   A.   Yes.

20   Q.   And do you happen to recall the name of that storage unit?

21   A.   I think it's Public Storage.  It's up on North Lamar

22   across Research, just across Research.

23   Q.   Ms. Steffens, I'm showing you what's been marked for

24   identification as Government's Exhibit W55-4.  Do you

25   recognize the photograph depicted in that exhibit?

*Houston - Direct*

1   A.   Yeah.

2   Q.   Is that the storage unit that you've previously described?

3   A.   It certainly appears to be.

4   Q.   Offer Government's W55-4 for the record, your Honor.

5        MR. T. MILLS:  No objection.

6        THE COURT:  Received.

7   Q.   (BY MR. CARRUTH) Now, Ms. Steffens, to your knowledge, was

8   this storage unit at Public Storage larger or smaller than the

9   one you had rented in which the gold coins were placed?

10  A.   It was much larger.

11  Q.   Large enough to drive a vehicle in?

12  A.   Yeah.

13  Q.   And had you ever been to that storage unit before?

14  A.   No.

15  Q.   Did you know anything about who rented that storage unit?

16  A.   Not then, no.

17  Q.   Well, in fact, had you not had a visit from Chico Osborne

18  earlier?

19  A.   Yes.

20  Q.   And please tell the jury about that transaction.

21  A.   Well, David Waters told me to give -- that Chico was going

22  to come.  Mr. Osborne was going to come by the apartment, and

23  I was to give him an envelope with -- I think the sum was

24  $700.  I was not to let him into the apartment nor was I to

25  allow him to use the telephone.

*Houston - Direct*

1          I did follow these directions.  I didn't know what it

2    was for.  I didn't ask.  And then, sometime later, Chico

3    returned to the apartment and I was at work, I think, and my

4    mother was there and she accepted an envelope from him.  But

5    as I had told her, don't let him come into the apartment and

6    she said that he asked to use the phone, and she said no, as

7    per my instructions to her.

8          So she took the envelope from him, laid it on the

9    dresser and that was -- that's the sum total of that.

10   Q.   Did you ever open or look into that envelope to examine

11   its contents?

12   A.   No, I didn't.

13   Q.   Do you know what became of that envelope?

14   A.   David took it.

15   Q.   Okay.  Now, you've mentioned your mother on a couple of

16   occasions during your testimony.  For approximately how long a

17   time was your mother visiting with you in Austin in 1995?

18   A.   I think it was ten days or two weeks.

19   Q.   And did she have an accident or a medical emergency while

20   she was there which required her to seek medical attention?

21   A.   Yeah, like, the second day she was there, she broke her

22   ankle.

23   Q.   Okay.

24   A.   She stepped off of -- you know, the sidewalk was up here,

25   and then, it was like a little ditch thing and she broke her

1    ankle.  So we had to take her -- I had to take her to the

2    emergency room.

3    Q.  Do you remember which emergency room you took her to?

4    A.  I think it was Seton.

5    Q.  Okay.  And as a result of that, I guess your mother was

6    not very ambulatory for the time she was here?

7    A.  No, unfortunately.

8    Q.  Was she walking on crutches or using a wheelchair or

9    walker?

10   A.  She was walking on crutches, but, you know, we lived on

11   the second floor.  So we didn't go out much after that.  So

12   she was at home a lot.

13   Q.  How many bedrooms did that apartment have that you and Mr.

14   Waters were staying in?

15   A.  Two.

16   Q.  Where was everybody staying or sleeping physically when

17   all of the three men and you and Mr. Waters and your mother

18   were there?

19   A.  Well, the three men were not there when my mother was

20   there.

21   Q.  Okay.  Your mother was there during the time that they

22   were gone for 30 days?

23   A.  Correct.

24   Q.  But you said in earlier testimony, if I understood you

25   correctly, that you and your mother had gone out for lunch or

*Houston - Direct*

1   breakfast on the morning that she was to leave, and you

2   encountered the three men, Mr. Waters, Mr. Karr, Mr. Fry, in

3   the same restaurant.

4   A.   Uh-huh.

5   Q.   But that was after they had returned from the 30-day

6   absence?

7   A.   Yeah, that was the first time that I -- that they

8   returned, all together.

9   Q.   And at that time, was that the same day your mother flew

10  back home?

11  A.   I believe so.

12  Q.   Okay.  How did the men appear for the first time when they

13  returned from the absence?  Tired?  Refreshed?  Anxious?

14  Happy?

15  A.   Well, David Waters had lost a lot of weight.  Seems to me

16  that he had grown some sort of beard thing.  They seemed --

17  well, they seemed worn-out.  And Danny seemed -- well, he

18  seemed sort of okay at the breakfast thing, but later, he had

19  seemed just awful.

20  Q.   But none of the men ever spoke to you or in your presence

21  and told you where they were and what they were doing during

22  that 30-day absence?

23  A.   No.

24  Q.   I'd like you to take a look at Mr. Karr, over here at the

25  defendant, and tell us if he appears the same today as he did

*Houston - Direct*

1   when you saw him after returning from that absence.

2   A.  Well, he's much thicker now.  He used to be kind of on the

3   skinny side.

4   Q.  Okay.  And did he have any facial hair?

5   A.  I think he had a mustache then.  He seemed like he usually

6   wore a mustache.

7   Q.  Okay.  Now, we were getting back to this storage unit.

8   And before we get to that, let me -- we now have an exhibit we

9   didn't have earlier.  When you described the gold coin that

10  Mr. Waters gave you that you hocked at Doc Holiday's, I'm

11  going to ask you to take a look at Government's Exhibit W57-2,

12  and tell us if any of those gold coins appear to be similar to

13  the one that you hocked on that occasion that you received

14  from Mr. Waters.

15  A.  This with the lady on it.

16          MR. CARRUTH:  Your Honor, we would offer W57-2 at this

17  time.

18          MR. T. MILLS:  May I ask a question?

19          THE COURT:  Uh-huh.

20          MR. T. MILLS:  Are these -- I have no objection.

21          THE COURT:  All right.  It's received.

22  Q.  (BY MR. CARRUTH) Now that that exhibit is in evidence,

23  let's hold it up here for the jury, and if you could show the

24  jury which of the three different types of coins is the one

25  that Mr. Waters gave you and that you subsequently pawned at

*Houston - Direct*

1    Doc Holiday's here in Austin.

2    A.   This is the one I'm thinking.

3    Q.   That's the one with the walking liberty and the eagle on

4    the back, or vice versa.

5    A.   Uh-huh.

6    Q.   Now, let's get back to this second storage unit, if we

7    could, ma'am.  Public Storage.  A larger storage unit.  What

8    occasioned you to personally go visit or to take Mr. Waters to

9    that storage unit?

10   A.   Well, it was sometime later, after the 30-day thing, and

11   he said, "Let's take a ride."  And so -- which was not unusual

12   for him to just, you know, give you an instruction, "We're

13   going to go, let's go here," you know, and never tell you

14   what's going on.

15        So I drove -- you know, where do I go?  So he directs

16   me to this Burnet -- not Burnet Road, but this Public Storage

17   unit.  And he had put a spray bottle in the back or there was,

18   you know, a spray bottle in the back of the truck.  So it was

19   the truck I was driving.

20        So I drove him out there and he says -- we go into the

21   storage units to the gate of the units, and he instructs me to

22   pull a bit forward of a particular garage door, you know, size

23   storage unit, and instructed me to stay in the vehicle and I

24   was to pull a little bit forward of it so I couldn't see

25   inside.

1          And so he gets the spray bottle out and he's inside

2   for, maybe, five, ten minutes, and he gets back in the truck.

3   And I can smell a faint odor of bleach.  And --

4   Q.  Are you familiar with the odor of bleach, ma'am?  Do you

5   do your laundry?

6   A.  Well, yes.

7   Q.  Did you have a Washateria in the apartment, or did you

8   have your own laundry products that you used?

9   A.  Well, there was a, you know, a laundry facility there on

10  the apartment -- in the apartment -- in our apartment but on

11  the apartment grounds.  And so, of course, I had laundry

12  products in my apartment.

13  Q.  And did that include a particular type of brand of bleach?

14  A.  Well, I use Clorox.

15  Q.  Okay.  Had you ever seen this spray bottle you've

16  described before that date?

17  A.  Yeah, it was in the apartment.

18  Q.  Do you recall where in the apartment it was located?

19  A.  Well, I guess the first time I saw it, it was probably in

20  the -- it was setting -- it was by the sliding glass doors in

21  the -- what would be the dining room portion of the apartment.

22  Q.  Ms. Steffens, I'm going to show you a spray bottle marked

23  Government's Exhibit W77-37, and ask if you can identify that,

24  please, ma'am?

25  A.  Well, that would appear to be the same spray bottle that

*Houston - Direct*

1    resided at our apartment.

2    Q.  Did you personally ever have occasion to use this spray

3    bottle after the incident you've just described regarding the

4    Clorox?

5    A.  Yes, I, in fact, employed this spray bottle to mix up a

6    bug spray to treat the apartment.

7    Q.  An insecticide?

8    A.  Yeah.

9    Q.  And do you put the liquid in, pump it up and then, press

10   the lever and then, it sprays?

11   A.  Uh-huh.

12   Q.  Did you purchase this spray bottle for the apartment?

13   A.  No.

14   Q.  Did you ever make any inquiry of Mr. Waters or did Mr.

15   Waters ever indicate to you or in your presence why he was

16   spraying the apartment -- or the rental unit with bleach?

17   A.  No.  I've got to tell you.  I mean, I really just had --

18          MR. T. MILLS:  Excuse me.  Object to speculation.

19   A.  -- fears.

20   Q.  (BY MR. CARRUTH) We don't want you to speculate, Ms.

21   Steffens.  If you know, or if he told you, or if one of the

22   other three men told you.

23   A.  No, he didn't tell me and I didn't ask.  I didn't want to

24   know.

25   Q.  Ms. Steffens, it seems like there's an awful lot of

1  unusual circumstances occurring in your presence in which you

2  made no effort to inquire or find out.  And can you tell us,

3  ma'am, if you know why?

4  A.  Well, I mean, at first, I would never have thought that

5  anything was going on that would involve human beings.

6  Q.  Was Mr. Waters ever physically abusive to you?

7  A.  Yes.

8  Q.  Did he ever stab or cut you with a knife?

9  A.  Yes.

10  Q.  Did he ever pistol whip you with a pistol?

11  A.  He did hit me in the mouth with a pistol.

12  Q.  And did that require you to seek dental care?

13  A.  Yes.

14  Q.  Was Mr. Gary Paul Karr present on that occasion?

15  A.  Yes.

16  Q.  And that was in your apartment, in Austin, Texas, after

17  the 30-day absence?

18  A.  Yes.

19  Q.  And what was it, if anything, you said that caused Mr.

20  Waters to strike you in the mouth and face with a pistol?  Or

21  what did you say to him after he struck you?

22  A.  Well, the situation was such that he was being very

23  threatening.  He was verbally menacing me and was moving

24  furniture around the room.  And he said he was going to show

25  me what pain was and all of these ugly, awful things.  And I

*Houston - Direct*

1    began to think that he might actually be going to kill me.

2          And Gary left the room.  He went into the bedroom and

3    he shut the door.  And this was all because I had left my

4    truck somewhere.  I walked home or took a cab home.

5    Q.  And is that because you had been drinking a little too

6    much and didn't feel that it was safe to drive your truck?

7    A.  Yes.

8    Q.  Okay.

9    A.  And so anyway, so he was doing all these things and I --

10   it was my gun, which I kept by the side of my bed.  And I made

11   a dash for the bedroom, and I was going to get the gun, and I

12   thought, well, you know, you're not going to do anything to

13   me.

14         So he takes the gun -- I mean, he doesn't take the gun

15   from me, he got there first.  He obviously knew what I had in

16   mind, and so I just -- I was just so angry and I just kept,

17   sort of, I don't know, sparring with him verbally, you know,

18   like just, scum bag, you know, sort of thing, and he hit me in

19   the mouth.

20         And I said, "Is this what happened to the Os?"

21   Q.  What did you mean by that remark, "Is this what happened

22   to the Os?"

23   A.  Well, is that happened to the O'Hairs?  I mean, did you

24   torture them and, you know, threaten them and then, finally,

25   just kill them when they, you know -- that's what I meant.  I

Houston - Direct

1   mean, because I had seen in the paper or the articles in the

2   paper, and I saw a Time magazine article indicating a white

3   van was seen at their house when they disappeared, and these

4   guys had been gone all this time.  And things were just too

5   weird.

6   Q.  And even though you had suspicions at that point, did you

7   have any direct proof that either of these or any of these

8   individuals at that time were involved in the disappearance of

9   the O'Hairs?

10  A.  No.

11  Q.  Did you know anything about the O'Hairs during the time

12  frame that we're talking about until after the men returned

13  from their absence?

14  A.  Well, do I know anything about them.  I mean, I knew stuff

15  about them from before.  I didn't -- I mean, I knew they were

16  supposed to go picket the Pope.  That I saw further, for

17  example, they didn't show up at the picket the Pope, which,

18  you know, they wouldn't miss.

19  Q.  I guess what I'm asking, Ms. Steffens, is if you believe

20  at that point that any or all of these men had been involved

21  in a violent criminal act, why did you not contact the police

22  or someone in law enforcement?

23  A.  I don't know.

24  Q.  Is it because you didn't have proof, that you just felt

25  bad or what?

1   A.  Well, I don't know.  I mean, you know, I guess I just held

2   it all inside.  I mean, you know, what are the police, you

3   know, what are they going to do?  I mean, what was I going to

4   say to them?  And then, the cat would be out of the bag.  You

5   know, it would be obvious that I would have been the one to

6   say something, and I figured it was too late.

7   Q.  Now, when Mr. Waters struck you with a pistol and Mr. Karr

8   was present and you made the statement you've just testified

9   about, "Is this what happened to the Os," did either Mr. Karr

10   or Mr. Waters make any statements in response to your

11   statement?

12   A.  Well, David said, "Never say that again," you know,

13   because we lived in apartment, you know, next door could

14   easily have heard.  And then, the next day, I was sitting on

15   the couch with Gary, and he said, "You remember what you said

16   about the Os?"  And I said, "Yeah."  And he said, "You know,

17   you should never say anything like that again."

18   Q.  Did he say why?

19   A.  Well, he didn't say directly why, but he said, "You know,

20   sometimes someplace when things are happening and you don't

21   approve of them, but, you know" -- and he said he didn't

22   approve of what Gary -- or what David had done to me, but, you

23   know, I have probably caused it.

24   Q.  Did you say or did you take his statement to mean he did

25   not approve of what Mr. Waters had done to you or what he had

*Houston - Direct*

1  done to the O'Hairs?

2  A.  Two separate things.  I mean, I think that, you know, he

3  indicated that, maybe, things get out of hand sometimes on the

4  O side.

5  Q.  Now, after the time frame that Mr. Waters and Mr. Karr

6  parted company, you say that there were subsequent meetings

7  between the two of them either in Austin, Texas or in Florida;

8  is that correct?

9  A.  Uh-huh, yeah.

10  Q.  And did Mr. Waters ever complain to you about Mr. Karr

11  being gone and what they might accomplish if he stuck around?

12  A.  Well, yes, I mean, it was, like, after the 30-day time

13  period, you know, Gary comes, they would come and go, and a

14  lot of the reason that he would have to go back to Florida --

15  and I don't know what they were doing, but they would leave,

16  like, for an overnight or whatever.  And Gary seemed to be

17  responding to having to go back because of Charlene.

18      And, you know, that infuriated David because he never

19  thought that you should give out to a woman, and he felt like

20  Gary was doing that.  And he said, "You know, there was

21  $100,000 just waiting, just setting there, and, you know, we

22  can't take care of business because he has to go, you know,

23  back to Florida."

24  Q.  Did you have any idea what Mr. Waters was referring to

25  about $100,000 just sitting there when he made this statement?

*Houston - Direct*

1    A.  No, not directly, but I mean, I sort of associated it with

2    -- I mean, in my mind, I thought, well, it's got something to

3    do with the O'Hairs.

4    Q.  Why did you think that, ma'am?

5    A.  Well, because I had seen the articles.  I mean, like when

6    I saw this first article, I saw the article laying there on

7    the -- Gary and David were sitting at the dining room table,

8    and there was a newspaper sort of overturned, and I flipped it

9    over and that's the first time I saw something mentioning the

10   O'Hairs being -- just disappeared.

11        And I said, "Did you have something to do with this?

12   Is this what you were doing?"  And David just, you know, sort

13   of laughed.  Only it was the kind of laugh that makes you

14   think that it's kind of an acknowledgment or prideful

15   acknowledgment only he would never say anything, you know, to

16   me.

17   Q.  Did Mr. Waters or Mr. Karr, in your presence, ever show

18   any particular interest in news broadcast or newspaper

19   articles or missing persons, America's Most Wanted, or

20   anything like that, articles that came out?

21   A.  Absolutely.  David watched -- well, David was a news hound

22   religiously anyway.  But, I mean, he went -- he looked like

23   7-11, you know, had all the papers, and he would, you know,

24   see what papers might have something about the O'Hairs in it.

25   They watched, you know, the news, watched America's Most

1   Wanted.  I mean, he kept his eye and ear open.  He would

2   research articles on the internet about it, you know, anything

3   he could find.

4   Q.  During the weekend that Mr. Fry disappeared and prior to

5   the stay of you and Mr. Waters and Mr. Karr and Charlene Karr

6   at the Four Seasons, did you have an occasion to find a bag, a

7   shopping bag in the kitchen of your home with anything unusual

8   contained in the bag?

9   A.  Yes.  There was a Randalls bag on the -- you know, right

10  when you go in the front door, there's a little tiled area.  I

11  used to sometimes set garbage bags there like garbage that was

12  heading out.  And there was a Randalls bag sitting there and

13  it had three pair of tennis shoes in it and a wash cloth, a

14  triple-edge wash cloth.

15  Q.  Did you recognize the wash cloth?

16  A.  I walked over -- I don't even know how I occasioned to

17  look in the bag because it was kind of -- but -- and David was

18  sitting at the dining room table.

19  Q.  Was the wash cloth clean or soiled?

20  A.  Well, it was soiled.  I mean, the reason -- anyway, the

21  reason that it caught my attention was because it was a wash

22  cloth that when my dad died, you know, I took that wash cloth.

23  Q.  And do you still have that wash cloth?

24  A.  Yes.  And so, anyway, I look in the bag and there's this

25  wash cloth setting on top of three pair of tennis shoes and

1  it's bloody.  And --

2  Q.  The wash cloth is bloody?

3  A.  The wash cloth is bloody, the tennis shoes are bloody.

4  Q.  Where on the tennis shoes, ma'am, did you observe any

5  blood?

6  A.  Well, on the -- well, when I just looked in the bag, I

7  observed blood, you know, just, like, smeared and sort of

8  splatted, you know, and just, you know, like up to here, you

9  know, just sort of up to there on your shoe.

10 Q.  Like someone had stood in a large puddle of a liquid?

11 A.  Well, yes.  I mean, for all three pair to have remnants of

12 blood like that, I thought, you know, it just almost made me

13 sick.  But anyway, David jumped up and, you know, nostrils

14 flaring and said, "Get away from there.  Don't ever look in

15 there again," or, you know, something to that effect.

16     And, you know, I kind of started to cry.  And I said,

17 "My dad's wash cloth."  And he grabbed it out of there and

18 washed it off and handed it to me.  And at some point, then --

19 no.  He left the apartment.  The shoes were still in there.

20 So I took them, you know, I looked.  I mean, of course, you're

21 going to look and I went over and looked, and I took the top

22 pair out and I looked at them, and there was blood.  You know,

23 there was just chunks of, you know, blood, like they had --

24 and I thought to myself like they were standing in the puddle

25 of blood.

*Houston - Direct*

1  Q.  And did you recognize any of the tennis shoes?

2  A.  Well, they -- at least one pair appeared to be the kind

3  that, like, David had, like an old pair.

4  Q.  Were they white canvas tennis shoes?

5  A.  Well, they were white, not canvas, but like the --

6  Q.  Leather?

7  A.  -- sort of leather or plastic or, you know, leather.

8  Q.  And do you recall what kind of shoes Mr. Fry and Mr. Karr

9  wore during the time they were staying at your apartment in

10  Austin in 1995?

11  A.  Well, Gary always wore tennis shoes.  Gary was a tennis

12  player, so he wore real actual tennis shoes almost all the

13  time.

14  Q.  Mr. Gary Karr, the defendant you're referring to?

15  A.  Yes.

16  Q.  Okay.

17  A.  He wore tennis shoes always.  And I think Danny wore

18  tennis shoes pretty much most of the time.  He was totally a

19  casual guy.

20  Q.  And when is the next time, if ever, you saw these tennis

21  shoes again?

22  A.  They disappeared.  I mean, I'm sure David took them out.

23  Q.  Did you know -- ever know Mr. Waters to own one or more

24  pair of handcuffs?

25  A.  Yeah.  About the same time -- well, yeah.  I'm thinking

*Houston - Direct*

1  in, like, '94 or something, he purchased two pair of

2  handcuffs.

3  Q.  Do you know where he purchased them?

4  A.  Well, at least one from McBride, if not both.

5  Q.  And were you with him when he purchased them?

6  A.  Yeah.  I mean, they were, like, police quality handcuffs.

7  And one was a pair of, like, hinged, you know, they didn't

8  have the chain.  Well, one had the chain between them and the

9  other were hinged.

10  Q.  One link with a chain and one hinged?

11  A.  Right.

12  Q.  Okay.  And did you ever see Mr. Waters in possession of

13  these handcuffs, or do you know whether he kept them in the

14  apartment, if he did?

15  A.  Well, he kept them under his socks.

16  Q.  His sock drawer?

17  A.  Uh-huh.

18  Q.  And do you know why he purchased these handcuffs?

19  A.  Well, I mean, when he actually purchased them, I didn't

20  directly know why, but then, I mean, he was going -- he was

21  hatching some sort of plan.  I mean, this was before the --

22  before '95.  He was hatching some plan to do something -- you

23  know, to, like, secure the O'Hairs.  And it was --

24  Q.  Ms. Steffens, I'm showing you -- you never have been Mrs.

25  Waters, have you?  You and Mr. Waters were never married?

*Houston - Direct*

1    A.   No.

2    Q.   Never lived in a common law relationship.  Never held

3    yourselves out as man and wife to the public?

4    A.   No, not myself anyway.

5    Q.   Okay.  And I apologize for calling you Mrs. Waters.  Ms.

6    Steffens, I'm showing you what's been marked for

7    identification as Government Exhibit W79-2, and W79-3.  Are

8    those the handcuffs you just told us about?

9    A.   This definitely appears to be, and those would be --

10   appear to be, also, yes.

11   Q.   Now, during the month of September 1995, were these

12   handcuffs present in your apartment in Austin, or were they

13   missing?

14   A.   Well, they were missing.  I mean, kind of the longer the

15   time period went on, I started thinking, well, what is going

16   on.  That began to give me a lot of tension, and, you know, a

17   couple of my friends at work noticed that I seemed to have

18   increasing preoccupation with gloom.

19        And so, anyway, I looked for these things.  I looked

20   in his sock drawer.  I mean, I sort of kind of looked around

21   in his stuff to see what was -- see if I could get any clues.

22   And the handcuffs were missing.  I thought, oh, that's not

23   good.

24   Q.   And do you know what Mr. Waters did with those handcuffs

25   after the 30-day event we've talked about?

*Houston - Direct*

1  A.  Well, yes.

2  Q.  Can you tell the members of the jury?

3  A.  Well, he asked me -- he had a number of things, including

4  the gold coin, which was not yet in the pawn shop.  And I

5  think he had the gold coin because it seems like there were

6  two.  And there was a knife and the handcuffs and I think

7  that's it.  And he had -- he asked me to box them up and send

8  it to my mom's house and asked her not to open these things so

9  that they would be out of the house.

10       And there were also some things that he asked me to

11  mail to my sister that were, like, little black boxes, like,

12  little electronic devices.

13  Q.  And is that the same time that -- or was it a different

14  trip when you took the gun up there that you previously

15  identified as having the barrel removed?

16  A.  I'm sorry, what?

17  Q.  Was the gun and the handcuffs taken up at the same time or

18  do you recall?  Was there more than one package shipped or

19  sent to Mr. Ron Waters in Peoria, Illinois?

20  A.  The gun was mailed.  The handcuffs were mailed.  And then,

21  when we went up -- during the time that he took the barrel

22  out, then I picked up the box from Mom.

23  Q.  And that was a different trip, in other words, correct?

24  A.  No.  I think that was the same trip.

25  Q.  Okay.  Did you ask him why he needed to get rid of the

*Houston - Direct*

1  handcuffs, the gun, or any of the other evidence, articles?

2  A.  Well, he was a felon, and I mean, he really wasn't

3  supposed to have, I'm assuming, things of criminal nature in

4  the house.  I don't even know if he was supposed to have a

5  knife, to tell you the truth.

6  Q.  Now, to your knowledge and while he resided with you, was

7  there a period of time when David Waters was employed by the

8  American Atheist General Headquarters here in Austin?

9  A.  Yes.

10  Q.  And were you living with him when he accepted that job?

11  A.  Yes.

12  Q.  And can you tell the jury members, if you know, how he

13  obtained that employment?

14  A.  Just an ad in the paper and he thought it would be a hoot

15  to work for Madalyn.

16  Q.  And what type of position was he applying for when he was

17  hired?

18  A.  The position advertised was typesetter.

19  Q.  And did Mr. Waters have any experience as a typesetter?

20  A.  No, but he could type about 90 words a minute, so, you

21  know, with accuracy.

