FILED

NOV 2 1 2000

1



CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                       ) Austin, Texas
                             )
5   GARY PAUL KARR           ) May 18, 2000

6                    VOLUME 5 of 12
7                 TRIAL ON THE MERITS
           BEFORE THE HONORABLE SAM SPARKS
8
    APPEARANCES:
9
10  For the United States:        Mr. Gerald C. Carruth
                                  Mr. Daniel H. Mills
                                  Assistant U.S. Attorneys
11                                816 Congress Avenue, Ste. 1000
                                  Austin, Texas 78701
12

13

14
15  For the Defendant:            Mr. Thomas W. Mills, Jr.
                                  Ms. Christi N. Williams
16                                Mills & Presby
                                  5910 North Central Expressway,
17                                Ste. 900
                                  Dallas, Texas 75206-5141
18

19
20  Court Reporter:               Lily Iva Reznik, RPR, CRR
                                  United States Courthouse
21                                200 West 8th Street
                                  Austin, Texas 78701
22                                Ph: (512)916-5564

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

            LILY I. REZNIK
         U.S. DISTRICT COURT
    WESTERN DISTRICT OF TEXAS (AUSTIN)   ORIGINAL

99

2

|                          | Direct | Cross | Redirect | Recross |
|--------------------------|--------|-------|----------|---------|
| Witnesses:               |        |       |          |         |
| Samuel Sykes Houston     | 6      | 7     |          |         |
| Jerry Basey              | 12     | 19    | 21       |         |
| Randy Mulroy             | 23     |       |          |         |
| Francis Cucinotta        | 25     |       |          |         |
| Arthur R. Miller         | 33     | 52    |          |         |
| David Edward Cox         | 54     | 65    |          |         |
| Dorris Alexander         | 68     | 71    | 73       |         |
| Diane Scott Thomison     | 74     | 82    | 85       | 89      |
| David Edward Cox         |        |       | 91       | 92      |
| Charlene Ray Karr        | 93     | 134   | 150      | 159     |
| Jean C. McKeegan         | 161    | 165   |          |         |
| Mel Davis                | 167    | 173   |          |         |
| Alice Petry              | 180    | 186   | 188      |         |
| Dale Douglas Coryell     | 190    | 198   | 203      |         |
| Alice Petry              | 206    |       |          |         |
| Penny Wilson             | 207    |       |          |         |
| Corey T. Ticknor         | 216    | 230   | 236      |         |
| Sonia Sanchez            | 238    |       |          |         |
| Mark David Sparrow       | 244    | 253   |          |         |

I N D E X

|                       | Page |
|-----------------------|------|
| Proceedings Adjourned | 255  |

| | E X H I B I T S | Offered | Admitted |
|---|---|---|---|
| | Government's | | |
| #W15-1 Credit Card Application | | 28 | 28 |
| #W16-1 Cassette Tape | | 118 | 119 |
| #W16-2 Ladies' Ring | | 104 | 104 |
| #W17-1 Times Sheets | | 34 | 35 |
| #W18-1 to #W18-3 Capps Rental Records | | 56 | 56 |
| #W18-4 Photos | | 55 | 55 |
| #W24-1 Interstate Inn Records | | 69 | 69 |
| #W24-2 Photo | | 70 | 70 |
| #W35-2 Motor Vehicle History | | 246 | 246 |
| #W36-1 Business Records Affidavit | | 253 | 253 |
| #W37-1 Title Transfer | | 164 | 164 |
| #W37-2 Credit Union Account Statement | | 165 | 165 |
| #W40-2 to #W40-4 Money Grams | | 131 | 132 |
| #W51-1 Frost Bank Transaction Report | | 239 | 239 |
| #W51-2 Frost Bank Transaction Report | | 240 | 240 |
| #W51-3 Frost Bank Signature Card | | 240 | 240 |
| #W51-4 Frost Bank Individual Account | | 240 | 240 |
| #W51-5 Frost Bank Joint Account | | 241 | 241 |
| #W55-1 Public Storage Rental Agreement | | 76 | 76 |
| #W55-2 Public Storage Refund Receipt | | 80 | 81 |
| #W57-1 Ticknor Records | | 219 | 219 |
| #W59-1 Jewelry Store Records | | 208 | 208 |

4

| | E X H I B I T S (Continued) | Offered | Admitted |
|---|---|---|---|
| #W72A & B Four Season Hotel Receipts | | 243 | 243 |
| #W74-1 Travel Itinerary | | 180 | 181 |
| #W90-1 Camp Wood Map | | 15 | 15 |
| #W86-2 Texas Highway Map | | 16 | 16 |
| #W86-2A Real County Map | | 17 | 17 |
| #W88-1 Hunting Lease Agreement | | 18 | 18 |

Defendant's

| | Offered | Admitted |
|---|---|---|
| #7 & #8 Photos | 83 | 83 |

```
 1          THE COURT:  Anything from the prosecution before we
 2   bring in the jury?
 3          MR. CARRUTH:  Nothing, your Honor.
 4          THE COURT:  Defense?
 5          MR. T. MILLS:  No, sir.
 6          THE COURT:  Bring in the jury.
 7      (Jury present.)
 8          THE COURT:  I was hoping that one of you might bring a
 9   little rain in as you come in.  I would not be opposed to
10   rain.  We often sit and listen and work.  I can look straight
11   through that window and watch it rain, and it beats the
12   monotony of watching cars come up and stop and take a right
13   and go halfway down the street and have to make a U-turn,
14   which happens about 20 times a day.
15          Since we last met, has anyone attempted to talk to you
16   about this case?
17          THE JURORS:  No.
18          THE COURT:  Have you talked to anybody about this
19   case?
20          THE JURORS:  No.
21          THE COURT:  And have you learned anything at all about
22   this case outside the presence of each other and this
23   courtroom?
24          THE JURORS:  No.
25          THE COURT:  Show negative responses to all questions
```

*Houston - Direct  (Resumed)*

1   by all the jurors.  And you may call your next witness.

2         MR. CARRUTH:  We recall Agent Sykes.

3         THE COURT:  That's correct, I'm sorry.  You're still

4   under oath, sir.

5         THE WITNESS:  Yes, sir.

6                   DIRECT EXAMINATION (Resumed)

7   BY MR. CARRUTH:

8   Q.  Agent Houston, when we broke for the evening yesterday,

9   you were telling us about the search conducted at the ranch

10  property near Camp Wood, Texas?

11  A.  Yes, sir.

12  Q.  And I believe you had testified that there had been heavy

13  rains in that area?

14  A.  Previous to that, yes, sir.

15  Q.  And I want to ask you one more question about that before

16  we move on to something else.  Was the search -- the three-day

17  search conducted last year over the Easter weekend by the FBI

18  and other state and federal agencies successful in locating

19  any human remains on the ranch?

20  A.  No human remains were found.

21  Q.  Okay.  Now, you told us, also, yesterday that back last

22  March, when you visited Mr. Karr in his home in Michigan, that

23  he made several statements to you that led you to the ranch?

24  A.  Yes, sir.

25  Q.  And during the course of that same statements that he made

*Houston - Cross*

1    to you, did he say anything about whether he took a trip out

2    of state with Jon Garth Murray during 1995?

3    A.  He said --

4          MR. T. MILLS:  Excuse me, Judge.  Because of the fact

5    that the statement -- two statements have been typed and

6    signed, we object to testimony about the statements instead of

7    the statements being introduced into evidence themselves.

8          THE COURT:  That objection's overruled.

9    Q.  (BY MR. CARRUTH) Do you want me to repeat the question?

10   A.  I traveled from interstate?

11   Q.  Yes, sir.

12   A.  Okay.  Mr. Karr indicated that he, in the company of Jon

13   Garth Murray, flew from San Antonio up to New Jersey, where

14   they spent the night and, apparently, he had some banking

15   transactions the following morning.

16   Q.  And did they subsequently return to San Antonio?

17   A.  Yes, sir, they did.

18   Q.  Now, did Mr. Karr tell you whether he traveled under his

19   own name or under an assumed name or alias?

20   A.  He said that he traveled under an assumed name of Conrad

21   Johnson.

22   Q.  Thank you, sir. Pass the witness.

23                        CROSS-EXAMINATION

24   BY MR. T. MILLS:

25   Q.  In the course of the investigation, did you -- have you

*Houston - Cross*

1  ever learned that Jon Murray was the person who suggested the

2  name that Gary Karr travel under because it was the first name

3  of an atheist friend and the last name of another atheist

4  friend?

5  A.  I certainly had that belief.  I'm not certain if he -- I

6  don't believe he actually indicated that.

7  Q.  All right.  You didn't -- your investigation did not

8  indicate that Gary Karr knew either one of these atheist

9  friends of the O'Hair Murrays, did he?

10  A.  I don't recall any mention of that.

11  Q.  All right.  Isn't it true that -- let me look at my notes

12  from yesterday.  When you and other law enforcement agents

13  went to the home of Gary Karr, you did not possess, none of

14  you, an arrest warrant, correct?

15  A.  No, sir.

16  Q.  All right.  You would have attempted in every way to

17  follow the laws concerning the rights of citizens, wouldn't

18  you?

19  A.  Yes, sir.

20  Q.  All right.  He had the right to not talk with you?

21  A.  That's correct.

22  Q.  You or one of the other agents read him what are commonly

23  called Miranda Warnings?

24  A.  Yes, sir, Mr. Martin did that.

25  Q.  All right.  And those include the statement you have the

Houston - Cross

1  right to an attorney, and if you can't afford one, one will be

2  appointed for you, correct?

3  A.  Yes, sir.

4  Q.  All right.  Did he ask for a lawyer?

5  A.  No, sir.

6  Q.  Okay.  I wrote down this quote yesterday:  You were

7  welcome to come inside.  Is that pretty much what you remember

8  him saying?

9  A.  I'm not sure he said "welcome," but as far as entry into

10  it, he was asked, and he responded that we could enter the

11  apartment and speak with him.

12  Q.  All right.  Now, the map that he drew was not where he

13  believed the bodies were buried, if they are buried, but what

14  he said that David Waters told him that the bodies were

15  buried, correct?

16  A.  Mr. Waters told him that was where they were buried, and

17  also, Mr. Karr went with Waters to this particular location

18  and drove around the field.

19  Q.  Correct.  But at no time during the conversation or during

20  the statement did Gary Karr say, "I killed Madalyn or Jon or

21  Robin," did he?

22  A.  No, sir, he did not.

23  Q.  "Or Danny Fry"?

24  A.  I don't think he was speaking for Danny Fry.

25  Q.  All right.  He did not ever say in your presence or the

*Houston - Cross*

1  presence, to your knowledge, the presence of the other agents

2  that he was present when Madalyn, Jon or Robin were killed, if

3  they were?

4  A.  No, sir.

5  Q.  All right.  And for three days and part of the nights, 80

6  to 100 law enforcement and law enforcement personnel and law

7  enforcement-related personnel were on this property?

8  A.  Yes, sir.

9  Q.  You set up a command post right near the corral, right?

10 A.  Yes, sir.

11 Q.  And it would be fair to say that sophisticated scientific

12 equipment was used to hunt the land for the possibility of

13 buried bodies?

14 A.  Yes, sir.

15 Q.  All right.  You did not find any bones that were believed

16 to be human, correct?

17 A.  Not that we believe to be human.

18 Q.  Did you find a deer carcass?

19 A.  We found several carcasses out there.  I'm not qualified

20 to indicate what they were.  The ones I do recall seeing were

21 larger than, I think, a deer carcass.

22 Q.  They were not determined to be human?

23 A.  No, sir.

24 Q.  All right.  Did you find any human clothing in any way

25 believed to be related to Madalyn, Jon or Robin?

*Houston - Cross*

1    A.  No, sir.

2    Q.  During the eight hours, on March the 24th, and

3    approximately two hours, on March the 25th, Mr. Karr had the

4    right at any time to stop talking, correct?

5    A.  Yes, sir.

6    Q.  He did not do that, did he?

7    A.  No, sir.

8    Q.  All right.  I believe that's all the questions that I

9    have.  Thank you.

10        MR. CARRUTH:  Nothing further, your Honor.

11        THE COURT:  You may step down.  You may call your next

12   witness.

13        MR. CARRUTH:  At this time, United States called Jerry

14   Basey.

15        THE COURT:  This is Mrs. Sims.  She's going to

16   administer an oath to you.

17     (Witness was sworn.)

18        THE COURT:  Now, if you'll just have a seat, sir.

19   Watch that microphone.  You can adjust that microphone if it's

20   bothering you.  Tell us your full name and spell your last,

21   please.

22        THE WITNESS:  Jerry Basey, B-A-S-E-Y.

23     JERRY BASEY, called by the Government, duly sworn.

24

25

Basey - Direct

DIRECT EXAMINATION

BY MR. CARRUTH:

Q.   Where do you live, Mr. Basey?

A.   In Austin.

Q.   And were you living here back in 1995?

A.   Yes, sir.

Q.   Have you ever been to the Poodle Dog Lounge on North
Lamar?

A.   Yes, sir.

Q.   Did you at that time know a lady by the name of Patti Jo
Steffens?

A.   Yes, sir.

Q.   How did you know Ms. Steffens?

A.   She tended bar.

Q.   Okay.  And would it be fair to say you were a frequent
customer at that establishment?

A.   Yes, sir.

Q.   And did you consider yourself to be a friend of Ms.
Steffens?

A.   Uh-huh.

Q.   Did there come a time during 1995 when -- by the way, did
you have a deer lease or hunting lease during that time?

A.   Yes, sir.

Q.   And how long had you had that hunting lease?

A.   About three years.

*Basey - Direct*

1  Q.  And did you ever talk about that hunting lease while you

2  were at the Poodle Dog Lounge?

3  A.  Oh, yeah.

4  Q.  Talk about it a lot?

5  A.  Oh, yeah.

6  Q.  Did Ms. Steffens know that you had this hunting lease?

7  A.  Yeah.

8  Q.  You talked to her about it.  Did there come a time in 1995

9  when Ms. Steffens asked to use or get access to that hunting

10  lease?

11  A.  Well, it was sort of like she was going on a weekend

12  vacation or something, you know.

13  Q.  Looking for a place to get away?

14  A.  Uh-huh.

15  Q.  Okay.  And what did you tell her?

16  A.  I just told her to go down to the deer lease, swim in the

17  river.  I have a camper down there.

18  Q.  Now, this is a rather isolated area, is it not?

19  A.  Not really.

20  Q.  Well, for someone who's never been there?

21  A.  Oh, yeah.

22  Q.  Did you give her any directions on how to get there?

23  A.  Yeah, I drew her a map.

24  Q.  Drew her a map.  Did you give her the combination to the

25  lock on the gate?

*Basey - Direct*

1  A.  Yeah, you had to get it to get in.

2  Q.  Do you remember what that combination was at that time?

3  A.  1111.

4  Q.  Okay.  Mr. Basey, I'm showing you what's been marked for

5  Government's Exhibit 90-1, and it purports to be a map drawn

6  on yellow line legal paper.  Did you prepare that map?

7  A.  Yes, sir.

8  Q.  Now, that is not the map you gave to Ms. Steffens, is it?

9  A.  I don't think so.

10  Q.  That's the one you prepared for the investigators to

11  replicate it?

12  A.  I believe it is, yes.

13  Q.  And on one side of the map, it shows the directions, what

14  highways to take from Austin to Camp Wood; is that correct?

15  A.  Yes, uh-huh.

16  Q.  And on the other side of the map, I believe it shows kind

17  of a --

18  A.  The area --

19  Q.  -- the area?

20  A.  -- the camp.

21  Q.  How you get to the camp from Camp Wood, correct?

22  A.  Yeah.

23  Q.  Off of Highway 55?

24  A.  Right.

25  Q.  Okay.  All right, sir.  We'd offer Government's Exhibit

1   W90-1.

2          MR. T. MILLS:  No objection.  It is, as I understand

3   it, like the map that he previously drew?

4          MR. CARRUTH:  It is a replicated version of the map

5   that he drew.

6          MR. T. MILLS:  No objection.

7          THE COURT:  All right.  It's received.

8   Q.  (BY MR. CARRUTH) Now, Mr. Basey, you've been out to that

9   deer lease several times over the last three years you had it,

10  correct?

11  A.  Uh-huh.

12  Q.  And I'm going to show you here part of a map of Texas, an

13  official highway map, and you'll notice it's marked

14  Government's Exhibit W86-2, and there's a yellow line drawn

15  here from Austin down to Camp Wood.  Do you see that?

16  A.  Uh-huh.

17  Q.  And is that the suggested route that you drew on your map

18  here that you told Ms. Steffens you take?

19  A.  Right, uh-huh.

20  Q.  And according to the official highway map, that distance

21  is approximately 187 miles each way.  Does that sound about

22  right?

23  A.  That's right, and there's another way you could go, the

24  back way, if you go this way through Vanderpool, through kind

25  of back roads, and that's a little shorter; that's about 178

*Basey - Direct*

1    and a half miles.  I don't know --

2    Q.  Part of the highway map?

3    A.  Yeah.

4    Q.  You recommended the other drive?

5    A.  That's the way we always went.

6    Q.  Okay.  At this time, your Honor, we'd offer Government's

7    Exhibit 86-2.

8         MR. T. MILLS:  No objection.

9         THE COURT:  Be received.

10        MR. CARRUTH:  Okay.

11   Q.  (BY MR. CARRUTH) Let me show you now, Mr. Basey, what's

12   been marked for identification as W86-2 second, so we'll make

13   that 2A.  It's a second exhibit to that, and that's a blowup

14   of the Camp Wood area made from the Real County map.  Do you

15   recognize that, sir?

16   A.  Yes, I certainly do.

17   Q.  And the ranch area that you had the lease on is outlined

18   in green at the bottom, correct?

19   A.  Right, uh-huh.

20   Q.  And it's just off of Highway 55?

21   A.  Right.

22   Q.  And there's a bridge here.  Do you know what river is

23   flowing through there?

24   A.  That's the Nueces River.

25   Q.  And do you know where the Nueces River empties into?

*Basey - Direct*

1   A.  Corpus, I believe.

2   Q.  Gulf of Mexico?

3   A.  Yeah.

4   Q.  Have you ever been out in that area when there's been

5   heavy flooding?

6   A.  It's rained down there several times.  I know one year, it

7   flooded, rerouted the river right there.

8   Q.  Yes, sir.  And what happened during the flood?  Did the

9   river get out of its banks?

10  A.  Well, we weren't down at the time.

11  Q.  Right.  Did you subsequently learn --

12  A.  It didn't get up into our camp road.

13  Q.  There are some arroyos and low areas completely washed

14  out?

15  A.  Right.

16  Q.  We'd offer at this time, your Honor, Government's Exhibit

17  W86-2, second part.

18          MR. T. MILLS:  No objection.

19          THE COURT:  It's received.

20          MR. CARRUTH:  Thank you.

21  Q.  (BY MR. CARRUTH) Mr. Basey, I'm now handing you what's

22  been marked as Government's Exhibit W88-1, and I'll ask you to

23  take that out of the plastic envelope and take a look at it.

24  Just go ahead and take it out, if you could, sir, so you could

25  read it and look at the signature.

Basey - Direct

1  A.  This is sort of the agreement that we had with the --

2  Q.  The landowner?

3  A.  Right.

4  Q.  And who was the landowner?  Who leased that property to

5  you for hunting?

6  A.  Don Friend.

7  Q.  Don Friend.  Okay.  And what's the date that that document

8  was executed?

9  A.  November 5th of 1994.

10 Q.  And is that your signature, Jerry Basey, as one of the

11 lessees?

12 A.  Yes, sir.

13 Q.  And there were others on the lease with you, right?

14 A.  Right, uh-huh.

15 Q.  At this time, your Honor, we would offer Government's

16 Exhibit No. W88-1.

17         MR. T. MILLS:  May I look at it first?

18         MR. CARRUTH:  Yes.

19         MR. T. MILLS:  No objection.

20         THE COURT:  Received.

21 Q.  (BY MR. CARRUTH) Mr. Basey, are you still a hunter?

22 A.  No.  I gave it up.

23 Q.  Gave it up.  Do you recall back in those days when you

24 were hunting when deer season normally begins?

25 A.  Yes, sir, November the 1st.

1    Q.  All right, sir.  So the months of September and October of

2    1995, or any other year during that time frame, would be

3    before the hunting season starts, when people normally

4    congregate on the hunting lease.  Is that a fair statement?

5    A.  Dove hunts starts in September.

6    Q.  Dove hunts.  Okay.  But did you dove hunt out there in

7    September?

8    A.  Very few times.

9    Q.  Okay.  Mostly used it for deer hunting?

10   A.  Right.

11   Q.  All right.  Pass the witness.

12                      CROSS-EXAMINATION

13   BY MR. T. MILLS:

14   Q.  Good morning.

15   A.  Good morning, sir.

16   Q.  My name is Tom Mills.  I met you, at one occasion, at the

17   Poodle Dog Lounge.

18   A.  Yeah, I remember.

19   Q.  All right.  If you were in your automobile -- if you were

20   in your car in Austin and you drove about 1993 miles in any

21   direction and turned around and drove back, the mileage would

22   be about 387 miles, wouldn't it?

23   A.  I suppose.

24   Q.  Well, if the mileage out there at this camp is about 387

25   miles round trip, and you got in my car and saw that I had

Basey - Cross

1  driven 357 miles, would you automatically know where I'd been?

2  A.  Not really.

3  Q.  You've walked around that property out there, haven't you,

4  the deer lease?

5  A.  A couple of times we had a wounded animal we had to go

6  look for.

7  Q.  Did you ever try to dig a hole out there?

8  A.  Yeah.

9  Q.  How deep did you get?

10  A.  About a foot.

11  Q.  It's rock, isn't it?

12  A.  But that was over at the camp site.

13  Q.  Yeah.  Well, so where it's soft?

14  A.  Well, the soil is soft, you know, when it would rain.  It

15  would be soft and you could get stuck in the mud.  But

16  normally about a foot deep be about always you could get

17  before you get rock.

18  Q.  You haven't done any looking to see what the weather was

19  like out there in terms of visibility or whether or not it was

20  rainy into September 1995, have you?

21  A.  I couldn't remember that.

22  Q.  When you were out there during the fall, during deer

23  season, did you ever see any bodies out there, dead bodies,

24  humans?

25  A.  No.

*Basey - Redirect*

1  Q.  Did you ever see any ground that looked like it might be a

2  grave site where ground had been piled up?

3  A.  No.

4  Q.  If you're in Camp Wood and you drive down Highway 55, you

5  go over a little bridge, don't you?

6  A.  Correct.

7  Q.  And the bridge is over the creek, which runs on through

8  the property, correct?

9  A.  Right.

10  Q.  And then, you go a little bit further and you turn -- you

11  go to that gate and you turn into that property, right?

12  A.  That's correct.

13  Q.  So if you went to the property from Camp Wood, you'd know

14  there was a creek because you were on a bridge, correct?

15  A.  It's called a dry wash, you know.

16  Q.  All right.  That's all the questions I have.

                    RE-DIRECT EXAMINATION

18  BY MR. CARRUTH:

19  Q.  Mr. Basey, I'd like to get you to take a look at some

20  photographs here, some aerial photographs of the property, and

21  see if that helps you recall the terrain out there.  It wasn't

22  just a smooth, open pasture, was it?

23  A.  It was -- it wasn't real thick brush, only in certain

24  places.  It was fairly open country.

25  Q.  Uh-huh.  Okay.  You know how many acres were on that deer

*Basey - Redirect*

1  lease?

2  A.  It's a thousand, 86, something like that.

3  Q.  You're not telling the jury you walked over all those

4  1,086 acres looking for bodies?

5  A.  No.

6  Q.  You just stayed in one particular --

7  A.  We had our deer stand.  We drove to those.

8  Q.  Pretty big piece of property, isn't it, sir?

9  A.  I think it's about a mile wide and two miles long.

10 Q.  Yes, sir.  Were there sheep or cattle on that property?

11 A.  Oh, yeah, there were goat, sheep and cattle --

12 Q.  Did the landowner --

13 A.  -- for some time.

14 Q.  -- did the landowner have a bulldozer out there that he

15 used to push out roads?

16 A.  No.

17 Q.  Did you ever see that bulldozer?

18 A.  Not that I've seen, no.

19 Q.  Okay.  Well, how did they push those roads out there that

20 got all those piles of caliche?

21 A.  That was done before we got there.

22 Q.  That was done in the off season?

23 A.  Done before we got there.

24 Q.  Okay.  That's all, your Honor.  Thank you.

25         MR. T. MILLS:  Nothing further.

*Mulroy - Direct*

1      THE COURT:  May this witness be excused?

2      MR. CARRUTH:  Yes, sir.

3      MR. T. MILLS:  Yes, sir.

4      THE COURT:  You may be excused, sir.  Call your next

5  witness.

6      MR. CARRUTH:  Randy Mulroy.

7    (Witness was sworn.)

8      THE COURT:  Walk around the column, please, sir, and

9  have a seat up here.  State your full name and spell your

10  last.

11      THE WITNESS:  Randy Mulroy, M-U-L-R-O-Y.

12    RANDY MULROY, called by the Government, duly sworn.

13                    DIRECT EXAMINATION

14  BY MR. CARRUTH:

15  Q.  How are you employed, Mr. Mulroy?

16  A.  I'm employed with the Austin Airport Police Department.

17  Q.  And how long have you been employed with the Austin

18  Airport Police?

19  A.  Fourteen years.

20  Q.  And can you tell the folks from out of town when Austin

21  moved its airport from Robert Mueller Airport, over here in

22  East Austin, out to the old Bergstrom Air Force Base?

23  A.  May 23rd of last year.

24  Q.  Okay.  And you had been employed at the Austin Airport --

25  Robert Mueller Airport, back in '95 and '96?

*Mulroy - Direct*

1   A.  Yes, sir.

2   Q.  I want to show you what's been previously admitted as

3   Government's Exhibit W21-2 and represent to you, it's a

4   certified copy of the title history.  Would you take a look at

5   that document and tell us whether or not you're familiar with

6   the vehicle that it references.

7   A.  Yes, sir, I am.

8   Q.  And what is that vehicle, sir?

9   A.  It's a 1985 Porsche.

10  Q.  And to whom was that vehicle registered in 1995?

11  A.  Robin Murray O'Hair.

12  Q.  And did you have an occasion to seize or impound that

13  vehicle from the parking lot at Robert Mueller Airport?

14  A.  Yes, sir.

15  Q.  And what caused you to take that action, sir?

16  A.  Two detectives from the Austin Police Department --

17  Q.  Without going into any hearsay.

18  A.  -- contacted us and asked us if we could show them where

19  it was.

20  Q.  Had you previously run a registration check on that

21  vehicle?

22  A.  Yes, sir.

23  Q.  And had it been in the lot unattended for a long period of

24  time?

25  A.  Yes, sir.

*Cucinotta - Direct*

1   Q.  Did you make any attempt to contact the owner of that

2   vehicle?

3   A.  Me personally, no.

4   Q.  Okay.  Pass the witness.

5       MR. T. MILLS:  I don't have any questions.

6       THE COURT:  You may be excused, sir.  You may call

7   your next witness.

8       MR. CARRUTH:  Francis Cuccinota.

9       THE COURT:  If you'll just come right up here, please,

10  ma'am.  This is Mrs. Sims.  She's going to administer an oath

11  to you.

12      (Witness was sworn.)

13      THE COURT:  You need to walk around and follow the

14  Security Officer there and walk around this column.  Tell us

15  your full name, please, ma'am, and spell your last name.

16      THE WITNESS:  Francis Cucinotta, C-U-C-I-N-O-T-T-A.

17                  DIRECT EXAMINATION

18  BY MR. CARRUTH:

19  Q.  Where do you live, Mrs. Cucinotta?

20  A.  3513 Luther Winn Avenue in Berwyn, Illinois.

21  Q.  Are you also known as Cookie Cucinotta?

22  A.  Yes, I am.

23  Q.  Ms. Cucinotta, do you know the defendant in this case,

24  Gary Paul Karr?

25  A.  Yes, sir.

*Cucinotta - Direct*

1   Q.  How long have you known Mr. Karr?

2   A.  Since approximately 1993, I believe.

3   Q.  And where did you meet him?  Under what circumstances?

4   A.  He was incarcerated.

5   Q.  Okay.  And was there a relative of yours who was

6   incarcerated at the same facility as Mr. Karr?

7   A.  Yes.

8   Q.  And is that how you were introduced to him?

9   A.  Yes.

10  Q.  Okay.  Did you develop a friendship with Mr. Karr after

11  you met him?

12  A.  Yes.

13  Q.  And can you tell us approximately when that would have

14  been that you met him?

15  A.  Approximately sometime in '93.

16  Q.  Okay.  And he was subsequently released from that

17  institution, was he not?

18  A.  Yes.

19  Q.  And did you have anything to do with providing

20  transportation from -- for Mr. Karr upon his release from that

21  institution?

22  A.  Yes.

23  Q.  Can you tell the jury what, if anything, you did to assist

24  him or provide him with transportation?

25  A.  I drove down there and picked him up.

*Cucinotta - Direct*

1  Q.  Okay.  And after Mr. Karr was released, do you recall when

2  that was?

3  A.  It was the beginning or the latter part of March of 1995.

4  Q.  Or the beginning of -- you were going to say?

5  A.  April.

6  Q.  Okay.  And where did you take him when you picked him up

7  in your motor vehicle?

8  A.  I took him back to my house.

9  Q.  Okay.  Did he reside with you in your home for a period of

10  time in Berwyn, Illinois?

11  A.  Yes.

12  Q.  Approximately how long did Mr. Karr reside with you?

13  A.  Two months.

14  Q.  Okay.  Did you and Mr. Karr jointly apply for a credit

15  card from the Harris Bank and Trust Company in Chicago?

16  A.  Yes.

17  Q.  Ms. Cucinotta, I'm showing you what's been marked for

18  identification as Government's Exhibit W15-1, and if you would

19  look through that, please, ma'am, for a moment, and tell me if

20  you've ever seen it before, if you recognize it.

21  A.  I need to put my glasses on.

22  Q.  Okay.  Please.

23  A.  Okay.  What was the question?

24  Q.  Would you look -- there's several pages in that exhibit,

25  please, ma'am.  Look through it and see if you see your

*Cucinotta - Direct*

1   signature on those pages.

2   A.  Yes, I do.

3   Q.  And do you see Mr. Karr's signature?

4   A.  Yes.

5   Q.  Okay.  What do those records show, ma'am, or what,

6   basically, are they?  Are they records of that application for

7   the credit card you previously talked about?

8   A.  Yes.

9   Q.  That you and Mr. Karr obtained together?

10  A.  Yes.

11  Q.  We would offer Government's Exhibit W15-1.

12          MR. T. MILLS:  No objection.

13          THE COURT:  Received.

14  Q.  (BY MR. CARRUTH) Can you tell from looking at this

15  application when you and Mr. Karr applied for this credit

16  card?  What type of credit card was it, do you remember?

17  A.  It was a Mastercard.

18  Q.  A Mastercard.  Okay.  Can you tell when you made

19  application to obtain that credit card based on those records?

20  A.  Yes, October of 1994.

21  Q.  Okay.  So even before Mr. Karr had been released, you and

22  he had jointly applied for a credit card?

23  A.  Yes.

24  Q.  How did he sign that application if he was incarcerated?

25  A.  I believe I might have mailed it to him.

*Cucinotta - Direct*

1  Q.  Okay.  And was that credit card issued?

2  A.  Yes, it was.

3  Q.  And was that credit card subsequently revoked by you?

4  A.  Yes, it was.

5  Q.  And for what purpose?

6  A.  When him and I split, I removed him from my account.

7  Q.  Did you pay the bills on that credit card?

8  A.  Yes.

9  Q.  Now, during the two months that Mr. Karr was residing with

10 you, and I believe that would be April and May of 1995; is

11 that correct?

12 A.  Yes.

13 Q.  Did he ever take any out-of-town trips?

14 A.  Yes.

15 Q.  Where did he go?

16 A.  One trip he went was to Florida.

17 Q.  Okay.  And do you know how he traveled to Florida?

18 A.  Yes, he drove.

19 Q.  Okay.  Did he have a car?

20 A.  Yes.

21 Q.  Did anyone travel with him?

22 A.  Yes.

23 Q.  Did he have a sister living near Chicago?

24 A.  Yes.

25 Q.  And what was her name or what is her name?

*Cucinotta - Direct*

1   A.  Sidney.

2   Q.  Sidney Karr?

3   A.  Yes.

4   Q.  Okay.  Is her full name Gayle Sidney Karr, or do you know?

5   A.  Yes.

6   Q.  Did you meet Mr. Karr's sister?

7   A.  Yes.

8   Q.  Did you know her previously to him moving in with you?

9   A.  Yes.

10  Q.  Okay.  In fact, you and she had had an acquaintance

11  before; is that not correct?

12  A.  We met prior to me going down and picking up Gary.

13  Q.  Okay.  And do you know why Mr. Karr and his sister

14  traveled from Illinois to Florida?

15  A.  Yes.

16  Q.  And what was that reason, ma'am?

17  A.  To visit his daughter.

18  Q.  And do you know his daughter's name, or did you ever meet

19  her?

20  A.  Yes, her name was Crystal.

21  Q.  Okay.  Did Mr. Karr ever use your credit card to purchase

22  an airline ticket to Austin, Texas?

23  A.  Yes.

24  Q.  And can you tell us when that was, if you know?  Let me

25  refer you, once again, to the exhibit that's in evidence,

*Cucinotta - Direct*

1  right here.  Does that indicate a date that the credit card

2  was used?

3  A.  Yes, May 9th of 1995.

4  Q.  May 9, 1995, and does it indicate what airlines?

5  A.  Southwest.

6  Q.  And does it show the destination of the flight?

7  A.  Austin, Texas.

8  Q.  And what was the price of that ticket?

9  A.  $249.

10  Q.  And was that roundtrip airfare, to your knowledge?

11  A.  I believe it was.

12  Q.  He came back, didn't he?

13  A.  Yes.

14  Q.  And who paid for that ticket?

15  A.  I did.

16  Q.  Now, did Mr. Karr tell you why he was flying to Austin

17  from Chicago?

18  A.  Yes, it was to visit a friend.

19  Q.  Okay.  And approximately how long was he gone on that

20  trip?

21  A.  I'm thinking about approximately a week.

22  Q.  Okay.  And did he tell you anything when he got back about

23  his visit, or who his friend was, or what they had talked

24  about?

25  A.  All I knew was that he went to see his friend that he

*Cucinotta - Direct*

1    referred to as Bubba.

2    Q.  Okay.

3    A.  And that's all I knew.

4    Q.  Okay.  And did you ever have any telephone calls or any

5    correspondence of any kind with a man by the name of David

6    Waters?

7    A.  I, no.

8    Q.  You don't know Mr. Waters?

9    A.  No.

10   Q.  Okay.  Thank you.  Pass the witness.

11         MR. T. MILLS:  I don't have any questions.

12         THE COURT:  May this witness be excused?

13         MR. CARRUTH:  Yes, sir.

14         THE COURT:  You may be excused, ma'am.  You may call

15   your next witness.

16         MR. D. MILLS:  Arthur Miller.

17         THE COURT:  If you'll come forward.  Mrs. Sims is

18   going to administer an oath to you, sir.

19     (Witness was sworn.)

20         THE COURT:  Now you need to walk around this column,

21   have a seat in the witness chair.  Tell us your full name,

22   please, sir, and spell your last.

23         THE WITNESS:  Full name is Arthur Raymond Miller, Jr.,

24   M-I-L-L-E-R.

25   ARTHUR R. MILLER, JR., called by the Government, duly sworn.

*Miller - Direct*

1                       DIRECT EXAMINATION

2    BY MR. D. MILLS:

3    Q.  Would you tell the jury where you reside and how you're

4    currently employed, if you are?

5    A.  I currently reside at 233 Sweet Bay Circle, Jupiter,

6    Florida, and I'm currently retired.

7    Q.  What did you retire from?

8    A.  The construction industry.

9    Q.  How long were you in the construction business and what

10   type of construction was it, please?

