FILED

*1*



NOV 2 1 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE WESTERN DISTRICT OF TEXAS |
| 2 | AUSTIN DIVISION |

UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
           )
v.           ) Austin, Texas
           )
GARY PAUL KARR     ) May 22, 2000

VOLUME 6 of 12
TRIAL ON THE MERITS
BEFORE THE HONORABLE SAM SPARKS

APPEARANCES:

For the United States:  Mr. Gerald C. Carruth
           Mr. Daniel H. Mills
           Assistant U.S. Attorneys
           816 Congress Avenue, Ste. 1000
           Austin, Texas 78701

For the Defendant:   Mr. Thomas W. Mills, Jr.
           Ms. Christi N. Williams
           Mills & Presby
           5910 North Central Expressway,
           Ste. 900
           Dallas, Texas 75206-5141

Court Reporter:    Lily Iva Reznik, RPR, CRR
           United States Courthouse
           200 West 8th Street
           Austin, Texas 78701
           Ph: (512)916-5564

Proceedings recorded by mechanical stenography, transcript
produced by computer.



*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS (AUSTIN)*  ORIGINAL

100

2

1                          I N D E X

2                          Direct    Cross    Redirect    Recross
       Witnesses:
3      Joe Raymond Cortez    6        19        39          40

4      Jaime Rene Valdez     40       50        64          67

5      Joey Cardenas         69       82

6      Richard Medina        98       104

7      Richard Grazier       108      111       113

8      Nizar Tawil           114

9      Concepcion Martinez   118      122

10     Richard D. Hogan      123      129       133

11     Manmohan Maken        135      138       140         140

12     James Van Winkle      147      147

13     David John Wostarek   152      156       157

14     Patricia Ann Fawcett  158      168       173

15     David Worsham         175      178

16     Donna Ganhito         182      187

17     Donna Jean Theese     189      192

18     William J. Murray     194      198

19     Gordon R. McNutt      214      226       233

20     John Earl Teague      237      243       254         255

21     Coy L. Smith          255      264

22

23                                                          Page

24     Proceedings Adjourned                                268

25

```
1                        E X H I B I T S

2                                      Offered      Admitted

3     Government's

4     #W22-1 to #W22-3 Travis Co.

5            Guardianship Records       196         197

6     #W25-1 to #W25-15 Warren Inn Records  160     160

7     #W25-17 Warren Inn Records        160         160

8     #W32-1 Drug Emporium Records      176         176

9     #W38-1 Americus Diamond Records   144         144

10    #W38-2 GIA Certificate            145         145

11    #W39-1 Diamond Ring               138         146

12    #W39-2 Check                      137         137

13    #W50-1 & #W50-2 Nat West Records  184         184

14    #W50-4 & #W50-5 Nat West Records  184         184

15    #W51-5A Check                     155         155

16    #W57-2 Gold Coin Photos           69          69

17    #W71-1 Letter                     71          71

18    #W70-2 & #W70-3 Photos            44          44

19    #W70-4 Letter                     66          66

20    #W73-1 Leon Valley Gold & Silver

21            Records                   115         115

22    #W74-1 Gold Coin                  119         119

23    #W75-1 Grazier Records            109         109

24    #W76-1 Dellview Records              101      101

25    #W101-1 Northwest Imports Records 153         153
```

|  | E X H I B I T S (Continued) | | |
|---|---|---|---|
|  |  | Offered | Admitted |
| **Defendant's** | | | |
| #JC-1 Cardenas Drawing | | 92 | 92 |
| #1 Texas Map | | 248 | 248 |
| #2 Ranch Diagram | | 245 | 245 |
| #3 Ranch Diagram | | 246 | 246 |
| #35 & #36 Warren Inn Room Layouts | | 169 | 169 |

5

1          THE COURT:  All right, counsel.  Anything before we

2     bring in the jury?

3          MR. CARRUTH:  Nothing from the government, your Honor.

4          MR. T. MILLS:  No, sir.

5          THE COURT:  Bring in the jury, please.

6        (Jury present.)

7          THE COURT:  Members of the jury, it was a long

8     weekend.  Nebraska won baseball, Nebraska won in softball,

9     Nebraska won in women's track, Nebraska won in men's track.

10    How many of you have ever been to Nebraska?  Any of you ever

11    wanted to go back?

12         Anyway, during the weekend, did anybody see anything

13    or talk to anybody about this case?

14         THE JURORS:  No.

15         THE COURT:  During the weekend, did anybody attempt to

16    talk to you about this case?

17         THE JURORS:  No.

18         THE COURT:  And during the weekend, have you learned

19    anything at all about this case outside the presence of each

20    other and this court?

21         THE JURORS:  No.

22         THE COURT:  All right.  Show negative responses to all

23    questions by all jurors.  Thank you.  And the government may

24    call your next witness.

25         MR. D. MILLS:  Mr. Cortez, your Honor.

*Cortez - Direct*

1    THE COURT:  If you'll come here and stop, we're going

2  to administer an oath to you, sir.

3    (Witness was sworn.)

4    THE COURT:  I want you to walk around this column,

5  please, sir, and have a seat in this blue chair.  If you'll

6  tell us, please, sir, your full name and spell your last name.

7    THE WITNESS:  Joe Raymond Cortez, C-O-R-T-E-Z.

8   JOE RAYMOND CORTEZ, called by the Government, duly sworn.

9    DIRECT EXAMINATION

10  BY MR. D. MILLS:

11  Q.  Mr. Cortez, tell the jury, please, where you currently

12  reside and why you reside there.

13  A.  I reside at T. Don Hutto Correctional Center.

14  Q.  And that's part of the Texas Prison System; is that

15  correct?

16  A.  Yes.

17  Q.  And why are you there?

18  A.  For murder charge.

19  Q.  And when were you convicted of murder?

20  A.  '99, June of 1999.

21  Q.  You're testifying here today under a grant of immunity

22  from the Travis County District Attorney's Office for your

23  role in the theft of some gold coins that you and some others

24  participated in back in September or October, rather, of 1995;

25  is that correct?

*Cortez - Direct*

1   A.  Yes, sir.

2   Q.  And can you tell the jury what your understanding of that

3   agreement is you have with the District Attorney's Office here

4   in Travis County about how you will or will not be prosecuted

5   depending on what you do from the witness stand?

6   A.  I will not be prosecuted if I comply with the -- give the

7   full testimony on what happened and what we did with the

8   coins.

9   Q.  And do you recall when this was that you came to Austin

10  and participated in the theft of some gold coins?  Was there

11  an event that occurred that day that you recall?

12  A.  Something with O.J. Simpson.  I'm not too sure what it

13  was.

14  Q.  Do you know if it was the day he was acquitted of his

15  charges?

16  A.  I believe so.

17       MR. T. MILLS:  Excuse me, Judge.  I object to leading

18  and suggesting questions.

19       THE COURT:  I don't believe it was.  Even on Mondays,

20  I'm required to make rulings when they object.  Objection is

21  good.  Please don't lead.  All right.

22  Q.  (BY MR. D. MILLS) Who participated with you in this theft

23  and how did those people come to be involved with you?

24  A.  I was with Jaime Valdez and Joey Cardenas.

25  Q.  Did you know both of those individuals?

8

*Cortez - Direct*

1  A.  Just Jaime.

2  Q.  And how did you know him?

3  A.  From high school.

4  Q.  And how did you come about setting this enterprise up just

5  to come to town and what was the purpose?

6  A.  It was to break into storage units.

7  Q.  And had you done this previously?

8  A.  In San Antonio, yes.

9  Q.  And can you tell the jury the nature of how you would go

10  about breaking into storage units?

11  A.  I had a master key that would open -- Master Locks, like a

12  skeleton key, I guess.

13  Q.  And where did you get that key from?

14  A.  From Soto, Larry Soto.

15  Q.  How often had you engaged in this type of activity?

16  A.  A few months.

17  Q.  How did you go about picking out the various units that

18  you would try to steal from?

19  A.  We would just go into them and see how many Master Locks

20  there were on the doors.  That way we could see how many we

21  could open.

22  Q.  Were there certain type of Master Locks that your key

23  would open and others that it wouldn't?

24  A.  It would open on the silver ones only, the ones with the

25  blue around at the bottom, they wouldn't open.

*Cortez - Direct*

1  Q.  When you came to Austin with Mr. Valdez and Mr. Cardenas,

2  do you recall how many units you went to that day?

3  A.  No, I don't.

4  Q.  Do you remember by chance the name of the unit where y'all

5  found gold coins?

6  A.  Burnet, I believe.

7  Q.  Burnet?

8  A.  Storage something.

9  Q.  Does this photograph accurately depict the unit, the

10  storage unit?

11  A.  That's the one.

12  Q.  Okay.  And can you tell the jury how it is that you came

13  to decide to use this particular unit to go to this unit?

14  A.  We just happened to drive by that unit and we stopped

15  there.

16  Q.  How many times that day did you go to that unit?

17  A.  Several.

18  Q.  And tell the jury why you made several trips to this unit

19  -- this Burnet Road Self-storage.

20  A.  Because there was other locks that we could open.  That's

21  why we kept going back.

22  Q.  Did you -- how many things did you steal from the Burnet

23  Road Self-storage?

24  A.  Quite a few.  I don't remember how many.

25  Q.  Did you take anything beside gold coins?

*Cortez - Direct*

1   A.  Yes.

2   Q.  What else did you take?

3   A.  A TV, I believe.

4   Q.  And after you -- did you acquire the TV before or after

5   the gold coins?

6   A.  Before.

7   Q.  And what did you do with the TV once you had taken it out

8   of that storage unit that day?

9   A.  We had tried to pawn it.

10  Q.  And were you successful?

11  A.  No.

12  Q.  What did you do with it?

13  A.  We left it in the shopping cart at a grocery store, I

14  believe.

15  Q.  Tell the jury when it was that you came upon the unit

16  where you found the gold coins.  Who opened the lock and who

17  was with you?

18  A.  I opened the lock and Joey was with me.

19  Q.  And Joey is Mr. Cardenas?

20  A.  Yes.

21  Q.  And what did you see in this unit when you opened it?

22  A.  Black suitcase.  That was it.

23  Q.  Can you describe whether it was light or heavy?

24  A.  It was heavy.

25  Q.  Could you lift it by yourself?

*Cortez - Direct*

1   A.   No, I did not.

2   Q.   Who assisted you?

3   A.   Mr. Cardenas.

4   Q.   What did y'all do with it when you picked it up?

5   A.   We threw it in the back of his trunk.

6   Q.   And then, where did you go?

7   A.   We picked up Jaime from the front of the store.

8   Q.   And what was Jaime doing at the front of the store?

9   A.   Getting prices about renting the storage unit.

10  Q.   And when you left the storage unit area, where did you go

11  and what did you do relative to those gold coins?

12  A.   We went to get something to eat at Burger King or Jack In

13  The Box.  I'm not sure which one it was.  And I opened the

14  suitcase and saw what was in there.  We stopped at a book

15  store to see what the coins were valued at.

16  Q.   I want to show you what's been marked for identification

17  as Government's W57-2, and ask you if you recognize those gold

18  coins as being the type of gold coins that you're talking

19  about?

20  A.   Those are the ones.

21  Q.   And you notice these cylinders in these containers up here

22  at the top.  Have you ever seen that before?

23  A.   Yes.

24  Q.   And can you tell the jury how it was that you saw those

25  cylinders that are depicted in that picture?

*Cortez - Direct*

1   A.  They were in the suitcase.

2   Q.  Were all the coins stored in those type of containers?

3   A.  Yes, they were.

4   Q.  Okay.  Do you know an individual named Chico Osborne?

5   A.  No, I don't.

6   Q.  When is the first time you heard that name?

7   A.  This morning.

8   Q.  And when did you hear it this morning?

9   A.  When you just told me about him.

10  Q.  When I asked you about him; is that correct?

11  A.  Yes.

12  Q.  After you discovered what you had in that suitcase, what

13  did you and Mr. Valdez and Mr. Cardenas do?

14  A.  Drove back to San Antonio.

15  Q.  And where did y'all go?

16  A.  To Mr. Valdez' house.

17  Q.  Where did you go once you were there?

18  A.  Separated the coins among the three of us.

19  Q.  And how did you go about separating them?

20  A.  It was just like one for each, you know -- one a piece

21  until the money ran out, until the coins ran out.

22  Q.  What did you do after you had your pile, if you will, of

23  coins?

24  A.  I went home.

25  Q.  And where did you store your coins?

*Cortez - Direct*

1   A.   At home under the bed.

2   Q.   Were you interviewed on two occasions by investigators

3   relative to this coin theft?

4   A.   Yes.

5   Q.   And were you asked about on two different occasions what

6   you did with these coins?

7   A.   Yes, sir, I was.

8   Q.   And what did you say the first time you were asked about

9   where you placed the coins?

10   A.   I said I had left them in a friend's car.

11   Q.   Why did you do that?  Why did you say you left them in a

12   car?

13   A.   I don't know.  I just didn't want to get in any more

14   trouble than I was.

15   Q.   And on the second occasion, what did you tell the person

16   interviewing you?

17   A.   That they were under the bed.

18   Q.   Do you know the approximate value of the coins that you

19   got your share of the -- of this theft, about how much was it?

20   A.   No, I don't.

21   Q.   Okay.  How long did it take you to dispose of the money or

22   of the gold coins?  Over what period of time?

23   A.   About a year and a half, two years.

24   Q.   And can you tell the jury how it was that you came to

25   dispose of these coins?  What did you do to turn them into

*Cortez - Direct*

1   currency?

2   A.   I took them to local coin stores and cashed them in.

3   Q.   Do you remember the names of some of the coin stores?

4   A.   Rufer's, Dellview Coins, San Antonio Rare Jewelry Coins,

5   something like that.  I don't happen to remember the rest of

6   them.

7   Q.   Have you ever heard of Loan Star Coin?

8   A.   Yes, I have.

9   Q.   Did you use that coin store?

10  A.   Yes.

11  Q.   How about Leon Valley?

12  A.   Yes.

13  Q.   Dennis Jewelers?

14  A.   Yes.

15  Q.   Now, can you tell the jury if you enlisted someone to

16  assist you in turning these gold coins into currency?  And if

17  so, explain how y'all did this.

18  A.   I enlisted several people.

19  Q.   And can you give me the names of some of those people that

20  you used to do this?

21  A.   Jeffrey Cedillo.

22  Q.   C-E-D-I-L-L-O?

23  A.   Yes.

24  Q.   Who else?

25  A.   Michael Gonzalez.

*Cortez - Direct*

1    Q.   All right.  If I call him Mike Gonzalez?  Who else?

2    A.   Daniel Ozuma.

3    Q.   O-Z-U-M-A?

4    A.   Yes.

5    Q.   All right.  Who else?

6    A.   Javier Diaz.

7    Q.   Okay.  Who else?

8    A.   John Goerana.

9    Q.   Can you spell that for me?

10   A.   G-O-E-R-N-A (sic).  And Patricia Santos.

11   Q.   Anyone else?

12   A.   That's it.

13   Q.   Okay.  And what did you do with these people in terms of

14   liquidating those gold coins?  Tell the jury how you did it.

15   A.   I would ask them to go cash in the gold coins, several of

16   them at a time, and I would give them a few hundred dollars

17   for them cashing that money.

18   Q.   How frequently did you take the coins to these various

19   gold dealers and liquidate them?

20   A.   Maybe two or three times a week, maybe more.

21   Q.   Did you have some explanation that you offered to these

22   gold dealers about how you came to get these coins?

23   A.   Yes, that my grandfather had passed away and he left me

24   the coins.

25   Q.   Why didn't you do it yourself?

*Cortez - Direct*

1  A.  Because it would look kind of funny if I kept on taking so

2  many coins in there, so I had other people do it.

3  Q.  Can you tell the jury what you did with this money that

4  you obtained from this theft over the year and a half period?

5  I'll ask you, first, if you took the trip to Las Vegas, and if

6  so, explain who went with you and what it cost.

7  A.  I don't remember what it cost.  All the males up there

8  went with me, and one of the guy's girlfriends went with me,

9  and I also took a female friend with me.

10  Q.  Okay.  Where did y'all stay?

11  A.  At the Excalibur Hotel.

12  Q.  For about how many days?

13  A.  About four.

14  Q.  And what did you -- what did you pay for?

15  A.  I'm sorry?

16  Q.  What did you pay for that -- in terms of the cost of the

17  trip for these people?

18  A.  I don't happen to remember how much it cost.

19  Q.  I'm sorry.  Who paid for the trip?  Did all of these

20  individuals pay or did --

21  A.  No, I did.

22  Q.  -- you paid for everything?

23  A.  Yes.

24  Q.  And the money that you used came from what?

25  A.  From the gold coins.

*Cortez - Direct*

1   Q.  Okay.  What else did you do with the money?

2   A.  We went to the mall, shopped a lot, bought jewelry.  Went

3   to the gun show and bought guns, cars, apartments, furniture.

4   Q.  What type of watches -- you said you went to jewelry

5   stores; is that correct?

6   A.  Yes.

7   Q.  What did you buy at the jewelry store?

8   A.  Tag watch and a Movado watch.

9   Q.  About what did those watches cost, if you recall?

10  A.  The Tag watch cost about $3,000 and the Movado watch was,

11  like, between 800 and a thousand, something like that.

12  Q.  What type of guns did you purchase?

13  A.  Several different kinds: Six Saywer, a Desert Eagle,

14  AK-47, Tech 9, HK.

15  Q.  You said you paid for an apartment.  Can you tell the jury

16  about that with the money?

17  A.  I paid for a townhouse up front for six months.

18  Q.  Do you remember what that approximately cost?

19  A.  No, I don't.

20  Q.  What type of furniture did you buy?

21  A.  A black leather couch.

22  Q.  Anything besides couches?

23  A.  Sony TV, a big screen, a VCR.

24  Q.  What type of automobile did you buy?

25  A.  I had two Mustangs, a '90 and '91, and a Plymouth Laser.

*Cortez – Direct*

1   Q.  Did you put any type of stereo system in these vehicles?

2   A.  Yes, I did.

3   Q.  Tell the jury what type you put in there and what they

4   cost.

5   A.  I put a Kenwood CD changer, four Kicker ten-inch woofers,

6   Rockford Fosgate amplifiers.  One of the systems was a little

7   bit over $3,000.

8   Q.  Do you know what an Eclipse CD is?

9   A.  Yes.

10  Q.  What is that?

11  A.  It's a top-of-the-line CD unit for a car.

12  Q.  Did you buy one of those?

13  A.  Yes, I did.

14  Q.  Where did you use that particular piece of equipment?

15  A.  In the convertible Mustang.

16  Q.  And what did that stereo system cost?

17  A.  That was the one, like, $3,000.

18  Q.  Did you frequent any strip clubs?

19  A.  Yes, I did.

20  Q.  And tell the jury how much money you would spend when

21  you'd go to these strip clubs.

22  A.  Maybe about a thousand dollars a night or more.

23  Q.  Did you ever figure out how much money you had obtained as

24  your portion of the theft?

25  A.  No, I didn't.

*Cortez - Cross*

1   Q.   Do you know a lady named Concepcion Martinez?

2   A.   Yes.

3   Q.   How do you know her?

4   A.   She's a friend of my mother.

5   Q.   Did you do anything with her relative to these coins?

6   A.   I had gave her a few.

7   Q.   You gave her some?

8   A.   Yeah.

9   Q.   Pass the witness, your Honor.

10                   CROSS-EXAMINATION

11  BY MR. T. MILLS:

12  Q.   Mr. Cortez, my name's Tom Mills.   I represent Gary Karr in

13  this matter.   What is your full name?

14  A.   Joe Raymond Cortez.

15  Q.   Are you actually Joe Raymond Cortez, Jr?

16  A.   Yes.

17  Q.   And your date of birth is?

18  A.   4-29-73.

19  Q.   And what felony convictions have you been finally

20  convicted of?

21  A.   The murder.

22  Q.   And?

23  A.   That's it.

24  Q.   Were you convicted in 1991 for possession of cocaine?

25  A.   I was not convicted; I got deferred probation.

*Cortez - Cross*

1    Q.  Having a deferred felony probation, how -- when you bought

2    guns, did you check the box that you had never been convicted

3    of a felony before?

4    A.  I bought them at the gun shows, sir.  They don't check

5    your background if you buy from a private collector.

6    Q.  All right.  But you were -- even though you didn't get

7    caught, you were a felon in possession of a firearm under

8    federal law, weren't you?

9    A.  I believe so.

10   Q.  Okay.  Do you have immunity from the Travis County

11   District Attorney's Office for that?

12   A.  No.

13   Q.  Do you have any federal immunity from the United States

14   Government?

15   A.  No.

16   Q.  Regarding your immunity, is it your understanding of the

17   immunity letter that you have to tell the whole truth about

18   what you know about this matter?

19   A.  Yes.

20   Q.  And, of course, it is the prosecution who decides if you

21   tell the whole truth or not?

22   A.  Yes.

23   Q.  You were convicted of murder on approximately or exactly,

24   if you know, what date?

25   A.  I believe it was June 7th of 1999.

*Cortez - Cross*

1   Q.   And what was your sentence?

2   A.   Ten years.

3   Q.   When were you first contacted by the -- by law enforcement

4   regarding these coins?

5   A.   I'm not too sure.  I think it might have been in

6   September, October.  I'm not too sure.

7   Q.   Of '99?

8   A.   Yes.

9   Q.   After you had a ten-year sentence?

10  A.   Yes.

11  Q.   Were you in custody when you were first contacted?

12  A.   Yes.

13  Q.   Did you end up with a lawyer on this coin issue?  Did you

14  have a lawyer?

15  A.   Yes.

16  Q.   And what was his name?

17  A.   Edward Garcia.

18  Q.   Is he from San Antonio?

19  A.   Yes.

20  Q.   Were you from San Antonio?

21  A.   Yes.

22  Q.   Before 1995, when you drove to Austin, and you ended up at

23  some storage units, you knew Mr. Valdez?

24  A.   Yes, I did.

25  Q.   How well?

*Cortez - Cross*

1  A.  Pretty well.

2  Q.  Had you ever before the day of this storage unit matter,

3  had you ever burglarized storage units with Mr. Valdez?

4  A.  Before?  Yes.

5  Q.  On many occasions?

6  A.  No, not many, no.

7  Q.  How well did you know Mr. Cardenas?

8  A.  I had just met him that day.

9  Q.  And how did Mr. Cardenas happen to be in the picture?

10  A.  Because me and Jaime needed a ride, so he called Mr.

11  Cardenas for the ride because he had a car.

12  Q.  And, in other words, Mr. Cardenas was Mr. Valdez' friend?

13  A.  Yes.

14  Q.  And how well did you know Larry Soto?

15  A.  I didn't know him too well.  I had only known him a couple

16  of months.

17  Q.  Several months?

18  A.  A couple of months.

19  Q.  Couple of months.  And it's your understanding that Mr.

20  Soto had keys that were master keys to Master Locks?

21  A.  Yes.

22  Q.  There's a brand of lock called a Master Lock, correct?

23  A.  Yes.

24  Q.  All right.  And is it correct that when you went to look

25  for locks that you needed to find a lock with a long hasp?

Cortez - Cross

1   A.   No.

2   Q.   Was there any kind of Master Lock -- was there any

3   particular kind of Master Lock that the master key supposedly

4   fit?

5   A.   It would fit all the silver ones except with the ones the

6   blue at the bottom that said "master" on it.

7   Q.   Is it true that it needed to be a Master Lock with a shank

8   that went through the lock?

9   A.   No.  That was the type of lock that was on that storage

10   unit, the one with the coins, but it didn't have to be that

11   kind of lock, just a Master Lock.

12   Q.   Okay.  Any kind of Master Lock except are you talking

13   about on the bottom of a lock where there's a circle and then,

14   kind of a little area for the key to go in -- I'm not a very

15   good artist, but are you talking about if this surrounding

16   area is blue?

17   A.   No.  On the lock.

18   Q.   Okay.  On the side of the lock.

19   A.   Okay.  Now, at the very bottom, make a line across.  That

20   would say "master" and blue and white.  Those you can open.

21   Q.   It would say the word "master" across here in blue and

22   white?

23   A.   Yes.

24   Q.   All right.  Any other kind other than a combination lock,

25   of course, you're saying that this key would fit?

*Cortez - Cross*

1   A.   Yes.

2   Q.   Okay.   Now, of course, Master is a very common type lock,

3   isn't it?

4   A.   Yes, it is.

5   Q.   I don't know if it's the most popular, but it certainly

6   sells a lot of locks?

7   A.   Yes.

8   Q.   And how well did you know Larry Soto?

9   A.   I didn't know him too well.

10  Q.   How did you know him at all?

11  A.   From parties, the clubs.

12  Q.   Do you know where he is now?

13  A.   No, I don't.

14  Q.   Do you know his full name?

15  A.   Larry Soto.   That's all I know.

16  Q.   About how old is he?

17  A.   About 24, 25, maybe 26, I don't know.

18  Q.   And when you knew him, he lived in San Antonio?

19  A.   Yes.

20  Q.   Do you know either one of his parents' name?

21  A.   No.

22  Q.   Do you know how he claimed to have gotten a master key to

23  Master Locks?

24  A.   No, I do not.

25  Q.   You have immunity for all of the different times that you

Cortez – Cross

1  broke into storage units?

2  A.  I believe so.  I'm not sure.

3  Q.  How many would that be in total?

4  A.  I don't know.

5  Q.  Twenty?

6  A.  Probably less than that.

7  Q.  All right.  So did Mr. Valdez call Mr. Cardenas?

8  A.  Yes, he did.

9  Q.  And when y'all were going to Austin that day from San

10 Antonio, did you go there with a plan to break into storage

11 units?

12 A.  Yes.

13 Q.  Okay.  Now, you have previously told the FBI that you

14 three decided to spend the day in Austin not intending to

15 break into any storage units, correct?

16 A.  I believe so if that's what it says.

17 Q.  Well, I'm just curious about which is it, which is the

18 truth, that you decided to go to Austin to break into storage

19 units, as you just said, or you decided not to break -- you

20 decided to go to Austin just for fun, not to break into

21 storage units, as you previously said?

22 A.  Well, it was like a spur-of-the-moment thing.  We had

23 decided to come to Austin, not intending to, but we saw the

24 storage units, so we went ahead and did it.

25 Q.  How did you happen to find a storage unit to break into?

*Cortez - Cross*

1   A.   We were just driving around Austin.

2   Q.   And you just happened to see a storage unit?

3   A.   Yes.

4   Q.   And you don't know where the storage unit is now?

5   A.   No, I don't.

6   Q.   But you remember the name of it?

7   A.   Yes.

8   Q.   Do you think that the fact that it's called Burnet Road

9   Self-storage would be a clue that it was on Burnet Road?

10   A.   Well, I'm sure now.

11   Q.   Well, how did you learn that it was named Burnet Road

12   Storage Unit?  Were you told that by someone or did you

13   remember that?

14   A.   I remembered by the picture, the sign.

15   Q.   You remember about a sign that said, "Burnet Road

16   Self-storage"?

17   A.   Uh-huh.

18   Q.   All right.  But before seeing a picture that you were

19   showed, you didn't remember what unit it was?

20   A.   No, I did not.

21   Q.   You couldn't have picked it out at all?

22   A.   No.

23   Q.   Were you just shown one picture of one storage unit?

24   A.   I was showed several pictures.

25   Q.   Of the same storage unit?

*Cortez - Cross*

1   A.   They were different ones.

2   Q.   All right.  How do you know that something happened in the

3   O.J. Simpson case on the day that you came to Austin?  Do you

4   have a memory of hearing it on the radio or TV, or did someone

5   remind you, one of the agents, when they were interviewing

6   you?

7   A.   It was on the radio.

8   Q.   How did you remember something in 1995 in 1999?

9   A.   Because that's a big deal.  Well, it was back then, so,

10  you know, I'm sure a lot of people remember that.

11  Q.   Okay.  At the Burnet Road Self-storage unit, if that's

12  what it was -- let me show you this photograph down at the

13  bottom.  Can you see it from there?

14  A.   No.

15  Q.   Do you wear glasses?

16  A.   No.

17  Q.   Okay.  Right here.  Is it one of those units that you

18  broke into?

19  A.   I believe so.

20  Q.   Tell me what you mean, "I believe so."

21  A.   Well, I think it is.  I mean, I don't remember the color

22  of the doors or anything, but I'm sure if that's the Burnet

23  Storage Road unit, that's more or likely it's the storage we

24  broke into.

25  Q.   I thought you said -- maybe I misunderstood.  You went to

Cortez - Cross

1    the Burnet Road Self-storage several times during the day.

2    A.   Yes, we did.

3    Q.   And you remember that O.J. Simpson was on the radio.   If

4    you went there several times, why do you not -- do you

5    remember what it looks like?   Do you remember what it looks

6    like?

7    A.   Yes and no.   It was back in '95, so I'm not really too

8    sure.

9    Q.   Okay.   If I showed you a picture of another storage unit,

10   do you think that you could tell which one you'd been at?

11   A.   No.

12   Q.   Okay.   Just some -- okay.   How many locks did you open on

13   that day at the storage unit that you say you were at?

14   A.   Maybe three or four, maybe more.

15   Q.   Did you open any after you opened the one that had a black

16   suitcase in it?

17   A.   No, I didn't.

18   Q.   Okay.   So the black suitcase was the last one you opened?

19   A.   Yes.

20   Q.   Was there somebody distracting the management?

21   A.   Yes.

22   Q.   Who?

23   A.   Jaime Valdez.

24   Q.   And that means Cardenas was with you?

25   A.   Yes.

*Cortez - Cross*

1   Q.   What's his first name?

2   A.   Joey.

3   Q.   That was the first day you've met him?

4   A.   The first day I met him, yes.

5   Q.   Did you know anything about him?

6   A.   No, I don't.

7   Q.   Did you then?

8   A.   No.

9   Q.   How did you know he was safe to go burglarize things with?

10  A.   Well, I figured if Jaime okayed him, then it was all

11  right.

12  Q.   Okay.  Can you describe the black briefcase other than

13  saying that it's a black briefcase?

14  A.   Just that it had Tippers and Williams at the bottom of it.

15  That's about all I remember.

16  Q.   Do you remember how you opened it?

17  A.   Opened what?

18  Q.   The black briefcase?

19  A.   I just unzipped it.

20  Q.   And you left the storage unit and went to a Burger King or

21  a Jack In The Box, correct?

22  A.   Yes.

23  Q.   Do you remember which?

24  A.   No, I don't.

25  Q.   Could it have been a McDonald's?

*Cortez - Cross*

1  A.  There was not a McDonald's.  It was either Burger King or

2  Jack In The Box.

3  Q.  And you know that because -- how do you know where the

4  Burger King or Jack In The Box is?

5  A.  I don't know where it is.

6  Q.  How do you know that there are Burger Kings or Jack In The

7  Boxes near Burnet Road Self-storage unit?

8  A.  Because that's where we went to go eat at.  It was either

9  one of the two.

10  Q.  Had you been to them before?

11  A.  No.

12  Q.  Did you open the briefcase while at the hamburger place?

13  A.  In the parking lot, yes.

14  Q.  Did you eat first or eat second?

15  A.  I opened the briefcase first, then we went inside and ate.

16  Q.  You opened the briefcase and saw that there were lots of

17  boxes of gold coins?

18  A.  Yes.

19  Q.  And you showed the other two men?

20  A.  Yes.

21  Q.  And you realized you might be in possession of hundreds of

22  thousands of dollars?

23  A.  Yes.

24  Q.  And so you went and had a Whopper Burger?

25  A.  Yes.

Cortez - Cross

1   Q.  And then, you went to the library?

2   A.  Not the library, the book store.

3   Q.  Went to a book store.  Did you find out the value of some

4   of these one-ounce coins?

5   A.  Yes, I did.

6   Q.  And they were in the 3 or $400 range?

7   A.  Yes.

8   Q.  And then, you -- do you remember how much they were?

9   A.  Well, gold always goes up and down, so in the book it says

10  425, I think, was one of the prices.

11  Q.  And did you count the number of coins in one roll?

12  A.  No, I didn't.

13  Q.  Did you estimate how many you had?

14  A.  No.

15  Q.  When you got back to Valdez' house, did you count the

16  coins?

17  A.  No, I didn't.

18  Q.  Did anyone count the coins?

19  A.  Not that I remember.

20  Q.  Did you know that you had, at least, 100 coins?

21  A.  Oh, yes.

22  Q.  Okay.  Do you know if you had 200 coins?

23  A.  Yes.

24  Q.  Do you think it was 300 coins?

25  A.  Yes.

*Cortez - Cross*

1  Q.  Do you think it was 400 coins?

2  A.  It was quite a bit of coins.

3  Q.  Do you think it was at least -- do you think it was 400?

4      MR. D. MILLS:  Your Honor, that's misleading.  He

5  didn't answer that question.  He suggested that answer.  He

6  went to 300, and he said he didn't know.  By interjecting his

7  opinion, he's misleading the witness by saying 400.  That was

8  not an answer that the witness gave.  That's my argument.

9  It's misleading.

10     THE COURT:  Okay.  Objection's overruled.  The witness

11 may listen to the question and answer the question.

12 Q.  (BY MR. T. MILLS) Would you give me a number, your

13 estimate as to how many coins you got?

14 A.  Altogether?

15 Q.  Yeah.

16 A.  Maybe, like, 5 or 600, I don't know.

17 Q.  Then, now I'm confused.  Altogether, you get 5 or 600.

18 The other man got --

19 A.  No.  I mean, altogether, it was in the suitcase you're

20 talking about?

