FILED

NOV 2 1 2000                                                        1

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

1            IN THE UNITED STATES DISTRICT COURT
2            FOR THE WESTERN DISTRICT OF TEXAS
                     AUSTIN DIVISION

3    UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                              )
4    v.                       ) Austin, Texas
                              )
5    GARY PAUL KARR           ) May 23, 2000

6                      VOLUME 7 of 12
7                   TRIAL ON THE MERITS
             BEFORE THE HONORABLE SAM SPARKS

8    APPEARANCES:

9
     For the United States:      Mr. Gerald C. Carruth
10                               Mr. Daniel H. Mills
                                 Assistant U.S. Attorneys
11                               816 Congress Avenue, Ste. 1000
                                 Austin, Texas 78701
12

13

14
     For the Defendant:          Mr. Thomas W. Mills, Jr.
15                               Ms. Christi N. Williams
                                 Mills & Presby
16                               5910 North Central Expressway,
                                 Ste. 900
17                               Dallas, Texas 75206-5141

18

19
     Court Reporter:             Lily Iva Reznik, RPR, CRR
20                               United States Courthouse
                                 200 West 8th Street
21                               Austin, Texas 78701
                                 Ph: (512)916-5564
22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

ORIGINAL



I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ron Waters | 5 | 24 | 35 | 38 |
| Kerry B. Meyer | 41 | 50 | | |
| Ronald E. Ingalls | 52 | 77 | 80 | |
| Robert Bjorklund | 83 | 91 | 103,113 | 110 |
| Clarence R. Fry | 116 | 131 | 149,172 | 168 |
| Steven Womack | 172 | 179 | 184,185 | 186 |
| Caroline Van Winkle | 187 | 195 | | |
| Katherine Long | 200 | 206 | 213 | |
| Constance Fisher | 215 | 231 | 235 | |
| Rusty White | 236 | 241 | 242,244 | 243 |
| Aaron Allen Morris | 247 | 261 | | |
| Jason Cross | 280 | | | |

| | Page |
|---|---|
| Proceedings Adjourned | 298 |

<pre>
 1                         E X H I B I T S

 2                                     Offered      Admitted

 3      Government's

 4      #W58-1 Photo                      63           63

 5      #W58-2 Photo                      63           63

 6      #W58-3 Photo                      64           64

 7      #W58-4 Photo                      65           65

 8      #W58-5 Bankruptcy Documents       55           55

 9      #W64-1 Texas Map                 178          178

10      #W64-5 Autopsy Report             88           88

11      #W64-6 Angle Iron                105          106

12      #W78-1 R. Karr Phone Bill         20           20

13      #W79-2 Hinged Handcuffs           45           45

14      #W79-3 Linked Handcuffs           46           46

15      #W79-6 Wesson .357 Revolver       42           43

16      #W79-7 Nine Millimeter            43           43

17      #W79-8 Shovel                     50           50

18

19      Defendant's

20      #25 Stipulation                   92           92

21      #25A Stipulation                  92           92

22

23

24

25
</pre>

4

```
1          THE COURT:  All right, counsel.  Anything before we
2     bring in the jury?
3          MR. CARRUTH:  Nothing from the government, your Honor.
4          MR. T. MILLS:  Nothing from the defense.
5          THE COURT:  All right.  Bring the jury in.
6      (Jury present.)
7          THE COURT:  Members of the jury, since last evening,
8     has anyone attempted to talk you about this case?
9          THE JURORS:  No.
10         THE COURT:  Have you talked to anybody about this
11    case?
12         THE JURORS:  No.
13         THE COURT:  And have you learned anything at all about
14    the case outside the presence of each other and this
15    courtroom?
16         THE JURORS:  No.
17         THE COURT:  All right.  Show negative responses by all
18    jurors to all questions.  And, Mr. Mills, you may call your
19    next witness -- or, Mr. Carruth.
20         MR. CARRUTH:  Thank you, your Honor.  The government
21    calls Ron Waters.
22         THE CLERK:  Would you raise your right hand?
23      (Witness was sworn.)
24         THE COURT:  And then, walk around this column, please,
25    sir, and have a seat up in this blue chair.  If you'll tell us
```

*Waters - Direct*

1    your full name, please, sir, and spell your last.

2              THE WITNESS:  Ron Waters, W-A-T-E-R-S.

3              THE COURT:  You may proceed.

4         RON WATERS, called by the Government, duly sworn.

5                        DIRECT EXAMINATION

6    BY MR. CARRUTH:

7    Q.  Mr. Waters, would you please tell the members of the jury

8    where you reside and what your current occupation is?

9    A.  Peoria, Illinois.  I'm a baker in a restaurant.

10   Q.  And are you related to David Rolland Waters?

11   A.  Yeah, he's my half brother.

12   Q.  Okay.  Where were you living back in 1995, sir?

13   A.  1624 Oak Douglas, Peoria, Illinois.

14   Q.  All right, sir.  Did you have an occasion to receive any

15   property from Mr. Waters --

16   A.  Yes, sir.

17   Q.  -- back in 1995?

18   A.  Yes, sir.

19   Q.  And what type of property, if any, did you receive from

20   Mr. Waters on that occasion?

21   A.  Well, he sent me -- you know, he sent me a gift, a

22   present.

23   Q.  When is your birthday month, sir?

24   A.  October.

25   Q.  And in October of 1995, did you receive something with a

*Waters - Direct*

1  birthday card from Mr. Waters?

2  A.  Yes, sir.

3  Q.  And what was that, sir?

4  A.  It was a gun.

5  Q.  Do you recall what type of gun it was?

6  A.  Nine-Millimeter.

7  Q.  And have you ever owned a handgun before?

8  A.  No, sir.

9  Q.  What did you do with that gun that you received from Mr.

10  Waters?  I assume it came in the mail; is that correct?

11  A.  Yeah -- yes, sir.

12  Q.  Well, what did you do with that Nine-Millimeter pistol?

13  A.  After I got done looking at it just pretty much put it up.

14  Q.  Was it in a gun case of some sort?

15  A.  Yeah, it was in a regular gun box.

16  Q.  Okay.  And did there come a time later, in 1995, around

17  the Christmas season, when Mr. Waters personally visited you

18  in Peoria, Illinois?

19  A.  Yes, sir.

20  Q.  And did he have anyone with him when he came to see you?

21  A.  Patti and her sister.

22  Q.  Okay.  That's Patti Jo Steffens?

23  A.  Yes, sir.

24  Q.  During that visit at Christmas, around 1995, did Mr.

25  Waters have any conversation with you regarding this

*Waters - Direct*

1   Nine-Millimeter pistol that he had sent you for your birthday?

2   A.   Yeah, he asked to see it.

3   Q.   Okay.  And your birthday was what day in October?

4   A.   Eleventh.

5   Q.   And the pistol arrived sometime after that; is that your

6   understanding?

7   A.   Roughly, sir.

8   Q.   Okay.  And when he asked to see the pistol, what, if

9   anything, did he do with it?

10   A.   He took it into the kitchen and took it apart.

11   Q.   Took it apart?

12   A.   (Moving head up and down.)

13   Q.   Did he put it all back together?

14   A.   Yeah.

15   Q.   Did he remove any of the parts?

16   A.   Yes, he did, sir.

17   Q.   And what was that, sir?

18   A.   It was the barrel.

19   Q.   The barrel of the gun?

20   A.   (Moving head up and down.)

21   Q.   Did you inquire why he was doing that?

22   A.   I asked him why.

23   Q.   And what did he respond?

24   A.   Just kind of shushed me -- "Sh, don't worry about it" kind

25   of thing.

*Waters - Direct*

1   Q.  Okay.  Did he take the barrel with him when he left?

2   A.  He put it in his pocket.

3   Q.  And you never saw the barrel again?

4   A.  No, sir.

5   Q.  Did he ever replace the barrel for you?

6   A.  No, sir.

7   Q.  So you were left with a gun with no barrel; is that

8   correct?

9   A.  Yes, sir.

10  Q.  Mr. Waters, I'm showing you what's been marked for

11  identification as Government's Exhibit W79-7.  Is that a gun

12  case that you recognize, sir?

13  A.  Yes, sir.

14  Q.  Where have you seen that before?

15  A.  Used to be mine.

16  Q.  Used to be yours?

17  A.  Uh-huh.

18  Q.  Given to you by Mr. Waters?

19  A.  Yes, sir.

20  Q.  You'll note it no longer has a barrel.  Did you later turn

21  this over to the Federal Bureau of Investigation?

22  A.  Yes, sir.

23  Q.  Did Mr. Waters ever give you any other guns after that?

24  A.  He showed up with a couple of guns.

25  Q.  And would that have been in the spring of last year?

*Waters - Direct*

1    A.   Yeah.

2         MR. T. MILLS:  Excuse me.  Object to evidence outside

3    of the allegation of conspiracy.

4         MR. CARRUTH:  Well, your Honor, obviously, the

5    government is not limited by the date of the conspiracy.  We

6    can show before, during and after the circumstantial evidence

7    relating to the conspiracy, and we submit that it will be

8    something connected up.

9         THE COURT:  Let's come over here.

10    (At the Bench, on the record.)

11        THE COURT:  What would be the relevance of the guns?

12        MR. CARRUTH:  It's on old .357 Magnum we believe

13   belonged to one of the victims.

14        THE COURT:  All right.  Objection's overruled.

15   Q.  (BY MR. CARRUTH) In the spring of 1999, did Mr. David

16   Waters come to your residence in Peoria, Illinois?

17   A.   Yes, sir.

18   Q.   And did he leave another gun with you on that occasion?

19   A.   There was a couple of guns.

20   Q.   Okay.  Do you recall what type of guns?

21   A.   There was a little small handgun and something that looked

22   like a -- I don't know what you call it, a Tech 9 or

23   something, something -- a bigger gun.

24   Q.   Okay.  And was there a larger caliber revolver?

25   A.   Well, the -- are we talking about March?

*Waters - Direct*

1    Q.  Yes, sir.

2    A.  Well, March, there was -- actually, that was a .357.

3    Q.  A .357?

4    A.  Yeah, March.

5    Q.  Was it a new or old .357?

6    A.  It was an older looking one.

7    Q.  Show you what's been marked for identification purposes as

8    W79-6.  Do you recognize that firearm?

9    A.  Looks like it, yes, sir.

10   Q.  Is that the gun that you gave to the FBI --

11   A.  Yes, sir.

12   Q.  -- during this investigation?

13   A.  Yes, sir.

14   Q.  And from whom did you receive that gun?

15   A.  David.

16   Q.  Did he leave anything else or send anything else to you

17   for safekeeping?

18   A.  He brought a box.  He sent me a box of pictures, and he

19   left us a box of pictures and stuff in my pantry and some

20   other stuff.

21   Q.  Do you remember what the other stuff was?

22   A.  I'm not real sure what you mean.

23   Q.  Well, did you turn over certain items of property to the

24   FBI that Mr. Waters had mailed or brought to your house that

25   came out of that box?

*Waters - Direct*

1   A.   Oh, the box?

2   Q.   Yes, sir.

3   A.   Yeah, there was some handcuffs in there.

4   Q.   And what else?

5   A.   Switch blades and pictures and, I believe, some bullets.

6   Q.   Okay.  Let me show you, sir, what's been marked for

7   identification as Government's Exhibit W79-2, a pair of hinged

8   handcuffs, and W79-3, a pair of linked handcuffs.  Do you

9   recognize those, sir?

10  A.   Best of my recollection, I saw them.

11  Q.   Did you give handcuffs like that to the FBI?

12  A.   Yes, sir, they were still in the box.

13  Q.   Show you what's been marked for identification as

14  Government Exhibit W79-9.  Do you recognize those switch blade

15  knives?

16  A.   I remember switch blades, but I didn't --

17  Q.   Did you give two switch blade knives to the FBI?

18  A.   Yes, sir.

19  Q.   And where did you get them?

20  A.   It was out of that box.

21  Q.   That Mr. David Waters left at your house or sent to your

22  house?

23  A.   Yeah.

24  Q.   Show you W79-1, ask you if you recognize that box of

25  bullets?

*Waters - Direct*

1   A.   Yeah, looks like them.

2   Q.   You gave those to the FBI?

3   A.   Yes, sir.

4   Q.   Where did you get the bullets?

5   A.   It came out of that box.

6   Q.   Do you know the defendant, Mr. Gary Paul Karr?

7   A.   Vaguely.

8   Q.   Has he ever been to your home in Peoria, Illinois?

9   A.   Just once.

10  Q.   Did you invite him to your home?

11  A.   No, sir.

12  Q.   And who invited him to your home?

13  A.   I would imagine David.

14  Q.   Okay.  During that visit, did Mr. Karr leave any property

15  at your house --

16  A.   No.

17  Q.   -- after he left?

18  A.   A couple of things, yeah.

19  Q.   Show you what's been marked as Government Exhibit W79-8.

20  Do you recognize that shovel?

21  A.   Yes, sir.

22  Q.   Where did you get that shovel?

23  A.   It was at my house.  David said he left it there with a

24  bag of salt.

25  Q.   A bag of salt, a shovel, anything else?

*Waters - Direct*

1    A.   Some tools -- little tool box with some tools in it.

2    Q.   Drill bits?

3    A.   Yeah, I believe it was, yeah.

4    Q.   Did you ever use that shovel yourself?

5    A.   Actually once, yeah.

6    Q.   What did you use it for?

7    A.   Planting tomatoes.

8    Q.   Okay.  Did you call the FBI and report to them that Mr.

9    Karr left that shovel at your house?

10   A.   Yes, sir.

11   Q.   Did they come out and pick it up?

12   A.   Yes, sir.

13   Q.   Now, what is the relationship between you and your half

14   brother, Mr. David Waters?

15   A.   Relationship?

16   Q.   Yes, sir.  Are you close?

17   A.   Not really.

18   Q.   And can you tell the members of the jury why your

19   relationship is strained, if it is?

20   A.   Well, it's -- I didn't really grow up around him.

21   Q.   Is he older or younger than you?

22   A.   Older.

23   Q.   Did you and he ever have a physical confrontation?

24   A.   Once.

25   Q.   And did he cause you any harm or injury?

*Waters - Direct*

1   A.   Yeah, he hit me a few times.

2   Q.   Okay.  In addition to those two weapons you've identified,

3   did Mr. Waters give you any other weapons?

4   A.   I believe it was the fall -- it was in the fall.  He came

5   down and I was at work when we got there --

6        MR. T. MILLS:  Excuse me, Judge.  I have the same

7   objection to it being irrelevant to accusations in this case.

8        (At the Bench, on the record.)

9        MR. CARRUTH:  We expect the witness to testify that he

10   took one of these weapons to Gary Karr.  He sent it to Gary

11   Karr at Mr. Waters' insistence.  Now, '98, there is that Mr.

12   Karr was afraid of Mr. Waters, and we're going to show that

13   they enjoyed a continuing relationship subsequent to that

14   time.

15        THE COURT:  You expect testimony that this witness

16   will say that had David Waters told him or instructions he

17   sent what to Mr. Karr?

18        MR. CARRUTH:  A Tech 9.

19        THE COURT:  One of the guns that's already in

20   evidence?

21        MR. CARRUTH:  No, sir, it's another gun.  The gun that

22   came out of that Indianapolis home invasion in 1998, in July,

23   and it --

24        MR. T. MILLS:  It was suppressed.

25        MR. CARRUTH:  No, it wasn't.  The guns that were

*Waters - Direct*

1   suppressed are the two .25 and .22 caliber that he had in his

2   room.  Not this Tech 9.

3          MR. T. MILLS:  Do you have the Tech 9?

4          MR. CARRUTH:  No?

5          MR. T. MILLS:  Mr. Karr had possession of it?

6          MR. CARRUTH:  Yes, according to this witness, he

7   mailed it to him.

8          MR. T. MILLS:  You don't have evidence he received it?

9          MR. CARRUTH:  I have evidence that Mr. Waters received

10  money for it in Peoria.  He drove him to catch the postman to

11  get the envelope with the money.

12         THE COURT:  All right.  Let's get back to this case

13  and this issue.  The theory of the prosecution is that this

14  shows that they were still --

15         MR. CARRUTH:  Still associating with one another as

16  early as January --

17         THE COURT:  All right.  I'll permit it.

18         MR. CARRUTH:  Thank you.

19         MR. T. MILLS:  My objection's overruled, your Honor?

20         THE COURT:  It is, sir.

21  Q.  (BY MR. CARRUTH) In addition to those two firearms that

22  you've identified that are here in court and the small

23  caliber, there was a smaller gun, you said?  Do you remember

24  what type of gun it was?

25  A.  It was just a small gun.

*Waters - Direct*

1    Q.   Was it a blue steel like that or was it a chrome,

2    stainless steel?

3    A.   I seem to remember chrome.

4    Q.   Okay.   And in addition, was there a fourth gun that you

5    received from Mr. Waters with instructions to mail to

6    somebody?

7    A.   Yes, sir.

8    Q.   And what kind of gun was that?

9    A.   It was a bigger gun.   I really don't -- it looked like, I

10   don't know, Tech 9 would be the right description, but --

11   Q.   Can you describe it, what it looked like?

12   A.   A big gun with a long curling magazine.

13   Q.   Long magazine protruding from the handle?

14   A.   Yes, sir.

15   Q.   Barrel with a sleeve-over containing holes?

16   A.   Yes, sir.

17        MR. T. MILLS:   Excuse me, Judge.   Object that the

18   testimony should come from the witness.   Object to leading.

19   Q.   (BY MR. CARRUTH) Why don't you describe the weapon for us,

20   sir, as you did in your statement?

21   A.   That's about it.   It had the little things with the hole

22   in the barrel and had the long magazine.

23   Q.   And from whom did you receive this gun?

24   A.   I believe it came with David when he came at the time, I

25   believe.

*Waters - Direct*

1   Q.  And do you recall telling the officers to whom you had

2   mailed that weapon at David's request?

3   A.  He asked me to mail it to Mr. Karr.

4   Q.  Okay.  And were you later present when Mr. Waters received

5   a package from Mr. Karr containing some money for that gun?

6   A.  He had money, but I didn't know -- I didn't see who it

7   came from.

8   Q.  Had you later -- had you earlier loaned your brother $50?

9   A.  Yes.

10  Q.  And what did he do after receiving that package?

11  A.  We opened it up and got the money out and gave me $50.

12  Q.  And did you take Mr. David Waters to find a mailman?

13  A.  Yes, sir.

14  Q.  And that was because they left one of those green cards?

15  A.  One of those -- yeah.

16  Q.  Notification of mail?

17  A.  Correct.

18  Q.  Okay.  And you don't know where that gun is today, do you,

19  sir?

20  A.  No, sir.

21  Q.  Now, when Mr. Karr came to your house to visit Mr. Waters,

22  you say that was in January of this year?

23  A.  Yeah.

24  Q.  How do you recall the date?

25  A.  Because of the snow storm.

*Waters - Direct*

1  Q.  Big snow storm in Peoria?  And were you expecting Mr. Karr

2  to show up on that occasion?

3  A.  Was I?

4  Q.  Yes, sir.

5  A.  No, I wasn't personally.

6  Q.  Okay.  What hours were you working back then at the

7  restaurant, sir?

8  A.  I was working going, like, 3:00 or 4:00.  I would get home

9  at, like, 1:00 in the morning or something like that,

10  sometimes later.

11  Q.  And on this particular occasion, you arrived home sometime

12  after 1:00 in the morning?

13  A.  Yes, sir.

14  Q.  And did you find an unexpected guest in your home?

15  A.  Yes.

16  Q.  And who was it?

17  A.  Mr. Karr.

18  Q.  And did Mr. Waters introduce you to Mr. Karr?

19  A.  Yes, he did, sir.

20  Q.  And what, if anything, did he tell you about him?

21  A.  Nothing really.  Just a friend.

22  Q.  Okay.  And did Mr. Karr and Mr. Waters spend the night in

23  your apartment?

24  A.  Yes, sir.

25  Q.  How large an apartment were you living in at that time?

*Waters - Direct*

1   A.   It was a house.

2   Q.   A house?

3   A.   Yeah, very small home.

4   Q.   How many bedrooms did you have?

5   A.   One.

6   Q.   And where did Mr. Waters and Mr. Karr sleep?

7   A.   Mr. Karr slept in a recliner, and my brother slept in a

8   day bed.

9   Q.   And before y'all retired for the evening, what, if

10  anything, were Mr. Karr and Mr. Waters doing when you arrived?

11  A.   Just watching television.

12  Q.   And were they consuming any alcoholic beverages?

13  A.   When I got there, I don't remember that, but I remember --

14  I remember having a beer or two.

15  Q.   With them?

16  A.   I think Mr. Karr had a beer, but I'm not sure.

17  Q.   Okay.  Did you have an occasion to talk to Mr. Karr in

18  January of '99, when he visited at your home?

19  A.   Briefly.

20  Q.   What did he say?

21  A.   Well, he introduced us and we just sat around talking

22  general things, but they were watching a movie so they were

23  talking about that.  Not really much conversation.  Just

24  watching a movie.  Everybody seemed to be tired.

25  Q.   Did you provide the investigators in this case a copy of

*Waters - Direct*

1   your telephone bill for January of 1999?

2   A.  Yes, sir.

3   Q.  I show you, sir, what's been marked for identification as

4   Government's Exhibit W78-1, and ask you if you could recognize

5   that as a copy of your phone bill?

6   A.  Yes, sir.

7   Q.  What is the date up here that it was -- month that it

8   was --

9   A.  January 16th, 1999.

10  Q.  Is that --

11  A.  That's actually a copy.

12  Q.  -- is this your telephone number up here?

13  A.  Yes, sir.

14  Q.  We'd offer Government Exhibit W78-1.

15       MR. T. MILLS:  Object to relevance of January '99.

16       THE WITNESS:  That's a copy.

17       THE COURT:  What is the relevance?

18       MR. CARRUTH:  It's going to show cause for Mr. -- his

19  house to Mr. Karr's house.

20       THE COURT:  All right.  Be overruled.

21  Q.  (BY MR. CARRUTH) Now, would you please read into the

22  record your telephone number as reflected on that statement?

23  A.  Area code?

24  Q.  Yes, sir.

25  A.  309-682-2544.

*Waters - Direct*

1   Q.  Okay.  Now, here on January the 6th, shows a call to Wald

2   Lake, Michigan.  Do you know anybody in Wald Lake, Michigan?

3   A.  No, sir.

4   Q.  Would you please read the phone number called in Wald

5   Lake, Michigan?

6   A.  248-926-0490.

7   Q.  And does it indicate the duration of the call?

8   A.  Twenty-three minutes.

9   Q.  Okay.  Now, on the other side, on January the 8th, is a

10  call to that same number in Wald Lake, Michigan, is it not?

11  A.  I believe it, yes.

12  Q.  And what was the duration of that call?

13  A.  One minute.

14  Q.  Okay.  To your knowledge, did Mr. David Waters call the

15  defendant, Mr. Gary Karr from your residence?

16  A.  No.

17  Q.  He did not?

18  A.  I don't know.

19  Q.  Did you make those calls?

20  A.  No, sir.

21  Q.  Was there anyone else that had access to your phone during

22  that time?

23  A.  No, sir.

24  Q.  How long was Mr. Waters staying with you when he came

25  during the big snow storm?

1   A.   Three or four days, I think it was.

2   Q.   Okay.  And how did he arrive, if you know?

3   A.   In January.

4   Q.   Yes, sir, during the big snow storm?

5   A.   I think the bus.

6   Q.   And how did he arrive in March when he brought you the old

7   .357 Revolver?

8   A.   A bus, I'm pretty sure.

9   Q.   Now, do you know a man named Chico?

10   A.   Yeah, I know Chico.

11   Q.   Where is Chico from?

12   A.   I met him in Peoria many, many years ago.

13   Q.   Met him where?

14   A.   Peoria.

15   Q.   Is he also a friend of Mr. David Waters?

16   A.   I think so.

17   Q.   Now, Mr. Chico's name is Osborne, is it not?

18   A.   Yeah.

19   Q.   And did he and Mr. Waters, your brother, travel to Texas

20   together to work on any occasion in which you're familiar?

21   A.   I'm really not sure.

22   Q.   Do you remember telling the investigators about a job in

23   Corpus Christi?

24   A.   Seems -- seems to me they worked down there together, but

25   somewhere down there.

Waters - Direct

1   Q.  Okay.  Did Mr. Waters, your brother, ever tell you that he

2   was writing a book?

3   A.  Yes, sir.

4   Q.  And did you know what the subject or topic of that book

5   was?

6   A.  Yeah, about Madalyn O'Hair.

7   Q.  Okay.  And this was after the O'Hairs had disappeared?

8   A.  Yes, sir.

9   Q.  And did you ever provide him any funds to try to find a

10  publisher for that manuscript?

11  A.  Well, he had found a publisher, but he needed some money

12  for -- to start the book.

13  Q.  How much money did you provide to Mr. David Waters?

14  A.  2,500.

15  Q.  And did you ever provide him any other money for any other

16  reasons such as to buy a computer?

17  A.  Yes.

18  Q.  How much money did you give him on that occasion?

19  A.  About 2100.

20  Q.  So you've loaned him about 45, 4600?

21  A.  (Moving head up and down.)

22  Q.  Has he ever repaid you?

23  A.  No, sir.

24  Q.  Now, after the FBI left your house when you turned this

25  property over to them, did you find some more bullets?

*Waters - Cross*

1    A.  Yes, sir.

2    Q.  What did you do with those bullets?

3    A.  Threw them away.

4    Q.  Pass the witness.

5                    CROSS-EXAMINATION

6    BY MR. T. MILLS:

7    Q.  Mr. Waters, how old are you?

8    A.  47.

9    Q.  What education do you have?

10   A.  Tenth grade.  I got a GED.

11   Q.  Do you take any medication?

12   A.  No, sir.

13   Q.  Do you sometimes have memory problems?

14   A.  Yeah, at times.

15   Q.  Sir?

16   A.  At times.

17   Q.  Yeah.  What's the basis for that, do you know?  From any

18   kind of problem or anything?  What's the basis for that?

19   A.  I really couldn't tell you.  I mean, I'm a nervy person by

20   rule anyway, working in a restaurant.

21   Q.  When did you call the FBI to turn things over?

22   A.  Like what things, sir?

23   Q.  Sir?

24   A.  I'm not sure what you mean.  What things?

25   Q.  Well, I understood from the questioning from the

*Waters - Cross*

1  prosecutor that you called the FBI somewhere, and they came

2  out and you gave them things.  Did that happen?

3  A.  Yes.

4  Q.  One time or more than one time?

5  A.  I believe one time.

6  Q.  All right.  Could it have been more than one time?

7  A.  I don't think so.

8  Q.  All right.  Well, when did you call them?

9  A.  Since -- after they left.  I thought it was a few weeks.

10 Q.  I don't know what you mean.  Since they left, you thought

11 it was --

12 A.  When the FBI left my house, I called them after that.

13 Q.  Oh, okay.  Let me start over again.

14 A.  Okay.

15 Q.  Did the FBI come to your house one day with a search

16 warrant?

17 A.  No.  They came to my house.  I don't know if they had a

18 search warrant or not.

19 Q.  Did they come to your house -- when they first came to

20 your house, had you already called them or no?

21 A.  No.

22 Q.  They just showed up?

23 A.  Yes, sir.

24 Q.  Did they ask to search your house?

25 A.  Yes, sir.

*Waters - Cross*

1    Q.  Did you give them permission?

2    A.  Yes, sir.

3    Q.  Okay.  Did they find things that they took away?

4    A.  Yes, sir.

5    Q.  And did -- after that, do I understand it that you called

6    them and said, "I have some more things"?

7    A.  I had a couple of things.  Just coals and a shovel.

8    Q.  So they came back out and got some more things?

9    A.  Yes, sir.

10   Q.  All right.  And you were living in Peoria, Illinois?

11   A.  Yes, sir.

12   Q.  How far from Chicago is that?

13   A.  Nearly 300 miles, I believe.

14   Q.  Okay.  Now, let me ask you about some more of your

15   testimony.  In 1995, you received in the mail a gun at about

16   the time of your birthday?

17   A.  Yes, sir.

18   Q.  All right.  And you were shown a gun -- this

19   semiautomatic?

20   A.  Yes, sir.

21   Q.  Do you know if that's the gun that you received?

22   A.  Well, it looks like it surely does.  The box, it's the

23   same, everything's the same.

24   Q.  All right.  Is there anything particular about this gun

25   that is any different from any other Browning Nine-Millimeter

*Waters - Cross*

1   pistol?  Is there anything that --

2   A.  I wouldn't know, sir.  I don't know that much about guns.

3   I really don't.

4   Q.  All right.  Well, when you received that, how much did you

5   know about guns?

6   A.  Probably no more than the average person.  I mean, just

7   not much, really.

8   Q.  Had you ever owned a gun?

9   A.  No, sir.

10  Q.  Had you ever shot a gun?

11  A.  No, sir.

12  Q.  Had you ever -- do you know what Nine Millimeter refers

13  to?

14  A.  I guess the size of the bullet, I guess.

15  Q.  Did you know the difference -- did you know how to work a

16  semiautomatic pistol?

17  A.  Not really.

18  Q.  Did you ever shoot that gun?

19  A.  No, sir.

20  Q.  Did you ever load that gun?

21  A.  No, sir.

22  Q.  Okay.  The revolver that's up there, did you know anything

23  about revolvers?

24  A.  No, sir.

25  Q.  Do you know if that's the same revolver?

*Waters - Cross*

1   A.   Looks like it to me.

2   Q.   Okay.  Because it's blue steel, brown handle, has a

3   cylinder that turns.  Are those the things that make it look

4   the same?

5   A.   I guess that could be true.  Just looks like the gun. It

6   looks like the gun that was at the house.

7   Q.   Okay.  And you said it was in a regular -- the

8   Nine-Millimeter, you said it was in a regular gun box?

9   A.   Yes, this one here, the gray box.

10   Q.   How did you know what a regular gun box looked like?

11   A.   Well, I've had friends, you know, friends with guns.

12   Q.   Okay.  You'd seen friends' guns in gun boxes?

13   A.   Yes, sir.

14   Q.   All right.  In Christmastime of 1995, do I understand it

15   that David Waters was at your home with Patti?

16   A.   Yes, sir.

17   Q.   Did they seem to be getting along?

18   A.   Yes.

19   Q.   Did she seem to be fearful of him?

20   A.   No, sir.  She was there with her sister.

21   Q.   I understand.  But she was also with David, right?

22   A.   Yes, sir.

23   Q.   Did you get the impression that she was -- that they were,

24   like, boyfriend and girlfriend?

25   A.   Yes, sir.

*Waters - Cross*

1  Q.  Okay.  Did she seem to care for him like a girlfriend

2  would?

3  A.  Yeah, I guess so.

4  Q.  All right.  And it was on that occasion that your brother

5  took the barrel out of the gun?

6  A.  Yes, sir.

7  Q.  You don't know why he did that?

8  A.  No, sir.

9  Q.  Now, what do you know about a Tech 9 gun?

10  A.  No more than what I've seen on television.

11  Q.  Well, what have you seen on television about a Tech 9 gun?

12  A.  Just, you know, regular movies, cop movies, whatever.

13  Q.  Okay.  So at some point in time, you say that your brother

14  -- did your brother give you or mail you a Tech 9 gun?

15  A.  He came over that -- it was -- I believe it was in the

16  fall or something like that, and he brought -- it came with

17  him, I believe.

18  Q.  It came with him?

19  A.  Yes, I believe it did, because I was at work when he got

20  to Peoria, and when I got off, he had already been there.

21  Q.  And left?

22  A.  No.  He was still in town.

23  Q.  But was he at your house?

24  A.  Yes.

25  Q.  He was at your house?

*Waters - Cross*

1    A.   (Moving head up and down.)

2    Q.   And there was a Tech 9 gun there?

3    A.   Yes.

4    Q.   And he said -- did he say to you this is a Tech 9?

5    A.   No.

6    Q.   Okay.  Did he say, "Will you mail this gun to Gary Karr?"

7    A.   Eventually, he did.

8    Q.   Did he give you an address for Gary Karr?

9    A.   Yes, sir.

10   Q.   And so you mailed a gun to Gary Karr?

11   A.   Yes, sir.

12   Q.   Did you mail it in such a way that there was a receipt to

13   see if it was received by the person, like a green card?

14   A.   I don't think so.  I really don't remember how I mailed

15   it.  I was just glad to get rid of it.

16   Q.   Now, why was it exactly that you were mailing a gun for

17   your brother?

18   A.   He asked me to.

19   Q.   Okay.  Do I understand that Gary Karr was at your house in

20   the winter?

21   A.   Yes, sir.

22   Q.   And had his work van had a fire?

23   A.   Yes, sir.

24   Q.   While at your home?

25   A.   Yes, sir.

*Waters - Cross*

1   Q.  And isn't it true that he took some things out of his van

2   because there had been a fire in it and it had to be repaired?

3   A.  That's what I assumed, yes.

4   Q.  All right.  That is what you assumed, isn't it?  Okay.

5   And it was very cold?

6   A.  Yes, it was.

7   Q.  It was, in fact, icy and snowy?

8   A.  (Moving head up and down.)

9   Q.  Yes?

10  A.  Yes, sir.

11  Q.  All right, now, I never have lived in the north, but I

12  understand that sometimes people use salt to keep the ice and

13  snow from being as slippery?

14  A.  Yes, sir.

15  Q.  So when you saw a bag of salt, did you think that that was

16  very suspicious and might be related to criminal activity?

17  A.  No, no, sir.

18  Q.  Did you think it might be because people use rock salt to

19  keep from -- to add traction on snow and ice?

20  A.  Yes, sir.

21  Q.  So it seemed perfectly normal?

22  A.  Yes, sir.

23  Q.  Do you have a driveway to your home?

24  A.  Yes, sir.

25  Q.  Have you ever used a shovel to clear snow and ice?

*Waters - Cross*

1   A.  Yes, sir.

2   Q.  When you saw a shovel, did you think that it was connected

3   to digging a hole to bury somebody in, or did you think it was

4   connected to shoveling ice and snow?

5   A.  Well, first, I had no thought about it, but the bottom

6   line, he just wanted to get everything out of my house that

7   belonged to anybody, so I just turned it over.

8   Q.  When Mr. Karr left on that trip?

9   A.  Yes, sir.

10  Q.  How did he leave?

11  A.  I was at work when he left.  He was trying to get a rental

12  or something, I think.

13  Q.  Okay.  He couldn't drive away in his van, could he?

14  A.  No, sir.

15  Q.  So he basically unloaded things from his van and left them

16  at your house, didn't he?

17  A.  Yes, sir.

18  Q.  Okay.  You didn't get the impression that he had come

19  there to hide things at your house, did you?

20  A.  No, sir.

21  Q.  Okay.  He was just -- it was your impression that he just

22  wasn't going to take them away in his rent car, or bus, or

23  however he traveled, correct?

24  A.  Well, he took some tools, I believe, back with him.

25  Q.  Smaller tools?

*Waters - Cross*

1   A.   Just a tool box type stuff he brought in.  He had left

2   one.

3   Q.   Okay.  Was it in January 1999 that Gary Karr visited in

4   your home and you saw him and your brother watching TV?

5   A.   I believe so.

6   Q.   All right.  Well, the phone calls to Wald Lake, Michigan,

7   do you understand that that was where Mr. Karr was living?

8   A.   No, I didn't know.

9   Q.   Don't have any idea one way or the other?

10  A.   (Moves head side to side.)

11  Q.   Sir?

12  A.   I don't know where he lived, no.

13  Q.   All right.  Well, do you know anything -- were you told

14  anything about a call or two calls to Wald Lake, Michigan?

15  A.   Gary asked me if he could use my phone, and I said, "Sure,

16  go ahead."

17  Q.   Do you have reason to believe that these phone calls to

18  Michigan were Mr. Karr's calls?

19  A.   I don't know.  I guess so.

20  Q.   They were either Mr. Karr's calls or your brother's calls?

21  A.   Yeah, it would be one or the other.

22  Q.   All right.  You just don't have a clue as to what the

23  significance of those calls is, do you?

24  A.   Actually, I didn't.  I didn't even think about it.  I just

25  paid the bill and didn't even think about it.

1  Q.  Okay.  And as far as sitting around drinking, do you

2  recall that you had a beer or two, correct?

3  A.  Yes, sir.

4  Q.  You don't have any independent recollection whether Mr.

5  Karr was drinking alcohol or not, do you?

6  A.  No, I mean, I think he had a beer.  I'm not sure, but I'm

7  not -- I know I offered.

8  Q.  Now, how well did you know this person named Osborne?

9  A.  Not well.

10  Q.  You met him one time?

11  A.  Yeah, really met one time.

12  Q.  All right.  Have you see him more than one time?

13  A.  I have seen him around.  I lived in Peoria.

14  Q.  You lived in Peoria, your brother grew up in Peoria, and

15  somebody named Chico Osborne grew up in Peoria?

16  A.  I don't know if he grew up there.  He was around in the

17  bar scene.

18  Q.  All right.  Weren't you around in the bar scene to see him

19  in the bar scene?

20  A.  Oh, occasionally.

21  Q.  Okay.  Did you ever see him with David Waters?

22  A.  David became friends with Chico, but as far as running

23  around together, no, I don't think so.

24  Q.  Okay.  Now, do I understand that after the O'Hairs were

25  left or were missing that your brother talked about writing a

*Waters - Redirect*

1  book?

2  A.  Yes, sir.

3  Q.  Now, what did you keep?  Did you have specific knowledge

4  about the saga of the O'Hairs?

5  A.  No, no, not really, no, not at all.  No more than what,

6  you know, the newspapers were writing about.

7  Q.  Do you know when the O'Hairs were missing or left?

8  A.  No, not really.

9  Q.  Do you even know what year it was?

10  A.  '94, '95, I'm not sure.

11  Q.  Okay.  But your brother was actively working on a book?

12  A.  He was working on -- it was writing a book, yeah.

13  Q.  Okay.  Did you see the manuscript?

14  A.  I saw part of it, yeah.

15  Q.  I think that's all the questions I have.

16                    RE-DIRECT EXAMINATION

17  BY MR. CARRUTH:

18  Q.  Counsel asked you whether or not when they came to see you

19  in December of '95, Patti Jo Steffens was afraid of David

20  Waters.  Do you recall that testimony?

21  A.  Yes, sir.

22  Q.  When Mr. Karr came to visit Mr. David Waters in your home

23  in January of 1999, did he appear to be afraid of Mr. Waters,

24  your brother?

25  A.  No, sir.

*Waters - Redirect*

1   Q.   Would you look on the phone bill, please, sir, that's been

2   introduced into evidence, Government Exhibit W78-1, and tell

3   me dates of those two telephone calls from your phone to Wald

4   Lake, Michigan.

5   A.   The dates?

6   Q.   Yes, sir.  Please, on the immediate left-hand column.

7   A.   1-6.

8   Q.   1-6-99?

9   A.   Yes, sir.

10  Q.   And when was the other one on the back?

11  A.   Well, actually, this is not '99.  This was a copy.

12  Q.   Right, January '99 was the phone bill for January 16th,

13  '99, isn't it?

14  A.   Yeah, okay.  It's 1-6 and 1-8.

15  Q.   And 1-8.  And so that's two days apart, right?

16  A.   Yes, sir.

17  Q.   Does it have the time of the calls?

18  A.   1-6 is 23 minutes.

19  Q.   No.  The time of day that the call was made, that would be

20  in the column immediately to the right of the date.  Let's

21  start with the one on 1-6.

22  A.   Oh, okay.

23  Q.   When was it made?

24  A.   10:11 a.m.

25  Q.   10:11 a.m. for 23 minutes?

*Waters - Redirect*

1    A.  Yes, sir.

2    Q.  And how about the one on 1-8?  What time was that call

3    made, sir?

4    A.  11:31 a.m.

5    Q.  And it was for how long?

6    A.  One minute.

7    Q.  Okay.  Now, Mr. Karr, you said, only stayed at your home

8    one night, correct?

9    A.  Well, he got there -- well, he was there the night I got

10   home from work, and he was there probably all day waiting to

11   get a rental.

12   Q.  Okay.

13   A.  I don't know exactly.

14   Q.  So either way you cut it, if he was there the 6th, the

15   7th, or the 8th, and the 9th, or the 5th and the 6th, he

16   wasn't there long enough to make both those calls, was he?

17   A.  I wouldn't think so.

18   Q.  He may have made one of them, but someone else made the

19   other one, correct?

20   A.  I guess so, sir.

21   Q.  And you didn't make it?

22   A.  No, sir.

23   Q.  And who was the only other person in your home on that

24   time?

25   A.  David.

Waters - Recross

1   Q.  David Waters.  Now, counsel asked you about this shovel.

2   After Mr. Karr's van caught on fire, did you see him use a

3   cell phone to arrange for other transportation?

4   A.  Yes, sir.

5   Q.  And he took most of his tools with him?

6   A.  Yes, sir.

7   Q.  And you know that shovel will fit in the trunk of a car,

8   do you not?

9   A.  Yes, sir.

10  Q.  But Mr. Karr didn't take that shovel, did he?

11  A.  No, sir.

12  Q.  And he never came back to pick it up, did he?

13  A.  No, sir.

14  Q.  And you must have thought there was something suspicious

15  about that shovel or you wouldn't call the FBI?

16  A.  It eventually dawned -- I had totally forgotten about it

17  at first, and it just dawned on me he was a suspect in all

18  this, so I thought I'd better give it up.

19  Q.  Okay.  Thank you, sir.  Pass the witness.

20                    RECROSS-EXAMINATION

21  BY MR. T. MILLS:

22  Q.  I was under the impression that you were really interested

23  in turning over anything that was related to your brother, or

24  to Mr. Karr, or to Mr. Osborne, just have them taken by law

25  enforcement; is that correct?

1    A.  Well, yes, sir.

2    Q.  And even if the shovel was used to shovel ice, since it

3    had belonged to Mr. Karr, you were -- thought it would be best

4    to turn it over?

5    A.  Yes, sir.

6    Q.  All right.  Now, I'm interested in your memory abilities.

7    Do you -- how specific a recollection do you have of what

8    happened on what days in the month of January 1999?  That

9    would be about 16 months ago.  Do you remember the exact day

10   of the week that your brother arrived?

11   A.  Actually, no, sir.

12   Q.  Did your brother arrive separately from Gary Karr?

13   A.  Yes, sir.

14   Q.  Did they arrive on the same day, if you remember?

15   A.  I don't really recall.  I don't recall.

16   Q.  Your working hours were 3:00 p.m. to -- got home about

17   1:00 a.m?

18   A.  It varies, yeah.

19   Q.  Well, is that -- what --

20   A.  That was, yeah, that was average.

21   Q.  And then, you slept when you got home and relaxed a little

22   bit?

23   A.  Well, relaxed and go to bed, yes, sir.

24   Q.  All right.  Well, do you know specifically with certainty

25   the exact number of nights that Gary Karr spent in your home

1    in the recliner or elsewhere in January of 1999?

2    A.  He arrived at night and the next day, the van caught on

3    fire, and he was gone that night after that.

4    Q.  He got an automobile --

5    A.  I don't know what he got -- the rental.  I don't know what

6    he actually got.  I wasn't home when he got his rental.

7    Q.  Uh-huh.

8    A.  He was trying to get one before I went to work.  Then, I

9    went to work and he was gone when I got back, and that was

10   late at night.

11   Q.  All right.  That's all the questions I have.

12        MR. CARRUTH:  Nothing further, your Honor.  May the

13   witness be excused?

14        THE COURT:  Counsel?

15        MR. T. MILLS:  No objection.

16        THE COURT:  You may be excused, sir.

17        MR. CARRUTH:  United States calls Kerry Bruce Meyer,

18   your Honor.

19        THE COURT:  Stand right there, please, sir.

20      (Witness was sworn.)

21        THE COURT:  You need to walk around this column,

22   please, sir, and have a seat right up here on this witness

23   box.  If you'll tell us, please, sir, your full name and spell

24   your last name.

25        THE WITNESS:  Full name is Kerry Bruce Meyer.  Last

Meyer - Direct

1    name is spelled M-E-Y-E-R.

2         KERRY BRUCE MEYER, called by the Government, duly sworn.

3                        DIRECT EXAMINATION

4    BY MR. CARRUTH:

5    Q.  Mr. Meyer, please tell the ladies and gentlemen where you

6    live and how you're employed.

7    A.  I'm a Special Agent of the FBI, and I live and work in

8    Peoria, Illinois.

9    Q.  And do you know Mr. Ron Waters, the witness who just left

10   the courtroom ahead of you?

11   A.  Yes, I do.

12   Q.  When and under what circumstances did you first meet Mr.

13   Ron Waters?

14   A.  Our office received a lead out of the Austin FBI Office

15   March 26th, 1999, to locate and interview Ron Waters.  At that

16   time, myself and Agent Mike Marshalton, also from the Peoria

17   office, went to his residence and interviewed him, Ron Waters.

18   Q.  And during that interview, did Mr. Waters turn over any

19   property to you?

20   A.  Yes, he did.  He turned over two handguns:  One is a Dan

21   Wesson, .357 Magnum Revolver; one is a Browning

22   Nine-Millimeter Pistol.  He also turned over two handcuffs,

23   two sets of handcuffs, two switch blades, one case containing

24   17 eight-millimeter movie cassettes, another case containing

25   film negatives, another case -- or a box -- unopened box

Meyer - Direct

1    containing hundreds of pornographic pictures, and another

2    unopened box containing twelve photo albums.

3    Q.  And did you record the serial number of those firearms you

4    received from Mr. Waters on that occasion so that you could

5    identify it again?

6    A.  Yes, I did record them.

7    Q.  Would you please look at the guns that have been

8    identified before you there and read the tag on the gun or the

9    box, and tell us if you can identify those as being the same

10   firearms you received from Mr. Ronald Waters on the date in

11   question.

12   A.  Do you want me to read the serial number?

13   Q.  Yes, sir.

14   A.  The serial number of the Dan Wesson Revolver, 9 -- let me

15   see here, 34639.  And this is the handgun that was found under

16   the sheets of Ron Waters' bed.

17   Q.  Okay.  And that's Government Exhibit what?  What's the

18   yellow tag?  W7-something?

19   A.  9-6.

20   Q.  W79-6.  We'd offer W79-6 into evidence.

21        MR. T. MILLS:  That's the Nine-Millimeter?

22        MR. CARRUTH:  .357.

23        MR. T. MILLS:  Object on the grounds that it is not

24   connected to anybody else in this case.  William Murray said

25   that he could not identify it.  Object to relevance.

*Meyer - Direct*

1        THE COURT:  Objection is overruled.

2   Q.  (BY MR. CARRUTH) Would you look new at the Nine-Millimeter

3   Browning, sir?

4   A.  The second handgun we located in Ron Waters' house

5   underneath the sheets of his bed in his bedroom is a Browning

6   Nine-Millimeter handgun pistol, this one right here.  And the

7   serial number on it, 245NX78339.  This is the gun that was

8   recovered under the sheets of his bed.

9   Q.  And what -- did you notice anything unusual about that

10  weapon when you examined it?  Any parts missing?

11  A.  At the time we could not pull the slide back and remove it

12  because the barrel had been removed, and the spring and the

13  spring keeper were in there jamming up the gun.  This is how

14  we found it at the time.

15  Q.  But when you were later able to disassemble it, did you

16  determine any parts were missing?

17  A.  Barrel.  The barrel was missing, yes.

18  Q.  And what is the government yellow exhibit tag number for

19  that firearm, sir?

20  A.  W79-7.

21  Q.  At this time, the Government Offers W79-7, your Honor.

22        MR. T. MILLS:  I think that I objected earlier, but I

23  think that's already in evidence.

24        THE COURT:  It is in evidence and it's admitted.

25  Q.  (BY MR. CARRUTH) Now, let's talk about those two weapons.

*Meyer - Direct*

1  Could you tell which one is the newer of the two guns, and if

2  so, how do you know that?

3  A.  Without doing extensive background on the guns, I'd have

4  to say that the Browning is the newer gun.  It shows less

5  wear, hardly a scratch on it.  It looks fairly new.  The sites

6  are not worn where someone would be pulling it in and out of a

7  holster or shooting it a lot.  The magazine is -- does not

8  look like it's been dropped.  It's not worn at the bottom.

9  There's not even any wear around putting the magazine in.

10       Looks like a fairly new weapon that has not been shot

11  that often.

12  Q.  And it also has a gun, a case and an owner instruction

13  manual with it, does it not?

14  A.  Right.  Newer items that had come out.

15  Q.  And what about the .357 Magnum Revolver?

16  A.  .357 Magnum, the blueing has worn off the gun in several

17  places, particularly up here at the sites and at the front

18  site, meaning it was either in and out of a holster or banged

19  against something.  The wooden pistol grip shows sign of wear

20  and deterioration.  The finish is worn off, and it's smooth

21  around the edges in some places.

22       The parts itself, especially around the cylinder here,

23  shows sign of excessive wear.  Somebody had been shooting it.

24  Blueing, of course, is worn off there.  Just looks like an

25  older gun.  Knowing that Dan Wesson hasn't really made guns in

*Meyer - Direct*

1    a while.

2    Q.  Yes, sir.  And you also mention two pairs of handcuffs.

3    Do you see them in front of you, sir?

4    A.  Yes, I do.

5    Q.  Would you please hold them up one, at a time, and describe

6    them?

7    A.  The first pair of handcuffs is a hinged pair of handcuffs.

8    The thing being right in the middle, holes in the back to

9    unlock the handcuffs.  It's an older kind of style handcuffs

10   because the newer hinged handcuffs are a little bit more

11   secure than this one right here.

12   Q.  And did you receive that pair of handcuffs from Mr. Ron

13   Waters in Peoria?

14   A.  Ron Waters gave these to us.  They were at his house.

15   Q.  And do you have an exhibit tag number that you could read

16   to us, please, on the hinged handcuffs?

17   A.  The exhibit tag number is W79-2.

18   Q.  Offer Government's Exhibit W79-2.

19        MR. T. MILLS:  Objection to relevance.  No evidence

20   that it was used in the allegations in this case.

21        THE COURT:  That objection is overruled.

22   Q.  (BY MR. CARRUTH) How about the other pair of handcuffs,

23   sir, that have a link chain or chain link?

24   A.  This pair of handcuffs are the standard handcuffs most

25   people would have.  It has a link chain.  Again, they have the

*Meyer - Direct*

1    unlocking mechanism in each handcuff, the double locking hole

2    on the back.  Just a typical standard pair of handcuffs.

3    Q.  And what is the government exhibit tag number on that set

4    of handcuffs, sir?

5    A.  W79-3.

6    Q.  We'd offer Government's Exhibit W79-3.

7         MR. T. MILLS:  Objection to relevance.

8         THE COURT:  Objection is overruled.

9    Q.  (BY MR. CARRUTH) Now, you mentioned some switch blade

10   knives.  Do you see them before you, sir?

11   A.  Yes, I do.

12   Q.  And would you hold them up and identify them by the

13   exhibit number, please?

14   A.  Government's Exhibit number is W79-9.  There's two switch

15   blades, one, a black one and one, kind of purple in color, the

16   hand.  Both are working switch blades that lock out, and you

17   have to release them to get them folded back.

18   Q.  And are those weapons that you received from Mr. Ron

19   Waters on the occasion you've testified about?

20   A.  Yes, on March 26th, Ron Waters gave these two switch

21   blades to me.

22   Q.  We'd offer W79-9, your Honor.

23        MR. T. MILLS:  Objection to relevance.

24        THE COURT:  I'll have counsel up here.

25        (At the Bench, on the record.)

*Meyer - Direct*

1      THE COURT:  We have the guns being handed over without

2   objection.  They have been displayed in front of the jury.

3   And now objection as to the admissibility of the switch blades

4   themselves, which have been discussed without objection.  What

5   is the relevance of the knives?

6      MR. CARRUTH:  We will present evidence today from one

7   of the inmates as soon as Mr. Karr admitted that he assisted

8   Mr. Waters and Mr. Fry in cutting up the bodies of the O'Hairs

9   in that storage unit and placing the body parts in 55-gallon

10   drums.  So we're seeking to offer any cutting instruments.  We

11   have the bow saw, we have the switch blades, and we have other

12   knives that were found during the search of Mr. Waters'

13   residence.

14      These were items that he was trying to get out of his

15   house just like --

16      THE COURT:  I can't imagine anybody cutting up a body

17   with a switch blade knife unless they had months to go about

18   it and was very patient and crazy.

19      MR. CARRUTH:  Well, your Honor, I've never cut up any

20   bodies other than deer carcasses, but they do have for cutting

21   and things like that they could be using.  Those knives are

22   very sharp, and that's why we sealed them in plastic.

23      THE COURT:  I've cut up 35 deer, and I don't believe

24   anybody ever tried to cut up bones.

25      MR. CARRUTH:  You could also stab somebody to death

*Meyer – Direct*

1  with them, your Honor.

2      THE COURT:  That's true.  Do you have any evidence of

3  any stabbing?

4      MR. CARRUTH:  Well, cutting.  There's going to be

5  cutting, dismembering.

6      THE COURT:  Well, it's all in front of the jury now.

7  To sustain the objection, I don't know, probably more

8  detrimental to the defendant than letting it go.  And you're

9  going to ask 79-1 for the bullets, also?  Are you going to

10  object to relevance there?

11      MR. T. MILLS:  Yes, sir.

12      THE COURT:  Sustain the objection on the knives and

13  the bullets.

14      MR. CARRUTH:  Thank you.

15      THE COURT:  You may proceed.

16      MR. CARRUTH:  May I approach the bench?  Is the Court

17  going to announce the ruling so the jury will know why it's

18  not in evidence?

19      THE COURT:  Just go on about your business.

20      MR. CARRUTH:  If they deliberate and ask where the

21  switch blades are?  I think we ought to rule, I would think.

22      THE COURT:  That's true.  Members of the jury, I'm

23  sustaining the objection to W79-4 and W79-1, which are the

24  switch blade knives and the bullets.  They have no relevance

25  to any issue that you're going to be deciding.  You may

*Meyer - Direct*

1   proceed.

2           MR. CARRUTH:  Thank you, your Honor.

3   Q.  (BY MR. CARRUTH) Agent Meyer, after you left Mr. Waters'

4   home on March -- is that 24th of last year?

5   A.  It was March 26th.

6   Q.  March 22nd?

7   A.  26th.

8   Q.  Did you have an occasion to return to pick up any

9   additional property?

10  A.  Yes, I did.  On June 11, Ron Waters called me and said he

11  suddenly remembered that there's a shovel in his garage that

12  came from a car or a van that had burned up at his residence

13  that belonged to Gary Karr.  He said it may be something that

14  we needed for the case.

15          I then went out to his residence, on June 14th, to

16  pick up the shovel.  At that time, he also gave me a black

17  plastic tool kit that contained a 112-piece drill bit set that

18  was drill bits, screws, screwdriver, Phillips and regular

19  attachments for a drill, and a phone bill from December 8th

20  until January 7th that Agent Martin had requested.

21  Q.  Okay. And would you take a look, sir, at that shovel

22  handle there, right to your left, and tell me if you recognize

23  the exhibit tag on there?  Can you identify that as being one

24  in the same shovel you testified about?

25  A.  Yes, the exhibit tag is W79-8.

Meyer - Cross

1    Q.  Okay.

2    A.  And this is the shovel that I -- Ron Waters gave me on

3    June 14th, 1999.

4    Q.  We'd offer W79-8, your Honor.

5         MR. T. MILLS:  I don't have any objection to its

6    admissibility.

7         THE COURT:  It's received.

8         MR. CARRUTH:  Thank you, your Honor.  Pass the

9    witness.

10                   CROSS-EXAMINATION

11   BY MR. T. MILLS:

12   Q.  Just a couple of questions, Mr. Meyer.  The shovel, did

13   you take it into your possession?

14   A.  Yes, I did.

15   Q.  Did you find out from any other FBI agents whether or not

16   there had been any soil samples taken from Camp Wood, Texas?

17   A.  I did not ask anybody of that.

18   Q.  Did you, yourself, conduct any kind of soil analysis in

19   Illinois at the FBI lab or elsewhere at an FBI lab?

20   A.  No, I didn't.

21   Q.  Were the guns or the handcuffs kept in such a way that

22   there could be a determination about whose fingerprints were

23   on them?

24   A.  The guns were lying just under some sheets.  Unless he put

25   rubber gloves on, Ron Waters would have had to touch them.  He

Meyer - Cross

1  also stated that he had shown a couple of friends of his the

2  Browning Nine-Millimeter.  So I'm sure in the course of

3  showing them, he -- other people touched them.

4          The handcuffs themselves were wrapped in tissue paper.

5  It was rubber bands around them individually.  I don't know

6  what else to say about that, but that's how they were wrapped.

7  Q.  Did you cause there to be a fingerprint analysis to be

8  done on either of the pairs of handcuffs?

9  A.  No, I did not request any analysis on anything.  I sent

10  the evidence directly down here to Austin.

11  Q.  All right.  What exactly can you explain what you mean

12  when you say that you located the guns under the sheets of his

13  bed?

14  A.  Myself and Agent Norris Ben were interviewing Ron Waters

15  at his house.  He was sitting in his recliner.  He just had a

16  hernia operation, and he wasn't getting up.  And we were

17  talking to him for a little while and asked about the guns,

18  about Gerald Osborne, Gary Karr, some other things finally --

19  and the guns and the gold coins and such.

20          Finally, he just said, all right, they're in there

21  under my bed, under the sheets in my bedroom.  Agent Marshall

22  and I then got up, lifted up the sheet on his bed and there

23  they were.

24  Q.  All right.  What did Mr. Waters say to you and the other

25  agent about his knowledge of any gold coins?

*Ingalls - Direct*

1   A.  Ron Waters stated he had no knowledge of any gold coins or

2   money, only what he had heard on the television show,

3   America's Most Wanted.

4   Q.  That's all the questions I have.

5          MR. CARRUTH:  Nothing further, your Honor.  May the

6   witness be excused?

7          MR. T. MILLS:  Yes, sir.

8          THE COURT:  You may be excused, sir.  You may call

9   your next witness.

10          MR. CARRUTH:  Government calls Ron Ingalls, your

11   Honor.

12      (Witness was sworn.)

13          THE COURT:  You need to walk around this column,

14   please, sir, and have a seat up here in the witness box.  If

15   you'll tell us your full name, please, sir, and spell your

16   last name.

17          THE WITNESS:  My name is Ronald Edward Ingalls.

18   That's I-N-G-A-L-L-S.

19    RONALD E. INGALLS, called by the Government, duly sworn.

20                      DIRECT EXAMINATION

21   BY MR. CARRUTH:

22   Q.  Mr. Ingalls, would you please identify yourself for the

23   members of the jury by occupation and profession and tell them

24   where you reside?

25   A.  I am a bankruptcy trustee.  I'm also an attorney.  I live

*Ingalls - Direct*

1   here in Austin and work here in Austin.

2   Q.  And do you have any connection to Madalyn Murray O'Hair,

3   Jon Garth Murray, or Robin Murray O'Hair in connection with

4   your official capacity as a bankruptcy trustee?

5   A.  Yes.  I was appointed as the bankruptcy trustee for the

6   Madalyn Murray O'Hair bankruptcy case.

7   Q.  And what are your duties and responsibilities as a

8   bankruptcy trustee, sir, particularly as it relates to the

9   case of the O'Hairs?

10  A.  My duties are to collect any assets that belonged to the

11  person filing bankruptcy.  Those assets which are not exempt,

12  I'm directed to liquidate those or sell them for the benefit

13  of the creditors of the person who filed bankruptcy.

14  Q.  Now, have you ever personally met Madalyn Murray O'Hair?

15  A.  No, I've not.

16  Q.  Have you ever personally met Jon Garth Murray?

17  A.  No, I have not.

18  Q.  Have you ever personally met Robin Murray O'Hair?

19  A.  No, I have not.

20  Q.  So then, we can assume that none of these three

21  individuals requested you to file a bankruptcy proceeding on

22  their behalf; is that correct?

23  A.  That's correct.

24  Q.  Can you tell the members of the jury how you came to be

25  appointed bankruptcy trustee in this case if the O'Hairs did

*Ingalls - Direct*

1  not request that you file bankruptcy?

2  A.  I am appointed by the United States Trustee.  I have a

3  one-year appointment, which has been renewed now three times.

4  And every time a Chapter 7 bankruptcy case gets filed --

5  there's four of us, and we're selected at random, and so I was

6  assigned to the Madalyn O'Hair case just as a random selection

7  when her bankruptcy case was filed.

8  Q.  Can you tell us, if you know, sir, who it was that filed

9  or requested the filing of the federal bankruptcy proceeding

10  before the United States Bankruptcy Court?

11  A.  Yes.  Her case was filed by --

12  Q.  Excuse me, by her, we have two hers here.

13  A.  Excuse me.  Madalyn O'Hair.  Madalyn O'Hair's bankruptcy

14  case was filed by Eric Tucker, who had the capacity of

15  receiver appointed by the Probate Court of Travis County,

16  Texas.

17  Q.  And is Mr. Eric Tucker also an attorney to your knowledge?

18  A.  I believe he is, yes.

19  Q.  And he requested or he filed the bankruptcy proceedings?

20  A.  That's correct, sir.

21  Q.  Okay.  Mr. Ingalls, I'm showing you what's been marked for

22  identification as Government's Exhibit W58-5.  Do you

23  recognize these documents, sir?  Well, first, before we talk

24  about them, do you recognize these are documents under seal of

25  the United States Bankruptcy Court for the Western District of

*Ingalls - Direct*

1  Texas, are they not?

2  A.  Yes, that's correct, in the matter of Madalyn E. Murray

3  O'Hair, bankruptcy case No. 97-11061, that's correct.

4  Q.  And this is Larry Kelly, the bankruptcy judge who signed

5  this, correct?

6  A.  Yes.

7  Q.  And also, the clerk of the bankruptcy court.

8  A.  That's correct.

9  Q.  And this is the proceeding that you were appointed to

10  represent Ms. O'Hair in?

11  A.  That's right.

12  Q.  We would offer Government's Exhibit W58-5, your Honor.

13       MS. WILLIAMS:  No objection.

14       THE COURT:  Received.

15  Q.  (BY MR. CARRUTH) Now that those exhibits are in evidence,

16  or that exhibit, would you look through those documents, sir,

17  and let's talk a little bit about it after you've had a chance

18  to review them.

19  A.  Yeah, all right, sir.

20  Q.  Are you familiar with those documents?

21  A.  Yes, I am.

22  Q.  And tell us what your role in that proceeding has been,

23  starting with when you were appointed by the bankruptcy

24  trustee -- or bankruptcy court, excuse me.

25  A.  When I'm appointed, the first thing that occurs is the

*Ingalls - Direct*

1    debtor, or the person filing bankruptcy's required to file

2    paperwork we call the schedules, list of assets and

3    liabilities.  I review those and, roughly, 30 to 40 days after

4    the case is filed, we go to what's called a meeting of

5    creditors.

6    Q.  When was the case filed, sir?

7    A.  Looks like March 21st of 1997.

8    Q.  And can you tell us, if you know, why the bankruptcy

9    proceeding was filed only in the name of Madalyn Murray O'Hair

10   and not her son or daughter, who were also missing?

11   A.  Under the Bankruptcy Code, each bankruptcy case has to be

12   filed separately unless it's husband and wife, and husband and

13   wife can file a joint case.

14   Q.  And to your knowledge, has there been a bankruptcy

15   proceeding filed on behalf of Jon Garth Murray or Robin Murray

16   O'Hair?

17   A.  Yes, bankruptcy cases were filed on behalf of both of

18   them.

19   Q.  And can you tell us, if you know, who were the trustees

20   appointed in their cases?

21   A.  Those cases were both filed under Chapter 11.  And under

22   Chapter 11, there is no trustee appointed unless it's a -- for

23   cause shown.  The normal Chapter 11 proceeding is the person

24   filing bankruptcy acts essentially as their own trustee as

25   debtor in possession.

*Ingalls - Direct*

1  Q.  And yet, you just stated that neither of these individuals

2  were here to file this for themselves, were they?

3  A.  That's correct.

4  Q.  So who filed these proceedings, if you know, on behalf of

5  the O'Hair children?

6  A.  It was the appointed state court receivers whose names

7  escape me.

8  Q.  Other attorneys or other receivers?

9  A.  Right, other receivers appointed by the probate court.

10  Q.  And can you state briefly for the record and for

11  explanation of the jury the difference between the two types

12  of bankruptcy you described, Chapter 7 and Chapter 11

13  bankruptcies?

14  A.  The Chapter 7, which was filed for Madalyn O'Hair, there's

15  no attempt to organize.  It's strictly a liquidation which the

16  trustee's duties is liquidate any non-exempt assets for the

17  benefit of the creditors.  The Chapter 11 is the

18  reorganization where the person filing bankruptcy is required

19  to produce a claim of organization for approval by the

20  creditors and the courts for payment in the future of the

21  debts that are owed.

22  Q.  And can you tell us, if you know, what outstanding debts

23  you located on behalf of Mrs. Madalyn Murray O'Hair?

24  A.  Well, the schedules showed a number of credit cards and

25  medical bills that each creditor's required to file what's

*Ingalls - Direct*

1   called a proof of claim at the bankruptcy court.  In the

2   Madalyn O'Hair case, there was only three proofs of claims

3   filed:  One was by the IRS, one was by the guardian ad litem

4   in the probate court, and the third was by the attorney ad

5   litem in the probate court.

6   Q.  And can you state whether or not, if you know, the

7   Internal Revenue Service, at some point in time, seized the

8   Greystone residence of Madalyn Murray O'Hair?

9   A.  I believe that occurred prior to the bankruptcy filing.

10  Q.  Okay.  So that was not involved in the bankruptcy

11  proceeding, correct?

12  A.  Only to the extent there was an adversary proceeding, a

13  lawsuit in the bankruptcy court that was filed by, I believe,

14  Robin O'Hair's receiver for declaratory judgment as to who was

15  the rightful owners of that residence.

16  Q.  Is this bankruptcy proceeding still pending or has it been

17  resolved?

18  A.  The Madalyn O'Hair case has been resolved and closed.

19  Q.  And how did you effect a resolution; that is, what assets

20  did you turn over, if any, or how did you satisfy any

21  outstanding debts or liabilities that Ms. O'Hair may have had

22  at the time of her disappearance in 1995?

23  A.  The first asset that we discovered was a bank account at

24  Frost Bank.  There was an agreement approved by the bankruptcy

25  court that divided that money between the Madalyn O'Hair

*Ingalls - Direct*

1  estate and the Jon Garth Murray Chapter 11 estate.

2  Q.  Now, can you tell us if you know the source of the funds

3  in that account in the Frost National Bank?

4  A.  I don't know other than they existed on the dates of the

5  bankruptcy filings.

6  Q.  Would there be anything in your records that would enable

7  you to tell us that?

8  A.  No.

9  Q.  Would you be able to tell us whether or not that account

10  had been accessed since the fall of 1995, when the O'Hairs

11  disappeared?

12  A.  Not that I recall.

13  Q.  Can you tell us approximately how much in funds was on

14  deposit in that account when it was seized?

15  A.  It was about $25,000.

16  Q.  Okay. And that was a joint account for the three O'Hairs,

17  to your knowledge?

18  A.  Yes.

19  Q.  And you say that money was divided how again?  How was it

20  on that?

21  A.  Just between the Jon Murray estate and the Madalyn O'Hair

22  estate.

23  Q.  Well, if it was a joint account listing all three of the

24  O'Hairs, why was the Robin O'Hair estate left out, if you

25  know?

*Ingalls - Direct*

1   A.  Well, the receiver for Jon Murray was the one who actually

2   obtained the turnover from Frost Bank.  And I intervened in

3   that, saying that that money -- at least some of it be

4   Madalyn's, and it was an agreement between Jon Murray's

5   receiver and me that resulted in the money being split as a

6   bankruptcy trustee.  Anything I do is always subject to

7   bankruptcy court approval.

8           And so after we had the agreement on the division, we

9   had to file that with notice Robin O'Hair's receiver along

10  with all the other creditors.

11  Q.  And when you noticed Robin O'Hair's receiver in this case,

12  did that receiver respond or attempt to assert a claim to any

13  of the funds on deposit in that joint account?

14  A.  No.

15  Q.  Okay.  In addition to the account of -- what did you say,

16  about $25,000?

17  A.  Yes, sir.

18  Q.  In the Frost National Bank, what other assets, if any, of

19  Madalyn O'Hair's did you locate?

20  A.  I obtained a set of diaries, some miscellaneous things

21  including old credit cards, and three boxes of photographs,

22  snapshots.

23  Q.  Okay.  And what disposition, if any, did you make of this

24  property?

25  A.  I sold all of those things as one lot.  We filed a motion

*Ingalls - Direct*

1  to obtain a hearing in the bankruptcy court.  There was a --

2  an auction held by me actually out in the hallway.  There was

3  I believe, three interested bidders, and at the conclusion, we

4  went back in, reported to the Court who the highest bidder

5  was, what the amount was.  It was an order confirming that

6  auction sale.

7  Q.  And how much did you realize through the auction of the

8  diaries of Madalyn Murray O'Hair?

9  A.  $12,000.

10  Q.  And what about the other property including the

11  photographs did you described?

12  A.  That was all part of one sale.

13  Q.  So $12,000 for the whole thing?

14  A.  That's right.

15  Q.  Okay.  So you have 25,000 in the bank account, you've sold

16  the diaries and photographs for 12,000.  So that brings you up

17  to about 37,000, correct?

18  A.  Yes.

19  Q.  Any other assets?

20  A.  No, sir.

21  Q.  What happened to the home they had on Greystone?

22  A.  The adversary proceeding that I mentioned earlier brought

23  by Robin O'Hair's receiver, that was resolved, again, through

24  a compromise in settlement.  The legal title of that was in

25  Jon Murray and Robin Murray and not Madalyn Murray O'Hair.

*Ingalls - Direct*

1  And so the compromise recognized that the recorded deeds

2  controlled and that Madalyn O'Hair had no ownership interest

3  in the house on Greystone.

4  Q.  Even though that was the home where she had lived prior to

5  her disappearance, correct?

6  A.  That's correct.

7  Q.  Her children actually held title to that piece of real

8  property?

9  A.  That's correct.

10  Q.  Okay.  Any other assets?

11  A.  There was -- prior to the bankruptcy filings, the IRS had

12  seized the contents of that home while the bankruptcy case was

13  pending.  There was an auction by the IRS of those items, but

14  all of those funds went to the IRS.

15  Q.  Did you ever attempt to locate any gold coins or jewelry

16  that may have belonged to the O'Hairs?

17  A.  I had heard rumors of -- that there could have been those

18  things, but I never found any witness to actually tell me if

19  they actually existed.

20  Q.  What about Rolex watches?

21  A.  No.

22  Q.  Did you determine or make any effort to determine whether

23  or not they had this type of personal property in their

24  possession prior to their disappearance in 1995?

25  A.  No, I did not.

*Ingalls - Direct*

1   Q.  Now, you earlier mentioned photographs.  Did you provide

2   certain photographs to Criminal Investigator Ed Martin here of

3   the Internal Revenue Service?

4   A.  Yes, I did.

5   Q.  May I show you, sir, what's been marked for identification

6   as W58-1.  Do you recognize that photograph as being one that

7   you provided to Agent Martin?

8   A.  Yes, I did.

9   Q.  And who is depicted in that photograph?

10  A.  That's Jon Murray.

11  Q.  We'd offer W58-1.

12        MS. WILLIAMS:  No objection.

13        THE COURT:  It's received.

14  Q.  (BY MR. CARRUTH) Would you please hold that up so the jury

15  may see it?  And where did you obtain that photograph, sir?

16  A.  This was one of the photographs in the three boxes of

17  photographs that I had obtained.

18  Q.  How about W80 -- excuse me, W58-2?  Do you recognize that

19  as one of the photographs that you provided Agent Martin?

20  A.  Yes, I did.

21  Q.  And who is depicted in that photograph?

22  A.  It's Madalyn O'Hair.

23  Q.  We would offer Government Exhibit W58-2, your Honor.

24        MS. WILLIAMS:  No objection.

25        THE COURT:  Received.

*Ingalls - Direct*

1    Q.   (BY MR. CARRUTH) Does that photograph appear to indicate

2    Mrs. O'Hair using any type of medical or health device or

3    aide?

4    A.   Yes, there's a walker cane.

5    Q.   And would you display that to the jury, please?  And I

6    believe it has a date down here at the bottom that photograph

7    was taken, does it not?

8    A.   Yes, it says 89-9-6.

9    Q.   All right, sir.  And how about Government Exhibit W58-3?

10   Do you recognize that photograph as one you provided to Agent

11   Martin?

12   A.   Yes, I do.

13   Q.   And who is depicted in that photograph?

14   A.   That's Madalyn O'Hair and Robin Murray O'Hair.

15   Q.   We'd offer Government Exhibit 58-3.

16          MS. WILLIAMS:  No objection.

17          THE COURT:  Received.

18   Q.   (BY MR. CARRUTH) Would you please display that for the

19   jury?  And finally, we have a photograph marked W58-4.  Do you

20   recognize that as one of the photographs that you provided to

21   Agent Martin?

22   A.   Yes, I do.

23   Q.   And who is depicted in that photograph?

24   A.   It's Robin Murray O'Hair and Jon Garth Murray.

25   Q.   We would offer Government Exhibit W58-4.

*Ingalls - Direct*

1      MS. WILLIAMS:  No objection.

2      THE COURT:  Received.

3  Q.  (BY MR. CARRUTH) Would you please display that photograph

4  for the jury?  Does it, likewise, have a date stamp on it?

5  A.  Yes, it does.  It's 89-9-20.

6  Q.  Thank you, sir.  Did you determine whether or not Mrs.

7  O'Hair had any creditors that needed to be paid?  Or did you

8  dispose of this approximately $37,000 in assets that you

9  located?

10  A.  Well, I filed what's called a final report before

11  distribution, which sets out what administrative expenses

12  there has been and how the money's to be divided among the

13  creditors.  There's a notice sent to all the creditors, the

14  credit card companies, IRS and everybody involved of that

15  report.  They have 30 days to register any objections to that

16  report.

17      If there's no objections, then the money will be

18  distributed as the report --

19  Q.  Can you tell us from reviewing the records that have been

20  placed in evidence how those funds were distributed, if they

21  were?

22  A.  Yes.  My commission as a trustee was $3,104.54.  My

23  expenses were $636.49.  The attorney's fees for my firm,

24  Alvis, Carssow & Ingalls, were $2,695.  Our expenses for the

25  firm were $6.40.  The accountant, John Mosley, received $315.

*Ingalls - Direct*

1  His expenses were $28.40.  There is a bond, a trustee's bond

2  payment of $5.13.  We paid $304 to the Internal Revenue

3  Service for income taxes of the bankruptcy estate.

4          There were phone bills of $205.41.  And the remainder

5  of the money was paid to the Internal Revenue Service on their

6  claim.

7  Q.  And can you give me a total amount of how much was paid to

8  the Internal Revenue Service?

9  A.  $16,245.

10 Q.  And how much were the expenses of the administration

11 bankruptcy proceeding?  By that, I mean the attorneys, and the

12 CPAs, and the trustee, and the receivers, and so forth.

13         THE COURT:  He's just stated --

14         MR. CARRUTH:  I want him to total it up.

15 Q.  (BY MR. CARRUTH) Give me a total figure, sir.  Can you

16 give me a total figure or is it totalled up there?

17 A.  It's not totalled up there.

18 Q.  Is it more or less than $16,000?

19 A.  Oh, much less.  It's roughly 6, 7,000.

20 Q.  Okay.  Pass the witness.

21         THE COURT:  Members of the jury, I'm going to give you

22 your morning break.  You're not confined to the building, but

23 please remember the instructions.  Be ready to come back in 15

24 minutes.

25     (Recess.)

1    MS. WILLIAMS:  Before the jury comes back in, I

2  anticipate that the next witness of the government -- the

3  government intends to try to introduce some photographs of the

4  body of Danny Fry, and I have some objections to those that

5  I'd like to make outside the presence of the jury.  I don't

6  know if this is -- I only have a couple of questions for this

7  witness.

8    THE COURT:  All right.

9    MS. WILLIAMS:  I don't know what the best way to

10  handle that is.

11    THE COURT:  Mr. Ingalls, let me get you to check out

12  in the hall here.  Don't run far.  Who is the next witness for

13  the record?

14    MR. CARRUTH:  It will be the Dallas detective, Mr.

15  Bjorklund.

16    THE COURT:  All right.

17    MR. CARRUTH:  After we get through with Mr. Ingalls.

18    THE COURT:  All right.

19    MR. CARRUTH:  We intend to offer through the testimony

20  of the next witness, your Honor, three photographs of the

21  deceased body of Danny Fry.

22    THE COURT:  For the record, these are --

23    MR. CARRUTH:  W64-2, 3 and 4, your Honor.

24    THE COURT:  All right.

25    MS. WILLIAMS:  Judge, my first objection to those

1    photographs is that they're not relevant to this case.

2    There's nothing in the indictment about Danny Fry.  Certainly

3    nothing in the indictment about the death of Danny Fry.  They

4    are also, as you've seen, extremely gruesome pictures.

5         My second objection is that if the Court determines

6    that they're relevant that they are so prejudicial as to

7    inflame the jury and prejudice my client.

8         MR. CARRUTH:  Your Honor, one of the counts in the

9    indictment specifies that the offense resulted in the death of

10   another.  It certainly resulted in the death of Danny Fry, who

11   was a coconspirator.

12        THE COURT:  It certainly did.

13        MR. CARRUTH:  Yes, sir, it did result in his death and

14   manner in which he met his death is under the government's

15   theory the same thing that happened to the O'Hairs, as will be

16   established by a witness later today.  If you would like to

17   hear from that witness first before considering these

18   photographs, we can do so, but we believe they're quite

19   relevant.

20        We also intend to offer evidence of Danny Fry's letter

21   to his brother, which turned out to be exactly true.  That's

22   what happened to him.  And we filed a trial brief on that

23   that, Mr. Mills, we can address later.  But at this point, we

24   believe they're very relevant.

25        MR. D. MILLS:  Your Honor, may I say one thing, too,

1  please?

2          THE COURT:  Sure.

3          MR. D. MILLS:  I'd like to cite the Court the case

4  United States vs. Hall, Fifth Circuit case, 152 Fed 3d, 381,

5  at page 401, and it's talking about photographs and whether

6  gruesomeness is a reason to keep them out.  And it also has

7  this case that the cause of death is relevant in this

8  particular case.

9          And I'm citing the Court we think the cause of death

10  here is very relevant, too, because as you've seen, the torso

11  has had the head cut off of it and the fingers cut off of it,

12  which is consistent with the theories, the government's theory

13  that the bodies of the O'Hairs were dismembered and cut up in

14  pieces.

15          And I will hand the Court the page if you'd like to

16  read the headnotes and citation about --

17          THE COURT:  That's all right.  I'm familiar with --

18          MR. D. MILLS:  That this is not a particularly

19  gruesome photograph, and we think it's relevant to show

20  similar mode of operation.

21          THE COURT:  The witness who you intend to put on, I'm

22  sorry, the name is --

23          MR. D. MILLS:  Bjorklund, I believe.

24          THE COURT:  Did he observe the body?

25          MR. CARRUTH:  Yes, sir, he responded to the scene.  He

1   was a homicide detective.

2         THE COURT:  What is -- there are not going to be any

3   objections, or if there are objections, they will be overruled

4   with regard to his description of the body as he sees it.

5   What does the pictures do but add gruesome, more detail down

6   to the point of getting down to zero point to me?

7         MR. CARRUTH:  Your Honor, this is a circumstantial

8   evidence case.  In a circumstantial evidence case, the

9   government should be permitted to produce all circumstantial

10  evidence and we expect to show --

11        THE COURT:  You're missing the point.  The officer can

12  testify that he found the body, that the body was identified.

13  That the body was headless, that his arms had been cut off.

14  He can describe the body.  What do the pictures do for that

15  testimony?

16        MR. CARRUTH:  Well, Judge, it's just like the pictures

17  in any way.  I've tried many murder cases, and photographs of

18  the deceased are always relevant.

19        MR. D. MILLS:  May I read from this opinion, your

20  Honor, maybe to address your issue?

21        THE COURT:  Sure.

22        MR. D. MILLS:  Court says Federal Rules of Evidence

23  401, advisory committee notes the reason a criminal defendant

24  cannot typically avoid the introduction of a particular

25  element of the offense by stipulation is that the government

```
 1    must be given the opportunity, quote, to present to the jury a
 2    picture of the events relied upon to substitute for such a
 3    picture, a naked admission might have the effect to rob the
 4    evidence of much of its fair and legitimate weight.  And it
 5    cites several other cases.
 6         And that's what we think this does, your Honor, is
 7    that it depicts how they went about doing this.  It also, like
 8    I said, it's consistent with the government's theory that they
 9    cut up the O'Hairs and disposed of the bodies.  And I think
10    it's relevant to see the picture for that reason because this
11    says to stipulate is to rob the jury of the benefit of the
12    utility of the photograph.
13         Just by -- they could say we stipulate Danny Fry was,
14    you know, cut up and his head was cut off and his fingers were
15    cut off.  That's what that quotation addresses that the
16    Circuit opinion wrote.  And I think it's the same with what
17    the Court is asking right now.
18         THE COURT:  Well, in this particular case,
19    notwithstanding the general description within the indictment,
20    the indictment charges Mr. Karr with conspiracy to kidnap and
21    harm the O'Hairs.
22         MR. CARRUTH:  And that the offense resulted in the
23    death of another unnamed person.
24         MR. D. MILLS:  And I could get -- I have some case law
25    -- didn't know this issue was going to come up -- on my desk
```

1  in some death penalty cases that are out of the Fifth Circuit,

2  your Honor, where they talk about the killing of a

3  coconspirator is a foreseeable type thing when one is in a

4  conspiracy.

5      And that is not -- that is not outside the scope of a

6  conspiracy that a coconspirator might be killed for the very

7  purpose of silencing that coconspirator, your Honor, and

8  that's exactly what the government's theory is here.  That Mr.

9  Fry was killed because they were afraid he would talk.  And I

10  can get those cases and show them to the Court.  I don't have

11  them with me right now, but they're on my desk.

12      That that is an objective that's clearly foreseeable

13  in a conspiracy.  It's a Fifth Circuit case, your Honor.

14      MR. T. MILLS:  But the government would have that

15  evidence from Mr. Bjorklund that he was found and they can

16  argue that he was a coconspirator.  The only thing that's

17  shown in those pictures would just be a gasp and shock value

18  because they're beyond just a body with a bullet hole with

19  some blood on the shirt that's the typical murder scene, I

20  believe.

21      Only thing it would add is the gruesome effect and

22  hoping that that produced horror in the jurors, which I'm sure

23  it would.

24      MR. D. MILLS:  I'll just read from -- I mean, this

25  case, again, says just because it's gruesome is not a reason

1    to exclude.

2            THE COURT:  Well, I understand that.  Sometimes you

3    just have to make a decision as to the probative value with

4    regard to prejudice.  And in this particular case, Mr. Fry was

5    certainly not a big player even though -- does the government

6    contend that one of the necessary elements of any criminal

7    charge is that the jury find beyond any reasonable doubt that

8    Fry was killed by the conspirators?

9            MR. CARRUTH:  They have to find that someone was

10    killed.  That the crime resulted in the death of another.  And

11    we're telling the Court that that other can be one of the

12    coconspirators just like if I go in to rob a bank and exchange

13    gunfire with the bank guard and an innocent bystander's

14    killed, I can still be tagged for murder even if the security

15    guard shoots the innocent bystander.

16            MR. D. MILLS:  May I read to the Court a description

17    of the photograph that was offered during the course that I'm

18    citing, your Honor?

19            THE COURT:  Well, it's all going to be whether it's an

20    abuse of discretion one way or the other.  I'm familiar with

21    that.  I get them on every -- you know, got one next week, boy

22    got run over with a riding mower.  I've had lots worse than --

23    lots worse pictures than these, and I've seen lots less

24    gruesome pictures than these that have been excluded.

25            MR. CARRUTH:  But I believe that's in a civil case.

1    And if we try to get the jury to award more money to the

2    victim here, we're trying to show the manner and means by

3    which we believe the crime was committed not only against Mr.

4    Fry, but also against the O'Hairs.  In fact, Mr. -- in Mr.

5    Karr's confession, he said that Danny Fry is with the O'Hairs.

6            MR. D. MILLS:  In Count 3, this is the phrase --

7            THE COURT:  I want to read it.  Katherine, give me

8    my --

9            MR. D. MILLS:  It's in Count 3.

10           MR. CARRUTH:  And, your Honor, as we've stated in our

11   requested jury instructions, we believe in light of Jones vs.

12   The United States car jacking case, the Supreme Court decided

13   recently that even though that's normally a punishment issue,

14   it must be submitted as an element to the jury because it

15   would provide an increased punishment in this case.

16           MR. T. MILLS:  Well, that phrase in Count 3 says

17   robbery and kidnapping resulting in the death of Danny Fry.

18   You're taking this toward a stretch.

19           MR. CARRUTH:  He participated in that offense and it

20   resulted in his death.

21           MR. T. MILLS:  Well, that's taking it completely out

22   of context.

23           MS. WILLIAMS:  Certainly the first time we've heard

24   this theory.

25           MR. CARRUTH:  Defense counsel filed a motion for bill

1   of particulars to discover the identities of the unnamed

2   coconspirators.  But they never filed such a bill of

3   particulars to determine the identity of the person whose

4   death resulted in this case.

5          MR. T. MILLS:  We didn't feel a need to.

6          THE COURT:  All right.  The objection to the pictures

7   will be sustained.  There will be no limitation on the

8   description of the body by the investigating police officer.

9          MR. CARRUTH:  In light of that ruling, your Honor, may

10  we offer the autopsy report that Mr. Fry --

11         THE COURT:  Let me see it.

12         MR. CARRUTH:  Okay.

13         MR. CARRUTH:  Let me get it from the officer.

14         MR. T. MILLS:  We haven't seen any autopsy

15  photographs, incidentally.  Oh, the report.

16         MR. CARRUTH:  May I approach, your Honor?

17         THE COURT:  Sure.

18         MR. CARRUTH:  Here's a copy of the autopsy report.

19         THE COURT:  Y'all have a copy of the autopsy report?

20         MS. WILLIAMS:  Yes.

21         THE COURT:  What's the position of the defendant with

22  regard to the autopsy report?

23         MS. WILLIAMS:  Well, your Honor, I believe we had a

24  prior discussion about the admissibility.  The government and

25  defense had a previous discussion about the admissibility and

1    we informed the government that we would stipulate the

2    admissibility of the autopsy report.

3              Again, I don't really know what this report adds to

4    what an eyewitness can describe on the stand with regard to

5    evidence.

6              THE COURT:  Let me see those pictures again.

7              MR. CARRUTH:  They're right there, your Honor, I gave

8    them to your clerk.  She says she needs to keep them.

9              THE COURT:  Let me see the pictures.

10             MS. WILLIAMS:  But if we had a choice between the

11   autopsy report and the photographs, we'd take the autopsy

12   report.

13             THE COURT:  Well, I'm not giving you a Hobson's choice

14   other than I'll make for the record that the pictures, W64-2,

15   3 and 4, are far more prejudicial than probative with two

16   exceptions, and that is the amputation of the hands and of the

17   head are what would appear to be fairly skillfully done,

18   consistent with the saw, which is the government's theory.

19             And the autopsy report, of course, supplements the

20   eyeball description, and I'm sure they can get into evidence

21   there.  The autopsy report I am not looking at is not

22   certified, but I assume the defendant would object to the lack

23   of authenticity.

24             MS. WILLIAMS:  No, your Honor.

25             THE COURT:  And I'll permit the autopsy report.

*Ingalls - Cross*

1      MR. CARRUTH:  Thank you, your Honor.

2      THE COURT:  I find expressly on the record that the

3  description of the body by an experienced law enforcement

4  officer as well as the autopsy report will be sufficient

5  evidence to uphold the responsibility of the United States

6  Attorney in prosecution of the case.  The pictures themselves

7  are the degree of prejudice that doesn't add anything other

8  than that -- other than the illustration of the rather

9  non-jagged amputations that the body received, which can be

10  described by the law enforcement officer.

11      All right.  Bring the witness back in.

12    (Jury present.)

13      THE COURT:  Members of the jury, we've had a couple of

14  legal questions come up.  Hopefully that will save us time

15  over the period of time of trial.  So while you were in your

16  room a little bit longer than normal for the break, I think it

17  will end up being less time for everybody.

18      All right.  Mr. Ingalls, you're still under oath.

19  And, counsel, you have the lectern.

20      MS. WILLIAMS:  Thank you, your Honor.

21               CROSS-EXAMINATION

22  BY MS. WILLIAMS:

23  Q.  Do you remember a notice filed by a creditor on behalf of

24  Laurence True?

25  A.  Yes, I do.

Ingalls - Cross

1  Q.  Can you tell the members of the jury what that had to do

2  with anything?

3  A.  There was a lawsuit in California where Madalyn O'Hair and

4  Laurence True, in an entity known as Truth Seekers, Inc., had

5  disputed Ms. O'Hair's right to some of the assets of Mr. True

6  prior to this -- or after his death.

7  Q.  And how was that resolved?

8  A.  Prior to the bankruptcy, there was a judgment in favor of

9  Mrs. O'Hair during the bankruptcy relief by the bankruptcy

10  court had to be given so that the appeal of that decision

11  could be continued.  It was appealed up to the Supreme Court,

12  who denied cert, and so that case was -- has been final in

13  favor of Ms. O'Hair.

14  Q.  So that went away?

15  A.  Went away.

16  Q.  Is it fair to say that Chapter 7 was filed as opposed to

17  Chapter 11 because the amount of money that Ms. O'Hair owed so

18  vastly exceeded her assets?

19  A.  That's correct.

20  Q.  Reorganization would be what you would choose if there was

21  some chance that there might be money left over?

22  A.  That's right.

23  Q.  And in this case, I think you testified on direct that the

24  Internal Revenue Service ended up being paid out of the

25  bankruptcy estate $16,000?

*Ingalls - Cross*

1   A.   Yes, ma'am.

2   Q.   What was the claim of the IRS?

3   A.   It was approximately $250,000.

4   Q.   And do you know what the basis of that claim was?

5   A.   There were income taxes due for a number of years in the

6   early '80s.  So a lot of that claim was penalties and interest

7   that accrued from the early '80s through 1997.

8   Q.   And those are income taxes due from her personal income

9   taxes?

10   A.   That's correct.

11   Q.   Was there any issue in -- within your knowledge of money

12   owed by the Society of Separationists?

13   A.   I believe they were listed as a creditor by the -- Mrs.

14   O'Hair's receiver.  That society never filed a proof of claim.

15   So I don't know if they were actually due any money.

16   Q.   When you say they were filed as a creditor by Ms. O'Hair's

17   receiver, I'm not sure I understand what you mean.  Will you

18   explain that to me?

19   A.   Okay.  Any bankruptcy debtor in this case, Mr. Tucker, the

20   receiver, is required to file a list of all of the creditors

21   whether you dispute their claim or not.  Society of

22   Segregationists was on that list.  It was on the documents of

23   the bankruptcy estate that were here a few minutes ago.

24   Q.   Do you have any knowledge of what they claim they were

25   owed?

*Ingalls - Redirect*

1  A.  I believe they were shown as either unknown or zero and

2  indicated it was a disputed claim.

3  Q.  Is that the extent of your knowledge of that?

4  A.  Yes.

5  Q.  Why was the joint bank account at Frost Bank split evenly

6  between Madalyn Murray O'Hair and Jon Garth Murray?

7  A.  Primarily because the -- from the bank statements that we

8  had, we couldn't tell where the money really came from.  And

9  so the agreement between John's receiver and me was to split

10  it.  It wasn't quite 50/50 because he undertook the burden to

11  prepare all the papers to get that agreement approved.

12  Q.  So that agreement had more to do with the lawyers involved

13  than it did the source of the funds?

14  A.  That's right.

15  Q.  Fair to say that when you tried to track the source of the

16  funds going into that joint bank account, it was virtually

17  impossible?

18  A.  That's right.

19  Q.  That's all I have.  Thank you.

20                    RE-DIRECT EXAMINATION

21  BY MR. CARRUTH:

22  Q.  Excuse me, Mr. Ingalls, could you clarify for the record

23  what joint bank account you're referring to here?

24  A.  It's the Frost Bank account that had roughly $25,000.

25  Q.  May I have a moment, your Honor?  I believe those records

*Ingalls - Redirect*

1   are in evidence.

2           THE COURT:  Yes, sir.

3   Q.  (BY MR. CARRUTH) Mr. Ingalls, I'm showing you what's

4   previously been offered and admitted into evidence as

5   Government Exhibit 51-5.  If you will move that from the

6   envelope, sir, and look through it, I believe those are the

7   Frost Bank records for that joint account that you've

8   testified about on cross-examination from Mr. Karr's attorney.

9   A.  Okay.

10  Q.  All right, sir.  Can you tell from examination of that

11  record, sir, what the source, if any, deposits into that joint

12  account may have been?

13  A.  Well, there appears to be primarily two sources, VA

14  benefits and Social Security.

15  Q.  And to your knowledge, was Madalyn Murray O'Hair receiving

16  Veterans of Administration benefits at the time of her

17  disappearance?

18  A.  Her receiver scheduled that she had that income, yes.

19  Q.  And was Ms. O'Hair at the time of her disappearance also

20  receiving a monthly check from the Social Security

21  Administration?

22  A.  Again, that was scheduled by her receiver.

23  Q.  And so when counsel refers to the funds going into that

24  account, there were no other sources for that account that you

25  have evidence of, were there?

Ingalls - Redirect

1   A.  Well, I have no evidence for the beginning balance that

2   was shown here.  So I don't know where that came from.

3   Q.  And those funds remained untouched for years, after Ms.

4   O'Hair disappeared, did they not?

5   A.  It was about a year, year and a half.

6   Q.  And that's how you were able to seize them?

7   A.  That's correct.

8   Q.  Pass the witness.

9        MS. WILLIAMS:  Nothing further.

10       THE COURT:  May this witness be excused?

11       MR. CARRUTH:  Yes, your Honor.

12       THE COURT:  You are excused.  Call your next witness.

13       MR. CARRUTH:  Your Honor, the government would call

14   Robert Bjorklund to the stand.

15       THE COURT:  Stand there, please, sir, and be sworn.

16     (Witness was sworn.)

17       THE COURT:  Walk around this column and have a seat up

18   here in the witness chair.  Sir, for the record, if you'll

19   tell us your full name, and spell your last name.

20       THE WITNESS:  Okay.  My name is Robert Bjorklund,

21   spelled B-J-O-R-K-L-U-N-D.

22     ROBERT BJORKLUND, called by the Government, duly sworn.

23

24

25                    DIRECT EXAMINATION

BY MR. CARRUTH:

Q.   Mr. Bjorklund, would you tell the members of the jury where you live, what city, and how you're employed?

A.   Okay.  I currently reside in the city of Crandall.  I work out of Dallas.  I work for the Dallas County Sheriff's Department.  I've been employed there since 1981, and I've been a detective in CID section since '91.  And I had a small -- about a year that I worked in the internal affairs section with Dallas County Sheriff's Department.

Q.   And for the record, Crandall is located in what county, sir?

A.   That's in Kaufman County.

Q.   Which adjoins Dallas County on the east side?

A.   Yes, it does.

Q.   Okay.  Now, what were your duties and responsibilities with the Dallas County Sheriff's Department back on -- in October of 1995?

A.   Okay.  I was -- at that time, I was currently assigned to CID, and I was called out to the scene of a homicide, and that was --

Q.   Did you routinely investigate homicide cases at that time or work with the other officers?

A.   Well, we don't get a lot of homicides in a year's time, but occasionally, if you're on call and you get called out, I'd have over the years -- I have investigated four or five

*Bjorklund - Direct*

1    homicides.

2    Q.  So if the homicide occurs within the city limits of

3    Dallas, let's say, or one of the other cities in Dallas

4    County, it's handled by the police department for that

5    municipality, correct?

6    A.  Yes, sir.

7    Q.  And your agency investigates homicides out in the county?

8    A.  In the unincorporated areas of Dallas.

9    Q.  Okay.

10   A.  Yes, sir.

11   Q.  And what was the date again that you got called out to do

12   a homicide investigation?

13   A.  That was October 2nd of 1995.

14   Q.  And where did you proceed to conduct your investigation?

15   A.  Okay.  I proceeded to the East Fort Trinity River, just

16   off the roadway up in Malloy Bridge Road, which is close to

17   Highway 175.

18   Q.  And is that near a town or community?

19   A.  It's just outside the city of Seagoville.  Just outside

20   the city limits of Seagoville.

21   Q.  Okay.  Let me show you, sir, what's been marked for

22   identification as Government Exhibit W64-1, and ask you

23   whether or not this map reflects Dallas, Seagoville and

24   Crandall, where you reside?

25   A.  Yes, sir.

*Bjorklund - Direct*

1  Q.  Okay.

2  A.  Right there.

3  Q.  Okay.  And that's right off of Highway 175?

4  A.  Yes, it is.

5  Q.  And where does the Trinity River flow through that area,

6  sir?

7  A.  Okay.  It's hard to see on this map, but it looks like

8  it's right there.  And there's a intersection right there.

9  And then, it doesn't show Malloy Bridge Road, but it was right

10  about there.

11  Q.  Okay.  What, if anything, did you observe upon your

12  arrival at the scene of the homicide?

13  A.  Okay.  I observed a decapitated body that did not have any

14  hands.  The hands were cut off at the wrist, and also, the

15  head was cut off.  It was cut off right here.  Right there.

16  And the hands were cut off right there.

17  Q.  And can you tell us, if you know, who found the body and

18  what time it was reported to you?

19  A.  Okay.  It was at approximately 2:30 p.m. on that day, on

20  10-2 of '95.  It was an elderly man by the name of James Berry

21  Parker, who located this body.  He was a -- an old man.  He

22  was approximately 80 years old.  He is now deceased.

23  Q.  What was he doing out in that area?

24  A.  He was just picking up can, cans along the river bank.

25  Q.  And approximately what time did you arrive at the scene?

*Bjorklund - Direct*

1  A.   It was -- what he did was he flagged down a motorist, and

2  then, they went over to Seagoville and told Seagoville PD.

3  And then, Seagoville went out there and realized that it was

4  in the unincorporated area of Dallas County, so they called

5  us.  So it was probably around 3:30, 4:00 by the time I got

6  out there.

7  Q.   Was the body clothed or unclothed?

8  A.   It was unclothed.  It was naked.  Completely naked.

9  Q.   And did you make an effort to search the area to determine

10 if you could locate the missing head and hands from this

11 corpse?

12 A.   Yes, we did.  What we did was we called out the Dallas

13 County Fire and Rescue, who came out there and dragged part of

14 the Trinity River that was just close by the body, and we

15 dragged it with some nets and different things, attempt to

16 locate the head and hands of this body.

17 Q.   Without success?

18 A.   We didn't find anything.

19 Q.   Did it appear to you or did you later determine what type

20 of instrument, if any, may have been used to sever the hands

21 and head from the body?

22 A.   Okay.  Could have been a knife, it could have been a saw.

23 It wasn't determined at the time of the autopsy what exactly

24 -- instrument was used.  They couldn't tell.

25 Q.   And was there any indication of a large amount of blood in

1 the area as if the body had bled out at that location?

2 A.  It appeared that it did not bleed out at that location.

3 There was not a lot of blood at the location.

4 Q.  And that would conclude you to believe what?

5 A.  That the body was killed elsewhere.

6 Q.  Now, approximately how far from the actual river bank or

7 the water was the body found?

8 A.  It was approximately 50 feet from the water.

9 Q.  And was it concealed in any underbrush or was it just

10 laying out in the open?

11 A.  No.  It was laid wide open.  It was facing up like this,

12 it was naked.

13 Q.  For the record, you're indicating a spread-out position?

14 A.  Exactly.

15 Q.  Like a crucifixion position?

16 A.  Yes, sir.

17 Q.  Did the medical examiner come to the scene and remove this

18 body?

19 A.  Okay.  It's actually a field agent that comes out there,

20 and they use a contract service to transport the body, and

21 they're the ones that transported the body down to the ME's

22 office to do an autopsy the following day.

23 Q.  And to your knowledge, an autopsy was performed?

24 A.  Yes, it was.

25 Q.  And did it conclude that the cause of death was by

Bjorklund - Direct

1   homicidal means?

2   A.  Yes, that's correct.

3   Q.  I'll show you what's been marked for identification, sir,

4   as Government Exhibit W64-5, and ask you if you recognize that

5   as a copy of the autopsy report, the protocol prepared in this

6   particular homicide case?

7   A.  Yes, it is.

8   Q.  We'd offer W64-5, your Honor.

9         THE COURT:  It's received.

10  Q.  (BY MR. CARRUTH) Now that that is in evidence, sir, would

11  you please remove it and indicate the medical examiner's

12  findings on the condition of the body and whether or not any

13  of the organs in the body were diseased or anything that might

14  have caused the death by natural means?

15  A.  Okay.  There was -- it definitely was not caused by

16  natural means.

17  Q.  And that's reflected by the autopsy report?

18  A.  Yes, sir.  It's been a while since I looked at this

19  report, but that's --

20  Q.  Well, just take your time, please, if you would, and

21  indicate what the medical examiner concluded.

22  A.  Okay.  The conclusion says based on the autopsy findings

23  and history as available to us, it is our opinion that this

24  34- to 46-year-old, five-five to five-eight, unknown,

25  light-skinned male, with no identifying marks or scars, died

Bjorklund - Direct

1   as a result of unknown homicidal violence; manner of death,

2   homicide.

3   Q.   And you've indicated there was no clothing on the body?

4   A.   That's correct.

5   Q.   And I assume there was no watch, ring or other jewelry?

6   A.   That's correct.

7   Q.   No wallet?

8   A.   That's correct.

9   Q.   No personal property of any type that may be used to aid

10  you in identifying these human remains?

11  A.   That's correct.

12  Q.   For how long did that body remain unidentified?

13  A.   That body remained unidentified for approximately three

14  and a half years.

15  Q.   And how was the body finally identified, if it was?

16  A.   Okay.  It was the three-year anniversary date that we did

17  a -- the man that does the -- our media man put out a -- he

18  put out a letter to all the media around the state, and that

19  one of the media people picked up on it and knew about this

20  story and knew about that our person could possibly be Danny

21  Fry, by the name of Danny Fry.

22       And this man's name was John McCormmick.  And John

23  McCormmick came up and told us about this story about the --

24  what was going on and who our victim might be.  So what we did

25  was -- he came up and met with us, and then, we --

Bjorklund - Direct

1    Q.  As a result of that information, did you contact any of

2    Mr. Fry's surviving family members in an effort to obtain a

3    voluntary blood sample?

4    A.  Yes, we did.  What we did was at that point, we went and

5    got some blood from -- I believe it was the brother of Danny

6    Fry, and we obtained a sample of blood from the son, Danny

7    Fry, Jr., and they did DNA with the blood samples that we kept

8    from this body and positively identified him as --

9            THE COURT:  Wait.

10           MS. WILLIAMS:  Object to this witness testifying

11   without test results that haven't been received in evidence.

12           MR. CARRUTH:  The chemist will be on soon, your Honor.

13           THE COURT:  All right.  You may restate your question.

14   Q.  (BY MR. CARRUTH) You did subsequently identify the body,

15   correct?

16   A.  Yes, we did.

17   Q.  And who was the body identified as?

18   A.  It was identified as Danny Fry.

19   Q.  To your knowledge, has anyone ever been arrested or

20   indicted in Dallas County, Texas for the murder of Danny

21   Raymond Fry?

22   A.  No, they haven't.

23   Q.  So that case is still on your books as an open, unsolved

24   homicide; is that correct?

25   A.  Yes, it is.

*Bjorklund - Cross*

1   Q.  Pass the witness.

2                    CROSS-EXAMINATION

3   BY MS. WILLIAMS:

4   Q.  Good morning.

5   A.  Good morning.

6   Q.  You and I have worked together before, correct?

7   A.  Yes, we have.

8   Q.  Mr. Carruth asked you some questions about the severed

9   head of the body of Danny Fry.

10  A.  That's correct.

11  Q.  And have you been receiving periodic reports from the

12  Southwest Institute of Forensic Sciences?

13  A.  We received several reports over the years.

14  Q.  That's the crime lab that Dallas County uses; is that

15  correct?

16  A.  Yes.

17  Q.  All right.  And as they conduct tests or make findings,

18  they submit a report to you as the investigating agency?

19  A.  Yes.

20  Q.  And have you shared those reports with the FBI, the IRS,

21  with Mr. Carruth in your joint cooperation investigation?

22  A.  Yes, anything that they needed, we shared with them.

23  Q.  Let me ask you to look at Defendant's Exhibit 25, which is

24  a stipulation, and Exhibit A to that, ask you if you recognize

25  that?

*Bjorklund - Cross*

1   A.   Okay.  Is it this one that I'm supposed to --

2   Q.   Right, Exhibit A attached.

3   A.   Okay.  I'm sure that's somewhere in our paperwork there.

4   Q.   This would have been something that you received and

5   provided to --

6   A.   Yeah, for one, it says that it went to Seagoville PD.  So

7   they probably faxed it to us.  For some reason, at times, they

8   sent some of this stuff to Seagoville PD.  I didn't know why.

9   Q.   If I represent to you that I got this from the government

10   and they represented to me that it came from you, you don't

11   have any reason to doubt me, do you?

12   A.   No.

13   Q.   All right.  Your Honor, Exhibit 25 is just a stipulation

14   to the -- to Larry Fletcher, the toolmark examiner, by the

15   defense and the defendant.  We'd ask that it be approved by

16   you and offer D25 and D25-A.

17        MR. CARRUTH:  No objection, your Honor.

18        THE COURT:  25 and 25A.  Members of the jury, what a

19   stipulation is, so that you'll know, is that it is one way of

20   admitting evidence where the parties agree that it is

21   admissible, and save you time by bringing other witnesses.

22   Proceed.

23        MS. WILLIAMS:  May I briefly publish the stipulation?

24        THE COURT:  Are you going to use it with regard to

25   this witness?

Bjorklund - Cross

1        MS. WILLIAMS:  Yes.

2        THE COURT:  You may.

3   Q.  (BY MS. WILLIAMS) If Larry Fletcher were called to testify

4   in this case, he would testify that on July 7th, 1997, he was

5   employed by the Southwestern Institute of Forensic Sciences at

6   Dallas, that he was a duly qualified firearm and toolmark

7   examiner on those dates, and Attachment A hereto is a true and

8   correct copy of his report and contains his findings.

9        Isn't it true, Detective, that what that report

10  indicates is that during the autopsy of Danny Fry that the

11  medical examiner saved some tissue and cartilage samples from

12  the neck portion of Danny Fry so that if, at a later time,

13  some sort of tool was recovered, that an investigative agency

14  believed was used to cut his head off, that that could be

15  compared?

16  A.  Yeah, apparently, that's why they would do that.

17  Q.  So isn't it true that if Government's Exhibit No. 38 --

18  have you seen this before?

19  A.  I've seen it some time, yeah.

20  Q.  In the course of your investigation?

21  A.  Yes.

22  Q.  Isn't it true that if Government's Exhibit 38 is believed

23  by the government to have been used to sever the head of Danny

24  Fry, that they could have submitted that saw to the Southwest

25  Institute of Forensic Sciences and they could have made a

Bjorklund - Cross

1    determination?  That's what that report indicates, doesn't it?

2    A.  It says at the bottom.

3    Q.  What does it say at the bottom?

4    A.  Okay.  It says the weapon to be compared to the chest

5    plate from the deceased has not been received; therefore, no

6    analysis will be performed at this time.

7    Q.  During your investigation in this case, did you, at

8    various times, travel to Austin, to San Antonio and either

9    alone or with members of this investigative government team,

10   go to various locations that you believe might be important?

11   A.  Yes, I did.

12   Q.  And was one of those locations the Interstate Inn in Buda?

13   A.  Yes, it was.

14   Q.  Do you remember going there in February of this year -- or

15   I'm sorry, of last year, of 1999?

16   A.  '99, yes, I believe we went there.

17   Q.  And while you were there, you examined some documents,

18   trying to determine when Danny Fry might have stayed at the

19   Interstate Inn?

20   A.  Yes, I believe I went there with Detectives Oliver and

21   Womack.

22   Q.  And Mr. Ed Martin from the IRS?

23   A.  And Ed -- Ed was there, too.

24   Q.  And on that date, did you determine that both Danny Fry

25   and David Waters were registered at the Interstate Inn in

*Bjorklund - Cross*

1  August of 1995?

2  A.  Okay.  I don't recall looking at that.  I'd have to see

3  the paperwork on that.

4  Q.  Let me refer you, if I may, to your report, and see

5  whether or not that refreshes your recollection.

6  A.  Okay.  This was submitted by Detective Oliver on this one.

7  Q.  All right.

8  A.  Okay.  So it was Detective Oliver and Ed Martin at the

9  time.

10  Q.  All right.  You weren't there?

11  A.  At that particular time, I wasn't there.

12  Q.  Were you made aware that that took place?

13  A.  Yes, I believe I was.

14  Q.  Later, did you return to the Interstate Inn and look at

15  some more records with regard to your investigation of this

16  homicide?

17  A.  Yes, at one time or another, we returned there.

18  Q.  And at that time, did you determine that in October of

19  1995, a man by the name of Jon Murray stayed at the Interstate

20  Inn?

21  A.  I don't recall that.  That's a different one.  Okay.  It

22  was a man by the name of Jon Murray.

23  Q.  All right.  That's my question.

24  A.  Okay.  It shows that -- yeah, that's what the report

25  indicates.

Bjorklund - Cross

1   Q.  All right.  And because the name of this man, Jon Murray,

2   was spelled J-O-H-N instead of J-O-N, you determined that it

3   wasn't the same Jon Murray; is that correct?

4   A.  I don't remember if we, you know, finalized the conclusion

5   on that.  I don't.

6   Q.  That was just an open piece of the puzzle?

7   A.  It was just something to see John Murray on, you know,

8   when we were going through the records.  I mean, that's a very

9   common name, Jon Murray.

10  Q.  Would it have been important to you in your investigation

11  to learn that Jon Murray had previously used the name John

12  Murray, J-O-H-N, in an attempt to disguise his identity?

13  A.  I don't know if I understand that question.

14  Q.  As you were trying to determine the weight of this piece

15  of evidence.

16  A.  Okay.

17  Q.  The fact that a John Murray stayed at the Interstate Inn

18  in October of 1995, that was certainly coincidental, if

19  nothing else, correct?

20  A.  Yes.

21  Q.  And the fact of the matter was that the name of the man

22  who stayed at the Interstate Inn, according to the slip that

23  you found, was J-O-H-N Murray instead of J-O-N Murray?

24  A.  Yeah.

25  Q.  Right?

*Bjorklund - Cross*

1  A.  Yes.

2  Q.  Would it have been important to you to learn in trying to

3  determine how important this piece of evidence was that Jon

4  Murray had, at prior times, tried to disguise himself by using

5  J-O-H-N Murray, the more common spelling?

6  A.  I guess it could have been.

7  Q.  All right.  But no one told you that; is that correct?

8  A.  That's -- yeah, I don't recall.  I don't --

9  Q.  You don't recall anyone telling you that that was the

10  case?

11  A.  I don't recall anybody saying that.

12  Q.  During your investigation, did you have occasion to spend

13  some time investigating a man by the name of Fen Solheim?

14  A.  He -- that name sounds familiar.  I don't know how far we

15  went in the investigation.  I'd have to be refreshed on that.

16  Q.  All right.  Isn't it true that a van belonging to Mr.

17  Solheim was photographed in the parking lot of the Central

18  Park Apartments where David Waters resided?

19  A.  Yes, it was.

20  Q.  And do you know where those photographs are?

21  A.  I'm not sure where those photographs -- we could find

22  them.  We could certainly locate those photographs.

23  Q.  Do you remember what the circumstances were that you were

24  there taking photographs of cars in that parking lot?

25  A.  Well, I think with that particular man, I think that some

Bjorklund - Cross

1    of the records, it showed that at one time, he stayed down at

2    the Warren Inn, and then, he stayed up in the Central

3    Apartments.  And we just thought that was kind of strange.

4    Q.  All right.  So the order -- I think I had it backwards

5    when I asked you the question.  But during your investigation,

6    you determined that a man by the last name of Solheim had

7    resided in the Warren Inn Village during -- from October 13th

8    of '95 until December 13th of 1995, right?

9    A.  Yeah.

10   Q.  And that was significant to you because it was very near

11   the time that you believe that David Waters and Gary -- and

12   Danny Fry were staying at the Warren Inn Village?

13   A.  Yeah.

14   Q.  And did you know at that time when you found those records

15   that he, Mr. Solheim, had been also a resident at the Central

16   Park Apartments?

17   A.  Yes, I think we found out where he -- that he did stay at

18   the Central Park Apartments.  I think he ended up moving.  I

19   think he went out of the country or something.  I don't know

20   what happened.

21   Q.  Was the order of the events that Mr. Solheim stayed at the

22   Warren Inn and then, moved to the Central Park Apartments, or

23   the other way around, or do you know?

24   A.  I'm not sure.  I'm not sure what the order is on that.

25   Q.  Fact of the matter is that you found some records

1  indicating that he had been a renter at the Warren Inn?

2  A.  Exactly.

3  Q.  And additionally, you found some records indicating that

4  he had been a renter at the Central Park Apartments?

5  A.  Yes, I think that's correct.

6  Q.  Where David Waters lived?

7  A.  Yes.

8  Q.  And you had taken some photographs of several vans,

9  registered to Mr. Solheim, during some sort of a surveillance

10  of David Waters' apartment?

11  A.  I believe that's what we did.

12  Q.  Do you remember --

13  A.  It should indicate it on the report there.

14  Q.  Do you remember why those vans were significant to you?

15  A.  I don't recall except that we just thought it was -- we

16  figured that Mr. Solheim might have been a friend of David

17  Waters'.

18  Q.  And isn't it true that some of the vans that Mr. Solheim

19  owned were dark-colored vans?

20  A.  I'd have to look at those pictures, and, you know, it

21  might say it in this report if you'll give me a second.

22  Q.  Okay.

23  A.  It doesn't show the color of the van.  It doesn't show the

24  color.  I'd have to look at the pictures to see the colors.

25  Q.  All right.  Isn't it true that the reason that you took

Bjorklund - Cross

1   photographs of Mr. Solheim's van was that a dark-colored van

2   was reported leaving the area where Danny Fry's body was found

3   on October 2nd of 1995?

4   A.  Okay.  That's what Mr. Parker -- you know, when we went

5   and interviewed Mr. Parker, we asked him if he could recall

6   anything, but he certainly didn't see any body being dumped or

7   anything.  And no telling, you know, that he saw, you know, a

8   van driving by, or whatever, if that was, in fact, you know,

9   the van that was dumping the body, which it wasn't.

10  Q.  But it was certainly significant to you in investigating

11  this case that this man who owned a dark-colored van and

12  dark-colored van was reported within your offense that had a

13  lot to do with David Waters?

14  A.  Of course, that was very early in the investigation.

15  Q.  And that was something that you checked out?

16  A.  Yeah, we checked --

17  Q.  Correct.

18  A.  We did check that out.

19  Q.  To the best of your ability?

20  A.  That's --

21  Q.  Because at some point, Mr. Solheim moved back to Sweden?

22  A.  Yeah, wherever he moved out of the country.  I don't

23  recall which country it was.

24  Q.  Were you present when a search was done of a storage unit?

25  A.  Yes, I was.

*Bjorklund - Cross*

1   Q.  Was that the Public Storage unit or the Burnet Road

2   Self-storage, or do you know?

3   A.  Okay.  I was present when we did some work on that and the

4   Public Storage unit on Lamar.  Is that what you're getting at?

5   Which one --

6   Q.  Correct.

7   A.  -- was I present at?

8   Q.  Right.

9   A.  Yeah, I was present at that one.

10  Q.  How many people were there, do you remember?

11  A.  You mean from the agencies?

12  Q.  From the agency, from the storage facility, from the

13  owner, the tenant?

14  A.  Okay.  We had -- I know Donna Cowling was there, and I

15  believe the Austin Police Department, their PES people were

16  there.

17  Q.  How many people were there?

18  A.  I'm not sure.  I'd have to look at some reports if there's

19  some reports available on that.  And then, of course, myself

20  and Detective Oliver and Womack were there.  And then, I think

21  a couple of other detectives from the missing persons section

22  of Austin PD were there.

23  Q.  Detective Baker?

24  A.  No, I don't believe it was Baker.  I think it was -- I

25  think he was -- he wasn't working there.  It was Nugent, I

Bjorklund - Cross

1   think, and they had another younger guy and I don't recall his

2   name.

3   Q.  And was the -- was there a tenant to that unit at the

4   time?

5   A.  The tenant wasn't actually at the search -- or not the

6   search, but when we were going through, you know, doing the

7   luminol and everything on the public storage unit.

8   Q.  The prior -- sorry.  Prior to the search, did the tenant

9   come and move whatever he was storing out?

10  A.  Yeah, I believe she did, yeah, she was there.  I remember

11  moving the stuff out.

12  Q.  And the manager of Public Storage?

13  A.  I think the manager was -- she made an appearance.  And I

14  don't think she stayed there the whole time.

15  Q.  Did you take any photographs?  You or anybody with the

16  Dallas Sheriff's Department?

17  A.  If we took photographs, it was -- I believe it was when we

18  were doing the luminol part.  I believe it was the Austin

19  Police Department that were actually conducting the -- you

20  know, doing the photographs on that.

21  Q.  So you don't believe he took any photographs?

22  A.  No.  I think we took some photographs of the Burnet

23  Storage unit, because we were also there, and we took some

24  photographs from there.  I think Steve Womack took some of

25  those.

Bjorklund - Redirect

1   Q.  Your Honor, I don't have any further questions of this

2   witness at this time, but I would like to ask that he try to

3   locate the photographs that I've referred to of the van.

4           THE COURT:  The photographs of the van taken when?

5           MS. WILLIAMS:  February 18th, 1999.

6           THE COURT:  Okay.

7                    RE-DIRECT EXAMINATION

8   BY MR. CARRUTH:

9   Q.  Detective Bjorklund, do you have any idea -- can you give

10  us your best estimate of how many dark vans are registered

11  just in the State of Texas alone?

12  A.  No telling.  That's a lot.

13  Q.  An infinite number?

14  A.  Yeah, I would say that.

15  Q.  Now, counsel asked you about the vans.  Did you become

16  aware during the course of your investigation that a van had

17  been rented by this defendant, Mr. Karr, on the same day Danny

18  Fry's headless, handless corpse was found in Dallas County,

19  Texas?

20  A.  Yes, we were.

21  Q.  And did you also recover suspected blood stains from the

22  floor mat of that van?

23  A.  Yes, we did.

24  Q.  Now, counsel asked you about luminol.  What is luminol and

25  what is it used for?

Bjorklund - Redirect

1   A.   Luminol is something that you spray it down and it shows

2   -- after something is cleaned up and it will show that there

3   was blood in certain areas of an area.  And it will show that

4   there was, in fact, blood, blood splatters.  It's just some

5   chemical that shows up, you know, the remnants of blood.

6   Q.   And when you were out there searching that storage unit, I

7   believe you've testified that was the Public Storage unit

8   that's reflected in Government's Exhibit W55-4, it was a

9   rather large unit, correct?

10  A.   Yes, that was it.

11  Q.   I believe it was 10/15 or something to that effect.

12  A.   Yes.

13  Q.   And did you remove anything or did any of the other

14  officers in your presence remove anything from the storage

15  unit on that occasion?

16  A.   I believe it was rented out to a person, and we moved it

17  into another storage unit and -- because, of course, that

18  wasn't -- that stuff wasn't there, you know, at the time that

19  you know, these other guys went and rented the unit.

20  Q.   Okay.  So after all the property belonging to the current

21  renter had been moved out, then you conducted your search of

22  the storage unit, correct?

23  A.   Yes, we did.

24  Q.   And sprayed for luminol to detect the presence of blood

25  stains.  And did you do anything else that day?

*Bjorklund - Redirect*

1    A.  We took off the angle iron that was at the bottom of the

2    -- that was attached to the walls.  They were steel.

3    Everything was steel in there.  And we took off the angle

4    iron, the galvanized angle iron.

5    Q.  And to your knowledge, was any suspected blood stains

6    found on that piece of angle iron you removed?

7    A.  It appeared that there was something on there.

8    Q.  And did you, yourself, and the other officers take any

9    precautions to avoid contaminating the scene when you were

10   searching that storage unit?

11   A.  Yes, we'd always put on those latex gloves to make sure

12   that --

13   Q.  And is that so in case maybe you pricked your finger, you

14   wouldn't bleed on the --

15   A.  Exactly.

16   Q.  Okay.  I'm showing you what's been marked for

17   identification as Government Exhibit W64-6, and ask you if

18   you've ever seen that before, sir?

19   A.  Yes.  That's one of the pieces that we took off the bottom

20   of the walls that was attached to the floor.

21   Q.  And does this section here indicate where suspected blood

22   stain was located?

23   A.  Yes, sir, I believe so.

24   Q.  Okay.  We would offer Government's W64-6.

25          MS. WILLIAMS:  Your Honor, I don't have any objection

*Bjorklund - Redirect*

1   to the piece of metal itself, but until the markings on the

2   evidence have been substantiated and identified, I do still

3   have objection to the chain of custody.

4        MR. CARRUTH:  Well, we'll connect it up, your Honor.

5        THE COURT:  All right.  Subject to connecting up

6   W64-6, it's admitted.

7   Q.  (BY MR. CARRUTH) Detective Bjorklund, could you please

8   with the permission of the Court step down from the witness

9   stand and come around and lay this piece of angle iron in the

10  position it was on the floor when you found it to give the

11  jury the idea of where it was, what part of the storage unit

12  there.

13  A.  Okay.  Could I use this indicating the wall?

14  Q.  Please.

15  A.  Okay.  It was like this and then -- I'm not sure if the

16  wall was like that or like that.  And it was attached to the

17  floor, to the concrete, and then, it was attached to the wall.

18  And we removed it, you know, took out the -- whatever was

19  holding it into the -- into the steel wall.

20  Q.  And this spot that you identified is on the back, where it

21  was against the wall, correct?

22  A.  Well, see, I don't know if it was like this.  I would

23  assume it was either like this because it was probably more

24  screws in here than in the floor.

25  Q.  I don't want you to assume if you can't be certain.

*Bjorklund - Redirect*

1   A.  Okay.

2   Q.  But I do want to ask you whether or not the suspected

3   blood stain was found on the front side, exposed, or the back

4   side, or bottom side, which was unexposed.

5   A.  Okay.  It would have been -- okay.  It had to have been

6   like this because this is a nail that goes into the

7   concrete --

8   Q.  Okay.

9   A.  -- okay?  So it would have been like this, and then, it

10  would have been unexposed right there.  So it would have been

11  right behind there.

12  Q.  So in order for some liquid to get in that position, it

13  would require a large volume to ooze under or over that angle

14  iron, would it not?

15        MS. WILLIAMS:  Object to leading and assuming facts

16  not in evidence.

17        THE COURT:  All right.  Question is leading and the

18  objection is sustained.

19  Q.  (BY MR. CARRUTH) Well, as a trained homicide investigator,

20  sir, how would you account for any blood being in an unexposed

21  area in an angle iron?  Please resume your seat.

22  A.  Okay.  I would think for the blood to get down there, it

23  would have to be a large amount of blood to actually get

24  behind -- to get, you know, blood that was, you know, over

25  three years old to get -- I mean, to stay there.  There would

*Bjorklund - Redirect*

1  have had to have been a lot of volume of blood.

2  Q.  Like puddles of blood, for example?

3  A.  Puddles or, you know, a lot of spraying of blood.

4  Q.  Now, Ms. Williams asked you about some Swedish gentleman

5  that you investigated.

6  A.  Yes, some Scandinavian.

7  Q.  Scandinavian gentleman.  During the three years plus that

8  Mr. Fry's remains were unidentified, you followed many leads

9  to nowhere, did you not, sir?

10  A.  Yes, I did.

11  Q.  And was it a dozen or more, or 20 or more, or a hundred or

12  more?  How many tips or leads did you get during that

13  three-year period plus that you investigated?

14  A.  I don't know a particular number, but there was a lot of

15  rabbit trails that we followed basically that didn't amount to

16  anything.

17  Q.  Okay.  And I assume that would be -- could be true for

18  most unsolved homicide cases, would it not?

19  A.  Yes, it would.

20  Q.  Have you ever been to Wald Lake, Michigan, outside of

21  Novey or Novey?  Did you hear the question, sir?

22  A.  Yes.  That would be to the residence of when we refer --

23  Q.  Yes, to the residence of Mr. Karr.

24  A.  Residence of Mr. Karr, yes, sir.

25  Q.  And did you accompany some federal agents to that address

*Bjorklund - Redirect*

1   last spring?

2   A.   Yes, I did.

3   Q.   And did you spend several hours visiting with Mr. Karr and

4   listening to his statements to you?

5   A.   Yes, I did.

6   Q.   And were you there particularly to question Mr. Karr or to

7   let the federal agents question him, if they did, regarding

8   your unsolved homicide case involving Danny Fry?

9   A.   Yes, that's -- was the purpose I was there.

10  Q.   And what, if anything, did Mr. Karr tell you on that visit

11  about the murder of Danny Fry?

12  A.   He said that he talked to David Waters, you know, it was a

13  very long, lengthy statement.  And he said that David Waters

14  told him that he did, in fact, kill Danny Fry.  He said that

15  in his statement.

16  Q.   And did he indicate whether or not Mr. Waters told him

17  that Danny Fry was killed there where the body was found or at

18  some other location?

19  A.   Okay.  He -- I believe in that statement, he said that he

20  was killed at the location.

21  Q.   Okay.  And did he, being Mr. Karr, the defendant here, did

22  he make any statement to you regarding that Danny Fry's with

23  the O'Hairs?

24  A.   Yes, he said that the head and the hands are with the

25  O'Hairs.

Bjorklund - Recross

1    Q.  And that was based on something Mr. Waters had told him?

2    A.  Yes, that was what Mr. -- yes.

3    Q.  And yet, did your investigation reveal that it was Mr.

4    Karr and not Mr. Waters who rented the van the same day that

5    the body of Danny Fry was discovered without its head and

6    hands?

7    A.  Yes, it was Mr. Karr.

8    Q.  I believe that's all.  Thank you.

9                    RE-CROSS EXAMINATION

10   BY MS. WILLIAMS:

11   Q.  If Mr. Karr rented a van in Austin and it was driven 215

12   miles and returned to Austin, is there any way that van could

13   have been driven from Austin to Dallas and back to Austin?

14   A.  Okay.  I didn't actually investigate the mileage thing,

15   and I think another detective, I think, Womack, was the one

16   that investigated the mileage thing.

17   Q.  Let me stop you there.

18   A.  Okay.

19   Q.  And just -- my question is pretty simple.  If a van was

20   rented in Austin and driven 215 miles and returned back to

21   Austin, could it have gone to Dallas and back?

22   A.  Not in 215 miles.

23   Q.  Isn't it possible that when Government Exhibit W64-6 was

24   installed in the Public Storage unit that the man or woman who

25   installed that piece of metal bled on it?  Isn't that

*Bjorklund - Recross*

1  possible?

2  A.  Is that possible?  Yeah, I don't know when those storage

3  units were built or how old they were, but that could be

4  possible.

5  Q.  Do you remember what -- generally what date the search was

6  done where you took this piece of metal?

7  A.  That would be in February of 1999 sometime in February.

8  Q.  You didn't make these markings on this piece of metal, did

9  you?

10  A.  No, I did not.

11  Q.  Your initials don't appear anywhere on it?

12  A.  No.

13  Q.  The van that Mr. Karr rented in Austin on October the 2nd,

14  do you know what color it was?

15  A.  I believe it was white.

16  Q.  You testified, I believe, on redirect examination that you

17  found some blood stains in a van?

18  A.  Okay.  Our PES unit is the one that actually, you know,

19  did the search of the van.

20  Q.  You have knowledge of that, do you not?

21  A.  Yeah, I was --

22  Q.  And the blood that was found in that van was tested, was

23  it not?

24  A.  Yes, it was tested.

25  Q.  And compared to the blood of Danny Fry, correct?

Bjorklund - Recross

1    A.   Yes, it was.

2    Q.   And it wasn't Danny Fry's blood; is that correct?

3    A.   No, it was not.

4    Q.   After you interviewed Mr. Karr at his home in Michigan and

5    after he told you that David Waters told him a whole series of

6    things -- make sure I'm clear -- Mr. Karr never said he killed

7    Danny Fry, correct?

8    A.   No, he never said that.

9    Q.   He never said he was there?

10   A.   No, he never said that.

11   Q.   He never said that he killed the O'Hairs, correct?

12   A.   He never said that.

13   Q.   Never said he cut them up?

14   A.   Never said that.

15   Q.   Never said he buried them?

16   A.   Never said that.

17   Q.   After he told you that David Waters told him that David

18   Waters killed Danny Fry, he provided you a written statement,

19   correct?

20   A.   Yes, he did.

21   Q.   More than one, correct?

22   A.   Two statements.

23   Q.   Despite the fact that he could have had a lawyer, he

24   didn't ask for one.

25   A.   That's correct.

*Bjorklund - Redirect*

1  Q.  And after you met with Mr. Karr and spoke with him, got

2  his statement, you were at his house how many hours?

3  A.  I don't recall exactly how many hours.

4  Q.  That didn't result in anyone being indicted in Dallas

5  County for the death of Danny Fry, correct?

6  A.  No, we didn't indict him.

7  Q.  Thank you.

8                    RE-DIRECT EXAMINATION

9  BY MR. CARRUTH:

10  Q.  Sir, counsel just asked you, was it possible that the

11  installer of this angle iron, whenever it may have been

12  installed years ago, could have cut themselves and bled on the

13  angle iron, correct?  And you said, "Sure, anything's

14  possible."

15         Now, I ask you, sir, is it possible that whoever

16  killed Danny Fry, using a sharp knife or saw, may have

17  accidentally cut themselves and bled in that van that Mr. Karr

18  rented?

19  A.  That's possible.

20  Q.  And to your knowledge, are other tests being conducted in

21  an effort to determine that?

22  A.  Yes, I believe they are.

23  Q.  Now, have you ever been a deer hunter and killed a deer,

24  dressed it out in the field?

25  A.  I haven't.

*Bjorklund - Redirect*

1   Q.  Have you ever seen it done?

2   A.  I'm not much of a hunter, but --

3   Q.  Well, do you know --

4   A.  -- yeah.

5   Q.  -- if it's done with a knife or a saw?

6   A.  I believe it's with a knife, isn't it?

7       MS. WILLIAMS:  Your Honor, I object to speculation of

8   this witness.

9       THE COURT:  Sustained.

10  Q.  (BY MR. CARRUTH) Did your investigation ever determine

11  whether the head and hands were severed with a knife or a saw?

12  A.  No, we never determined that.

13  Q.  And to your knowledge, does the Southwest Institute of

14  Forensic Sciences Laboratory even have the ability to make

15  that determination?

16  A.  I don't know how they could.

17  Q.  Have you ever seen that done in any other homicide case

18  you've investigated?

19  A.  No.

20  Q.  Pass the witness.

21      MS. WILLIAMS:  Nothing further.

22      THE COURT:  All right, sir.  I'm going to ask you to

23  check about any photographs taken on February 18, 1999

24  regarding that van.

25      THE WITNESS:  Okay.

Bjorklund - Redirect

1        THE COURT:  When you have a report, if you'll report

2   to the government.

3        MR. CARRUTH:  May we approach, your Honor?

4        THE COURT:  You may.

5      (At the Bench, on the record.)

6        MR. CARRUTH:  The next witness, your Honor, besides

7   being quite lengthy, will be the brother of Danny Fry, and I

8   understand that we filed a trial brief, and I believe they

9   have some objection to it, and I wondered if the Court wanted

10  to address this outside the presence of the jury or wait to

11  that point where we believe that we might want to offer that

12  letter or evidence of the letter.

13        THE COURT:  I don't want to waste a whole lot of time

14  on 20 minutes.  If you've got 20 minutes.

15        MR. CARRUTH:  Oh, absolutely.  Yes, sir.

16        MR. D. MILLS:  Call Mr. Fry.  Your Honor, privy to

17  that conversation, but I'm not sure there's 20 minutes of

18  questioning without getting into that subject matter.

19        THE COURT:  Well, let's find out.  They beat me down.

20  I'm going to let you go to lunch.  Please follow the

21  instructions.  Be ready to come back at 1:20.

22      (Jury not present.)

23        THE COURT:  I appreciate your candor, Mr. Mills, but

24  when you get as experienced as Mr. Carruth, you can find 20

25  minutes on the witness at any time.

*Fry - Direct*

1      MR. D. MILLS:  Yes, your Honor, that is probably true.

2      THE COURT:  Bring Mr. Fry in, please.  Let's find out

3  what he's going to say, and we'll look into the objections.

4      MR. D. MILLS:  Should we just go into the letter right

5  now rather than all of his testimony?

6      THE COURT:  I don't know.  I don't know what his

7  testimony is.  I do know from the -- if you'll come forward,

8  please, and be sworn.  I do know we have the problem of the

9  alleged letter.

10     MR. D. MILLS:  That Lisa Jones testified that she got

11  from Mr. Fry that it was confidential that she gave to him.

12     THE COURT:  I don't know what the testimony will be.

13  I don't know what the objection will be.  This is Mrs. Sims.

14  She's going to administer an oath to you.

15     (Witness was sworn.)

16     THE COURT:  If you'll walk around, please, sir, this

17  column, and have a seat right up here in the witness box.  All

18  right, sir.  If you'll tell us your full name and spell your

19  last, please.

20     THE WITNESS:  Clarence Robert Fry, F-R-Y.

21   CLARENCE ROBERT FRY, called by the Government, duly sworn.

22                  DIRECT EXAMINATION

23  BY MR. D. MILLS:

24  Q.  Where do you live, sir?

25  A.  Illinois, Rock Island, Illinois.

*Fry - Direct*

1   Q.   How are you employed?

2   A.   I'm disabled.

3   Q.   And do you know Danny Fry?

4   A.   Yes, I do, he's my brother.

5   Q.   I want to direct your attention to September or the -- or

6   let's start out sometime in late 1995.  Did you have a

7   conversation with your brother about his going to Texas?

8   A.   Yes, I did.

9   Q.   And did he tell you what he was going to do in Texas?

10  A.   He said he was going to go there and possibly sell home

11  improvement.

12  Q.   Okay.  Did you have conversations with him after he was

13  purportedly in Texas?

14  A.   Yes, I did.

15  Q.   Do you know if he had contact with an individual named

16  David Waters?

17  A.   That's who flew him to Texas.

18  Q.   And are you aware of Danny Fry having a daughter?

19  A.   Yes, Lisa.

20  Q.   And did -- in her -- or her 16th birthday was what day of

21  that year, if you recall?

22  A.   September 30th.

23  Q.   And at or near that time of her birthday, preceding her

24  birthday, did you receive a phone call from your brother

25  regarding some type of letter that he was sending you?

*Fry - Direct*

1  A.  Yes, I did.

2  Q.  And can you tell the Judge what that letter -- what that

3  conversation was about and what he instructed you to do

4  regarding the letter that he was sending you?

5  A.  He asked me to go to his girlfriend, Lisa Jones' house and

6  pick up a letter --

7  Q.  Did you do --

8  A.  -- and not to open it up.

9  Q.  And not to open it?

10  A.  Yes.

11  Q.  Did you do so?

12  A.  Yes, I did.

13  Q.  Did you find the letter?

14  A.  Lisa Jones handed it to me.

15  Q.  Did it have any markings on it?

16  A.  It said do not open until October 5th.

17  Q.  Did you follow the instructions on the letter of do not

18  open until October 5th?

19  A.  No, I didn't.

20  Q.  Why not?

21  A.  I opened it sooner.

22  Q.  Did you open it prior to the 30th of September, the

23  birthday of his daughter?

24  A.  Yes, I did.

25  Q.  And what did the contents of the letter say?

1   A.  It says if you're reading this, I'm probably dead and to

2   take it to the FBI.  And David Waters -- and there was another

3   person's name that I don't recall -- planned this score and

4   that --

5   Q.  Did it?

6   A.  -- and he wanted to apologize.  He said I'm sorry that I

7   was involved in it.  And he said the FBI would have no trouble

8   connecting David Waters to the crime because it was a very

9   high -- it would be a very high profile thing in Texas.  And

10  David Waters is already on probation for embezzlement and

11  check cashing.

12  Q.  After you read the letter, what did you do with it?

13  A.  I held on to it for a few days.

14  Q.  Did you become -- did you talk to your brother on the 30th

15  of September?

16  A.  No.  I talked to him about a day or two before that.

17  Q.  And did you come to believe that he was returning to

18  Florida where you lived at the time?

19  A.  He told me he was.  He said he'd be back shortly.

20  Q.  When did you become concerned that he hadn't returned to

21  Florida after that conversation?  Do you recall the date, the

22  time --

23  A.  When I really got concerned was about the following

24  Thursday, after the 30th.

25  Q.  Which would have been -- if it's been testified that the

Fry - Direct

1  30th was a Saturday, 30 days in September, that would make it

2  the 5th of October would have been Thursday; is that correct?

3  A.  Yes.

4  Q.  Why did you become concerned at that time?

5  A.  Well, we talked -- I talked to Lisa Jones and to Danny's

6  daughter, and they had said that he mentioned that he might be

7  driving back from Texas.  And during that period of time,

8  there was a hurricane that went up through the panhandle of

9  Florida.  So I figured that might be a couple of days, maybe

10  phone lines were down and he couldn't call, that type of

11  thing, and he might be stranded in that area.

12        So I figured, you know, that might be a couple of days

13  before we could hear from him.

14  Q.  And on the 5th, when he hadn't returned, did you make a

15  phone call inquiring about his whereabouts?

16  A.  Yes, I asked David Waters to -- called David Waters'

17  house.

18  Q.  And what did Mr. Waters tell you about his knowledge of

19  Danny Fry's whereabouts?

20  A.  He said he took off.  He said he probably headed for

21  Kansas with friends -- to his friend in Kansas City.  That's

22  what he first told me.  And he said -- and he also said he'll

23  probably be calling you.  If he calls you, I need to talk to

24  him about my storage area.  He had stuff stored in there,

25  also, and it was left open and some of my stuff's missing.

Fry - Direct

1  Q.  Did you have a subsequent conversation with David Waters?

2  A.  Yes, I did.

3  Q.  And do you know how many days later in time that was?

4  A.  Just probably the next day, on a Friday.

5  Q.  Let me direct your attention to a time frame, then maybe

6  we could work backwards.  Did David Waters ultimately show up

7  on your doorstep?

8  A.  Yes, he did.

9  Q.  And do you remember what day of the week that was?

10  A.  It was on Sunday --

11  Q.  And --

12  A.  -- following that Thursday.

13  Q.  Okay.  And had you had a call from David Waters that

14  Sunday morning before he arrived at your residence, Sunday at

15  dusk?

16  A.  Yes, I did.

17  Q.  And prior to the Sunday morning phone call, had you had

18  another phone call with Mr. Waters?

19  A.  Yes, I called him, and I already destroyed the letter, but

20  I wanted to find out if I get a response about Danny to find

21  out where he was at or maybe have Danny call me.  That maybe

22  if he was still alive that Waters would have Danny call me.

23  So I told him I had the letter in my possession and it said,

24  "Do not open."

25  Q.  What did Mr. Waters tell you?

*Fry - Direct*

1  A.  First time I ever talked to him where he didn't have a

2  quick answer, he hesitated for a second like he was thinking

3  of something.  He said to me, he says, "Don't open it."  He

4  says, "I'm sure Danny's going to show up shortly or I'll get a

5  hold of him and have him call you."  He said, "But don't open

6  it."

7  Q.  Were you concerned for your well-being about what Mr.

8  Waters was capable of doing to you from conversations you had

9  with your brother, Danny, in terms of did you have some reason

10  to fear David Waters?

11  A.  I felt that David Waters would probably, you know, not let

12  anybody stop him from wanting -- from what he wanted to

13  accomplish.  If somebody knew something, I'm sure he would not

14  hesitate to take care of them.

15  Q.  On this conversation -- in any of the conversations prior

16  to the Sunday morning phone call, when Mr. Waters called you,

17  had you given him your physical address?

18  A.  The morning of the Sunday that he showed up.

19  Q.  And why did you give it to him then?

20  A.  He called me and said he found a letter in Danny's room

21  where Danny was staying.  And on the letter, it said "Bob" on

22  it.  And David says you're the only person that I can think of

23  that's a Bob that Danny knows.  What's your address so I can

24  mail this letter to you?

25  Q.  And that was Sunday morning?

1  A.  Yes.

2  Q.  And then, how many hours later before someone showed up at

3  your doorstep?

4  A.  Not many.

5  Q.  Did Mr. Waters come alone?

6  A.  No, he didn't.

7  Q.  Do you remember the name of the person who came with him?

8  A.  I can't be sure of it.  I'm not positive.

9  Q.  What were you doing at the time these two -- two men,

10  correct, that came to your house, David Waters and another

11  man; is that correct?

12  A.  Yes.

13  Q.  They knocked on your door?

14  A.  Yes, they did.

15  Q.  What did they -- you let them in?

16  A.  Yeah, Waters identified himself at the door.  I called out

17  and I said who was there?  And I was getting a little nervous

18  after the phone call in the morning, the letter just didn't

19  make no sense, you know.  So when he said he was there at the

20  door, I hesitated and my first instinct was to call 911.

21  Q.  And why didn't you?

22  A.  I said in my head, "What am I going to tell the police,"

23  you know.  I don't know anything.

24  Q.  Are you a combat veteran of the Vietnam war?

25  A.  Yes, sir.

*Fry - Direct*

1  Q.  Did you fly in a helicopter gunship?

2  A.  Yes, sir.

3  Q.  Did you receive any metals for doing that?

4  A.  Yes, I did.

5  Q.  What did you receive?

6  A.  Just numerous -- Flying Cross, Purple Heart, several

7  combat assault air metals.

8  Q.  And did you tell me last night that you received a

9  Distinguished Flying Cross that you had to fly in at least 25

10 actual combat missions?

11 A.  That was the air metal, it was a 25 on it.

12 Q.  25 --

13 A.  Air --

14 Q.  -- 25 times that you had flown in at least 25 missions; is

15 that correct?

16 A.  Yeah, under hostile conditions.

17 Q.  Okay.  The area where you reside or lived at that time --

18 if people drive up to the front of your house on the street,

19 would you normally notice them?

20 A.  Oh, you'd hear -- you'd hear your neighbor cough if you --

21 you know, with the window open.  It's very quiet, safe area to

22 live.

23 Q.  And did you notice any vehicle traffic just immediately

24 prior to these -- Mr. Waters and this other man showing up on

25 your doorstep?

Fry - Direct

1  A.  No.  That was another reason I was surprised when he said

2  it was Waters.  I thought, maybe, it was a neighbor knocking

3  or something because I didn't hear a car door.

4  Q.  Is there an alley behind your house?

5  A.  Yes, there is.

6  Q.  If someone parks in the alley, are you able to hear the

7  vehicle?

8  A.  Yes, you would hear probably a -- you know, within a half

9  a block.  All the way around you, you would hear a car door.

10  Q.  Okay.  When David Waters and this other person came in the

11  house, what did they do?

12  A.  First question they asked -- they asked if I was alone.

13  Q.  And what did you tell them?

14  A.  I said yes, I was.

15  Q.  And then, what did they do in terms of searching the

16  house?

17  A.  They just immediately went into the bedroom, and I had a

18  dog -- I had a two-bedroom house at the time.  I had my dog in

19  the one room.  She was barking quite a bit and acting upset.

20  And they immediately checked the other bedroom and looked

21  around in there and looked into the bathroom, which was real

22  small.  The rest of the house was real easy to see there was

23  nobody there.  It was very small.

24      They more or less -- when they walked in the door,

25  they took charge.

1   Q.  Did you have a discussion about this letter?

2   A.  That's what -- yes, sir.  That's when they -- David Waters

3   said, "We were sent here to pick up that letter that you

4   called me about."

5   Q.  And what did you -- how did you respond?

6   A.  I said, "I don't have it anymore.  I burned it and flushed

7   it down the toilet."  And he said -- he questioned me about

8   the letter in several different ways to try and see if I was

9   lying to him.  He tried to see if I was -- if I read it.  And

10  he said things to me, like, "The people that sent us are worse

11  than the Mafia, they're tougher than the Mafia, and they have

12  no qualms about coming here and doing whatever it takes to get

13  this letter.  They wouldn't be stopped."

14          They asked me if Lisa Jones still had the letter.  I

15  assured she didn't.  They said, "Well, if she does, we'll go

16  up there and get it.  Just tell us.  We don't even have to go

17  up there.  Just tell us and we'll get it from her."

18  Q.  Did they reference what they were concerned about, why

19  they were interested in the letter?

20  A.  They told me -- both of them -- David Waters told me that

21  they did a big score together and the person that was with

22  them -- and Danny for these people and that this letter

23  contained a negative thing or anything about it about the job,

24  you know, they didn't want it getting out.

25  Q.  Did they say specifically this thing that they had done --

Fry - Direct

1   A.   Was a major score was what they said.

2   Q.   Did they say in a particular state where it occurred?

3   A.   Texas.

4   Q.   Did they make any -- did they tell you that they would

5   come back if there was some reason to?

6   A.   Oh, they threatened me.  They threatened me if, you know,

7   that I better not have it and --

8   Q.   When you had conversations with your brother, did you come

9   to learn that he had a gun?

10  A.   Yes, I did.

11  Q.   How did you find that out?

12  A.   I was visiting or I was baby-sitting Lisa Jones' son and

13  Danny's daughter, at Lisa Jones' house, and Danny called me --

14  called the house there.  I hardly talked to Danny in Texas.

15  This was one of the first times I talked to him.  And I got on

16  the phone and talked to him, and he said he was going to send

17  some money home to Lisa to help with the bills or whatever.

18  I'm not sure that he said.

19       He said he was going to send some money home and

20  that's why he was calling.  He's going to express mail some

21  money.  And I just talked to him a little bit, and he said he

22  was learning how to -- that Waters had bought a gun and took

23  him to a gun range, was showing him how to shoot a gun.

24  Q.   Did he tell you why he needed a gun?

25  A.   I asked him.  I said, "What in the heck" -- I said, "Why

*Fry - Direct*

1   in the hell do you need a gun for?"  I says, "You never were

2   interested in firearms."  I mean, we were originally from

3   Missouri, and we'd go out and shoot rifles, once in a while,

4   or go rabbit hunting and stuff like that.  He would never do

5   that.  He wasn't interested in that type of thing.

6   Q.  And what did he say to you why he had a gun?

7   A.  His words to me, he says, "Man, this is Texas.  Everybody

8   has a gun here."  That was his response.

9   Q.  When David Waters first came to your house on that Sunday,

10  did he talk to you about your brother having an alcohol

11  problem?

12  A.  He said, "Your brother has a bad drinking problem, doesn't

13  he?"  I said, "He drinks a lot."  I responded like that.  And

14  then, he says, "He tends to talk a lot when he drinks, also."

15  He said that he made a statement like that and looked at me if

16  I would agree or not.

17  Q.  During the period of time that your brother had come to

18  Texas before David Waters came to see you, how many phone

19  calls would you say that you had with him?

20  A.  With Danny?

21  Q.  With Danny, yes, sir.

22  A.  When he was in Texas total about five.

23  Q.  And how would you characterize your brother in terms of

24  talking on a phone?  Did he talk a lot, talk a little?  How

25  was he formally in dealing with him?

*Fry - Direct*

1    A.  Well, I don't know -- the difference in Danny is before

2    when you would talk to him, before this Texas thing, if you

3    got on the phone with him, he'll talk to you for, maybe, two

4    or three hours, telling you -- I mean, long-winded.  He's, you

5    know, he's been a salesman all his life.  He'll tell you about

6    his day, who he saw, funny story about this, funny story about

7    that.  In Texas, he would talk to you, maybe, just a couple of

8    minutes and cut you off.  You ask him a question, he wouldn't

9    answer it.

10   Q.  Did you discern any type of fear or nervousness on his

11   part, and if so, how did you determine that to exist?

12   A.  By the way he responded to the questions.  I told him at

13   one time that I wanted to come there and get him out of Texas,

14   and he said, "No," he says, "I don't want you here; these

15   people are animals, they're crazy animals."  This was towards

16   the end.  Last conversation I had with him.

17   Q.  You told -- basically what you've relayed here, you've

18   told that to Agent Martin; is that correct?

19   A.  Yes, I did.

20   Q.  I think you said two or three conversations with you; is

21   that correct?

22   A.  Yes.

23   Q.  Prior to telling Agent Martin, did you tell someone else,

24   basically, about this letter and this statement that your

25   brother made before law enforcement ever came in contact with

Fry - Direct

1   you?

2   A.   Yes, I did.

3   Q.   And who did you tell that to?

4   A.   Tim Young.

5   Q.   And he would be?

6   A.   Private investigator.

7   Q.   And do you know who he worked for?

8   A.   Yeah, he worked for the Express News in San Antonio with a

9   reporter named McCormmick.

10  Q.   And how long ago did you disclose this -- the existence of

11  this letter to him and these circumstances to him, do you

12  recall?

13  A.   No.  It's a couple of years ago.  Two or three years ago.

14  I saw a show on Nightline about the O'Hair case and the time

15  frame and stuff, and I started thinking about my brother's

16  time frame, when he came to Texas and when he became missing

17  and when the O'Hairs became missing, and when I saw that

18  report where there are numbers with Mr. McCormmick's number

19  and Mr. Young's number, I called them and asked them if they

20  thought any of this would match up.

21       I tried to talk to the, you know -- I just wanted to

22  see if I had anything.  I didn't know if there was anything

23  there or not in this, and I just wanted to match up.  And they

24  did a lot of research and came up with a lot of things that,

25  you know, corresponded.

*Fry - Cross*

1      My brother called me from the Warren Inn, from a pay

2  phone there, and I guess that's where, you know, a lot of

3  stuff happened that I know now.

4  Q.  And you did destroy the letter on your own.  It wasn't

5  done at the instance of --

6  A.  My brother asked me to.

7  Q.  Okay.

8  A.  When he said he was on his way back and everything was

9  taken care of.

10  Q.  Okay.  Pass the witness.

11                  CROSS-EXAMINATION

12  BY MR. T. MILLS:

13  Q.  Judge, I'm assuming that this is on the issue of his

14  testimony about the contents of the letter, not just

15  everything?  That would be --

16      THE COURT:  Ask him whatever questions you want.

17  That's the one thing that I'm aware of that, apparently, when

18  we get into this gentleman's testimony may be objections.

19  You're the one in charge of the objections.  You've got his

20  statement, I don't.  I don't know what he's going to testify

21  to, so I can't direct any of you around.  But we don't have a

22  jury here.  Ask him whatever questions you have.  Then, we can

23  excuse the gentleman, and then, we can decide what objections

24  you have and give me a little bit of insight as to what's

25  coming down the bend.

Fry - Cross

1          MR. T. MILLS:  Yes, sir.

2     Q.  (BY MR. T. MILLS)  I just want to get a chronology.  You

3     got the letter from Lisa Jones on September 30th.

4     A.  Approximately that time.

5     Q.  Approximately.  Do you know --

6          MR. D. MILLS:  Your Honor, that's a -- he's

7     misquoting.  He didn't say he got the letter on the 30th.  He

8     testified he got it prior to the birthday.

9          THE WITNESS:  Yes.

10         MR. D. MILLS:  Not the 30th.  And counsel does that a

11    lot, you know, misquoting the evidence.  And I object --

12         THE COURT:  Well, let's --

13         THE WITNESS:  It was before that.

14         THE COURT:  Listen to the question.

15         THE WITNESS:  And answer it.

16         THE COURT:  Because you agreed to ride with him, he

17    can ask the question any which way you want.  I don't want

18    anybody standing up in front of this jury and saying you're

19    misquoting evidence.  Approach the bench if you think it's

20    misquoted or you could just object, as any lawyer does, that

21    there's no evidence to support the statement.  But let's don't

22    get into any of that.

23         Just listen to the question carefully and answer the

24    question.  All right.  Proceed.

25    A.  I answered that wrong.

*Fry – Cross*

1  Q.  (BY MR. T. MILLS) Okay.  When did you get the letter from

2  Lisa Jones' house?

3  A.  Approximately the beginning of September.

4  Q.  The beginning of September?

5  A.  Yes.

6  Q.  When did you read the letter?

7  A.  Maybe five, six days after I received it.

8  Q.  When did you destroy the letter?

9  A.  When I -- towards the end of September, probably the 27th

10  or 28th, the last time I talked to Danny.

11  Q.  Did you talk to Danny on the 28th of September?

12  A.  I'm not sure which day -- I'm not sure which day I talked

13  -- it was the 28th, or 27th, or 29th, one of the three days I

14  talked to him.

15  Q.  After you -- well, at any time after you received the

16  letter -- after you read the letter, did you make any notes

17  about the contents of the letter?

18  A.  No, I didn't.

19  Q.  Was the first time you talked to anybody about the letter

20  when you talked to investigator Tim Young?

21  A.  First time I talked to anybody about the letter was when I

22  talked to my brother about it.

23  Q.  Okay.  I meant other than your brother.

24  A.  I brought it up -- I believe I brought it up to Mr.

25  McCormmick when I first talked to him, and then, he wanted me

Fry - Cross

1    to talk to Tim Young, explain everything to him because he was

2    the investigator.

3    Q.  All right.  Do you remember when you talked to Mr. Ed

4    Martin, the IRS agent, on August the 20th, 1998?

5    A.  Yes, I remember talking to him.

6    Q.  All right.  Do you remember saying to him that the letter

7    said, "If I'm not back by a date," was that October 5th?

8    A.  October 5th, yes.

9    Q.  "Contact the FBI because I won't be back because something

10   happened to me.  Tell them to check out David Waters.  The FBI

11   will know what I was involved in because of the people

12   involved."

13   A.  Yes, but the way the letter read, that was -- I was just

14   giving them a general outline of what the letter said.  The

15   letter said it means I was killed, what the letter said,

16   actually said.

17   Q.  It actually said those words or that was your impression?

18   A.  No.  It was actually the word "am."

19   Q.  Okay.

20   A.  That was an outline of what the letter said that I gave Ed

21   Martin.

22   Q.  All right.  When you talked to Mr. Martin, you did not

23   mention that the letter said to check out anybody but one

24   person, David Waters.  And I want to ask you, isn't that your

25   best recollection of what the letter said that it said check

Fry - Cross

1    out David Waters?

2    A.   No.  The letter said David Waters, and there was a second

3    name that I can't recall.

4    Q.   Why wouldn't you have said that to Mr. Martin?

5    A.   I told you, that was a general outline of the letter.  And

6    that was the only name I remembered, so that was probably why

7    I didn't say a name I didn't know.

8    Q.   Okay.  Now, it's my understanding that you don't remember

9    the name of the person that was in your house with David

10   Waters, do you?

11   A.   No, I don't.

12   Q.   And you don't -- you can't give an accurate description --

13   real detail description of that person, can you?

14   A.   No.  Now -- well, no.  No, I can't.

15   Q.   Okay.  If you look around this courtroom, do you see the

16   person that was in the room with David Waters?

17   A.   I'm not 100 percent sure.

18   Q.   You have to guess?

19   A.   Yes.

20   Q.   All right.  When two people were in your house, you

21   testified several times that they searched your house, they

22   said something, they threatened you.  Did David Waters do all

23   of the talking?

24   A.   No.

25   Q.   The other person did some of the talking?

Fry - Cross

1  A.  Yes.  He mainly backed up what Waters said.  Waters was in

2  control, but he knew what was going on.  There was a second

3  person.

4  Q.  Was -- is it correct that the first time that you really

5  thought back about the content of that letter, as far as the

6  details of what it said, was when you were interviewed by

7  investigator Tim Young or by John McCormmick?

8  A.  No.  I have a hard time getting that out of my head for

9  years.  I've been thinking about that letter, wishing that I

10  would have took it right to the police, realized I made a

11  serious mistake.  I think about that constantly today.

12  Q.  Okay.  In your interviews with law enforcement, have --

13  I'm not suggesting anything improper, but have you ever had

14  law enforcement people put down or say to you verbally a list

15  of people that were -- that are possible suspects, like, could

16  the letter have said "Smith"?  Could the letter have said

17  "Brown"?  Could the letter have said --

18  A.  No --

19  Q.  Okay.

20  A.  -- never happened.

21  Q.  Okay.  So you don't have -- really, there's no way to

22  reconstruct your memory about who that other person was that

23  was in the letter, right?

24  A.  I think if I was within a few feet of the person and was

25  talking to him, it would come back to me.  If he had three or

Fry - Cross

1    four people in a room, and I was talking to them, I would

2    remember who the person was, but that would be the only way.

3    Q.  Because you'd recognize the voice?

4    A.  Yeah, the voice, the mannerisms.

5    Q.  Okay.

6    A.  I have a -- you know, when -- if somebody doesn't --

7    Waters -- I just -- that's the only time I ever saw both of

8    these people in my life --

9    Q.  Right.

10   A.  -- was at my house.

11   Q.  I understand.

12   A.  And since then, in newspapers.

13   Q.  Right.  All right.  That's all the questions that I have

14   on that issue about the letter.  And on his use is kind of

15   minor, but his use of the words "they did this," "they did

16   that," I would ask that he be more specific.

17          THE COURT:  Any further questions?

18          MR. D. MILLS:  No, your Honor.

19          THE COURT:  Mr. Fry, if you'll step outside, please.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  All right.  I'll hear your objections.

22          MR. D. MILLS:  Do you want me to go first with this

23   proffer?

24          THE COURT:  No.  You've proffered the testimony.  Do

25   you have any objections to the testimony?

Fry - Cross

1      MS. WILLIAMS:  Yes, your Honor.  The defense objects

2   to --

3      THE COURT:  Well, come to the lectern, like a real

4   lawyer.

5      MS. WILLIAMS:  The defense objects to Mr. Fry's

6   testimony about the contents of the letter that he received

7   from his brother.  The contents of the letter are hearsay.

8   The letter doesn't exist anymore.  He destroyed it

9   four-and-a-half years ago.  And he -- the testimony that you

10  just heard is not the same as the testimony that's indicated

11  in bold on the first page of the government's trial brief nor

12  is it the same testimony that is indicated in quotes in -- on

13  page two of four of the IRS that was done on August 20th of

14  1998.

15     And I have that page I'd like to offer as Defendant's

16  Exhibit Record 1.

17     THE COURT:  All right.

18     MS. WILLIAMS:  It's the defense's position that this

19  testimony is the very reason why we have the hearsay rule.

20  It's not an exception based on a statement of a coconspirator

21  because it's not in furtherance of the conspiracy.  It's not

22  an exception under 8033 because it's not a statement of the

23  then existing emotional condition, as indicated by the

24  government; and it doesn't fall under Rule 807 because there

25  aren't independent indicia of reliability.

Fry - Cross

1          THE COURT:  Mr. Mills, do you want to respond?

2          MR. D. MILLS:  For the record, your Honor, the

3    statement that has come in that Mr. Karr gave the agents, he's

4    admitted to being the other individual that went with David

5    Waters to Mr. Fry's house.  So that will tie him in to being

6    the other individual that was making threats.

7          I assume the Court has read the memorandum that was

8    prepared with the case law, and unless you want to ask me

9    questions about that, that's all I have to offer.  I think

10   those cases allow for this --

11         THE COURT:  Those cases went to authenticity.  What

12   exactly is your proffer of this testimony?  It either comes in

13   under some exceptions of the hearsay rule.  You know, what

14   indicia of reliability exists in this record?  I have

15   inconsistent statements and I'm not going to be critical of

16   any inconsistent statements in a brief filed by the

17   government, but here, we have an FBI or a treasury agent's

18   report where a second person is even mentioned.

19         I've got testimony that I've heard today that's

20   dissimilar from the testimony that's summarized in the trial

21   brief, but that just can be human error.  I've got a

22   credibility issue as to whether or not the --

23         MR. D. MILLS:  Your Honor, as to credibility.  I would

24   say it's proven up by the fact that Mr. Karr and Mr. Waters

25   went to get the letter from him.  That proves the very

*Fry - Cross*

1  existence of the letter, and it also shows --

2          THE COURT:  Well, he testified he received the letter.

3  The objection is as to the content of the letter.

4          MR. D. MILLS:  But it goes to Danny Fry's existing

5  state of mind, i.e., "I might be killed, I'm probably dead."

6  It's also an admission against penal interest of his saying,

7  "I was involved in a big crime in Texas with other people."

8  And I think --

9          THE COURT:  It would be against Mr. Fry's criminal

10  conduct.

11          MR. D. MILLS:  But he acts as the agent of the other

12  coconspirator, too, under 801(d).

13          MR. CARRUTH:  2.

14          MR. D. MILLS:  I'm trying to find it.  801(d)(e) is in

15  furtherance of the conspiracy, but it's also a statement by

16  party agent you could talk about concerning a matter with his

17  employment.

18          THE COURT:  This is the contents of an alleged letter

19  that was destroyed.

20          MR. D. MILLS:  That's correct, and the best he could

21  do is paraphrase.  They're allowed to attack the credibility

22  by saying, did you tell Agent Martin this, did you tell

23  somebody else this, is this inconsistent to your testimony?

24  They could point out those flaws to make it appear to the jury

25  that maybe his memory is deficient in exactly what he's saying.

*Fry - Cross*

1   today, but that doesn't exclude it.  That goes more to the

2   weight of whatever the jury wants to place upon the words that

3   he ultimately testifies to when he does testify, if the Court

4   allows him to do so.

5        Point out that he said this to Agent Martin.  Ask

6   Agent Martin.  Did you write the down?  Is this a quotation or

7   is this a paraphrasing?  They're allowed to pick at that.  I

8   don't object to that, your Honor, at all.  But in terms of the

9   availability -- in terms of it coming in, it should come in

10   because it does reflect the declarant's state of mind, Danny

11   Fry's, and it's consistent with what happened.

12        He's dead, this defendant and the other one came and

13   threatened this man.  They were so concerned about the

14   contents of that letter.  They're acting in furtherance of the

15   conspiracy to try to conceal and take this letter away for

16   fear of what's in there.

17        They said, "He's got a big mouth.  We're afraid he's

18   going to talk."  It shows his state of mind, and we think it's

19   relevant for that reason, your Honor.

20        MR. CARRUTH:  And, Judge, the federal rules

21   specifically provide for the admissibility of secondary

22   evidence where the original's been lost or destroyed through

23   no bad faith on the part of the proponent.

24        MR. D. MILLS:  We cited --

25        MR. CARRUTH:  The case law is clear and they involved

1    threats.

2         THE COURT:  The one case y'all give me is not even at

3    point, but I'm very familiar with evidence and evidence

4    rulings with regard to lost documents.  I've never seen a case

5    where -- would fit this circumstance.  And I'll give you

6    another hour to look at it, and I'll look at it in an hour.

7    Recess until 1:30.

8         MR. CARRUTH:  Thank you, your Honor.

9      (Lunch recess.)

10        THE COURT:  All right.  Counsel, anything further on

11   this evidentiary point before I make a decision from the

12   defendants, excuse me?

13        MS. WILLIAMS:  No, Judge.

14        THE COURT:  Anything further from the prosecution?

15        MR. D. MILLS:  We'd also ask the Court to look at

16   804(b)(2), the statement under belief of impending death is an

17   exemption to the hearsay rule.

18        THE COURT:  Very familiar with that and the fact that

19   the Congress tried to expound on that to cover situations like

20   this and in civil trials and it was turned down.

21        MR. D. MILLS:  And we'd offer it, then -- we'd urge

22   all the grounds plus the admission by a party opponent,

23   declaration against his penal interest.  We had been involved

24   in a crime.  It doesn't directly implicate this defendant in

25   any way.  He's never mentioned the defendant's name, so it's

Fry - Cross

1    not a Bruton problem.  So we think we could get it in under

2    that exception to the hearsay rule.

3          And I have some cases on that point saying as long as

4    it doesn't directly implicate the defendant by name, that it's

5    not a Bruton error.  And I have three cases to cite, two Ninth

6    Circuit cases and three Fifth Circuit cases.

7          THE COURT:  You could summarize them.  I wasn't

8    thinking too much of Bruton.  I was thinking about the --

9    first off, the coconspirator theory, but I didn't know -- no

10   way in the world you can advance the admission on that because

11   it's not in furtherance of any conspiracy.  And yet, the

12   evidence is going to be that several days later, he withdrew

13   the letter.  So that would go out anyway.  But there's no

14   advancing the conspiracy on the statement.

15         MR. D. MILLS:  This Ninth Circuit case is United

16   States vs. Martin Enriquez-Estrada, 999 Fed. 2d, 1355, Ninth

17   Circuit, decided July 7, 1993, cert denied, 117 Supreme Court

18   1566, 1997.  The headnote reads, evidence of codefendant's

19   confession had it been redacted to eliminate references to

20   defendant's name but not to their existence was not

21   incriminating on its face but only when linked with evidence

22   introduced later and thus, admission of redacted confession

23   did not violate defendant's confrontation clause right under

24   Bruton.

25         It says -- I'm reading on page 1359 of that opinion.

*Fry - Cross*

1    It's citing a case, Vasquez:  The defendant challenged the

2    admission into evidence of a codefendant's confession has been

3    redacted to eliminate all references to Vasquez' name but not

4    to his existence.  Instead the neutral word --

5            THE COURT:  Wasn't the alleged confession being

6    offered against the codefendant?

7            MR. D. MILLS:  Not this defendant.  It only implicates

8    David Waters.

9            THE COURT:  No, in your case, there's a codefendant

10   there.  So a statement, confession is being offered against

11   the codefendant.  The Bruton problem is not there because the

12   other defendant's recitals, if any, have been eliminated plus

13   the fact you don't have a hearsay document in the beginning.

14           MR. D. MILLS:  Well, it's the codefendant's

15   confession, your Honor, that was -- that was there, not the

16   statement.  It says the Eleventh Circuit rejected the

17   challenge concluded that the admission in a joint trial of a

18   codefendant's confession that is redacted to substitute a

19   neutral pronoun or other general word for the name of the

20   complaining defendant does not violate Bruton so long as the

21   confession is not -- compelled direct implication of the

22   complaining defendant.

23           And a Fifth Circuit case that's the same on point is

24   148 Fed. 3d, 518, United States vs. Walker.  And on page 522,

25   it says there are two well-established exceptions to the

*Fry - Cross*

1    Bruton rule, however.  First, Bruton only applies to

2    out-of-court statements that are facially incriminating,

3    citing Richardson vs. Marsh, 481 U.S. 200, at 209, 1987,

4    Supreme Court case.

5        And it basically discusses things that as long as they

6    don't directly implicate the defendant, they're admissible.

7    And even if evidence comes in later and links that defendant

8    up by virtue of what was said in that statement, that is

9    permissible.  And that's what we will have here, your Honor,

10   is that other evidence will come and link this defendant up to

11   that statement based upon what was done and the threats that

12   were made.

13       Would you like me to give you the opinions to read?

14       THE COURT:  Sure.  I'll be glad to read them.

15       MR. D. MILLS:  Mr. Carruth, I wanted out 204A hearsay

16   exception with declarant is unavailable, which we have here.

17   It's a statement of -- against interest, pecuniary,

18   proprietary or penal.  It's another exception, your Honor.

19       THE COURT:  Let the record reflect I read the United

20   States vs. Peterson, 140 Fed. 3d, 819, United States vs.

21   Enriquez-Estrada, 999 Fed. 2d, 1355, and United States vs.

22   Walker, 148 Fed. 3d, 518, all of which deal with confessions.

23   I'll give those back to the defendant.

24       There is no question that the alleged letter, written

25   by Danny Fry to his brother, is a hearsay statement.  It is a

Fry - Cross

1   statement allegedly made in writing.  It was a statement

2   nonetheless made by declarant.  There is no question that the

3   declarant is unavailable, outside the presence of the Court

4   room.  I've looked at all of the exceptions.

5        The exceptions with regard to what we call the last

6   utterance is not applicable because, obviously, death wasn't

7   imminent as held by all the cases that I'm familiar with,

8   including the Circuit.  It may be against penal interest of

9   Mr. Fry, but it's certainly not the penal interest of anybody

10  else that has cross-examination, for example, the defendant in

11  this case.

12       Under the last exception, which is 807, which is the

13  catch-all, residual exception, I can't see sufficient evidence

14  of reliability to make an otherwise inadmissible statement

15  admissible.  The Defendant's Exhibit Record 1 indicates from

16  the law enforcement stage that Mr. Karr was not even mentioned

17  in the original communication to the federal authorities.

18       He has given testimony which is inconsistent with that

19  although he doesn't name Mr. Karr, he brings in another person

20  unknown in the letter.  I'll sustain the objection with regard

21  to the content of the letter.  The existence of the letter, of

22  course, is another matter.  And all the evidence that

23  surrounds the existence of the letter, the receipt of the

24  letter, what was done, who came, who tried to get it back, all

25  of that, of course, can be admitted, but the content will be

*Fry - Cross*

1   excluded.

2        MR. CARRUTH:  Your Honor, our trial brief also

3   addressed oral statements made by Danny Fry to his brother

4   during the time he was in Texas such as "David Waters bought

5   me a gun and he's taken me to learn how to shoot it."  The

6   Court's ruling does not encompass or prohibit as to those

7   statements.

8        THE COURT:  It does not.  That could well be under the

9   code of conspirators statement.  The gun could be in

10  furtherance of the conspiracy.

11       MR. CARRUTH:  As well as the fact that Mr. Danny Fry

12  called his brother and told him to destroy the letter.  That's

13  not precluded by the Court's ruling, is it?

14       THE COURT:  I suspect that will be objected to, and

15  that's a hearsay statement.  How would you try to get it

16  admitted?

17       MR. CARRUTH:  If it's objected to, since Mr. Mills is

18  going to be doing the questioning, can we cross the bridge at

19  that time?

20       THE COURT:  Yeah, get his explanation.  That was very

21  clever.  All right.  This is part of the record.  All right.

22  Anything further before we bring in the jury?

23       MR. CARRUTH:  Nothing from the government, your Honor.

24       THE COURT:  Mr. Mills, since you're going to be up, do

25  you have anything further?

Fry - Cross

1        MR. D. MILLS:  No, your Honor.

2        MS. WILLIAMS:  Judge, we would just ask that you

3   instruct the witness as to your ruling so that we're sure that

4   he's clear what the Court's ruling is since he's already

5   testified previously about the contents.

6        THE COURT:  Well, I'll tell you what.  I'll let Mr.

7   Mills go out and instruct the witness.  Tell him not to go

8   into the contents of the letter.  All right.  Bring the jury

9   in.

10       (Jury present.)

11       THE COURT:  Members of the jury, during the noon

12   break, did anyone attempt to talk to you about this case?

13       THE JURORS:  No.

14       THE COURT:  Did you talk to anybody about the case?

15       THE JURORS:  No.

16       THE COURT:  And did you learn anything at all about

17   the case outside the presence of each other and this

18   courtroom?

19       THE JURORS:  No.

20       THE COURT:  Show negative responses to all questions

21   by all jurors.  Mr. Fry, you've been sworn; you stay under

22   oath, sir.  You may have the lectern.

23

24

25                    RE-DIRECT EXAMINATION

*Fry - Redirect*

1  BY MR. D. MILLS:

2  Q.  Tell the jury your name, sir.

3  A.  Clarence Robert Fry, F-R-Y.

4  Q.  Where do you live, sir?

5  A.  In Rock Island, Illinois.

6  Q.  In 1995, where were you residing?

7  A.  Naples, Florida.

8  Q.  And are you Danny Fry's brother?

9  A.  Yes, I am.

10  Q.  Tell the jury your background, your educational

11  background, and how you're currently employed, any military

12  experience that you've had.

13  A.  I have high school education, went into the service right

14  after high school in the Army, went to Vietnam, 18 months

15  overseas.  I got back from Vietnam, went to college for a

16  year, junior college, didn't get an associate's.  Had several

17  different jobs.  Went back into the service for a short period

18  of time.

19       I couldn't adapt to it after being in combat,

20  state-side duty, so I got out of the service.  I've just been

21  -- then, I was -- went into a PTSD program, and I was wounded

22  in Vietnam, also.  I went into the hospital for problems I was

23  having with my knees.  I couldn't walk.

24       I was administered to a hospital one year and was in

25  the hospital.  They also diagnosed me with PTSD.

1    Q.   Would you tell the jury what PTSD is, please?

2    A.   Post Traumatic Stress Syndrome.

3    Q.   And can you briefly tell the jury what that involves?

4    A.   Involves having flashbacks of combat action.  It can also

5    be a woman that was raped that has a -- or some survivor of a

6    hurricane and lives in their house.  They could be any kind of

7    tragedy.  The more often you've been exposed to something, the

8    harder -- the more effect PTSD has on you.

9    Q.   Tell the jury, please, what your combat experience was in

10   Vietnam and what you did.

11   A.   I was a helicopter crew chief and gunner.  I flew on a

12   gunship in Vietnam.

13   Q.   Did you receive any metals for doing that work?

14   A.   Yes, I did.  I got a Purple Heart, a Distinguished Firing

15   Cross, several air metals.

16   Q.   How many combat missions did you estimate that you flew?

17   A.   For every air metal, it's 25 assault missions, and I had

18   25 Star Air metals, so 25 times 25.  And you flew almost every

19   day, and I was there for 18 months total.

20   Q.   In the summer of 1995, where were you living in Florida?

21   A.   Naples.

22   Q.   And where was your brother living in Florida, if he was?

23   A.   Naples, also.

24   Q.   Did you have a lot of contact with him?

25   A.   I wouldn't say, like, most brothers do.  I had a fair

Fry - Redirect

1   amount of contact with him.

2   Q.  Before I forget to ask you, did you give some blood to a

3   law enforcement authority for purposes of a DNA sampling?

4   A.  Yes, I did.

5   Q.  And when did you do that?

6   A.  '98, I think.

7   Q.  Do you remember what law enforcement agency it was?

8   A.  Dallas County.

9   Q.  Did they come to you to take the sample, or did you go

10  there, or how was it done?

11  A.  They had me go to a doctor there, get it done, have it

12  sealed, and express it to their lab.

13  Q.  Do you remember a time in the summer of 1995 when your

14  brother decided to go to Texas?

15  A.  Yes.

16  Q.  Can you tell us about how you came to know about his

17  leaving for Texas and approximately when he left for Texas and

18  how he got to Texas?

19  A.  He started talking about it in the spring, he first

20  brought it up to me.  He said he was in contact with David

21  Waters.  I was surprised because I haven't heard his name in

22  quite a while.  And he said that Dave wanted to come to Texas

23  and -- to make some money and work for him.  So he told me

24  about one time and then, over a period -- then, maybe, two or

25  three weeks later, he brought it up again.

Fry - Redirect

1    He probably brought it up two or three times to me,

2    but it took a long time from the first time till he finally

3    left on July 18th.  I was even wondering if he was going to

4    go.

5    Q.  Do you know if your brother had a daughter?

6    A.  Oh, yes, Lisa.

7    Q.  And do you know how old she became in the year 1995 on the

8    date of her birthday?

9    A.  16.

10   Q.  Her birthday was what date, if you know?

11   A.  September 30th.

12   Q.  Was your brother involved with a woman at that time that

13   you knew in terms of living with or dating?

14   A.  Yeah, Lisa Jones from Naples, Florida.

15   Q.  How long had your brother known Lisa Jones?

16   A.  Over a year.

17   Q.  And how long had you known Lisa Jones?

18   A.  Probably eight months.

19   Q.  Did you know where she lived?

20   A.  Yes.

21   Q.  About how far from where you live did she reside?

22   A.  Ten minutes.

23   Q.  When your brother left, on July 18th, for Texas, do you

24   know how he traveled to Texas?

25   A.  Yes, Lisa Jones and her daughter took him to the airport.

*Fry - Redirect*

1    He flew.

2    Q.  Can you tell the jury when the last time you talked to

3    your brother was in 1995?

4    A.  A few days before Lisa's birthday.  Probably the 27th as

5    an estimate.

6    Q.  How many phone conversations did you have with your

7    brother during the period of time between July 18th, when he

8    left, and sometime in September 27th or 28th, when the last

9    conversation?  How many phone calls or different means of

10   communication did you have with your brother?

11   A.  Approximately five.

12   Q.  What did your brother -- what line of work was he best at

13   in your experience?

14   A.  Home improvement sales, especially siding, windows.

15   Q.  What type of person was he?  Quiet?  Talkative?  Shy?

16   Outgoing?  How would you describe him?

17   A.  Very outgoing, very talkative.

18   Q.  Had he lived in other places?

19   A.  Yes.

20   Q.  Prior to his going to Texas and your having these five

21   phone conversations, had you had phone conversations with him

22   on other occasions?

23   A.  Well, he was in Florida?

24   Q.  Yes, or other places that he may have been while he was

25   working other places?

*Fry - Redirect*

1   A.   When he was in Florida, he left Florida one time and he

2   went back to Illinois, and he sent his daughter to stay with

3   her mother for a couple of weeks in Hanford, and that's the

4   only time that I know of that he left Florida.   And while he

5   was in Illinois, he painted our mother's house for her.

6   Q.   The phone conversations that you have with your brother,

7   other than the time he was in Texas that we've described,

8   between July 18th and September 27th of 1995, what type of

9   conversations were they?   Long?   Short?   How would you

10  characterize them?

11  A.   Short.

12  Q.   The ones prior to going --

13  A.   Oh, prior to going --

14  Q.   -- prior to going to Texas, it was very long-winded?   What

15  would you talk about?

16  A.   If he was selling that day, he would talk about the person

17  whose house he was at.   He would, you know, have a few funny

18  jokes that he had told them, and he would repeat them to me.

19  He liked to let you know that he was -- you know, he was

20  having fun.   And then, people had a good time while he was in

21  their presence, and they bought from him.   They sold the deal.

22  Q.   Had you ever heard of the Warren Inn?

23  A.   Yes, I have.

24  Q.   How did you hear that?

25  A.   Once when Danny called me, he said he was calling from a

*Fry - Redirect*

1   pay phone by the Warren Inn by the pool.

2   Q.  And this phone call would have occurred during the period

3   between July of '95 and September 28th or 29th of '95?

4   A.  It would have been September.

5   Q.  We'll call these the Texas phone calls, how about that?

6   Is that an acceptable -- anything in that period we'll call

7   the Texas phone call --

8   A.  Okay.

9   Q.  -- all right?  During that time frame, did you ever have a

10  conversation with your brother about a gun?

11  A.  Yes.

12  Q.  Had you ever --

13  A.  Early on.

14  Q.  -- pardon me?

15  A.  Early on one of the first conversations.

16  Q.  Had you ever known your brother to own a weapon prior to

17  him talking to you on the telephone?

18  A.  No, I never saw him even hold one.

19  Q.  What did he tell you about this gun that he had?

20  A.  He said that David Waters bought it for him and took him

21  to the ranch because he wanted to know how to shoot it.

22  Q.  In the Texas phone conversations that you had, describe

23  your brother's nature compared to when you talked to him

24  previously when he wasn't in Texas.

25  A.  He was very short on the phone.  He wanted to make a point

*Fry - Redirect*

1 and get off quick.  Like, I was baby-sitting at Lisa Jones'

2 house one time, and he called and said he was sending money

3 back, and then, he was ready to get off the phone.  I said,

4 "Well, do you want to talk to your daughter Lisa?"  And he

5 goes, "Well, I've really got to go.  Tell her I'll call

6 later."  And that's just not like him.  That was a complete --

7 you know, to be that short.

8 Q.  Did he ever tell you what he was doing in Texas when he

9 made the phone calls to you from Texas?

10 A.  When he called me from the Warren Inn, he made a statement

11 that -- I said, "Well, let's talk.  What's going on?"  He

12 says, "I can't talk very long.  I'm setting on these people."

13 He didn't specify what was -- who he was setting on or what

14 was going on.

15 Q.  Did he tell you who these people were?

16 A.  No, sir.

17 Q.  When you talked to him last on the 27th, 28th or 29th, did

18 he tell you when he was -- if he was coming back, and if so,

19 when was he coming back to Florida?

20 A.  He said he was on his way shortly.  Things were coming to

21 an end.

22 Q.  During the period of time that you were having the Texas

23 phone conversations, did you ever become concerned for his

24 well-being?

25 A.  Yes, I did.

*Fry - Redirect*

1   Q.   Did you offer to do anything to assist him?

2   A.   I offered to drive there and pick him up and get him out

3   of there.

4   Q.   And what did he tell you?

5   A.   He told me not to go up because he says -- he says "David

6   Waters" -- and he said another person's name -- "are both

7   animals and you don't want to get involved in this, and I

8   don't want you to get involved in this."

9   Q.   Did there ever come a time when he told you about a letter

10   that he had written?

11   A.   Yes.

12   Q.   And did he tell you where the letter was?

13   A.   Yes, it was at Lisa's house.

14   Q.   What did he instruct you to do regarding the letter?

15   A.   To pick it up from her and to hold on to it.

16   Q.   Did you do that?

17   A.   Yes, I did.

18   Q.   And approximately when did you go and retrieve the letter

19   from Lisa Jones?

20   A.   That was before he called me from the Warren Inn, probably

21   a week before the 30th, or two weeks.

22   Q.   Did -- were there any instructions on the letter in terms

23   of what to do with it?

24   A.   He said, "Do not open until October 5th."

25   Q.   Until October 5th?

*Fry - Redirect*

1  A.  Yes.

2  Q.  Did you open the letter?

3  A.  Yes, I did.

4  Q.  Did you read the letter?

5  A.  Yes, I did.

6  Q.  Did you become concerned after you read the letter?

7  A.  Absolutely.

8  Q.  And when did you open the letter?

9  A.  Just a few days after I got it.  Up to a week, maybe.

10  Q.  If there's been evidence that the 30th of September was a

11  Saturday, would that comport with your recollection?  Would

12  you have any reason to disagree with that?

13  A.  No.

14  Q.  So that would make the first of October a Sunday; is that

15  correct?

16  A.  Yes.

17  Q.  And the following would be the 8th, seven more days added

18  to one would be the 8th, correct?

19  A.  Yes.

20  Q.  During that first week of October, was there any type of

21  storm that entered -- that gave you any reason to be concerned

22  about your brother's well-being?

23  A.  Yes.  Lisa Jones had indicated that Danny might be driving

24  back from Florida.  And during that period of time after --

25  right after Lisa's birthday, a hurricane went through the

1   panhandle of Florida, and we thought maybe he could have been

2   caught up in that somehow and not be able to communicate.

3   That's why we didn't hear from him for -- during the few days.

4   Q.  So when was it that you became concerned enough to try and

5   take some action to locate your brother?

6   A.  On the Thursday.

7   Q.  Which would have been the 5th?

8   A.  Fifth.

9   Q.  And what did you do in terms of trying to locate your

10  brother?

11  A.  I called up David Waters' house.

12  Q.  Did you talk to David Waters?

13  A.  Yes, I did.

14  Q.  What did you ask him?

15  A.  I asked him if he had any knowledge of where Danny was and

16  Waters says, "No.  He's down here, he took off.  I think he's

17  going up to Kansas City to see a friend of his there."  And

18  that was about the extent of the conversation.  Oh, he also

19  told me that "If you hear from Danny, tell him I need to talk

20  to him because he had stuff in my storage shed, and when he

21  got his stuff out of the storage shed, he left it open and

22  some of my stuff's missing."

23  Q.  Did you have a subsequent phone conversation with David

24  Waters?

25  A.  Yes, I did.

*Fry - Redirect*

1   Q.  Did you call him or did he call you?

2   A.  I believe I called him again.

3   Q.  And would that have been on Saturday, which would have

4   been --

5   A.  Yeah, it would have been Saturday because he told me

6   that --

7   Q.  And this is -- he told you being in the conversation you

8   had with him on the 7th?

9   A.  Yeah, that he had heard from Danny and Danny was in Dallas

10  and he was drunk.  He called him very late at night, Friday

11  night, but he was okay.

12  Q.  Anything else in that phone conversation that you asked

13  Waters or he related to you about your brother's well-being or

14  where he was?

15  A.  I brought it up to him about the letter because the

16  craziness -- I wasn't the only one calling Waters.  I probably

17  can't talk about that.  That would be hearsay.

18         THE COURT:  Just listen to the question and answer the

19  question, sir.

20         THE WITNESS:  All right.  I'm sorry.

21  Q.  (BY MR. D. MILLS) You brought up the letter; is that

22  correct?

23  A.  Yes.

24  Q.  And had you talked to David Waters on other occasions?

25  A.  Yes.

*Fry - Redirect*

1   Q.  When you told him about the existence of this letter, what

2   happened on the end of the phone that Mr. Waters was holding

3   relative to immediately pause and ask you questions?

4   A.  Immediately stopped talking for a minute.  Before that,

5   any time I called him, he had a ready answer, a very

6   methodical of what he said, had an answer for anything you

7   said.  When I said that to him, he had a pause for a minute,

8   and then, he started talking.  He says, "Don't open the

9   letter, whatever you do.  Danny will be back before long, I'm

10  sure.  And just don't open the letter because it doesn't

11  concern you and just don't open it."  He said it over and

12  over.

13          And he made me say to him on the phone that I would

14  not open it.

15  Q.  Go to Sunday, the 8th.  Did you receive a phone call from

16  David Waters?

17  A.  Sunday morning.

18  Q.  And what did Mr. Waters tell you or ask you about?

19  A.  He said, "I found a letter in Danny's room where he stayed

20  at my house with the name Bob on it, and I need your address

21  because you're the only Bob that I can think of that Danny

22  knew to send this letter to."

23  Q.  When you called him on Saturday night -- or did he call

24  you, the Saturday night phone conversation?

25  A.  Saturday morning?

*Fry - Redirect*

1  Q.  No.  Saturday night.  Not Sunday morning but Saturday

2  night, the phone call where you disclosed to him that you had

3  a letter from your brother.

4  A.  That was Saturday morning.

5  Q.  Oh, Saturday morning?

6  A.  Yes.

7  Q.  Did you call him?

8  A.  Yes.

9  Q.  Where did you call him?  What number did you call him?

10  A.  His home number.

11  Q.  And that would have been in what town?

12  A.  Austin.

13  Q.  And then, Sunday morning, what time did he call you?

14  A.  Maybe 8:00.

15  Q.  In regards to this letter that he claimed he had of your

16  brother's, did he ask you for anything so that he could get

17  the letter to you?

18  A.  My address.

19  Q.  Did you give it to him?

20  A.  Yes, I did.

21  Q.  Later that evening, did you get a couple of visitors come

22  to your house?

23  A.  Yes, I did.  Just about dark, I got a knock on the door.

24  Q.  And tell the jury about the neighborhood where you resided

25  at the time.  Was it quiet?  And if so, were you able to hear

*Fry - Redirect*

1   vehicles that would drive up?

2   A.  Yeah, the neighborhood I lived in, it's called Old Naples.

3   It's a very wealthy area.  I lived in an older home, but most

4   of the homes in the area down there -- the police patrol on

5   bicycles.  It's just very little crime.  Most people leave

6   their doors open, windows open.  Everybody knows each other in

7   the neighborhood.  And real quiet, I mean, there's not much

8   car traffic.  It's a very quiet neighborhood.

9   Q.  Prior to someone knocking on your door that evening, did

10  you hear a vehicle drive up and park either in the front or

11  back of your house?

12  A.  No, I didn't.

13  Q.  Would you normally be able to hear a vehicle if they

14  parked in the front or back of your house?

15  A.  Oh, absolutely.  I'd be right up to the door to see who

16  pulled up.

17  Q.  Was anyone else in the house with you at that time?

18  A.  No.

19  Q.  Did you have an animal?

20  A.  Yes, I had a labrador dog.

21  Q.  And what did you do with the dog, if anything, at the time

22  the knock came on the door?

23  A.  Well, normally, she always backs when somebody comes up,

24  but normally when I tell her to quiet down, she does and you

25  could have somebody come in, but she just wouldn't behave.  So

*Fry - Redirect*

1    I put her -- locked her in one of the bedrooms.

2    Q.  Did you go to the door?

3    A.  Yes, I did.

4    Q.  Do you have a peep hole or anything like that that you

5    could look through?

6    A.  No.  I just yelled out "Who's there?"

7    Q.  And what was the response you received?

8    A.  David Waters.

9    Q.  And did he come in the house?

10   A.  Yes, he did.

11   Q.  Did he come in with someone else?

12   A.  Yes, he did.

13   Q.  And what did they do -- the two men do once they came into

14   your house?

15   A.  First thing, they asked if I was alone.

16          MR. T. MILLS:  Objection to the responsiveness or --

17   nonresponsiveness of the word "they."  If he could identify

18   the speakers.

19   Q.  (BY MR. D. MILLS) Who asked if you were alone?

20   A.  Mr. Waters.

21   Q.  Who did most of the talking of the two men?

22   A.  David Waters.

23   Q.  Did the other man talk at all?

24   A.  Yes.

25   Q.  And when you -- when we come to those parts, if you'll

*Fry - Redirect*

1  allude to that as the other individual, keep it straight from

2  David Waters and the other man, okay?

3  A.  Okay.

4  Q.  You responded how to that question?

5  A.  I said, "I'm alone."

6  Q.  What did David Waters or the other man do relative to your

7  house, if anything?

8  A.  David Waters and the other man both checked the bedroom

9  that was opened, looked into it, and looked into the bathroom,

10  and looked into the -- just looked around and made sure nobody

11  was -- they did not open the door where the dog was.  But they

12  did ask me:  "Are you sure there's nobody in there with the

13  dog?"  David Waters asked that question.

14  Q.  The other man, was he a Caucasian?

15  A.  Yes.

16  Q.  How were they dressed?

17  A.  Nice, casual clothes.  Clothes looked new or looked, you

18  know, real nice.

19  Q.  Was the subject of this letter brought up at this point in

20  time?

21  A.  Yes.

22  Q.  And who had that discussion with you?

23  A.  David Waters said, "We came here -- we were sent here to

24  pick up the letter that you have."

25  Q.  Did he tell you why he wanted that letter?

*Fry - Redirect*

1   A.   Yes, he said that people that they did the score for --

2   and they, he didn't elaborate.  He said they did the score for

3   in Texas were very serious people and very dangerous.  And him

4   and the person that was with him were worried about their

5   health if they didn't get the letter back and I should be

6   worried, also.

7   Q.   How long did the discussion last relative to the existence

8   of this letter?

9   A.   It went on for quite a while.  He came at me at different

10  angles, watching my face, asked me in different ways, tried to

11  break me down.

12  Q.   Had you given him a response as to the existence of that

13  letter when he initially asked you about it as to what you had

14  done?

15  A.   I told him I had burned it, flushed it down the toilet

16  while reading it.

17  Q.   And did you -- you gave him that answer at his initial

18  inquiry?

19  A.   Yes.

20  Q.   But he continued to question you?

21  A.   Yes.

22  Q.   Did he make any reference to Lisa Jones in her possibly

23  having the letter, and if so, what did Mr. Waters say to you?

24  A.   He asked if Lisa Jones still had the letter, and if she

25  did, it would be no problem, they would go up there and get it

*Fry - Redirect*

1   from her.

2   Q.   And what did you tell them?

3   A.   I said she didn't have it.

4   Q.   How long did they -- do you estimate that these two men

5   stayed in your house?

6   A.   I mean, when being questioned like that, seems like a long

7   time.   I would estimate to 30 minutes to an hour and a half.

8   Q.   Were you concerned for your safety?

9   A.   I was very nervous.

10   Q.   And they used the phrase "a heavy score in Texas"?

11   A.   Yes.

12   Q.   What did you interpret that to mean?

13   A.   Something illegal.   First thing that popped in my mind in

14   Texas was drugs at that time.

15   Q.   Did Mr. Waters have a conversation with you about your

16   brother?

17   A.   Yes.

18   Q.   What did he discuss particularly about some of his

19   personal habits that you recall?

20   A.   He mentioned that my brother drank a lot and he had a

21   tendency to talk a lot when he drank.

22   Q.   Did he give you the letter that he claimed to have had

23   when he asked you for your address?

24   A.   No.

25   Q.   Pass the witness, your Honor.

*Fry - Recross*

RECROSS-EXAMINATION

BY MR. T. MILLS:

Q.  Just a couple of questions, Mr. Fry.  I wanted to kind of make sure that I have the chronology right.  Danny left Florida on July 18th, 1995 to go to Texas?

A.  Yes, sir.

Q.  And he said that it had something to do with selling aluminum siding or some kind of house siding?

A.  Home improvements.

Q.  But he also mentioned the name David Waters?

A.  He said that's who had set it up, the job for him.

Q.  And then, did you see him again?

A.  See my brother?

Q.  Yes.

A.  No, not after he left.

Q.  All right.  And you last talked with him around September 27th?

A.  Around there, yes.

Q.  And you went and got a letter from Lisa Jones around early September?

A.  Early September, the first week, something like that, first week to ten days.

Q.  So approximately --

A.  Yeah, I can't give an exact date.

Q.  I understand.  But would approximately September 1st

Fry - Recross

1  through September 10th be --

2  A.  Be close.

3  Q.  -- be the best estimate?

4  A.  Yes.

5  Q.  And during the time he was in Texas, you got five calls

6  that you remember?

7  A.  Approximately five.

8  Q.  And do you know that he was in Texas because he said that

9  he was in Texas or from some other way?

10  A.  I knew he was in Texas because his daughter and his

11  girlfriend told me they took him to the airport and saw him

12  get on a plane and leave.

13  Q.  Okay.  Was your concern about him due to the fact -- one

14  of the main reasons due to the fact that he didn't have real

15  long conversations, that he just had very short cryptic

16  conversations?

17  A.  Partly.  And the gun thing, him shooting the gun didn't

18  make no sense.

19  Q.  You probably knew that not everybody in Texas carries a

20  gun?

21  A.  Nobody anywhere -- everybody carries guns, I know that.

22  Q.  Right.  And then, he called you from the Warren Inn, did

23  he say that he was sitting with people?

24  A.  Sitting on someone.  Sitting on some people.

25  Q.  Do you know the date?

*Fry - Recross*

1   A.   No.  It was in September.

2   Q.   And did you know what he meant by that phrase?

3   A.   No.  At first, I thought he was going to close the deal,

4   maybe.

5   Q.   Sitting on some people as in trying to talk them into

6   something?

7   A.   Yeah, that's what --

8   Q.   Close the sale?

9   A.   It didn't make sense after I thought about it.

10  Q.   And after you thought about it, did you think about it --

11  did you form any conclusion about sitting on it as in sitting

12  with somebody, as in sitting, guarding somebody, or did you

13  attach any meaning to it?

14  A.   I didn't form any conclusions on it until I saw a show on

15  TV.  I think it was 20/20 when --

16  Q.   Several years later?

17  A.   Yes.

18  Q.   Before July the 18th, 1995, had you ever met a Mr. Chico

19  Osborne?

20  A.   I don't know if I have.  The name doesn't ring a bell.

21  Q.   Have you ever met a man named Gary Karr?

22  A.   Not that I know of.

23  Q.   All right.  And then, you did not -- did you meet any of

24  those men, to your knowledge, after July 18th, 1995?

25  A.   By their names, no, not that I know of.

*Fry - Recross*

1   Q.   And when you talked to David Waters on the morning of

2   October the 7th, did you call him at his phone number in

3   Austin, Texas?

4   A.   I called him, yes.

5   Q.   And that would be how you would know he was in Austin

6   because he picked up the phone?

7   A.   Yes.

8   Q.   When you called his Austin number?

9   A.   Yes, and that was very early.

10  Q.   And he emphasized in trying to -- in talking with you that

11  the people that he was working for or had worked for were the

12  people that he or others had done a heavy score with, correct?

13  A.   Who was emphasizing this to me?

14  Q.   David Waters?

15  A.   Yeah, he was at my house.  He said they set up the score,

16  and David, my brother and whoever else they were, did the

17  score.

18  Q.   But the heavy people meaning powerful people?

19  A.   Yeah, like I said, he told me they were stronger and more

20  vicious than the Mafia was his words, so, yeah.

21  Q.   All right.  You didn't -- and this conversation lasted

22  somewhere between a half an hour and an hour and a half?

23  A.   Yes.

24  Q.   That's all the questions I have.

25                    RE-DIRECT EXAMINATION

*Womack - Direct*

1    BY MR. D. MILLS:

2    Q.  When did you first learn your brother was dead?

3    A.  A couple of years ago now.  I don't remember the exact

4    date.  After they did the DNA testing.

5    Q.  That's all, your Honor.

6         MR. T. MILLS:  No further questions.

7         THE COURT:  May this witness be excused, counselor?

8         MR. D. MILLS:  Yes, your Honor.

9         THE COURT:  You may be excused.  You may call your

10   next witness.

11        MR. CARRUTH:  Caroline Van Winkle.  We'll call Steve

12   Womack and then, Caroline Van Winkle.

13        THE COURT:  Come right here, please, sir.

14    (Witness was sworn.)

15        THE COURT:  If you'll walk up here, around this

16   corner, have a seat in that blue chair.  If you'll tell us

17   your full name and spell your last name, please.

18        THE WITNESS:  My name is Steven Womack, W-O-M-A-C-K.

19     STEVEN WOMACK, called by the Government, duly sworn.

20                    DIRECT EXAMINATION

21   BY MR. CARRUTH:

22   Q.  Mr. Womack, tell the jurors where you live and how you're

23   employed.

24   A.  I live in Mesquite, Texas.  I'm employed by the Dallas

25   County Sheriff's Department as a detective in the Criminal

*Womack - Direct*

1   Investigation Division.

2   Q.  And in that official capacity, sir, have you been involved

3   over the past couple of years, at least, in the investigation

4   of the murder of Danny Fry in Dallas County, Texas?

5   A.  Yes, sir, that's correct.

6   Q.  Did you come to Austin, Texas last year to a storage unit

7   that's been previously identified as Government Exhibit W55-4?

8   A.  Yes, sir.

9   Q.  And what was your purpose in coming to that storage unit,

10  sir?

11  A.  We had located that storage unit in a search through

12  Public Storage archives as a unit that had been rented by an

13  individual named Gerald Osborne, who listed a Dave Waters as a

14  person who could have access to that storage unit, which was a

15  key figure in the investigation.

16  Q.  And did you learn at the time of your investigation that

17  back in 1995, this Mr. Gerald Osborne, also known as Chico,

18  resided over here at West Tawakoni?

19  A.  Yes, sir, that is correct.

20  Q.  And that's not too far from where the body of Danny Fry

21  was found, is it, sir?

22  A.  No, sir, not far at all.

23  Q.  Does Mr. Osborne have a prior criminal history?

24  A.  Yes, sir, he does.

25  Q.  Without specifying what it may be?

*Womack - Direct*

1    A.   Yeah, I couldn't specify, but I'm aware that he does.

2    Q.   Okay.  Did you determine that he was an old friend of Mr.

3    David Waters?

4    A.   Yes, sir, that is correct.

5    Q.   Now, during the date that you came to Austin, Texas to

6    search this storage unit, were there any other law enforcement

7    officers present?

8    A.   Yes, sir, myself, Detective Bjorklund with the Dallas

9    County Sheriff's Department, Detective Oliver with the Dallas

10   Sheriff's Department, Agent Donna Cowling with the FBI, Agent

11   Ed Martin with the IRS, and then, Crime Scene Specialist James

12   Bush with the Austin Police Department.

13   Q.   Okay.  When you left that day, did you have any evidence

14   with you in your possession?

15   A.   Yes, sir.

16   Q.   And what did you take out of that storage unit?

17   A.   There were numerous items that were removed by Officer

18   Bush: three pieces of angle iron that were removed, several

19   nuts and bolts, other items that he had collected and packaged

20   up and turned over to us to take up to Dallas to submit to the

21   Southwestern Institute of Forensic Sciences.

22   Q.   And that was done in your presence and you immediately

23   took that back to Dallas; is that correct?

24   A.   Yes, sir, we did.

25   Q.   Let me show you, Mr. Womack, what's been marked as

*Womack - Direct*

1    Government's Exhibit W64-6, and I'll ask you whether you are

2    able to identify that piece of angle iron?

3    A.   Yes, sir.

4    Q.   Where have you seen that before, sir?

5    A.   That is the angle iron that was removed from the storage

6    unit by Crime Scene Specialist Bush.

7    Q.   And why had this piece of angle iron been removed from

8    that storage unit, if you know?

9    A.   I believe he removed it for the primary purpose of sending

10   it in to have it analyzed to determine whether or not there

11   was any type of blood or tissue evidence, and so forth, to

12   have it analyzed in a laboratory.

13   Q.   And after you took that piece of angle iron back to

14   Dallas, did you submit it for a laboratory analysis?

15   A.   Yes, sir, I did.

16   Q.   And to what laboratory was it submitted?

17   A.   It was submitted to the Southwestern Institute of Forensic

18   Sciences.

19   Q.   Okay.  And after they had done their analysis, did they

20   return the evidence to you?

21   A.   Actually, they didn't return it to me.

22   Q.   Or did you go retrieve it?

23   A.   No, sir, I did not.

24   Q.   Did someone from your department go retrieve it?

25   A.   I believe Karen Cook with Physical Evidence Section would

*Womack - Direct*

1    have collected these items and brought them back to the PES

2    Office.

3    Q.  And at some subsequent point in time, was it turned over

4    to an FBI agent?

5    A.  Yes, sir, it was.

6    Q.  Who was that?

7    A.  Donna Cowling.

8    Q.  Now, there's been some testimony presented about a van

9    that was rented by Mr. Karr on the same day that Mr. Danny

10   Fry's body was found in Dallas, October the 2nd, 1995.  Are

11   you familiar with that van, sir?

12   A.  Yes, sir.

13   Q.  And did you do any investigation to determine whether or

14   not there was a mileage discrepancy on that van after it was

15   rented in Austin and returned the next day?

16   A.  Yes, sir, I did.

17   Q.  Tell the members of the jury what, if anything, you found

18   out during that investigation.

19   A.  What I found was -- I was able to obtain the records from

20   July 1995 through December of 1995 from Capps Van and Car

21   Rental.  When I picked that up, I was able to identify three

22   vans that had been rented at the end of August, at the end of

23   September, and on the 2nd of October of 1995 by Gary Karr.

24        On the third vehicle, I was able to track through

25   using the vehicle number that's assigned by Capps and listed

*Womack - Direct*

1   in the daily reports that Capps does at each location.  By

2   tracking that vehicle number, you can see when contracts

3   opened and closed.  Next to that vehicle number is always the

4   name of the person renting the vehicle and then, the contract

5   number.

6        Once you determine that a contract has been opened on

7   that vehicle, you can reference that contract or go to the

8   file for those contracts, then pull the contract out and

9   determine what the beginning mileage is and any mileage is.

10  We did this with all three vans.  The van that was rented on

11  October 2nd showed an ending mileage, which was 204 miles less

12  than the contract -- the beginning mileage on the contract the

13  next time this vehicle was rented.

14  Q.  And taking that 204-mileage discrepancy into consideration

15  -- sir, by the way, this was the van that blood stains were

16  found in the carpet --

17  A.  Yes, sir.

18  Q.  -- on the floorboard, right?  And taking that 204-mileage

19  discrepancy into account, sir, I'll ask you by showing you

20  what's been marked as Government's Exhibit W64-1 if, in fact,

21  as calculated by the official state highway map that the

22  roundtrip mileage between Austin and the area here, around

23  Seagoville where Danny Fry's body was found on October the

24  2nd, regardless of whether you go all the way up IH-30 and get

25  on the loop and go around to 175, or whether you cut off here

*Womack - Direct*

1  around Edna and go through Avalon and Ennis and that way,

2  either way, it's the same, 206 miles one way; is that correct?

3  A.  Yes, sir.

4  Q.  So a 206 mile -- if you double that, that would be -- a

5  roundtrip would be approximately 412 miles, correct?

6  A.  Yes.

7  Q.  Either way you go from this area back to Austin?

8  A.  Yes, sir.

9  Q.  And adding in the 204-mileage discrepancy on the third van

10  in which blood was found, that's 419 miles?

11  A.  Yes, sir.

12  Q.  Correct?

13  A.  That is correct.

14  Q.  Because it had 206 miles -- or 215 miles shown on it, yes,

15  when it was turned in.  So would that be consistent with a

16  roundtrip between Austin and Seagoville?

17  A.  Yes, sir.

18  Q.  With a few miles to spare?  And just a few miles up the

19  road here is where Mr. Chico Osborne lived, isn't it?

20  A.  That's correct.

21  Q.  We'd offer this, Government's Exhibit W64-1.

22       MS. WILLIAMS:  No objection.

23       THE COURT:  It's received.

24  Q.  (BY MR. CARRUTH)  Thank you.  And we pass the witness, your

25  Honor.

CROSS-EXAMINATION

BY MS. WILLIAMS:

Q.  Do you remember how many days went by between when Gary Karr returned the van to Capps Auto Rental and when the next person rented the van?

A.  On the third van?

Q.  Yes.

A.  The third van was rented again on October the 6th according to the records.

Q.  So how many days went by between the time that --

A.  Three days.

Q.  -- three days went by?  And you don't know what happened to the van in between there?

A.  No, ma'am.

Q.  Know if an employee took it out and ran an errand?

A.  No, I don't know that.

Q.  You don't have any way of knowing that, do you?

A.  No, ma'am.

Q.  And clearly, if the van traveled 215 miles, it wasn't going to make it all the way to Dallas and back --

A.  That's correct.

Q.  -- correct?  The only van that you have knowledge of any witness seeing around that scene was a dark-colored van.

A.  That's -- yes, that's correct.

Q.  And this van that Mr. Carruth asked you about was a white

*Womack - Cross*

1  van?

2  A.  Yes, ma'am.

3  Q.  And the blood that Mr. Carruth referred to multiple times

4  in his direct examination of you is not Danny Fry's blood,

5  correct?

6  A.  I have to see the report on it.  I'm pretty certain that

7  that is the case, but I have not actually read any official

8  report from any DNA labs or anything to where I could be

9  knowledgeable enough to  testify to that.

10  Q.  You haven't heard it is Danny Fry's blood?

11  A.  I have not heard that, that is correct.

12  Q.  Or that is anybody else's blood that has been identified,

13  correct?

14  A.  That is correct.

15  Q.  And did you do enough investigation to determine how many

16  people have rented that van, that third van from Capps Auto

17  Rental from the time Capps acquired it until the time that you

18  tested it for blood?

19  A.  No, ma'am.

20  Q.  When did you test that van, do you know?

21  A.  That particular van was obtained from the current

22  registered owner, I believe, on February 23rd of '99 by our

23  physical evidence sergeant and myself, James Howell.  And we

24  retrieved the van and brought it back for Physical Evidence

25  Section to process.  So I don't know as far as the time frame

*Womack - Cross*

1   when it was actually tested or the exact date that it was

2   tested.  I know the date that we retrieved it for them to

3   process.

4   Q.  To the best of your knowledge, somewhere in February 1999?

5   A.  Yeah, that would be correct.

6   Q.  Let me ask you to look at this report and see whether or

7   not that refreshes your recollection about whether or not the

8   blood in that van belonged to Danny Fry.

9   A.  Okay, yes, it is correct.  That blood did not belong to

10  Danny Fry.

11  Q.  Thank you.  When you took custody of the angle iron that's

12  in front of you, where did you take it?

13  A.  Initial custody was taken by Detective Bjorklund for James

14  Bush.  He wrapped up the items and everything, and I believe

15  Detective Bjorklund secured those items in the trunk of his

16  car until we returned back to Dallas.

17  Q.  Wrapped them up in what?

18  A.  Paper.

19  Q.  What kind of paper?

20  A.  Paper -- looked like, I think, paper sacks.

21  Q.  Real life paper sack or paper sack material?

22  A.  Actually real-life paper sack, I think.

23  Q.  Grocery sacks?

24  A.  Yes, grocery sack.

25  Q.  Where did they come from?

1   A.   James Bush had them.  I guess it's equipment he carries in

2   his physical equipment van.

3   Q.   Besides that piece of angle iron, there were also two

4   other pieces of angle iron, screws, nut, bolts, other items,

5   correct?

6   A.   Yes, ma'am.

7   Q.   Do you remember what else?

8   A.   I'd have to review the evidence sheet to be able to tell

9   you exactly what.

10  Q.   Some sort of debris?

11  A.   I do seem to recall seeing -- I do recall seeing that

12  because what we had to do was we had to transcribe everything

13  that he listed on his evidence recovery log over to our

14  evidence sheet, and I do seem to remember seeing something

15  that said possible blood.  But I don't know what the possible

16  blood was.  I don't know if it was debris that he had found or

17  something he had scraped up.  I don't know.

18  Q.   Were you present in the storage unit during the collection

19  of the evidence?

20  A.   Off and on.  I tried to stay out.  I mean, obviously, when

21  you're doing this, you want to let him do his job and do what

22  he's an expert at.  And so I believe I was in and out but

23  probably mostly out.

24  Q.   And when you say "let him do what he's an expert at," are

25  you referring to James Bush?

1  A.  Yes, James Bush.

2  Q.  From the Austin Police Department?

3  A.  That's correct.

4  Q.  And how long were you at the storage unit?

5  A.  Seems to me we took possession of those items somewhere

6  around 1:30, if I'm not mistaken, and we were probably there

7  from 8:00 or 9:00 in the morning, so a good four or five

8  hours.

9  Q.  Besides what you've testified to on direct examination,

10  you participated with Detective Bjorklund in investigating the

11  death of Danny Fry?

12  A.  Yes, ma'am, that's correct.

13  Q.  And you, like Detective Bjorklund, traveled to Austin,

14  traveled to San Antonio, has worked with IRS Agent Ed Martin

15  and FBI Agent Donna Cowling in trying to figure out what

16  happened?

17  A.  That's correct.

18  Q.  In the course of your investigation, did you go to San

19  Antonio to a bar called Bonnie Jean's?

20  A.  Yes, we did.

21  Q.  Did you talk to people there?

22  A.  Yes, we -- as a matter of fact, I think we -- Detective

23  Oliver and I interviewed Bonnie Jean herself.  I don't know

24  her last name.

25  Q.  And did you learn that Madalyn Murray O'Hair, Jon Garth

*Womack - Redirect*

1   Murray and Robin Murray O'Hair had been seen in Bonnie Jean's?

2   A.  That's what she had told us, that she recalled seeing them

3   in '95.

4   Q.  And did you learn during the course of your investigation

5   that they were there alone?

6   A.  That was her recollection of that story, yes.

7   Q.  And did you learn that they went in and had a drink, paid

8   in cash and left?

9   A.  Yes, that's what she told us.

10  Q.  When you went to Bonnie Jean's, did you take note of how

11  close it was to the Warren Inn Village?

12  A.  Yes, ma'am.

13  Q.  And tell the members of the jury how close it is.

14  A.  It's within, I think, probably 100 yards, maybe.  It's

15  very close.  You walk across the parking lot and walk across

16  the street, then you're at the Warren Inn.

17  Q.  Thank you, sir.

18                      RE-DIRECT EXAMINATION

19  BY MR. CARRUTH:

20  Q.  Isn't it a fact that Bonnie Jean's bar owner told you

21  there was no other witness to her sighting of the O'Hairs?

22  A.  That is correct.

23  Q.  No one else was in the bar or on the street or, all of a

24  sudden, the three O'Hairs materialized?

25  A.  That is correct.

1  Q.  Did she tell you Elvis was there, too?

2  A.  No, she didn't tell me that.

3  Q.  Pass the witness.

### RE-CROSS EXAMINATION

5  BY MS. WILLIAMS:

6  Q.  Isn't it true, Detective, that Ms. Davis had a very

7  specific recollection of having seen specifically Madalyn

8  O'Hair?

9  A.  That was her recollection, yes, that's what she relayed to

10  us.

11  Q.  Isn't it true that she recalled very specific details of

12  her encounter with Ms. O'Hair?

13  A.  Yes, she did.

14  Q.  And what were those details?

15  A.  That would be in my report again.  I feel a lot more

16  comfortable if you can produce it.  Okay.

17  Q.  Tell the members of the jury, having refreshed your

18  recollection, the details of Ms. Davis' encounter with Ms.

19  O'Hair.

20  A.  She recalled Ms. O'Hair came in with a walker and was

21  having a hard time getting around, and she recalled that she

22  came over and had to escort the lady that she believed to be

23  Madalyn Murray O'Hair to the bathroom while these individuals

24  were there.  And after that, they stayed for one drink and

25  left.

*Womack - Redirect*

1    Q.  She remembered that they paid in cash?

2    A.  Yes, they did pay in cash.

3    Q.  And that they left.  Thank you, sir.  Nothing further.

4                    RE-DIRECT EXAMINATION

5    BY MR. CARRUTH:

6    Q.  Did this bar owner, Bonnie Jean, tell you anything about a

7    private investigator coming by about a week later, looking for

8    the O'Hairs?

9    A.  Yes, sir, she did.

10   Q.  And did you find out to be someone credulous since they

11   had not yet been reported missing?

12   A.  Yes, sir, that was a key factor in our conclusion of that.

13   Q.  Thank you, sir.  Pass the witness.

14            MS. WILLIAMS:  Nothing further, your Honor.

15            THE COURT:  May this witness be excused?

16            MR. CARRUTH:  Yes, your Honor.

17            THE COURT:  You may be excused, sir.

18            MR. CARRUTH:  Caroline Van Winkle, your Honor.

19        (Witness was sworn.)

20            THE COURT:  Follow the Security Officer, please,

21   ma'am.  Tell us your full name, please, ma'am, and spell your

22   last name.

23            THE WITNESS:  Caroline Van Winkle, V-A-N-W-I-N-K-L-E.

24        CAROLINE VAN WINKLE, called by the Government, duly sworn.

25                    DIRECT EXAMINATION

*Van Winkle - Direct*

BY MR. CARRUTH:

Q.  Ms. Van Winkle, would you please tell the members of the

jury where you live and what your business or occupation is?

A.  Yes, I live between Dallas and Fort Worth, Texas, and I'm

a forensic DNA analyst.  I've worked both at the Dallas County

Criminal Investigation Laboratory, what's commonly called

SWIVS.  And presently, I'm working in Tarrant County again in

the Criminal Investigation Laboratory as a DNA analyst.

Q.  And could you please describe for the jury and the Court

your educational background, training and experience which

qualifies you to come here today and testify as an expert

witness in forensic DNA analysis?

A.  Basically, I have a bachelor of science degree as a

starting point, and I have been registered as a medical

technologist.  I've also been registered as a specialist in

blood bank technology.  I have a bachelor of science degree in

medical technology.  I also have a master of science degree

with a major in molecular biology.  I've had training

specifically in the area of forensic DNA testing at the FBI

academy in Quantico, Virginia at Selmar, which is one of the

first laboratories in this country to do DNA testing.

And also have spent some time at the National

Institute of Standards in Technology in Gatersburg, Maryland,

working specifically on standards used for forensic DNA

testing.  Subsequent to that training, I've had numerous

*Van Winkle - Direct*

1   seminar, trainings, other educational opportunities concerning

2   specifically this rapidly changing field of forensic DNA.

3   Q.  And, in fact, have you taught at some of those seminars?

4   A.  Yes, certainly.  We -- I have routinely taught both

5   investigators, crime scene people, district attorneys as far

6   as DNA information on forensic cases, medical examiners, and

7   it's an ongoing process as far as educating personnel and

8   people dealing with forensic cases.

9   Q.  Are you a member of any professional organizations or

10  associations?

11  A.  Yes, I've been registered by the American Society of

12  Clinical Pathologists.  I've also been registered and am a

13  member of the American Society of Forensic -- American Academy

14  of Forensic Sciences and, also, American -- the Southwestern

15  Association for Forensic Scientists, and acting at this time

16  as secretary for what we call SWETEMER, Southwestern Working

17  Group on DNA Analytical Methods.

18  Q.  And prior to serving in your present position as a

19  forensic DNA analyst, which I believe you've held for some

20  nine years?

21  A.  Fourteen -- correct, that is correct.

22  Q.  And prior to that, were you a forensic serologist for the

23  Southwest Institution of Forensic Sciences in Dallas?

24  A.  Yes, that's correct.

25  Q.  And prior to that, were you a paternity lab director?

1    A.   Yes, I was.  This was pre-DNA testing, but at that time, I

2    did do paternity testing.  Most of those cases were with the

3    Attorney General's Office of Texas.

4    Q.   And can you tell us, first, whether or not the science

5    that involves DNA -- and I take it that's molecular biology;

6    is that correct?

7    A.   That's certainly a part of it, yes.

8    Q.   What is DNA for starters?

9    A.   DNA stands for deoxyribo nucleic acids, and it's actually

10   packaged in all our new created cells.  We as, human beings,

11   have normally 23 pair of chromosomes, and we inherit

12   approximately half of that DNA in those chromosomes from our

13   biological mother and the other half from our biological

14   father.

15   Q.   And have you previously testified in other trials and been

16   qualified as an expert witness in the field of forensic DNA

17   analysis?

18   A.   Many times.

19   Q.   And can you tell us, ma'am, whether or not in addition to

20   forensic DNA that DNA has other uses outside the courtroom in

21   the medical field or related fields?

22   A.   Certainly.  It's certainly used for plant research, the

23   engineering of food products, in research as far as disease

24   states and treatment for disease such as cancer.  It can be

25   used also a different type of DNA, what's called mitochondrial

*Van Winkle - Direct*

1   DNA for the identification of war remains.  So there are many

2   fields in which DNA is a part.

3   Q.  Now, you're here to testify primarily today about what's

4   known as nuclear DNA, correct?

5   A.  That's correct.

6   Q.  Which differs from mitochondrial DNA, and would it be a

7   fair statement that when we speak of nuclear DNA, all human

8   individuals share who more than 99 percent of the same DNA

9   characteristics?

10  A.  We as, human beings, that's correct, our chromosomes are

11  over 99 percent the same, our DNA sequences are the same.  As

12  a forensic scientist, we are interested in those areas on the

13  chromosomes that differ, those areas that highly differ

14  between individuals.

15  Q.  And that would be less than one percent of the DNA?

16  A.  Yes.

17  Q.  Okay.  Now, how does one normally extract DNA from a body

18  fluid, or hair, or whatever else might be a source or

19  character?

20  A.  It's a little bit different depending on the extract.  For

21  instance, if you have a blood or hair, you take that DNA

22  that's innate in that sample and you purify it.  You get rid

23  of the proteins, and histones, and other factors, or things

24  that are in that particular sample and you purify the DNA, and

25  then, you assess how much DNA you have in that sample.

*Van Winkle - Direct*

1           You want to know how much you have in addition to

2    that, you want to know the quality of the DNA.  In other

3    words, in a forensic sample, the DNA is very long in length,

4    and as it, what's called, degrades, which is a normal process,

5    it breaks into shorter links.

6    Q.  Now, would you normally expect to find DNA in blood?

7    A.  Certainly.

8    Q.  Saliva?

9    A.  Certainly, again, the nucleated cells in blood, yes.

10   Q.  Semen, other bodily fluids?

11   A.  The sperm cell, yes.

12   Q.  Hair follicles?

13   A.  The root molecular materials of the hair, yes.

14   Q.  And what might be other sources of human DNA that you

15   would expect to recover from a crime scene?

16   A.  For instance, any type of tissue whether it be hit-and-run

17   or a shooting where you may have physical tissue, any tissue

18   of your body, our skin, our brain cell, heart cells, any

19   tissue in our body will have nucleated cells containing DNA.

20   Q.  Now, did you become involved in seeking to identify the

21   remains of a headless, handless corpse that was discovered in

22   Dallas County, Texas, on the afternoon of October the 2nd,

23   1995?

24   A.  Yes.

25   Q.  And can you tell the jury what, if anything, you did in

*Van Winkle - Direct*

1  your attempts to identify the body of the headless, handless

2  corpse?

3  A.  Additionally, again, the sample was submitted into the

4  laboratory, and the sample from the body was retained frozen,

5  a blood sample from that body was retained frozen, dried up in

6  a sterile coffin and frozen.  Subsequent to that time, there

7  was a request to compare a couple who had a missing son to

8  that particular sample, and that identification was performed

9  and they were not the parents of this particular individual.

10      Several years after that time, another request was

11  made to compare that sample retained frozen from that

12  unidentified body to another individual of a missing person.

13  And again, that was eliminated as a possible association of a

14  parent or mother, I believe, was the sample to that particular

15  body.

16  Q.  So several unsuccessful efforts were made to identify this

17  particular body; is that correct?

18  A.  That's correct.

19  Q.  And did there come a time in late 1998 when you obtained

20  blood samples from a Clarence Robert Fry and a Danny Raymond

21  Fry, Jr?

22  A.  Yes.

23  Q.  And did you run those samples against the known sample of

24  the deceased's headless, handless body?

25  A.  Yes, I did.

*Van Winkle - Direct*

1    Q.  And can you please explain briefly what methodology you

2    employed in doing this DNA testing?

3    A.  This type of testing was looking at seven different highly

4    variable regions of the chromosome, and in each of those

5    testing of results that we obtained, none of those seven

6    different highly variable regions could this body be

7    eliminated as a father of Danny Raymond Fry, Jr., or a brother

8    of Clarence Raymond Fry -- Clarence Fry.

9    Q.  And so you concluded a 99.99 percent, did you not, that

10   this was the body of Danny Raymond Fry?

11   A.  Well, there are several numbers that are associated with

12   this testing that was done, but over 99.99 percent of the

13   random population, the random male population was excluded as

14   being a father of Danny Raymond Fry, Jr.

15   Q.  Now, is it fair to say that DNA is more effective for

16   excluding than including individuals?

17   A.  Well, certainly, that's the value of the DNA test, it's

18   highly discriminating, so it does -- certainly if an

19   individual's falsely accused or there's a false association,

20   the value is its ability to exclude.

21   Q.  And you told us that you use a nuclear DNA?

22   A.  Yes.

23   Q.  Because you were fortunate enough to have a blood sample

24   from the deceased victim, correct?

25   A.  Certainly if you have a large enough sample, a sample that

*Van Winkle - Direct*

1    is not highly degraded, the optimal type of testing is nuclear

2    DNA testing, and that's what was done in this case.

3    Q.   And when you don't have a sufficient sample or a known

4    sample from the body of the victim, you sometimes resort to

5    what's known as mitochondrial DNA; is that correct?

6    A.   Well, certainly, if you have a very limited sample such as

7    a single hair, or very, very tiny sample, or a very, very

8    degraded sample, the only result that may be possible is

9    mitochondrial DNA, yes.

10   Q.   And how does mitochondrial DNA function or the test for

11   detection of mitochondrial DNA as opposed to that for

12   nucleated DNA?

13   A.   The mitochondrial DNA's a little different in that the

14   types in the mitochondrial are inherited from the maternal

15   line.   In other words, we're not concerned with a paternal

16   contribution in the mitochondrial.   It's simply a maternal

17   line that you're looking at as opposed to a case where we have

18   nuclear DNA, where we see a contribution from both parents,

19   both the mother and the biological father.

20   Q.   So in your professional opinion, are either of these tests

21   preferable or more precise than the other?

22   A.   Certainly given a sufficient sample, nuclear DNA testing

23   is preferred.

24   Q.   Okay.   And can you tell us the effect of bleach upon blood

25   stains or any other DNA contributing source?

1   A.   Bleach is a common -- what might be considered a

2   disinfectant.  It's certainly a cleaning agent.  We routinely

3   use bleach, even in the laboratory, to clean our utensils, to

4   clean our counter tops.  It essentially will break down the

5   DNA, degrade the DNA such that it won't be usable or

6   utilizable.

7   Q.   So you're telling us that bleach --

8   A.   What is in bleach that is a reactive agent that has the

9   effect of breaking down or degrading DNA, it's a hydroxide and

10  it's very basic.  So it's very hostile to DNA.

11  Q.   So that if a DNA sample were treated with a solution

12  including bleach, you would expect it to be degraded or even

13  destroyed to the point where you could not obtain a sample

14  suitable for testing; is that correct?

15  A.   It's certainly possible.

16  Q.   Thank you.  Pass the witness.

17                    CROSS-EXAMINATION

18  BY MS. WILLIAMS:

19  Q.   Ms. Van Winkle, the only questions that I really have of

20  you center around how you got to 99.99 percent exclusion.  You

21  mentioned to Mr. Carruth, and he really didn't follow up with

22  you, that there are several numbers involved, several

23  population indices involved, and I'd like the jury to hear a

24  little bit more about that.

25          How did you get to 99.99 percent of the Caucasian male

*Van Winkle - Cross*

1  population excluded?

2  A.  Okay.  The first thing that we do is, of course, assess

3  the data and the data in each of the seven different

4  poly-market regions there was a pattern that, what we call,

5  matched Danny Raymond Fry, Jr. and the unidentified body.

6  That particular band that had to be contributed by Danny

7  Raymond Fry, Jr.'s father, biological father, had a frequency.

8      And we determined that frequency by studying large

9  groups of database samples.  Basically, there are three

10  population groups that we look at.  We look at a causation

11  population group, a Hispanic population group, and then,

12  African-American population group.  And we look at the

13  frequency of that obligated allele or obligated gene that had

14  to be inherited from the father.

15      And that frequency was what we were using.  We take

16  the most common across the three races, and that's how we

17  determined what's called the paternity index -- I'm sorry, the

18  number of individuals that are excluded as being a potential

19  contributor.  And that's where the greater than 99.99 percent

20  frequency of individuals that could not contribute to this

21  obligated allele.

22  Q.  Let me see if I can translate a little bit.  I don't know

23  if I can, so help me.  Each of the probes that you did

24  resulted in a separate paternity index?

25  A.  Yes, that's correct.  In other words, each one of the

1  seven will have a frequency or likelihood of how likely it is

2  that that individual contributed to that obligate allele.

3  Q.  So there were seven probes or tests or --

4  A.  Correct.

5  Q.  -- and for each one, there's a separate paternity index,

6  and what does paternity index mean?

7  A.  Paternity index, another way of thinking of it is just

8  what's called a likelihood ratio.  For instance, common

9  statistics where you're so many more times likely to have a

10  particular, say, allele than a random individual.

11  Q.  All right.  My writing is even worse than I thought, but

12  the first probe, YNH 24 had a paternity index of 5.50?

13  A.  Correct.

14  Q.  What does that mean in real numbers?

15  A.  In other words, given that particular hyper variable

16  region by itself, looking at only that region, it's 5.50 times

17  more likely that this particular unidentified body has that

18  type rather than an individual off the street, random male.

19  Q.  All right.  Then, you take the second one and the third

20  one, and I'm not going to go through all this because I don't

21  think the jury wants to hear it, but each one of those had --

22  each one of the seven had a paternity index that was somewhere

23  between 2.25 and 9.43?

24  A.  Correct.

25  Q.  All right.  You take all those and somehow multiply them

*Van Winkle - Cross*

1   out and determine how likely it is that this person that you

2   tested is not the father of the second person that you tested.

3   A.  Basically, it's again, a likelihood ratio.  In other

4   words, when you have a product that each of the individual

5   likelihoods, you get a likelihood overall, considering all

6   seven types, how likely it is that that individual contributed

7   all the obligate alleles as opposed to a random individual.

8   Q.  And that overall likelihood was?

9   A.  Approximately 97,000 times more likely than each of these

10  obligate alleles came from, this unidentified body in this

11  case compared to a random male.

12  Q.  And you mentioned applying this number to a large group of

13  database sample?

14  A.  No.  This number -- the frequency of each of the

15  individual obligate alleles was taken from a database, a

16  database in which the typing had been done at each of those

17  seven locations of the chromosome low side and a frequency

18  assigned to each of those.

19  Q.  Can you apply this to a number that we can understand,

20  like, the world's population?

21  A.  No.

22  Q.  All right.  Can you apply this in terms of any sort of

23  number one in a -- a one in X chance?

24  A.  Well, there's also in addition to the 99 -- over 99.99

25  percent that random males that would be excluded, given this

Van Winkle - Cross

1   data, there's also what's called a paternity index, and that,

2   again, 100 percent would be absolutely proof of paternity.  In

3   this particular case, we got, again, 99.99 percent for a

4   probability of paternity.  100 percent would be unachievable.

5   Q.  99.99 percent of the random male population is excluded --

6   A.  Correct.

7   Q.  -- is that right?

8   A.  Correct, over 99.99 percent.

9   Q.  Thank you, your Honor.  That's all I have.

10         MR. CARRUTH:  Nothing further, your Honor.  May the

11   witness be excused?

12         THE COURT:  Counsel?

13         MS. WILLIAMS:  Yes.

14         THE COURT:  You may be excused, ma'am.  Members of the

15   jury, I'm going to give you your afternoon break.  15 minutes.

16   You're not confined to the courthouse.  If you want to go out

17   and get mugged by the weather, it's all right with me.  Be

18   ready to come back in 15 minutes.

19     (Recess.)

20         THE COURT:  Anything before we bring in the jury,

21   counsel?

22         MR. CARRUTH:  No, your Honor.

23         MR. T. MILLS:  No, your Honor.

24         THE COURT:  Bring in the jury.

25     (Jury present.)

*Long - Direct*

1    THE COURT:  Call your next witness.

2    MR. CARRUTH:  United States will call Katherine Long

3  to the stand, your Honor.

4    (Witness was sworn.)

5    THE COURT:  Tell us, please, ma'am, your full name and

6  spell your last name.

7    THE WITNESS:  My name is Katherine Long, L-O-N-G.

8    KATHERINE LONG, called by the Government, duly sworn.

9                    DIRECT EXAMINATION

10  BY MR. CARRUTH:

11  Q.  Ms. Long, would you tell the members of the jury where you

12  reside and what your current occupation is, please?

13  A.  I reside in Dallas, Texas.  My current occupation is a

14  forensic serologist at the Institute of Forensic Sciences in

15  Dallas.

16  Q.  And how long have you been employed for the Institute of

17  Forensic Sciences?

18  A.  Six years.

19  Q.  And would you give the jury and the Court the benefit of

20  your background qualifications including your formal

21  education, training and experience which qualifies you to

22  testify as an expert witness here today?

23  A.  I have a bachelor of science degree in medical technology

24  from the University of Texas at El Paso.  I've also received

25  graduate level courses from the University of Texas in

*Long - Direct*

1   Arlington, University of Texas Southwestern Medical School

2   and, also, the University of Virginia.  I received continuing

3   education from the FBI Academy, from the DPS Academy, here in

4   Austin, and, also, through an association that I belong to,

5   which is the Southwestern Association of Forensic Scientists.

6   Q.  And in addition to your membership in that professional

7   organization, are you the member of any other professional

8   societies or organizations?

9   A.  Yes, sir. I'm a member of the American Society of Clinical

10  Pathologists, also, the Southwestern Working Group of -- on

11  DNA Analysis, and I currently applied for a membership in

12  crime scene reconstruction.

13  Q.  Would you basically describe your duties and

14  responsibilities in your present position with the Southwest

15  Institute of Forensic Sciences, please?

16  A.  Any time there's been any type of criminal activity that

17  involves any type of body fluids or questioned body fluids,

18  those could be collected by an agency and submitted to us.  My

19  job, then, is to identify them as to what type of body fluids

20  they are, whether blood or semen or saliva, and it's then my

21  job to identify them as being human in nature.

22       From that point, I then retain those fluids in the

23  event the DNA analysis is required later.  At this point, I'm

24  not doing the DNA analysis, but that would be saved and

25  retained for another analyst to do.  And through DNA analysis,

1   they can either include or exclude any potential contributors

2   of those fluids.

3   Q.  And in connection with this case, ma'am, I'll ask you

4   whether or not you had an occasion to examine some evidence

5   that was submitted to you by the Dallas County Sheriff's

6   Department and was removed from a storage unit here in Austin,

7   Texas?

8   A.  Yes, sir.

9   Q.  And what types of submission did you receive in this case?

10  A.  I received several items of evidence.  Would you like me

11  to list all of them?

12  Q.  Please.

13  A.  I received packets of what I would consider unknown matter

14  in unknown flakes.  I didn't know the origin of these matters,

15  that's why I called them unknown.  I also received some

16  washers, some metal nuts, some sections of material and, also,

17  some pebbles.

18  Q.  And what, if anything, were you asked to determine when

19  these items of an evidentiary nature was submitted for your

20  examination?

21  A.  I was asked to look for the presence of blood on all these

22  items.

23  Q.  And would you tell the jury the methodology you employed

24  to attempt to detect the presence of blood?

25  A.  What I would do particularly with a large section of metal

Long - Direct

1    is I'll take sterile damp swabs and swab very gently along --

2    after I've done a visual to make sure there's not any obvious

3    stains, I'll swab along portions of the pieces of metal.

4    Then, I'll do a chemical change test on the actual swab

5    itself.

6         If blood's present, it will turn blue.  It's a very

7    simple test.  Then, I know that I have blood or presumptive

8    test where blood is positive there.  That's when I then retain

9    a portion of that.  And generally, what we'll do if we can

10   freeze the whole item, we'll go ahead and freeze the whole

11   item.  If it's a larger item such as a telephone or a piece of

12   metal, what I'll do is go ahead and swab the area that was

13   positive, and I'll freeze the swab, again, in the event the

14   DNA analysis is required later.

15   Q.   Is this what's known as acid phosphatide test?

16   A.   No, sir.  That would actually be the particular agent that

17   we use is a Lueco Malachydrine (phonetic).

18   Q.   Okay.  What is the acid phosphatide test that was used in

19   the case?

20   A.   The acid phosphatide test is the test we use for the

21   presence of seminal fluid.  Acid phosphatide that's an enzyme

22   that's present in seminal fluid in high quantity.

23   Q.   When you take these swabs, you check them for acid

24   phosphatide as well as the presence of blood; is that correct?

25   Or I see in your report a reference to acid phosphatide.

1  Could you explain that, please, ma'am?

2  A.  That was actually done on a sexual assault kit that was

3  collected at autopsy on an unknown body that we got in.

4  That's where those swabs came into play, they were anal swabs.

5  Q.  Was that the headless, handless body discovered on the

6  banks of the Trinity River, to your knowledge?

7  A.  Yes, it was.

8  Q.  You were attempting to match up anything that you found on

9  that body with anything from that storage unit; is that

10  correct?

11  A.  No, sir.  On that anal swabs, I was looking for the

12  presence of acid phosphatide which would have indicated that a

13  sexual assault would have taken place.  Those swabs are

14  negative for the presence of acid phosphatide.

15  Q.  Okay.  Did your test result in the positive results or

16  readings for the presence of blood on any of the pieces of

17  angle iron or any of the submitted items that came from the

18  storage unit in Austin, Texas?

19  A.  I got a positive presumptive test for blood on one of the

20  sections of angle iron.  I also got a test that was what we

21  consider positive or traces of blood.  It's something that we

22  can't see and there's not enough there to actually confirm

23  that it is blood.  In this particular instance, I went ahead

24  and froze that item just in case DNA analysis was required

25  later.  And I also retained the stain from the portion of

*Long - Direct*

1  angle iron that was positive for the presence of blood.

2  Q.   I show you, ma'am, what's been previously marked as

3  Government's Exhibit W64-6, and ask to examine this item and

4  see if you can find any of your identifying markings, case

5  number, so forth?

6  A.   Yes, sir.  I have the forensic laboratory number here at

7  the end along with the individual item number, and my

8  initials.

9  Q.   And is that the piece of angle iron you previously

10  described as having found a presumptive test that was positive

11  for the presence of blood?

12  A.   Yes, sir, it does.

13  Q.   And did you mark on that angle iron where that swab was

14  taken from that resulted in a positive test for the

15  identification of blood?

16  A.   Yes, sir, I did.

17  Q.   Would you please show us where that is?

18  A.   It's approximately in the middle of the angle iron on the

19  outside, and I circled it in green and, also, black.

20  Q.   Now, you say on the outside, but in fact, you know how an

21  angle iron fits up against a wall, do you not, ma'am?

22  A.   Yes, sir.

23  Q.   So that would be, actually, on the side that was secured

24  to the surface of the floor and the wall, would it not?

25  A.   That would be facing outward from the room, I assume.

*Long - Cross*

1  Q.  So it would be actually assuming this nail here goes into

2  concrete and that is the base and this top side here is the

3  wall, it would be on the back side?

4  A.  That is correct.

5  Q.  Pass the witness.

<u>CROSS-EXAMINATION</u>

7  BY MS. WILLIAMS:

8  Q.  When you received this piece of metal, were there other

9  pieces of metal that were also submitted?

10  A.  Yes, there were.

11  Q.  How many?

12  A.  There were actually three pieces of angle iron including

13  the one that I just described, two metal nuts and two washers.

14  Q.  And did you perform the tests on each of these items?

15  A.  Yes, I did.

16  Q.  Did I understand that there are two separate swabs that

17  are done?

18  A.  What will initially be done is I'll screen the piece of

19  evidence, I'm just looking for something that's positive.

20  When I find something that's positive, I will save that swab.

21  What happens is once I've done the chemical reaction test on

22  the swab, I have to discard that because that would not be

23  good for DNA analysis.

24  Q.  All right.  Let me stop you right there just so I could

25  make sure that we all understand.  You take this piece of

Long - Cross

1   metal and you do what to it to do this presumptive test?

2   A.  I'll swab individual portions of it and then, I actually

3   test the swab.

4   Q.  With what?

5   A.  With the Leuko Malachydrine agent.

6   Q.  On what?

7   A.  On the actual swab.

8   Q.  Which looks like a -- is it -- how is it different from,

9   like, a Q-tip?

10  A.  It's basically a Q-tip with one end.

11  Q.  All right.  And you put the chemical solution on there,

12  and you apply it to various places on the metal or straight

13  down the metal or how?

14  A.  Actually, I would section off the piece of metal and I

15  would -- what I do is swab the metal with the sterile swab.  I

16  then perform a chemical reaction test on the swab so the

17  chemical reagents never touched the piece of metal.

18  Q.  Take a clean, dry swab?

19  A.  A clean damp swab.

20  Q.  Damp with what?

21  A.  Damp with sterile deionized water.

22  Q.  And swab a section?

23  A.  Correct.

24  Q.  However big, all the way down?

25  A.  It would be probably very small sections because it's a

*Long - Cross*

1   piece of angle iron and it tends to be dirty.

2   Q.  Okay.  How big a section are you going to test at any one

3   time?

4   A.  Probably, like, maybe, that big.

5   Q.  Six inches?

6   A.  Correct.

7   Q.  Then, you take the damp sterile swab and how do you know

8   it's sterile?

9   A.  Because we autoclave them.

10  Q.  And you are taking precautions to make sure that you're

11  not adding any contaminants while you're testing?

12  A.  Correct.

13  Q.  And what precautions are those?

14  A.  I would be wearing gloves.  The actual piece of angle iron

15  would be unwrapped.  It was received in a wrapped condition.

16  It would be unwrapped on to a clean piece of paper.  I then

17  use sterile swabs to do the swabbings.  The swab that is

18  actually retained in the end is, again, a sterile swab.

19  Q.  You -- do you remember whether this was wrapped when you

20  received it?

21  A.  Yes, it was.

22  Q.  Although you take precautions, you don't really have any

23  control over what happens to this piece of metal before it

24  gets to you?

25  A.  That is correct.

Long - Cross

1    Q.   And you don't have any control of it after it leaves you?

2    A.   That is correct.

3    Q.   You take this damp swab, you swab along the metal and you

4    take that swab and do what with it?

5    A.   That would be the chemical reaction.

6    Q.   You dip it into something?

7    A.   It's actually the reagent is a two-step reagent, and it's

8    dripped on to the swab.

9    Q.   You make that swab, you drip some chemical solution, and

10   you wet it to see if it turns blue?

11   A.   Correct.

12   Q.   If it turns blue, that indicates to you what?

13   A.   It's presumptive test positive for blood.

14   Q.   And why is it a presumptively positive test for blood?

15   A.   There's been some literature that indicates that the

16   reagent that we use may give false positives with various

17   contaminants in the environment.  One of the things that's

18   been brought out in literature is bee juice.  And in our own

19   laboratory, we performed our own test and we have not found

20   those results.

21        The false positives that we've seen give a different

22   color, and an experienced analyst would recognize the

23   difference in color.  However, there is absolutely no way we

24   could test everything in the environment to make sure that

25   nothing's giving us false positive.  That's why we call it a

1  presumptive test.

2        I did not do any confirmatory testing in this matter

3  or in this particular case because there was such a small

4  sample.  So it's a presumptive test.  We're just presuming

5  that blood is there.  It's not confirmatory of blood.

6  Q.  After you take the swab that's turned to blue and it came

7  off this section, how do you know that you haven't taken all

8  the blood off?

9  A.  That's why I swabbed very, very lightly along the thin

10  piece of metal.

11  Q.  What do you do after the swab turns blue?

12  A.  That swab would then be discarded.  Then I would --

13  Q.  You get rid of that swab.

14  A.  Correct.

15  Q.  All right.  Then what?

16  A.  Then, I would collect the portion that gave me a positive

17  test.

18  Q.  Collected how?

19  A.  That would again be with another sterile swab, moistened

20  with a sterile deionized water.  I would collect it, allow it

21  to dry and place it in the freezer.

22  Q.  In the freezer in a bag of some sort?

23  A.  Yes, I believe at that particular time they were using

24  weigh paper, which is kind of like wax paper.  I would fold up

25  the swab and then, place it into a coined envelope, and that

1  would be placed into the freezer.

2  Q.  What's the difference between a positive result consistent

3  with traces of blood and a positive result consistent with

4  blood?

5  A.  Traces of blood is a very, very small amount.  The reagent

6  that we use is -- can detect blood up to a concentration of

7  one in 10,000.  That would be one drop in 10,000 drops of

8  water, or one drop of blood in 10,000 drops of water.  Traces

9  of blood is even more than that, more dilute.  It's something

10  that I can't see.  There is no visible stain, and generally,

11  it's not enough to go further with testing.  But in as much as

12  the test for traces of blood was positive on an unknown

13  matter, I went ahead and obtained that matter.

14  Q.  Did you have any recollection of what the unknown matter

15  was?

16  A.  If it's unknown, I have no idea what it is.

17  Q.  All right.  You don't know whether it was -- you don't

18  know what it was?

19  A.  Right.  I mean, in this particular case, I believe it was

20  some sort of dirt-type material.

21  Q.  Somebody swept the floor and submitted that to you or

22  something like that?

23  A.  Correct.

24  Q.  The Leuko Malachydrine, is that the --

25  A.  It's close.

Long - Cross

1   Q.  Tell me one more time.

2   A.  Leuko Malachydrine.

3   Q.  Does it test for any other substances other than blood?

4   A.  No.

5   Q.  All right.  So if there was, for example, saliva contained

6   somehow on this piece of angle iron, you can't distinguish

7   that from traces of blood?

8   A.  The Analay is a different test, but the saliva would not

9   have given a positive result, that's correct.

10  Q.  But if there was in this section that you tested that was

11  presumptively positive, if there was saliva contained on this

12  section when you swabbed it, you wouldn't be able to tell

13  that?

14  A.  Correct.

15  Q.  You could test for that, but that wasn't one of the things

16  that was asked?

17  A.  Correct.

18  Q.  And would the same thing be true for sweat?

19  A.  Yes.

20  Q.  If there was sweat mixed with blood or sweat in a

21  different place from blood on this section when you swabbed,

22  you would get the sweat and the blood, but you wouldn't know

23  you had the sweat --

24  A.  Correct.

25  Q.  -- correct?

*Long - Redirect*

1  A.  Correct.

2  Q.  And -- although you don't do DNA testing, you know that

3  that would be important?

4  A.  Yes.

5  Q.  No further questions.

                    RE-DIRECT EXAMINATION

7  BY MR. CARRUTH:

8  Q.  When you swabbed this piece of metal, for example, did you

9  swab it throughout its entire surface on both sides?

10  A.  Yes, sir.

11  Q.  And so if there had been some other type of substance or

12  chemical on there, would that swabbing have likely removed it?

13  A.  It is possible, yes, sir.

14  Q.  I'm talking particularly if someone had previously sprayed

15  that down with, say, Clorox Bleach, and you came along and

16  swabbed it, what would be the effect of that?  Would it remove

17  it from the metal in all likelihood?

18  A.  Yes, sir, it would.

19  Q.  And so, if a subsequent test were run on that piece of

20  metal to defect the presence of Clorox Bleach, you would not

21  expect anyone to find it, would you?

22  A.  That is correct.

23  Q.  Now, what did you do with this piece of angle iron and the

24  other evidence that was submitted for your examination after

25  you concluded your examination and filed your report of your

1  conclusions?

2  A.  What I would do was wrap the evidence back up.  It would

3  go to our evidence storage, and it will be released to the

4  submitting agency.

5  Q.  And that, in this case, would be the Dallas County

6  Sheriff's Department; is that correct?

7  A.  That is correct.

8  Q.  Thank you, ma'am.  No further questions.

9           MS. WILLIAMS:  Nothing further.

10          MR. CARRUTH:  May the witness be excused, your Honor?

11          THE COURT:  You may be excused, ma'am.

12          MR. CARRUTH:  The United States calls Dr. Connie

13  Fisher.

14          THE COURT:  Just come right here.  This is Mrs. Sims.

15  She's going to administer an oath to you.

16     (Witness was sworn.)

17          THE COURT:  If you'll walk around this column up here,

18  please, have a seat in the witness box.  If you'll tell us

19  your full name, and spell your last name.

20          THE WITNESS:  Constance L. Fisher.  Fisher is spelled

21  F-I-S-H-E-R.

22      CONSTANCE L. FISHER, called by the Government, duly sworn.

23

24               DIRECT EXAMINATION

25  BY MR. CARRUTH:

*Fisher - Direct*

1   Q.   Where do you live, ma'am, and how are you employed?

2   A.   I live in Maryland and I'm employed by the DNA II Unit in

3   the FBI Laboratory.  It's a Federal Bureau of Investigation.

4   Q.   Okay.  And would you give the jury members the benefit of

5   your educational background, training and experience which

6   qualify you to testify as an expert here today on forensic DNA

7   analysis?

8   A.   I have a  bachelor's in biochemistry from the Pennsylvania

9   State University and a Ph.D. in biochemistry from the

10   University of North Carolina at Chapel Hill.  Following that,

11   I spent three years at the National Center Immunology and

12   Respiratory Medicine in Denver, Colorado.  Following that, I

13   was a senior staff fellow at the National Institute of Health,

14   which is commonly referred to as NIH.

15        While I was at NIH, I used molecular biology

16   techniques which were standardly used in the forensic

17   mitochondrial DNA analysis.  I used those routinely and am

18   very well-versed in those techniques and very proficient in

19   them.

20        And some of my publications that arose from my work at

21   NIH relied exclusively on these molecular biology techniques

22   that are also used in mitochondrial DNA analysis.  I not only

23   have had experience with these techniques in a research

24   setting but, also, during my training in the FBI Laboratory in

25   a forensic setting.

*Fisher - Direct*

1      I have received additional training in DNA forensics

2  at the course given by the FBI in conjunction with the

3  University of Virginia.  Also attempted a DNA statistics

4  workshop given by Dr. Grossweir in North Carolina state

5  university.  And I'm also trained as an inspector for the

6  American Society for Crime Lab -- American Society of Crime

7  Lab Directors accreditation for it, which is in charge of

8  inspecting laboratories and accrediting them.

9  Q.  Are you a member of any professional societies or

10  associations?

11  A.  Yes, I'm a member of the Mid-Atlantic Association of

12  Forensic Scientists and provisional member of the American

13  Academy of Forensic Scientists.

14  Q.  What do your duties entail in your present position?

15  A.  My present position is a mitochondrial DNA examiner in

16  which I supervise a team of biologists who do the laboratory

17  work, and I communicate with them throughout the procedures.

18  I then generate the sequences from the laboratory work.  I

19  generate a result.  I generate a report and testify to the

20  results of the report and the analysis when necessary.

21  Q.  And to your knowledge, is the FBI Laboratory renowned as

22  one of the leading forensic laboratories in this country

23  regarding DNA analysis?

24  A.  I would hope so.

25  Q.  Okay.  You're here to tell us today about mitochondrial

1   DNA; is that correct?

2   A.   Yes, it.

3   Q.   Briefly, what is mitochondrial DNA and how does it differ

4   from nuclear DNA?

5   A.   Your Honor, I have some overheads which would help explain

6   this.

7   Q.   May the witness be permitted to step down to the overhead

8   projector, your Honor?

9           THE COURT:   She may.

10          MR. CARRUTH:   Thank you.

11   D-E-O-X-Y-R-I-B-O-N-U-C-L-E-I-C.

12   A.   You've heard a little bit about DNA already, but let's

13   make sure we're all on the same page.   Start off, what is DNA.

14   DNA is abbreviated for deoxyribonucleic acid.   It's the

15   genetic material in a body, makes us who we are, makes us

16   what's different from our neighbor, and makes us different

17   from a dog and cat.   Or it's a substance which is found in

18   most cells, and it's a two-stranded structure which is found

19   in forms of a twisted ladder or spiral staircase.

20          If you took a section of this spiral staircase to

21   straighten it out, this would be represented on the left.

22          THE COURT:   Let me stop you, ma'am.   When you turn and

23   you speak towards those windows, the Court Reporter cannot

24   hear you.   So we're going to have to do something about that.

25   So there's not a mic that's picking you up, so she's going to

1   have to pick you up.  Here's a mic.  It may help.

2   Q.   (BY MR. CARRUTH) It might also be helpful if you could

3   stand on the other side of the screen, please.

4   A.   Okay.  Would you like me to start over again?  I was about

5   to explain the rungs of the ladder.

6          THE COURT:  Just continue on.

7   A.   Now, if you take this representation of a DNA structure

8   over on the left here, the rungs on these -- of the ladder or

9   the steps of the staircase are made of pairs of what we call

10  bases.  And bases are the building blocks of DNA.  And there

11  are four U bases which are designated by the letters G, C, A

12  and T, and they bind to each other in a specific manner so if

13  we know the sequence or the order of the bases on one strand,

14  we can determine the order of the sequence and the bases on

15  the other strands.

16          Now, these four bases, I used as kind of an alphabet

17  to spell words or you may have heard the term genes and some

18  of these words in genes are hundreds of bases long and some

19  are thousands of bases long.  What is important is the order

20  of the bases.

21          It's the order of the bases that stores the

22  information.  You can think of this as a phone number.  If you

23  have this phone number here, this 123, 1234, if you would dial

24  that number, you would get a particular information.  If you

25  would -- particular person.  If you took those same numbers

*Fisher - Direct*

1   and scrambled them up to 321-4321 and you dialed that, you

2   would get a different individual.

3          So much in the same way that a phone number can store

4   information, using limited number of numbers, that's how DNA

5   can store the information to make the instructions that it

6   needs to do.  That's what DNA is.

7          There are two sources of DNA in a cell.  And you can

8   think of a cell as an egg where the egg yolk is what we call

9   the nucleus, and the egg white we'll just call the outer

10  function of the cell.  Now, nuclear DNA you've already heard a

11  little bit about today, and the most of the DNA in a cell is

12  nuclear DNA and it's the kind -- if you've heard of DNA

13  before, this is the kind you probably heard about.

14         And most of the DNA, 99 percent of the DNA is found in

15  the nucleus.  This is the kind of DNA that you inherit from

16  both your mother and from your father.  One copy of each of

17  these genes were from your mother and father.  And it's

18  this combination of these genes from your mother and your

19  father that makes a unique signature.

20         And because of that, nuclear DNA is unique to an

21  individual.  And analysis of nuclear DNA can point to an

22  individual to the exclusion of others.  Now, the other less

23  known -- less well-known type of DNA is found in a

24  mitochondria.  A mitochondria are found in the outer egg white

25  portion of the cell, and they're responsible for producing

*Fisher - Direct*

1    energy so that your cells in your body can survive.

2         As you can see, there are many of these penny-shaped

3    sacks in this outer white portion of the cell.  And if you can

4    look inside each of these little sacks, there are several

5    copies of these little circles representing the mitochondrial

6    DNA.  So because you have many mitochondrial cells and several

7    of these mitochondrial molecules inside of each mitochondria,

8    on average, you have about a thousand copies of mitochondrial

9    DNA per cell.  Contrast that with only two copies of each

10   nuclear gene.

11        Another difference between nuclear DNA and

12   mitochondrial is it is inherited differently.  Nuclear DNA

13   when you get from both parents, mitochondrial DNA is only

14   inherited maternally; you only get it from your mother.

15   Because of that, we already know that mitochondrial DNA cannot

16   be used to point to the -- to an individual to the exclusion

17   of all others.

18        Let me go through it a little bit more detail what I

19   mean by maternal inheritance.  In this diagram, we have males

20   are represented by squares and females are represented by

21   circles.  We start out with a couple at the top.  They have

22   two different types of mitochondrial DNA.  When they -- man

23   and this woman have children, these three individuals here,

24   they will inherit their mother's type of mitochondrial DNA,

25   this blue type.

*Fisher - Direct*

1        When the daughters have children, they also pass on

2    their mitochondrial DNA, the blue type to their children.

3    However, when the son has children, his children will have the

4    mitochondrial DNA type of their mother, this yellow-striped

5    type.  So in this diagram, everyone in blue is maternally

6    related and would have the same type of mitochondrial DNA.

7        You may wonder why would you use mitochondrial DNA.

8    And basically, as in this case, you can use it when you can

9    get results in situations where you're unable to get a nuclear

10   DNA type.  For instance, when there isn't enough -- when there

11   isn't enough DNA.  And the instance of those are -- includes

12   hairs, teeth and bones and, also, when the DNA is degraded.

13       Another interesting application of mitochondrial DNA

14   is a missing person's cases when you don't have a known from

15   the victim to be able to compare to the remains.  Because

16   mitochondrial DNA is maternally inherited, you could use a

17   maternal relative to compare mitochondrial DNA types.  And

18   even though you can't point to an individual to the exclusion

19   of all others, there is -- mitochondrial DNA is still highly

20   variable, which means unrelated to the individuals.

21       This is a blowup of one of those little circles inside

22   those blue kidney-shaped sacs, and it represents the

23   mitochondrial DNA.  And mitochondrial DNA was discovered in

24   the 1960s, and it's been discovered -- been studied

25   extensively but since then, by medical biologists,

1   evolutionary biologists and molecular anthropologists.  And

2   from their studies, we know that the majority, this portion in

3   white out here, of mitochondrial DNA is the same between

4   unrelated individuals.

5        Changes out here have been linked to certain diseases.

6   If there is -- you can imagine this mitochondrial DNA codes

7   for information of how to make some of the energy producing

8   equipment that the mitochondrial need.  So if there is a

9   defect in some of those instructions, that can lead to

10  disease.

11       However, also from all these studies, we know that

12  there is a region called the control region which can tolerate

13  differences or variances between individuals.  And those

14  differences or variances are clustered into two regions called

15  hyper variable region 1, HV1, and hyper variable region 2,

16  HV2, and these are the two regions we look at when doing

17  mitochondrial DNA analysis.

18       The steps involved in mitochondrial DNA analysis are

19  actually quite simple.  The first step involves extraction.

20  Simply breaking open the cell and purifying the DNA away from

21  all the other portions of the cell.  This would be the same

22  for mitochondrial DNA and for nuclear DNA.

23       The second step is called amplification.  You may have

24  heard the term PCR, which stands for preliminary chain

25  reaction.  And what amplification or PRC does is simply makes

1  many copies of a specific region of DNA.  You can think of it

2  as a molecular photocopier.  If you take those two strands of

3  DNA, think of them as pieces of paper, you pass them through

4  the photocopier the first time.

5      When you're done, you have four copies, four pieces of

6  paper.  Take those four out to the second round and put it

7  through the photocopier again, after that second round, you'll

8  have eight.  Do it again, you'll have 16, and so on and so on.

9  We do that over 30 times.  We have hundreds of millions of

10  copies of our starting materials.  That gives us enough so we

11  can analyze it, and again, this process is used for both

12  nuclear and mitochondrial DNA analysis.

13      What's different is which areas you target.  And we

14  target those HV1 and HV2 region I showed you a few slides ago,

15  P-O-L-Y-N-E-R-A-S-E.  The third step is called sequencing.

16  Simply determining the order of those bases, the individual

17  Gs, Cs, As and Ts.  Then, finally, we do a sequence

18  comparison.

19      The first selection mentioned that we have two types

20  of evidence samples in the laboratory.  We have what we call

21  questioned or Q samples where the source is questioned.  We

22  don't know what the source is.  It's unusual that questioned

23  items are usually associated with a crime or crime scenes in

24  some manner.

25      Case samples are known samples, come from a known

*Fisher - Direct*

1    source usually like a blood sample or saliva sample, so what

2    we do is we take the question sample through the whole

3    process, determine a sequence, then take the known sample

4    through the whole process and determine their mitochondrial

5    DNA sequence; then, we compare the two.

6         And this first case on the left here, we have two

7    sequences and they're clearly different.  And because they're

8    different, we say that's an exclusion.  In other words, the

9    contributor of this known sample cannot be as excluded as the

10   source of the questioned sample.

11        In this second case over here, both of these sequences

12   are the same, in that case, we cannot exclude that the

13   contributor of the known sample is also the contributor of the

14   questioned sample.  When we have a case where something --

15   someone cannot be excluded, we then run the samples through a

16   database, compare them to sequences we have in a database.

17        Actually, this database is composed of many individual

18   databases of broken down into different ratio and, in some

19   cases, ethnic groups.  But within all of these databases,

20   there are some common themes.  There are some sequences, like

21   these people in green in the corner which are seen fairly

22   frequently, and there are other sequences which are seen,

23   maybe, once.

24        So what we do is we compare the sequence that we've

25   determined in the case and compare it -- run through the

1   database and see if it's something that's not seen very often

2   or something that's seen a lot.  And that's what we do when we

3   do a mitochondrial DNA analysis.

4   Q.  (BY MR. CARRUTH) Thank you, Doctor.  You may return to the

5   stand, please.  Now, if I might direct your attention to this

6   particular case in which you're appearing to testify today.

7   Did you receive any type of evidence from Special Agent Donna

8   Cowling of the FBI, here in Austin, that was submitted to your

9   laboratory for you to analyze in this case?

10  A.  I did not receive it directly from Agent Cowling.  I

11  received it from Agent Smrz, who through the laboratory

12  process received it from Agent Cowling.

13  Q.  But you and Agent Smrz work in the same laboratory

14  together, right?

15  A.  Different units, but yes.

16  Q.  Of the FBI Laboratory?

17  A.  Yes.

18  Q.  And I'm sure that evidence in your laboratory is secure

19  from tampering once it reaches any of its departments?

20  A.  Yes, it is.

21  Q.  And what was it that you had been requested to do by Agent

22  Cowling, or your laboratory had been requested to do, in an

23  attempt to determine whether or not you could identify the DNA

24  on a particular specimen or sample of evidence?

25  A.  You -- would you like to know the samples that we

*Fisher - Direct*

1   received?  Is that what you're asking?

2   Q.  Yes, what evidence did you receive?  Not what -- I'm going

3   to get into the known donor samples in a minute, but what

4   evidence did you receive from the FBI in Austin, Texas?  What

5   items of evidence, if any, that you were going to employ this

6   DNA test tag you've just described to us?

7   A.  I received a swabbing from the angle iron that Agent

8   Cowling --

9   Q.  Okay.  And were you aware that this swabbing had

10  previously been tested and presumptively positive for blood?

11  A.  Yes.

12  Q.  And was this same type of test repeated in your laboratory

13  by the lady you just named?

14  A.  I believe it was.  I don't know.  I wasn't present.

15  Q.  You did not personally perform that test?

16  A.  No, I did not.

17  Q.  Now, DNA may be obtained from many sources, may it not?

18  A.  Yes.

19  Q.  And including blood?

20  A.  Yes.

21  Q.  And did you have any known samples of blood in this case,

22  particularly a sample from William Murray, the son of Madalyn

23  Murray O'Hair, and brother of Jon Garth Murray?

24  A.  Yes, I do.

25  Q.  Did you also have a known blood sample from the biological

*Fisher - Direct*

1    mother of Robin Murray O'Hair without identifying her at this

2    time?

3    A.   Yes, I did.

4    Q.   And so did you follow the process that you described in

5    your presentation with the overhead, using the known samples

6    of the biological mother of Robin Murray O'Hair and William

7    Murray, the known sample of William Murray, the son of one of

8    the missing victims, and the brother of another of the missing

9    victims?

10   A.   Yes.  We first performed the analysis on the questioned

11   sample and then did the knowns.

12   Q.   Okay.  And what conclusions, if any, did you draw from

13   going through the steps in analyzing the DNA samples and

14   comparing the known with the questioned samples?

15   A.   Well, when I compared the sequence we obtained from the

16   swabbing from the angle iron with that of the mother, of Robin

17   Murray O'Hair, those sequences were different.  Because of

18   that, the paternal relatives of the mother of Robin Murray

19   O'Hair, including Robin Murray O'Hair, can be excluded as the

20   source of the swabbing -- the DNA on the swabbing.

21   Q.   And so that would mean that if, in fact, blood was found

22   on this angle iron and submitted to your laboratory, you can

23   definitely say conclusively that it was not the blood of Robin

24   Murray O'Hair; is that correct?

25   A.   That's true.

*Fisher - Direct*

1  Q.  Because you were able to eliminate her through

2  mitochondrial DNA analysis?

3  A.  Yes.

4  Q.  Now, what can you tell us, if anything, about whether you

5  could eliminate Madalyn Murray O'Hair or Jon Garth Murray as

6  possible donors of the suspected blood sample?

7  A.  I was unable to exclude them as potential donors.

8  Q.  And can you tell us why that was?

9  A.  Well, first, I should mention that when I was -- obtained

10  the sequence from that swabbing, we were unable to get both

11  those HV1 and HV2 regions.  We only got a portion of the HV2

12  region.  When I compared the portion that we did get with the

13  sequence that we got from William Murray, they were the same.

14  Because of that, I could not exclude that that -- that the

15  swabbing from the angle iron came from either -- a maternal

16  relative of William Murray, which would include Madalyn Murray

17  O'Hair, and Jon Garth Murray.

18  Q.  So you could not exclude either of those individuals as a

19  possible donor?

20  A.  Yes.

21  Q.  But because of the inadequacy of the sample, you could not

22  conclusively say that it was either or the other of them; is

23  that correct?

24  A.  Well, mitochondrial DNA would never be able to distinguish

25  between maternal relatives anyway.

Fisher - Direct

1  Q.  And would there be any problems resulting if their blood

2  from two individuals had been commingled in a particular crime

3  scene and that you had received a swab containing a mixture of

4  blood of two individuals?

5  A.  If there's a mixture of blood between two individuals, it

6  makes us unable between two unrelated -- un-maternally related

7  individuals, would make it very difficult, if not impossible

8  for us to come up with a single mitochondrial DNA type.

9  Q.  And I believe that you indicated in your presentation that

10 mitochondrial DNA is more useful for excluding rather than

11 including particular individuals; is that right?

12 A.  Yes, it is.

13 Q.  And can you tell us, did you do the population data there

14 what percentage of Caucasian individuals share common

15 characteristics of those found in the blood sample submitted

16 in the swab that you received from Agent Cowling of the FBI

17 here in Austin?

18 A.  Well, I compared it to the database which contains many

19 different populations.  I'd like to go through those.

20 Q.  Please.

21 A.  There are individuals of African descent and there are ten

22 individuals of African descent which match the same sequence

23 -- the portion of the HV2 sequence that we got.  There were

24 six out of 332 African-American sequences in individuals that

25 had the same sequence.  Four out of 116 Afro-Carribean,

*Fisher - Direct*

1    individuals that have that same sequence.  None of 115

2    Africans from Sierra Leon had that sequence.  Other

3    individuals of Caucasian descent, there were 1219 individuals

4    in the database and of those, 303 have that sequence.

5            No individuals of Asian descent have that sequence,

6    and this includes 162 Japanese and 180 Koreans.  And 14 of 302

7    Hispanic individuals in the database also have this sequence.

8    Q.  And so placing that in the mathematics at the level that

9    most of us might be able to understand, can you give us a

10   percentage?  Was it one in four, approximately, people --

11   Caucasian people share common characteristics?

12   A.  Yes.

13   Q.  And would it be a fair statement that included among those

14   individuals would be Madalyn Murray O'Hair and Jon Garth

15   Murray?

16   A.  Yes.

17   Q.  And that blood sample is consistent with having come from

18   either or both of them?

19   A.  Yes, it's true.

20   Q.  But you cannot say conclusively that it is their blood?

21   A.  That's also true.

22   Q.  And using mitochondrial DNA, you could never arrive at a

23   conclusive determination, correct?

24   A.  Yes, that's true.

25   Q.  Pass the witness.

*Fisher - Cross*

1          CROSS-EXAMINATION

2    BY MS. WILLIAMS:

3    Q.  When this piece of angle iron arrived at the FBI

4    laboratory, are you aware that Ms. Smrz tested it and didn't

5    find any blood?

6    A.  I'm not really aware of what Ms. Smrz did.  I know that I

7    received a swabbing from that angle iron.

8    Q.  Let me ask you to look at Defendant's Exhibit Stipulation

9    29, and Exhibit A that's attached is really the part I'm

10   interested in.

11   A.  Which part?

12   Q.  Exhibit A.  Actually, it's Exhibit B.  Do you have any

13   knowledge of that at all?

14   A.  No.  I only dealt with the swabbing.

15   Q.  Would you agree that because the population database is so

16   small in mitochondrial DNA that the results are limited?

17   A.  I wouldn't exactly agree with that statement.  This -- the

18   numbers that were seen here basically 25 percent are -- if you

19   include the 95 percent confidence interval ends up being 27

20   percent.  That's a number that I believe is -- will hold up no

21   matter how large the database would get.

22   Q.  The second difficulty with this particular sample is that

23   instead of a series of 600 bases, you were only able to

24   isolate because of the sample -- I did the math over here --

25   231?

*Fisher - Cross*

1    A.   That's true.

2    Q.   Less than half?

3    A.   Little bit of a third, yes.

4    Q.   All right.  Isn't it true that in doing mitochondrial DNA,

5    you prefer to deal with bones, teeth and hair?

6    A.   No, that's not true.

7    Q.   Isn't it true that when you're dealing with bones, teeth

8    and hair, you can clean the sample?

9    A.   Yes, we can.  The reason I answered negatively before was

10   that we prefer to work with blood because a nice, good known

11   blood sample is very easy to work with.

12   Q.   Sure.

13   A.   But most of our sample, yes, are either hairs, bones or

14   teeth.

15   Q.   And tell the members of the jury what can be done when

16   you're dealing with those items to clean them or -- I don't

17   know any other word is -- clean is probably the scientific

18   word.

19   A.   The reason -- perhaps I should say the reason why it's so

20   crucial that we do clean them is because, as I mentioned

21   before, if there were a mixture of two different types of

22   mitochondrial DNA, it would almost make it impossible for us

23   to determine a single mitochondrial DNA type.

24        So in hair, we put them in several different baths to

25   remove any possible adhering or contaminating DNA with bones.

*Fisher - Cross*

1   We sand off the outer layer to remove any -- if someone had

2   touched it, they could have put their DNA on there, and we

3   remove that outer layer to help minimize the amount of

4   contamination by another person.

5   Q.   Why is it more important in mitochondrial DNA to worry

6   about contamination than even in nuclear DNA?

7   A.   There are several reasons.   I'll try and keep it simple.

8   Nuclear DNA can handle mixtures between individuals because

9   what they're looking at, the mixtures in people are different,

10   you can tell them.   You can tell the different types that are

11   there.   Since we're looking at the sequence or the order of

12   the individual bases, if that particular spot you've got a G

13   and an A, you don't know who that came from.   Is that a minor

14   contributor or a major contributor?   We can't tell that.

15   Q.   If there was saliva or sweat mixed with this blood, that

16   would affect the results?

17   A.   Yes, it could.

18   Q.   All right.   And you didn't test, and nobody did, to your

19   knowledge, for the presence of anything on this swab other

20   than blood?

21   A.   That's true.

22   Q.   Are swabs your preferred method of receiving a sample?

23   A.   They're not the preferred method of receiving a sample,

24   but we can't stick a piece of angle iron into a test tube

25   either.

*Fisher - Cross*

1    Q.  Why don't you -- why are swabs not your preferred method?

2    A.  Well, it would be great to deal with the actual source.

3    That's why when we deal with the hairs, we actually have

4    hairs, bones or teeth.  Swabs are a perfectly legitimate way

5    to deal with it, though.

6    Q.  All right.  There's no way for you to tell in a sample if

7    two maternally related individuals are contained, there's no

8    way to differentiate at all?

9    A.  I'm sorry.  You said two related?  Maternally related.

10   Q.  Maternally related individuals, there's no way to tell?

11   A.  That's correct.

12   Q.  When it comes right down to it, one in every four

13   causations in your database contains the same series of bases

14   that you found in this swab?

15   A.  Given the limited amount of sequence we were able to get,

16   yes.

17   Q.  Right.  So statistically, it's just as likely that it's

18   one of the four people sitting at that table as that it's

19   Madalyn Murray O'Hair or Jon Garth Murray?

20   A.  Statistically, yes.

21   Q.  Nothing further.

22

23

24

25

*Fisher - Redirect*

### RE-DIRECT EXAMINATION

1  
2  BY MR. CARRUTH:

3  Q.  Counsel asked you whether or not you usually have

4  approximately 600 bases, I believe, for an evaluation, and in

5  this case, you identified approximately one-third of that

6  amount.  Did you say 231?

7  A.  Yes.

8  Q.  And is that because the DNA sample was degraded or was it

9  not sufficient quantity or quality?

10  A.  It's because I'm not sure what the reason was.  We are

11  only able to get that reason -- that amount of DNA.  Usually

12  that's because of insufficient quality or insufficient

13  quantity.

14  Q.  And can you tell us whether or not bleach will degrade

15  DNA?

16  A.  Bleach does tend to destroy or under appropriate

17  conditions, can degrade DNA.

18  Q.  Thank you, ma'am.  Pass the witness.

19        MS. WILLIAMS:  Nothing further, your Honor.

20        THE COURT:  May the witness be excused?

21        MS. WILLIAMS:  Yes.

22        THE COURT:  You may be excused.

23        MR. CARRUTH:  United States calls Rusty White, your

24  Honor.

25        THE COURT:  If you'll be sworn, please, sir.

1      (Witness was sworn.)

2         THE COURT:  If you'll just walk around this column and

3   have a seat up here in the witness chair, please.  If you'll

4   tell us, please, sir, your full name and spell your last.

5         THE WITNESS:  Thomas Russ White, W-H-I-T-E.

6                      DIRECT EXAMINATION

7   BY MR. CARRUTH:

8   Q.  Mr. White, would you please tell the members of the jury

9   where you reside and what your current business or occupation

10  is?

11  A.  Yes, sir.  I live in Austin, Texas.  I am a forensic

12  chemist with the Texas Department of Public Safety Crime

13  Laboratory.

14  Q.  And would you please give the ladies and gentlemen of the

15  jury the benefit of your prior academic training, education,

16  experience that qualify you to testify as an expert witness in

17  this case?

18  A.  I received a bachelor of science degree in chemistry from

19  Texas A & M University.  Shortly afterwards, I was employed by

20  the DPS Crime Lab.  I served for two years in the toxicology

21  section, which we screen blood and other biological samples

22  for different types of drugs.  And then, after that, I've been

23  in the trace evidence section for two years.

24        And I'm certified in paint analysis, fiber analysis,

25  shoe print comparisons, glass comparison, gunshot residue

1  testing, among other things.  Our training program for our --

2  for the tests that we typically perform consists of being

3  trained by an experienced analyst in each particular

4  discipline that we are going to perform.

5      And this training consists of case work as well as

6  various -- well, a lot of reading, different textbook, journal

7  article, things like that, and attending different seminars

8  and workshops and schools put on throughout the state and

9  sometimes throughout the country, depending on where we can

10  go.

11  Q.  And have you previously qualified as an expert witness and

12  testified in any trials, state or federal, or criminal or

13  civil?

14  A.  Yes, sir, I have in district court.

15  Q.  And in this particular case, sir, did you receive a sample

16  of several pieces of angle iron, submitted by the FBI here in

17  Austin, for examination?

18  A.  Yes, sir, I did.

19  Q.  And these were constructed of galvanized steel; is that

20  correct?

21  A.  That is what I have been told.  I didn't do any testing to

22  confirm that.

23  Q.  Okay.  What test, if any, were you asked to perform on

24  these pieces of angle iron?

25  A.  I was asked to examine these pieces of angle iron and

*White - Direct*

1    detect any bleach if it was present.

2    Q.   Now, bleach is an oxidizer, is it not, sir?

3    A.   Yes, sir, it is.

4    Q.   And what does that mean in lay terms?

5    A.   Okay.  An oxidizer is a chemical that rips electrons away

6    from another substance and that changes the chemical

7    properties of that substance.  In this case, the test I used

8    would be that I added some chemicals to this questioned

9    sample.  And if there had been bleach or other oxidizers

10   there, then my testing chemicals would have lost some

11   electrons, and that would have resulted in color change.  That

12   would have gone from a clear liquid to a blue-black liquid.

13   Q.   I'm showing you, sir, what's been marked for

14   identification as Government's Exhibit W64-6.  I'll ask you to

15   examine that and see if you can find your laboratory number on

16   there, sir.

17   A.   Yes, sir, I do.

18   Q.   And what condition was that piece of angle iron when you

19   received it in your laboratory for analysis?  How was it

20   packaged?

21   A.   May I refer to my notes?

22   Q.   Please.

23   A.   I received three pieces of angle iron which were wrapped

24   in brown paper, and all three were in a sealed cardboard box

25   together.

*White – Direct*

1   Q.   And they were submitted to you by the FBI, correct?

2   A.   These pieces of angle iron were submitted to the

3   laboratory by Richard Simerly --

4   Q.   Of the Federal Bureau of Investigation?  You don't know

5   that?

6   A.   That's all the information I have.

7   Q.   Assuming that the evidence will show that Mr. Simerly is

8   an associate of Ms. Donna Cowling, did you ever speak with

9   Special Agent Donna Cowling of the FBI regarding your analysis

10   of this piece of angle iron?

11   A.   Yes, sir, I had several phone conversations with her.

12   Q.   Okay.  And what tests, if any, did you perform in an

13   effort or attempt to detect the presence of bleach on this

14   angle iron?

15   A.   I swabbed all three pieces of angle iron with Q-tips,

16   which I moistened with water, and then, in the manner I

17   previously alluded to, I tested those Q-tips for the presence

18   of oxidizers.

19   Q.   And were you aware that prior to your swabbing of these

20   angle iron, that another laboratory had previously swabbed

21   them in order to detect the presence of blood in it?

22   A.   I was aware that other analyses had been done.  A few days

23   after I did my testing, I did talk with another analyst from

24   another laboratory who told me that she had swabbed the entire

25   piece of angle iron.

*White - Direct*

1   Q.  So you were not aware at the time you took your swabs that

2   the angle iron had previously been swabbed for presence of

3   blood?

4   A.  I was aware that some testing had been done.  I was not

5   clear on how extensive that testing was at the time.

6   Q.  In your professional opinion, sir, what would have been

7   the result if there had been oxidizers present on this angle

8   iron at an earlier occasion and it had been swabbed by some

9   previous laboratory before it came to your laboratory?

10  A.  It's very likely that swabbing by another laboratory would

11  have removed any bleach or other oxidizers that had they been

12  present.

13  Q.  And tell us whether you found or detected the presence of

14  any oxidizers, bleach, or otherwise, on any of those three

15  pieces of angle iron.

16  A.  No, sir, I did not.

17  Q.  And I believe in your written summary of opinion, you have

18  offered four conclusions or explanations as to why your tests

19  were negative.  Could you share those with the jury, please?

20  A.  The four possibilities that I have stated are that bleach

21  was never present on this angle iron.  Bleach was present but

22  the amount of the bleach there was too small for detection by

23  the type of test that I performed.  Bleach was present but had

24  degraded over time.  Or bleach had originally been present but

25  removed prior to my testing.

*White - Cross*

1   Q.  Such as by prior swabbing?

2   A.  Yes, sir.

3   Q.  Thank you, sir.  Pass the witness.

4                     CROSS-EXAMINATION

5   BY MS. WILLIAMS:

6   Q.  The piece of angle iron that's in front of you and the two

7   other pieces of angle iron, those are the only things you

8   tested for the presence of bleach?

9   A.  No, they're not.

10  Q.  What else did you test?

11  A.  I tested another long piece of angle iron and three bags

12  of -- yes, three bags of debris, and a bag of screws that were

13  all removed from Room No. 52.

14  Q.  All right.  Do you know where those are --

15  A.  Where the evidence is?

16  Q.  -- today?

17  A.  Yes, ma'am, they're in our laboratory.

18  Q.  They're in your laboratory?

19  A.  Yes, ma'am.

20  Q.  Can you describe -- you didn't bring them with you?

21  A.  No, ma'am.

22  Q.  Can you describe for the members of the jury what a bag of

23  debris -- what's in it?

24  A.  It was mostly dirt and old leaves.

25  Q.  All right.  What did you do to test for oxidation on the

*White - Redirect*

1   bag of debris?

2   A.   I dripped this testing chemical onto the debris itself.

3   Q.   And there were no results?

4   A.   No, ma'am, there were no reactions.

5   Q.   And with regard to, I think you said, a bag of screws,

6   nuts and bolts?

7   A.   A bag of screw, yes.

8   Q.   All right.  Did you examine those for the presence of

9   oxidation?

10  A.   Yes, ma'am, I did.

11  Q.   And what were the results of those?

12  A.   I did not detect any oxidizers on those either.

13  Q.   Nothing further, your Honor.

                    RE-DIRECT EXAMINATION

15  BY MR. CARRUTH:

16  Q.   Mr. White, I want you to look at your laboratory report,

17  dated April 27th, 2000, examine it carefully under the

18  category of evidence submitted, and tell the members of the

19  jury whether or not you misspoke when you said those items

20  came from unit 52 of the storage locker.  And I'm talking now

21  about the additional items just talked about on

22  cross-examination as opposed to the angle iron in front of

23  you.

24  A.   Okay.

25  Q.   That you received from the DPS Crime Search Team on 3-10

*White - Recross*

1  of 2000.

2  A.  According to my information, I'm sorry.  They were from

3  the -- from a room adjacent to Room No. 52.

4  Q.  And adjacent means next to?

5  A.  Next to it, yes, sir.

6  Q.  So it would not surprise you to learn that they were from

7  Room No. 53?

8  A.  No, sir, it wouldn't.

9  Q.  Are you aware of how these storage units were constructed?

10  A.  No, sir, I was not present at this collection.

11  Q.  Thank you, sir.  So you do want to correct your testimony

12  that the other three items you examined that the defense

13  counsel asked you about on cross-examination, the angle iron,

14  the debris and the screws, were from a room -- a wall adjacent

15  to Room 52?

16  A.  Yes, sir, they were adjacent to, from the room adjacent

17  to.

18  Q.  In fact, from Room 53 or 51, depending on which side they

19  were adjacent to?

20  A.  Depending on how it's numbered, yes.

21  Q.  Thank you, sir.  That's all.

22                    RE-CROSS EXAMINATION

23  BY MS. WILLIAMS:

24  Q.  I'm confused, then.  Do you have a report that discusses

25  your examination of items from Unit 52?

1    A.   The only information that I was given on the location as

2    to the -- as to where this angle iron came from in front of me

3    is that it was from a storage unit.

4    Q.   All right.  You don't know that that came from Storage

5    Unit 52.  You don't know one way or another?

6    A.   Not with the notes I have, no, ma'am.

7    Q.   All right.  So it's fair to say that if during the

8    extraction of the piece of angle iron that's in front of you

9    and the two that you received with it, it says, "three pieces

10   of galvanized steel."

11   A.   Yes.

12   Q.   It's fair to say that if screws, nuts and bolts were

13   collected during the process of extracting that piece of angle

14   iron that's in front of you, Government's Exhibit W64-6, those

15   weren't submitted to you?

16   A.   No, ma'am, they were not.

17   Q.   Nothing further.

18                       RE-DIRECT EXAMINATION

19   BY MR. CARRUTH:

20   Q.   Just so the jury and the Court will understand, the three

21   pieces of galvanized steel, including the one you've just

22   identified with your lab number, was submitted to you by FBI

23   Agent Richard Simerly, correct?

24   A.   Yes, sir.

25   Q.   The additional objects, the angle iron, the debris and the

*White - Redirect*

1   screws from the floor and wall adjacent to Room 52, were

2   submitted by whom?

3   A.  By a DPS Crime Scene Search Team.

4   Q.  Thank you, sir.  No further questions.

5       MS. WILLIAMS:  Your Honor, I don't have anything

6   further, but I'm very confused and I think that the jury may

7   be, too.  And I'd really like to offer part of this report,

8   but it really needs to be redacted.  May I just go ahead and

9   offer and redact it during a break?

10      THE COURT:  I stopped giving legal advice when they

11  stopped paying me for it.

12      MS. WILLIAMS:  May we approach?

13      THE COURT:  You may.

14    (At the Bench, on the record.)

15      THE COURT:  What is this?

16      MS. WILLIAMS:  I just feel like the jury may be

17  horribly confused about what he did.  So this is the part of

18  his report that's -- that he's testified to.  This part of it

19  has to do with someone else's report that isn't testifying.

20  Has to do with hairs and that sort of thing.  So I would like

21  to put --

22      MR. CARRUTH:  I think the witness is more confused

23  than the jury, but I have no objection to her putting that in.

24  But it does contain the other -- the hairs that they sought to

25  exclude early on in the testimony.  So if she wants to redact

 1    it, I have no objection.

 2            THE COURT:  All right.

 3            MR. CARRUTH:  And while we're here, Mr. Mills.

 4            MR. T. MILLS:  Yes, sir.

 5            MR. CARRUTH:  On the day of jury selection, the

 6    defense filed its motion in limine, and the Court, I believe,

 7    carried along certain matters in there including the matter of

 8    the three inmate witnesses who -- one of whom will be our next

 9    witness.  So they had raised some argument as to the

10    competency, I believe, of these witnesses, and the Court had

11    taken it under advisement.

12            Do we need to excuse the jury and bring in the witness

13    and let Mr. Mills examine them?

14            MR. T. MILLS:  I don't think that I have anything that

15    is really not just cross-examination material.

16            THE COURT:  Okay.

17            MR. CARRUTH:  Is he withdrawing his motion in limine,

18    then, as to the three inmate witnesses?

19            THE COURT:  Unless he makes the objection.

20            MR. CARRUTH:  I just wanted to again bring it up.

21            THE COURT:  No limine order.

22            MR. CARRUTH:  I did not want to violate anything.

23            THE COURT:  No, you're not.  He may make any

24    objections.

25            MR. CARRUTH:  We may have the same problem when we get

*Morris - Direct*

1   to the confession, which he had some objections to.  He wanted

2   it to be redacted, I believe, in certain parts.

3        MR. T. MILLS:  Several sentences.

4        THE COURT:  Is that going to be the next witness?

5        MR. CARRUTH:  No, sir.  Probably tomorrow.  Your

6   Honor, we have no more questions of the witness, and request

7   he be excused if defense counsel has no further questions.

8        MS. WILLIAMS:  Correct.

9        THE COURT:  You may be excused.  You may call your

10  next witness.

11       MR. CARRUTH:  At this time, the United States calls

12  Aaron Morris.

13     (Witness was sworn.)

14       THE COURT:  You'll need to walk around this column and

15  have a seat here on the witness box.  If you'll tell us,

16  please, sir, your full name and spell your last name.

17       THE WITNESS:  Aaron Allen Morris, M-O-R-R-I-S.

18     AARON A. MORRIS, called by the Government, duly sworn.

19                       DIRECT EXAMINATION

20  BY MR. CARRUTH:

21  Q.  Mr. Morris, are you currently in federal custody?

22  A.  Yes.

23  Q.  Have you been convicted previously of a felony in the

24  United States District Court?

25  A.  Yes.

*Morris - Direct*

1   Q.  And where was that, sir, and what was the felony for which

2   you were convicted?

3   A.  In Michigan for drug smuggling.

4   Q.  And in addition to your current conviction for drug

5   smuggling, do you have any other prior felony convictions?

6   A.  Yes.

7   Q.  And what are those?

8   A.  Drug smuggling and welfare fraud.

9   Q.  Do you have any convictions for crimes of violence?

10  A.  No.

11  Q.  Do you know the defendant in this case, Mr. Gary Paul

12  Karr?

13  A.  Yes.

14  Q.  When and under what circumstances did you first meet Mr.

15  Karr?

16  A.  In Milam, Michigan, we were roommates together in the

17  federal detention center there.

18  Q.  Okay.  And for how long a period of time were you

19  incarcerated with Mr. Karr?

20  A.  Maybe four months.

21  Q.  And can you give us an approximate time frame, sir?

22  A.  From late April to August, first part of August.

23       THE COURT:  What year, sir?

24       THE WITNESS:  Of '99, sir.

25  Q.  (BY MR. CARRUTH) Now, you and Mr. Karr became friends?

*Morris - Direct*

1   Would that be a fair statement?

2   A.   Yes, sir.

3   Q.   You got along with each other?

4   A.   Yes.

5   Q.   And he asked to become your roommate?

6   A.   Right.

7   Q.   And in July of last year, you became roommates or cell

8   mates; is that correct?

9   A.   Right.

10  Q.   In FCI Milam, Michigan?

11  A.   Yes.

12  Q.   And did your wives have an opportunity to talk or get

13  together?

14  A.   Yes.

15  Q.   Your wife and Mr. Karr's girlfriend, or fiance, I guess it

16  would have been, right?

17  A.   Yes.

18  Q.   But you are married?

19  A.   Yes.

20  Q.   Do you have any children?

21  A.   Yes.

22  Q.   Did there come a time when your wife attempted to visit

23  you, driving in from Kansas, and her car broke down in

24  Indiana?

25  A.   Yes.

*Morris - Direct*

1    Q.  And did she plan on staying with Mr. Karr's girlfriend,

2    Kelly Johnson?

3    A.  Yes.

4    Q.  And where was Kelly Johnson residing at that time?

5    A.  In Wald Lake, Michigan.

6    Q.  Wald Lake, Michigan?

7    A.  Yes, sir.

8    Q.  And was there also some discussion among your wife and

9    Kelly Johnson regarding use of the internet?

10   A.  Yes.

11   Q.  Can you tell us about that, please?

12   A.  Mr. Karr had said that if, you know, if they had gotten

13   bored that, you know, if they could get together and do things

14   on the internet.  Kelly could show my wife stuff on the

15   internet.

16   Q.  Okay.  And you and Mr. Karr subsequently had many

17   conversations, did you not?

18   A.  Right.

19   Q.  And did the conversations ever turn to the O'Hair

20   disappearance?

21   A.  Yes.

22   Q.  Can you recall -- did you have one or more than one

23   conversation with Mr. Karr about the O'Hair case?

24   A.  I'd say more than one.

25   Q.  And what, if anything, did Mr. Karr tell you about his

*Morris - Direct*

1  alleged involvement in the O'Hair case?

2  A.   Just told me that at one time, Mr. Waters had called Mr.

3  Karr at a time, I guess, when Texas was having some real bad

4  rains, and had asked him to come back down here to help him

5  remove the bodies from where they were buried at because he

6  was afraid that they was going to wash up.

7  Q.   Okay.  Did he tell you anything else about his activities

8  with Mr. Waters or anyone else in Texas?

9  A.   Yeah, little bits, little bits and pieces.

10  Q.   Did he mention anything about a fella called --

11          MR. T. MILLS:  Object on the grounds of leading.

12          MR. CARRUTH:  All right.  I'll withdraw the question.

13  Q.   (BY MR. CARRUTH) Just tell us what he told you, little by

14  little, and just tell us.

15  A.   It all started from the time that, I guess, the FBI or the

16  federal agents had did a sweep of his house.

17  Q.   Okay.  What did he tell you about that?

18  A.   He said that --

19          MR. T. MILLS:  Object to evidence from that which has

20  been a subject that I brought up for the Court in limine

21  regarding some suppressed evidence in another jurisdiction.

22          THE COURT:  The question is what did he tell you.  If

23  you'll answer that question.

24          THE WITNESS:  About the sweep or about everything

25  that's happened?

*Morris - Direct*

1          THE COURT:  Well, I'm not asking the questions.  So

2   I'll let you --

3   Q.  (BY MR. CARRUTH) I would like to hear first --

4   A.  He's told me quite a bit.

5   Q.  Yes, sir, I'd like to go through all of it if we have

6   time.  So let's begin with what he told you about the sweep.

7   A.  Told me the agents had went by, dropped by his house to do

8   a sweep of the house, looking for evidence in the O'Hair case.

9   Q.  Okay.

10  A.  That he told me that he had offered the federal agents to

11  come inside the house to do a sweep of the house.

12  Q.  Okay.

13  A.  And upon sweeping the house, they found a pistol laying

14  out in plain view.

15  Q.  Okay.

16          MR. T. MILLS:  Objection on the grounds that the

17  evidence of the pistol was suppressed by a United States Judge

18  in Michigan, and it should not be part of this case and should

19  be -- the rule of law, the rule of that case should be applied

20  and it should be in this one.

21          THE COURT:  Objection is overruled.  This is

22  conversation made by the defendant to this witness.

23  Q.  (BY MR. CARRUTH) What, if anything, did Mr. Karr tell you

24  about where the gun was located in the house and whether he

25  was trying to conceal it from anyone?

*Morris - Direct*

1    A.  No, he never said anything about it being concealed.  It

2    was laying in wide open on an end table or some kind of table

3    in the bedroom.

4    Q.  Okay.  What else did Mr. Karr tell you relative to the

5    O'Hair investigation?

6    A.  That when the O'Hairs supposedly -- he had went down to

7    play in a poker game with Mr. Waters and two females and a

8    male.

9    Q.  Did he mention any of the males' name?

10   A.  No.

11   Q.  Okay.

12   A.  That they had -- he had won quite a bit of money in this

13   poker game.

14   Q.  Did he ever --

15   A.  After the poker game, he said that David would take the

16   people home, and then, after that, as far as I know, nobody's

17   ever seen them since.

18   Q.  Okay.  Did Mr. Karr ever mention a gentleman from Florida?

19   A.  Yes.

20   Q.  And who was that?

21   A.  Danny Fry.

22   Q.  What, if anything, did he tell you about Danny Fry?

23   A.  That Danny Fry had come down to help with the O'Hairs and

24   that he had gotten -- I guess him and David had gotten in an

25   argument at one time when the time that Danny was supposed to

*Morris - Direct*

1   go back to Florida.  Danny had went out, got drunk, come back,

2   and him and David had gotten into an argument and that was the

3   last of anything I've heard from David.

4   Q.  Did he tell you what that argument was about?

5   A.  No.

6   Q.  Did he mention anything about a Rolex watch or any other

7   type of jewelry?

8   A.  Yes, he said that one of the O'Hairs' watches ended up at

9   -- in his sister's possession.

10  Q.  In Mr. Karr's sister's possession?

11  A.  Right.

12  Q.  Okay.  Did he mention anything about the search of a ranch

13  in Texas?

14  A.  Yes.

15  Q.  What did he tell you about that?

16  A.  That he had told me originally that that's where the

17  bodies were at until him and David had went and taken the

18  bodies out and that the FBI had went and searched Camp Wood.

19  Q.  He told you that he and David Waters moved the bodies from

20  the ranch?

21  A.  Yes.

22  Q.  Did he tell you anything about a letter that he wrote?

23  A.  Yes.  Said that he had wrote a letter, and if anything was

24  to happen to him, he wrote a letter to his lawyer and if

25  anything was to happen to him, that he was to open this letter

1   and let the certain authorities know what had happened.

2   Q.  Okay.  Did he mention anything to you about any medication

3   for any of the O'Hairs?

4   A.  That they went and filled prescriptions for Madalyn's

5   medication.

6   Q.  Okay.

7   A.  So I assumed that they, you know, that they would have had

8   Madalyn --

9          MR. T. MILLS:  Objection.  Speculation.

10  Q.  (BY MR. CARRUTH) Just what he told you, sir.

11  A.  He told me they went and picked up medication for Madalyn

12  after the disappearance was made public or stated.

13  Q.  And did you ask him or did he tell you how he knew these

14  things that he was telling you about the O'Hairs?

15  A.  From receipts, from being with them, seen in a motel with

16  them.  They were out and about with them in a motel or a

17  hotel, I'm not for sure which one.  But they had -- people had

18  seen them out and about.  So there was, you know, like there

19  was no speculation that they had kidnapped them, that they

20  were with them at the whole time and people had seen them.

21  Q.  And did he say anything about using any credit cards?

22  A.  There was credit card receipts, yes.  There was -- credit

23  card receipts was mentioned.

24  Q.  Did he mention anything about a trip to New Jersey?

25  A.  Yes.  He said that the FBI said that he had took a trip

*Morris - Direct*

1   with Jon to New Jersey, but that it wasn't him.

2   Q.   And did he say who went to New Jersey with Jon?

3   A.   No.

4   Q.   Did he say anything about an argument resulting from

5   somebody throwing some stuff in the garbage?

6   A.   Right.  That was the argument between Danny and David.

7   Q.   Danny who, sir?

8   A.   Danny Fry.

9   Q.   And David?

10   A.   David Waters.

11   Q.   Waters.  And what did he say was the result of the cause

12   of that argument?

13   A.   I'm not even -- I'm not for sure.  He never really said

14   that, you know, that Danny was killed, or whatever.  Just that

15   Danny and David had gotten into an argument, and then, after

16   that, Danny was never seen again.

17   Q.   Did he say anything about a shoe print found at a crime

18   scene?

19   A.   Right.  There was a shoe print that matched a set of shoes

20   found in David's house that was the shoe print was next to

21   Danny's body.

22   Q.   Okay.  Did he tell you why Mr. Waters had called Mr. Fry

23   to come from Florida to Austin, Texas?

24   A.   No, not that I recall.

25   Q.   Did he tell you anything about Mr. Waters' prior

*Morris - Direct*

1  employment history with the O'Hairs?

2  A.  Yes.

3  Q.  What did he say about that?

4  A.  He was their office manager or some type of manager for

5  them.  Some kind of office work for Madalyn.

6  Q.  And did he talk about anybody causing problems?

7  A.  Yes, David.

8  Q.  What kind of problems did they say David was causing?

9  A.  Embezzled $54,000 from the company.  And David was not

10  real happy with a newsletter that was published by Madalyn.

11  Q.  And did he say whether David made any threats to get even

12  for that newsletter?

13  A.  Yes, he said that David would like to hurt Madalyn.

14  Q.  Okay.  Did he mention anything about any blood being found

15  in a vehicle?

16  A.  Yes, he did.

17  Q.  What did he say?

18  A.  Said that there was some blood found in a rental van, one

19  of the rental vans that he had rented along with an apartment

20  that he rented for Danny -- for David, excuse me, and that

21  they weren't for sure, yet, whether or not if it was human

22  blood or animal blood.

23  Q.  And did he mention anything about gold coins?

24  A.  Yes, that there was $500,000 worth of gold coins that were

25  involved in this deal.

*Morris - Direct*

1   Q.  And did he indicate what happened to these gold coins?

2   A.  He said that they were stolen.

3   Q.  Okay.  Did he indicate where these gold coins were

4   obtained?

5   A.  From a coin dealer in Texas.

6   Q.  And did he mention anything about a bank out of state?

7   A.  Somewhere in New Zealand and they wired the money from New

8   Zealand from a bank in New Jersey and then, from New Jersey to

9   a Texas coin dealer.

10  Q.  Okay.  Did he say anything about what happened the day the

11  O'Hairs disappeared?

12  A.  Not that I recall.

13  Q.  Anything about a note?

14  A.  No, not that I recall.

15  Q.  Okay.  Anything about anybody picking up a payroll?

16  A.  Something about -- he said something about a note that was

17  taped to the atheist door about something picking up a

18  payroll, yes.

19  Q.  Okay.  Do you recall him mentioning anything about a

20  Mercedes Benz automobile?

21  A.  Yes.

22  Q.  What did he say about that?

23  A.  He said that they had sold the Mercedes to a guy -- I

24  don't remember if he gave a name or not, but they had sold it

25  for fairly cheaper than what the Mercedes was worth and that,

1   supposedly, Jon was in the bar next to the motel or some

2   building that was next to the bar where they sold the

3   Mercedes.

4   Q.  Did he discuss anything about the O'Hairs as to whether

5   they were large people, or small people, or average size

6   people?

7   A.  Yes, he said they were very large people, and he said that

8   there was -- it was completely impossible for guys his size or

9   David's or Danny's size to be moving somebody this big against

10  their own free will.

11  Q.  Did he ever state anything about a storage unit?

12  A.  Yes.

13  Q.  What did he say about a storage unit?

14  A.  He said that they were trying to accuse him and some lady

15  of going to the storage unit and cleaning the storage unit out

16  with some bleach or some cleaning chemicals or something.

17  Q.  Did he tell you whether he had been seen --

18  A.  Yes.

19  Q.  -- at the storage unit with any type of -- what did he

20  say?

21  A.  He said that somebody had said they had seen him with some

22  wind-blown hair and that they, you know, that they had

23  recognized him and two other males at the storage shed with

24  the pickup truck.

25  Q.  Did he mention anything about the barrels?

*Morris - Direct*

1   A.  Yes, he said some things about some 55-gallon barrels.

2   That the bodies were supposedly kept in 55-gallon barrels.

3   Q.  Okay.  Did he mention anything about his ex-wife, Mr.

4   Karr's ex-wife?

5   A.  Yes.

6   Q.  What did he say about her?

7   A.  He said that she had made a statement to the investigators

8   and that she was just an old drunk and they wouldn't believe

9   her anyway.  That she drank quite considerably amount of

10  alcohol.

11  Q.  Okay.  Did Mr. Karr indicate to you whether he had any

12  interest in computers?

13  A.  Yes, he did.  There was times that his girlfriend at the

14  time, Kelly, would send him PC computer magazines in the mail.

15  Q.  And was there a point in time when you were shown a

16  line-up of photographs including the picture of Mr. Karr,

17  which you pointed out?

18  A.  Yes.

19  Q.  And do you see him here in court today?

20  A.  Yes.

21  Q.  Where is he seated and what's he wearing?

22  A.  Seated right there, wearing a gray jacket with red tie.

23  Q.  Thank you, sir.  Pass the witness.

24          THE COURT:  Members of the jury, I'm going to give you

25  a ten-minute break.  You'll be able to use the facilities,

*Morris - Cross*

1    stretch.  Be ready to come back in ten minutes.

2        (Recess.)

3                    CROSS-EXAMINATION

4    BY MR. T. MILLS:

5    Q.  Mr. Morris, how old are you?

6    A.  28 years old.

7    Q.  What educational background do you have?

8    A.  High school diploma.

9    Q.  Where did you graduate from high school?

10   A.  Graduated from LeBeck Community College.

11   Q.  From what?

12   A.  Lebeck Community College.  It's in Kansas.

13   Q.  What city?

14   A.  Oswego.

15   Q.  Oswego?

16   A.  Yes, O-S-W-E-G-O.

17   Q.  And is it a high school or a college?

18   A.  It was a community college, but I got my GED through

19   there.

20   Q.  All right.  Did you grow up in Oswego, Kansas?

21   A.  No.  I was born and raised in California.

22   Q.  What city?

23   A.  Newport Beach.

24   Q.  And you mentioned, as I took notes, three felony

25   convictions?

*Morris - Cross*

1  A.  Right.

2  Q.  And was one of them for drug smuggling, or drug

3  possession, or drug manufacture, or what?

4  A.  Drug smuggling more or less.

5  Q.  Tell me --

6  A.  I was caught coming back from California on an airplane

7  with three pounds of methamphetamine.

8  Q.  Three pounds of methamphetamine?

9  A.  Yes.

10  Q.  From Mexico?

11  A.  No.  Coming from California.

12  Q.  To what state?

13  A.  Stolen to Kansas.

14  Q.  Okay.  What year was that, your arrest?

15  A.  '99.

16  Q.  '99?

17  A.  Yeah.

18  Q.  That's your most recent?

19  A.  Yes.

20  Q.  And were you -- have you been prosecuted for that?

21  A.  Yes.

22  Q.  Federally?

23  A.  Yes.

24  Q.  State, too?

25  A.  No.

*Morris - Cross*

1    Q.  What was your federal sentence?

2    A.  I signed a plea bargain for 138 months.

3    Q.  Did you have an attorney?

4    A.  Yes.

5    Q.  Privately retained?

6    A.  No.

7    Q.  What was the felony conviction that you had before that

8    one?

9    A.  The possession with intent to sell.

10   Q.  Again, methamphetamine?

11   A.  Right.

12   Q.  What year was that?

13   A.  '94.

14   Q.  Where were you prosecuted?

15   A.  Topeka, Kansas.

16   Q.  State court?

17   A.  Yes.

18   Q.  What sentence did you get?

19   A.  Four and a half years.

20   Q.  How much of it -- strike that.

21   A.  I believe I had taken plea bargain to boot camp, did five

22   and a half months on that, got out on ISP, violated ISP, and

23   they imposed a original sentence of two years.  So I did most

24   of that in the state pen.

25   Q.  ISP is intense supervision?

*Morris - Cross*

1   A.   Right.

2   Q.   And you violated by dirty urinalysis?

3   A.   No, not reporting.

4   Q.   Didn't report.

5   A.   Right.

6   Q.   And then, what was your -- before that one, the --

7   A.   Well, that and the welfare fraud were tied in together.

8   Q.   How was that?

9   A.   They were ran consecutive.

10  Q.   I mean, what was your welfare -- how did you defraud

11  welfare?

12  A.   I bought $63,000 worth of food stamps from an undercover

13  agent.

14  Q.   With intent to do what with them?

15  A.   To sell them.

16  Q.   For a profit?

17  A.   Yes.

18  Q.   Do you have any other felonies?

19  A.   No.

20  Q.   Now, you were in Michigan and for several months, you were

21  the roommate of Mr. Karr?

22  A.   Yes.

23  Q.   And that was in '99?

24  A.   Yes.

25  Q.   And you learned from either Mr. Karr or from some source

Morris - Cross

1  that he was interviewed in March of 1999 by federal agents?

2  A.  Right.

3  Q.  Did he discuss that with you in terms of just general

4  statements about his life?

5  A.  Like you mean at what had went on at this interview or

6  just things from the past?

7  Q.  The fact of the interview.

8  A.  Oh, yeah.

9  Q.  All right.

10  A.  Yes.

11  Q.  And so off and on, for how many months were you with him?

12  Four months?

13  A.  Four months.

14  Q.  So off and on for four months, he would make statements to

15  you?

16  A.  Right.

17  Q.  All right.  You are not claiming that he ever said that he

18  killed the O'Hairs?

19  A.  No.

20  Q.  Or anyone else?

21  A.  No, I'm not saying that at all.

22  Q.  Okay.  And you are not saying that he ever said that he

23  personally saw them killed if they were killed?

24  A.  No.

25  Q.  Okay?

*Morris - Cross*

1    A.   No, he never told me that.

2    Q.   Now, during the period of time that you were in jail,

3    wasn't he a little bit of a curiosity to you with just a

4    little, you know, kind of a high-profile case?

5    A.   No, because, at first, I didn't really even know what he

6    was in there for, didn't really care.

7    Q.   Well, I mean, after you found out.

8    A.   Yeah, I had heard -- we were sitting around a card table

9    at one point, and somebody had stated to Mr. Karr that --

10   Q.   Excuse me.  I'm going to object to nonresponsiveness.

11   I'll just try to do it in question and answer form.

12   A.   Okay.

13   Q.   You read some material either from newspapers or from the

14   internet or some source about the O'Hair matter, didn't you?

15   A.   Right.

16   Q.   And basically for a period of months, Gary Karr told you

17   things that people were saying about him, law enforcement

18   people or other people, correct?

19   A.   Right.

20   Q.   When you were there incarcerated in Michigan, were you

21   able to watch TV?

22   A.   Yes.

23   Q.   And did you ever see anything on the TV about the O'Hair

24   matter?

25   A.   Yes.

1  Q.  And do you know from your experience with law enforcement

2  of your own, you can't always know exactly what really

3  happened by watching the TV programs?

4  A.  Right.

5  Q.  But nevertheless, you learned a little bit about the

6  matter?

7  A.  Right.

8  Q.  Now, is it possible that some of the things that you're

9  saying today that Mr. Karr said that he did that, perhaps

10  through innocence, you're mixing it up and maybe he said that

11  Mr. Waters did it?

12  A.  No.

13  Q.  All right.  So let me just give you an example.  You're

14  sure that Mr. Karr said that one day that he went to a storage

15  unit, did something at the storage unit, and came out smelling

16  like bleach?

17  A.  No, that's not what I said.  What I said was that he had

18  told me that they were saying that he was seen in the storage

19  unit.  That somebody had saw him in the storage shed.  He

20  never told me that.  I mean, he never said that he put himself

21  there.  He just said that law enforcement was saying he was

22  there.  He never denied it.  He never, you know, never

23  acknowledged being there, but he never denied it either.  He

24  just said that law enforcement had said that somebody saw him

25  in that storage shed.  That was all they said.

*Morris - Cross*

1   Q.  Didn't you say that he said that he had some connection

2   with bleach?

3   A.  Yeah, he said that they were trying to accuse him of using

4   some chemicals.  That's all I said.  I never said that he did

5   it.  Just that they were trying to say that he went in there

6   with some chemicals.  Him and some other lady friend or a

7   lady, they went in together and that she -- he come back out

8   and he was smelling like bleach.

9   Q.  Okay.  But you're pretty sure that you're not mistaking

10  what he said about David Waters and Patti Steffens and David

11  Waters smelling like bleach?

12  A.  No, he never -- no.

13  Q.  Now, did -- from your testimony, from your recollection

14  and your testimony, did Gary Karr ever say that he knew who

15  was responsible for Danny Fry's death?

16  A.  No.

17  Q.  All right.  Now, you're serving a 138-month sentence?

18  A.  Right.

19  Q.  Which is twelve times twelve is 144?

20  A.  Eleven years, six months, somewhere around there.

21  Q.  Eleven years, six months.  You are familiar with the

22  federal procedure for a Rule 35 application for a sentence

23  reduction?

24  A.  Right.

25  Q.  And what is that?

*Morris - Cross*

1    A.   That's where you get sentenced and you come back on

2    testifying against somebody else and get a time reduction.

3    Q.   Okay.  Get your time reduced by testifying against

4    somebody else?

5    A.   Right.

6    Q.   Right.  Is that your main purpose for being here?

7    A.   No, I am not receiving a Rule 35 or nothing from this.

8    Q.   Now, how in the world would you know since you haven't

9    even testified yet -- I mean, finished testifying?

10   A.   Nobody's ever promised me, nobody's ever offered me

11   anything.

12   Q.   Of course.  I understand.  You have discussed with your

13   appointed lawyer or your public defender about being here,

14   haven't you?

15   A.   Yes, I told him that I was coming here.

16   Q.   Right.  Now, how old were you when you got convicted of

17   the -- when you got convicted of the welfare fraud?  That

18   would have been -- would that have been in '94?

19   A.   Right, I would have been --

20   Q.   22 years old?

21   A.   -- between 22 and 23.

22   Q.   So at 22 years old, you had $63,000 in cash to buy --

23   A.   No.

24   Q.   No?

25   A.   No.  Food stamps I was buying for 35 cents on the dollar.

*Morris - Cross*

1   Q.  All right.  Now, regarding a watch, it's my understanding

2   that Mr. Karr said that a Rolex watch ended up in his

3   possession?

4   A.  Right, ended up in his sister's possession.

5   Q.  Ended up in his sister's possession?

6   A.  Right.

7   Q.  And regarding -- did he tell you that in March of 1999

8   that a lot of federal agents went out and searched some

9   property in West Texas?

10  A.  Right.

11  Q.  And did you -- did he tell you that to his understanding,

12  there wasn't anything found?

13  A.  As far as I understand, yes.

14  Q.  Okay.

15  A.  As far as he said, yeah, there was no bodies found there,

16  right.

17  Q.  And did he tell you on another occasion or on the same

18  occasion that one time, Mr. Waters called him up and that --

19  did he say that he was afraid of Mr. Waters?

20  A.  He had told me at one time that the -- yeah, the reason

21  why that he had the gun in his house was he feared for David.

22  Q.  All right.

23  A.  But, yeah, he told me he met -- him and David went to Camp

24  Wood together.

25  Q.  All right.  And did he say that was because David had said

Morris - Cross

1   that there was something incriminating buried out there?

2   A.  He said that there was some flooding, and he was worried

3   that the bodies were going to come up, recover or, you know,

4   come up out of the ground.

5   Q.  All right.  Now, did Mr. -- Mr. Karr never said that he

6   saw any bodies out there, though, did he?

7   A.  He told me that he helped move the bodies.

8   Q.  Really?

9   A.  Yes.

10  Q.  Mr. Karr told you --

11  A.  Yes.

12  Q.  -- that he helped move bodies?

13  A.  Right.

14  Q.  Now, that's not what you told these two agents when they

15  interviewed you, is it?

16  A.  Right.  I told them that him and David had gotten in an

17  argument.

18  Q.  Yes, you did.  That's what the notes reflect?

19         THE COURT:  One at a time.

20  A.  And that he had left David there.

21  Q.  (BY MR. T. MILLS) That's right.

22  A.  He later testified or he later told me that he had helped

23  David move the bodies and that was all that was said.  That

24  was as far as -- you know, I don't know how many occasions

25  they went out there, on what dates, or anything like that.

*Morris - Cross*

1  But he did tell me that him and David had gotten in an

2  argument, he left David.

3  Q.  All right.  Let me try to break it down to where I

4  understand what you're saying.  Mr. Karr told you that he had

5  gone to this West Texas property with David Waters?

6  A.  Right.

7  Q.  And that he, Mr. Karr, had left David Waters at the

8  property?

9  A.  Right.

10  Q.  And had gone away?

11  A.  Right, left, him and David had gotten in an argument and

12  left.

13  Q.  All right.  And that's what you told these two agents,

14  isn't it?

15  A.  Right.

16  Q.  All right.  And but now, you are saying that Mr. Karr said

17  that on some other occasion, he went there and actually moved

18  some bodies?

19  A.  Well, it wasn't on some other occasion.  It was just that

20  he had helped David move the bodies.  Whether he went back to

21  there or -- I don't know.  I don't know where he came from at

22  that time, but he did say that he helped move them.

23  Q.  All right.  Now, you never told these two agents that,

24  didn't you?

25  A.  I thought I did.  I thought I did.

*Morris - Cross*

1   Q.  Well, if Mr. Karr had said to you that he had actually

2   helped move some bodies, that would have been almost the first

3   thing you would have told a federal agent, isn't it?  That

4   would --

5   A.  That wasn't the first line of questioning that came out

6   when they came to talk to me, no.

7   Q.  All right.

8   A.  I mean, it progressed into that.  It started with the

9   sweep of the house.

10  Q.  All right.  Well, you will admit that it would be

11  extremely unusual if these people had gone to visit you in

12  Michigan and had an interview with you, and you never

13  mentioned anything about Gary Karr saying that he had moved a

14  body.

15  A.  They never came to Michigan to me.  I came to --

16  Q.  Where was the interview?

17  A.  I was in Kansas when they came to me.

18  Q.  All right.  Same thing.

19  A.  But I'm almost positive that I did tell them that.  I

20  could be mistaken.

21  Q.  All right.  Well, before testifying, you could be

22  mistaken?

23  A.  Yes.

24  Q.  Okay.

25  A.  I could be mistaken.

*Morris - Cross*

1   Q.  Okay.  It could be that you did not tell them that?

2   A.  Right.

3   Q.  All right.  Before testifying today, have you had an

4   opportunity -- and I'm not saying there's anything wrong of

5   this -- of looking over their notes of their interview with

6   you just to refresh your recollection?

7   A.  No.

8   Q.  Is it your testimony that Mr. Karr never said that he

9   received anything for his work?

10  A.  I'm -- I don't understand.

11  Q.  Did Mr. Karr ever tell you that he received anything --

12  A.  Like as in money or --

13  Q.  -- things of value, jewelry, anything?

14  A.  No, he never told me that he was given anything for

15  helping do anything, no.  I can't say that he did.

16  Q.  All right.  Do you know Jason Cross?

17  A.  Yes.

18  Q.  Do you know Brian Chase?

19  A.  Yes.

20  Q.  All right.  Those are two fellas that were in this same

21  jail facility, correct?

22  A.  Right.

23  Q.  And have you seen them here?  They're here to testify,

24  right?

25  A.  Right.

*Morris - Cross*

1   Q.  Okay.  Now, you've talked with them about testifying here

2   today, haven't you?

3   A.  As in -- what we're all doing here?

4   Q.  Well, just swapped conversation about it.

5   A.  No.  We don't -- it's not -- no, we didn't discuss what we

6   was going to say or nothing if that's what you're implicating.

7   Q.  Well, yes.

8   A.  No.

9   Q.  Did you while you were in Michigan?

10  A.  No.

11  Q.  Okay.  How much -- when you were in Michigan, were the

12  facilities such that on a daily basis for a while, you would

13  see Gary Karr?  He was your roommate?

14  A.  Right.

15  Q.  Did you have more than one roommate?

16  A.  From the time I got there, yeah.  Yeah, I think he was my

17  second or third roommate.

18  Q.  All right.  But I mean, did you have more than one at a

19  time?

20  A.  No.  Just me and him at one time.

21  Q.  Okay.  But then, sometimes during the day, you would go

22  out into day rooms or outside?

23  A.  Right.  Play cards, shoot basketball, right.

24  Q.  Okay.  So there were times when you and Gary Paul Karr and

25  Brian Chase and Jason Cross were all together, the four of

*Morris - Cross*

1   you?

2   A.   No.   I would say me, Mr. Karr and Mr. Cross would

3   frequently be together, not Chase.

4   Q.   Well, there were times when he would be in the group?

5   A.   Not that I can recall.   I can't really say that he was.

6   He was pretty much alone or he didn't -- you know, I worked

7   with him in the kitchen, and that was about as far as that

8   went.

9   Q.   All right.   Well, did you ever have a conversation with

10  Jason Cross to the effect that, hey, this guy is accused of

11  this thing in Texas and he's kind of telling us about what

12  he's accused of.   Do you think that we should contact the

13  federal agents and kind of --

14  A.   No, I never -- no, I never had that conversation with Mr.

15  Cross.

16  Q.   Did he with you?

17  A.   No.

18  Q.   Okay.

19  A.   I left way before any of these -- you know, like I said, I

20  left in August, and this wasn't until --

21  Q.   What wasn't until when?

22  A.   April, until the agents had come and even said anything to

23  me about it.   It wasn't until April of this year.   But me and

24  Cross, no, we never discussed anything about Gary's case or

25  nothing.

*Morris - Cross*

1   Q.  All right.  Mr. Karr told you that coins that had been

2   purchased at a coin store had been stolen, correct?

3   A.  Right.

4   Q.  And you told the agents that when you visited with them in

5   Kansas that Mr. Karr told me that these coins were stolen?

6   A.  Right.

7   Q.  Now, regarding these 55-gallon barrels, it's my

8   understanding that Mr. Karr said that he was not ever at a

9   storage shed if there were 55-gallon barrels at a storage

10  shed, correct?

11  A.  That's not what he told me.  He told me that somebody had

12  said they saw him at the storage shed with a pickup truck and

13  some 55-gallon barrels.  That was all that was said.  Nothing

14  else.  It didn't go any further than that.

15  Q.  Didn't he also say it wasn't him?

16  A.  Right, that's what he told me.

17  Q.  That it wasn't him?

18  A.  Right, that's what he said.

19  Q.  Okay.  Oh, you saw Mr. Karr in possession of the federal

20  search warrant affidavit?

21  A.  Yes.

22  Q.  You did?

23  A.  Yes.

24  Q.  So his attorney or me or someone had sent him a copy of

25  it, and you saw him with it?

*Morris - Cross*

1    A.   He had it in his possession, right.

2    Q.   All right.  And you saw it?

3    A.   Right.

4    Q.   And that outlined the agent's evidence at some point in

5    history, didn't it?

6    A.   I don't understand what you're trying to say.

7    Q.   Well, a search warrant affidavit is when a federal agent

8    sets forth what they think has happened chronologically in

9    time, and they write it down and swear to it, and then try to

10   get a search warrant?

11   A.   Right.

12   Q.   But it tells an immense --

13   A.   This was after they had searched his house already,

14   though?

15   Q.   Well, sure.

16   A.   Okay.  I didn't --

17   Q.   It tells intricate details about what the agents know

18   about the case, doesn't it?

19   A.   As far as I know.  All I went into is where they found the

20   gun in his house.  That's all that I read.

21   Q.   You just stopped there?

22   A.   Right.  I mean, I didn't go in any further --

23   Q.   Right.  And all you remember him saying about his ex-wife

24   was that she was an old drunk?

25   A.   Yeah, he said that she had made a statement against him

*Morris - Cross*

1    and that --

2    Q.   She was a liar and a drunk?

3    A.   Her story wouldn't stand.  She was a liar and a drunk.

4    Q.   Did you ever meet his ex-wife?

5    A.   No.

6    Q.   He advised you that the O'Hairs may well be in New

7    Zealand, correct?

8    A.   Yeah, he stated that they could be alive and be there.

9    Q.   All right.  Now, did the thought -- did a light bulb go

10   off in your head, wait a minute, how would he have moved

11   bodies and, yet, they're in New Zealand, possibly?

12   A.   Right, yes, it did.  I didn't get the whole concept of

13   what was going on.

14   Q.   Well, might you have misunderstood it?

15   A.   No.

16   Q.   No?

17   A.   Huh-uh.

18   Q.   Okay.  And you reported to the federal agents that every

19   now and then, Mr. Karr's ex-girlfriend or girlfriend would

20   send him PC magazine?

21   A.   Right, computer magazine.

22   Q.   Yeah.  And having been his roommate for four months, when

23   they showed you a photo line-up, you were, of course, able to

24   pick him out?

25   A.   Right.

*Cross - Direct*

1    Q.  I don't think I have any other questions.

2         MR. CARRUTH:  Nothing further, your Honor.  May the

3    witness be excused, returned to the custody of the Marshals?

4         THE COURT:  You may be excused, sir.  You may call

5    your next witness.

6         MR. CARRUTH:  United States calls Jason Cross to the

7    stand.

8      (Witness was sworn.)

9         THE COURT:  Walk around this column, please, and have

10   a seat up here in the blue chair.  If you'll tell us your full

11   name and spell your last name, please.

12        THE WITNESS:  Jason Scott Cross, C-R-O-S-S.

13    JASON S. CROSS, called by the Government, duly sworn.

14                      DIRECT EXAMINATION

15   BY MR. CARRUTH:

16   Q.  Mr. Cross, are you currently in federal custody?

17   A.  Yes, sir.

18   Q.  For what felony offense have you been convicted?

19   A.  Unarmed bank robbery.

20   Q.  And are you currently serving a federal sentence?

21   A.  Yes, sir.

22   Q.  And of what duration is that sentence?

23   A.  Seven years.

24   Q.  And have you been convicted of any other felony offenses

25   in either state or federal court?

*Cross - Direct*

1   A.  Yes, sir, I have, in state court.

2   Q.  And what are those, sir?

3   A.  I was convicted of three larcenies from a person, and I

4   was caught with 11.7 grams of marihuana on school property

5   there.

6   Q.  Okay.  Have you ever served time in a penal institution in

7   Detroit, Michigan?

8   A.  Yes, sir, I have.

9   Q.  While there, did you come to know a man by the name of

10  Gary Paul Karr?

11  A.  Yes, sir.

12  Q.  Do you see Mr. Karr in this courtroom today?

13  A.  Yes, sir.

14  Q.  And where is he, please?  Could you point him out?

15  A.  Sitting to the right, in a gray suit with a reddish tie

16  with the blue stripes.

17  Q.  Writing a note?

18  A.  Yeah.

19  Q.  Okay.  When and where did you meet Mr. Karr?

20  A.  Milam, Michigan.

21  Q.  And what were the circumstances under which you and Mr.

22  Karr became acquainted?

23  A.  We were both locked up together.

24  Q.  Okay.  Did y'all share any -- what some people might say

25  was a vice in common?

*Cross - Direct*

1   A.   Advice?

2   Q.   Well, some people consider smoking a vice.

3   A.   Oh, yeah, we both smoked.

4   Q.   Okay.  And did you provide him cigarettes on occasion?

5   A.   Yes, I did.

6   Q.   And that was contraband in jail, wasn't it, sir?

7   A.   Yes, sir, it was.

8   Q.   So you had to sneak them to him?

9   A.   Yes, sir.

10  Q.   And as a result of you providing him cigarettes, did you

11  and Mr. Karr become close friends or associates?

12  A.   Yes, sir, we did.

13  Q.   And where did you go to smoke these cigarettes since they

14  were contraband?

15  A.   Oh, we smoked them in the showers or smoked them in the

16  rooms.

17  Q.   Okay.  And for what period of time did you and Mr. Karr

18  become friends or associates?

19  A.   Around April, we met in Wayne County.

20  Q.   And that was --

21  A.   April of '99.

22  Q.   Okay.  And for how long a period of time were you and Mr.

23  Karr incarcerated in the same penal institution?

24  A.   About nine months, eight or nine months.

25  Q.   During those eight or nine months that you and Mr. Karr

Cross - Direct

1  shared a friendship and contraband cigarettes together, did he

2  ever confide in you anything about the O'Hair case or what he

3  had been involved in in Texas?

4  A.  Yes, he did.

5  Q.  And what did he tell you?

6  A.  He told me that him and David Waters and Danny Fry --

7  Danny Fry and David Waters had kidnapped the O'Hairs from

8  their home.  They had killed the O'Hairs and cut them up and

9  put their bodies in the barrels in a storage unit that was

10 rented by Chico Osborne.  And they extorted the O'Hairs out of

11 a half million dollars in gold coins that was actually

12 supposed to be $600,000 in gold coins.

13 Q.  And what, if anything, did Mr. Karr admit to you was his

14 role in this crime?

15 A.  That he helped cut up the bodies, he helped put the bodies

16 in the barrels, he helped -- he flew to New Jersey with Mr.

17 O'Hair and -- to help, how should I say, more or less escort

18 him to make sure that he didn't get out of hand while they had

19 the O'Hairs at the apartment.

20 Q.  Okay.  Now, did he tell you all this over a seven- or

21 eight-month period or did he sit down and confess to you all

22 in one setting?

23 A.  It took about, maybe, four months.

24 Q.  Okay.

25 A.  Four months.

Cross - Direct

1   Q.   Did you and Mr. Karr begin to trust each other?

2   A.   Yes.

3   Q.   And did he ever tell you how he got involved in this

4   particular crime in Texas?  Who got him involved, if anyone?

5   A.   David Waters.  They did some time together in Chicago, I

6   believe it was.

7   Q.   And did he tell you what Mr. Waters did to induce him or

8   to involve him, if he did?

9   A.   He offered him $30,000.

10   Q.   Okay.  To do what?

11   A.   To help kidnap the O'Hairs and to extort them out of half

12   a million dollars that they had over in New Zealand.

13   Q.   Did he ever say anything to you about playing in a big

14   card game in Texas?

15   A.   He mentioned something like that, but I didn't really pay

16   too much attention, and I don't really recall anything like

17   that, really.

18   Q.   Did he ever tell you he had been hired as a bodyguard to

19   help the O'Hairs flee the country?

20   A.   No.

21   Q.   He didn't ever say that.  Were those his words, kidnapped

22   and extortion and abduction?

23   A.   Yes, sir.

24   Q.   Did you know what that meant?

25   A.   Yes, sir.

*Cross - Direct*

1    Q.  And he had been promised, you said, $30,000 for his

2    assistance?

3    A.  Yes, sir.

4    Q.  Did he say anything about Mr. Waters' prior relationship

5    with the O'Hairs?

6    A.  He said he used to work for them.  He was an accounting

7    manager or something like that.

8    Q.  And did Mr. Karr tell you whether he rented any vehicles

9    or apartment facilities in connection with this crime?

10   A.  He rented an apartment to keep the O'Hairs at and rented

11   -- I believe it was three rental vans.

12   Q.  Did he mention anything about handcuffs?

13   A.  Yeah, the O'Hairs were kept handcuffed at the apartment.

14   Q.  Okay.  And I believe you had previously stated that he

15   talked about a trip to New Jersey that he took with the son?

16   A.  Yes, sir.

17   Q.  To kind of keep an eye on him, you said?

18   A.  To keep an eye on him just so he wouldn't get out of line,

19   you know, run off and try to get help or try to get help for

20   himself and his mother and his sister.

21   Q.  Did he tell you why they made this trip to New Jersey?

22   A.  Yeah, it was to have $600,000 transferred to Texas to a

23   coin dealer.

24   Q.  For what purpose?

25   A.  They were turning the money into gold coins.

Cross - Direct

1    Q.   And did Mr. Karr admit to you what he did with his share

2    of the proceeds from this crime?

3    A.   He bought some clothing, some suits, some jewelry,

4    motorcycles, computer equipment.

5    Q.   Did he say what kind of motorcycle he purchased?

6    A.   Harley Davidson.

7    Q.   Did he mention anything about a computer?

8    A.   Mentioned a computer.  Told me he bought a computer.

9    Q.   Okay.  And where did he say the money came from that he

10   used to buy these material possessions?

11   A.   From Dave Waters.

12   Q.   Okay.  Did he tell you whose idea it was to abduct the

13   O'Hairs and extort money from them?

14   A.   David and Danny's.

15   Q.   By Danny, you mean Mr. Fry?

16   A.   Yes.

17   Q.   And whose idea was it that once the money was received,

18   the O'Hairs would be killed?

19   A.   That was David's.

20   Q.   Okay.  But did he say he went along with it?

21   A.   Yes, sir.

22   Q.   And he told you he rented these three vans in Texas,

23   correct?

24   A.   Yes, sir.

25   Q.   Did he say what those vans were used for?

Cross - Direct

1   A.   They took -- well, he took all their paperwork and

2   clothing and moved the O'Hairs, a lot of their stuff from

3   their house to the apartments.

4   Q.   Okay.  And you mentioned a man named Osborne who rented a

5   storage unit?

6   A.   Yes, sir.

7   Q.   And what did Mr. Karr tell you he was to receive for his

8   share in this crime?

9   A.   $30,000.

10   Q.   Okay.  Did Mr. Karr ever state to you that he assisted Mr.

11   Waters or anyone else in transporting the O'Hairs to a storage

12   unit in Austin?

13   A.   Yes.

14   Q.   What did he say about that?

15   A.   He said they -- they took the bodies from the apartment to

16   the storage unit where they were to be cut up and put into the

17   barrels.

18   Q.   Did he state that -- or did he ever state who killed the

19   O'Hairs, or how they were killed, or where they were killed?

20   A.   He never stated how they were killed.

21   Q.   Okay.  Did he mention anything about cutting up bodies in

22   a storage unit?

23   A.   Yes.

24   Q.   What did he tell you about that?

25   A.   He told me that that's where they cut the bodies up.

*Cross - Direct*

1   Q.   Did he say he personally participated in that?

2   A.   Yes.

3   Q.   And who, if anyone else, participated?

4   A.   David Waters and Danny Fry.

5   Q.   And what was their purpose in cutting up or dismembering

6   the bodies?

7   A.   To get rid of the O'Hairs.

8   Q.   And what did they do with the body parts according to what

9   Mr. O'Hair told you --

10   A.   You mean what Mr. Karr told me.

11   Q.   I mean what Mr. Karr told you.

12   A.   Could you repeat the question again?

13   Q.   What did Mr. Karr tell you that they did with the body

14   parts?

15   A.   They put them in the drums.

16   Q.   And did he say what size drums?

17   A.   55-gallon drums.

18   Q.   Did he say whether it was very bloody at the storage unit

19   when they were cutting up the bodies?

20   A.   It was very bloody, very messy.

21   Q.   Did he mention how Mr. Fry was reacting, whether he was

22   squeamish about this activity?

23   A.   Yeah, he was very squeamish.  He didn't -- I think he got

24   himself in a little too deep.

25   Q.   And did Mr. Karr tell you how they cleaned up the storage

*Cross - Direct*

1   unit, if they did?

2   A.  With bleach and other various clean-up supplies.

3   Q.  Okay.  Did he tell you there was a fourth man involved in

4   this crime?

5   A.  Yes.

6   Q.  Did he tell you where the O'Hairs were buried?

7   A.  He said -- he told me a piece of property that either

8   David Waters' friend owned or I know they had keys to the

9   property.

10  Q.  Did he mention anything about a subdivision?

11  A.  Yes, he did.

12  Q.  What did he say about that subdivision?

13  A.  He said they moved the bodies from the piece of property

14  to a subdivision.

15  Q.  Okay.  Did he tell you about anyone seeing their bloody

16  tennis shoes?

17  A.  Yes.

18  Q.  What did he tell you?

19  A.  He said that his ex-girlfriend, or maybe ex-wife, seen the

20  bloody shoes and that -- or -- maybe Patti Jo.  Patti Jo seen

21  the bloody tennis shoes and she was supposed to get rid of the

22  shoes or supposed to dispose of the bloody clothes, also.

23  Q.  And did he tell you she was his ex-girlfriend or one of

24  the other fellas' ex-girlfriends?

25  A.  I took it as she was his ex-girlfriend.

Cross - Direct

1  Q.  Okay.  Did he say anything about Mr. Waters having a plan

2  to make the disappearance of the O'Hairs look like they left

3  because of the IRS?

4  A.  Yes.

5  Q.  Did he ever tell you, he, Mr. Karr, anything about going

6  to a shooting range while he was in Texas with Mr. Waters?

7  A.  I don't recall anything like that, no.

8  Q.  Did he mention guns or firearms at all?

9  A.  Yes.  He mentioned that he had a .22 and a .25 himself.

10 Q.  And did he ever tell you he was fearful or afraid of David

11 Waters?

12 A.  No, sir.

13 Q.  Did he tell you that he and Mr. Waters had been friends

14 for a long time?

15 A.  Yes.

16 Q.  And that they would not rat on one another?

17 A.  Yes.

18 Q.  Did he make any statements to you about whether or not the

19 Feds had found the bodies?

20 A.  Whether the Feds had found the bodies or not?  He said

21 they did not find the bodies.

22 Q.  And what else did he say in that regard, that without the

23 bodies, they don't have --

24 A.  Oh, without the bodies, they didn't have any evidence.

25 Q.  Okay.  Did he mention anything about a witness who

*Cross - Direct*

1   described him as having long, sandy brown hair?

2   A.  Yes, he did.  He said there was a witness that the storage

3   unit where the bodies were cut up that had seen him, and back

4   in '95, I believe it was, he had had blondish, brownish hair,

5   little bit longer, clean-shaven.

6   Q.  And did he indicate to you whether he was making any

7   attempt to change his appearance so as to avoid identification

8   by the witness?

9   A.  Yes, he did.  He had grown a beard for a while and his

10  hair turned completely gray.

11  Q.  Did he tell you anything about Danny Fry?

12  A.  Yes.

13  Q.  What did he say happened to Danny Fry?

14  A.  He said that Danny Fry, they had shot Danny Fry and cut

15  his head off and cut his hands off.

16  Q.  And did he say why they had done this?

17  A.  They were afraid that he was going to tell on them.

18  Q.  And when you say "they," to whom was Mr. Karr referring?

19  A.  Him and David Waters and Chico and --

20  Q.  Did they tell you why Mr. Fry was killed other than the

21  fact that he had a big mouth?  Any disputes about anything?

22  A.  Not that I can recall, no.

23  Q.  Okay.  Have you ever heard Mr. Karr use the phrase "If it

24  bleeds, it leads"?

25  A.  Yes.

1   Q.  And what did he refer to when he said, "If it bleeds, it

2   leads"?

3   A.  I took it as he referred it to as, like, the bodies.  If

4   the bodies bled, you know, it would lead to the crime, or that

5   there was blood, it would lead to the crime.

6   Q.  Did Mr. Karr ever personally tell you that he shot anyone?

7   A.  Danny Fry.

8   Q.  Did he tell you what he shot him with?

9   A.  I don't exactly recall.  I believe it was a .22.  I don't

10  think he told me that it was a .22, though.

11  Q.  Did he tell you anything about why a .22 caliber weapon

12  was good for killing?

13  A.  Yeah, because the bullet usually didn't exit the body.  It

14  just kind of bounces around and tears up your inside, less

15  mess.

16  Q.  Did Mr. Karr tell you why the head and hands of Danny Fry

17  had been separated from the torso?

18  A.  So he couldn't be identified.

19  Q.  Did Mr. Karr mention anything about blood in a rental

20  truck or van?

21  A.  Yeah, there was some blood, I guess, on the right

22  passenger side of the floor that FBI had found.  Wasn't sure

23  where that blood had come from themselves.  Thought it might

24  have come from their bloody shoes, but he wasn't sure.

25  Q.  Did Mr. Karr ever tell you that he had given his former

*Cross - Direct*

1   lawyer statements and records about the O'Hair matter when he

2   was in Texas?

3   A.  He said he gave them a letter, you know, stating why or

4   what really had happened if something were to happen to him,

5   something to that effect.

6   Q.  Did Mr. Karr tell you whether any of these individuals

7   were sexually assaulting Madalyn's daughter while she was held

8   against her will?

9   A.  David Waters.

10  Q.  And did he use the term sexually assault or did he use

11  some more vernacular term?

12  A.  Yeah.

13  Q.  What did he say?

14  A.  Do you want me to say that in here?

15  Q.  Yes, sir.

16  A.  He said that he was butt-fucking her.

17  Q.  Madalyn's daughter?

18  A.  Yes.  Sorry.

19  Q.  Those are his words, not yours; is that correct?

20  A.  Yes.

21  Q.  Did he say anything about Chico, the man who rented the

22  storage unit?

23  A.  Yeah, he told me that he rented the storage unit.

24  Q.  Did he say who knows where the O'Hairs are buried today?

25  A.  Yeah, him, David and Chico.

*Cross - Direct*

1    Q.   Did he mention anything about the sales of a Mercedes Benz

2    in San Antonio?

3    A.   Yes.

4    Q.   What did he tell you about that vehicle?

5    A.   He told me it was sold for $15,000.

6    Q.   Did he mention anything about Rolex watches?

7    A.   Yes.

8    Q.   What did he say?

9    A.   He said he had three of them that were the O'Hairs and

10   that he had told me he had distributed one to some guy in

11   Chicago and another guy in Florida.

12   Q.   Did he mention anything about his sister having one of the

13   watches?

14   A.   No, I don't recall him telling me that he had -- that he

15   gave one to his sister.

16   Q.   Now, with regard to this ranch property, you said that he

17   told you Mr. Waters had access to this ranch?

18   A.   Yes.

19   Q.   Keys or combination or something?

20   A.   Yes.

21   Q.   And did he say where on this ranch the bodies were buried?

22   A.   He said down in a gully they were buried.  I guess, Texas

23   had had a lot of flash floods and storms and stuff like that,

24   and they hadn't buried the barrels deep enough and they were

25   floating up out of the ground.

Cross - Direct

1   Q.  And did he tell you that Chico was paid extra to help them

2   move the barrels?

3   A.  $5,000.

4   Q.  And did he state that his knowledge of where the bodies

5   were buried was his ticket to his freedom?

6   A.  Yes.

7   Q.  Did Mr. Karr ever discuss in your presence or hearing

8   anything about gold coins?

9   A.  Yes.

10  Q.  What did he tell you about these knowledge of gold coins?

11  A.  He told me a lot about gold coins, you know, what the

12  worth was of them, the different types of gold coins,

13  Krugerrands, American Eagles, the Maple Leaves, how gold could

14  fluctuate, you know, anywhere from $250 to, you know, $380 an

15  ounce, just how they put alloy in gold coins to make them

16  sturdier.  He was always watching the stock market on gold

17  coins, gold.

18  Q.  Did he tell you any of the gold coins that they didn't get

19  after they committed the crime?

20  A.  Yeah, there was $100,000 that they never went back and

21  got.

22  Q.  Did he tell you in what kind of container the coins were

23  stored when they were stolen?

24  A.  It was a storage container that Patti Jo had rented.

25  Q.  Okay.  Did he tell you or did he suspect who had stolen

*Cross - Direct*

1    the coins?

2    A.   He told me that some -- Patti Jo and Chico had hired some

3    guys to steal the coins and, you know, to distribute -- you

4    know, they were paid a certain amount of money to distribute

5    the coins so it made it look good so they could distribute

6    them, also, and be able to spend them, because I guess they

7    were having trouble spending them because of the fact they

8    were traceable or --

9    Q.   Did Mr. Karr tell you how much money was split between him

10   and Chico and Mr. Waters?

11   A.   They only got $30,000 a piece, Danny and Gary.

12   Q.   So they split $90,000?

13   A.   Sixty.

14   Q.   Did you say, also, Mr. Osborne was paid 30,000 for renting

15   the storage unit?

16   A.   Yeah, Mr. Osborne, Mr. Karr and then, Chico Osborne's

17   girlfriend.

18   Q.   Did Mr. Karr say anything to you about weapons or firearms

19   including automatic weapons?

20   A.   He said he knew some Chicago outlaws who could, you know,

21   hook him up with any kind of, you know, automatic weapons that

22   he needed.

23   Q.   Do you know what a Tech 9 is?

24   A.   No, I'm not really familiar with guns.

25   Q.   Did Mr. Karr indicate to you in addition to the money what

Cross - Direct

1   material possessions, if any, he got out of this crime spree?

2   A.   Not really.  Just the watches and, you know, the computer

3   equipment and Harley Davidson, you know, some clothing, some

4   -- that was pretty much about it.

5   Q.   Did he tell you about his nice clothes and jewelry and

6   rings?

7   A.   Yeah, he had a lot of rings.  Rings mostly --

8   Q.   Have you ever --

9   A.   -- jewelry-wise.

10  Q.   -- have you ever heard Mr. Karr say, quote, if you play,

11  you pay?

12  A.   Yes.

13  Q.   Have you ever heard him say, if you tell in hell, you

14  dwell?

15  A.   Yes.  May I drink some water?

16       THE COURT:  (Moving head up and down.)

17  Q.   (BY MR. CARRUTH) Did he say anything to you about having

18  any guns when he was arrested in Detroit?

19  A.   Yeah, he had a .22 on a nightstand and a .25 in a fanny

20  pack.

21  Q.   Now, once again, these statements were made over a long

22  period of time; is that correct?

23  A.   Yes, sir.

24  Q.   Pass the witness.

25       THE COURT:  Members of the jury, I'm going to give you

1   your evening break.  Please remember the instructions.  See

2   you in the morning at 8:30.  8:30 in the morning.

3       (Jury not present.)

4           THE COURT:  You may be seated.  You may be excused,

5   sir.  Mr. Carruth, what's your expectation in the morning?

6           MR. CARRUTH:  We have four more witnesses, possibly

7   finish by noon.

8           THE COURT:  All right.  Thank you.  8:30.

9       (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25