22  Q.  Okay.

23  A.  So he was --

24  Q.  So he applied for the job?

25  A.  -- he applied for the job.  They interviewed him.  They

Houston - Direct

1    seemed to like him.

2    Q.   Okay.

3    A.   And he got the job.

4    Q.   Okay.  And for approximately how long a period of time did

5    he work for the O'Hair Atheist Organization here in Austin?

6    A.   I want to say one or two, maybe two years.

7    Q.   Okay.  And during that time, to your knowledge, was he

8    promoted from typesetter to office manager?

9    A.   Yes.  Yeah, apparently, I wasn't working there, but

10   apparently, it was very stressful.  And the woman that was the

11   manager then, I think, resigned, because she felt like she was

12   going to have a nervous breakdown or something, and they

13   offered the position to David.

14   Q.   And was David's predecessor, to your knowledge, Denise

15   Cushman, whom you know?

16   A.   Yes.

17   Q.   And you've visited with Ms. Cushman, I believe, and had

18   dinner with her on occasion; is that not correct?

19   A.   Yeah, we visited her house once, and I think we went out

20   to eat one other time.  But that was so that they could talk

21   and gossip about the O'Hairs.

22   Q.   And the stress of the job was too much for Ms. Cushman, so

23   she resigned.  Is that your testimony?

24   A.   That's to the best of my knowledge, that's what happened.

25   Q.   And Mr. Waters succeeded her?

*Houston - Direct*

1    A.   Uh-huh.

2    Q.   Now, after Ms. Cushman left the employ with the American

3    Atheist, did she and Mr. Water remain friends?

4    A.   Yes.

5    Q.   Did you become aware about this same period of time or

6    thereafter that Mr. Waters was writing or had written a

7    manuscript about the O'Hairs?

8    A.   After the '95, 30-day period.

9    Q.   After the event?

10   A.   After the event, yes.

11   Q.   Did he ever permit you to read that manuscript?

12   A.   Yes.  I mean, actually, I mean, I did some typing on it

13   for him because, you know, frankly, I thought, well, he had

14   quit a job to do this book, and I thought, well, once he

15   writes this book, you know, I had all these landmarks.  Once

16   he writes this book, then he'll move.  Once he does this, then

17   he'll move.

18   Q.   Now, what types of material, if you know, was Mr. Waters

19   using as background for his book?

20   A.   Well, he was writing it from a personal point of view, his

21   experience there, and he had taken a lot of documents from

22   them.

23   Q.   You mean stolen documents from the Atheist Organization?

24   A.   Yes.

25   Q.   And have you reviewed any of those documents?

Houston - Direct

1   A.   Yeah, I mean, I've seen the ones that he had.

2   Q.   Seen them in your home?

3   A.   Yeah.

4   Q.   Including books from the Atheist Library?

5   A.   Yes, while he was working there.  I mean, he would

6   regularly come home with books.

7   Q.   Ms. Steffens, you testified earlier about a manuscript

8   that Mr. Waters had prepared and that you had assisted him in

9   typing.  I'm going to show you what's been marked as

10  Government's Exhibit W77-45, and I'll ask you to examine the

11  contents of that, please, and tell us if you're able to

12  identify it.

13  A.   Well, yeah, this is the manuscript that he was working on.

14  Q.   Does it have a title?

15  A.   Good Gawd, Madalyn! The Not-So-Sudden Disappearance of

16  Madalyn Murray-O'Hair, The Most Hated Woman In America.

17  Q.   And to your knowledge, had he previously had another title

18  for that work named Code Name Satan?

19  A.   Yeah, Code Name Satan was a working title because that was

20  something that they used they thought was humorous, like a --

21  I don't know if it was like a secret name or if it had

22  something to do with moving the library or what, but that was

23  an O'Hair thing.

24  Q.   How did Mr. Waters feel about the O'Hair family members?

25  A.   Well, when he first started working there, he had

1  admiration for Madalyn and not very much admiration for Jon.

2  Q.  Why did he dislike Jon?

3  A.  Well, he thought he was weak and, you know, just basically

4  just did whatever Madalyn requested.

5  Q.  Did he believe Jon was of the type of person could be

6  manipulated?

7  A.  Well, yeah, I'm sure.

8  Q.  You mentioned that he brought home some books.  I'm going

9  to show you what's been marked for identification as

10  Government's Exhibit W77-43, and ask you if you've ever seen

11  that in the apartment you shared with Mr. Waters in Austin,

12  Texas.

13  A.  Yes.

14  Q.  How about Government's Exhibit W77-44?

15  A.  Yes.

16  Q.  And are these books stamped where they came from?

17  A.  Yes.

18  Q.  American Atheist Library?

19  A.  Uh-huh.

20  Q.  And would you look in this one and tell me if there's any

21  business card used as a bookmark, and if so, who they belonged

22  to.

23  A.  R. Murray O'Hair, that would be Robin, both of them.

24  Q.  Government's Exhibit W77-4 appears to be some atheist

25  materials.  Have you ever seen those in your home that you

*Houston - Direct*

1   shared with Mr. Waters on Lamar Boulevard in Austin, Texas?

2   A.   Well, yes, I've seen similar things of these.  These are,

3   like, special cancellations that they had.  And I think I've

4   seen this one in particular.  He actually had a lot of them.

5   Q.   A lot of them, yes, ma'am.  Did you become aware that

6   there was a time when Mr. Waters assisted in packing or

7   cataloging the Atheist Library at the American Atheist

8   headquarters here on Cameron Road in Austin, Texas?

9   A.   Yes, they were packing up everything valuable, and also,

10   you know, of course, including the library, and that's all

11   that they did.  That's what everyone did is they were packing

12   and cataloging.  And David was entering titles into the

13   library computer so that they could catalog everything that

14   they packed.

15   Q.   And did Mr. Waters, to your knowledge, ever become aware

16   that any of the items from the library were stored in a

17   storage unit in Kansas City, Missouri?

18   A.   Well, I believe that he had some paperwork.  He had seen

19   some paperwork that indicated they were in a storage unit in

20   Kansas City, but I think they got -- they had been to Houston,

21   too.

22   Q.   Can you take a look at what's been marked as W7F-2, and

23   take that out, please, and examine it, and let me know if you

24   recognize it.  I'm told that's 77 rather than 7F, your Honor.

25   A.   Yeah, I think I have.

1   Q.  Where have you seen those documents before?

2   A.  At the house, at the apartment.

3   Q.  And those appear to be original documents or records, do

4   they not?

5   A.  Yes, they do.

6   Q.  How would Mr. Waters have obtained those, if you know?

7   A.  May 1st, '94, that's after he left.

8   Q.  Those documents are dated after he left the employment of

9   the Atheist Organization?

10  A.  Yeah, I believe that was -- I believe he left there prior

11  to May 1st.  So it's possible -- well, okay.  Well, he had

12  keys to their house because Jon had given him keys to their

13  house.

14  Q.  And that's when the O'Hairs were out of town?

15  A.  Yes, when he was still a -- when he was still a manager,

16  Jon had entrusted him with keys to their house because they

17  were leaving -- I think it was for the Rico suit --

18  Q.  Okay.

19  A.  -- in California, and I'm sure that he kept copies.

20  Q.  You told us earlier that Mr. Waters had inputted certain

21  information into a computer at the American Atheist

22  Headquarters relative to the package or packing up and

23  shipment of the library to put it in storage?

24  A.  Right.

25  Q.  And to your knowledge, was there subsequently a theft of

1    that computer from the American Atheist office?

2    A.   Yes, David stole that computer.

3    Q.   You had personal knowledge of that?

4    A.   Yes, I do, because he called me from -- he called me at my

5    job and asked me to come over and park in the back parking

6    lot, and he carried the computer out the side door in black

7    duffel bags and put it in my car.  I mean, I drove that

8    computer away.

9    Q.   So you actually helped Mr. Waters steal the computer?

10   A.   Well, it wasn't my idea, but technically, I did help him,

11   yes.

12   Q.   Okay.

13   A.   I certainly didn't refuse.

14   Q.   And did you assist him in disposing of the computer at

15   some subsequent point in time?

16   A.   Yes.

17   Q.   Please tell us about that.

18   A.   Well, he couldn't figure out how to get into the programs,

19   and I mean, he didn't want it in the apartment.  Obviously, I

20   didn't want it in the apartment.  So he destroyed the monitor

21   and threw it away in the dumpster at our apartment, and

22   dismantled the hard drive, which I subsequently threw in Town

23   Lake.

24   Q.   The hard drive of the stolen computer?

25   A.   Right.

Houston - Direct

1   Q.  Okay.  And who instructed you, if they did, to dispose of

2   that hard drive from the computer?

3   A.  Well, David Waters.

4   Q.  Okay.  In addition to the computer -- and why did he

5   dispose of the computer?

6   A.  Well, because I mean, he couldn't get into the

7   information.  I'm really not sure what he was trying to -- I

8   mean, I don't even know what his motivation was for taking

9   that computer, but since he couldn't use it and he didn't want

10  it in the apartment where somebody might happen upon it, you

11  know, he wanted to get rid of it.  It was a ludicrous

12  situation.

13  Q.  And do you know whether or not the O'Hairs were out of

14  town at the time that computer was taken?

15  A.  I believe they were.  I believe they were out of town, but

16  there were still employees there because we did it right with

17  the employee in the building.

18  Q.  Now, did you also become aware of a theft of other

19  property from the American Atheist Organization at the time

20  Mr. Waters was employed there?  And I'm particularly

21  referencing some bonds that were in a safe.

22  A.  Yes, he stole -- while Jon left the safe open all the

23  time.  And so David took about $80,000 worth of bearer bonds,

24  about 5,000 or so dollars in cash of -- these were bills that

25  people had donated to the atheists because they were printed

Houston - Direct

1    prior to the inclusion of "In God We Trust" on the bills.  And

2    Larry Flint, the pornographer, had given her, I want to say,

3    two or three gold medallion things on chains, and he took the

4    chains, but he didn't take the medallions, I don't believe.

5    Q.  Now, you've used two pronouns here, he and she.  By she,

6    Larry Flint had given her --

7    A.  Larry Flint had given Madalyn.

8    Q.  And he took the chains but left the medallions.

9    A.  And David took the chains but left the medallions.

10   Q.  Thank you.  I just wanted to clarify that for the record.

11        THE COURT:  All right.  Members of the jury, I'm going

12   to give you your noon break.  Please remember the

13   instructions.  I want you back at -- ready to go at 1:30, but

14   I have another hearing at 1:30 that relates to this case.  I

15   don't think it's going to take but a few minutes, but be a

16   little patient, and we'll get you on as soon as 1:30 as

17   possible.  But be in the jury room and be ready to come back

18   at 1:30.  Recess till 1:30.

19        (Lunch recess.)

20        THE COURT:  Ms. Casas, if you'll come forward, please.

21   Let the record reflect that the city of Austin has complied

22   with the system and has been released.

23        MS. CASAS:  Your Honor, we've gone through the file --

24   for the record, Elaine Casas on behalf of the Travis County

25   District Attorney's Office.  We have gone through the file and

*Houston - Direct*

1  pooled the items that would be responsive to your request.  We

2  only have two things that are a little odd that we would like

3  for you to rule on.

4         One of them, we've got two sheets of paper that are

5  attorney work product.  They're created by the district

6  attorneys handling the case.  And since this is still an

7  active file --

8         THE COURT:  All right.  Let me look at that.  Are

9  these copies, Ms. Casas?

10        MS. CASAS:  No, your Honor.  These are the original.

11        THE COURT:  All right.  I agree both of these are work

12  product.  Neither of them would be helpful to discovery, and

13  neither of them are subject to discovery.  What I'm going to

14  have is Ms. Sims run a copy and then, seal them as Court

15  Exhibit 1 so you could retain the originals.

16        MS. CASAS:  Your Honor, also, we have entered an

17  agreement with defense counsel who issued the subpoena

18  regarding some of the documents.  They're affidavits from

19  witnesses and police reports that normally would not be

20  released to the defendant, Waters.  If he came to look at the

21  DA's file on an active case, he could review them, but they

22  wouldn't be released.  Defense counsel has agreed not to

23  release the documents so that they don't get to Mr. Waters or

24  his attorney.

25        The only concern we had is if these documents were

*Houston - Direct*

1  admitted into evidence, how would that affect the agreement

2  not to release?  And we talked about, maybe, getting the Court

3  to order that they be sealed, also.

4         THE COURT:  No problem.  I do that all the time.  So

5  if that comes to -- y'all know what documents they are?  So

6  under your agreement, then, just ask to approach the bench,

7  and advise me it's one of those documents and I'll handle it

8  with an order.

9         MR. CARRUTH:  Is the government going to be provided

10  access to those same documents?

11         THE COURT:  Well, I do not know.  You're asking one

12  person --

13         MR. CARRUTH:  We have a reciprocal discovery order in

14  place, your Honor, and we have not been provided --

15         THE COURT:  My suggestion is that you ask either Ms.

16  Casas, who you have not discovered, or counsel.  I'm sure

17  they're going to share those documents with you.

18         MR. CARRUTH:  Thank you, your Honor.

19         THE COURT:  They would not try to take advantage of

20  you, Mr. Carruth.

21         MR. CARRUTH:  We hope not, your Honor.

22         MS. CASAS:  And, your Honor, that's it.  All the rest

23  of them were okay with turning over the letters from the

24  O'Hairs.

25         THE COURT:  If you'll do that, then I'll show the

*Houston - Direct*

1    record that the subpoena's been complied with.  Anything else

2    from the defendant's standpoint?

3         MS. WILLIAMS:  Only thing is we haven't been provided

4    copies of these documents, and not having had a chance to look

5    at them, I'm just hoping that there's something in there that

6    we might need this afternoon to cross this witness.  Might I

7    have a chance to just briefly look over them before they leave

8    so that I could ascertain whether or not there would be any

9    such documents?

10        THE COURT:  Are you going to provide --

11        MS. CASAS:  We had the originals and we talked about

12   getting them copied once we decided what was going to be

13   turned over.  But I don't have a problem with letting them

14   have the originals and taking them and copying them and bring

15   them back.

16        THE COURT:  Well, I do.  I want you to supply copies.

17   I want you to always retain the originals with the one

18   exception that I've had my clerk now handing you back the

19   originals.  Those will be sealed, held privileged, Court

20   Exhibit 1, Ms. Sims.  Just take a second and, all four of you,

21   come in and see if there is a statement in there from Patti Jo

22   Steffens.  So let's check that.  I have an idea Ms. Steffens

23   will be on the stand for a while.

24        MS. CASAS:  Your Honor, you also asked us to bring a

25   custodian of records, and we've got Rosemary Lindbergh here.

1  Can she be released?

2        THE COURT:  (Moving head up and down.)

3        Counsel, I'm not interested in y'all reading

4  everything right now.  Only thing I'm interested is whether or

5  not there's a statement of Ms. Steffens.  If not, Ms. Casas

6  will take her original file, will go duplicate it and then,

7  bring it back so you'll have it before the end of the day.

8        MS. WILLIAMS:  We didn't locate any, your Honor.

9        THE COURT:  Ms. Casas, if you will then duplicate it

10  so that -- is Ms. Casas here?

11        MS. CASAS:  I'm right here.

12        THE COURT:  So that Mr. Carruth won't feel chided,

13  hurt.  If you make two copies, I will appreciate it.  Get it

14  over here.  We'll be here till at least 6:00.

15        MS. CASAS:  Thank you, your Honor.

16     (Lunch recess.)

17        THE COURT:  Yes, ma'am.  Bring the jury in.

18     (Jury present.)

19        THE COURT:  Mr. Rodriguez, are you feeling any older?

20        THE JUROR:  About a year older.

21        THE COURT:  During the noon break, did anyone attempt

22  to talk to you about this case?

23        THE JURORS:  No.

24        THE COURT:  Did you talk to anybody about this case?

25        THE JURORS:  No.

Houston - Direct

1        THE COURT:  And did you learn anything at all about

2   the case outside the presence of each other and this

3   courtroom?

4        THE JURORS:  No.

5        THE COURT:  Show everybody answered except Ms.

6   Williams.  Will you acknowledge?

7        THE JUROR:  Oh, I said no.

8        THE COURT:  Okay.  Just didn't hear you.  All right.

9   Negative answers to all questions by all jurors.  Where is the

10   witness?  There she is.  If you'll have a seat, please, ma'am.

11   Ms. Steffens, you remain under oath.  You may proceed.

12        MR. CARRUTH:  Thank you, your Honor.

13   Q.  (BY MR. CARRUTH) Ms. Steffens, prior to noon recess, you

14   had told us about some bonds that you indicated were stolen

15   from the American Atheist Headquarters by David Waters.  Do

16   you have personal knowledge of that or is that something he

17   told you?

18   A.  Well, no.  I actually saw the bonds and also was present

19   when they were destroyed.

20   Q.  And why were they destroyed, ma'am, if you know?

21   A.  Well, because he had asked me to try to find out if they

22   could be -- how they could be cashed, or whatever, and, you

23   know, I really couldn't get any information.  They didn't

24   appear to be as easy as he first thought.  And, also, he was

25   trying to get rid of everything, any kind of paperwork that

*Houston - Direct*

1    was related to the O'Hairs that -- before, you know, he would,

2    I guess be in trouble, you know, in case they would come and

3    try to get information from him about it.

4    Q.   And did you assist him in any way of disposing of these

5    bonds, or do you know how they were disposed of, if they were?

6    A.   Well, we were sitting in the back of the car -- or we were

7    sitting in the car in the back of The Filling Station down on

8    Barton Springs Road, and we were just tearing up anything and

9    everything that was related to those, to the paperwork that he

10   had currently had from the O'Hairs including the bonds.

11   Q.   And for those members of the jury who may be from outside

12   of Austin, by The Filling Station, you mean not a gasoline

13   service station, but a bar and grill, so to speak, which is

14   called The Filling Station; is that right?

15   A.   That's right.   It's a bar and grill down on Barton Springs

16   Road in Austin.

17   Q.   Okay.   Now, in addition to the theft of the computer from

18   the American Atheist Center and the theft of the bonds, which

19   you've just talked about, are you familiar with another theft

20   of more than $54,000 in funds belonging to the American

21   Atheists?

22   A.   Yes.

23   Q.   And was Mr. Waters, to your knowledge, involved in that

24   theft?

25   A.   Yes.

*Houston - Direct*

1    Q.  And can you tell the jury how he executed that theft?

2    A.  Well, when the O'Hairs went to California for the

3    racketeering influenced, organized crime trial that they were

4    part of, he -- there were checks left behind, I believe, for

5    one of the other staff members to use to pay bills, and so

6    forth.  He entered the building.  I guess he took a bunch of

7    those checks, and then, he cashed them.  He wrote them out to

8    himself, cashed those checks under the idea that there was a

9    -- you know, that he and Jon had cooked up a scheme to move

10   funds, you know, to turn funds into cash in the event that

11   they would lose the Rico trial and have to leave the country.

12   Q.  Now, this Rico trial you referred to was a civil Rico

13   trial, was it not, known as the Truth Seekers trial?

14   A.  Right.

15   Q.  All right.  And the occasion you've just described, is

16   that the time that Mr. Waters allegedly lay in wait for the

17   O'Hairs upon their return?

18   A.  Uh-huh, yes.

19   Q.  And in preparation for that, did he go out and purchase

20   any implements or obtain any implements that he may use to

21   execute his plan?

22         MR. T. MILLS:  Excuse me.  I object to the details of

23   the offense that's not part of the charged conspiracy against

24   Mr. Karr.

25         MR. CARRUTH:  It goes to show motive and intent, your

*Houston - Direct*

1   Honor, as to why he felt the way he did and what actions he

2   took, and that, in fact --

3       THE COURT:   I believe the indictment alleges from

4   April of '95 to October, and I'll sustain the objection.

5   They're not within that time frame.

6   Q.  (BY MR. CARRUTH) Well, let me ask you this, then, ma'am:

7   Subsequent to the $54,000 plus theft and the theft of the

8   bonds, and the theft of the computer, which were all

9   attributed to you by Mr. Waters, did he continue his

10  employment with the American Atheist Organization?

11  A.  No.

12  Q.  Subsequent to his leaving his employment with the American

13  Atheist Organization, did Madalyn Murray O'Hair write a very

14  scathing article in the Atheist Newsletter concerning Mr.

15  Waters?

16  A.  Yes.

17  Q.  And to your knowledge, was that newsletter seen and read

18  by Mr. Waters?

19  A.  Yes.

20  Q.  Have you seen and read that newsletter?

21  A.  Yes.

22  Q.  Let me show you a copy of what's been previously admitted

23  into evidence as a newsletter through another witness, by Mr.

24  Morgan, and ask you to just take a moment and review that, and

25  tell us if that's the newsletter you're referring to, please,

*Houston - Direct*

1  ma'am.

2  A.  Yes.

3  Q.  And Mr. Waters actually had a copy of that in your

4  apartment on Lamar?

5  A.  Uh-huh, yes.

6  Q.  Even though he had already left his employment with the

7  American Atheist?

8  A.  Yes, we received it, I believe, by fax.

9  Q.  Okay.  And can you tell us, ma'am, what Mr. Waters'

10  reaction was after reading that newsletter, published by the

11  O'Hair organization?

12  A.  He was furious with her, and not being melodramatic, vowed

13  revenge.

14  Q.  Can you be more specific about whether or not he made any

15  threats, due harm to Madalyn or anyone else?

16  A.  He often spoke about, you know, because she -- you know,

17  he had a genius IQ, and he considered her to be true

18  intelligentsia, and so it was sort of an ego thing with him.

19  And he just had these fantasies about separating her from her

20  money because she so cleverly -- he felt that she was, like, a

21  televangelist and would get people to send her money and send

22  her things.

23       That all of her money came from just that sort of

24  activity, you know, it wasn't earned.  It was just taken from

25  people who -- that she convinced of a particular philosophy.

*Houston - Direct*

1  And he often, I mean, he -- you know, I know we've all read

2  about the snipping off the toe, but he would actually say

3  things like that.

4  Q.  Ms. Steffens, we must assume for purposes of the record

5  that the jury has not read anything that they are to consider

6  in this case.  So if you could repeat the testimony you just

7  alluded to, please, ma'am.

8  A.  Well, he would say -- you know, he would sort of talk

9  about how he would like to hurt her, how he would like to, you

10  know, he'd like to torture her, you know, snip off her toes --

11  take pliers and pull her toes off, you know, that kind of

12  thing, which, you know, --

13  Q.  Was he saying this in a rather humorous or kidding manner,

14  or did you take it as serious?

15  A.  Well, both.  I mean, you know, there's a kind of a, you

16  know, an ironic wit, you know, that you can look at things

17  that are absurd and they almost seem funny.  But yet, at the

18  same time, I mean, he was truly furious about this.  And I

19  think -- and, again, I reiterate, you know, he had a sense of

20  vengeance about after this newsletter appeared, it was, like,

21  there was a calm came over here about Madalyn.  I mean, there

22  was something.  I think he really wanted to prove a point to

23  her face-to-face.

24  Q.  And to your knowledge, had Mr. Waters become aware of the

25  many assets held by the O'Hair Atheist Organization during his

*Houston - Direct*

1   employment there?

2   A.   Yes.

3   Q.   Including the overseas accounts in New Zealand?

4   A.   Yes.  Yeah, I mean, when he liked her, he thought that

5   was, you know, kind of a, you know, an admirable scam that she

6   had going or something, but he was very aware of it.

7   Q.   He admired her for her intellect.  Is that what you're

8   telling us?

9   A.   Yes.

10   Q.   That he felt she was smart?

11   A.   He felt he was equal and intelligent, I'm sure.

12   Q.   Ms. Steffens, you told us this morning about a Raymond

13   Weil watch that Mr. Waters came back, I believe, after the

14   30-day absence in September of 1995; is that correct?

15   A.   Uh-huh.

16   Q.   I show you, ma'am, what's been marked for identification

17   as Government's Exhibit W77-49, and ask you if you've seen

18   that watch before?

19   A.   Yes, that appears to be the same watch that David had.

20   Q.   Now, I also want you to take a look at what's been marked

21   Government's Exhibit W77-29, and Government's W77-30, and ask

22   you if you've seen those knives before in your apartment?

23   A.   Well, I have definitely seen this one.  This was purchased

24   in Mexico.

25   Q.   What is your exhibit number you're referring to there?

Houston - Direct

1  A.  That is W77-30.  I am not as certain about this one, but

2  it's possible.

3  Q.  Now, to your knowledge, was Mr. Waters a hunter, or

4  fisherman, or outdoorsman, someone that might use a knife like

5  that?

6  A.  No.

7  Q.  You also told us this morning that you had seen some

8  records in the apartment you shared with Mr. Waters regarding

9  the Atheist Library being stored in Kansas City.  Did you also

10 see this Kansas City map that Mr. Waters had, marked

11 Government's Exhibit 77-48?

12 A.  Yes, I saw that in the Camaro.

13 Q.  Okay.  And here is a book entitled, Poor Man's James Bond,

14 marked Government's Exhibit 77-23.  Have you ever seen that

15 book before?

16 A.  Yes, that was David's.

17 Q.  And how do you know that?

18 A.  Well, I was with him when he bought it.  I probably bought

19 it, actually.

20 Q.  And do you know where he bought it?

21 A.  The Spy Exchange.

22 Q.  And what is that book about, if you know?

23 A.  Well, it's about, you know, poisoning people and, you

24 know, bombs and, you know, spy devices, I suppose.

25 Q.  Does it tell how to make a firearm silencer?

*Houston - Direct*

1    A.   Probably.  I didn't read it.

2    Q.   I want to show you now what's been marked for

3    identification as Government's Exhibits W77-24 and W77-25, and

4    ask you if you've seen those items before?