11   A.  We were in the construction business from 1974 till

12   approximately 1996.  And the methods or the types of

13   construction was originally in the petrochemical industry in

14   California, and then, eventually migrated into the new home

15   construction.

16   Q.  Mr. Miller, you met me for the first time last evening; is

17   that correct?

18   A.  That's correct.

19   Q.  And we spent, maybe 30, 40 minutes together discussing

20   your possible testimony; is that correct?

21   A.  That's correct.

22   Q.  Reviewing a statement last evening?

23   A.  That's correct.

24   Q.  During the time that you had a construction business, did

25   you come to know Mr. Karr?

*Miller - Direct*

1    A.   Actually, I was winding my business down at the time I

2    came to know Mr. Karr.

3    Q.   How is it you came to know Mr. Karr?

4    A.   My current wife, who I was dating in July of 1995, worked

5    at a restaurant where Gary's ex-wife worked.

6    Q.   Do you see Mr. Karr in the courtroom here today?

7    A.   Yes, I do.

8    Q.   And what time period was that that he came to be employed

9    by you?

10   A.   July, 1995.

11   Q.   And in front of you is a document labeled Government's

12   Exhibit W17-1; is that correct?

13   A.   Yes.

14   Q.   And you've previously seen that?

15   A.   Yes.

16   Q.   And you know what that is?

17   A.   Yes.

18   Q.   Those are records of your business related to the time

19   worked by Mr. Karr; is that correct?

20   A.   These are actually some material receipts that Gary filled

21   out and, also, time sheets that Gary filled out.

22   Q.   And those are in his handwriting; is that correct?

23   A.   That's correct, yes, sir.

24   Q.   We'd offer W17-1, your Honor.

25        MR. T. MILLS:  No objection.

*Miller - Direct*

1      THE COURT:  Received.

2   Q.  (BY MR. D. MILLS) Do you have a copy -- the typewritten

3   copy of the statement that Agent Martin prepared after he

4   interviewed you?

5   A.  Yes, I did.

6   Q.  And would you look at the top of the second page and tell

7   the jury -- you reviewed this previously.  Tell the jury the

8   records indicate what time that Mr. Karr was working for you

9   in the summer of 1995.  You could do any time, June, July,

10  August and September through October, and just tell the jury

11  what days that shows that he was actually in Florida working

12  for you.

13  A.  Do you want me to just read these off?

14  Q.  You can read that if that's --

15  A.  Okay.  Gary actually -- I hired Gary as a subcontract

16  painter at the request of my wife and through his ex-wife.

17  And these records show that he worked on July 14th, 17th,

18  18th, 19th, 20th and 251st, and then, on July 24th, 25th,

19  26th, 27th and 28th.  There was then a lapse in the work time,

20  and there really wasn't much being done on the house because

21  my wife and my two sons had gone on a boating trip towards the

22  Keys.

23      So the next time I showed Gary working is on August

24  7th, the 14th, 15th, 16th, 17th, the 18th, the 19th and the

25  22nd.

*Miller - Direct*

1    Q.  And then, is there a gap in time?

2    A.  There's a large gap in time.

3    Q.  That gap begins when?

4    A.  Begins at the end of August, and then --

5    Q.  What's the date that your records show that August what?

6    A.  He did not work from August 24th through October 11th.

7    Q.  And then, he came back to work in October; is that

8    correct?

9    A.  I have him working on October 12th, 13th, 16th, 17th, 19th

10   and 20th.

11   Q.  And do you also have him -- you show him the last time you

12   paid him for some work was January 9th of 1996?  Or February

13   2nd, 1996, I guess.  There's two payments there; is that

14   correct?

15   A.  Yes.  The last -- I don't actually have the records for

16   the January and the February amounts that he was paid or what

17   he was paid for.

18   Q.  But you know he was paid on those dates; is that correct?

19   A.  Yes.

20   Q.  All right.  When Mr. Karr was working for you, do you know

21   where he stayed?  Where he made his home?

22   A.  Gary started out originally living with his ex-wife,

23   Charlene, and I don't remember exactly where the address was.

24   And then, they separated, split up, or whatever, and Gary

25   actually resided in one of the rooms in our house.  And he

*Miller - Direct*

1  lived there until sometime in February -- I'm going to say

2  sometime after February 15th.

3  Q.  And in February 15th -- around February 15th of 1996, were

4  you doing something with your house that caused him, Mr. Karr,

5  that you asked him to leave?

6  A.  Yes, at that time, we had the house on the market.  We

7  pretty much finished all the work on it, and my wife and I had

8  gone to a boat show in Miami, and while we were en route to

9  the boat show, my son -- my oldest son, who also lived at the

10  house at that time, called and said that a realtor wanted to

11  show the house that afternoon and he wanted to make sure it

12  was okay.

13        And I said, yeah, go ahead, and make sure everything's

14  straightened up.  And I said, "Just get Gary to give you a

15  hand."  And he says, "Well, I haven't seen too much of Gary

16  around."  And he says, "To be honest with you, Dad, he says

17  Gary's -- you know, the room that he was staying in was kind

18  of trashed."  I said, "Just pick it up the best you can."

19        And when we came home, at that point, I said to Gary,

20  you know, "It's time for you to go."

21  Q.  In August of 1995, do you recall receiving a telephone

22  call from an individual named David Waters?

23  A.  I actually did not receive a call from Waters in 1995.  I

24  received a phone call from him at a later date.

25  Q.  Do you recall Mr. Waters calling Mr. Karr at your house?

*Miller - Direct*

1   A.   The only thing I have is his -- a record that Agent Martin

2   asked if I was aware of a call that was made at that time,

3   that they show a call to my phone number.  That was made by

4   Walters, which I did not know at the time.

5   Q.   Okay.

6   A.   At the time of that call that Agent Martin was referring

7   to was August 5th, and that's when we were on the boat trip.

8   Q.   Okay.  Did you know from Mr. Karr telling you that he had

9   previously been incarcerated in a penal institution?

10  A.   When --

11  Q.   Without going into the details, just were you aware that

12  he had been in prison?

13  A.   Yes.

14  Q.   In August, you've indicated that he was not in your

15  employment from August 24th to August 11th, 1995.  Did Mr.

16  Karr tell you what he was going to do during that period of

17  time?

18  A.   Yes.  At that time, Gary said that he had an opportunity

19  to go to Texas to participate in some kind of a poker game

20  where he was going to be backed by some individuals and that

21  it would be an opportunity for him to receive a pretty good

22  amount of cash if he was successful in the card game.

23  Q.   Did you question him about being involved in such an

24  activity based upon his former imprisonment?

25  A.   At that point in time, just a brief comment about it, but

*Miller - Direct*

1   Gary's comment was -- is, you know, after 20 years, I need to,

2   you know, basically build a stake to get myself going.

3           MR. T. MILLS:  Excuse me.  I object to the last

4   response -- statement being nonresponsive.

5           THE COURT:  Sustained.

6   Q.  (BY MR. D. MILLS) How many times did Mr. Karr leave

7   Florida and go to Texas that you're aware of?

8   A.  I know of Gary leaving Florida four times.  There was a

9   period in the early part of July or sometime in the July

10  period where he had to go to -- he told me he had to go to

11  Illinois to report in to his parole officer.  Then, he left

12  for the card game.

13  Q.  And that would have been --

14  A.  The card game?

15  Q.  Right.

16  A.  That would have been in that time period between --

17  Q.  August 24th and October 11th?

18  A.  Yes.

19  Q.  Okay.  And do you know how he went on that occasion to

20  Texas?

21  A.  Yeah, Gary had purchased a white jeep that he drove to

22  Texas.

23  Q.  When Mr. Karr returned, did you question him about his

24  trip to Texas and his -- the true purpose of that trip?

25  A.  No.  At that point in time, Charlene, his ex-wife, had

Miller - Direct

1   basically been in touch with us and said that he had been

2   previously --

3           MR. T. MILLS:  Excuse me.  Object to hearsay and

4   nonresponsiveness.

5           THE COURT:  Sustained.

6   Q.  (BY MR. D. MILLS) If you need to, look at the document

7   that we went over with last night, and see if -- when he

8   returned from Texas, if you had some conversation with him

9   regarding the veracity of his story about playing a poker

10  game.  Item No. 8 on the report.

11  A.  Okay.  At the time of Gary's return from his first trip,

12  no.  Gary made a second trip to Texas because he did not

13  return with any money after the first trip.  And on the second

14  trip, he stated that he was going to get his money.  At that

15  point in time, when he returned from the second trip again,

16  without any money is when I questioned, you know, why he was

17  doing this and what he was getting involved with.

18  Q.  What did he tell you in response to your questioning him?

19  A.  At that point in time, we got into more of a conversation,

20  and I said I had a problem with understanding about the card

21  game.  And Gary began to tell me more a little bit about the

22  details of what he was actually doing in Texas.

23  Q.  And what did he tell you he was -- what was his role in

24  what he was doing in Texas?

25  A.  His role in Texas, he told me at that time, was as a

*Miller - Direct*

1  bodyguard for a group of people that were atheists.  He said

2  that there was a grandmother, a son and a son either had a

3  wife or there was a granddaughter because the girl called her

4  her -- called the older lady grandma.  And then, there was a

5  grandson.

6  Q.  And did he tell you what the purpose of -- did he say they

7  were serving as bodyguard is what you testified to?

8  A.  That's correct.

9  Q.  And why -- did he tell you why his people needed a

10  bodyguard?

11  A.  He said the people were being harassed by the IRS and that

12  they were planning on liquidating their assets and leaving the

13  country and either going to someplace like Australia or New

14  Zealand.

15  Q.  Did he mention any names of who these people were?

16  A.  Just the first two names are the only ones I know was

17  Madalyn and Jon, and I didn't know the two younger names.

18  Q.  Did he tell you where these people were going?

19  A.  Basically that they were leaving the country to either New

20  Zealand or Australia.

21  Q.  Did he tell you who he was working with in this

22  enterprise?

23  A.  Yeah, at that point, there was a gentleman by the name of

24  David Waters that had worked, I guess, for these people or

25  this group at that time.  And that --

*Miller - Direct*

1      MR. T. MILLS:  Excuse me.  Object to the continuation

2  of his answer as being nonresponsive to the question.

3      THE COURT:  All right.  Just wait for the question and

4  just answer the question.

5      THE WITNESS:  Okay.

6  Q.  (BY MR. D. MILLS) Did he tell you where they were going to

7  go, right?

8  A.  Yes.

9  Q.  And that was?

10  A.  Australia or New Zealand.

11  Q.  And he told you he was working with the individual named?

12  A.  David Waters.

13  Q.  Did he mention any other names of other persons that were

14  going to be involved?

15  A.  There was a total of four individuals, and at that time, I

16  knew one gentleman as Danny, and I think there was a brief

17  mention of a guy by the name of Chico.

18  Q.  Did he tell you the locations of where this guarding of

19  these individuals was occurring?

20  A.  Predominantly, Austin.

21  Q.  Did he mention any other places?

22  A.  San Antonio.

23      THE COURT:  Please mark your place.  I'm going to have

24  to take a short break.  Members of the jury, I'm going to give

25  you ten minutes, at least, ten minutes.

*Miller - Direct*

1    (Recess.)

2          THE COURT:  Bring the jury in.  You may proceed.

3    Q.  (BY MR. D. MILLS) I believe we were talking about Mr. Karr

4    telling you about the people being moved from location to

5    location; correct?

6    A.  Correct.

7    Q.  Did he indicate anything to you about the disposition of

8    assets of these individuals, what they were doing?

9    A.  Basically, they were supposedly cashing out their accounts

10   and transferring the assets into either bearer bonds or gold.

11   Q.  Did he mention any amounts of money?

12   A.  About 600,000.

13   Q.  Did Mr. Karr tell you anything about a trip he had taken

14   with one of these persons they were guarding to obtain some of

15   this money?

16   A.  He indicated that he had traveled to New York with the

17   gentleman named Jon.

18   Q.  Did he indicate what name he had used when he accompanied

19   Jon?

20   A.  Yeah, he said he was kind of concerned that he used his

21   own name because he really didn't want to be associated with

22   these people.

23   Q.  What did he indicate to you when he came back from Florida

24   as to whether he had any money from this enterprise?

25   A.  This was after he came back the second time and, you know,

*Miller - Direct*

1   the -- the story of the poker game fell apart, and he said he

2   was waiting for Waters to be paid so that he could be paid.

3   Q.  Did he tell you the amount of money that he was supposed

4   to be paid for this enterprise?

5   A.  He guestimated about 50 to $75,000.

6   Q.  Do you know if anyone accompanied Mr. Karr on his trip to

7   Austin the second trip that he took?

8   A.  His ex-wife met him there.

9   Q.  Okay.  She came and met him here during the second

10  occasion; is that correct?

11  A.  Right.

12  Q.  Did he tell you then?

13  A.  We knew that, both him and her.

14  Q.  Did you have occasion to interact with Mr. Karr and his

15  ex-wife when they returned from Florida without having

16  received any money?

17  A.  Yeah, they were both upset.

18  Q.  What, if anything, did Mr. Karr tell you about any other

19  contact with Mr. Waters and an individual named Danny Fry?

20  A.  Mr. Waters traveled to Florida after the second trip to

21  visit Danny Fry's brother, who lived in Naples.

22  Q.  What did Mr. Karr tell you about the purpose of that trip?

23  A.  He said that Danny Fry's brother had not heard from Danny

24  and, I guess, had been calling David Waters in Texas.  And

25  that Waters came to Florida to talk to Dan's brother, and, you

*Miller - Direct*

1  know, that he didn't know where he was or what was going on

2  with him or whatever.  And, also, that what they were doing

3  was to be kept quiet.

4  Q.  When you say "to be kept quiet," who was to be kept quiet?

5  A.  They wanted Danny's brother to keep quiet.

6  Q.  So Mr. Karr told you, then, that Mr. Waters and Danny Fry

7  went to see Danny Fry's brother?

8  A.  No.  Danny Fry was -- it was just Mr. Waters.

9  Q.  Okay.  He didn't mention an individual.  He just -- did he

10  say Mr. Waters and someone else, or just Mr. Waters?

11  A.  Mr. Waters and somebody else came.  I don't know who the

12  other individual was, but it was regarding Danny Fry and

13  talking to Danny Fry's brother and neighbors.

14  Q.  And the purpose he told you that Mr. Waters had indicated

15  he was going to talk to Danny Fry's brother was to do what?

16  A.  To keep him quiet.

17  Q.  What inquiry, if any, did you make about keeping this

18  individual quiet, if you did?

19  A.  I don't know if I have a specific recollection.

20  Q.  That's fine.  I just asked the question generally, if you

21  did or you didn't.  That's fine.  After Mr. Karr told you

22  about Mr. Waters coming to Florida to threaten Danny Fry's

23  brother, did Mr. Karr indicate anything about his concern for

24  his well-being?

25  A.  Yes, he did.

*Miller - Direct*

1   Q.   And what did he express to you?

2   A.   He was concerned that Waters was able to move about pretty

3   easy coming to Florida to talk to Danny's brother and that

4   Gary had actually indicated that Waters had basically

5   threatened Charlene and his daughter, Crystal, and at that

6   point in time, Gary just had a new grandson who he was quite

7   attached to and that he had also been threatened.

8   Q.   Was there a third trip that Mr. Karr took to Texas that

9   you're aware of?

10  A.   Yes.

11  Q.   And would you tell us any conversation -- the conversation

12  you had with Mr. Karr prior to his leaving Florida on that

13  third occasion?

14  A.   Waters had called Gary to have him come to Texas, and Gary

15  was concerned about -- enough about it that he first asked me

16  if I would go with him.

17  Q.   Why did he want you to go?

18  A.   To basically cover his back.

19  Q.   Did he ask you to loan him anything for this trip?

20  A.   Yeah, he wanted to borrow, first off, my wife's car and

21  the reason for that was -- is the jeep was a rough ride coming

22  out here.

23  Q.   Anything else?

24  A.   He asked to borrow -- she had an old gun that he asked to

25  borrow.

*Miller - Direct*

1   Q.  What did you say to Mr. Karr relative to this inquiry

2   about I'd like to borrow a gun and your car in terms of,

3   maybe, going to the authorities?

4   A.  At that point, first off, the response to both those

5   requests was no, and then, I said to Gary that, you know, if

6   you're so concerned with this guy, maybe it's time that you,

7   maybe, go talk to the police about it.  And Gary advised me

8   that I didn't know how it worked in prison and, you know,

9   that's the last thing he wanted to do.

10  Q.  When he said you did not know how it worked in prison, did

11  he indicate anything about any concern for his safety?

12  A.  Basically, he said that even if Waters were to be picked

13  up that he had friends that would be able to fulfill any of

14  the threats that had been made.

15  Q.  In response to this, did you say anything to Mr. Karr

16  regarding the veracity, as you perceived it, of his story that

17  he was telling?

18  A.  Could you restate that?

19  Q.  Did you -- in hearing this, did you ask Mr. Karr anything,

20  like, why don't you tell me the whole truth, or did you

21  believe this story or not believe this story to where you made

22  further inquiry?

23  A.  Actually, that took place after the poker story fell apart

24  that we got to the actual involvement that Gary was involved

25  with with the bodyguarding, and the only thing he was

*Miller – Direct*

1  concerned about at that time was he wasn't sure what might

2  have happened with the people in Texas.

3  Q.  Did you make an inquiry at some point in time to say,

4  "Level with me"?

5  A.  Yeah.

6  Q.  And when did that occur?

7  A.  That was prior to the trip, the third trip to Texas.

8  Q.  Okay.  And in response to that, what did Mr. Karr tell you

9  about his role in this enterprise that was occurring in Texas?

10  A.  Basically, what he said at that point was -- is that he

11  had been responsible for bodyguarding these people, he had

12  made the trip to New York, that he had been involved in moving

13  them from, basically, safe house to safe house, from Austin

14  and San Antonio.  He said the people didn't feel comfortable

15  staying in any one location for more than a couple of nights.

16        And he said --

17  Q.  Did he tell you that -- who had ultimately left with

18  Madalyn and/or Jon and what he was doing during the time that

19  he said that these people had taken Madalyn and Jon someplace?

20  A.  Yeah.  Waters and, I think, one of the other individual

21  had taken Jon and Madalyn off someplace.  And at that point,

22  Gary was left in charge of the two young people.  And he said

23  he had gone about 20 hours with the kids, and when Waters

24  returned, Gary said at that point, he went to a hotel or a

25  motel and slept for about 14 hours.  And when he got up and

*Miller - Direct*

1  returned -- freshened up and returned to wherever they were,

2  everybody was gone.

3  Q.  Did you find that unusual from your knowledge of Mr.

4  Karr's behavior while he was living with you in terms of

5  sleeping for 14 hours?

6  A.  That's pretty unusual because I'm a workaholic and we

7  would work in Florida in the sun 14, 15 hours a day, and that

8  takes you hours and go to a restaurant to get something to

9  eat.  And Gary would have a tendency to wait till his ex-wife

10  got off of work, which sometimes could be midnight.  So I

11  figured he must have been pretty tired from the events to have

12  slept for that long a period of time.

13  Q.  Did Mr. Karr indicate to you during this conversation

14  where the individuals had been taken that were being

15  bodyguarded?

16  A.  He assumed that they had been transported into Mexico.

17  Q.  After this conversation, what trips, if any, did Mr. Karr

18  make to Texas that you're aware of?

19  A.  After that conversation, he made the trip immediately that

20  he wanted to borrow the car and the handgun.  And he went on

21  that trip and then, returned back.

22  Q.  Do you remember how long it was that he was gone?

23  A.  Not exactly.

24  Q.  Did you have a -- have any conversations with him after he

25  returned regarding what he was doing in Texas?

*Miller - Direct*

1  A.  Yes.

2  Q.  And can you tell us what you asked him and how he

3  responded to you?

4  A.  I asked Gary how the trip went in Texas, and he said that

5  it didn't go well.

6  Q.  What did he indicate was the problem in not going well?

7  A.  He indicated that David Waters -- he felt that the -- that

8  David had killed these people and had buried their bodies in

9  an arroyo someplace.  And he said that he and David spent a

10  couple of days running around West Texas someplace, you know,

11  trying to clean up David's mess.

12  Q.  Did he tell you specifically -- when you say that David

13  had killed these people and the bodies had been buried, did he

14  tell you specifically where or some relationship to some town

15  in Texas that you recall?

16  A.  I'm going to say that it was somewhere a couple of hours

17  away from Austin here.

18  Q.  Was there any talk about weather such as rain being a

19  problem based upon the activity that they had been engaged in?

20  A.  That was Waters' concern was rain.

21  Q.  And what was Waters concerned that Mr. Karr expressed to

22  you?

23  A.  That if these assumed bodies washed up, that it would be a

24  problem.

25  Q.  What did you, in response to learning about people being

1  killed and buried and bodies washing up, what, if anything,

2  did you tell Mr. Karr?

3  A.  Well, this was still a lot of -- it was still very hazy

4  and ambiguous, but there was enough of a concern that I said

5  to Gary, again, that he should either contact the police, and

6  he said, "No, I can't do that."  And I said, "Then, you need

7  to go see an attorney."

8         And so I had him go -- we called and made an

9  appointment with one of the attorneys in a law firm that I

10  use, and Gary set up an appointment to go see them.

11  Q.  Do you know if he did go and see them?

12  A.  Yes, he did.

13  Q.  Did Mr. Karr return and tell you about his discussion with

14  this attorney?

15  A.  Yes, he did.

16  Q.  And what did he tell you when he returned after speaking

17  with the lawyer?

18  A.  He had actually seen one of my attorneys, named Chuck

19  Phillips, and he spent a couple of hours with him.  And he

20  said that he had presented Phillips with the ideas and the

21  theories that he had, and that Phillips had advised him that

22  since nothing was factual that nothing -- not to worry about

23  it.

24  Q.  Pass the witness, your Honor.

25                    CROSS-EXAMINATION

*Miller - Cross*

1  BY MR. T. MILLS:

2  Q.   Mr. Miller, I'm Tom Mills.  I don't know if you remember

3  it, but we spoke real briefly several months ago.

4  A.   Yes, sir, I do.

5  Q.   Yes.  Just a couple of questions.  There wasn't any time

6  when Gary talked with you after that final trip to Texas when

7  he actually said that he had specific knowledge that these

8  atheists had been killed; isn't that right?

9  A.   No, not specific.

10  Q.   Okay.  I mean, you've used the words "he thought, he

11  felt"?

12  A.   Correct.

13  Q.   All right.  And going out to the -- to West Texas or South

14  Texas because Waters was afraid that the rain would wash up

15  some bodies.  He never did indicate that he ever saw any body,

16  did he?

17  A.   No, he did not.

18  Q.   And prior to that time, he had assumed or speculated that

19  Waters had gotten them into Mexico?

20  A.   Yes.

21  Q.   And during the period of time that he said that he was

22  helping the atheists move from house to house, didn't he

23  indicate that they were liquidating, possibly, millions of

24  dollars?

25  A.   Yes, it was possibly millions, but I think at that point

Miller - Cross

1    in time, he said he knew of at least 600,000.

2    Q.  All right.  You've lived in Florida for how long?

3    A.  Since 1991.

4    Q.  And you lived in California before that?

5    A.  That's correct.

6    Q.  You've had some good luck in your day?

7    A.  That's true.

8    Q.  All right.  Win the lottery?

9    A.  That's true.

10   Q.  Congratulations.  Ten million?

11   A.  That's correct.

12        MR. CARRUTH:  Your Honor, I fail to see the relevance

13   of that.

14        MR. T. MILLS:  I can withdraw it if it's

15   objectionable.  Just a unique instance regarding his finances.

16   I don't have any other questions.

17        THE COURT:  Objection's overruled.

18        MR. D. MILLS:  We don't have anything further, your

19   Honor.

20        THE COURT:  May the witness be excused?

21        MR. D. MILLS:  Yes, from the government.

22        THE COURT:  You may be excused.  Call your next

23   witness.

24        MR. CARRUTH:  David Cox, your Honor.

25        (Witness was sworn.)

Cox - Direct

1    THE COURT:  Now, walk around this column, please, sir,

2  have a seat.  Tell us your full name and spell your last name.

3    THE WITNESS:  Full name is David Edward Cox.  Last

4  name is spelled C-O-X.

5    DAVID EDWARD COX, called by the Government, duly sworn.

6                    DIRECT EXAMINATION

7  BY MR. CARRUTH:

8  Q.  How are you employed, Mr. Cox?

9  A.  I am the chief operating officer of Capps Rental Car.

10  Q.  And does Capps Rent-a-Car maintain a facility for the

11  rental of vans here in Austin?

12  A.  Yes.

13  Q.  And did they do so back in 1995?

14  A.  Yes.

15  Q.  Mr. Cox, I'm showing you what's been marked for

16  identification as Government's Exhibit W18-4.  Do you

17  recognize that?

18  A.  Yes, that's our office in Austin.

19  Q.  As it appeared back in 1995 airport?

20  A.  Yes.

21  Q.  The Robert Mueller Airport before they moved?

22  A.  Yes.

23  Q.  And the other photographs depict two vans that you're

24  going to testify about here in a minute, right?

25  A.  That's correct, yes.

*Cox - Direct*

```
 1    Q.  We'd offer Government's Exhibit W18-4.
 2          MR. T. MILLS:  No objection.
 3          THE COURT:  Received.
 4    Q.  (BY MR. CARRUTH) Now, did you bring with you to court
 5    today certain records, business records of Capps Rental Car
 6    Agency?
 7    A.  Yes, sir.
 8    Q.  And can you tell the jury briefly how those records are
 9    maintained by your agency?
10    A.  Okay.  Are you talking about the contracts?
11    Q.  Contract, the rental records, yes, sir.
12    A.  Okay.  We have a centralized billing system, which is in
13    Dallas, Texas.  So after a -- all the contracts for the day
14    are done and deposits are made, they are sent Fed Ex to the
15    Dallas office where data reports are maintained and stored.
16    Q.  And are those records maintained in the normal course of
17    business of the Capps agency that you work for?
18    A.  Yes.
19    Q.  And are the entries on those records made by someone
20    having personal knowledge at or near the time of the
21    occurrence?
22    A.  Yes.
23    Q.  And do you rely, in part, on information provided to you
24    by the customer who rents the van?
25    A.  Yes, sir.
```

Cox - Direct

1          MR. T. MILLS:  We don't have any objection to the

2     records.

3          MR. CARRUTH:  All right.  Thank you.

4     Q.  (BY MR. CARRUTH) Showing you now, sir, what's been marked

5     for identification purposes as Government's Exhibits W18-1,

6     W18-2 and W18-3.  If you could, please, sir, take those out of

7     the plastic envelopes so that you can refer to them.  First,

8     I'll ask you if you recognize those.

9     A.  Yes, sir.

10    Q.  And are those records that you provided from your

11    business?

12    A.  Yes, sir.

13    Q.  Okay.  We would offer them at this time, your Honor.

14          MR. T. MILLS:  No objection.

15          THE COURT:  Received.

16          MR. CARRUTH:  Thank you.

17    Q.  (BY MR. CARRUTH) Let's begin with the first one, sir, if

18    you could tell us the exhibit number on the little yellow

19    sticker.

20    A.  W18-1.

21    Q.  And does that reflect the rental of a van by your agency?

22    A.  Yes, sir.

23    Q.  And what was the date of the rental?

24    A.  It was August 26th, 1995.

25    Q.  And what type of vehicle was involved in the rental?

*Cox - Direct*

1    A.   It's a Ford Windstar, which is a minivan, 1995.

2    Q.   And to whom was that van rented?

3    A.   Gary Karr.

4    Q.   And is an address for Mr. Karr shown on the rental

5    records?

6    A.   Yes, sir.

7    Q.   And what is that address?

8    A.   5207 Turquoise Lane in New Port, Florida.

9    Q.   And is there a phone number shown on the records?

10   A.   Yes, sir.

11   Q.   And what phone number is that?

12   A.   813-848-3285.

13   Q.   And was there any -- when you rent a van like that to

14   someone from out of state, do you require a local phone number

15   if they're staying in --

16   A.   Yes, sir.

17   Q.   And was that done in this case?

18   A.   Yes, sir, it was.

19   Q.   And what phone number is on that rental car, local phone

20   number?

21   A.   Area code 512-459-4640.

22   Q.   And is there a name of anybody at that phone number?

23   A.   No.

24   Q.   Okay.  And when was that?  You say the van was rented on

25   August the 26th?

*Cox - Direct*

1   A.   Yes, sir.

2   Q.   And what does the date show that it was returned on your

3   records?

4   A.   August 28th, 1995.

5   Q.   And during that two-day rental period, how many miles

6   accrued on the van according to the odometer reading?

7   A.   247 miles that were driven.  Do you want me to tell you

8   when it was rented, miles out?

9   Q.   Yes, sir.

10   A.   Miles out were 20,712, miles in were 20,959.

11   Q.   For a total of?

12   A.   247 miles.

13   Q.   Okay.  Let's go to the next exhibit, sir, the second van.

14   Do you have it?

15   A.   Yes, sir.

16   Q.   Please tell us the exhibit number.

17   A.   W18-2.

18   Q.   Okay.  And does that, likewise, reflect the rental of a

19   van?

20   A.   Yes, sir.

21   Q.   Is that the same or different from the first van?

22   A.   It is a different van and different model and different

23   van.

24   Q.   What type of van is it?

25   A.   It is a cargo van, Ford cargo van.

Cox - Direct

1   Q.  And can you look at the photograph to your immediate left

2   and tell the jury members which one of the vans you're talking

3   about depicted by the license number?

4   A.  It would be the lower van here.

5   Q.  The lower van that we're looking at the rear of?

6   A.  Yes, sir.

7   Q.  Okay.  And by whom was that van rented?

8   A.  Gary Karr.

9   Q.  And does he show the same address in Florida as on the

10  other rental documents?

11  A.  Yes, same -- yeah, the same -- yes, sir, the same address.

12  Q.  Okay.

13  A.  There's a little different city, one says New Port, the

14  other one says New Port Richey, so obviously, they may have --

15  Q.  Okay.  And what was the date of the rental of the second

16  van?

17  A.  September 27th, 1995.

18  Q.  And when was that van returned?

19  A.  September 30th, 1995.

20  Q.  And does it have that same local phone number on there

21  that you gave us previously, 459-4640, for contact?

22  A.  No, it does not.

23  Q.  Okay.  And can you tell how many miles that van was driven

24  when it was returned?

25  A.  It was driven 381 miles.

*Cox - Direct*

1  Q.  I want to show you what's previously been introduced into

2  evidence as W86-2, part 1, purports to be a map.  Are you

3  familiar with the Austin Central and West Texas?

4  A.  Somewhat, not very.

5  Q.  You ever heard of a place called Camp Wood?

6  A.  No, I have not.

7  Q.  Okay.  If I told you that the mileage from Austin to Camp

8  Wood, going the yellow route here, was one way 187 miles, a

9  round trip of 374 miles, would that be consistent with the

10  rental van mileage that you just talked about, 381 miles?

11  A.  Yes, sir.

12  Q.  And if you want a shorter route through Henry, indicated

13  by the orange route, down through Vanderpool and Leakey,

14  through Camp Wood, according to the official road map, that

15  would be 178.5 miles, one way, or 357 mile round trip.  That

16  would, likewise, be consistent in miles, would it not?

17  A.  Yes, sir.

18  Q.  By the way, sir, do your records reflect whether a credit

19  card was used to rent these vans, or how were they paid for?

20  A.  We require a credit card to rent a van.

21  Q.  Okay.

22  A.  But these, I believe all three of them -- and yes, all

23  three of them were paid with cash.

24  Q.  Paid with cash.  And what was the amount of the rental

25  charge for the first van?

Cox - Direct

1   A.  The first van was $159.50.  The second van --

2   Q.  Do you --

3   A.  -- the second was $218.59.

4   Q.  Okay.  You were going to tell us about the third van,

5   right?

6   A.  Sure.

7   Q.  Go ahead and give us a sticker number, please.

8   A.  It's KR8057 -- I'm sorry.  I'm thinking license.  Exhibit

9   is W18-3.

10  Q.  And is that van depicted in one of the photographs to your

11  immediate left, sir?

12  A.  It is the middle picture.

13  Q.  And is it, likewise, a cargo van?

14  A.  Yes, sir.

15  Q.  1995 Ford cargo van?

16  A.  Yes, sir.

17  Q.  Okay.  And I believe you stated it, but if you didn't, the

18  second van was also a 1995 Ford cargo van?

19  A.  That is correct, yes, it is.

20  Q.  Unlike the first van, which is a mini-van, passenger van,

21  correct?

22  A.  That is correct.

23  Q.  Now, please tell us the information on the third van, sir.

24  A.  Third van was rented October the 2nd, 1995.  It was

25  returned October the 3rd, 1995.

Cox - Direct

1   Q.   Okay.

2   A.   And it was driven a total of 215 miles.

3   Q.   Okay.  Who was that third van rented by?

4   A.   Gary Karr.

5   Q.   The same individual that rented the previous two?

6   A.   Yes, sir.

7   Q.   And was it, likewise, paid for in cash?

8   A.   Yes, sir.

9   Q.   And what was the amount of that?

10  A.   $137.28.

11  Q.   Okay.  Now, do your records also reflect the times of day

12  or that these vans were rented and the times they were turned

13  in?

14  A.   Yes, sir.

15  Q.   Okay.  Can you go back to the first van and tell us when

16  on the 26th it was rented, what time of day?

17  A.   It was rented at 14:11, which, I believe, is 2:11 p.m.,

18  and it was returned at on the 28th, two days later, at 15:00,

19  which is 3:00 p.m.

20  Q.   3:00 p.m.   Okay.  Now, the second van was rented on

21  September 27th, 1995, at what time?

22  A.   At 17:00, which is 5:00 p.m.

23  Q.   Okay.

24  A.   And returned three days later, on the 30th at 11:41 a.m.

25  Q.   Okay.  And the third van, rented on October the 2nd, at

Cox - Direct

1    what time?

2    A.   At 10:15 a.m.

3    Q.   And returned on the 3rd at what time?

4    A.   18:12, which is 6:12 p.m.

5    Q.   6:12.   Now, when the customer returns a van, do they

6    normally write down the mileage, or do you have an employee

7    that normally independently checks that, or how is that

8    handled?

9    A.   Employee that checks it because we also search for damage

10   through the ran.

11   Q.   And how late does your establishment stay open or did it

12   stay open in 1995 in the evening?

13   A.   7:00 p.m.

14   Q.   And so this last van was returned after 6:00 p.m?

15   A.   That's correct.

16   Q.   Now, can you tell me when that van was next rented out by

17   your agency based on the records you brought?

18   A.   It was rented out on the 6th, three days later.

19   Q.   Okay.   And when that van was rented out on the 6th, what

20   was the starting mileage?

21   A.   Starting mileage was 18913.

22   Q.   Okay.   And what do you show the mileage to have been when

23   it was turned in on October the 3rd?

24   A.   18709.

25   Q.   Now, that's a discrepancy of over 200 miles; isn't it?

*Cox - Direct*

1    A.   Yes, sir.

2    Q.   And you searched your records and contacted your

3    headquarters in an attempt to try to find an explanation for

4    that, right?

5    A.   Yes, I have.

6    Q.   And there were no rentals in between Mr. Karr returning

7    the van on October the 3rd and the next time the van went out

8    on October the 6th?

9    A.   No, sir.

10   Q.   Is it possible that someone made an error in your records

11   in recording the odometer mileage on the van?

12   A.   Yes, sir.

13   Q.   And if you add that additional mileage, the discrepancy

14   shown by the odometer to the 215 miles that you originally

15   showed on the third van, what would be the total miles that

16   van was driven assuming it was a mileage odometer error or

17   mileage was recorded in error?

18   A.   The discrepancy is 204 miles and the van was driven 215,

19   so it would be 419 miles.