21 Q.  Yes.

22 A.  About 5 or 600.  Maybe more.

23 Q.  Did you get exactly one-third, or do you know how many

24 each person got?

25 A.  I don't know how many each person got.

Cortez - Cross

1   Q.   Okay.  So you don't know if you got the same number as

2   Cardenas?

3   A.   No.  What we did was since they were in the little

4   containers, we'd open one and just pass one out to each of

5   them until they ran out and grabbed another one and did the

6   same thing.

7   Q.   All right.  So do you think that each of you got an equal

8   share?

9   A.   I believe so.

10  Q.   All right.  So each of you got a third of 600 is 200,

11  right?

12  A.   Yes.

13  Q.   Did you ever multiply 200 times 425?

14  A.   No, I didn't.

15  Q.   That would be $85,000.  Did you ever do anything to try to

16  figure out what was the approximate value of the coins you

17  had?

18  A.   No.

19  Q.   Did anybody else count them for you?

20  A.   No.

21  Q.   Were you curious as to how much money you had?

22  A.   No, I wasn't.  I just knew the money was there.

23  Q.   All right.  When you were first interviewed by the IRS,

24  you said you had stored money -- the coins in an automobile,

25  right?

*Cortez – Cross*

1  A.  I was never interviewed by the IRS.

2  Q.  Excuse me.  When you were interviewed by the FBI, you said

3  you had kept the coins in your car, correct?

4  A.  And a friend's car.

5  Q.  A friend's car.  Okay.  Now, when you were in this

6  interview with the FBI, had they told you about how we'll give

7  you immunity, but you have to tell the truth, and these kinds

8  of things?

9  A.  Yes.

10  Q.  All right.  And after having done that, you lied to the

11  FBI?

12  A.  Yes.

13  Q.  All right.  Now, then, you were interviewed again by the

14  FBI, and you said then that you actually stored them under

15  your bed?

16  A.  Yes.

17  Q.  Did you get immunity from a criminal tax prosecution for

18  failing to report that money as income?

19  A.  No.

20  Q.  Duo taxes on the money as income civilly?

21  A.  Not that I'm aware of.

22  Q.  Is there anybody else other than Cardenas and Valdez who

23  saw all the coins together, the big total amount of the coins?

24  A.  Just us three.

25  Q.  Just you three.  Did you keep any kind of written record

Cortez - Cross

1    of how you spent the coin money?

2    A.  No.

3    Q.  Do you -- has your attorney -- is it Mr. Garcia --

4    A.  Yes.

5    Q.  -- said that if you testify in this case that it might

6    help your ten-year murder sentence get reduced?

7    A.  No, he didn't.

8    Q.  Are you hoping that it will?

9    A.  I know it won't.

10   Q.  You know that it won't because?

11   A.  Because I just know it won't.

12   Q.  Okay.  What leads you to make that statement?

13   A.  I'm just guessing.  But you know --

14   Q.  Okay.  You hope it would, of course.

15   A.  Well, I know it's not.

16   Q.  Okay.  When was the last time that you talked to Larry

17   Soto?

18   A.  Sometime in '95.

19   Q.  Do you know where he went after that or if he is still in

20   San Antonio?

21   A.  I have no idea where he is.

22   Q.  Did the three of you, Mr. Cardenas and Valdez and

23   yourself, have a conversation about what explanation you would

24   give if it was ever found out that the coins were missing?

25   A.  No.

Cortez - Cross

1  Q.  After the day that the coins were taken, did you continue

2  to see Mr. Valdez some?

3  A.  I'd see him once in a while at a gentleman's bar, but that

4  was about it.

5  Q.  And did you see Mr. -- did you -- when you would see him,

6  would y'all whisper and talk about what was going on with the

7  coins?

8  A.  No.

9  Q.  Never a word spoken?

10  A.  I just told him I would see him when the money ran out and

11  that was basically it.

12  Q.  How about Mr. Cardenas?

13  A.  I only spoke to him that one day and that was all.

14  Q.  Never seen him again?

15  A.  No.

16  Q.  Never talked to him again?

17  A.  No.

18  Q.  Do you know what he does for a living?

19  A.  No, I do not.

20  Q.  Do you have any idea what he does for a living?

21  A.  No.

22  Q.  What happened to the master key to Master Locks?

23  A.  I have no idea where they are.

24  Q.  What did you do with them?

25  A.  I misplaced them.

Cortez - Cross

1   Q.   You misplaced them.  Did you have two?

2   A.   Did I have two?

3   Q.   Two?

4   A.   Yeah, there was two keys on there.

5   Q.   Okay.  I didn't know if you just -- did you steal one from

6   Mr. Soto?

7   A.   There was two keys on the key ring because you needed --

8   there was two kinds of patterns to the locks, so therefore, it

9   required two keys.

10  Q.   Clarify just a little bit.  If you had a lock, one of two

11  keys would fit it?

12  A.   Yes.

13  Q.   You didn't have to use both keys?

14  A.   No.

15  Q.   So you had two kinds of Master Lock keys?

16  A.   Yes.

17  Q.   Some would fit some Master Locks and others would fit

18  other Master Locks?

19  A.   That's correct.

20  Q.   But neither one of them would fit it if they had "master"

21  written across the bottom in blue?

22          MR. D. MILLS:  Asked and answered, your Honor, and

23  repeating.

24          THE COURT:  What else?

25          MR. T. MILLS:  That's all the questions I have, sir.

*Cortez - Redirect*

<u>RE-DIRECT EXAMINATION</u>

BY MR. D. MILLS:

Q.   What county is San Antonio in?

A.   Bexar County.

Q.   Do you have -- did you get a -- I'll ask you if you can

recognize this letter from the District Attorney's Office.

Have you seen that before?

A.   Yes, I have.

Q.   And that is for -- that's the immunity letter that you're

testifying as you understand it here today; is that correct?

A.   Yes.

Q.   And that is in Travis -- you know Austin is what county?

A.   Travis County.

Q.   Do you have a similar immunity letter from the Bexar

County District Attorney's Office for your burglaries of those

buildings that you said you committed?

A.   No.

Q.   Did -- have you ever seen this gentleman sitting over at

the table with a blue coat on before?

A.   No.

Q.   Have you ever seen this gentleman sitting right here?

A.   No.

Q.   And you've seen this lady before; is that correct?

A.   Yes.

Q.   Tell the jury what promises, if any, she made you

*Cortez - Recross*

1  regarding what would be done relative to your murder

2  conviction if you testified here.

3  A.  She didn't make any promises.

4  Q.  And when did you meet me for the first time?

5  A.  This morning.

6  Q.  Tell the jury what promises, if any, I made you relative

7  to that murder conviction.

8  A.  He didn't make any promises.

9  Q.  The black bag that you found that contained the gold

10  coins, does it look like this?

11  A.  No.

12  Q.  Does it look like this?

13  A.  No.

14  Q.  Do you know what a suitcase is?

15  A.  Yes.

16  Q.  Would you characterize it more as a suitcase or briefcase,

17  the bag that was in the locker where you found the coins?

18  A.  A suitcase.

19  Q.  And what type of material was it made out of, if you

20  remember?

21  A.  I don't know.

22  Q.  That's all I have, your Honor.

23                    RE-CROSS EXAMINATION

24  BY MR. T. MILLS:

25  Q.  Do you know if it had a handle that pulled out of it or

*Valdez - Direct*

1   not?

2   A.  Yes, it did.

3   Q.  No -- that's all the questions I have.

4        THE COURT:  May this witness be excused?

5        MR. D. MILLS:  Yes, your Honor.

6        MR. T. MILLS:  Yes, sir.

7        THE COURT:  You may be excused, sir.  You may call

8   your next witness.

9        MR. D. MILLS:  Mr. Valdez.  Jaime Valdez.

10        THE COURT:  If you'll come right about there, please,

11  and stop.

12    (Witness was sworn.)

13        THE COURT:  I need you to walk right across here,

14  please, sir, around this column over here by me, and sit in

15  the witness chair.  If you'll tell us your full name, please,

16  sir, and spell your last name.

17        THE WITNESS:  Jaime Rene Valdez, V-A-L-D-E-Z.

18   JAIME RENE VALDEZ, called by the Government, duly sworn.

19                DIRECT EXAMINATION

20  BY MR. D. MILLS:

21   Q.  Where do you live, sir?

22   A.  San Antonio, Texas, 123 West Rosewood.

23   Q.  And how are you employed?

24   A.  I'm not working now.

25   Q.  How old are you?

*Valdez - Direct*

```
 1    A.   Twenty-four years old.

 2    Q.   Have you been convicted of any criminal offenses?

 3    A.   I have a misdemeanor assault that I have been convicted.

 4    Q.   Anything other than misdemeanor of assault?

 5    A.   On probation for aggravated assault and unlawful carrying,

 6    but I haven't been legally convicted.

 7    Q.   When you say "unlawful carrying," unlawful carrying what?

 8    A.   A weapon.

 9    Q.   What type of a weapon?

10    A.   .380 caliber handgun.

11    Q.   And what county are you -- is this deferred adjudication

12    for the aggravated assault?

13    A.   Correct, for both of them.

14    Q.   And what county is that that you're on?

15    A.   Bexar County.

16    Q.   Do you know Mr. Cortez?

17    A.   Yes, I do.

18    Q.   Tell the jury how you know Mr. Cortez.

19    A.   Through high school.

20    Q.   And what city was this?

21    A.   San Antonio, Texas.

22    Q.   Tell the jury what criminal activities you've engaged in

23    with Mr. Cortez.

24    A.   We broke into a storage facility together.

25    Q.   How many storage facilities?
```

*Valdez - Direct*

1   A.   One.  One or two.

2   Q.   In different counties?

3   A.   No.  Just in one county.

4   Q.   Which county would that be?

5   A.   Here in Austin, Travis County.

6   Q.   Did you get -- were you given some type of immunity to

7   come here to testify today?

8   A.   Yes, I was.

9   Q.   And tell the jury what your understanding of that immunity

10  agreement is that you have and who that immunity agreement is

11  with.

12  A.   That I corroborate with the federal agents, tell them

13  everything I know, I'll get immunity for burglary in Austin.

14  Q.   What burglary in particular?

15  A.   Burglary that took place at a storage facility.

16  Q.   And when did this burglary of this storage facility occur?

17  A.   October 3rd in 1995.

18  Q.   And how do you remember that particular date?

19  A.   That's the date that O.J. Simpson got convicted.  I

20  remember hearing that on the radio.

21  Q.   You said the day O.J. Simpson got convicted?

22  A.   Oh, got not guilty.

23  Q.   Tell the jury how you came to be involved in this burglary

24  enterprise here in Austin, Travis County, on that date in

25  October.

*Valdez - Direct*

1    A.   Well, in October 2nd, me and Cortez were talking about

2    going up to Austin.  We needed a ride, so me and Cortez had

3    another person drive us up there to break into storage

4    facilities.

5    Q.   And who was this other person?

6    A.   Cardenas, Joey Cardenas.

7    Q.   And how do you know him?

8    A.   A friend of a friend.

9    Q.   So what did y'all do in terms of starting out that

10   morning?  Tell the jury how you got to come to Austin.

11   A.   Well, we got up early in the morning, Cortez met me at my

12   house, and the other -- Joey Cardenas came over there, and

13   then, we headed out for Austin.  We'd go around -- we don't

14   know the Austin area too much, so we drove around, and we went

15   to the first storage facility we came across.

16   Q.   And what I -- why were you going to storage facilities?

17   A.   Because Cortez had skeleton keys to open certain locks.

18   Q.   Do you know what type of locks would open?

19   A.   I think it was the Master Lock.

20   Q.   How many keys did he have?

21   A.   I think it was just one.

22   Q.   There's a set of photographs, I believe, on the desk in

23   front of you.  Would you look at the back of them and tell the

24   reference number?  It says Government Exhibit W70-something?

25   A.   73.

*Valdez - Direct*

1   Q.  W70-3, is that --

2   A.  Correct.

3   Q.  And another one, also?

4   A.  70-2.

5   Q.  I want to ask you to now look at those and see if you can

6   identify those photographs.

7   A.  Yes, I can.

8   Q.  And you can identify them for what reason?

9   A.  This is the facility that we broke into.

10  Q.  We'd offer W70-3 and W70-2, your Honor.

11       MR. T. MILLS:  No objection.

12       THE COURT:  They're received.

13  Q.  (BY MR. D. MILLS) Can you tell the jury why you and Mr.

14  Cortez and Mr. Cardenas picked this particular unit to go to?

15  A.  No particular reason.  We just -- the first one we saw.

16  Q.  And you ultimately found a black bag with gold coins at

17  that unit; is that correct?

18  A.  Correct.

19  Q.  And prior to finding the black bag with gold coins, did

20  you take anything else out of that unit, and if so, what did

21  you take?

22  A.  Out of the facility or that particular unit?

23  Q.  That particular facility.  Not that particular unit.  Just

24  the facility.

25  A.  Right before that, we went to that facility, and we stole

*Valdez - Direct*

1   I think, two TVs that we couldn't pawn, so we just put them

2   away.  And we left that facility, we went looking for another

3   place.  We couldn't find any, so we went back.

4   Q.  And what did you do when the burglaries were going on at

5   the facilities?

6   A.  I distracted the management.

7   Q.  How did you do that?

8   A.  I went in there acting like I was interested in renting a

9   storage facility.

10  Q.  Were you actually present when the black bag that

11  contained the gold coins was taken out of the locker?

12  A.  No, I wasn't.

13  Q.  When did you first see that black bag with the gold coins?

14  A.  I was walking back to the car.  I saw them taking that

15  black bag into the car.

16  Q.  When you say you saw them, who did you see?

17  A.  Cortez and Cardenas.

18  Q.  What did y'all do after the black bag was put in Mr.

19  Cardenas' car?

20  A.  We left.

21  Q.  Where did you go?

22  A.  We went to go eat.

23  Q.  Do you remember where?

24  A.  Burger King.

25  Q.  When did you first know there were coins in that black

*Valdez - Direct*

1  bag?

2  A.  Right after we left the facility, I opened it up.  I was

3  in the back seat with the bag.

4  Q.  Show you what's been admitted as W57-2.  Does that appear

5  to be the type of coins that you found in that bag?

6  A.  Correct.

7  Q.  And you see in the upper right-hand corner there appear to

8  be something in rolled containers.  Have you ever seen that

9  before?

10  A.  Yes, I have.

11  Q.  Can you tell the jury where it was when you saw those

12  rolled-type containers?

13  A.  Those were in the black bag.

14  Q.  If I show you what's been admitted as W11-6, is that the

15  same storage unit?

16  A.  Correct.

17  Q.  Do you recognize any of the -- all the photographs in

18  there?  Does it appear to be the particular unit that you

19  robbed?  Do you remember that far back?

20  A.  Yeah, it is.  I can tell by the sign.

21  Q.  Okay.  After you discovered the gold coins and you had

22  lunch, what did you next do relative to your criminal

23  enterprise here?

24  A.  We went to a book store to look up to see how much the

25  coins were worth.

*Valdez - Direct*

1   Q.  And did you find out how much they were worth?

2   A.  No, we had no luck, so we didn't find out until the next

3   day.

4   Q.  How did you find out till the next day?

5   A.  When I got back into San Antonio, I gave three of them to

6   a friend of mine, and so he came back the next day to me,

7   telling me how much they're worth.  And by then, Cortez and

8   Cardenas had already called me, also, telling me they found

9   out how much they were worth.

10  Q.  And when you left the storage unit after you had the black

11  bag in the trunk, did you burglarize any more buildings that

12  day?

13  A.  No.  We went home.

14  Q.  When you say you went home, where did you go?

15  A.  San Antonio.

16  Q.  To whose place?

17  A.  My house.

18  Q.  What did you do once you were there?

19  A.  We divided up all the gold.

20  Q.  Tell the jury how you went about dividing up the coins.

21  A.  We took them all out of the black bag and just handed them

22  out to each other.

23  Q.  Do you know the approximate value of the coins that you

24  obtained from this burglary?

25  A.  Me, myself, I figured anywhere between 120 and 140,000.

*Valdez - Direct*

1  Q.  Can you tell the jury what you did with the money that you

2  obtained?

3  A.  Bought cars, leased houses, clothes, went out.

4  Q.  When you say you "went out," where did you go to spend

5  this money?

6  A.  Strip clubs.

7  Q.  Did you take the gold coins and give them to people or how

8  did you --

9  A.  No.  The money was turned to cash.

10  Q.  How did you turn the money into cash?

11  A.  Well --

12  Q.  Or the coins into cash?

13  A.  The next day, October 4th, I gave all my coins to one

14  particular person, so he just cashed in everything for me.  So

15  I didn't have to sign my name or do anything.  I never saw the

16  coin again after October 4th.  I just saw the money.

17  Q.  How much money did you receive in cash that day?

18  A.  About 3,000.  The next day, I cashed out for 3,000.  I

19  went shopping.  And then, later on that week, I cashed out for

20  about 10,000.  Bought a car.

21  Q.  So how much money did you ultimately get out of the theft

22  of the coins?  Did you get just 13,000?

23  A.  Oh, no, I got the full amount pretty much, about $120,

24  $140,000.

25  Q.  So you did that by doing what with the coins?

*Valdez - Direct*

1    A.  I gave them to my friend, and my friend would go cash them

2    in at the coin stores or pawn shops, wherever.

3    Q.  And how much did you give your friend for assisting you in

4    doing this?

5    A.  I gave him $50 for each one.

6    Q.  And what was the name of this person that you used to

7    assist you?

8    A.  Armando Rodriguez.

9    Q.  How long did it take you to spend the 120 to $140,000?

10   A.  About four to six months.

11   Q.  Did you travel anyplace outside of Texas to cash the -- to

12   convert the coins?

13   A.  No, I didn't.

14   Q.  Do you remember the name of any of the places where the

15   gold coins were converted into currency in the San Antonio

16   area, if that's where it occurred?

17   A.  Dellview was one of the places.  Not any particular coins,

18   but I know some of the other guys went and cashed theirs

19   there.

20   Q.  Did you go to topless bars, I believe you said?

21   A.  Correct.

22   Q.  How much money would you spend in an evening when you

23   would go there?

24   A.  A minimum a thousand a night, I would take, at least.

25   Q.  And how many automobiles did you buy with the proceeds of

*Valdez - Cross*

1  this gold?

2  A.  I bought three cash and I was paying payments on another

3  one.

4  Q.  Pass the witness, your Honor.

5                    CROSS-EXAMINATION

6  BY MR. T. MILLS:

7  Q.  Mr. Valdez, I want to ask you what it is that you have

8  legal immunity from.

9  A.  From the burglary in Austin.

10  Q.  All right.  Did you do other burglaries with Mr. Cortez?

11  A.  My first one.

12  Q.  And on that day that O.J. Simpson was acquitted, you did,

13  maybe, one burglary for some TVs before the coins?

14  A.  Correct.

15  Q.  And were you in charge of distracting the manager the

16  first time you went to that storage unit?

17  A.  No.  The first time, we didn't even think about that.  We

18  thought it was kind of fishy to go back again, so that's why I

19  went and distracted the manager.

20  Q.  All right.  And why were you not able to pawn two TVs?

21  A.  They were very old.

22  Q.  So they were literally worthless?

23  A.  Pretty much.  They didn't even want to give us $5 for

24  them.

25  Q.  All right.  Do you have immunity from having your pro --

*Valdez - Cross*

1  your felony probation revoked?  In other words, you're on

2  felony probation right now, right?

3  A.  Correct.

4  Q.  And one of the requirements of probation is that you not

5  violate the law.

6  A.  Correct.

7  Q.  And so you have violated the law?

8  A.  Correct.

9  Q.  But you're not going to get your probation revoked,

10  correct?

11  A.  No.

12  Q.  No, you're not going to get it revoked?

13  A.  Right.

14  Q.  Do you have immunity from federal prosecution?

15  A.  I'm not sure.  I would believe so.

16  Q.  Do you have to pay income tax on the 120 or $140,000 that

17  you got?

18  A.  No.

19  Q.  You won't get criminally prosecuted for failing to report

20  income either, will you?

21  A.  I'm not sure.

22  Q.  You've never heard that you would?

23  A.  Correct.  Never heard that I would.

24  Q.  How well did you know Joe Cardenas on October the 3rd,

25  1995?

*Valdez – Cross*

1   A.   I know him pretty good.

2   Q.   You used the phrase he was a friend of a friend.

3   A.   Right.

4   Q.   Who was he a friend through?

5   A.   My friend Adrian.

6   Q.   Who?

7   A.   My friend Adrian.

8   Q.   Adrian?

9   A.   Correct.

10  Q.   What's Adrian's last name?

11  A.   Rodriguez.

12  Q.   Is that a male or female?

13  A.   A male.

14  Q.   And had you ever met Mr. Cardenas before?

15  A.   Yes, sir.

16  Q.   And did you call him simply because he had an automobile?

17  A.   His name came to mind because, yeah, he did have an

18  automobile, but during that time, we had still talked and gone

19  out together and hung out.

20  Q.   You and Cardenas?

21  A.   Right, we were still friends before.  Just didn't call him

22  out of the blue.

23  Q.   Had you done crimes together?

24  A.   No.

25  Q.   What kind of work did Cardenas do?

*Valdez - Cross*

1  A.  At that time, I'm not sure what he did.  I know right now,

2  he works for an investigating company.  I don't remember what

3  he did back then.

4  Q.  What kind of work did you do in 1995?

5  A.  Well, I worked at the mall.

6  Q.  For what?

7  A.  A fast food in the food court.

8  Q.  And what kind of work did Mr. Valdez do then -- Mr. Cortez

9  do then?

10  A.  I think, if I remember correctly, he -- I think he worked

11  for a telemarketing company, but I think he quit that day we

12  went to Austin, or he didn't go in or something like that.

13  Q.  And when you three decided to go to Austin, was that for

14  the purpose of just having a recreational day or for the

15  purpose of doing burglaries?

16  A.  For the purpose of doing burglaries.

17  Q.  Mr. Cardenas knew that?

18  A.  Correct.

19  Q.  And he voiced no objection to going to do burglaries?

20  A.  No, he didn't.

21  Q.  Now, was the first time you were interviewed by any law

22  enforcement agency or law enforcement agent 1999?

23  A.  Yes, it was.

24  Q.  In other words, in 1995 and 1996, 7 and 8, the three of

25  you had basically gotten by with this coin theft, correct?

*Valdez - Cross*

1  A.  Correct.

2  Q.  No one had filed a warrant for theft against you for

3  burglary?

4  A.  No.

5  Q.  Okay.  And then, all of a sudden, what happens?  You're

6  approached by a -- how did you find out that you were being

7  investigated?

8  A.  It was all over the papers.  Well, no, I'm sorry.

9  Actually, all the guys were talking about it.  Cortez had

10  about ten people selling the coins for him, and so all the

11  agents were going to them.  I never put my name on anything,

12  so they never knew about me.  I voluntarily went.

13  Q.  Went where?

14  A.  To go -- I went to my lawyer's office, and from there, we

15  set up a meeting with the federal agents.

16  Q.  And you went to be interviewed?

17  A.  Correct.

18  Q.  And when -- okay.  When you went to your lawyer's office

19  and you told -- did you tell your lawyer or did you know that

20  you were being investigated for break-in of the storage unit?

21  A.  No, I didn't know I was being investigated, but I knew my

22  name was going to come up sooner or later, so I thought I'd go

23  talk to the lawyer.

24  Q.  All right.  Now, at that time, you did not remember what

25  day of the month it was, did you?

*Valdez - Cross*

1  A.  Yes, I did.

2  Q.  In other words, you remembered in 1999 that you broke into

3  a storage unit on October 3rd, 1995?

4  A.  I remember exactly that day.

5  Q.  And how did you remember that?

6  A.  That's the date that he was acquitted.

7  Q.  Okay.  How did you know that O.J. was acquitted on October

8  3rd, 1995?

9  A.  Because when we were in Austin, we stopped in a little

10  store to get something to drink -- or I don't know why we

11  stopped, but we were in the car, and we all just stayed quiet

12  because they had the verdict on the radio.

13  Q.  All right.  And then, thereafter, forever, for the next

14  four years, you remembered that it was October 3rd, 1995 that

15  O.J. was acquitted?

16  A.  Yeah, it's not something you forget.

17  Q.  All right.  What other memorable historic events do you

18  remember in 1995, like something happened on such and such a

19  date?

20  A.  That's the only one that's significant.

21  Q.  Okay.

22  A.  October 3rd.

23  Q.  Okay.  Do you remember any significant people who have

24  died or been elected to a federal office in 1995, 6, 7 or 8?

25  Can you tell me any dates?

*Valdez - Cross*

1  A.  No.

2  Q.  Do you have any brothers or sisters?

3  A.  I have three older sisters.

4  Q.  Do you know their birth dates?

5  A.  I don't know any of the birth dates.

6  Q.  Do you know your parent's birth dates?

7  A.  No.

8  Q.  Do you know your birth date?

9  A.  It's tomorrow.

10  Q.  You remember that Mr. Cortez had one key, correct?

11  A.  Yeah, one or two.

12  Q.  Could it have been three or four?

13  A.  I don't think three or four.  I think one or two.

14  Q.  Okay.  Why would you -- did you see a key?

15  A.  Yes, I did.

16  Q.  Okay.  Do you remember seeing a key?

17  A.  Yes, I do remember seeing a key.

18  Q.  Do you remember seeing a key as well as you do remembering

19  the radio saying O.J. Simpson got acquitted?

20  A.  No, not that good.

21  Q.  Okay.

22  A.  That's why I can't say I don't remember if I saw one key

23  or two keys, but I definitely did see a key.

24  Q.  You saw at least one key?

25  A.  Correct.

*Valdez - Cross*

1    Q.   Was it a silver key?

2    A.   I don't remember.

3    Q.   Was it a bronze or gold key?

4    A.   I know -- no.  I would remember that.  I think it was a

5    silver key.  I'm not sure.

6    Q.   If it wasn't a silver key, what color would it have been?

7    A.   I have no idea.

8    Q.   Okay.  But you're not sure that it was a silver key?

9    A.   Right.

10   Q.   Were you there during the first break-in where -- was

11   there two TVs taken from one storage unit or two TVs taken

12   from two storage units?

13   A.   Two TVs taken from one storage unit.

14   Q.   You were right there?

15   A.   Right.

16   Q.   You had to go up to -- were you standing beside Mr. Cortez

17   when he was working on the lock -- I mean, not this lock, but

18   a lock?  Were you standing right beside him?

19   A.   I don't remember.  I don't remember if I was standing by

20   him.

21   Q.   Were you standing near him when he opened up and saw two

22   TVs inside?

23   A.   Yeah, because I think I'm the one who grabbed one of the

24   TVs.

25   Q.   And he got the other?

*Valdez - Cross*

1   A.   Yeah.

2   Q.   All right.  Do you remember whether or not he tried one

3   key or two keys?

4   A.   No, I don't remember that.

5   Q.   All right.  Of the things that you bought -- that you say

6   that you bought with this stolen money, were they -- they were

7   confiscated by the FBI?

8   A.   No.

9   Q.   You got to keep them?

10  A.   No, I no longer had it.

11  Q.   You didn't have anything by the time they interviewed you?

12  A.   No, sir.

13  Q.   Nothing?

14  A.   Three-year-old daughter.

15  Q.   I mean, material things that you bought?

16  A.   No.

17  Q.   It's my understanding that you drove from San Antonio to

18  Austin.  Did you drive to Austin in the morning?

19  A.   Yeah, we left in the morning.

20  Q.   It's about an hour drive?

21  A.   Yeah.

22  Q.   And you drove on the highway that connects the two, 35?

23  A.   Right.

24  Q.   And you started driving around Austin?

25  A.   Correct.

*Valdez - Cross*

1   Q.  And you got all the way to Burnet Road before you saw a

2   storage unit?

3   A.  Yeah, I think so.  We stopped at the first one we saw.

4   Q.  Stopped at the first one you saw?

5   A.  Right.

6   Q.  Now, the time that you distracted the management, did you

7   actually get into the back seat of the car and the black

8   suitcase was back there?

9   A.  Right.

10  Q.  Okay.  Would you describe the black suitcase?

11  A.  Yeah, it had wheels on it, a handle.  It was about -- I

12  don't know how big, about this big.  One of those that you

13  carry and you roll.

14  Q.  Okay.  When you got to your house, did you -- were all of

15  the coins taken out of their wrappers?

16  A.  Right.

17  Q.  And were they actually counted?

18  A.  No, they weren't counted.

19  Q.  Do you know if you got the same number as the other two?

20  A.  Cortez got the most.

21  Q.  Cortez got the most.

22  A.  Right.

23  Q.  And then, you and Valdez got something less?

24  A.  Me and Cardenas got something less.

25  Q.  You and Cardenas?

*Valdez - Cross*

1    A.  Got something less.

2    Q.  All right.  And was that done intentionally or did Cortez

3    just grab more?

4    A.  No, I don't know how it happened, but there was some left

5    over and we just gave them to Cortez.  We didn't know how much

6    they were worth at the time.

7    Q.  The three cars -- you paid for three cars in cash?

8    A.  Correct.

9    Q.  And by the time you got interviewed, you didn't own any of

10   those cars?

11   A.  They were all wrecked.

12   Q.  Where were they, the wrecked cars?

13   A.  I sold them.

14   Q.  And did you buy jewelry?

15   A.  No, no jewelry.

16   Q.  Did you buy guns?

17   A.  No guns.

18   Q.  What else did you buy besides the cars and the strip

19   clubs?

20   A.  I leased houses, clothes, that was all.

21   Q.  Did you buy any houses?

22   A.  No.

23   Q.  Buy any furniture?

24   A.  No.

25   Q.  You spent 120 to $140,000 on renting apartments, clothes

*Valdez - Cross*

1  and three cars?

2  A.  Mostly went to the strip clubs.

3  Q.  And you spent a thousand dollars a night at the strip

4  club?

5  A.  At least.

6  Q.  Sometimes $10,000 a night at a strip club?

7  A.  No, not that much.  But I spent, like, at least about a

8  thousand to 1500, but I went every day.

9  Q.  So you spent, what, $50,000 a month, you're saying, on

10  strip clubs?

11  A.  I don't know exactly how much it is, but I know I spent a

12  lot.

13  Q.  Well, if there are 30 days in a month, did you really go

14  every day?

15  A.  Pretty much.  I had a girlfriend that worked there.

16  Q.  So you gave your girlfriend a thousand to $1500 a day?

17  A.  I don't know about that, but I remember giving her about

18  500 bucks so she wouldn't go to work so we could just stay

19  home.

20  Q.  And then, so that you could just stay home and then, you

21  went to the strip club?

22  A.  No.  We would stay home -- I would compensate the money

23  that she was going to lose from not going to work.

24  Q.  So you didn't actually spend it on strippers at the strip

25  club?

*Valdez - Cross*

1  A.  Oh, yeah, I did.  That was just like, maybe, once a week,

2  but I mostly was at the strip club.  That's where you could

3  find me.

4  Q.  Okay.  Did it all -- was she a dancer, your girlfriend?

5  A.  Right.

6  Q.  And did you spend it all on her or her friends?

7  A.  Both.

8  Q.  Okay.  And the idea is that you just give the money?

9  A.  Well, yeah, took them and buy drinks, and buy drinks for

10  everybody, and buy drinks for the waitresses, and buy drinks

11  for every stripper in there.

12  Q.  And, of course, you don't get any kind of receipt or proof

13  that you spent your money there, do you?

14  A.  You could go ask them.  They still remember me.

15  Q.  They lost a good customer?

16  A.  I think they did.

17  Q.  So you spent $120,000 to $140,000.  What kind of cars did

18  you buy?  Mustangs?

19  A.  I had a high performance Mustang, a convertible LeBaron,

20  Accura Legend, and I'm making payments on a '95 Prelude, Honda

21  Prelude.

22  Q.  What are the three that you bought in cash?

23  A.  The Accura Legend and LeBaron and the Mustang.

24  Q.  How much did you pay for the Legend?

25  A.  I think that was about 3,000.

*Valdez - Cross*

1    Q.   How much did you pay for the Mustang?

2    A.   Mustang was 7,000 -- 7 or 8,000.

3    Q.   How about the LeBaron?

4    A.   The LeBaron was, like, 5,000, 6,000.

5    Q.   So that's 15,000.

6    A.   Oh, and I bought a stereo -- I bought a $3,000 stereo

7    system for the Mustang.  I added a bunch of stuff to it.

8    Q.   So, maybe, $20,000 on cars plus the stereos?

9    A.   Yeah.

10   Q.   Okay.  So that still leaves 100 to $120,000 that you would

11   have dropped at strip clubs?

12   A.   And I leased houses and hotels.

13   Q.   When you say you leased houses, do you mean to live in?

14   A.   Correct.

15   Q.   So you make a payment once a month?

16   A.   Yeah, but I was living at -- I was making two different

17   payments at the same time.  I had two houses.

18   Q.   Okay.  And that was because you --

19   A.   I live with my girlfriend and making the payments on that

20   house, and I had my own house that I leased.  So I still had a

21   house to go into whenever we fight.

22   Q.   So, maybe, 500 a month per house?

23   A.   Right.

24   Q.   But that didn't last too long if you spent it all --

25   A.   No, it didn't last too long.

*Valdez - Redirect*

1   Q.  And then, you were contacted by the FBI.  When you were

2   contacted by the FBI, did you demand immunity, or did you even

3   know exactly what immunity was?