5    A.   Well, these appear to be two items that were in the

6    apartment and that I believe I had originally -- I mean, after

7    -- during about the same time that we sent off the handcuffs,

8    and so forth, I mailed those to my sister.

9    Q.   At Mr. Waters' request?

10   A.   Yes.

11   Q.   Do you know what those electronic devices appear to be?

12   A.   No, I don't.  I often puzzled over what they might be.

13   Q.   Some sort of electronic or communication device?

14   A.   Possibly.

15        MR. T. MILLS:  Judge, we object to further

16   descriptions, questions about descriptions of evidence with

17   the witness if they're not in evidence and are not going to be

18   offered through the witness.  I had anticipated there was

19   going to be an offer, but in the absence, I would object to

20   the continuation of this.  They're not in evidence, yet, and

21   he's not laying a predicate with the witness in order to offer

22   them.

23        THE COURT:  You're objecting to his failure to put

24   something in evidence?

25        MR. T. MILLS:  No.  I'm objecting to him eliciting

1    testimony about items that are not in evidence if he knows

2    that he's not going to be offering them through this witness.

3         THE COURT:  Well, I don't know that I know which ones

4    he's going to offer or not either.  So if you'll give me a

5    hint, but you may respond.

6         MR. CARRUTH:  Your Honor, we're asking the witness to

7    identify certain items that she's seen in her apartment that

8    we intend to offer through the custodian who has seen them

9    unless he wants to waive the chain of custody --

10        THE COURT:  That's all right.  We'll let him -- his

11   representation to the Court is that he hasn't forgotten them.

12   He intends to offer them at some point in time.

13        MR. T. MILLS:  Yes, sir.

14        THE COURT:  All right.

15        MR. CARRUTH:  Thank you, your Honor.

16   Q.  (BY MR. CARRUTH) Show you what's been marked for

17   identification as W77-26.  Do you recognize this holster,

18   ma'am?

19   A.  Yes.  These are the -- actually, this particular one is

20   the one that's in the pictures that I took of David.

21   Q.  And this one, in particular, have you ever --

22   A.  And this one, I think that he got this sometime after,

23   like, maybe during that month, and then, afterwards, he gave

24   it to me for my Reuger.

25   Q.  Okay.

*Houston - Direct*

1  A.  But I gave it back to him.

2  Q.  I want to show you now, Ms. Steffens, what's been marked

3  for identification purposes as Government Exhibit W77-20,

4  W77-19 and W77-22.  Do you recognize those as being address

5  books you've seen before in your apartment?

6  A.  Yeah, this one, at the time I was with David, W77-19 was

7  his current -- then current address book.  W77-20 was an older

8  address book from --

9       MR. T. MILLS:  We object to further testimony about

10  this address book on the grounds of relevance unless there's

11  some -- something in there that is relevant that I'm not aware

12  of.

13  Q.  (BY MR. CARRUTH) Well, if you were to look in there, would

14  you be able to find the names and telephone numbers of Mr.

15  Karr, Mr. Waters, or Mr. Fry?

16  A.  I suspect so, at least in this one, and probably this one,

17  too.

18  Q.  And Government's Exhibit 22 has the name KJEAR.  Does that

19  mean in addition to you?

20  A.  That's Gary Karr's AOL address.

21  Q.  On e-mail, electronic mail?

22  A.  Yeah, that appears to be, possibly, like a chat number.

23       MR. T. MILLS:  May I observe the document?

24       THE COURT:  You may.

25  Q.  (BY MR. CARRUTH) And there's one more here, Government

*Houston - Direct*

1    Exhibit 77-14?

2          THE COURT:  Let's not get too far afield.  I have an

3    objection on the floor.

4          MR. CARRUTH:  Oh, I'm sorry.

5          MR. T. MILLS:  If there is a specific item that Mr.

6    Carruth believes is relevant, then I don't object.  I don't

7    know the relevance of these matters.  And so I object on that

8    ground.

9          THE COURT:  Do you want to respond to relevance

10   objections, Mr. Carruth?

11         MR. CARRUTH:  I do, your Honor.  I think these address

12   books would show that Mr. Waters was in regular contact and

13   communication with Mr. Karr, Mr. Osborne and Mr. Fry.  And

14   that their addresses, phone numbers, and so forth, some cases

15   e-mail addresses, may be found among the books, address books

16   recovered in Mr. Waters' apartment, which this witness has

17   seen.

18         THE COURT:  She's seen the address books and she

19   assumes they're there.  Are they there or not?

20         MR. CARRUTH:  They are there, your Honor.

21         THE COURT:  All right.  Then, the objection is

22   overruled.

23         MR. CARRUTH:  All right.  I will offer these through

24   the custodian.

25   Q.  (BY MR. CARRUTH) Now, you mentioned that KJEAR was an

*Houston - Direct*

1   e-mail address for Mr. Karr, the defendant.  Did Mr. Waters or

2   Mr. Karr, to your knowledge, maintain communications by e-mail

3   along other means?

4           MR. T. MILLS:  Request time period of the -- in the

5   question.  We object on the grounds that it does not specify

6   time period.

7   Q.  (BY MR. CARRUTH) Well, at any time --

8   A.  Yes.

9   Q.  -- since you've lived with him?

10  A.  Yes.

11          THE COURT:  Objection is overruled.

12  Q.  (BY MR. CARRUTH) And what was the e-mail handle or address

13  that Mr. Waters used when communicating with Mr. Karr and

14  other persons on the internet?

15  A.  Well, one address that he used was Sir Rolland.

16  Q.  Okay.  Now, you testified earlier -- did you ever know Mr.

17  Waters to have any false identification documents in his

18  possession?

19  A.  Yeah.

20  Q.  Let me show you what's been marked for identification as

21  Government Exhibit No. 13, which is a -- appears to be a

22  driver's license.  Do you recognize the photograph of the

23  individual on that?

24  A.  Well, that's David.

25  Q.  And without saying what the name is, does the name on the

1   license match the man in the photograph?

2   A.   No.

3   Q.   And by the same token, Government Exhibit No. 15 appears

4   to be a Social Security card.   Does that Social Security

5   number, to your knowledge, belong to Mr. David Rolland Waters?

6   A.   No.

7   Q.   Ms. Steffens, I'm now handing you a rather large or thick

8   exhibit of documents, marked Government's Exhibits W10-1,

9   parenthesis 1, close parenthesis, and attached to the front of

10   that is an affidavit from the custodian of records for the

11   Southwestern Bell Telephone Company, attesting that the

12   attached 698 pages of records are business records maintained

13   in normal course of business by Southwestern Bell Telephone

14   Company.   And it's signed by a notary public, by Deborah

15   Stoner, the custodian.   And those purport to be your telephone

16   records during the time that you resided with David Waters; is

17   that correct?

18   A.   Uh-huh.

19   Q.   And, your Honor, we would offer these, and I understand

20   there's no objection from Mr. Karr's attorneys.

21       MR. T. MILLS:   No objection.

22   Q.   (BY MR. CARRUTH) And would you look -- first --

23       THE COURT:   Received.

24   Q.   (BY MR. CARRUTH) -- identify this as your phone number

25   that you had when you were living with Mr. Waters?   Let's

*Houston - Direct*

1 start right here.  Does it say to whom that number was
2 assigned?  Right here.
3 A.  Patti Steffens.
4 Q.  And what was the address?
5 A.  6008 North Lamar, Apartment 219, Austin, Texas.
6 Q.  And that apartment number is 219 that you previously
7 testified about where you lived with Mr. Waters?
8 A.  Uh-huh.
9 Q.  And did so back in 1995?
10 A.  Uh-huh.
11 Q.  Now, I want you to go through, ma'am -- I have marked four
12 tabs in these records, and I want you to go through and look
13 at these, one at a time, and tell me if you can identify any
14 collect calls charged to your phone from Vienna, Illinois.
15 Would you go through there, please, ma'am, and see if you
16 identify those?  If you do, tell me the dates of the call and
17 the duration of the call.
18 A.  Where was the date located?
19 Q.  Would be 12-26.  That's '94.
20 A.  Well, there's one on 12-4, 12-26.
21 Q.  Of 1994?
22 A.  Appears to be.
23 Q.  And then, the next one would be?
24 A.  1-29, probably '95.
25 Q.  Okay.  And the next one?

*Houston - Direct*

1    A.  2-19.

2    Q.  Of '95?

3    A.  Of '95.  And 3-11 of, I guess, '95.

4    Q.  And do you know anyone in Vienna, Illinois?

5    A.  Well, that's where Gary had formerly resided.

6    Q.  And I show you now what's been marked for identification

7    as Government's Exhibit W11C-1, and ask you to compare the

8    telephone number listed on this exhibit, which, again, is

9    under seal of the custodian of the Consolidated Communication

10   Public Services and which defense counsel has no objection,

11   and we would offer at this time, your Honor, W11C-1.

12        THE COURT:  Be received.

13        MR. CARRUTH:  Thank you.

14   Q.  (BY MR. CARRUTH) Would you compare the telephone number on

15   the top of the second page of that exhibit?  And if you'd

16   like, I'll read it into the record or you could read yours

17   into the record.

18   A.  618-658-2039.

19   Q.  Would that be the same one shown on the W11C-1 Exhibit

20   right here?

21   A.  Yes.

22   Q.  Okay.  And can you look over, then, on the third page of

23   this exhibit and tell me to whom that number is registered or

24   was registered in 1994 and '95, according to the records of

25   the General Telephone Company, which had been taken over by

1  the Consolidated Communications Public Services?

2  A.  It's a Vienna Correctional Center.  It's spelled Vienna,

3  but they pronounced it Vienna.

4  Q.  Do you have any knowledge of any or all of these collect

5  calls, who they were from?

6  A.  From Gary.

7  Q.  And when Mr. Karr called, did you ever have occasion to

8  answer the phone?

9  A.  Well, yes.

10  Q.  Now, did you ever talk to him?

11  A.  Well, on one occasion, in particular, back when we had

12  first -- the first year that we moved to Austin, David put me

13  on the phone with him, and we chatted about, you know, music

14  and about the educational programs he was involved with and,

15  you know, just had his activities, and so forth, and just a

16  chat.

17  Q.  And was it subsequent to those collect telephone calls

18  that Mr. Karr traveled to Austin for the first time in 1995?

19  I'm not suggesting that's the first time he had been to

20  Austin, but in 1995 he was?

21  A.  Yes.

22  Q.  And do you recall in 1995, how many trips he may have made

23  to Austin and by what mode of travel, if you know?

24  A.  Well, I think that he flew there to visit once, and then,

25  it seems like he drove.  Like once, I think that he had moved

Houston - Direct

1  from Florida or moved to Florida, and I think he drove there.

2  So he flew and he drove.

3  Q.  Do you know a lady by the name of Francis Cucinotta?

4  A.  Not personally.

5  Q.  Have you ever had any contact or dealings with her by

6  phone or otherwise?

7  A.  Not myself.  I know that she was his girlfriend when he

8  first got out.

9  Q.  Okay.  And when is the first time you ever spoke to or met

10  Mr. Gary Karr, the defendant in this case?

11  A.  Well, I spoke to him on the telephone in '92.  We moved

12  from San Antonio to Austin on September of '92.  So it was

13  probably late '92, as we were still in that apartment, 308.

14  Q.  Okay.  And did you continue to maintain contact with him

15  or he with you over the ensuing years?

16  A.  Well, with David, not with me personally.

17  Q.  And when did you meet Mr. Karr for the first time

18  face-to-face, in person?

19  A.  Well, in '95.

20  Q.  That's when he flew to Austin the first time?

21  A.  Yeah.

22  Q.  Okay.  Now, you told us earlier on your direct examination

23  that you worked at the Poodle Dog Lounge on North Lamar?

24  A.  Yes.

25  Q.  While you were employed at the Poodle Dog Lounge, did you

*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS (AUSTIN)*

Houston - Direct

1    come to meet a man known as Jerry Basey from Austin?

2    A.   Yes.

3    Q.   To your knowledge, in 1995, did Mr. Jerry Basey from

4    Austin have a hunting lease near Camp Wood, Texas?

5    A.   Yes.

6    Q.   And how did you know that?

7    A.   Well, because, I mean, I had heard him talking about it.

8    I mean, the same guys come in, you know, every day, and I

9    worked Wednesday through Saturday, day shift at this bar.  You

10   know, and it was, like, older guys, and they would come there

11   and they'd have a few beers, you know, so you just learn,

12   practically, everything about them.

13          And I had heard him talking about it, you know.  It

14   was fairly common knowledge.  Everybody there knew each other

15   forever.

16   Q.   And did there come a time during the episode or the event

17   in 1995 that Mr. Waters contacted you and asked you to talk to

18   Mr. Basey about visiting his hunting lease?

19   A.   Well, yes.  I mean, he asked me if I, you know, knew of

20   anyplace like where he could get away, you know, a place way

21   far away from everything.  And I said, well, you know, how

22   about a hunting lease?

23   Q.   And did he want to go hunting or camping or picnicking?

24   A.   No.  He said vaguely something about camping, but you

25   know, he's not a camper by any means.

*Houston - Direct*

1   Q.  And as a result of that, did you make a request of Mr.

2   Jerry Basey for the use of his hunting lease in Camp Wood?

3   A.  Yes.

4   Q.  And did he concede to your request?

5   A.  Yes, he knew both of us.  He didn't -- he drew me a map,

6   gave me the combination to a gate lock and --

7   Q.  Did Mr. Waters ever communicate to you about what you

8   should tell Mr. Basey about whether or not y'all ever used the

9   hunting lease?

10  A.  Well, yes.  He said, you know, because I had -- I don't

11  remember quite what was said precisely, but, you know,

12  somebody said, "Well, you know, if we don't go out there, what

13  am I supposed to tell Jerry or what should I say?"  And he

14  said, "Tell him that, you know, it was raining or that we just

15  didn't get a chance."

16  Q.  Did you personally ever go out to that hunting lease at

17  Camp Wood?

18  A.  No.

19  Q.  Did there come a time during this same time frame that

20  we're talking about, the 30-day period, when the three men

21  were gone and came back periodically from time to time, when

22  Mr. David Waters ever asked you to wash or clean his Camaro?

23  A.  Yes.

24  Q.  And can you tell us why it needed washing or cleaning, if

25  it did?

*Houston - Direct*

1    A.  Well, it needed washing or cleaning because he said so.  I

2    mean, you know, it had quite a bit of mud in the wheel walls,

3    but he said the particular detail that he insisted upon was

4    that I get an underbody wash.

5    Q.  And did you do so at his request?

6    A.  Yes, because he was very adamant that I should -- if he

7    asked me to do something, he wanted it done now.

8    Q.  Now, Ms. Steffens, during the time that you were at the

9    Poodle Dog Lounge, were there any illegal drugs used either by

10   yourself or anyone else in your presence?

11        MR. T. MILLS:  Excuse me, Judge.  I object on the

12   grounds of relevance.

13        THE COURT:  If you'll come up, please.

14      (At the Bench, on the record.)

15        THE COURT:  What's the relevance?

16        MR. CARRUTH:  Just going to steal his thunder.  He's

17   just going to ask her if I don't.  I think I want to disclose

18   her prior drug use than let him hammer away like she's trying

19   to hide it.

20        MR. T. MILLS:  I didn't know it was her direct use.  I

21   thought it was an accusation.

22        MR. CARRUTH:  There's others besides her that use

23   drugs.  You don't want to get into it, we won't get into it.

24        MR. T. MILLS:  I object to evidence of Mr. Karr being

25   involved in drugs.

```
 1          THE COURT:  I haven't heard anything to --

 2          MR. T. MILLS:  I don't know how to be more specific.

 3          MR. CARRUTH:  Are you going to cross her about her

 4   drug use?

 5          THE COURT:  He doesn't have to answer your questions.

 6   Let me ask you this:  Do you intend to elicit evidence that

 7   Karr used drugs?

 8          MR. CARRUTH:  Not that he used drugs, but he asked her

 9   for a contact to sell some drugs.

10          THE COURT:  At what time frame?

11          MR. CARRUTH:  During this same time period after it

12   was over.

13          THE COURT:  All right.  Objection's overruled.

14   Q.  (BY MR. CARRUTH) Would you like for me to repeat the

15   question?

16   A.  Sure.

17   Q.  During the time period that you resided with Mr. Waters

18   when Mr. Karr was in and out, was anybody using drugs --

19   A.  Well --

20   Q.  -- in your group?

21   A.  Well, I can speak for myself, and yes, I did.

22   Q.  Okay.  Did you ever use drugs to the point where you had

23   to seek treatment for addiction or go to the Betty Ford Center

24   and dry out, or anything like that?

25   A.  Never.
```

*Houston - Direct*

1   Q.  You used illegal drugs recreationally?

2   A.  Yes, and opportunistically.  I did not purchase drugs.

3   Q.  Did you ever sell drugs?

4   A.  No.

5   Q.  Did you ever exchange drugs for sexual favors?

6   A.  No.

7   Q.  Did you ever know Mr. David Waters to use drugs, illegal

8   drugs?

9   A.  Well, he smoked marihuana.

10  Q.  Do you know a Kelly Johnston?

11  A.  Yes.

12  Q.  Did you ever know of her using drugs?

13  A.  Well, yes.

14  Q.  What is she, if anything, to Mr. Gary Karr?

15  A.  Well, I think girlfriend, fiance, current.

16  Q.  Do you know a lady named Donna Brooks?

17  A.  Yes.

18  Q.  Have you ever seen or known Ms. Donna Brooks to use

19  illegal drugs?

20  A.  Yes.

21  Q.  And what, if anything, is she to Mr. Gary Karr?

22  A.  Well, probably I guess you would just say a friend or

23  whatever, but I think, you know, they sort of, you know, were

24  seeing each other a little, you know, sleeping together or

25  whatever.

*Houston - Direct*

1   Q.  Okay.  And this was during the time that she was using

2   drugs?

3   A.  Well, she probably uses, yeah.  You know, specifically,

4   (Moves head side to side.)

5   Q.  Now, have you ever been convicted of a felony?

6   A.  No.

7   Q.  Have you ever been convicted of a misdemeanor?

8   A.  No.

9   Q.  Have you ever done anything for which you probably could

10  be convicted but you weren't?  By that I mean assist in

11  stealing any property, or take any money illegally, anything

12  of a dishonest nature that you'd like to share with this jury?

13  A.  Well, you know, yes, I've done things.

14  Q.  You're not an angel; is that correct?

15  A.  (Moves head side to side.)

16  Q.  What was it that caused you to split up with Mr. Waters

17  and when did that occur, if it did?

18  A.  Well, I don't know why it didn't happen earlier, but I

19  just couldn't take his life-style anymore.  And, I mean, we

20  had just -- you know, we had been a couple in name only for so

21  long.

22  Q.  By that you mean you were sleeping in separate bedrooms?

23  A.  Well, you know, we just weren't sleeping together.  I

24  mean, there were times we slept in the same bed, but I mean,

25  it meant absolutely nothing.  But for the most part, I mean,

*Houston - Direct*

1    really, after the first two years, I mean, we just didn't

2    really -- I don't know how to describe it.

3    Q.   When did you leave Mr. Waters?

4    A.   '98.

5    Q.   Did you subsequently marry a man named Dwayne Chavez?

6    A.   Yes.

7    Q.   Are you and Mr. Chavez still legally married, although

8    separated?

9    A.   We are legally married, yes.

10   Q.   Ms. Steffens, after putting up with the -- all these

11   things for years, the abuse that you obviously have told us

12   you took from Mr. Waters, what was it that finally occasioned

13   or caused you to come forward and contact the FBI to report

14   what you believe to be criminal conduct by Mr. Waters and

15   other persons?

16   A.   Well, I was sitting in my office, and really, John

17   McCormmick changed my whole paradigm.

18   Q.   And who is John McCormmick for the jurors who may not be

19   familiar with him?

20   A.   Well, he's a reporter that, I guess, had the sense or the

21   insight to have Danny's body, DNA identified.  So, you know,

22   when I saw that in black and white and I determined that

23   everything that I really thought and just tried to push away

24   from my conscience all this time was true.  It was just right

25   there.

Houston - Direct

1          It was like I just tried to shield myself from the

2    truth so much.

3    Q.   Were you in denial?

4    A.   Complete.

5    Q.   When you realized Mr. Fry was dead, what did you do?

6    A.   Well, when my husband contacted the authorities and

7    Special Agent Cowling made contact with me, or I made contact

8    with her, however you want to put it, and I determined that

9    she was a woman to be trusted.  And I got an attorney and told

10   him what I thought had happened.

11   Q.   Did your attorney contact my office?

12   A.   Yes, I believe so.

13   Q.   And arrange for what is known in law as use immunity?

14   A.   Yes.

15   Q.   And what do you understand that to mean, Ms. Steffens?

16   A.   I understand that to mean as long as I tell everything, no

17   matter how awful, and I tell the truth, that it can't be used

18   against me because I didn't do anything to those people.  I

19   might have accepted money and did some really stupid things,

20   but I didn't kill anybody or participate in the planning of

21   it.

22   Q.   Did you also receive an immunity letter from the District

23   Attorney of Dallas County, Texas relating to Mr. Fry's murder?

24   A.   Yes.

25   Q.   And this is, likewise, use immunity, the same as you've

Houston - Cross

1    been given by the federal government; is that correct?

2    A.  It is, but if I killed Danny, it would not protect me from

3    that.

4    Q.  And this use immunity is conditioned on the representation

5    that you are not liable for the deaths of Madalyn Murray

6    O'Hair, Jon Garth Murray, Robin O'Hair or Danny Raymond Fry as

7    a primary actor.  Is that your understanding of it?

8    A.  As a primary actor.

9    Q.  Have you ever killed anybody?

10   A.  No.

11   Q.  Have you ever kidnapped anybody?

12   A.  Never.

13   Q.  Have you ever extorted anybody?

14   A.  No.

15   Q.  Have you ever robbed anybody?

16   A.  No.

17   Q.  Pass the witness.

18                        CROSS-EXAMINATION

19   BY MR. T. MILLS:

20   Q.  Ms. Steffens, my name is Tom Mills, and I represent Gary

21   Karr.  I know that -- I think that you know this, but you know

22   that Mr. Waters is not on trial here today.

23   A.  Uh-huh, yes.

24   Q.  I'm going to attempt to ask you real specific questions,

25   and if you don't understand the question, will you let me

*Houston - Cross*

1   know?

2   A.   (Moving head up and down.)

3   Q.   If you do understand the question, will you try to just

4   answer my question?

5   A.   (Moving head up and down.)

6   Q.   All right.  I think the Court Reporter -- it would help if

7   you say "Yes" or "No" instead of just nodding your head.

8   A.   Yes.

9   Q.   And let me know or the Court know if you need a break.

10  A.   Okay.

11  Q.   After Dwayne Chavez contacted the authorities, do I

12  understand that you had contact from an FBI agent?

13  A.   Well, I went to them, yes.

14  Q.   Okay.  And when you went to them, had you already hired a

15  lawyer?

16  A.   No.

17  Q.   Did you talk to the FBI about your -- about details of

18  what you were going to say then, or did you go get a lawyer?

19  A.   Well, I gave them a lot of details.  We talked for a long

20  time.

21  Q.   Do you know the date of that first contact?

22  A.   Not right offhand.

23  Q.   Would it have been February 1999?

24  A.   That sounds right.

25  Q.   And between February 1999 and May 2000, that's where we

*Houston - Cross*

1   are now, you have had many contacts, interviews and talks with

2   either the FBI agent or the IRS agent that are involved in

3   this case, correct?

4   A.   Yes.

5   Q.   All right.  And by many, it might be as many as 40 or 50;

6   isn't that true?

7   A.   Well, I don't know if it's that many.

8   Q.   Well, it's -- well, would you agree that it's probably for

9   than 25?

10  A.   Well, sure.

11  Q.   All right.  And do these documents that I'm going to show

12  you represent immunity agreements with Dallas County District

13  Attorney's Office and the United States Department of Justice

14  for the Western District of Texas?

15  A.   Those appear to be the one.

16  Q.   We would offer into evidence PS-1 and PS-2, Pattie

17  Steffens 1 and 2.

18          MR. CARRUTH:  No objection, your Honor.

19          THE COURT:  They're received.

20  Q.   (BY MR. T. MILLS) Now, first of all, the one with the

21  Dallas County District Attorney's Office, it's my

22  understanding that Danny Fry's body was found in Dallas

23  County; is that right?

24  A.   That's my understanding.

25  Q.   All right.  So you have immunity from the murder of Danny

*Houston - Cross*

1    Fry, correct?

2    A.  I believe so -- well, no, not for murder.

3    Q.  Well, to be prosecuted for the murder.

4    A.  I think that if I were a primary actor in that murder, I

5    would not be immune.  That's my understanding.

6    Q.  All right.  Well, what crime do you have immunity from

7    prosecution for in Dallas County?

8    A.  Well, I guess knowledge of or assisting in, but not the

9    actual murder, as I understand it.

10   Q.  All right.  What federal crimes do you understand that you

11   have immunity from prosecution covered in the Western District

12   of Texas?  Would that be -- would it include kidnapping Ms.

13   O'Hair and Jon and Robin?

14   A.  Well, I suppose.

15         MR. CARRUTH:  Your Honor, I would like -- and this is

16   a legal point at which the witness may not be informed, but I

17   think he's implying that she has immunity from prosecution,

18   and that is not what she has in either of these two immunity

19   agreements.  She has immunity from the use of her testimony

20   against her in the prosecution, not that she gets a free walk

21   or free ride.