20   Q.   And you live in the Dallas/Fort Worth area?

21   A.   Yes, sir.

22   Q.   Would that be consistent with a round trip between Austin

23   and the Dallas/Fort Worth area?

24   A.   Yes, sir.

25   Q.   And those vans depicted up there are white; is that

Cox - Cross

1    correct?

2    A.   Yes, sir.

3    Q.   Thank you.  Pass the witness.

                        CROSS-EXAMINATION

5    BY MR. T. MILLS:

6    Q.   Are all of the vans that your company -- all the passenger

7    vans that your company rents white?

8    A.   Passenger vans?  No, they're not all white.

9    Q.   Okay.  What color was the passenger van that was rented on

10   August the 26th, 1995?

11   A.   August the 26th?

12   Q.   Yes.

13   A.   I would not have that information.

14   Q.   Does any record in your company at all show that

15   information?

16   A.   Yes, if I found the -- in our computer system, I could

17   find out what color that is in the fleet.

18   Q.   All right.  Does -- and your computer system is in Dallas

19   -- no.  It's in --

20   A.   We are centralized in Dallas.

21   Q.   Is that where you'd have to --

22   A.   Yes, sir.

23   Q.   -- either do it or have someone do it?

24   A.   Yes, sir.

25   Q.   All right.  But you could do it by phone call?

*Cox - Cross*

1  A.  Yes, sir, I could.

2  Q.  Now, it's my understanding that in 1995, your company had

3  an absolute rule that you had to have a credit card to rent a

4  van?

5  A.  Yes, sir, that is correct.

6  Q.  And Mr. Karr showed a credit card that was recorded in

7  your records on each of these three occasions, didn't he?

8  A.  Yes, sir.

9  Q.  Now, let me ask you about this third trip.  Your records

10  show that the van went 215 miles, doesn't it?

11  A.  Yes, sir.

12  Q.  And your company stayed open until 7:00 p.m., didn't it?

13  A.  Yes, sir.

14  Q.  And it was turned in before 7:00 p.m., wasn't it?

15  A.  Yes, sir.

16  Q.  Do you have any reason to think that that 215 miles is

17  wrong?

18  A.  I have no reason, no.

19  Q.  All right.  The fact that somebody else rented it four

20  days later and there were 204 miles --

21       MR. CARRUTH:  Excuse me, your Honor.  I object to the

22  four days later.  I believe he testified it was a shorter

23  duration, was it not?

24       MR. T. MILLS:  Well, October 6th through October 3rd,

25  three days later.  I stand corrected.

Cox - Cross

1   Q.  (BY MR. T. MILLS) Three days later, somebody rented it,

2   showing a beginning mile of 204 extra, right?

3   A.  Yes, sir.

4   Q.  Well, isn't it just as possible as anything else that that

5   -- if something was recorded incorrectly, that that was

6   recorded incorrectly?

7   A.  Yes, sir.

8   Q.  Is it possible that an employee put 204 miles on it doing

9   company business?

10  A.  Yes, sir.

11  Q.  All right.  I don't have any further questions, but I

12  would like to ask that he not be released until he can make

13  the call to find out the color of the computer -- of the first

14  van.

15      MR. CARRUTH:  I have no objection to that.  No further

16  questions.

17      THE COURT:  Okay.  You need to make that call.  And if

18  you will be back here at 1:30.

19      THE WITNESS:  1:30?  Do I just leave this here?

20      THE COURT:  Call your next witness.

21      MR. D. MILLS:  Dorris Alexander.

22      THE COURT:  This is Mrs. Sims.  She's going to

23  administer an oath to you.

24      (Witness was sworn.)

25      THE COURT:  If you would walk around up here to this

*Alexander - Direct*

1   column and have a seat in the witness chair.  I need for you

2   to tell me your full name, please, ma'am, and spell your last

3   name.

4          THE WITNESS:  Dorris Alexander, A-L-E-X-A-N-D-E-R.

5          THE COURT:  Proceed.

6   DORRIS ALEXANDER, called by the Government, duly sworn.

7                    DIRECT EXAMINATION

8   BY MR. D. MILLS:

9   Q.  Tell the jury where you live and how you're employed,

10  please, ma'am.

11  A.  Right now, I live at 1300 Pancho in Lockhart, Texas, and

12  I'm employed at 221 Truck Stop.

13  Q.  Back in 1995, where were you employed?

14  A.  The Interstate Inn in Buda, Texas.

15  Q.  And what capacity did you serve there?

16  A.  Manager.

17  Q.  And you previously testified in a case where I was a

18  prosecutor, have you not?

19  A.  Yes.

20  Q.  So we've met each other on another occasion?

21  A.  Yes.

22  Q.  But we hadn't met each other until right now relative to

23  this matter, correct?

24  A.  Yes.

25  Q.  I'm going to show you what's been marked for

*Alexander - Direct*

1  identification purposes as Government's W24-1, and ask if you

2  can look at those and identify those as business records of

3  the hotel where you were employed in 1995.

4  A.  Yes, they are.

5  Q.  We'd offer W24-1, your Honor.

6         MS. WILLIAMS:  No objection.

7         THE COURT:  Received.

8  Q.  (BY MR. D. MILLS) Can you take that out of the envelope,

9  please, and tell the jury what those documents are, who signed

10 them, and what dates are indicated for use of the rooms at

11 that hotel where you were the manager?

12 A.  These are receipts.  The first one, the date is coming in

13 8-25, checking out 8-27, and it's Daniel Waters.  The second

14 one is 8-28, checking out 8-29, and it's -- I'm sorry, it

15 looks like David Waters.

16 Q.  Okay.  They appear to be the same signature?

17 A.  Yes, uh-huh.

18 Q.  That was in 1995; is that correct?

19 A.  Yes.

20 Q.  All right.  Now, I'd ask you if you could identify what's

21 been marked for identification purposes Government's W24-2.

22 A.  This is the --

23 Q.  Do you recognize what that is?

24 A.  Yes, it's the Interstate Inn.

25 Q.  Do you recognize all the photograph, the phones and things

*Alexander - Direct*

1    on there?

2    A.  Yes.

3    Q.  And this accurately depicts the hotel as it existed in

4    September and October and August of 1995; is that correct?

5    A.  Yes.

6    Q.  We'd offer W24-2, your Honor.

7           MS. WILLIAMS:  No objection.

8           THE COURT:  It's received.

9    Q.  (BY MR. D. MILLS) And would you tell the jury what this is

10   a figure of?  Can you see it from right there?

11   A.  Yes.  This is the front of the Interstate Inn.  This is

12   also a front and side of Interstate Inn.  This appears to be

13   an upstairs room.

14   Q.  Okay.  And these telephones are the phones -- pay phones

15   that are on the premises?

16   A.  Yes, sir.

17   Q.  And this is located on Interstate Highway 35, south of

18   Austin; is that correct?

19   A.  Yes, it is.

20   Q.  And do you, by chance, know what a mile marker is on the

21   highway, the interstate highway system?

22   A.  221.

23   Q.  Okay.  This is by mile marker 221; is that correct?

24   A.  Yes.

25   Q.  Okay.  Pass the witness, your Honor.

*Alexander - Cross*

CROSS-EXAMINATION

BY MS. WILLIAMS:

Q.  Ms. Alexander, how did the United States Attorney's Office

get these records from you?

A.  They came in and asked for the records, and we went and

searched for them.

Q.  What records did they ask for?

A.  They asked for specific dates.

Q.  And on those specific dates, what specifically did they

ask for, do you remember?

A.  They asked to look through at that particular time.

That's all.

Q.  And did you allow them to look through all of the records

for the dates they asked for?

A.  Yes.

Q.  Do you know what names they looked for?

A.  At that time, no.

Q.  Did they talk to you about the name David Waters?

A.  No.

Q.  They didn't talk to you about the name Gary Karr?

A.  No.

Q.  They just looked through all of the records and you don't

know whether they looked for specific names, and the only

thing they made a copy of was this record on David Waters?

A.  It was after they found those particular documents is when

*Alexander - Cross*

1   I realized what they were looking for.  But before that, no.

2   Q.  All right.  I just want to make sure I'm clear.  They came

3   in and they asked to look through these specific dates?

4   A.  Uh-huh.

5   Q.  And you pulled those records?

6   A.  Yes.

7   Q.  Were they in a file cabinet?

8   A.  They were boxed away.

9   Q.  How many boxes of records did you give to -- was it Mr.

10  Martin that came?  Mr. Ed Martin right here?

11  A.  I guess so.  I don't remember.

12  Q.  How many boxes of records did you pull?

13  A.  We had a roomful of records.  So we had a roomful of

14  boxes.  So they went and looked through until they found the

15  date they were looking for.

16  Q.  Do you know how many records there were for those

17  particular dates?

18  A.  The box held about two months.

19  Q.  About two months of records?

20  A.  Yes.

21  Q.  How many rooms are in your hotel?

22  A.  There were 44.

23  Q.  There are 44 rooms?

24  A.  Uh-huh.

25  Q.  All right.  So for three nights, there could be

*Alexander - Redirect*

1  potentially hundreds of records?

2  A.  Uh-huh.

3  Q.  And you don't know whether they looked for the name Mary

4  Jane O'Connor?

5  A.  No.

6  Q.  You don't know whether they looked for the name Patrick

7  O'Connor?

8  A.  No.

9  Q.  You don't know whether they looked for the name Madalyn

10  Maze?

11  A.  No.

12  Q.  You don't know whether they looked for the name Conrad

13  Johnson?

14  A.  No.

15  Q.  Or Jon Murray?

16  A.  No.

17  Q.  Or Madalyn Bible?

18  A.  No.

19  Q.  Thank you, ma'am.  I don't have any further questions.

20                    RE-DIRECT EXAMINATION

21  BY MR. D. MILLS:

22  Q.  Could you look on those hotel receipts again and tell the

23  jury how many people were registered in staying in that room

24  on those two occasions?

25  A.  Two on each day.

*Thomison - Direct*

1    Q.  And do you know how the room was paid for?  Credit card?

2    Cash?  Or what?

3    A.  Cash.

4    Q.  On both instances?

5    A.  Yes.

6    Q.  Thank you.

7          THE COURT:  Any further questions?

8          MS. WILLIAMS:  Nothing further, your Honor.

9          THE COURT:  May this witness be excused?

10          MR. D. MILLS:  Yes, your Honor.

11          THE COURT:  You may be excused, ma'am.  Call your next

12    witness.

13          MR. CARRUTH:  Diane Scott Thomison, your Honor.

14    Thomison.

15          THE COURT:  If you'll stand there, please, ma'am.

16       (Witness was sworn.)

17          THE COURT:  If you'll follow the Security Officer.

18    State your full name, and spell your last name, please.

19          THE WITNESS:  My full name is Diane Scott Greenhill

20    Thomison, T-H-O-M-I-S-O-N.

21    DIANE SCOTT THOMISON, called by the Government, duly sworn.

22                         DIRECT EXAMINATION

23    BY MR. CARRUTH:

24    Q.  And you go by Scott Thomison?

25    A.  Yes, I do.

*Thomison - Direct*

1   Q.   How are you employed?

2   A.   I manage a Public Storage facility at 8128 North Lamar

3   Boulevard.

4   Q.   I show you what's been previously introduced into evidence

5   as W55-4, and ask you if you recognize that as the facility in

6   which you were a manager?

7   A.   Yes, that is it.

8          THE COURT:   What is the number again?

9          MR. CARRUTH:   W55-4.   It's already been admitted, your

10  Honor.

11  Q.   (BY MR. CARRUTH) Approximately how many units do you have

12  available at that place?

13  A.   Approximately 445.

14  Q.   And do they come in different sizes?

15  A.   Yes, sir, they do.

16  Q.   How many different sizes do you have available?

17  A.   Six.

18  Q.   And can you give us an approximate idea of how they range

19  in size?

20  A.   Dimensions of the interior of the storage units from units

21  of five-by-five up to ten-by-thirty.

22  Q.   And can you tell by looking at the photograph depicted

23  there on the door at the bottom what size unit that would be,

24  if you know?

25  A.   Unit No. 52 listed here, I believe that to be in Building

1  F.  That happens to be a 10-by-15-foot space.  I know that

2  from looking at the picture, I would not be able to tell that

3  did I not know it.

4  Q.  Okay.  I want to show you what's been marked for

5  identification purposes as Government Exhibit W55-1, and I'll

6  ask you if that's a rental agreement from Public Storage that

7  you recognize?

8  A.  Yes, sir, it.

9  Q.  And did you provide those records to the investigators in

10  connection with this case?

11  A.  Yes, sir, I did.

12  Q.  Would you please take that out of the envelope -- first,

13  we would offer Government Exhibit 55-1, your Honor.

14        MR. T. MILLS:  No objection.

15        THE COURT:  Received.

16  Q.  (BY MR. CARRUTH) Would you take that out of the envelope,

17  please, ma'am, and look at it, make sure everything is there?

18  A.  Yes, sir, it seems to be in order.

19  Q.  All right.  What is the date of that rental agreement?

20  A.  September 26th, 1995.

21  Q.  And what is the name of the customer who rented that unit?

22  A.  Gerald L. Osborne.

23  Q.  And does it show here the dimensions of the unit?

24  A.  Yes, sir, its size is it's 10-by-15.

25  Q.  And for how long a period of time did Mr. Osborne rent

*Thomison - Direct*

1   that unit on September 26th, 1995?

2   A.   From that date until October 31st, 1995.

3   Q.   Okay.  And I believe there was a refund check issued.

4   Does that mean that he returned it before the rental was up?

5   A.   This is a month-to-month contract.  The refund suggests to

6   me that he had paid well in advance, and he had some number of

7   whole months for which he had paid that were being refunded to

8   him.

9   Q.   And he had paid in advance.  Can you tell the method of

10   payment?  Was it credit card?  Cash?  Check or what?

11   A.   I believe it was cash from looking at these journal

12   records.

13   Q.   And how much cash did Mr. Osborne pay to rent that storage

14   unit initially?

15   A.   $282.

16   Q.   Okay.  And you said there was a re --

17   A.   May I amend that?

18   Q.   Yes.

19   A.   It was 272.

20   Q.   Okay.  And how much of that 272 was refunded to Mr.

21   Osborne?

22   A.   $172.

23   Q.   And how was that refund paid, if you know, ma'am?

24   A.   I believe it would have been a check.

25   Q.   And to whom would that check have been sent or to what

*Thomison - Direct*

1   address would that check have been sent?

2   A.   The check was addressed to Mr. Gerald L. Osborne.  It was

3   sent to Route 1, Box 981-A 7, West Tawakoni, Texas, 75474.

4   Q.   Okay.  Do you know where Tawakoni is?

5   A.   No, sir, I do not.

6   Q.   Okay.  Now, I'll ask you to look at the front of this and

7   tell me whether or not that's the same address Mr. Osborne

8   gave to you when he initially rented the storage unit on

9   September the 26th.

10   A.   No, sir, it is not.

11   Q.   What address give did he provide when he rented the unit?

12   A.   5637 Puerta Viallarta, North Richard Hills, Texas, 76180.

13   Q.   Could that be Richland?

14   A.   Yes, it is, I'm sorry.

15   Q.   Now, in addition to Mr. Osborne, are tenants required to

16   provide their own locking system for these units?

17   A.   Yes, sir.

18   Q.   Or do they have a self-contained lock?

19   A.   They provide their own locks.

20   Q.   And did Mr. Osborne secure a lock for this storage unit?

21   A.   I assume so.  It is contrary to every company policy I

22   know.

23   Q.   I guess my question is, would he have purchased that lock

24   from you, or are customers required to provide their own

25   locks?

1   A.   They are required to provide their own locks.  They may

2   purchase locks from Public Storage.

3   Q.   You have locks available for sale or rental?

4   A.   For sale, yes, sir.

5   Q.   Okay.  Can you tell by looking at these documents whether

6   anyone in addition to Mr. Gerald Osborne was authorized to

7   access that storage unit?

8   A.   Yes, sir.

9   Q.   And who would that be?

10  A.   Dave Waters.

11  Q.   And how do you know that, ma'am?

12  A.   Mr. Waters is listed as an authorized for access on the

13  lease itself.

14  Q.   And if someone were not listed as authorized access, how

15  would they be able to gain admission into this -- this is a

16  secure area in here, is it not?

17  A.   Yes, sir.  The tenant could give the party a key and a

18  code to enter the gate.

19  Q.   Okay.

20  A.   I suppose a person could tailgate in or out.

21  Q.   Let's talk about that a minute.  About tailgating, you

22  mean if you have a rental unit there and you know the code and

23  I don't, and I just get behind you and when the gate opens for

24  you, I follow in behind you; is that correct?

25  A.   Yes, sir, that's correct.

*Thomison – Direct*

1   Q.   Tailgating, is that what you call it?

2   A.   Yes, sir.

3   Q.   And does your agency maintain and did they maintain in

4   1995 records of entrance into and exit out of this secure area

5   that surrounded the storage units?

6   A.   Yes, sir.

7   Q.   And how are those records maintained?  What type of system

8   do you have?

9   A.   At that time, the gate system in place would record the

10   entry of a code, and it would record the entry of a code to

11   exit the gate.

12   Q.   Okay.

13   A.   It would record the time at which those were made.

14   Q.   And are those records electronically maintained, I mean,

15   on a computer, or does somebody have to write it down

16   manually?

17   A.   No, sir, to the extent that no human being's involved,

18   they are electronically maintained.

19   Q.   Okay.  Showing you now, ma'am, what's been marked for

20   identification as Government Exhibit W55-2, and I believe that

21   reflects the deposit -- or refunded or returned to Mr. Osborne

22   at that West Tawakoni address, correct?

23   A.   Yes, sir, that would be the refunded rental amount.

24   Q.   We would offer W55-2, your Honor.

25          MR. T. MILLS:  No objection.

*Thomison - Direct*

1          MR. CARRUTH:  And W55-1, if I have not previously done

2     so.

3          MR. T. MILLS:  No objection.

4          THE COURT:  Received.

5     Q.  (BY MR. CARRUTH) Final exhibit I'd like for you to

6     identify, please, ma'am, is marked W55-3.  Can you tell us

7     where you recognize those records?

8     A.  This appears to be a cash journal from 1995, September

9     26th, and a bank deposit slip for that date.

10    Q.  Okay.  And can you look through these records and tell me

11    whether or not there are any records in here that would enable

12    you to determine when the unit was accessed?

13    A.  Yes, sir.  These tapes here are gate tapes.

14    Q.  Okay.

15    A.  If you were to look at the tape, you would find the unit

16    -- the code associated with the unit.  For instance, in this

17    case, C12 would be entered on the left side of the tape, above

18    which is according to military time, the hour and minute at

19    which that code was entered into the gate --

20    Q.  Okay.

21    A.  -- to see when a -- a code was used to exit the gate, you

22    would look on the right side of the gate and again, the time

23    would be --

24    Q.  Are those codes punched in manually?

25    A.  Yes, sir.

1   Q.  At the entrance?

2   A.  Yes, sir.

3   Q.  And I believe you stated earlier from the photograph you

4   identified that just so that the records reflect, what storage

5   unit number are we talking about having been represented by

6   Mr. Osborne?

7   A.  That storage number would be F052.

8   Q.  F052 as depicted in the photograph?

9   A.  Yes, sir.

10  Q.  And at this time, I would like to offer Government Exhibit

11  W55-3.

12          MR. T. MILLS:  No objection.

13          MR. CARRUTH:  And we'd pass the witness, your Honor.

14          THE COURT:  It's received.

15                      CROSS-EXAMINATION

16  BY MR. T. MILLS:

17  Q.  Ms. Thomison, I'm not familiar with the policy at this

18  particular Public Storage, but because of possible damage to

19  automobiles trying to zip in behind somebody that tailgating

20  is not encouraged, is it?

21  A.  No, it certainly is not.

22  Q.  It's officially prohibited?

23  A.  That's correct.  And the lecture ensues when I catch

24  people.

25  Q.  And the reason is because the gates close automatically,

*Thomison - Cross*

1  and that second car can get dinged up?

2  A.  Yes, sir, that and the gate can get dinged up.

3  Q.  All right.  Mess up the motor of the gate closing?

4  A.  Yes, sir.

5  Q.  All right.  On the document where it showed that there was

6  an authorized access for Dave Waters, you do not see the name

7  Gary Karr, K-A-R-R, on that document, do you?

8  A.  No, sir.

9  Q.  All right.  Let me show you a couple of photographs that

10 I've got marked as Defendant's Exhibit 7 and 8.  I'll show

11 them to you first.  If you look close enough, can you see that

12 number?

13 A.  Yes, sir.

14 Q.  And that number would apply to that, wouldn't it?

15 A.  That's correct.

16 Q.  And then, isn't it correct that immediately behind it is

17 this road?

18 A.  Yes, sir.

19 Q.  All right.  So this number would be immediately behind

20 that?

21 A.  I believe that's correct.

22 Q.  We would offer Defendant's Exhibits No. 7 and 8.

23       MR. CARRUTH:  No objection, your Honor.

24       THE COURT:  Received.

25 Q.  (BY MR. T. MILLS) The door that I have my finger on is

*Thomison - Cross*

1  number -- Unit No. 52, correct?

2  A.  That's correct.

3  Q.  And that's the same thing as F052?

4  A.  Correct.

5  Q.  All right.  And it is the fourth in that row of door -- of

6  storage?

7  A.  Yes, sir.

8  Q.  All right.  And it is part of a building to where

9  immediately behind No. 52, there is another storage shed,

10  correct?

11  A.  That's correct.

12  Q.  And it would be the fourth one in, and that is No. 4,

13  correct?

14  A.  Yes, sir.

15  Q.  All right.  And then, 53 is next to 52 and 51 further down

16  than 4, correct?

17  A.  Yes, sir, I believe that's correct.

18  Q.  All right.  It goes 1, 2, 3, 4 and 5.

19  A.  Yes, sir, my only question is I'm just trying to recall

20  whether the numbers go up or down.  So this would be No. 53

21  right here, and 53 would correspond with No. 3 on the other

22  side.

23  Q.  All right.

24  A.  I think I'm correct.  Let me just make sure.

25  Q.  I don't have a magnifying glass.  It appears that this is

*Thomison – Redirect*

1   1, 2, 3, 4, 5.

2   A.  Yes, sir, it's unit 52 and then, 53.

3   Q.  All right.

4   A.  So, in effect --

5   Q.  This would be 51?

6   A.  Correct.

7   Q.  All right.  The floor of the Unit 52 in 1995 was made of

8   concrete, wasn't it?

9   A.  That's my understanding.

10  Q.  That's what it is now?

11  A.  Yes, sir.

12  Q.  And, likewise, it's your understanding that the floors of

13  units immediately behind and to the sides of 52 were made of

14  concrete in 1995?

15  A.  That's correct.

16  Q.  In 1995, was there any kind of surveillance security

17  camera, like a video camera, that existed as part of the

18  security system there?

19  A.  Not to my knowledge, however, in 1995, I did not know

20  about the property itself.

21  Q.  That's all the questions that I have.

22                    RE-DIRECT EXAMINATION

23  BY MR. CARRUTH:

24  Q.  Ms. Thomison, Mr. Mills asked you about the floor of the

25  units, I believe you testified a concrete floor.

*Thomison - Redirect*

1  A.  Yes, sir.

2  Q.  What type of siding did they have separating the units?

3  A.  It is corrugated metal siding that separates the units and

4  forms three sides of each storage unit.  The fourth side of

5  the building in question would be the rolled door of each

6  storage unit.

7  Q.  Do you know what a piece of angle iron is?

8  A.  Yes, sir.

9  Q.  Is there a piece of angle iron in any of these units,

10  particularly the one you just referred to identified in the

11  photograph?

12  A.  Yes, sir, it would be angle iron in each unit, and I do

13  know that there was angle iron in F52.

14  Q.  And that angle iron runs along the baseboard or the floor

15  of the unit to hold up the corrugated metal siding, does it

16  not?

17  A.  Yes, sir, that is correct.

18  Q.  And inside the unit, against one wall is a piece of angle

19  iron, and on the other side, it's in the next unit?

20  A.  Correct, sir.

21  Q.  So that each unit has within its contents only one piece

22  of angle iron on one side; is that correct?

23  A.  Yes, sir, I believe that's correct.

24  Q.  And during the investigation of this case, were you

25  present and did you consent to the removal of a piece of angle

*Thomison - Redirect*

1    iron from that unit that Mr. Osborne rented back in 1995 --

2    A.  Yes, I did.

3    Q.  -- for certain examination?

4    A.  Yes, sir, I did.

5    Q.  And, of course, the investigators replaced that for you,

6    did they not --

7    A.  Yes, they did.

8    Q.  -- and took it with them?

9    A.  Yes, sir.

10   Q.  Now, when a person rents a storage unit from your

11   facility, are they required to tell you what type of contents

12   they intend to store there?

13   A.  No, sir.

14   Q.  Would it be common for you to inquire or for a customer to

15   say, "I want to rent this unit to store my furniture when I

16   move -- or my library" or something like that?

17   A.  Yes, sir, that would be very common in assessing what size

18   unit would be best suited to the customer's need.  Public

19   Storage employees frequently ask, "What are you going to be

20   storing?"

21   Q.  And is there any concern by yourself or the members of

22   your staff about any hazardous materials being stored in those

23   units?

24   A.  Yes, sir, it is prohibited in our leases.

25   Q.  And do you frequently check or go around and check the

1  units for security purposes or to find out what's going on

2  with the tenants, or are the tenants pretty much keep to

3  themselves?

4  A.  They keep to themselves.  We do check the premises, at

5  least daily, to make sure that the units are locked.  We check

6  to make certain -- sure certain stickers are on the units that

7  we put there as part of our security.  But as to what goes on

8  within those units, we basically have no knowledge.

9  Q.  And I believe you told counsel that you are unaware of any

10  surveillance cameras.

11  A.  I don't believe there were any in place.

12  Q.  Okay.  And is this particular unit you described in the

13  photograph, is it concealed from view from the public street

14  or public road out there?

15  A.  Yes, sir, I would say so.

16  Q.  Okay.  Now, let me ask you this:  If a customer came in

17  and indicated to you that he needed a storage unit, say, that

18  size to store some household furniture and a short time later,

19  you observed some barrels in or near that unit, would that

20  cause you any concern?

21      MR. T. MILLS:  Excuse me.  Speculation, your Honor,

22  not based on any evidence of this witness.

23      MR. CARRUTH:  It's not speculation.  I'm just asking

24  her if -- she said already she was concerned about the storage

25  of hazardous materials.  I could ask her how those are

*Thomison - Recross*

1    normally stored, but I think --

2            THE COURT:  Objection's overruled.  You may answer.

3    A.  Yes, sir, if I saw something that made me apprehensive or

4    suspicious that something prohibited by the lease agreement

5    was being stored, I would certainly talk to the tennant.

6    Q.  (BY MR. CARRUTH) Thank you, ma'am.  Pass the witness.

7                    RE-CROSS EXAMINATION

8    BY MR. T. MILLS:

9    Q.  As part of the security concerns, isn't it a -- is it a

10   fact that there is good lighting there to make sure that not

11   only can the customers see in the driveways between the

12   storage units, but that management can see who's on the

13   property?

14   A.  I would agree that there is good lighting, but the

15   arrangement of the buildings is such that absent going out on

16   the property, I cannot see what is happening on that property

17   from my office.  I must physically inspect it.

18   Q.  I understand.  Do I understand that were you present when

19   law enforcement people removed the angle iron?

20   A.  Yes, sir, I was.

21   Q.  Did you actually get to watch it?  I mean --

22   A.  I did not watch the operation from start to finish.  I do

23   think I saw a piece of angle iron come out of the unit.

24   Q.  All right.  About how many people associated with either

25   law enforcement officers or associated with law enforcement

*Thomison - Recross*

1  were there?

2  A.  I'm not certain, but as my memory serves, I think it was

3  four or five.

4  Q.  All right.  And do you recall that there were photographs

5  taken of what they were doing?

6  A.  Yes, sir, I do believe I saw photographs being taken.

7  Q.  Do you remember how many people were actually involved in

8  picking up and holding the angle iron?

9  A.  No, sir, I don't.

10  Q.  All right.  No further questions.

11       MR. CARRUTH:  Nothing further, your Honor.  May the

12  witness be excused?

13       MR. T. MILLS:  I would like to make inquiry about

14  looking at pictures and, maybe, excuse subject to telephone

15  contact --

16       THE COURT:  Well --

17       MR. T. MILLS:  -- in case I want to call her back, ask

18  her about the photographs.

19       MR. CARRUTH:  She's a local witness, so that shouldn't

20  be any problem, your Honor.

21       THE COURT:  All right.  All of that mumbo jumbo means

22  they may call you back.

23       THE WITNESS:  Call me back to come back here, or call

24  me to look for the things they're looking for?

25       THE COURT:  I do not forecast the future.

*Cox - Recross*

1    THE WITNESS:  All right.  Thank you, your Honor.

2    MR. CARRUTH:  Your Honor, I'm informed Mr. David Cox

3    is ready to come back at the request of Mr. Mills.  He asked

4    him to check on the information regarding that van.

5    THE COURT:  Have Mr. Cox --

6    MR. CARRUTH:  We'll recall him, if that's appropriate,

7    for Mr. Mills.

8    THE COURT:  Mr. Cox, have a seat.  Mr. Cox, you're

9    still under oath, sir.  Do you understand that?

10   THE WITNESS:  Yes, sir.

11   THE COURT:  All right.  Mr. Mills.

12                    RE-CROSS EXAMINATION

13   BY MR. T. MILLS:

14   Q.  Yes, sir.  Did you find out about the color of one or more

15   -- I don't know what you did, but did you find out about any

16   colors?

17   A.  Yes.  I think the question was the passenger van.  The

18   first one is a mini van, and it is teel.

19   Q.  Teel.

20   A.  Yes, sir.

21   Q.  All right.

22   A.  The cargo vans are all white.

23   Q.  All right.  Teel is, I guess, a shade of blue-green?

24   A.  I would say -- yes.

25   Q.  All right.  That's all the questions that I have, your

*Cox - Redirect*

1    Honor.  Thank you.

2                    RE-DIRECT EXAMINATION

3    BY MR. CARRUTH:

4    Q.  Just one brief thing.  That Ford Windstar passenger van is

5    teel; it has seats for passengers?

6    A.  Yes, sir.

7    Q.  And approximately how many adults can comfortably sit in

8    it?

9    A.  Seven.

10   Q.  Seven.  And the other two vans, the white cargo vans, no

11   seats in the back, are there?

12   A.  No, sir, just the driver and passenger, two seats.

13   Q.  The cargo area is completely open, so you could store

14   large objects or items in there?

15   A.  Yes, sir.

16   Q.  Thank you.  Nothing further.

17            THE COURT:  We may excuse the witness now.  Members of

18   the jury, I'm going to give you a short break.  You'll be able

19   to use the facilities, but then, come right back.

20        (Recess.)

21            MR. CARRUTH:  United States calls Charlene Karr.

22        (Witness was sworn.)

23            THE COURT:  You need to walk around and follow the

24   security officer.  Have a seat in the chair.  Tell us your

25   full name and spell your last, please.

*Karr – Direct*

1         THE WITNESS:  Charlene Ray Karr, K-A-R-R.

2      CHARLENE RAY KARR, called by the Government, duly sworn.

3                      DIRECT EXAMINATION

4    BY MR. CARRUTH:

5    Q.  Where do you live, ma'am?

6    A.  New Port Richey, Florida.

7    Q.  Are you acquainted with the defendant, Mr. Gary Paul Karr,

8    seated here behind me, with his lawyer?

9    A.  Yes, I am.

10   Q.  And how do you know Mr. Gary Paul Karr?

11   A.  I was married to him at one time.

12   Q.  And when did you and Mr. Karr marry each other?

13   A.  In 1974.

14   Q.  And when were you divorced from Mr. Karr?

15   A.  I'm not real sure on the date.  '76, '77.

16   Q.  Okay.  Did you and Mr. Karr have any daughters?  Any

17   children together?

18   A.  Yes, we did.

19   Q.  And would you please identify them by name and gender and

20   age?

21   A.  We had one daughter, named Crystal.

22   Q.  Okay.  And when was Crystal born?

23   A.  September 30th, '74.

24   Q.  Okay.  And do you know where Crystal Karr resides today?

25   A.  Yes, I do.

*Karr - Direct*

1    Q.   And where is that?

2    A.   On Dunedin Beach in Florida.

3    Q.   Okay.  Where were you residing in 1995?

4    A.   4945 New England Boulevard, in the same place I live now.

5    Q.   In New Port Richey, Florida?

6    A.   New Port Richey.

7    Q.   And that's on the Gulf Coast?

8    A.   Right.

9    Q.   The west side of Florida, correct?  And is it a little bit

10   below Tampa?

11   A.   It's about 25 miles from Tampa.

12   Q.   Okay.  And do you know where Naples, Florida is located?

13   A.   It's about a three-hour drive.

14   Q.   And that's further south along the coast?

15   A.   Approximately.

16   Q.   And if I told you that the Florida official highway map

17   shows it to be a distance of about 175 miles of the interstate

18   highway, would you agree with that?

19   A.   That sounds about right.

20   Q.   About a three-hour drive?

21   A.   Uh-huh.

22   Q.   Okay.  Have you ever been to Naples, Florida?

23   A.   Yes, I have.

24   Q.   I want to direct your attention back to the spring of

25   1995, when your former husband, Mr. Karr, was released from

1  incarceration.  Do you remember that occasion?

2  A.  When he was released?

3  Q.  Yes, ma'am.

4  A.  I would believe March of '95.

5  Q.  Yes, ma'am.  And did you have an occasion to see him

6  within the next couple of months during the spring of 1995,

7  following his return to the free world?

8  A.  Yes, I did.

9  Q.  And where and under what circumstances did you see the

10  defendant after he was released?

11  A.  My first encounter of meeting Gary, I flew into Chicago

12  and had dinner with him and my former fiance at that time, and

13  we had dinner together.

14  Q.  Okay.  And did Mr. Karr, the defendant, have any siblings

15  who resided in the greater Chicago area in Illinois?

16  A.  Yes, he has two brothers and a sister.

17  Q.  Okay.  And did you know these individuals?

18  A.  Yes, I do.

19  Q.  Okay.  And what is his sister's name?

20  A.  Gayle Sidney Karr.

21  Q.  Gayle Sidney Karr?

22  A.  Uh-huh.

23  Q.  Does she usually go by Sidney?

24  A.  She does now.

25  Q.  Okay.  How long a period of time have you known Ms. Gayle

*Karr – Direct*

1  Sydney Karr?

2  A.  Close to 30 years.

3  Q.  Is she younger or older than the defendant, to your

4  knowledge?

5  A.  She is younger.

6  Q.  Okay.  When and where did you first meet Mr. Karr?

7  A.  I believe I met him on a highway.

8  Q.  You met him on the highway?

9  A.  Uh-huh.

10  Q.  Could you elaborate on that briefly?

11  A.  We were cruising down on 47, and I thought he was a very

12  handsome man.

13  Q.  Okay.  And do you recall what year that may have been?

14  A.  1973.

15  Q.  Okay.  So y'all got acquainted and dated and later, got

16  married the next year, correct?

17  A.  Uh-huh.

18  Q.  When you went to Chicago in the spring of 1995 to have

19  dinner with Mr. Karr and your then fiance, you said?

20  A.  Uh-huh.

21  Q.  Did Mr. Karr discuss with you any plans he had to travel

22  to Texas or anywhere else?

23  A.  Not at that time.

24  Q.  Okay.  When was the next time you saw Mr. Karr after that

25  occasion in Chicago?

*Karr - Direct*

1  A.  I was coming home from work and he was waiting on my front

2  step.

3  Q.  In New Port Richey, Florida?

4  A.  In New Port Richey.

5  Q.  And can you give us an approximate date of when that might

6  have been?

7  A.  I'm not sure.

8  Q.  Do you know where he was staying immediately after being

9  released from the penitentiary?

10 A.  He was staying with a woman named Cookie.

11 Q.  In Chicago?

12 A.  Correct.

13 Q.  Okay.  And had he come to visit you?

14 A.  Yes.

15 Q.  That second time when you found him sitting on the steps

16 of your residence?