4   A.  No, I didn't demand it.  I think it was something my

5   lawyer brought up.

6   Q.  So you have, to your knowledge, complete immunity.  That

7   means, in your mind, that means the law enforcement are not

8   going to do anything to you?

9   A.  Correct.

10  Q.  Okay.  For 120 to $140,000 theft --

11        MR. D. MILLS:  Should be $140,000, your Honor.

12  Q.  (BY MR. T. MILLS) -- times three, a $600,000 theft, you

13  thought that was a pretty good deal?

14  A.  Right.  Well, who wouldn't?

15  Q.  That's all the questions I have.

16                   RE-DIRECT EXAMINATION

17  BY MR. D. MILLS:

18  Q.  Were you on probation for these -- this deferred

19  adjudication that you're talking about relating to the weapon

20  and the aggravated assault at the time that you committed this

21  burglary?

22  A.  Yes, I was.

23  Q.  You were.  And that was in -- and when did that occur?

24  A.  I got on probation on that August -- August of '95, I was

25  put on probation.

*Valdez - Redirect*

1  Q.  Do you -- I'll show you a letter and ask you if you

2  recognize this letter.

3  A.  Yes, I recognize that.

4  Q.  Is that letter addressed to your lawyer?

5  A.  No.  I think you gave me Cortez'.

6  Q.  Okay.  Do you have a letter that's similar to that?

7  A.  Correct.

8  Q.  And it comes from the Travis County District Attorney's

9  Office; is that correct?

10  A.  Correct.

11  Q.  Do you have -- in the deferred adjudication that you're

12  on, what county is that from?

13  A.  Bexar County.

14  Q.  Do you have any kind of agreement with the Bexar County

15  District Attorney's Office regarding your testifying here in

16  this proceeding?

17  A.  Not that I'm aware of.

18  Q.  Did Mr. Martin, the gentleman sitting over there at the

19  table where I was sitting, have you ever talked to him before?

20  A.  No.

21  Q.  Did you get any type of -- who gave you a promise that you

22  wouldn't have to pay income tax on the money that you received

23  from this theft?

24  A.  That's never, ever came up.

25  Q.  No one ever gave you such a representation?

*Valdez – Redirect*

1   A.   No one ever gave me that promise or brought that question

2   up.

3   Q.   Did anybody here at this table, this agent or that agent,

4   tell you that you were going to get anything relative to your

5   deferred adjudication if you testified here?

6   A.   No.

7   Q.   Who is your lawyer?

8   A.   Allen Brown.

9   Q.   Is that the immunity letter from the Travis County

10   District Attorney's Office that relates to your testifying

11   here relative to the theft of those gold coins?

12   A.   Yes, it is.

13   Q.   And it's directed to your lawyer; is that correct?

14   A.   Correct.

15   Q.   And the date of that letter?  Look at the top, maybe.

16   A.   June 3rd, 1999.

17   Q.   We'd offer W70-4, your Honor.

18        MR. T. MILLS:  No objection.

19        THE COURT:  Received.

20        MR. D. MILLS:  Pass the witness.  Oh, may I have one

21   more question?

22        THE COURT:  Sure.

23   Q.   (BY MR. D. MILLS) Can you spell the name of the individual

24   for me that you gave the gold coins to?  You said Armando?

25   A.   Armando Rodriguez.

*Valdez - Recross*

1  Q.  R-O-D-R-I-G-U-E-Z?

2  A.  Correct.

3  Q.  Thank you, your Honor.

4                    RE-CROSS EXAMINATION

5  BY MR. T. MILLS:

6  Q.  The aggravated assault that you're on probation for,

7  that's a -- is it your understanding, a recollection that

8  that's a second degree felony?

9  A.  I'm not sure what kind of felony it is.

10  Q.  How many years probation are you on?

11  A.  Ten.

12  Q.  So it's your understanding that if the prosecution decided

13  to try to move to adjudicate that felony, that you could get

14  up to at least ten years?

15  A.  Correct.

16  Q.  But you're safe from that?

17  A.  Correct.

18  Q.  Allen Brown is your attorney?

19  A.  Correct.

20  Q.  Did you retain him or did someone else retain him?

21  A.  Cardenas retained him for both of us.

22  Q.  All right.  And did Cardenas tell you that he was

23  retaining a lawyer for both of you?

24  A.  Correct.

25  Q.  Did you talk to Cardenas about the fact that people were

*Valdez - Recross*

1  getting interviewed by the FBI and that this thing might come

2  to light?

3  A.  Correct.

4  Q.  Did you call Cardenas or did he call you?

5  A.  He called me because the agents went to his house.

6  Q.  And then, he called you?

7  A.  Correct.

8  Q.  That's all the questions I have.

9       MR. D. MILLS:  Nothing further.

10      THE COURT:  May this witness be excused?

11      MR. D. MILLS:  Yes, your Honor.

12      THE COURT:  Just have a seat.  Members of the jury,

13  I'm going to give you your morning break.  You're not

14  restricted to inside, but be ready to come back in 15 minutes.

15      (Jury not present.)

16      THE COURT:  Mr. Cardenas, I want to ask you a couple

17  of questions and make sure I understand it.  You've got

18  deferred adjudication for assault, aggravated assault and

19  unlawful carrying of a weapon?

20      THE WITNESS:  No.  I have it for aggravated assault

21  and unlawful carrying.

22      THE COURT:  And unlawful carrying.  All right.  You

23  may be excused.

24      THE WITNESS:  Thank you.

25      THE COURT:  Counsel, you indicated Exhibit 57-2 has

*Cardenas - Direct*

1   been admitted.  No tender has been made.  You've referred to

2   57-2, but it hasn't been admitted.  It's been displayed

3   several times before the jury.  Is there any objection to

4   57-2?

5          MR. T. MILLS:  No, sir.

6          THE COURT:  All right.  It will be admitted.  All

7   right.  Fifteen minutes.

8       (Recess.)

9          MR. D. MILLS:  Mr. Cardenas.

10          THE COURT:  Come forward, please.  Stand right there

11   and be sworn.

12       (Witness was sworn.)

13          THE COURT:  Now, walk around this column, please, sir,

14   and have a seat here.  Tell us your full name, please, sir,

15   and spell your last name.

16          THE WITNESS:  Joe Cardenas, C-A-R-D-E-N-A-S.

17       JOE CARDENAS, called by the Government, duly sworn.

18                    DIRECT EXAMINATION

19   BY MR. D. MILLS:

20   Q.  Where do you live, sir, and how are you currently

21   employed?

22   A.  I live in San Antonio, Texas, and I'm employed as an

23   investigator.

24   Q.  And for whom?

25   A.  For Employers Surveillance.

*Cardenas - Direct*

1    Q.  And what do you do basically for a living, then?

2    A.  Investigator.  I do investigative work.

3    Q.  Tell the jury what type of investigative work is it?

4    A.  Mainly photo surveillance.

5    Q.  In what area?

6        THE COURT:  Did you say photo surveillance?

7        THE WITNESS:  Yes, in photo surveillance.

8    Q.  (BY MR. D. MILLS) What do you do photo surveillance on?

9    What kind of clients do you have?

10   A.  Individuals.  The clients are usually insurance companies.

11   Q.  In front of you, there's a document that's labeled with a

12   number W71-1.  Do you see that?

13   A.  Yes, sir.

14   Q.  Are you familiar with that document?

15   A.  Yes, I am.

16   Q.  And you have a lawyer on that document; is that correct?

17   A.  Yes.

18   Q.  And your lawyer was?

19   A.  Allen Brown.

20   Q.  And in reference to a theft or burglary of a storage shed,

21   you got immunity; is that correct?

22   A.  Yes.

23   Q.  And that's what that letter references; is that correct?

24   A.  Correct.

25   Q.  And that's the -- that is the true -- that is a true and

*Cardenas - Direct*

1  accurate copy?

2  A.  Yes.

3  Q.  We'd offer W71-1.

4      MR. T. MILLS:  No objection.

5      THE COURT:  It's received.  Is that 71-1?

6      MR. D. MILLS:  71-1, your Honor.

7  Q.  (BY MR. D. MILLS) Would you tell the jury your

8  understanding of your immunity as given by that letter from

9  the District Attorney's Office?

10 A.  Yes, in exchange for my testimony, they won't prosecute

11 me.

12 Q.  They being which district attorney's office?  Does it say?

13 A.  For state, I believe.

14 Q.  And does it say -- do you see at the very top of it, it

15 has a seal of the State of Texas; is that correct?

16 A.  Correct.

17 Q.  And underneath it, does it say which county?  Look right

18 at this seal, right up here at the top.

19 A.  It doesn't -- Travis County.

20 Q.  Do you have any convictions for any other criminal

21 activity?

22 A.  No.

23 Q.  Has any other type of promise or offer of immunity been

24 given to you besides what's stated on this letter --

25 A.  No.

*Cardenas - Direct*

1   Q.   -- of your coming here to testify today?

2   A.   No.

3   Q.   Will you tell the jury how you came to be involved in this

4   burglary that is referenced in that letter of immunity?

5   A.   A friend of mine, Jaime Valdez, came to me and said he had

6   another friend, Mr. Cortez, and they were interested in going

7   to Austin to go into storage sheds and asked me if I was

8   interested in driving them.

9   Q.   Had you ever done anything like this before?

10  A.   No.

11  Q.   Who had the means by which the burglaries were going to be

12  committed?

13  A.   Mr. Cortez.

14  Q.   And what did he have that was going to be utilized to

15  commit these burglaries?

16  A.   He had a master key for a brand of locks.

17  Q.   Why did you decide to come to Austin instead of San

18  Antonio?

19  A.   Well, it was explained to me that Mr. Cortez had already

20  used the key several times in San Antonio, and he wanted a

21  different area.

22  Q.   What time of the day did the three of you come to Austin?

23  A.   We came in the morning hours.

24  Q.   Did you hear anything on the radio that was of some

25  significance to you that was occurring at that point in time?

*Cardenas - Direct*

1    A.   Yes.

2    Q.   And what would that have been?

3    A.   The Simpson verdict.

4    Q.   Do you know the date that the Simpson verdict was that it

5    was a specific day?

6    A.   I believe it was October the 3rd, '95.

7    Q.   When you came to Austin, how many units did you go and

8    attempt to burglarize that day?

9    A.   Two or three.

10   Q.   Do you recall which was the first one that you went to?

11   A.   As far as location?

12   Q.   Yeah, which storage unit did you go to first, if you

13   recall?

14   A.   No, I don't recall the order or the names.

15   Q.   I want to show you what's been admitted as W11-6, and ask

16   you if you've ever been to that storage unit before?

17   A.   Yes.

18   Q.   And can you tell the jury when it was that you were at

19   that storage unit and what all that you may have stolen from

20   various units there?

21   A.   We were there on the afternoon of October the 3rd, '95,

22   and we -- from one of the storage units, we got a black

23   suitcase.

24   Q.   Did you take anything other from that storage unit earlier

25   in the day before you found the black suitcase?

*Cardenas - Direct*

1   A.   No.

2   Q.   What did you find in the black suitcase?

3   A.   Gold coins.

4   Q.   I'm going to show you what's been admitted as W57-2.   Does

5   this appear to be pictures of the gold coins, the types of

6   gold coins that you stole?

7   A.   Yes.

8   Q.   And up at the upper right-hand corner, there's a depiction

9   of the coins being rolled up.   Had you ever seen that before?

10   A.   Yes.

11   Q.   And where was that that you saw that?

12   A.   That's how the coins were packaged inside the suitcase.

13   Q.   Did the three of you have individual roles or duties in

14   terms of burglarizing these vehicles?   What did you do?   What

15   did Mr. Cortez do?   And what did Mr. Valdez do?

16   A.   Myself and Mr. Valdez, we would look for a particular

17   style of lock, and Mr. Cortez had a key for them, and Mr.

18   Cortez would open the lock.

19   Q.   What type of key or what type of lock were you looking

20   for?

21   A.   It was a silver lock, a long cylinder on it.   The lock

22   itself was rectangle with three or four bars going across it.

23   There was no brand name or anything on it.

24   Q.   When you opened -- you say you found a black bag in this

25   storage unit; is that correct?

*Cardenas - Direct*

1   A.   Yes.

2   Q.   Who was with you when you found it?

3   A.   Mr. Cortez.

4   Q.   How many people did it take to lift the bag?

5   A.   It took at least two, if not all of us.

6   Q.   And what did you do once you lifted the bag?  Where did

7   you place it?

8   A.   We placed it in the trunk of my vehicle.

9   Q.   At the time you picked it up from the storage unit, did

10  you know what was in the bag?

11  A.   No.

12  Q.   When did you first discover what was in the bag?

13  A.   When we were in the parking lot.

14  Q.   Did y'all go to get something to eat?

15  A.   I think we may have, yes.

16  Q.   Do you recall where you went?

17  A.   Fast food.  If it was, it was fast food.

18  Q.   And who opened the container up and discovered the gold

19  coins are in there?

20  A.   Well, we were all present when we opened it.  I may have

21  been the one that actually unzipped it.  I can't recall, but

22  we were all present.

23  Q.   Once you found out that it was full of gold coins, what

24  did the three of you do?

25  A.   We closed it back up and we decided to go to a book store

*Cardenas - Direct*

1  to try and determine what they were.

2  Q.  Did you determine what they were?

3  A.  No.  Well, we determined that they were gold coins, but we

4  didn't determine the value of them.

5  Q.  After you went to these book stores and had the gold

6  coins, what did you next do?  Where did you go?

7  A.  After the book store, we decided to go ahead and leave

8  Austin.

9  Q.  And where did you go?

10  A.  We returned to San Antonio to Mr. Valdez' residence.

11  Q.  And what did you do once you got there?

12  A.  We unloaded the suitcase and proceeded to open it up and

13  empty out all the containers.

14  Q.  And then, what did you do after the containers were all

15  emptied out?

16  A.  Once we had all the gold coins on the floor, we got three

17  bowls and each of us put a bowl in front of us, and then, we

18  began to divide the coins.

19  Q.  Do you know approximately how much money you got in terms

20  of the value of the coins that was your share of this

21  particular burglary?

22  A.  About $140,000.

23  Q.  What did you do with your share of the coins?  Where did

24  you take them after y'all got through dividing them up?

25  A.  At that time, I was residing at my parent's house, so I

*Cardenas - Direct*

1    took them home.

2    Q.  Where did you store them?

3    A.  In the closet.

4    Q.  How long did it take you to spend the money that you --

5    the coins?  What period of time before you had completely done

6    away with all of them?

7    A.  I would say about two years.

8    Q.  And how did you go about spending the proceeds of what you

9    had stolen in terms of these gold coins?

10   A.  Various items, clothing, food.

11   Q.  Did you take the coins and give them to people, the actual

12   gold coins?

13   A.  As me as, like, a gift?

14   Q.  No.  Like did you go to the store with the gold coins and

15   buy a shirt?

16   A.  Oh, no.

17   Q.  How did you -- what did you do to get the coins changed

18   into something else?

19   A.  Sold them to various coin shops.

20   Q.  Do you remember the names of some of the coin shops?

21   A.  Not offhand, no.

22   Q.  Were they in the San Antonio area?

23   A.  A couple were in the San Antonio area.

24   Q.  Did you ever go to Tennessee?

25   A.  Yes.

*Cardenas - Direct*

1   Q.  What did you do in Tennessee relative to these gold coins?

2   A.  Sell it.

3   Q.  And did you have someone in Tennessee assist you?

4   A.  Yes.

5   Q.  And who was that?

6   A.  Ramon Clements.

7   Q.  And who is this person?

8   A.  He was a friend of mine.

9   Q.  Clements is his name?

10  A.  Yes.

11  Q.  And how many of the coins did you dispose of in Tennessee?

12  A.  The bulk of them through --

13  Q.  Did you just make one trip to Tennessee or make numerous?

14  A.  Several, numerous trips.

15  Q.  How did he assist you in disposing of the coins in terms

16  of what did he do relative to negotiating these coins?

17  A.  He said one container belonged to him, and he sold them

18  and he received the money.

19  Q.  Did you give him any of the money when he returned from

20  selling the -- converting the gold coins into currency?

21  A.  I don't recall.

22  Q.  Where in Tennessee did you go?

23  A.  To Clarksville, Tennessee.

24  Q.  Did you ever do anything to limit the total volume of

25  coins that you were selling at one time?

*Cardenas - Direct*

1   A.   Yes.

2   Q.   And why did you do that and what was the limit that you

3   had decided to --

4   A.   Well, each time I sold coins, I never sold more than

5   10,000 at a time.

6   Q.   And why did you not want to sell more than 10,000 at a

7   time?

8   A.   Because anything over 10,000 in one day, you have to

9   declare it to the IRS that the shop has to fill out.

10  Q.   Do you know what happened to the black suitcase where the

11  coins were in after y'all divided the coins up?

12  A.   We got rid of it.

13  Q.   How did you get rid of it?

14  A.   Threw it in a dumpster.

15  Q.   Would you describe it as a suitcase or a briefcase?  Which

16  would you choose to describe it?

17  A.   More like a travel suitcase.

18  Q.   Did it have wheels on it?

19  A.   Yes.

20  Q.   Did it have a handle you could pull out?

21  A.   Yes.

22  Q.   Tell the jury what you did with your share of the

23  proceeds.  What various things did you buy over that period of

24  time, that two years?

25  A.   Clothes, jewelry, a vehicle, weapons, day-to-day living

*Cardenas - Direct*

1   expenses, rent, pretty much.

2   Q.   Did you ever go to nightclubs?

3   A.   Yes.

4   Q.   What type?

5   A.   All types, various nightclubs, adult nightclubs, regular

6   nightclubs.

7   Q.   When you say "adult nightclubs," what do you mean?

8   A.   Strip clubs.

9   Q.   How much money would you spend in the strip clubs in an

10  evening's time?

11  A.   In an evening's time, depending on the occasion, who was

12  there, on average, I would say probably, at least, 8, $900 a

13  night, more or less.

14  Q.   And how do you spend that much money in an evening?  What

15  would you buy to spend 8 or $900?

16  A.   Well, there again, depending on who was there at the club,

17  drinks for other people, table dances for other people.

18  Q.   Did you ever give any of these to your mother?

19  A.   Yes.

20  Q.   And what did she do with them?

21  A.   She sold them for me.

22  Q.   Do you know how many your mother sold for you?

23  A.   Number-wise, no.  But value-wise, I would say a couple of

24  thousand dollars.

25  Q.   Do you remember some of the type of jewelry that you

*Cardenas - Direct*

1  bought?

2  A.  I bought a watch.

3  Q.  What type?

4  A.  A Tag, Tag Hauer.

5  Q.  Do you know how expensive they are?

6  A.  At the time, I got about a $1300 watch.

7  Q.  How about rings or necklaces?

8  A.  Gold necklace, diamond ring.

9  Q.  How much did you pay for the diamond ring?

10  A.  I would say probably 6, $700.

11  Q.  For yourself?

12  A.  Yes.

13  Q.  Do you remember when the law enforcement came first to

14  interview you about your participation in this theft of these

15  gold coins?

16  A.  Yes.

17  Q.  When was that?  When did that occur that you were first

18  interviewed by law enforcement regarding your theft of these

19  gold coins?

20  A.  Almost a year ago, I would say.

21  Q.  And at the time that you were first interviewed by the law

22  enforcement authorities, did you have any of the assets left,

23  any of the gold, any of the jewelry, any of the coins, any of

24  that stuff left?

25  A.  No.

Cardenas - Cross

1    Q.  What had happened to it?

2    A.  Throughout the years, I had sold it.

3    Q.  Do you have the diamond ring?

4    A.  No.  Everything's been sold.

5    Q.  Pass the witness.

6                    CROSS-EXAMINATION

7    BY MR. T. MILLS:

8    Q.  Mr. Cardenas, do you live at 3115 Royalton?

9    A.  Yes.

10   Q.  In San Antonio?

11   A.  Yes.

12   Q.  And before that, what was your family's address?

13   A.  Before that, I don't remember the exact, but it was an

14   apartment off of IH-10 West.

15   Q.  Was it on Waverly?

16   A.  No.

17   Q.  Was it on 12200 West Highway 10?

18   A.  Yeah, that's it.

19   Q.  Before that, did you live on Waverly?

20   A.  No.

21   Q.  Did your family live on Waverly?

22   A.  My grandmother lives on Waverly.

23   Q.  Okay.  How long have you lived in -- on Royalton?

24   A.  Majority of my life.

25   Q.  Since you were young?

Cardenas - Cross

1    A.   Yes.

2    Q.   When you -- were you -- when you were first approached in

3    1999 by a law enforcement agent, was that an FBI agent?

4    A.   Yes, I believe so.

5    Q.   Was it a female?

6    A.   No.

7    Q.   And had that been the first time anybody had brought up

8    since 1995 this coin theft that you and your friends had done?

9    A.   Yes.

10   Q.   Did you openly confess to them or did you talk to Mr.

11   Brown first?

12   A.   I talked to the FBI first.

13   Q.   And did you tell them that you had done the coin theft or

14   did you, first of all, tell them you didn't do the coin theft?

15   A.   No.  I told them I had not done the coin theft.

16   Q.   Had not?

17   A.   Had not.

18   Q.   Was there two agents?

19   A.   Yes.

20   Q.   They sometimes travel in two, I think.  And then, did you

21   contact Mr. Brown?

22   A.   Yes.

23   Q.   And did you hire Mr. Brown?

24   A.   Yes.

25   Q.   Did you pay Mr. Brown?

Cardenas - Cross

1   A.  Yes.

2   Q.  Did you hire him for Mr. Valdez, also?

3   A.  Yes.

4   Q.  Did you hire him for Mr. Cortez?

5   A.  No.

6   Q.  Did you call Mr. Valdez, tell him that the FBI had come

7   calling?

8   A.  Yes.

9   Q.  Did you tell him that you denied knowledge?

10  A.  Yes, I believe I did.

11  Q.  After you talked with Mr. Brown, do you know if Mr. Brown

12  got in touch with the FBI?

13  A.  Yes.

14  Q.  Is that when you first heard about there might be an

15  immunity agreement?

16  A.  Soon after, yes.

17  Q.  Okay.  And was the immunity agreement supposed to be for

18  you to tell what really happened?

19  A.  Yes.

20  Q.  Now, if you did not tell what really happened, you could

21  lose your immunity, I think; is that --

22  A.  Correct.

23  Q.  -- correct?  Yes?

24  A.  Yes.

25  Q.  Did you talk with Mr. Valdez before talking with the FBI a

Cardenas - Cross

1  second time to kind of get your stories straight?

2  A.  No, I don't believe so.  I believe after I talked to Mr.

3  Brown, got his services, and then, a couple of days later, I

4  believe, is when we had the interview.

5  Q.  When you first talked with Mr. Brown, don't tell me

6  anything that was said, but was it just you and Mr. Brown in

7  the room, or was it you, Mr. Brown and Mr. Valdez in the room?

8  A.  No.  The very first time, it was just me and Mr. Brown.

9  Q.  All right.  Do you know who in Texas that you liquidated

10  the coins with that you sold the coins to get cash?

11  A.  One of them I remember was Dellview Coins on

12  Fredericksburg Road.

13  Q.  Dellview?

14  A.  Yes.

15  Q.  All right.  And then, most of the $140,000 was exchanged

16  into cash in Tennessee?

17  A.  Correct.

18  Q.  And how did you know to keep it below a $10,000

19  transaction?

20  A.  Common knowledge.

21  Q.  Before your work for In Photo Surveillance Company, did

22  you work for a -- another private security company?

23  A.  I've worked for a couple other security companies.

24  Q.  Right before working -- how long have you worked for In

25  Photo?

1   A.   Approximately five months.

2   Q.   Five months?  So early 2000?

3   A.   Yes, I started in December '99.

4   Q.   And what company did you work for before that?

5   A.   Prior to that, I worked for Dunbar Armor.

6   Q.   Doing investigation?

7   A.   No.  I started off as a driver guard, and then, I was

8   promoted to vault manager.

9   Q.   And prior to Dunbar Armor, who had you worked for?

10  A.   Prior to that, I worked briefly for Allied Security.

11  Q.   As a security guard?

12  A.   Yes.

13  Q.   As a private investigator for Allied Security?

14  A.   No.  Security.

15  Q.   You work as a private investigator now?

16  A.   Correct.

17  Q.   Do you have a license to do that, to be a private

18  investigator in Texas?

19  A.   It's pending.

20  Q.   You do not have one now?

21  A.   No.  It's pending.  We're waiting on -- my application has

22  been submitted.

23  Q.   When was it submitted?

24  A.   In December.

25  Q.   So it's been pending for seven months, six months?

*Cardenas - Cross*

1  A.  Five months.

2  Q.  Five months.  All right.  In December 1995, you bought a

3  Dodge Shadow car?

4  A.  No.  I purchased that back in '90.

5  Q.  '90?

6  A.  Correct.

7  Q.  In December '95, did you buy another car?

8  A.  Yes, I bought an Eclipse.

9  Q.  '95?  In '95, you bought an Eclipse?

10  A.  Yes.

11  Q.  And what is an Eclipse?

12  A.  Mitsubishi.

13  Q.  And did you pay cash for it?

14  A.  Yes.

15  Q.  How much?

16  A.  About 7,000.

17  Q.  And you say that you ran out of money in about -- by about

18  the fall of '97?

19  A.  More or less, yes.

20  Q.  And in the fall of '97, did you buy a -- do you have a

21  sister?

22  A.  Yes.

23  Q.  April?

24  A.  Yes.

25  Q.  How is she employed?

Cardenas - Cross

1   A.   She's -- she worked at nails and hair.

2   Q.   Nails and hair?  All right.  In the fall of 1997, did you

3   buy her a Nissan car?

4   A.   No.

5   Q.   Did she buy a Nissan car?

6   A.   She may have.

7   Q.   You didn't use any of your coin money to buy a Nissan car

8   in 1997?

9   A.   No.

10   Q.   Did you buy any other kind of car in 1997?

11   A.   '97, I believe I got a Maxima, Nissan Maxima.

12   Q.   All right.  And you paid cash for it?

13   A.   Yes.

14   Q.   How much?

15   A.   Well, I traded in my Eclipse, and I paid the difference,

16   but about 5,000.

17   Q.   All right.  And then, in May of '98, did you buy a Mercury

18   Grande Marquis?

19   A.   No.

20   Q.   Did you buy a Mercury automobile?

21   A.   '98, no.

22   Q.   Did you buy a Mercury automobile in another year?

23   A.   Yes.

24   Q.   What year?

25   A.   In '99.

*Cardenas  -   Cross*

1   Q.   You paid cash?

2   A.   No.

3   Q.   Financed it?

4   A.   Yes.

5   Q.   Trade in the Maxima?

6   A.   No.

7   Q.   Kept the Maxima?

8   A.   Actually, I had -- prior to that, I had traded in the

9   Maxima for a Jeep, a '99 Jeep.

10   Q.   Then, did you trade in the Jeep, or did you keep the Jeep?

11   A.   No.  I traded in the Jeep.

12   Q.   For the Mercury?

13   A.   Yes.

14   Q.   Had you owned two different kinds of Mercuries?

15   A.   No.

16   Q.   In 1998 and 1999, were you still spending proceeds from

17   the gold coin theft?

18   A.   No.

19   Q.   How many times in Tennessee or elsewhere did you have

20   cause to have coins turned into money in an amount to keep it

21   under $10,000?

22   A.   I'd say probably around three or four visits.

23   Q.   All right.  And you're aware that each one of those is a

24   federal offense if it's done to -- if it's considered to be a

25   money laundering offense, or do you know that?

*Cardenas - Cross*

1    A.   No, I was not aware.

2    Q.   Do you have any immunity from federal criminal money

3    laundering?

4    A.   Not that I'm aware of, no.

5    Q.   You would not be able to keep your private investigators

6    license if you're convicted of a felony, would you?

7    A.   No.

8    Q.   Were you in the Army?

9    A.   Yes.

10   Q.   When?

11   A.   Between '89 and '93.

12   Q.   In Photo Surveillance is a national chain of investigative

13   agencies, isn't it?

14   A.   Yes.

15   Q.   They're in most states?

16   A.   Correct.

17   Q.   Their national headquarters, is it in Detroit, Michigan?

18   A.   No.  It's in Plainfield, Illinois.

19   Q.   Suburb of Chicago?

20   A.   Correct.

21   Q.   Does this appear to be your application for Security

22   Officer Commission?

23   A.   Yes.

24   Q.   Did you fill one out -- it has a date on it of November

25   14, 1997.  Would that have been about when you filled it out?

Cardenas - Cross

1  A.  Yes.

2  Q.  Question No. 5, have you ever applied with this agency for

3  a commission registration or license, you put?

4  A.  No.

5  Q.  Hadn't you previously applied?

6  A.  No.

7  Q.  In 1999, when you applied for a Security Officer

8  Commission, you also said no that you had never applied,

9  didn't you?

10 A.  I don't recall.  Actually, the majority was handled by In

11 Photo.

12 Q.  I'm sure you read it to make sure it was accurate.

13 A.  Briefly, yes.

14 Q.  On the day that you were at an Austin Self-storage unit in

15 1995, do you recall that Cortez used one, two or three keys?

16 A.  One, I believe.

17 Q.  Weren't you right there by him, within several feet when

18 he opened the lock?

19 A.  Yes.

20 Q.  And did you see how he determined what lock to try his key

21 on?  In other words, was there a certain brand?  Was there a

22 certain color?

23 A.  Yes, certain style.

24 Q.  Certain style?

25 A.  Yes.

*Cardenas — Cross*

1   Q.  What was that style?

2   A.  Well, like I described with the prosecution, it was a

3   silver lock.

4   Q.  Would you mind drawing a rough diagram of what the lock

5   looked like and what the shank or the -- what did the bars

6   that stick down into the lock called?

7   A.  Sure.

8   Q.  Are you a good artist?

9   A.  No.

10  Q.  Just very simple.  All right.  Could you put your initials

11  down there?  Is that JC?

12  A.  Yes.

13  Q.  I'm going to put below it JC-1.  We would offer JC-1 into

14  evidence.

15          MR. D. MILLS:  No objection, your Honor.

16          THE COURT:  It's received.

17  Q.  (BY MR. T. MILLS) Now, this indicates that the locking

18  device was to go through the lock.  Is that what I understand?

19  A.  Yes.

20  Q.  Was it supposed to have any kind of coloring, or design,

21  or logo, or writing, or a brand on it?

22  A.  No.  It's just silver.

23  Q.  Had you done this before with Mr. Cortez?

24  A.  No.

25  Q.  And the key -- would the key stick in the bottom?

*Cardenas - Cross*

1   A.   Correct.

2   Q.   And then, would that entire U-shaped thing pull out?

3   A.   Yes.

4   Q.   Is that what happened on this day?

5   A.   Yes, when he opened it.

6   Q.   Did you go to a storage unit before you opened the one

7   with the black suitcase in it?

8   A.   We may have, yes.

9   Q.   Do you remember if you got any kind of other stolen items

10  like guns, or sporting equipment, or TVs?

11  A.   I don't believe it was at this location, but we did get a

12  TV from a storage, yes.

13  Q.   All right.  You got one TV or more than one TV?

14  A.   One TV.

15  Q.   One TV?

16  A.   Yes.

17  Q.   Okay.  And did you go and pawn the TV?

18  A.   We attempted to.

19  Q.   And did you get any money for it?

20  A.   No, I don't believe so.  I believe they didn't take it.

21  It was an older model TV.

22  Q.   Okay.  All right.  And were all three of you together when

23  you were examining the suitcase to decide whether or not to

24  take it?

25  A.   No.

*Cardenas – Cross*

1   Q.   Who was?  You and --

2   A.   Myself and Mr. Cortez.

3   Q.   Where was Mr. Valdez?

4   A.   He was outside of the storage.

5   Q.   Did you close the door back and put the lock back on?

6   A.   We closed the door.  I don't believe we put the lock back

7   on.

8   Q.   What did you do with the lock?

9   A.   I believe Mr. Cortez threw it away.

10  Q.   And do I understand that the suitcase was put in the

11  trunk, not the front seat or the back seat?

12  A.   Correct, in the trunk.

13  Q.   And you specifically remember that?

14  A.   Yes.

15  Q.   And it had not -- and when it was put in the trunk, you

16  did not know what was in it?

17  A.   Correct, we hadn't opened it.

18  Q.   Okay.  And when you divided the money up at Mr. Valdez'

19  house, did each of you get the same amount, or did someone get

20  a different amount?

21  A.   Well, there was no way to tell for sure what the amounts

22  were, but I believe Mr. Cortez got a little extra.

23  Q.   You couldn't just say "One for you"?

24  A.   No, that's not how --

25  Q.   How did you do it?  Did you fill up a bowl in front of

*Cardenas - Cross*

1   each of you --

2   A.  Pretty much, yes.

3   Q.  -- and just sort of rounded the bowl off?

4   A.  Well, the pile was in the middle of the floor.  We were

5   all around it.  A bowl in front of me, a bowl in front of Mr.

6   Valdez, Mr. Cortez, and we would just grab handfuls.  One

7   would throw in one bowl, one in the other.  Sometimes maybe

8   you did two in one, sometimes you did three in one.  It didn't

9   matter.

10  Q.  All right.  How did you happen to choose to go to

11  Tennessee to try to get rid of the coins?

12  A.  Well, while I was in the military, I was stationed up

13  there.