22         And I'd like that to be explained to the witness and

23   the jury.  And she has counsel in the courtroom if we could

24   take a recess and let her confer with counsel, because he's

25   asking her questions --

Houston - Cross

1    THE COURT:  He's entitled to ask her questions, Mr.

2   Carruth, as to what he believes she has immunity from being on

3   the stand.  So your objection, if it is an objection, is

4   overruled.  It's a speech.  It's overruled.  Sit down.  You

5   may continue your question.

6    MR. CARRUTH:  Thank you, your Honor.

7   Q.  (BY MR. T. MILLS) In each of these letters, the

8   prosecutor, either in state court or federal court, has to

9   determine whether you're being cooperative and truthful in

10  terms of enforcing this agreement, don't they?

11  A.  I guess.

12  Q.  All right.  Well, I'll let you see them, but isn't that

13  what they say?

14  A.  Well, you know, you're asking me about things that perhaps

15  are fine points that are very obvious to you, but perhaps are

16  not so obvious to me in use of your terminology.  So as my

17  understanding is as long as I tell the truth about the items

18  that I know that that truth cannot be used against me.

19     For example, I accepted money that was obviously taken

20  from people who are now dead.  I suppose that's against the

21  law, but by telling that, they're not going to use that

22  against me.  I'm just restating what I think.

23  Q.  Well, have you ever read these two immunity -- these two

24  letters?

25  A.  Yes.

*Houston - Cross*

1    Q.  All right.  And may I refer you to PS-1, the -- tell me if

2    I read this correctly.  This proffer of use immunity is

3    authorized by Castergar vs. United States, 406 U.S. 441, 1972,

4    shall be applicable so long as your client provides truthful

5    information and evidence.  And that was what I was --

6    A.  Oh, okay, yeah.

7    Q.  And to your understanding, it's the prosecution who

8    decides if what you say is truthful?

9    A.  I would think so.

10   Q.  All right.  Well, you certainly have every motivation to

11   be pleasing to the prosecution in this case, do you not?

12   A.  Sure.

13   Q.  And in August and September and early October of 1995, you

14   observed certain facts and events that you were called upon to

15   think back on in early 1999 by law enforcement, correct?

16   A.  Uh-huh.

17   Q.  Yes?

18   A.  Yes.

19   Q.  All right.  You did not make a diary between '95 and '99,

20   did you?

21   A.  No.

22   Q.  Did you make any other kind of written record of what you

23   saw, who said what, that sort of thing?

24   A.  No.

25   Q.  All right.  Now, when you observed events that you've

*Houston - Cross*

1    testified to upon questioning by Mr. Carruth, in 1995, you did

2    not necessarily attach criminal meaning to them, did you?

3    A.   I didn't attach certain criminal meaning to them.   I

4    attached, you know, suspicious activity perhaps.

5    Q.   All right.  And yet, if you attached very much suspicious

6    activity to them, you would really not have stayed and lived

7    with David Waters until 1998, would you?

8    A.   Well, I did, so yes, I guess -- I mean, I did.

9    Q.   I know you did.  You lived with him for a couple of years

10   -- maybe more -- after events that you're thinking back now

11   and saying, oh, my gosh, but in 1995 and 6 and 7 and 8, you

12   may not have been sleeping with him all the time, but you were

13   living with him during all those years, right?

14   A.   Uh-huh.

15   Q.   And I'm just saying isn't it true that during those years,

16   you didn't move out or have him evicted; you just kept living

17   with him, right?

18   A.   Well, I couldn't have him evicted.  His name was on the

19   lease.

20   Q.   Yes --

21   A.   I didn't want to move out because it was my stuff, my

22   apartment.  I paid for everything.

23   Q.   All right.

24   A.   I asked him to move many times.  There was always a reason

25   why he couldn't move, why he didn't move, why he wouldn't

*Houston - Cross*

1  move.  And in the end of '98 or mid-'98, he had agreed to

2  move.

3  Q.  All right.  Well, during August, the end of August of

4  1995, when a note was found on the O'Hairs' business and they

5  left Austin, you do not know specifically on what days of

6  August 1995 that Gary Karr was even in the state of Texas, do

7  you?

8  A.  Of August 1995?

9  Q.  Yes.

10  A.  It was, like, the last two weeks.  I mean, I suppose --

11  no, I suppose I can't give you actual dates.

12  Q.  Well, do you -- do you know of your own personal knowledge

13  that Gary Karr was in Texas every day for the last two weeks

14  of August?

15  A.  No.

16  Q.  Because there were days when you didn't see him, right?

17  A.  Right.

18  Q.  And you don't know if he was in Florida with Charlene or

19  somewhere else, do you?

20  A.  Not absolutely, no.

21  Q.  All right.  And when he was in Austin, he did not sleep at

22  y'all's apartment every night, did he?

23  A.  Well, when he was in Austin, pretty much he slept at our

24  apartment.

25  Q.  I understand.  But there's a difference in pretty much and

Houston - Cross

1  every night.  And I'm saying, isn't it a fact that when he was
2  in Austin, he didn't stay at your apartment every night, did
3  he?
4  A.  I just can't agree.  I mean, I can't say "Yes" to that.  I
5  mean, because if he was in Austin, he was staying at our
6  apartment.  If he wasn't in Austin, he wouldn't have been
7  staying at our apartment.  I do not recall him ever spending
8  -- if he was in Austin, he was at our apartment.
9  Q.  All right.  In the month of September, isn't it true that
10  you saw him, maybe, three times, Gary Karr?
11  A.  Uh-huh.
12  Q.  That's a "Yes"?
13  A.  Yes.
14  Q.  All right.  And on the 27 days that you did not see him,
15  do you know of your own personal knowledge exactly where he
16  was and what he was doing?
17  A.  No.
18  Q.  All right.  I mean, it would be impossible, wouldn't it?
19  A.  Yes.
20  Q.  All right.  You never in your life have seen Gary Karr in
21  possession of a gun, correct?
22  A.  I don't believe so.
23  Q.  All right.  Let me ask you about these fanny packs.  Did
24  -- have you seen people who wear fanny packs that, to your
25  assumption, they're just putting stuff in it to keep their

*Houston - Cross*

1  hands free?

2  A.  Uh-huh.

3  Q.  Right?

4  A.  Yes.

5  Q.  All right.  They don't automatically have a criminal

6  association in your mind, do they?

7  A.  Well, they kind of do, because David often wore fanny

8  packs so that he could steal things.

9  Q.  And that made a deep impression on you?

10  A.  Well, it certainly, you know, sort of lifts the veil of,

11  you know, innocence.

12  Q.  To fanny packs on David?

13  A.  Well, you know, it sort of opens your eyes to what people

14  can do.  You know, just because somebody has a fanny pack on

15  doesn't mean they're not sticking stuff in it.  On the other

16  hand, it doesn't guarantee that they're stealing things.

17  Q.  All right.  You went through the exercise with Mr. Carruth

18  of seeing whether or not a gun would fit in these, but there

19  are other things, like keys, contact lens solution, a wallet

20  that lots of things can fit in fanny packs, correct?

21  A.  That's right.

22  Q.  Okay.  How many days in your lifetime did you see Gary

23  Karr wearing a fanny pack in your memory?

24  A.  I guess twice.

25  Q.  Okay.  And you don't know if he had a gun, a knife, a

*Houston - Cross*

1   ballpoint pen, or popcorn in there, do you?

2   A.   No.

3   Q.   All right.   Now, do you know September either through --

4   thinking about these events or by talking with the prosecution

5   agents, or whatever reason, do you know the days and dates in

6   September in terms of when you described some event that you

7   know that that was September the 29th or 31st, or 22nd, do you

8   pretty much?

9   A.   Could you repeat the question?

10  Q.   Have you gone over your memory and your testimony enough

11  to where you remember what events happened on what days?

12  A.   Well, there are some events that are landmarked for me

13  because of the presence of my mother, the presence of, like,

14  photographs with, you know, from my girlfriend who had a date

15  stamped on them, the date that she would leave, you know, the

16  date that my mom came.   Certain things have date stamps for me

17  on them, yes.

18  Q.   All right.   Well, what day, for example, did your mom --

19  if you remember this, what day did your mom break her ankle?

20  A.   Let's see.   I don't know.   Maybe the 18th or something

21  like that.

22  Q.   Maybe the 18th?   Well, then, let me pick a different one.

23  Do you know of any events that happened toward the end of

24  September, like the Wednesday, the 28th, or Tuesday, the 27th,

25  or the 29th, or 30th?   Do you know any of these dates, what

*Houston - Cross*

1   happened?

2   A.   Let me see.  It was Friday; is that correct?  Friday is

3   the 30th?

4   Q.   Well, maybe my calendar's wrong.  I hope it's not.  But do

5   you have a recollection that it's a different day?

6   A.   I was thinking it was a Saturday, but I could be wrong.

7   Q.   Well, unless I -- till I find out for sure if it's -- do

8   y'all know if it's right?

9        MR. D. MILLS:   27th was a Wednesday.

10  Q.   (BY MR. T. MILLS) Then, I'll wait until I get it right.

11  Well, let me ask you about a shovel.  Prosecution Exhibit

12  W79-8.  All right.  You -- in 1995, you saw a shovel in the

13  back of a Cadillac that David Waters had bought in the trunk;

14  is that right?

15  A.   Uh-huh.

16  Q.   Yes?

17  A.   Yes.

18  Q.   Okay.  And you saw -- you opened the trunk up to put

19  something in there.  You saw a shovel and a saw, correct?

20  A.   Correct.

21  Q.   Did you shut it -- or did you study it for a long period

22  of time?

23  A.   Well, I did kind of look at it for a bit because I wanted

24  to determine if there was -- I don't know, any evidence on it,

25  I guess.

Houston - Cross

1   Q.   All right.  Well, do you remember if the shovel was clean?

2   A.   Well, it didn't have debris like that.

3   Q.   Did not have debris like this does?

4   A.   Right.

5   Q.   All right.  Do you remember -- do you know enough about

6   gardening tools or work tools to know that shovels come in

7   different shapes for different purposes?

8   A.   Yes.

9   Q.   All right.  You don't know for sure that this shaped

10  shovel is the same kind that you saw in the trunk, do you?

11  A.   I'm pretty certain.

12  Q.   You're pretty certain?

13  A.   Yeah, I mean, I grew up on a farm.  That was the kind of

14  shovel it was.

15  Q.   All right.  And do you remember that it was an old shovel

16  like this that has a whole bunch of rust on it?

17  A.   No, it wasn't old.

18  Q.   It was not old?

19  A.   It was not brand new, but it wasn't old.

20  Q.   Okay.  Now, since this was -- do you feel that this is

21  representative of just being a shovel as opposed to being the

22  shovel that you saw?

23  A.   Well, that is the kind of shovel that was in the back of

24  the car.

25  Q.   Okay.  It's the kind of shovel, but it's not the shovel

Houston - Cross

1    because it's not clean and it's got a lot of rust on it; is

2    that accurate?

3    A.  Well, it's like I told him, it's not the shovel.

4    Q.  Okay.  It's just a shovel.  You grew up on a farm?

5    A.  Yeah.

6    Q.  Did you ever use a bow saw?

7    A.  Yes.

8    Q.  Are they commonly or frequently used for trimming trees?

9    A.  Yes.

10   Q.  Okay.  Was Apartment 219 the second apartment that you and

11   Mr. David Waters lived in in Austin?

12   A.  Yes.

13   Q.  And did Mr. Waters have a bow saw at the first apartment?

14   A.  No.

15   Q.  Did Mr. Waters have a bow saw in the second apartment?

16   A.  After September 30th, he did.

17   Q.  After September 30th.  And the significance of September

18   30th is?

19   A.  Well, it's the end of the crime month -- I mean, it wasn't

20   there before, and then, it was there after he came home.

21   Q.  It was there being the apartment?

22   A.  Correct.

23   Q.  Okay.  It was there in the sense that he came home.  And

24   do you recall that he came home on Saturday, September 30rd?

25   A.  Well, I'm not saying that he came home on Saturday,

1    September 30th.  I'm just saying that after he came home, the

2    bow saw was there.

3    Q.  All right.  Where did you see it?

4    A.  Well, it was in the closet outside -- there was, like, a

5    water heater closet outside our front door, and it was in

6    there.

7    Q.  And you saw it on the same day that you saw him for the

8    first time in a long time?

9    A.  No.

10   Q.  When did you first see it?

11   A.  I saw it in the back of the trunk, and then, that same saw

12   showed up in our closet.

13   Q.  And thinking back upon 1995, do you recall if that was a

14   red bow saw?

15   A.  It was like that, sort of orange.  It was that bow saw.

16   Q.  It was this exact bow saw?

17   A.  Well, I would say yeah.  I mean, you know, maybe there's

18   been one substituted, but that's the kind of bow saw.

19   Q.  Now, you never did say, David, what are you using the bow

20   saw for, did you?

21   A.  (Moves head side to side.)

22   Q.  No?

23   A.  No.

24   Q.  About -- let me look at the date.  I don't have the date.

25   Three or four weeks ago, I -- there was a conference call

1   where I asked you some questions on the telephone, correct?

2   A.   Uh-huh.

3   Q.   And your attorney was present in the U.S. Attorney's

4   Office, and the prosecution and the agents were there, too, to

5   your knowledge.

6   A.   Yeah, there was one agent, I believe.

7   Q.   All right.  And you didn't -- I'm not saying that you were

8   under oath or in front of a notary or anything, but you didn't

9   tell me the truth about all of your statements that day, did

10  you?

11  A.   I don't remember making any specific lies.

12  Q.   All right.  Well, you said the only drug that you had used

13  was marihuana.

14  A.   I don't believe I said that.

15  Q.   All right.  What do you believe you said?

16  A.   Well, I believe I said, yes, I used marihuana in the

17  1990s.

18  Q.   And do you remember if I asked you if you had used any

19  other drugs?

20  A.   Well, it was kind of a compound question.  We ended up

21  with the marihuana question, and I said yes, I had used

22  marihuana.

23  Q.   Is it your testimony today when you are under oath that

24  you -- that I did not ask you about any other drugs?

25  A.   No.  You did mention other drugs.

Houston - Cross

1   Q.  Did you name any other drugs?

2   A.  No.

3   Q.  Okay.  You have used methamphetamine?

4   A.  Yes.

5   Q.  You have used heroin?

6   A.  Yes.

7   Q.  You have never told the prosecutors that you have used

8   heroin, have you?

9   A.  Yes.

10  Q.  Was that only after -- was that just recently?

11  A.  Yes.

12  Q.  All right.  Because I told them that, correct?

13  A.  Yeah, well, I've got to admit, you know, there are things

14  that I didn't really think was everybody's business because I

15  didn't really consider them to be pertinent to this.  But it's

16  not because I was trying to hold myself out as an angel.

17  Q.  Well, I understand, but -- I understand.  When you worked

18  at the Poodle Dog Lounge, did you give them at different -- in

19  different years slightly different Social Security numbers?

20  A.  No.

21  Q.  Is your social Security Number 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?

22  A.  That is the correct one.

23  Q.  Have you seen these records?

24  A.  I haven't seen them, but yeah, I mean, I saw them.  I

25  didn't examine them.

1   Q.  All right.  Is your Social Security 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?

2   A.  No.

3          MR. CARRUTH:  Your Honor, these are records prepared

4   by the employer, not by Ms. Steffens, and it's an obvious typo

5   and one digit which she is --

6          THE COURT:  Counsel, do you have an objection?

7          MR. CARRUTH:  Yes, I object to him questioning her

8   from an exhibit that's not in evidence and has not been proven

9   up by proper business records predicate.

10         THE COURT:  Okay.

11         MR. T. MILLS:  Well, I won't ask her any more

12  questions.

13         THE COURT:  All right.  Sustain the objection.  The

14  jury is instructed not to consider the last question and

15  answer for any purposes.

16  Q.  (BY MR. T. MILLS) You admit to participating in the

17  computer theft from the Atheist Organization, correct?

18  A.  I admit to being a part of it, yes.  Not a planner, but

19  yeah.

20  Q.  All right.  You admit to financially benefitting from the

21  fact that David Waters stole money from the Atheist

22  Organization in terms of gifts or trips, don't you?

23  A.  Yes.

24  Q.  How many times did you go with David Waters to Las Vegas?

25  A.  Once, I think.

Houston - Cross

1  Q.  You helped tear up and throw away stolen bearer bonds,

2  didn't you?

3  A.  Well, between the two of us, we tore them up, yes.  I

4  mean, not specifically bearer bonds, but that and many other

5  documents.

6  Q.  All right.  Did you -- I was taking notes as fast as I

7  could.  Did you say that it's your opinion that David Waters

8  is a genius?

9  A.  Well, he's been tested.  He has a genius IQ.

10  Q.  All right.  And you know that because you've seen the

11  tests or because he told you?

12  A.  Well, because he told me, his brother told me, his mom

13  told me.

14  Q.  Okay.  You haven't seen any proof of that?

15  A.  I have not, but I don't doubt it.

16  Q.  All right.  You have testified about e-mail addresses.

17  During that period of time, you used an e-mail address of

18  what?

19  A.  I would prefer not to say my e-mail address aloud.

20  Q.  Well, I'll say it.

21        MR. CARRUTH:  Objection on grounds of relevance, your

22  Honor.

23        THE COURT:  Well, it's been all over the county on

24  what everybody's e-mail address is.  You must answer the

25  question.

*Houston - Cross*

1    A.   Okay.  I used MIA58@hotmail.com.

2    Q.   And did you use -- were you also Hot Patti?

3    A.   No.  That was David's fabrication.

4    Q.   Okay.  You do not know if -- well, let me ask you this.

5    Do you know where David Waters drove the Camaro to get it

6    dirty when he asked you to get it washed?

7    A.   No.

8    Q.   A Camaro, was that a four-door vehicle?

9    A.   No.

10   Q.   What -- can you describe it for me?

11   A.   Well, it was a -- I think an '86 Camaro, so it had that

12   sort of longer body style.  Two-door, T-top, red.

13   Q.   All right.  And do you know on what day he asked you to

14   have it washed relative to when you first saw him on the same

15   day that you saw the saw?

16   A.   It was late in the month of September.

17   Q.   All right.  Well, let me make sure I understand this,

18   because I might be confused.  Did you say that on September

19   the 30th was when you believe he came back to the apartment

20   and you saw him?

21   A.   I believe so.

22   Q.   All right.  Well, it can't get much later in the month

23   than the 30th.  In fact, that's the last day of the month.

24   A.   I'll say it was after the 17th.

25   Q.   All right.

Houston - Cross

1   A.  So it was between the 17th and the 30th.  It was in the

2   latter half of the month, let's -- shall we say.

3   Q.  So you saw him in September before the 30th?

4   A.  Yeah.

5   Q.  All right.  And on that day that you saw him, was Gary

6   Karr with him?

7   A.  I don't remember if he was with him that day.

8   Q.  All right.  So you don't have any reason to be able to say

9   it appeared to me that Gary Karr was with him whenever he got

10  the underside of his car muddy because you didn't see Gary

11  Karr that day, did you?

12  A.  No.

13  Q.  All right.

14  A.  I don't believe I did.

15  Q.  All right.

16  A.  I saw Gary just a couple of, you know, just a few times.

17  Q.  I understand that.  Did you go to the Warren Inn at any

18  time during September?

19  A.  No.

20  Q.  Or late August?

21  A.  No.

22       MR. CARRUTH:  Excuse me, your Honor.  Could we get him

23  to clarify the year because the testimony indicates she

24  previously resided at the Warren Inn?

25       MR. T. MILLS:  1995.

Houston - Cross

1    THE COURT:  Question was 1995.  Your answer's holding

2  at 1995?

3  A.  Yes.

4    THE COURT:  All right.

5  Q.  (BY MR. T. MILLS) During your multi-year relationship with

6  David Waters, would you say -- agree that it was true that he

7  manipulated you and others by making up things by sometimes

8  lying?

9  A.  Well, I'm sure that he lied, but his manner of

10  manipulation was more on a need-to-know basis or, you know,

11  you're stupid if you're afraid to do this.  It was more

12  intimidation.

13  Q.  All right.  Did you ever see him intimidate men?

14  A.  Men?

15  Q.  Men.

16  A.  I think in a verbal just -- he would always come out on

17  top.

18  Q.  All right.

19  A.  It was not mean intimidation, like vicious, that I could

20  think of.

21  Q.  All right.  You were aware from some source or another

22  that Mr. Karr enjoyed playing tennis, correct?

23  A.  Yes.

24  Q.  All right.  Did you hear that he played tennis with Jon

25  Murray in September 1995?

*Houston - Cross*

1    A.   No.

2    Q.   Isn't it true that he typically wore traditional, real

3    tennis shoes, in other words, not jogging shoes, not -- but

4    real tennis shoes with the flat surface so that it doesn't

5    disturb the play?

6    A.   That's my observation.

7    Q.   All right.  Now, was it on this day, the 30th, returning

8    of -- seeing David Waters' bow saw that you saw a bag in

9    y'all's apartment that had your dad's wash rag or wash cloth

10   in it?

11   A.   Was it on the 30th?  It was either on the 30th or,

12   possibly, the 1st because my mother was gone.

13   Q.   All right.  And do I understand that you saw something on

14   it that you believed was on this wash -- was it a wash cloth?

15   A.   Uh-huh.

16   Q.   Yes.

17   A.   Yes.

18   Q.   That you believe was blood?

19   A.   Yes.

20   Q.   All right.  And is it true that Mr. David Waters got the

21   wash cloth, went over to the sink and rinsed it out?

22   A.   Yes.

23   Q.   All right.  And did it appear that it came out?

24   A.   Well, it didn't come, you know, fully clean, no.

25   Q.   Okay.  Now, in the bag, did you see any traditional tennis

*Houston - Cross*

1    shoes like we just discussed about the kind that Gary Karr

2    normally wore?

3    A.  Well, yes.

4    Q.  You did -- as opposed to jogging shoes?

5    A.  Yes, as opposed to a running shoe, yes.

6         THE COURT:  Counsel, make a note where you are.

7    Members of the jury, I'm going to give you your afternoon

8    break.  At least 15 minutes.  Please be ready to come back in

9    in 15 minutes.  You can step outside if you wish, but don't

10   run away.

11      (Recess.)

12        THE COURT:  Ms. Steffens, you remain under oath.

13   Counsel.

14        MR. T. MILLS:  May it please the Court.

15   Q.  (BY MR. T. MILLS) Ms. Steffens, referring to the two

16   documents, PS-1 and PS 2, the two use immunity letters, is it

17   correct that they were written to your attorney here in

18   Austin, Mr. Wayne Meisner?

19   A.  Yes.

20   Q.  And at the time that they were written, on February the

21   5th, is it correct that you had spoken with the FBI agent on

22   one occasion, or had there been more than one occasion?

23   A.  I think just one occasion, if my memory serves me.

24   Q.  All right.  In the conversation that I had with you over

25   the speaker -- over the telephone, is it correct that you

Houston - Cross

1    stated that of -- is it correct that you stated that you saw

2    four pairs of tennis shoes?

3    A.  No.

4    Q.  Is it correct that you stated of the three pairs of tennis

5    shoes that you could not say that any of the three were

6    specifically ones that Gary Karr had worn?

7    A.  Right.  I could not.

8    Q.  But you do not have any other knowledge about David

9    Waters, or Danny Fry, or Chico Osborne buying tennis shoes for

10   themselves or others in your presence, do you?

11   A.  Did I see them buying tennis shoes for themselves or

12   others?

13   Q.  Yes.

14   A.  No -- well, David, yes.

15   Q.  You did see David buy tennis shoes?

16   A.  I've seen David buy lots of shoe, tennis shoes among

17   those.

18   Q.  During the time period we've been mainly concentrating on,

19   August through September of 1995, were you present when David

20   Waters bought some tennis shoes?

21   A.  No.

22   Q.  Did David Waters ever say anything to you about buying one

23   or more pairs of tennis shoes in August or September 1995?

24   A.  No.  But one pair of tennis shoes that were in there

25   appeared to be a pair of his old ones.

*Houston - Cross*

1   Q.  His being David Waters?

2   A.  David Waters.

3   Q.  All right.  Do you remember when in the month of September

4   -- and all I've got are the last two days, Friday the 29th and

5   Saturday, the 30th, but do you remember other than Saturday,

6   the 30th -- well, do you remember when in the month of

7   September the three times were that you saw Gary Karr?  For

8   example, even if you don't know the exact date, like the

9   first, middle, or the last or two at this point?

10  A.  Well, I would have seen him leave the end of August, and

11  then, he came back a couple of times.  I remember seeing him

12  in the Cadillac with David, outside the Poodle Dog.

13  Q.  What time period?

14  A.  In September?

15  Q.  Yes, when in the month?

16  A.  Well, having owned the Cadillac would have placed it after

17  mid-month.

18  Q.  And then, did you see him at the very end of the month?

19  A.  Well, yes, all three men.

20  Q.  And would that have been on Saturday, September the 30th?

21  A.  Saturday, September the 30th, I believe is correct.

22  That's the day that my mother left, and I think that's when we

23  all were together at Grace's Restaurant.

24  Q.  And this is kind of one of those obvious questions, but

25  since you weren't with David Waters, or Danny Fry, or Chico

*Houston - Cross*

1   Osborne, you don't know when in the other 27 days Gary Karr

2   was with either one or more of them?

3   A.   No.  But actually, there was a couple of additional times

4   that I did see him, come to think of it, because when my mom

5   was there, David and Gary both came in, like, kind of the

6   middle of the night sort of thing, and that happened a couple

7   of times.

8         But during the day, in daytime, it would have been two

9   or three times.

10  Q.   Well, when were the -- in the middle of the nights?

11  A.   Well, my mom was there two weeks at the end of September,

12  so I know at least one of them occurred then.