17 A.  Uh-huh.

18 Q.  And how did he arrive there, if you know?

19 A.  I'm not sure.

20 Q.  Was his sister, Gayle Sidney Karr, with him?

21 A.  Not at that time.

22 Q.  Did you see her any time during that visit?

23 A.  No, I did not.

24 Q.  Okay.  So he just showed up without a vehicle?

25 A.  Correct.

*Karr - Direct*

1   Q.   And was sitting on your steps?

2   A.   Uh-huh.

3   Q.   And did he say why he was there?

4   A.   To see me.

5   Q.   Okay.  And, also, to visit his daughter, Crystal; is that

6   correct?

7   A.   Yes.

8   Q.   During that meeting, did Mr. Karr indicate anything to you

9   about a possible trip to Texas?

10  A.   I don't recall much about a trip at that time.

11  Q.   Now, at that time, did you know a man named David Waters?

12  A.   Not until later.

13  Q.   Okay.  When did you first meet David Waters?

14  A.   In October of '95.

15  Q.   And where did you meet Mr. David Waters?

16  A.   I believe it was called the Four Seasons Hotel.

17  Q.   And where is that hotel located, please, ma'am?

18  A.   I believe it was here in Austin, Texas.

19  Q.   Okay.  I'm going to show you, ma'am, what's been marked

20  for identification purposes as Government's Exhibit W16-3, and

21  ask you if you recognize your initials and a date and time on

22  that photograph?

23  A.   Yes, I do.

24  Q.   And the man depicted in that photograph that you

25  identified, who is that man?

*Karr - Direct*

1   A.   David Waters.

2   Q.   I offer Government's W16-3, your Honor.

3            MR. T. MILLS:   We object on the grounds that it

4   appears to be a law enforcement photo line-up, and it seems

5   like it's interjecting the other individuals into this case.

6   There is a single picture of Mr. Waters, but we do object to

7   this photo line-up.

8            THE COURT:   All right.   I'll have counsel at the

9   bench.

10       (At the Bench, on the record.)

11           THE COURT:   Your objection is because it's a blank,

12   and you don't have any idea what it --

13           MR. T. MILLS:   I just never have seen somebody

14   identified by tossing in a line-up like this.   I guess I don't

15   know who the other five people are connected to this case.

16           MR. CARRUTH:   Not the same picture, but she initialed

17   that.   We don't want to show a person one picture.   That would

18   be as suggestive if we have them take out several pictures to

19   show that they, in fact, know that person.

20           THE COURT:   Well, you can ask the questions without

21   admitting the documents.   Just ask the questions of the

22   pictures, are they different.

23           MR. CARRUTH:   That would be fine.

24   Q.   (BY MR. CARRUTH) Ms. Karr, on this Exhibit W16-3, how many

25   photographs are depicted on that exhibit, ma'am?

*Karr - Direct*

1   A.   There are six here.

2   Q.   Six photographs?

3   A.   Uh-huh.

4   Q.   And you identified the individual in the middle of the

5   lower --

6   A.   Correct.

7   Q.   -- three as Mr. David Waters?

8   A.   Correct.

9   Q.   And the officer showed that to you to see if you could

10   pick him out; is that correct?

11   A.   Correct.

12   Q.   Would you look and tell me whether or not Government's

13   Exhibit W11-1 appears to be the same photograph of the same

14   individual you identified there?

15   A.   Yes, it does.

16   Q.   And what date does that reflect you made your

17   identification and signed your initials?

18   A.   February 18th of '99.

19   Q.   Okay.   Thank you.   Now, what occasioned you to come to the

20   Four Seasons Hotel in Austin, Texas, in October of 1995, where

21   you met Mr. David Waters?

22   A.   I came on the occasion because Gary Karr called me at my

23   home and asked me if I'd come to Texas to meet him.

24   Q.   And did you know previously to that that he had been in

25   Texas?

*Karr - Direct*

1   A.   Yes, I did.

2   Q.   For how long a time, to your knowledge, had he been in

3   Texas?

4   A.   I'm not positive, but it was several days.  It could have

5   been longer.

6   Q.   Did you have any idea prior to his departure that he was

7   going to Texas?

8   A.   Yes, I did.

9   Q.   What did he tell you?

10  A.   He told me he was going to leave for Texas.

11  Q.   And did he say why?

12  A.   He was going to go and play in a big card game.

13  Q.   And did he mention the name David Waters?

14  A.   He said he was going to go play cards with David Waters

15  because David Waters had the money to put up and Gary would

16  play the cards.

17  Q.   Okay.  Do you recall telling the investigators anything

18  about some prior letters between Mr. Karr and Mr. Waters?

19  A.   Yes.  David Waters wrote Gary letters while he was

20  incarcerated, stating that when he got out that they had a big

21  plan.

22  Q.   A big plan.  Did you ever have occasion to speak to Mr.

23  Waters on the telephone in 1995?

24  A.   Numerous times.

25  Q.   And would he be calling for Mr. Gary Karr or calling to

*Karr - Direct*

1   speak to you?

2   A.   No.  He was calling for Gary.

3   Q.   During the time that Mr. Karr was in Texas with David

4   Waters, I presume, is that where he had understood to play in

5   the big card game?

6   A.   Uh-huh.

7   Q.   During that time frame, did he send or wire transfer you

8   any money?

9   A.   Yes, he did.

10   Q.   On more than one occasion?

11   A.   Yes, he did.

12   Q.   And can you tell us if you recall the approximate amounts

13   of funds that he wire transferred to you from Texas?

14   A.   He sent one Western Union in the amount of $2500.

15   Q.   And did he give you an indication of what that money was

16   intended to be used for by you?

17   A.   Money was sent to the girls in California.

18   Q.   Is that Crystal?

19   A.   His other daughter, Chrissie.

20   Q.   Okay.  Was that by a previous marriage?

21   A.   By a previous woman.

22   Q.   Okay.  And was that the only wire transfer of funds you

23   received from Mr. Karr during the time that he was in Texas?

24   A.   I received another one for about 1500.

25   Q.   Okay.  And what was that money for?

*Karr - Direct*

1  A.  To send to Crystal, who was visiting Gary's daughter in

2  California.

3  Q.  So you received a total of approximately $4,000 in wire

4  transfers from him while he was in Texas, correct?

5  A.  About.

6  Q.  Now, was Mr. Karr employed, to your knowledge, during this

7  period of time?

8  A.  While he was in Texas playing cards?  No.

9  Q.  Okay.  Did he indicate to you the source of this $4,000

10  that he wire transferred to you?

11  A.  Could you repeat that?

12  Q.  Did Mr. Karr indicate to you the source of this $4,000

13  that he had wire transferred to you from Texas?

14  A.  The source of the money was from a card game.

15  Q.  That's what he told you?

16  A.  Uh-huh.

17  Q.  Okay.  Did Mr. Karr ever give you any jewelry after his

18  visit to Texas?

19  A.  He gave me a pocket watch and a ring.

20  Q.  Show you what's been marked as Government's Exhibit 16-2.

21  Do you recognize that ring?

22  A.  Uh-huh.

23  Q.  Have you seen that before?

24  A.  Uh-huh.

25  Q.  Where did you get it?

*Karr - Direct*

1  A.  From Gary.

2  Q.  And was that after his trip to Texas?

3  A.  Uh-huh.

4  Q.  Offer Government's W16-2, your Honor.

5      MR. T. MILLS:  No objection.

6      THE COURT:  It's received.

7  Q.  (BY MR. CARRUTH) Oh, would you describe that ring for the

8  record?  It appears to be a dinner ring?  Would that be

9  appropriate?

10 A.  It looks like a cocktail ring.

11 Q.  And what type of stones or setting does it have, if you

12 know?

13 A.  They look like they could be garnets.

14 Q.  And it's a gold --

15 A.  With the gold band.

16 Q.  Gold band.  Okay.  And are there also --

17 A.  Two diamonds.

18 Q.  -- diamonds in there?

19 A.  Uh-huh.

20 Q.  Do you have quite a bit of jewelry?

21 A.  Huh-uh.

22 Q.  Did you ever see Mr. Karr with any other types of jewelry

23 or watches when he returned from Texas?

24 A.  Yes, I did.

25 Q.  And can you tell us about those, please?

Karr - Direct

1    A.  He showed me two ladies' Rolex watches and one gentlemen's

2    Rolex watch.

3    Q.  And can you describe for the members of the jury, were

4    they gold, silver, what?

5    A.  The ladies' were gold and silver.

6    Q.  Okay.

7    A.  And the gentlemen's was blue in face, like Presidential.

8    Q.  As a Presidential Rolex?  And did Mr. Karr ever tell you

9    what these watches were worth?

10   A.  Well, he assumed that the value of the women's were around

11   $3500.

12   Q.  A piece?

13   A.  Uh-huh.

14   Q.  And how about the men's?

15   A.  Anywhere between 7 and 9,000.

16   Q.  Okay.

17   A.  Maybe 11.

18   Q.  And did he, in fact, now try to give you one of these

19   watches?

20   A.  Yes, he did.

21   Q.  Did you accept it from him?

22   A.  No, I did not.

23   Q.  Why not?

24   A.  I didn't want it.

25   Q.  Did you know where those watches came from?

*Karr - Direct*

1   A.  Not at that time.

2   Q.  Did he later tell you where the watches came from?  He

3   being Mr. Karr, the defendant?

4   A.  Later on he told me.

5   Q.  What did he tell you?

6   A.  That they were won in a card game, but they also came off

7   the bodies of the O'Hairs, the daughter and the son.

8   Q.  Okay.  To your knowledge, did Mr. Karr transport these

9   watches from Texas back to Florida and then, on to Chicago?

10  A.  Yes.

11  Q.  In fact, you were with him on that trip, were you not,

12  after the Four Seasons stay?

13  A.  Yes.

14  Q.  You flew out here to Austin?

15  A.  Yes, I did.

16  Q.  And who paid for your airline ticket?

17  A.  Gary.

18  Q.  And do you know how he paid for it?

19  A.  I don't.

20  Q.  And when you stayed at the Four Seasons that night, did

21  you have room service?

22  A.  Yes, we did.

23  Q.  Do you remember what you had?

24  A.  I had lobster and capers and Melba toast.

25  Q.  And what did Mr. Karr have?

*Karr - Direct*

1   A.   I'm not real sure on that, but I think he had duck.

2   Q.   Duck?

3   A.   (Moving head up and down.)

4   Q.   Did you have any wine or champagne delivered to your room

5   that night?

6   A.   We had wine.

7   Q.   Okay.  And who paid for that overnight stay at the Four

8   Seasons Hotel?

9   A.   Gary.

10  Q.   And how did he pay for it?

11  A.   I wasn't there to see.

12  Q.   Okay.  And later on, did you and he return to Florida

13  after your stay at the Four Seasons?

14  A.   Yes, we did.

15  Q.   And what mode of transportation did you use?

16  A.   Gary had rented a car.

17  Q.   Was it a full-size car?

18  A.   It was a nice-sized car.

19  Q.   And you drove a rental car back to your home in New Port

20  Richey, Florida?

21  A.   Correct.

22  Q.   Did you drive all the way through or did you spend the

23  night en route?

24  A.   No.  We drove all the way through except we stopped to

25  eat.

*Karr - Direct*

1   Q.  Okay.  And that's when Mr. Karr showed you three Rolex

2   watches?

3   A.  No, he didn't show them to me.

4   Q.  After you got back to Florida?

5   A.  I'm not exactly sure when he showed them to me, but it was

6   later after that.

7   Q.  Okay.  And Mr. Karr tried to sell or dispose of any of

8   these watches?

9   A.  Yes, he did.

10  Q.  And can you tell us what happened to those watches if you

11  know?

12  A.  I'm not sure where two of them went, but I know that he

13  did sell one to his sister, Sidney.

14  Q.  Sidney Karr in Chicago?

15  A.  Yes.

16  Q.  How do you know that?

17  A.  Because he told me.

18  Q.  Do you know a man named Phil Sykes?

19  A.  Yes, I do.

20  Q.  Who is Mr. Sykes?

21  A.  He is a parole officer in New Port Richey.

22  Q.  And does he know Sidney Karr -- Gayle Sidney Karr?

23  A.  Yes, he does.

24  Q.  And has he seen her in possession of that watch?

25  A.  Yes, he has.

*Karr - Direct*

1   Q.  Did Mr. Karr ever say anything to you about some gold

2   coins?

3   A.  No, he didn't.

4   Q.  He never did?

5   A.  No, he didn't.

6   Q.  You don't recall telling me last night about some gold

7   coins that had been stolen?

8   A.  He told me that he had put money into a storage unit.

9   Q.  That he had?

10  A.  Him and David.

11  Q.  David Waters?

12  A.  Uh-huh.

13  Q.  Okay.  And what had happened to those gold coins that he

14  and Mr. Waters put in a storage unit?

15          MR. T. MILLS:  Objection.  That was a misstatement of

16  her testimony.  I don't think she used the word "gold coins."

17  Q.  (BY MR. CARRUTH) Well, can we clarify this, Ms. Karr.

18  What are we talking about here that was put in a storage unit?

19  A.  He put stones, gold coins and cash.

20  Q.  In a storage unit?

21  A.  In the storage unit.

22  Q.  Do you know where that storage unit was located?

23  A.  No, I don't.

24  Q.  Was it in Texas somewhere?

25  A.  Yes, it was.

Karr - Direct

1  Q.  And did he say what happened to any of the property that

2  had been placed in the storage unit?

3  A.  The place was robbed.

4  Q.  So he didn't get any gold coins to take back to Florida

5  that you saw?

6  A.  No.

7  Q.  Now, after the two of you spent the night together at the

8  Four Seasons on that trip, did you have any contact with Patti

9  Jo Steffens and David Waters?

10  A.  Not until the next morning.

11  Q.  You didn't see them that evening?

12  A.  No, I did not.

13  Q.  Where did you see them the next morning?

14  A.  In the lobby downstairs.

15  Q.  And did y'all have Bloody Marys together?

16  A.  Yes, we did.

17  Q.  And is that the first time you had ever met or had any

18  contact with Patti Jo Steffens?

19  A.  Yes.

20  Q.  Did you have any contact with her subsequent to that trip

21  to Austin?

22  A.  No, I didn't.

23  Q.  You never saw her again?

24  A.  Oh, yes.

25  Q.  Well, tell us about the next time you saw Patti Jo

*Karr - Direct*

1   Steffens.

2   A.   David and Patti took a trip to my house.

3   Q.   And how long after the Four Seasons stay in Austin did

4   Patti Jo and David Waters come to your house?

5   A.   It must have been -- I can't be sure, two weeks.

6   Q.   And do you know what the purpose of their trip was?

7   A.   To visit --

8        MR. T. MILLS:   Objection.  Speculation.

9   A.   -- at that time.

10   Q.   (BY MR. CARRUTH) If she knows.

11   A.   It was for a visit at that time.

12   Q.   Okay.  During that trip, did Mr. Karr, the defendant, and

13   Mr. Waters ever leave for a period of several hours?

14   A.   Yes, they did.

15   Q.   And did you know where they had gone during that period of

16   time?

17   A.   No, I do not.

18   Q.   And I believe you said they were gone about six to eight

19   hours; is that correct?

20   A.   That's correct.

21   Q.   And it takes about three hours to drive from New Port

22   Richey down to Naples, Florida?

23   A.   Correct.

24   Q.   So six to eight hours would be consistent with a roundtrip

25   between New Port Richey and Naples, is it not?

*Karr - Direct*

1   A.   Correct.

2   Q.   Do you know why they were gone for that period of time?

3   A.   I don't know.

4   Q.   What did you do while they were gone?  Were you working

5   during that time period?

6   A.   I was working, and when I got off work, Patti and I went

7   across over by the Ramada and sat there for a couple of hours.

8   Q.   Okay.  Now, to your knowledge, after that visit by Patti

9   Jo Steffens and David Waters, did Mr. Gary Karr ever return to

10  Texas?

11  A.   Yes, he did.

12  Q.   How many times?

13  A.   Several.

14  Q.   Do you know what his purpose in returning to Texas may

15  have been?

16  A.   The first few visits were he was going to go back to

17  finish the card games.

18  Q.   To finish the card games?

19  A.   Uh-huh.

20  Q.   Okay.  That's what he told you?

21  A.   Uh-huh.

22  Q.   Did he ever tell you anything about guarding anybody or

23  being a security guard or a bodyguard?

24  A.   No.

25  Q.   He never mentioned that to you?

*Karr - Direct*

1    A.   No.

2    Q.   Did you question him about this big card game in Texas?

3    A.   I thought it was a pretty heavy card game.

4    Q.   And did you have any reason to doubt the story that Mr.

5    Karr had told you?

6    A.   At that time, no.

7    Q.   Later, did you come to doubt it?

8    A.   Yes.

9    Q.   Why?

10   A.   There was too much money, too much property --

11   Q.   In addition to the --

12   A.   -- to win in a card game like that.

13   Q.   Okay.  In addition to the Rolex watches and the other

14   jewelry that you've described, did Mr. Karr have any clothing

15   or any personal possessions when he returned from the trip to

16   Texas?

17   A.   Yes, he did.

18   Q.   Could you describe that for the members of the jury,

19   please?

20   A.   He came home with several suits of Armanis, silk ties,

21   expensive socks, beautiful shirts, expensive shoes.

22   Q.   And can you approximate --

23   A.   Leather jacket.

24   Q.   A leather jacket?

25   A.   From what was in my house, he had to have over 15,000 --

*Karr - Direct*

1  Q.  Over $15,000 worth of clothing and shoes?

2  A.  -- with the tax on.

3  Q.  And do you have any idea how he was able to afford new

4  clothes if he had not been employed when he was in Texas?

5  A.  From his card game.

6  Q.  From the card game.  Now, there was a period of time he

7  did some work for Art Miller in Florida, was there not?

8  A.  Yes, there was.

9  Q.  Before he went to Texas and after he got back; is that

10 correct?

11 A.  After he got back from Texas.

12 Q.  Okay.  And was there a period of time when he moved -- was

13 he living with you during this time frame?

14 A.  Yes.

15 Q.  And was there a period of time when he moved out of your

16 residence and actually resided with Art Miller and his family?

17 A.  Correct.

18 Q.  And can you tell us why that occurred, if you know?

19 A.  Because I thought it was best that Gary wasn't in my life

20 anymore, and it was time for him to leave.

21 Q.  And was that when you figured out that there was something

22 wrong?

23 A.  By the time he told me what was wrong.

24 Q.  What did he tell you?

25 A.  He told me that there was a card game and that there were

Karr - Direct

1  four other people that were playing, and David had taken three
2  of the people home and he had told Gary that three of the
3  people never made it home.
4  Q.  And what did you interpret that to mean?
5  A.  Well, he told me what it meant.
6  Q.  What did Mr. Karr tell you it meant?
7  A.  He told me that David had killed them.
8  Q.  Okay.  Did he say why David had killed the people?
9  A.  No.
10 Q.  What else did Mr. Karr tell you?
11 A.  As far as what?
12 Q.  About the -- what you now know to be it was not a card
13 game?  Did he ever tell you about any threats against your own
14 life?
15 A.  He has threatened me.
16 Q.  What did he tell you?
17 A.  He has threatened to kill me.
18 Q.  Did he say why he was going to kill you --
19      MR. T. MILLS:  Excuse me.  I didn't hear the answer as
20 to who made a threat to kill her.  I didn't hear her
21 testimony.
22 A.  Gary Karr.
23 Q.  (BY MR. CARRUTH) And was that after he told you what
24 happened in Texas?
25 A.  Correct.

1   Q.   And could you recall for us --

2   A.   He told me that he hid behind -- in front of my house

3   behind a tree and waited for me to get home.

4   Q.   And did he tell you whether there was anyone with him on

5   that occasion?

6   A.   He said he was with -- with somebody.   Whom somebody was,

7   I don't know.

8   Q.   And why was he waiting behind the tree in front of your

9   home?

10   A.   Because he wanted to kill me.

11   Q.   Why did he want to kill you?

12   A.   Because I knew what I knew.

13   Q.   And is it at that time that you thought he should leave,

14   or had he already left the house?

15   A.   He was already gone.

16   Q.   Okay.   What else did Mr. Karr tell you about the

17   connection, if any, between Mr. Waters and these folks in

18   Texas who were in the big card game and didn't make it home?

19   A.   He didn't say too much.   He told me that it was Madalyn

20   O'Hair --

21   Q.   Excuse me just a minute.   Get up closer to the microphone.

22   A.   I'm sorry.

23   Q.   Would you repeat your last answer, please?

24   A.   He told me about Madalyn O'Hair, that she took the prayer

25   out of school, and David Waters hated her.   And he told me

Karr - Direct

1  about the daughter and the son and that David disposed of

2  them.

3  Q.  What else did he tell you?

4  A.  He received the phone call from David to my house, and

5  David threatened him to go back to Texas and Gary went back to

6  Texas.

7  Q.  Did he tell you why Mr. Waters wanted him to come back to

8  Texas?

9  A.  He wanted him to help to rebury the bodies.

10  Q.  Okay.  Had Mr. Karr indicated to you or did he indicate

11  after that trip to Texas you've just described where the

12  bodies were buried?

13  A.  He told me that the bodies were buried in a -- where they

14  were building new subdivisions, and it was a matter of time

15  before more subdivisions were going to be going up.

16  Q.  And did Mr. Karr subsequently attempt to change your mind

17  about what he had told you where the bodies were buried?

18  A.  Yes, he did.

19  Q.  Please explain that for the jury.

20  A.  We had a phone conversation, and I told Gary what he had

21  said to me, and Gary said it wasn't so.  So we had words back

22  and forth because I felt that he was trying to make me feel

23  that I was imagining things that he was saying to me.

24  Q.  Okay.  Ms. Karr, I'm showing you what's been marked for

25  identification as Government Exhibit W16-1, and ask you if you

1  recognize that?

2  A.  Yes.

3  Q.  What is that exhibit, ma'am?

4  A.  It's a tape of a phone conversation.

5  Q.  Did you review that last night in my office and initial

6  it?

7  A.  Yes, I did.

8  Q.  Is that your initials "C.K." for Charlene Karr in there?

9  A.  Yes, it is.

10 Q.  Do you -- did you recognize the voices on this tape?

11 A.  Yes, I did.

12 Q.  And whose voices are on this tape?

13 A.  Gary Karr's and myself.

14 Q.  And did you call the investigators and report the

15 conversation with Gary Karr after it had been made --

16 A.  Yes, I had.

17 Q.  -- and recorded?  We'd offer at this time Government's

18 Exhibit W16-1, your Honor.

19      MR. T. MILLS:  I don't object to those portions that

20 are relevant to what this issue about trying to change her

21 mind, but I think that there are some -- a lot of extraneous

22 things on the tape that are on other subjects that I would

23 object to.

24      THE COURT:  Members of the jury, that means you get an

25 early lunch.  Please be ready to come back at 1:30.  Follow

*Karr - Direct*

1    the instructions of the Court.

2        (Jury not present.)

3            THE COURT:  How long does it last?

4            MR. CARRUTH:  About ten minutes.

5            MR. T. MILLS:  All right, Judge.  I just had a

6    conversation with Mr. Carruth, and it doesn't contain some

7    issues that I thought it did.  Apparently, there's several --

8            MR. CARRUTH:  Doesn't mention Mr. Tom Mills.

9            MR. T. MILLS:  And there is one that does, and I just

10   didn't want it brought up in front of the jury.

11           THE COURT:  I'm going to play like I understand that,

12   but I do not.  The net effect is you don't have any objection?

13           MR. T. MILLS:  Correct.

14           THE COURT:  All right.  1:30.

15           MR. CARRUTH:  Is it admitted for the record?

16           THE COURT:  It is admitted.

17           MR. CARRUTH:  Thank you, your Honor.

18       (Lunch recess.)

19           THE COURT:  Anything before we bring in the jury?

20           MR. CARRUTH:  Nothing from the government, your Honor.

21           THE COURT:  All right.  Bring the jury in.  Do you

22   wish the witness in the room?

23           MR. CARRUTH:  Yes, we would like to have the witness,

24   Charlene Karr.

25           THE COURT:  Bring Ms. Karr back in.  You will be glad

*Karr - Direct*

1    to know, ladies and gentlemen of the jury, that the government

2    of the United States through the General Service

3    Administration tells me that we have the same temperature in

4    the morning as we have in the afternoon in the courtroom.   I

5    have encouraged them to come in and put their arms where their

6    mouth are.

7              But they are safe in their cubby hole about three or

8    four blocks down the street, but I believe it will get a

9    little warmer as the afternoon goes on.   During the noon hour,

10   did anyone attempt to talk to any of you about this case?

11             THE JURORS:  No.

12             THE COURT:  Did you talk to anybody about this case?

13             THE JURORS:  No.

14             THE COURT:  Y'all are almost, almost ready for

15   professional choir.  And have you learned anything at all

16   about this case outside the presence of each other and this

17   courtroom?

18             THE JURORS:  No.

19             THE COURT:  Show negative responses to all questions

20   by all the jurors.  Ms. Karr, you are still under oath.   You

21   may proceed.

22   Q.  (BY MR. CARRUTH) Prior to the noon recess, the government

23   had offered Government Exhibit W16-1, and Ms. --

24             THE COURT:  It's been admitted.

25             MR. CARRUTH:  We'd request permission of the Court to

*Karr - Direct*

1    play that for the jury at this time.

2            THE COURT:  You may proceed.

3            (Cassette tape played.)

4            SPEAKER:  "Hello.

5            MR. KARR:  Hello.  Is Crystal there?

6            SPEAKER:  Hold on.  Let me check.

7            MS. KARR:  Hello.

8            MR. KARR:  Hi, Char?

9            MS. KARR:  Yes.

10           MR. KARR:  Is Crystal around?

11           MS. KARR:  No, she's not.

12           MR. KARR:  She's not?

13           MS. KARR:  No.

14           MR. KARR:  What would be a good time to catch her?

15           MS. KARR:  Who is this?

16           MR. KARR:  Her father.

17           MS. KARR:  Oh, hi, Gary.

18           MR. KARR:  How are you doing?

19           MS. KARR:  Fine.  Wrong time to catch her.

20           MR. KARR:  Huh?

21           MS. KARR:  She's in and out.

22           MR. KARR:  In and out?

23           MS. KARR:  Yeah.  What's wrong?

24           MR. KARR:  Nothing.  She hasn't heard from me for a

25    while and wanted to know if I called.

*Karr - Direct*

1         MS. KARR:  Oh, how are you doing?

2         MR. KARR:  Oh, doing pretty good.  Things are looking

3    real good.

4         MS. KARR:  I hope.

5         MR. KARR:  Yeah.

6         MS. KARR:  I just got busy last week.

7         MR. KARR:  Did you?

8         MS. KARR:  Yeah, I was in Chicago.  I'm leaving again

9    in a couple of days.

10        MR. KARR:  Working back there or just hanging out

11   or --

12        MS. KARR:  No.  Working.

13        MR. KARR:  Working?

14        MS. KARR:  Uh-huh, working.  Are you mad at me?

15        MR. KARR:  Am I mad at you?

16        MS. KARR:  Yeah.

17        MR. KARR:  Not that I know of.

18        MS. KARR:  Oh.

19        MR. KARR:  Should I be?

20        MS. KARR:  No.

21        MR. KARR:  Okay.

22        MS. KARR:  You told me to tell the truth and I did.

23        MR. KARR:  That's right.  That's all you have to do.

24   We told a little more than the truth, but --

25        MS. KARR:  No, I didn't.

*Karr - Direct*

1    MR. KARR:  Well, I never said nothing about no -- that

2  he followed them back to their house, or took them to their

3  house and killed them all and buried them in a field next to a

4  subdivision.

5    MS. KARR:  You did.

6    MR. KARR:  No, I did not.

7    MS. KARR:  Yes, you did.  How would I make that up?

8    MR. KARR:  I don't know how you would make that up.

9    MS. KARR:  Oh.

10    MR. KARR:  You know, it's an impossibility, for one,

11  for him to kill four people.

12    MS. KARR:  Oh, you didn't tell me how many.

13    MR. KARR:  You said four people.

14    MS. KARR:  No, I didn't.

15    MR. KARR:  Well, I got the statement.

16    MS. KARR:  I told them exactly who it was.  Three.

17    MR. KARR:  Three?

18    MS. KARR:  Uh-huh.

19    MR. KARR:  Well, then you heard it wrong.  But no, I'm

20  not mad at you.  I told you to tell the truth.

21    MS. KARR:  You told me, I did that, and you don't know

22  what to do.  You saw a lawyer.

23    MR. KARR:  I told, well, the same thing I told Art.

24  The same thing I told the lawyer is the same thing I told you.

25  I highly believe he did it.  You know, I didn't see him do it,

*Karr - Direct*

1   so I don't know that he did it.

2          MS. KARR:  Exactly and he threatened you.

3          MR. KARR:  He threatened me, he threatened you, he

4   threatened my daughter.

5          MS. KARR:  Exactly and so you went back.

6          MR. KARR:  Yeah.

7          MS. KARR:  And you saw parts of the body.

8          MR. KARR:  No.  He was careful.

9          MS. KARR:  He wanted you to rebury them.

10         MR. KARR:  Right.  He had me take him to an area, and

11  you know, he wanted to examine an area, and he did.  I stayed

12  in the vehicle, and he went out and examined the area, he came

13  back and we left.  He was careful that the rains or floods or

14  something may have uncovered something.  But, yeah, that's all

15  the truth.  No, I'm not mad at you.

16         MS. KARR:  I didn't lie.

17         MR. KARR:  No, you didn't lie, but it's like they

18  added something to it.

19         MS. KARR:  No, that's not my fault.

20         MR. KARR:  No.  But, you know, what you said is

21  basically --

22         MS. KARR:  I told them that you were honest, caring

23  and giving, and if you really knew him, he would give you the

24  shirt off his back.

25         MR. KARR:  See, you're careful.  No, I'm not mad at

*Karr - Direct*

1  you.  You know, I knew it had to come to an end.  I actually

2  feel better that it has come to this conclusion, you know.

3  And when it's over, it's over, you know.  Fortunately, I'll be

4  talking to a civil lawyer in the next day or two, and, you

5  know, there will be some real liabilities on the FBI's part

6  and whatnot.

7       MS. KARR:  Yeah.

8       MR. KARR:  Because they lied to the grand jury and,

9  you know, they lied to the magistrate, they lied to the Judge,

10  they lied to the newspapers.

11       MS. KARR:  I don't know about that.

12       MR. KARR:  Well, yeah, they said I confessed to four

13  murders, and they put me in jail and no bond, you know, and

14  ran all these nasty articles on the TVs and newspapers about

15  me, and I never confessed to anything, you know.  And there

16  was nothing more than a conspiracy on their part to make him

17  think that, you know, that I had confessed so that he would

18  confess.

19       But he must have read that and laughed because, you

20  know, he knows I can't confess to four murders I didn't

21  commit.  So he just kind of laid back, probably, and laughed

22  and let it go.  But that was their attempt.  They were hoping

23  that if he thought I rolled on him, he would roll on me.

24       MS. KARR:  Uh-huh.

25       MR. KARR:  But their theory was wrong and it didn't

*Karr - Direct*

1    work and, you know --

2         MS. KARR:  Yes, you did tell me they were buried out

3    in a field near a subdivision that would probably be built,

4    and he was worried about them finding the bodies.

5         MR. KARR:  No.  The area that they were buried in was

6    way out in the middle of nowhere.  It wasn't anywhere near a

7    subdivision.

8         MS. KARR:  Gary, you told me that he was worried about

9    them building on the land.

10        MR. KARR:  No.

11        MS. KARR:  Oh, whatever.

12        MR. KARR:  Okay.  Because, you know, the only thing I

13   told you he was worried about is that it was a hunting

14   reserve, and he was worried that the rains, the floods, spring

15   floods and whatnot.

16        MS. KARR:  That's not what you said.

17        MR. KARR:  Well, no, I didn't go into details with

18   you.

19        MS. KARR:  No.  You told me that it was going to be in

20   a new subdivision going up.

21        MR. KARR:  No, I did not.

22        MS. KARR:  Yes, you did.

23        MR. KARR:  Well, it's immaterial because there's no

24   subdivision could be built in that area.

25        MS. KARR:  Well, whatever, but you said it to me, so I

*Karr - Direct*

1  have no idea.

2          MR. KARR:  Okay.

3          MS. KARR:  As far as I know, you weren't playing

4  cards.

5          MR. KARR:  Well, that's something -- that's something

6  to argue about.  You know, it's like it's four years ago and,

7  you know, things change.

8          MS. KARR:  I told them that, too.  It's been a long

9  time.  I can't recall dates.  I can't recall word-for-word.  I

10  can't recall.

11          MR. KARR:  Exactly.  But, you know, I mean, it's not

12  hurting me.  You know, it can't hurt me.

13          MS. KARR:  I wasn't doing anything to hurt you.  You

14  are already between bars.

15          MR. KARR:  Exactly what I told you to do from the very

16  beginning, just tell the truth.  You know, you don't have to

17  make nothing up.  Just be honest, you know, and basically,

18  that's what you did, you know, and I have nothing to say, you

19  know.  But --

20          MS. KARR:  Crystal didn't give me a word of where

21  she's at because she's mad at me.  So it seems over for now.

22          MR. KARR:  She's mad at you?  What did you do now?

23          MS. KARR:  I didn't do anything.  She was embarrassing

24  in front of people.  So obviously -- so you can reach her

25  at --

*Karr - Direct*

1    MR. KARR:  I need you to do it for me because I can't

2    leave the phone booth to go get a pencil or paper or nothing,

3    but it's a long process for me.  It takes about a month to get

4    a phone number approved.  So if you can let me know if she's

5    going to stay where she's at.  And did you give Sidney the

6    phone number?

7    MS. KARR:  She's doing the custody thing, so she's not

8    allowed to move.  So right now, she's pissed off to be there

9    for a while.

10   MR. KARR:  Okay.  Well, then, maybe I can do is I'll

11   drop her a card or something and say that" --

12   (End of cassette tape.)

13   Q.  (BY MR. CARRUTH) Ms. Karr, you told us earlier you were

14   able to identify the voices on that tape.  Would you tell the

15   jury, again, who was doing the speaking there again, ma'am?

16   A.  That was Gary's voice and my voice.

17   Q.  By Gary, you mean Mr. Gary Paul Karr?

18   A.  The defendant in this case, right.

19   Q.  And was that tape made before or after he had threatened

20   to kill you for what you did?

21   A.  That tape was made after.

22   MR. T. MILLS:  What was?  I didn't hear what she said.

23   A.  It was made after.

24   Q.  (BY MR. CARRUTH) Now, is this the occasion you referred

25   to, earlier this morning, where Mr. Karr and another man were

*Karr - Direct*

1   hiding behind the tree, waiting for you at your residence?

2   A.  Correct.

3   Q.  Did Mr. Karr indicate to you that he or the other man, I

4   believe to use your words what you told me last night, blow --

5   A.  Blow me away.

6   Q.  Is that what he said?

7   A.  That was Gary.

8   Q.  Gary was going to blow you away himself?

9   A.  Uh-huh.

10  Q.  Now, during the time period in question, 1995 and

11  thereafter, did you have more than one telephone number in New

12  Port Richey?

13  A.  No, I didn't.

14  Q.  Did you have a work phone and a home phone?

15  A.  Yes, I did.

16  Q.  Okay.  Do you recall those phone numbers for us, please,

17  ma'am?

18  A.  In '95?

19  Q.  Yes, ma'am.

20  A.  My home phone number is 848-3885.

21  Q.  And what's the area code, please, ma'am?

22  A.  727.

23  Q.  Okay.  What was your work phone back in 1995?

24  A.  848-0008.

25  Q.  And was that also area code 727?

*Karr - Direct*

1    A.   727.

2    Q.   Was there other phone numbers that you used during that

3    time period in 1995?