14  Q.  So you were -- were you in the military when you did the

15  burglary?

16  A.  No.

17  Q.  You did the burglary and then, joined the military?

18  A.  No.

19  Q.  Oh, no.  You knew -- you had been in the military, and

20  then, you went back to Tennessee?

21  A.  Correct.

22  Q.  And why did you go back there to sell the gold coins?

23  Just because you had been in the military there?

24  A.  Well, a different -- at that time, I didn't want to sell

25  them here in San Antonio.

Cardenas - Cross

1  Q.  So just to kind of get away from town?

2  A.  Correct.

3  Q.  When was it -- I believe that you have done quite a bit of

4  independent research on the -- all of the different issues

5  involved in the Madalyn Murray O'Hair and her family, correct?

6  A.  I've done some, yes.

7  Q.  Did you start that before you got interviewed by the FBI?

8  A.  No.

9  Q.  Did you do that -- you began it afterwards?

10  A.  Yes.

11  Q.  And you have done without -- I understand modesty, but

12  you've done quite a bit of research, haven't you?

13  A.  I don't know if I can categorize it as quite a bit, but I

14  have done some, yes.

15  Q.  You've done some writing on it?

16  A.  Writing?

17  Q.  Well, in terms of possibly writing a book on some aspect

18  of this case?

19  A.  No.

20  Q.  You've -- have you not discussed that with other people,

21  the possibility of doing a book?

22  A.  As far as myself writing a book?  No.

23  Q.  Well, or getting someone to write it with you.

24  A.  I've joked around about it, yes.

25  Q.  That is correct, isn't it?  You have -- I don't know if it

1  was joking, but you have discussed it with people, haven't

2  you?

3  A.  Yes.

4  Q.  Have you ever done any investigative work that in any way,

5  however remotely, relates to the O'Hair case?

6  A.  No.

7  Q.  Have you ever talked with people with In Photo Corporation

8  from the Chicago or Michigan -- Detroit, Michigan area about

9  doing investigation for anyone involved in this case?

10  A.  No.

11  Q.  Have you ever talked to or met Jason Cross or any of his

12  family?

13  A.  No.

14  Q.  That's all the questions that I have.

15       MR. D. MILLS:  Nothing further, your Honor.

16       THE COURT:  May this witness be excused, counsel?

17       MR. D. MILLS:  Yes, your Honor.

18       THE COURT:  You may be excused.  Call your next

19  witness.

20       MR. CARRUTH:  The United States calls Richard Medina,

21  your Honor.

22       THE COURT:  Stand right there, please, sir, and have a

23  stand.  And you're going to get an oath sworn to you.

24     (Witness was sworn.)

25       THE COURT:  If you'll walk around this column, please,

*Medina - Direct*

1    and have a seat at the blue chair.  If you'll tell us your

2    full name and spell your last name.

3           THE WITNESS:  My name is Richard Medina, spelled

4    M-E-D-I-N-A.

5       RICHARD MEDIAN, called by the Government, duly sworn.

6                       DIRECT EXAMINATION

7    BY MR. CARRUTH:

8    Q.  Mr. Medina, please tell the members of the jury where you

9    live and what your employment or occupation is.

10   A.  I live at Stanton, Texas.  I'm employed by Loan Star Coin

11   Collectors.  I'm a coin dealer.  That's what we use as the

12   title.

13   Q.  Were you so employed back in 1995?

14   A.  Yes, sir.

15   Q.  Have you done business under other names than Loan Star

16   Coin?

17   A.  Yes, sir, we were known as Dellview Coins and Jewelry for

18   many years.

19   Q.  And what about Stamps Unlimited?

20   A.  That's probably our parent name of the corporation.

21   Q.  Okay.  What exactly does your business consist of, sir?

22   A.  The focus of the business is rare coins or collectible

23   coins for kids, adult, anybody who wants to buy them.  We do

24   bullion, which is gold silver, platinum palladium.  We do

25   paper money and other collectibles related.

*Medina - Direct*

1    Q.  Let me show you, sir, what's previously been introduced

2    into evidence as Government Exhibit W57-2.  Do you recognize

3    the type of coins depicted on that exhibit?

4    A.  Yes, sir, I do.

5    Q.  Could you identify those for the record, please?

6    A.  These are one-ounce South African Krugerrands made in the

7    country of South Africa.  These are one-ounce Canadian Maple

8    Leaves from Canada.  And the far right one is U.S. American

9    Eagle, made by our country.

10   Q.  If someone were to have some of those coins they wanted to

11   dispose of, could they take them to your store and exchange

12   them for cash?

13   A.  Yes, sir.

14   Q.  And how would you determine what to pay for those coins?

15   A.  These coins are based on the gold spot markets, either the

16   Swiss market or the London close for the New York Commodities

17   Open.  We get -- starts here about 7:30 central standard time.

18   Q.  And do you pay the full value for the coin or discount

19   value so that you can earn a profit?

20   A.  It depends on the supply available worldwide.  Right now,

21   today, we pay a discount because of all the gold that's come

22   back on the market because of the Y2K.  At this particular

23   time, we did pay a little bit of a premium, but what's

24   important is the buy and sell spread, and for our company,

25   it's between $11 and $13.  If we buy it at one price, we sell

1    it for about $12 more.

2    Q.  And assuming as you said that each of those coins, the

3    three types contained approximately one ounce of gold?

4    A.  They each contained exactly one ounce of gold.

5    Q.  And is their value identical?

6    A.  No, sir, it's not.  The South African Krugerrand, because

7    of the perception of illegality to own, it carries about a

8    four or $5 discount.

9    Q.  All right, sir.  And what about the Canadian Maple Leaf

10   versus the American Eagle?  Which of those is more value?

11   A.  They normally sell at the same price.  Sometimes the Maple

12   Leaf's a dollar cheaper just depending upon distribution

13   costs.

14   Q.  Is it common for someone to bring in four or five or a

15   handful of those coins to sell?

16   A.  Just about every day, sir.

17   Q.  Okay.  In connection with this investigation, sir, did you

18   check your records for the time frame of late 1995 through

19   early 1996 and determine if any one of several named

20   individuals had sold any of these types of gold coins at your

21   business here in San Antonio?

22   A.  Yes, sir.

23   Q.  By the way, where is your business, Loan Star Coin,

24   located?

25   A.  It's on -- the address is 3534 Fredericksburg Road.  It's

*Medina - Direct*

1  about a mile and a half inside Loop 410, and it's probably

2  considered on the north, north central side of town.

3  Q.  And were you doing business there back in 1996 as Del Coin

4  and Jewelry, I believe you said?

5  A.  Dellview, yes, sir.

6  Q.  Dellview.  Excuse me.  Let me show you, Mr. Medina, what's

7  been marked for identification as Government's Exhibit W76-1.

8  I'll ask you to examine the contents of that exhibit and tell

9  us if you recognize it as business records that you've

10  previously provided.

11  A.  Yes, sir.

12  Q.  Would you like to take it out and look through it, sir?

13  A.  It's all --

14  Q.  Are those your business records?

15  A.  Yes, sir, they are.

16  Q.  We'd offer Government's 76-1, your Honor.

17        MR. T. MILLS:  No objection.

18        THE COURT:  It's received.

19  Q.  (BY MR. CARRUTH) Mr. Medina, now that those records have

20  been admitted, can you tell us whether they contain cancelled

21  checks and invoices for your business from the time frame of

22  late September 1995 through early March 1996?

23  A.  They do, sir.

24  Q.  Do they also contain your check registers?

25  A.  Yes, sir.

*Medina - Direct*

1    Q.  For the month of September 1995 through March of 1996?

2    A.  Yes, sir, they do.

3    Q.  And do they also contain detailed cash disbursement

4    journals kept by your business during this same time period?

5    A.  Yes, sir, they do.

6    Q.  And do they also contain a bank statement for 11-30-95

7    through 12-29-95 for International Bank Shares Corporation for

8    Dellview Coins and Jewelry?

9    A.  Can I have those dates again, sir?

10   Q.  Yes, sir.  I believe it's a bank statement, November and

11   December '95, for Account No. 31100-01.

12   A.  They're here, sir.

13   Q.  Okay.  Now that you have those before you, sir, could you

14   look on there and tell me whether or not your records reflect

15   that you purchased any gold coins described there from any

16   individuals by the names of Joe Cortez, Jaime Valdez, Joe

17   Cardenas, Jeffrey Cedillo, Michael Gonzalez, Daniel Ozuma,

18   Javier Diaz, Jon Goerana, Patricia Santos, or Armando

19   Rodriguez during the time frame in question?

20   A.  I think I see most of those names.  I don't remember all

21   of them as you stated, but I see a lot of the names.

22   Q.  But the records will speak for themselves, correct?

23   A.  Yes, sir.

24   Q.  And just take Joe Cortez, for example.  Do you see his

25   name?

*Medina - Direct*

1   A.   Yes, sir.

2   Q.   Okay.  What was the date that Mr. Cortez sold you some

3   coins and how much did you pay him for them?

4   A.   The date was December 2nd, 1995.  He sold a total of five

5   coins four Canadian Maple Leaves and one American Golden

6   Eagle.

7   Q.   How much did you pay him for those coins?

8   A.   Each coin we paid him $387 for a total of $1,935.

9   Q.   Now, can you look through your records, sir, and tell us

10  whether any or all of the particular coin transactions are

11  $10,000 or more, or whether they're all less than that amount?

12  A.   All transactions less than $10,000.

13  Q.   And if the transaction had been more than $10,000, that

14  would trigger an IRS reporting requirement, would it not?

15  A.   Actually, I think it would be more correctly an IRS or

16  Treasury Department cash transaction form.

17  Q.   Yes, sir.  And did you know the IRS is part of the

18  Department of the Treasury?

19  A.   Now I do.

20  Q.   Okay.  So if a customer comes in and brings you more than

21  $10,000 worth of gold coins?

22  A.   That's -- no, sir.  If our --

23  Q.   If you pay them more than $10,000?

24  A.   Correct, in cash.

25  Q.   In cash, and these payments were made in cash, were they

*Medina - Cross*

1   not?

2   A.  No, sir.  A lot of them were checks.

3   Q.  Okay.  All of them were checks?

4   A.  I didn't look that closely.  There may have been some in

5   cash.

6   Q.  Okay.  So if there's an expenditure in excess of $10,000

7   in cash, you have to report it?

8   A.  Yes, sir.

9   Q.  But if it's less than that, you don't?

10  A.  Correct.

11  Q.  And all of those names are included in your records that

12  you've told us about, Jeffrey Cedillo, Michael Gonzalez,

13  Daniel Ozuma, Javier Diaz, Jon Goerana, Patricia Santos and

14  Armando Rodriguez?

15  A.  I believe so, yes, sir.

16  Q.  Pass the witness.

                    CROSS-EXAMINATION

18  BY MR. T. MILLS:

19  Q.  Tell me your last name again.

20  A.  Medina, sir.

21  Q.  Medina.  How long have you been in the coin business?

22  A.  In the ownership of a coin -- of a store front, probably

23  18 years in the sense of doing it as a business, probably

24  since the age of 17, so 25 years.

25  Q.  In terms of doing it as a business, is it desirable for

*Medina - Cross*

1  you to have a gold coin that is in good condition rather than

2  cash?  In other words, is there a benefit for you to buy good

3  gold coins from people who come in?

4  A.  What's your definition of good?

5  Q.  Well, not scratched.

6  A.  Oh, okay.  I thought you meant counterfeiting.  People

7  that buy the commodity gold and silver, a lot of them have the

8  attitude of distrust.  They don't like checks.  They don't

9  like paperwork.  So if we can pay them cash, we don't mind.

10  If they demand cash, as long as they understand the paperwork

11  with that, then we don't mind either.

12  Q.  All right.  I'm not sure that my question was clear.  Of

13  the different names that were read to you and you were looking

14  at a record to see if somebody came in.

15  A.  Oh, okay.

16  Q.  Three of the names were Cortez, Valdez and Cardenas,

17  correct?

18  A.  I believe so, yes, sir.

19  Q.  All right.  And do your records indicate how frequently

20  people come in to sell coins?

21  A.  No, sir.

22  Q.  Would you show me what you're looking at to see, for

23  example, if Mr. Cortez had been in?

24  A.  It just shows his name, the address, his driver's license

25  number, and the date he came in.  We don't keep a record of if

Medina - Cross

1   you come in in January and you come in a year later, we don't

2   keep that kind of record.

3   Q.  What if you come in January 1st and again on January 5th?

4   A.  There's no set-up for us to keep that record.

5   Q.  What if a person came in -- are you the person in your

6   shop in 1995 and 6 who would take a coin and write a check or

7   give cash for it?

8   A.  One of them, yes, sir.

9   Q.  All right.  What mechanism do y'all have set up for people

10  who are coming in very frequently to buy $9,000 worth of -- to

11  sell $9,000 worth of coins?

12  A.  The selling is not what you report, sir.  What you report

13  is the cash.  If they come in and sell me 15 coins or -- at

14  this time, the price was roughly $400 a coin.  So if they sell

15  me 26 some-odd coins or 30 coins, if it's under the $10,000

16  and we give them the cash, there's no reporting.

17      The law's a little vague because what happens is if

18  they sell me 25 ounces of gold, of, say, the Krugerrand --

19  sorry -- then, we have to fill out another form at the end of

20  the year, a 1099.  But if they sell me 23 ounces of five

21  different types of coins, the law does not apply.  So it's a

22  little bit confusing.

23  Q.  You don't have to fill out -- you don't have to be alert

24  for structuring in terms of cash transaction reports?

25  A.  Cash transactions, yes, sir, but not if we write checks

*Medina - Cross*

1   for the merchandise.

2   Q.  All right.  And you hope they'll take a check?

3   A.  Doesn't matter to me.

4   Q.  All right.  And you have people come in, literally, daily

5   selling gold coins?

6   A.  Most of the time, yes, sir, we buy gold coins usually

7   every day.  It really depends what the market's like in that

8   particular time event.

9   Q.  You have not taken the names that Mr. Carruth has given

10  you, like, on this chart, or Cortez, Valdez and Cardenas, and

11  added up what those sales to your company totalled, have you?

12  A.  Not then or now, no, sir.

13  Q.  All right.  That's all the questions I have.

14       MR. CARRUTH:  Nothing further, your Honor.  May the

15  witness be excused?

16       MR. T. MILLS:  Yes, sir.

17       THE COURT:  You may be excused, sir.  You may call

18  your next witness.

19       MR. CARRUTH:  The United States would call Richard

20  Grazier, your Honor.

21       THE COURT:  Come forward, please.  This is Ms. Sims.

22  She's going to administer an oath to you.

23     (Witness was sworn.)

24       THE COURT:  Come around this column, please, sir, and

25  sit up in the witness chair.  If you'll tell us your full

*Grazier - Direct*

1    name, and spell your last name, please.

2           THE WITNESS:  Richard Grazier, G-R-A-Z-I-E-R.

3     RICHARD GRAZIER, called by the Government, duly sworn.

4                    DIRECT EXAMINATION

5    BY MR. CARRUTH:

6    Q.  Please tell the jury where you live and how you're

7    employed, sir.

8    A.  I live in San Antonio.  I'm a general manager of Royalty

9    Coins in San Antonio.

10   Q.  And were you so employed back in 1995?

11   A.  Yes, I was.

12   Q.  And where is your coin -- Royalty Coins facility located?

13   A.  At 431 East Commerce, downtown in San Antonio.

14   Q.  Can you see the gold coins depicted in this exhibit marked

15   W57-2?

16   A.  Yes, I can.

17   Q.  Can you identify those three types of gold coins, sir?

18   A.  Yes.  One is a Canadian Maple Leaf, South African

19   Krugerrand, American Gold Eagle.

20   Q.  And if I were to have one or more of those coins, could I

21   come to your store and exchange it for United States currency?

22   A.  Yes, you could.

23   Q.  And what -- how do you determine the price at which to buy

24   that gold?

25   A.  Based off the daily spot price of gold.

*Grazier - Direct*

1   Q.  Okay.  Let me show you what's been marked for

2   identification as Government Exhibit W75-1, and ask you if you

3   recognize those as business records you previously provided to

4   the government in this investigation.

5   A.  Yes, I do.

6   Q.  Does that reflect the sale of -- would you take it out,

7   please, sir, and tell us if you could?

8   A.  Yes, it does show that we purchased Krugerrands and Maple

9   Leafs.

10   Q.  During what time period, sir?

11   A.  On November 10th of '95 --

12   Q.  Okay.

13   A.  -- in the afternoon.

14   Q.  Let me offer the exhibit before we -- I offer W75-1 for

15   the record.

16       MR. T. MILLS:  No objection.

17       THE COURT:  It's received.

18   Q.  (BY MR. CARRUTH) Now, please continue, sir.  What are the

19   dates and amounts of those purchases of gold coins?

20   A.  The first purchase ticket is November 10th, 1995, five

21   Krugerrands, four Canadian Maple Leaves, and purchased by a

22   check by a total amount of $3,460.  Then, on December 4th,

23   1995, a purchase of five one-ounce American Gold Eagles,

24   purchase price of $1,925.  And the third on December 14th,

25   1995, ten one-ounce American Gold Eagles for purchase price of

*Grazier - Direct*

1    $3,908.

2    Q.  And was the gentleman by the name of Armando Rodriguez the

3    seller of any or all of those gold coins?

4    A.  Two of the purchases we provided identification by Armando

5    Rodriguez.

6    Q.  Okay.  And the name of the other purchaser was?

7    A.  Angela Fay Jackson.

8    Q.  Okay.  Now, is it common or uncommon for people to come in

9    off the street and sell you gold coins at the type you've

10   described?

11   A.  It's common.

12   Q.  Okay.  And what is the source of these gold coins?  Where

13   do these people get them, if you know?

14   A.  From a -- could either be investment purposes,

15   inheritances.

16   Q.  Do you ever have any reason to question the source of the

17   gold coins that someone brings to you for sale?

18   A.  Normally not.

19   Q.  And do you normally pay them in cash or by check?

20   A.  Pretty much a company policy, if it's more than $500, we

21   pay by check.

22   Q.  All right.  That's the maintaining a record for the IRS?

23   A.  Yes.

24   Q.  Thank you.  Pass the witness.

25

*Grazier – Cross*

1         CROSS-EXAMINATION

2   BY MR. T. MILLS:

3   Q.  How long have you been in the coin business?

4   A.  Since 1974.

5   Q.  Has it changed somewhat in the sense of there being more

6   people of our society who feels comfortable dealing in gold

7   coins from different countries?

8   A.  Not that I'm aware of.

9   Q.  It's been pretty steady during your whole business career?

10  A.  It's been, I'd say, steady, yes.

11  Q.  All right.  Are the different kinds of coins pictured on

12  the exhibit that you were shown good in international travel?

13  In other words, are they current?  Can they be redeemed for

14  money in any country of the world that you know of?

15  A.  I don't believe so.

16  Q.  What limitations are there?

17  A.  The -- I'm not so much aware of them being exchanged for

18  face value other than being bought in store for the gold

19  content.

20  Q.  Can you explain that?

21  A.  The -- you're saying if they can be used or that I'm aware

22  of that in other countries, if they can be traded for

23  currency?

24  Q.  Yes.

25  A.  I would say not that I was aware of.  I would say just be

*Grazier - Cross*

1   involved -- sold for the gold rather than being exchanged for

2   currency.

3   Q.  All right.  Which of the different coins of Canadian and

4   United States and the South African Krugerrands, or the

5   Canadian Maple Leaves, are they the most widely used, to your

6   knowledge?

7   A.  No.  I'd say probably Krugerrands.  I'd say we probably

8   buy and sell more Krugerrands.

9   Q.  If a person had Krugerrands, and they were in a foreign

10  country, maybe it depends on which country, but wouldn't that

11  person be able to use that piece of gold to obtain some value

12  in terms of money or merchandise?

13  A.  I don't know.

14  Q.  Why wouldn't they?

15  A.  I'm not aware of the face value that it would carry that

16  -- I would just assume they would be bought and sold for the

17  gold content.

18  Q.  Is the gold content what you referred to as the daily spot

19  value?

20  A.  Yes.

21  Q.  And is that off several international markets?

22  A.  That is normally based off either a New York or a London

23  spot price.

24  Q.  All right.  And normally, that would be what they would be

25  worth that day?

*Grazier - Redirect*

1  A.  Yes.

2  Q.  So a person would be able to get that much for them from a

3  money exchange, correct?

4  A.  Yes.

5  Q.  Thank you.

6                    RE-DIRECT EXAMINATION

7  BY MR. CARRUTH:

8  Q.  Counsel asked you about the availability of changing this

9  for currency or value in a foreign country.  If someone were

10  trying to avoid any type of reporting requirement, do you know

11  whether or not countries outside the United States have the

12  same reporting requirements that we do?

13  A.  I don't know.

14  Q.  You don't know.  All right.  Pass the witness.

15        MR. T. MILLS:  No further questions.

16        THE COURT:  May the witness be excused?

17        MR. CARRUTH:  Yes, your Honor, please.

18        THE COURT:  You may be excused.  Call your next

19  witness.

20        MR. CARRUTH:  We call Nizar Tawil.

21     (Witness was sworn.)

22        THE COURT:  Follow the Security Officer, please.  Tell

23  us your full name, please, sir, and spell your last name.

24        THE WITNESS:  My name is Nizar Tawil, T-A-W-I-L.

25     NIZAR TAWIL, called by the Government, duly sworn.

*Tawil - Direct*

<u>DIRECT EXAMINATION</u>

BY MR. CARRUTH:

Q.  Please tell the members of the jury where you live and how you're employed, sir.

A.  I live in San Antonio, Texas.  I work with Leon Valley Jewelry.

Q.  All right, sir.  Is that also known as Leon Valley Gold and Silver?

A.  Yes, sir.

Q.  And were you so employed back in 1995?

A.  Yes, sir.

Q.  Do you buy or sell gold coins including the three types depicted right immediately in front of you in that exhibit?

A.  Yes, I do.

Q.  And do you recognize the types of coins in that exhibit before you?

A.  Yes, sir.

Q.  What are those, sir?

A.  American Eagle, the Krugerrand, and the Maple Leaf -- Canadian Maple Leaf.

Q.  If someone comes in with one or more of those coins to sell, how do you determine the value to pay them?

A.  We go by gold value.

Q.  Do you normally pay it by cash, or by check, or how?

A.  Most of the time, by cash, because the people want cash.

Tawil - Direct

1  We give checks if they take checks.

2  Q.  So it depends on what the customer wants?

3  A.  That's right.

4  Q.  Did you provide certain records to the federal

5  investigators in connection with this case?

6  A.  Yes, I did.

7  Q.  I'm going to show you what's been marked for

8  identification as W73-1.  Do you recognize those as records

9  that you've previously provided in connection with this

10  investigation?

11  A.  Yes, sir.

12  Q.  Are those your business records and cancelled checks --

13  A.  Yes, sir.

14  Q.  -- for the time frame of 1995, late 1995?

15  A.  Yes, sir.

16  Q.  We'd offer Government's Exhibit W73-1, your Honor.

17         MR. T. MILLS:  No objection.

18         THE COURT:  Received.

19  Q.  (BY MR. CARRUTH) Now that those exhibits and records are

20  in evidence, please take a look, sir, and I want to ask you if

21  you see any records of gold sales or gold purchases made by

22  the following or gold sales to you and purchases by you for a

23  -- let's start with Javier Diaz.

24  A.  Yes, sir.

25  Q.  How many different purchases did you make from Javier Diaz

*Tawil - Direct*

1    in late 1995?

2    A.  Six.

3    Q.  And were all of those purchases for more or less than

4    $10,000?

5    A.  Less than 10.

6    Q.  All right.  How about Daniel Ozuma?  Do you see any

7    purchases of gold from you -- by you from Daniel Ozuma in late

8    1995?

9    A.  Three of them.

10   Q.  And, again, were those purchases and amounts of less or

11   more than $10,000?

12   A.  Less.

13   Q.  And what about Jeffrey Cedillo?  Did you make any gold

14   purchases from Jeffrey Cedillo in late 1995?

15   A.  Three of them.

16   Q.  And, once again, was it for more or less than $10,000 on

17   each of those purchases?

18   A.  Less.

19   Q.  How about Angela Fay Jackson?

20   A.  One.

21   Q.  How about Christina Rodriguez?

22   A.  Two.

23   Q.  Once again, were they for less than $10,000?

24   A.  Yes, sir.

25   Q.  How about Rolando Flores?

*Tawil - Direct*

1   A.  One.

2   Q.  Was that for more or less than 10,000?

3   A.  Less than 10.

4   Q.  All right.  How about Jon Goerana?

5   A.  One.

6   Q.  For more or less?

7   A.  Less.

8   Q.  Okay.  And Diana -- is it Ubanes or Urobanes?

9   A.  One.

10  Q.  And Noey Villarreal?

11  A.  One.

12  Q.  Now, on those receipts, do they reflect the date of birth,

13  address in addition to the name of each of these individuals?

14  A.  Yes, sir.

15  Q.  And how much -- you paid them for the gold?

16  A.  Yes, sir.

17  Q.  And in each and every case, it was under $10,000?

18  A.  That's right.

19  Q.  Thank you, sir.  Pass the witness.

20      MR. T. MILLS:  No questions.

21      THE COURT:  May this witness be excused?

22      MR. CARRUTH:  Yes, your Honor.

23      THE COURT:  You may call your next witness.

24      MR. D. MILLS:  Concepcion Martinez.

25      THE COURT:  If you'll come forward.  This is Mrs.

Martinez - Direct

1    Sims.  She's going to administer an oath to you.

2        (Witness was sworn.)

3            THE COURT:  If you'll walk around this column, please,

4    ma'am, and have a seat up here in the witness chair.  You need

5    to tell us your full name and spell your last name, please.

6            THE WITNESS:  Concepcion Martinez, M-A-R-T-I-N-E-Z.

7                       DIRECT EXAMINATION

8    BY MR. D. MILLS:

9    Q.  Would you tell the jury where you live and how are you

10   employed, please, ma'am?

11   A.  Notre Dame, San Antonio, Texas, I'm a housekeeper.

12   Q.  You're in housekeeping?

13   A.  Uh-huh.

14   Q.  Are you nervous?

15   A.  I am what?

16   Q.  Are you nervous?

17   A.  Yes.

18   Q.  Do you have some difficulty in translating from English

19   into Spanish?

20   A.  Yes.

21   Q.  Is it better if I go slow?  Is that correct?

22   A.  Please.

23   Q.  There's an exhibit in front of you that has a sticker on

24   it that says W74-1.  Do you see that?

25   A.  Yes, sir.

Martinez - Direct

1  Q.  Do you recognize that item?

2  A.  Yes, sir.

3  Q.  And has it previously been shown to you?  Have you seen

4  that item before?

5  A.  Yes, sir.

6  Q.  Was it in your possession in -- one of your items at one

7  point in time?

8  A.  Yes, sir.

9  Q.  We'd offer W74-1, your Honor.

10         MR. T. MILLS:  No objection.

11         THE COURT:  Received.

12         MR. D. MILLS:  Was it admitted, your Honor?

13         THE COURT:  Yes, sir.

14         MR. D. MILLS:  Thank you.

15  Q.  (BY MR. D. MILLS) Can you hold that up and show it to the

16  jury, please?  Can you just pick it up and show them what

17  we're talking about?  And it's a gold coin, correct?  Look on

18  the other side.  Turn it over.  What is that?

19  A.  A gold coin.

20  Q.  And it was yours at one time?

21  A.  Yes, sir.

22  Q.  Who did you get it from?

23  A.  Joey Cortez.

24  Q.  Can you tell the jury how you got it from Mr. Cortez?  How

25  did you come to get -- did he give it to you?  Did he sell it

1  to you?

2  A.  He gave it to me.

3  Q.  Tell the jury about when, if you remember, that he gave it

4  to you, do you know?

5  A.  I don't remember.

6  Q.  Did you pay money for it?

7  A.  No.

8  Q.  What did you do with it after you got the gold coin?  Was

9  it a gold coin or was it a necklace when you received it?

10  A.  It was a gold coin.

11  Q.  And as it currently exists in that envelope now, is it a

12  necklace?

13  A.  It is.

14  Q.  Can you tell the jury how it got made from a gold coin

15  into a necklace?  How did it become a necklace when it was a

16  gold coin that Mr. Cortez had originally given you?

17  A.  Oh, I sent him to do it, my boyfriend did it for me.

18  Q.  Your boyfriend took it?

19  A.  Yes.

20  Q.  And how did you wear it when you had it?

21  A.  Well, I didn't wear it that much, but I just -- maybe a

22  couple of times.

23  Q.  Was it a necklace?

24  A.  Yes, sir.

25  Q.  When you first received the coin when Mr. Cortez gave it

*Martinez - Direct*

1  to you, did you test it to see if it was real?

2  A.  (Moving head up and down.)

3  Q.  What did you do?

4  A.  I scratched.

5  Q.  How do you know Mr. Cortez?

6  A.  Through my son.

7  Q.  Your son?

8  A.  (Moving head up and down.)

9  Q.  Can you tell the jury a little bit more -- what did your

10 son and Mr. Cortez do with each other that you knew him?

11 A.  They used to go to school together.

12 Q.  Did Mr. Cortez ever owe you any money?

13 A.  Well, he used to stop and ask me for gas money every once

14 in a while.

15 Q.  Did he owe you some money at the time he brought --

16 A.  $20.

17 Q.  How much?

18 A.  $20.

19 Q.  And what did you do relative to the 20?

20 A.  I didn't understand.

21 Q.  What did you do relative to the $20 that he owed you at

22 the time he gave you that coin?

23 A.  Well, he gave me the coin for the $20.

24 Q.  Did you know what that coin was when you received it?

25 A.  (Moves head side to side.)

*Martinez - Cross*

1   Q.  Pass the witness, your Honor.

2                    CROSS-EXAMINATION

3   BY MR. T. MILLS:

4   Q.  How did you scratch the coin to see if it was real?

5   A.  How?  With a knife.  It was something.  I don't remember,

6   but I did it with something.

7   Q.  Something sharp like a knife?

8   A.  No.

9   Q.  No?

10  A.  Well, I really don't remember, but I know that I tried to

11  scratch it.

12  Q.  Okay.  Is this coin scratched?  Do you see the scratch if

13  you could show me?

14  A.  I don't see it.

15  Q.  When you scratched it, did you make a little mark on it to

16  see if it was real gold?

17  A.  I don't remember.

18  Q.  Don't remember?

19  A.  Huh-uh.

20  Q.  You don't see a scratch on this one?

21  A.  I don't see anything.

22  Q.  Okay.  That's all the questions I have.

23          MR. D. MILLS:  That's all, your Honor.

24          THE COURT:  May this witness be excused?

25          MR. D. MILLS:  Yes, your Honor.

*Hogan - Direct*

1       MR. T. MILLS:  Yes, sir.

2       THE COURT:  You may be excused, ma'am.

3       MR. CARRUTH:  Government calls Richard Hogan, your

4  Honor.

5     (Witness was sworn.)

6       THE COURT:  If you'll walk around this column, up here

7  in the witness stand, please, sir, and have a seat.  If you'll

8  tell us your full name, please, sir, and spell your last name.

9       THE WITNESS:  My name is Richard Dean Hogan,

10  H-O-G-A-N.

11     RICHARD D. HOGAN, called by the Government, duly sworn.

12                    DIRECT EXAMINATION

13  BY MR. CARRUTH:

14  Q.  Please tell the members of the jury where you live and

15  what your business or occupation is, Mr. Hogan.

16  A.  I'm a general contractor, and I live in Weatherford,

17  Texas.

18  Q.  And did you live in that area back in 1995?

19  A.  Yes, I've lived there for about 25 years.

20  Q.  Are you affiliated in any way with the American Atheist

21  Association?

22  A.  Yes, I'm the treasurer of all four corporations, and I

23  also sit on the board.

24  Q.  And in your official capacity, did you have occasion to

25  receive some gold coins from the Internal Revenue Service as a

*Hogan - Direct*

1   result of the case now on trial?

2   A.   Yes, I received some gold coins.

3   Q.   And from whom did you receive those gold coins on behalf

4   of the Atheist Organization?

5   A.   I received the gold coins from Ed Martin.

6   Q.   With the Internal Revenue Service?

7   A.   Yeah, on behalf of the organization.

8   Q.   Okay.  And can you tell us the amount, if you know, of the

9   gold coins that you received?

10   A.   The -- I sold them for $106,000.

11   Q.   Okay.  And can you see these gold coins depicted in this

12   exhibit I'm holding up here, which has been introduced as

13   W57-2?

14   A.   Yes.

15   Q.   Do those appear to be the same type of gold coins that

16   were returned to you by the Internal Revenue Service?

17   A.   The ones I got, all of them were the Canadian Maple Leaf.

18   Q.   Okay.  They were all Canadian Maple Leaf.  100,000 were --

19   you sold them for 106?

20   A.   Yes, that's correct.

21   Q.   Okay.  Now, during the time that you served as treasurer

22   of the organization -- are you still treasurer?

23   A.   Yes, I am.

24   Q.   Did you come to know a man by the name of Mr. David

25   Waters?

*Hogan - Direct*

1   A.   I knew David Waters earlier, back in -- from the

2   organization, but I was not treasurer at that time.

3   Q.   Okay.  How did you know Mr. Waters?

4   A.   Just from him working at the office.

5   Q.   And did you become aware of a -- as a treasurer or as a

6   board member of the theft of some bonds from the safe of the

7   Atheist Organization here in Austin, back in the mid-'90s,

8   '94, or so?