13  Q.   Well, that would be around -- I mean, two -- the two-week

14  period between the middle and the end?

15  A.   Yes.

16  Q.   All right.  Do you know if it was toward the middle of the

17  month or the end of the month?

18  A.   Well, it was after she broke her ankle because she was

19  laying on the Futon with the thing on her leg.  So, you know,

20  sometime probably once in the first week.  I mean, you're

21  asking me to remember a date of an event that happened five

22  years ago.  No, I don't know, but I can generally tell you.

23  My mom was on the Futon with a cast on her leg and had to be

24  the last two weeks of September.

25  Q.   All right.  So maybe at time -- maybe another time in this

*Houston - Cross*

1  two-week period?

2  A.  Uh-huh.

3  Q.  Correct?

4  A.  Yes.

5  Q.  All right.  Now, on Monday, October 2nd, that would be the

6  day that you saw Mr. David Waters and Gary Karr together, I

7  believe.  Do you remember if that's correct?

8  A.  I don't recall that's correct.  I had gotten -- let me

9  see.  I don't remember.  I mean, I may have.

10  Q.  All right.  Well --

11  A.  You know, frankly, I'm getting a little fogged.  I'm a

12  little tired.

13  Q.  Well, I can identify --

14  A.  We're here all day, so I don't want to answer incorrectly.

15  Q.  All right.  Let me ask you this:  Was there a time that

16  you got -- that you say that you got emotionally upset because

17  you saw David Waters and he had some bruises?

18  A.  Uh-huh.

19  Q.  Yes?

20  A.  Yes.

21  Q.  And was that the day before -- was that the day that Mr.

22  Waters said that he was storing a half million dollars worth

23  of gold coins?

24  A.  No.

25  Q.  Was it the day -- when was it in relationship to that day?

Houston - Cross

1   A.  Well, it was after that day.

2   Q.  Well?

3   A.  Within a few days, within a couple of days.

4   Q.  All right.  Well, do you remember if the day that the gold

5   coins that you were called by him and said, "Oh, my gosh, the

6   coins are gone," that that was October the 3rd?

7   A.  I don't remember.

8   Q.  All right.  Do you remember if the documents that are in

9   evidence indicate that you checked into the Four Seasons Hotel

10  on Tuesday, October the 3rd?

11  A.  October the 3rd, I guess that was it.

12  Q.  Well, let me see if that -- referring to Exhibit W11A-1,

13  I'm off.  The arrival date at the Four Seasons --

14         MR. CARRUTH:  Excuse me, your Honor.  That's the Royal

15  Sonesta in New Orleans.

16         MR. T. MILLS:  Sorry.  I'll just wait until I can find

17  that exhibit to go back to that question.

18  Q.  (BY MR. T. MILLS) During the time that you talked with the

19  agents or prosecutors in this case, there were times when you

20  learned a fact that was purported to be a fact that you did

21  not know of beforehand, correct?

22  A.  Well, I suppose it's possible.

23  Q.  Well, you remember earlier when you -- I don't remember

24  your exact words, but you said, "Well, at the time, I didn't,

25  but now I do," to some question?

1  A.  No.  I mean, the context of that kind of statement would

2  indicate, I mean, from my point of view, at the time I didn't

3  know that they were kidnapping the O'Hairs.

4  Q.  If they were?

5  A.  If they were.  If the alleged kidnapping occurring, I was

6  not aware of a plan to do so, for example.

7  Q.  Right.

8  A.  And now that I am pretty sure that they're dead, and I

9  definitely know Danny's dead.  Well, you know, I might know

10  that.

11  Q.  Okay.

12  A.  I might say I know that.

13  Q.  Well, just for example, have you seen a picture of Danny's

14  deceased body?

15  A.  Yes.

16  Q.  All right.  The photograph that is W11-5, parenthesis 4,

17  can you see it from here?

18  A.  Uh-huh.

19  Q.  All right.  Is this person Gary Karr with the gray hair?

20  A.  Yes.

21  Q.  And does it appear that his hair is about the same color

22  then as it is now?

23  A.  I suppose more or less.

24  Q.  All right.  And the bottom of this Exhibit W11-54

25  indicates that it was taken August 25th, 1995, during the time

Houston - Cross

1   of the alleged conspiracy to do these things, correct?

2   A.  Well, I call it the planning period.

3   Q.  All right.  Well, the indictment calls the conspiracy

4   April to October 1995.

5   A.  Okay.

6   Q.  Is this you?

7   A.  Yes.

8   Q.  Was Mr. Karr discussing any kind of conspiracy with you

9   there?

10  A.  No.

11  Q.  Was he of a real serious, intense frame of mind as he sat

12  by the pool?

13  A.  No.

14  Q.  All right.  This book, Exhibit W77-23, the original, the

15  Poor Man's James Bond, Volume 1, do I understand that you had

16  seen that in y'all's apartment during the year 1995?

17  A.  Yes.

18  Q.  And '94?

19  A.  Late '94 is when we purchased it.

20  Q.  Where did you buy it?  At a gun show?

21  A.  No, Spy Exchange.

22  Q.  By exchange?

23       THE COURT:  Spy.

24  A.  Spy, S-P-Y.

25  Q.  (BY MR. T. MILLS) Excuse me.  All right.  And it's got all

Houston - Cross

1  kinds -- have you ever looked through it?

2  A.  I glanced through it, but --

3  Q.  Yeah.  I mean, it tells you how to make rockets and an

4  amazing number of mortars, how to design your own balloon?

5  A.  How to poison.

6  Q.  How to poison.  The fact your man was buying this Poor

7  Man's James Bond did not strike fear in your heart and cause

8  you to move out, did it?

9  A.  No.

10  Q.  Did you ever see David Waters make a silencer?

11  A.  Yes, I did.

12  Q.  When?

13  A.  Let me see.  I'm not really sure when.  It was sometime

14  after the purchase of weapons, but I mean, I don't think that

15  he actually used it as one.  But he got, like, a -- I don't

16  know.  Some sort of, like, a styrofoam cooler or something and

17  was sort of trying to fashion a silencer out of that.

18  Q.  Was that in '94?

19  A.  I don't recall.  Might have been -- well, probably '94,

20  '95 --

21  Q.  All right.

22  A.  -- but actually --

23  Q.  Are you about to say something else?

24  A.  No.

25  Q.  All right.  You testified that in 1994, you believe that

Houston - Cross

1    David Waters, the man that you lived with for six years, was

2    hatching a plan to secure the O'Hairs.  Do you remember that?

3    A.   Uh-huh.

4    Q.   Do you remember saying that?

5    A.   Yes.

6    Q.   All right.  And did you see Gary Karr in 1994?

7    A.   No, I think he was still in Miami.

8    Q.   All right.  And did you have the perception based upon

9    what Mr. Waters said that he was going to -- that he was

10   hatching a plan in '94 to secure the O'Hair Murrays with these

11   two sets of handcuffs that he bought?

12   A.   Well, I think my previous testimony has indicated that he

13   actually went to their place and waited for them and had rope

14   and tape and things --

15   Q.   Handcuffs?

16   A.   -- pardon?

17   Q.   Handcuffs?

18   A.   I think he had handcuffs with him, yeah.

19   Q.   All right.  These different fanny packs, Exhibits W77-50B,

20   50A and 50C, do you know which one, if any, that Gary Paul

21   Karr wore?

22   A.   I couldn't tell you.

23   Q.   Do you know which one anyone wore?

24   A.   No.

25   Q.   Do you know for sure that these are the exact fanny packs

*Houston – Cross*

1   that you saw in 1995?

2   A.   I know the blue one and the gray one are definitely two of

3   those.

4   Q.   That would be 50B and 50C.  And 50A --

5   A.   And there was a black one that I'm just going to assume is

6   that one.

7   Q.   All right.  But it could have been a black one that's of

8   this other type material, correct?

9   A.   Yes.

10   Q.   And do you have knowledge of what fanny packs were owned,

11   if any, by Gary Karr in 1995?  Just for --

12   A.   You mean by him personally?

13   Q.   Yeah, for just walking around purposes.

14   A.   No.

15   Q.   On a day in -- in what month did you see David Waters with

16   a spray bottle?

17   A.   October.

18   Q.   All right.  And did you smell the liquid that was in the

19   spray bottle as opposed to just him when he got back in the

20   truck?

21   A.   Well, no.  I smelled on him.

22   Q.   All right.  Do you know if there are any -- you used this

23   for insecticide?

24   A.   After the fact, yes.

25   Q.   Okay.  And do you know if there are any insecticides that

Houston - Cross

1   smell like bleach, or if only bleach smells like bleach?

2   A.  Well, I personally do not know.

3   Q.  All right.

4   A.  But having worked with insecticides a lot, I have never

5   encountered one because Self Chem was a place that had -- that

6   sold insecticides.

7   Q.  Speaking of which, you have testified or, let's see, you

8   have previously stated that David Waters would sometimes talk

9   about killing people in a social -- at a social event, like,

10  watching TV in the evening, correct?

11  A.  Well, I didn't testify that he would talk about killing

12  people.  I testified that he would -- it wasn't even

13  testimony, it was a discussion.

14  Q.  Right.

15  A.  I indicated that in watching television or seeing a movie

16  or things of that nature that if something would come up where

17  a body had to be disposed of or something like that, David

18  would say, "Well, that would be easy.  You just take them out

19  in the desert and bury them or put them in gallon containers

20  and put acid on them," or, you know, various manners in which

21  bodies could be disposed of in what he considered to be an

22  easy fashion.

23  Q.  All right.  In August or September, did you see David

24  Waters in possession of any barrels or large containers?

25  A.  No.

Houston - Cross

1   Q.  Okay.  Did you see Mr. Gary Karr in possession of any

2   such?

3   A.  No.

4   Q.  When you worked at Self Chem, did you work at the

5   corporate office?

6   A.  Yes.

7   Q.  And what was the address of that?

8   A.  Something Longhorn Boulevard.

9   Q.  All right.  And they are chemicals such as chlorine used

10  in swimming pool maintenance, correct?

11  A.  Uh-huh.

12  Q.  Yes?

13  A.  Yes, and insecticides, and so forth.

14  Q.  All right.  And interestingly enough or not, there are

15  many large, dark-colored, 55-gallon barrels at that corporate

16  office where you worked, correct?

17  A.  Well, not that I recall.  I mean, a lot of it was -- I

18  mean, we didn't handle enormous containers of stuff.  We

19  handled, like, five-gallon buckets of chlorine tablets and

20  things.  I mean, I didn't work in the warehouse.  I suppose

21  it's possible that there were barrels in there.  But for the

22  most part, I would say no.

23  Q.  All right.  Now, are you sure about that?  Are you sure

24  about your testimony about that?

25  A.  No -- well, I'm sure that I'm telling you as I recall it.

1    Q.  All right.  During the month of August or September, did

2    David ever tell you that he was obtaining coins for someone

3    else?

4    A.  No.

5    Q.  Did he ever tell you that he had coins?

6    A.  During September?  It was either September, end of

7    September, I think he said that he was going to put a suitcase

8    with a half a million dollars in gold coins in the storage

9    locker that he had asked me to secure for him.

10   Q.  All right.  And you got the lock, right?

11   A.  Yes.

12   Q.  And it was a key lock?

13   A.  Yes.

14   Q.  It was a Master Lock?

15   A.  Right.

16   Q.  And you never did see any but two gold coins, correct?

17   A.  Correct.

18   Q.  You don't really know if he ever put the coins in the

19   closet?

20   A.  No, I don't.

21   Q.  You don't really know if he put the suitcase in the

22   closet?

23   A.  No.

24   Q.  You don't know if he did have possession of coins, if he

25   was holding it for Jon Murray or the other O'Hair Murrays, do

Houston - Cross

1   you?

2   A.  Well, no.

3   Q.  Over the time period of six or so years that you were

4   living with David Waters, he gave you periodically gifts of

5   jewelry, didn't he?

6   A.  No, not periodically.

7   Q.  All right.  How would you describe it, then?

8   A.  Well, I would describe it as one time, he gave me some

9   items that I figured were stolen.

10  Q.  And you turned them back and refused them?

11  A.  Well, no.  I took them and I, you know, set them aside,

12  and then, I gave them back to him.

13  Q.  Okay.

14  A.  And I think once, at Christmas, he gave me a pair of gold

15  earrings.

16  Q.  Did you give them back?

17  A.  No.  I snipped them up.

18  Q.  Do you know of your own personal knowledge what

19  interaction David Waters had with Danny Fry during the day or

20  so that they were not in your presence?

21  A.  No.

22  Q.  You don't know whatever happened between David Waters and

23  Danny Fry, whether Danny Fry left and someone else killed him

24  or whether David Waters killed him.  You don't know if Gary

25  Karr was with them, do you?

```
1   A.  Of course not.
2   Q.  All right.  When Danny seemed sick, you do not know if he
3   was physically sick or not, do you?  I mean, he may have
4   seemed sick because he was sick, right?
5   A.  I think he was probably sick.  He looked like he didn't
6   feel good.
7   Q.  Okay.  Was the -- you have testified that the absence of
8   Danny Fry was upsetting to you then.  Is that really true?
9   A.  Then?
10  Q.  Yes.
11  A.  It was extremely upsetting to me.
12  Q.  All right.  Isn't it true that the same day or the next
13  day, you went to the Four Seasons to enjoy massages and
14  make-up, facials and champagne?
15  A.  No, not champagne.
16  Q.  Okay.  It seems that you must have felt better very
17  quickly to enjoy the partying at the Four Seasons.
18  A.  There was no partying at the Four Seasons --
19  Q.  Okay.
20  A.  -- with me or with David, for that matter.
21  Q.  All right.
22  A.  Those two stayed in their room, we stayed in our room.  I
23  think both of us ordered room service because people have to
24  eat.  Yes, I got a massage.  Yes, I got a salt glow.
25  Q.  Blow?
```

1   A.  Glow, G-L-O-W.  That's where they rub salt on your skin.

2   Q.  All right.

3   A.  And that doesn't mean that I felt festive or --

4   Q.  No.

5   A.  -- it was not really any festivities --

6   Q.  All right.

7   A.  -- we were just there.

8   Q.  On the date that Mr. -- that David Waters hit you in the

9   mouth, do you remember what date that was?

10  A.  Exact date, no.

11  Q.  Do you remember what month?

12  A.  Maybe -- I don't know.  Maybe, October of '96.

13  Q.  Of '96?

14  A.  It was the following -- I believe it was the following

15  year.

16  Q.  All right.  Well, then, are you sure that Gary Karr was

17  present?

18  A.  Oh, absolutely.

19  Q.  All right.  So he was present with you in '96?

20  A.  Uh-huh.

21  Q.  All right.  And please explain what contribution, if any,

22  Gary Karr had to David Waters assaulting you.

23  A.  What contribution he had to assault, well, he didn't

24  assist him, if that's what you mean.  And, in fact, he

25  Bandaided my lip afterwards.  And it was Gary that went to

*Houston - Cross*

1    verify that the truck was where I said it was, which sort of

2    defused the situation a little bit.

3    Q.  All right.  On that evening, you decided on your own,

4    probably a mature decision, that you were too drunk to drive,

5    correct?

6    A.  Uh-huh.

7    Q.  Yes?

8    A.  Yes.

9    Q.  So you walked home?

10   A.  Took a cab.

11   Q.  Took a cab.  And was that the night that you got arrested

12   for walking down the street drunk, and you got arrested for

13   public intoxication?

14   A.  No.

15   Q.  That was -- was that another night in September?

16   A.  That was -- I think it was the 28th of August.

17   Q.  All right.  When was the first time that you recall that

18   David Waters expressed anger at Gary Karr always having to go

19   back to Florida for something to satisfy Charlene?

20   A.  Well, it was, you know, kind of a constant complaint, but

21   you know, it would have been after September of '95.

22   Q.  To your knowledge, when was it that Mr. Waters hired a

23   ghostwriter to help him try to write this Good Gawd! Madalyn

24   book?

25   A.  Oh, it was '96, I believe -- no.  It was '97.  Maybe

1    February of '97.

2    Q.  Did you ever go to the American Atheist Center while he

3    worked there?

4    A.  Yes.

5    Q.  Did -- well, you did go there one time to help steal the

6    computer, didn't you?

7    A.  Yes.

8    Q.  Did you go there on other occasions?

9    A.  Well, I went there to have lunch with them.

10   Q.  Did you go into the building?

11   A.  Yes.

12   Q.  Did you know Madalyn Murray O'Hair, or Jon, or Robin?

13   A.  I met Robin once.

14   Q.  All right.

15   A.  That's when she took him to -- took David to, like, a, you

16   know, emergency facility because he had a sort of a fainting

17   spell.

18   Q.  All right.  And did I understand from one of David Waters'

19   thefts, do I understand from information about that that Larry

20   Flint, the pornographer, was close friends or an admirer of

21   Madalyn Murray O'Hair?

22   A.  I believe that she was a speech writer for him.

23   Q.  What topic did he write on -- talk on?

24   A.  Well, Larry Flint, I mean, I suppose he was politically --

25   he was kind of a reactionary.

Houston - Redirect

1   Q.  All right.

2   A.  But anyway, she -- I believe she was a speech writer for

3   him.

4   Q.  One last topic that I could think of.  At the time -- and

5   I'm going to go back in time just a little bit.  At the time

6   that Danny Fry was getting ready to leave Austin and you were

7   packing his suitcase, Gary Karr was not there at that very

8   time when you were packing his suitcase, was he?

9   A.  When I was packing the suitcase?  He may have been in the,

10  you know, apartment, but, you know, I don't really recall them

11  being there, no.

12  Q.  Okay.  Whatever David Waters did in terms of emptying the

13  suitcase or putting them up for his -- Danny Fry's daughter on

14  a shelf, you do not have personal knowledge of what part of

15  that transaction that Gary Karr knew about, if any, correct?

16  A.  Well, I don't know which one did what.  I know the result.

17  Q.  All right.  That's all the questions that I have.

18                   RE-DIRECT EXAMINATION

19  BY MR. CARRUTH:

20  Q.  Ms. Steffens, counsel asked you whether or not Mr. Waters

21  ever bought you any jewelry, and I believe you told him about

22  some diamond earrings and other such things.  Do you recall

23  during the month of September 1995 whether David Waters showed

24  you a round-cut solitaire diamond on a piece of white

25  lightweight tissue paper?

Houston - Redirect

1    A.   Yes, he showed it to me, but it wasn't for me.

2    Q.   He did not get that diamond for you?

3    A.   No.

4    Q.   Do you know what happened to that solitary?

5    A.   Well, at some point, much later, couple of years, he

6    needed money, and he asked Gary Karr to sell it for him.

7         MR. T. MILLS:  Excuse me.  Object unless -- and she

8    may have -- unless she has personal knowledge of this

9    transaction.

10   Q.   (BY MR. CARRUTH) Do you have personal knowledge of this

11   transaction?  Did you receive any money from Mr. Karr after he

12   sent the diamond to him?

13   A.   Well, yes, he sent money -- well, it was for David when

14   David asked him.

15   Q.   Do you know why Mr. Waters would have sent this solitaire

16   diamond to Mr. Karr and have him sell it rather than just go

17   down here to Doc Holiday's or give it to you to sell it?

18   A.   Well, I suspect that --

19        MR. T. MILLS:  Object.  Speculation.

20        THE COURT:  Sustain the objection.

21   Q.   (BY MR. CARRUTH) Okay.  Let's move on to another subject.

22   Counsel asked you about the day that Mr. Waters told you to

23   rent the storage locker on the Burnet Road Storage across from

24   the Poodle Dog Lounge, and he told you that he was going to

25   put half a million dollars in gold coins.  Do you remember

1   that conversation?

2   A.  Yes.

3   Q.  Was Mr. Gary Karr present when David Waters made that

4   representation to you about the gold coins?

5   A.  Yes.

6   Q.  And did he say or do anything in response to Mr. Waters

7   telling you what he did about the gold coins?  By he, I mean

8   the defendant, Mr. Gary Paul Karr.

9   A.  Well, Gary told him or, you know, shook his head no and

10  indicated he should not -- that he didn't think it was wise to

11  tell me.

12  Q.  About the gold coins?

13  A.  About the gold coins.

14  Q.  Thank you very much.  Pass the witness.

15          MR. T. MILLS:  No questions.

16          MR. CARRUTH:  No further questions, your Honor.  May

17  the witness be excused?

18          THE COURT:  Counsel?

19          MR. T. MILLS:  Yes, sir.

20          THE COURT:  You may be excused.  You may call your

21  next witness.

22          MR. D. MILLS:  Lisa Jones.

23          THE COURT:  Come right up here.  This is Mrs. Sims.

24  She's going to administer an oath to you.

25      (Witness was sworn.)

*Jones - Direct*

1    THE COURT:  If you'll walk around this column, right

2  here.  Have a seat up there in the witness chair.  If you'll

3  tell us your full name, please, and spell your last name.

4    THE WITNESS:  Lisa Jones, J-O-N-E-S.

5    THE COURT:  Mr. Mills, witness is yours.

6    LISA JONES, called by the Government, duly sworn.

7             DIRECT EXAMINATION

8  BY MR. D. MILLS:

9  Q.  Thank you, your Honor.  Would you tell the jury where you

10  currently reside and how you're employed, please?

11  A.  I currently reside in Naples, Florida, and at this time,

12  I'm doing property management.

13  Q.  You met me for the first time this morning; is that

14  correct?

15  A.  Yes, sir.

16  Q.  At our office and we visited, and that is the only time

17  you ever probably talked with anyone at the U.S. Attorney's

18  Office; is that correct?

19  A.  That's correct, sir.

20  Q.  And you have met an FBI agent and a deputy sheriff from

21  the Dallas County Sheriff's Office before giving a statement

22  to them; is that correct?

23  A.  That is correct.

24  Q.  And I showed you a copy of that this morning; is that

25  correct?

*Jones - Direct*

1   A.   That is correct.

2   Q.   And do you know an individual by the name of Danny?   Or

3   did you know an individual by the name of Danny Fry?

4   A.   Yes, I did.

5   Q.   And can you tell the jury briefly how you came into

6   contact with Mr. Fry, when that was, and what your

7   relationship developed to be?

8   A.   It was kind of early '94.  I had some work I needed done

9   on my home, and I had heard that he did side work,

10  handyman-type work.  So I had gotten his number and reached

11  him, and from that point on, we talked several times.

12  Eventually, I did meet him and he did do some work for me.

13          In a period of, well, quite a while, we did things

14  together and went out a couple of times and that went on and

15  eventually -- first part of --

16  Q.   Would this have been -- if you said the date, I didn't

17  hear you.  Would this have been in 1994?

18  A.   I said '94, yes, I'm sorry.

19  Q.   I didn't hear you.

20  A.   Am I talking long?

21  Q.   No.  That's all right.  I just didn't catch you.  Go

22  ahead.

23  A.   And then, it was probably around the first part of May of

24  '95, he and his daughter, Lisa, moved in with my son and I.

25  Q.   What was Mr. Fry's relationship to his daughter?  Were

1  they real close or --

2  A.  I thought extremely close.  He adored Lisa.  He had raised

3  her pretty much through -- up to her teenage years, and I

4  found out they had a very good relationship.

5  Q.  And about how old was she when they moved in with you in

6  1995?

7  A.  Well, it was right before she turned 16.  It was the

8  summer -- starting the summer before she turned 16.

9  Q.  And do you know when her birthday was?

10  A.  September 30th, '95.

11  Q.  Okay.  How would you describe Mr. Fry in terms of his

12  personality to the jury?

13  A.  When I first met Danny, I found him to be a very likable

14  person.  He was charming, very witty.  He laughed a lot.  That

15  was pretty much my first impression.  And he was a very

16  likable man.  He liked to talk to people, and he did that very

17  well.

18  Q.  Your interview with the -- this was the FBI agent that you

19  had an interview with, Ms. Cowling; is that correct?

20  A.  Yes, sir.

21  Q.  And a Dallas County Sheriff's investigator?

22  A.  Yes, sir.

23  Q.  And when did that occur?

24  A.  February sometime, '99.

25  Q.  So early last year?

*Jones - Direct*

1   A.   Early last year, yes.

2   Q.   And I showed you this morning in your statement the agent

3   had written down that you had -- you called Mr. Fry -- or he

4   wrote down that you called Mr. Fry a con man.  Could you

5   explain to the jury why you used that term and that interview

6   at that point in time?

7   A.   Yes, I will explain.  My reference to that remark was from

8   the fact of finding out quite a period of time I was no longer

9   able to talk to him that he didn't go to Texas for what I

10  thought.  And I found out things that I didn't know at the

11  beginning.  So my reference to that remark is the fact that

12  what I thought in the beginning had changed.

13  Q.   Did there come a time, in July of 1995, that Mr. Fry

14  decided to leave Florida?

15  A.   Yes.  I can't recall the exact time frame other than it

16  was somewhere around May.

17  Q.   And do you --

18  A.   I'm sorry.

19  Q.   Go ahead.

20  A.   Where he talked about possibly traveling here, and then,

21  it was first part of July, maybe the end of June when we got

22  the ticket for him.

23  Q.   When you say, "got the ticket," tell the jury what you

24  mean by "got the ticket."

25  A.   He purchased a one-way ticket for him to come to Texas.

Jones - Direct

1   Q.   So he flew from Florida to Texas?

2   A.   Yes, sir.

3   Q.   Did you buy the ticket?

4   A.   Yes, I did.

5   Q.   Did you take him to the airport?

6   A.   Yes, I did.

7   Q.   Who else went with you, if anyone?

8   A.   His daughter, Lisa.  We both drove that day, dropped him

9   off at Fort Myers so he could fly out.