4    A.   My cell phone.

5    Q.   What was your cell phone?

6    A.   846-3252.

7    Q.   And was that 727 area code?

8    A.   Correct.

9    Q.   Okay.  Now, was there ever a time, subsequent to your trip

10   to Austin in October of 1995, when you spent the night at the

11   Four Seasons and then, drove back with Mr. Karr that

12   subsequent to that, that you overheard a conversation

13   regarding the O'Hairs between Mr. Karr and Mr. Waters?

14   A.   I didn't hear that conversation until David Waters showed

15   up at my house with Patti.

16   Q.   Yes, ma'am.  It was subsequent or after the Four Seasons?

17   A.   It was after the Four Seasons.

18   Q.   And then, Patti Steffens and Mr. Waters came to your place

19   in Florida?

20   A.   Yes.

21   Q.   And what did you hear the men talking about, if anything?

22   A.   I quite couldn't hear anything except the name O'Hair.

23   Q.   Okay.  And did you tell us that in addition to the new

24   clothes, which I believe you said was at least $15,000 this

25   morning?

*Karr – Direct*

1    A.   Uh-huh.

2    Q.   Did Mr. Karr expend any other funds, to your knowledge,

3    like, buying a motorcycle?

4    A.   To my knowledge, he bought a motorcycle.

5    Q.   And a computer?

6    A.   And a computer.

7    Q.   And did he buy an automobile for one of his daughters?

8         MR. T. MILLS:  Excuse me.  I object to leading this

9    witness.

10   A.   Yes, he did.

11   Q.   (BY MR. CARRUTH) Well, tell me what all he purchased after

12   the trip to Texas in 1995, ma'am, as best you can recall.

13   A.   He purchased a computer, furniture, a motorcycle, the car

14   he purchased prior to the Texas trip.

15   Q.   Okay.  And did he own a Jeep Wrangler --

16   A.   Yes, he did.

17   Q.   -- at some point in time?  And had he used that car

18   before, the vehicle, to go to Texas?

19   A.   Yes, he did.

20   Q.   Now, you testified this morning about some wire transfer

21   of funds that you received from Mr. Karr while he was in

22   Texas.  I'm going to show you what's marked for identification

23   as Government's Exhibit W40-2, W40-3 and W40-4, and I'll ask

24   you whether or not those are all money grams that relate to

25   Mr. Karr during the time period in question.  Do you recognize

*Karr - Direct*

1 those, ma'am?

2 A. Yes.

3 Q. Do those include the money grams you were talking about

4 earlier?

5 A. Yes.

6 Q. We would offer at this time Government Exhibit W40-2,

7 W40-3 and W40-4.

8    MR. T. MILLS:  No objection.

9    THE COURT:  Received.

10 Q. (BY MR. CARRUTH) Do those money grams reflect two cash

11 payments sent to you and one sent to -- who's this right here?

12 Do you see where my pen was pointing?

13 A. I don't know.

14 Q. Can you read the name, please?

15 A. It says Lisa.

16 Q. Lisa who?

17 A. Jones.

18 Q. Do you know Lisa Jones?

19 A. No, I don't.

20 Q. And the other two were sent to you, Charlene Karr, right?

21 A. Correct.

22 Q. And what's the face amount of this one?

23 A. $3,361.

24 Q. And what is the date that it was sent?

25 A. August 29th.

*Karr - Direct*

1    Q.  Of what year?

2    A.  '95.

3    Q.  And this other one sent to you in the amount of what?

4    A.  2,000.

5    Q.  And by Mr. Karr.  The date it was sent?

6    A.  9-16-95.

7    Q.  Thank you, ma'am.  And these wire transfers of funds, you

8    indicated earlier, were intended for Mr. Karr's daughters, I

9    believe; is that correct?

10   A.  Correct.

11   Q.  He did not send you any money personally?

12   A.  No, he did not.

13   Q.  But he did give you the watch and the dinner ring; is that

14   correct?

15   A.  Yes.

16   Q.  Are you still afraid of Mr. Karr?

17   A.  Sometimes.

18   Q.  Has he ever threatened you on more than one occasion that

19   you've told us about earlier?

20   A.  Yes.

21   Q.  Pass the witness.

22        MR. T. MILLS:  Let me see those exhibits.

23

24                    CROSS-EXAMINATION

25   BY MR. T. MILLS:

*Karr - Cross*

1    Q.  Ms. Karr, my name is Tom Mills.  I represent Gary Karr.

2    Let me ask you about Government's Exhibit W40-2.  This appears

3    to be a money gram transaction activity report for Gary Karr,

4    $2700.  The sender is Gary Karr, and it looks like received,

5    Lisa Jones.  Do you know a Lisa Jones?

6    A.  No, I don't.

7    Q.  Do you know anything about this transaction whatsoever?

8    A.  Not to my knowledge.

9    Q.  Are you on any medication right now?

10   A.  No.

11   Q.  How was the recording made that we heard?  In other words,

12   did you hook up a recording device to your phone or had a law

13   enforcement agency done it so that you could record a call?

14   A.  After my conversation with Gary, I was so upset with him,

15   I made a phone call to Donna Cowling.

16   Q.  That's this nice lady over here.

17   A.  How she got the conversation, you would have to ask her.

18   Q.  Okay.  You didn't record it?

19   A.  No, I did not.

20   Q.  Okay.  The jail may have recorded it?

21   A.  Correct.

22   Q.  All right.  In October 1995, Gary Karr accused you of

23   cheating on him, didn't he?

24   A.  Yes, he did.

25   Q.  And that was with a man who ran the kareoke bars, right?

*Karr - Cross*

1    A.   No.   That was with the man I had been with for 17 years.

2    Q.   The law enforcement agent in Chicago?

3    A.   Correct.

4    Q.   Gary Karr said that he had parked across the street from

5    your house and watched you entertaining this man, didn't he?

6    A.   I have no idea.

7    Q.   Did he say that to you?

8    A.   No, he did not.

9    Q.   He basically ended the relationship with you in October

10   1995, didn't he?

11   A.   No, he did not.

12   Q.   When do -- what date do you attach to him ending the

13   relationship with you?

14   A.   Our relationship didn't end until almost Christmas.

15   Q.   Of 1995?

16   A.   Correct.   He proposed and put a ring on my finger on

17   November the 9th of '95.

18   Q.   All right.   You don't -- you are angry at him now, aren't

19   you?

20   A.   No, I'm not.

21   Q.   You're not angry with him?

22   A.   No, I'm not.

23   Q.   You claim that you are fearful of him, true?

24   A.   Sometimes.

25   Q.   Okay.   You claim that you're fearful of him but that

*Karr - Cross*

1   you're not angry with him?

2   A.   Correct.

3   Q.   Are you fearful that he can do something to you through

4   the phone line?

5   A.   No.

6   Q.   All right.  Before you came here within the last several

7   days, you made a statement to Crystal that, quote, I can say

8   anything I want --

9          MR. CARRUTH:  Excuse me, your Honor.  I'm going to

10   object to this as hearsay.  If he wants to call Crystal Karr

11   to come testify, he may.  But he may not cross-examine the

12   witness on statements that are not in evidence, not before the

13   Court.

14          MR. T. MILLS:  I'm asking her about her statement.

15   That wouldn't be hearsay to her.  It would be her statement.

16          THE COURT:  All right.  Your question is, did you tell

17   somebody this.

18          MR. T. MILLS:  Yes.

19          THE COURT:  All right.  Objection's overruled.

20          MR. CARRUTH:  Thank you.

21   Q.   (BY MR. T. MILLS) Is that the statement that you made to

22   Crystal?

23   A.   Can you repeat that?

24   Q.   "I can say anything I want there"?

25   A.   True.

Karr - Cross

1   Q.   Do you believe that anything you say in this courtroom

2   will be believed even if it's not the truth?

3   A.   Everything I have said has been the truth.

4   Q.   You have been interviewed by the FBI and, possibly, other

5   law enforcement agents since what year?

6   A.   I'm not sure.

7   Q.   Well, was it -- was the first time you were interviewed --

8   A.   It's been over a year.

9   Q.   And you have talked with -- isn't it true that you've

10  talked with law enforcement agents for more than over six

11  separate times?

12  A.   Yes.

13  Q.   And isn't it true that if you said it yesterday, it was

14  the first time in your life that you have ever said anything

15  about Gary saying, "I will blow you away"?

16  A.   Gary has said that to me twice.

17  Q.   Okay.  You have never said that in any interview with law

18  enforcement until last night, true?

19  A.   No, that's not true.

20  Q.   You claim that you have told other law enforcement agents

21  that?

22  A.   Yes.

23  Q.   Okay.  Then, it would be in your interviews, I'm sure?

24  A.   Yes, it is.

25  Q.   All right.  Have you read your interviews?

1   A.   Yes, I have.

2   Q.   Okay.  You've read the law enforcement agents' notes about

3   their interviews with you to prepare you to testify?

4   A.   Uh-huh.

5   Q.   Right?

6   A.   Yes.

7   Q.   Do you regularly take pain medication?

8   A.   No, I do not.

9   Q.   Do you regularly take the prescription medicine Soma?

10   A.   No, I do not.  The only prescriptions I've ever taken was

11   prescribed.

12   Q.   During the month of September 1995, how many days did you

13   see Gary Karr?

14   A.   In September?

15   Q.   Yes.

16   A.   Probably a couple of weeks.

17   Q.   You mean you think you may have seen him for as many as 14

18   days --

19   A.   Uh-huh.

20   Q.   -- okay, there in New Port Richey, Florida?

21   A.   Correct, at my house.

22   Q.   Staying with you?

23   A.   Correct.

24   Q.   Having a romantic relationship with you?

25   A.   Yes.

*Karr - Cross*

1  Q.  Okay.  While you were having a romantic relationship with

2  somebody for 17 years, were you having that relationship then?

3  A.  Yes, I was.

4  Q.  He wasn't there, was he?

5  A.  No.  He lives 1300 miles away.

6  Q.  Of the 16 days in September, when you did not -- when Mr.

7  Karr was not with you, you don't have personal knowledge of

8  exactly where he was, do you?

9  A.  He was in Texas.

10  Q.  And you know that because you saw him here or some other

11  way?

12  A.  He called to tell me he was in Texas.

13  Q.  Did he call you collect each time?

14  A.  Not each time.

15  Q.  At some point, isn't it true that Gary Karr told you that

16  he believed that David Waters had killed the O'Hair Murrays?

17  A.  Yes.

18  Q.  He never did -- I'm going to be kind of technical and try

19  to ask you this precise question.  He never did say that he

20  knew that David Waters had killed any of those three people,

21  did he?

22  A.  He told me David Waters had killed the O'Hair family.

23  Q.  Okay.  Then, why did you agree with me in my question

24  before that Gary Karr said that he believed that David Waters

25  had killed the O'Hair family?  You agreed with that statement.

*Karr - Cross*

1   A.  That he believed that he killed him.

2   Q.  Okay.  But you're now saying that Gary Karr said he

3   definitely killed them; is that right?  Or that he just

4   thought that he killed them?

5   A.  If he believed he killed them and he told me that he

6   killed them, I believed what he had said to me.

7   Q.  All right.  And from this recording, do I understand that,

8   at one time, that Gary Karr said to you that David Waters had

9   buried the bodies near a new subdivision?

10  A.  That's correct.

11  Q.  Okay.  And isn't it true that if bodies are buried near a

12  new subdivision, isn't it true Gary Karr never said, "I buried

13  some bodies near a new subdivision"?

14  A.  That's true.  He said bodies were buried.

15  Q.  Just a minute ago, you agreed with me that he said David

16  Waters buried the bodies?

17  A.  That was a conversation before the conversation you're

18  asking of now.

19  Q.  All right.  Did Gary Karr say that David Waters had buried

20  the bodies near a new subdivision?

21  A.  That is correct.

22  Q.  Okay.  Did Gary Karr ever say to you that David Waters

23  buried some bodies in the country somewhere in the woods, in

24  the Hill Country?

25  A.  No, he did not.

*Karr - Cross*

1  Q.  In preparing for your testimony, have you seen either

2  pictures of this ranch land or a map of some ranch land out in

3  the country?

4  A.  Huh-uh.

5  Q.  No?  Is it true that Gary Karr said -- or was it just your

6  fear that the watches were taken from dead bodies as opposed

7  to being part of his payment for helping get them out of town?

8  Was that something that you feared and assumed?

9  A.  Gary told me the watches were won in a card game.  That

10  was his share of the winnings.

11  Q.  All right.  Did Gary ever tell you that they came from

12  anyplace else besides the card games, or was it just the card

13  games?

14  A.  Later on, he told me where they came from.

15  Q.  And later on, did he say that David Waters had taken them

16  from dead bodies or live people, or what?

17  A.  He already had them in his possession because he won them

18  in a card game.  Later on, he told me the real story was they

19  came off the O'Hair family.

20  Q.  Whatever his exact words were, he didn't say words that

21  led you to know if he meant live people or dead people, did

22  he?  He just didn't use those words, did he?

23  A.  By this time, I already knew that they were dead.

24  Q.  But you -- if they are dead, if they were dead, what I'm

25  talking about is when did the watches come off of them if they

*Karr - Cross*

1    -- at what point?  He never did go into that detail, did he?

2    A.  No, he didn't.

3    Q.  All right.  I may have written this down wrong, so forgive

4    me if I have, but I thought you said in response to one of Mr.

5    Carruth's questions that Gary never told you about gold coins;

6    is that correct?  Did Gary ever tell you about gold coins?

7    A.  The only time I heard about the gold coins is after I was

8    in Texas, and Gary says that they put the coins and the money

9    in a storage.  That's the first I've heard of it.

10   Q.  All right.  Did he tell you that a person named Jon Murray

11   had gone to a bank and taken possession of gold coins that day

12   that they put them in a storage shed, a storage closet, or did

13   he say anything about that?

14   A.  No, he did not.

15   Q.  All right.  When David Waters and Patti visited in

16   Florida, several weeks later, did you say that at one point,

17   David and Gary Karr were gone for several hours?

18   A.  Yes, I did.

19   Q.  All right.  And I wrote down several.  You said several

20   hours, didn't you?

21   A.  Several.

22   Q.  Several, right?

23   A.  Uh-huh.

24   Q.  S-E-V-E-R-A-L.  All right.  Then, the next question to you

25   from Mr. Carruth was, do you know what they did for those six

*Karr - Cross*

1    or eight hours?  You didn't say six or eight hours, did you?

2    You said several.

3    A.   Several is more than three or four.

4    Q.   Is it?

5    A.   Yeah.

6    Q.   Okay.  Well, you didn't say six or eight.  You didn't say

7    either one of those numbers, did you?

8    A.   No, I didn't say any number.  I didn't know I had to.

9    Q.   You didn't have to.  But you were questioned about six or

10   eight hours.  Those were not your words, were they?

11   A.   I said several hours.

12   Q.   All right.  Do you know --

13   A.   Most of the day, whatever you want to assume the limit.

14   Q.   Did you first have a conversation -- were you first

15   questioned by law enforcement in 1999?

16   A.   I believe it was '99.

17   Q.   '99.  And whether it was Ms. Cowling or someone else, you

18   were asked to think back about events in October of 1995,

19   weren't you?

20   A.   Correct.

21   Q.   Okay.  So you were thinking about three and a half to four

22   years before, right?

23   A.   Uh-huh.

24   Q.   And now it's 2000, I think.  We're in May of 2000.  And

25   you -- do you really remember the exact number of hours that

*Karr - Cross*

1  the men were gone on one day in 1995?

2  A.  I can't give you exact hours.

3  Q.  That's fine.

4  A.  I can tell you that they were gone most of the day.

5  Q.  Well, how do you define most of the day?  Most of the day

6  to mean --

7  A.  Most of the day is when I go to work at 10:00, and they're

8  still not back at 6:00 in the evening.

9  Q.  All right.  Now, do you have any knowledge as to where

10 they were during that time?

11 A.  No, and I didn't ask.

12 Q.  Mr. Carruth asked you if they had time to go to Naples,

13 Florida, right?

14 A.  Uh-huh.

15 Q.  And to your knowledge, they would have?

16 A.  Exactly.

17 Q.  How many other cities in Florida would they have had time

18 to go to and come back from?

19 A.  Quite a few.

20 Q.  How do you know they left New Port Richey, Florida at all,

21 or maybe you don't?

22 A.  I don't.

23 Q.  You used -- I wrote down this phrase.  Correct me if I

24 wrote it down wrong.  To your knowledge, Gary Karr bought a

25 motorcycle?

*Karr - Cross*

1    A.   Correct.

2    Q.   Did you see a motorcycle?

3    A.   No, I did not.

4    Q.   Did you hear him driving a motorcycle by your house that

5    you recognized it was a motorcycle engine?

6    A.   I did not.

7    Q.   At some point in history and time, did Gary Karr tell you

8    he bought a motorcycle?

9    A.   He told our daughter.

10   Q.   He told your daughter.  Who told you?

11   A.   Because he lived with my ex-brother-in-law, whom my nephew

12   used to hang out with all the time, and I heard from him, too.

13   Q.   So you heard through the grapevine that he was driving a

14   motorcycle?

15   A.   Uh-huh.

16   Q.   All right.  Did you hear from the grapevine that he had a

17   computer?

18   A.   Uh-huh.

19   Q.   Did you hear from the grapevine that he had some

20   furniture?

21   A.   I wrote him on his computer and got a response.

22   Q.   You wrote him on his computer?

23   A.   Uh-huh.

24   Q.   You mean you --

25   A.   I e-mailed --

1    Q.   You sent him an e-mail?

2    A.   -- pretending I was my daughter.

3    Q.   Okay.  And you know who owned the computer that he was

4    using, right?

5    A.   According to Gary, it was his because he couldn't send it

6    to his daughter.

7    Q.   And he sent that to you or to his daughter?

8    A.   He sent it to my daughter about a month ago.

9    Q.   And through the grapevine, did you learn that he had some

10   furniture?

11   A.   My daughter went and stayed at his house for three weeks

12   and was upset with him.

13   Q.   Okay.  Now, what month is it that you claim that Gary Karr

14   said that he hid behind the tree and -- did he say that he was

15   with someone else?

16   A.   He was with somebody, but he didn't say who.

17   Q.   Okay.  When you say he was with somebody, did you see him?

18   A.   No.

19   Q.   Okay.  So you don't know if he was with anybody?

20   A.   No.

21   Q.   Okay.  But you're saying Gary Karr said, "I was with

22   somebody and we were hiding behind a tree"?

23   A.   Correct.

24   Q.   And "I'm going to kill you"?

25   A.   And "I came this close to pulling the trigger."

Karr - Cross

1    Q.   Okay.  Did you have a -- if that happened, did you have a

2    clue as to what he was talking about?

3    A.   It didn't matter what he was talking about.  The fact that

4    he thought he was going to shoot me.

5    Q.   Okay.  Was that when he was arguing with you about dating

6    this other guy when he didn't think you were when he came back

7    from Texas one day early?

8    A.   If that's what he wants to say.  Under my assumption, it

9    was because of what I knew.

10   Q.   Well, all right.  Let me ask you a couple of questions

11   about that.  It's your assumption that he threatened to kill

12   you because you know something, right?

13   A.   He came to my door with a gun.

14   Q.   When?

15   A.   The day that he told me he was going to pull the trigger.

16   Q.   He had a gun?

17   A.   Yes, he did.

18   Q.   What kind of gun?

19   A.   I'm not real good with guns.

20   Q.   Okay.  Have you told people about this before?

21   A.   It was a pistol.

22   Q.   Have you told any law enforcement agents about that

23   before?

24   A.   What, that he was going to shoot me?

25   Q.   No.  That Mr. Karr came to your door with a pistol?

1   A.   I don't believe I did.

2   Q.   Okay.  May the 18th, 2000 is the first time that you've

3   ever stated those facts in this case to your knowledge, right?

4   A.   To my knowledge.

5   Q.   All right.  Well, was this period of time when he was

6   saying angry things the same time period that y'all were

7   bickering about him saying that you were cheating on him?

8   A.   I don't care what his excuse was or --

9   Q.   Is that a yes?

10  A.   -- or reason --

11  Q.   Is that a yes?

12  A.   I don't recall for it being any other reason than for me

13  knowing what I know.

14  Q.   All right. Well, what it is that you think you know that's

15  -- he would want to kill you about?  He never admitted killing

16  anybody to you, did he?  Right?

17  A.   Indirectly or directly, he did not kill somebody.

18  Q.   Let me ask my question.  I'll try to ask it real clearly.

19  Did Gary Karr ever tell you that he killed Ms. O'Hair or her

20  son or granddaughter?  Yes or no?

21  A.   No.

22  Q.   Did Gary Karr ever tell you that he buried Ms. O'Hair, or

23  her son, or her granddaughter, he himself?

24  A.   No.

25  Q.   Well, in fact, Gary Karr told you that he was fearful of

1   David Waters, correct?

2   A.   Yes.

3   Q.   And, in fact, asked you to not let David Waters know where

4   he was living?

5   A.   Correct.

6   Q.   In that telephone conversation that was taped, two or

7   three times when you and Gary Karr were talking, you would --

8   you brought up this -- you told me that they were buried in a

9   new subdivision.  Had you been coached by somebody about what

10  to say?

11  A.   No.

12  Q.   Okay.  Why were you bringing that up?  You brought it up

13  at least twice.  I'm just curious.

14  A.   Because Gary was trying to make me believe other than what

15  he was saying, and I know what he said to me.

16  Q.   Okay.  You know that at some point in time, Gary Karr said

17  that the O'Hair family was buried somewhere near some new

18  housing development?

19  A.   There was a development going up, and it was only a period

20  of time before they would reach and add new development and

21  find the bodies.

22  Q.   All right.  And you understood that to either be a housing

23  development or a business development?

24  A.   Subdivision or whatever.

25  Q.   All right.  And in the visit when David Waters and Patti

*Karr - Redirect*

1   were in New Port Richey, Florida, the only thing that could

2   conceivably be suspicious that you overheard the two men

3   saying was one of them said the word "O'Hair"?

4   A.   Uh-huh, that's the first time I heard the name.

5   Q.   That's all the questions that I have.   Thank you.

6                    RE-DIRECT EXAMINATION

7   BY MR. CARRUTH:

8   Q.   Counsel earlier asked you about an engagement ring.   Do

9   you recall that testimony?

10   A.   Pardon?

11   Q.   Mr. Mills asked you earlier in your cross-examination

12   about an engagement ring that you had received.

13        MR. T. MILLS:   Excuse me.   I'd object to his question

14   because I don't think it's based on any fact in evidence.   I

15   don't believe I asked any question about an engagement ring.

16        MR. CARRUTH:   Well, about a ring, a diamond ring, a

17   solitaire ring.   There was some testimony elicited that I was

18   going to clear up for the record.

19        THE COURT:   Ask your question.

20   Q.   (BY MR. CARRUTH) Do you recall what you told Mr. Mills

21   about a ring, a diamond ring?

22   A.   He asked me if I've seen a solitaire ring.

23   Q.   And your response was?

24   A.   That I had not.

25   Q.   Okay.   Now, you did not know that tape was being made when

*Karr - Redirect*

1  you had that telephone call with Mr. Karr, did you?

2  A.  No, I did not.

3  Q.  Okay.  And counsel has suggested that you waited until

4  today to come up and make up all these stories.  Do you recall

5  you were interviewed by the FBI, back on February of 1999,

6  more than a year ago?

7  A.  You have to refresh my memory.

8  Q.  Yes, ma'am.  FBI 302 recorded your interview.  There was

9  one done with you showing interviews on February 17th and

10  18th, 1999; it's five pages in length?

11  A.  Uh-huh.

12  Q.  Would you please read at the bottom of page 4 and the top

13  of page 5, and just to yourself, and tell me whether or not

14  you reported, more than a year ago, about David laying in wait

15  with another man behind the tree and threatening to kill you?

16  Is that in there?

17  A.  Uh-huh.

18  Q.  And, also, he questioned you about the time they were gone

19  from New Port Richey.  Did you say at the top of page 3, "The

20  first night, Karr and Waters were gone for four to five,

21  possibly six to eight hours"?

22          MR. T. MILLS:  Excuse me, Judge.  This is improper

23  bolstering and leading a witness.  This isn't even a

24  transcript of her testimony.

25          MR. CARRUTH:  Pursuant to Rule 801D(1)(b) --

1    THE COURT:  The objection is overruled.  You may ask

2  the question.

3    MR. CARRUTH:  I would like to offer the entire

4  statement, your Honor, as a prior statement by the witness

5  that is consistent with the declarant's testimony and is

6  offered to rebut a charge of recent fabrication or improper

7  influence under Rule 801D(1)(b) of the Federal Rules of

8  Evidence.

9    MR. T. MILLS:  Let me take a look at that specific

10  rule just a moment, Judge.

11    MR. CARRUTH:  We could substitute a clean copy for the

12  record.  This one's marked up.

13    MR. T. MILLS:  Well, if I don't -- I don't object to

14  her statements if the -- if only her statements are admitted.

15  I would assume an FBI 302 has a lot more than just quotes.

16  But the quotes I have no objection to.  The rest can be

17  omitted.

18    MR. CARRUTH:  Well, your Honor, he's attempted to

19  impeach her on several different areas --

20    THE COURT:  No, no.  Let me tell you.  I've got a

21  white flag back in the office somewhere, and when I need help,

22  I'm going to go find it and I'm going to raise it.  Until

23  then, y'all can state your objections and your positions.  I

24  will permit you to go over here and show him what sections

25  that you are going to ask the witness to read or you can read

*Karr - Redirect*

1  and ask the witness if it is not contained therein and that

2  that's a statement prepared as of a certain day.

3        MR. CARRUTH:  I think we've got it narrowed down, your

4  Honor.

5  Q.  (BY MR. CARRUTH) Ms. Karr, I'm going to read to you from

6  your statement a reported interview with the FBI, dated 2-17

7  through 18, 1999, New Port Richey, Florida.  And I want you to

8  tell me whether or not these are the statements you made to

9  the FBI agent on that occasion.

10        At the page, first paragraph on page 3.  During

11  October, Waters and his girlfriend came to visit for two days.

12  Source, and that's you, was uncomfortable with Waters while

13  they were visiting.  Waters and his girlfriend arrived in

14  Waters' white car --

15        MR. T. MILLS:  Excuse me, Judge.  Object on the

16  grounds that this is not one of the quotes that I agreed to.

17        MR. CARRUTH:  Well, it's in the same sentence.  I'll

18  skip down.

19        THE COURT:  Well, the objection is sustained.  Members

20  of the jury, I'm going to excuse you for a minute.

21     (Jury not present.)

22        THE COURT:  All right.  Counsel, both of you go to

23  this little teeny desk right here.  Do one of you have a

24  pencil or a pen?  Both of you have a pencil.  Do you have a

25  transcript?

*Karr - Redirect*

1       MR. CARRUTH:  No, your Honor, it's not a transcript.

2  It's a report of an interview.

3       THE COURT:  It is a transcript, that is, it is

4  printed, typed, something in it; it's a written document.

5  Circle what you wish to read on your theory of showing that

6  the witness did not manufacture testimony today as inferred by

7  the questioning of counsel.  Just circle it.

8       MR. CARRUTH:  All right, sir.  This paragraph here.

9       THE COURT:  All right.  Let's get it all because I'm

10  just going to --

11       MR. CARRUTH:  But you see, your Honor, if you just

12  read something out of context, it doesn't make any sense.

13  That's why I was reading the entire paragraph.

14       THE COURT:  First off, let's let counsel see it.

15       MR. CARRUTH:  He's seen it when I circled it, your

16  Honor.

17       MR. T. MILLS:  I couldn't read it.  May I underline

18  that portion that I agree with?

19       THE COURT:  Yes.  His is a circle, yours is an

20  underline.  Mine is a cannon.

21       All right.  Counsel, I have placed, of course, which

22  has come out in three different colors of ink because of the

23  wonderful modern world we live in, the underline in orange as

24  to what can be asked.  And the question to be asked in light

25  of the proffer is:  On a statement of July -- of February 17,

*Karr - Redirect*

1  18, 1999, does the following -- is the following contained in

2  there:

3       During October, Waters and his girlfriend came to

4  visit for two days.  The first night, Karr and Waters were

5  gone for four to five -- four to five, possibly six to eight,

6  six to eight hours in the Waters car.  Source and Waters'

7  girlfriend went drinking while the men were gone, period.  Is

8  that in the statement of February '99?

9       MR. CARRUTH:  Well, yes, but I don't think either side

10 wishes to make an issue of drinking.

11      MR. T. MILLS:  I think it puts it in a good context.

12      THE COURT:  I don't care.  Neither one of you, I don't

13 -- you know, with the way you two are acting, I'd like a

14 drink.  The next is the same truth.  Whether or not the

15 statement underlined is in part of the statement.  You have

16 proffered this evidence simply to show that it was in

17 existence at a time prior to May of 2000.  That's the only

18 point of this whole thing.

19      MR. CARRUTH:  That's the exact point I'm trying to

20 make, your Honor.  He suggested she could come in here today

21 and say anything she wanted to.

22      THE COURT:  But you, also, of course, want the whole

23 loaf of bread, bread truck.  You want to read the whole

24 statement in, I'm not going to let it.  I'm going to let you

25 read those portions and ask if those are contained in the

*Karr - Redirect*

1    statement.  Other than that, the objection is good.  We're

2    going to go on to something else.

3           MR. CARRUTH:  I have another statement in here I'd

4    like to read about Waters killing them and burying them in a

5    field in a subdivision that's a bone of contention.

6           THE COURT:  Well, it wasn't circled.  Do you want to

7    circle it?

8           MR. CARRUTH:  Could I use your pen?

9           THE COURT:  No.  Instead of ordering a transcript, Mr.

10   Mills, you'd better be up here looking at what's being

11   circled.  I'll permit it.

12          MR. CARRUTH:  Thank you, your Honor.

13          THE COURT:  All right.  Bring the jury back.

14      (Jury present.)

15   Q.  (BY MR. CARRUTH) Ms. Karr, I'm going to ask you to read

16   with me the highlighted portions of a statement prepared by

17   the FBI agent who interviewed you back on February the 17th

18   and 18th of 1999.  Do you recall that interview, ma'am?

19   A.  Uh-huh.

20   Q.  And in this statement, you're referred to as a source

21   rather than by name; is that correct?

22   A.  Correct.

23   Q.  They were trying to keep your identity confidential.

24   A.  Right.

25   Q.  Now, right here, it says, "During October, Waters and his

*Karr - Redirect*

1  girlfriend came to visit for two days."  Do you want to just

2  read it?  Don't just read these right here.  "The first

3  night," right here, just start right there.

4  A.  "The first night, Karr and Waters were gone for four to

5  five, possibly six to eight hours in Waters' car.  Source and

6  Waters' girlfriend went drinking while men were gone."

7  Q.  Stop.  Now, jump down here.

8  A.  "Waters killed them and buried them in a field in Texas

9  near a subdivision."

10  Q.  Now down to here, please.

11  A.  "Karr was concerned because he thought that the bodies

12  were going to be found due to ongoing construction."

13  Q.  All right.  Now we're going to slip over to the bottom of

14  page 4, and if you read that, please, where it's highlighted

15  in orange.

16  A.  "While Karr was still living in New Port Richey, Sidney

17  came down for a visit.  Exact date unknown.  During this time

18  period, Karr came over to source's residence and stated, 'You

19  came this close to dying.'"

20  Q.  And that's in quotes, is it not?

21  A.  Yes, it is.  "We were behind the tree and we came this

22  close to shooting you because you knew what happened.  Karr

23  told source that it had been he and Waters behind the tree.

24  He instructed her not to say anything because that would be

25  what would happen to her."

*Karr - Redirect*

1  Q.  So you did report this threat more than a year ago to the

2  FBI, didn't you?

3  A.  Yes, I did.

4  Q.  Didn't you, Ms. Karr?

5  A.  Yes.

6  Q.  Did you make those statements you just read?

7  A.  Yes, I did.

8  Q.  Now, did you also tell the investigator that at some point

9  after he returned from the Texas trip, Mr. Waters contacted

10 Art Miller, his part-time employer?

11 A.  I'm sorry.  Can you repeat that?

12 Q.  Yes.  Sometime after he returned from the Texas trip in

13 1995 that he talked to Art Miller, his employer --

14 A.  Right.

15 Q.  -- and relayed to him what had happened or some of the

16 events you've testified about?

17 A.  Right.

18 Q.  And at some point in time, it was determined that he

19 should consult with an attorney in Florida, correct?

20 A.  That's correct.

21 Q.  What is your knowledge about that?

22 A.  He did go over to Art Miller's house, and Art Miller did

23 get him an attorney to speak to.

24 Q.  And do you know whether or not there was a recording made

25 of his conversation with either Mr. Miller or the attorney in

*Karr - Recross*

1   Florida?

2   A.  I didn't see the tape, but Gary had told me he had spent

3   hours talking to the attorney and if something should happen

4   to him, to keep the attorney's name that he would carry the

5   tapes.

6   Q.  So the attorney has a tape in Florida according to Mr.

7   Karr?

8   A.  Right.

9   Q.  Pass the witness.

10                          RECROSS-EXAMINATION

11  BY MR. T. MILLS:

12  Q.  Do you happen to know the name of the attorney?

13  A.  I have it written down at home.  I don't know it offhand.

14  Q.  Have you ever spoken to the attorney?

15  A.  No, I haven't.

16  Q.  Do you know if there really is a tape recording of your

17  own personal knowledge?

18  A.  I believe so.  Gary said so.

19  Q.  Okay.  You don't have any other basis -- I mean, that's

20  your basis that he said so?

21  A.  Art Miller said that he sent them to the attorney to make

22  a tape.

23  Q.  Okay.  That's all the questions I have.

24       MR. CARRUTH:  Nothing further, your Honor.  May the

25  witness be excused?

*Karr - Recross*

```
 1          THE COURT:  Counsel?

 2          MR. T. MILLS:  Yes.

 3          THE COURT:  You may be excused.  Call your next

 4  witness.

 5          MR. CARRUTH:  United States calls Jean McKeegan.

 6          THE COURT:  Ma'am, if you will come right here.  This

 7  is Mrs. Sims.  She's going to administer an oath to you.

 8      (Witness was sworn.)

 9          THE COURT:  Ma'am, how good are you in stairs?

10          THE WITNESS:  Not too good.

11          THE COURT:  There are four of them you're going to

12  have to negotiate to get up on the --

13          THE WITNESS:  Is there something to hang on to?

14          THE COURT:  Well, I can give you a lot of men.

15          THE WITNESS:  This gentleman here says I can --

16          THE COURT:  If not, we'll pull a chair up.  We can't

17  move the column, the whole thing --

18          THE WITNESS:  The whole thing will fall down.

19          THE COURT:  Would you prefer just sitting in front?

20          THE WITNESS:  No.

21          THE COURT:  Okay.  If you'll tell us your full name

22  and spell your last name.

23          THE WITNESS:  I'm Jean C. McKeegan.  Last name is M-C,

24  capital, K-E-E-G-A-N.

25      JEAN C. MCKEEGAN, called by the Government, duly sworn.
```

McKeegan - Direct

<u>DIRECT EXAMINATION</u>

BY MR. CARRUTH:

Q.  Ms. McKeegan, where do you currently reside?

A.  In San Antonio.

Q.  And is that your husband out in the hall that came with you today?

A.  Yes.

Q.  I believe he's a retired Air Force officer, isn't he?

A.  Right.

Q.  And back in 1995, did you folks own an Eldorado Cadillac that you were looking to sell?

A.  Yes, we advertised it in the paper.

Q.  And was it a white Cadillac?

A.  Yes.

Q.  And did you get any response to your advertisement in the paper to sell that Cadillac?

A.  Yes, we did.

Q.  And do you remember the particulars of that?  Was it in about September of 1995?

A.  It was, yes.

Q.  Okay.  And tell us what happened when you put that ad in the paper.

A.  We received a call from Austin, I think, the second day the ad was in, and a gentleman came down in the afternoon to look at it.