9   A.   Yes, I did.

10  Q.   And this was the time Mr. Waters was employed there?

11  A.   Yes, sir.

12  Q.   Did you ever have an occasion to negotiate with anyone in

13  an effort to recover those stolen bearer bonds?

14  A.   Yes, I did.  I negotiated with Mr. Waters.

15  Q.   And why were you negotiating with Mr. Waters?

16  A.   To get our bonds back.

17  Q.   Well, what reason did you have to believe Mr. Waters could

18  assist you in getting your bonds back?

19  A.   I approached Mr. Waters and asked him -- told him that I

20  would be willing to buy the bonds back.  The bonds were no use

21  to anyone but American Atheist because they were bearer bonds.

22  We're the only ones that could cash it.

23  Q.   And was Mr. Waters receptive to your offer?

24  A.   Yes, at the time Mr. Waters owed the state or they were

25  making him make restitution for another issue that he -- he

*Hogan - Direct*

1  stole some money from us, $50,000, and they had reduced what

2  he had to pay back to 15,000.  We were trying to pay that off

3  for him, personal bonds.

4  Q.  Can you tell us if you know why this deal was never

5  consummated?

6  A.  Because he was arrested.

7  Q.  Okay.  Now, you also knew Madalyn Murray O'Hair, I guess?

8  A.  Yes.

9  Q.  Prior to her disappearance in 1995?

10  A.  Yes.

11  Q.  And do you know how she felt about David Waters prior to

12  her disappearance?

13  A.  She was very afraid of David Waters.

14  Q.  And what led you to believe that Ms. O'Hair was afraid of

15  Mr. Waters?

16  A.  She had told me that on several occasions.

17  Q.  To your knowledge, did the organization expend over $6,000

18  to erect a security fence around the headquarters about this

19  time?

20  A.  About 7200, yes.

21  Q.  7200.  And to your knowledge, did Ms. O'Hair attempt to

22  get a restraining order against Mr. Waters in the courts?

23  A.  Yes, they did.

24  Q.  Based upon your knowledge of Ms. O'Hair and Mr. Waters,

25  prior to their disappearance in 1995, can you tell us whether

Hogan - Direct

1    or not Mrs. O'Hair would ever voluntarily have gone anywhere

2    with Mr. Waters?

3            MR. T. MILLS:  I object on the grounds of speculation,

4    being outside of the scope of this witness' knowledge.

5            THE COURT:  Sustain the objection.

6            MR. CARRUTH:  Thank you.  Pass the witness.

7            MR. T. MILLS:  May I approach the bench, your Honor?

8            THE COURT:  You may.

9        (At the Bench, on the record.)

10           MR. T. MILLS:  This witness is not on the government's

11   witness list, and we don't have a 302 on him.  And I just

12   wondered if we could have him -- if there is one we could have

13   it --

14           MR. CARRUTH:  There is not.  He came in the other day

15   to be interviewed with one of the witnesses, Ellen Johnson,

16   and we've never met him, never interviewed him.  But during

17   that conversation, that's when he relayed this information to

18   me.  There is no written report.

19           MR. T. MILLS:  He didn't make a report of that

20   interview?

21           MR. CARRUTH:  I don't know.

22           MR. T. MILLS:  Could I have a copy of the agent's

23   notes of that interview of him?

24           MR. CARRUTH:  Sure.  Do you want to take a recess and

25   we could talk about it?

```
 1          THE COURT:  All right.  Members of the jury, I'm going
 2   to give you your lunch break.  1:20.  Try to be back, ready to
 3   work at 1:20.
 4       (Jury not present).
 5          THE COURT:  All right.  Counsel, we'll take a break
 6   till 1:20.  Whatever records need to be delivered, please
 7   deliver them during the recess.
 8       (Lunch recess.)
 9          THE COURT:  All right, counsel.  Anything before we
10   bring in the jury?
11          MR. CARRUTH:  No, your Honor.
12          MR. T. MILLS:  No, your Honor.
13          THE COURT:  Counsel, you got everything you need?
14          MR. T. MILLS:  Yes, sir.  Thank you.
15       (Jury present.)
16          THE COURT:  All right.  Members of the jury, when I
17   took the break, I went back in, it was before 12:00, and it
18   looked like my office was on like it was normally on Sunday
19   afternoon.  And I thought what's going on?  I ate my lunch, I
20   did -- I came back and nobody's still there.  And then, they
21   kind of trailed in.
22          How many of you went down to watch them make the
23   movies?  Uh-huh.  I think my staff thinks they were going to
24   get into the movie.  While you were watching the movies, or
25   otherwise, during the noon hour, did anyone attempt to talk to
```

*Hogan - Cross*

1    you about this case?

2         THE JURORS:  No.

3         THE COURT:  Did you learn anything at all about the

4    case --

5         THE JURORS:  No.

6         THE COURT:  -- outside of each other and this

7    courtroom?

8         THE JURORS:  No.

9         THE COURT:  If you're a monkey, say no.  And has --

10   has anybody talked to you about this case?

11        THE JURORS:  No.

12        THE COURT:  Show negative responses to all questions

13   by all jurors.  And, Mr. Mills, I do believe the witness is

14   yours.  You remain under oath, sir.

15        THE WITNESS:  Yes, sir.

16                     CROSS-EXAMINATION

17   BY MR. T. MILLS:

18   Q.  Mr. Hogan, you are the treasurer for what organization?

19   A.  For the four corporations under American Atheist, American

20   Atheist, Inc., Charles E. Stevens, American Atheist Archives,

21   Society of Separationists, and the American Atheist General

22   Headquarters.

23   Q.  And how long have you been the treasurer?

24   A.  For about two years.

25   Q.  Who was the treasurer in 1995?

Hogan - Cross

1  A.  One of the -- I think the treasurer by the name of -- he's
2  changed his name -- Henry Morgan, but it was Henry Schmuck.
3  Q.  Were you familiar with the bookkeeping methods and
4  procedures for accounting for assets that went to one of the
5  four Atheist Organizations that were in use in 1995?
6  A.  No.
7  Q.  When did you first meet David Waters?
8  A.  I would say in '90 -- early '92, '91, just somewhere at
9  the center of that time.  I don't remember the exact date,
10  just that time frame.
11  Q.  You were active before with the Atheist Corporations even
12  before you became treasurer?
13  A.  Yes, I've been a member since the '80s, and I knew the
14  O'Hairs probably since the '60s is when I first met them.
15  Q.  And was David Waters, to your knowledge, a member of one
16  or all of the Atheist Organizations?
17  A.  I don't think he was a member of any of the organizations.
18  Q.  And did you -- you must have known Madalyn Murray O'Hair
19  quite well having known her for that long?
20  A.  I don't know if it was quite well, but I did know her on a
21  personal level, yes.
22  Q.  Did you ever know her customs and habits in the type of
23  people that she would hire to work for the different
24  organizations?
25  A.  I knew the people that she hired for that particular

Hogan - Cross

1    organization and the time that I was active in it, yes.

2    Q.  Did you know that Mr. Waters had a criminal record?

3    A.  None of us did.

4    Q.  Well, she had kind of a history of hiring people for some

5    jobs who did have criminal records that she knew about, didn't

6    she?  Isn't that true?

7    A.  I don't know.  I don't think that's necessarily true.  I

8    think that may -- she may have hired someone with a criminal

9    record, but I don't think she knew it at the time she hired

10   them.

11   Q.  All right.  Did -- do I understand that the bearer bonds

12   could only be signed by someone specifically with the -- who

13   could it be signed by?

14   A.  I think it had to be signed -- I think -- if bearer's the

15   correct word, and I used that word a while ago because I

16   thought that's what the term for those type of bonds, and I

17   think those bonds can only be used by a specific -- either

18   individual or someone responsible for a corporation endorsed

19   it.  That's my understanding of them.  I've never had one in

20   my life.

21   Q.  Well, so if David Waters stole them, was it your opinion

22   that he had no way to negotiate it, to get money for it?

23   A.  Yeah, the bonds -- it was my opinion that the bonds were

24   useless to David Waters.

25   Q.  So did you specifically talk with him about that?

*Hogan - Cross*

1    A.   Yes, I did.

2    Q.   And did you get them back from him?

3    A.   No, I did not.

4    Q.   But somehow, the amount of money that he owed the Atheist

5    Organization was reduced from 54,000 to 15,000?

6    A.   It was reduced by the judge in court.

7    Q.   Did that decision have -- and that means the amount that

8    he had to pay back, right?

9    A.   To us, yes.  To make restitution back to us, yes, that was

10   the amount he -- that was reduced for him to pay back.

11   Q.   Well, had he paid $39,000 to get it reduced from 54 to 15?

12   A.   No.  I believe that was reduced by the judge in court.

13   Q.   Do you know what the reason was?

14   A.   I think it was just because he couldn't pay.  He didn't

15   have any money.

16   Q.   Oh, so he had -- it was possibly the decision that if you

17   can't pay 54, can you pay 15?

18   A.   That decision -- I don't have any idea what decision the

19   judge would have made to reduce that to that amount.

20   Q.   All right.

21   A.   But I know that it was reduced from what he owed and what

22   he admitted he stole from us to the amount that we're talking

23   about.

24   Q.   You do not know of your own personal knowledge if Mr.

25   Waters had any kind of conversation with Ms. O'Hair within,

1  say, a couple of weeks of August the 26th, 1995, do you?

2  A.  No, I do not.

3  Q.  By the way, did you ever see David Waters in possession of

4  these bonds?

5  A.  No.  The only information I had that he had the bonds is

6  he told me he had the bonds.

7  Q.  All right.  But you don't know -- I realize it would be

8  unusual for somebody to say, "I have bonds."  But you don't

9  know if he was telling the truth or not?

10  A.  No.  I approached him and asked him the question.

11  Q.  And he said, "Yes, I have the bonds"?

12  A.  Well, right off the bat, he didn't say yes.  We talked

13  about them on several phone conversations, and I said, "Look,

14  you owe us money.  You -- apparently, you've got the bonds,

15  the $70,000.  Let me get them back, let me pay the DA's Office

16  what you owe and you give me the bonds."  They're no good to

17  him.  And that was what we were talking about at the time.

18  Q.  But it never happened?

19  A.  It never happened.

20  Q.  And you never saw the bonds?

21  A.  I never saw the bonds.

22  Q.  That's all the questions I have, sir.

23                    RE-DIRECT EXAMINATION

24  BY MR. CARRUTH:

25  Q.  Mr. Hogan, were you present when Mr. Waters was being

*Hogan - Redirect*

1    interviewed by the news media and made any type of admission

2    regarding taking of those bonds?

3    A.  I'm not sure that the admission or the news media was

4    about the bonds.  I think the admission was about some other

5    things that he had taken from the center, which is a computer

6    with some disk, because he had told myself and the reporter

7    from San Antonio and the America's Most Wanted that he had a

8    disk that he had hired an ex-FBI agent to try to crack and he

9    couldn't open it.  I don't know how much truth is in it, but

10   he acknowledged that he had that computer and the disk.

11   Q.  And can you tell us, sir, whether or not your efforts to

12   negotiate with Mr. Waters over the missing bonds was before or

13   after you overheard him make those admissions during a

14   television news interview?

15   A.  It was after that because that's when I decided, well,

16   this might be an opportunity for me to regain, you know, some

17   -- at least salvage some of that expense.

18   Q.  Thank you, sir.  Pass the witness.

19          MR. T. MILLS:  No further questions.

20          THE COURT:  May this witness be excused?

21          MR. CARRUTH:  Yes, your Honor.

22          THE COURT:  You may be excused.  Call your next

23   witness.

24      (Witness was sworn.)

25          THE COURT:  If you'll tell us your full name, please,

Maken - Direct

1    sir, and spell your last name.

2            THE WITNESS:  Full name is Manmohan Maken, M-A-K-E-N.

3            THE COURT:  You may proceed.

4        MANMOHAN MAKEN, called by the Government, duly sworn.

5                    DIRECT EXAMINATION

6    BY MR. D. MILLS:

7    Q.  Tell the jury where you live, sir, and how you're

8    employed, please.

9    A.  I live in Carol Stream, Illinois, and I have the business

10   which is called Commercial Cosmetics, Inc.

11   Q.  What type of business is that?

12   A.  We do remodeling and refurnishing of restaurants.

13   Q.  How long have you been in that business?

14   A.  Since 1996.

15   Q.  Are you a general contractor?  Would that be a fair

16   description?

17   A.  Yes, please.

18   Q.  Did there come a time when you met Gary Karr?

19   A.  Yes, sir, I had -- go ahead.

20   Q.  Do you see him in the courtroom today?  Look around.

21   A.  Yes, he's right there, yeah.

22   Q.  Tell the jury how it was that you came into contact with

23   Mr. Karr and approximately the time period when you came in

24   contact with him.

25   A.  It has to be somewhere in summer of 1996 we came in

*Maken - Direct*

1    contact.

2    Q.  What was the occasion you came into account with --

3    contact with him?  Why did you come to meet him?

4    A.  I think it was through the newspaper.  We put an ad in the

5    paper.

6    Q.  And after you met him, what occurred?

7    A.  So he was working with us as a subcontractor.  Then, he

8    left us.  He came back again somewhere in '97, end of '97.

9    Q.  And in what capacity did you employ him in 1997?

10   A.  He was a technician, and then, he was a director of

11   Michigan Region.

12   Q.  Would you look at the document that's marked W39-1 that's

13   in front of you?

14   A.  Uh-huh.

15   Q.  And W39-2.

16   A.  Yes, sir.

17   Q.  Have you previously seen those?

18   A.  Yeah, this is the ring my wife had and this is the check I

19   gave for the diamond which I bought it from Mr. Gary Karr.

20   Q.  Okay.  Tell us the circumstances about the diamond ring,

21   how it was that you came to buy the diamond ring.  Or did you

22   just buy a diamond ring?

23   A.  Diamond.  Just the diamond.

24   Q.  Tell the jury how it was that you came to buy the diamond

25   that's in the Exhibit 39.

*Maken - Direct*

1   A.  Mr. Gary Karr approached me and he was with his

2   girlfriend, Kelly Johnson, I think, and he wants to sell that

3   diamond.  Since I don't know nothing about stones, I said,

4   "Let's go to a jeweler, see what they appraise, and I'll buy

5   it."

6   Q.  Did you go to a jeweler?

7   A.  Yes.

8   Q.  What was the jeweler that you went to?

9   A.  Nickie Jewelers in Chicago.  I gave him the address.  When

10  they direct, I met them in my car over there and the deal was

11  made, and I wrote him a check right there for 3500 bucks.

12  Q.  And is W39-2 a copy of the check that you wrote Gary Karr?

13  A.  Yes, please.

14  Q.  That's correct?  That's the check?

15  A.  Yes.

16  Q.  We'd offer 39-2, your Honor.

17          MR. T. MILLS:  No objection.

18          THE COURT:  Received.

19  Q.  (BY MR. D. MILLS) What's the date of that check?

20  A.  9-4, 1997.

21  Q.  And if you would, take the diamond and the ring out of

22  39-1, I'm going to ask you if you can identify those.

23  A.  This one?

24  Q.  Yes.

25  A.  Yeah, this is my wife's ring.

*Maken - Cross*

1  Q.  Did you have that made -- that band made into a ring?

2  A.  Yes.

3  Q.  And did you previously, just before you came here to look

4  at the stone that's inside the white piece of paper folded

5  over there?

6  A.  I'm not a diamond expert, but it looks like the same.

7  Q.  We'd offer 39-1, your Honor.

8       MR. T. MILLS:  I have no objection for it being a

9  diamond, but I object to the predicate for it being the exact

10 same diamond.

11      MR. D. MILLS:  We'll link it up with the next witness,

12 your Honor.

13      THE COURT:  Okay.  I'll hold it in abeyance till then.

14      MR. D. MILLS:  I'll pass the witness.

15                    CROSS-EXAMINATION

16 BY MR. T. MILLS:

17 Q.  Mr. Maken?

18 A.  Yes, sir.

19 Q.  You worked as a general contractor in Florida?

20 A.  No, sir.

21 Q.  Where?

22 A.  In Chicago.

23 Q.  In Chicago?

24 A.  Yes, sir.

25 Q.  And when was it that Gary Karr worked for you?

*Maken - Cross*

1  A.  It was in 1996, the first time I met him, and then, he

2  left us and then he came back.  Off and on, he used to work

3  for us.  But somewhere at the end of '97 to middle of '98, he

4  was on the payroll.

5  Q.  Okay.  Do you have any kind of papers or certificates that

6  describe the diamond that you had mounted in your wife's ring?

7  A.  No, I don't.

8  Q.  Is the diamond -- the diamond's not --

9  A.  I have the paper there.

10  Q.  Do you know what kind of cut the diamond was that you

11  purchased?

12  A.  No idea.

13  Q.  Do you know the exact number of karats it was?

14  A.  No, sir.

15  Q.  Do you know the clarity of it?

16  A.  No.

17  Q.  Do you know the color of it?

18  A.  No.

19  Q.  Do you have any kind of a document that shows where the

20  flaws were in it?

21  A.  No.

22  Q.  So the main thing that you can identify is this gold --

23  A.  Ring of my wife.

24  Q.  -- ring?

25  A.  Yeah.

*Maken - Redirect*

1    Q.   Okay.  That's all the questions that I have.

2          THE COURT:  Any further questions?

3                    RE-DIRECT EXAMINATION

4    BY MR. D. MILLS:

5    Q.   Did you see a jeweler take that stone out of that ring?

6    A.   Yes.

7    Q.   And where did that occur?

8    A.   Downstairs in the basement.

9    Q.   Of this building?

10   A.   Yes.

11   Q.   And when did that occur?

12   A.   This morning, before lunch.

13   Q.   That's all I have, your Honor.

14          THE COURT:  May this witness be excused?

15          MR. T. MILLS:  No.

16                    RE-CROSS EXAMINATION

17   BY MR. T. MILLS:

18   Q.   During the time Mr. Karr worked for your company or for

19   you, what kind of work did he do?

20   A.   He did everything, sir, painting, tile work, carpentry,

21   masonry, managing people.

22   Q.   When he was there working, was he a good worker?

23   A.   Very good worker.

24   Q.   That's all the questions that I have.

25   A.   Thank you.

*Van Winkle - Direct*

1    MR. D. MILLS:  Nothing further, your Honor.

2    THE COURT:  You may be excused, sir.

3    THE WITNESS:  Thank you, sir.

4    THE COURT:  You may call your next witness.

5    MR. D. MILLS:  Jim Van Winkle.

6    THE COURT:  Stand right there and be sworn, please.

7    (Witness was sworn.)

8    THE COURT:  If you'll follow the Security Officer.  If

9    you'll tell us, please, sir, your full name and spell your

10   last name.

11   THE WITNESS:  My name is James Van Winkle, V-A-N,

12   W-I-N-K-L-E.

13   JAMES VAN WINKLE, called by the Government, duly sworn.

14                    DIRECT EXAMINATION

15   BY MR. D. MILLS:

16   Q.  Tell the jury where you live and how you're employed,

17   please.

18   A.  I live in San Antonio, Texas, and I own a jewelry store

19   called Americus Diamond.

20   Q.  And how long have you owned that company?

21   A.  Since its inception in 1984.  Actually, the company was

22   started in '80.  The store in San Antonio was '84.

23   THE COURT:  You said Americus Stone or --

24   THE WITNESS:  Diamond, sir.

25   Q.  (BY MR. D. MILLS) Are you a gemologist?  Is that a correct

1   term?

2   A.   That is a correct term.  No, I have not completed all of

3   the color stone gemology.  I've completed all the diamond

4   gemology.  My business is in diamonds.

5   Q.   So what type of training do you have relative to analyzing

6   diamonds?

7   A.   Well, I went to New York City in 1980, when I had been in

8   the business for a while, and took a gemology course from the

9   Gemological Institute of America, which is a nonprofit

10  educational organization that trains approximately 80 percent

11  of the gemologists in the United States.  At that time, I took

12  diamond grading courses, everything that a gemologist will

13  take pertaining to diamonds.

14        Since that period of time, I've done 150,000 diamonds

15  and graded far more than that.  I've sent at least 25,000

16  diamonds to be certified over the last 20 years and upgraded

17  those prior and after they have been sent back for

18  certification.

19  Q.   What does it mean to be certified?

20  A.   Well, when you send a diamond to be certified at one of

21  these labs, GIA, Gemological Institute of America is the most

22  respected laboratory in the world.  They developed the

23  international grading scale and that everyone uses.  When you

24  send a diamond to GIA, a nonprofit organization, a laboratory

25  in Los Angeles or in New York City, they have three

*Van Winkle - Direct*

1   gemologists that will inspect the diamond.

2         And there are 14 different parameters that they look

3   at.  Each gemologist does it individually.  They look at the

4   color of the stone, they weigh it very precisely, they take

5   very precise measurement of the stones so they know the

6   diameter of the stone, the minimum, the maximum, millimeter

7   sizes to the nearest hundredth of a millimeter, will measure

8   the depth of the stone the nearest hundredth of a millimeter.

9         They measure the big facet on the top, called the

10  table, to the nearest hundredth of a millimeter.  They look at

11  the girdle and describe the girdle of the stone.  That's the

12  edge that runs and it very precisely -- it's a very thin, very

13  thick, they tell you exactly what it is.

14        They look at the polish of the stone to see if it's

15  well-polished, and they give that a grade.  They look at the

16  impurity of the stone.  They give that a grade.  Then, they

17  test the stone for fluorescence under ultraviolet light to see

18  if it has any fluorescence and they describe that.  And then,

19  they describe any comments on the stone's polish.

20        So all of these parameters are very, very specific.

21  And even in the GIA courses for gemologists, they say that

22  it's almost impossible for any stone to have all of these 14

23  different qualities be the same.  It would be unbelievably

24  rare.

25  Q.  Would you look at what's been marked for identification as

*Van Winkle - Direct*

1   38-1 up there?  Do you see that number?  Is it W38-1, maybe?

2   A.  Yes, sir, it is.

3   Q.  And do you recognize that?

4   A.  Yes, sir, I do.

5   Q.  And is that one of the business records from the Americus

6   Diamond stores that you're familiar with?

7   A.  Yes, sir, it is.

8   Q.  We'd offer 38-1.

9         MR. T. MILLS:  No objection.

10        THE COURT:  Received.

11  Q.  (BY MR. D. MILLS) Would you tell the jury what that piece

12  of paper is, please?

13  A.  Yes, this is a receipt of sale, dated 9-16 of '95, to Mr.

14  Jon Murray, at 3702 Greystone Drive, in Austin, Texas.  It was

15  a diamond stock No. 30159 for a 92.F Color Internally Flawless

16  Diamond.  We sold for $6186, and it was paid for with an Am

17  Ex.  What this does is the stock number gives us a tie back to

18  all of our records that tell us exactly where that stone was

19  purchased, when it was purchased, how it was certified and all

20  that.

21  Q.  And the date you said again?

22  A.  The date was 9-16 of '95.

23  Q.  And W38-2, do you recognize that document?

24  A.  Yes, sir, I do.

25  Q.  Is it another one of your business records from your

*Van Winkle - Direct*

1  store?

2  A.  Sir, this was a -- this was a copy of a business record.

3  This is the actual GIA certificate, a copy of the certificate

4  that was made back in '95.  This diamond was sent to the GIA.

5  It was graded and it had all of these parameters on it that

6  said the cut, the weight, the color, the clarity and the

7  parameters that I spoke of before.

8       When we were told that this diamond was -- could

9  possibly be in evidence in this case, I called GIA and they

10  retrieved this information from their microfilm, and they

11  printed a duplicate of it.  So this is -- and this is

12  something that they do a lot when they have a stone --

13  certificate that's lost, they can print it.

14       And this has all the exact information describing this

15  Internally Flawless.

16  Q.  So it is -- that is a copy of the copy that you have as

17  one of your business records, is that correct, for the stone?

18  A.  The original certificate would have been given to Jon

19  Murray at the time of purchase.  This is an exact copy from a

20  microfilm of the original certificate.

21  Q.  We'd offer 38-2.

22       MR. T. MILLS:  No objection.

23       THE COURT:  Received.

24  Q.  (BY MR. D. MILLS) Have you -- there is another envelope

25  there, and I don't know the numbers.  30 -- what is the number

*Van Winkle - Direct*

1  with a ring and a little piece of tissue in it?

2  A.  W39-1.

3  Q.  And are you familiar with the contents of that envelope?

4  A.  Yes, sir, I am.

5  Q.  And when did you last examine the stone that's contained

6  inside that piece of tissue paper there?

7  A.  Approximately four hours ago.

8  Q.  Where did you do this examination?

9  A.  In the grand jury room.

10  Q.  And when you first saw that, was the stone attached to the

11  ring that's in 39-1?

12  A.  Yes, sir, it was.

13  Q.  And who removed it?

14  A.  I did it.

15  Q.  And did you compare the diamond that was in 39-1 with the

16  38-2 reference there that you retrieved from microfiche?

17  A.  Yes, sir.

18  Q.  And do you have an opinion whether it's one in the same

19  diamond?

20  A.  Yes, I believe that it's the same diamond.

21  Q.  And we'd re-offer 39-1, your Honor.

22       MR. T. MILLS:  What is that?

23       MR. D. MILLS:  That's the ring or the stone.

24       MR. T. MILLS:  No objection.

25       THE COURT:  All right.  It's received.

*Van Winkle - Cross*

1          MR. D. MILLS:  Pass the witness.

2                    CROSS-EXAMINATION

3    BY MR. T. MILLS:

4    Q.  You are able to examine the diamond that is in the tissue

5    and say that it is the same diamond that you sold on 9-16-96

6    to Jon Murray?

7    A.  I believe that.  It's -- we compared all of these

8    different parameters.  I compared all the parameters.  They

9    are exactly the same, yes.

10   Q.  What all parameters did you have in 1996?  Would that be

11   those on the certificate?

12   A.  Yes, sir.  The stone had been certified prior to being

13   sold.

14   Q.  All right.  Are all of the stones you sell certified prior

15   to being sold?

16   A.  Within the last three or four years, I would say that 99

17   percent of all diamonds that we sell are certified

18   independently in one of four gemological laboratories in the

19   country.  At that time, we were certifying only the

20   particularly rare diamonds, as is this one.  Internally

21   Flawless is a very rare quality.  It's Internally Flawless,

22   describes the clarity characteristics of the diamond whether

23   it has flaws or not.

24          This stone is flawless.  It's extremely rare.

25   Q.  Well, I cannot -- I've never been to the school --

1   A.  Yes, sir.

2   Q.  -- but let me ask you about degrees of precision in this

3   grading, if I might.

4   A.  Of course, sir.

5   Q.  I would -- I don't know, maybe I'm wrong, but would you

6   say that you cannot say with absolute certainty that this is

7   the same diamond?

8   A.  Of course that's true.

9   Q.  All right.

10  A.  But I would say that the chances of it not being the same

11  diamond are incredibly minute.  Incredibly minute.

12  Q.  All right.

13  A.  I couldn't even begin to calculate that.

14  Q.  All right.  It is called a -- in shape, it's a round

15  diamond.

16  A.  Yes, sir.

17  Q.  In cutting style, it's called a brilliant diamond?

18  A.  Yes, sir.

19  Q.  That only -- those two categories only narrow it down to

20  millions, I would assume, of diamonds?

21  A.  Tens of millions.

22  Q.  Tens of millions.

23  A.  Yes.

24  Q.  Its measurements are 6.36 to 6.46, and what does that

25  refer to?

*Van Winkle - Cross*

1  A.  That refers to the -- a diamond shape where it's round if

2  we're looking at it this way.  That is the minimum measurement

3  of the girdle and the maximum measure of the girdle.  Almost

4  no diamond is completely round, so they'll have a range.

5  Q.  If it was round, would that be the diameter?

6  A.  Yes, sir.

7  Q.  All right.  So on -- when you're measuring it across

8  through the center?

9  A.  Yes, sir, you use a millimeter gauge.  It's a -- what I

10  use is a -- an electronic gauge.

11  Q.  All right.  And you were able to say that it was between

12  6.36 and 6.46?

13  A.  No, sir, that's not true.  The minimum diameter was the

14  smaller -- I don't have it.

15  Q.  Here, I have it.

16  A.  I think I have a copy.  The minimum was 3.36, and the

17  maximum was 6.46 to the nearest hundredth of a millimeter.

18  Q.  All right.  And then, 3.76 is the depth?

19  A.  Yes, sir, that's from the top of the stone to the very

20  bottom of the stone, it was exactly 3.76.

21  Q.  All right.  If you had a stone that weighed .920?

22  A.  Yes, sir.

23  Q.  And a stone that weighed .929?

24  A.  Yes, sir.

25  Q.  Would those be a significant difference?

*Van Winkle - Cross*

1   A.   920 and -- I'm sorry.

2   Q.   .929.

3   A.   .929 and .920, oh, well, it's -- that difference is

4   measured, yes.  It's measured to the nearest thousandth of a

5   karat, which is a fifth of a gram.

6   Q.   But this measurement only measures it to .92 to a hundred?

7   A.   Yes, sir.  They use a scale that goes to three spaces so

8   they can round up or round down for the second digit.  But the

9   question that you asked is -- I think I understand what you're

10  getting at.  92-point stones, there's a variety of cutting.

11  You could point a 92-point stone that had a millimeter --

12  minimum millimeter width of, say, 5.6 millimeters and you

13  could find one that was very broad that might be 7.2.

14       So the range of millimeter size for a 92 stone is

15  actually quite a bit larger.  So you could actually have a

16  stone that was a tenth -- maybe even one or two points bigger

17  than this that would actually have a smaller millimeter size.

18  So the range is quite large.

19       To have a specific range like this is -- it's very,

20  very specific.

21  Q.   All right.  The clarity grade seems to be of significance

22  to you.

23  A.   Yes, sir.

24  Q.   Now, the clarity grade of Internally Flawless is not the

25  best clarity grade of them all, is it?

*Van Winkle - Cross*

1   A.  No, sir.  Flawless is the best clarity grade.  Internally

2   Flawless refers to that there are no flaws inside the diamond.

3   Flawless refers that there are no blemishes on the surface of

4   this diamond.  I have seen perhaps in my life 250 Internally

5   Flawless stones out of the hundreds of thousands I've looked

6   at.  And I've seen perhaps two flawless stone glass.

7   Q.  All right.  The color grade of F is not the best of the

8   colorless scale, is it?

9   A.  No, sir, it is not.

10  Q.  Well, it appears to you to be very likely, then, that this

11  is the same diamond?

12  A.  Yes, sir, it's -- it is very likely.  It's extremely

13  likely.

14  Q.  That's all the questions that I have.

15          MR. D. MILLS:  Nothing further, your Honor.

16          THE COURT:  I have one question.  Could I see 38-1?

17          THE WITNESS:  Yes, sir.

18          THE COURT:  In your direct examination, you discussed

19  a sale in September of '95.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  And then, your cross-examination, you

22  discussed a sale of September of '96.  Which is correct?

23          THE WITNESS:  It would be the date that's on this

24  receipt.  I'm sorry.

25          THE COURT:  Which is what?

*Wostarek – Direct*

1    THE WITNESS:  9-16-95.

2    THE COURT:  All right.  Any further questions?

3    MR. D. MILLS:  No, your Honor.  And if we might

4  withdraw the ring itself, not the diamond, to give back to Mr.

5  Maken.  I don't know if defense counsel has any objection to

6  it.  We just wanted to leave it all together until he took it

7  apart, but we don't need the ring.  And Mr. Maken would like

8  the gold ring part back if that's acceptable.

9    THE COURT:  Counsel, answer that at a break or

10  whatever.  All right.  You may be excused, sir.

11    THE WITNESS:  Thank you, your Honor.

12    THE COURT:  Call your next witness.

13    MR. CARRUTH:  Government calls David Wostarek, your

14  Honor.

15    (Witness was sworn.)

16    THE COURT:  You need to follow the Security Officer

17  and walk around this column and have a seat up here.  If

18  you'll tell us your full name, sir, and spell your last name.

19    THE WITNESS:  David John Wostarek, spelled

20  W-O-S-T-A-R-E-K.

21   DAVID JOHN WOSTAREK, called by the Government, duly sworn.

22    DIRECT EXAMINATION

23  BY MR. CARRUTH:

24  Q.  Mr. Wostarek, would you please tell the members of the

25  jury where you live and what your business or occupation is?

*Wostarek - Direct*

1  A.  I live in Northwest Austin, and I have a import car repair

2  shop, called Northwest Imports.

3  Q.  And is that located in Palm Springs Road here in Austin?

4  A.  Yes, sir.

5  Q.  And was it at that location back in August of 1995?

6  A.  Yes, sir.

7  Q.  What types of motor vehicles do you specialize in at your

8  repair shop, sir?

9  A.  We do Porsche, Audi, BMW, Volkswagon and Volvo.

10 Q.  Okay.  Prior to 1995, sir, and in 1995, did you know

11 either Jon Garth Murray or Robin Murray O'Hair?

12 A.  I have met both of them, yes.

13 Q.  And in what capacity did you meet them, sir?

14 A.  They brought their Porsche 944 into our shop for service.

15 Q.  Okay.  I'm going to show you what's been marked for

16 identification purposes as Government Exhibit W101-1, then

17 I'll ask you if you recognize that as one of your business

18 records that you provided to us recently.