10  Q.   What was his purpose in coming to Texas?

11  A.   I was told that there was -- with a lot of the growth here

12  in Texas, there was a construction outfit that he wanted to

13  talk to about being a backer for Florida, because we also have

14  -- at that time, we had a lot of reason for growth.  But I was

15  told that he was here to meet with someone in order to try and

16  start a business or bring a business into Florida with

17  possible backers from Texas.

18  Q.   Did you assist him in packing his luggage?

19  A.   Yes, I did.

20  Q.   Do you know what type of luggage he had?

21  A.   One was a carry-on and one was a small, little just

22  luggage.  You couldn't fit a whole lot into it, but it was

23  black, kind of -- not really parachute-type material, but it

24  was a soft, pliable-type material and it was all black.

25  Q.   So he had two bags and they were both black; is that

*Jones - Direct*

1   correct?

2   A.  Yes, sir.

3   Q.  Prior to Mr. Fry traveling to Texas on this ticket that

4   you purchased, had he made phone calls to Austin that you were

5   aware of?

6   A.  He made a lot of phone calls.

7   Q.  Let me show you what's been marked for identification

8   purposes as Government's W13-1, and ask you if you can

9   identify this telephone number without saying it.  Can you

10  identify and can you tell if this is -- if this is a record of

11  your bills for your telephone number?

12  A.  Yes, it is.

13  Q.  And you previously reviewed this; is that correct?  This

14  set of documents, this was previously shown to you, I believe,

15  just earlier this afternoon.

16  A.  I briefly, like, skimmed through it, yes.

17  Q.  Okay.  And that is your phone number?

18  A.  Yes, it is.

19  Q.  And that's who you are; is that correct?

20  A.  That is very correct.

21  Q.  We'd offer W13-1, your Honor.

22          MS. WILLIAMS:  No objection.

23          THE COURT:  Received.

24  Q.  (BY MR. D. MILLS) If you can read this.  You see where it

25  says "date."  This shows, does it not -- what date does this

*Jones - Direct*

1  indicate that there was a telephone call placed from your

2  phone number to a phone number in Austin?

3  A.   May 31st.

4  Q.   And it shows a phone number in Austin being?

5  A.   459-4640.

6  Q.   And this area code was?

7  A.   512.

8  Q.   All right.  And then, if we turn to the next page, and

9  this is for 1995, correct?

10 A.   Yes, sir.

11 Q.   Okay.  Then, if we turn to the next page, we see that

12 phone number repeat itself on what date?

13 A.   June 12th.

14 Q.   And does it appear, again, on this telephone on another

15 date?

16 A.   June 22nd.

17 Q.   Twice on June 22nd; is that correct?

18 A.   That is correct.

19 Q.   And then, again, on --

20 A.   The 26th, also, of June.

21 Q.   And also?

22 A.   27th.

23 Q.   And they're all to the same phone number; is that correct?

24 A.   That is correct.

25 Q.   And there's another phone call on the 30th of May to that

*Jones - Direct*

1   same phone number, is that correct, from your phone?

2   A.   Yes, sir.

3   Q.   Do you know what that phone number is in Austin that keeps

4   recurring on your telephone bill?

5   A.   I believe that's Waters.

6   Q.   Mr. Waters' residence is what you believe that number to

7   be?

8   A.   Yes.

9   Q.   Did you ever call it?

10  A.   Yes, I did.

11  Q.   And did you talk with Mr. Waters at that phone number?

12  A.   Yes, I did.

13  Q.   We'll go into that conversation in a minute.  So you

14  actually did dial that number and greet someone who did

15  identify themselves as Mr. Waters, correct?

16  A.   (Moving head up and down.)

17  Q.   All right.

18  A.   Yes, I did.

19  Q.   When Mr. Fry initially left Florida and went to Austin,

20  did you receive a lot of telephone calls from him?

21  A.   Yes, I did.  At the very beginning, it was every day for a

22  long time.  It was very, very frequent.

23  Q.   What was the length of those phone calls?  Were they

24  short?  Were they long?

25  A.   Pretty much in the beginning in very long conversations.

Jones - Direct

1  Sometimes we'd be on the phone an hour talking.

2  Q.  And you placed a lot of calls to him, is that correct, at

3  that phone number?

4  A.  Yes.

5  Q.  Did he place some collect calls to you?

6  A.  Yes, he did.

7  Q.  About when did the -- do you recall about when the time

8  was that the phone calls ceased to be of some length and

9  changed where they were more brief?  Do you have some idea?

10  A.  Period of time, I couldn't quite say I could pinpoint it,

11  but it seemed after he was going several -- several weeks, the

12  phone calls -- they weren't as frequent.  Every day as

13  especially.  It seemed to -- instead of being an hour, maybe

14  it was 20 minutes.

15      Occasionally, maybe a five-, ten-minute conversation

16  where he was just trying to see how myself or Lisa was doing.

17  Q.  And if we look through these phone records and we go back

18  to, like, September, this is the date, September 11; is that

19  correct?

20  A.  Yes, sir.

21  Q.  And that's a February call, that same Austin number,

22  459-4640, correct?

23  A.  Yes, sir.

24  Q.  And you see there that the length of the call was -- do

25  you see the notation immediately under it is?

*Jones - Direct*

1   A.   One.

2   Q.   Okay.  And if we look back to here is a collect call from

3   Austin; is that correct?  Do you see it's from Austin from

4   that phone number?

5   A.   Yes.

6   Q.   On what date?  Do you see the date there?

7   A.   August 20th.

8   Q.   And the number of minutes that he spoke with you, whoever

9   placed the call spoke with you?

10  A.   Sixty minutes.

11  Q.   And if we go here, there's another phone call on what

12  date?

13  A.   August 2nd.

14  Q.   For how many minutes?

15  A.   Thirty.

16  Q.   Now, if we go back to September, this September 1st, there

17  was a one-minute telephone call from your residence to that

18  residence, correct?

19  A.   Yes, sir.

20  Q.   Then, if we move over to the next times there -- a number

21  in this area that is what date?

22  A.   September 10th.

23  Q.   And it's a phone call from where?

24  A.   San Antonio.

25  Q.   And does it give a number in San Antonio?

Jones - Direct

1    A.   Area code 210, 342-9137.

2    Q.   And do you see that number indicated again right down

3    below where you called that number 340 -- 99 --

4    A.   17.

5    Q.   I'll move my hand out of the way so you could see.

6    September 12th.  And you talked at that time, on September

7    12th, for how many minutes?

8    A.   Fifty-one.

9    Q.   And then, you called again on the 12th, and you talked for

10   how long?

11   A.   Twelve minutes.

12   Q.   Then, you come down to this date, the 15th; is that

13   correct?  Can you see that date there?  There are three phone

14   calls on the 15th to that number that you've identified in Mr.

15   Waters' residence, correct?

16   A.   Yes, sir.

17   Q.   And the length of those calls are?

18   A.   One.

19   Q.   One, one and one; is that correct?

20   A.   One, one and one, yes.

21   Q.   And there's another phone call where your finger is,

22   again, on the 15th to Austin for one minute; is that correct?

23   A.   Yes, it is.

24   Q.   All right.  And then, if we move on down the page, you

25   will see on the date being the 26th of September.  That what

*Jones - Direct*

1  that record shows right there, then, the 27th and the 28th --

2  A.  Yes.

3  Q.  -- that you called 340-9917 in San Antonio, correct?

4  A.  That's correct.

5  Q.  You talked for how many minutes on the 26th?

6  A.  Nineteen.

7  Q.  On the 27th?

8  A.  Fifteen.

9  Q.  And on the 28th?

10  A.  Thirty-seven minutes.

11  Q.  There's another call on the 28th to that same number in

12  San Antonio and you talked --

13  A.  Thirty-seven minutes.

14  Q.  All right.  There is a collect -- there is a series of

15  collect calls from San Antonio, is that correct, from this

16  phone number, 342-9137; is that correct?

17  A.  Yes, sir.

18  Q.  And the date of those being?

19  A.  September 19th, September 28th and September 30th.

20  Q.  And the one on the 30th was -- how long was that

21  conversation?

22  A.  It was an hour.

23  Q.  No, look how many minutes.

24  A.  I'm sorry.  A minute.

25  Q.  And the one on the 26th?

*Jones - Direct*

1   A.   Nine minutes.

2   Q.   And the one on the 19th?

3   A.   Was six minutes.

4   Q.   All right.  As the phone calls shortened in length, did

5   you notice any change in Mr. Fry's tone, behavior, or anything

6   that seemed different from the way you normally had

7   conversations with him?

8   A.   Yes, I did.  As time progressed, he didn't seem to be as

9   loving or affectionate over the phone.  He seemed to be in a

10   hurry a lot.  Very close to the end when I last talked to him,

11   around that time frame, he was not very talkative, as I said,

12   in a hurry, sometimes very short.

13   Q.   And you said the 30th was his daughter's birthday; is that

14   correct?

15   A.   Yes, sir.

16   Q.   Was there a party planned?

17   A.   Yes.  Since she had -- that was her 16th birthday, and we

18   threw a little party for her age group and it was evening

19   time.

20   Q.   Did you have conversation with Mr. Fry about whether he

21   should attend that party?

22   A.   Yes, I did.  I had wanted him to come back to Naples to be

23   there for Lisa's birthday.  I felt 16th is once in your

24   lifetime and especially for a young lady, it's a very

25   important date.  And so I had asked him to come home for that.

Jones - Direct

1  And then, the day of her birthday, it was -- again, I wanted

2  him to come home.  I wanted him to be there, especially for

3  her.

4  Q.  And did you actually have a phone call to him on the 30th

5  of the day of her birthday?  Do you recall that?

6  A.  Yes, we spoke.

7  Q.  And did he agree to come?

8  A.  No, no, he basically said he needed a little more time in

9  Texas, and he would be home as soon as he could.  He would try

10  to be home within -- I believe he said two weeks or very close

11  to that time frame.

12  Q.  During the period of time that Mr. Fry was in Austin prior

13  to this phone call, was there an occasion that he sent you

14  money?

15  A.  Yes.

16  Q.  And if so, explain to the jury how that came to be,

17  please.

18  A.  In the very end of May, I had lost my job.  And as time

19  went on, I had gone through savings that I had saved up and,

20  you know, paying bills, and so on and so on.  At one point, I

21  had told him that I was going to get a job because I needed,

22  you know, money, and he sent me some money.  It was a Western

23  Union -- I believe it was around 1500.

24  Q.  Do you know if he ever sent some money to your parents?

25  A.  Yes, he did.

*Jones - Direct*

1   Q.  Do you know how much?

2   A.  I was informed that it was 2,000.  That he had, at some

3   point, borrowed from them to buy a car before he left.

4   Q.  Okay.  After the 30th of September, did you ever hear from

5   Mr. Fry again?

6   A.  No, I did not.

7   Q.  Do your telephone records indicate that there were no more

8   calls made from Texas basically to you that you can identify

9   as being conversations with him?

10  A.  No, there was none.

11  Q.  Did you eventually call again, that your telephone records

12  reflect, to that Austin number that's indicated?

13  A.  Yes, I did, after a short period of time, a couple of

14  days, maybe a week, I hadn't heard from Danny.  None of us

15  had, his daughter.  And I was just trying to find him.  And I

16  called and finally spoke to David's girlfriend.  She didn't

17  know.  She couldn't give me any information.

18       I tried calling a couple of more times, and then, I

19  finally, at one point -- when I caught the situation at the

20  right time, I did speak with Dave.

21  Q.  On Mr. Waters; is that correct?

22  A.  On the phone, yes, I did speak with Mr. Waters.

23  Q.  What did he tell you about Mr. Fry's whereabouts?

24  A.  He said that Danny wasn't there at that time.  He didn't

25  know where he was.

Jones - Direct

1   Q.  Did he tell you --

2   A.  He said that Danny was partying a lot or drinking and he

3   had money.  I guess he was partying a lot.

4   Q.  Did he tell you about him leaving with anybody?

5   A.  At one point, I'm not sure whether it was the actual

6   conversation what David told me or I found out from Bob.  At

7   that point, I was so upset, but conversation was that Danny

8   had met some man in a bar that had tattoos, and they were

9   chumming around and heading to Kansas City, I believe it was.

10  Q.  Okay.  Prior to Mr. Fry leaving Florida, had your

11  relationship, your personal relationship changed right before

12  he left in some way?

13  A.  Well, it changed from the beginning on, of course, as time

14  went on.  But right before he left, he asked me to marry him.

15  It was not official per se when he left, but he had asked me

16  to marry him.

17  Q.  At some point in time toward the end, the latter part of

18  September, did you receive a letter from Mr. Fry?

19  A.  Yes, I did.  Letter was addressed to me, and then, I was

20  instructed to give it to his brother, Bob Fry, and not open

21  it.

22  Q.  Did you comply with the instructions on the letter and

23  give it to his brother, Bob Fry?

24  A.  Yes, I did.

25  Q.  And where does Mr. Bob Fry live in relation to where you

*Jones - Direct*

1   live in Florida?

2   A.  I would say, maybe, within a ten-mile radius.  Maybe a

3   little more, so it wasn't that far away.

4   Q.  I'm going to show you what's been marked and admitted as

5   Government's Exhibit 11-3, and ask you if this is a photograph

6   of Mr. Fry?

7   A.  Yes, it is.

8   Q.  It is?  All right.  Thank you.  I'll pass the witness,

9   your Honor.

10          MS. WILLIAMS:  I don't have any questions for Ms.

11   Jones.

12          THE COURT:  May this witness be excused, counsel?

13          MS. WILLIAMS:  Yes.

14          THE COURT:  You may be excused, ma'am.  Call your next

15   witness.

16          MR. CARRUTH:  At this time, United States calls Willis

17   Albarado.

18      (Witness was sworn.)

19          THE COURT:  If you'll walk around this column, please,

20   sir, and have a seat in this witness chair.  Tell us your full

21   name and spell your last, please.

22          THE WITNESS:  Willis Albarado.  Last name,

23   A-L-B-A-R-A-D-O.

24      WILLIS ALBARADO, called by the Government, duly sworn.

25              DIRECT EXAMINATION

*Albarado - Direct*

1    BY MR. CARRUTH:

2    Q.  Where do you currently reside, Mr. Albarado?

3    A.  3217 Pine Road.

4    Q.  And are you retired from the Texas Highway Department?

5    A.  That's correct.

6    Q.  And how long ago did you retire from the state?

7    A.  Twelve, 13 years.

8    Q.  All right.  Subsequent to your retirement from the State

9    Highway Department, have you served as a volunteer in the

10   American Atheist Headquarters?  Or did you serve as a

11   volunteer back in 1995 prior to the disappearance of the

12   Murray O'Hair family members?

13   A.  Would you restate the question?

14   Q.  Yes, sir.  It was rather lengthy.  What did you do after

15   you retired from the Highway Department in regards to

16   volunteering for Madalyn O'Hair and her children?

17   A.  Yes, I did volunteer at the request of Spike Tyson.

18   Q.  All right, sir.  And what did you volunteer to do?  What

19   services did you perform for the O'Hairs, if any?

20   A.  Mostly just taking care of plants --

21   Q.  Okay.

22   A.  -- at the center.

23   Q.  Would it be fair to state you were the gardener?

24   A.  No.

25   Q.  You were not the gardener?

*Albarado - Direct*

1    A.   No.

2    Q.   Educate me.  I'm not a horticulturist.  What did you do

3    that a gardner did not do?

4    A.   I'm not sure I could answer that question, but I could

5    tell you what I did.  I watered the plants inside the

6    building, and I did some trimming of some bushes outside of

7    the building itself.

8    Q.   And did you use a bow saw when you did the trimming of the

9    trees?

10   A.   No.

11   Q.   How did you trim the trees?

12   A.   Well, there were bushes that I was trimming, and I used my

13   own hand clippers.

14   Q.   Okay.  And you normally did this on the weekends or Monday

15   through Friday?

16   A.   Not any particular time, just when Spike asked me to

17   assist.

18   Q.   And your reference to Spike is Mr. Orin Tyson, who also

19   goes by Spike?

20   A.   Uh-huh.

21   Q.   And you sort of worked in conjunction with Mr. Tyson?

22   A.   Yes, that is correct.

23   Q.   Okay.  Did you ever have any contact with any of the

24   O'Hairs, Madalyn Murray O'Hair, Jon Garth Murray, or Robin

25   Murray O'Hair?

*Albarado - Direct*

1   A.  Yes, I saw them in the center.

2   Q.  Do you know what type of automobiles they drove during

3   this time period?

4   A.  Yes.  There was a -- Jon drove a Mercedes sedan.

5   Q.  Do you recall the color, sir?

6   A.  I think it was gray.

7   Q.  Okay.

8   A.  And Dr. O'Hair generally rode with him.  And Robin drove a

9   -- some type of sports car.  I believe it was a red sports car

10  of some type.  I'm not sure of the make or model.

11  Q.  To your knowledge, how long had you been a volunteer for

12  the American Atheist Organization here in Austin in 1995?

13  A.  Probably a couple of years.

14  Q.  And were you aware that Dr. O'Hair, as you refer to her,

15  previously owned, yet, another Mercedes Benz?

16  A.  No, I didn't know that.

17  Q.  Okay.  And so when you were working there, there was a --

18  Robin had a red sports car, and Jon had a gray Mercedes Benz,

19  and Madalyn frequently rode with one or the other?

20  A.  I only saw her ride with him on those occasions.

21  Q.  Okay.  Now, I believe, Mr. Albarado, that on the Sunday or

22  the weekend before the O'Hairs disappeared -- and that's an

23  event you remember, I guess; is that correct?

24  A.  I have some recollection of it, yes.

25  Q.  Would it have been sometime in late August of 1995 --

*Albarado - Direct*

1        MS. WILLIAMS:  Your Honor, I object to leading.

2        THE COURT:  It is leading.

3        MR. CARRUTH:  I'll restate the question, your Honor.

4   Q.  (BY MR. CARRUTH) Tell us your best recollection of when

5   the O'Hairs disappeared, what you saw and did, and so forth.

6   A.  Spike Tyson had asked me to trim some hedges so that the

7   front gate would open completely.

8   Q.  And was this at the American Atheist Center on Cameron

9   Road?

10  A.  That is correct.

11  Q.  Here in Austin?  All right, sir.  Please continue.

12  A.  And it must have been a Sunday because there was no staff

13  there.  I arrived shortly after lunch and the gate was open.

14  The Mercedes and the sports car were parked where they were

15  usually parked near the front door.

16  Q.  Did you see any other vehicles on the property at that

17  time?

18  A.  Yes, I noticed a white mini-van, a van parked behind one

19  of the hedges.  Couldn't be seen from the street.

20  Q.  All right, sir.  And what did you do at that point, if

21  anything?

22  A.  I proceeded to trim the hedges as requested by Spike

23  Tyson, and several times -- it was a hot day.  Several times,

24  I went to the front door, ringing the bell to gain entrance so

25  I might get something to drink.  Neither time was there any

1    response.

2    Q.  Did you find that to be surprising, sir?

3    A.  No, not really.

4    Q.  Well, let's -- first, was that gate normally locked on

5    weekends when no one was at the center?

6    A.  When no one was there, it was always locked.  But there

7    was obviously someone there with both cars were parked there.

8    So the gate was open.

9    Q.  But whoever was there would not respond to your knock on

10   the door; is that your testimony?

11   A.  It's not a knock, but there was a service bell.

12   Q.  A bell.

13   A.  But there was no response.

14   Q.  Okay.  And do you know, from having been inside the

15   Atheist Headquarters, where that bell -- it's like a doorbell,

16   I guess?

17   A.  Yes, it rang throughout the whole center.

18   Q.  Can it be heard throughout the whole center?

19   A.  Yes, everywhere.

20   Q.  And you rang more than one time?

21   A.  Yes, two different times.

22   Q.  And there was no response?

23   A.  No response.

24   Q.  And being unable to quench your thirst, what did you do

25   then?

1  A.  I continued to work till I completed my assigned task and

2  loaded the clippings into my own van, and I left the center.

3  Q.  Now, you said that on two occasions, you went to ring the

4  doorbell?

5  A.  Yes.

6  Q.  Was there a time frame span between the two?

7  A.  Probably about 30, 40 minutes to my best recollection.  I

8  was there probably a couple of hours.

9  Q.  All right, sir.  And this was in the afternoon?

10  A.  It was in the afternoon.  It was rather warm.

11  Q.  And you believe it was a Sunday?

12  A.  Yes, I believe it was a Sunday.

13  Q.  Okay.  Now, did you report what you had seen or heard to

14  Mr. Tyson or anyone else in the organization?

15  A.  No, there didn't seem to be anything unusual.

16  Q.  When did you next learn that the O'Hairs had mysteriously

17  left Austin without telling anybody where they were?

18  A.  Spike called me and said that I need not show up at the

19  center until further notice.  That upon his arrival, Monday

20  morning, there was a note on the gate and that my services

21  wouldn't be needed until he talked to me again.

22  Q.  All right, sir.  And when was the next time, if any, that

23  you had any contact with any of the American Atheist folks

24  here in Austin, including Mr. Spike Tyson?

25  A.  I can't remember the exact length of time, but he did call

*Albarado - Direct*

1   me later and asked if I would assist him in clearing away dead

2   plants from the O'Hairs' residence.

3   Q.   Now, we're talking about the residence?

4   A.   That is correct, the residence.

5   Q.   As opposed to the Atheist Center on Cameron Road?

6   A.   That is --

7   Q.   Talking about the Greystone residence?

8   A.   That is the residence, yes.

9   Q.   Did your duties as a volunteer include from time to time

10  trimming away shrubbery?

11  A.   No.

12  Q.   So was this the first time you had been to the O'Hairs'

13  Greystone house?

14  A.   That is the first time I had been there.

15  Q.   And approximately how long after they left Austin was it

16  before you went out there with Mr. Tyson to help him clean up

17  the house or cut the underbrush?

18  A.   I don't have an idea other than the fact that all the

19  plants were dead, and so it must have taken more than a week,

20  maybe as much as three weeks to a month.

21  Q.   It could have been anywhere from a week to a month; is

22  that correct?

23  A.   Its could have been, yes.

24  Q.   Was it sometime after they failed to appear for the Pope

25  picket in New York, or do you know?

*Albarado - Direct*

1   A.   I don't remember.  I don't recall.

2   Q.   Okay.  And did you go over there with Mr. Tyson?

3   A.   No.  He called and gave me the address, and I went on my

4   own and just met him there.

5   Q.   Now, these dead plants that you found, were these plants

6   outside or inside the house?

7   A.   Both.

8   Q.   And how did you gain access to the house?

9   A.   Spike was there and he opened the door and let me in.

10  Q.   He had a key?  Did you notice whether there was any mail

11  that had been delivered?

12  A.   Yes, he walked me through the property.  He asked me if I

13  was interested in seeing the place.  I had never been there

14  before, so he walked me through.  Yes, there was a stack of

15  mail.

16  Q.   Was there a mail drop in the front?

17  A.   There was a mail drop in the front door, so the mail was

18  slipped through and piled up on the inside.  He said he had

19  gone through, looking for some bills to pay.

20  Q.   Okay.  And what else, if anything, did you notice inside

21  the house that appeared to be unusual?

22  A.   Well, I found it unusual that the -- there were dishes in

23  the kitchen.  Just walking through the house except for the

24  mail piled up, it looked like any house where the residents

25  just left, just walked away from it.  Like my house would look

*Albarado - Direct*

1    when I was working and I just get up and leave.

2    Q.  Okay.  Did you see anything on the dining room table or on

3    the kitchen table?  Where was the kitchen located in the

4    house?

5    A.  Well, the kitchen -- yes, the kitchen table was located in

6    the kitchen, and there were dishes on the table and some in

7    the sink.  Spike --

8    Q.  Dirty dishes?

9    A.  Dirty dishes, yes, sir.

10   Q.  And did you see any coffee cups?

11   A.  I seem to recall a coffee cup or two, yes.

12   Q.  And do you recall whether there was any liquid in those

13   coffee cups or whether it may have evaporated?

14   A.  You know, I don't recall.

15   Q.  Did you see any uneaten food in any of the dishes?

16   A.  I don't recall.

17   Q.  Do you recall whether or not Mr. Tyson opened the

18   refrigerator and showed you anything?

19   A.  Yeah, he thought it might be interesting for me to look at

20   the refrigerator.  He opened it, and apparently, the power had

21   been off, obviously, for quite a while, and there was mold and

22   looked like rotting food inside.

23   Q.  Spoiled food in the refrigerator?

24   A.  Yes.

25   Q.  And all the plants in the house were wilted and dead?

*Albarado - Direct*

1   A.   Every plant was dead.

2   Q.   Did you go in any other rooms in the house besides the

3   kitchen?

4   A.   He walked me through the house completely.

5   Q.   Did you go into the bedrooms of Madalyn Murray O'Hair?

6   A.   Yes.

7   Q.   Jon Garth Murray?

8   A.   Yes.

9   Q.   And Robin Murray O'Hair?

10  A.   Yes, sir.

11  Q.   And can you tell us what you saw in each of these

12  bedrooms, please?

13  A.   Well, looked like somebody just got up from bed.  I seem

14  to recall there was some clothes -- washed clothing on the bed

15  in Dr. O'Hair's room.  John's bed was -- had been slept in as

16  Dr. O'Hair's had been.

17  Q.   Did they appear to be unmade?

18  A.   They were unmade, yes.

19  Q.   Okay.

20  A.   And I don't recall much about Robin's room.  It was at the

21  other end of the house.

22  Q.   Did you notice whether or not there were any dirty clothes

23  on the floor in any of the bedrooms?

24  A.   I can't recall if they were on the floor or on the bed,

25  but I seem to recall there was -- I made a mental note, well,

*Albarado - Direct*

1    looks normal, like someone just got up and left.