McKeegan - Direct

1  Q.  Okay.  And did you know this gentleman's name or did he

2  tell you his name?

3  A.  Yes.  I can't remember.  Waters, is it?

4  Q.  Waters?  Okay.  Was he alone or in the company of another

5  person?

6  A.  He had a gentleman with him.

7  Q.  Okay.  And what happened after he saw the car?

8  A.  After he sold it?

9  Q.  He saw it.  He came down to first look at it.

10  A.  He said that he would like to buy it.

11  Q.  Did he take a test drive in it?

12  A.  Yes, he did.  He and his friend that brought him down --

13  Q.  Okay.

14  A.  -- took a drive in it and brought the car back real --

15  very quickly.

16  Q.  Okay.

17  A.  And said he would like to buy it and --

18  Q.  And how much were you and your husband asking for this

19  Cadillac?

20  A.  13,000.

21  Q.  And did he agree to meet your price?

22  A.  Yes.  There was no argument or anything.

23  Q.  And do you recall what day of the week this was that he

24  came --

25  A.  It was a Saturday afternoon.

1  Q.  A Saturday afternoon.  And did he have money to pay for

2  the car.  Or how did he handle the finances?

3  A.  He said he would be back shortly.  He had to go get some

4  money, money to pay for it.

5  Q.  Okay.

6  A.  And he came back within an hour or less.

7  Q.  Okay.  And this was in San Antonio, Texas?

8  A.  This was in San Antonio.

9  Q.  And did you find anything strange or unusual about that?

10  A.  Yes, I did, because it was a Saturday afternoon, and he

11  said he was from Austin and he was gone such a short time.  I

12  couldn't figure out whether he went to a bank or where he got

13  the money unless he had it with him when he came.  I don't

14  know.  But cash was a little unusual, even at the Credit

15  Union.  He asked -- he said, "Is cash all right?"  And even

16  the woman at the bank was a little surprised that someone

17  would have that much cash to pay for the car.

18  Q.  And did you take him to your credit union?

19  A.  Credit Union.

20  Q.  Was that Randolph/Brooks Federal Credit Union in San

21  Antonio?

22  A.  Right.

23  Q.  Did you bring with you to court today a copy of your

24  account --

25  A.  Yes.

*McKeegan - Direct*

1    Q.   -- statement showing the deposit of those funds in your

2    account?

3    A.   Yes, I do.

4    Q.   Let me show you what's been marked for identification as

5    Government's Exhibit W37-1.  Would you take a look at that,

6    please, ma'am, and tell me if you've ever seen it before or

7    can recognize any of the documents there?

8    A.   Yes.

9    Q.   It's a certified copy of a title history on the vehicle

10   you sold.  Do you recognize it?

11   A.   I suppose --

12   Q.   It's got a title or chain of title in here.  And prior to

13   it being owned by this gentleman?

14   A.   Yes.

15   Q.   Is that your signature right there?

16   A.   Yes.

17   Q.   So your signature's in the chain of title on this

18   Cadillac?

19   A.   Right.

20   Q.   We'd offer Government's Exhibit 37-1, your Honor, under --

21   a state document under seal of the Texas Department of

22   Transportation.

23          MS. WILLIAMS:  No objection.

24          THE COURT:  Received.

25   Q.   (BY MR. CARRUTH) And now that that document is in

*McKeegan - Direct*

1   evidence, does it reflect who the next purchaser was from the

2   McKeegans right down at the bottom?

3   A.   Yes, it does, David R. Waters.

4   Q.   And what is the date of the title transfer?

5   A.   16th of September, 1995.

6   Q.   All right.  Government's Exhibit W37-2, I believe you

7   brought with you today, did you not, ma'am?

8   A.   Right.

9   Q.   And that's a copy of your account statement at

10  Randolph/Brooks Federal Credit Union showing the deposit into

11  your account along with the payment of the outstanding balance

12  that you owed the Credit Union for the Cadillac; is that

13  correct?

14  A.   Right.

15  Q.   We'd offer W37-2.

16          MS. WILLIAMS:  No objection.

17          THE COURT:  Received.

18  Q.   (BY MR. CARRUTH) Thank you.  Had you ever seen this man,

19  Mr. Waters, before?

20  A.   No.

21  Q.   And have you ever seen him since?

22  A.   No.

23  Q.   Pass the witness.

24                      CROSS-EXAMINATION

25  BY MS. WILLIAMS:

*McKeegan - Cross*

1  Q.  Hi, Ms. McKeegan.  We met in the hall earlier.

2  A.  Yes.

3  Q.  And Ms. Cowling and I showed you a series of pictures to

4  see if you could identify who the other person was that was

5  with David Waters.  We showed you those in the hall during

6  lunch?

7  A.  Yes.

8  Q.  And you weren't able to pick anybody out; is that correct?

9  A.  No.

10  Q.  That's all I have.

11        MR. CARRUTH:  Nothing further, your Honor.  May the

12  witness be excused to return to San Antonio?

13        MS. WILLIAMS:  Yes.

14        THE COURT:  You may be excused, ma'am.  Thank you.

15  You may call your next witness.

16        MR. CARRUTH:  I believe Mr. Mills has the next

17  witness, your Honor, and I think he seems to have stepped out.

18  Let me find him.

19        THE COURT:  Just come right there, please, sir.  This

20  is Mrs. Sims.  She's going to administer an oath to you.

21     (Witness was sworn.)

22        THE COURT:  Walk around this column, have a seat up

23  here on the witness box.  If you'll tell us your full name and

24  spell your last, please.

25        THE WITNESS:  Mel Davis, D-A-V-I-S.

*Davis - Direct*

1        MEL DAVIS, called by the Government, duly sworn.

2                      DIRECT EXAMINATION

3    BY MR. D. MILLS:

4    Q.   Where do you reside, sir, and how are you currently

5    employed?

6    A.   I reside in Floresville, Texas, and I'm self-employed.

7    Q.   What do you do?

8    A.   I do contract work for U.S. Bankruptcy Trustees in San

9    Antonio.

10   Q.   What type of work is that?  What do you do for the

11   bankruptcy trustees?

12   A.   I sell real estate for them, pick up collateral and do

13   options.

14   Q.   During June of 1995, did you have occasion to be in San

15   Antonio, Texas, staying at or near the Warren Inn?

16   A.   Yes, sir.  We moved into the -- we moved into the Warren

17   Inn, I think, in June of '95, and left, I believe, in August

18   of '96.

19   Q.   You say "we."  You're talking about --

20   A.   My family: my wife and two children.

21   Q.   And what was your purpose for residing in the Warren Inn

22   at that time?

23   A.   We were in transition, trying to get from -- move from

24   Boerne down to Floresville.  We just kind of got stuck.

25   Q.   And how long did you stay there?

1   A.  Well, about 13, 14 months.

2   Q.  Did you stay in the same location, the same unit?

3   A.  Yes, sir.

4   Q.  There are different types of units there?

5   A.  Yes, sir.

6   Q.  Can you tell the jury the different types of units that

7   are there?

8   A.  Well, the ones I know about, they have an efficiency and

9   they have a one-bedroom and a two-bedroom.  We happen to be in

10  the two-bedroom, and all the units in our particular unit were

11  two-bedroom apartments.

12  Q.  I'll show you what's been admitted as Government's Exhibit

13  25-16, and ask you if that is a picture of the Warren Inn as

14  you recognize it to have been?

15  A.  Yes, sir, that's correct.

16  Q.  Okay.  Is this area where you can stay for longer periods

17  of time, do you get to where you socialize with people there

18  like you would in a neighborhood or not?

19  A.  This is more of a transient-type apartment complex.  I

20  would say we were there a little over a year.  Probably one or

21  two others were there a year.  Most people went in and out in

22  a couple of months.

23  Q.  I'm going to show you what's been marked as Government's

24  Exhibit W26-1, and ask you if you've ever seen this before?

25  A.  Yes, sir.

*Davis - Direct*

1   Q.  Does this -- on the item that's enumerated No. 5, does

2   that appear to be your signature?

3   A.  Yes, sir.

4   Q.  And then, the second page of this exhibit, there are six

5   photos; is that correct?

6   A.  Yes, sir.

7   Q.  And do you have your initials on two of the six?

8   A.  Yes, sir.

9   Q.  That would be No. 3 and No. 4; is that correct?

10  A.  Yes, sir.

11  Q.  The first page of W26-1, you initial photograph No. 5; is

12  that correct?

13  A.  Yes, sir.

14  Q.  Does Government's Exhibit W11-1 appear to be the same

15  photograph?

16  A.  Yes, sir.

17  Q.  And on page 2, you initialed 4 and 3.  Does No. 3 appear

18  to be the same photograph of a person in W11-2?

19  A.  Yes, sir.

20  Q.  Do you know the names of those individuals?

21  A.  No, sir.

22  Q.  Can you tell the jury how it is that you came to identify

23  those individuals when you were asked to do so?

24  A.  When we lived in the Warren Inn, we were up in the very

25  top, right-hand corner, and two or three doors down, Ms.

*Davis - Direct*

1    O'Hair and her son and someone else lived in that apartment.

2    There was people in and out all the time.  These people, I

3    don't recall exactly seeing them go in and out of the

4    apartment, but you know, you just don't pay that much

5    attention all the time.

6         I remember seeing them -- you'll have to remember,

7    everybody kind of goes out the same way to the parking lot.  I

8    remember seeing them either in the parking lot or in the

9    walkway to the parking lot.

10   Q.  Can you give the jury a time frame as to when you saw them

11   during your stay?  Was it during the '95 or do you recall?

12   A.  Yes, sir, it was either in August or September of '95.

13   Q.  Now, you say you knew some individuals named Ms. O'Hair,

14   her son and another individual?

15   A.  I didn't know them.  I just -- I saw her and her son and a

16   third individual on the -- actually, on the lower floor, but I

17   knew and -- I knew three people lived in that apartment and I

18   knew she lived in that apartment, but you know, I didn't know

19   them.  I mean, I just saw her and I believe it was her son

20   with her.  And then, there was a third person, but I don't

21   recall who that was.

22   Q.  I want to show you what's been admitted as Government's

23   W1-54A, which purports to be a photograph of Madalyn Murray

24   O'Hair.  Is this the woman that you're speaking about that you

25   saw in the apartment?

*Davis - Direct*

1  A.  Yes, sir.

2  Q.  And W1-56B is purportedly a driver's license picture of

3  Robin Murray O'Hair.  Is that the other individual that you

4  saw there?

5  A.  I'm not sure about that.

6  Q.  Okay.  And how about W1-56C, which purports to be a

7  photograph driver's license picture of Jon Garth Murray?

8  A.  I think he was there.  He was with her, I think.

9  Q.  How often did you see them there and where did you see

10 them when you saw them?

11 A.  You know, I just -- you don't really pay that much

12 attention.  I recall him helping her, and somebody else

13 downstairs.  And at the time, you know, I recognized her, but

14 I didn't really put it all together.  And then, those people

15 go in and out of the apartments.  Like I said, I knew they

16 lived there.

17       Again, those apartments, it's kind of different groups

18 of people lives there.  So it's lots of usual activity, I

19 guess you might say, so I didn't think much of it when I saw

20 people go in and out.

21 Q.  Did you notice if Ms. O'Hair had to walk with some

22 assistance?

23 A.  I thought the day I saw her she had a cain, but I wouldn't

24 swear.  But that guy was helping her or something -- I don't

25 know if something had happened, she stumbled or what, he was

*Davis - Direct*

1   helping her.  And I just remember looking at her face very

2   clearly.

3   Q.  When you say "different kind of people living there," what

4   do you mean by that?

5   A.  Well, I don't mean -- it's -- you know, everybody's in

6   transition there or people are coming in to -- that's not

7   really the right thing to say.  Probably a better thing,

8   business people, I guess, come in for a week might stay there

9   or below us.  There was a couple and their granddaughter came

10  and stayed for a month while they visited their kids.

11        It's not a permanent-type residence.  You know, people

12  are moving in and out more so than you would find in an

13  ordinary apartment.  Maybe that's a better explanation still.

14  Q.  Do you remember seeing a white Cadillac vehicle parked in

15  the area during the time the O'Hairs -- that you were there?

16  A.  Yes, sir.

17  Q.  And did you also see a gray Mercedes Benz?

18  A.  I never saw the gray Mercedes.

19  Q.  Did you find anything unusual seeing that white Cadillac

20  there?

21  A.  No, sir.

22  Q.  Okay.  You just noticed it?

23  A.  I just know there was a white Cadillac in the parking lot.

24  Q.  Okay.

25  A.  You know, to give you just a quick example, while we were

*Davis - Cross*

1    there, a guy set his apartment on fire and burned up.  I mean,

2    that was just the kind of stuff that went on around there.  It

3    was different, and that was the same time they were there when

4    it got burned up, I think.

5    Q.  Do you know if your wife saw the gray Mercedes Benz?

6    A.  My wife saw the gray -- my wife used to walk around the

7    complex and she saw the Mercedes -- I wouldn't have any reason

8    to go to that part -- and she walked around, she saw it.

9    Q.  Pass the witness, your Honor.

10                        CROSS-EXAMINATION

11   BY MR. T. MILLS:

12   Q.  Mr. Davis, my name's Tom Mills.  I represent Gary Karr,

13   who's one of the individuals I believe you picked out as

14   having seen around the complex.

15   A.  Yes, sir.

16   Q.  All right.  Do you recognize him -- do you recognize

17   anybody in the courtroom as having been one of the individuals

18   that you saw there?

19   A.  I believe that's him over there.

20   Q.  All right.  Would you stand up?  That man?

21   A.  Yes, sir.

22   Q.  All right.  On how many -- let me ask you this:  Some

23   people might have recognized Madalyn Murray O'Hair from having

24   seen her in the news magazine or TV.  Did you recognize when

25   you saw this elderly lady with the cane, did you attach some

Davis - Cross

1   significance to that or --

2   A.   Just to give you a little bit of a time line, you know, it

3   jarred that, you know, I know this person, you know, but I

4   didn't really -- you know, you don't stare.  I just thought

5   that I recognized her.

6   Q.  All right.

7   A.   And then, several months later, I think is when, as I

8   recall, the Internal Revenue Service seized her furniture and,

9   maybe, her home, and it was all that stuff went to Gaston, she

10  and the auction company in Pflugerville.  Then, it was

11  sometime after that that they put in the Chapter 7, I

12  remember.

13       And Bob Sheehan said, "Did you know that the" -- and

14  Bob Sheehan's the auctioneer that had all the stuff, and he

15  said, "Did you know the O'Hairs were living in San Antonio

16  when they disappeared?"  And I said, you know, "She lived next

17  door to me."  And he thought I was kidding.  You know, he made

18  a joke of it, and I couldn't convince him.  I said, "They're

19  there.  I saw, they were there."

20       And that's in all honesty when I put it all together,

21  but I just never --

22  Q.  About how many times do you recall having seen her walking

23  around?

24  A.  Definitely once.  And again, you know, I knew where they

25  lived because I went out there with the agents, and I showed

1    the agents, you know, where they lived.  So I knew where they

2    lived, and that was the only reason I would know is either saw

3    her or her son or this gentleman going in or out.  And that's

4    -- but to say I saw her multiple times, no, you know, I don't

5    recall that.

6    Q.  Did you ever see another female going in-and-out of that

7    apartment?  It was No. 11.

8    A.  No, sir, I don't recall.

9    Q.  All right.  The man that was with her that you think was

10   Jon, was he kind of a tall guy?

11   A.  He was taller than her.

12   Q.  Okay.  And the third person --

13   A.  I mean, you know, maybe this much taller than her.  I'm

14   trying -- you know, it's been a while.  And the third person,

15   I just don't recall.  I don't remember.  I thought about that

16   about who -- it was a man, but I don't recognize him as this

17   gentleman here or either one of these or any of these other

18   people -- this other man.  I don't recall it being either one

19   of these guys.

20   Q.  Okay.  You used the phrase that you looked -- "I remember

21   looking at her face very clearly."  Okay.  Did she appear to

22   be -- to have any kind of expression on her face that alarmed

23   you?

24   A.  Oh, no, sir.  It was more of a pain expression like I

25   think -- it's, like, maybe she may have stepped wrong and they

1    were helping her or, you know, it wasn't like I didn't -- I

2    didn't ever get the sense of anything that was going on there

3    that there was any kind of problem.  I mean, it wasn't unusual

4    to see people going in and out of apartments around there.

5          So there's nothing that I would -- and I get triggered

6    by this stuff because I've been around a few unusual

7    situations before, so I'm aware of -- I think I like to think

8    I'm aware of my surroundings, what's going on.

9    Q.  All right.  There is a tennis court there or there was a

10   tennis court there, was there not?

11   A.  Yes, sir.

12   Q.  Do you ever remember seeing this man playing tennis?

13   A.  No, sir.

14   Q.  Do you remember ever seeing anybody play tennis?

15   A.  Seems like they took them out after a while.  I remember

16   the courts being there.  I don't know.  I may have --

17   Q.  How long were you there?

18   A.  Thirteen or 14 months.

19   Q.  All right.  Do you remember seeing any kind of little

20   personal items on the windowsill of 11, kind of like little

21   things that you kind of put your own identity on a place,

22   little knickknacks or anything?

23   A.  I thought there was.  In one of those apartments -- their

24   apartment was past where the stairs went down, and I went down

25   there occasionally, and not very many people did that sort of

Davis - Cross

1   thing.  But it may have been the apartment before.  They were,

2   like, the third one away from me, I think, second or third

3   one.

4   Q.  And during that period of time, there was a maintenance

5   fellow who painted the frames of the doors on the apartments

6   in the complex, was there not?

7   A.  Yes, sir.

8   Q.  And did they do that on the one you were living in?

9   A.  Yes, sir.

10  Q.  And to do that, was it necessary to open the doors so that

11  he could paint the frame?

12  A.  Yes, sir.

13  Q.  Where the frame's painted on the inside as well as the

14  outside?

15  A.  I think so.  I will say, you know, the time -- I got to

16  thinking about that.  He was -- they didn't start doing that.

17  That guy at that time that did the painting, he worked over at

18  the Pilgrim's Cleaners across the street.  He didn't start

19  working the maintenance at the apartment probably sometime

20  during the winter.  So it probably wasn't the spring until

21  they started painting those doors.

22  Q.  All right.  You don't know his name?

23  A.  No, sir, but he worked at the Pilgrim's Cleaners, and

24  then, he went from there to do maintenance there at the Warren

25  Inn.

*Davis - Cross*

1   Q.  All right.  Were you -- was there an apartment between the

2   one where you lived and the one that the O'Hairs and others

3   lived in?

4   A.  Yes, sir.

5   Q.  So you couldn't hear activity in the room?

6   A.  No, sir.

7   Q.  Did you -- of course, reading from some notes about

8   interviews with you, you went down one time to the Bonnie

9   Jean's?

10  A.  Yeah, yes, sir.

11  Q.  And it was in -- it is -- may be 100 to 200 yards down the

12  street or shopping center from the complex, the Warren Inn?

13  A.  Yes, sir.

14  Q.  And it's a pleasant-looking place from the outside, isn't

15  it?

16  A.  Looks like part of a strip center.

17  Q.  All right.  It did not turn out to be your favorite place

18  to have a beer?

19  A.  I didn't stay.  I just went in and I left.  I didn't stay.

20  Q.  Okay.  Did you ever see Ms. O'Hair in there?

21  A.  No, sir.

22  Q.  That's all the questions that I have.  Thank you.

23          MR. D. MILLS:  May I have just one moment, your Honor?

24          THE COURT:  Yes, sir.

25          MR. D. MILLS:  No further questions, your Honor.

*Davis - Cross*

1        THE COURT:  May this witness be excused, counsel?

2        MR. D. MILLS:  Yes, your Honor.

3        MR. T. MILLS:   Yes, sir.

4        THE COURT:  You may be excused.  Call your next

5   witness.

6        MR. CARRUTH:  Alice Petry, your Honor.

7        THE COURT:  Members of the jury, I've been advised by

8   Ms. Sims, we haven't had an afternoon break.  I thought we had

9   two or three, but I guess not, so I'm going to let you go for

10   15 minutes.  You can go outside, stretch around, do whatever.

11   Be ready to come back in 15 minutes.

12      (Recess.)

13        THE COURT:  I know it's right about now, members of

14   the jury, you wonder if I have a wrist watch.  I do have a

15   wrist watch, but it was Judge Capelle's birthday today, and I

16   was compelled to run up there and say happy birthday to a

17   person 20 years younger than I am.

18        So anyway, that's why there's a small delay.  You may

19   call your next witness.

20        MR. CARRUTH:  Government calls Alice Petry to the

21   stand.

22        THE COURT:  If you'll just come forward.  This is Mrs.

23   Sims.  She's going to administer an oath to you.

24      (Witness was sworn.)

25        THE COURT:  Now you need to walk, follow the Security

*Petry - Direct*

1    Officer, please.  If you'll tell us, please, ma'am, your full

2    name and spell your last.

3            THE WITNESS:  My name is Alice Petry, P-E-T-R-Y.

4        ALICE PETRY, called by the Government, duly sworn.

5                        DIRECT EXAMINATION

6    BY MR. CARRUTH:

7    Q.  Ms. Petry, would you please tell the jury where you live

8    and how you're employed?

9    A.  I live in San Antonio, Texas, and I work at a travel

10   agency.  I own a travel agency.

11   Q.  And the name of that travel agency?

12   A.  Petry Travel Agency.

13   Q.  All right.  How long have you been involved in the travel

14   agency business, ma'am?

15   A.  Thirty years.

16   Q.  And this the same location on Callaghan Road in San

17   Antonio?

18   A.  Yes, I had that location, and one on Basse Road, which I

19   have closed in the last year.

20   Q.  Okay.  Let me direct your attention back to September the

21   21st, 1995, and show you what's been marked for identification

22   purposes as Government Exhibit W47-7.  Do you recognize that,

23   ma'am, as a travel itinerary that was issued by your office

24   for a trip booked back on the date that I just mentioned,

25   September 21, 1995?

*Petry - Direct*

1    A.   Yes, I do.  I actually wrote that.

2    Q.   You did that yourself?

3    A.   Yes, I did.

4    Q.   And does that relate to a Mr. Jon Garth Murray and a Mr.

5    Conrad Johnson?

6    A.   Yes, it does.

7    Q.   We'd offer Government's Exhibit W74-1.

8         MR. T. MILLS:  No objection.

9         THE COURT:  Received.

10   Q.   (BY MR. CARRUTH) Please take that out of the envelope, now

11   that it's in evidence, ma'am, and let's talk about it a few

12   minutes.  Did you say you personally handled this transaction?

13   A.   Yes, I did.

14   Q.   And how are you able to tell us that, ma'am?

15   A.   Salesperson agent 35, that's me.

16   Q.   And do you happen to know what day of the week this might

17   have been?

18   A.   Oh, no.

19   Q.   Okay.  Can you tell me whether or not the reservation for

20   the flight was made the same day as the flight was scheduled?

21   A.   I'm sorry.  I can tell.  It was a Thursday.  He bought the

22   ticket the same day and left.

23   Q.   And was there anything unusual about that?  Is that the

24   way most folks book airline tickets?

25   A.   That's very unusual and it's a very expensive ticket.

*Petry - Direct*

1   Q.   And how much did Mr. Murray pay for those tickets?

2   A.   1177 per person, $1,177.

3   Q.   And was it scheduled for a return flight the following

4   day, September 22nd?

5   A.   Yes, it was.

6   Q.   And was that via Continental Airlines?

7   A.   Yes, it is.

8   Q.   From San Antonio to Houston and into Newark, New Jersey?

9   A.   Correct.

10  Q.   On this September 21st, 1995 with the return on the same

11  day -- the following day --

12  A.   The following day.

13  Q.   -- 22nd.  Again, the name of the parties traveling were?

14  A.   Jon Murray and Conrad Johnson.

15  Q.   And, ma'am, was this before the time that travelers on

16  airlines were required to show their photo identification to

17  prove the identity, or do you know?

18  A.   I don't think so -- I think it was already in effect.

19  Q.   You do, but you're not sure about that?

20  A.   No, I'm not.

21  Q.   Did you see any identification of either these individuals

22  or is there any identification in your file that would enable

23  you to say these individuals were who they claimed to be?

24  A.   Well, when I took the credit card, you know, there's a lot

25  of -- not very many people pay this much, you know, and so I

*Petry - Direct*

1  looked at the credit card and that is the way it read.  And I

2  asked for -- generally I don't take a credit card unless I

3  know it's the right person.

4      So I apparently wrote this just the way it was on the

5  credit card.

6  Q.  And would you read what you wrote, please, that was on the

7  credit card?

8  A.  Jon Garth Murray, SOC Separationists.

9  Q.  Society of Separationists?

10 A.  Okay.

11 Q.  Was that an American Express card that was used?

12 A.  It was an American Express, yes.

13 Q.  Okay.  So Mr. Murray paid for both tickets, correct?

14 A.  Correct.

15 Q.  And Mr. Conrad Johnson, other than the fact that he's

16 listed as another passenger, he did not do any financial

17 transactions at that time with your agency?

18 A.  No, he did not.

19 Q.  Okay.  Do you remember or have an independent recollection

20 of almost five years later of that transaction because of its

21 significance because of the large amount involved?

22 A.  Well, I don't have a personal recollection, no, but I can

23 read the information on it.

24 Q.  Do you recall whether or not Mr. Murray came in alone or

25 was he accompanied by this other individual?

1   A.   No, I couldn't tell you that.

2   Q.   And which of your two locations was this transaction?

3   A.   He came into the Basse Road office.

4   Q.   And for those of us not familiar with San Antonio, can you

5   tell me in what quadrant of San Antonio that is?

6   A.   Well, it's Northeast Alamo Heights.

7   Q.   Okay.  Alamo Heights area?

8   A.   It's actually Lincoln Heights, Alamo Heights area.

9   Q.   Okay.  And can you tell what time of day or evening or

10   afternoon this was, morning or afternoon?

11   A.   Well, the flight left at 5:00.

12   Q.   Can you tell when the tickets were purchased?

13   A.   No, I can't.

14   Q.   Sometime prior to 5:00?

15   A.   It's available -- I could go back and find out, but -- to

16   see if it was early in the day.

17   Q.   Could you do that with a phone call?

18   A.   No.

19   Q.   You're the only one --

20   A.   Well, I mean, it's not a real quick phone call because

21   they're going to have to find these '95 records, and we may

22   not have them.

23   Q.   Could you check when you go back --

24   A.   Actually, I could tell you exactly because I do have

25   microfiche.

*Petry - Direct*

1  Q.  Think we would like to know that, ma'am, if you could,

2  when you're through testifying today, if you return home,

3  maybe you could fax them.

4  A.  I could call and have them pull up the microfiche and see

5  exactly.  We do have microfiche.

6  Q.  But it's your testimony it was unusual for that large

7  amount of cash, leaving the same day the tickets were

8  purchased?

9  A.  I think so.

10  Q.  Sort of like the travelers were in a hurry to get where

11  they were going, correct?

12  A.  I would think so.

13  Q.  Had you ever done any business with Jon Garth Murray

14  before, or the Society of Separationists?

15  A.  No.  And it didn't ring a bell to me at that point, no.

16  Q.  Did these individuals just walk in off the street or did

17  they call ahead or do you remember?

18  A.  Well, I understand they called us.

19  Q.  And that's based upon --

20  A.  Yes, because -- well, I was informed that he had made a

21  phone call to us.

22  Q.  Okay.

23  A.  And that's why we were supposed to look for some -- you

24  know, we wrote a ticket for them.

25  Q.  And that's the only time you've ever handled any travel

*Petry - Cross*

1    you can recall for this particular --

2    A.  That's the only time.

3    Q.  Either of these particular individuals, Jon Garth Murray

4    or Conrad Johnson?

5    A.  That's the only time.

6    Q.  Thank you.  Pass the witness.

7                        CROSS-EXAMINATION

8    BY MR. T. MILLS:

9    Q.  You were asked by Mr. Carruth whether or not -- I don't

10   remember the exact question that he used.  He used the plural

11   individuals in your office.  Do you actually remember whether

12   or not there were -- whether there was one person, two people,

13   three people?

14   A.  No, I don't.

15   Q.  All right.  When you have been interviewed previously by

16   any law enforcement agents, have you been shown any pictures

17   of people to see if you recognize individuals?

18   A.  No, not by law enforcement agent.

19   Q.  By other people?

20   A.  Yes.

21   Q.  Who else has interviewed you?

22   A.  Well, not interviewed.  I was shown some photographs if I

23   could place anybody and I could not.

24   Q.  Okay.  What was that, by journalists?

25   A.  Yes.

*Petry - Cross*

1   Q.   Okay.  Mr. McCormmick, again?

2   A.   Possibly -- yes.

3   Q.   Speaking -- yes, ma'am.  Now, I notice that this itinerary

4   has Hotel Newark?

5   A.   Correct.

6   Q.   And it has listed the Sheraton, Tara or Tara Hotel,

7   Parsippany, correct?

8   A.   Correct.

9   Q.   And that indicates that when the ticket was purchased or

10   the tickets were purchased, that the individuals must have

11   made reservations already at the Sheraton Hotel there because

12   they knew to give you that and even the confirmation number at

13   the hotel, correct?

14   A.   I made this reservation.

15   Q.   You made the reservation while --

16   A.   They were there.

17   Q.   Okay.  Now, let me ask you, again, and I don't mean to be

18   picky, but was it really they were there?

19   A.   Well, no.  You know what?  I think they were, too, because

20   I'm looking at this and I knew to say request two beds.  You

21   know, I presume two men are going to be in this room, I guess

22   we need two beds.

23   Q.   Unless one man said I need two beds?

24   A.   He could have.  That could have happened.

25   Q.   Okay.  All right.

*Petry – Redirect*

1  A.  But that's a little bit out of the ordinary there.

2  Q.  All right.  Until you were questioned or interviewed or

3  several years later, there was nothing that caused this to

4  seem odd or unusual enough for you to attach any importance to

5  it at the time, right, other than it was an expensive ticket?

6  A.  Correct.

7  Q.  Okay.  You don't remember thinking this person or these

8  people who are buying these tickets looked like they were in

9  danger?

10  A.  No.

11  Q.  That's all the questions I have.  Thank you.

                     RE-DIRECT EXAMINATION

13  BY MR. CARRUTH:

14  Q.  Counsel asked you about this reservation that you said you

15  made at the hotel in Newark.  Can you tell us what the rate on

16  that room was, please, ma'am, for that one night?

17  A.  $125.

18  Q.  And do you normally make hotel reservations for your

19  customers, or would this have been a special request?

20  A.  No, this is pretty common.  And I also made a car rental

21  reservation for them.

22  Q.  For Budget Rent-a-Car?

23  A.  For Budget Rent-a-Car.

24  Q.  And can you tell from that what type of vehicle they

25  rented?

Petry - Redirect

1    A.   An intermediate mid-size.

2    Q.   Okay.  And they specified they wanted a room with two

3    beds?

4    A.   Yes, because that was a special request.  Generally we

5    just put in the reservation and put the credit card because a

6    guarantee at arrival, and then, as a remark, I said request

7    two beds.

8    Q.   And I believe you told us earlier that the flight left at

9    -- did you say 4:40 p.m?

10   A.   5:00.

11   Q.   And what time would it have arrived in Newark, New Jersey?

12   A.   11:14 p.m.

13   Q.   And that's why you had to confirm the late arrival?

14   A.   Correct.

15   Q.   And the return flight the next day, the 22nd, what time

16   were they scheduled to fly out of Newark?

17   A.   That was at 4:40 p.m.

18   Q.   P.m?

19   A.   Yeah.

20   Q.   And what time would they have arrived in San Antonio?

21   A.   8:52 p.m.

22   Q.   How far is your office located from the San Antonio

23   International Airport?

24   A.   Probably ten minutes.

25   Q.   Okay.  Could they not have done the same thing that your

*Coryell - Direct*

1   agency does by going directly to the airport and booking these

2   with the carrier, Continental Airlines?

3   A.  Yes, they could have.

4   Q.  Pass the witness.

5           MR. T. MILLS:  No questions.

6           THE COURT:  May this witness be excused?

7           MR. CARRUTH:  Yes, sir.

8           MR. T. MILLS:  Yes.

9           THE COURT:  You may be excused.  Call your next

10  witness.

11          MR. CARRUTH:  Call Dale Coryell, please.

12      (Witness was sworn.)

13          THE COURT:  Follow the Security Officer.  Please tell

14  us your full name and spell your last name.

15          THE WITNESS:  Dale Douglas Coryell, C-O-R-Y-E-L-L.

16          THE COURT:  Proceed.

17  DALE DOUGLAS CORYELL, called by the Government, duly sworn.

18                       DIRECT EXAMINATION

19  BY MR. CARRUTH:

20  Q.  Mr. Coryell, tell the members of the jury where you reside

21  and what your business or occupation is, sir.

22  A.  I reside at 11001 Research Boulevard.

23  Q.  And that's here in Austin, Texas?

24  A.  Yes, it is.  And it's Public Storage, mini-storage

25  facility that my wife and I manage.

Coryell - Direct

1   Q.  And how long have you been involved in the public storage

2   business, sir?

3   A.  Nine years.

4   Q.  Okay.  And that's located out on -- what's the address?

5   A.  10931, basically the same as us, as my home address.

6   Q.  Okay.  You live on the premises, then?

7   A.  Yes.

8   Q.  Let me show you what's been previously introduced as

9   Government Exhibit W55-4, and I'll ask you if that reflects

10  the Public Storage facility that you're referring to?

11  A.  No, sir.  This is the -- currently, I'm at the one on

12  Research.

13  Q.  In 1995, were you located at this one?

14  A.  Right.

15  Q.  Okay.  Now, there's been some prior testimony that the

16  unit indicated in that photograph was rented back on September

17  the 26th of 1995 by a man named Gerald L. Osborne.  Would you

18  take a look at what's been admitted as W55-1 and pull it out,

19  see if that refreshes your memory on this, please, sir?

20  A.  It's correct.  It's one of our leases.

21  Q.  Were you involved in any way in the rental of that lease?

22  A.  Yes, sir, I was in the office.  My wife actually signed

23  the lease, but I was in the office at the time the gentleman

24  came.

25  Q.  Do you remember talking to this man depicted in W11-4, who

*Coryell - Direct*

1  rented that unit?

2  A.  I couldn't say for sure.

3  Q.  Couldn't say for sure.  Do you remember where the man was

4  from?

5  A.  He indicated he was from Fort Worth area.

6  Q.  Did he indicate to you why it was he was renting that

7  storage unit?

8  A.  Said he was moving down -- they were moving down to the

9  Austin area from Fort Worth.

10  Q.  Okay.  And by that, you believe that he was going to store

11  some household goods, furniture in there; is that correct?

12  A.  That's correct, yes, sir.

13  Q.  Did you ever see that man again in or near that storage

14  unit?

15  A.  Yes, I did.  While I saw him drive in a couple of times in

16  his pickup.

17  Q.  What type of pickup was this man driving?

18  A.  It was a tan -- not sure of the make.  I think it was a

19  Chevrolet, but I'm not sure, but a tan pickup.

20  Q.  You saw him drive in and he would have had access to the

21  gate code to do that; is that right?

22  A.  That's right.

23  Q.  Saw him drive in a couple of times?

24  A.  Right.

25  Q.  And when is the next time you saw him, sir?

*Coryell - Direct*

1   A.  Well, I'm not sure, you know, two or three or four times

2   that I saw him coming in and out of the gate.  Then, I saw him

3   down at his unit one time --

4   Q.  Okay.

5   A.  -- also.

6   Q.  And on this occasion, were you driving around the grounds

7   in your golf cart, kind of checking on things?

8   A.  That's correct, right.

9   Q.  And what did you see when you encountered that unit that

10  this man from Fort Worth had rented?

11  A.  Well, the reason it had caught my attention, there was a

12  couple of pickups there, his pick up and another pick up

13  beside the unit.  And I was on the golf cart going the

14  opposite direction, and there's a slant for drainage, so I was

15  a little bit below the unit level.