19 A.  Yes, it is.

20 Q.  Does that detail some work that you did on a 1985 Porsche

21 for Robin O'Hair?

22 A.  Yes, it does.

23 Q.  We'd offer Government's W101-1, your Honor.

24        MR. T. MILLS:  No objection.

25        THE COURT:  It's received.

Wostarek - Direct

1   Q.   (BY MR. CARRUTH) Can you take that exhibit, sir, and tell

2   us what it was, what type of repairs were done to that

3   vehicle?

4   A.   Okay.  Looks like we did some repairs on the air

5   conditioner, and we did some repairs on the cooling system,

6   and did some other maintenance stuff.  I don't recall the

7   exact circumstance, but there was something that had been done

8   improperly before we serviced the car that we straightened

9   out.

10  Q.   And what was the total amount of the bill paid for your

11  labor and parts to repair that Porsche automobile?

12  A.   $1,109.60.

13  Q.   And can you tell from the records in evidence what date

14  that bill was paid?

15  A.   Yes, sir, it was August 25th, 1995.

16  Q.   So on August 25th, 1995, the O'Hairs spent $1109.60 on

17  that Porsche automobile?

18  A.   Yes, sir.

19  Q.   I now show you what's been marked for identification

20  Government's Exhibit W51-5A, and ask you to take a look at

21  that front and back and tell me if you can identify it.

22  A.   It's a check that we deposited that they wrote for the

23  repairs.

24  Q.   And does that relate to the bill you've previously

25  identified?

*Wostarek - Direct*

1  A.  Yes, it's the same amount.

2  Q.  W51-5A we'd offer at this time.

3       MR. T. MILLS:  No objection.

4       THE COURT:  Received.

5  Q.  (BY MR. CARRUTH) Does that appear to be a check signed by

6  -- can you tell who it was signed by?  Jon?

7  A.  Jon was the one who I talked to most of the time.

8  Q.  Okay.

9  A.  Little hard to read the signature on there, but that looks

10 like it.

11 Q.  Does it have a date up at the top of the check?

12 A.  Yes, August 25th, 1995.

13 Q.  And it's payable to Northwest Imports.  That's your

14 business?

15 A.  That's correct.

16 Q.  For $1,109.60?

17 A.  That's correct.

18 Q.  And in the lower left-hand corner, what does it say down

19 here?

20 A.  It says -- looks like some abbreviation there, Porsche

21 RMO.

22 Q.  Would that be --

23 A.  Robin O'Hair, yeah, Robin Murray O'Hair.

24 Q.  Porsche?

25 A.  Porsche.

*Wostarek - Cross*

1   Q.   That was endorsed and deposited on your account for

2   Northwest Imports?

3   A.   Yes.

4   Q.   And this transaction occurred on 8-25-95?

5   A.   Yes.

6   Q.   And you specifically recall Mr. Jon Garth Murray coming in

7   to pay this bill?

8   A.   Yes, sir.

9   Q.   And did he take the car with him or did he bring his

10  sister in to pick up the car?

11  A.   Robin was there to pick up the car with him.

12  Q.   Thank you.  Pass the witness.

                    CROSS-EXAMINATION

14  BY MR. T. MILLS:

15  Q.   When you were shown this exhibit, W51-5A, were you able to

16  see who signed that check?  Were you able to determine?  I

17  think you were asked.

18  A.   Yes, it's a little bit sketchy on the signature, but we

19  have dealt with the -- Jon and Robin before, at least twice

20  previous to that.  So I know that was them that signed it or

21  it was Jon that signed it.

22  Q.   All right.  These kind of repairs would be common and not

23  unusual if someone was about to use the vehicle for a vacation

24  or a long drive, wouldn't it?

25  A.   Probably most of them would have had to be performed just

*Wostarek - Redirect*

1  to be able to continue driving the car.

2  Q.  All right.  Do you remember any conversation that you had

3  with Jon or Robin on the date that the car was brought in?

4  A.  It's been long enough ago that I've -- don't recall.  I

5  mean, I know I talked to them, but I couldn't tell you what

6  about.

7  Q.  Do you know when the car was brought in from any records

8  that you've looked at?

9  A.  I haven't looked at any.  I could probably pull it up on

10  our computer system.

11  Q.  The -- this document does not have a space for when it was

12  brought in?

13  A.  It doesn't on there.  Like I said, it's stored in the

14  computer system.  Judging by the type of repairs, I would say

15  it was there at least two days.

16  Q.  I don't have any other questions.  Thank you.

17                    RE-DIRECT EXAMINATION

18  BY MR. CARRUTH:

19  Q.  Mr. Mills asked you whether or not this work was the type

20  of work that would be done on a car for a trip?

21  A.  Uh-huh.

22  Q.  Would this type of work be performed on a car to spend

23  $1100 for a car that was going to be abandoned at an airport,

24  a couple of days later, to make it look like you've flown out

25  of town?

Fawcett - Direct

1    A.   No.

2    Q.   Thank you.   That's all.

3         THE COURT:   If there are no questions, may this

4    witness be excused?

5         MR. CARRUTH:   Yes, your Honor.

6         MR. T. MILLS:   Yes, sir.

7         THE COURT:   You may be excused.   Call your next

8    witness.

9         MR. CARRUTH:   The government calls Pat Fawcett.

10       (Witness was sworn.)

11        THE COURT:   Walk around this column and have a seat up

12   here, please, ma'am.   Tell us your full name, please, ma'am,

13   and spell your last name.

14        THE WITNESS:   Patricia Ann Fawcett, F-A-W-C-E-T-T.

15    PATRICIA ANN FAWCETT, called by the Government, duly sworn.

16                        DIRECT EXAMINATION

17   BY MR. CARRUTH:

18   Q.   Ms. Fawcett, could you please tell the members of the jury

19   where you live and how you're employed?

20   A.   I live at San Antonio, Texas, 5050 Fredericksburg Road,

21   and I'm area supervisor for Warren Properties.

22   Q.   And does that include the Warren Inn Village on

23   Fredericksburg Road in San Antonio, Texas?

24   A.   Yes, it does.

25   Q.   I'm showing you what's been previously produced as

159

*Fawcett - Direct*

1   Government's Exhibit No. W25-16.  Can you see this --

2   A.  Yes.

3   Q.  -- photograph?

4   A.  Uh-huh.

5   Q.  Do these photographs fairly and accurately depict the

6   Warren Inn?

7   A.  Yes, they do.

8   Q.  And you manage that property?

9   A.  Yes, I do.

10   Q.  And did you manage that property back in 1995?

11   A.  No, I didn't.

12   Q.  Are you testifying today from business records maintained

13   by the Warren Inn Village?

14   A.  Yes, I am.

15   Q.  In that time period?

16   A.  Yes, I am.

17   Q.  And have you brought with you in response to a subpoena

18   certain business records for the time period of 1995?

19   A.  Yes, I have.

20   Q.  Let me show you, ma'am, what's been marked for

21   identification purposes as Government Exhibit W25-1, 25-2,

22   25-3, 25-4, 25-5, 25-6, 25-7, 25-8, 25-9, 25-10, 25-11, 25-12,

23   25-13, 25-14, 25-15 and 25-17 -- 16 is already entered with

24   the photographs.  Do you recognize those all being business

25   records provided by you, relating to the Warren Inn, for the

*Fawcett - Direct*

1   time period 1995?

2   A.  Yes.

3   Q.  We would offer at this time, your Honor, Government's

4   Exhibit W25-1 through 15 and 17, 16 having previously been

5   admitted.

6         MR. T. MILLS:  No objection.

7         THE COURT:  Received.

8   Q.  (BY MR. CARRUTH) Thank you.  Now, could we go through

9   these one-by-one and ask you to explain to the members of the

10  jury what each one is?  Let's talk about 25-1.

11  A.  This is the credit application of a David Waters.

12  Q.  Okay.  And there's a notation at the upper top.  Would you

13  read that into the record, please?

14  A.  Its says, "Used to live here."

15  Q.  And what would that normally mean to you?

16  A.  When they come in and fill out an application, if they

17  have lived here before, they would tell us that they lived

18  here.

19  Q.  Okay.

20  A.  And then, our desk clerk would write that at the top.

21  Q.  Okay.  Can you tell us what date Mr. Waters applied for --

22  or made application for the lodging at your establishment?

23  A.  August 28th, 1995.

24  Q.  And is there a type of vehicle listed on that application?

25  A.  Yes, there is.

Case 1:99-cr-00274-LY   Document 100   Filed 11/21/00   Page 161 of 240

161

*Fawcett – Direct*

1   Q.   And what is that?

2   A.   It's a 1995 Ford van.  I think it's a van.

3   Q.   Yes, ma'am.  That's correct.  Okay.  And do you secure --

4   normally secure a photo of the driver's license of your

5   applicants?

6   A.   We do.

7   Q.   And I asked you to look at W25-2, and tell me if you can

8   identify that as a photocopy of a driver's license.

9   A.   Yes, it is.

10   Q.   And whose driver's license is that, ma'am?

11   A.   David Waters.

12   Q.   Okay.  W25-3 relates to parking for tenants at the Warren

13   Inn properties; is that correct?

14   A.   Yes, it is.

15   Q.   And then, in addition to the 1995 Ford van listed on the

16   original application, is there another vehicle listed on here

17   for parking purposes?

18   A.   Yes, it is.

19   Q.   And what would that be?

20   A.   A 1989 Camaro.

21   Q.   Okay.  And does it have the license number?

22   A.   It does.

23   Q.   Okay.  Now, W25-4, would you recognize that as a resident

24   credit application?

25   A.   Yes, it is.

LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

*Fawcett - Direct*

1   Q.  And who is the applicant on that document?

2   A.  Gary Karr.

3   Q.  And what date was that document executed?

4   A.  8-25 of '95.

5   Q.  Okay.  And does Mr. Karr provide an address?

6   A.  Yes, he does.

7   Q.  Okay.  And is it an out-of-state address?

8   A.  Yes, it is.

9   Q.  And is it in Florida?

10  A.  Yes, it is.

11  Q.  And as a result, did you get a photocopy of the driver's

12  license of Mr. Karr?

13  A.  Yes, we did.

14  Q.  I'll show you W25-5, and ask you if you can identify that,

15  please, ma'am?

16  A.  Yes, it's a Florida driver's license.

17  Q.  Of?

18  A.  Mr. Karr.

19  Q.  And that's the applicant with Mr. Waters, correct?

20  A.  Yes.

21  Q.  W25-6 is an appliance rental agreement.  Can you explain

22  the significance of that document, please, ma'am?

23  A.  In our two-bedroom apartments, we do not provide TVs, and

24  so they rented a TV.

25  Q.  Okay.  And how much were they charged for the rental of

*Fawcett - Direct*

1    the television set?

2    A.   $12.93 a week.

3    Q.   Okay.  Now, W25-7 appears to be a department -- apartment

4    inventory; is that correct?

5    A.   Okay.  This is the policy.  It's not the inventory.  This

6    is the policy.

7    Q.   Okay.  So when it says policy/apartment inventory, this is

8    only the inventory?

9    A.   This is the policy and the inventory is -- would be on the

10   back side of this.

11   Q.   Okay.  And by whom is that document signed?

12   A.   A Gary Karr and a David Waters.

13   Q.   And when is that document executed?  What date up here?

14   A.   8-28 of '95.

15   Q.   And can you tell us what they agreed to pay for rent on

16   that apartment?

17   A.   Yes, $411 a month.

18   Q.   And for how long a period of time did they lease it?

19   A.   They leased it for 30 days.

20   Q.   Okay.  And then, Government's Exhibit 25-8, once again, is

21   another document.  Please explain the significance of that.

22   A.   Well, these -- we have property rules, and this is a pool

23   property rule, and it's also that we don't allow pets and what

24   they're allowed to do on property.

25   Q.   Okay.  And is that signed by the lessees?

*Fawcett - Direct*

1    A.   Yes, both David Waters and David Karr.

2    Q.   All right.  Thank you.  What about W25-9, please, ma'am?

3    A.   This is just a tenant check-in list that we do to make

4    sure we have all the proper paperwork in order.

5    Q.   Okay.  And how many keys were given to Mr. Karr and Mr.

6    Waters when they checked in?

7    A.   We gave them two property keys and one mailbox key.

8    Q.   Okay.  Was this a one-, two-, three-bedroom apartment?

9    A.   Two-bedroom.

10   Q.   Was it an upstairs apartment?

11   A.   Yes, it was upstairs.

12   Q.   And can you tell what the apartment number was on these

13   documents?

14   A.   Yes, it was Apartment 11.

15   Q.   Okay.  Government's Exhibit W25-10, what does that purport

16   to show, please, ma'am?

17   A.   This is what we call a CRJ, and this is what we use our

18   electric cards for that shows when they paid their rent and

19   what they paid.

20   Q.   Okay.  And how was the rent paid on this apartment rented

21   by Mr. Karr and Mr. Waters?

22   A.   It was paid in cash.

23   Q.   Okay.  Same for W25-11 and W25-12, and W25-13?

24   A.   Right.

25   Q.   Do those show payments of rent?

*Fawcett - Direct*

1    A.   No.  These show the payments of the TV.  They only paid

2    the rent one month.

3    Q.   Okay.  Are you able to determine how much they spent in

4    addition to the rental rate on the room and the rate on the TV

5    and any other deposit that was put up?

6    A.   Yes.  You can do it through this and, also, the ledger

7    card.

8    Q.   Okay.  And can you tell us the total amount spent by Mr.

9    Karr and Mr. Waters at the Warren Inn Village during 1995?

10   A.   Right.  Can I get it out of my --

11   Q.   Please.

12   A.   Okay.  They spent a total of $776.69.

13   Q.   And was that paid by credit card, check or cash?

14   A.   It was all cash.

15   Q.   Thank you.  Now, W25-14 -- by the way, did there come a

16   time when they extended that initial 30-day period for any

17   more time?

18   A.   Yes, they did.

19   Q.   And can you tell us about that, please, ma'am?

20   A.   Can I get my folder out?

21   Q.   Yes, ma'am.

22   A.   When they moved in, they were to be moved in from 8-28

23   through 9-27.  They came in on 9-28 and extended it to 9-3.

24   Q.   So September 30th of 1995 was their last day, correct?

25   A.   Yes, sir.

*Fawcett - Direct*

1   Q.   And did they check out on that occasion?

2   A.   Well, they did not personally come in and check out.

3   Q.   Did they leave?

4   A.   They left, yes.

5   Q.   Okay.  And I notice here, on W25-14, it shows the actual

6   date of move-out to be 10 -- is that 10-3-95?

7   A.   Right.

8   Q.   So were they allowed a couple of extra days?

9   A.   That's when -- this shows when we did the move-out

10  inventory on their property.

11  Q.   Okay.  This is what you did to check and make sure the

12  property was still there?

13  A.   Yes, uh-huh, correct.

14  Q.   And did you determine that any property was missing when

15  Mr. Waters and Mr. Karr checked out?

16  A.   Yes, we do an inventory, check-in and an inventory

17  check-out, and it showed that we had a queen bedspread that

18  was missing.

19  Q.   A queen-sized bedspread was missing?

20  A.   Yes, sir.

21  Q.   Now, it also reflects up here that Mr. Waters left no

22  forwarding address; is that correct?

23  A.   That's correct.

24  Q.   And did Mr. Waters and Mr. Karr move out owing you any

25  money, or did you owe them a refund for their deposit?

*Fawcett - Direct*

1    A.   We owed them a refund.

2    Q.   And you were unable to provide that because they left no

3    forwarding address?

4    A.   Correct.

5    Q.   W25-15, would you please explain the significance of that?

6    A.   This is a ledger card for Apartment 14.

7    Q.   And what does it reflect, please, ma'am?  Is that the

8    next-door neighbor?

9    A.   No.

10   Q.   This would be one of the neighbors?

11   A.   Yes, it would be two doors -- it would be three doors

12   down.

13   Q.   And can you tell who that individual was that occupied

14   that residence?

15   A.   Well, it's got a Rogers Metz is the last -- well, it shows

16   two different names.  It shows a Hatfield and a Rogers and it

17   shows a Metz.

18   Q.   Okay.  And what about this final Exhibit W25-17, an

19   apartment inventory sheet?

20   A.   This is the inventory that we did when they moved in.

21   David Waters signed this.

22   Q.   Okay.

23   A.   And it shows that one -- shows what the size of the

24   apartment was, which was 11-G.

25   Q.   And what was the size of the apartment?

*Fawcett - Cross*

1    A.   It was a two-bedroom.

2    Q.   Okay.  And how many beds?

3    A.   It had one room, it had a queen size bed and the other

4    bedroom, it had two twins.

5    Q.   Okay.  And does that inventory sheet also show any

6    property missing?

7    A.   Yes, I have a bedspread, it shows when they moved out, we

8    only got two 10, which would be two twins and no queen.

9    Q.   Queen-size bedspread was missing?

10   A.   Was missing.

11   Q.   Any other property that you could tell?

12   A.   No.  That would be all on this inventory.

13   Q.   Thank you.  Pass the witness.

14                      CROSS-EXAMINATION

15   BY MR. T. MILLS:

16   Q.   One of your exhibits there, does it show a Warrens

17   Property, Inc. credit application for -- named Gary Karr?

18   A.   Yes, sir.

19   Q.   I wrote down you said there was a date of 8-25-95, and I

20   didn't see that.  Would you look again at that?

21   A.   8-28 -- I'm sorry.  8-28 of '95.

22   Q.   All right.  I just want you to make sure on the one that

23   says Gary Karr.

24   A.   Yes, Gary Karr is 8-28 of '95.

25   Q.   All right.  Let me show you two diagrams, Defendant's

*Fawcett - Cross*

1   Exhibit No. 34 and Defendant's Exhibit No. 35 -- 36, and ask

2   you if these diagrams are used at the Warren Inn to show

3   people about different sizes -- first of all, Defendant's

4   Exhibit No. 36.  Do you recognize that?

5   A.  Yes, sir.

6   Q.  And Defendant's Exhibit No. 34, do you recognize that?

7   A.  Yes, sir.

8   Q.  All right.  Are those diagrams that are used at the Warren

9   Inn to show prospective tenants the lay-out of the apartment

10  complex and the different types of bedrooms and configurations

11  of rooms that are available?

12  A.  Yes.

13  Q.  All right.  We'd offer Defendant's Exhibit No. 34 and 36.

14        MR. CARRUTH:  No objection.

15        THE COURT:  Received.

16  Q.  (BY MR. T. MILLS) Defendant's Exhibit No. 34, this yellow

17  sticky up here with an arrow is mine, but can you tell if it

18  points to No. 11?  It's kind of a --

19  A.  Yes, it does.

20  Q.  All right.  And is the way this is laid out, is there a

21  highway in front of these buildings or a feeder street from a

22  highway, or is it this side?

23  A.  No.  It's where No. 11 is, it would be on Magic Drive.

24  Q.  All right.  And what's on this side?

25  A.  Okay.

*Fawcett - Cross*

1  Q.  Where is that office that you walk up to?

2  A.  Okay.  The office that you walk up to would be -- but this

3  is the village, okay?  We have a village and an inn.  This is

4  just the village.

5  Q.  I see.

6  A.  You don't have the inn and that's where the office is is

7  off of Fredericksburg.

8  Q.  All right.  So the village, which is pictured here, sits

9  behind the inn?

10  A.  Correct.

11  Q.  And the office that I would have walked up to would have

12  been the inn?

13  A.  Correct.

14  Q.  All right.  So the back side of the property is where the

15  No. 11 would be?

16  A.  Correct.

17  Q.  All right.  And then, this diagram, which is Defendant's

18  Exhibit No. 36?

19  A.  Uh-huh.

20  Q.  Where my finger is, this points to a two-bedroom lay-out?

21  A.  Yes.

22  Q.  And it has two bedrooms plus a bath, several closets, a

23  kitchen, a dining room, a living room, correct?

24  A.  Correct.

25  Q.  And this arrow that I have here just -- is intended to

*Fawcett - Cross*

1    point to this entire space --

2    A.   Yes.

3    Q.   -- all right?  And you said that there were two twin beds

4    in one of the two bedrooms?

5    A.   Correct.

6    Q.   This actually shows one bed in each bedroom, but --

7    A.   There is two twins.

8    Q.   Because it's small, your Honor, may I publish it to the

9    jury?

10           THE COURT:   You may.

11   Q.   (BY MR. T. MILLS) Do your records indicate whether or not

12   the room had a television?

13   A.   It had the TV that they rented.

14   Q.   Did they rent it from you from --

15   A.   Yes, they did.

16   Q.   Did it have a VCR?

17   A.   No, sir.

18   Q.   All right.  If they had used a VCR, they would have had to

19   have gotten it on their own?

20   A.   Correct.

21   Q.   Now, your job is you and your husband are area

22   supervisors?

23   A.   Yes, sir.

24   Q.   And did you turn over documents requested by the IRS?

25   A.   Yes.

*Fawcett - Cross*

1  Q.  All right.  And were documents requested of the tenants of

2  the two apartments that were on either side of No. 11, like 10

3  and 12?

4  A.  We gave them all the paperwork that they needed, and it

5  was of the complex -- the apartments on that floor.

6  Q.  You gave them documents on every apartment?

7  A.  No, sir.  The ones that they asked for.  I do not know if

8  they received the 10.

9  Q.  Or the 12?

10  A.  Correct.

11  Q.  All right.  Do your documents -- I gather you don't work

12  in the office there, or do you?

13  A.  I did.  I don't at this time.  I'm area supervisor for

14  five complexes.

15  Q.  Did you in '95?

16  A.  No, sir.

17  Q.  All right.  Do you know who actually walked in on

18  September 28th and extended the rental term three days?

19  A.  No, sir.

20  Q.  Do you know if it was -- do you know if Mr. Karr did?

21  A.  I don't know, sir.

22  Q.  All right.  And you don't know when Mr. Karr stayed at

23  this apartment No. 11, of course.  You don't have any

24  knowledge of that, do you?

25  A.  No, sir.

*Fawcett - Redirect*

1    Q.  All right.  Do your records indicate any complaints

2    emanating from apartment 11 during the time -- during

3    September 1995?

4    A.  Not on my records, no.

5    Q.  Is there a place where if a tenant was too noisy or if a

6    tenant was playing music too loud, or something of this, or

7    having a fight or something of this nature, may call --

8    somebody called the office where such a complaint would be

9    registered?

10   A.  They would put it in their file.

11   Q.  All right.  And there's nothing in this file?

12   A.  No, sir.

13   Q.  Thank you, ma'am.

14                    RE-DIRECT EXAMINATION

15   BY MR. CARRUTH:

16   Q.  Ms. Fawcett, is there anything on your records that allows

17   you to determine whether or not there was a telephone in the

18   particular room in question rented by Mr. Waters and Mr. Karr?

19   A.  We had a telephone, yes, but I don't have anything showing

20   because we don't do that.  We don't do the televisions.

21   Q.  Normally, you do not provide a telephone.  If the tenant

22   wants to subscribe and provide television service, you have

23   jacks available?

24   A.  Yes, sir.

25   Q.  And the nearest public phones would be those shown in the

*Fawcett - Redirect*

1  photograph including those downstairs by the pool; is that

2  correct?

3  A.  Yes, uh-huh.

4  Q.  Now, would you take a look at what's previously been

5  introduced as Exhibit W25-15?  That's where it has the various

6  tenants listed.  And please take that out of the plastic

7  folder and look for June '95, and tell me whether or not you

8  find a listing for any residents by the name of Mel or Donna

9  Davis.

10 A.  Yes, I do.

11 Q.  And what apartment would they have occupied and what

12 period of time?

13 A.  It would be Apartment 4, and they moved in on 6-2 of '95,

14 and they moved out 8-29 of '96.

15 Q.  And would Apartment 14 be three doors down from Apartment

16 11, or are they odd- and even-numbered apartments next to each

17 other?

18 A.  It would be three doors down.

19 Q.  Three doors down.  Thank you very much.  No further

20 questions.

21       MR. T. MILLS:  No further questions.

22       THE COURT:  May this witness be excused?

23       MR. CARRUTH:  Yes, your Honor.

24       THE COURT:  You may be excused.  Call your next

25 witness.

*Worsham - Direct*

 1          MR. D. MILLS:  David Worsham.

 2      (Witness was sworn.)

 3          THE COURT:  Just walk around this column right up

 4  here, and sit in the witness chair, please, sir.  I need for

 5  you to tell us your full name and spell your last.

 6          THE WITNESS:  Okay.  David Worsham, W-O-R-S-H-A-M.

 7      DAVID WORSHAM, called by the Government, duly sworn.

 8                      DIRECT EXAMINATION

 9  BY MR. D. MILLS:

10  Q.  Tell the jury where you live and how you're employed,

11  please.

12  A.  San Antonio, Texas.  I'm a pharmacist and I was

13  vice-president of pharmacy for Drug Emporium Pharmacies and

14  currently work for Cardinal Health, a health sale drug

15  distributor.

16  Q.  And where did you obtain your pharmacy degree?

17  A.  University of Texas here in Austin.

18  Q.  And when was that?

19  A.  1971.

20  Q.  Were you previously the director of pharmacy for Drug

21  Emporium?

22  A.  Yes, I was.

23  Q.  And what duties did you have when you had that job?

24  A.  I was responsible for the administration and management of

25  the eight pharmacies that we operated.

Worsham - Direct

1    Q.  If you looked in front of you, there's a glassine envelope

2    with a sticker W32-1, and ask you if you can identify it as

3    one of business records of Drug Emporium Pharmacies?

4    A.  Yes, these are business records, and this is the patient

5    profile for Madalyn O'Hair.

6    Q.  We'd offer W32-1, your Honor.

7         MS. WILLIAMS:  No objection.

8         THE COURT:  It's received.

9    Q.  (BY MR. D. MILLS) And that -- you said it's a profile or a

10   patient record?

11   A.  It's a patient profile.  It's a record of medications

12   taken, dispensed to this individual.

13   Q.  And does it show an area where those -- which pharmacy was

14   dispensing the drugs that are indicated on the various dates?

15   A.  Yes, these were all dispensed at our pharmacy on Military

16   Highway in San Antonio.

17   Q.  And can you tell the jury, please, from that record, what

18   drugs were -- what prescriptions were filled on what dates?

19   A.  Okay.  We had prescriptions filled beginning on 9-1-95, on

20   9-12-95 and 9-23-95 from a Dr. Tom Blevins.

21   Q.  And are they Synthroid, Lanex, Lanoxin?

22   A.  Lanoxin.

23   Q.  Bumex and Micro-K and Capoten?

24   A.  That's correct.

25   Q.  That prescription was filled or those prescriptions were

*Worsham - Direct*

1    filled what date?

2    A.   Well, Synthroid was filled on 9-1 and, again, on 9-12 and,

3    again, on 9-23.

4    Q.   Lanoxin?

5    A.   Lanoxin was filled on 9-1-95, on 9-12-95 and that's all.

6    Just those two times.

7    Q.   The Bumex was filled when?

8    A.   Bumex was filled on 9-1-95, 9-12-95 and 9-23-95.

9    Q.   The Micro-K?

10   A.   The Micro-K was filled on 9-1-95, and that's the only time

11   it was filled.

12   Q.   And the Capoten?

13   A.   Capoten was filled on 9-1-95, 9-12-95, and those are the

14   only two times it was filled.

15   Q.   Do you know what those drugs are for?

16   A.   Yes, sir.

17   Q.   Could you tell the jury, please, what each of these drugs

18   is for?

19   A.   Certainly.  Synthroid is a thyroid medication to treat

20   hypothyroidism.  Lanoxin is a heart medication to strengthen

21   the opening and closing of the heart.  The Bumex is a drug

22   that's used for edema or fluid retention, could be used in the

23   case of congestive heart failure or renal insufficiency.

24   Micro-K is a potassium supplement.  And Capoten is a drug used

25   to treat high blood pressure.

*Worsham - Cross*

1  Q.  Do you know what the total bill for the prescriptions was?

2  A.  All the prescriptions we filled came to $156.69, eleven

3  prescriptions.

4  Q.  Pass the witness.

5                    CROSS-EXAMINATION

6  BY MS. WILLIAMS:

7  Q.  Which of these drugs that you have just told Mr. Mills

8  about are used to treat diabetes?

9  A.  None of these.

10  Q.  And there isn't any indication that would have been

11  something that would have been obtained by a pharmacist?

12  A.  To treat diabetes?

13  Q.  Yes.

14  A.  You could buy insulin without a prescription.

15  Q.  Where would you buy that?

16  A.  From a pharmacy.

17  Q.  If someone came in and bought insulin, would that not be

18  reflected on your records?

19  A.  No.

20  Q.  Why not?

21  A.  Only if they had a prescription from their doctor for it.

22  Q.  All right.  And if you had to call and get permission from

23  a doctor to dispense insulin, would it be on there?

24  A.  Yes, if we had called the doctor and got permission from

25  the doctor.  It's over the counter.  It's -- no prescription's

*Worsham - Cross*

1    required.

2    Q.   What about syringes?

3    A.   Syringes, no prescription's required.

4    Q.   Don't you make sure that before you sell a syringe as a

5    pharmacist, make sure that the patient has a -- an adequate

6    medical need for a syringe?

7    A.   Yes, we do.

8    Q.   But you don't have any records that indicate that insulin

9    or syringes or any sort of blood testing equipment was sold to

10   Ms. O'Hair?

11   A.   No, not under prescription.

12   Q.   How many days supply was dispensed on the first of each of

13   these medications, or can you tell?

14   A.   It looks like ten-day supply.

15   Q.   All right.  The quantity was ten.  Are these items that

16   would have been taken once a day?

17   A.   Well, Micro-K, there was 30.  It's taken three times a

18   day.  Capoten, 40, taken four times a day.

19   Q.   And Bumex is only taken once a day?

20   A.   Yes, Bumex is taken once a day.  Lanoxin typically is

21   taken once a day.

22   Q.   So on the 12th, when some of these items were refilled,

23   that's eleven days?

24   A.   Correct.

25   Q.   So you don't have any knowledge of what happened on that

*Worsham - Cross*

1  extra day?

2  A.  No.

3  Q.  Are these the kind of medications that need to be taken on

4  a regular basis?

5  A.  The Lanoxin should be taken on a regular basis.  You

6  should not skip a day.

7  Q.  Or what happens?

8  A.  Well, if the heart is weak, it goes back to not

9  functioning properly.

10  Q.  So the fact that a day went by when, according to your

11  records, the patient wouldn't have had any medication

12  indicates that there's some likelihood that there was some

13  medication on hand.

14  A.  This doesn't indicate when the prescriptions were started.

15  They were filled on 9-1.  They could have started taking them

16  on 9-2.

17  Q.  Correct.  And if a patient was currently taking these five

18  medications and from 9-26 -- I'm sorry, from 8-26 to 9-1, how

19  many days would that be?

20  A.  From 8-26 to 9-1?  Six days.

21  Q.  And is there any way to tell what time of the day these

22  prescriptions were dispensed?

23  A.  No.

24  Q.  Do you know how you were able to dispense these

25  medications since this patient didn't live in San Antonio?

*Worsham - Cross*

1  How would you be able to dispense these medications for her

2  without a written prescription?

3  A.  By telephoning her doctor.  It was an Austin doctor that

4  we contacted.

5  Q.  And you did that.  You have recollection of doing that?

6  A.  I don't have personal recollection.  I wasn't a dispensing

7  pharmacist.  We have on file -- this record indicates it was

8  Dr. Tom Blevins from Austin.

9  Q.  Isn't it also possible that you called Drug Emporium in

10  Austin if she used Drug Emporium in Austin --

11  A.  Yes.

12  Q.  -- and got the records from them?

13  A.  We could have done that, yes.

14  Q.  Do you know -- do you have any recollection of the glucose

15  testing machine?

16  A.  Uh-huh.

17  Q.  In 1995, were those available?

18  A.  Yes.

19  Q.  All right.  And do you have an independent recollection of

20  about how much those cost back then?

21  A.  Under $100.

22  Q.  All right.  But close to $100?

23  A.  Between 60 and 100.

24  Q.  Thank you.  I don't have any further questions.

25        THE COURT:  Any further questions?

*Ganhito - Direct*

1          MR. D. MILLS:  No, your Honor.

2          THE COURT:  May this witness be excused?

3          MR. D. MILLS:  Yes.

4          THE COURT:  You may be excused.  Call your next

5    witness.

6          MR. CARRUTH:  Government calls Donna Ganhito to the

7    stand.

8       (Witness was sworn.)

9          THE COURT:  If you'll come up across here, please,

10   ma'am, and walk -- just follow the Security Officer.  If

11   you'll tell us your full name and spell your last name,

12   please.

13         THE WITNESS:  Donna Ganhito.  Last name,

14   G-A-N-H-I-T-O.

15      DONNA GANHITO, called by the Government, duly sworn.

16                     DIRECT EXAMINATION

17   BY MR. CARRUTH:

18   Q.  Please tell the members of the jury where you live and how

19   you're employed.

20   A.  I live in Warren, New Jersey, and I work for Fleet Bank.

21   Q.  And is that close to Newark?

22   A.  That's Newark, New Jersey.

23   Q.  Okay.  And in 1995, where were you employed, September of

24   1995?