2    Q.  Did you notice whether any prescription medications were

3    present inside?

4    A.  Spike pointed out that there was some of Dr. O'Hair's

5    insulin in the ice box.  I don't recall seeing it.  He just

6    said, well, there's her medication, that's curious.

7    Q.  Were there any vehicles in the garage when you went to the

8    house?

9    A.  No.

10   Q.  And did the house appear to have been broken into?

11   A.  No.

12   Q.  No broken windowpanes or anything?

13   A.  I didn't see any, no.

14   Q.  Now, is there anything else you can add about the

15   condition of the interior of that house when you visited and

16   that was the only -- first and only occasion you had been

17   there; is that correct?

18   A.  That is correct.

19   Q.  Anything else that we have not covered that you feel is

20   important?

21   A.  No, not to my knowledge.

22   Q.  Mr. Albarado, after you were questioned by the

23   investigators in this case -- and I think that for some time

24   late last year, did you draw a map of -- excuse me.  It would

25   have been January of this year according to the date -- a map

Albarado - Direct

1  of the interior of the O'Hair Greystone residence as it

2  appeared to you.  Do you remember providing such a map?

3  A.  I could have.  I remember drawing one of the driveway of

4  the center.

5  Q.  Let me show you what's been marked for identification as

6  Government's Exhibit W20-1, and appears to be dated January

7  25th, 00, and it says, "Willis Albarado."  Do you recognize

8  that?

9  A.  Yes, uh-huh.

10  Q.  Is that your handwriting?

11  A.  That is correct.

12  Q.  And there's drawings on both sides of that paper, are

13  there not?

14  A.  Yes, uh-huh.

15  Q.  And does one of those show the exterior of the Atheist

16  Center where the vehicles were parked?

17  A.  That is correct.

18  Q.  On that Sunday, as the other side shows the interior of

19  the house when you went in with Mr. Tyson on Greystone; is

20  that correct?

21  A.  Yes, uh-huh.

22  Q.  At this time, your Honor, we'd offer Government's Exhibit

23  W20-1.

24          MS. WILLIAMS:  No objection.

25          THE COURT:  Received.

Albarado - Cross

1          MR. CARRUTH:  And we'll pass the witness, your Honor.

2                    CROSS-EXAMINATION

3   BY MS. WILLIAMS:

4   Q.  Educate me on the correct pronunciation of your name.

5   A.  Albarado.

6   Q.  When you typically went to the headquarters to do the

7   trimming of the hedges or to go in, what day did you typically

8   go on, or did it vary?

9   A.  It varied.

10  Q.  The date that you've testified about was, I think you

11  said, a Sunday.  Did you expect someone to be there?

12  A.  Yes, the O'Hairs didn't usually recognize the sabbath, and

13  so they worked on Sunday.  It wasn't unusual for them to be

14  there.  But the reason I thought it was Sunday was because

15  half didn't usually show up on Sunday.  There was no staff

16  there.

17  Q.  And the reason that it's your recollection that it was

18  Sunday was because the three cars of the O'Hairs were there.

19  The two cars of the O'Hairs were there, but there weren't any

20  staff?

21  A.  That's correct.

22  Q.  Typically, would staff be there on a Saturday?

23  A.  Yes.

24  Q.  If no one had been there, would the gate typically have

25  been locked?

*Albarado - Cross*

1   A.   Yes, it would.

2   Q.   And do you have a key to the gate?

3   A.   No.

4   Q.   So if you had shown up and no one was there, you would

5   have had to just go home?

6   A.   That's correct.

7   Q.   All right.  You also didn't have a key to the center?

8   A.   No.

9   Q.   When -- how long after that did you go to the house on

10  Greystone?

11  A.   I just can't recall.  It has to have been a reasonable

12  time, reasonably long time because I'm sure the plants were

13  alive -- must have been alive at their home before they left,

14  and all of the plants were dead.  So it's going to take more

15  than a week, maybe three weeks to a month.

16  Q.   And when you say, "All of the plants were dead," the

17  shrubbery, that sort of thing?

18  A.   The plants on the inside of the house were all dead.  The

19  O'Hairs had quite a few plants on the back deck, and those

20  were all dead.

21  Q.   And I believe that you told Mr. Carruth that you went in

22  with Mr. Tyson into the house.

23  A.   Into the Greystone, their home?

24  Q.   Yes.

25  A.   Yes.  Spike was there and he opened the door and let me

*Albarado - Cross*

1  in.

2  Q.  He had a key?

3  A.  I'm presuming he did.

4  Q.  All right.  You don't have any recall of that?

5  A.  No.

6  Q.  But he must have.  Did you go in through the front door?

7  A.  No.  I went in through the back.

8  Q.  Did Mr. Tyson indicate how many times he had been there

9  previously?

10  A.  No.

11  Q.  You knew he had been there at least once to get the bills

12  out of the mail?

13  A.  Presuming so, yes.

14  Q.  All right.  He told you that he did?

15  A.  I don't recall him saying that.  He just called and asked

16  if I would help him clear some of the dead plants away.

17  Q.  At some point during your visit, though, he indicated to

18  you that he had been in the house before?

19  A.  Yes.

20  Q.  And did it seem strange to you that Mr. Tyson would go

21  over to the house and leave food on the table and rotten food

22  in the refrigerator and not clean that out?

23  A.  Didn't seem strange to me, no.  Spike, as I understood him

24  to say, he was there to pay some bills that needed to be paid.

25  And he wasn't living there at the time, so he came -- I'm

Albarado - Cross

1   presuming he came and did what he needed to do and left.

2   Q.  Did -- what were the circumstances that he took you on a

3   tour of the house and showed you the different rooms and

4   pointed out various things that he thought were strange?  Why

5   did he do this or do you know?

6   A.  I don't know why he offered to.  I'm presuming that I was

7   doing him a favor by helping him clean up the place, and if I

8   was at all curious, he might wish to satisfy my curiosity.  I

9   didn't express an interest in it.

10  Q.  It wasn't that you went in and said, "Can you show me

11  around?  Can you show me all these things I've heard about?"

12  A.  I hadn't heard much that point in time.

13  Q.  Did Mr. Tyson indicate at all to you what his thoughts on

14  the matter were with regard to what might have happened?

15  A.  No, he didn't really share much about it.  The few times

16  we spoke about it, we said that they seem to be -- I think

17  they were still on the phone at that time that had some

18  business to attend and that's all he knew.

19  Q.  But he made it a point to point out Dr. O'Hair's insulin

20  in the refrigerator, dirty clothes, that sort of thing?

21  A.  I don't know if it was make a point.  It was just sort of

22  casually mention it.

23  Q.  Now, did you tell the agents when they interviewed you

24  that you did not see Madalyn O'Hair's wheelchair at the house?

25  A.  I didn't see the wheelchair at the house.  I did see it at

*Albarado - Redirect*

1   the center later on.

2   Q.  When were you at the center later on?

3   A.  When Spike was -- I guess he became responsible for

4   keeping the center going.  He asked me to continue to water

5   the plants at the center, and I saw a wheelchair there.  I'm

6   presuming it was hers.

7   Q.  Thank you, sir.  I don't have anything further.

8                    RE-DIRECT EXAMINATION

9   BY MR. CARRUTH:

10  Q.  For all you know, that wheelchair could have been moved

11  from the house to the center some earlier time; is that

12  correct?

13  A.  I have no idea at all.  I just remember seeing it at the

14  center when they were there, and I remember seeing it at the

15  center later on.

16  Q.  In addition to the vehicles driven by the O'Hairs, did the

17  center own any motor vehicles to use for deliveries or

18  anything?

19  A.  It did.  It owned a large, white Chevrolet van, a windowed

20  van, but I can't recall whether that was purchased after the

21  O'Hairs left or if they had it before.

22  Q.  Is it possible the van you saw on that Sunday may have

23  been that van belonging to the Atheist Center?

24  A.  No.  It's an entirely different van.  The one that I saw

25  in the driveway of the center was a mini-van that was a

*Albarado - Redirect*

1  paneled van.  There were no windows in the back or the sides.

2  Just the door in the front.

3  Q.  Could you determine or make any effort to determine

4  whether that was a rental van?

5  A.  There was some writing on the side.  I didn't really pay

6  much attention to it, but I seem to recall something having to

7  do with a rental.  And in my own mind, I thought, well, maybe

8  the O'Hairs were renting something, and they're having it

9  delivered.

10  Q.  Or moving something?

11  A.  Or moving something.  I don't know.

12  Q.  Thank you, sir.  Pass the witness.

13        MS. WILLIAMS:  Nothing further, your Honor.

14        THE COURT:  I'm going to give the jury a little break.

15  Ten minutes.  Please be ready to come back in ten minutes.

16     (Jury not present.)

17        THE COURT:  Ladies and gentlemen, those members of the

18  media that are still here, if any of you have any influence

19  over the people with the television outside with these people

20  who are just dedicated of putting my jurors on television, I'm

21  not going to let anybody back in this courtroom if the media

22  doesn't start straightening up.

23        So if you've got any influence with the folks outside

24  and you like for their well-being and you want to stay in the

25  courtroom, you might mention to them to get those cameras away

Simon - Direct

1    from these jurors or I'm going to have the United States

2    Marshals have extra cameras for about a week.  And I want to

3    know how many Marshals I've got.  All right.  We've got ten

4    minutes.

5        (Recess.)

6        THE COURT:  This is Mrs. Sims.  She's going to

7    administer an oath to you.

8        (Witness was sworn.)

9        THE COURT:  If you'll walk around this column right up

10   here up at this box, called the jury witness box.  Have a seat

11   right there.  If you will, tell us your full name and spell

12   your last name.

13       THE WITNESS:  Cynthia K. Simon, S-I-M-O-N.

14   CYNTHIA K. SIMON, called by the Government, duly sworn.

15                     DIRECT EXAMINATION

16   BY MR. D. MILLS:

17   Q.  Tell the jury where you live and where you're employed,

18   please.

19   A.  I live out in Cedar Park, and I'm employed at the Griffith

20   Animal Hospital as the office manager.

21   Q.  And where is that located and how long have you been so

22   employed?

23   A.  It's located on 2222, Northland Drive just west of MoPac,

24   about two blocks.  And I've been employed there since February

25   of '91.

Simon - Direct

1   Q.  And briefly tell the jury what your duties and

2   responsibilities are and if they changed, you know, if they

3   evolved over time.

4   A.  Just the hospital administrator.  I mean, there's a number

5   of duties that go along with it, just managing the clinic and

6   the doctors and the employees.  And just --

7   Q.  That's your only position that you've ever occupied?

8   A.  Yes, sir.

9   Q.  During the time that you were there, did you come to know

10  the O'Hair family?

11  A.  Robin O'Hair.

12  Q.  And how was it that you came to know Robin O'Hair?

13  A.  She was a client of Dr. Griffith's that would come in

14  frequently.  And on occasion, I'd be in the front office

15  helping the receptionist, so we would meet and talk.

16  Q.  Bringing animals?

17  A.  Bringing animals to the clinic for treatment.

18  Q.  What type of animals?

19  A.  She had some Cocker Spaniels.

20  Q.  How many?

21  A.  She had -- I think at one time, she had four.  There were

22  two that came in most frequently.

23  Q.  Did you get to know her pretty well over the time, say,

24  between 1991, and August or September, of 1995?

25  A.  I knew her as a client well more so than probably other

Simon - Direct

1    clients, but just a client relationship.

2    Q.   Do you find it customary that people dote over their

3    animals, baby their animals?  Is that normal or abnormal or

4    some people do it more than others?

5    A.   I think some people do it more than others, however, I

6    think more and more people are doing that, treating them like

7    children.

8    Q.   And how did Robin O'Hair, in your presence, interact with

9    her dogs?

10   A.   She appeared to love them very much.  She treated them as

11   though they were her own children.

12   Q.   You were asked to bring some records; is that correct?

13   A.   Yes, sir.

14   Q.   And if you'll look in front of you, there's a document

15   with an Exhibit Number W27-1.  Do you see that?

16   A.   Yes, sir.

17   Q.   And does that appear to be a true and correct copy of the

18   records that you brought relative to the O'Hair and their

19   business dealings with the animal hospital where you work?

20   A.   Yes, sir.

21   Q.   And that is one of the business records of the animal

22   hospital where you were employed; is that correct?

23   A.   That is correct.

24   Q.   We'd offer W27-1, your Honor.  Let me show them a copy.

25        MR. T. MILLS:  No objection.

LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

Simon - Direct

```
1        THE COURT:  W27-1 is received.
2   Q.  (BY MR. D. MILLS) The first page of that document has a
3   owner's manual; is that correct?
4   A.  Correct.
5   Q.  And it shows the owner's name to be?
6   A.  They have that backwards.  The owner's name is shown to be
7   Shannon, and the patient's name shown to be O'Hair.
8   Q.  So it should have been O'Hair.  So the dog's name that was
9   referenced there was Shannon?
10  A.  That's correct.
11  Q.  Do you know that to be true that they -- Robin had a dog
12  named Shannon?
13  A.  Yes.
14  Q.  And does it show the date of service being provided there
15  for this animal?
16  A.  Yes.
17  Q.  And that date would be?
18  A.  8-24-95.
19  Q.  Well --
20  A.  Actually, I'm sorry, 8-29-95.
21  Q.  If you'll look to the third page, which is a typewritten
22  page, you can see arrival date.  Do you see that printed on
23  there?
24  A.  Yes, that's correct, uh-huh.
25  Q.  It shows the arrival date being what?
```

*Simon - Direct*

1    A.   August 29th, 1995.

2    Q.   And over on the edge there, it's under patient's name, it

3    shows Shannon, does it not?

4    A.   That is correct.

5    Q.   And then, the next page shows the name for another dog?

6    A.   That's correct.

7    Q.   Being?

8    A.   Gallagher.

9    Q.   And the same arrival date?

10   A.   That's correct.

11   Q.   And is there a -- is there also another dog that's listed

12   on the following page that's not typed but handwritten?

13   A.   Gannon.

14   Q.   Did you know her to have a dog named Gannon?

15   A.   Yes.

16   Q.   And then, arrival date is the same; is that correct?

17   A.   Correct.

18   Q.   Now, there's an entry on this record on the first page of

19   this exhibit of W27-1.  There's a notation.  Can you read that

20   notation and tell us what that means?  It says --

21   A.   Yes, at the top, "TC," that's telephone call, it has an O

22   with a slash over it.  Owner called, very upset, had had a

23   family emergency and left town Sunday, leaving two dogs in the

24   backyard and one in house, asked if someone could get dogs

25   from yard and transport to kennel at GSAH, which is Griffith

Simon - Direct

1    Small Animal Hospital.

2         I volunteered to pick up the dogs from the yard,

3    brought to GSAH to board until further notice.  And then, it's

4    signed by Gretchen Clap.

5    Q.  Do you know who Gretchen Clap is?

6    A.  Yes, she's one of our receptionists.

7    Q.  All right.  You didn't take that phone call?

8    A.  I did not.  That's correct.

9    Q.  Do you recognize that handwriting?

10   A.  Yes, I do.

11   Q.  And that would be the handwriting of?

12   A.  Gretchen Clap.

13   Q.  All right.  Do you know when these dogs -- when they came

14   in on the 29th, what actually happened to the dogs in terms of

15   the final disposition?  By looking at your records, can you

16   tell what happened to them?

17   A.  As far as the treatment that they received?  Is that what

18   you mean?

19   Q.  Well, I mean what did you do while they were there and

20   when was -- and when were they actually removed or taken out

21   of your care, custody and control?

22   A.  Okay.  From the records, they did board with us.  We had

23   to vaccinate them and do some treatment on the animals

24   themselves.  There was some problems with the ears, and

25   overall, the general appearance looked good.

Simon - Direct

1   Q.  If you'll look on to that first page --

2   A.  Yes.

3   Q.  -- there's -- I'll call it an entry.  First date being

4   8-29.  Then, look down to the sixth entry, and it's the date,

5   I believe, 10 --

6   A.  10-27-95.

7   Q.  Yes.

8   A.  Yes, release dogs to Spike Tyson.

9   Q.  And there's some phone numbers by his name; is that

10  correct?

11  A.  That is correct, there's two phone numbers.

12  Q.  And if you will look at the last page of the exhibit

13  labeled W27-1.

14  A.  Uh-huh.

15  Q.  Can you tell the jury what that is and what the purpose of

16  that document being created was for?

17  A.  Sure, this document is a document that veterinarians are

18  required by law to send to owners of abandoned animals at

19  practices.  So what I did in this letter is write a letter to

20  Ms. O'Hair, Robin O'Hair, informing her that we did have the

21  animals, and that twelve days from the date of the letter, if

22  she did not come and pick up the animals, then we would

23  dispose of them as we felt appropriate.

24  Q.  And the date of this letter was?

25  A.  October 14th, 1995.

1  Q.  And does it show a balance of how much was owed for

2  boarding them as of October 10th of '95?

3  A.  Yes.  That would be for boarding and the treatment,

4  $1,343.90.

5  Q.  And did you get a response to this letter that you're

6  aware of?

7  A.  It was returned.  The letter itself?

8  Q.  Is that correct?

9  A.  I did not get a response.  No, the letter was returned to

10  us.

11  Q.  So after the letter was returned, then what did you do in

12  terms of how you came to come in contact with this individual

13  named Spike Tyson?

14  A.  I had called the office number and he was the one who was

15  answering the telephones, and said that he would rather pick

16  up the dogs and take care of the dogs instead of us either

17  bringing them to the Humane Society or putting them to sleep.

18  So we allowed that to be okay and had him authorize to pick up

19  the dogs.

20  Q.  Okay.  Did you ever get paid for the boarding of these

21  animals by the O'Hairs?

22  A.  No.

23  Q.  Have the O'Hair family -- and I guess, principally, Robin

24  that you're saying --

25  A.  Correct.

Simon - Cross

1    Q.  -- have there been other occasions when they boarded dogs

2    with you?

3    A.  Yes.

4    Q.  And had they been extended periods of time?

5    A.  Yeah, some extended.

6    Q.  And during those periods of time, do you have personal

7    knowledge of whether the dogs' well-being was checked upon by

8    virtue of a phone call from Robin?

9    A.  Yeah, she would usually call in either when they were for

10   surgery or for boarding, she would call and check on them.

11   Q.  So in this case, if August has 31 days, we went from the

12   29th -- this is three days, 30 in September is 33 and 27 in

13   October, so 60 days before they were disposed of?

14   A.  Yes, that's correct.

15   Q.  Do your records reflect that Robin O'Hair made any contact

16   with the vet clinic during that period of time?

17   A.  No, they do not.

18   Q.  Pass the witness.

19                    CROSS-EXAMINATION

20   BY MR. T. MILLS:

21   Q.  Do you know if the dogs had a tag or other identification

22   that in case they got lost that somebody could call the

23   veterinarian or call the owner, or do you remember?

24   A.  When they came in to the clinic that day?

25   Q.  Yes.

Simon - Cross

1   A.  I don't recall --

2   Q.  All right.

3   A.  -- whether or not they did.

4   Q.  All right.  Did Gretchen Clap do what the -- I don't know

5   if the clinic has a policy, but was her response to someone

6   calling in and saying there's been a sudden decision to leave,

7   will you get the dogs, did she do what would be considered the

8   right thing to do by going and helping a patient or a client's

9   dogs out?

10  A.  For her, it was the right thing.  I did not want her to

11  go.  I was worried of liability.  But she had known Robin

12  better than I had and Dr. Griffiths better than I had because

13  he worked there longer than I had.  So in an instance, she

14  felt very comfortable doing that.

15  Q.  All right.  Thank you.  That's all the questions I have.

16          MR. D. MILLS:  No further questions, your Honor.

17          THE COURT:  You may step down.  Thank you.  You may

18  call your next witness.

19          MR. D. MILLS:  Gretchen Roufa.

20          THE COURT:  If you'll come right here.  This is Mrs.

21  Sims.  She's going to administer an oath to you.

22      (Witness was sworn.)

23          THE COURT:  Walk over here.  Tell us your full name,

24  and spell your last name, please.

25          THE WITNESS:  Gretchen Roufa, R-O-U-F-A.

*Roufa - Direct*

```
 1          GRETCHEN ROUFA, called by the Government, duly sworn.

 2                         DIRECT EXAMINATION

 3   BY MR. D. MILLS:

 4   Q.  How are you employed currently and where do you live?

 5   A.  Currently, I'm not employed, and I live in Wells Branch,

 6   Austin.

 7   Q.  All right.  Did you at one time work at the Griffith

 8   Animal Hospital, and if so, what was the time period and what

 9   were your duties and responsibilities, please?

10   A.  Yes, I did.  I was employed there from, roughly, August of

11   '90 to, like, September of '95, and I was a receptionist

12   there, which involved answering the phone, checking in-and-out

13   of the clients and stuff like that.

14   Q.  During the course of your employment, did you come to know

15   Robin O'Hair?

16   A.  Yes, I did.

17   Q.  And how is it you came to know her?

18   A.  She was a client there and would bring the pets in when

19   they needed medical care.

20   Q.  And the type of pets that she had?

21   A.  Cocker Spaniels.

22   Q.  How many?

23   A.  Three of them.

24   Q.  Is there an exhibit up in front of you numbered Government

25   Exhibit 27-1?
```

*Roufa - Direct*

1   A.  Yes.

2   Q.  And that's been admitted into evidence.  And the first

3   entry there is 8-24-95, and then, there's some handwriting

4   next to it.  Do you recognize that handwriting?

5   A.  Yes, it's mine.

6   Q.  And did you make that -- did you make that notation there

7   based upon a phone call that's contemporaneous with a date

8   that's indicated?

9   A.  Yes.

10  Q.  And tell us how you came to make that notation there.

11  A.  I just received a phone call from Madalyn, and it was a

12  very odd phone call which is why I made notes on the carts.

13  We normally don't.

14  Q.  Let me ask you this:  You said for Madalyn?

15  A.  Not Madalyn, I'm sorry.  It wasn't Madalyn, it was Robin.

16  Q.  And then, you wrote down basically what she told you there

17  that there was a family emergency and they had to leave town;

18  is that correct?

19  A.  Right.  She had -- yes.

20  Q.  Did you go -- did you act and go and retrieve some of the

21  dogs?

22  A.  Yes, I did.  I went and got two of the dogs out of their

23  backyard.  I couldn't get the third dog because the house was

24  locked.

25  Q.  Who got the third one?

Roufa - Direct

1    A.   I am not clear as to who got the third one.  I had left

2    the employment there after that one had been picked up or

3    before that one was picked up, excuse me.

4    Q.   When you went to the house, what did you observe about

5    activity around the house over on Greystone?  Is that where

6    you went?

7    A.   Yes, I believe that --

8    Q.   Had you been there to the Greystone address before?

9    A.   I had never been to that address before.

10   Q.   So, basically, you used your business records to find the

11   Greystone address?

12   A.   Right.

13   Q.   Did you see any activity in the house?

14   A.   I could see their dog that was in the house, but there was

15   nobody there.

16   Q.   Had you talked with Robin O'Hair on other occasions?

17   A.   Yeah, as a receptionist, if she would call, I would make

18   appointments for her and things like that.

19   Q.   When she called you on the 29th of August of 1995,

20   characterize her tone and her behavior and her emotional

21   state, if you can, from the observations you made by talking

22   with her.

23   A.   She was very upset.  I would almost say frantic.  She was

24   very frantic.  She wanted me to -- she was begging me

25   basically to go and get the dogs from the backyard because

*Roufa - Direct*

1    they had left town and hadn't made arrangements for the dogs

2    and just left with the dogs -- this is what she had implied

3    to me -- that they had left town and not made provisions for

4    the dogs.

5           And so she was asking me very strongly to please go

6    get the dogs from her backyard, and so I did.

7    Q.  Could you discern if she was crying?

8    A.  She appeared to be crying at one point.  She was really

9    upset.

10   Q.  When you say "crying," could you tell she was sobbing, or

11   how did you make -- come to form that opinion that she was

12   crying?

13   A.  Just from the sound of her voice.  She was very upset and

14   she had mentioned that -- I don't know if she was upset from

15   the dogs.  She was worried, very worried about the dogs being

16   in the backyard without any food or water.  And she had also

17   mentioned that somebody was ill and that they had had to go to

18   be with that person.

19          So I don't know what she was upset from, but she was

20   definitely very upset.

21   Q.  So you left the employment of the clinic before the

22   animals that were -- the two that you picked up were --

23   actually had some final disposition; is that correct?

24   A.  Right.

25   Q.  Pass the witness, your Honor.

Roufa - Cross

1                    CROSS-EXAMINATION

2   BY MR. T. MILLS:

3   Q.  I may have heard it wrong.  Do you have the record in

4   front of you?

5   A.  Yes, I do.

6   Q.  All right.  What date do you show that this event

7   happened?

8   A.  My handwriting's kind of bad and the copy's not very good.

9   I look at it and I see it as the 29th, but from my

10  handwriting, it could have been the 24th, too.  The copy's not

11  very good.

12  Q.  All right.  Did you know these three dogs?  Had you helped

13  get treatment for them for Robin before?

14  A.  Right, yeah, I didn't work on them directly, but I was the

15  receptionist that would check them in or out when they bring

16  them in for medical care.

17  Q.  Did you know them well enough to know that there were two

18  of the dogs that couldn't be together because they fought?

19  A.  I don't recall that, but, you know, it was a while ago.

20  Q.  I understand.  If that was the case -- or there were two

21  in the yard and one in the house.

22  A.  Yes.

23  Q.  All right.  And did you know why the one in the house was

24  separated from the dogs outside?