16          At that time, I saw inside the unit, I saw some

17  barrels that had caught my attention because I knew that he --

18  I was assuming that he was going to store furniture, and it

19  caught my attention that there were some barrels in there and

20  I might get a little nervous when I saw things like that,

21  afraid that somebody's storing something they shouldn't be

22  storing.

23  Q.  Okay.  And is it true that your rental agreements then, as

24  they do now, prohibit the storage of any hazardous waste

25  material?

*Coryell - Direct*

1    A.  Right.

2    Q.  And were you concerned that something of an illegal nature

3    might be contained within those barrels?

4    A.  Right, or something that might leak into another unit and

5    harm somebody else's property or something.

6    Q.  All right, sir.  Did you stop to investigate or make

7    inquiry as to what the men had in the barrels?

8    A.  No, I didn't.

9    Q.  And did you recognize one of the men, at least, as the man

10   who had rented the storage unit?

11   A.  I believe so, yes.

12   Q.  And could you give us a general description of the two

13   other men that were with him?

14   A.  Well, they were Caucasian, probably in their 40s, fairly

15   -- that's about as far as I know.  One of the gentleman, I

16   noticed, I recall had had a thick head of hair.  I don't

17   really know that much, you know, other than that.

18   Q.  And do you recall how the men were dressed?

19   A.  They had, I think, just normal what you see around town,

20   jeans and shirts.

21   Q.  And do you recall whether or not -- or what type of

22   footwear the men were wearing?

23   A.  I do not.

24   Q.  Okay.  Did you exchange greetings or speak to these men?

25   A.  I think -- I'm sure I spoke to them.  I believe I just

*Coryell - Direct*

1   probably said, you know, hello, how's it going, not long

2   enough to see what was going on.

3   Q.  Do you recall in the morning or afternoon this might have

4   occurred?

5   A.  I think before lunch.  We don't open till 9:30, so it

6   could have been -- I think it was the morning, though.

7   Q.  Now, you told one of the agents when you were interviewed

8   that the barrels appeared to be oversized.  What did you mean

9   by that, sir?

10  A.  Well, it just looked to be a little bit larger than a

11  normal 55-gallon barrel.

12  Q.  Okay.  And do you recall the type of construction of these

13  barrels, what they could have been made of, or did you see

14  them that closely?

15  A.  No.  As far as I can recall, I think I was thinking that

16  they were some other material, maybe, than steel.  That they

17  might have been plastic or something else.  When I think of an

18  oil drum, I think of a closed oil drum with a bung hole on it.

19  I know these were different because or -- or at least one of

20  them is different because the lid was off.  It's the type that

21  had a ring around it.

22  Q.  Okay.  Do you happen to recall what color these barrels

23  were when you saw them?

24  A.  I thought one of them was blue.

25  Q.  Okay.  And you say there were two barrels.  Could there

*Coryell - Direct*

1  have been other barrels inside the unit?

2  A.  Sure.  There could have been things in the back of the

3  unit.  The light is not too good in the back.

4  Q.  Okay.  And what did these three men appear to be doing

5  when you drove up?  Were they unloading the barrels out of the

6  trucks in the unit, or did they appear to be taking the

7  barrels out of the unit and loading them into the trucks?

8  A.  I don't think they were doing anything with them.  One was

9  at the back of the pickup and walked over towards the other

10  ones, and I thought maybe I saw the, you know, lid popped on

11  one, leaning at a 45, or so forth.  I don't think they were

12  loading them or unloading them to my knowledge.

13  Q.  They just stood there as you drove by?

14  A.  Right.

15  Q.  And do you recall whether or not the tailgate on either of

16  the pickups was down?

17  A.  No, I don't.

18  Q.  Okay.  When was the next time that you saw any of these

19  three men again, including the man who rented the storage

20  unit?

21  A.  I don't recall.  I'm sure I probably saw one or to of them

22  again, but I don't recall.  Maybe I didn't.  I just have no

23  recollection.

24  Q.  I believe the jury heard a prior witness had testified

25  regarding your entry and exit system.

*Coryell - Direct*

1   A.   Uh-huh.

2   Q.   And just to clarify that, this required an electronic code

3   to be punched in --

4   A.   Right.

5   Q.   -- to gain entry.  And that was electronically recorded on

6   a tape like a cash register tape?

7   A.   That's correct.

8   Q.   But is it possible to tailgate someone else through

9   without having to key in the code?

10   A.   Without having the code, that's possible.

11   Q.   Have you ever seen that occur during the years you've been

12   there?

13   A.   Sure, very -- happens more than we like.

14   Q.   Do you tend to discourage that?

15   A.   Yes, sir.

16   Q.   And why is that, sir?

17   A.   Well, we want a record of who was there and who was not

18   there, and we don't want anyone on the property that doesn't

19   belong there.

20   Q.   All right, sir.  And I believe you describe this -- one of

21   these males as a working man, redneck type.  Do you stand by

22   that statement today?

23   A.   Yes -- well, I guess so.  I guess so, yeah.

24   Q.   Okay.  From Fort Worth area?

25   A.   I do, yes, sir.

*Coryell - Cross*

1   Q.  Thank you, sir.  Pass the witness.

2           THE COURT:  Any questions?

3           MR. T. MILLS:  Yes, sir.

4                   CROSS-EXAMINATION

5   BY MR. T. MILLS:

6   Q.  Mr. Coryell, my name is Tom Mills.  I represent Gary Paul

7   Karr in this case.  And I am -- have had the benefit of

8   looking at some notes of your interview in the past.  Do you

9   recall -- I know this is 1995 that we're asking you to

10  remember.

11          In addition to there being four -- three or four years

12  of time since this happened, did you attach any particular

13  significance to this event?  In other words, was this a big

14  deal back then when it happened.

15  A.  No -- well, it's just that it was out of the ordinary, and

16  I have a ten -- I like to notice things out of the ordinary.

17  And to call the EPA or something like that, no, I didn't do

18  anything if that's what you're asking.

19  Q.  Well, you were driving by in your golf cart?

20  A.  Right.

21  Q.  Let me show you what's in evidence as D7 -- whoops.

22  Defendant's Exhibit No. 8, and it's a picture of some units.

23  This one has No. 52 on it.  Is that what you're -- what the

24  unit was that you're talking about?

25  A.  Right.

Coryell - Cross

1    Q.  All right.  I'm putting my forefinger on it.

2    A.  Okay.

3    Q.  All right.  So when you drove by in your golf cart, were

4    you able to look directly into the storage unit or were you at

5    an angle?

6    A.  I would be able to look directly into it.  There was a

7    pickup setting there, though, that I could look directly into

8    the unit.

9    Q.  All right.

10   A.  It was a little lower -- I was a little lower than the

11   floor of the unit because of the drainage area.

12   Q.  Was the -- were there two pickups there?

13   A.  Yes.

14   Q.  And one was tan and you don't remember the color of the

15   other one?

16   A.  I think it was a medium blue.

17   Q.  Medium blue.

18   A.  Or white, maybe two-tone white top.

19   Q.  All right.  And were they parked -- was the door raised?

20   A.  Yes.

21   Q.  All the way up?

22   A.  Yes, sir.

23   Q.  And were the pickup trucks parked side-by-side or in the

24   end?

25   A.  In the end.

*Coryell - Cross*

1   Q.  But you could see over the back of the pickup truck to the

2   back of the storage unit?

3   A.  I sure could.

4   Q.  All right.

5   A.  One of the pickups was not fully blocking it either.

6   Q.  All right.  And as I recall, the golf carts there don't go

7   real fast.

8   A.  That's true.

9   Q.  So you drove by, made your observations.  Did you stop?

10  A.  I could have but not -- you know, let off on the gas well

11  enough to say hello and greet the gentlemen and --

12  Q.  But you didn't make specific inquiry like, "Hey, Bud, what

13  you got in the barrels?"

14  A.  No, I did not.

15  Q.  And -- do you recall that barrel that the men appeared to

16  be between 45 and 55?

17  A.  Could be.

18  Q.  Do you recall that one of the men had a lot of black

19  wind-blown hair?

20  A.  Yes, I do recall that.

21  Q.  Do you recall this man as being one of the men there?

22  A.  I could not say for sure.

23  Q.  All right.  You'll agree that at least at this point, he

24  does not have black hair, it's gray?

25  A.  I agree with that.

*Coryell - Cross*

1   Q.  All right.  Looking at Government Exhibit W11-5,

2   parenthesis 4, this is just a side picture of a man, but from

3   the side view, can you tell if that man appears to be someone

4   that was there?

5   A.  I couldn't tell.

6   Q.  Okay.  Do I understand -- tell me again where the barrels

7   that you saw were.

8   A.  They were over to the -- looking into the unit from my

9   vantage point, they would be on the left-hand side, left-hand

10  side of the unit.

11  Q.  All right.

12  A.  About probably two or three feet inside the door.

13  Q.  All right.  And you recall that one of them, you think,

14  was blue?

15  A.  (Moving head up and down.)

16  Q.  Yes?

17  A.  Yes.

18  Q.  And you don't recall whether the other one -- you don't

19  recall what color the other one was?  No?

20  A.  I don't recall how many they are.  It was two or more.

21  Q.  All right.  There may have been half a dozen?

22  A.  It's possible.  I doubt it.  There's limited space in

23  there.

24  Q.  Well, there may have been three or four?

25  A.  Could have been.

*Coryell - Cross*

1  Q.  Okay.  And -- you don't remember if all the barrels -- or

2  maybe you don't remember.  Did you get a good enough view to

3  know that all of them were exactly the same kind of barrel or

4  container?

5  A.  No, I didn't.

6  Q.  Let me show you a photograph and ask you if this kind of

7  container might have been one of the kinds of containers?

8  A.  No, I don't recall seeing anything like that.

9  Q.  All right.  Does the storage facility have the right to go

10 in there and when the tenant is locked up, when the property's

11 locked up, unit's locked up and use the key to examine what's

12 in there?

13 A.  No.

14 Q.  Do you happen to remember how long that particular storage

15 unit No. 52 was leased by this man who said he was from Fort

16 Worth?

17 A.  No, I don't.

18 Q.  Do you ever remember going into unit No. 52 on any other

19 occasion in 1995?

20 A.  In 1995?

21 Q.  Yes.

22 A.  Sure.  I cleaned it for the men who rented it and I

23 cleaned it after they left.

24 Q.  Do you remember if that man left in 1995?

25 A.  No, I'm not positive.  I think so.

*Coryell - Redirect*

1  Q.  Do you remember there being a giant amount of -- a giant

2  amount or less, any amount of what appeared to be blood stains

3  on the floor of the unit?

4  A.  No.

5  Q.  That would be something you probably would remember,

6  wouldn't it?  Catch your attention?

7  A.  Well, blood stains could turn dark, and I wouldn't know it

8  as a blood stain.  I mean, I don't think I would.

9  Q.  Well, do you remember any dark stains in that unit when

10  you cleaned it up?

11  A.  Sure.  That place was built in 1982, so there had been

12  stains over the years.  There had been people moving in and

13  out.  It's not uncommon.

14  Q.  All right.  That's all the questions I have.  Thank you,

15  sir.

16                    RE-DIRECT EXAMINATION

17  BY MR. CARRUTH:

18  Q.  When you clean out those storage units, do you use Clorox

19  Bleach?

20  A.  No, I don't.

21  Q.  Is it uncommon for a tenant to clean out their own storage

22  unit before it's returned at the conclusion of the rental

23  period?

24  A.  Is it uncommon?

25  Q.  Yes.

*Coryell - Redirect*

1    A.   Yes.   Occasionally, somebody might sweep one, but not very

2    often.

3    Q.   So normally, you have to go in and clean up after them.

4    A.   (Moving head up and down.)

5    Q.   Do you recall whether this particular unit 52 was already

6    cleaned when you went in there?

7    A.   If I recall correctly, it was clean.

8    Q.   It had been cleaned.   Now, can you tell us a little bit

9    more about this tan pickup?   Was it old or new?

10   A.   A newer one.

11   Q.   A newer tan pickup?

12   A.   Nearly three-quarter ton, fairly good size.

13   Q.   What about the other truck?   Was it a old or newer truck?

14   A.   I recall it to be an older, two-tone, blue and white top,

15   older.

16   Q.   Now, counsel asked you to have his client stand up and

17   take a look at his hair, which is mostly gray now.   Take a

18   look at W11-2, the way he appeared back in 1995.   Does the man

19   depicted there have black wind-blown hair?

20   A.   Similar hair.

21   Q.   Similar hair.   Would you hold that up and show it to the

22   jury, please?   And how about this man in W11-3?   Does he

23   appear to have black, wind-blown hair?

24   A.   I recall it being bushier than this.

25   Q.   Bushier than this, more like the first one you held up?

*Coryell – Redirect*

1  A.  Yes, sir.

2  Q.  Okay.  And how about this photograph here, W11-14?  Do you

3  recognize any of the individuals in that photograph?

4  A.  I couldn't say.

5  Q.  Okay.  Thank you, sir.  Pass the witness.

6       MR. T. MILLS:  Can I see the picture of Mr. Karr?  I

7  don't have any other questions of this witness.

8       THE COURT:  May the witness be excused?

9       MR. CARRUTH:  Yes, your Honor.

10      MR. T. MILLS:  I would like him to be on call.  I

11  might have some other questions when we get another

12  photograph.

13      THE COURT:  Plan on being here next week.

14      THE WITNESS:  There's some doctors appointments.  I'd

15  be leaving town.

16      THE COURT:  What they're saying is they're not

17  releasing you, but I didn't want to keep you down here at the

18  courthouse.  If they need you, do they have your telephone

19  number?

20      THE WITNESS:  Yes, sir.

21      THE COURT:  They can call and you'll come in?

22      THE WITNESS:  Yes, sir.

23      THE COURT:  All right.  You may be excused for the

24  day.

25      MR. CARRUTH:  Your Honor, I'm advised Ms. Petry of

Petry - Redirect

1  Petry Travel Agency is back with the time of the reservation

2  that she promised us.  If we could recall her at this time.

3          THE COURT:  Ms. Petry, if you'll come up and take your

4  seat, ma'am.  State your name again, please.

5          THE WITNESS:  Yes, Alice Petry.

6          THE COURT:  You remain under oath.

7                    RE-DIRECT EXAMINATION

8  BY MR. CARRUTH:

9  Q.  Ms. Petry, you left the courtroom a few moments ago and

10 indicated you were going to attempt to make a phone call and

11 try to find out what time the airline reservations were made

12 on September 21st, 1995 for the flight from San Antonio to

13 Newark, New Jersey by Mr. Jon Murray and Conrad Johnson.  Have

14 you been successful in doing that?

15 A.  Yes, I did.

16 Q.  And can you tell us, please, what time the reservations

17 were made in your office?

18 A.  At 2:42.

19 Q.  2:42 p.m?

20 A.  Yes.

21 Q.  For a flight that left just before 5:00?

22 A.  At 5:00.

23 Q.  Thank you.  Pass the witness.

24         MR. T. MILLS:  No questions.

25         THE COURT:  You may be excused at this time.

*Wilson - Direct*

1          MR. D. MILLS:  Penny Wilson, your Honor.

2          THE COURT:  This is Mrs. Sims.  She's going to

3    administer an oath to you, ma'am.

4        (Witness was sworn.)

5          THE COURT:  Follow the Security Officer.  If you'll

6    tell us your name, please, ma'am, and spell your last name.

7          THE WITNESS:  Yes, Penny Wilson, W-I-L-S-O-N

8        PENNY WILSON, called by the Government, duly sworn.

9                        DIRECT EXAMINATION

10   BY MR. D. MILLS:

11   Q.  Would you tell the jury where you live, ma'am, and how

12   you're employed, please?

13   A.  I live in Austin, Texas.  You need the address?

14   Q.  That's fine.

15   A.  Okay.  And I'm employed at Don Wilson Jewelers, Burnet

16   Road.

17   Q.  And what do you do in the -- in that employment?

18   A.  Just a little of everything.

19   Q.  So are you a jeweller by trade?

20   A.  No.  I do sales, bookkeeping, stringing of beads, taking

21   in watch repair, jewelry repair.

22   Q.  How long have you been in that business?

23   A.  Twenty-five years, as of April 1st.

24   Q.  There's a document in front of you with a bunch of

25   invoices.  Are you familiar with those?

*Wilson - Direct*

1   A.   The blue job envelopes?

2   Q.   Yes, ma'am.

3   A.   Yes, sir.

4   Q.   And could you tell the Court Reporter and the jury the

5   exhibit number that's on that?  W --

6   A.   Okay.  The first one is 25 --

7   Q.   No.  On that envelope that says Government's Exhibit --

8   A.   I'm sorry, yes.

9   Q.   You could take it out.  That's all right.  I'm going to

10  ask you about it.  But what's the exhibit number on the

11  envelope, the glassine envelope that it was contained in?

12  A.   W59-1.

13  Q.   Okay.  And you've seen the documents that are in your

14  hand; is that correct?

15  A.   Yes, I have.

16  Q.   And they're your business records from your jewelry store?

17  A.   Yes, sir.

18  Q.   We'd offer W59-1, your Honor.

19       MR. T. MILLS:  No objection.

20       THE COURT:  Received.

21  Q.   (BY MR. D. MILLS) Could you tell the jury what those

22  pieces of paper are and then, we'll go through each one of

23  them.

24  A.   Yes.  We take in watch repairs and these are the envelopes

25  we put the items in.  And, like, this one says "Rolex," which

*Wilson - Direct*

1   is the name of the watch that was taken in, and we describe

2   them.  And this was the -- it also tells what was done to the

3   watch at the time it was being serviced.

4   Q.  And you have a form number on the first one.  I believe

5   it's form No. 2591; is that correct?

6   A.  Yes, sir, that's correct.

7   Q.  And would you tell the jury the date that that watch was

8   taken in for repair?

9   A.  Okay.  It looks like 12-26-89.

10  Q.  And the owner of the watch is listed?

11  A.  Jon Murray, and it has, also, O'Hair written on there.

12  Q.  Do you know what type of Rolex watch it was?

13  A.  Yes.  This one -- it looks like the X was on the lady's

14  and it was a steel and gold.

15  Q.  Now, I also place three other envelopes up there in front

16  of you.  Now, you could put that down for just a minute.

17  Would you read the number -- look at 3 and see if you can --

18  if you know the persons depicted in those driver's license

19  photos.

20  A.  Yes.

21  Q.  And the first one is the photograph of?

22  A.  Madalyn Murray O'Hair.

23  Q.  And the exhibit number?

24  A.  Is W1-56-A.

25  Q.  All right.  And the next one?

1    A.   This is Robin Murray.

2    Q.   And it's -- the exhibit number?

3    A.   W1-56B.

4    Q.   And then, the last one?

5    A.   Is Jon Murray.

6    Q.   The exhibit number?

7    A.   It's W1-56C.

8    Q.   And you were familiar with these people; is that correct?

9    A.   Yes, sir, they were customers.

10   Q.   Okay.  Now, the next blue form is No. 2664; is that

11   correct?

12   A.   Yes, sir.

13   Q.   And --

14   A.   This is --

15   Q.   Go ahead.  You can say --

16   A.   Madalyn Murray is on this one.  Again, it's a Rolex.  It's

17   a lady's steel and gold.

18   Q.   And the date?

19   A.   The date on this one is 9 -- looks like 9-10-96.

20   Q.   Okay.  And then, the next one?

21   A.   Is job No. 3173 and it has Robin O'Hair Murray on it, and

22   the date on it was 6-19-91, and it was a Rolex, lady's Rolex.

23   It was not checked, but I'm sure -- I know from my previous

24   records it was a steel and gold, also.  Do you want the next

25   one?

*Wilson - Direct*

1   Q.   Yes.

2   A.   3459 is Robin O'Hair, a Rolex, and the date on that is

3   8-11-90 and it was a lady's.  It was a come back.  And the

4   next one is 3465, M. O'Hair, and it was a lady's Rolex, steel

5   and gold, and the date on this one is 6-23-90.

6   Q.   And the next one?

7   A.   Is 3707, and the date on that was 8-26-91, again, a lady's

8   Rolex.

9   Q.   Okay.

10  A.   And then, the next one is 3708, Robin O'Hair, 8-26-91,

11  lady's Rolex.

12  Q.   And the next one?

13  A.   3981, Robin O'Hair, it was -- I'm not quite sure of the

14  date.  It looks like 11-26.  There was no year put on there,

15  and it was a lady's Rolex.

16  Q.   I believe it's the last one.

17  A.   The last one is 4433, Jon Murray, and it was 12-16-92, and

18  it was a man's Rolex, gold, 18-karat gold.

19  Q.   And do you know the approximate value of these watches?

20  A.   Approximate because at the time we were not actually

21  carrying the watches, but on the dates from -- I think they

22  dated around in the late '80s, on the lady's steel and gold

23  would probably be $2500, and John's -- I know John's was a

24  Gentleman's Presidential 18-karat gold because I checked on

25  here and I did this one, probably between 6 to $7,000.

*Wilson - Direct*

1   Q.  That's for the man's --

2   A.  That's for the man's.

3   Q.  -- watch?  Okay.  And then, the value of the ladies'

4   watches?

5   A.  Probably $2500 at that time.

6   Q.  The form No. 3708, which is about the seventh item in the

7   package, is it -- work on more than one watch?

8   A.  No.  We try to always -- no.  It would just be one.  It

9   was probably next to the watch that was repaired prior because

10  it's got "come back," "CB," which means come back.

11  Q.  Do you have some type of a log that you keep --

12  A.  Yes.

13  Q.  -- that corresponds with that?

14  A.  Yes, sir.

15  Q.  Did you bring that along?

16  A.  Yes, sir, I did.

17  Q.  Okay.

18  A.  I've got it right here.  I do have that.  I think you may

19  have copies, also.

20  Q.  Is the handwritten like --

21  A.  Yes, it's handwritten.

22  Q.  -- like these?

23  A.  Uh-huh.

24  Q.  And can you find these various entries in there?

25  A.  Yes.

1  Q.  Can you find the first one, which was, I believe, 2591, I

2  believe, is that the first one?

3  A.  That was the first one.  That was in 12 of '89, it looks

4  like.  The pages are not in order.

5  Q.  And on your handwritten notes, it shows it being --

6  A.  It was taken in on 12-26 of '89.

7  Q.  Okay.

8  A.  And it corresponds with the No. 2591, and it's under Jon

9  Murray.

10  Q.  Okay.  And then, would you --

11  A.  It was a two-tone.  There's a double T, meaning a two-tone

12  Rolex.

13  Q.  And then, would you find the next one of 2664 in your

14  handwritten notations?  It's probably on the sixth page of

15  your --

16  A.  Yeah, I may not have mine in order.

17  Q.  Okay.  Let me show you this one.

18  A.  It might be -- if you know the date at the top.

19  Q.  Does this appear to be your same handwriting?

20  A.  Yes, same page.  I should have marked them.

21  Q.  Here it says --

22  A.  26.

23  Q.  -- 2664?

24  A.  Yes.

25  Q.  What does it show?

*Wilson - Direct*

1   A.  9-8-90.

2   Q.  What was the date on that that you earlier said?  Was

3   it --

4   A.  9 -- I thought it was 9-10.  It may be 9-20.  It's kind of

5   smeared because this is a bottom copy.  Sometimes the last

6   copy doesn't always come out.

7   Q.  Did you originally say or did I just misunderstand you

8   said it was September 10th of 1996?

9   A.  Yes, sir, but it's not --

10  Q.  So it is --

11  A.  It is 9-20 of '90.

12  Q.  And it follows in the sequential order that these numbers

13  flow, does it not, in your handwritten notes?

14  A.  Yes, uh-huh.

15  Q.  So I'm asking you the question, when you were given the

16  date of 1996 was not accurate; is that correct?

17  A.  That's correct, 6-62.  It would be 9-20 of '90.  Sometimes

18  the bottom copy, which this would be the last in carbon, does

19  not always come out.

20  Q.  To your knowledge, did the O'Hairs -- any of the three

21  that you've identified in those driver's licenses, did they

22  have more than one Rolex watch?

23  A.  Not that I know of.  I know Jon had the President and

24  Madalyn and Robin each had a Rolex.

25  Q.  Is there a distinctive feature about a Rolex Presidential

*Wilson - Direct*

1   -- President's watch?

2   A.   Yes.

3   Q.   And could you tell the jury what that distinctive feature

4   is?

5   A.   They're 36 millimeters in size and they are an 18-karat

6   gold, and they're fairly heavy watches.  They have a date at

7   the top -- or the day of the week at the top, and then, at the

8   three, they have the date.

9   Q.   Do -- does the face of the watch come in different colors?

10  A.   They do come in different colors.  And that, I don't

11  remember.

12  Q.   You don't have any indication what that was --

13  A.   No, sir.

14  Q.   -- on that one?

15  A.   I don't know if it would have been on the back of the

16  watch repairs.  Sometimes we do make comments on the back, but

17  it's not on this one.

18  Q.   Okay.  Pass the witness, your Honor.

19          MR. T. MILLS:  No questions.

20          MR. D. MILLS:  Call Corey Ticknor, your Honor.  And

21  this witness may be excused.

22          THE COURT:  You may be excused.  Come right up,

23  please.  This is Ms. Sims.  She's going to administer an oath

24  to you.

25      (Witness was sworn.)

Ticknor - Direct

1        THE COURT:  Follow the Security Officer.  Tell us your

2   full name, please, sir, and spell your last name.

3        THE WITNESS:  Corey T. Ticknor.  Last name is spelled

4   T-I-C-K-N-O-R.

5     COREY T. TICKNOR, called by the Government, duly sworn.

6                        DIRECT EXAMINATION

7   BY MR. D. MILLS:

8   Q.  Where do you reside?  How are you employed?

9   A.  I'm the owner of Corey's Fine Jewelry in San Antonio,

10  Texas, and I reside at 20121 Helotes Creek, in Helotes, Texas.

11  Q.  And what do you do for a living?

12  A.  I'm a jeweller and a coin jeweller -- or jeweller and a

13  coin salesman.

14  Q.  Can you tell the jury how long you've been in that

15  business and how it was that you came to be in that business?

16  A.  I've been a jeweller for approximately 20 years.  And in

17  1980, I got out of the military and worked as a security guard

18  for eight months.  And in those eight months, I worked for a

19  coin and jeweller in San Antonio.

20  Q.  And then, after serving the business?

21  A.  For eight months.  Then, I went back in the military for a

22  short period of time, and then, I got out and went ahead and

23  was hired by one of the jewelry companies in San Antonio.

24  Q.  What branch of the military were you in?

25  A.  Marines.

*Ticknor - Direct*

1   Q.  Do you have any law enforcement background relative to

2   being in the military?

3   A.  Yes, sir, I was an MP, or military policeman, in the

4   Marines.

5   Q.  For what period of time?

6   A.  From 1976 to 1983.

7   Q.  So how long have you owned your fine jewelry and rare coin

8   business now?

9   A.  I opened it up in November of 1994.

10  Q.  Did you bring some of your business records with you?  Do

11  you have them up there?

12  A.  Yes, sir.

13  Q.  I'm going to direct your attention back to September of

14  1995, and ask if you recall a coin transaction where you were

15  asked to purchase approximately $600,000 worth of coins?

16  A.  Yes, sir.

17  Q.  And I met you for the first time this afternoon outside,

18  and we talked about -- or maybe this morning -- about five or

19  ten minutes; is that correct?

20  A.  Yes, sir.

21  Q.  And went over your business records?

22  A.  Correct.

23  Q.  And can you tell the jury, if you recall, from looking at

24  your business records when this contact occurred relative to

25  the $600,000 transaction that we're going to discuss in some

1  detail?

2  A.  Around the middle of September, I believe it was.  A

3  gentleman called me on the phone and asked if I was capable of

4  selling him $600,000 worth of gold.

5  Q.  And the year that we're talking about will be?

6  A.  1995.

7  Q.  All right.  And you responded?

8  A.  I said, yes, sir, I was capable of selling him that amount

9  of gold, but he'd need to pay for it in advance.

10  Q.  And can you tell the jury what type of transaction you

11  would require, in turn, before you would engage in whatever

12  you needed to do to acquire that amount of coin?  What did

13  this individual have to do relative to providing security, if

14  any, before you would go purchase those coins?

15  A.  What I told him was that he would need to wire the money

16  into my account or make a deposit into my account.  That way,

17  it would secure the amount that he wanted purchased; then, I

18  would go ahead and purchase it for him.

19  Q.  After this initial phone call, how did you contact the

20  individual who had called you?

21  A.  I called him on his mobile phone.

22  Q.  And do you recall the number that you called?

23  A.  I have it here in my records.  Area code 512-461-4478.

24  Q.  And does your list -- do you have your phone bills there

25  with you?

*Ticknor - Direct*

1    A.   Yes, sir.

2    Q.   Can you tell when your phone bill indicates your first

3    phone call was made to that cell phone number?

4    A.   September the 20th.

5    Q.   What is the phone bill that you're looking at -- what is

6    the date that's indicated that's contained in that bill?  From

7    what time period to what time period?

8    A.   From September the 1st to September the 28th.

9    Q.   Can you see if there was -- so you began calling him on

10   the 20th; is that correct?

11   A.   Yes, sir, I believe he contacted me the previous week and

12   was asking if I was capable of doing the transaction.

13   Q.   Okay.  I want to show you what's been marked for

14   identification as Government's W57-1, and ask if these are

15   copies of your original business records that you brought?

16   A.   Yes, sir.  Here I have a notebook that I jot down notes

17   in, and the --

18   Q.   Before you answer, those are -- you've looked at those

19   documents before; is that correct?

20   A.   Yes, sir.

21   Q.   And those are true and accurate copies of your --

22   A.   Correct, I have the originals in my possession.

23   Q.   We'd offer 57-1.

24        MR. T. MILLS:  No objection.

25        THE COURT:  Received.

*Ticknor - Direct*

1  Q.  (BY MR. D. MILLS) Would you tell the jury what the first

2  payment is you were beginning to do as it relates to this

3  particular transaction?

4  A.  The first page that I'm looking at or the first top part

5  I'm looking at is -- I believe the gentleman indicated that he

6  wanted a mix of coins.  What I'm referring to is I have 550

7  AEs, which stands for American Eagles, 550 MLs, or Maple

8  Leaves, and 480 -- 408 Krugerrands.

9  Q.  And if I show you this -- what's been admitted as

10  Government's 57-2, does -- do you see this?

11  A.  Yes, sir.

12  Q.  And do these depict the Maple Leaves -- describe the

13  coins.

14  A.  The Canadian Maple Leaves, one-ounce American Eagle, and

15  the South African Krugerrands.

16  Q.  That's the kinds you indicated you were going to purchase,

17  correct?

18  A.  Correct.

19  Q.  Did you specify that or did someone else specify that?

20  A.  No, sir.  He requested it.

21  Q.  Did there come a time when you acquired a driver's license

22  number for the individual that you were talking with?

23  A.  Yes, sir.  What I usually do is just to verify before I --

24  his identity.  What I did is I went ahead -- I believe when I

25  met the gentleman, I went ahead and notated driver's license,

*Ticknor - Direct*

1  and I believe that this would have been the driver's license

2  number of the gentleman.

3  Q.  And I'm showing you what's been admitted as W1-56C, which

4  is the driver's license of Jon Garth Murray.  And you see the

5  number that's on this driver's license number, does it

6  correspond with the number that you wrote down?  Take your

7  time and find it.

8  A.  I remember I jotted down -- I wrote down a 06434693, yes,

9  sir.

10  Q.  So it's the same as this driver's license that's been

11  previously admitted as Mr. Murray's driver's license, correct?

12  A.  Correct.

13      MR. T. MILLS:  May I see where that driver's license

14  number is?

15      MR. D. MILLS:  This is on another piece of paper that

16  he's got.  I don't think it's contained in yours.

17  Q.  (BY MR. D. MILLS) This document that you're reading off

18  of, did you record that writing at the time that you made the

19  phone call and had him give you the phone number?  Was that

20  prepared at the same time?

21  A.  The question, please?

22  Q.  Okay.  More artfully, maybe.  You wrote that driver's

23  license number down on that piece of paper at the same time

24  you were talking to the individual who was giving it to you,

25  back in September of 1995; is that correct?

*Ticknor - Direct*

1   A.  I believe so.

2   Q.  Okay.  Now, you have some -- do you have some more

3   information on the first page of that exhibit?  Not the yellow

4   pages but the one with the glassine envelope, that one, that

5   relates to this transaction?

6   A.  Yes, sir.

7   Q.  And could you tell the jury what the other information is

8   that's in your handwriting?

9   A.  Yes, sir.  I wrote down Mr. Murray's number -- correction.

10  Mr. Murray's name, Jon Murray, his telephone number where I

11  could reach him at, and, also, this is dated from 10-9,

12  October the 9th, 10th, 11th, 12th, and the 13th, 16th, 17th,

13  19th and 23rd.  These are the days after Mr. Murray picked up

14  the coins.  I attempted to contact him and told him when he

15  had originally picked up the coins, he picked up a large

16  percentage of them but not all of them.

17          And when the remainder arrived, I attempted to contact

18  Mr. Murray and let him know that the rest of the coins were

19  in.

20  Q.  So the original pick-up occurred when?

21  A.  The original pick-up was 9-29.

22  Q.  I believe you have copies.  I'm going to use the copy

23  that's admitted and reference you to different things, and we

24  could do this, maybe, a little faster.  You're looking at that

25  piece of paper that says invoice 423, does it not?

*Ticknor - Direct*

1   A.   Correct.

2   Q.   And it shows that this shipped to Jon Murray; is that

3   correct?

4   A.   Yes, sir, Mr. Murray picked up 550 American Eagles, 206

5   Maple Leaves and 408 Krugerrands.

6   Q.   Okay.  And before that occurred, there's some bank

7   documents, if you'll look in yours, that show statement of

8   activity.  Are you familiar with those?

9   A.   Yes, sir.

10   Q.   Can you tell the jury when money was wired into your

11   account and what account it was wired into from the documents

12   that you have there?

13   A.   September 22nd, $600,000 was wired into my checking

14   account.

15   Q.   Does it say the origin on the wire transfer?  See where it

16   says O-R-G?

17   A.   Yes, sir.

18   Q.   And who does it say the originating party of the wire is?

19   A.   United Secularists of America.

20   Q.   And does it say from which bank it was coming?

21   A.   From National Westminster Bank of New Jersey.

22   Q.   And then, once you received the money, what did you do

23   with it?

24   A.   Once I completed the -- or completed the transaction with

25   Mr. Murray, I went ahead and wired the amount due to my -- the

*Ticknor - Direct*

1   people that I was purchasing the gold from, which is the

2   Equity Bank in Dallas, who is the banker for Dillan Gage

3   Precious Metals in Dallas.

4   Q.  And how much did you wire of the 600,000 to them?

5   A.  $591,991.70.

6   Q.  And the difference between the amount wired and the

7   600,000, is that basically your profit or is it some other --

8   A.  It's my profit, sir.

9   Q.  All right.  And then, there's another document -- it's

10  about the -- little further behind.  It says Dillan Gage

11  Metals Division.  Can you tell the jury what that is?

12  A.  Yes, sir.  When I buy the gold, if I don't have the gold

13  on hand, then I go ahead and purchase it from a broker, and

14  Dillan Gage is a broker in Dallas, and I bought the gold from

15  them.

16  Q.  Okay.  Then, we have some dates referencing Online Safe

17  Box History Systems; is that correct?

18  A.  Yes, sir, this is my safe deposit box.

19  Q.  And where is this safe deposit box located?

20  A.  There is a Frost Bank, which is located several blocks

21  from my office, and the gold was arriving, delivered by the

22  Post Office.  And to ensure security, I went ahead and rented

23  a safety deposit box and was taking the gold, as it

24  accumulated, down to the safety deposit box.

25  Q.  Okay.  These are your telephone tolls, basically, that you

*Ticknor - Direct*

1   referred to earlier, showing your phone contact with Mr.