25   A.  I was also working for the same bank.  It was called

*Ganhito - Direct*

1    National Westminster Bank, Nat West for short, but not at that

2    location.  I was in University Heights, One Springfield Avenue

3    in New York.  Right now, I'm located in 176000 Carol Stream,

4    New York.

5    Q.  Do you know a lady named Donna Theese?

6    A.  Yes.  She's a manager of the bank.

7    Q.  And she was a manager at the Net West, which is now Fleet

8    Bank in Boonton, New Jersey?

9    A.  In New Jersey, yes.

10   Q.  Now, can you tell us whether or not the National

11   Westminster Bank, also known as Nat West Bank, and now, the

12   Fleet Bank, are federally insured by the Federal Deposit

13   Insurance Corporation for their asset -- I mean, for their

14   deposits and accounts?

15   A.  Yes.

16   Q.  And were they a federally insured financial institution

17   back in 1995?

18   A.  Yes.

19   Q.  And based upon -- how many years of banking experience do

20   you have with this organization?

21   A.  Fourteen.

22   Q.  And do your banks currently or did they in 1995 regularly

23   engage in interstate commercial financial transactions as well

24   as international wire transfers and other money transfers?

25   A.  Yes.

*Ganhito - Direct*

1   Q.  Let me show you what's been marked for identification as

2   Government's Exhibit W50-1, W50-2, W50-4 and W50-5.  I believe

3   W50-3 has already been admitted.  Do you recognize these as

4   documents provided by you or your financial institution?

5   A.  Yes.

6   Q.  And do they relate to an account of Jon Garth Murray in

7   your bank and the deposit or the cashing of a check on that

8   account?

9   A.  Yes.

10  Q.  And does the time period reflected show to be September

11  1995?

12  A.  Yes.

13  Q.  We'd offer Government's W50-1, 2, 3 -- excuse me, 2, 4 and

14  5.

15  A.  Yes.

16      MR. T. MILLS:  I need to look at them real quick.  No

17  objection, Judge.

18      THE COURT:  All right.  They're received.

19  Q.  (BY MR. CARRUTH) Now, what do these documents purport to

20  show collectively?  Briefly explain, give us a shorthand

21  rendition of what these documents portray.

22  A.  Okay.  This one right here --

23  Q.  Please identify it for exhibit number.

24  A.  W50-4 is a bank signature card that we use when we open an

25  account.

*Ganhito - Direct*

1   Q.  Okay.

2   A.  It also has a driver's license which we ask for when they

3   come to cash a check.

4   Q.  Okay.

5   A.  And this right here, it's a bank check, personal check.

6   Q.  What about W50-2?

7   A.  That's a copy of our signature cards faxed over from one

8   branch to the other.

9   Q.  Is that the same signature cards as we have in W50-4, or

10  does it appear to be different?

11  A.  Yes, same signature.

12  Q.  Okay.  And what about W50-1?

13  A.  That's a copy of the driver's license that we --

14  Q.  Account holder?

15  A.  Yes.

16  Q.  And what is W50-5?

17  A.  That's a insurance action report that we use for large

18  currency.

19  Q.  Okay.  Let's begin with the signature card, first, and

20  tell us, if you can, when this account was opened in the

21  National Westminster Bank and who were the signatories on that

22  account.

23  A.  It was open in September 5th, 1995, and it's Robin Murray

24  O'Hair, Ellen Johnson and Jon Murray.

25  Q.  Okay.  And it appears that someone holding this driver's

Ganhito - Direct

1  license later came in and cashed a check on that account; is

2  that correct?

3  A.  Correct.

4  Q.  And can you tell us the date of the check drawn on that

5  account and what amount it was made payable, and to whom it

6  was made payable, and by whom it was signed?

7  A.  It was -- the day was September 22nd, 1995 for $12,000.

8  It was signed by Jon Murray, and it was payable to cash.

9  Q.  And did you get a photocopy or your bank get a photocopy

10  of the driver's license of the customer, Jon Murray?

11  A.  We asked them for a copy of -- driver's license, we made a

12  copy.

13  Q.  Is that normally routine in a large transaction like this?

14  A.  Yes.

15  Q.  And then, you filed a CTR, currency transaction report for

16  that $12,000 check.  Can you explain to the members of the

17  jury why that was necessary in this case?

18  A.  Whenever you do a transaction over $10,000, if you're

19  depositing or cashing a check over 10,000, we have certain

20  obligations with the federal government that we need to do a

21  report to report the transaction.  In this case, it was a

22  check being cashed for over $10,000, which it was $12,000, so

23  we had to do a report.

24  Q.  And by the way, to whom did that account belong?

25  A.  It was a business account payable to -- the name on the

*Ganhito - Cross*

1  account was Union --

2  Q.  Could that be United?

3  A.  United and I can't pronounce --

4  Q.  Secularists?

5  A.  -- Secularists of America, Inc.

6  Q.  Okay.  Thank you.  Pass the witness.

7              CROSS-EXAMINATION

8  BY MR. T. MILLS:

9  Q.  Ma'am, this activity, was that at which branch of which

10  bank?

11  A.  Nat West at the time it was called, and it's located in

12  176 South Street, Newark, New Jersey.

13  Q.  You were not -- were you one of the -- an individual that

14  actually was -- that did one of these transactions?

15  A.  No.

16  Q.  Okay.  You did not see Jon G. Murray present his driver's

17  license and cash a $12,000 check?

18  A.  No.

19  Q.  Do you know where the $12,000 check was cashed?

20  A.  It was cashed at 176 South Street, Newark, New Jersey.

21  Q.  On 9-22?

22  A.  On 9-22.

23  Q.  And what's the significance of the signature card that has

24  Robin Murray O'Hair, Ellen P. Johnson, Jon G. Murray?  Does

25  that indicate when this account was opened?

*Ganhito - Cross*

1  A.  The account was opened on 9-5-95.  That's the date.  And

2  the three names are the signers on the account.

3  Q.  Does this mean that they signed it on 9-5-95?

4  A.  No, it doesn't mean that they signed on that day.

5  Q.  Do you know how much money was used to open a new checking

6  account on September the 5th, 1995?

7  A.  On this particular account, how much they used?  I don't

8  know.

9  Q.  Do any of the records that you have before you a moment

10  ago show that?

11  A.  No.

12  Q.  So on September the 5th, 1995, a new account was opened

13  for the United Secularists of America, Inc?

14  A.  Yes.

15  Q.  And I guess that a $12,000 check cleared, but you don't

16  know how much was in the bank that day?

17  A.  No.

18  Q.  And the currency transaction report, I'm sure there's a

19  date on here that says when it was filled out, 9-23-95.  The

20  very bottom here, down by signature, title, 9-23-95?

21  A.  Yes, the next day.

22  Q.  The next day of what?

23  A.  That we cashed the check.

24  Q.  The next day after cashing the $12,000 check?

25  A.  Uh-huh.

*Ganhito - Cross*

1  Q.  There was a movement of funds of the 12 -- I mean, this is

2  just documented at 12?

3  A.  Yeah, 12,000.

4  Q.  I see.  And this indicates that Mr. Murray got $12,000 in

5  cash?

6  A.  Yes.

7  Q.  Not a cashier's check?

8  A.  No.

9  Q.  If it was a cashier's check, would you have had to fill

10  out a CTR?

11  A.  No.

12  Q.  That's all the questions that I have.

13          MR. CARRUTH:  Nothing further, your Honor.  May the

14  witness be excused?

15          MR. T. MILLS:  No objection.

16          THE COURT:  You may be excused.

17          MR. CARRUTH:  Government calls Donna Theese.

18      (Witness was sworn.)

19          THE COURT:  You need to walk around this column,

20  please, and stand up here and sit down in the witness box.  If

21  you'll tell us your full name, please, ma'am, and spell your

22  last name.

23          THE WITNESS:  Donna Jean Theese, T-H-E-E-S-E.

24      DONNA JEAN THEESE, called by the Government, duly sworn.

25

*Theese - Direct*

1  48-3, rather than 53 -- reflects a wire transfer of $600,000

2  made by your bank to the Frost National Bank in San Antonio;

3  is that correct?

4  A.  Yes, it is.

5  Q.  Did you have anything to do with the -- can you tell us

6  anything about that particular transaction?

7  A.  I would have been the person that did the wire transfer.

8  Q.  Okay.  And from what account was that money going out of,

9  if you can tell?

10  A.  It was coming out of a checking account.

11  Q.  For?

12  A.  For the United Secularists of America, Incorporated.

13  Q.  Okay.  And to whom was the $600,000 wire transfer being

14  sent?

15  A.  To the national -- Frost National Bank in San Antonio,

16  Texas.

17  Q.  And does it say for the account of any particular person

18  or not?

19  A.  It has a deposit account.

20  Q.  Okay.  Does it have a name under that?

21  A.  Corey Ticknor.

22  Q.  Okay.  What was the date of that $600,000 wire transfer,

23  please, ma'am?

24  A.  September 25th, 1995.

25  Q.  Now, can you tell me what your bank's policy was in

*Theese - Direct*

1

2                           DIRECT EXAMINATION

3    BY MR. CARRUTH:

4    Q.  Ms. Theese, please tell the members of the jury where you

5    live and how you're employed.

6    A.  I live in Boonton Township, and I'm employed by Fleet

7    Bank.

8    Q.  And for those of you in Texas, could you tell us where

9    Boonton Township is?

10   A.  New Jersey.

11   Q.  How were you employed back in September of 1995?

12   A.  I was employed by Nat West Bank, who became Fleet Bank a

13   couple of years later.

14   Q.  And where were they located at that time?

15   A.  They were located in Boonton Township, New Jersey.

16   Q.  Okay.  And were you the general manager at that time?

17   A.  Yes, I was the branch manager.

18   Q.  Branch manager.  Excuse me.  Let me show you what's been

19   previously introduced into evidence as Government's Exhibit

20   W50-1, 2, 3, 4 and 5, and I'll ask you to look at those just a

21   moment, and I want to ask you a few questions, please, ma'am.

22   Do you want to look through the exhibits, tell me whether

23   you're familiar with them.

24   A.  Yes.

25   Q.  Now, Government's Exhibit No. W48-3 -- excuse me, that's

*Theese - Cross*

1  September of 1995 regarding a wire transfer of that magnitude,

2  whether or not you required the customer to personally appear

3  and verify his identity?

4  A.  The person would have to personally appear for any amount

5  on a wire transfer.  It doesn't matter how much it is.  They

6  would have to be in my presence.  I would have to ID them with

7  a driver's license, and they would have to sign the paperwork

8  in front of me.

9  Q.  And was that done in this case?

10  A.  Absolutely.

11  Q.  And can you tell us whether or not the individual depicted

12  in W50-1, the driver's license is the same individual who came

13  in to authorize the sending of that wire?

14  A.  I would say I don't remember him doing it at this point,

15  but he would absolutely be that person.  I would not have done

16  it.

17  Q.  Okay.  You would not have done it without personal

18  identification?

19  A.  Right.

20  Q.  Thank you, ma'am.  Pass the witness.

21                    CROSS-EXAMINATION

22  BY MR. T. MILLS:

23  Q.  Is one of these documents -- I haven't really looked at

24  them in the last few minutes.  Do they show both money coming

25  into the account from New Zealand as well as money going from

Theese – Cross

1  the account to Austin?

2  A.   That particular form you're probably looking at, which is

3  the wire form, would only be the wire going out.

4  Q.   Well, to cut down on my searching, would you show me where

5  it shows that?

6  A.   This would be the account that was debited.  This 442

7  would have been my account coming out of this account right

8  here.  This would have been the address and this is the

9  address of my branch, Power Well Road in Boonton Township, and

10 this was where it was going to, Frost National Bank in San

11 Antonio.

12 Q.   And what was the amount?

13 A.   The amount was $600,000 right there.

14 Q.   All right.  And is there another document that you have

15 seen, or provided even, that shows the 600,000 or some other

16 figure arriving at your bank from New Zealand?

17 A.   I don't know.

18 Q.   And the wire went from New Jersey to San Antonio on what

19 date?

20 A.   September 25th, 1995.  It's up there on the right.

21 Q.   All right.  That's all the questions that I have.  Thank

22 you, ma'am.

23        MR. CARRUTH:  Nothing further, your Honor.  May the

24 witness be excused?

25        THE COURT:  She may.  You may be excused.  How long is

Murray - Direct

1   your next witness?  Members of the jury, I'm going to give you

2   your afternoon break.  You're not confined to the courthouse,

3   but don't run away.  Be back in about 15 minutes.

4        (Recess.)

5            MR. CARRUTH:  At this time, the government calls

6   William Murray.

7            THE COURT:  Come forward, please, sir.  This is Mrs.

8   Sims.  She's going to administer an oath to you.

9        (Witness was sworn.)

10           THE COURT:  Need to walk around this column, please,

11  sir, and have a seat in the blue chair.  Tell us, please, sir,

12  your full name and spell your last.

13           THE WITNESS:  William J. Murray, M-U-R-R-A-Y.

14      WILLIAM J. MURRAY, called by the Government, duly sworn.

15                      DIRECT EXAMINATION

16  BY MR. CARRUTH:

17  Q.  Mr. Murray, tell the members of the jury where you live

18  and what your business or occupation is.

19  A.  I'm the chairman of the Religious Freedom Coalition, and I

20  reside in Spotsylvania, Virginia.

21  Q.  All right, sir.  Prior to their disappearance in 1995, did

22  you know Madalyn Murray O'Hair?

23  A.  She was my mother.

24  Q.  And what about Jon Garth Murray?

25  A.  And he was my half brother.

*Murray - Direct*

1  Q.  And what about Robin Murray O'Hair?

2  A.  She was my natural daughter.

3  Q.  And had she been adopted by your mother, Madalyn?

4  A.  That is correct.

5  Q.  Now, did there come a time when you became somewhat

6  estranged from your other family members?

7  A.  Yes, sir, in late 1977.

8  Q.  All right, sir.  And prior to that time, you had been

9  involved in the American Atheist movement yourself, had you

10  not, sir?

11  A.  That is correct.  I had worked at the American Atheist

12  Center with them for approximately two years up to that time.

13  Q.  And you left to become a Christian evangelist; is that a

14  fair statement?

15  A.  Well, at that time, it was an estrangement that had

16  nothing to do with religion at all.

17  Q.  But later, you became a Christian --

18  A.  Later, I became a Christian, that is correct.

19  Q.  Now, when did you first become aware that your mother,

20  brother and daughter were missing?

21  A.  Very, very shortly.  It may have been in late August or

22  September of 1995.

23  Q.  Did you attempt to contact anyone in an effort to locate

24  them or determine where they had gone?

25  A.  No, sir, I did not.

*Murray - Direct*

1   Q.  Okay.  Did there come a time when you came to Austin,

2   Texas or phoned Austin, Texas and filed a missing person's

3   report on these three individuals with the Austin Police

4   Department?

5   A.  Yes, sir.  After about a year, it became apparent to me

6   that none of the individuals connected with them or associated

7   with them were going to file a missing person's report, and I

8   felt obligated because of my relationship to do that.

9   Q.  All right, sir.  And did you subsequent to that, having

10  reported these relatives of yours missing, seek through an

11  attorney to get yourself appointed guardian of the estate of

12  Madalyn, Jon and Robin?

13  A.  Yes, sir, I did.  I was under the opinion that if I could

14  have the ability to look at the financial records and could

15  see what happened to their funds that I could find out what

16  had happened to them.

17  Q.  Mr. Murray, I'm showing you what's been marked for

18  identification as Government Exhibit W22-1, W22-2, W22-3 and

19  which I represent to the Court and counsel are certified

20  documents under seal by the Travis County Clerk of Austin,

21  Texas, attesting to the guardianship of an incapacitated

22  person in the name of Robin Murray, Jon Garth Murray and

23  Madalyn O'Hair, filed of record in Probate Court 1, in Travis

24  County, Texas, and I would offer them at this time, your

25  Honor.

*Murray - Direct*

1      MR. T. MILLS:  No objection, Judge.

2      THE COURT:  Received.

3  Q.  (BY MR. CARRUTH) I would ask you, Mr. Murray, to look

4  inside each of these documents and tell me if you find an

5  application filed by your attorney on your behalf, and if so,

6  what it was for.

7  A.  Yes, sir, in each one of these there was an application

8  for appointment as guardian, and those would have been filed

9  almost exactly one year after the disappearance.

10  Q.  And did the Court -- the Probate Court of Travis County

11  Texas grant your application for a guardianship of the estates

12  of your mother, brother and daughter?

13  A.  They would have under condition that I place a gigantic

14  bond equal to many times the values of the estates, which I

15  was unable to do, so I withdrew the application.

16  Q.  And do you know of your own knowledge as reflected by

17  those records whether or not other individuals were appointed

18  as guardians and/or receivers and/or attorney ad litems for

19  the estate of a person of your mother, your brother and your

20  sister, all of whom were missing since 1995?

21  A.  Yes, sir.  There was an overall counsel coordinator, and

22  then, there were three attorneys, I believe, appointed to each

23  one of the estates, bankruptcy attorney, an ad litem and a

24  receiver.

25  Q.  And so far as you know, those matters are still pending in

*Murray - Cross*

1  the Probate Court?

2  A.  That is correct, sir.

3  Q.  Okay.  Now, during the time that you resided with your

4  family before leaving, did you ever know of any of them to own

5  any firearms?

6  A.  Yes, sir.

7  Q.  Who, if anyone, of your family members owned a firearm?

8  A.  My brother owned a .357, .357 Magnum pistol.

9  Q.  And that is Jon Garth Murray?

10  A.  That is correct.

11  Q.  And do you know what type of revolver this was other than

12  being a .357, the make or model?

13  A.  No, sir, I don't.

14  Q.  Do you know whether it was chrome, stainless or blue

15  steel?

16  A.  Blue steel.

17  Q.  And where did he keep this revolver in your knowledge?

18  A.  In his desk drawer.

19  Q.  Did you just, a few months ago, agree to provide a blood

20  sample to the FBI for use in possible DNA analysis?

21  A.  Yes, sir, I did.

22  Q.  Pass the witness.

23                    CROSS-EXAMINATION

24  BY MR. T. MILLS:

25  Q.  Mr. Murray, my name is Tom Mills.  I attempted several

*Murray - Cross*

1    times to get in touch with you.  Did you ever get any of my

2    messages?

3    A.  I returned your phone call and your e-mail, sir.

4    Q.  I'm sorry.  I didn't know you did.

5    A.  Yes, sir.

6    Q.  Is the proper way to address you as mister or as opposed

7    to -- are you a doctor, or reverend, or pastor, or father?

8    A.  I have -- I have a DD, but I just prefer mister, thank

9    you.

10   Q.  You have a Doctor of Divinity?

11   A.  That's correct.

12   Q.  Where from?

13   A.  Sweetwater College.

14   Q.  Where did you graduate from high school?

15   A.  Baltimore Politic Institute.

16   Q.  And college?

17   A.  Sweetwater College.

18   Q.  Where is that?

19   A.  Arizona.  Phoenix, Arizona.

20   Q.  All right.  I have read your book My Life Without God, and

21   one about the getting prayer back in school.  But I haven't

22   been able to find your My Life Without God Part Two.  Is it on

23   the market?

24   A.  That is the only book that is -- of the five books I've

25   written, that is the only one about that subject.

Murray - Cross

1   Q.  All right.  The part two is not about your family?  Well,

2   this one has a lot of information about your upbringing?

3   A.  Right.

4   Q.  What about My Life Without God Part Two?

5   A.  There is no My Life Without God Part Two.

6   Q.  Oh.  Early in this trial, we saw a videotape of your

7   mother and Jon -- I believe it was in 1994 -- speaking to some

8   law students or at a law school, South Texas of College --

9   South Texas College of Law at the University of Houston in

10  Houston, Texas.  And we didn't see the -- we didn't watch the

11  whole thing, but your mother spoke some and Jon spoke some.

12        Do you call him your brother or did you call him your

13  brother when --

14  A.  Yes, that is correct, I called him Garth.

15  Q.  Not Jon?

16  A.  No.

17  Q.  All right.  Have you ever heard anyone in your family,

18  that is, Madalyn, Jon or Robin, say prayer is insanity?

19  A.  I am sure I have more than once.

20  Q.  All right.  To your knowledge, to your recollection, that

21  would be consistent with their atheist beliefs?

22  A.  That sounds like it would be consistent, yes.

23  Q.  All right.  Your mother, in videos that I have viewed,

24  seemed to be a -- quite an outspoken woman.  Would you agree

25  with that?

1   A.  Oh, absolutely.  I don't think that she could probably be

2   anywhere in the world without somebody recognizing that she

3   was so outspoken.

4   Q.  I don't want to say things that are cruel about Madalyn,

5   or embarrassing, so tell me when I go over the line if I do.

6   She had --

7          THE COURT:  I'll tell you, counsel.  You just ask your

8   questions.

9          MR. T. MILLS:  Yes, sir.

10  Q.  (BY MR. T. MILLS) She had or has a foul mouth, doesn't

11  she, in terms of curse words?

12  A.  She used the English language in a very lively manner,

13  sir.

14  Q.  All right.  The atheist movement, she, of course, was

15  quite active in?

16  A.  That is correct.

17  Q.  And was it your opinion that she was the head of the

18  family in terms of being the dominant personality?

19  A.  She was the dominant personality within the family, that's

20  correct.

21  Q.  If the three of them were kidnapped -- and I realize this

22  is a hypothetical.  We don't know all the circumstances.  If

23  she was to tell Jon to take some action to try to save them,

24  do you think he would?

25  A.  I believe that if she told him to take an action that he

*Murray - Cross*

1  would, and that if she told him not to take an action, that he

2  probably wouldn't have.

3  Q.  Well, in general, was her personality aggressive and

4  assertive?

5  A.  She was definitely a Type A personality.

6  Q.  Was she kind of an in-your-face-type personality?

7  A.  She was extremely aggressive with her views.

8  Q.  All right.  Do you know of an organization that's

9  headquartered in Atlanta, Georgia called the Interfaith

10  Evangelism Association?

11  A.  No, I'm not.  I'm not, no.

12  Q.  All right.  Did you have communication with members of the

13  Atheist Organizations in Austin and Ellen Johnson during the

14  year where you did not know where Madalyn, Jon and Robin were?

15  A.  I believe that we debated on a couple of occasions on

16  television over some issues.

17  Q.  All right.  Did you ever have conversations with any

18  members of the atheist groups about whether or not to report

19  them missing as opposed to just being gone with their own

20  volition?

21  A.  Only one individual, I believe, Arnold Via, who I knew to

22  be close and who also lived in Virginia, and I believe that

23  both of us were fairly much at the conclusion that her

24  disappearance was not voluntary.  And he was trying to assert

25  himself within the Atheist Organization to have them do

1    something other than what they were doing.

2    Q.  Isn't it true that your mother had some delight in hiring

3    ex-cons or criminals to work with her organization?

4    A.  My mother knew that it was easy to control people that

5    were on parole and to obtain a work load out of them that

6    would not be easy to obtain out of somebody that wasn't in a

7    similar situation.

8    Q.  So with that explanation, that is a yes, isn't it?

9    A.  Yes, she had employed people that were felons in the past

10   that I have known of, yes.

11   Q.  In the past, even murderers, correct?

12   A.  That's correct, yes.  She had murderers working for her,

13   yes.

14   Q.  She did not keep her house decorated with Christian

15   symbols or other religious symbols, did she?

16   A.  Oddly enough, she did.

17   Q.  She did?

18   A.  Yeah, she put up --

19   Q.  Crosses?

20   A.  -- she put up a divinity scene every Christmas and played

21   Christmas carols.  It was one of the rather -- one of her

22   oddities.

23   Q.  All right.  Also, decorating with statuettes of animals?

24   A.  She had many statuettes of many animals in her home, yes.

25   Q.  You have previously expressed the opinion that your

Murray - Cross

1   mother's actions were evil, correct?

2   A.  I believe that many of the things that she did led to an

3   evil outcome.  Whether or not she intended them to or not,

4   frequently they did.

5   Q.  All right.  You formed the opinion that she stole large

6   amounts of money from Atheist Organizations, didn't you?

7   A.  My mother was extremely good at convincing individuals to

8   leave her estates.  In my view, it was my view that that was

9   stealing money that belonged rightfully to be inherited to

10  other people.  Legally it wasn't theft.  I mean, legally she

11  had talked them into giving them those funds.  In my view, it

12  wasn't, but that was in my personal.

13  Q.  But we're talking about large sums of money in some cases

14  and large estates, aren't we?

15  A.  There were hundreds -- of those that I knew about, I think

16  the largest was 6 or $700,000 that I had personal knowledge

17  of.

18  Q.  And you do not have knowledge that everything that was

19  deeded or transferred by someone always went to the Atheist

20  Organization as opposed to a family checking account?

21  A.  I believe that my mother viewed the corporate account more

22  or less like a personal account.  She viewed the organization

23  as being her organization as you or I might if we owned a

24  small business.

25  Q.  You have knowledge that in her lifetime that she obtained

*Murray - Cross*

1  false identification?

2  A.  No, I don't think I do.

3  Q.  Well, I'm thinking that on page 148 of your book --

4  A.  I'm sorry.  This was in 1960 or '61 or '62 you're talking

5  about.  I thought you were talking in a more recent time

6  frame.  Yes, I do.

7  Q.  She at least had the knowledge of how to obtain false

8  driver's licenses?

9  A.  Yes, she obtained one in 1960, '61 -- no.  '64, '65,

10  something like that.

11  Q.  More recently, you knew that she had the ability to print

12  phony stock certificates?

13  A.  Yes, that is correct.

14  Q.  All right.  Did she have a love of the IRS, to your

15  knowledge, or a respect?

16  A.  Love/hate relationship.

17  Q.  All right.

18  A.  I'm sure she despised every penny that they got.  On the

19  other hand, any move that they made against her was

20  financially beneficial to her.

21  Q.  If the IRS took action against her, it was beneficial to

22  her because she could then complain to members of her

23  organization and have them donate fresh money?

24  A.  Absolutely.  If the IRS got a $50,000 lien, she brings a

25  quarter-of-a-million with it.  If they got a

Murray - Cross

1   quarter-of-a-million-dollar lien, she'd raise $2 million for

2   it.

3   Q.  Therefore, is it correct to say that she could be

4   manipulative?

5   A.  She was -- knew how to deal with other individuals and

6   fairly much get what she wanted out of it, even if they were

7   hostile to her, that would be correct.

8   Q.  All right.  She was or is a smart lady, right?

9   A.  She was a very smart individual.

10  Q.  All right.  She was or is a very clever person, wasn't or

11  isn't she?

12  A.  She was a very clever person.

13  Q.  During times in your lifetime with her, she -- when she

14  encountered problems, she would flee the United States,

15  wouldn't she?

16  A.  On one occasion, she did do that, that is correct.

17  Q.  Are you referring to Mexico?

18  A.  That is correct.

19  Q.  Okay.  Did she discuss going to Cuba?

20  A.  Yes, at one time, she wanted to defect to Cuba.

21  Q.  Did she attempt to move to Russia?

22  A.  At one time, she attempted to defect to the Soviet Union.

23  Q.  She could get extremely angry, couldn't she?

24  A.  She was -- she had a temper, that's correct.

25  Q.  Didn't she have extreme mood swings where she would all of

1  a sudden get something in her mind and do it?

2  A.  She did and may -- although undiagnosed, she may have

3  actually suffered from some type of symptoms of being a manic

4  depressant.

5  Q.  So that is even in more detail, you agree that she had

6  great mood swings?

7  A.  She had fairly large mood swings, yes, sir.

8  Q.  All right.  She could act in a way that would indicate

9  even violence, couldn't she?

10  A.  At a point in her age, yes.  I think that in her late 60s

11  and early 70s, I think that physical abilities, her abilities

12  became quite hindered.  I mean, she walked with a walker and

13  had a implanted hip.  That tends to slow people down in their

14  ability to follow through on anger.

15  Q.  As a younger woman, she even asked you to kill her father?

16  A.  Yes, at one time she did.

17  Q.  Did you have knowledge of her talking about having foreign

18  or offshore bank accounts?

19  A.  At one time, she did have offshore account, yes.

20  Q.  Do you know if she had any money in Switzerland?

21  A.  At one time, she had, I believe, around $100,000 in

22  Switzerland or less.  I don't remember the exact amount to be

23  honest with you, but I think it was less.

24  Q.  All right.  Did she periodically make up things about

25  herself, for example, all of her educational claims and

*Murray - Cross*

1  degrees, correct?

2  A.  No, sir, they weren't.

3  Q.  What do you know about that?

4  A.  She had a bachelor's degree from Abilene College.  She had

5  a law degree from the South Texas College of Law, and those

6  were the extent of her degrees.

7  Q.  And to what extent do you know or did you hear that she

8  was claiming other degrees?

9  A.  Well, she claimed she had a JD.  Of course, later on, the

10  title of an LLB would change to JD.  You're a JD now.  And she

11  claimed some doctorates.  But then, again, she may have had

12  honorary doctorates.  I have several honorary doctorates

13  myself.

14  Q.  All right.  Would you look at Defense Exhibit No. 37,

15  there's a very tiny photograph, and I would ask if you could

16  recognize the person depicted in this photograph?  It may be

17  too small.

18  A.  No, sir, I can't.  I'm sorry, I can't.

19  Q.  All right, sir.

20  A.  I just can't.

21  Q.  It's all right.  If you by happenstance ran into one of

22  the -- Jon, Madalyn or Robin in 1995, just by coincidence, and

23  it seemed as though they had a little body odor, as though

24  they hadn't bathed, would that surprise you?

25  A.  Yes.

Murray – Cross

1    Q.   I thought that you had written that they generally bathed

2    very infrequently?

3    A.   When I was very young, the family was -- had a lot of

4    German tradition, which was to bathe once a week, on Friday or

5    Saturday, or something like that.  As my mother became older,

6    I think that she moved away from that.

7    Q.   All right.  Did she have a tendency to blame people or

8    organizations or problems in ways that did not seem always

9    rational?

10   A.   As long as she could write a good fundraising letter out

11   of it, yes.

12   Q.   All right.  That seems consistent with being manipulative;

13   would that be correct?

14   A.   Yes, but I understand fundraising letters.  I get a lot of

15   them.

16   Q.   All right.  In 1995 -- oh, excuse me.  Strike that.  She

17   was very active in the legal system in terms of suing people;

18   isn't that true?

19   A.   She kept, I believe, several lawsuits active at any given

20   time.

21   Q.   All right.  In her life, she had sued the Pope, right?

22   A.   Well, I think she sued to stop the Pope from appearing

23   somewhere, being on some public property.  I don't know if the

24   lawsuit was per se against the Pope or against the -- the

25   public park that was going to allow him to be there.  I don't

*Murray - Cross*

1   know which, but there were such lawsuit.

2   Q.  Do you know what the basis was for her big feeling that

3   the Pope shouldn't be in the United States?

4   A.  Her concept publicly would have been the separation of

5   church and state, that he shouldn't be on public property,

6   shouldn't be in a public park, shouldn't be on public

7   buildings to make a religious pronouncement.

8   Q.  Should only be done on private property?

9   A.  That's correct.

10  Q.  All right.  And a lawsuit against Billy Graham, Reverend

11  Billy Graham?

12  A.  Yeah, I believe for the same thing.  He was in a baseball

13  stadium that was owned by --

14  Q.  Public place?

15  A.  Publicly owned.

16  Q.  All right.  Did she represent herself in most of these

17  lawsuits that she filed or do you know?

18  A.  I think many times, she had counsel, and I believe it

19  would depend on how serious the suit was, whether it was

20  something she wanted to accomplish or whether it was for

21  fundraising.

22  Q.  All right.  And in 1995, how long had it been since you

23  had seen Madalyn, Jon and Robin?

24  A.  In person?  Or --

25  Q.  In person.

Murray - Cross

1  A.  In person, would have been since 1977, so it would have

2  been 18 years.

3  Q.  Did you correspond with them?

4  A.  I attempted to on many occasions.  I sent my mother a

5  Mother's Day card every year.  I sent my daughter numerous

6  letters, e-mails, things hoping to -- that they get past my

7  mother.  I even sent her a copy once of John Bradshaw's The

8  Family in hopes that -- I believe she has the intellectual

9  ability of reading that book might help her in some way.

10 Q.  Did you have communication with any other individuals in

11 the Atheist Organizations to where you could find out just

12 about her or was that not done either?

13 A.  There were occasions when I have debated individuals on

14 television, or radio, or whatever, that in the studio within

15 -- you know, there would be conversations about my mother that

16 weren't air-type quality, weren't actually debate

17 conversation.

18 Q.  All right.  Well, did you have knowledge in the '90s of

19 how the Atheist Organizations that she was a part of formally

20 kept track of money, stock, land, assets that were to be given

21 to Atheist Organizations?

22 A.  In the '90s?

23 Q.  Yes.

24 A.  No, I did not.

25 Q.  All right.  The gun that you were -- the pistol that you

*Murray - Cross*

1   had knowledge that at one time that Jon owned, did you say

2   that it was a revolver?

3   A.   That's correct, it was a .357 revolver.

4   Q.   All right.  And have you been asked to look at any guns in

5   this case to see if you recognized any?

6   A.   Here today?

7   Q.   Or yesterday?

8   A.   I was shown a revolver, yes.

9   Q.   All right.  Could you identify it?

10  A.   Only that it was like the one my brother -- I couldn't

11  possibly, after 22 years, remember a specific weapon.

12  Q.   Right.  Did you have knowledge that your mother spoke of

13  leaving the United States after you were separated from the

14  family, leave the United States with Jon and Robin?