25  A.  I did not.

1  Q.  All right.  And did I understand you to say that you quit

2  that day?

3  A.  No, not that day, closely after that.  I don't remember

4  the exact date that I left.

5  Q.  All right.

6  A.  I was getting married and wasn't aware of the date.

7  Q.  Thank you.  That's all the questions.

8                       RE-DIRECT EXAMINATION

9  BY MR. D. MILLS:

10  Q.  If you'll look on page 3 of that exhibit, it's typed.  Do

11  you see the arrival date that's typed in there?

12  A.  Yes, it's August 29th.

13  Q.  Okay.  Thank you.

14          THE COURT:  May this witness be excused?

15          MR. D. MILLS:  Yes, your Honor.

16          THE COURT:  You may be excused, ma'am.

17          MR. CARRUTH:  United States called Samuel Sykes

18  Houston to the stand, your Honor.

19          THE COURT:  Come forward, please, sir.  This is Mrs.

20  Sims.  She's going to administer an oath to you.

21      (Witness was sworn.)

22          THE COURT:  You can walk around this column, please,

23  sir, and have a seat.  Let us have your full name, please,

24  sir, and spell your last.

25          THE WITNESS:  Samuel Sykes, S-Y-K-E-S, Houston, Jr.

*Houston - Direct*

1   SAMUEL SYKES HOUSTON, called by the Government, duly sworn.

2                        DIRECT EXAMINATION

3   BY MR. CARRUTH:

4   Q.   Please tell the jury how you're employed, Mr. Houston.

5   A.   I've been employed as an FBI agent for 29 years.

6   Q.   And in your official capacity, have you been involved in

7   an investigation which has resulted in the defendant -- in the

8   indictment of the defendant, Mr. Gary Paul Karr, who's seated

9   here at counsel table behind me?

10  A.   Yes, sir.

11  Q.   Have you ever personally met Mr. Karr?

12  A.   Yes, I have.

13  Q.   Can you tell us when that was, sir, the first time you met

14  him?

15  A.   First met him at his residence, in Michigan, on March the

16  24th of 1999.

17  Q.   And can you tell us, sir, what was your purpose in going

18  to Mr. Karr's residence in Michigan, on March the 24th of

19  1999?

20  A.   Went to ask him what he knew about the disappearance of

21  Madalyn Murray O'Hair, Robin O'Hair and Jon Garth Murray.

22  Q.   All right, sir.  Did you go alone to that residence or did

23  other officers or agents accompany you?

24  A.   Ed Martin with the IRS accompanied me.  Fella by the name

25  of William O'Leary, who's an FBI agent in the Detroit office.

*Houston – Direct*

1    Q.   Okay.

2    A.   Robert Bjorklund, who is a sheriff's deputy in Dallas,

3    Texas, and young man named Randy Newland, who was the Oakland

4    County, Michigan State Sheriff's Office.

5    Q.   Okay.  And did you go and knock on Mr. Karr's door after

6    you determined whether or not he was home?

7    A.   That's correct, about 10:30 in the morning.

8    Q.   And did he come to the door?

9    A.   He came to the door.

10   Q.   And did y'all identify yourselves as law enforcement

11   officers?

12   A.   Yes.  Mr. Martin was the first one to talk to him, and he

13   identified himself as an IRS agent and kind of went through

14   the whole list of people, told him who we were and why we were

15   there.

16   Q.   And did Mr. Karr allow you to enter his residence?

17   A.   Right.  Mr. Martin talked to him briefly at the door and

18   asked if we could come in and talk to him, and he said, "Come

19   on in."  Welcomed us inside.

20   Q.   And did Mr. Karr agree to answer your questions and talk

21   to you generally about the investigation you were pursuing at

22   that time involving the disappearance of the Murray O'Hair

23   family members?

24   A.   That's correct.  He expressed a willingness to discuss the

25   matter with us, and we took the liberty of advising him of his

*Houston - Direct*

1    rights.

2    Q.  And can you be more specific what those so-called Miranda

3    rights we hear about on television?

4    A.  Those are the one, yes, sir.

5    Q.  And did you advise him of his right to remain silent, not

6    to say anything?

7    A.  Yes, sir.

8    Q.  Anything he said could be used against him in a court of

9    law?

10   A.  Yes, sir.

11   Q.  Advise him of his right to have an attorney, and if he

12   could not have an attorney -- hire an attorney, one would be

13   appointed for him by the Court prior to any questioning?

14   A.  Yes, sir.

15   Q.  You advised him of all of that?

16   A.  Yes, sir, Mr. Martin did.

17   Q.  Mr. Martin, in your presence?

18   A.  In my presence.

19   Q.  And that did Mr. Karr respond when you advised him of his

20   constitutional rights?

21   A.  He acknowledged that he understood the rights and

22   expressed that he would discuss the matter with us.

23   Q.  All right.  So Mr. Karr was generally cooperative with the

24   investigators; is that correct?

25   A.  Yes, sir.

*Houston - Direct*

1  Q.  At one point in time, after your initial arrival, did you

2  ask Mr. Karr's permission to conduct a protective sweep of the

3  premises to see if anyone else might be present?

4  A.  After we had been in his small apartment for a brief

5  period, we asked -- or actually, it was Agent O'Leary of the

6  Detroit Office -- asked his permission to go through the house

7  and see if there were other people that might be there.  He

8  said it's a safety precaution.

9  Q.  A protective sweep, I believe as officers refer to,

10  correct?

11  A.  That's correct.  And asked him if it was okay to do that,

12  and he said yes.

13  Q.  And Mr. Karr consented to that, correct?

14  A.  Yes, sir, he did.

15  Q.  Now, did he begin to talk to you about -- and answer your

16  questions regarding this investigation?

17  A.  He did after he was warned of his rights.  We asked him to

18  just to listen to us for a bit.

19  Q.  Okay.

20  A.  We laid out in front of him a lot of the information that

21  we were aware of which would relate to the O'Hairs.

22  Q.  Now, prior to going to visit Mr. Karr, you had been

23  involved in this investigation, your agency, for a lengthy

24  period of time; is that correct?

25  A.  Yes, sir.

Houston - Direct

1   Q.  And were you also aware that on the same day, you went to

2   Michigan to interview Mr. Karr, that a federal search warrant

3   was being executed here in Austin at the residence of Mr.

4   David Waters?

5   A.  That's correct.

6   Q.  And that at the same time, Special Agent Donna Cowling of

7   the FBI was sent up to the Chicago area to locate a Rolex

8   watch?

9   A.  That's correct.

10  Q.  In the possession of Sidney Karr, the defendant's sister?

11  A.  Yes, sir.

12  Q.  And all of this was simultaneously happening at the same

13  time?

14  A.  Yes, sir.

15  Q.  And on the same day, other officers were going to the

16  residence --

17         MR. T. MILLS:  Excuse me.  I object to his testifying.

18         MR. CARRUTH:  Just trying to move it along.  I'll

19  rephrase.

20         THE COURT:  The objection's good.  It is leading.

21  Q.  (BY MR. CARRUTH) All right.  To your knowledge, sir, were

22  there other officers dispatched to the Fort Worth area around

23  Wetherford?

24  A.  Yes, sir.

25  Q.  And what was their purpose in going up there, if you know?

Houston - Direct

1    A.   Talk to a possible confederate in the leasing of one of

2    the storage units.

3    Q.   And that would be Mr. Osborne?

4    A.   Yes, sir.

5    Q.   Also known as Chico?

6    A.   Chico, yes, sir.

7    Q.   Okay.  So this was all happening at the same time; is that

8    correct?

9    A.   That's correct.

10   Q.   On the same day.  And did you advise Mr. Karr that he was

11   a suspect in this investigation based on information you'd

12   uncovered?

13   A.   Yes, sir, we did.

14   Q.   And was he still willing to talk to you about it?

15   A.   He thought about it for quite a while, and after he heard

16   what I had to say, he said he better -- he chose to make his

17   part of the scheme known.

18   Q.   Now, you didn't threaten or coerce him, did you, sir?

19   A.   No, sir.

20   Q.   What was it that he heard you had to say that made him

21   want to talk to you?

22            MR. T. MILLS:  Object.  Speculation.

23            MR. CARRUTH:  Well, let me rephrase it.

24            THE COURT:  Rephrase the question.

25   Q.   (BY MR. CARRUTH) What did you tell Mr. Karr prior to him

1    agreeing to talk to you in addition to advising him of his

2    constitutional rights that you've previously testified about?

3    A.   I presented documents from Capps Auto Leasing here in

4    Austin, which had him renting three vans over the period --

5    pertinent period, from August to September of 1999.

6    Q.   Excuse me.  '99 or another year?

7    A.   '95.

8    Q.   '95.

9    A.   '95.

10   Q.   Yes, sir.  And you had his signature on certain rental

11   documents?

12   A.   Yes, sir.

13   Q.   Okay.  And what other evidence, if any, did you present to

14   Mr. Karr on that occasion?

15   A.   Showed him a registration that he had made at the Warren

16   Inn in San Antonio, Texas.

17   Q.   And is that where his driver's license had been

18   photocopied by the clerk?

19   A.   That's correct.

20   Q.   Okay.  And what other evidence, if any, did you show him

21   on that occasion, you and Mr. Martin and the other officers?

22   A.   I can't think of anything else.

23   Q.   Okay.  And did he thereafter make a voluntary statement to

24   you --

25   A.   Yes, sir.

1  Q.  -- and was that statement subsequently reduced to

2  writing --

3  A.  Yes, sir, it was.

4  Q.  -- by Agent Martin utilizing a laptop computer that he had

5  brought along?

6  A.  Yes, sir.

7  Q.  And was this a rather lengthy statement or was it a short

8  statement?

9  A.  It was considerable in length, and the interview was also

10  unusually long, I suspect.

11  Q.  And approximately how many hours did you and the other

12  officers spend visiting Mr. Karr in his residence in Novey,

13  Michigan?

14  A.  We started about 10:30 in the morning and we finished up,

15  and were leaving his residence about 7:30 that evening.

16  Q.  And did you provide Mr. Karr with a noon meal and see that

17  he was comfortable?

18  A.  Yes, sir.  We purchased some hamburgers for all people

19  that were there.  And I went out subsequent to that and bought

20  him some cigarettes.  And we asked him, is there anything else

21  we could do for him, and then, we tried to comply with all the

22  requests.

23  Q.  And was he allowed to have a rest room break, if needed,

24  or anything else, so that he was comfortable and he was not

25  under arrest, was he, and not coerced at that point?  Strike

*Houston - Direct*

1    that --

2    A.   Yeah.

3    Q.   -- strike that.  He was not coerced at that point, was he?

4    A.   He was coerced at no time.

5    Q.   He was not threatened by you or anybody else?

6    A.   No, sir.

7    Q.   You did not have an arrest warrant for him --

8    A.   No, sir, I did not.

9    Q.   -- correct?  Okay.  Now, did he admit that he, in fact,

10   was the man who had rented those three vans in Austin, Texas,

11   during the summer or early fall of 1995?

12   A.   Yes, sir, he said that he had done that and that at the

13   request of David Waters.

14   Q.   Okay.  He admitted he knew Mr. Waters?

15   A.   Yes, sir.

16   Q.   And did he admit that that was, in fact, his signature and

17   driver's license at the Warren Inn in San Antonio, Texas?

18   A.   Yes, sir.

19   Q.   And did he offer any explanation as to why he had rented a

20   room or apartment at the Warren Inn with Mr. Waters for 30

21   days in 1995?

22   A.   His story was that David Waters had been commissioned by

23   the O'Hairs to participate in a scheme whereby they were going

24   to hide or get away from the authorities here in the United

25   States, and that they needed some time to make their plans to

*Houston - Direct*

1    leave, and that they had requested Mr. Waters to provide them

2    with security for this time period.

3    Q.   Okay.   And assuming that to be how Mr. Waters got

4    involved, how would that implicate Mr. Karr all the way back

5    in Michigan?

6    A.   Mr. Karr had met Mr. Waters several years prior to that,

7    and they had maintained a friendship during that period.

8    Q.   Okay.

9    A.   From about 1990.

10   Q.   Did he indicate to you whether Mr. Waters had solicited or

11   invited him to come to Austin, Texas?

12   A.   Yes, sir.

13   Q.   To be part of this plan?

14   A.   That's correct.

15   Q.   And that he --

16   A.   Like a security officer for the O'Hairs.

17   Q.   And he willingly agreed to come to Austin, Texas and

18   assist Mr. Waters in this plan or endeavor?

19   A.   That's correct.

20   Q.   Okay.   Did he mention a man named Danny Fry?

21   A.   Yes, he did.   Said that he was another individual who was

22   acquainted with David Waters, and that David Waters had also

23   asked Mr. Karr -- excuse me, Mr. Fry to come to Austin to

24   participate in the same endeavor.

25   Q.   Okay.   Did Mr. Karr indicate to you that he had received

Houston - Direct

1  anything of value for assisting Mr. Waters in his plan?

2  A.  Yes, sir, he had received some money from Mr. Waters, and

3  also, had -- they had gone out and had a spending spree and

4  purchased quite a bit of clothes, jewelry and dress

5  accessories.

6  Q.  Did he mention anything about three Rolex watches?

7  A.  He said that came a part later on and that Mr. Waters had

8  given him three Rolex watches, two women's and one man's

9  watch.

10  Q.  And did he tell you whether Mr. Waters said where those

11  watches came from?

12  A.  Said they were from the O'Hairs.  Said they no longer

13  wanted them.

14  Q.  And did he tell you, at some point in time during your

15  questioning of him, that David Waters told him that he,

16  Waters, had killed the O'Hairs?

17  A.  Yes, sir.

18  Q.  Did he also involve Mr. Waters in the death of Danny

19  Raymond Fry?

20  A.  Yes, sir, according to him, Mr. Waters had made that

21  statement to him.

22  Q.  And Mr. Karr had knowledge of those events; is that your

23  testimony?

24  A.  Yes, sir.

25  Q.  Did Mr. Waters -- or, excuse me, Mr. Karr make any

Houston - Direct

1   statements to you regarding the disposition of a Porsche

2   automobile belonging to Robin Murray O'Hair when he was in

3   Texas in 1995?

4   A.   He stated that when the group of people left Austin en

5   route to San Antonio, that Robin Murray O'Hair's vehicle, a

6   1985 Porsche, was driven to the parking lot of the Austin

7   Mueller Airport at that time and left in the parking lot.

8   Q.   And had your investigation subsequently revealed that that

9   vehicle was, in fact, recovered and impounded by the Airport

10  Police at the old Austin Airport, Robert Mueller Airport?

11  A.   It had been left there for over a year, and the company

12  organized -- that organized the parking lot there had moved it

13  from a close end location to one of their remote parking lots.

14  And that, ultimately, the Austin Police Department came and

15  asked about the vehicle, and it was shown to the Austin Police

16  Department and subsequently impounded by the Austin Police

17  Department.

18  Q.   Okay.  But initially, it was discovered by the Airport

19  Police Department and impounded; is that correct?

20  A.   Yes, sir.

21  Q.   I'm going to show you, sir, what's been marked for

22  identification as Government Exhibit W21-2.  I'll ask you to

23  examine that document and tell me whether you're able to

24  identify it, please.

25  A.   Yes, sir.

1   Q.  Do you recognize that as a certified copy of a title

2   history from the Texas Department of Transportation under seal

3   of -- by the custodian of records for the State Department?

4   A.  Yes, sir.

5   Q.  At this time, we would offer Government's Exhibit W21-2,

6   your Honor.

7            MR. T. MILLS:  No objection.

8            THE COURT:  Received.

9   Q.  (BY MR. CARRUTH) Now that that exhibit is in evidence,

10  would you kindly remove it from the plastic container and tell

11  us what it is?

12  A.  It's a registration for the 1985 Porsche two-door, lists

13  the previous owner and the owner at the time, being Robin

14  Murray O'Hair, 3702 Greystone Drive, Austin, Texas.

15  Q.  And that is the vehicle that was recovered from the Austin

16  Airport; is that correct?

17  A.  Yes, sir, it was.

18  Q.  And did Mr. Karr offer any explanation as to how that

19  vehicle got there?

20  A.  He stated that he had driven there and parked it in the

21  lot just before they left to go to San Antonio.

22  Q.  Did he say why he had done that, sir?

23  A.  To make it look like the O'Hairs, or at least Robin

24  O'Hair, had willingly left Austin.

25  Q.  Okay.  Now, this written statement that was prepared by

Houston - Direct

1  Agent Martin on a computer, was there more than one draft of

2  this statement?

3  A.  Yes, sir.

4  Q.  And was Mr. Karr provided an opportunity by Agent Martin

5  and yourself and the other officers to review and rewrite and

6  edit anything in his statement that he wanted to change?

7  A.  We started off with an interview without notes being

8  taken, just trying to find out where we were, what it is that

9  he knew, what he might share with us, and so we went through,

10  probably, a couple of hours in interview prior to bringing up

11  the statement.  And after we had gone through the verbal

12  statement, Mr. Martin started to take down a written statement

13  from him, and he worked with Mr. Karr in the wording or

14  drafting of the statement.

15       And Mr. Martin had a first draft which he printed out

16  and showed it to Mr. Karr and to me.  And we looked at it and

17  tried to see if it was as accurate as we had heard from the

18  previous discussion.

19  Q.  And when Mr. Karr was satisfied with the contents of the

20  statement, did he voluntarily execute it by signing his name

21  and initialling every page after he had made any suggestive

22  changes or corrections?

23  A.  Yes, sir, we went over the statement in detail.  He looked

24  at it.  Had made some suggestions, and they were all

25  incorporated in the final draft, which he did initial at the

1   end of each page and signed the document at the end.

2   Q.  And did the Miranda warning that you just testified about

3   appear on the face of that statement?

4   A.  It was printed on the very first page of the statement.

5   Q.  Now, did you have an occasion the following day, on March

6   25th, 1999, to re-interview Mr. Karr?

7   A.  Yes, sir, I did.

8   Q.  And on that occasion, did he tell you anything

9   additionally that he had not put in his statement of the

10  previous day?

11  A.  Yes, sir.  We met him at the Sheriff's Office, and he had

12  indicated that he had some more information he wanted to

13  share.

14  Q.  Okay.

15  A.  And Mr. Bjorklund of the Dallas Sheriff's Office was with

16  him quite a bit in trying to clear up some facts which may

17  have been pertinent to the investigation in Dallas.  And he

18  talked to him, Mr. Martin, then I talked to him, also, toward

19  the end of the interview.

20  Q.  Okay.  And when you talked to him towards the end of the

21  interview after the Dallas officers had obtained the

22  information they were seeking, did you have a discussion with

23  him regarding the location in which the O'Hairs' bodies had

24  been buried?

25  A.  He had indicated that the bodies had been taken to a place

1    in Texas called Camp Wood, which is down South Texas in Real

2    County.

3    Q.  Okay.  And did he draw you any sort of a map or diagram

4    directing you to this rural location?

5    A.  Yes, sir, he did.

6    Q.  Agent Houston, I'm showing you what's been marked for

7    identification purposes as Government Exhibit W80-1.  And I'll

8    ask you if you recognize that as the map that Mr. Karr drew

9    for you on March the 25th of last year?

10   A.  Yes, it's the same map.

11   Q.  At this time, your Honor, we'd offer into evidence

12   Government Exhibit W80-1.

13        MR. T. MILLS:  No objection.

14        THE COURT:  It's received.

15   Q.  (BY MR. CARRUTH) Now that this is in evidence, sir, can

16   you briefly explain what it purports to show?

17   A.  He started the description with the town of Camp Wood as

18   one reference point and the river adjacent to the property as

19   the other reference point.

20   Q.  And did your investigation determine whether that was --

21   what river it was?  Was it a branch of the Nueces, or do you

22   know?

23   A.  I'm not sure, sir --

24   Q.  Okay.

25   A.  -- but it was most definitely a river.  And he said coming

*Houston - Direct*

1    from the town of Camp Real --

2    Q.   Camp Wood.

3    A.   -- Camp Wood, take Road 337, it says, proceed to the east

4    and said when you get to the river, you've gone too far and to

5    go back to the first gate on the -- which would lead to the

6    north side.

7    Q.   Now, this drawing appears to indicate a road with the fork

8    in it through which one passes several gates.  Did he tell you

9    how many gates on the property they went through when they

10   were out at this location?

11   A.   He said, at first, the first gate, which entered the

12   property, this first gate.  He said it had a combination lock

13   on it and that the combination for the lock equation was -- it

14   read the same way, left to right as it did right to left.

15   Q.   Meaning that the same number would be the same frontwards

16   or backwards?

17   A.   Yes, sir.

18   Q.   And what did he tell you was the combination to the lock

19   on that gate?

20   A.   That's what he said.  The same combination as left to

21   right and right to left.

22   Q.   And what did you subsequently determine through your

23   investigation to be the combination?

24   A.   Owners indicated that the combination was 1111.

25   Q.   And Mr. Karr knew that?

1    A.  Yes, sir.

2    Q.  Now, after Mr. Karr gave you this map, did you and the

3    other officers proceed in an aircraft to overfly the location

4    described on the map and attempt to photograph it?

5    A.  Yes, sir.

6    Q.  I'm going to show you what's been marked for

7    identification as Government's Exhibit W26-1.  Do you

8    recognize those aerial photographs of the property described

9    by Mr. Karr pursuant to your investigation?

10   A.  Yes, sir, I do.

11        MR. CARRUTH:  I would offer this exhibit, your Honor.

12        MR. T. MILLS:  No objection.

13        THE COURT:  Received.

14   Q.  (BY MR. CARRUTH) I want to also show you, sir, a

15   Government Exhibit W86-1.  Same one, it's a second.  I guess

16   we'll have this A and B.  It's marked two of two.

17   A.  Yes, sir.

18   Q.  Same photograph.  We'd like to offer that, your Honor.

19        THE COURT:  Now, is this 86 or 26?

20        MR. CARRUTH:  It is W86-1, but it says part 2 of 2.

21   In other words, these are all aerial photographs of the ranch

22   property; is that correct?

23        THE COURT:  It's received.

24   Q.  (BY MR. CARRUTH) Now, in this one, both of these, for the

25   record, are a collage of eight area photographs, and the lower

1    right-hand corner, if we could put it up here where everybody

2    could see it, there appears to be a mound or pile of dirt; is

3    that correct?

4    A.   Yes, sir.

5    Q.   Now, had Mr. Karr indicated on the map that he drew that

6    there was some dirt piles over to the left of the road?

7    A.   Yes, sir, to the right of the road.

8    Q.   I'm sorry.  To the right.  Okay.  And did he put the gates

9    -- how many gates did he say you had to go through to get to

10   the area where he believed the bodies were buried?

11   A.   Three gates.

12   Q.   And did you find three gates on the property?

13   A.   Yes, sir.

14   Q.   Did you also find the fork in the road that's quite easily

15   to see from the aerial photographs consistently with the map

16   drawn by Mr. Karr?

17   A.   Yes, sir.

18   Q.   Did you also make any effort to contact the county

19   records, deed records of Real County, to determine who owned

20   the property on which Mr. Karr told you the bodies were

21   buried?

22   A.   Yes, sir, we did.

23   Q.   And who did you determine to be the property owner?

24   A.   Joanne Friend.

25   Q.   And based upon that information, were there other trips

*Houston - Direct*

1   made out there, to your knowledge, to fly over again and

2   obtain other information about the property?

3   A.  We got the description of it, and we went down with the

4   intention of searching the property at a subsequent date, yes,

5   sir.

6   Q.  And did you obtain a federal search warrant authorizing

7   you to enter the premises?

8   A.  Yes, sir, we did.

9   Q.  And did you personally participate in the execution of

10  that federal search warrant?

11  A.  Yes, sir, I did.

12  Q.  And do you recall when that was?  A religious holiday last

13  year?

14  A.  I'm not sure.

15  Q.  Was it over the Easter --

16  A.  Easter.

17  Q.  -- weekend?

18  A.  Right.

19  Q.  Okay.  And how many days did the officers spend out there

20  searching that ranch?

21  A.  At least three.

22  Q.  Okay.  And there were several -- numerous officers out

23  there?

24  A.  Yes, there were.

25  Q.  State and federal, correct?

*Houston - Direct*

1  A.  Probably close to 80 to 100.

2  Q.  And there were some sophisticated equipment brought in by

3  the FBI laboratory people?

4  A.  Yes, sir.

5  Q.  And there was some professionally trained cadaver-sniffing

6  dogs trained to detect dead bodies?

7  A.  Yes, sir, we had two out there.

8  Q.  And was there even an aircraft deployed equipped with gear

9  for infrared?

10  A.  Yes, sir, we used that, I think.

11  Q.  And you were out there night and day --

12  A.  Yes, sir.

13  Q.  -- is that correct, for three days?

14  A.  Yes, sir.

15  Q.  Did you use the backhoe to do any digging?

16  A.  When the dogs sniffed an area that engaged in some

17  indication that there might be something there, we utilized

18  the digging in the rocky areas with the backhoe and some of

19  the other spots that were possibly identified.  We used

20  regular shovel to do the digging there.

21  Q.  Okay.

22  A.  We used several types of excavating --

23  Q.  And did you learn from the local officials or from the

24  landowner that there had been recent flooding in that area?

25  A.  Yes, sir, the huge flood that went through Del Rio and

*Houston - Direct*

1   even up to this area, been a major flooding down there.

2          THE COURT:  Mark your spot.

3          MR. CARRUTH:  Yes, sir.

4          THE COURT:  Ladies and gentlemen, I'm going to let you

5   go home for the evening, recess.  Please remember the

6   instructions so that you can answer the questions

7   appropriately in the morning.  Have a nice evening.  8:30 in

8   the morning.

9      (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25