2   Murray's cell phone, is that correct --

3   A.  Correct.

4   Q.  -- last?

5   A.  Yes, sir.

6   Q.  Now, tell the jury, if you will, please, when Mr. Murray

7   came to pick up the gold.

8   A.  It was a Friday afternoon and on the 26th of September --

9   correction, 29th of September, and Mr. Murray had called the

10  day before and requested if he could pick up the gold that had

11  arrived and would like to pick it up on a Friday afternoon.

12  Q.  And at that time, you had accumulated how much of the

13  gold?

14  A.  At that time -- by that time, I'd accumulated 500,000 of

15  the 600,000 that was originally purchased.

16  Q.  So what arrangements did you make for him to pick up this

17  gold?

18  A.  I went ahead and reserved a conference room at the bank,

19  which is a secure location, and I reserved a conference room,

20  and I met Mr. Murray at the Frost Bank.

21  Q.  Did you have anyone there with you?

22  A.  Yes, sir, I had -- I hired a San Antonio Police Officer to

23  provide security for the transaction.

24  Q.  Was anyone with Mr. Murray?

25  A.  No, sir.

1   Q.   Y'all met in the lobby at the bank; is that correct?

2   A.   We met in the parking lot right outside the bank and

3   walked with Mr. Murray inside the bank.

4   Q.   And once inside the bank, where did you go?

5   A.   The bank is kind of like a two-story building, and the

6   lower floor is where they have the safety deposit box.  So we

7   went to the safety deposit box, picked the gold up, put it on

8   a cart, because it was heavy, and took the elevator to the

9   second floor, where the conference room was located, went in

10  the conference room and counted the gold.

11  Q.   Tell the jury what the process is of counting the gold.

12  A.   Mr. Murray at that time picked up approximately 1200

13  ounces of gold.  It's about 100 pounds of gold.  And the way

14  they come is they come in these little tubes, little small

15  tubes, and they come anywhere from 10, 15, or 20, or 25 coins

16  in a roll.  And what we did is we sat down and we counted out

17  and checked each roll, made sure, verified the amount of coins

18  that were in there and then, initialed the top of the tube.

19  Q.   Do the three different coins that are depicted that you

20  purchased, do they weigh different amounts and thus, have

21  different value?

22  A.   Slight -- well, the values are approximately the same.

23  They all contain one-ounce gold, but the Maple Leaf is

24  24-karat pure gold, which means it weighs 31 grams, and the

25  other two are 22-karat gold, but they contain one ounce and

*Ticknor - Direct*

1   ten percent of alloy; so they're slightly heavier but very

2   little.

3   Q.  So it took you how long to do this accounting process?

4   A.  Approximately 45 minutes to an hour.

5   Q.  And what physical proximity were you to Mr. Murray?

6   A.  He was relatively close to me, within -- it was a

7   conference table, an oval-shaped conference table, and he was

8   pretty much close, next to me.  So he would -- I would count

9   them, he would count them, and we put the rolls down to the

10  end of the table that were both verified by he and myself.

11  Q.  Was he as close to you as I was when I was standing by

12  that column there?

13  A.  Yes, sir.

14  Q.  Did you notice anything about his personal hygiene and his

15  physical appearance in terms of his dress?

16  A.  He was -- he had kind of a scraggly beard and he was a

17  little ripe.  I guess it's kind of like you've been outside in

18  the heat in Texas.  So he was a little bit ripe.  And his

19  shirt was like a short-sleeve white shirt and a tie and blue

20  pants, but the shirt was kind of wrinkled.

21  Q.  Did he give the appearance of having been slept in?

22  A.  It's possible.  It looked like it was -- like a shirt that

23  hadn't been ironed.

24  Q.  After you got through counting the money in determining, I

25  guess, satisfying both sides that it was roughly $500,000

1  worth of coins, what did you do then?

2  A.  Mr. Murray had come in with a -- kind of like an airport

3  dolly, kind of like what's right there.  It's got wheels on

4  it, and you could see them in the airport all the time.

5  They're kind of like a little long rectangular suitcase, and

6  we put the gold in boxes, the tubes in the boxes.  And little

7  boxes were, like, six-by-six.  They come -- that's the way the

8  Post Office or the way they're shipped.  And we put those in

9  the light suitcase, and then, we put it on a dolly, and we

10  rolled it out to his car and put the gold in the trunk of his

11  car.

12  Q.  What type of vehicle did you put them in?

13  A.  To the best of my recollection, I believe it was, like, a

14  blue Lincoln Towncar.

15  Q.  So did you watch him drive off?

16  A.  Yes, sir, I did.

17  Q.  Did you see any other event -- any other individuals

18  approach him at the time he was driving off, getting in the

19  vehicle with him, anything of that nature?

20  A.  No, sir.

21  Q.  How long after this -- I believe you said it was the 29th.

22  How long after that did you accumulate -- before you

23  accumulated the other $100,000 worth of coins?

24  A.  Monday morning.  Mr. Murray picked them up on Friday, and

25  the balance of the gold came in on Monday.

*Ticknor - Direct*

1  Q.  And what did you do then?

2  A.  That's when I attempted to contact Mr. Murray for the next

3  couple of weeks.

4  Q.  And your phone records indicate you made how many attempts

5  to call him and the last attempt being?

6  A.  I called Mr. Murray nine days straight.  I called him on

7  the 9th, 10th, 11th, 12th 13th, 16th, 17th, 19th and 23rd, and

8  the last attempt was on the 23rd of October.

9  Q.  And you never heard from the individual again?

10  A.  No, sir.

11  Q.  What ultimately happened to the other $100,000 worth of

12  coins?

13  A.  I turned them over to the IRS.

14  Q.  Did you turn them over to this gentleman, Mr. Martin?

15  A.  To Mr. Martin, yes, sir.

16  Q.  And do you also have some records showing that no one else

17  -- where the coins were stole -- how many times did you enter

18  into that safety deposit box during this period of time?

19  A.  When the original amount of coins came in, I had a larger

20  safety deposit box, but since I was paying quite a bit more

21  money for the larger safety deposit box, since I hadn't heard

22  from Mr. Murray, I went ahead and decided to shrink -- get a

23  smaller safety deposit box to save me some money.  And what I

24  had done is gone in a couple of times over a couple of years

25  just to check on it and to make sure it was okay.

*Ticknor - Cross*

1  Q.  You're the only one who has access to that, correct?

2  A.  Yes, sir.

3  Q.  And can you tell the jury what your records reflect in

4  terms of the times that you entered?

5  A.  I went in in November of '95 and then, I didn't go back to

6  the safety deposit box for nine more months, and then, I went

7  in another month later.  And then, I went in three more times

8  in December of '97, and that was it.

9  Q.  Pass the witness, your Honor.

10                     CROSS-EXAMINATION

11  BY MR. T. MILLS:

12  Q.  Good afternoon, Mr. Ticknor.

13  A.  Good afternoon, sir.

14  Q.  My name is Tom Mills.  I think we've met one time before.

15  A.  Yes, sir.

16  Q.  Just a couple of questions.  Let me ask you if Defendant's

17  Exhibit No. 23 accurately reflects what the parking lot view

18  of the Frost Bank looks like in San Antonio?

19  A.  This is taken from another side.  If you go to the back

20  side of the building is where the entrance to the parking lot

21  is -- the entrance that we used.

22  Q.  Okay.  So this may be accurate, but it's not the direction

23  that y'all left at?

24  A.  I believe so, yes, sir.

25  Q.  All right, sir.  When you met Jon Murray and talked with

1  him, were you able to tell that by his voice that he was the

2  same person that you had talked to previously on the

3  telephone?

4  A.  I believe so, yes, sir.

5  Q.  All right.  There was nothing about it that made you think

6  when he introduced -- did you -- did he ever come to your

7  store?

8  A.  No, sir.

9  Q.  Okay.  Was the only time you ever met him at the Frost

10  Bank?

11  A.  Correct.

12  Q.  And there was nothing about the way he sounded when you

13  met him in person that made you think, well, this isn't the

14  same person that I talked to before?

15  A.  When I was speaking with Mr. Murray, I'd call Mr. Murray a

16  couple of times and somebody else had answered his phone and

17  said he either wasn't available or he would get a message to

18  him.

19  Q.  All right.  But maybe I'm wrong, but did you talk with a

20  person who identified himself as Jon Murray on the telephone?

21  A.  Yes, sir.

22  Q.  Prior -- I mean by the telephone?

23  A.  Yes, sir.

24  Q.  All right.  And when you met a person who walked into the

25  bank and said, "I'm Jon Murray,"  did it seem like the same

1   voice?

2   A.  Yes, sir.

3   Q.  All right.  And that was on Friday, September the 29th,

4   correct?

5   A.  Yes, sir.

6   Q.  And you had a person by the name of Gary Albrecht meet you

7   at the bank on that day?

8   A.  Mr. Albrecht met me at my store, and we drove down to the

9   Frost Bank.

10  Q.  And who is Gary Albrecht?

11  A.  He's a San Antonio Police Officer.

12  Q.  And why did he happen to be there on Friday, September the

13  29th?

14  A.  Usually with customers -- some customers feel better with

15  me providing security on a larger transaction like that.  I

16  thought it would be -- Mr. Murray would appreciate it.

17  Q.  All right.  Was he in uniform?

18  A.  Yes, sir.

19  Q.  Did he have a gun?

20  A.  Yes, sir.

21  Q.  Did he have a walkie-talkie radio on his belt?

22  A.  Yes, sir.

23  Q.  Did you -- did the three of you meet in a bank conference

24  room?

25  A.  Yes, sir.

1   Q.  To your recollection, did the bank conference room have a

2   video camera, like a security camera, or do you remember?

3   A.  I don't remember, no, sir.

4   Q.  All right.  When the business transaction was done between

5   you and Mr. Murray, where was Officer Albrecht?  He was there

6   in the conference room?

7   A.  Yes, sir.

8   Q.  Was the door to the conference room closed?

9   A.  Yes, sir.

10  Q.  For privacy?

11  A.  Yes, sir.

12  Q.  All right.  And you had gone to your safe and gotten

13  $500,000 worth of coins, correct?

14  A.  Safety deposit box downstairs, yes, sir.

15  Q.  Safety deposit box.  And if Mr. Murray was in danger or

16  being kidnapped at that time, there was nothing physically

17  that would have kept him from alerting the police at that

18  time?

19  A.  No, sir.

20  Q.  All right.  He did not seem nervous to you, did he?

21  A.  No, sir.

22  Q.  He -- nothing about his mannerisms caused you to be

23  suspicious, did it?  Like this is something illegal, or this

24  is something unusual, or this man is in danger?  Those kind of

25  red flags didn't go off in your brain, did they?

*Ticknor - Cross*

1    A.   No, sir.

2    Q.   And the gold would have weighed about 125 pounds?

3    A.   The total amount would have been about 125 pounds, but he

4    picked up a portion of it, and the 500,000 would have been

5    approximately 100 pounds.

6    Q.   One-hundred pounds.  And when -- did he spend several

7    hours in that room examining the coins and counting them?

8    A.   No, sir, approximately 45 minutes to an hour.

9    Q.   Forty-five minutes to an hour?

10   A.   Yes, sir.

11   Q.   And no one accompanied him in there, did they?

12   A.   No, sir.

13   Q.   And then, did the three of y'all walk out to the -- of the

14   back side to his car?

15   A.   Yes, sir.

16   Q.   And I don't think that I have a picture of it, but my

17   recollection is that that's a little bit smaller parking lot

18   than the one I showed you?

19   A.   Yes, sir, it is.

20   Q.   All right.  Did you see anything suspicious in the parking

21   lot such as some vehicle or person kind of standing

22   suspiciously around or sitting in their car with the car motor

23   running, or anything that alerted you?

24   A.   No, sir.

25   Q.   And you do have some background in terms of military

*Ticknor - Cross*

1   police and police or security work --

2   A.   Yes, sir.

3   Q.   -- after you got out of the military?

4   A.   Yes, sir, I would have been very aware of that for Mr.

5   Murray's sake.

6   Q.   All right.   And, quite frankly, perhaps for your own sake,

7   if it was going to be a stick-up or a robbery?

8   A.   Yes, sir.

9   Q.   That's a lot of gold coins.   All right.   Were you able to

10   determine if there was anyone else in the blue Lincoln

11   Towncar?

12   A.   No, sir, it was empty.

13   Q.   All right.   Now, the $100,000 that came in -- or the

14   $100,000 worth of gold coins that came in -- came in to your

15   store or to the bank, wherever it came.

16   A.   To my store -- Post Office to the store the following

17   Monday, yes, sir.

18   Q.   The following Monday.

19   A.   Correct.

20   Q.   And that was in the month of October.   By definition --

21   A.   If I picked it up on the 29th -- yes, sir, first of

22   October, approximately.

23   Q.   All right.   So you don't know of any explanation why a

24   person would abandon $100,000 worth of gold coins?

25   A.   No, sir.

*Ticknor - Redirect*

1   Q.   Okay.  And it's difficult to think of one unless they had

2   to make an exit before October 1st arrived, correct?

3   A.   Yes, sir.

4   Q.   That's all the questions I have.

5                        RE-DIRECT EXAMINATION

6   BY MR. D. MILLS:

7   Q.   Does your entry into the safe deposit box for those -- do

8   you remember what time of the day it was that you conducted

9   this transaction?

10  A.   Enter the safety deposit with the balance of them?

11  Q.   No.  When you did the $500,000 worth on the 29th.

12  A.   In the afternoon.

13  Q.   Early or --

14  A.   About 2:00.

15  Q.   -- somewhere in there?

16  A.   Yes, sir.

17  Q.   And when you -- how does one negotiate a coin like that?

18  Where do you have to take them if you want to convert it into

19  currency?

20  A.   You could take them to a number of different places.  You

21  could take them to coin dealers or some jewelry stores, or

22  pawn shops will buy them.

23  Q.   Okay.  If you take them to a pawn shop, what is normally

24  the value you receive for one of them when you take it there?

25  A.   Normally the price of gold is approximately the same all

*Ticknor - Redirect*

1  day long, and it's either printed or everybody has it.  It's

2  printed in the newspaper or they can call and get quote lines

3  in some of the different towns, and the price would be pretty

4  much the same every place you go.

5  Q.  When you went outside to the parking lot with Mr. Murray

6  and you had this police officer with you, did you notice any

7  other vehicles in the parking lot?

8  A.  I'm sure there were several.  There were a number of other

9  vehicles in the parking lot, yes, sir.

10 Q.  And would it have been possible, since you were asked

11 these questions, that somebody could have been in one of those

12 other vehicles watching what you were doing?

13 A.  It's possible.

14 Q.  Pass the witness.

15        MR. T. MILLS:  No further questions.

16        THE COURT:  May this witness be excused?

17        MR. D. MILLS:  Yes, your Honor.

18        THE COURT:  You could be excused.  I'll have counsel

19 up here.

20     (At the Bench, on the record.)

21        THE COURT:  How are we with witnesses?

22        MR. CARRUTH:  I have a couple of more left, and if we

23 run out of time, I could call Donna Cowling and go all day.

24 Do you want to quit early?

25        THE COURT:  We've got two more?

*Sanchez - Direct*

1        MR. CARRUTH:  I've got two more from out of town that

2    we'd like to get rid of because they're from San Antonio.  And

3    then, we've got one who's local.

4        THE COURT:  All right.  Ten-minute recess.

5      (Recess.)

6        MR. CARRUTH:  Sonia Sanchez.

7      (Witness was sworn.)

8        THE COURT:  If you'll tell us, please, ma'am, your

9    full name and spell your last name.

10        THE WITNESS:  Sonia Sanchez, S-A-N-C-H-E-Z.

11      SONIA SANCHEZ, called by the Government, duly sworn.

12                  DIRECT EXAMINATION

13    BY MR. CARRUTH:

14    Q.  Please tell the jury where you live and how you're

15    employed.

16    A.  I live in San Antonio.  I'm employed at Frost Bank.

17    Q.  Okay.  And what is your particular duties and

18    responsibilities there?

19    A.  Custodian of records in the legal research department.

20    Q.  Okay.  And are you appearing here today in response to a

21    subpoena?

22    A.  Yes, sir.

23    Q.  Let me ask you this:  Is the Frost National Bank a

24    federally insured financial institution?  Are your deposits

25    and accounts insured through the FDIC, Federal Deposit

*Sanchez - Direct*

1   Insurance Corporation?

2   A.  Yes.

3   Q.  And does your bank or your financial institution normally

4   conduct interstate financial transactions affecting interstate

5   commerce?

6   A.  Yes.

7   Q.  From state to state?

8   A.  (Moving head up and down.)

9   Q.  Okay.  Let me show you, first, what's been marked for

10  identification as W51-1, and ask you if you recognize that

11  document, please, ma'am?

12  A.  Yes.

13  Q.  Does that purport to be a transaction report on a $600,000

14  wire transfer coming from the National Westminster Bank of New

15  Jersey -- Jersey City, New Jersey to Corey's Fine Jewelry in

16  San Antonio, Texas?

17  A.  Yes, it is.

18  Q.  And was that financial transaction handled by your bank?

19  A.  Yes.

20  Q.  On what date, please, ma'am?

21  A.  This was done on September 22nd, '95.

22  Q.  We'd offer at this time, your Honor, W51-1.

23       MR. T. MILLS:  No objection.

24       THE COURT:  Received.

25  Q.  (BY MR. CARRUTH) W51-2 is, likewise, a transaction report

*Sanchez - Direct*

1    from the Frost National Bank, is it not?

2    A.   Yes.

3    Q.   And what does that report show, please, ma'am?

4    A.   This shows this was another wire from Corey's Fine Jewelry

5    and Rare Coins to Equitable Bank in Dallas.

6    Q.   Okay.  And you said on that wire.  Does that mean the

7    600,000 came in and the amount herein, $591,991.70, was less

8    his commission or his fee was then wired to his bank or

9    Equitable Bank to Dillan Gage Metal?

10   A.   Yes.

11   Q.   That's W51-2, which we'd offer at this time.

12        MR. T. MILLS:  No objection.

13        THE COURT:  Received.

14   Q.   (BY MR. CARRUTH) W51-3 is a account and signature card for

15   Corey Ticknor, is it not?

16   A.   Yes, it is.

17   Q.   You're familiar with these records because you brought

18   them?

19   A.   Yes.

20   Q.   If you examine that document behind the signature card, it

21   will show the deposit of these funds in Mr. Ticknor's account

22   and your bank, is that correct?

23   A.   Yes.

24   Q.   Offer 51-3.

25        MR. T. MILLS:  No objection.

*Sanchez - Direct*

1      THE COURT:  Received.

2  Q.  (BY MR. CARRUTH) Now, W51-4 is an individual account in

3  your bank in the name of Jon Garth Murray, is it not?

4  A.  Yes, it is.

5  Q.  And does that show any activity in that account?

6  A.  Yes, there's activity.

7  Q.  Okay.  And we'd offer W51-4.

8      MR. T. MILLS:  No objection.

9      THE COURT:  Received.

10  Q.  (BY MR. CARRUTH) And W51-5 is a joint account in your

11  bank.  Actually, when it was open it was the Frost National

12  Bank Northwest Hills for Madalyn O'Hair, Jon G. Murray and

13  Robin Murray O'Hair; is that correct?

14  A.  Yes.

15  Q.  And offer W51-5.

16      MR. T. MILLS:  No objection.

17      THE COURT:  Received.

18  Q.  (BY MR. CARRUTH) Finally, 51-6 is an Online Safe Box

19  history showing box information for a safe deposit box rented

20  by Corey T. Ticknor; is that correct?

21  A.  Yes.

22  Q.  And those are the records of the entry -- exit and entries

23  into that safe deposit box?

24  A.  Yes.

25  Q.  They're marked W51-6; is that correct?

*Sanchez - Direct*

1   A.   Yes.

2   Q.   I want to talk to you briefly about W51-5, if you'll take

3   that out for me, please, ma'am.  Can you tell me, first,

4   ma'am, what is an ACH deposit?

5   A.   It's automatically clearing house.  It's paperless item

6   that comes through the system.

7   Q.   Okay.  That record that you now hold in your hand, the

8   joint account that the three O'Hairs shared in the Frost

9   National Bank, does that have any ACH deposits in it?

10  A.   Yes, it does.

11  Q.   And from whom was the funds received for those deposits?

12  A.   They were coming from the U.S. Treasury, Social Security

13  and the VA benefits.

14  Q.   And can you tell when was the last time anyone made a

15  withdraw from that account?

16  A.   Looking at these statements?

17  Q.   Well, based on your knowledge, do you know whether the

18  funds have laid in that account several years unclaimed?

19  A.   Yes, it was.  It was inactive for quite a while.

20  Q.   Okay.  So those checks were being automatically deposited

21  from the Social Security Administration and the Veterans

22  Administration, and yet, no one was withdrawing any funds; is

23  that correct?

24  A.   Correct, yes, sir.

25  Q.   And do you know what the final account balance is or was

1   in that account?

2   A.   By looking at this one, I believe this is -- let me just

3   double check.

4   Q.   Or what was it that particular time?

5   A.   The one I'm looking at here, the 12-96, last balance date,

6   December 26th was $22,344.61.

7   Q.   Okay.  Thank you. Pass the witness.

8           MR. T. MILLS:  We have no questions.

9           MR. CARRUTH:  May the witness be excused, your Honor?

10           THE COURT:  She may be excused.

11           MR. D. MILLS:  While we're waiting, your Honor, I'd

12   like to offer Government's Exhibit W72B and W72A.  I've shown

13   them to defense counsel.  He has no objection.  They are

14   rental receipts for the Four Seasons Hotel for David Waters.

15   W72A shows him checking out the 3rd of October, exiting the

16   4th, putting up the $300 cash deposit.  And W72B is for Gary

17   Karr of New Port Richey, Florida, arrival 10-3, departure,

18   1-4, putting up a $300 cash deposit.

19           THE COURT:  All right.  W72A and B are received.  This

20   is Ms. Sims.  She's going to administer an oath to you, sir.

21       (Witness was sworn.)

22           THE COURT:  If you'll follow the Security Officer,

23   please.  Tell us, please, sir, your full name and spell your

24   last name.

25           THE WITNESS:  Mark David Sparrow, S-P-A-R-R-O-W.

*Sparrow - Direct*

1      MARK DAVID SPARROW, called by the Government, duly sworn.

2                      DIRECT EXAMINATION

3  BY MR. D. MILLS:

4  Q.  Where do you reside, sir, and where are you employed?

5  A.  I'm in San Antonio, Texas, and I'm a real estate agent.

6  Q.  I want to direct your attention to September of 1995, and

7  ask if you had an opportunity that month to purchase a gray

8  Mercedes Benz vehicle?

9  A.  Yes, sir, I did.

10  Q.  And can you tell the jury how you first became aware this

11  vehicle was for sale?

12  A.  I was reading the ads in the newspaper, automotive ads,

13  and saw the car in the paper advertised for sale.

14  Q.  And what type of vehicle did you see that was advertised

15  and what particularly struck your attention about that

16  vehicle?

17  A.  It was a 1988 Mercedes 300 SEL.  It was priced at $15,000,

18  which was probably $6,000 under the book value.

19  Q.  And how do you know the book value?

20  A.  Had my bank check it and make sure.

21  Q.  And in response to this ad for this gray Mercedes Benz, in

22  the year model --

23  A.  The 1988, 300 SEL.

24  Q.  What did you do in response to that ad?

25  A.  512 area code on the phone number, so I dialed that and

1   spoke to a gentleman.  He told me where the car would be and

2   how much he wanted for it and told me a little bit about the

3   car.

4   Q.  And where -- go ahead.  I'm sorry.

5   A.  And he said I could see it over at Bonnie Jeans', which is

6   a bar on Fredericksburg Road.

7   Q.  And do you know the address there on Fredericksburg Road?

8   A.  I'm not sure.

9   Q.  Okay.  What did you do in response to being given that

10  instruction?

11  A.  Well, my wife and I went over to look at the car, and the

12  car wasn't there.

13  Q.  And then, what did you do when you couldn't locate the

14  vehicle?

15  A.  We called the same number back later that afternoon, and

16  the gentleman said that the car would either be at Bonnie

17  Jean's or at the Warren Inn, which is across the side street

18  from the bar.

19  Q.  So it's close to this bar that you were instructed to go

20  to in the first place; is that correct?

21  A.  Yes, sir.

22  Q.  And I'll show you what's been admitted as W25-16 that

23  purports to be the Warren Inn in San Antonio.  Is that what

24  you -- the place where you relocated the vehicle?

25  A.  Yes, sir.

Sparrow - Direct

1  Q.  And I'll show you a certified copy of a Motor Vehicle

2  History for the vehicle in question and ask if you can

3  identify some of the title documents in here as involving you

4  and your wife purchasing this vehicle and the financing of it;

5  is that correct?

6  A.  Yes, sir.

7  Q.  And we'd offer W35-2.  It's a certified copy of a Motor

8  Vehicle History for the Mercedes Benz in issue, your Honor.

9       THE COURT:  35 what?

10       MR. D. MILLS:  35-2.

11       THE COURT:  It's received.

12  Q.  (BY MR. D. MILLS) So when you went -- so you found the

13  vehicle at the Warren Inn; is that correct?

14  A.  Yes, sir.

15  Q.  And it was -- was there a person there to show you the

16  vehicle?

17  A.  The gentleman said that once you saw the car, if you're

18  interested in it, then he would be in Bonnie Jean's, come in

19  there and found him.

20  Q.  Did he give you a description of himself for you to locate

21  him?

22  A.  He said just come in and ask for Jon Murray.

23  Q.  All right.  And when you and your wife saw the vehicle,

24  what did you then do?

25  A.  It was in the parking lot of the Warren Inn.  We went back

1    across the street to Bonnie Jean's, and I went inside and

2    asked for Jon Murray and this gentleman stood up in the bar

3    and came outside.  Then, we went outside together.

4    Q.  Were you -- at some point in time, I'm showing a --

5    showing this photograph of six individuals.

6    A.  Yes, sir.

7    Q.  And did you pick one of these individuals out of this

8    line-up as being the one that identified himself as Jon

9    Murray?

10   A.  Yes, I did.

11   Q.  And were you asked to write on the inside of that

12   photographic array which number you picked out?  Do you

13   recognize?

14   A.  I recognize my signature.

15   Q.  And which photograph did you pick out?

16   A.  I picked out No. 4.

17   Q.  And does the photograph that's been previously identified

18   -- or Government's Exhibit W11-3, which is Danny Fry, is that

19   the same individual you picked out?

20   A.  Yes, sir, it is.

21   Q.  And this is the individual that posed as Jon Murray; is

22   that correct?

23   A.  Yes, sir, it is.

24   Q.  What did you do with Mr. Fry, who was posing as Jon

25   Murray, in relation of negotiating the sale of that vehicle?

1   A.  Well, we talked out in front of Bonnie Jean's for a

2   minute, and he gave us the keys to the car, and we test drove

3   the car.  Then, we came back, met him out in front of Bonnie

4   Jean's again and negotiated the price of the car.  I attempted

5   to negotiate the price, and he told me he was selling it for

6   $15,000, firm price.  Said he was getting divorced, and he was

7   trying to save his assets from his -- to keep his ex-wife from

8   getting them.

9   Q.  That's what he told you was the reason for the sale?

10  A.  Right.  And that's why -- I asked him why he had it priced

11  so inexpensively, and he said he priced it to sell quickly

12  because he was trying to get it sold so he could liquidate his

13  assets prior to his divorce.

14  Q.  Do you remember how he was dressed when you first met him?

15  A.  Yes, sir, he had on a -- I believe it was a blue button

16  shirt, like a work shirt.  He had on acid-washed jeans, white

17  tennis shoe, I believe, and that's about it.

18  Q.  Any particular reason that you remember white tennis

19  shoes?

20  A.  No, just -- I just took the overall impression of him,

21  sizing him up.  It was kind of an unusual deal, unusual

22  character.

23  Q.  Now, how did -- where did you finance the vehicle, if you

24  did?

25  A.  U.S.A.A. Bank.

*Sparrow - Direct*

1  Q.  And does the exhibit that I introduced showing the title

2  history indicate that U.S.A.A. Bank had a lien -- you'll have

3  to look back through there.  There's that couple of pages back

4  where you first see your name.  There's a title there.  I

5  believe it shows the bank you just described as being a

6  lienholder.  Is that accurate?

7  A.  Yes, sir.

8  Q.  And how much of the purchase price did you finance?

9  A.  The whole thing.

10  Q.  And can you tell the jury how the arrangements went to

11  consummate the sale of this vehicle?

12  A.  Well, when we -- I told him I had a lien at the bank and

13  it would be finalized that afternoon and asked him what time

14  we could meet at the bank to finalize the transfer of the

15  title.  And he said just to call him and let him know when it

16  was done.  That he would have -- he was busy.  He'd have to go

17  to the bank by himself because he didn't want to try to

18  coordinate with his schedule meeting me at the bank at the

19  same time.

20  Q.  And so what did you do in response to that?

21  A.  Well, I finalized the loan at the bank, ensured -- made

22  sure the loan officer would actually go out and verify the

23  title of the same VIN number as the car did, because I was a

24  little bit uneasy with the fact he couldn't go to the bank

25  with us with the title.  I just wanted to make sure the title

1   was a good, clean title to the car.

2   Q.  And did he ultimately go by to your knowledge?

3   A.  Yes, sir, he did.

4   Q.  And how did you discern that fact?

5   A.  Well, I called him and told him it was ready, and he said

6   he would go that afternoon and then, he would deliver the car

7   to headquarters of the home builder I worked for.

8   Q.  And that was Kaufman & Broad?

9   A.  At the time it was Rayco, yes, sir.

10  Q.  And so what did you do in response to him telling you he

11  was going to deliver the vehicle to that location?

12  A.  He said he dropped the keys off by -- I believe it was

13  2:00 in the afternoon.  And so my wife and I went back over

14  there to pick the car up, and as we were turning -- you could

15  turn left into their headquarters off Fredericksburg Road,

16  there was the Mercedes -- we actually ended up being right

17  behind him.  He was in the left-turn lane ahead of us.

18       Actually, there was a truck in front of us, and he was

19  ahead of the truck.

20  Q.  And was the individual in that photograph Danny Fry

21  driving that vehicle?

22  A.  Yes, he was driving the Mercedes.

23  Q.  Okay.  And there was a pickup in between you and the

24  Mercedes.  Is that what you testified to?

25  A.  Yes, sir.

*Sparrow - Direct*

1  Q.  And so did you get a good view of the people in the pickup

2  truck?

3  A.  I did, got a better view of them in the parking lot.

4  Q.  Can you tell the jury what transpired and what you saw

5  occur with the pickup truck?

6  A.  Okay.  The parking lot at the headquarters is an unusual

7  parking lot.  It's a building where there's parking down on a

8  lower level underneath the building for the executives.  The

9  Mercedes went down underneath where he wasn't supposed to go.

10 He's supposed to park up on the upper level, which is open

11 parking, and pickup truck followed him down.  So I stopped my

12 car by the front doors of the building and waited for him to

13 come back up the hill from underneath it, downstairs parking.

14       And he came up to the top of the hill where I was

15 standing, and he stopped the Mercedes and the pickup truck had

16 followed him down and back around and they passed him and

17 turned into -- there's two parking lots up on top.  And

18 instead of just pulling in front of him and stopping, they

19 went to the second parking lot and stayed facing away from

20 where we were standing.

21 Q.  And did Mr. Fry then give you the keys to the vehicle?

22 A.  Yes, sir, he did.

23 Q.  And after he gave you the keys to the vehicle, what did he

24 do?

25 A.  He walked over to the, you know, across the parking lots

Sparrow - Direct

1    and got into the pickup truck.

2    Q.  And did you -- could you describe the people in the pickup

3    truck?

4    A.  I watched him as he went across there.  The pickup truck

5    was a '65 Chevrolet brown pickup truck, and the gentleman

6    driving has -- was a large man with broad shoulders.  Had

7    long, brown hair in the back.  The lady that was sitting in

8    the passenger side, just saw the back of her, had brown curly

9    hair, was a large woman.  I would say she was obese.  To move

10   over, she picked herself up from the seat and moved across the

11   seat and kind of plopped herself down.

12   Q.  When she -- this large woman moved herself over, did you

13   notice anything about the clothing she was wearing, and if you

14   did, what would you describe that type of apparel as being?

15   A.  I would have said it was a mumu; it was a flower type --

16   upper part was flower and it had big puffy sleeves, and it was

17   kind of square-cut across the back.

18   Q.  And how far away did the pickup stop?

19   A.  It was probably 30 to 40 feet away.  They could have

20   stopped much closer.

21   Q.  And I want to show you a business record affidavit, it's

22   W36-1, and ask you if you recognize this as being your bank's

23   transaction of funding that vehicle.  Could you look through

24   these documents?  There's a cashier's check going to --

25   A.  Uh-huh.

*Sparrow - Cross*

1   Q.  -- for 15,000, and the date is September 5th, 1995; is

2   that correct?

3   A.  Yes, sir.

4   Q.  Do these documents reflect the pay-out by your bank for

5   that vehicle?

6   A.  Yes, sir.

7   Q.  We'd offer W36-1.

8          MS. WILLIAMS:  No objection.

9          THE COURT:  It's received.

10          MR. D. MILLS:  Pass the witness.

11                      CROSS-EXAMINATION

12   BY MS. WILLIAMS:

13   Q.  Mr. Sparrow, during this strange transaction, did you ever

14   see this man right here?

15   A.  No, ma'am.

16   Q.  Nothing further.

17          MR. D. MILLS:  Witness may be excused, your Honor.

18          THE COURT:  You are excused, sir.

19          MR. CARRUTH:  Your Honor, by my count, we count 17

20   witnesses today.  We'd request a recess today for the jury and

21   ourselves.

22          THE COURT:  With the mercy you may or may not answer.

23   Will the next witness with a substantial witness?

24          MR. CARRUTH:  We stipulated during the break, your

25   Honor, and the next witness after that would be a substantial

1    witness, yes, if we have to call them.

2         THE COURT:  All right, ladies and gentlemen of the

3    jury.  Don't tell anybody I got easy and let y'all out at

4    5:30.  Remember now, y'all sit down for just a second.  Long

5    weekend because I've given you Friday to catch up, just like

6    we're going to catch up on all of the materials, hearings that

7    we have this week.

8         But remember the instructions because Monday morning,

9    I'll be asking you those questions under oath.  Very important

10   that you comply with the answers.  Be very safe.  Have a good

11   weekend.  I'll see you Monday morning at 8:30.

12        (Jury not present.)

13        THE COURT:  Mr. Carruth, what's your estimate of where

14   you are?

15        MR. CARRUTH:  The way we're going now, we may very

16   well finish next week, your Honor.  I've been in touch with

17   the Marshals' Office, and they're supposed to get some inmates

18   here by Monday night.  So we're really ahead of schedule.  I'm

19   surprised.

20        THE COURT:  We're not really ahead of schedule.

21        MR. CARRUTH:  May I say that your Honor tries a case

22   like the Honorable Lucius Bunton?

23        THE COURT:  No, you may not.  As a matter of fact, I

24   testified in front of the Congress that was one of the reasons

25   I wanted this job, so I wouldn't have to try cases in Judge

1   Bunton's court.

2          MR. CARRUTH:  Mr. Mills has been helpful by not

3   cross-examining too much and only when necessary.  We could

4   rest by next week.

5          THE COURT:  Okay.  Keep Mr. Mills in the pipeline so

6   that he can line up his witnesses when and if you do rest.

7          MS. WILLIAMS:  We do have some concern, your Honor, we

8   have some out-of-state witnesses that I don't want to have to

9   bring in and have the government have to pay for a long --

10   over a long weekend.  So I don't want to get in the spot that

11   the government was in the other day where they won't have

12   enough witnesses to fill up an entire day.  They would have to

13   rest.

14          THE COURT:  That was my big card -- that was the big

15   poker day of the -- well, I hope you don't get in that

16   position either, but it sure makes for a short trial.  All

17   right.  I'll see y'all Monday morning.

18      (Proceedings adjourned.)

19

20

21

22

23

24

25