15  A.   As a serious discussion, no.  My mother maintained a

16  love/hate relationship with the prosperity of the United

17  States.  She loved to hate it and would make many disparaging

18  remarks about it, but yet, it gave her a cash flow of hundreds

19  of thousands, sometimes millions of dollars a year to spend

20  that she couldn't have anywhere else.

21  Q.   Did your mother ever claim any money as income, to your

22  knowledge, personal knowledge?

23  A.   I'm sorry.  I'm not understanding.

24  Q.   Do you have knowledge as to whether or not she was on a

25  salary or had income that was officially attributed to her?

*Murray – Cross*

1   A.   From the Atheist Organization?

2   Q.   Well, I really guess, I mean, from anywhere.

3   A.   Before she became -- before she reached the age of 65, she

4   had the rather odd habit of issuing herself paychecks and

5   then, not cashing them so that she would be able to pay into

6   the Social Security system, which boggles my mind because she

7   would have put that much in savings, she would have done much

8   better.

9        And -- but at that particular time, her personal

10  income was coming, some of it from Richard O'Hair, some of it

11  from his retirement, some of it from other places, sometimes

12  she'd cash those paychecks, sometimes she wouldn't cash those

13  paychecks.  I just, to be honest with you, never figured that

14  out.

15  Q.   And you don't have the knowledge about what she was doing

16  in the '80s or '90s?

17  A.   I do not have any direct knowledge of how the finances

18  were handled during the '80s and '90s, no, sir.

19  Q.   All right, sir.  That's all the questions that I have,

20  sir.

21       MR. CARRUTH:  Nothing further, your Honor.  May the

22  witness be excused?

23       THE COURT:  Counsel?

24       MR. T. MILLS:  No objection.

25       THE COURT:  You may be excused.  You may call your

*McNutt - Direct*

1   next witness.

2          MR. CARRUTH:  Government calls Gordon McNutt, your

3   Honor.

4      (Witness was sworn.)

5          THE COURT:  If you'll come around, sir, and walk

6   around this column, have a seat up here.  Tell us, please,

7   sir, your full name and spell your last name.

8          THE WITNESS:  Gordon Russell McNutt, Jr., M-C-N-U-T-T.

9    GORDON RUSSELL MCNUTT, called by the Government, duly sworn.

10                    DIRECT EXAMINATION

11  BY MR. CARRUTH:

12  Q.  Mr. McNutt, please tell the jury where you reside and what

13  your business or occupation is.

14  A.  I reside in Austin, Texas, and I'm in business for myself.

15  In this context, I'm -- have served as the probate

16  court-appointed receiver and guardian for Jon Murray.

17  Q.  And before you on the desk, there are three exhibits from

18  the Probate Court of Travis County which have already been

19  admitted.  Would you look through there and find the one that

20  relates to you particularly and identify it by exhibit number,

21  and tell the Court and jury what it purports to be, please,

22  sir?

23  A.  All right.  Obviously, I've just looked at the first page

24  at this point, but there are three here.  One of them relates

25  to Jon Garth Murray, and the other two relate to Robin Murray

1   O'Hair and Madalyn Murray O'Hair.  I have nothing to do with

2   those two.  I am involved in Jon Garth Murray.

3          And this appears to be, just glancing at it, a copy of

4   -- it says here, it's the certified copy of all the original

5   documents out of the -- I'm sure the Probate Court file at

6   Travis County.

7   Q.  And does that have a yellow sticker on it that enables you

8   to decipher its number for the record, please?

9   A.  If you're referring to you the lower right-hand corner, it

10  says Government Exhibit 22-2.

11  Q.  Yes, sir, that's it.  Are you a representative of the

12  estate of Jon Garth Murray, or what were you appointed -- in

13  what capacity were you appointed by the probate court, if you

14  were?

15  A.  I was appointed -- first of all, I'm independent in the

16  sense that I have no relationship whatsoever with the

17  individual.  I didn't know him or any of the people.  Judge

18  Herman in the Probate Court appointed me originally to be what

19  was called the receiver for Jon Garth Murray and then,

20  subsequently, added the appointment of a guardian for Jon

21  Garth Murray; and in that capacity, I am responsible for,

22  basically, the financial affairs for Jon Garth Murray.

23  Q.  And can you tell the members of the jury what action, if

24  any, you took in an effort to locate assets of Mr. John Garth

25  Murray after you had been appointed by the Probate Court of

1   Travis County to act as receiver and later, guardian for the

2   estate of Mr. Murray?

3   A.   There was another attorney -- I'm not an attorney, but

4   there was an attorney who had done some prior work, whose name

5   is Jodie Hillman, and I took over certain records from Jodie

6   Hillman that he had provided relating to various assets for

7   Jon Garth Murray.  So that was my starting point.  In addition

8   to that, I sought to determine if I could find any other

9   assets or liabilities that related to Mr. Murray's financial

10  affairs.

11        And over a period of time, I sought -- in some

12  instances, located assets.

13  Q.   Did you locate any assets or accounts in New Zealand for

14  Mr. Murray?

15  A.   I did.

16  Q.   And can you tell us where those funds were kept on

17  deposit, if they were?

18  A.   There were -- if -- as I recall, there were five separate

19  accounts in three financial institutions, and I'm speaking

20  from memory, but one of them was A and Z Bank, the other one

21  is the Guardian Trust Bank, both in New Zealand, and then, a

22  third -- what I'm calling financial institution, which was,

23  really, more like the Federal Reserve System here in the U.S.,

24  which is some sort of New Zealand government agency that

25  issues bonds like U.S. Government Bonds.

*McNutt - Direct*

1          So there were two notes -- what they call notes issued

2    by the New Zealand Government in Jon Murray's name, and that

3    was two of the five.  Then, there were accounts that -- two

4    accounts at Guardian Trust, and one account at A and Z Bank,

5    as I recall.

6    Q.  And in locating these assets of Mr. Murray, did you have

7    any conversations or contact with a man by the name of Jack

8    Jones in New Zealand?

9    A.  I have in my files correspondence related to Jack Jones.

10   I don't recall specifically having direct conversations with

11   Mr. Jones, but I may have.

12   Q.  Let me show you what's been marked for identification

13   purposes as Government Exhibit W7-1.  I'll ask you to remove

14   that from the plastic envelope, and tell me if that's a

15   correspondence to which you refer.

16   A.  This correspondence is a letter, dated July the 10th, and

17   this is a copy out of my file from -- I mean, to Mr. Jones

18   from Jon Murray, yes.

19   Q.  And did you provide that to Mr. Martin of the Internal

20   Revenue Service?

21   A.  I did.

22   Q.  And did you rely upon the contents of that letter in

23   seeking to locate and secure the overseas bank accounts of Mr.

24   Jon Murray pursuant to your appointment by the Probate Court?

25   A.  It is a document that supported our efforts.  And the

*McNutt - Direct*

1   facts are that, as I recall the sequence of events, the

2   accounts that were in Jon Murray's name had -- we already had

3   bank statements, and so forth, that this substantiated those.

4   Q.  And what action, if any, did you take, Mr. McNutt, to

5   reclaim those accounts, or return them to this country, if you

6   did?

7   A.  It was a -- was to me a somewhat long, arduous, but

8   necessary process.  We retained, basically, a law firm in one

9   of -- Auckland, as I recall, New Zealand, and used that law

10  firm to go through the legal steps or procedures in New

11  Zealand to secure the money.  And as I'm sure is the case in

12  this country, you have to be able to substantiate that you're

13  who you are and that you're entitled to the money, and so

14  forth.

15          And they wanted to be sure that it's -- that they're

16  turning it over under proper authority.  In summary, we went

17  through two or three false -- we tried two or three different

18  routes and finally hit up on a route that was successful and

19  basically got a court in -- I mean, we meaning this law firm

20  in New Zealand, got a court in New Zealand to take it to --

21  I've forgotten the particular court it was to get a court

22  order releasing the funds.

23          And we used a -- an agency in New Zealand called the

24  -- again, I'm going on memory, but the New Zealand Insolvency

25  Agency, or something to that effect, which is a New Zealand

*McNutt - Direct*

1    government agency that deals with the trustee service that

2    deals with this sort of thing.  And it was just a -- there's a

3    procedure that we went through, and it eventually resulted in

4    that insolvency or trustee service collecting the money from

5    these various accounts that I outlined into one central

6    account and then, transferring it to the United States, which

7    we did, and we've had -- and we've had it since then.

8    Q.  And can you give us an approximation, sir, of the total

9    amount or the cumulative amount of the funds secured from

10   those various New Zealand accounts and transferred to this

11   country?

12   A.  I'm going on memory again.

13   Q.  Yes, sir.

14   A.  I'm certain without looking through this that it's

15   enumerated in detail in this file.  My recollection was that

16   we collected about $125,000.  Might have been as much as 135

17   or 40 U.S. dollars, which represented accounts which were

18   denominated in New Zealand dollars that were -- appeared to be

19   about twice that amount.

20        So if memory serves me correctly, the bank statements,

21   in the aggregate, added up to $250,000 to 300,000 New Zealand

22   dollars, which when converted to U.S. dollars at the then

23   current exchange rate of a little over 52 or 53 cents a

24   dollar, converted to about $125 or $130 U.S. dollars.

25   Q.  Already, sir.  How did you determine, if you did, that

McNutt - Direct

1  these were funds personally belonging to Jon Murray as opposed

2  to funds belonging to the organizations of which he was

3  president, the Atheist Organizations?

4  A.  Well, first of all, just to elaborate briefly, I had

5  nothing to do with the organization that he was an officer of.

6  My responsibilities were solely that of his individual assets.

7  I had no authority to deal with anything that he had done in

8  his official capacity.

9      The bank statements were my primary source to support

10  that.  I mean, they were issued in his personal name, his

11  personal home address, and correspondence and bank statements,

12  and so forth, were -- that related to these accounts were to

13  him individually.

14      I'm certain that he had his own identifying numbers,

15  like Social Security numbers and that sort of thing.  I'm

16  certain that periodically, he had reported income at least on

17  some of those accounts to the -- you know, his personal income

18  tax, as I recall.  And so there was never any doubt in my

19  mind, then or now, that the money that I was dealing with was

20  his personal money.

21      Now, I -- so I guess that's the answer to your

22  question.

23  Q.  Well, again, if you'd refer to that correspondence between

24  Mr. Murray and Mr. Jones that's before you, did you not learn

25  or does that not discuss some tax liabilities in New Zealand?

McNutt - Direct

1   Did Mr. Murray have to pay taxes on any of these funds?  And

2   if so, did you, as his personal representative, have to pay

3   any taxes in order to secure these funds and return them to

4   the United States in New Zealand?

5   A.  I know there were taxes related to funds that were over

6   there, and I know that the money that we got was net of all of

7   the taxes.  And I know that -- plus some fees, and so forth,

8   for the insolvency, sir, and I know that that's all elaborated

9   and enumerated in these statements.  I don't recall, you know,

10  a whole lot of detail quivelling about taxes over there.  I

11  just -- that just wasn't something that was a major issue, as

12  I recall.

13  Q.  But at any rate, a New Zealand court agreed to allow your

14  attorneys to return these funds to this country?

15  A.  Absolutely.

16  Q.  And where were --

17  A.  Let me just be clear.  The Court allowed the funds to go

18  to this New Zealand government agency, which returned it to

19  me.

20  Q.  And once they were returned to you, what disposition did

21  you make of the funds?

22  A.  Well, I put it all in a bank account, and then, I paid

23  certain obligations out of the funds including about $109,000,

24  as I recall, in a negotiated settlement with the Internal

25  Revenue Service on back taxes and penalties and interest and

McNutt - Direct

1    other things that were represented to be owed.  And when I say

2    "represented to be owed," we hired -- we, meaning myself, on

3    behalf of this guardianship, hired a CPA, locally, to do

4    several years of tax returns and to -- because there had been

5    -- because this was done, like, in 1999, I guess, I believe.

6         And so there were three or four years of back tax

7    returns that had not been done because the party was not

8    around to do them.  And the CPA did the tax returns and also

9    negotiated with the Internal Revenue Service on back taxes and

10   penalties and interest.  And we arrived at a -- at an agreed

11   settlement, which was the $109,000, the round numbers that I'm

12   speaking of that we paid.

13   Q.  All right, sir.  And after you located these assets in New

14   Zealand, were you able to determine whether or not Mr. Jon

15   Murray, or anyone else acting on his behalf, had accessed

16   those funds or attempted to move those funds subsequent to his

17   disappearance in the fall of 1995?

18   A.  It was quite apparent to me -- and I didn't say this, but

19   I was in the banking business for 25 years before I went into

20   business for myself.  So I have some knowledge of the way

21   banks work.  And it was quite clear to me that these accounts

22   had never been accessed.

23        I got bank statements for a period before the subject

24   date when they seemed to have disappeared, and it showed a

25   pattern of activity.  And I saw bank statements, you know,

*McNutt - Direct*

1    from September of '95 forward, and it was quite clear to me

2    that there was no activity whatsoever on the accounts other

3    than some internal credits for interest or debits for fees, or

4    something like that, of a small amount.

5        But there was never any activity on any of the

6    accounts. Now, I should add that on at least three of the

7    accounts, they were not the type of accounts that have

8    activity. I mean, they were just bonds that have interest

9    paid, but the interest, for example, was accumulated. It was

10   never distributed. It stayed at the financial institution

11   that was paying the interest.

12       So it was never picked up. I had correspondence with

13   the various people at the banks, and they confirmed to me that

14   there had never been any contact made. And one of the things

15   that the Court required and we've paid a small fee for -- as I

16   recall, it wasn't a huge amount of money -- the Court in New

17   Zealand required that a private investigator be hired to try

18   to determine if there was anyone in -- you know, if they were

19   there, and that I was who -- that they weren't just sort of

20   there and not coming into the bank.

21       And they looked and were not -- they didn't find any

22   evidence. And so it was quite clear to me that that money sat

23   there, it earned interest, interest was never distributed. No

24   one ever came into the bank, and that was the pattern that

25   occurred. And a private investigator hired by the trustee

*McNutt - Direct*

1  service, or a law firm, or whatever it was, determined that

2  they weren't there.

3  Q.  And when you say, "they weren't there," who is "they" and

4  who -- where is "there"?

5  A.  Well, okay.  Let me -- I should clarify that.  I

6  apologize.  I shouldn't have said "they."  I think in my -- in

7  this particular instance, it was only Jon Murray.

8  Q.  Okay.

9  A.  But I don't -- they may -- they being the lawyers, or they

10 being the Court, or they being the bank may -- were aware that

11 this group of three people were missing, and so they may have

12 -- those -- that they may have asked, looked for those people.

13 But my inquiries were on behalf only of the -- of Jon Murray.

14 Does that answer your question?

15 Q.  I think so.  Do the documents before you reflect that in

16 addition to yourself being appointed as the receiver and

17 guardian for the estate of Jon Garth Murray, that other

18 receivers or guardians were appointed for the estates of

19 Madalyn Murray O'Hair and Robin Murray O'Hair?

20 A.  That's a correct statement.

21 Q.  And to your knowledge, these people -- none of these

22 people were ever located in New Zealand; is that correct?

23 A.  I am quite certain that they weren't.  And I am quite

24 certain -- I know from what I did personally that Jon Murray

25 was never located there.  And I'm confident that the other

*McNutt - Direct*

1   receivers that dealt -- or guardians that dealt with the other

2   two parties found no evidence whatsoever of either of the

3   other two being in New Zealand at the subject time.

4           I think they had been there prior to September of '9

5   -- when we got involved.

6   Q.  At least Mr. Murray had possibly?

7   A.  Yeah, I don't know.

8   Q.  Let me see that if, if you would -- and, once again, this

9   W7-1 is a document upon which you relied in securing the

10  assets.  It discusses the particular holdings in the various

11  accounts, and it's a letter between Mr. Murray -- Jon G.

12  Murray and Jack Jones, correct?

13  A.  Again, as I said, it clearly substantiated all of that and

14  it was dated before, and it had helped us know what was there

15  and, you know, but the bank statements themselves were also,

16  you know, really the source documents.

17  Q.  And this document's on the letterhead of the United

18  Secularists of America, correct --

19  A.  That's correct.

20  Q.  -- dated July 10, 1994, long before the O'Hairs'

21  disappearance?

22  A.  That's correct.

23  Q.  We'd offer Government Exhibit W7-1.

24          MS. WILLIAMS:  I'd renew our previous objection that

25  the document is hearsay.

*McNutt - Cross*

1          THE COURT:  Let me see it.  Sustain the objection to

2    W7-1.

3          MR. CARRUTH:  Thank you, your Honor.  We'll pass the

4    witness.

5                    CROSS-EXAMINATION

6    BY MS. WILLIAMS:

7    Q.  Do I understand that -- correctly that it was your job to

8    look at Jon Murray's finances and determine what money was

9    there, take that money and try to pay off whatever liabilities

10   he may have had?

11   A.  That's a fair statement, yes.

12   Q.  Other than that, did you have responsibilities?

13   A.  I think that my responsibilities were basically related to

14   assets and liabilities and financial transactions.

15   Q.  Okay.  How did you determine what bank accounts existed?

16   A.  Well, I looked through a considerable number of records

17   that were at the residence of Jon Murray and his two

18   relatives.

19   Q.  And what point -- what date, approximately, did you get

20   involved?

21   A.  I was appointed in mid-March 1997, as I recall.

22   Q.  Were the documents that you looked through still inside

23   the residence at the time you went and picked them up?

24   A.  No.

25   Q.  Where were they located?

*McNutt - Cross*

1  A.  As I recall, another attorney -- and I'm not an attorney,

2  but an attorney by the name of Jodie Hillman had been asked by

3  the Probate Court judge to take possession of those records,

4  and he, in fact, had taken a lot of records.  So I got them

5  from him, as I recall.

6  Q.  So simultaneously, there are -- there's a probate matter

7  going on.  Is your receivership going on and there's some

8  bankruptcy proceedings going on?

9  A.  No.  Well, I don't mean to split hairs with you, but the

10  probate matter established the guardianship/receivership, and

11  we determine -- did the -- determined that the bankruptcy

12  proceeding needed to take place.

13  Q.  All right.  Other than looking at records that were

14  contained within the Greystone house, at some point, it had

15  been taken from the Greystone house by Jodie Hillman and then,

16  subsequently given to you.  Other than looking at those

17  records, what did you do to determine the existence of other

18  bank accounts?

19  A.  I think that that substantially was it.  I mean, I was --

20  I became aware of a couple of bank accounts that were at Frost

21  Bank, for example, but to be fair, I may have gotten those

22  bank statements at that same location.  I, you know, as I

23  said, we had this private investigator hired in New Zealand

24  who searched some private records -- I mean, some public

25  records over there.

McNutt - Cross

1    I believe that the probate judge had also hired a

2  private investigator to make some searches over here prior to

3  my involvement.  I didn't just -- I basically took that

4  information.  I was -- tried to be sensitive to the fact that

5  there might be accounts elsewhere, but I saw no evidence that

6  there were.  And I didn't just start, you know, randomly

7  calling banks.

8  Q.  All right.  But if, for example, Jon Murray --

9  A.  Now, let me also say that there were a bunch of credit

10  cards that were involved, too.

11  Q.  Sure.

12  A.  But that's -- and they were issued by banks, but I'm

13  talking about assets, not liabilities in the context you're

14  asking the question.

15  Q.  And so am I.  That's what I was asking.

16  A.  Yeah.

17  Q.  If, for example, Jon Murray had established one or more

18  bank accounts in his name or in another name in the United

19  States or outside of the United States and hadn't listed the

20  Greystone address or the Cameron Road address, where the

21  multiple corporations resided, you wouldn't have had any way

22  of knowing about that?

23  A.  That's, I think, a reasonable statement.

24  Q.  All right.

25  A.  Now, I will -- now, let me just clarify.  The CPA that we

*McNutt - Cross*

1    hired to do the tax returns tried to diligently make sure that

2    all the tax information was correct and that the tax returns

3    were thorough.  And so I'm confident that she -- had she run

4    across some indication of another account, for example, in

5    interest payment, or something like that, that was reported,

6    would have brought it to my attention, and that didn't occur.

7    Q.  Sure.  Those tax returns were only prepared, though, for

8    '96, '97, later years, right?

9    A.  Yes, ma'am.

10   Q.  And in --

11   A.  Might have included '94.  I know it included in '95.  I

12   don't remember about '94 to be honest.

13   Q.  And in doing so, did the CPA go back and do an analysis of

14   the funds to determine where they came from and whether they

15   came from the United Secularists of America or from American

16   Atheists?

17   A.  I don't believe that was done.

18   Q.  All right.

19   A.  I do believe that the IRS may have -- may have been some

20   discussions about the source of that, but I don't think it was

21   ever a, you know, an in-depth issue as to the source.

22   Q.  Let me talk about the IRS for a minute.  You were aware,

23   were you not, that there was a pretty substantial tax

24   liability owed to the IRS, according to the IRS, by Jon

25   Murray?

McNutt - Cross

1   A.   That's what I -- yes, ma'am, I was, and that was what I

2   was alluded to in my testimony when I said we settled at

3   $109,000.

4   Q.   And that $109,000, was that what was left over after the

5   IRS had taken the proceeds of the sale of the house?

6   A.   No, ma'am.

7   Q.   That $109,000 was the total?

8   A.   Yes.

9   Q.   Who took the proceeds of the sale of the house?

10  A.   Myself on behalf of Jon Murray, you know, receivership,

11  and another receiver guardian by the name of Walter Aronson on

12  behalf of Robin Murray.  In other words, he and I jointly

13  because it was our belief that the house on Greystone was 100

14  percent owned by the two of them, 50 percent each.  We put the

15  house -- we dealt with the house and had it sold, and we

16  collected the net proceeds from the sale, and then, pursuant

17  to a court order, we split it up.  And as I recall, it was an

18  even split.  He took half and on behalf of Robin, and I took

19  half on behalf of Jon.

20       There were some other taxes that were paid that were

21  past due real estate taxes, but they were paid at the closing.

22  Q.   Did you go back to determine in deciding that half of the

23  house was owned by Robin and half of the house was owned by

24  Jon, did you go back to determine how they got their interest

25  in the house?

*McNutt - Cross*

1   A.  No.

2   Q.  So you don't know that the house was sold to Robin O'Hair

3   by the Society of Separationists for $10?

4   A.  I do not know that.

5   Q.  You had never heard that?

6   A.  I don't recall hearing that.  I don't -- I'm not saying I

7   didn't, but very candidly, we heard many stories and, you

8   know, some of which may have been, you know, completely

9   accurate or may not have been.  But the real property records

10  indicated that the title was in the name of Robin and Jon, and

11  we had issued -- we had -- in order to convey the property to

12  the new buyer, we had to have a title report done.  We had an

13  extensive title report done.  And they were able to issue a

14  title policy to the new owner conveying that -- conveying the

15  property.

16       Now, I recall that the title report was substantial.

17  I mean, it was a thick report, and there was a lot of

18  documentation in it.  But, very candidly, I didn't examine it.

19  Q.  All right.  When I asked you that question, I meant from a

20  reliable source.  I meant from the IRS, did you know that the

21  IRS believed that's what had happened, and I think your answer

22  remains no.

23  A.  Yeah, I did not know that.  But again, I just want to be

24  clear.  If they told us that or if they told our CPA that,

25  that may very well have happened.  I just don't recall it

McNutt - Cross

1  myself.

2  Q.  And where would that title history be located?  Would it

3  be in your files?

4  A.  The title history?

5  Q.  The title history that you just referred to?

6  A.  Yes.  Well, it would be several places.  I would have a

7  copy of it in my file.

8  Q.  And would you have provided that to -- I don't know who

9  you've been dealing with over here, but to the government?

10  A.  If they were -- yes, it was -- access to it was there,

11  yes.  But let me say that the original would have, of course,

12  been done by the title company.

13  Q.  Sure.

14  A.  If somebody really wanted to see the original title work,

15  they would contact Heritage Title, and it would be readily

16  available because all -- as you know, all it is is a

17  compilation of public records.

18  Q.  There was a joint bank account at Frost Bank.  Do you

19  recall that?

20  A.  Yeah, I do, recall it very well.

21  Q.  Did you have some trouble determining who of the three

22  Murray O'Hairs owned whatever money was left in that account?

23  A.  Not really.

24  Q.  All right.  How did that split out?

25  A.  My recollection was that we got possession of the account,

McNutt - Redirect

1    and as I recall, I got possession of the account on behalf of

2    Jon and used it to fund some costs at the house and some

3    various things of that nature, repairs and so forth, and then,

4    later, we had that -- we had a court order.  As I recall, it

5    was the probate court.  It might have been the bankruptcy

6    court or it may be both.  I don't remember at this instance.

7         But we had a court order that looked at the account

8    and agreed upon how it should be distributed.

9    Q.  After you -- and you may not be able to answer this

10   question, but maybe I'll go on.  After you figured out how

11   much money was there --

12   A.  Are you talking about that account or everything?

13   Q.  Now I'm sort of talking about everything, sold the house,

14   paid the IRS, filed bankruptcy, paid the creditor.  How much

15   money's left over?

16   A.  The chronology, it wasn't exactly right, but what you're

17   basically getting at is there's about 25 or $30,000 left in

18   Jon Murray's account.

19   Q.  All right.  Thank you, sir.

20                    RE-DIRECT EXAMINATION

21   BY MR. CARRUTH:

22   Q.  Mr. McNutt, counsel just asked you about this joint

23   account that Madalyn, Jon and Robin had in the First National

24   Bank.  Can you tell us, if you know, sir, whether that account

25   was where the monthly deposits were being made automatically

McNutt - Redirect

1   by the Veterans Administration and the Social Security

2   Administration?

3   A.  Yes, sir.  Let me -- you said First National.  I believe

4   you meant Frost.

5   Q.  I meant Frost National Bank.  Excuse me.  Frost National

6   Bank.

7   A.  Sure.  That money -- that account, it was at Frost

8   National Bank, and it was funded primarily -- maybe

9   exclusively, as I recall, by the government checks that you're

10  talking about, and they accumulated over a period of a couple

11  of years, quite a period of time.  So most of that money was

12  actually funded from -- on behalf of, I believe, Madalyn

13  O'Hair.

14  Q.  So that was to be my next question.  You were able to

15  determine that the beneficiary of those accounts or of those

16  checks, those monthly checks coming in from the government

17  would have been Madalyn O'Hair as opposed to Jon or Robin?

18  A.  Well, that's a -- you know a lot more about the law than I

19  do, but it was a joint account.

20  Q.  Yes, sir.  I understand that.

21  A.  And so my view is that they all equally owned it.  Now,

22  the source of the money, I think, and arguably could have been

23  that it was hers.

24  Q.  Did you determine that she was, prior to her disappearance

25  receiving, VA benefits and Social Security benefits?

*McNutt - Redirect*

1  A.  I did not because I was not her -- I had nothing to do

2  with her guardianship or her receivership.  I'm quite certain

3  without having done it myself that my counterpart would have

4  determined that that was, in fact, the case.

5  Q.  And you're saying that you seized that account or obtained

6  possession of it in order to effect a division of property --

7  A.  Yes.

8  Q.  -- among the various guardianships?  Can you tell the

9  jury, if you know, approximately how much in U.S. dollars was

10  on deposit in that account and how long it had been before any

11  withdrawals had been made from it?

12  A.  The dollar amount was $27,000 in round numbers, but it was

13  very close to -- that was almost -- it was not exactly 27,000,

14  but it was very close to 27,000.  And it had been -- what I do

15  not recall offhand is the date at which the regular payments

16  ceased.  But they went on for a couple of years between, let's

17  say, September of 1995 and sometime prior to March of 1997.

18       So that period -- they went on during that period of

19  time, but I don't recall the precise days.

20  Q.  They continued uninterrupted for that period of time?

21  A.  That's right, and that's why it accumulated.

22  Q.  With no withdrawals?

23  A.  None whatsoever, which was peculiar, of course, and it

24  just kept growing because they had been taking it out, as I

25  recall, or she had been living off it.

*McNutt - Redirect*

1    Q.  So after the O'Hairs disappeared in September of 1995,

2    from that point on, there were no more withdrawals by anybody

3    from that account until you took possession of it, two years

4    later, in 1997?

5    A.  That's correct.

6    Q.  And it had accumulated a total of $27,000?

7    A.  In round numbers, yes.

8    Q.  Thank you, sir.  Pass the witness.

9         MS. WILLIAMS:  I have nothing further.

10        MR. CARRUTH:  Nothing further, your Honor.  May the

11   witness be excused?

12        MS. WILLIAMS:  No objection.

13        THE COURT:  You may be excused, sir.  You may call

14   your next witness.

15        MR. CARRUTH:  John Earl Teague.

16        THE COURT:  Just come forward, please, sir, and be

17   sworn.

18   (Witness was sworn.)

19        THE COURT:  Come up here and walk around that column

20   and get up and sit down in the witness chair, please.  If

21   you'll tell us your full name, please, sir, and spell your

22   last name.

23        THE WITNESS:  John Earl Teague, T-E-A-G-U-E.

24   JOHN EARL TEAGUE, called by the Government, duly sworn.

25

*Teague - Direct*

1

2                    DIRECT EXAMINATION

3    BY MR. CARRUTH:

4    Q.  Please tell the members of the jury where you live, Mr.

5    Teague, and how you're employed.

6    A.  I'm a rancher, and I live three and a half miles south of

7    Camp Wood, Texas.

8    Q.  And is that in Real County, Texas for the record?

9    A.  In the corner, yes, sir, Real County.

10   Q.  How long have you lived in Real County, sir?

11   A.  For 45 years.

12   Q.  And approximately how large a ranch do you run or do you

13   own?

14   A.  My personal part is 2,000, sir.

15   Q.  2,000 acres?

16   A.  Yes, sir.

17   Q.  And does this ranch adjoin the Don Friend Ranch?

18   A.  Yes, it does.

19   Q.  And can your ranch property be accessed through the Friend

20   Ranch, which was leased for hunting back in 1995?

21   A.  Yes, sir.

22   Q.  And do you go through a series of three gates, after you

23   go through the gate, with the combination lock on it to access

24   your property?

25   A.  Yes, sir.

*Teague - Direct*

1  Q.  Now, do you recall what happened -- anything of an unusual

2  nature last Easter weekend of 1999?

3  A.  Yes, sir, I do.

4  Q.  Can you briefly tell the members of the jury what occurred

5  on that occasion of an unusual nature, if anything?

6  A.  On April the 2nd -- on April 2nd, I was visited by several

7  law enforcement officers, including an FBI officer, informed

8  that there was a warrant that they were searching for the

9  O'Hairs on our ranch, which is the Cooksey Ranch.

10  Q.  And did you understand that the federal agents had

11  obtained a search warrant for the Don and Joanne Friend Ranch,

12  which adjoins your property, correct?

13  A.  Yes, sir, I do.

14  Q.  But then, once they got out there, they realized that your

15  ranch could be accessed from the Friend portion of the

16  property?

17  A.  Yes, sir.

18  Q.  Of the Cooksey Ranch.  It was all subdivided in the past,

19  was it not?

20  A.  Yes, sir.

21  Q.  And at that point, did anyone from any federal law

22  enforcement agency request and obtain from you written consent

23  to search your 2,000-acre ranch property?

24  A.  Yes, sir.

25  Q.  And did you agree in writing to consent to the search of

*Teague - Direct*

1  that property?

2  A.  Yes, I did.

3  Q.  Now, once again, I want to show you some photographs,

4  aerial photographs that had previously been introduced into

5  evidence as Government Exhibits W86-1A and B, or 1 and 2 of

6  the same exhibit.  Can you see these all right if I display

7  them here before you?

8  A.  Yes, sir.

9  Q.  Do you recognize the property depicted here?

10  A.  Yes, sir, I do.

11  Q.  And is that -- when you first enter the property and go

12  past the pens out here, is that part of your property or is

13  that Mr. Friend's property?

14  A.  That's Mr. Friend's property.

15  Q.  And how far back do you have to go on the property,

16  approximate distance from the road, in order to access your

17  property, sir?

18  A.  I believe it's about a mile.

19  Q.  About a mile.

20  A.  Mile and a half, maybe.

21  Q.  And I believe you mentioned earlier in looking at these

22  pictures that there's a dry creek bed that runs through there,

23  is there not?

24  A.  Yes, there is.

25  Q.  And in relation to Camp Wood -- show you what's been

*Teague - Direct*

1   marked Government's Exhibit A6-2B, and introduce as a map of

2   the Camp Wood area.  Would your ranch property have been here

3   in the outline?

4   A.  Yes, sir.

5   Q.  There appears to be a creek or dry creek bed running

6   through here; is that correct?

7   A.  Yes, sir.

8   Q.  And then, there's a river that it ties into right here.

9   Can you identify that creek bed and that river for us, sir?

10  A.  Yes, sir, I can.  This is Ranch Creek, which is a fairly

11  large creek which drains a lot of country, so there's a lot of

12  water coming through from when we have a rise; and it runs

13  under the bridge of Highway 55 into the Nueces River.

14  Q.  Okay.  Do you know where the Nueces River empties into?

15  A.  Yes, sir, the Gulf of Mexico.

16  Q.  Okay.  Now, subsequent to the fall of 1995, can you tell

17  us whether or not you had rather heavy rains out there in that

18  area?

19  A.  Yes, sir.  Since then?

20  Q.  Yes, sir.

21  A.  We have had some -- in fact, we had one rise that was

22  probably the largest since 1955.

23  Q.  And when did that occur?

24  A.  I don't remember, but it's since '95.

25  Q.  Okay.  And when that occurs, what happens to this Ranch