FILED

1



NOV 2 1 2000

U.S. DISTRICT COURT
DISTRICT OF TEXAS

DEPUTY CLERK

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                              )
 4   v.                       ) Austin, Texas
                              )
 5   GARY PAUL KARR           ) May 24, 2000

 6
                         VOLUME 8 of 12
 7                     TRIAL ON THE MERITS
                BEFORE THE HONORABLE SAM SPARKS
 8
     APPEARANCES:
 9
     For the United States:      Mr. Gerald C. Carruth
10                               Mr. Daniel H. Mills
                                 Assistant U.S. Attorneys
11                               816 Congress Avenue, Ste. 1000
                                 Austin, Texas 78701
12

13

14
     For the Defendant:          Mr. Thomas W. Mills, Jr.
15                               Ms. Christi N. Williams
                                 Mills & Presby
16                               5910 North Central Expressway,
                                 Ste. 900
17                               Dallas, Texas 75206-5141

18

19
     Court Reporter:             Lily Iva Reznik, RPR, CRR
20                               United States Courthouse
                                 200 West 8th Street
21                               Austin, Texas 78701
                                 Ph: (512)916-5564
22

23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```





LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

ORIGINAL

102

2

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jason Cross | | 8 | 38 | 48 |
| Brian Chase | 54 | 59 | | |
| Emil Parelli | 84 | 103 | 107 | |
| Donna C. Cowling | 111 | 128 | 133 | |
| Edmond Martin | 134 | 218 | | |
| William E. Gordon | 196 | 208 | | |

| | Page |
|---|---|
| Proceedings Adjourned | 236 |

*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS (AUSTIN)*

<u>E X H I B I T S</u>

|  |  | Offered | Admitted |
|---|---|---|---|
| <u>Government's</u> | | | |
| #WA1-1 Articles of Incorporation | | 160 | 160 |
| #W10-1 Southwestern Bell Records | | 154 | 154 |
| #W19-1 & 2 Discover Records | | 155 | 156 |
| #W19-3 Discover Records | | 156 | 156 |
| #W30-1 Cell Phone Records | | 154 | 154 |
| #W31-1 MCI Records | | 155 | 155 |
| #W34-1 National Car Rental Records | | 159 | 159 |
| #W36-2, 3 & 4 USAA Fed. Savings Records | | 161 | 161 |
| #41-1, 2, 3 & 4 Western Union Records | | 159 | 159 |
| #W42-1 Citibank Records | | 157 | 157 |
| #W43-1 First USA Records | | 158 | 158 |
| #W44-1 American Express Records | | 157 | 157 |
| #W44-2 Optima Records | | 157 | 157 |
| #W44-3 American Express Records | | 158 | 158 |
| #45A-1 Citibank Mastercard Records | | 158 | 158 |
| #45A-2 Diner's Club Records | | 158 | 158 |
| #W45-1 Bank of America Records | | 157 | 157 |
| #W46A-1-6 New Zealand Trust Records | | 161 | 161 |
| #W46-1 Associates Records | | 156 | 156 |
| #W53-1 Seton Hospital Records | | 116 | 116 |
| #W61-1 Sidney Karr's Will | | 126 | 127 |
| #W61-2 Jewellers Receipt | | 126 | 127 |

4

|  | Offered | Admitted |
|---|---|---|
| E X H I B I T S (Continued) | | |
| Government's | | |
| #W61-3 Photo | 126 | 127 |
| #W69-1 Letter of Immunity | 160 | 160 |
| #W77-1 Cashier's Check | 90 | 90 |
| #W77-2 Handwritten Note | 91 | 91 |
| #W77-3 Manila Folders | 89 | 89 |
| #W77-4 Inquisition | 89 | 89 |
| #W77-5 Handwritten Note | 90 | 90 |
| #W77-13 R. Waters' Driver's License | 97 | 97 |
| #W77-14, 19, 22 & 46 Address Books | 93 | 93 |
| #W77-15 R. Waters' S.S. Card | 97 | 97 |
| #W77-16 R. Waters' Birth Certificate | 96 | 96 |
| #W77-17 Woman's Driver's License | 97 | 97 |
| #W77-18 New ID In America | 95 | 95 |
| #W77-21 Memo Pad | 95 | 95 |
| #W77-24 & 25 Black Boxes | 101 | 101 |
| #W77-28 Magazine Loader | 101 | 101 |
| #W77-29 Hunting Knife | 100 | 100 |
| #W77-30 Straight-edge Knife | 100 | 100 |
| #W77-35 Memo Pads | 94 | 94 |
| #W77-37 Spray bottle | 103 | 103 |
| #W77-38 Bow Saw | 102 | 102 |
| #W77-39 Greyhound Ticket | 96 | 96 |

|  | E X H I B I T S (Continued) | | |
|---|---|---|---|
| 2 | | Offered | Admitted |
| 3 | Government's | | |
| 4 | #W77-43 Book | 88 | 88 |
| 5 | #W77-44 Book | 88 | 88 |
| 6 | #W77-45 Madalyn Manuscript | 98 | 98 |
| 7 | #W77-48 Kansas City Map | 100 | 100 |
| 8 | #W77-49 Raymond Weil Watch | 98 | 98 |
| 9 | #W77-51 Letter | 94 | 94 |
| 10 | #W77-52 Midtown Billing Statements | 92 | 92 |
| 11 | #W77-53 Videotape | 95 | 95 |
| 12 | #W86-3 Karr's Florida License | 122 | 122 |
| 13 | #W91-1 Ameritech Records | 153 | 153 |
| 14 | #W92-1 Yahoo! E-mail Records | 161 | 162 |
| 15 | #W93-1 Phone Calling Card | 155 | 155 |
| 16 | #W97-1 Cross Handwritten Notes | 42 | 44 |
| 17 | #W100-1 Karr Supp. Statement | 150 | 150 |
| 18 | #W100-2 Karr Statement | 144 | 147 |
| 19 | #W100-3(1) Karr Movement Chart | 163 | 163 |
| 20 | #W100-3(2) Karr Movement Chart | 165 | 166 |
| 21 | #W100-3(3) Karr Movement Chart | 166 | 166 |
| 22 | #W100-3(4) J. Murray Movement Chart | 166 | 166 |
| 23 | #W100-4 | 194 | 194 |
| 24 | #W100-6 Time Line Chart | 171 | 171 |
| 25 | #W100-6(3) Time Line Chart | 174 | 174 |

|  | E X H I B I T S (Continued) | | |
| --- | --- | --- | --- |
|  |  | Offered | Admitted |
| **Government's** | | | |
| #W100-6(5) Time Line Chart | | 180 | 180 |
| #W100-6(6) Time Line Chart | | 185 | 185 |
| #W100-51 Spreadsheet Chart | | 189 | 189 |
| #W100-52 Spreadsheet Chart | | 190 | 190 |
| #W100-53 Spreadsheet Chart | | 191 | 192 |
| #W100-54 Spreadsheet Chart | | 193 | 193 |
| #W100-61 | | 168 | 168 |
| #W100-71, 72 & 73 Blowup Calendar | | 167 | 167 |
|  | | | |
| **Defendant's** | | | |
| #D2, D28A, D29, | | | |
| D29A & B, D30, D30A Stipulations | | 103 | 103 |
| #D39 | | 131 | 131 |
| #D40 | | 130 | 130 |

1          THE COURT:  All right, counsel.  Anything before we

2     bring in the jury?

3          MR. CARRUTH:  No, your Honor, nothing from the

4     government.

5          MR. T. MILLS:  No, sir.

6          THE COURT:  All right.  Bring in the jury.

7       (Jury present.)

8          THE COURT:  Ladies and gentlemen, in the ever ongoing

9     effort of the General Services Administration, your government

10    at work to make us uncomfortable, we were without air

11    conditioning for the evening.  I have not gotten the report.

12    Sometimes the report is they cut off the air conditioning to

13    conserve, of course, which is absurd, because by the time it

14    cools up, it costs more.

15         I think what happened is we've got a little

16    construction on and somebody cut a power line that nobody

17    wants to admit it.  In any event, we're going to be a little

18    stuffy today.  There's not a thing I can do about it except

19    I'm tempted to make them come over with fans individually and

20    fan us, but that would give up rest and it wouldn't do anybody

21    any good.  So feel free to use the fans.  They're trying to

22    get it as comfortable as they can.

23         During the evening recess, did anyone attempt to talk

24    to you about this case?

25         THE JURORS:  No.

*Cross - Cross*

1          THE COURT:  Did you talk to anybody about this case?

2          THE JURORS:  No.

3          THE COURT:  And did you learn anything at all about

4    the case outside the presence of each other and this

5    courtroom?

6          THE JURORS:  No.

7          THE COURT:  Thank you.  Let the record reflect

8    negative responses to all questions by all jurors.  If you'll

9    come up, please, sir.  Take the witness stand.  Mr. Cross, you

10   are still under oath, sir.

11         THE WITNESS:  Yes, sir.

12                      CROSS-EXAMINATION

13   BY MR. T. MILLS:

14   Q.  Mr. Cross, my name's Tom Mills, and I'm one of the lawyers

15   who represent Gary Karr.  I had a couple of questions for you.

16   Would you please tell the members of the jury the felony

17   offenses that you've been convicted of?

18   A.  I was convicted of unarmed robbery, three larcenies from a

19   person, and I was caught with marihuana, also, marihuana case.

20   Q.  All right.  Anything else?

21   A.  I believe when I was 14, I got caught with some mescaline

22   in high school.

23   Q.  That's a hallucinogenic drug?

24   A.  Yes, it is.

25   Q.  You can pull that toward you.  The unarmed robbery was

*Cross - Cross*

1  your most recent conviction?

2  A.  Yes.

3  Q.  That was in Michigan?

4  A.  Yes.

5  Q.  You're from Michigan?

6  A.  Yes.

7  Q.  Your family lives in Michigan?

8  A.  Yes.

9  Q.  Do you have a sister?

10  A.  No.

11  Q.  Brothers?

12  A.  One brother.

13  Q.  The larceny from a person, that means theft from a person?

14  A.  Yes.

15  Q.  And you have how many convictions for that?

16  A.  Three.

17  Q.  With a weapon or without a weapon?

18  A.  Without.

19  Q.  On your most recent conviction, what sentence did you get

20  in a federal court in Michigan?

21  A.  84 months.

22  Q.  Well, actually, you got -- did you first get a higher

23  sentence?

24  A.  No, sir.

25  Q.  You got 84 months?

Cross - Cross

1    A.  Yes, sir.

2    Q.  Now, in that case, you were represented by a lawyer named

3    Neil Fink?

4    A.  Yes.

5    Q.  And he's from Birmingham, Michigan?

6    A.  Yes.

7    Q.  And at the beginning of the case, after you were arrested

8    for unarmed robbery, were you released on bond or did you stay

9    in jail?

10   A.  No.  Stayed in jail.

11   Q.  And Mr. Fink was your attorney?

12   A.  Yes.

13   Q.  And he moved the court for a neurological and psychiatric

14   exam of you, didn't he?

15   A.  Yes.

16   Q.  And that's because you have a history of many, many head

17   injuries, don't you?

18   A.  Yes.

19   Q.  Beginning when you were a child, you had a head injury,

20   didn't you?

21   A.  Yes, sir.

22   Q.  You had many episodes of seizures when you were a child,

23   didn't you?

24   A.  No.

25   Q.  Have you -- did you read the report by Dr. Michael

*Cross - Cross*

1   Abramski that was done for Mr. Fink?

2   A.  No, I did not.

3   Q.  As a child, you fell out of a window and hurt your head,

4   didn't you?

5   A.  Yes, I did.

6   Q.  When you were 13, you had a motorcycle accident and hit

7   your head, didn't you?

8   A.  Yes, sir.

9   Q.  When you were older, you were in a fight and kicked in the

10  head, weren't you?

11  A.  No, sir.

12  Q.  When you were 15?

13  A.  I don't recall having a head injury being kicked in the

14  head in a fight.

15  Q.  Well, how about being hit in the head in a fight?

16  A.  I don't recall anything like that either.

17  Q.  You do have brain damage, though, in your left hemisphere,

18  don't you?

19  A.  Not that I recall or not that I've been diagnosed by

20  anybody that I know of.  I never was able to read the

21  neurological exam that they did on me.  I don't know what they

22  found.

23  Q.  Oh, all right.  Well, sometimes you do have memory

24  problems, don't you?

25  A.  I don't remember at all sometimes, just reading books and

1    stuff like that.

2    Q.   Yeah.  And you have been treated for alcohol and drug

3    abuse, correct?

4    A.   Not alcohol.  I had a drug problem before, yes.

5    Q.   All right.  And you have -- did you -- were you sent

6    copies or did you have an opportunity to read pleadings that

7    your lawyer filed for you in federal court for the Eastern

8    District of Michigan?

9    A.   Pleadings?

10   Q.   Pleadings, like motions, like documents that a lawyer

11   files with the judge.

12   A.   Not that I recall.  I don't believe so.

13   Q.   Well, do you remember being at a -- did you discuss with

14   your lawyer what actions he was going to take for you?

15   A.   As far as defending me?

16   Q.   Right, or trying to get you as light a sentence as

17   possible?

18   A.   We were going for a diminished capacity.

19   Q.   Uh-huh, because of your brain problems, right?

20   A.   Just because I had impulsive behavior, and I had a

21   gambling problem.

22   Q.   And were you -- and you were successful in presenting or

23   -- I guess you or he were successful in presenting evidence

24   that you, in fact, suffer from diminished mental capacity.

25   That worked, didn't it?

Cross - Cross

1    A.  No, it did not.

2    Q.  It did not work?

3    A.  No, sir.

4    Q.  Well, you were facing up to 138 months, weren't you?

5    A.  I don't recall what the guidelines were.

6    Q.  Well, they were well over 100 months, weren't they?

7    A.  I believe so.

8    Q.  Do you not remember?

9    A.  I don't recall what the guidelines were. I just remember

10   what my lawyer said that I would more than likely get.

11   Q.  All right.

12   A.  Which was somewhere around 76 to 97 months.

13   Q.  All right.  In addition to whatever documents the

14   prosecutor -- your defense lawyer filed, the prosecutor in

15   Michigan filed a motion for you to get a low sentence because

16   of your telling the government in this case what you did,

17   right?  You're aware of that, aren't you?

18   A.  I'm aware of the 5K1.

19   Q.  Yes.

20   A.  Yes.

21   Q.  All right.  5K1 is a section in a book called the Federal

22   Sentencing Guideline, isn't it?

23   A.  Yes, sir.

24   Q.  All right.  And when -- as a result of telling agents in

25   this case things that you say that Gary Karr said, you got

*Cross - Cross*

1  your sentence lowered, didn't you?

2  A.  I don't know if I got my sentence lowered or not.  I

3  thought that was just an offer from the prosecution.  You

4  know, this is all new to me.  I don't really know how things

5  work.  You know, I just thought that was -- I didn't know that

6  that was part of a 5K1.

7  Q.  All right.  Well, is it your belief that when you get back

8  to prison that as a result of testifying here that you hope to

9  get your sentence lowered some more?

10  A.  No.

11  Q.  No?  Why?

12  A.  I haven't been promised anything or --

13  Q.  I didn't ask that, did I?

14  A.  Yeah, it would be nice.

15  Q.  Okay.  I didn't use the word "promise," did I?

16  A.  No.

17  Q.  And the prosecutor has not promised you that you would get

18  a lower sentence, has he?

19  A.  No, he has not.

20  Q.  But that is a hope you have, isn't it?

21  A.  I would hope so.

22  Q.  All right.  Now, do you remember what months -- what month

23  that you were interviewed by the FBI and IRS?  What month and

24  year?

25  A.  I believe it was in August of '99.

*Cross - Cross*

1  Q.  And you were -- you had access to or you were in the same

2  physical area with Mr. Karr during what months?

3  A.  From April to around December of '99.

4  Q.  From April to December?

5  A.  Yes.

6  Q.  And you believe that you were interviewed in August of

7  '99?

8  A.  I don't exactly recall the exact month, but I believe it

9  was August.

10  Q.  All right.  Well, between April and December, that's

11  April, May, June, July, August, September, October, November,

12  December, in nine months, over how many of those months do you

13  claim that Mr. Karr was making confessions to you about

14  everything you've testified to?

15  A.  Probably a four-month period or so.

16  Q.  Okay.  Now, isn't it true that over a four-month period,

17  when you say that he was making confessions to you, that on

18  one day, you wrote down everything that you say he had said as

19  opposed to notes on a day-by-day basis?  Isn't that true?

20  A.  No, it's not.

21  Q.  All right.  Well, I've got a copy of your notes and all of

22  them say August the 12th, 1999.  Did you make them on August

23  the 12th, 1999?

24  A.  I don't believe so.  I think that was the date that,

25  maybe, the agents came to see me.

1   Q.  August the 12th, '99?

2   A.  I think so.

3   Q.  All right.

4   A.  I think so and I think I just dated those on that

5   particular day.

6   Q.  All right.  Between April and, say, August of 1999, you

7   had communication with family members naturally, didn't you?

8   A.  Oh, yes.

9   Q.  And you could talk with your lawyer if he was in the

10  office.  You could call him collect, couldn't you?

11  A.  Yes.

12  Q.  He could visit you?

13  A.  Yes.

14  Q.  Was he on your visiting list or did he have to be --

15  A.  No, he never came and visited me.

16  Q.  All right.  And your lawyer's investigator's name was

17  what?

18  A.  I don't know.  Investigator?

19  Q.  Private investigator?

20  A.  I don't know of any private investigator.

21  Q.  Okay.

22  A.  Not that I can recall.  I don't remember anybody like

23  that.

24  Q.  Did you -- without it being your lawyer's private

25  investigator, did you or your family hire a private

*Cross - Cross*

1   investigator to help you out about collecting information?

2   A.  No, sir.

3   Q.  All right.  You had access to and had read documents about

4   the O'Hair case, hadn't you?

5   A.  No, sir, I had not.

6   Q.  You never have in your life?

7   A.  I have now, but I hadn't prior to that.

8   Q.  Prior to what?

9   A.  Prior to talking with Mr. Karr.

10  Q.  Okay.  During the period of April through December 1999,

11  you had an opportunity to read documents about the O'Hair

12  investigation, didn't you?

13  A.  From April till December?

14  Q.  That period.

15  A.  I don't believe so.  We watched a television show on it,

16  but I never looked at any documents or anything.

17  Q.  Never?

18  A.  Not that I can recall, no.

19  Q.  All right.  Why would you not be able to recall that if

20  you did?

21  A.  I just don't recall ever looking at any documents.

22  Q.  But you're saying that you can't --

23  A.  Where would I get documents from?

24  Q.  Well, Mr. Karr had some documents that pertained to his

25  case.

1   A.   Only thing I ever looked at of Mr. Karr's was his -- when

2   he got caught with some guns in his house.   Everything that

3   had happened, you know, with the gun case.

4   Q.   Uh-huh.   There was a --

5   A.   He read some of it to me.

6   Q.   There was a write-up that was done by the investigating

7   agency, wasn't there?   That's what --

8   A.   I don't know who it was wrote up by.

9   Q.   It was a --

10   A.   Like a PSI report type deal.

11   Q.   All right.   You know Brian Chase?

12   A.   Yes, I do.

13   Q.   You know Aaron Morris?

14   A.   Yes, I do.

15   Q.   You know Marvin Gambrion, inmate, prisoner?

16   A.   Yes, I do.

17   Q.   Okay.   Now, you told the FBI or the IRS, or both, when

18   they came that Aaron Morris was present during the time that

19   Mr. Karr was making confessions to you about crimes, didn't

20   you?

21   A.   Yes, I did.

22   Q.   Okay.   And so Aaron Morris would, of course, since he was

23   there, too, would have heard what you heard, right?

24   A.   I would think so.

25   Q.   All right.   Now, have you thought about this concept that

1  some of the things that you have told the agents that he said

2  are inconsistent with each other?  Have you thought that

3  before?  Has that thought entered your mind?

4  A.  I don't understand the question.

5  Q.  All right.  Let me ask you this:  Do you know what the

6  word "inconsistent" means?  I can use a different word if you

7  want.

8  A.  Yes, if you could use a different word.

9  Q.  Okay.  Do you know what the word "inconsistent" means?

10  A.  No, I don't.

11  Q.  Okay.  Do you know what the word "different" means?

12  A.  Yes.

13  Q.  Like, if I say I have five fingers up, but I had four

14  fingers up, that would be two different facts.  Either I had

15  four or I had five?

16  A.  All right.

17  Q.  All right.  Now, you have said that Mr. Karr told you --

18  and I guess Aaron Morris -- was Brian Chase there, too?

19  A.  No.

20  Q.  Okay.  That he was concerned that somebody saw him with

21  his long, blond hair; is that correct?

22  A.  I don't recall ever -- I don't ever remember Aaron being

23  there when he told me that.

24  Q.  Okay.  I'll correct that.  You have testified that Mr.

25  Karr told you in 1999, while y'all were in jail, that he --

*Cross - Cross*

1   I'm going to ask you a question, but you tell me exactly what

2   you remember.  That he was concerned because somebody might

3   have seen him with his long, blond hair?

4   A.  Yes.

5   Q.  All right.  Now, let me show you what's marked as

6   Government's Exhibit W11-5, parenthesis 4.  In 1995 -- do you

7   recognize anybody in that photograph?

8   A.  No.

9   Q.  All right.  Do you recognize this man right here?

10  A.  I can't see his face, so no.

11  Q.  All right.  I want you to look at this man right here, and

12  then, I want you to look at Mr. Karr -- turn your head

13  sideways, and I want you to see if you recognize that as being

14  Gary Karr.

15  A.  I don't recognize that because I can't see the guy's face

16  in the picture.

17  Q.  All right.  Let me try to ask it this way.  If Mr. Karr --

18  you claim that Mr. Karr said he had long, blond hair in 1995

19  and that he was concerned about being recognized, right?

20  A.  I didn't say long, blond hair.  I said blondish, brownish

21  hair.

22  Q.  All right.

23  A.  Little longer.

24  Q.  Well, now, yesterday, you didn't say --

25  A.  Well, longer blondish, brownish hair.

*Cross - Cross*

1   Q.  Longer blondish, brownish hair?

2   A.  Yes.

3   Q.  All right.  Now, would it be confusing to you if you

4   learned that that would make no sense for him to say that

5   because witnesses have identified him in that photograph as

6   having gray hair that's not long?

7   A.  I don't know.  That's just what he told me.

8   Q.  All right.  That's not something that you made up to try

9   to help the government to try to help you get a lower

10  sentence?

11  A.  No, sir.

12  Q.  Did I understand your testimony to be that Mr. Karr said

13  that the three O'Hairs -- or the O'Hairs and Murray were never

14  out together as a group?

15  A.  No.

16  Q.  He did not say that?

17  A.  No.  He did say that.

18  Q.  He did say that?

19  A.  Yes.

20  Q.  Okay.  Now, that would be unusual.  Do you know what

21  unusual means?

22  A.  Yes.

23  Q.  If Mr. Karr said that since there is testimony that the

24  three were out together, right, that would be confusing,

25  wouldn't it?

*Cross - Cross*

1  A.  I don't know.  That's just what the man told me.

2  Q.  Okay.  How did he tell you these things?  Did he sit down

3  at a table or in a TV room and say, "I would like to confess

4  today.  I've never told my ex-wife, law enforcement, best

5  friends, but you, a stranger, I'd like to confess to"?

6  A.  We used to talk a lot.  We used to talk a lot especially

7  after I had cigarettes.

8  Q.  Okay.  You think the cigarettes did it?

9  A.  I don't know what did it.  Might have helped.

10  Q.  Okay.  Let me ask you this.  You testified yesterday that

11  Mr. Karr said two different stories about the bodies or about

12  the barrels.  One, you testified that he said he went out to

13  this country place with David Waters and didn't do anything

14  with any barrels.  All he did was leave David Waters out in

15  the country by himself?

16  A.  No, I never said anything like that.

17  Q.  You didn't?

18  A.  No, I didn't.

19  Q.  Okay.  Well, have you told the agents that Gary Karr said

20  that he went out to the country with David Waters, they had an

21  argument, and he abandoned Waters in the country?

22  A.  No, I did not.

23  Q.  Did you testify yesterday that Mr. Karr said that he went

24  out in the country and dug up some barrels that were buried?

25  A.  No, I never said that either.

*Cross - Cross*

1   Q.  All right.  What other individuals, if any, have you

2   testified or given evidence about that might lower your

3   sentence?  You could give them by name.

4   A.  Thomas Sutton.

5   Q.  Thomas Sutton?

6   A.  S-U-T-T-O-N.

7   Q.  Was he a jail mate?

8   A.  He was -- yeah, he was incarcerated at Milam.

9   Q.  And that was with the hope of getting out sooner in some

10  way, correct?

11  A.  Yes.

12  Q.  Did you testify that Mr. Karr claims that he cut up three

13  bodies, dismembered them?

14  A.  Yes.

15  Q.  Okay.  And did he say that all of that blood would have

16  left some kind of a stain on the cement floor?

17  A.  No, he never said anything like that.

18  Q.  Do you claim that Mr. Karr said that he got $30,000 out of

19  this deal?

20  A.  Yes.

21  Q.  I assume or did he say -- do you claim that he said

22  $30,000 in cash?

23  A.  I don't recall him ever saying how he was paid in cash.

24  Q.  Check?

25  A.  I would assume.  I assumed cash and I don't know for sure.

*Cross - Cross*

1  Q.  All right.  Do you know of anyone there, whatever he said,

2  or any other source of information who saw him with that much

3  cash or any significant amount of cash?  Are you aware of any

4  such evidence?

5  A.  No, I don't believe so, no.

6  Q.  Are you aware of any evidence that periodically that Jon

7  Murray, Madalyn O'Hair were seen walking around the apartment

8  complex where they stayed for a month?

9  A.  Am I aware of any evidence?

10 Q.  Any facts about that?

11 A.  Just what Gary told me.

12 Q.  Did Gary tell you that?

13 A.  He told me that they were escorted whenever they walked

14 around.

15 Q.  Well, I thought you said yesterday that they were kept

16 handcuffed all the time.

17 A.  Well, they were kept handcuffed.

18 Q.  Well --

19 A.  I'm talking about when they were brought outside to be

20 seen, so they could be seen, so it didn't look obvious.

21 Q.  So Mr. Karr said that these reasonably high-profile

22 people, Madalyn Murray O'Hair and her son and granddaughter,

23 that it was part of the plan for the public to be able to see

24 them in public so that it wouldn't look fishy, right?

25 A.  Yes.

*Cross - Cross*

1   Q.   That's what Mr. Karr said to you?

2   A.   Yes.

3   Q.   And Mr. Karr said to you that they were killed in the

4   apartment complex?

5   A.   No.

6   Q.   Did Mr. Karr -- do you claim that Mr. Karr said where they

7   were killed?

8   A.   No.

9   Q.   You have testified that Mr. Karr said that either he or

10  David Waters had a key to this country property, right?

11  A.   He said David, yeah.

12  Q.   All right.  And you told the agents that?

13  A.   Yes, I did.

14  Q.   And did they say to you, "But wait a minute, they were

15  combination locks?  What's your story about?"

16  A.   They never said anything like that to me.

17  Q.   Really?  You learned from some source, a newspaper

18  article, or some television source, or from some source that

19  some blood had been found in a van in 1999, didn't you?

20  A.   No.

21  Q.   You told these agents, over here, that Gary Karr said that

22  there was blood in a van?

23  A.   Yes.

24  Q.   And that it was Danny Fry -- it was the result of Danny

25  Fry being killed, right?

*Cross - Cross*

1   A.  No, he didn't know -- Gary didn't know whose it was.  It

2   might have been is what he said.

3   Q.  Let me try to get a picture of this.  Y'all are in a room

4   together and --

5   A.  Yes.

6   Q.  -- Gary Karr is telling you about a heinous, horrible

7   crimes that he's done?

8   A.  Yes.

9   Q.  And anybody else who's around?

10  A.  No.

11  Q.  Just you.  But it's not really just you because it was

12  sometimes Aaron Morris, right?

13  A.  Yeah, Aaron lived with him.

14  Q.  Yeah, all right.  And so one day, he says to you, "You

15  know, back in '95, there was this van and it had some blood,

16  and I don't know if it was Danny Fry's blood or whose blood it

17  was"?

18  A.  I don't exactly recall how the conversation started up,

19  but I just remember him saying that they had found blood in

20  the van on the right passenger side, but they didn't know

21  whose body it came from, if it can come from the O'Hairs or

22  the Frys.

23      He said that they would have known where it came from

24  that they would have contacted him by now and charged him with

25  something.

*Cross - Cross*

1   Q.  Well, did he tell you -- strike that.  He couldn't have

2   told you that, sir, because he hadn't rented the van until

3   well after the disappearance or leaving of the O'Hairs.  Did

4   you know that?

5   A.  I don't know that.  I just know what he told me.

6   Q.  Okay.  And when you told that to these agents, I'm

7   assuming that they said to you, "Well, the blood testing shows

8   that it wasn't Danny Fry's blood."  Did they say that to you?

9   A.  No, they did not.

10  Q.  When you -- you say that Mr. Karr said that he had a

11  ticket to freedom?

12  A.  Yes.

13  Q.  Okay.  That's not some phrase that you made up or that

14  somebody helped you make up, is it?

15  A.  No.

16  Q.  Okay.  Now, does it appear to you that Mr. Karr has cashed

17  in that ticket to freedom if he would have said that, that

18  here he is on trial?

19  A.  I don't know what he's doing.

20  Q.  That doesn't make any sense to you, does it, sir?

21  A.  It doesn't make any sense to me he hasn't cashed in on his

22  ticket to freedom?

23  Q.  If he really said that.

24  A.  That's up to him.

25  Q.  Now, it's my understanding that you say that Gary Karr

*Cross - Cross*

1   said that he got $30,000 and you assumed in the context of

2   what he said that it was cash, right?

3   A.   Yes.

4   Q.   And that was his $30,000 that he was supposed to get out

5   of the deal?

6   A.   Yes.

7   Q.   And that was what he was supposed to get out of the deal,

8   according to you, $30,000, right?

9   A.   Yes.

10  Q.   All right.  And yet, yesterday, you said -- and you have

11  told these agents that Gary Karr read the newspaper for the

12  spot gold prices because he had coins that he was interested

13  in.  Did you testify to that yesterday?

14  A.   I didn't say that he had coins he was interested in, but I

15  said he checked the stock market on gold.

16  Q.   On gold because he owned gold?

17  A.   I don't know if he owned gold or not.

18  Q.   Well, was that the impression that you were trying to give

19  when you told the agents that he checked the gold market?

20  A.   No, I wasn't trying to give any impression.

21  Q.   Just as a hobby, he checked the gold market?

22  A.   He looked at the stock market quite a bit.

23  Q.   Stock market or for gold?

24  A.   Stock market, gold, yeah.

25  Q.   Did he ever tell you that he owned stock?

Cross - Cross

1   A.  No.  He said he was checking in some Home Depot stock

2   and --

3   Q.  Did he tell you that he's indigent?  Do you know what that

4   word means?

5   A.  No.

6   Q.  That he's broke.  Did he tell you that?

7   A.  No.

8   Q.  You have the impression that he was checking the stock

9   market because he was interested in buying Home Depot stock?

10  A.  Yeah.

11  Q.  Do you say under oath that Mr. Karr told you that he was

12  interested in buying stock including Home Depot?

13  A.  I don't recall him saying that he was going to buy stock

14  in it.  I just -- I thought that he was interested in buying

15  stock.  He talked about it all the time.

16  Q.  He talked about it all the time?

17  A.  Yeah, he talked about lots of stocks.

18  Q.  Well, then, you must have thought that he had money?

19  A.  Thought he had money.

20  Q.  You thought he had money?

21  A.  (Moving head up and down.)

22  Q.  You thought that he had the ability --

23  A.  I didn't know he was broke.

24  Q.  Sorry?

25  A.  I didn't know he was indigent, like you said.

Cross - Cross

1   Q.  You thought he had the ability to invest in the stock

2   market or the gold market?

3   A.  I thought he had the ability, yeah.

4   Q.  Yes?

5   A.  Yes.

6   Q.  Well, then, why, if that was what you really believed,

7   would he have to bum cigarettes from a rich guy like you?

8   A.  He didn't bum them, he paid for them.

9   Q.  Oh.

10  A.  I mean, we both paid for cigarettes.  You know, I was

11  getting cigarettes in, but we both, you know, were paying for

12  them.

13  Q.  How did you smuggle them in?

14  A.  Well, other guys were smuggling them in, and then, we

15  started -- we devised our own little system of getting them in

16  through the newspaper.

17  Q.  Through the newspaper?

18  A.  Yes.

19  Q.  Okay.  So you were getting them in, but he was buying them

20  from you?

21  A.  No.  Once we started getting them in, they were free.  We

22  didn't have to pay $10 and $20 a cigarette anymore.

23  Q.  You knew that he had a friend who, once a month or once

24  every two weeks, would put some money on his books for his

25  toothpaste and living necessities, didn't you?

Cross - Cross

1   A.  I don't really know who put his money on there for him.

2   Q.  After you were interviewed by the agents, that was when

3   you began taking some notes; is that right?

4   A.  No.

5   Q.  Did they suggest to you that you do take notes?

6   A.  No, they did not.

7   Q.  Did they ask you if you had taken notes?

8   A.  Yes, they did.

9   Q.  Did you give them the notes?

10  A.  Yes, I did.

11  Q.  Okay.  Did you -- how many times did you meet with them?

12  A.  Twice.

13  Q.  During what months?  One in August and one when -- or both

14  in August?

15  A.  I don't really recall when the next time was.

16  Q.  How many months later?  How many days later?

17  A.  Maybe a couple of months later.  I'm not really positive

18  on that.  I don't really recall.

19  Q.  Okay.  All right.  I want you to think back about -- this

20  is May of the year 2000.

21  A.  Okay.

22  Q.  I want you to think back to August through December of

23  1999.  That's last year, right?  Now, I'm not quarreling with

24  you, but you don't remember after they visited you in August,

25  you don't remember if you next visited with them in September,

Cross - Cross

1  or October, or November, or December, right?

2  A.  I really don't recall.  I really don't recall when I was

3  -- it might have been a month later.  I'm not really positive.

4  Q.  Might have been three months later?

5  A.  I don't think it was that long.

6  Q.  All right.  And yet, you say that you remember specific

7  words from five years ago that he said --

8          MR. CARRUTH:  Your Honor, I'm going to object to that

9  as not supported by anything in the record.

10         MR. T. MILLS:  I apologize.

11         THE COURT:  Okay.

12 Q.  (BY MR. T. MILLS) You say that in the spring and summer of

13 1999, you can remember specific words from specific

14 conversations from Mr. Karr?

15 A.  Yeah, I remember some specific things that were said.

16 Q.  Do you remember topics like a storage shed, something

17 about some barrels, and then, in order to testify, you make up

18 the details that go with the topics?

19 A.  No, sir.

20 Q.  Okay.  You told these agents that Patti Steffens and Chico

21 Osborne hired some young men to steal the coins for them?

22 A.  Yes.

23 Q.  Did the agents say to you, "Well, there's nothing to

24 suggest that that happened.  We know of nothing to suggest

25 that that's even in the same planet that we're in"?

1   A.   No.

2   Q.   No?  Do you know Patti Steffens?

3   A.   No, I do not.

4   Q.   Did you know that she lived with David Waters?

5   A.   No, I didn't know she lived with David Waters.

6   Q.   All right.  Did you know the woman who lived with Chico

7   Osborne?

8   A.   No, I did not.

9   Q.   And yet, you say that Gary Karr said that Patti and Chico

10  got together, hired some young men to steal the coins?

11  A.   Yes.

12  Q.   And do you say that Gary Karr said that, then, the young

13  men gave the coins to Chico and to Patti for their use?

14  A.   I took it as they already had the coins themselves, and

15  they just paid these young men to distribute the coins.  No,

16  they gave them some coins to distribute.

17  Q.   Why would they give them some coins to distribute?

18  A.   To make it -- you know, to make it easier for them to

19  spend the coins because they were putting coins in

20  circulation.  That's how I took it.

21  Q.   You understood Mr. Karr to tell you that Chico and Patti

22  had the coins?

23  A.   Yes.

24  Q.   So, then, do you say that Mr. Karr said that Chico and

25  Patti stole the coins from where they were kept?

1   A.   No.  Patti Jo -- it was her storage locker.

2   Q.   It was?

3   A.   Yes.

4   Q.   All right.  And so do you say -- is it your testimony that

5   Mr. Karr told you one day that Patti Jo stole the coins?

6   A.   No, she didn't.  He didn't say she stole the coins.

7   Q.   Okay.  Well, is it your testimony that Mr. Karr said that

8   Patti Jo had the coins?

9   A.   Patti Jo had the coins.

10  Q.   Okay.  And do you claim that he told you how she got the

11  coins from the storage shed?

12  A.   She always had the coins, I guess.

13  Q.   Well, it's your testimony and you told these agents that

14  Gary Karr said that Patti and Chico basically had control of

15  the coins, correct?

16  A.   Yes.

17  Q.   But they gave a few to some young men to put into

18  circulation?

19  A.   Yes.

20  Q.   And you told the agents that?

21  A.   Yes, I did.

22  Q.   And they wrote it down?

23  A.   I don't know if they wrote it down or not.

24  Q.   Were they taking notes on what you said?

25  A.   I believe they took some notes on what I said.

Cross - Cross

1  Q.  When you decided to give some information to the federal

2  government, did you, yourself, contact a prosecutor, or the

3  FBI, or the IRS, or did your lawyer or did someone else, a

4  family member?

5  A.  I don't know who -- I contacted my lawyer.  I assumed my

6  lawyer contacted the prosecutor, asked about it.

7  Q.  You were in jail in Kansas?

8  A.  No.  I was in Milam.

9  Q.  Okay.  That's right.  Do you remember when you told your

10  lawyer?

11  A.  I believe it was in August, also.  Just a couple of days

12  -- I believe it was just a couple of days before they came to

13  see me.

14  Q.  All right.  And did they interview Aaron Morris at the

15  same time?

16  A.  No.

17  Q.  I don't mean at the same exact time, I mean on the same

18  trip.

19  A.  I don't know.

20  Q.  Okay.

21  A.  I don't believe so.

22  Q.  All right.  You were in -- were you in a prison in or near

23  Fort Worth, Texas?

24  A.  I'm not really familiar with Texas too much.  I was in

25  Beaumont.

*Cross - Cross*

```
 1   Q.  Beaumont?

 2   A.  Yes.

 3   Q.  Is that where you are assigned to do your time?

 4   A.  Yes.

 5   Q.  At what prison were you with -- maybe more than one --

 6   Marvin Gambrion?

 7   A.  That was in Milam.

 8   Q.  All right.  Do you know where he is now?

 9   A.  I assume he is still at Milam.

10   Q.  But if he's not, you don't know where he is?

11   A.  No, I don't.

12   Q.  You were in a cell sort of near Marvin Gambrion in Milam,

13   weren't you?

14   A.  Yes, I was.

15   Q.  And it was kind of a protected cell?

16   A.  Yes, it was.

17   Q.  And it was so that if nobody could hurt you for being a

18   government witness, right?

19   A.  No, that's not the reason I was in there.

20   Q.  And Mr. Gambrion was in a cell next to yours, wasn't he?

21   A.  No, he wasn't directly next to me.  He was quite a few

22   cells down, maybe three, four.

23   Q.  All right.  And was -- were you near where Aaron Morris

24   was being held at that time?

25   A.  At the time that I was in the hall?
```

*Cross - Cross*

1   Q.  Yes.

2   A.  No.  Aaron Morris was in a totally other building.

3   Q.  Was Brian Chase --

4   A.  No, I believe Aaron Morris was not even in Milam.  I think

5   he had gone back to Kansas already.

6   Q.  All right.  And was Brian Chase near you and Mr. Gambrion?

7   A.  No --

8   Q.  All right.

9   A.  -- he wasn't.

10  Q.  There was another inmate that was near you and Mr.

11  Gambrion, wasn't there?

12  A.  Yeah, there was a few inmates that were.

13  Q.  Yeah, all right.

14  A.  It was about seven or eight cells all next to each other.

15  Q.  And among other topics, you and other inmates discussed

16  how to best give information to the federal law enforcement

17  people, even if it was made up, in order to get a lighter

18  sentence?

19  A.  No, sir.

20  Q.  After you found out that Gary Karr was associated with the

21  investigation into the O'Hair matter, isn't it true that you

22  told an inmate there when you were in this isolation area that

23  you called your wife and mother and asked them to research the

24  O'Hair matter?

25  A.  No, sir.

*Cross – Redirect*

1  Q.  Just for general interest?

2  A.  No, sir.

3  Q.  That's all the questions that I have.

4         MR. CARRUTH:  Thank you, your Honor.

5                    RE-DIRECT EXAMINATION

6  BY MR. CARRUTH:

7  Q.  Counsel asked you about whether or not you were locked up

8  to protect you as a witness.  Are you aware of any threats

9  that have been made against you or your family members as a

10  result of your cooperation in this case?

11  A.  Yes, sir.

12  Q.  And was Marvin Gambrion one of the witnesses who was

13  threatening your family?

14  A.  Yes, sir, he was.

15  Q.  Is he a friend of Mr. Karr's?

16  A.  He said he was.

17  Q.  Did Mr. Karr ever assist you in making any third-party

18  telephone calls from FCI Milam?

19  A.  Yes, he did -- no, not from FCI Milam, no.

20  Q.  From Wayne County Jail?

21  A.  Yes, sir.

22  Q.  Now, that was against the rules, wasn't it?

23  A.  Yes, it's against the rules.

24  Q.  How did Mr. Karr accomplish that?

25  A.  Through his girlfriend, Kelly.  He called her, and then,

1   she would, like, click over and then, dial, like, the

2   telephone number to my wife.  And then, you click back over

3   and let us talk, they set the phone down.

4   Q.  Now, counsel asked you about what Mr. Karr told you about

5   cutting up bodies.  Do you recall that?

6   A.  Say it again.

7   Q.  Counsel asked you a while ago about Mr. Karr telling you

8   they cut up bodies.

9   A.  Yes, sir.

10  Q.  In the storage unit?

11  A.  Yes, sir.

12  Q.  Did Mr. Karr tell you what they used to cut the bodies up?

13  A.  Bow saw.

14  Q.  Was it one or more bow saws?

15  A.  Two bow saws.

16  Q.  Did he mention any particular color of bow saw?

17  A.  An orange one and a blue one.

18  Q.  And did he state whether or not the FBI had one of the bow

19  saws?

20  A.  I believe they said he had the orange one.

21  Q.  Okay.  Now, counsel also asked you about gold coins.

22  A.  Yes, sir.

23  Q.  Did Mr. Karr ever tell you where he was or what he was

24  doing when Jon Murray picked up these gold coins from the

25  bank?

*Cross - Redirect*

1    A.   Waiting outside for him.  He was following him.

2    Q.   Okay.  And counsel asked you about the statements Mr. Karr

3    said, make sure the O'Hairs were never all seen together.  Did

4    Mr. Karr tell you why they followed that plan, if they did?

5    A.   Because they didn't want everybody to be out at one time.

6    You know, they could keep two in the apartment and, you know,

7    let one come out and walk around and be seen.

8    Q.   Did he mention anything about that's how you keep control

9    of the situation?

10   A.   Yes.

11   Q.   Counsel also asked you about the handcuffs, and if I

12   understood you correctly, you said the O'Hairs were handcuffed

13   not all the time but most of the time?

14   A.   Yes.

15   Q.   That's what he told you?

16   A.   Yes, sir.

17   Q.   Counsel asked if you could identify a photo taken back in

18   1955 where the defendant appears differently than he does

19   today.

20   A.   Yes, sir.

21   Q.   Does the defendant appear the same today as he did when he

22   was confined in jail with you, or has he changed his hair

23   style, or facial hair, or color of his hair?

24   A.   I didn't really -- I didn't recognize anybody in the

25   picture so --

*Cross - Redirect*

1   Q.  As you look at him today, does he look the same as he did

2   when he was in jail with you, or did he have facial hair, or

3   different hair style or color?

4   A.  He had a beard, a beard, and he pretty much had the same

5   color hair.

6   Q.  And did he tell you why he grew that beard?

7   A.  So the witnesses that had seen him at the stores wouldn't

8   recognize him.

9   Q.  Now, counsel asked you to speculate about Mr. Karr's

10  ticket to freedom.  Why if you had a ticket to freedom, that

11  is, knowledge where the bodies were buried, why is he going to

12  trial; is that right?

13  A.  Yes, sir.

14  Q.  Do you remember that question?

15  A.  Yes, sir.

16  Q.  Do you reckon he's waiting to see if he's convicted in

17  this case to see if he cashes in that ticket?

18  A.  I don't know.  I mean, that would be my guess.

19  Q.  Okay.  By the way, did Mr. Karr ever advise you not to

20  talk to any other inmates about your case?

21  A.  Yes, he did.

22  Q.  Why did he tell you that?

23  A.  Because he said that other inmates would try and get a

24  downward departure or, you know, try and get some time cut off

25  to go home early.

*Cross - Redirect*

1   Q.  But other inmates would snitch on you?

2   A.  Yes.

3   Q.  Did you follow his advice and not discuss your case with

4   other inmates?

5   A.  Yes, I did.

6   Q.  Mr. Karr apparently didn't follow his own advice, did he?

7   A.  No, he didn't.

8   Q.  I'm going to show you, sir, what's been marked for

9   identification as W97-1.  I'm going to ask you to take that

10  exhibit out and examine its contents, please, all 15 pages.

11  Do you recognize those 15 pages of handwritten notes?

12  A.  Yes, sir.

13  Q.  Are those in your own handwriting?

14  A.  Yes, sir, they are.

15  Q.  And were those notes made by you contemporaneously after

16  you had various discussions over a several-month period with

17  Mr. Karr?

18  A.  Yes, sir.

19  Q.  And are those the same notes you turned over to the

20  investigators when they interviewed you on August 12th of last

21  year?

22  A.  Yes, they are.

23  Q.  Your Honor, we would offer those notes under Rule

24  801(d)(b) as a prior consistent statement made by the witness,

25  which is offered to rebut the charge by Mr. Karr's attorneys

*Cross - Redirect*

1   of recent fabrication or improper motive.

2   　　MR. T. MILLS:  There are just a very few individual

3   entries that have to do with different topics that I have

4   objection to and would like to have --

5   　　THE COURT:  Well, members of the jury, you'll get to

6   have a little early break.  Don't get spoiled on me.  Fifteen

7   minutes.

8   　(Jury not present.)

9   　　THE COURT:  All right, counsel.  I'm going to give you

10  the Exhibit W97-1.  You could question the validity.  The rule

11  is clear on simultaneous leave up to the jury.  Tell me what

12  is so prejudicial that it should be redacted.  Do you wish the

13  witness to remain in the hall?

14  　　MR. T. MILLS:  No, sir.  On page 2, entry No. 15 --

15  numbered 15, it tells what sentence Mr. Karr served previously

16  or was serving in some detail, and I think that it's in there

17  several times, and I think that that is prejudicial --

18  　　THE COURT:  The whole thing is prejudicial.  All the

19  evidence is prejudicial.  But you did question his putting it

20  down at one time, and he said that he did it at several times

21  and just dated it.  So you question the validity of his

22  statements, so technically, the government's tender is

23  appropriate.

24  　　But if there's something so prejudicial that

25  notwithstanding the now admissibility because of the

*Cross - Redirect*

1   cross-examination, I'll be glad to hear from you.  But why

2   would the sentence that he is sentenced right now be so

3   prejudicial as to have to be redacted?

4           MR. T. MILLS:  Well, it says Gary served 20 years and

5   ten months in prison, had seven felonies.  It seems to me like

6   -- that that is the -- the specifics of that are so

7   prejudicial as to outweigh the relevance.

8           THE COURT:  His whole testimony's based allegedly on

9   what the defendant told him.

10          MR. T. MILLS:  Yes, sir.

11          THE COURT:  And what the defendant told him you are

12  going to be arguing is so incorrect that he's not credible,

13  but the defendant told him that he wrote down, it appears to

14  me, is material.  The objection's overruled.  W97-1 is

15  admitted into evidence.  You have a 15-minute break.

16          MR. CARRUTH:  Thank you, your Honor.

17          MR. T. MILLS:  I'm going to have one more objection to

18  make.

19          THE COURT:  I'm sorry.  I didn't mean to cut you off.

20          MR. T. MILLS:  Page 6, there's an entry that says Gary

21  has seven felonies, served 20 years and ten months, and I

22  object to that on the same grounds.  And I believe those are

23  the only two.

24          THE COURT:  You know, when you take a hot chess pie

25  with lemon out of the oven and eat the whole thing, sometimes

*Cross - Redirect*

1    you get a stomach ache, Mr. Carruth.

2            MR. CARRUTH:  I beg your pardon, your Honor?

3            THE COURT:  Just sometimes when you eat the whole pie,

4    you get a stomach ache.  What's the government's position on

5    the objections?  In the event there is conviction, in the

6    event there is an appeal, you'll have to carry that on.  Do

7    you wish to redact that or not?

8            MR. CARRUTH:  I think it's what the defendant said,

9    your Honor.  I think he said the same thing in his --

10           THE COURT:  I've made a ruling.  I'm asking the

11   government for their position on it.

12           MR. CARRUTH:  The government will be willing to defend

13   it on appeal in the event of a conviction, because he made the

14   same statement in his voluntary confession to Agent Martin.

15           MR. T. MILLS:  Which I'm objecting to, too, when that

16   statement -- I mean, that's the same issue.

17           MR. CARRUTH:  And if counsel can come up with any law

18   whatsoever before this case is submitted to the jury, we can

19   redact it at that time as the Judge has --

20           THE COURT:  Well --

21           MR. CARRUTH:  But, I mean, Mr. Karr said it.

22           THE COURT:  The only objection is in light of cross.

23   The only objection is, is it more prejudicial than probative

24   with regard to -- basically the same thing as the pictures.

25           MR. CARRUTH:  I did not hear him make that specific

*Cross - Redirect*

1    objection.

2         THE COURT:  Well, that's what he's making objection

3    on.  I overruled it and the government's willing to ride on

4    it, that's fine.  That's anything that he told him to put down

5    that would contest the validity or the credibility of the

6    witness is at issue.  So 97-1 goes in.

7         MR. CARRUTH:  Thank you, your Honor.

8         THE COURT:  Are you through with this witness?

9         MR. CARRUTH:  Your Honor, I have one more question --

10   or one more series of questions to ask him.

11        THE COURT:  All right.  Fifteen minutes.

12     (Recess.)

13        THE COURT:  All right.  Bring the jury in.

14     (Jury present.)

15        MR. CARRUTH:  Your Honor, we re-offer Government

16   Exhibit W97-1.

17        THE COURT:  And it's admitted.

18        MR. CARRUTH:  Thank you.

19        MR. T. MILLS:  My objection is noted.

20        THE COURT:  Your objection is noted and overruled.

21   Q.  (BY MR. CARRUTH) Sir, I'm told I may have misspoke as this

22   picture being 1995, someone indicated I said 1955, but that

23   was in 1995.

24   A.  Yes, sir.

25   Q.  Okay.  I apologize.  Sir, now, with regard to Exhibit

*Cross - Redirect*

1   97-1, the 15 pages of handwritten notes, at the top of each

2   page and, apparently, a different pen in some cases from the

3   notes themselves.  Is the date August 12th --

4   A.  Yes, sir.

5   Q.  -- 1999?  And the initials "J.C.," right here?

6   A.  Yes, sir.

7   Q.  And did you put that on there?

8   A.  Yes, sir, I did.

9   Q.  Does that stand for Jason Karr?

10  A.  Jason Cross.

11  Q.  Cross, I'm sorry.

12  A.  Yes, sir.

13  Q.  Now, besides making those notes, did you confide in anyone

14  else the things Mr. Karr was telling you over a period of

15  several months?

16  A.  Mr. Chase?

17  Q.  I'm sorry.

18  A.  Brian Chase.

19  Q.  Was Mr. Chase another inmate?

20  A.  Yes, sir, he was.

21  Q.  Did you say anything to your wife or any other family

22  members?

23  A.  Yes, I told my wife and my mother about it.

24  Q.  And did you tell your lawyer, Mr. Fink, about it?

25  A.  Yes, sir, I did.

Cross - Recross

1   Q.  Thank you, sir.  Pass the witness.

2                    RE-CROSS EXAMINATION

3   BY MR. T. MILLS:

4   Q.  You did tell Brian Chase about the details of what you say

5   that Mr. Karr said to you, correct?

6   A.  I don't remember everything that I told Mr. Chase, but

7   yes, I did tell Mr. Chase quite a few things about Gary Karr.

8   Q.  All right.  The notes are dated -- I don't know if you

9   still have that up there.

10  A.  Yes, they're right here.

11  Q.  They're dated August 12th, 1999, right?

12  A.  Yes.

13  Q.  And you have previously testified -- or let me ask you

14  this:  Is that the date that you think the agents visited you?

15  A.  That's the date I believe they visited me, yes, it is.  It

16  is the date they visited me.

17  Q.  All right.  And that was less than a year ago?

18  A.  Yes, yes, sir.

19  Q.  All right.  And then, you remember, when I asked you a few

20  minutes, about whether or not they next visited you in

21  September, October, November, December.  Do you remember when

22  I asked you that?

23  A.  Yes.

24  Q.  All right.  Now -- and you did not remember?

25  A.  Yeah, I wasn't sure.

Cross - Recross

1   Q.  And you still do not remember?

2   A.  I'm still not positive, no.

3   Q.  Okay.  Well, do you remember whether or not this August

4   the 12th, 1999 was the first time the agents interviewed you?

5   A.  No, it was not.  It was not.  It was the second time that

6   they visited me, I believe.  You know what?  I'm not positive.

7   I think it was -- I think I initialed these the second visit

8   and not the first visit.

9   Q.  Well, if that's --

10  A.  I did.  I did not -- I initialed these the second visit.

11  I did.  This was the second visit.  So they would have visited

12  me before August.

13  Q.  Yes, Mr. Cross, they would have.

14  A.  Yes.

15  Q.  Mr. Cross, they visited you on June 22nd, 1999, didn't

16  they?

17  A.  I'm not positive, but yes, they did visit me before

18  August.  I didn't recall -- I didn't recall when they did

19  visit.

20  Q.  So a little bit ago when I was asking you, was it

21  September, October, November, December, it was none of those

22  months?

23  A.  It was none of those.  It was none of those.

24  Q.  All right.

25  A.  I didn't know -- I wasn't sure.  I just wasn't sure.  But

Cross - Recross

1  now I remembered looking at the paper that I had -- I remember
2  that I had given them these notes the second time, and
3  initialed them and dated them the second time.
4  Q.  Yes, sir.  Mr. Cross, is your memory such that you
5  remember things a long time in the past better than you
6  remember things more recently?
7  A.  I pretty much remember the same.
8  Q.  All right.
9  A.  It's just I'm not that great with dates.  So much has gone
10 on, you know, since I've been locked out.  I didn't recall
11 when I initialed those the first or the second time.
12 Q.  All right.
13 A.  I'm positive I initialed them the second time, and it was
14 before August --
15 Q.  Yes, sir.  All right.  I understand that you have said
16 that Mr. Karr said to you that he was going to have his hair
17 or his hair and mustache, or hair and beard, his grooming, his
18 hair such that witnesses couldn't identify him.  Did he really
19 say that?
20 A.  Yes, he did.
21 Q.  Well, don't you agree that his hair in this picture -- I
22 put it back in here.  I want you to see it as well as you can.
23 Looks just about identical with this photograph from 8-25-95?
24 A.  I don't know if that's Gary Karr in that picture.
25 Q.  All right.  Well, if it is Gary Karr, this man right here,

Cross - Recross

1  don't you agree that this man's hair is darn near identical to

2  what it is right now?

3  A.  Whoever that man is in that picture, it looks similar to

4  Gary's hair.

5  Q.  All right.  Which would be inconsistent with him growing

6  his hair long, or dyeing his hair, or bleaching his hair, or

7  anything like that, correct, because his hair's the same?

8  A.  I don't know.  That's what he told me.

9  Q.  Do I understand that Mr. Karr told you that he was waiting

10 outside in the parking lot at Frost Bank so that when Jon

11 Murray walked out with a suitcase or a brief -- suitcase full

12 of gold coins that he would be there?

13 A.  Yes, but he didn't say Frost Bank.  He didn't tell me what

14 bank it was.

15 Q.  All right.  Are you aware that the bank officer and a

16 uniformed, armed policeman escorted Jon Murray to his

17 automobile, looked in the car, looked in the parking lot when

18 Jon Murray picked up his coins?

19 A.  No, sir.

20 Q.  How well do you know a prisoner named Martin Buchanan?

21 A.  Martin?

22 Q.  Martin Buchanan?

23 A.  I don't really recall Mr. Buchanan.  I recall the name a

24 little bit.  I just can't picture the face.

25 Q.  All right.  Did you have conversations with an inmate

*Cross - Recross*

1   about talking to federal agents and making notes to make your

2   story more believable?

3   A.   Repeat the question again.

4   Q.   Did you talk to an inmate, a prisoner, about the advantage

5   of making some notes when you talked to the federal agents so

6   it would make it look more believable?

7   A.   No, sir, I did not.

8   Q.   I'd like to direct your attention to a statement in here.

9   These first five words.  I have written, David has 500,000 of

10  money.  Is that exactly the same thing as you have written

11  down there?

12  A.   Yes, sir, it is.

13  Q.   All right.  Is it your testimony that Gary Karr told you

14  that David had $500,000 in money?

15  A.   Yes, he did.

16  Q.   And that would be David Waters, you believe?

17  A.   Yes, sir.

18  Q.   From anything you have learned about this case, from any

19  source other than whatever Mr. Karr did or did not say to you,

20  television, anything, do you have any reason to believe that

21  anyone believing, even law enforcement, that David Waters got

22  $500,000?

23  A.   Does anybody believe that David Waters got $500,000?

24  Q.   Basically.

25  A.   I don't know.

Cross - Recross

1   Q.  Would you read this sentence to me where I'm starting

2   right here?

3   A.  Right here?

4   Q.  Yes.  Starting with the word "Gary."

5   A.  "Gary said you're still not sure if the O'Hairs are dead

6   or not."

7   Q.  All right.  Now, who was he referring to when he says

8   "Gary said you're still not sure"?

9   A.  The agents, the people investigating the case.

10  Q.  Gary said to you, "You're still not sure if the O'Hairs

11  are dead or not"?

12  A.  Not me, the agents.

13  Q.  Well, you didn't write down, "Gary said the agents still

14  are not sure if the O'Hairs are dead or not," did you?

15  A.  No.  I was writing this more or less to the agents, so

16  that's why I put in there, "Gary said you're still not sure."

17  Q.  I see.  And the next sentence is -- will you follow me?

18  "You have no idea how they were killed or if they're dead,

19  right?"

20  A.  Yes.

21  Q.  And was he telling you in that conversation that the

22  agents really didn't know if they were missing of their own

23  free will or if they were dead?

24  A.  No, he didn't say if they were missing of their own free

25  will.

*Chase - Direct*

1   Q.  I know.  I don't have any other questions.

2        MR. CARRUTH:  Nothing further, your Honor.  May the

3   witness be excused?

4        THE COURT:  Counsel?

5        MR. T. MILLS:  Hold on just a minute, Judge.  We don't

6   have any objection.

7        THE COURT:  You may be excused, sir.  You may call

8   your next witness.

9        MR. CARRUTH:  Government calls from Brian Chase.

10       (Witness was sworn.)

11       THE COURT:  If you'll walk around this column, please,

12   sir, and have a seat.  Sir, if you'll tell us your full name

13   and spell your last name.

14       THE WITNESS:  My name is Brian Chase, C-H-A-S-E.

15       BRIAN CHASE, called by the Government, duly sworn.

16                   DIRECT EXAMINATION

17   BY MR. CARRUTH:

18   Q.  Mr. Chase, please tell the members of the jury where you

19   live or where you've been staying prior to the last 24 hours.

20   A.  I've been in the county jail here in Texas, here in

21   Austin.

22   Q.  And prior to you being transported here, where were you

23   incarcerated?

24   A.  At the Federal Detention Center, Milam, Michigan.

25   Q.  Okay.  And are you a convicted felon?

*Chase - Direct*

1   A.   Yes, I am.

2   Q.   For what felony have you been convicted?

3   A.   I've been convicted for four felonies, conspiracy to

4   distribute cocaine, exportation of stolen aircraft, money

5   laundering, and murder for hire.

6   Q.   All right, sir.  And are you currently serving a federal

7   sentence for any or all of those prior convictions?

8   A.   For all of them, sir.

9   Q.   And what is your federal sentence?

10  A.   Fifteen years.

11  Q.   And where are you serving that federal sentence?

12  A.   I'm still at the Federal Detention Center at Milam.  They

13  haven't been designated yet.

14  Q.   You're awaiting transporting to a Federal Bureau facility?

15  A.   Yes, I am.

16  Q.   During the time you were incarcerated in the Milam

17  facility, did you come to know the defendant in this case, Mr.

18  Gary Karr?

19  A.   Yes, I did.

20  Q.   Do you see him in the courtroom today?

21  A.   There he is over there, behind you.

22  Q.   Behind me?

23  A.   Yes, sir.

24  Q.   Okay.  And how did you meet Mr. Karr?

25  A.   He came into the same unit that I was living at, East Unit

Chase - Direct

1    at the Federal Detention Center.

2    Q.  And did y'all have occasion to work together in any of the

3    facilities within the institution?

4    A.  Yes, we did.  We shared jobs in both the kitchen,

5    particularly the bakery and the commissary.

6    Q.  Okay.  Did you befriend Mr. Karr or did he befriend you?

7    A.  A mutual befriending, I guess.  We started to get to know

8    each other over the newspaper.

9    Q.  Did you subscribe to a particular newspaper during the

10   time you were incarcerated at FCI Milam?

11   A.  Yes, I did.

12   Q.  FDC, Federal Detention Center?

13   A.  Yes, sir.  Detroit News.

14   Q.  That's a local paper in Detroit, Michigan?

15   A.  Yes.

16   Q.  And did Mr. Karr express any interest in your copies of

17   the Detroit News?

18   A.  Yes, he did.  He came to me and asked me if he could read

19   the paper after I got done.

20   Q.  And were you receiving this paper in the lock-up?

21   A.  Yes, I was.

22   Q.  How was it delivered, through the mail?

23   A.  Yes, it is.

24   Q.  Okay.  And did he indicate to you why he wanted to see

25   your newspapers?

LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

*Chase - Direct*

1    A.   He said that there was news about his case in the paper

2    almost daily, I guess, and he wanted to read the articles

3    about his case.

4    Q.   And did he make any statements to you when he was reading

5    or after reading those articles?

6    A.   Yes, he did.

7    Q.   What did he tell you?

8    A.   Upon reading the first article, I delivered the paper to

9    him and he looked through it real quick and he saw the article

10   about his case, and he showed me the article and he said, "All

11   we got for this was a half a million in gold and we expected

12   to get a lot more."

13   Q.   Now, do you know a gentleman by the name of Jason Cross?

14   A.   Yes, I do.

15   Q.   And you do you know Mr. Cross?

16   A.   From FDC Milam.

17   Q.   Were you cell mates or bunk mates at any time with Mr.

18   Cross?

19   A.   Yes, I was.

20   Q.   And was this at the time that Mr. Karr was also

21   incarcerated at the same facility?

22   A.   While I was with Jason as a bunke, you mean?

23   Q.   Yes, sir.

24   A.   Yes, Mr. Karr was there, too.

25   Q.   Okay.  Did Mr. Cross ever discuss with you any

*Chase – Direct*

1   conversations he had with Mr. Karr about the case involving

2   the missing atheists?

3   A.  Yes, he did.

4   Q.  And did you prepare a letter based upon what Mr. Cross had

5   told you and mailed to the federal prosecutor in Detroit?

6   A.  Yes, I did.

7   Q.  Show you what's been marked Government Exhibit W99-1, sir,

8   I'll ask you to take that out of the envelope, examine the --

9   I believe it's three pages.  See if you recognize that as a

10  copy of your letter.

11  A.  Yes, sir, it is.

12  Q.  Three pages and an envelope?

13  A.  Yes, sir.

14  Q.  What is the date of that letter?

15  A.  9-23-99.

16  Q.  And to whom is it addressed?

17  A.  Mr. Joe Allen.

18  Q.  Who?  Joe Allen?

19  A.  He's a United States Assistant -- Assistant United States

20  Attorney that prosecuted me.

21  Q.  And does that three-page letter detail or provide details

22  that Mr. Jason Cross had related to you about his

23  conversations with Mr. Karr?

24  A.  Yes, it does.

25  Q.  While you were incarcerated together?

*Chase - Cross*

1    A.  Yes.

2    Q.  At this time, we would offer Government Exhibit W99-1.

3          MR. T. MILLS:  Objection to hearsay and improper

4    bolstering.

5          MR. CARRUTH:  Well, your Honor, it's also a -- to show

6    a prior consistent statement by Mr. Cross to rebut counsel's

7    suggestion in front of this jury that it was a recent

8    fabrication or that it was for an improper motive.

9          THE COURT:  Mr. Cross, did he sign this letter?

10         MR. CARRUTH:  He did not, your Honor.

11         THE COURT:  Well, the objection is sustained.

12         MR. CARRUTH:  Thank you, your Honor.  No further

13   questions.  Pass the witness.

14         THE COURT:  Questions of this witness?

15         MR. T. MILLS:  Yes, sir.

16                    CROSS-EXAMINATION

17   BY MR. T. MILLS:

18   Q.  Mr. Chase, you -- tell me, again.  I couldn't write fast

19   enough.  You've been convicted of conspiracy to distribute

20   cocaine?

21   A.  Yes, sir.

22   Q.  What quantity?

23   A.  Approximately 450 kilos.

24   Q.  A thousand pounds?

25   A.  Approximately.

*Chase - Cross*

1   Q.  And you were convicted -- did you plead guilty?

2   A.  Yes, I did.

3   Q.  You were convicted for being hired to commit murder?

4   A.  I was involved -- I hired somebody.

5   Q.  You hired somebody?

6   A.  Yes, sir.

7   Q.  To murder somebody?

8   A.  Yes, sir.

9   Q.  And when did you get convicted on the thousand pounds of

10  cocaine?

11  A.  When?

12  Q.  When.

13  A.  '97.

14  Q.  And when did you get convicted for hiring someone to

15  commit murder?

16  A.  1997, also, they all came the same year.

17  Q.  Did you hire someone to kill a rival drug dealer?

18  A.  Yes, sir, I did.

19  Q.  And then, what was the third conviction?

20  A.  Exportation of stolen aircraft.

21  Q.  You flew an airplane out of the United States that was

22  stolen?

23  A.  Yes, sir.

24  Q.  Where did you fly it to?

25  A.  Columbia.

*Chase - Cross*

1   Q.   To get drugs?

2   A.   No, sir.  To sell the plane.

3   Q.   When did -- did you plead guilty?

4   A.   In '97, also.

5   Q.   Bad year?

6   A.   Pardon me?

7   Q.   What was your fourth conviction?

8   A.   Money laundering.

9   Q.   Did you plead guilty?

10  A.   Yes, I did.

11  Q.   1997?

12  A.   Yes, sir.

13  Q.   How much money was involved?

14  A.   $2 million.

15  Q.   The government seize the money?

16  A.   I think they got $350,000 assets from me.

17  Q.   And you got a 15-year sentence -- or it was a higher

18  sentence, and it's already been reduced to 15?

19  A.   I was sentenced to 15 years.

20  Q.   Was that a result of having -- did you get a break on that

21  because you previously have testified against some other

22  people?

23  A.   I agreed to testify and cooperate with the government, and

24  that's how I was given 15 years for that.

25  Q.   All right.  And you have testified in a case against

Chase - Cross

1    somebody else, haven't you?

2    A.   Yes, two other cases already.

3    Q.   Two other cases.  And you understand that there's a rule

4    in the federal rule book that's dear to prisoners' hearts

5    that's No. 35.

6    A.   Yeah, dear to some prisoners' hearts, yes.

7    Q.   Right.  And that gives the prosecutor the ability to ask a

8    judge to lower someone's sentence?

9    A.   Yes, you can ask, yeah.

10   Q.   And I guess, naturally, you would like to get as low a

11   sentence as possible?

12   A.   Naturally, but I don't expect any.

13   Q.   No.  Did you also know Aaron Morris?

14   A.   Yes, sir.

15   Q.   Did you also see anything on TV about the O'Hair

16   investigation?

17   A.   No, sir.

18   Q.   Read any information about it?

19   A.   I've read articles in the paper occasionally.

20   Q.   And it's my understanding that one day -- did you say you

21   worked in the kitchen?

22   A.   Yes, sir, I did.

23   Q.   And did Gary Karr work in the kitchen?

24   A.   Yes, he did.

25   Q.   What did y'all do in the kitchen -- what did you do?

Chase - Cross

1   A.   We were both in the bakery.

2   Q.   Bakery?

3   A.   (Moving head up and down.)

4   Q.   Okay.  And one day, he said, "All we got was a half

5   million dollars"?

6   A.   That happened a month before we worked in the bakery.  I

7   didn't even really know the man.  He had been at the FDC Milan

8   perhaps two weeks when he said this.

9   Q.   All right.  Did he just hail you down and say, "Looked

10  like a nice trustworthy guy, all we got was a half million

11  dollars"?

12  A.   He hailed me down to read the newspaper.

13  Q.   Oh, okay.

14  A.   When he saw the article, he started talking about it.

15  Q.   Okay.  And I guess -- well, from the context of it, did

16  you believe that he got -- or someone -- they got away with a

17  half million dollars in gold?

18  A.   Yeah, I believe -- that's what he told me, yeah.

19  Q.   Okay.

20  A.   I assumed that.

21  Q.   Right.  How old are you?

22  A.   I'm 49.

23  Q.   49?

24  A.   Right.

25  Q.   I don't have any further questions.

1          MR. CARRUTH:  Nothing further, your Honor.  May the

2  witness be excused?

3          MR. T. MILLS:  Yes, sir.

4          THE COURT:  You may be excused, sir.

5          THE WITNESS:  Thank you.

6          THE COURT:  Call your next witness.

7          MR. CARRUTH:  United States calls J. R. Parelli, your

8  Honor.  Parelli.

9     (At the Bench, on the record.)

10          MS. WILLIAMS:  David Waters' house that he only -- he

11  and his girlfriend's case, kind of going down that same road.

12  So I don't know whether you want us to make our objections

13  before they wave it in front of a  jury.

14          MR. CARRUTH:  We do intend to offer evidence of a

15  crime, your Honor, it was seized at Mr. Waters' residence, the

16  112 rounds of ammunition, .380 calibers.  We believe it's a

17  circumstance we should be entitled to show the jury the guns

18  are in evidence.

19          THE COURT:  The guns are in evidence and the evidence

20  is that the guns were obtained from the brother.  What's the

21  relevance of the --

22          MR. CARRUTH:  They also had -- guns had bullets.  I

23  mean --

24          THE COURT:  Okay.

25          MR. CARRUTH:  It's all part and parcel.  I don't see

```
 1   how you could do the guns without the bullets.  We could

 2   substitute photographs if that's an objection.

 3        THE COURT:  That's not the point.  What else?  We have

 4   bullets?

 5        MS. WILLIAMS:  I don't really know.  I mean, I've

 6   asked to look at --

 7        MR. CARRUTH:  They're all laid out over there if you

 8   want to look at them.

 9        THE COURT:  Members of the jury, I'm going to excuse

10   you for a minute.  Please stay handy.

11      (Jury not present.)

12        THE COURT:  My understanding -- or I assume Mr.

13   Parelli is a law enforcement officer.

14        MR. CARRUTH:  FBI agent, your Honor, who acted as the

15   seizing officer during the execution of the search warrant of

16   Mr. Waters' residence of March 24th of last year.

17        THE COURT:  Where?

18        MR. CARRUTH:  In Austin, Texas.

19        THE COURT:  And you proffer what testimony as a result

20   of the search warrant?

21        MR. CARRUTH:  I'm proffering to connect up the chain

22   of custody on the seized evidence from Mr. Waters' residence

23   that includes many of the items that we've talked about before

24   and the witness, particularly the witness Patti Jo Steffens,

25   identified such as the spray bottle, and the bow saw, and the
```

```
 1   holsters, and other items after various books and documents
 2   that we believe were stolen from the O'Hairs and other items
 3   that were taken from Mr. Waters' apartment.
 4          THE COURT:  All right.  What is the objection?
 5          MS. WILLIAMS:  Well, there are several items over
 6   there, your Honor, including bullets and --
 7          THE COURT:  I don't understand the importance of the
 8   bullets.  I understand well the saw.  It seems like the
 9   bullets are not very important to the saw when you get to
10   consider it.  Other than bullets, what are the objections?
11          MS. WILLIAMS:  I don't know until I look at the
12   evidence, your Honor.
13          THE COURT:  Well, okay.  I've got the jury out.  Go
14   look at the evidence.
15          MS. WILLIAMS:  Well, here's a marriage license of
16   Patti Jo Steffens and Dewayne Chavez.
17          THE COURT:  Very important.
18          MR. CARRUTH:  Mr. Waters acquired after she was
19   married and he, apparently, was stalking her.  No, I say that,
20   your Honor, because he also had a photograph of the apartment
21   where she lived.  And she had moved and he tracked her down
22   and even went so far as to get a copy of her marriage license.
23          MS. WILLIAMS:  Ron Waters' birth certificate.
24          MR. CARRUTH:  Mr. Ron Waters has previously identified
25   that along with a copy of a driver's license that had Mr.
```

1  David Waters' photograph on it, Mr. Ron Waters' name and a

2  Social Security card bearing Mr. Ron Waters' Social Security

3  number but signed by Mr. David Waters in his handwriting.

4       MS. WILLIAMS:  Three watches.

5       MR. CARRUTH:  There is testimony that from Patti Jo

6  Steffens that after the crime spree, Mr. Waters came home and

7  had new clothes and jewelry, including a Raymond Weil watch,

8  and other matters that had been purchased with the loot.

9  That's what that is.  That's a speed loader for a

10 Nine-Millimeter semiautomatic pistol.

11      MS. WILLIAMS:  We would object to that.  Here are some

12 memo pads that I believe have names and addresses on them.

13      MR. CARRUTH:  They do, your Honor, and, also, phone

14 numbers that we will attempt to show through our summary

15 witness that these individuals were in contact with each other

16 by telephone.  It's based on the telephone records that have

17 been introduced.

18      MS. WILLIAMS:  Well, Mr. Carruth, I'm specifically

19 referring to Government Exhibit W77-35.  I don't believe

20 you'll find any coconspirators' names or addresses in that.

21      MR. CARRUTH:  Those are e-mail addresses, your Honor,

22 of various individuals.  There's been testimony that Mr. Karr

23 used the name KJEAR and that Mr. Waters used the name Sir

24 Rolland, communicated with each other via e-mail.

25      THE COURT:  All right.  It's obvious that we're going

1    to have lots of objections and lots of decisions to make as to

2    what is relevant or not, so we will proceed.  I don't want any

3    speeches, though.  On relevance objections, I'll have counsel

4    up at the bench so that I'll find out what the government's

5    theory is without having many jury arguments.

6           MR. CARRUTH:  Yes, your Honor.

7           THE COURT:  All right.

8           MS. WILLIAMS:  Is it my understanding that the witness

9    is going to be allowed to identify the exhibit, and then, we

10   can object?

11          THE COURT:  Well, I'll expect you'll object when they

12   move for the introduction of the evidence.  But I don't know

13   what you're going to do; I don't foresee the future.

14          MS. WILLIAMS:  Well, I would object to Mr. Carruth

15   approaching the witness with items that --

16          MR. CARRUTH:  I don't know how else he can identify

17   them.

18          MS. WILLIAMS:  And having them be identified in front

19   of the jury and then, so the jury already knows what it is,

20   it's not relevant to this case, and then, I'm forced to object

21   in front of the jury that it's not relevant to this case after

22   they already know what it is.

23          THE COURT:  All right.  Well, you've indicated, what,

24   the speed loader?

25          MS. WILLIAMS:  Bullets.  I don't see the bullets.

1        THE COURT:  How about giving me a number, counsel?

2        MS. WILLIAMS:  All right.  W77-28, a speed loader.

3        MR. CARRUTH:  Tom Mills is --

4        THE COURT:  No.  We'll just get a list of the

5   objections right now.

6        MS. WILLIAMS:  Exhibit W77-25, a black box with a

7   wire.  W77-24, a different black box with a wire.  W77-16, Ron

8   Waters' birth certificate.  W77-41, Patti Jo Steffens' and

9   Dewayne Rodriguez-Chavez' marriage license.

10        THE COURT:  What is the date on that?

11        MR. CARRUTH:  The date it was issued by -- it was

12   recorded by the Clerk of Travis County on October 15, 1998.

13   It was certified on that date, also.  And attached to that is

14   a resume of David R. Waters.

15        THE COURT:  All right.  What is the number on that?

16        MR. CARRUTH:  This is Government Exhibit W79-41, your

17   Honor.

18        THE COURT:  All right.

19        MR. CARRUTH:  Those are knives from Mr. Waters' house.

20        MS. WILLIAMS:  Ron.

21        MR. CARRUTH:  No, David.

22        MS. WILLIAMS:  W77-30 Sylvester Choice Handle knife

23   and sheathe, W77-29, a different knife and sheathe.  W77-49, a

24   watch.  W77-21, another memo pad with names and phone numbers.

25        MR. CARRUTH:  With Mr. Karr's e-mail address on the

1   front.

2         THE COURT:  I'm going to ask -- when they finish the

3   list, I'm going to ask you what the relevance is.  You might

4   be ready.

5         MS. WILLIAMS:  W77-54, two watches, one Timex -- three

6   watches, one Timex, one Jazz, one Citizen.  W77-34, a spiral

7   notebook containing what looked like web site addresses, some

8   notes from playing a computer game.

9         MR. CARRUTH:  There was evidence, your Honor --

10        THE COURT:  Okay.  I've got it down.  Let's go to the

11  next one.

12        MS. WILLIAMS:  W77-20, a red address book, W77-46, a

13  daytimer address book.  W77-14, an address book with a

14  unicorn.  W77-19 --

15        THE COURT:  Wait.  Okay.  77 what?

16        MS. WILLIAMS:  Did you get 14?

17        THE COURT:  I've got 14, the unicorn address book.

18        MS. WILLIAMS:  W77-19, address and phone directory.

19  W77-6, what purports to be a gun case with a pair of earplugs

20  inside.  W77-36, what looked to be David Waters' resumes and

21  job application.

22        MR. CARRUTH:  Where he lists Mr. Chico Osborne as a

23  reference, your Honor.

24        THE COURT:  I take it he didn't --

25        MR. CARRUTH:  Shows that he was working for him when

1    in truth and in fact he's not except they were working on this

2    case.  We're trying to tie these people together because it is

3    a conspiracy, your Honor.

4            THE COURT:  Well, any further on the list?

5            MR. CARRUTH:  A copy of an Exhibit W77-51, which has

6    previously been introduced into evidence through Denise

7    Cushman, a copy of that same document, tieing it to Mr. Waters

8    and showing that he received it.  It was found in his

9    apartment as was the copy of the July 1995 Atheist Newsletter,

10   marked W77-52.

11           MS. WILLIAMS:  W77-40, a copy of the Federal Gun

12   Control Act for deferred adjudications of David Waters.

13           MR. CARRUTH:  Showing Mr. Waters that it was illegal

14   for him to ship or transport firearms in interstate commerce.

15           THE COURT:  Kind of self-improvement material?

16           MS. WILLIAMS:  Government Exhibit 15, a Social

17   Security card in the name of Ron Waters.

18           MR. CARRUTH:  Which has previously been identified by

19   the witness, Ron Waters, as having the --

20           THE COURT:  Wait a minute.  We've got to go over this

21   in a minute.  Let's just take a -- what is W15?  The 77-15?

22           MS. WILLIAMS:  No.  It's just Government Exhibit 15.

23           MR. CARRUTH:  Government 77-15 should be.

24           MS. WILLIAMS:  All right.  That's 77-15.  And 77-13,

25   an Illinois driver's license in the name of Ron Waters.

1          MR. CARRUTH:  And whose photograph is on that license?

2          MS. WILLIAMS:  Can't tell you.

3          MR. CARRUTH:  It's Mr. David Waters.

4          MS. WILLIAMS:  All right.  The following exhibit

5    numbers all appear to be bullets of some kind.  W77-7, 77-9,

6    77-11, 77-12, 77-8 and 77-10.  Two holsters, 77-26 and 77-27.

7          THE COURT:  All right.  Mr. Carruth, let's start off

8    with my list as W77-28, the speed loader.  What relevance is

9    that?

10          MR. CARRUTH:  The speed loader, your Honor, is a gun

11    accessory for the Nine-Millimeter Browning that's already in

12    evidence.  It enables one to load the magazine with that gun

13    without wearing out your thumb.  We think the evidence

14    suggests that firearms were used in this case to abduct the

15    O'Hairs, they were kidnapped, handcuffed.  And, obviously,

16    those firearms were loaded with bullets.

17          THE COURT:  All right.  What did the black boxes with

18    the wire -- 77-25?

19          MR. CARRUTH:  That is a sending and receiving device,

20    your Honor, such as allows the coconspirators to maintain

21    contact with each other while one or the other of them is with

22    the O'Hairs, guarding them or setting on them.

23          THE COURT:  All right.  Ron Waters' birth certificate.

24          MR. CARRUTH:  It shows, as Mr. Waters previously

25    testified, that he did not know his brother David had that nor

1  did he know how he got his Social Security card with his

2  signature on it.  That was not Ron Waters' signature nor did

3  he know how he got his driver's license that has Ron Waters'

4  name and address on it but the photograph of Mr. David Waters.

5          THE COURT:  What relevance is that?

6          MR. CARRUTH:  There's been a lot of talk in this case

7  about false IDs.  And we also found a book on false IDs, and

8  we just want to show that --

9          THE COURT:  All right.  You don't have to stretch to

10  show that Mr. Waters is not the all-American boy.

11          MR. CARRUTH:  Yes, sir, he's a coconspirator of Mr.

12  Karr.

13          THE COURT:  Well, that's true, you know, he may have

14  kicked his mother, but that's not relevant right now.  What

15  relevance specifically is the Ron Waters -- his brother's

16  materials?

17          MR. CARRUTH:  Well, his brother --

18          THE COURT:  Other than just unexplained stuff,

19  prejudicial stuff?

20          MR. CARRUTH:  Well, everything we introduce is

21  probably prejudicial to the defendant.  It's our job to

22  present --

23          THE COURT:  I'm asking the relevance to one of these

24  charges.

25          MR. CARRUTH:  It relates to Mr. David Waters, a

1   coconspirator in this case, with Mr. Karr.

2          THE COURT:  All right.  How about the certificate of

3   marriage of Chavez and Steffens?

4          MR. CARRUTH:  It corroborates Ms. Patti Jo Steffens'

5   testimony that she left Mr. Waters and married Dewayne Chavez,

6   which she testified to previously, and that somehow, Mr.

7   Waters acquired this after she left and married Mr. Chavez.

8          THE COURT:  The knives and the sheathes.

9          MR. CARRUTH:  The evidence now indicates that the

10  O'Hairs were cut up inside a storage unit.  Anyone who has

11  ever been a deer hunter or filleted a fish or anything with a

12  carcass knows you normally use a knife.  Since the Court did

13  not let us get in photographs that show the jagged wounds or

14  the smooth wounds, the jury can't look at those and determine

15  whether the cuts were made with a bow saw or a knife, even the

16  medical examiner could not determine.

17         So in a circumstantial evidence case, we believe the

18  cutting instruments that the defendants had is very

19  significant and very relevant, and for that reason, we would

20  like to re-offer the switch blade knives that the Court later

21  -- earlier declined based on the testimony that we've heard

22  since then about the cutting up of the bodies in the storage

23  unit.

24         THE COURT:  Well, I may not have gutted as many deer

25  as in this courtroom, but I would bet $5 on it.  I've never

1  used a switch blade knife because it would take you forever.

2  What kind of knives are they?

3      MR. CARRUTH:  These are sheathe knives, the one out of

4  Mr. Waters' house.

5      THE COURT:  Let me look at them.

6      MR. CARRUTH:  Yes, sir.

7      THE COURT:  All right.  W49, a watch.

8      MR. CARRUTH:  That's the Raymond Weil watch that Patti

9  Jo Steffens, a witness, testified Mr. Waters purchased.  We

10 intend to show through our summary witness on what the

11 coconspirators did with the money they obtained from this

12 criminal enterprise, and part of it was buying this watch.

13     THE COURT:  I take it it's different from a Timex?

14     MR. CARRUTH:  Yes, it's a very expensive watch, your

15 Honor.

16     THE COURT:  All right.  Memo pad, W77-21.

17     MR. CARRUTH:  On the front of that memo pad, your

18 Honor, appears KJEAR, which has previously been indicated to

19 be the e-mail address of the defendant, Mr. Gary Karr.

20     THE COURT:  All right.

21     MR. CARRUTH:  Timex, Jazz and Citizen watches.

22     MR. CARRUTH:  Those are other pieces of jewelry that

23 Mr. Waters bought after the crime spree with the proceeds of

24 the crime.

25     THE COURT:  I don't know anything about anything, but

1  Timex --

2      MR. T. MILLS:  I don't remember anything on that.

3      THE COURT:  Are these offered because they're

4  expensive jewelry?

5      MR. CARRUTH:  No, your Honor.  But there's more than

6  one watch in here.  I'd like for the -- would the Court like

7  to look at them?

8      THE COURT:  Well, I wouldn't know one from another.

9  I'm asking you the relevance.  Do you believe that he got --

10  his $500,000, ran out and bought a Timex watch?

11      MR. CARRUTH:  Your Honor, we know what happened to the

12  $500,000.  There was also approximately 90,000 --

13      THE COURT:  I don't know that anybody knows anything.

14      MR. CARRUTH:  There was also approximately $90,000 in

15  cash that was obtained through credit cards and stuff.  And

16  the evidence is indicated that all the coconspirators spent

17  freely to buy new clothes, shoes, watches, and so forth, other

18  jewelry.

19      THE COURT:  All right.  I don't know it shows anything

20  more than he might be selling watches.  All right.  Notebook,

21  W77-39 -- excuse me, 77-34, I'm sorry.  Some notebook.

22      MR. CARRUTH:  This has an e-mail addresses of various

23  individuals, and including some folks in Indianapolis,

24  Indiana, who were the victims of a home invasion robbery, and

25  that was the source of the guns that we've heard testimony

1    about including the Tech 9 that Mr. David Waters had his

2    brother, Ron Waters, mail over to Mr. Gary Karr and, also, a

3    certain .22 caliber revolver that Mr. Karr had in his

4    possession when he was arrested, was stolen.

5         We also found photographs in Mr. Waters' apartment

6    that came out of this home invasion robbery.

7         MR. T. MILLS:  We would, of course, be objecting to

8    evidence of a home invasion robbery in another state.

9         MR. CARRUTH:  Well, the notebook itself does not say

10   anything about a home invasion robbery.  It simply shows the

11   address of these people in Indianapolis with the line drawn

12   through it, crossing them out along with many other people

13   whose names were crossed out.

14        THE COURT:  And what gun was obtained in that

15   alleged --

16        MR. CARRUTH:  Three weapons, your Honor, .380 caliber

17   semiautomatic pistol, Tech 9 semiautomatic pistol, and .39

18   Revolver, as well as .22 caliber Mr. Karr admits to his

19   statement and his fellow inmates that he had.

20        THE COURT:  All right.  Red address book, 77-20.

21        MR. CARRUTH:  Mr. Gerald Chico Osborne's number is in

22   this address book.  He's one of the unindicted coconspirators.

23   And what we intend to offer through our summary witness is

24   evidence to tie all these coconspirators together through

25   phone numbers and phone records to show that various

1    coconspirators were calling each other during the time frame

2    of the conspiracy.

3              THE COURT:  All right.  The daytime address book,

4    77-46.

5              MR. CARRUTH:  This is an address book which contains

6    both Mr. Gary Karr's and Mr. Chico Osborne's addresses and

7    telephone numbers.

8              THE COURT:  All right.  How about 77-14?

9              MR. CARRUTH:  That is an address book containing the

10   name and phone numbers for Gerald Chico Osborne and Osborne's

11   sister, Connie Tandy, who he gave as a reference when he

12   rented that storage locker with Mr. Waters on September 26th

13   of 1995, and her name and address and that phone number appear

14   on that document that's in evidence just to show who she is.

15             THE COURT:  Unicorn.  Okay.  How about the phone

16   directory, 77-19?

17             MR. CARRUTH:  That's an address book containing the

18   names of Francis Cuccinata, a witness who previously testified

19   in this case, that Mr. Karr stayed with her immediately upon

20   being released from prison in the greater Chicago area.  Dan

21   Fry, we know what happened to him.  Bob Fry, Mr. Gary Karr,

22   Mr. Osborne and Connie Tandy, Mr. Osborne's sister.

23             THE COURT:  All right.  77-6, the gun case and -- I

24   assume, empty gun case.

25             MR. CARRUTH:  Yes, it is an empty gun case, your

1   Honor, and this gun case is depicted in one of the photographs

2   that's already been admitted showing Mr. David Waters firing

3   his Nine-Millimeter at the shooting range.  It's open before

4   him on the shooting bench.

5           There was testimony by the witness, Patti Jo Steffens,

6   that during the time that these three men were gone for a

7   month or so, that the gun was gone, too, and so were the

8   handcuffs.  It's another circumstance, your Honor, to show

9   that firearms were used culpable with the fact that she had

10  three fanny packs, each of which would hold the

11  Nine-Millimeter that normally is kept in this case.

12          THE COURT:  Mr. Waters' resume, 77-36.

13          MR. CARRUTH:  He lists in there that he worked for

14  Fleet Management, which was owned and operated by Mr. Gerald

15  Lee Osborne.  It's another tie to Mr. Osborne.  And he never

16  did work for Mr. Osborne except in an illegal enterprise.

17          THE COURT:  All right.  How are you going to prove

18  that?

19          MR. CARRUTH:  Well, I can call the witness if you'll

20  let me.  But it is just a circumstance, your Honor, of what we

21  found, tieing him to Mr. Osborne.

22          THE COURT:  Okay.  W15, Social Security card of Ron

23  Waters.

24          MR. CARRUTH:  Mr. Ron Waters has previously identified

25  that as being his Social Security number but not his

1    signature.  It also is a link between Mr. Ron Waters and Mr.

2    David Waters and corroborates Mr. Ron Waters' testimony that

3    after the crime spree, Mr. Waters sent or brought certain

4    evidence to be concealed by Mr. Ron Waters, which he --

5              THE COURT:  All right.  How about the holster?

6              MR. CARRUTH:  The holsters, again, as part of the

7    guns, your Honor, everything dealing with firearms.

8              THE COURT:  All right.  Counsel want to make any

9    specific statement with regard to any of these numbers before

10   I make a ruling?

11             MS. WILLIAMS:  Well, I'd like just to point out to the

12   Court that some of the things that Mr. Carruth has told the

13   Court about why he thinks these are admissible --

14             THE COURT:  Are not --

15             MS. WILLIAMS:  -- are not in evidence.

16             THE COURT:  That's true, but I don't know if they're

17   going to be or not.  I certainly understand what is and what

18   is not in the record.

19             MS. WILLIAMS:  All right.  Other than that, no, your

20   Honor.

21             MR. CARRUTH:  I didn't know that they specifically

22   objected to this but --

23             MS. WILLIAMS:  I didn't.

24             MR. CARRUTH:  -- Mr. Mills is expressing an interest

25   in it.  It is a videotape of the America's Most Wanted segment

1   on the O'Hairs, and it was found in Mr. Waters' apartment.

2           MS. WILLIAMS:  I didn't object to that.

3           MR. CARRUTH:  Okay.  The jury may want to play it.

4           THE COURT:  Certainly hope not.  All right.

5           MR. CARRUTH:  Did they object, I believe, to the

6   Federal Gun Control Act, W77-40?

7           THE COURT:  They did.  Is there anything other than

8   the Federal Gun Control Act on there?

9           MR. CARRUTH:  For deferred adjudications, there's been

10  evidence in the record through the form of the July '95

11  Atheist Newsletter about Mr. Waters' prior conviction and the

12  fact that he was -- this reflects that he was -- I believe it

13  has a date on it that it was executed on July 6th, 1995, after

14  he was placed on deferred adjudication probation for stealing

15  $54,000 from the O'Hairs.

16          There's been testimony offered that part of his motive

17  in this case, greed and revenge, was a desire to get back at

18  the O'Hairs because they had him prosecuted in this case.

19  That's another circumstance, your Honor.

20          THE COURT:  They are circumstances and there are

21  circumstances.  Anything further?

22          MS. WILLIAMS:  No, your Honor.

23          THE COURT:  All right.  I don't see that it has any

24  relevance, but I don't see where it is prejudicial either.  On

25  the Chavez-Steffens marriage, what is the specific objection?

1   Counsel at the end of the case is getting around to use this

2   in his argument, he's grasping at straws.

3        MS. WILLIAMS:  My objection, your Honor, is simply

4   that it's not relevant to this case.

5        THE COURT:  And your ideas it's evidence --

6        MR. CARRUTH:  It supports -- bolsters -- or not

7   bolsters but substantiates her testimony that she left Mr.

8   Waters and married Mr. Chavez.

9        THE COURT:  Well, that's not relevant.  The speed

10  loader --

11       MR. CARRUTH:  She testified to that without objection,

12  your Honor.

13       THE COURT:  Well, that's wonderful.  I hope she gets a

14  trophy for it.

15       MR. CARRUTH:  Would you tell me the exhibits you're

16  excluding, your Honor, so we won't offer?

17       THE COURT:  W79-41, W77-34, the notebook.  You have

18  not indicated to me anything on that particular notebook that

19  ties into any of the alleged conspirators.

20       MR. CARRUTH:  That does relate to an extraneous

21  offense, your Honor, which the government may seek to re-offer

22  under 404B before we rest and close.

23       THE COURT:  All right.  77-6, 77-36, gun case and

24  gloves and Waters' resume, indicate that they took bullets,

25  but the whole series of bullets, I don't see any relevance

1    whatsoever.

2         MR. CARRUTH:  May the agent be permitted to testify

3    that they did seize 112 rounds?

4         THE COURT:  That is a fact.

5         MR. CARRUTH:  Yes, your Honor.

6         THE COURT:  But doesn't need to be admissible, and I

7    don't see any point in the holsters.  So the relevance

8    objection will be sustained, if appropriately made, on W79-41,

9    W77-34, W77-6, W77-36, W77-9, 7, 11, 12, 8 and 10.

10        MR. CARRUTH:  That was 9, 7, 11 --

11        THE COURT:  Let's do it this way.  It's 7, 8, 9, 10,

12   11 and 12.  That will help you.

13        MR. CARRUTH:  Yes, your Honor.

14        THE COURT:  And the holsters are 77-26 and 27.

15        MR. CARRUTH:  26 and 27.

16        THE COURT:  Sustain for relevance objections on that

17   subject to retender if they become relevant.  All right.

18   Bring the jury in.

19        MR. CARRUTH:  Thank you, your Honor.

20        THE COURT:  Bring the witness back in, please.

21     (Jury present.)

22        THE COURT:  Be sworn, sir.

23     (Witness was sworn.)

24        THE COURT:  And if you'll walk around, please, sir,

25   this column, have a seat in the blue chair.  I need for you to

*Parelli - Direct*

1    tell us your full name and spell your last name, please, sir.

2         THE WITNESS:  My name is Emil Parelli, spelled

3    P-A-R-E-L-L-I.

4         EMIL PARELLI, called by the Government, duly sworn.

5                    DIRECT EXAMINATION

6    BY MR. CARRUTH:

7    Q.  Do you also go by J. R. Parelli?

8    A.  Yes, I do.

9    Q.  Is that because you're a junior?

10   A.  Yes, sir.

11   Q.  Would you please tell the members of the jury where you

12   reside, what city, and how you're currently employed?

13   A.  I'm employed by the Federal Bureau of Investigation, and

14   I'm currently assigned to the Bridgeport, Connecticut Resident

15   Agency.

16   Q.  And where were you assigned back on March 24th of 1999?

17   A.  I was assigned to the Austin, Texas Resident Agency.

18   Q.  Did you have an occasion to participate on that date, in

19   March 24, 1999, concerning the execution of a search warrant

20   at the residence of David Rolland Waters, here in Austin,

21   Texas, at 6008 North Lamar Boulevard, Apartment 219?

22   A.  Yes, I did.

23   Q.  What were your particular duties and responsibilities on

24   that occasion?

25   A.  I was assigned as the seizing agent.  I was responsible

*Parelli - Direct*

1   for collecting the evidence collected during the search.

2   Q.  And so as the evidence was allocated by any of the

3   officers, you would seize it and mark it in some way with your

4   initials so that you could identify it later?

5   A.  Yes, sir.

6   Q.  How long did you spend at Mr. Waters' residence on that

7   date, sir?

8   A.  We were there for approximately nine hours.

9   Q.  And were there any other state or federal law enforcement

10  officers, besides yourself, present during the execution of

11  that search warrant?

12  A.  Yes, sir, there were 14 other law enforcement officers.

13  Q.  And were those state or federal or mixture thereof?

14  A.  There was a mixture thereof.  There was some federal and

15  some state law enforcement.

16  Q.  Okay.  Did you seize any evidence on that occasion?

17  A.  Yes, sir, we did.

18  Q.  And as the law requires, did you make a return be filed

19  with the Court?

20  A.  Yes, sir, we did.

21  Q.  And did you arrest Mr. Waters or did someone arrest Mr.

22  Waters on that date as a result of the evidence seized in his

23  residence?

24  A.  Yes, sir, another agent arrested Mr. Waters.

25  Q.  Why was Mr. Waters arrested on that occasion?

*Parelli - Direct*

1    A.   He was arrested for the charge of felon in possession of

2    ammunition.

3    Q.   And did you find some ammunition in Mr. Waters' residence?

4    A.   Yes, sir, we did.

5    Q.   Approximately how many rounds of ammunition and what type,

6    if you can tell us?

7    A.   I believe the total was 118 rounds of ammunition, 30 was

8    of a .357 Magnum, 41 rounds of .380 caliber, and 47 rounds of

9    Nine-Millimeter.

10   Q.   Okay.  Now, what, in particular, were you searching for on

11   that occasion?

12   A.   We were searching for weapons.  We were searching for

13   records concerning use of funds of possibly stolen money.  We

14   were searching for any evidence of crimes.

15   Q.   And what particular crimes were you investigating or

16   against whom, if you recall?

17   A.   We were searching for evidence of crimes concerning

18   conspiracy, interstate transportation of stolen money, money

19   laundering, conspiracy for money laundering, and felon in

20   possession of a firearm.

21   Q.   Okay.  And did you have an occasion to read the search

22   warrant affidavit prior to execution of the warrant on that

23   date?

24   A.   Yes, sir, I did.

25   Q.   Now, you did not apply for that warrant, did you, sir?

*Parelli - Direct*

1   A.   No, sir.

2   Q.   Do you know who the affiant was or the applicant for the

3   warrant?

4   A.   Yes, sir, it was Special Agent Martin from Internal

5   Revenue Service.

6   Q.   Who's seated here in the courtroom with me, correct?

7   A.   That's correct.

8   Q.   And each officer was assigned a particular role, I gather;

9   is that correct?

10  A.   Yes, sir.

11  Q.   And you were the seizing officer?

12  A.   That's correct.

13  Q.   Okay.  Let me show you some items, sir.  And I apologize,

14  these are not going to be in any particular order, but I want

15  you to look through these and tell me if you can identify all

16  of them as having been seized by you on the occasion in

17  question, and then, we'll talk about what they are, sir.

18        First, I want you to try to locate your mark or

19  initials, or what have you.

20  A.   Yes, sir, these are items I seized.

21  Q.   Are those all or some of the items?

22  A.   These are some of the items.

23  Q.   All right, sir.  Let's begin, first, with this large book

24  here.  Would you read the Government Exhibit Number on it,

25  please?

*Parelli - Direct*

1  A.  W77-44.

2  Q.  We'd offer W77-44.

3       MS. WILLIAMS:  No objection.

4       THE COURT:  Received.

5  Q.  (BY MR. CARRUTH) And does that appear to be a book about

6  the Renaissance?

7  A.  Yes, sir.

8  Q.  And if you'd open -- I believe there's some business cards

9  contained in that book.  Is the book mark --

10 A.  Yes, sir.

11 Q.  Would you turn to those, please, and tell me whose name

12 appears on the business cards?

13 A.  First business card is R. Murray O'Hair.

14 Q.  Okay.

15 A.  And the second is also R. Murray O'Hair.

16 Q.  Okay.  Thank you.  Please replace them.  All right.  Let's

17 look at this book, sir.  It's marked W77-43, which we would

18 offer at this time.

19       MS. WILLIAMS:  No objection.

20       THE COURT:  Received.

21 Q.  (BY MR. CARRUTH) Does this appear to be a book about The

22 Inquisition, the various torture instruments?

23 A.  Yes, sir.

24 Q.  And does it bear a stamp inside the cover?

25 A.  Yes, sir, it does.

*Parelli - Direct*

1   Q.   And what is stamped there?

2   A.   Appears to be a rubber stamp.  It's the American Atheist

3   Pittsburgh Chapter in Pittsburgh, Pennsylvania.

4   Q.   All right, sir.  The next exhibit, sir, is marked

5   Government Exhibit W77-3, and appears to be a series of manila

6   folders.  We would offer that at this time, your Honor.

7            MS. WILLIAMS:  No objection.

8            THE COURT:  It's received.

9   Q.   (BY MR. CARRUTH) And do these appear to have been taken

10  from some file cabinet or filing system?

11  A.   I believe they were taken from the dining room table

12  filing system.

13  Q.   Okay.  And the various individual folders are dated here.

14  We have November '94 and January '94.  They have dates

15  appearing on the tabs, correct?

16  A.   Yes, sir.

17  Q.   And I believe on the front of that, there's some

18  description of the literary guide, free thinker, and some

19  volume and description numbers; is that correct?

20  A.   That's correct.

21  Q.   Now, Government Exhibit W77-4, we would offer at this

22  time.

23            MS. WILLIAMS:  No objection.

24            THE COURT:  It's received.

25  Q.   (BY MR. CARRUTH) Now, these appear to be original -- is

*Parelli - Direct*

1   that what you call a first cover or stamped envelopes from the

2   American Atheists when an American atheist comes of age?

3   A.   They appear to be original envelopes, yes, sir.

4   Q.   Okay.   And W77-1 appears to be a cashier's check.   We'd

5   offer W77-1.

6         MS. WILLIAMS:   No objection.

7         THE COURT:   Received.

8   Q.   (BY MR. CARRUTH) And on that is a handwritten note that

9   says, "Jon, I found this recently on my desk.   It is payment

10  for shipment of books out of Houston.   And it's made payable

11  to Westheimer Allied Van Lines in the sum of $2,450"?

12  A.   That's correct, sir.

13  Q.   And Mr. Waters had that in his apartment?

14  A.   Yes, he did.

15  Q.   I offer W77-5.

16        MS. WILLIAMS:   No objection.

17        THE COURT:   Received.

18  Q.   (BY MR. CARRUTH) And this appears to be a document

19  consisting of several pages relating to U.S. postal

20  cancellations issued by the United States Postal Service for

21  an atheist event --

22        MS. WILLIAMS:   Your Honor, I object to Mr. Carruth

23  testifying, leading.

24  Q.   (BY MR. CARRUTH) Well, would you read, then, what that is,

25  sir?

1   A.   Yes, sir.  It says, "The very first cancellation ever

2   issued by the United States Postal Service for an atheist

3   event."

4   Q.   And does it have Madalyn O'Hair's photograph on there?

5   A.   Yes, sir.

6   Q.   And does it have a quote from her down here?

7   A.   Yes, sir.

8   Q.   Please read that into the record.

9   A.   It says, quote, don't tell me how great I am, send money.

10  Madalyn Murray O'Hair.

11  Q.   Thank you.  And W77 -- is that 2?

12  A.   Appears to be a 2, yes, sir.

13         MS. WILLIAMS:  No objection.

14         THE COURT:  Received.

15  Q.   (BY MR. CARRUTH) These appear to be billing statements,

16  and would you read where they're from, please?

17  A.   Yes, sir.  They are from the Midtown Self-storage in

18  Kansas City, Missouri, and it's --

19  Q.   Who does it indicate is the tenant for that billing

20  statement?

21  A.   CESAALA, Incorporated, D/B/A, AA Press.

22  Q.   Okay.  And do you know what that stands for?

23  A.   I believe it's the American Atheist Press.

24  Q.   Okay.  And does it also include a purchaser's copy of a --

25  what appears to be a cashier's check in the sum of $70 payable

*Parelli - Direct*

1   to Midtown Self-storage?

2   A.  Yes, sir.

3   Q.  And can you tell me the date that that instrument was

4   executed?

5   A.  It was dated 4-20 of '94.

6   Q.  Do you know whether or not that would have been after Mr.

7   Waters left the employment of the O'Hairs, or do you know

8   that?

9   A.  I do not know that.

10  Q.  And then, we have W77-52.

11       MS. WILLIAMS:  No objection.

12       THE COURT:  It's received.

13  Q.  (BY MR. CARRUTH) Does that appear to be the July 1995

14  edition of the American Atheist Newsletter?

15  A.  Yes, sir.

16  Q.  Edited by Jon G. Murray, Madalyn Murray O'Hair, and

17  showing the managing editor is R. N. Murray O'Hair?

18       MS. WILLIAMS:  Again, I object to Mr. Carruth

19  testifying.

20       MR. CARRUTH:  Well, your Honor, he can say it, I can

21  say it.  I'm trying to save a little time on what it is.

22       THE COURT:  I appreciate you saving time, but we'll

23  stay with the Rules of Evidence.

24       MR. CARRUTH:  Thank you, your Honor.

25  Q.  (BY MR. CARRUTH) Now, I'm handing you another group of

*Parelli - Direct*

1  exhibits, sir, and see if you could search through them and

2  see if you can find your identifying mark that enables you to

3  state with certainty that those came out of the search that

4  you've described.

5  A.  Yes, sir, they all came from the search.

6  Q.  And do all of those exhibits appear to be some sort of

7  address or telephone book, something that you would record

8  names, addresses, telephone numbers, and so forth, in?

9  A.  Yes, sir, they all are.

10  Q.  We would offer at this time Government's Exhibits 14, 19,

11  20, 22 and 46.

12         MS. WILLIAMS:  I'm sorry, 46?

13         MR. CARRUTH:  46.  All bearing the prefix W77.

14         MS. WILLIAMS:  Renew my previous objection that those

15  books contain material not relevant in this case.

16         THE COURT:  Subject to being connected up, the Court

17  admits 77-14, 19, 20, 22 and 46.

18  Q.  (BY MR. CARRUTH) I'll show you another group of exhibits,

19  Mr. Parelli, and I want you to examine them for your initials

20  or identifying mark.

21  A.  Yes, sir, they all came from the search.

22  Q.  All right, sir.  Let's begin with Government Exhibit No.

23  23 -- W77-23, which has already been admitted through another

24  witness, but can you identify this book as having come from

25  the search of David Waters' residence in March of last year?

*Parelli - Direct*

1   A.   Yes, sir, Poor Man's James Bond.

2   Q.   Are you familiar with what that book is about?

3   A.   Not very, no, sir.

4   Q.   Have you ever looked through the book?

5   A.   No, sir, I can't say that I have.

6   Q.   Would you look here, where it's tabbed, and tell me what

7   it purports to show?

8   A.   Yes, sir, it purports to show how to prepare firearms

9   silencers, and an impact ignition fire bomb.

10   Q.   Thank you, sir.  W77-51, we offer at this time.

11        MS. WILLIAMS:  No objection.

12        THE COURT:  It's received.

13   Q.   (BY MR. CARRUTH) Can you tell us what that is, sir?

14   A.   Yes.  It's a letter dated January 29th, 1997 to David.

15   Q.   Okay.  Is it talking about the O'Hairs in particular?

16   A.   Yes, sir.

17   Q.   Okay.  W77-35, appears to be some memo pads clipped

18   together.

19        MS. WILLIAMS:  No objection.

20        THE COURT:  Received.

21   Q.   (BY MR. CARRUTH) And without opening them, I guess you

22   don't know what they contain, do you?

23   A.   I believe they contain the names and addresses and

24   things --

25   Q.   Of various individuals?

*Parelli - Direct*

1   A.   Exactly.

2   Q.   Okay.  W77-18.

3        MS. WILLIAMS:  No objection.

4   Q.   (BY MR. CARRUTH) That's a book, and would you read the

5   title, please?

6        THE COURT:  Received.

7   A.   It is New ID In America.  How To Create A Full-Proof New

8   Identity.

9   Q.   (BY MR. CARRUTH) Thank you.  W77-53.

10  A.   Is a videotape.

11  Q.   We would offer -- is 18 in, your Honor?

12       THE COURT:  18 is in.

13       MR. CARRUTH:  We would offer 53.

14       MS. WILLIAMS:  No objection.

15       THE COURT:  It's received.

16  Q.   (BY MR. CARRUTH) That appears to be a videotape.  Do you

17  have any idea what's on that videotape?

18  A.   I believe it is an episode of America's Most Wanted.

19  Q.   Okay.  About anybody in particular?

20  A.   I believe it was about the O'Hairs.

21  Q.   W77-21, another memo pad containing names, addresses and

22  phone numbers?

23       MS. WILLIAMS:  No objection.

24       THE COURT:  It's received.

25  Q.   (BY MR. CARRUTH) W77-33, do you recognize that?

*Parelli - Direct*

1   A.  Yes, sir.

2   Q.  We would offer it at this time.

3        MS. WILLIAMS:  No objection.

4        THE COURT:  Received.

5   Q.  (BY MR. CARRUTH) Appear to be some sort of ticket -- or

6   receipt for Greyhound Bus Lines?

7   A.  That's what it states, yes, sir.

8   Q.  And can you tell where the traveler was going?

9   A.  Looks to me, Peoria, Illinois and Bloomington, Illinois.

10  Q.  Okay.  Please look at these exhibits, sir, and tell me if

11  you can identify them.

12  A.  Yes, sir, they're all documents we took at the search.

13  Q.  Is it 33 instead of 39?

14       THE COURT:  It's 39 instead of 33.

15       MR. CARRUTH:  I apologize.  I re-offer it.

16       THE COURT:  Let the record show W77-39, which is the

17  Greyhound ticket, is admitted.

18       MR. CARRUTH:  Thank you.

19  Q.  (BY MR. CARRUTH) All right.  You recognize all these

20  documents I've handed you?

21  A.  Yes, I do.

22  Q.  Let's begin with W77-16.

23       MS. WILLIAMS:  I object to that as not relevant to

24  this case.

25       THE COURT:  All right.  That's in.

*Parelli - Direct*

1  Q.  (BY MR. CARRUTH) All right.  Now that that is in, would

2  you tell the members of the jury what it is, please?

3  A.  Yes, sir.  The certificate of birth of Ronald Waters.

4  Q.  And that was found in Mr. David Waters' apartment?

5  A.  Yes, sir.

6  Q.  Now, do you also -- we'd offer Government W77-15.

7        MS. WILLIAMS:  No objection.

8        THE COURT:  Received.

9  Q.  (BY MR. CARRUTH) Can you tell us what that exhibit is,

10  please, sir?

11  A.  That is a Social Security card in the name of Ronald

12  Jeffrey Waters.

13  Q.  And it came out of Mr. David Waters' apartment?

14  A.  Yes, it did.

15  Q.  We offer W77-13.

16        MS. WILLIAMS:  No objection.

17        THE COURT:  Received.

18  Q.  (BY MR. CARRUTH) Is that a driver's license?

19  A.  It's an Illinois state driver's license in the name of

20  Ronald Waters.

21  Q.  And whose photograph is shown on that driver's license

22  bearing the name Ronald Waters?

23  A.  Appears to be that of David Waters.

24  Q.  Finally, Government's Exhibit 17.

25        MS. WILLIAMS:  No objection.

*Parelli - Direct*

1    THE COURT:  Received.

2    Q.  (BY MR. CARRUTH) What is Government's Exhibit 17?  And

3    please hold it up to the light, if you can, and see if you

4    could see anything.

5    A.  It's a copy of a Texas Department of Public Safety

6    driver's license with a woman's photo on it.

7    Q.  And has anything been whited out that you can tell?

8    A.  Yes, it looks to be the name of David Waters whited out.

9    Q.  Okay.  Please examine this next stack of exhibits, sir,

10   for your initials or identifying mark.

11   A.  Yes, sir.

12   Q.  All right, sir.  Let's begin, first, with W77-49.

13        MS. WILLIAMS:  No objection.

14        THE COURT:  It's received.

15   Q.  (BY MR. CARRUTH) Can you identify that exhibit, sir, what

16   it contains?

17   A.  Yes, sir, it's a Raymond Weil wrist watch.

18   Q.  All right, sir.  What about Government's Exhibit W77-54?

19        MS. WILLIAMS:  Renew my previous objection that that

20   exhibit is not relevant to this case.

21        THE COURT:  That objection is overruled.

22   Q.  (BY MR. CARRUTH) Would you please identify what's

23   contained in that exhibit, sir?

24   A.  Yes, sir, there are three different wrist watches.

25   Q.  All right, sir.  How about W77-45?  We'd offer that.

*Parelli - Direct*

1        MS. WILLIAMS:  No objection.

2        THE COURT:  Received.

3    Q.  (BY MR. CARRUTH) Could you remove that from the binding,

4    sir, and take it out and tell us, first of all, who does it

5    say on the top?  Who is it addressed to and who is the return

6    address from?

7    A.  Addressed to David Waters at 6008 North Lamar, No. 219,

8    Austin, Texas, and the return address is also from David

9    Waters, 6008 North Lamar, No. 219, Austin, Texas.

10   Q.  And there are several documents contained in that manila

11   folder, are there not?

12   A.  There's a manuscript.

13   Q.  And what is the title of that manuscript?

14   A.  The title is Good Gawd! Madalyn, The

15   Not-So-Sudden-Disappearance of Madalyn Murray O'Hair, The Most

16   Hated Woman In America.

17   Q.  And does it say who it's prepared by or typed by?

18   A.  It says by David R. Waters.

19   Q.  Okay.  Please put it back.  Please look at the next group

20   of exhibits, Agent Parelli, and tell us if you can identify

21   them as having come from the search.

22   A.  The map I can't find my initials on, but everything else I

23   did locate from the search.

24   Q.  Okay. For the record, that's Government Exhibit No. --

25   A.  48.

*Parelli - Direct*

1    Q.  -- 48.  Without objection, your Honor, we'd offer

2    Government Exhibit W77-48.

3         THE COURT:  It's received.

4    Q.  (BY MR. CARRUTH) And does that appear to be a city map of

5    a particular city in the United States?

6    A.  Yes, sir, it is the city map of Kansas City, Kansas and

7    Missouri.

8    Q.  And is that to your recollection the same place, the

9    storage record where that library came from?

10   A.  Yes, sir.

11   Q.  Now, show you Government's Exhibit No. W77-30, and offer

12   it at this time.

13        MS. WILLIAMS:  Object to relevance.

14        THE COURT:  The objection is overruled.

15   Q.  (BY MR. CARRUTH) What is that, sir?

16   A.  It is a straight-edge knife with a turquoise handle and a

17   sheathe.

18   Q.  Sheathe knife or hunting knife?

19   A.  That's correct.

20        MS. WILLIAMS:  I'm sorry.  What's that exhibit number?

21        MR. CARRUTH:  W77-30.

22   Q.  (BY MR. CARRUTH) W77-23?

23   A.  Looks like 29.

24   Q.  29.  W77-29.

25        MS. WILLIAMS:  Object to relevance.

*Parelli - Direct*

1        THE COURT:  Objection is overruled.

2  Q.  (BY MR. CARRUTH) What is that exhibit, sir?

3  A.  That appears to be a hunting knife, also, with a sheathe.

4  Q.  All right, sir.  W77-24 and 25.  We offer those at this

5  time.

6        MS. WILLIAMS:  Object to relevance.

7        THE COURT:  Those objections are overruled and they're

8  received.

9  Q.  (BY MR. CARRUTH) Can you describe those devices for us,

10  sir?

11  A.  They're -- they appear to be two parts of a transmitting

12  and receiving device.

13  Q.  All right, sir.  Take a look at that, sir, and see if

14  you're able to identify it.

15  A.  Yes, sir.

16  Q.  Did that come out of the search of Mr. Waters' house?

17  A.  Yes, it did.

18  Q.  We would offer Government Exhibit W77-28.

19        MS. WILLIAMS:  Object to relevance.

20        THE COURT:  It's overruled.

21  Q.  (BY MR. CARRUTH) What is that exhibit, Agent Parelli?

22  A.  That is what is known as a magazine loader.

23  Q.  Sometimes called a speed loader?

24  A.  It would be a speed loader for a magazine.  It would

25  assist in loading ammunition into a magazine.

*Parelli - Direct*

1    Q.  What type of weapon does that fit or could it be used

2    with, if you know?

3    A.  I believe it's a Nine-Millimeter.

4    Q.  All right, sir.  Now, these three fanny packs have

5    previously been introduced into evidence, but I want you to

6    see if you can identify them with your initials as having come

7    out of the search of Mr. Waters' apartment.

8    A.  They don't bear my initials, but I do recall getting those

9    at the search warrant.

10   Q.  They're already in through another witness, but you do

11   recall seeing those and they're included on your return?

12   A.  That's correct.

13   Q.  Okay.  These exhibits, too, were, likewise, entered

14   through another witness, W77-31 and 32.  Do you recognize

15   either or both of those exhibits, sir?

16   A.  Yes, sir, I do.

17   Q.  And for the record, those are what?

18   A.  They appear to be torn pieces of T-shirts.

19   Q.  And they came out of Mr. Waters' apartment?

20   A.  Yes, they did.

21   Q.  Government Exhibit W77-38.

22        MS. WILLIAMS:  No objection.

23   Q.  (BY MR. CARRUTH) Do you recognize that exhibit, sir?

24   A.  Yes, sir.

25   Q.  We'd offer that at this time, your Honor.

*Parelli - Cross*

1    THE COURT:  Received.

2    Q.  (BY MR. CARRUTH) And what is that for the record, sir?

3    A.  That's a bow saw.

4    Q.  And what is the color on the handle of the bow saw?

5    A.  Orange.

6    Q.  I show you what's been marked W77-37 for identification,

7    and ask you if you recognize it?

8    A.  Yes, sir, I do.

9    Q.  Did that come out of the search of Mr. Waters' residence?

10   A.  Yes, it did.

11   Q.  We offer Government's W77-37.

12       MS. WILLIAMS:  No objection.

13       THE COURT:  Received.

14       MR. CARRUTH:  We pass the witness, your Honor.

15                   CROSS-EXAMINATION

16   BY MS. WILLIAMS:

17   Q.  Sir, what was the date of the search?

18   A.  March 24th of 1999.

19   Q.  And do you know when the date of the indictment in this

20   case is?  Do you know when the alleged conspiracy took place?

21   A.  The dates I recall from the search warrant was August of

22   1995 and September of 1995.

23   Q.  Your Honor, at this time, I'll offer Defendant's Exhibit

24   D28 and Exhibit A, D29 and D29A and B, and D30 and D30A.

25       MR. CARRUTH:  No objection, your Honor.  These are

*Parelli - Cross*

1    stipulations which the government has agreed.

2         THE COURT:  I want to make sure I've got it.  28, 28A,

3    29A, 29B, 30?

4         MS. WILLIAMS:  29 has A and B.

5         THE COURT:  Right.  And the 30?

6         MS. WILLIAMS:  30 and 30A.

7         THE COURT:  30A?

8         MS. WILLIAMS:  Yes, your Honor.

9         THE COURT:  Are admitted.

10   Q.  (BY MS. WILLIAMS) You testified that W77-37 came out of

11   the search of David Waters' apartment; is that correct?

12   A.  That's correct.

13   Q.  May I publish the stipulation, your Honor?

14        THE COURT:  Yes.

15   Q.  (BY MS. WILLIAMS) If Robert Rooney were called to testify

16   in the above number and styled cause, he would testify on May

17   20th, 1999, he was employed by the Federal Bureau of

18   Investigation in the chemistry unit, that he was duly

19   qualified on that date, and attached Exhibit A hereto is a

20   true and correct copy of his report and contains its finding.

21        Sir, I'm going to ask you to look at D28A for a

22   moment.

23   A.  Yes, ma'am.

24   Q.  Isn't it the case that Mr. Rooney's report indicates that

25   the spray bottle was tested and that no bleaches or ammonia

*Parelli - Cross*

1   cleaners were identified at all?

2   A.   That's what the report says.

3   Q.   And he came from the FBI lab, correct?

4   A.   I believe so.   That's what it says at the top of --

5   Q.   You don't have any reason to doubt Mr. Rooney, do you?

6   A.   No, ma'am.

7   Q.   All right.   You testified, didn't you, that you

8   recollected that these three fanny packs came out of the

9   search of David Waters' apartment in 1999, correct?

10   A.   That's correct.

11   Q.   77-50A, B and C?

12   A.   Yes, ma'am.

13   Q.   Let me hand you Defendant's Exhibit 30A.   May I publish

14   this stipulation, your Honor?

15        THE COURT:   You may.

16   Q.   (BY MS. WILLIAMS) If Carlo Rosati were called to testify

17   in the above-numbered cause, he would testify on March 16th,

18   2000, he was employed by the Federal Bureau of Investigation

19   in the Firearms and Tool Marks Unit, that he was duly

20   qualified on that date, and that the attached Exhibit A hereto

21   is a true and correct copy of his report and contains his

22   finding.

23        Isn't it the case that Mr. Rosati's report indicates

24   that he examined these three fanny packs and microscopically

25   and chemically and found no presence of gunshot residue?

*Parelli - Cross*

1  A.  That's what the report states, yes, ma'am.

2  Q.  Have any reason to doubt it, do you?

3  A.  No, ma'am.

4  Q.  It was your prior testimony, was it not, that Government's

5  Exhibit 77-38, the saw, 77-30, a silver knife and sheathe, and

6  77-29, another knife and sheathe, were taken in the search of

7  Mr. Waters' apartment?

8  A.  That's correct.

9  Q.  Let me ask you to look at Defendant's Exhibit D29A.  May I

10  publish this stipulation, your Honor?

11       THE COURT:  You may.

12  Q.  (BY MS. WILLIAMS) If Melissa Ann Smrz were called to

13  testify in the above-numbered cause, she would testify that on

14  August 4th, 1999 and September 29th, 1999, she was employed by

15  the Federal Bureau of Investigation in the DNA Analysis Unit

16  1, that she was duly qualified as an expert on that date, and

17  that attached Exhibits A and B hereto are true and correct

18  copies of her reports and contain her finding?

19       Now, isn't it true, sir, that Ms. Smrz indicates that

20  she tested both the knife and sheathe, contained in 77-30, the

21  knife and sheathe, contained in 77-29, and the bow saw,

22  77-38 --

23  A.  I'm sorry.  Does this refer to numbers?  I can't tell you

24  which ones she had examined.

25  Q.  All right.  You can examine those, if you'd like, but I --

*Parelli - Redirect*

1  I represent to you that if you'll compare those numbers,

2  that's what you'll find.

3  A.  If they're identical to those, then, yes, ma'am.

4  Q.  All right.  That Ms. Smrz tested those items that are in

5  front of you and conducted a chemical test for the presence of

6  blood and found no blood.

7  A.  If those are the same ones that she cited in her report

8  because she cited there was one -- at least there was --

9         MR. CARRUTH:  Your Honor,  I stipulated to this.

10  There's no need to question the witness.  We stipulated and

11  agreed with providing them the reports.

12         MS. WILLIAMS:  I just want to make sure that the

13  witness were satisfied that these were the items that were

14  tested.  There is one she said there was some blood on, some

15  item, I just wanted to make sure it wasn't one of the three we

16  were talking about.  If those item numbers matched up to where

17  she said there was none, then I believe there was none.

18  Q.  (BY MS. WILLIAMS) All right.  Those are all the questions

19  I have.

                    RE-DIRECT EXAMINATION

21  BY MR. CARRUTH:

22  Q.  Agent Parelli, do you still have those stipulations

23  counsel was waving around?

24  A.  No, sir.

25  Q.  The first one here she asked you about was a -- by a

*Parelli - Redirect*

1  chemist by the name of Robert Rooney, remember that, on the

2  spray bottle?

3  A.  Yes, sir.

4  Q.  And she only had you read part of that where it says no

5  bleaches or ammonia cleaners were found.  What does Mr. Rooney

6  say in the sentence immediately preceding that sentence about

7  the bleaches?

8  A.  It says solid and liquid residue was removed from the Q126

9  spray bottle contained components consistent with insecticides

10  such as Cyprometrin (phonetic).

11  Q.  And are you aware, or are you not, where a prior witness

12  has testified that that bottle, at one time, contained

13  insecticides?

14  A.  No, sir, I'm not aware of that.

15  Q.  Okay.  Counsel also asked you about the absence of gunshot

16  residue on the fanny packs.  Now, you carry a firearm in the

17  normal course of your duties, do you not?

18  A.  Yes, I do.

19  Q.  Do you normally clean your firearm after you use it?

20  A.  Yes, sir, I do.

21  Q.  And do you know what cleaning does to the presence of

22  gunshot residue?

23  A.  It should remove the gunshot residue.

24  Q.  And would you -- of course, you're not a chemist, I

25  understand, or an expert in firearms or tool marks, but do you

*Parelli - Redirect*

1  know what it would require -- and I don't want you to answer

2  this if you don't know.  But do you personally know what it

3  would require to deposit gunshot residue on an item of

4  clothing, or a fanny pack, or any such item?

5  A.  No, sir, I really don't.

6  Q.  Okay.  And counsel also asked you about the absence of any

7  blood on certain cutting and sawing instruments that have been

8  introduced.  Are you aware or do you know that bleach degrades

9  blood or DNA?

10  A.  I learned that yesterday, yes, sir.

11  Q.  And that there's been prior testimony by DNA experts that

12  they cleaned their instruments with bleach.  Just remove --

13        MS. WILLIAMS:  Your Honor, I object to that as outside

14  the record.

15        THE COURT:  Well, it's not outside the record.  It's

16  testimony unsworn without a question.

17        MS. WILLIAMS:  Object to leading.

18        MR. CARRUTH:  It's in the record, your Honor.

19        THE COURT:  Ask the question.

20  Q.  (BY MR. CARRUTH) Are you aware of that testimony, sir?

21  A.  No, sir, I was not.

22  Q.  Thank you.  Pass the witness.

23        THE COURT:  Any further questions?

24        MS. WILLIAMS:  No, your Honor.

25        THE COURT:  You may be excused.  Members of the jury,

1    it's a fortunate day for you.  You will not have to listen to

2    the speech I have to give on intellectual properties today, at

3    noon, so that you will not ever know that I know very little

4    about intellectual property.  I was reminded last evening by

5    my secretary this method.

6         However, it is my full intent to start up at 1:30.

7    But if we're a few minutes behind, be patient with me.  But

8    remember the instructions.  Have a full lunch.  Be ready to

9    work at 1:30.

10       (Jury not present.)

11       MR. CARRUTH:  We have two more witnesses, your Honor.

12   We'll make every effort to finish this witness.  They're

13   lengthy summary.

14       THE COURT:  All right.  1:30.

15       (Lunch recess.)

16       THE COURT:  All right, counsel.  Anything before we

17   bring in the jury?

18       MR. CARRUTH:  No, your Honor.

19       MR. T. MILLS:  No, sir.

20       THE COURT:  Bring in the jury.

21       (Jury present.)

22       THE COURT:  Members of the jury, during the noon hour,

23   did anyone attempt to talk to you about this case?

24       THE JURORS:  No.

25       THE COURT:  Did you talk to anybody about the case?

*Cowling - Direct*

1        THE JURORS:  No.

2        THE COURT:  Did you learn anything at all about the

3    case outside the presence of one another and this courtroom?

4        THE JURORS:  No.

5        THE COURT:  Thank you.  Show negative responses by all

6    jurors to all questions.  You may call your next witness.

7        MR. CARRUTH:  United States would call Donna Cowling

8    to the stand.

9      (Witness was sworn.)

10       THE COURT:  If you'll tell us your full name and spell

11   your last, please.

12       THE WITNESS:  My name is Donna C. Cowling.  It's

13   C-O-W-L-I-N-G.

14     DONNA C. COWLING, called by the Government, duly sworn.

15                    DIRECT EXAMINATION

16   BY MR. CARRUTH:

17   Q.  Please tell the members of the jury where you reside and

18   what your current occupation is.

19   A.  I reside here in Austin, Texas, and I am an agent with the

20   Federal Bureau of Investigation.

21   Q.  And are you, together with Mr. Ed Martin of the Internal

22   Revenue Service, one of the co-case agents in the case now on

23   trial against Mr. Karr?

24   A.  I am.

25   Q.  By way of background, could you briefly tell the jury how

*Cowling - Direct*

1   your agency became involved in this particular investigation?

2   A.   During late October of 1998, we received a phone call from

3   the United States Attorney's Office regarding a meeting that

4   was going to occur at United States Attorney's Office with

5   regard to Madalyn Murray O'Hair, Jon Garth Murray and Robin

6   Murray O'Hair.

7        I attended a meeting.  I learned certain information

8   from Agent Martin regarding a disappearance of the O'Hairs,

9   and at that point in time, the FBI got involved initially on a

10  possible theft case where Mr. Murray would have -- that he

11  took the $600,000, and it would have been a theft case if the

12  FBI could be involved in.

13       We also got involved by way of looking for the O'Hairs

14  as possibly having been kidnapped.

15  Q.   And prior to that time, to your knowledge, had the O'Hair

16  case been treated, at least by the Austin Police Department,

17  as a missing person's case?

18  A.   That is correct.

19  Q.   And did there come a time when the focus of the

20  investigation changed after the identification of Mr. Fry's

21  remains?

22  A.   That is correct.

23  Q.   And shortly after that occurred, I believe -- would that

24  have been in January of this year --

25  A.   I believe --

*Cowling - Direct*

1   Q.  -- or '99, excuse me?

2   A.  -- I believe it was the end of January, 1999.

3   Q.  Shortly after that incident that the identification of Mr.

4   Fry's remains, did you come to know a lady by the name of

5   Patti Jo Steffens?

6   A.  Within a day or so of the newspaper article coming out

7   about the identification of Mr. O'Hair -- excuse me, of Mr.

8   Fry, I met Patti Jo Steffens.

9   Q.  And did you seek her out or did she seek you out?

10  A.  She seeked us -- it was through her husband that we

11  initially met.  She did -- I did not go to her initially.

12  Q.  Okay.  And for the record, his name was Mr?

13  A.  It was Dewayne Chavez.

14  Q.  Okay.  And did you have one or more meetings with Ms.

15  Steffens?

16  A.  We had numerous meetings.

17  Q.  Where she relayed certain information to you without going

18  into the -- what it was at this time?

19  A.  That is correct.

20  Q.  And at some point in time, did her attorney get involved?

21  A.  Yes, he did.

22  Q.  And his name is?

23  A.  Wayne Meisner.

24  Q.  And did Mr. Meisner negotiate with the United States

25  Attorney's Office, as well as District Attorney's Office in

1   the Dallas County, Texas, an immunity of use agreement on

2   behalf of Ms. Steffens?

3   A.  Yes, he did.

4   Q.  What does that mean, if you know?

5   A.  It's my understanding that as long as Ms. Steffens tells

6   us the truth about everything regarding this matter and any

7   possible involvement she may or may not have had that she will

8   not be prosecuted for the information that she provides us,

9   but if we were to find out other information outside of her

10  providing it to us, she could be prosecuted.

11  Q.  Now, during the time that Ms. Steffens has been

12  cooperating with your investigation, has she been residing out

13  of state at an undisclosed location?

14  A.  Yes, she has.

15  Q.  And why was that necessary?

16  A.  After speaking to Ms. Steffens early on and obtaining or

17  finding out the amount of information she knew, it was very

18  apparent to us that Ms. Steffens was scared for her life.  So

19  within a week or so, we had her moved out of the state for her

20  protection.

21  Q.  And counsel, when he was cross-examining Ms. Steffens

22  early in this trial, elicited testimony from her that you and

23  she had had many visits, 30, or 40, or 50, or 60, or something

24  of that amount, is that a true statement?

25  A.  That is correct.

*Cowling - Direct*

1   Q.   And were all of those visits or contacts for the purpose

2   of eliciting information, or might there have been other

3   purposes in you contacting Ms. Steffens or she contacting you?

4   A.   There were contacts that we had that did not have to do

5   with testimony or information that she was providing regarding

6   this case.

7   Q.   Such as?

8   A.   For instance, I received a phone call from Ms. Steffens,

9   she left me a phone message at work --

10  Q.   Without going into what was said.  She left me a phone

11  message where she was leaving, where she was residing to a --

12          MR. T. MILLS:   Excuse me.  Object to hearsay.

13          THE COURT:   Sustained.

14  Q.   (BY MR. CARRUTH) Just the nature of the conversation.

15  There were contacts to check on her welfare --

16  A.   There were contacts the see how she was doing, to see how

17  members of her family were doing, et cetera.

18  Q.   And during the course of this investigation, did you come

19  to meet and interview the mother of Ms. Patti Jo Steffens?

20  A.   I have not personally met her.  I've spoken to her on the

21  phone on numerous occasions.

22  Q.   And did you learn her identity?

23  A.   Yes, I did.

24  Q.   And what is the name of the mother of Patti Jo Steffens?

25  A.   Loria Wise.

*Cowling – Direct*

1   Q.   Now, you were present in the courtroom when Ms. Steffens

2   testified that sometime during 1995, that her mother visited

3   her in Austin, Texas and had a medical injury that required

4   treatment.  Do you recall that?

5   A.   That is correct.

6   Q.   And did you make an effort to check the various hospitals

7   or emergency rooms in an attempt to locate a record of that

8   lady receiving medical treatment in September of 1995?

9   A.   The one hospital that I checked was Seton Emergency Room,

10  which is where Ms. Steffens told me she took her mother.

11  Q.   I'm showing you, Agent Cowling, what's been marked for

12  identification as Government Exhibit W53-1.  I'll ask you to

13  remove that document from the envelope and see if you

14  recognize it.

15  A.   Yes, I do.

16  Q.   Is that a record of the medical records from Seton

17  Hospital regarding the mother of Patti Jo Steffens?

18  A.   Yes, it is.

19  Q.   We'd offer Government's Exhibit W53-1.

20       MR. T. MILLS:  We don't have any objection to those

21  medical records coming in, Judge.

22       THE COURT:  All right.  Received.

23  Q.   (BY MR. CARRUTH) Now that that record is in evidence, can

24  you tell us the date on which she received medical treatment

25  and for what condition?

*Cowling - Direct*

1  A.  The admit date is 9-19, 1995.

2  Q.  And does it indicate what her complaint was, nature of her

3  injury?

4  A.  It says, "Chief complaint, ankle injury."

5  Q.  Okay.  Now, there's also been some testimony in this trial

6  regarding three young men who -- I believe the news media

7  characterizes as the gold thieves in San Antonio?

8  A.  That is correct.

9  Q.  Came in here and said they got off with some gold coins.

10  Well, first of all, let me ask you:  Without revealing any

11  confidential sources, can you tell us how the FBI found those

12  three gentlemen?

13  A.  We received a phone call -- our San Antonio office

14  received a phone call -- I believe it was during the Memorial

15  weekend holiday last year -- from a female who did not

16  identify herself and said that she had information that a

17  young man by the name of Joey Cortez was bragging about having

18  stolen some coins and that he was selling these coins at a

19  jewelry store in San Antonio.

20      They gave us the crosstreets where the jewelry store

21  was close to but could not provide us with any further

22  information than that.  Myself and Agent Martin, the following

23  week, traveled to San Antonio, located numerous jewelry stores

24  in this area.  We finally located a jewelry store by the name

25  of Leon Valley.

*Cowling - Direct*

1    And in looking through their records, what we found

2  was only one sale of a gold coin by an individual named Joey

3  Cortez.  But what we also noticed was that there were numerous

4  individuals that were selling coins around the same time

5  frame.  These individuals appeared to be about the same age.

6  A lot of them lived within the same zip code.

7    After that, Agent Martin and I obtained a copy of the

8  1995 yellow pages and then, proceeded to different coin

9  dealers that were in the yellow pages during 1995.  From

10 there, we obtained a lot of the same names.  We also obtained

11 some additional names.  And that was how we got our list from

12 the individuals that we contacted later in June.

13 Q.  And did you and Mr. Martin and other agents attempt to

14 locate and interview all of these named individuals?

15 A.  We did during June in coordination with the San Antonio

16 Police Department, the IRS and the FBI.  We contacted these

17 individuals.

18 Q.  And approximately how many individuals were you able to

19 identify who admitted to you that they had assisted one of

20 these three young men in disposing of some gold coins in late

21 1995?

22 A.  I believe that there may have been 13 or 14.

23 Q.  And can you provide the names of those individuals for the

24 record, please, ma'am?

25 A.  I apologize.  I left it sitting on the table.  The

*Cowling - Direct*

1    individuals whom we contacted who had received from the sale

2    of gold coins were Joe Cardenas, Virginia Cardenas, Noey

3    Villarreal, Javier Diaz, Diana Eridalas, Jon Anthony Goerana,

4    Armando Rodriguez, Rolland Flores, Jeffrey Cedillo, Michael

5    Gonzalez, Angela Pokerova, Christina Rodriguez, Daniel Ozuma,

6    Joe Cortez.  And we also contacted an individual by the name

7    of Warren Craig, who we determined through interviewing of him

8    had no relation to any of these individuals and was not

9    connected to assisting either Mr. Cardenas, Cortez, or Valdez

10   in the sale of these gold coins.

11   Q.  Did your investigation reveal any connection whatsoever

12   between any of those named individuals as well as the three

13   young men who testified about breaking into the storage unit

14   and stealing the coins?  Any connection whatsoever between any

15   of those individuals and the defendant, Mr. Karr?

16   A.  No, it did not.

17   Q.  Between any of those individuals and Mr. David Waters?

18   A.  No, it did not.

19   Q.  Or between those individuals and Mr. Chico Osborne, or

20   Gerald Osborne?

21   A.  No, it did not.

22   Q.  Or Patti Jo Steffens?

23   A.  No, it didn't.

24   Q.  Or Danny Fry?

25   A.  No, it did not.

*Cowling - Direct*

1    Q.  Or any other individual involved in this investigation as

2    a suspect?

3    A.  No.

4    Q.  Now, there was some testimony yesterday about a second

5    piece of angle iron that had been removed from an adjacent

6    storage unit to adjacent 53.  Do you recall that testimony?

7    A.  Yes, I do.

8    Q.  And the chemist from DPS experienced some difficulty in

9    explaining that.  Could you tell the jury, if you know, where

10   that second piece of angle iron came from?

11   A.  The second piece of angle iron that DPS conducted the

12   search and submitted it to their own laboratory came from Unit

13   53, a unit that is adjacent to storage Unit 52.

14   Q.  And did DPS take that action at the request of you or

15   Agent Martin?

16   A.  Yes, they did.

17   Q.  And can you tell us why it was decided to test that second

18   piece of angle iron?

19   A.  We thought that if -- due to the fact that the units are

20   connected by those walls and that there's angle iron on

21   opposite walls that we thought that there may be some seepage

22   from one unit to the next.

23   Q.  And so that second piece of angle iron from the adjoining

24   unit was tested and the test was negative; is that correct?

25   A.  That is correct.

*Cowling - Direct*

1  Q.  Now, for the record, could you please tell us who Richard

2  Simerly is, the man who submitted the angle iron, the first

3  piece of angle iron to the DPS laboratory?

4  A.  Richard Simerly is an agent here, in Austin, who I work

5  with, who, at my request, took the angle iron from Unit 52 out

6  of our evidence collection and transported it to the

7  Department of Public Safety for me.

8  Q.  And he is an agent of what organization, ma'am?

9  A.  The Federal Bureau of Investigation.

10  Q.  Okay.  Now, there's been some testimony about a blood

11  sample being found in one of the vans rented by Mr. Karr.  I

12  believe it's been identified as the third van, correct?

13  A.  That is correct.

14  Q.  And there's been other testimony that the DNA of that

15  blood sample did not match that of Mr. Fry; is that correct?

16  A.  That is correct.

17  Q.  To your knowledge, is other testing currently in progress

18  to determine any other possible sources of the DNA?

19       MR. T. MILLS:  Excuse me.  I object to that as being

20  irrelevant unless there's some reason to believe that it's

21  going to be finished in time for this jury to consider it.

22       MR. CARRUTH:  Well, there's testimony in the record, I

23  believe, to that effect, your Honor.  I'm simply trying to

24  clarify it.

25       THE COURT:  Well, it's not relevant to any issue

*Cowling - Direct*

1   that's going to be determined by this jury.

2   Q.  (BY MR. CARRUTH) Okay.  Now, with regard to the photograph

3   of Mr. Gary Karr that's in evidence -- Agent Cowling, I'm

4   showing you what's been previously marked and produced as

5   Government Exhibit 11-2.  Do you recognize that as a

6   photograph of Mr. Gary Karr, the defendant in this case?

7   A.  Yes, I do.

8   Q.  And can you tell us, if you know, the source of that

9   photograph?

10  A.  This photograph is a blowup of Mr. Karr's Florida driver's

11  license.

12  Q.  And I now show you what's been marked for identification

13  as Government Exhibit 86-3, and ask you if you recognize that

14  Florida driver's license of Mr. Karr?

15  A.  Yes, I do.

16  Q.  And does that photograph appear to be the same photograph

17  as has been blown up in Government Exhibit W11-2?

18  A.  Yes, it is.

19  Q.  We would offer W86-3.

20      MR. T. MILLS:  I don't have any objection to the

21  introduction of this document because what's on the back, it

22  appears that it's not the original driver's license which I

23  thought that it was identified as.

24      THE COURT:  It's received.

25      MR. T. MILLS:  Whatever it is, it's a copy.  I don't

*Cowling - Direct*

1    mind.

2    Q.  (BY MR. CARRUTH) It is what you received from the state of

3    Florida, correct?

4    A.  It is a copy of Mr. Karr's Florida driver's license that

5    the FBI --

6    Q.  Can you tell me when this license was issued to Mr. Karr

7    by Florida?

8    A.  The date that it has issued is 7-13, 1995.

9    Q.  And so there's been some discussion throughout the trial

10   regarding Mr. Karr's appearance and how he looks now versus

11   how he looked in 1995.  And you can testify that these

12   photographs were taken in 1995, when he renewed his -- or when

13   he obtained a Florida driver's license?

14   A.  That is correct.

15   Q.  And can you look at those photographs and look at Mr.

16   Karr, as he sits in the courtroom today, and tell me whether

17   or not his appearance has been altered or changed?  Does he

18   appear to be the same as he appears in that photograph?

19   A.  His appearance is different.

20   Q.  Now, Agent Cowling, there's been some talk about some

21   Rolex watches, and we've heard evidence that March 24th of

22   1999 was a big day in this investigation, was it not?

23   A.  Yes, it was.

24   Q.  On this day, Mr. Waters' premises was searched by search

25   warrant?

*Cowling - Direct*

1    MR. T. MILLS:  Excuse me.

2    Q.  (BY MR. CARRUTH) Tell me what happened on that day.

3    A.  On March 24th, there was a series of events that occurred

4    simultaneously with agents here in Austin, Texas, and agents

5    in Detroit, and myself, and agent in Illinois.  Initially,

6    beginning of the morning, myself and an agent contacted Sidney

7    Karr, the sister of Mr. Karr, attempted to speak to her about

8    a Rolex watch, were asked to leave her residence immediately

9    or within about five minutes.

10        At that point in time, I contacted agents in Detroit,

11    told them that I had made -- I had made contact with Ms. Karr,

12    that she was not going to provide us with the watch, and

13    agents at that point contacted Mr. Karr when they were in --

14    inside with Mr. Karr and had -- were aware of where he was, a

15    telephone call was made back to Austin, Texas, at which time

16    the search warrant at Mr. Waters' residence was executed.

17    Q.  Okay.  And in addition to the officers visiting with Mr.

18    Waters and Mr. Karr and Ms. Sidney Karr on that date, were

19    there any other offices elsewhere in connection with this

20    investigation in the Dallas/Fort Worth area?

21    A.  Yes, there were officers went to the residence of Mr.

22    Gerald Osborne.

23    Q.  Also known as Chico?

24    A.  That is correct.

25    Q.  Now, you indicated that Ms. Karr asked you to leave her

*Cowling - Direct*

1  apartment?

2  A.  Yes, she did.

3  Q.  And where exactly does she reside?

4  A.  She resides in a suburb, just outside of Chicago.

5  Q.  Is that Oak Park, Illinois?

6  A.  That is correct.

7  Q.  And had Mr. Karr ever indicated to any of the officers in

8  this investigation that he had provided one of the Rolex

9  watches received from Mr. David Waters to his sister?

10 A.  At the point that we entered his residence -- we entered

11 her residence, he had not yet told that to the agents.  I had

12 heard that from another -- from, actually, two other sources

13 prior to Mr. Karr giving the statement.

14 Q.  Okay.  And when you initially confronted Sidney Karr --

15 and I believe her full name is Gayle Sidney Karr, is it not?

16 A.  That is correct.

17 Q.  Did she tell you she had the watch?

18 A.  No.

19      MR. T. MILLS:  Excuse me.  Object to statements by

20 Sidney Karr as being hearsay.

21      THE COURT:  Sustain the objection.

22 Q.  (BY MR. CARRUTH) Well, in an effort to locate the watch,

23 what action, if any, did you take that involved the United

24 States District Court for the Eastern Division of the Northern

25 District of Illinois?

1    A.   After asking Ms. Karr for the watch, explained to her that

2    we were just attempting to retrieve the property and leaving

3    the residence, we went back and we obtained a search warrant

4    for her residence.

5    Q.   And did you execute that search warrant of Ms. Karr's

6    residence?

7    A.   Yes, we did that day.

8    Q.   Did you locate the Rolex watch at her address?

9    A.   No, we did not.

10   Q.   Did you locate any evidence that she had had it in her

11   possession?

12   A.   Yes, we did.

13   Q.   Show you what's been marked as Government Exhibit W61-1.

14   Do you recognize that as having come out of this search

15   warrant?

16   A.   Yes, I did.

17   Q.   W61-2?

18   A.   Yes.

19   Q.   W61-3?

20   A.   Yes.

21   Q.   Is it your testimony that all those items were seized from

22   the residence of Gayle Sidney Karr when you executed your

23   search warrant?

24   A.   Yes, they were.

25   Q.   We would offer at this time Government's Exhibit W61-1, 2

*Cowling - Direct*

1    and 3, your Honor.

2         MR. T. MILLS:  No objection.

3         THE COURT:  Received.

4    Q.  (BY MR. CARRUTH) Now that those exhibits are in evidence,

5    would you please hold them up, one by one, and tell the jury

6    what they are?

7    A.  This is the will of --

8    Q.  Please identify it by number.

9    A.  Excuse me.  W61-1 is the will of Gayle Sidney Karr.

10   Q.  And what, if anything, is significant about the will of

11   Gayle Sidney Karr?

12   A.  May I open it?

13   Q.  Please.

14   A.  What's significant about her Last Will and Testament is

15   that on the very first page, the second article, she says that

16   -- it states, "I give, devise and bequeath my Rolex watch,"

17   and this is to one of her children.

18   Q.  All right.  Please go on to the next exhibit.

19   A.  W61-2 is a receipt from James and Williams Jewelers in

20   Berwyn, Illinois, and it is a $20 receipt for appraisal --

21   excuse me -- appraisal of a lady's Rolex.

22   Q.  And when is that receipt dated, please, ma'am?

23   A.  2-17, 1998.

24   Q.  Okay.  What is the next exhibit, please?

25   A.  W61-3 is a picture of Ms. Karr.  It has a date stamp on it

*Cowling - Cross*

1  of 8-27, 1996.  She's wearing a two-tone gold and silver

2  watch.

3  Q.  Okay.  Now, did you give Ms. Karr a receipt for these

4  items of evidence that you took from her apartment on that

5  occasion?

6  A.  Yes, we did.

7  Q.  And did she sign that receipt?

8  A.  I'd have to look at the receipt.  I don't believe she did,

9  but I would have to look at it again.

10  Q.  Generally speaking, did you find Ms. Karr to be

11  cooperative or uncooperative?

12  A.  She was extremely uncooperative.

13  Q.  Thank you.  Pass the witness.

14                    CROSS-EXAMINATION

15  BY MR. T. MILLS:

16  Q.  Did Ms. Karr do things of an uncooperative nature, like

17  insist on exercising her constitutional right to not have

18  agents search her house without a search warrant?

19  A.  She did express the desire for us to leave her residence,

20  yes.

21  Q.  What was the date of the -- when was the will that named

22  the -- a Rolex watch executed?

23  A.  It says the 14th today of January, 1997.

24  Q.  And does it, by any chance, describe the Rolex in terms of

25  a serial number or any other kind of identification?

1    A.   No, it does not.

2    Q.   Referring you to Government's Exhibit W11-5, parenthesis

3    4, this photograph by the pool.  Do you believe, based on your

4    investigation, that that was taken at the pool where Apartment

5    219 was located?

6    A.   Yes, I do.

7    Q.   And would that have been where Patti and David lived?

8    A.   That's correct.

9    Q.   And do you recognize the female in this photograph?

10   A.   That's Patti Steffens.

11   Q.   And do you recognize the man seated next to her?

12   A.   She has told me that it's Gary Karr.

13   Q.   All right.  And this was dated at the bottom 8-25-95?

14   A.   That's correct.

15   Q.   So what his hair looked like during the -- this aspect --

16   this time period of the alleged conspiracy would -- don't you

17   agree that it looks like this picture?  I mean, this is a

18   picture of him?

19   A.   Correct.

20   Q.   All right.  And will you agree that that -- that you would

21   not describe his hair in this picture as long, sandy-brown

22   hair?

23   A.   Not in that picture.

24   Q.   Well, do you have another picture of him in August or

25   September of '95?

*Cowling - Cross*

1  A.  No, I do not.

2  Q.  I wanted to ask you a question about the angle iron.

3  A.  It's back there by those boxes.

4  Q.  It's my understanding that this angle iron came out of

5  space No. 52 -- or it was actually F0052; isn't that right?

6  A.  I think it's F052.

7  Q.  All right.  And the way Mr. Carruth or Mr. Mills explained

8  it, I think earlier, it was on the -- if this was the door, it

9  was on this side where the yellow line is of 52?

10  A.  That is correct.

11  Q.  All right.  It was on the inside of 52, and there was also

12  one on the inside of 53, next-door to it, that got examined?

13  A.  That's correct.

14  Q.  I would offer just as a demonstrative exhibit to show

15  these relationships Defendant's Exhibit No. 40.

16      MR. CARRUTH:  No objection, your Honor.

17  Q.  (BY MR. T. MILLS) Now, if you believed that there was

18  blood that might have seeped into the angle iron in 52, then

19  you also decided, just to be on the safe side, to see if blood

20  could have seeped from 52 under the dividing line, the wall

21  between 52 and 53, to see if this other angle iron might have

22  some blood?

23  A.  That's correct.

24  Q.  All right.  And doesn't that mean that blood that was

25  found in 52 could have seeped from 51 under the wall and

Cowling - Cross

1    gotten into the angle iron in 52?

2    A.   It's my understanding that the angle iron -- that the way

3    the angle iron is, it's up against the wall.  It would have

4    had to seep under and back up.

5    Q.   Exactly how it would have had to have seeped in 53?

6    A.   Not if it had seeped just directly under and was on the

7    base of the angle iron.

8    Q.   But, in fact, you found no blood or anything suspicious in

9    53?

10   A.   No, we did not.

11   Q.   And when you decided to find out if there had been any

12   bleach on the angle iron or on the screws, it was analyzed

13   scientifically, right?

14   A.   That's correct.

15   Q.   All right.  And does Defense Exhibit 39 reflect evidence

16   that you submitted or requested analysis and results?

17   A.   Yes, it does.

18   Q.   We would offer Defendant's Exhibit No. 39.

19        MR. CARRUTH:  No objection.

20        THE COURT:  Received.

21   Q.   (BY MR. T. MILLS) Of the evidence submitted, the angle

22   iron from 52 was submitted -- no.  Excuse me.  On this

23   particular document, Defendant's Exhibit No. 39, the angle

24   iron from the wall adjacent to Room 52 was analyzed for the

25   material that is bleach, correct?

Cowling - Cross

1   A.   That's correct.

2   Q.   And the screws from the wall adjacent to 52, which would

3   be 53, were submitted for analysis?

4   A.   That is correct.

5   Q.   Was the angle iron from 52 -- was it analyzed and found to

6   not have bleach but that might be because it was wiped down?

7   A.   That's my understanding.

8   Q.   Okay.  Were the screws from the angle iron in 52 submitted

9   for analysis?

10   A.   No, they were not.

11   Q.   Were they saved?

12   A.   They should be in evidence, yes.

13   Q.   Have they ever been analyzed for bleach?

14   A.   No, they have not.

15   Q.   Is this item which appears to me to be a nail, is that

16   what is called in this context a screw?

17   A.   Those are nails, and there were screws and bolts within

18   the storage unit.  And I believe that the screws and bolts may

19   have actually come off of some metal that was going up -- that

20   was perpendicular to the floor.

21   Q.   All right.  Well, do you know if any nails from 52 were

22   analyzed for bleach?

23   A.   I don't believe they were.

24   Q.   That's all the questions that I have.

25

*Cowling - Redirect*

## RE-DIRECT EXAMINATION

BY MR. CARRUTH:

Q. Agent Cowling, just to clear up the chain of custody on this piece of angle iron, marked W64-6, were you the individual responsible for receiving this from the Dallas Sheriff's Department after it had been analyzed by the lab in Dallas and transmitting it to the FBI laboratory in Washington D.C?

A. I personally picked up the evidence. I picked up this angle iron in Dallas County. I transported it back to Austin, at which time it was put into our evidence, given to our evidence custodian and logged as evidence, and then, it was sent via Fed Ex to Washington, D.C.

Q. And you received it back after they analyzed it?

A. That is correct.

Q. Your Honor, I believe it's in evidence, but if not, I would re-offer W64-6 for the record.

MR. T. MILLS: I don't have any objection. I was thinking that it was in evidence.

THE COURT: I think it is. It's in evidence.

MR. CARRUTH: Thank you, your Honor.

Q. (BY MR. CARRUTH) Agent Cowling, Mr. Karr's attorney asked you, again, about the hair color of Mr. Karr as it appeared in a pool photograph and his driver's license. During the course of this investigation, have you received any evidence

*Martin - Direct*

1   regarding Mr. Karr either dying his hair or, otherwise,

2   seeking to change his appearance?

3   A.  I have.

4          MR. T. MILLS:  Object to hearsay.

5          THE COURT:  I sustain the objection to the question

6   asked.  You may rephrase your question.

7   Q.  (BY MR. CARRUTH) Just simply call for a "Yes" or "No"

8   answer without what -- I'll pass the witness.

9          MR. T. MILLS:  No more questions.

10          MR. CARRUTH:  Nothing further.  May the witness be

11   excused?

12          THE COURT:  Yes, sir.

13          MR. CARRUTH:  At this time, we would call Ed Martin to

14   the stand, your Honor.  Be sworn, please, sir.

15      (Witness was sworn.)

16          THE COURT:  Have a seat, please.  Tell us, please,

17   sir, your full name and spell your last.

18          THE WITNESS:  My name is Edmond, E-D-M-O-N-D, Martin,

19   M-A-R-T-I-N.

20      EDMOND MARTIN, called by the Government, duly sworn.

21                  DIRECT EXAMINATION

22   BY MR. CARRUTH:

23   Q.  Mr. Martin, please tell the members of the jury where you

24   live and how you're currently employed.

25   A.  I live in Austin Texas.  I've been here 25 years.  And I'm

*Martin - Direct*

1  employed with the Internal Revenue Service, Criminal

2  Investigation Division.

3  Q.  And how long have you been employed by the Internal

4  Revenue Service?

5  A.  Twent-four years, sir.

6  Q.  Would you please detail for the members of the jury your

7  educational background, training and experience in the field

8  of accounting and fraud investigations?

9  A.  Yes, sir.  My degree is in accounting.  I started with the

10  Internal Revenue Service in 1969.  I was with them 15 years.

11  I left for six years, went to work for the State Securities

12  Board.  After that, I worked -- I worked for the Securities

13  Board two and a half years.  I then went into private practice

14  as an accountant and a private investigator for three and a

15  half years.

16      And in 1991, I went back to work for the Internal

17  Revenue Service, Criminal Investigation Division.

18  Q.  And can you tell the -- have you ever had any specialized

19  training?  Or are you a member of any professional

20  associations that deal with fraud investigations or tax

21  investigations?

22  A.  Yes, sir.  I'm a -- almost a charter member of the

23  Certified Fraud Examiners and was past president of the First

24  Chapter of the Certified Fraud Examiners.

25  Q.  And in your many years with the government, do you have

Martin - Direct

1   occasion to participate in the training or teaching of other

2   state and federal law enforcement agents in conducting

3   financial investigations?

4   A.   Yes, sir, I do.  I've trained as -- I've taught both at

5   Glencoe, which is a federal law enforcement training center in

6   Glencoe, Georgia, and in basic criminal investigation, basic

7   special agent school, and I've also taught in advanced school.

8   Q.   Can you briefly tell the members of the jury how a special

9   agent of the Internal Revenue Service became involved in what

10   essentially turned out to be a crime of violence?

11   A.   Yes, sir.  Initially, it was reported that the O'Hairs

12   were missing and that there was a Form 990, which was filed by

13   the United Secularists, which reported missing funds of about

14   $600,000.

15   Q.   And a Form 990 is an Internal Revenue tax form?

16   A.   Yes, sir, it's a nonprofit organization form.

17   Q.   And I believe that form is in evidence, but could you just

18   briefly relate what it alleged that caused you to become

19   involved in your official capacity, if it did?

20   A.   Yes, sir.  There was a statement attached to the return

21   that indicated that it was reporting that Jon Murray O'Hair --

22   Jon Murray, I'm sorry, had possession of the $600,000, and at

23   this point in time, he was missing and they didn't know what

24   the accounting was for that.

25   Q.   And you were assigned in that particular investigation?

*Martin - Direct*

1  A.  Yes, sir, I initiated that investigation.

2  Q.  And what steps, if any, did you initially take to commence

3  your investigation of this matter?

4  A.  Initially, my investigation was a money laundering

5  investigation, not an income tax investigation.  And what I

6  endeavored to do was to contact your office to obtain grand

7  jury subpoenas for obtaining the documents which would prove

8  the transfer of the $600,000.

9  Q.  And do you recall approximately what month and year your

10  investigation began?

11  A.  I initiated my investigation in February of 1997.

12  Q.  Okay.  And were you successful in locating any assets of

13  the O'Hairs after they disappeared?

14  A.  Yes, I was able to -- I ultimately found and traced the

15  $600,000 coming from a bank in -- actually, it's a Guardian

16  Trust in New Zealand, and subsequent to that, in about

17  December of 1997, the U.S. Attorney's Office received a phone

18  call from an individual named Corey Ticknor, or Mr. Ticknor's

19  attorney, who advised that he was in possession of $100,000

20  worth of gold coins.

21  Q.  And did you subsequently obtain those gold coins from Mr.

22  Ticknor?

23  A.  Yes, sir, I did.

24  Q.  And what disposition, if any, did you make of these gold

25  coins?

Martin - Direct

1   A.  He initially received the gold coins and held them, and

2   then, in a civil matter, they filed proof of claim.

3   Q.  They being who, sir?

4   A.  The United Secularists of America.  Mr. Richard Hogan is

5   the person I dealt with, and his attorney, Mr. Ron Howdyshell.

6   Q.  Okay.

7   A.  And they proceeded to follow the procedures that we have

8   established for seized assets.  And because these funds, from

9   what I could determine, belonged to the United Secularists of

10  America, we were -- a determination was made that those funds

11  should be returned.

12  Q.  Can you tell us, if you know, sir, why the IRS didn't go

13  after those funds to satisfy the tax liabilities of the

14  O'Hairs?

15  A.  Well, their collection division, as my understanding, was

16  attempting to find the gold, but I found it first.  And at

17  this point in time, I don't -- and even at that time, I didn't

18  believe that the United States Government, the Internal

19  Revenue Service is entitled to those coins.  I felt that they

20  belonged to United Secularists.

21  Q.  Okay.  Was there also an occasion during this

22  investigation when the Greystone home of the O'Hairs was

23  seized by an arm of the Internal Revenue Service?

24  A.  Yes, sir, the collection division seized a home and the

25  contents.

1   Q.  Now, so that the jury may know the collection division,

2   the revenue officers are different.  Their function and duties

3   are different than yours as a special agent in the Criminal

4   Investigation Division, correct?

5   A.  Yes, sir.  Their function is basically the collection of

6   money.

7   Q.  Could you briefly detail the responsibility of each arm of

8   the IRS?

9   A.  Yes, sir.  The collection division, first of all, the

10  examination division generally establish a tax liability,

11  establishes an assessment of the tax.  That was being done,

12  apparently, and had been done.  And it had been a decision

13  made that a notice was made.  I think the O'Hairs had not

14  appeared or had not paid the tax.  So the IRS then proceeded

15  against the major asset belonging to the estate.

16      They seized the residence and the contents of the

17  residence for the collection of tax initially.  And in my

18  case, the Criminal Investigation Division, we investigate

19  criminal violations of the Internal Revenue laws in addition

20  to money laundering violation.

21  Q.  And at what point or when did you become aware or

22  determined that this may be more than a money laundering

23  investigation?

24  A.  In analyzing the information, my expertise is financial

25  investigation.  So in analyzing the financial transaction and

*Martin - Direct*

1    following the money, I determined that it appeared that

2    between checks being issued and credit card advances that in

3    the month of -- the last few days of August and in the month

4    of September, approximately $86 to $90,000 was withdrawn along

5    with the sale of a vehicle and such.

6          So there was an accumulation of cash, and it was kind

7    of strange in characteristics to what I was able to see in the

8    accounts of the O'Hairs.

9    Q.  And was that in addition to the $600,000 wire transfer

10   that was converted into gold coins?

11   A.  Yes, sir, that was in addition to.

12   Q.  And during your investigation, did you attempt to contact

13   the leaders of the American Atheist Organization in attempt to

14   determine where the O'Hairs could be found?

15   A.  Yes, sir, one of my first contacts was Ellen Johnson.

16   Q.  Okay.  And did you also contact Interpol, or any other

17   international law enforcement agency, in an effort to

18   institute a search or to see if they had any information

19   regarding the missing O'Hair family members?

20   A.  Yes, sir, I contacted Interpol -- we have a special agent

21   that works for Interpol -- and requested that they look for

22   them in New Zealand, Canada and Mexico.

23   Q.  And what were the results of that inquiry or search?

24   A.  The inquiry for -- I received a negative response from New

25   Zealand and, also, Mexico.  I did not receive anything from

1   Canada.  And in addition to that, I think I also submitted a

2   subsequent request to -- for Iceland and Greenland.  I

3   received some information and had not received any kind of

4   response on those.

5   Q.  During the course of your investigation, did you also

6   become aware of a bank account at the Frost National Bank here

7   in Austin, Texas?

8   A.  Yes, sir, there was an account in the name of Madalyn

9   Murray O'Hair, and I think Jon and Robin had signature

10  authority on those accounts -- on that account.

11  Q.  And did you determine whether any funds were in that

12  account?

13  A.  Yes, sir, I determined that the account had -- it was a

14  repository.  The money was just flowing into the account, no

15  money was being drawn from the account.

16  Q.  And did you identify the source of the funds that was, you

17  say, flowing into the account?

18  A.  Yes, sir, I determined that the account was receiving

19  funds from the Veterans Administration and Social Security

20  Administration.

21  Q.  And did you determine whether or not those funds had been

22  touched or whether there had been any withdrawals from that

23  account since the O'Hairs disappeared in the fall of 1995?

24  A.  There was no -- there were no withdrawals from that

25  account, sir.

*Martin - Direct*

1  Q.  Okay.  Can you tell us, briefly, how Mr. Karr was

2  developed as a suspect in this case?

3  A.  Initially, when Ms. Cowling and I began working together

4  on the investigation, we went to the Warren Inn --

5      MS. WILLIAMS:  I'm sorry.  I'm going to object to

6  this.  It was my understanding that Mr. Martin was being

7  called as a summary witness of voluminous financial records.

8  This testimony would be outside the scope of that sort of

9  summary witness under the Rules of Evidence.

10     THE COURT:  The question is, would you tell me how he

11 became a suspect.  I'll overrule the objection.  You may

12 answer.

13 A.  When Ms. Cowling and I went down to the Warren Inn, we

14 searched their records.  They had boxes and boxes of records.

15 We searched through their records, and we found the needle in

16 a haystack.  It was the record that showed that Gary Karr and

17 David Waters had leased an apartment.  We didn't find anything

18 for the O'Hairs at that point.

19     So there was something there that triggered the -- the

20 involvement of Mr. Karr.

21 Q.  And what was it that led you to the Warren Inn in San

22 Antonio?

23 A.  Previously, we had information that there was -- I mean,

24 reading in a newspaper and other information that the Warren

25 Inn was where the O'Hairs might be.

Martin - Direct

1   Q.  Okay.  Now, once the investigation began to focus on Mr.

2   Karr, did there come a time when you and other officers

3   traveled to Novey, Wald Lake, Michigan to contact Mr. Karr

4   regarding this case?

5   A.  Yes, sir, we did.

6   Q.  And when was that, sir?

7   A.  That was March the 24th, 1999.

8   Q.  And was Mr. Karr generally cooperative?

9   A.  When -- yes, sir, he was.

10  Q.  And did he agree to answer your questions regarding the

11  investigation?

12  A.  He was a little apprehensive at first, but yes, he

13  ultimately did.

14  Q.  And during the course of the investigation, was Mr. Karr

15  advised of his constitutional rights?

16  A.  Yes, sir, he was.

17  Q.  Who did that?

18  A.  I did.  I advised him of his rights according to our -- we

19  have a form that we -- standard form that we read from.

20  Q.  Okay.  And did he agree to waive those rights and discuss

21  his knowledge of this case with you?

22  A.  Yes, sir, he did.

23  Q.  And as a result of that interrogation or questioning of

24  Mr. Karr, did he ultimately execute a written statement?

25  A.  Yes, sir, he did.

*Martin - Direct*

1   Q.  I believe the first statement he gave is approximately

2   eight pages in length; is that correct?

3   A.  Yes, sir, it is.

4   Q.  I'm going to show you what's been marked for

5   identification as Government Exhibit 100-2, and ask you to

6   examine all pages of that exhibit and tell us if you're able

7   to identify it.

8   A.  Yes, sir, this is the statement that I prepared and Mr.

9   Karr signed in the presence of a number of agents.

10  Q.  Now, was that statement typed up in final form the first

11  time, or were there multiple drafts that were gone over and

12  corrected?

13  A.  There were multiple drafts.

14  Q.  And when it was put in final form, did Mr. Karr initial

15  each page and sign it on the last page?

16  A.  Yes, sir, he did.

17  Q.  And did you sign it?

18  A.  Yes, sir, my name is right below Mr. Karr's name.

19  Q.  And did other law enforcement officers in attendance sign

20  it as witnesses?

21  A.  Yes, Robert Bjorklund and Sammy Houston, William O'Leary

22  and Mr. Newland.

23  Q.  At this time, your Honor, we'd offer Government Exhibit

24  W100-2.

25          MS. WILLIAMS:  Your Honor, we renew our previous

*Martin - Direct*

1  objections to portions of the statement.

2       THE COURT:  Members of the jury, I'm going to give you

3  a ten-minute break.

4     (Jury not present.)

5       THE COURT:  Counsel, tell me what portions.

6       MR. T. MILLS:  I have put a yellow marker on this.

7  It's our position that the length of the sentence and the

8  length of time that's referred to is basically letting the

9  jury know indirectly that there was some kind of previous

10  extremely serious crime, which is not provable by direct

11  evidence.  And we think that it's much more prejudicial than

12  relevant to what was done in this case.

13       THE COURT:  Counsel, on the exhibit, page 5, is that a

14  part of the --

15       MR. CARRUTH:  That was Mr. Karr's marking it out, your

16  Honor.  He apparently objected to something that was in the

17  statement and -- is that correct, Agent Martin?

18       THE WITNESS:  Yes, sir, it is.

19       THE COURT:  So the two supplemental statements, what

20  you are objecting to, is the phrase, quote, I have been in

21  state prison for 20 years and nine months, end quote, and,

22  quote, David Waters was released from prison four or five

23  years prior to my release?

24       MR. T. MILLS:  Yes, sir.

25       THE COURT:  What's the government's position?

*Martin - Direct*

1    MR. CARRUTH:  Your Honor, we think the evidence is

2  clear that Mr. Karr has a history of incarceration.  I don't

3  know that the length of that incarceration would necessarily

4  be any more prejudicial than the fact that he has been

5  incarcerated.  It is his voluntary statement.  He deleted one

6  part that he objected to.  It is a true statement.

7    We also believe that at the conclusion of this case,

8  we may ask the Court to admit that entire prior conviction for

9  armed robbery and aggravated kidnapping under 404B, since his

10 intent has been placed in issue by his counsel in

11 cross-examining the government's witnesses.  And should that

12 occur and the conviction were to come in, it would show he

13 received a sentence, I believe, of 30 to 50 years for the

14 rape, kidnapping and robbery involving the daughter of a

15 judge.

16    THE COURT:  Are you through with the speeches?

17    MR. CARRUTH:  Well, the jury's out, your Honor.

18    THE COURT:  Are you just practicing?  I will redact

19 the phrase in the first sentence, for 20 years and nine

20 months.  That will be redacted, so it will read:  I have been

21 in state prison, redacted.  It is material when David Waters

22 was released.  I will not redact that.  And I'll ask Mr.

23 Carruth to accommodate that.

24    MR. CARRUTH:  And in view of that court's ruling, your

25 Honor, I told Mr. Mills during the noon recess if the Court

*Martin - Direct*

1  ruled in that manner, we would also agree to redact the

2  15-page statement of the inmate, Jason Cross, wherein Mr. Karr

3  makes that same statement to him.  So that it's out for all

4  purposes.

5         THE COURT:  I think one piece of pie is plenty, Mr.

6  Carruth.

7         MR. CARRUTH:  Thank you.

8         THE COURT:  If you will be sure that those two

9  exhibits are redacted.  We'll take ten minutes.

10     (Recess.)

11         MR. CARRUTH:  Your Honor, during the recess, we've

12  redacted both documents with the Court's instruction --

13  pursuant to the Court's instruction.  Counsel are satisfied.

14         THE COURT:  Then, I will announce that W100-2 is in

15  evidence.  All right.  Bring the jury in.

16     (Jury present.)

17         THE COURT:  Members of the jury, again, I apologize

18  for the delay.  One of my opinions of one of our great judges,

19  gentleman out in -- lives in Odessa, named Lucius Bunton, been

20  a judge little over 20 years, yesterday for health reasons, he

21  decided that he won't be coming to the courtroom anymore and

22  sent us all e-mails -- we get e-mails nowadays -- and that's

23  caused a lot of reorganization of the judges in the Circuit as

24  it is.

25         And that's what I've been doing, most of today, since

Martin - Direct

1   early this morning is talking with other judges and trying to

2   figure out how we're going to handle those 700 cases that he

3   has.  So we're working on that.  So it's my fault.  Nobody

4   else's.  You may proceed.

5          MR. CARRUTH:  Your Honor, at this time, we'd offer

6   Government Exhibit W100-2.

7          THE COURT:  It is received.

8          MR. CARRUTH:  May the government publish that to the

9   jury by having Agent Martin read it into the record, your

10  Honor?

11         THE COURT:  Read the entire?

12         MR. CARRUTH:  It would be quicker, I think, than

13  having the jurors each individually have to read it.

14         THE COURT:  All right.  It will be available to them

15  on deliberation.

16         MR. CARRUTH:  All right, sir.

17  Q.  (BY MR. CARRUTH) Subsequent to that statement by taken --

18  by the way, in that statement that's just been admitted, did

19  Mr. Karr make any admissions to you regarding a trip from New

20  Port Richey, Florida, down to Naples, Florida to visit Bob

21  Fry, Danny Fry's brother?

22  A.  Yes, sir, he did.

23  Q.  Can you briefly tell us what he told you?

24  A.  He said that he and David Waters went in his jeep down to

25  Naples, and that they parked a block away or so from the

1   house, and Mr. Waters, on the way down, explained to him that

2   Danny Fry's brother was causing trouble and was calling him

3   and that he could create problems for the O'Hairs and that he

4   could not afford that at this time.

5       And that Danny had left and did not know where he was

6   is basically what he said.  And then, approximately -- for

7   approximately 35 minutes, Mr. Waters and Mr. Fry -- Mr. Fry

8   was present -- I'm sorry.  Mr. Karr, confronted Mr. Fry about

9   a letter that Danny Fry had written.  And David told Mr. Fry

10  -- this is what Mr. -- I mean, Mr. Karr told me that David

11  told Bob Fry that Danny was involved with big people and that

12  the letter and his continued phone calls could cause problems,

13  and the people would be unhappy if he did not come back with

14  the letter.

15      Mr. Fry told him that the letter had been destroyed,

16  and they ultimately left and did not -- they left the house.

17  In the process, too, Mr. Karr advised me that Mr. Waters had

18  brought a weapon with him.  My understanding, it was a

19  Nine-Millimeter Browning that he brought with him --

20      MS. WILLIAMS:  Your Honor, I'm going to object to

21  Agent Martin adding to what's actually in the statement.

22      THE COURT:  Well, he has specifically been asked to

23  read that portion of the statement when counsel, of course, is

24  not restricted to that.

25      MR. CARRUTH:  Thank you.

*Martin - Direct*

1   Q.  (BY MR. CARRUTH) Please continue.  When you say weapon in

2   one place and other place, it says Nine-Millimeter on the last

3   paragraph, does it not?

4   A.  Yes, sir.

5   Q.  Okay.

6   A.  Well, he took the Nine-Millimeter with him, but he did not

7   use it.  Mr. Karr told me that he had told David Waters that

8   if he planned on killing the man, he was going to walk.  He

9   was going to leave him.

10  Q.  Okay. Now, subsequent to that statement being taken on

11  March the 24th, did you return the next day and take a second

12  shorter statement from Mr. Karr?

13  A.  Yes, sir, we did.

14  Q.  Show you what's been marked for identification as W100-1,

15  and ask if you can identify that?

16  A.  Yes, sir, I could identify that.  That was the second

17  statement -- this is the second statement that we took from

18  Mr. Karr.

19  Q.  And is this a supplement to the first statement?

20  A.  It's an addition, yes.

21  Q.  And we would offer W100-1 at this time.

22       MS. WILLIAMS:  No objection.

23       THE COURT:  It's received.

24  Q.  (BY MR. CARRUTH) And in that statement, did Mr. Karr just

25  put in a few details that had been omitted from the earlier

*Martin - Direct*

1    statement?

2    A.  Yes, sir, that's basically what it is.

3    Q.  And again, he -- after being advised of his rights, did he

4    initial it on both pages and sign it in your presence and the

5    presence of other witnesses?

6    A.  Yes, sir, he did.

7    Q.  Now, also, on that second occasion, did Mr. Karr draw you

8    a map?

9    A.  Yes, in talking to Mr. Karr, we had learned that -- I had

10    learned that he had information about, potentially, location

11    of the bodies.

12    Q.  Okay.  I show you what's been marked for identification as

13    Government Exhibit W100-3.

14    A.  Yes, sir.

15    Q.  Do you recognize that exhibit as being a map drawn by you

16    -- for you by Mr. Karr on the occasion in question?

17    A.  I think that in following the advice of Mr. -- the

18    instruction of Mr. Karr, drew this map out according to what

19    he described to me.

20    Q.  He provided direction?

21    A.  Yes, sir.

22    Q.  We'd offer Government Exhibit W100-3.

23        MS. WILLIAMS:  May I take the witness on voir dire

24    briefly?

25        THE COURT:  You may.

*Martin - Voir Dire*

## VOIR DIRE EXAMINATION

BY MS. WILLIAMS:

Q.  Is it your testimony the handwriting contained on Government 100-3 is that of Mr. Karr?

A.  No, ma'am, it is mine.

Q.  All right.  And it's your testimony that you drew this according to what Mr. Karr told you?

A.  Yes.

Q.  Do Mr. Karr's initials appear on this anywhere indicating his adoption of your drawing?

A.  I don't believe they are.

Q.  All right.  Then, I object, your Honor.

MR. CARRUTH:  May we do a sidebar, your Honor?

THE COURT:  Yes.

(At the Bench, on the record.)

MR. CARRUTH:  They just told me during the break they had no objection to it, otherwise, I'm going to offer it.

MS. WILLIAMS:  Well, I didn't know when you asked me that my client didn't write on that.  I thought he did.  I thought all this time that Gary drew that map, and I didn't know that he didn't.

MR. CARRUTH:  Okay.

MS. WILLIAMS:  So I apologize.

MR. CARRUTH:  I'll withdraw.  I never would have offered if I --

*Martin - Direct (Resumed)*

1    THE COURT:  Okay.

2    MR. CARRUTH:  Your Honor, the government will withdraw

3  its tender of Government Exhibit 100-3.

4    THE COURT:  All right.

5         DIRECT EXAMINATION (Resumed)

6  (BY MR. CARRUTH).

7  Q.  Now, Mr. Martin, at the time Mr. Karr made these two

8  statements on successive days, did he say anything to you to

9  indicate that he was holding back any information in this

10  case?

11  A.  Yes, sir, he told us when all agents were present that --

12  in the process of preparing this statement, I asked him if

13  there's anything more, he basically told me that -- or told us

14  that he learned that in prison, basically, that you don't tell

15  law enforcement everything the first time you meet with them.

16  Q.  Okay.  Mr. Martin, during the course of this

17  investigation, did you determine or obtain copies of the

18  telephone records of Mr. Karr during the time frame in

19  question?

20  A.  Yes, sir, we did.

21  Q.  I show you what's been marked as Government's Exhibit

22  W91-1, a certification from Ameritech regarding Mr. Karr's

23  phone records.  Do you recognize that?

24  A.  Yes, sir, these are the phone records that we subpoenaed.

25  Q.  Thank you.  At this time, we'd offer Government's Exhibit

*Martin - Direct (Resumed)*

1  W91-1.

2         MS. WILLIAMS:  No objection.

3         THE COURT:  Received.

4  Q.  (BY MR. CARRUTH) Did you also, during the course of your

5  investigation, obtain similar phone records from Southwestern

6  Bell Telephone Company relating to Patti Jo Steffens and Mr.

7  Waters, who was residing with her at that time, as well as

8  Corey Ticknor, a jeweler in San Antonio, Texas?

9  A.  Yes, sir, and this is the subscriber information that we

10 requested from the telephone company.

11 Q.  We'd offer W10-1, sub 3.

12        MS. WILLIAMS:  No objection.

13        THE COURT:  Received.

14 Q.  (BY MR. CARRUTH) Did you also obtain copies of telephone

15 records for the cellular phone of Jon G. Murray, marked

16 Government's Exhibit W30-1?

17 A.  Yes, sir, we did obtain the cellular phone records as part

18 of the investigation, very important part of the

19 investigation.

20 Q.  And we would offer Government Exhibit W30-1.

21        MS. WILLIAMS:  No objection.

22        THE COURT:  Received.

23 Q.  (BY MR. CARRUTH) Did you also obtain -- let me show you

24 what's also been marked as Government's Exhibit 30-1, and see

25 if you can identify that for the record, please.

Martin - Direct (Resumed)

1    A.   This is the MCI account for the Society of United

2    Secularists.   Apparently, it was John Murray's credit card,

3    his MCI card.

4    Q.   Thank you.   We'd offer Government Exhibit 31-1.

5        MS. WILLIAMS:   I'm sorry.   MCI phone bill?

6    A.   Phone records, yes.

7        MR. CARRUTH:   Phone credit card records, yes.

8        MS. WILLIAMS:   No objection.

9        THE COURT:   Received.

10   Q.   (BY MR. CARRUTH) I'll show you what's been marked W93-1,

11   phone calling card that you determined had been used by one of

12   the party principals in this case.

13   A.   Yes, sir, this is from IIS.   It's a phone card that was

14   sent to Mr. Waters.

15   Q.   We'd offer Government Exhibit W93-1.

16       MS. WILLIAMS:   No objection.

17       THE COURT:   Received.

18   Q.   (BY MR. CARRUTH) Show you, sir, what's been marked

19   Government's Exhibit W19-1 for identification, and W19-2.   Do

20   you recognize those as credit card records?

21   A.   Yes, sir, these are credit card records of Mr. Gary Karr,

22   19-1, and 19-2 is Jon Murray.   And I believe they're Discover

23   cards.   Yes, that's what they are.

24       MR. CARRUTH:   We would offer at this time, your Honor,

25   Government's 19-1 and 2.

Martin - Direct (Resumed)

1          MS. WILLIAMS:  No objection.

2          THE COURT:  Received.

3    Q.  (BY MR. CARRUTH) Show you what's been marked W19-3 for

4    identification, and tell us if you're able to identify that.

5    A.  These are credit card records of Jon Murray.  And,

6    apparently, the credit card company has changed the name from

7    a Karen McNutt, but the account has been -- maintained that

8    now.  But these are credit card records of from, like, '93 to

9    '97 for Discover, also.

10   Q.  We'd offer W19-3.

11         MS. WILLIAMS:  Discover?

12         THE WITNESS:  Yes, ma'am.

13         MS. WILLIAMS:  No objection.

14         THE COURT:  Received.

15   Q.  (BY MR. CARRUTH) Show you what's been marked W46-1 for

16   identification.  Do you recognize those records?

17   A.  Yes, sir, 46-1 is Associates; it's a credit card, also.

18   And this is -- I believe it's of Jon Murray.  I'm trying to

19   find the name.  It's the account of Jon Murray, yes, sir.

20   Q.  We would offer W46-1.

21         MS. WILLIAMS:  No objection.

22         THE COURT:  Received.

23   Q.  (BY MR. CARRUTH) Show you now W42-1, ask you if you

24   recognize this document from Citibank?

25   A.  Yes, sir.  This is Citibank Universal Card Services, and

*Martin – Direct (Resumed)*

1   it's for the account of Jon Murray, one of his credit cards.

2   Q.  We would offer Government Exhibit W42-1.

3        MS. WILLIAMS:  No objection.

4        THE COURT:  Received.

5   Q.  (BY MR. CARRUTH) Show you now Government Exhibit 45-1.

6   A.  This is Bank of America card, I believe, of Jon Murray and

7   his credit card records.

8   Q.  Offer W45-1.

9        MS. WILLIAMS:  No objection.

10        THE COURT:  Received.

11   Q.  (BY MR. CARRUTH) Show you W44-1, sir.

12   A.  This is the American Express account of Jon Garth Murray,

13   Society of Separationists.

14   Q.  Offer W44-1.

15        MS. WILLIAMS:  No objection.

16        THE COURT:  Received.

17   Q.  (BY MR. CARRUTH) Show you W44-2.

18   A.  44-2 is an Optima card for Jon Garth Murray, appears to be

19   individual.

20   Q.  Offer Government W44-2.

21        MS. WILLIAMS:  No objection.

22        THE COURT:  Received.

23   Q.  (BY MR. CARRUTH) Show you what's been marked Government

24   Exhibit W44-3, and ask you if you can identify that, sir.

25   A.  It's an additional account of Jon Murray for -- it's an

*Martin - Direct (Resumed)*

1    American Express credit card account, another account.

2    Q.  Offer W44-3.

3         MS. WILLIAMS:  No objection.

4         THE COURT:  Received.

5    Q.  (BY MR. CARRUTH) Show you W44-1.

6    A.  Yes, sir, this is a First U.S.A. credit card, also, and it

7    is of the account of -- an account for Jon Murray.

8    Q.  Offer W43-1.

9         MS. WILLIAMS:  No objection.

10        THE COURT:  Received.

11   Q.  (BY MR. CARRUTH) Show you two exhibits now, marked W45A-1

12   and W45A-2.  Do you recognize those?

13   A.  These are Citibank Mastercard.  Yes, 45A-1 is a Citibank

14   Mastercard for Madalyn Murray O'Hair.

15   Q.  Offer W45A-1.

16        MS. WILLIAMS:  No objection.

17        THE COURT:  Received.

18   A.  And this is a -- it's like a Diner's Club although it says

19   Citibank.  It's Diner's Club for Jon Murray with United

20   Secularists -- I'm sorry, Society of Separationists.

21   Q.  Offer W45A-2.

22        MS. WILLIAMS:  No objection.

23        THE COURT:  Received.

24   Q.  (BY MR. CARRUTH) I'm now showing you, sir, what's been

25   marked for identification purposes as W41-1, W41-2, W41-3 and

*Martin - Direct (Resumed)*

1   4, combined in one exhibit.

2   A.   Yes, sir, these are the -- this is the money transfer

3   items, but I believe they're with the Western Union.   These

4   are Western Union.

5   Q.   Western Union Financial?

6   A.   Yes, sir.

7   Q.   Relating to what particular transfer?

8   A.   Transfers of -- this one is of Gary Karr to Crystal Karr,

9   looks like Patti Steffens to FM Services, and Gary Karr to

10  Christine Von.

11  Q.   Okay.   Offer Government Exhibit W41-1, 2, 3 and 4.

12       MS. WILLIAMS:   No objection.

13       THE COURT:   They're received.

14  Q.   (BY MR. CARRUTH) Please look now at W34-1.   W34-1 are the

15  records of National Rent-a-Car that relate to the Lincoln

16  Continental rented by Jon Murray?

17  A.   In San Antonio.

18  Q.   Yes, sir.   Offer W34-1.

19       MS. WILLIAMS:   No objection.

20       THE COURT:   What is that last number?

21       MR. CARRUTH:   W34-1, your Honor.

22       THE COURT:   It's received.

23  Q.   (BY MR. CARRUTH) Show you W69-1, and ask you if you

24  recognize that as a copy of a letter of immunity granted to

25  Mr. Joey Cortez or Joe Cortez by the Travis County District

*Martin - Direct (Resumed)*

1    Attorney's Office?

2    A.  Yes, I've seen this in our office.

3    Q.  We'd offer W69-1.

4         MS. WILLIAMS:  No objection.

5         THE COURT:  Received.

6    Q.  (BY MR. CARRUTH) I show you Government Exhibit W1A-1, a

7    certified copy under seal of the Secretary of the State of

8    California, regarding United Secularists of America.  Do you

9    recognize that document?

10   A.  Yes, these look like the articles of incorporation for the

11   United Secularists of America.

12   Q.  Offer WA1-1, your Honor.

13        MS. WILLIAMS:  No objection.

14        THE COURT:  Received.

15   Q.  (BY MR. CARRUTH) Show you a document, marked W36-2, from

16   U.S.A.A. Federal Savings Bank regarding Mark and Shirley

17   Sparrow.  Do you recognize that?

18   A.  Yes, sir, this is a -- relates to the documents that are

19   involved in the sale of purchase, actually, of the Mercedes.

20   Q.  As well as -- excuse me, W36-3 and 4?

21   A.  Yes, sir, this relates to the check that was used to

22   purchase and this is the CTR, I believe.

23   Q.  And all of these relate to the purchase of the Mercedes

24   Benz by Jon and Mark and Shirley Sparrow?

25   A.  Yes.

*Martin - Direct (Resumed)*

1   Q.   We would offer Government Exhibit 36-2, 3 and 4.

2        MS. WILLIAMS:   No objection.

3        THE COURT:   Received.

4   Q.   (BY MR. CARRUTH) I show you now what's been marked for

5   identification as W46A-1, W46A-2, W46A-3, W46A-4, W46A-5 and

6   W46A-6.  Can you identify these records for us, please, sir?

7   A.   Yes, sir.  These are the records that I received from --

8   they're under seal and they were received from Colin Newby in

9   Auckland, New Zealand.  He works for the New Zealand Trust

10  Financial Services.

11  Q.   All right.  And was that the source of the $600,000 that

12  was wire transferred to New Jersey and then, on to San

13  Antonio?

14  A.   Yes, sir, it was.

15  Q.   We would offer Government Exhibit W46A-1 through 6.

16       MS. WILLIAMS:   No objection.

17       THE COURT:   They're received.

18  Q.   (BY MR. CARRUTH) Show you what's been marked W92-1 for

19  identification.  Do you recognize that document, sir?

20  A.   Yes, sir, these are the e-mails that we subpoenaed from

21  Yahoo! in regards to David Waters.

22  Q.   Did they also relate to Mr. Karr?

23  A.   They also -- they contain e-mails back and forth between

24  various people including Mr. Karr.

25  Q.   We'd offer W92-1, your Honor.

*Martin - Direct (Resumed)*

1    MS. WILLIAMS:  Your Honor, I object to the exhibit

2    because it contains a great number of e-mails that are

3    completely irrelevant to this case.

4    MR. CARRUTH:  We'll be happy to let counsel go through

5    it before it goes to the jury, your Honor, and take out those

6    that she objects to.

7    THE COURT:  All right.  I will reserve on 92-1 until

8    in the morning.  Counsel will have an opportunity to go

9    through during the evening recess.

10   Q.  (BY MR. CARRUTH) Now, Mr. Martin, the purpose in putting

11   all of those exhibits in at one time is to enable you to

12   testify as a summary witness, correct?

13   A.  Yes, sir.

14   Q.  Can you tell the jury and the Court whether or not, during

15   the past, how many years have you been involved in this

16   investigation?

17   A.  Three years now.

18   Q.  That you have reviewed all of the records that have gone

19   into evidence and using general accounting principles, have

20   prepared charts and diagrams to aid the jury, if it does, in

21   deliberating and interpreting the evidence in this case?

22   A.  Yes, sir, I have.

23   Q.  Let me show you, first, sir, what's been marked for

24   identification as Government Exhibit W100-31.  Do you

25   recognize that chart, sir?

*Martin - Direct (Resumed)*

1  A.  Yes, sir, that's the chart that I had directed to be built

2  by our trial orchestrator in Kentucky.

3  Q.  And it purports to show areas among various states?

4  A.  It points to show the movement of an individual, Gary

5  Karr, during 1995.

6  Q.  And are those information on this chart either supported

7  by the records in evidence or other exhibits or the testimony

8  of witnesses who have preceded you?

9  A.  Yes, they have.

10  Q.  We would offer Government Exhibit W100-3(1) in

11  parenthesis.

12      MS. WILLIAMS:  Your Honor, the only objection I have

13  to that chart is the title of it indicates 1995, which would

14  indicate that it contains movement of my client outside the

15  scope of the alleged conspiracy.  So if it does, that's my

16  objection.

17      THE COURT:  I'll let you ask a couple of more

18  questions.

19      MS. WILLIAMS:  I'll withdraw my objection, your Honor,

20  based on counsel's assertion.

21      THE COURT:  All right.  100-31 is submitted.

22      MR. CARRUTH:  Thank you.

23  Q.  (BY MR. CARRUTH) Now, with the permission of the Court,

24  could you come down here on the pointer and indicate to the

25  jury what these lines back and forth indicate as they relate

*Martin - Direct (Resumed)*

1   to the interstate movement of Mr. Karr during 1995, during the

2   time frame of the alleged conspiracy?

3   A.   Yes, your Honor.   This movement shows the -- him leaving

4   Vienna, going to Chicago, where he stayed with Francis

5   Cuccinata.   Moving down to New Port Richey, where he lives

6   around, or near, or maybe with Charlene Karr, then he moved to

7   Austin and was with David Waters here at times.   The movement

8   then -- as the arrow shows, it moved back and forth, so there

9   are times that he moves back to New Port Richey.

10         Then, also shows movement to Buda, Texas, where the

11   Interstate Inn is located.   Then, down to San Antonio, where

12   the Warren Inn is located.   Then, from San Antonio, the arrow

13   goes back and forth to New Jersey, where the Boonton Bank or

14   the Nat West, or National Westminster Bank, is located, where

15   the $600,000 transfer was done on September the 21st.   And

16   then, returns on September the 22nd to San Antonio.

17         From that, also, there was a movement indicating here

18   from Austin to Camp Wood, and that is indicated by his

19   statement to me when I talked with him.

20   Q.   Thank you, sir.   Now, the next exhibit, sir, is marked

21   Government Exhibit W100-O3, paren 2.   Does that show a similar

22   interstate movement by Mr. David Waters during the time frame

23   in question?

24   A.   Yes, sir, it does show similar movement.

25   Q.   And we would offer at this time Government Exhibit W100-3,

1   subsection 2.

2          MS. WILLIAMS:  No objection.

3          THE COURT:  Received.

4          MR. CARRUTH:  Thank you.

5   Q.  (BY MR. CARRUTH) Could we please display that for the jury

6   now and indicate to them what those directions of travel were?

7   A.  Yes, sir.  Initially, the movement is from Austin to Buda,

8   and then, Buda back and forth -- or, actually, to San Antonio

9   and back and forth to Austin.  Then, the movement also is from

10  Austin to Dallas, and then, from -- this should be back and

11  forth.  This arrow should be -- oh, it is two.  It's to New

12  Port Richey via vehicle.  It wasn't an arrow like there kind

13  of indicates.

14         And then, moving from New Port Richey to Naples,

15  Florida.  Then, from Naples, Florida back to New Port Richey.

16  New Port Richey to New Orleans, Louisiana, and then, back to

17  Austin, Texas.  From Austin -- prior to that, though, the

18  movement was also from Austin to Camp Wood, Texas.  Then,

19  there's movement, also, from Austin to Dallas, Texas and back.

20  Q.  Now, you mentioned the movement between New Port Richey

21  and Naples, Florida.  Is that same movement also shown on the

22  movement of Gary Karr down here?

23  A.  Yes, sir, it is.

24  Q.  And is that the trip to see Bob Fry regarding the alleged

25  letter?

*Martin - Direct (Resumed)*

1    A.   That represents the trip to Bob Fry.

2    Q.   Thank you.   The next chart, sir, is marked for

3    identification W100-3, subsection 3.   And does that relate to

4    the interstate movement of Danny Fry during the time frame in

5    question?

6    A.   Yes, sir, it does.

7    Q.   We'd offer that at this time, your Honor, W100-3, 3 in

8    parenthesis.

9         MS. WILLIAMS:   No objection.

10        THE COURT:   Received.

11   Q.   (BY MR. CARRUTH) Please tell the jury what that was.

12   A.   Yes, it represents Danny Fry coming from Austin -- I mean,

13   from Naples, Florida to Austin in July of 1995, and Danny Fry

14   moving from Austin to Buda, from Buda -- in Buda, where he was

15   at the Interstate Inn, and then, from Buda to the Warren Inn,

16   and then, back to Austin on September 23rd -- September 30th.

17        And then, he travels and his body is found in Dallas

18   -- southeast of Dallas on October the 2nd.

19   Q.   All right, sir.   And finally, we have the chart marked

20   W100-3, subsection 4, showing interstate movement of Jon Garth

21   Murray during 1995.

22        MS. WILLIAMS:   No objection.

23        MR. CARRUTH:   We would offer W100-3, subsection 4.

24        THE COURT:   Received.

25   Q.   (BY MR. CARRUTH) Would you please explain to the jury what

*Martin - Direct (Resumed)*

1  these travel arrows indicate with regard to Mr. Murray?

2  A.  Yes, sir.  Mr. Murray traveled, initially in July, from

3  Austin to New Jersey -- actually, to New York to visit the

4  area in which they were going to picket the Pope.  He flew

5  back to Austin.  Then, they flew -- the family flew to

6  Richmond, Virginia and that area where they met with Arnold

7  Via.  And they returned to Austin shortly before the end of

8  August, 1995.

9       Then, the movement then is from Austin to Buda at the

10  Interstate Inn.  Then, from Buda to San Antonio, where they

11  were at the Warren Inn.  And then, this arrow here represents

12  Jon Murray flying to New Jersey on August the -- I'm sorry,

13  September 21st and returning on September 22nd.  And that's

14  what it shows.

15  Q.  Thank you, sir.  Agent Martin, in order to aid the jury,

16  if it does, in interpreting the evidence, have we prepared

17  blowups of calendars for the months of August, September and

18  October of 1995?

19  A.  Yes, sir, there are blank calendars representing August,

20  September and October 1995.

21  Q.  And those are marked for identification W100-71, 72 and

22  73; is that correct?

23  A.  Yes, sir, it is.

24  Q.  And we would offer that at this time, your Honor.

25       MS. WILLIAMS:  No objection.

*Martin - Direct (Resumed)*

1    THE COURT:  Received.

2  Q.  (BY MR. CARRUTH) Now, after your analysis of the evidence

3  in this case, sir, have you prepared a time line based on the

4  evidence that has been presented either by the testimony of

5  witnesses or by the exhibits and records that have been

6  introduced into the record?

7  A.  Yes, sir, I did.

8  Q.  I show you first what's been marked as Government Exhibit

9  W100-61.

10    MS. WILLIAMS:  No objection.

11    THE COURT:  Received.

12  Q.  (BY MR. CARRUTH) Could you please come back down here and

13  with your pointer, briefly run the jury through this and what

14  it indicates, the significant dates in question.

15  A.  First of all, the information that we obtained was from

16  the witnesses' testimony in this trial.  And the telephones,

17  you'll see here, represent cellular phone calls or, at this

18  point, telephone calls between Mr. Waters and Mr. Karr, then

19  Mr. Waters and Mr. Osborne.

20    And in this instance here, 1994, the first one up here

21  is the arrest of Mr. Waters and -- on the theft of $54,000

22  from the American Atheist and from Jon Murray.  The remainder

23  is we have a lot of telephone records, and I attempted here to

24  summarize those phone records so that you can see the various

25  phone calls being made.

*Martin - Direct (Resumed)*

1         Initially, these are two phone calls that are collect

2    in December of 1994 from Mr. Karr to Mr. Waters.  And as a

3    result, what I've got, again, is that the next phone calls are

4    of Mr. Karr calling and it says where he's calling from,

5    Vienna, Illinois.  And then, things change because Mr. Karr is

6    paroled and then -- when he was paroled, he then resides with

7    Francis Cuccinata, who he then starts to call Mr. Waters from

8    Ms. Cuccinata's home.

9         He then buys a ticket here on his Discover card -- or

10   Discover card that Ms. Cuccinata and he had together.  I

11   believe it was Discover -- Southwest Airlines and comes to

12   Austin.  There are a number of phone calls, then, that start

13   from David Waters' residence to Lisa Jones' home, indicating

14   to me that that would be -- he would be calling Danny Fry.

15        MS. WILLIAMS:  Your Honor, I'm going to object to any

16   indications to Agent Martin what his conclusions are from his

17   summary of these records.

18        THE COURT:  Sustain the objection.

19        THE WITNESS:  Yes, sir.

20   A.   Waters then pled guilty May of 1995 to the $54,000 theft.

21   There are a number of other telephone calls being made between

22   Mr. Karr and Mr. Osborne and Mr. Waters and Mr. Fry.  The

23   O'Hairs have asked to -- for a restraining order against Mr.

24   Waters in June.  They erect a fence in June of 1995 around the

25   American Atheist Headquarters.

Martin - Direct (Resumed)

1          There are additional telephone calls here between Mr.

2    Karr and Mr. Waters, Mr. Fry and Mr. Waters.  Then, Mr. Fry

3    travels to Austin.  This is approximately July of -- July

4    18th, 1995.  Mr. Karr is employed by Mr. Art Miller.  These

5    are the dates that he was employed by Mr. Miller.

6          Then, the American Atheist Newsletter is published,

7    reflecting the criminal history of Mr. David Waters and the

8    fact that they had employed him.  There are a number of other

9    telephone calls from Mr. Waters to Mr. Karr.  There's travel

10   here to Texas by Mr. Karr in -- sometime in August.

11         Then, the O'Hairs leave Austin and they go to Virginia

12   and stay with Mr. Arnold Via.  From there, Art Miller pays Mr.

13   Karr in August -- on August 23rd, 1995 for his labor in

14   working at his residence.  Mr. O'Hair then cuts a check to the

15   Four Seasons Travel for the trip of Madalyn Murray for her and

16   Robin Murray O'Hair to the October picket the Pope.  That's a

17   prepaid ticket.

18         Mr. Karr then travels to Austin on the 25th.  There is

19   a rental of a van, van No. 1 as it's referred to.  Van No. 1

20   is rented.  It is a Ford Windstar, teel in color, rented by

21   Mr. Karr.  The van was rented by a credit card paid, actually,

22   in cash.

23   Q.  Show you the next chart, Agent Martin, and it continues

24   the time line, marked for identification as Government's

25   Exhibit W100-6, subsection 2.  And we would offer it at this

1   time.

2          MS. WILLIAMS:  No objection.

3          THE COURT:  It's received.

4   A.  I want to correct myself.  I stated that Mr. Karr came to

5   Austin on a Discover card.  It was actually a Mastercard that

6   he had with Mrs. Cuccinata.  August the 27th, the O'Hairs were

7   last seen -- at least they were at their location and seen by

8   Mr. Albarado.  Mr. Karr advised me that he moved the Porsche

9   to the Austin Airport on or about August the 27th.

10         On the 27th, the Interstate Inn is rented.  The

11  Interstate Room No. 219 is rented at the Interstate Inn by Mr.

12  David Waters.  Ms. Steffens received a phone call from Capps

13  about the return of a van.  Then, there is a note left on the

14  door of the American Atheist General Headquarters on August

15  28th, but the note is dated August the 27th.  It says that we

16  won't be back.  We've been called out of town on emergency and

17  we won't be back until September 15th.

18         Mr. Waters then rents the Interstate Inn a second

19  night, the 28th, and stayed -- the room is rented.  Then, Mr.

20  Waters and Mr. Karr register at Warren Inn on August the 28th,

21  and they register from August the 28th through September the

22  27th -- September the 27th.  They pay in advance.

23         Then, the rental car or the rental van is returned to

24  Austin, van No. 1 is returned to Austin.  That then proceeds

25  to be -- and you'll notice that these are green indications of

*Martin - Direct (Resumed)*

1   money.  Jon Murray issues two checks, $1500 each for a total

2   of $3,000 on August the 28th.

3         Mr. Fry leaves Austin and is not seen by Ms. Patti

4   Steffens again until September the 30th.  Mr. Tyson, after

5   seeing this letter, this note on the door, goes to the

6   O'Hairs' residence on Greystone and leaves a note in the door,

7   checks on the dogs, sees the garage door open.

8         Mr. Fry, who is now at the Interstate Inn, calls Lisa

9   Jones from the Interstate Inn and the truck stop, 221 Truck

10  Stop there.  Then, the next day, September the -- I mean,

11  August the 29th, Mr. Karr calls Lisa Jones from the Warren Inn

12  Apartments.

13        MS. WILLIAMS:  Excuse me.  You mean Mr. Fry.

14  A.  Mr. Fry, I'm sorry, not Mr. Karr.  Mr. Fry calls Lisa

15  Jones, his girlfriend, from the Warren Inn in San Antonio.

16  Robin Murray O'Hair then calls the Griffith Hospital about her

17  animal.  She's concerned about them.  She advises she had a

18  death in the family.  Griffith goes by and picks up the dogs

19  from the residence.  Mr. Tyson returns to the residence the

20  next day, checks the house, finds the dogs are gone and the

21  garage door still open, and the note is gone.

22        Then, again, there's another withdrawal of cash.  Mr.

23  -- I'm sorry.  Mr. Karr, in this instance, sends a money gram

24  to Charlene Karr for $3,361 plus a fee.  And at the same time,

25  Mr. Karr sends to Lisa Jones a money gram for $2,700 plus a

*Martin - Direct (Resumed)*

1   fee.  So $6,319 was spent at that point in time.

2           On August the 30th, Jon Murray issued check No. 1513

3   for $2,000 to cash, cashes that check, and a check No. 215 on

4   another account for $9,000, cashes that check, for a total of

5   $11,000.  On August the 31st, Jon Murray rents a Lincoln

6   Towncar in San Antonio from National Rent-a-Car.  He had

7   rented it on -- to be returned on September the 14th.

8           Then, on August the 31st, again, Jon Murray issues a

9   check No. 216 for $6,500 to cash and makes a bank debit of

10  $400.  So he obtains $6,900 out of the bank on August the

11  31st.  Jon Murray's cellular call, he's making phone calls

12  through MCI WorldCom, at 7:00 p.m. at night, to call -- and

13  looks like his first call to New Zealand.  New Zealand is a

14  15-hour difference in time or 16 hours difference in time from

15  us.  Jon Murray's cellular phone, again, called WorldCom in

16  New Zealand.

17          Mrs. Steffens -- Ms. Steffens receives an envelope

18  with $5,000 in cash left behind by Mr. Waters in -- sometime

19  in this time sequence.  Then, Jon Murray is -- on September

20  5th, again, is calling New Zealand and through his MCI card.

21  There is a signature card that was signed by John Murray on

22  September the 5th and returned to the Nat West Bank, which

23  established a United Secularists account number, too.  And it

24  also -- I think United Secularists No. 1.

25          On the 5th of September, the 300 SEL Mercedes Benz,

Martin - Direct (Resumed)

1   owned by the -- by Jon Murray, was sold to Mark Sparrow for

2   $16,000.  A cashier's check was issued and that check was

3   subsequently cashed.  I missed here, on September the 1st,

4   this was the first of three prescriptions being filled by the

5   Drug Emporium in San Antonio for Madalyn Murray O'Hair's

6   prescriptions.

7          In September, again, Mr. Tyson advised that the

8   Donahue Show was calling for Madalyn Murray O'Hair to be on

9   that show.

10  Q.  As a continuation of the time line, your Honor, we would

11  offer Government Exhibit W100-6, subsection 3.

12         MS. WILLIAMS:  No objection.

13         THE COURT:  It's received.

14  A.  Mr. Murray's cellular phone is, again, is calling a number

15  of types on the cellular phone out to New Zealand on his MCI

16  card.  Then, on September the 8th, Mr. Murray issues a check

17  for $2,000 to the City of Austin Utilities.  Mr. Murray's

18  cellular phone calls a number of the credit card companies

19  that we have -- that we have here.

20         And then, Mr. Tyson, on September the 11th, receives a

21  letter that was dated September the 7th, which -- in which the

22  -- he's told about the operation, and he's given this check

23  for $650 and some keys and a security code.  And then, again,

24  there are a number of telephone calls made on the cellular

25  phone of Mr. Murray to -- this Fleet Bank is actually the bank

1   that -- it took Nat West.  So that is the Nat West Bank he was

2   calling.

3           And then, there's another of -- this is a credit card

4   company and this Cirrus cash machine located -- it's like a

5   company -- a number that you would call to tell you where you

6   can cash certain types of -- I mean, you could use certain

7   types of credit cards.

8           Jon Murray's cellular phone then calls Nat West again,

9   answer service, and for the first time, Mr. Murray's phone --

10  cellular phone calls Corey Ticknor on September the 12th.

11  Then, he calls, again, a number of different places, different

12  credit card companies.

13          Then, on September the 12th, Mr. Murray receives two

14  wire transfers from New Zealand in the amount of $4,000, which

15  went to his Frost National Bank account, and a $3,132 amount

16  that went to the National -- I mean, Nat West Bank, which went

17  to the United Secularists account.

18          Mr. Murray then is making phone calls to New Zealand.

19  He's calling various other places.  Looks like he calls -- he

20  was supposed to return his rental car on September the 14th,

21  so he is calling National Rental Car at that point.  Calls

22  Discover card a number of times.

23          Then, on September 14th, also, he withdraws a total of

24  $9,500 from three credit cards.  On the 15th, Mr. Murray makes

25  additional phone calls to various -- the cellular phone makes

*Martin - Direct (Resumed)*

1  phone calls to various credit card companies.  On September

2  the 15th, there are also various credit card companies plus

3  Americus Diamond.

4      On September the 15th, again, there's a wire transfer

5  of $8,136.25, which is received by the Nat West Bank, on one

6  of the United Secularists account.  On the other account, an

7  additional $12,457.90 was received on the other United

8  Secularists account at Nat West Bank.

9      Then, on September the 15th, credit card is withdrawn

10  on for the total of $3,650, these various credit cards.  The

11  O'Hairs were supposed to return to Austin on September the

12  15th in accordance with the letters that they had written.

13  And at this point, September the 15th -- this is Saturday,

14  September the 16th -- yes.

15      Waters purchased a 1990 white Cadillac Eldorado for

16  $13,000 from the McKeegans, and that was a San Antonio

17  purchase and -- then, next, September the 16th, Mr. Karr was

18  also -- I'm sorry, was present during that particular purchase

19  of that vehicle.

20      MS. WILLIAMS:  Your Honor, I object to that as a

21  misstatement of the testimony.

22      THE COURT:  The jury will recall what the testimony

23  is.

24      THE WITNESS:  I'm sorry, sir.

25      THE COURT:  You may proceed.

*Martin - Direct (Resumed)*

1  A.  September the 16th, Mr. Karr sent $800 from Austin to his

2  daughter, Charlene Von, via Western Union.  Mr. Karr also sent

3  $2,000 to -- via a money gram to Charlene Karr.  On September

4  the 16th, Ellen Johnson issued a check for a thousand dollars

5  to John Murray and sent it to him Federal Express.

6       On September the 16th, American Express card was used

7  to purchase Americus Diamond, a diamond at Americus Diamond

8  for $6,665.42.  On September 19th, Jon Murray received a

9  package containing the -- I messed up again.  Receiving a

10  package containing that thousand-dollar check from Mrs. Ellen

11  Johnson.

12       I missed here, on September the 15th, that another

13  prescription was filled for Madalyn Murray O'Hair at the Drug

14  Emporium.  There are a number of calls to various banks.

15  Then, Ms. Steffens received $11,000 in cash in an envelope

16  from Mr. Waters, and Ms. Steffens spent -- sent via Western

17  Union a payment to FM Services.

18  Q.  (BY MR. CARRUTH) As a continuation of the time line, your

19  Honor, the government would offer W100-6, subsection 4.  I

20  believe we're going to need some tape if there's any

21  available, your Honor.  As modified, we re-offer this exhibit,

22  your Honor.

23       MS. WILLIAMS:  No objection.

24       THE COURT:  Received, 100-6.

25       MR. CARRUTH:  Thank you.

*Martin - Direct (Resumed)*

1   A.   On September the 18th, Ms. Steffens' mother arrives in

2   Austin.   On September the 19th, John Murray's cellular phone

3   was calling, first, Frost National Bank.   Mr. Murray, on

4   September the 19th, deposited a check for a thousand dollars,

5   he transfers $4,000 in cash, a check for $3,000.   He

6   transferred the check from one account to another and then,

7   wrote a check number of 2,049 on that account.

8          On September the 20th, Mr. Murrays' cellular phone is

9   calling a number of different banks, including Nat West Bank,

10  mainly in New Jersey these phone calls are being made to.

11  Then, on September 20th, Mr. Fry calls Lisa Jones and at the

12  Warren Inn, at 12:00 noon.   September the 20th, Mr. Jon Murray

13  calls or cellular phone called a number of jewelry stores and,

14  again, called Corey Ticknor's Jewelry Store.   In addition to

15  that, he calls Continental Airlines.

16         On the 21st, Murray called Corey Ticknor's Jewelers,

17  Centennial Precious Metals, the Nat West Bank and Petry

18  Travel.   Mr. Murray then went to Petry Travel and at 2:45,

19  purchased a ticket for him and a Mr. C Johnson, Conrad

20  Johnson, to go to New Jersey.   He paid for it with his

21  American Express credit card.

22         Mr. Murray called and spoke to Mr. Corey Ticknor about

23  noontime.   And then, at 5:00 in the afternoon, Mr. Murray,

24  along with Mr. Conrad Johnson, left for New Jersey.   Mr.

25  Murray's cellular phone is called from his -- Mr. Murray's MCI

1   phone card while Mr. Murray is in New Jersey.

2        Then, the $600,000 that -- a $600,000 wire transfer is

3   made from the Nat West Bank in New Jersey to the Frost

4   National Bank in the account of Corey Ticknor.  Mr. Murray

5   then, his cellular phone, Mr. Murray called -- his cellular

6   phone, again, three times from New Jersey.

7        Mr. Murray called Austin -- this is on September 22nd

8   still.  And he called -- his cellular phone called North

9   Austin Medical Center and Corey's Fine Jeweler twice.  On a

10  date not certain, Bob Fry sent a letter -- I'm sorry.  Danny

11  Fry sent a letter to Bob Fry through Lisa Jones.

12       On September 22nd, Mr. Jon Murray entered a bank in

13  New Jersey and cashed a check for $12,000.  That was at the

14  Nat West Bank in Newark, New Jersey.  On September the 22nd,

15  Jon Murray travels to San Antonio with Mr. C. Johnson, and

16  they arrive in San Antonio.  The expenses there -- they stayed

17  in a hotel and expenses were paid with an American Express

18  credit card.

19       The wire transfer to Corey Ticknor was received about

20  10:28 a.m. in the amount of $600,000.  A call to and from Mr.

21  Murray's cell phone to Corey Ticknor on the 22nd.  On the

22  23rd, Mrs. O'Hair's -- Ms. O'Hair's third prescription was

23  filled at a Drug Emporium in San Antonio.

24       On the 23rd, again, of September, Mr. Waters instructs

25  Ms. Steffens to rent a storage unit on Burnet Road, and she

*Martin - Direct (Resumed)*

1    rents Unit 1640.  On September 23rd and 24th, this is the

2    Pecan Street Festival, and after one night, Mr. Waters is in

3    Austin.  He asked Ms. -- Ms. Steffens sees a shovel and a bow

4    saw in the trunk of his Cadillac.

5         Waters instructs Ms. Steffens, also, in that period of

6    time to go and wash his Camaro and get the dirt specifically

7    out of the wheelbarrows.  Mr. Corey Ticknor, on Monday,

8    September the 25th, purchases through Dillan Gage 500 --

9    $600,000 worth of gold.

10        MR. CARRUTH:  Continuing the time line, your Honor, we

11   offer Government Exhibit W100-6, subsection 5.  I believe the

12   defense has an objection to -- Mr. Martin.  As modified, your

13   Honor, the Government offers W100-6, 5 in parenthesis.

14        MS. WILLIAMS:  No objection.

15        THE COURT:  All right.  It's received.

16   A.  And continuing, September 26th, Mr. Osborne rented a

17   Public Storage unit and that's the Unit No. F052 at Public

18   Storage Unit, prepaid to December 1995, receiving funds he

19   paid with money received from Patti Steffens.  Ms. Steffens

20   purchased a 1983 GMC pickup truck.  On September 27, Mr.

21   Ticknor is calling -- I mean, Mr. Murray's cellular phone is

22   calling Mr. Ticknor and Capps Rental Car.

23        On September the 27th, van No. 2, the van is a Ford

24   cargo van -- is rented from Capps Rental Car here in Austin,

25   Texas.  On September the 28th, the rental of room No. 11 is

*Martin - Direct   (Resumed)*

1    extended for three days.  On September the 28th, a cellular

2    phone receives incoming calls from Corey Ticknor's and from

3    Corey Ticknor's Fine Jewelers.

4          On September 28th, Mr. Ticknor enters his safe deposit

5    box at the Frost National Bank to deposit gold received.  On

6    September the 29th, Jon Murray's cellular phone called New

7    Jersey, called Corey Ticknor, Society of Separationists, and

8    this is the last telephone call made by that cellular phone.

9    It was at 12:23 p.m.

10         On September the 29th, continuing, Mr. Ticknor

11   released $500,000 in gold bullion to Jon Garth Murray.  And

12   Mr. Albrecht was present with Mr. Ticknor.  In 1995, Mr.

13   Waters and Mr. Karr went to the Burnet Storage unit at 1640,

14   unit No. 1640, in Austin, Texas, for the transfer of the gold.

15         September the 30th, Mr. Murray's Lincoln Continental

16   Towncar is returned to the San Antonio Airport, the National

17   Rent-a-Car.  On October the 30th, Public Storage Unit is

18   accessed at 8:54, 10:51, 12:21.  Between -- it says here in

19   September, October, Mr. D. Coryell, manager of Public Storage,

20   saw three men with 55-gallon barrels and two pickup trucks in

21   the vicinity of Unit F052.

22         On September 30th, Ms. Steffens' mother, Ms. Wise,

23   sees David Waters' car and Fry at Grace's, a restaurant,

24   having breakfast.  And Mrs. Wise leaves Austin.  Van No. 2 is

25   returned at 11:41 to Capps Rent-a-Car on September the 30th.

Martin - Direct (Resumed)

1  On September the 30th, Lisa Jones was called by Danny Fry from

2  Waters' apartment at 2:27 p.m., 16th birthday of Lisa Fry,

3  last time Danny Fry is heard from.

4       On September the 30th, Waters, Fry and Karr returned

5  to the apartment in Austin, physically exhausted.  Waters

6  returned with lots of money, expensive clothes and a Raymond

7  Weil watch.  On September the 30th, Steffens saw three pairs

8  of bloody tennis shoes in the bag of the apartment of Waters.

9       On September the 30th, Danny Fry slept and awoke when

10  Steffens packed his suitcase.  Waters hateful to Danny Fry.

11  On September the 30th, Waters, Fry and Karr leave the

12  apartment and are gone overnight.  On October 1st, Public

13  Storage unit is entered at 9:54 p.m. for 21 minutes.

14       On October the 2nd, Mr. Karr calls Charlene Karr at

15  her residence.  On October the 2nd, Public Storage Unit No.

16  F052 is accessed at 9:24 for 23 minutes.  On October the 2nd,

17  Mr. Karr rents a van, a cargo van at Capps Rental Car, at

18  10:51 in the morning, and is, again, rented by credit card and

19  paid by cash.

20       The -- on October the 2nd, the Public Storage unit at

21  052 is entered again at 10:53, and the exit is not recorded.

22  On October the 2nd, Danny Fry's body is found at 2:30 in the

23  afternoon in Southeast Dallas, missing his head and his hands.

24  On October the 2nd, Corey Ticknor received the remaining

25  $100,000 in gold coins and deposits in a safe deposit box and

*Martin - Direct  (Resumed)*

1    never claimed by Mr. Murray.

2         On October the 2nd, Mr. Karr called Ms. Karr again in

3    Florida.

4         MR. CARRUTH:  Okay.  And continuing the time line,

5    your Honor, we offer Government's  W100-6(6).

6         MS. WILLIAMS:  Your Honor, I have several objections

7    to this item.

8         THE COURT:  Members of the jury, I'll give you a

9    break.  You may use the facilities, stretch, be ready to come

10   back in ten minutes.

11       (Jury not present.)

12        MS. WILLIAMS:  Your Honor, in a continuing effort to

13   respond to our subpoena, Mr. Hawkins has just delivered some

14   new items to us from the Austin Police Department, missing

15   person's file.  I want to make the Court aware that there is

16   -- I don't know what's in there, I haven't had a chance to

17   look at it, but we're receiving it.

18        THE COURT:  Still on the same subpoena?

19        MR. HAWKINS:  Yes, your Honor.  What happened is one

20   officer had gotten subpoenaed and had gone through the file

21   and pulled out some materials before we had gotten the other

22   subpoena to do it.  And he's now in the Family Violence

23   Section, and so we called him up -- or he was contacted by the

24   subpoena, and he said, "Oh, I bet you I have some of those

25   originals."

*Martin - Direct (Resumed)*

1          So I asked him to fax that over to me as soon as he

2     can.  I went through the material.  The material that you

3     provided that was new, I did with my own handwriting and wrote

4     "new" on it.  The material that we had already previously

5     provided that he also sent to me, I did that, too, so they're

6     already separated.

7          THE COURT:  Thank you, Mr. Hawkins.

8          MR. HAWKINS:  Hopefully no more problems.

9          THE COURT:  How are we on the exhibit now?

10         MR. CARRUTH:  This is the last one, your Honor, then

11    we have a few more on financial transactions.  And I

12    anticipate we'll be through in less than an hour.  Hopefully

13    by 5:00.  At least we'll pass the witness, your Honor.  We're

14    ready.  Your Honor, before we display this chart, though, we

15    will elicit some testimony from Agent Martin so it will

16    comport with what's on there.  Very short if I may do it from

17    just standing there.

18         THE COURT:  We'll all take a little break.  Five to

19    six minutes.

20       (Recess.)

21         THE COURT:  All right.  Bring the jury back.

22       (Jury present.)

23         MR. CARRUTH:  Thank you, your Honor.  If it pleases

24    the Court, before we offer this final exhibit of the time

25    line, I'd like to ask Agent Martin, who's still under oath, a

*Martin - Direct (Resumed)*

1  couple of questions for its admissibility.

2  Q.  (BY MR. CARRUTH) Agent Martin, did you determine during

3  your investigation that between 1996 and 1999, until he was

4  arrested, did Mr. David Waters prepare a manuscript for

5  publication about the O'Hairs' disappearance?

6  A.  Yes, sir, he did.

7  Q.  Did you also determine that he maintained a web site in

8  which he sold O'Hair memorabilia?

9  A.  Yes, sir.

10 Q.  And what was the name of that web site, if you know?

11 A.  It was named Madalyn's Attic.

12 Q.  And was that over the internet?

13 A.  Yes, sir, it was posted on Cool Chat.

14 Q.  And did your investigation determine during that same time

15 frame, between 1996 and the spring of 1999, when he was

16 arrested, that Mr. David Waters and Mr. Gary Karr, the

17 defendant, maintained regular contact through personal

18 visitation, telephone calls and e-mails?

19 A.  Yes, sir.

20 Q.  Thank you.  With that predicate, your Honor, we would

21 re-offer Government Exhibit W100-6(6).

22        MS. WILLIAMS:  No objection.

23        THE COURT:  Received.

24 A.  Continuing with the time line, October the 2nd, Ms.

25 Steffens sent a money gram to Crystal Karr.  October the 2nd

*Martin - Direct (Resumed)*

1  to the 4th, there is a picketing of the Pope, which Madalyn

2  Murray O'Hair, Jon Murray were scheduled to picket the Pope in

3  New York and never appeared.

4         On October the 3rd, the gold coins were stolen from

5  the Burnet Storage Unit.  On October the 3rd, after a call

6  from David Waters, Steffens contacted the Burnet Storage Unit

7  concerning the empty Unit No. 1640.  On October the 3rd, Four

8  Seasons Hotel, David Waters and Ms. Steffens checked in, and

9  Mr. Karr checked in with Ms. Charlene Karr.

10        On October the 3rd, Mr. Karr called Charlene Karr in

11 Florida, called the number in Florida, and she flew in to

12 Austin and drove to the Four Seasons Hotel.  On October the

13 3rd, a rental van No. 3 was returned at 6:12 p.m. to Capps

14 Rental Car.  October 4th, the Four Seasons Hotel, Mr. Waters

15 checked out, Mr. Karr checked out.

16        On October the 4th, Mr. Karr and Charlene Karr leave

17 Austin for Florida.  On October the 4th, David Waters gave Mr.

18 Karr three Rolex watches before Karr left Austin.  On October

19 the 5th, Ms. Steffens received a call from Danny Fry -- from

20 the Fry -- from Fry's daughter Lisa and questioned the

21 whereabouts of Danny Fry.

22        On October the 5th, Bob Fry called Mr. Waters

23 regarding the whereabouts of Danny Fry.  On October the 5th,

24 Waters and Steffens called Charlene Karr in Florida, that

25 phone number.  On October the 6th, Bob Fry called Waters

Martin - Direct (Resumed)

1    regarding the whereabouts of Danny Fry and mentioned a letter.

2         On October the 6th, Waters, Steffens called Charlene

3    Karr's number again in Florida.  On October -- or in October,

4    around this period of time, Mr. Tyson entered the O'Hairs'

5    residence and viewed the attic and found the suitcases and

6    walker gone.  On October 7th, Waters and Steffens drive to

7    Florida and stayed with the -- with Karr -- with the Karrs for

8    a few days.

9         On October the 8th, Waters called Bob Fry to get his

10   address to deliver a letter.  Waters and Karr went to Bob

11   Fry's residence and Waters carried a gun.  On October the

12   10th, Waters and Steffens, driving back to Austin, stayed in

13   New Orleans at the Royal Sonesta.  On October the 11th, Waters

14   and Steffens arrive in Austin and called Charlene Karr's

15   number.

16        On October the 11th, the birthday of Ron Waters, and

17   he received a Nine-Millimeter weapon after that.  On October

18   the 12th, Mr. Karr returns to the job at Art Miller, and he's

19   working October the 12th through the 20th.  October the 28th,

20   the Public Storage records of -- for Unit No. 052 reflect that

21   a relative was to come by and to take a lock off of -- take

22   the lock by October the 3rd and refund to be sent to Osborne

23   at West Tawakoni, Texas address.

24   Q.  On October 29th, Steffens drove Waters to the Public

25   Storage Unit.  October -- F052.  Waters uses a spray bottle

*Martin - Direct (Resumed)*

1  with bleach solution, sprayed the unit.  Public Storage

2  records for a unit 052 reflect that it was accessed at 3:05 in

3  the afternoon and exited at 3:12 in the afternoon.

4  On October 30th, Public Storage records reflect that

5  unit -- the tenant refund requested $172 issued to Mr.

6  Osborne.  The unit was emptied on October the 31st.  Mr.

7  Waters, on October the 31st to November the 4th, Waters and

8  Steffens called Charlene Karr in Florida, numerous times.

9  In October -- in November 1995, Mr. Gary Karr and

10  David Waters drive to Camp Wood, Texas.  November to December

11  1995, Waters and Steffens call Charlene Karr in Florida

12  numerous times before Christmas.  On October the 18th through

13  the 31st, Waters and Steffens take a trip to Peoria for

14  Christmas.  David Waters removed the barrel from the gun of

15  Mr. Ron Waters.

16  1996 to 1999, Mr. Waters prepared a manuscript

17  publication about the O'Hairs and maintained a web site,

18  referred to Madalyn's Attic, which resold Madalyn O'Hair

19  memorabilia.  1996 to 1999, David Waters and Gary Karr

20  maintained contact through visitations and telephone calls and

21  e-mails.

22  Q.  (BY MR. CARRUTH) Now, just one point of clarification,

23  Agent Martin.  Throughout your time line, you've made several

24  references to Waters and Steffens phone to be used to call

25  someone.  Is it a fair statement of the evidence that they

*Martin - Direct (Resumed)*

1   both were living together at that time and both had access to

2   that particular telephone?

3   A.  Yes, sir.

4   Q.  So could have been one or the other instead of both of

5   them at the same time?

6   A.  Yes.

7   Q.  All right.  Now, utilizing your financial investigative

8   technique, did you prepare a spreadsheet based upon the

9   financial aspects of this case to show the income allegedly

10  received by principals and the expenditures made by the

11  principals on the other side?

12  A.  Yes, sir.

13  Q.  Sort of a incoming, outgoing chart?  We offer Government

14  Exhibit W100-51.

15          MS. WILLIAMS:  No objection.

16          THE COURT:  It's received.

17  Q.  (BY MR. CARRUTH) Could you run through this just as

18  briefly as possible, please?

19  A.  Yes.  This is referred to as a source and application of

20  funds.  It is a common technique used by the Internal Revenue

21  Service to determine unreported income.  What I have on this

22  side is the sources of money.  It represents checks in this

23  particular month.  This is the month of August, and it

24  represents checks issued by Jon Murray.

25          And, also, a debit memorandum here for withdrawal of

*Martin - Direct (Resumed)*

1  funds.  That total withdraw was $20,090 in August.  At the

2  same time, accounting for the money being spent by David

3  Waters for the hotel and the Interstate Inn for receiving --

4  Patti Steffens receiving $5,000, and the various other things

5  that were paid for during that particular month, and money

6  grams, and things that were sent by Mr. Karr -- Mr. Karr to

7  Charlene and to Lisa Jones, the total expenditures during that

8  month of these funds that we could account for was $12,268.41.

9  Q.  Okay.  Continuing with W100-52.  We would offer as

10 modified W100-52, your Honor.

11      MS. WILLIAMS:  No objection.

12      THE COURT:  It's received.

13 A.  This is a continuation as to the month of September.  And

14 in addition to checks issued here, there were also credit card

15 withdrawals and advances.  It's also a few unusual items in

16 that this is cash proceeds from the sale of the Mercedes that

17 are available.  It was cashed $15,000.  And in this instance,

18 this is the purchase of the Americus diamond for $6,665.42.

19      All the other items are in credit cards are check

20 withdrawals, and that total amount of sources of funds and

21 items which would generate cash is total $60,665.92.  On this

22 side, there are a number of expenditures that I accounted for

23 from review of the records, and they total -- I applied the --

24 I pushed or put the receipt of the diamond as income item and

25 an expenditure item, because Mr. Waters has possession of that

*Martin - Direct (Resumed)*

1    diamond.

2        As a result, in this instance, there are a number of

3    different expenditures, one being Steffens receiving $11,000

4    in cash from David.  Mr. Karr sending his daughter, Christina,

5    a money order.  And expenditures made by Ms. Steffens.  And to

6    avoid double counting when Ms. Steffens paid Mr. Chico Osborne

7    for the rental of the warehouse, I did not add that 7 -- $700

8    considering the fact it was probably part of that $11,000 in

9    the first place.

10        In addition to that, Ms. Steffens purchased a 1983 GMC

11    pickup.  And I did not pick up that because that's part of the

12    11,000.  David Waters returned to the apartment with the

13    Raymond Weil watch.  That was the only thing of value,

14    approximate value of $11,000, that I could come up with in the

15    computation.  I had no direct evidence of anything additional.

16        The payment of cash for the van No. 2 with Mr. Karr.

17    The total amount of expenditures is $34,436.  The amount of

18    income was $60,665, are funds available, that is, not income.

19    Q.  (BY MR. CARRUTH) In continuation, the government would

20    offer W100-53.  We would re-offer W100-53, your Honor.

21        MR. T. MILLS:  We don't have any objections to it

22    being admitted.  We are going to argue with some of the

23    numbers, but I think that our objection would go to the weight

24    rather than admissibility.

25        THE COURT:  All right.

*Martin - Direct (Resumed)*

1    MR. T. MILLS:  Would that be all right?

2    THE COURT:  100-53 is admitted without objection.

3  A.  Continuing, this is October and in this instance, there

4  were no checks written, no credit card withdrawals, but there

5  was the value of the Rolex.  In the testimony here, I believe

6  it was $10,000 was the total amount testified to.  So I

7  included that as a source or a fund item.  And I passed that

8  over to Mr. Karr when he received it from Mr. Waters at

9  $10,000.

10    Now, in the process, in October, there were a number

11  of wire transfers of moneys that although there's no money

12  from this side, during October, there are funds left over from

13  the previous month that can go to the expenditures that are

14  here, including $15,000 here for watches and jewelry.

15    Again, there were payments to the Four Seasons for the

16  rental of a car.  I don't know what that number is nor the

17  purchase of the airline ticket for Mrs. Karr.  But there were

18  -- there had to be expenditures to get these people to where

19  they were going.

20    In addition to that, we have expenditures that are

21  made after October concerning the purchase of a Harley

22  Davidson, a computer, furniture and a car for Crystal.  I have

23  no way of knowing what that amount is.  So in the month of

24  October, there were $10,000 of available funds and items and

25  available for expenditure.

Martin – Direct (Resumed)

1      And then, in October, the expenditures totalled

2  $27,829.78.  Taking the total amount -- the grand total of all

3  income or all moneys and items of -- available for the months

4  of August, September and October totals $91,565, and the

5  expenditures that were made total $74,534.40, resulting in

6  about $17,000 left over.  Also resulting in about 81 percent

7  of the moneys that were available were expended according to

8  what I determined here.

9      MR. CARRUTH:  As modified, your Honor, we'd offer

10  Government Exhibit 100-54.

11      MS. WILLIAMS:  No objection.

12      THE COURT:  Received.

13  A.  This represents the source of funds being the gold coins.

14  The gold coins were transferred from New Zealand in the amount

15  -- well, I'm sorry.  The money used to purchase was

16  transferred via wire transfer of $608,000 from New Zealand

17  account to the Nat West Bank account in New Jersey.

18      The transfer -- then, the funds were transferred,

19  600,000 of those funds were transferred to Corey Ticknor's

20  account in San Antonio to purchase the gold.  Mr. Murray

21  picked up $500,000 worth of gold.  Corey Ticknor received an

22  additional $100,000 worth of gold.  So I'm accounting for the

23  $600,000.

24      The gold coins stored in Unit 1604, $500,000.  Three

25  young men steal $500,000 worth of gold coins from Unit 1640,

*Martin - Direct (Resumed)*

1   $444,000.  It leaves approximately $60,000 for additional

2   expenditures.

3   Q.  (BY MR. CARRUTH) Agent Martin, in addition to the figures

4   displayed on the spreadsheets, did you identify any additional

5   expenditures made by Mr. Gary Karr during the month of

6   September 1995 that were not reflected on that particular

7   spreadsheet?

8   A.  Yes, sir, there was a -- I omitted another wire transfer.

9   I believe it was a wired fund of $2,079 to Charlene Karr on

10  September 16th.

11          MR. CARRUTH:  And, your Honor, the government would

12  offer Government Exhibit W100-4.

13          MS. WILLIAMS:  No objection.

14          THE COURT:  100-4 is received.

15  Q.  (BY MR. CARRUTH) Agent Martin, does this chart more

16  clearly explain the transfer of moneys from New Zealand to New

17  Jersey to San Antonio used to purchase the gold coins?

18  A.  Yes, sir.  This is the -- represents the United -- New

19  Zealand Guardian Trust.  They transfer $608,000 to this

20  particular account at -- it was the United Secularists account

21  at the Nat West Bank, and then, they transferred $12,000 from

22  another account -- from the same account in New Zealand to a

23  second account at the Nat West account -- Nat West Bank.

24          Then, Mr. Murray transferred $600,000 out of this

25  account, account last numbers are 079.  And then, when he was

*Martin - Direct (Resumed)*

1   in New Jersey, in Newark, New Jersey, he cashed a check for

2   $12,000 on account number ending in 547.  That money was

3   cashed.  This money was transferred to the account of Corey

4   Ticknor.

5   Q.  Thank you, Agent Martin.  We pass the witness, your Honor.

6           MS. WILLIAMS:  May we approach, your Honor?

7       (At the Bench, on the record.)

8           MS. WILLIAMS:  I expect my cross-examination of Agent

9   Martin to last at least an hour.  We have a witness who is

10  here from Georgia we would like to take out of order at this

11  point so he can go back to Georgia and not to spend another

12  night.

13          MR. CARRUTH:  We have no objection to that, your

14  Honor.

15          MS. WILLIAMS:  Would that be all right?

16          THE COURT:  Uh-huh.  Members of the jury, I'm sorry

17  that you had to come to the federal court to learn that the

18  world is not perfect.  And, occasionally, because of schedules

19  and whatnot, we'll take people out of order.  And the lawyers

20  have asked me to have a witness out of order.  Defendant

21  wishes to call a witness who must leave tonight.

22          So I'm going to stop with Mr. Martin.  He can go take

23  his seat for the time being.  Please remember that this is a

24  witness called on behalf of the defendant and will not be

25  available tomorrow.  You may proceed.

*Gordon - Direct*

1       MS. WILLIAMS:  Thank you, your Honor.  We call Dr.

2  William Gordon.

3       THE COURT:  Come forward, please, and be sworn.

4    (Witness was sworn.)

5       THE COURT:  Come around this column here, please, sir,

6  and sit in the witness box.  If you'll tell us your full name

7  and spell your last name, please.

8       THE WITNESS:  Full name is William Edward Gordon, Jr.

9  Last name is spelled G-O-R-D-O-N.

10   WILLIAM E. GORDON, JR., called by the Defendant, duly sworn.

11                   DIRECT EXAMINATION

12 BY MR. T. MILLS:

13 Q.  Do you have a doctoral degree?

14 A.  Yes, I do.

15 Q.  All right.  Dr. Gordon, where do you live?  If you'd tell

16 the members of the jury and his Honor.

17 A.  I live in South Forsyth County.  My mailing area is

18 Alpharetta, but I actually don't live in the city of

19 Alpharetta, Georgia.

20 Q.  All right.  How old are you?

21 A.  I am 46 years old.

22 Q.  Are you married?

23 A.  Yes.

24 Q.  How long have you been married?

25 A.  I'll be married 25 years May the 30th.

*Gordon - Direct*

1    Q.  Do you have any children?

2    A.  Yes, I have three boys.

3    Q.  How old are they?

4    A.  22, 20 and, I think, 18.  I'm not absolutely positive

5    about that.

6    Q.  All right.  Let me show you what's been -- what I have

7    marked as Defendant's Exhibit No. 40, and ask if this is a

8    resume of your employment, education and other activities?

9    A.  Yes.

10   Q.  And is it accurate?

11   A.  To the best of my knowledge, it is.

12   Q.  All right, sir.  We would offer this Defendant's Exhibit

13   No. 40.

14          THE COURT:  Excuse me.  You have a 40.

15          MR. CARRUTH:  Your Honor, I know of no hearsay

16   exception that would allow the admissibility of the resume of

17   a witness.  I object to it on that basis.

18          THE COURT:  It is hearsay.  The objection is

19   sustained.

20   Q.  (BY MR. T. MILLS) Where did you go to college and when?

21   A.  I went to LSU in Shreveport, Louisiana, and I graduated in

22   '71.

23   Q.  And did you earn a degree?

24   A.  Yes, I did.

25   Q.  What was your degree?

*Gordon - Direct*

1   A.  Bachelor of Science in Finance and Business

2   Administration.

3   Q.  And then, did you get a master's degree in ministry?

4   A.  Yes, I did, from Criswell College.

5   Q.  Where is Criswell College?

6   A.  In Dallas, Texas.

7   Q.  All right.  You lived in Dallas?

8   A.  At that time, yeah.

9   Q.  For how many years?

10  A.  Three or four years.

11  Q.  All right.  And what year did you get your master of

12  ministry degree?

13  A.  I believe it was in '78.

14  Q.  All right.  Did you get a second -- did you get a master

15  of divinity degree?

16  A.  Yes, I did, from New Orleans Baptist Theological Seminary.

17  Q.  In what year?

18  A.  I believe that was in '79.

19  Q.  All right.  Did you get a doctor of theology degree?

20  A.  Yes, I did.

21  Q.  From what seminary?

22  A.  From New Orleans Baptist Theological Seminary, and I

23  earned that one in '87.

24  Q.  All right.  And have you been a pastor at several

25  churches?

*Gordon - Direct*

1    A.   Yes, I have.

2    Q.   In 19 -- were you a pastor at Hooper Road Baptist Church?

3    A.   In Baton Rouge, yes, Louisiana.

4    Q.   All right.  And where did you move to after that church?

5    A.   I moved to Maryland, Cockeysville, Maryland and pastored

6    the church there.

7    Q.   All right.  And in 1988, what work did you begin?

8    A.   I went to work for the Home Mission Board of the Southern

9    Baptist Convention at that time.

10   Q.   What is the Home Mission Board?

11   A.   It no longer exists.  It was merged into the North

12   American Mission Board about three years ago.

13   Q.   And was that an administrative-type job or could you

14   describe what you did?

15   A.   I basically did research as the theologian.

16   Q.   All right.  In 1989, what did you begin doing?

17   A.   I've had so many jobs there, they kind of merge together,

18   quite honestly.

19   Q.   All right.

20   A.   But I -- basically, the whole time I've been there, I've

21   worked for the Interfaith Evangelism Team.

22   Q.   All right.  And do you still work with the Interfaith

23   Evangelism Team?

24   A.   Yes, I do.

25   Q.   And is that a part of the Southern Baptist Convention?

*Gordon - Direct*

1    A.  Yes, it's a part of the North American Commissioner Board,

2    which is a subsidiary agency of the Southern Baptist

3    Convention.

4    Q.  All right.  As part of your studies, did you ever do any

5    study of atheism?

6    A.  Yes, I did.  I did my doctoral dissertation in the area of

7    atheism.  I think the full title was A Contemporary

8    Apologetic, the concept of apologetics and writings of Peter

9    R. Burger and Hans Koon.

10   Q.  All right.  And did you ever have an occasion to see

11   either in a photograph, or a book cover, or in any other

12   capacity, Madalyn Murray O'Hair?

13   A.  Yes, I have.

14   Q.  All right.  Did you meet her in -- did you -- prior to

15   1997, did you ever meet her in person?

16   A.  No.

17   Q.  All right.  Do you -- did you -- did she ever do any, that

18   you were aware of, any scholarly or academic writing?

19   A.  Not to my knowledge, she didn't.

20   Q.  All right.  Did you -- how would you describe her in terms

21   of just her appearance?  Was she a unique-looking lady?

22   A.  I would say so, yes.

23   Q.  All right.  During your business professional career, have

24   you gone to other countries to teach?

25   A.  Yes, I have.

Gordon - Direct

1  Q.  Okay.  What countries have you been to?

2  A.  I have been to Switzerland, and I have also been to

3  Romania.

4  Q.  When did you teach in Switzerland?

5  A.  I don't recall the exact date.  I think it was about a

6  year and a half or two years before I went to Romania.  I

7  could check my passport if you want me to, and I could find

8  the exact date.

9  Q.  No.  That's all right.  After teaching in -- when did you

10 have an occasion to teach in Romania?

11 A.  In November of 1997.

12 Q.  All right.  For those of us who may not know exactly where

13 Romania is, would you generally describe it?

14 A.  It's in Eastern Europe.

15 Q.  All right.  Is it north of Italy?

16 A.  Yes, I believe it is.

17 Q.  All right.  And what -- why were you in Romania in 1997?

18 A.  I was invited to come and teach a class by the president

19 of one of the Baptist colleges there.  I believe the name was

20 the Emmanuel Bible Institute of Oradea.

21 Q.  What is Oradea?

22 A.  Oradea is the name of the town there in Romania where I

23 was at.

24 Q.  Do you know how it's spelled?

25 A.  No, I don't.

*Gordon - Direct*

1    Q.  Is it, like, phonetically I-R-I-D-I-A -- I-R-A-D-I-A,

2    Iradia?

3    A.  It begins with an "O," I know that, Oradea.

4    Q.  Oradea?

5    A.  I'm sorry.

6    Q.  And how long did you live in Oradea?

7    A.  I was there for about five days.

8    Q.  All right.  And did you have the services of a translator?

9    A.  Yes, I did.

10   Q.  All right.  Did you frequently do things with the

11   translator in terms of --

12   A.  Yes.

13   Q.  -- just --

14   A.  Just about everytime I went someplace, there was a

15   translator with me --

16   Q.  All right.

17   A.  -- provided by the school.

18   Q.  All right.  What was translater's name?

19   A.  Well, there were actually several translators that were

20   with me at various times.

21   Q.  All right.  Was there -- did you have an occasion to be

22   with the trans -- with one of the translators when you were

23   eating an evening meal?

24   A.  Yes.

25   Q.  And while you were eating an evening meal, did you see

*Gordon - Direct*

1   someone that you believed you recognized?

2   A.  Yes, I did.

3   Q.  Were you surprised to see this person?

4   A.  Yes, I was.

5   Q.  And who did you believe the person was?

6   A.  I believe the person I saw was Madalyn Murray O'Hair.

7   Q.  In November 1997?

8   A.  That is correct.

9   Q.  All right.  Compared to, say, this man, seated right here,

10  or this lady here, about how far was your chair from this

11  woman's chair?

12  A.  I would say somewhere between those two in distance.

13  Q.  All right.

14  A.  About right there.  That's an approximation.

15  Q.  All right.  Would you approximate that this is ten feet?

16  A.  Thereabouts.

17  Q.  All right.  And did you -- what did she look like?

18  A.  She looked overweight.  She looked sickly.  And she

19  looked, I'd say, in her mid '70s.

20  Q.  What color hair did she have?

21  A.  Whitish, grayish.

22  Q.  All right.  Did you ever see her when she was standing up?

23  A.  No, I did not.

24  Q.  Did you see if she had a cane or any other kind of device

25  with her?

*Gordon - Direct*

1   A.  No, I did not notice anything.

2   Q.  All right.  Did you have a conversation with your

3   translator about your opinion about who this was?

4   A.  As I was leaving the hotel restaurant.

5   Q.  You did?

6   A.  Yeah, my translator turned to me and he said, "Was that

7   Madalyn Murray O'Hair?"

8   Q.  All right.

9   A.  And I said, "It looked like her to me."

10  Q.  All right.  Now, before this time in November 1997, had

11  you ever seen Madalyn Murray O'Hair in person?

12  A.  No, I had not.

13  Q.  All right.  Let me show you what is marked as Government's

14  Exhibit W58-2 and W58-3.  Can you see these two pictures?  I

15  can come closer.

16  A.  I would like you to come closer.

17  Q.  All right.

18  A.  I believe this is the woman I saw although she looked a

19  little older when I saw her.

20  Q.  And you just looked at W58-2.  Will you also look at

21  W58-3?  They're different haircuts in the two.

22  A.  Yeah.  I'd say this picture looks a little closer to what

23  I saw her look like when I was there.

24  Q.  Referring to W58-2?

25  A.  Yeah.

*Gordon - Direct*

1   Q.  Did you go over and talk with this woman that night?

2   A.  No, I did not.

3   Q.  Did you go to the restaurant the next night?

4   A.  Yes, I did.

5   Q.  Did you carry anything with you?

6   A.  I carried my camera.

7   Q.  Did you see her the next night?

8   A.  No, I did not.

9   Q.  Did you ever see her again?

10  A.  No, I haven't.

11  Q.  All right.  Immediately after the night that you saw the

12  lady that you thought was Madalyn Murray O'Hair, did you

13  communicate your opinion to anyone?

14  A.  Yes, I called my secretary, Judy Gillette at that time,

15  and I told her I thought I had seen Madalyn Murray O'Hair.

16  Q.  Since then, have you mentioned it to other people?

17  A.  Yes.  When I found out that there was a missing persons

18  case on her, I reported it to a police officer with the city

19  of Austin.

20  Q.  All right.  Have you ever been interviewed about this by

21  any state -- well, city or state or federal law enforcement

22  officer?

23  A.  I did talk with a person from the Austin City Police.  I

24  do not recall his name, but I have not talked with anyone from

25  the federal government at all.

*Gordon - Direct*

1   Q.  All right.  Were you -- were you drinking that night?

2   Something that might cause you to be off of your -- I don't

3   guess baptists are supposed to drink.

4   A.  Actually, I could get fired for doing that.

5   Q.  All right.  Well, were you drinking anyway?

6   A.  No, I have never taken a drink of alcoholic beverage in my

7   entire life.

8   Q.  All right.  Were you on any kind of medication?

9   A.  No.

10  Q.  Okay.  Have you ever been locked up in a psychiatric

11  institution or accused of being delusional?

12  A.  No.

13  Q.  All right.  Can you say that you know with what you would

14  consider to be 100 percent certainty that that was Ms. O'Hair?

15  A.  No, I can't say with 100 percent certainty.  How could I

16  say that?  I simply say I thought the woman was Mrs. O'Hair.

17  It looked like her, but I can't say it beyond a shadow of a

18  doubt that it was her.

19  Q.  All right.  I'll go ahead and ask this.  Are you the kind

20  of person who has -- believes periodically that they see

21  Elvis, or are you prone to reporting that you've seen famous

22  people?

23  A.  No.

24  Q.  Has anything like this ever happened to you before?

25  A.  No.

*Gordon - Direct*

1  Q.  How long were you sitting approximately ten feet from this

2  woman?  Approximately?

3  A.  I was aware of her presence for about 15 minutes, I would

4  say.

5  Q.  All right.  Did she -- did you leave first?

6  A.  Yes, I did.

7  Q.  All right.  How were you sitting in relationship to this

8  person?  In other words, were you sitting at a table and

9  facing her, or was she behind you?

10  A.  She was in a table right next to me.  It was kind of to

11  that direction from me.  I did not notice that she was there

12  until I turned around and looked for the waiter and saw her

13  sitting at the next table, facing me.

14  Q.  She was facing you?

15  A.  Yes.

16  Q.  When you turned?

17  A.  When I turned.

18  Q.  And then, during the time that you -- the 15 --

19  approximately 15 minutes or so, did you turn several -- at all

20  several -- one or more times to see this person again?

21  A.  Yes.  Actually, when I saw her, I moved my chair so I was

22  kind of sitting sideways so I could turn and look at her

23  without being too obvious.

24  Q.  Did she ever make eye contact with you?

25  A.  No.

1  Q.  What -- how would you describe her during the time that

2  you were watching her?

3  A.  She was fully engaged in eating.

4  Q.  All right.  There has been an accusation that there has

5  been a -- do you believe Ms. O'Hair was deceased in November

6  of 1997?

7  A.  I knew she had been missing for a couple of years.  That's

8  why I got so excited when I thought I saw her.  But I had not

9  heard about her being deceased or anything at that time.

10  Q.  All right.  When you contacted Austin PD, were you

11  expecting a call from anyone back or did -- what was that

12  communication like?

13  A.  I believe I talked to them one time, and the officer that

14  I talked to sounded interested and, you know, that's all I can

15  say.

16  Q.  Did you ever talk to an organization -- international

17  organization called Interpol?

18  A.  No, I did not.

19  Q.  Did they ever contact you?

20  A.  No, they did not.

21  Q.  That's all the questions that I have, sir.  The others

22  may.

23                    CROSS-EXAMINATION

24  BY MR. D. MILLS:

25  Q.  Did you, in your testimony earlier, say that when you

Gordon - Cross

1    found out that she was a missing person that you reported it

2    to the police after you came back from Romania?

3    A.  Yes, I did.  I believe it was sometime in '98.  I don't

4    remember the exact date.

5    Q.  So when you -- so sometime after you came back from

6    Romania, you found out she was a missing person, and that's

7    when you first called --

8    A.  No.  I found out there was a missing person's case on her.

9    I knew she had disappeared before that, but I wasn't aware of

10   any legal authorities that were looking for her at that time.

11   Q.  But in the latter part of your testimony, just a few

12   moments ago, you said you knew she was missing and you got

13   excited; is that correct?

14   A.  That is correct.

15   Q.  So if you knew she was missing, what's the difference

16   between knowing she was missing and filing a missing --

17   waiting till you find out about a missing person's report when

18   you come back from Romania to report it to the police?

19   A.  It's my understanding if somebody wants to disappear,

20   that's their right.  But, you know, when -- someone, you know,

21   there's a police case on someone, a missing person's case, I

22   consider that differently.  I didn't know who to report it to

23   until I found out there was a missing person's case.

24   Q.  When you came back, did you make some type of inquiry with

25   law enforcement to find out if there was a missing person's

Gordon - Cross

1  report on Ms. O'Hair?

2  A.  I did do a database check on the internet on news

3  articles, and I could not find where there was someone that,

4  you know, was looking for her as far as any legal authority.

5  I couldn't find anything that talked about any warrants, or

6  anything like that, for her arrest.  That's all I did, and it

7  wasn't until I became aware that there was a missing person's

8  case on her that I reported my findings to the Austin City

9  Police.

10 Q.  But you knew she was a missing person?

11 A.  I knew she had disappeared, that's correct.

12 Q.  But you didn't have any reason to believe there was any

13 kind of foul play going on at the time?

14 A.  I had not read anything at that time that indicated anyone

15 suspected foul play.

16 Q.  And in your doctoral study, you knew she was a prominent

17 figure in the atheist movement; is that correct?  Would you

18 say that's true?

19 A.  I would say that was a result of my work at the board, the

20 Mission Board.  One of my areas of responsibility is to -- if

21 someone calls in, you know, and is all concerned about the

22 O'Hair petition to the FCC, I'm the one that they send those

23 things to so I can debunk it for the people and explain to

24 them that it's a hoax.

25 Q.  So during the period of time that you were doing your

*Gordon - Cross*

1  doctoral dissertation, were you or were you not aware of Ms.

2  O'Hair being a, if you will, prominent atheist?  And if you

3  don't like the word "prominent" --

4  A.  I was aware that she was an atheist although I don't

5  consider anything that she's done to be scholarly or

6  significant enough, you know, work to merit discussion at a

7  doctoral dissertation.

8  Q.  Had you studied photographs of her and looked at

9  photographs of her?

10  A.  I have looked at photographs of her, yes.

11  Q.  Do you know what vintage those photographs would have been

12  that you viewed?  Would they have been when she was 30 years

13  old, 40 years old, 50 years old?  Do you have any idea?

14  A.  The latest one that I remembered looking at was one that

15  was taken by someone with the Sunday School Board of the

16  Southern Baptist Convention.  She was at a -- I believe it was

17  a book seller's meeting in Russia.  May have been '90, or

18  something like that, but around that date.

19  Q.  Do you remember what she looked like in that photograph?

20  A.  Yes, I believe I do.

21  Q.  Could you tell us?

22  A.  She looked like the woman I saw in Romania.

23  Q.  So she looked the same from 1990 to 1998, she hadn't

24  changed any is what you're telling me?

25  A.  No.  She looked older when I saw her.  She looked -- I

1   would say not only did she look older, but she looked to be in

2   more frail health.  She did not look to be a very healthy

3   woman.

4   Q.  Did you see if she had any walking aides with her at the

5   table?

6   A.  No, I did not notice anything.

7   Q.  Like you know what a walker is that people walk with?

8   A.  Right.

9   Q.  Didn't see anything like that?

10  A.  I did not see a walker or a --

11  Q.  A cane?

12  A.  I did not notice a cane.  I did not notice a cane.  She

13  was sitting when I saw her.

14  Q.  But you notice she was old?

15  A.  Yes.

16  Q.  Did she have anyone at the table with her?

17  A.  No.

18  Q.  Do you know anything about the fact that she and her son

19  and her granddaughter, who she adopted as her daughter,

20  normally were considered an inseparable group, that they

21  always went places together?

22  A.  I would -- really don't know that much about her as far as

23  her habits or things like that.

24  Q.  Was the lighting in the restaurant as bright as the

25  lighting in this courthouse?

Gordon - Cross

1  A.  I would say it was not.

2  Q.  And how long had you been seated in the restaurant before

3  you noticed this person that you believe to be -- someone who

4  appears to be Ms. O'Hair in your opinion?

5  A.  I would say approximately about 15 to 20 minutes.  I was

6  about halfway through the meal.

7  Q.  And you stayed another 15 minutes?

8  A.  Yes.

9  Q.  So, basically, you had dinner in about a 30-minute time

10  period?

11  A.  Approximately.  I didn't have any stopwatch out or

12  anything.

13  Q.  But you knew she was missing?

14  A.  I knew she had disappeared, yes.

15  Q.  And --

16  A.  That's why I wanted to go back and get my camera.

17  Q.  If you were willing to go back and get your camera, you

18  could have just walked over and introduced yourself and said,

19  "I'm so and so with the Southern Baptist.  How are you, Ms.

20  O'Hair," couldn't you?

21  A.  Yes, but I also knew if she was missing, she didn't want

22  to be found.

23  Q.  But you were willing to go back and take a photograph of

24  her the next night, for some reason, to basically take that

25  photograph and memorialize the fact that you had seen her or

Gordon - Cross

1  found her; isn't that correct?

2  A.  I actually answered documentation that I found her.

3  Q.  And it would have been just as easy and say, "I'm so and

4  so, are you Mrs. O'Hair," because you didn't believe there was

5  any foul play going on with her being missing, did you?

6  A.  No, but I thought that if, you know, she had been

7  disappeared for approximately two years, she didn't want to be

8  found.

9  Q.  How was she dressed?

10  A.  I believe she had a dress on, but I really can't recall

11  any details.

12  Q.  Maybe a dress and, maybe, slacks and a blouse?

13  A.  I really don't recall.

14  Q.  Color?  Bright?  Dull?

15  A.  I really don't recall.  I can't remember what my wife was

16  wearing last week.

17  Q.  What time of the day was this?

18  A.  This was in the evening.  It was dark.

19  Q.  6:00 p.m?  7:00 p.m?  8:00 p.m?

20  A.  I would say around 7:00, but that's an approximation.

21  Q.  You described her as fully engaged in eating.  What was

22  she eating?

23  A.  I believe it was some kind of a pasta meal, but there's a

24  lot of food in Romania that I can't identify or recognize.

25  Q.  And you -- your curiosity was somewhat overwhelmed when

*Gordon - Cross*

1   you assumed that you saw Madalyn Murray O'Hair.  Would that be

2   a fair statement?

3   A.  I would say that my adrenaline was definitely going.

4   Q.  Because you turned your chair?

5   A.  Yes, and tried to get a view of her.  I was shocked to see

6   her.

7   Q.  What was your interest in her?

8   A.  Well, one of my areas of responsibility at the board is

9   doing research on atheism.  I, you know, knew that she had

10  disappeared and thought that I had seen her.

11  Q.  And why did -- and why was that of some significance to

12  you?

13  A.  No one knew where she was.

14  Q.  And yet, you had the opportunity to walk over and say,

15  "I'm so and so.  Are you Madalyn Murray O'Hair?"  And you

16  didn't do that?

17  A.  No, I didn't, because I was afraid that I wouldn't have an

18  opportunity to take her picture if I did that.

19  Q.  You had a witness with you, though, that could have said

20  that the lady that you introduced yourself to identified

21  herself to you as Madalyn Murray O'Hair?

22  A.  Well, I have a witness that was with me who thought it was

23  her, too.

24  Q.  And this is somebody from -- this is a Romanian

25  translater?

*Gordon - Cross*

1    A.   Yes.

2    Q.   And so he had independent knowledge that this woman looked

3    like Madalyn Murray O'Hair is what you're telling us?

4    A.   No.   He said he thought that the woman looked like Madalyn

5    Murray O'Hair.

6    Q.   Does he study atheism, too, that he would know who she is?

7    A.   No.   He reads American magazines, especially Christian

8    magazines.

9    Q.   How far was this restaurant adjacent to your hotel or in

10   your hotel?

11   A.   It was in the resort town of Felix.   I don't know where

12   that is.   In terms of proximity -- I don't know where it is

13   either in relationship to Oradea.   I knew it was about 20 or

14   25 minutes away driving.

15   Q.   To -- back to your hotel?

16   A.   I was actually staying at the college.

17   Q.   And so where is the college in relation to the restaurant?

18   A.   About 20 or 25 minutes away.

19   Q.   Okay.   So you could have gone over there and gotten your

20   camera and come back, but you decided not to do that that

21   evening, correct?

22   A.   That is correct.   I didn't anticipate her still be there

23   eating when I got back.

24   Q.   What made you believe she was sickly if you saw her

25   sitting down and you can't describe anything about her in

Gordon - Cross

1   terms of what she was wearing or that -- what brought out to

2   you that she was sickly?

3   A.  Her face.

4   Q.  Did you see her from a profile or did you get a full

5   view --

6   A.  Full view of her face.  I saw her like I'm seeing you.

7   Q.  So she was behind you, as you indicated, over --

8   A.  Right.

9   Q.  Was she looking that way or was she sitting on the far

10  side of a table, looking back this way so that when you turned

11  and you looked at her --

12  A.  She was on the opposite side of the table from me which

13  means that he was facing in my direction.

14  Q.  Was she against the wall?

15  A.  There may have been a pillar there, but she was not on the

16  edge of the room.

17  Q.  Would that be a darker portion of the restaurant?

18  A.  The lighting was about the same.

19  Q.  And you had difficulty seeing in the photographs when

20  counsel showed them to you from this position a while ago; is

21  that correct?

22  A.  I wanted to see them closer, yes.

23  Q.  And you testified that she was about where I am from you

24  to me right now; is that correct?

25  A.  Right.  Those photos aren't quite as large.

*Martin - Cross*

1  Q.  But it's a lot more bright in it, isn't it, sir?

2  A.  Oh, yes, it is.

3  Q.  I believe that's all, your Honor.

4       MR. T. MILLS:  We have no further questions.  May he

5  be excused?

6       THE COURT:  You are free to leave.  Mr. Martin, if

7  you'll return to the witness chair, please.

8                      CROSS-EXAMINATION

9  BY MS. WILLIAMS:

10  Q.  Agent Martin, I want to ask you a couple of questions

11  about your spreadsheet.  You have a copy?

12  A.  Yes.

13  Q.  On Government Exhibit W100-5, parenthesis 3, when you

14  indicate that Mr. Karr purchased a Harley Davidson motorcycle,

15  a computer, furniture, and purchased Crystal a car, you don't

16  have any evidence of that, do you?

17  A.  I have the statement of Charlene Karr.  That's all I have.

18  Q.  All right.  You don't have any credit card receipts, bank

19  records.  You didn't find any of these items, that type thing,

20  correct?

21  A.  That's correct.

22  Q.  But you looked, didn't you?

23  A.  Well, nothing on those credit cards that's to be sure.

24  Q.  And you tried to find evidence of a Harley Davidson

25  motorcycle, did you not?

*Martin - Cross*

1   A.   Yes, ma'am.

2   Q.   But you didn't find any?

3   A.   No, I didn't.

4   Q.   And when you indicate at the bottom of this exhibit, on

5   line 58, remaining gold proceeds available for motorcycle,

6   computer, furniture and car purchases, you indicate $60,000?

7   A.   Yes --

8   Q.   Now --

9   A.   -- that's a balance.

10   Q.   -- is that based on your analysis from W-105, parenthesis

11   4, where you indicate that there was $500,000 in gold coins

12   picked up from Mr. Ticknor?

13   A.   Yes.

14   Q.   You subtract from that $440,000, right?

15   A.   Right.

16   Q.   And that's where you get 60,000?

17   A.   That's correct.

18   Q.   All right.  Now, to get $440, what did you do?

19   A.   The testimony of the three gold thieves.

20   Q.   Which was 140, 140 and 120?

21   A.   140, 140 and a little more than 140.

22   Q.   All right.  So took 140 and 140 and added that together

23   and got?

24   A.   Well, if you take three times 140, that is -- that's 420.

25   If you add another 20, which is one Mr. Cortez, as my

*Martin - Cross*

1  understanding, got additional funds, that's 440.

2  Q.  All right.  So when these men testified that one got

3  additional, you just plugged in the number 20?

4  A.  Yes.

5  Q.  All right.  Isn't it correct that you could have taken the

6  records of the pawn shops and the coin dealers and the -- all

7  the records you tracked down that you attributed to these

8  three men -- remember that list of names?  You remember

9  that --

10  A.  Yes, I remember the list.

11  Q.  Okay.  Couldn't you have taken all of those records and

12  added all those up and gotten a number?

13  A.  That number was not correct.  Would not have been correct.

14  We did not have all the evidence on the gold coins.

15  Q.  My question was, couldn't you have taken all those numbers

16  and added them together and come up with a figure that was

17  supported by the records that you had accumulated?

18  A.  Yes.

19  Q.  All right.  Did you ever add all those up?

20  A.  At one time, I did.

21  Q.  All right.  Do you remember what the total was?

22  A.  At this time, no.

23  Q.  Well, you said you didn't believe it was correct.  Was it

24  not correct because it didn't add up to $440,000?

25  A.  No.  It was not correct because the major one, Mr.

*Martin - Cross*

1   Cardenas, because of his cashing most of his money in

2   Tennessee, we were not able to obtain any records.

3   Q.  All right.  But if you had added all those up, couldn't

4   you have gotten a figure that was supported by the records of

5   what Mr. Cortez and Mr. Valdez cashed in in San Antonio?

6   A.  Yes.

7   Q.  But you don't remember what that number is?

8   A.  It was -- it would have been much smaller than the number

9   that we've got here, much smaller than $440,000.

10  Q.  Would it have been much smaller than $140 plus $140,000

11  plus some?

12  A.  Probably smaller, yes.

13  Q.  So this figure, $440,000, as well as the figure $60,000,

14  are not really a summary of the evidence that's been admitted

15  in this case; is that correct?

16  A.  Well, the additional $20,000 probably represents something

17  that was something in our notes.

18  Q.  Just summary of the mind of Ed Martin?

19  A.  Yes, the additional money.

20  Q.  I'm not going to pull out the chart, but you have the

21  smaller versions of the -- this time line --

22  A.  Yes.

23  Q.  -- in front of you?  Do you recall an entry on August

24  27th, 1995?  If you'd go to that page, look at the second

25  chart.  Do you have a notation there on what government

*Martin - Cross*

1   exhibit that would be?

2   A.  No, I don't.  It's page 2, as far as I'm concerned.

3   Q.  For the record, W-106, parenthesis 2.  The first entry on

4   that page, I believe, read, "The Murray O'Hairs were last seen

5   by volunteer Albarado," right?

6   A.  It didn't say "by."  It says, "The O'Hairs last seen,

7   volunteer W. Albarado," yes.

8   Q.  All right.  Does that not apply to that they were last

9   seen by that man?

10  A.  The sentence that follows says, "Sees Robin Murray

11  O'Hair's Porsche and Jon Murray's Mercedes."

12  Q.  What, in fact, the testimony is is that Mr. Albarado sees

13  the vehicles there?

14  A.  Yes.

15  Q.  All right.  He didn't testify and it's not your belief

16  that he said he saw them on that day, correct?

17  A.  He did not see him as far as testimony, yes.

18  Q.  As Mr. Carruth asked you, on those charts, you indicate,

19  repeatedly, that certain people called certain other people.

20  And what you mean by that is the phones registered to certain

21  people.  All the phones registered to certain other people.

22  A.  That's correct.

23  Q.  All right.  And in some cases, the jury can remember the

24  testimony that, you know, Lisa Fry remembered getting a phone

25  call from Danny Fry?

Martin - Cross

1    A.  Yes.

2    Q.  But other than that, it's -- the phone at one residence

3    calls a phone at another residence, and you don't know who's

4    on either end.

5    A.  That's correct.

6    Q.  Let me ask you about the next to the last chart, 5, which

7    should be Government Exhibit 100 --

8    A.  6-5.

9    Q.  -- 6, parenthesis 5?

10   A.  Yes, ma'am.

11   Q.  All right.  In the third column, after you discussed the

12   Public Storage unit being accessed and before the dates of

13   September 30th, when Patti Steffens and her mother recalled

14   seeing David Waters, Gary Karr and Danny Fry having breakfast,

15   and before this rental van, there's a box and it's dated

16   September/October 1995.  Do you see that box?

17   A.  Yes, uh-huh.

18   Q.  All right.  Now, you stuck that box in there although you

19   don't have any idea whether it happened on September 30th,

20   correct?

21   A.  At this point, that's why it says September/October.

22   Q.  All right.  But my question is you had to stick it

23   somewhere --

24   A.  Yes.

25   Q.  -- in the time line --

*Martin - Cross*

1 A. Right.

2 Q. -- of events.  And it just as easily could have gone

3 somewhere over here in October.

4 A. No.  It would have been more like October the 1st would be

5 the farthest it could go because of the entry records.

6 Q. Well, you're assuming in putting it in here that Mr.

7 Coryell saw three people that had to do with this case,

8 correct?

9 A. That's right.

10 Q. And you don't know that, do you?

11 A. I don't know specifically, but Mr. Coryell testified.

12 Q. All right.  And the jury can recall what Mr. Coryell's

13 testimony was.

14 A. Yes, ma'am.

15 Q. But the fact of the matter is that you stuck this where it

16 looked good, right?

17 A. No.  It's in the month of September.  It's before -- it

18 could have been at the end of September 30th, but it happens

19 to be there because of the entry record of September the 30th.

20 Q. Because you're making the assumption that the people that

21 Mr. Coryell saw are the same people who entered on that day?

22 A. Yes.

23 Q. You testified, I believe, that when you were at my

24 client's residence, back in March, that he gave you a written

25 statement?

*Martin - Cross*

1   A.   Yes, ma'am.

2   Q.   And that at the time he made that written statement, he

3   told you orally that, basically, I think was your word, that

4   he wasn't telling you everything.

5   A.   That's correct.

6   Q.   All right.  Isn't it a fact that that happened on the

7   first day?

8   A.   It did happen on the first day.

9   Q.   All right.  And isn't it a fact that on the second day,

10  the day after that, on March the 25th, you went back to Mr.

11  Karr's residence and he told you more stuff?

12  A.   Didn't go to his residence.

13  Q.   All right.  Isn't it a fact that he told you more things

14  on that day?

15  A.   He told us -- on the second day, he told us some

16  additional information, yes.

17  Q.   Isn't it a fact he gave you a second statement on that

18  day?

19  A.   He sure did.

20  Q.   And isn't it a fact that it was on that day that he drew

21  you a map to where David Waters took him when he came back to

22  Texas?

23  A.   Well, I drew the map, right?  And he drew Mr. Houston's

24  map.

25  Q.   He drew a map for a Special Agent Sykes Houston?

*Martin - Cross*

1    A.  As far as I know, yes.

2    Q.  On the 25th?

3    A.  On the 25th.

4    Q.  All right.  On that day, did he tell you that he wasn't

5    telling you everything?

6    A.  We didn't get into that discussion.

7    Q.  He didn't tell you that, did he?

8    A.  He didn't tell me, no.

9    Q.  On your time line charts, I didn't notice when I was

10   listening to you explaining them to the jury where you

11   indicated that Danny Fry had rented a room at the Interstate

12   Inn.  Was that on there or did I miss it?

13   A.  It was not on there.

14   Q.  All right.  Why not?

15   A.  Because Danny Fry, as far as I know, did not rent a room

16   at the Interstate Inn.

17   Q.  You were here, were you not, when Detective Bjorklund

18   testified that when he reviewed the records of the Interstate

19   Inn, his notes reflect that Danny Fry stayed at the Interstate

20   Inn on the same dates that David Waters stayed there?

21   A.  I don't know where Mr. Bjorklund got that information.

22   Q.  You do recall that information?

23   A.  I do remember him saying that here, but that's all I

24   remember.

25   Q.  All right.  And you just don't know anything about that.

Martin - Cross

1  A.  There's no evidence to that in the record, ma'am.

2  Q.  Well, there's evidence of that from Detective Bjorklund,

3  is there not?

4  A.  There is a statement made by Mr. Bjorklund.  If that would

5  have been an invoice at that hotel, I would have found it.  We

6  went through those records.  I was there.

7  Q.  All right.  So are you telling this jury that the only

8  thing in this case they can rely on are things that they have

9  had admitted on a piece of paper?

10  A.  No, because there's testimony of other people that have

11  direct knowledge.

12  Q.  All right.  And are you telling this jury that they should

13  discount Detective Bjorklund's testimony?

14  A.  In that particular instance, yes.

15  Q.  Think he made it up?

16  A.  I don't know what he did.

17  Q.  Think he imagined it?

18  A.  I don't know what he did, ma'am.  That's his misstatement,

19  not mine.

20  Q.  Do you recall in your investigation of this case some

21  testimony about the O'Hairs' dogs?

22  A.  Yes, ma'am.

23  Q.  And do you recall that Mr. Tyson testified that he saw his

24  two dogs in the backyard and then they were gone and -- you

25  remember all of that?

*Martin - Cross*

1    A.  Yes.

2    Q.  And you're aware, are you not, through your investigation

3    of this case, that it was Mr. Tyson who picked up the dogs

4    from the Griffith Animal Hospital?

5    A.  Yes, ma'am, I am.

6    Q.  Are you aware through your investigation of this case that

7    sometime late in the year, probably in December, that those

8    dogs disappeared from the backyard of the American Atheist

9    Headquarters?

10   A.  That was my understanding, yes.

11   Q.  You've heard that?

12   A.  Yes.

13   Q.  And what's your explanation for that?

14   A.  I have none.  Mr. Tyson told me and the rest of the people

15   that we spoke to said that there were people going around

16   releasing dogs in Austin.  That's the best we got.

17   Q.  All right.  So a gang of people were freeing dogs?

18   A.  That's what we were told.  I wasn't there at the time.

19   Q.  And that's the best explanation you have for why the --

20   A.  It wasn't all three dogs, though, was it?  I believe it

21   was only two.

22   Q.  It was the two cocker spaniels, wasn't it?

23   A.  I don't know which dogs they were.

24   Q.  Do you recall through your investigation of this case that

25   one of the creditors of Jon Murray was Blockbuster Video?

*Martin - Cross*

1  A.  I don't know -- creditors -- I'm not specifically aware of

2  that, no.

3  Q.  Are you aware that Jon Murray's Blockbuster card was used

4  in San Antonio during the time that the O'Hairs were there?

5  A.  I'm not aware of that.

6  Q.  Does that surprise you?

7  A.  No.

8  Q.  Are you aware of a subpoena that went out during the

9  pendency of this case to Blockbuster Video in San Antonio?

10 A.  Oh, I think Mr. Mills did mention a subpoena went out,

11 yes.

12 Q.  All right.  So you -- does that jog your memory about

13 knowing about Blockbuster or that's all you know?

14 A.  That's all I know.

15 Q.  During your investigation of this case, did you find some

16 various receipts for purchases that were made during the month

17 of August by the O'Hairs?

18 A.  Yes.

19 Q.  Do you remember receipts to Rainbow Car Wash, on August

20 the 26th of 1995, by Jon Murray?

21 A.  Yes, ma'am.

22 Q.  And does it appear to you from those receipts that Mr.

23 Murray took two vehicles to the car wash on that date and

24 washed them and filled them up with gas?

25 A.  I think he had them detailed, yes, I think he did.

*Martin - Cross*

1    Q.  Do you recall a receipt -- a check written by Jon Murray

2    to Drug Emporium in late August of 1995?

3    A.  Yes, I do.

4    Q.  Do you recall the date of that check?

5    A.  No.  But you have it there.  You can refresh me.

6    Q.  If I can find it, I will.  While I look for it, did you do

7    any sort of an investigation to determine what Mr. Murray

8    purchased on that day?

9    A.  I think the record that I remember seeing, I think that's

10   Mr. Gordon McNutt that the receipt was attached to it.

11   Q.  All right.

12   A.  So it was medicine he had purchased.

13   Q.  Okay.  And did you do any sort of investigation such as

14   subpoenaing the prescription records of the Drug Emporium

15   here, in Austin, to determine what Mr. Murray purchased on --

16   I'll show you the date of the check -- on August 26th of 1995?

17   A.  No, I didn't.

18   Q.  Do you recall that?

19   A.  Yes.

20   Q.  Do you have the original of that somewhere?

21   A.  No, I do not.  I have a copy, possibly.

22   Q.  All right.  On the original, is the receipt any easier to

23   read than on my copy, to your recollection?

24   A.  It may be.  If I have the -- I don't have the original.  I

25   have a copy, I'm sure.

*Martin - Cross*

1    Q.  But your copy may be --

2    A.  It may be better.

3    Q.  We may look at that over the break.

4    A.  That's fine.

5    Q.  Do you remember that Government Exhibit W47-1, the Petry

6    Travel records?

7    A.  Yes.

8    Q.  Do you remember what sort of rental car Mr. Murray got on

9    that occasion?

10   A.  Budget Rental Car.

11   Q.  And do you remember from your review of the credit card

12   records what sort of car Mr. Murray rented when he traveled

13   with his mother and his sister to -- on their vacation to

14   Virginia?

15   A.  I'll have to check.  I might have that information.

16   Q.  I think if you'll look in Optima, that will help you.

17   A.  I don't have the record.  If you could provide the record,

18   I'd be happy to look.

19   Q.  I'll show you my copy.

20   A.  From Budget Rental Car.

21   Q.  All right.  We'll get the exhibit that the records are in.

22   Do you remember some testimony from Ms. Johnson about how she

23   felt it was sort of unusual that when Mr. Murray traveled to

24   New Jersey in September that he stayed at the Sheraton Tara

25   Hotel?

*Martin - Cross*

1    A.  Yes.

2    Q.  And do you recall what she thought was so unusual about

3    that?

4    A.  He generally stayed at the Embassy Suites across the

5    street.

6    Q.  Do you know, from your review of the records, where Mr.

7    Murray stayed with when he went to New Jersey to visit Ellen

8    Johnson, the month before?

9    A.  No, I don't.  The month before, no, I don't.

10   Q.  All right.  Again, I'm going to show you my copy of the

11   Citibank Diner's Club records from Jon Murray and the Society

12   of Separationists, on July the 3rd of 1995.

13   A.  Marriott Hotel.

14   Q.  And what was the charge on that date?

15   A.  $256.34.

16   Q.  And what was the charge for the hotel that Mr. Murray

17   stayed at when he went in September?  I'm sorry.  It's on that

18   -- it's on the Petry Travel records.

19   A.  Yes.  Well, it's $112 -- it's also on the American

20   Express, September the 22nd, Sheraton Hotel, $145.

21   Q.  All right.  Let me refer you back to Diner's Club.  Do the

22   records show where Mr. Murray stayed when he traveled to

23   Houston back in March of '95?

24   A.  The Four Seasons -- well, no, not in March.  I don't see

25   March here on my schedule.  The Sheraton Astrodome.

*Martin - Cross*

1  Q.  And in April?

2  A.  I don't have that -- my schedule starts in June.  The

3  Clarion Hotel.

4  Q.  And in May, again, to Houston?

5  A.  The Double Tree Post Oak.

6  Q.  And looks like the Allen Park Inn, also, twice.  And in

7  June?

8  A.  Four Seasons Hotel.

9  Q.  And in St. Petersburg?

10  A.  Hampton.

11  Q.  So from your review of the financial records, would it be

12  fair to say that Mr. Murray stayed at a wide variety of hotels

13  during his travel?

14  A.  Yes, ma'am.

15  Q.  Do you have any knowledge of what Mr. Murray was doing

16  when he went to Florida in June?

17  A.  I don't.

18  Q.  All right.  Do your American Express records -- do your

19  summaries go back that far according to what you have on your

20  table?

21  A.  I have an entry on June 23rd for Vital Records Services.

22  That's the only thing I have.

23  Q.  I'm sorry.  For what?

24  A.  BCN Florida Vital Records Information Service in

25  Jacksonville, Florida.

Martin - Cross

1   Q.  Do you know what that is?

2   A.  No.

3   Q.  Did you make any inquiry about that?

4   A.  No.

5   Q.  That wasn't part of your money laundering investigation?

6   A.  That's correct.

7   Q.  Did you notice in July, purchases of consumer electronics

8   by Jon Garth Murray on his American Express card?

9   A.  I don't see anything on my analysis, but if you have a

10  record, I'll look at it.  Okay.

11  Q.  Do you see purchases by Mr. Murray of consumer electronics

12  in July of 1995?

13  A.  AlTex Electronics, San Antonio, Texas, July '95, yes.

14  Q.  All right.  Would a consumer electronics store be the kind

15  of place that one would purchase items like Government Exhibit

16  D77-24 and W77-25?

17  A.  I have no idea.

18  Q.  Are these electronic?

19  A.  Yes, but that could easily be anything.

20  Q.  Did you note in your analysis of the records that a

21  payment was received on Mr. Murray's American Express card in

22  February of 1996?

23  A.  The analysis I have, it stops at 1995.  I'd have to look

24  at the -- there are two payments in February.

25  Q.  Two payments in February on two separate dates?

Martin - Cross

1    A.   Yes.

2    Q.   How much money did your investigation reveal that the

3    three Murray O'Hairs and the corporate entities owed the IRS

4    when they vanished from public view?

5    A.   I didn't get to the IRS aspect of it.  I looked at the

6    probate records and some additional records that we had here,

7    I think the Travis County probate records and others that have

8    liens filed that indicates, like, $200,000 or a little more on

9    Madalyn's case, and 30,000 in Robin and, maybe, 40,000 on Jon.

10   Q.   But you didn't do any sort of a summary or an analysis of

11   how those numbers compare to the numbers on your spreadsheet,

12   did you?

13   A.   There's no relationship.

14   Q.   My question was, did you do any sort of analysis to

15   compare the amount that the O'Hairs owed the IRS with the

16   amounts reflected on your spreadsheet?

17   A.   I did not prepare because there is no relationship.

18   Q.   In your opinion, there's no relationship, but you didn't

19   do any sort of an analysis to determine the comparison between

20   those numbers and the numbers that the Murray O'Hairs owed the

21   IRS; is that correct?

22   A.   I did not prepare a analysis.

23   Q.   When the house and its contents were auctioned off, how

24   were the proceeds distributed among the IRS, if you know?

25   A.   I do not know.

Martin - Cross

1          MS. WILLIAMS:  Your Honor, are we at a good breaking

2    point?  I have some detailed questions that --

3          THE COURT:  How much longer do you think?

4          MS. WILLIAMS:  Longer than after 6:00.

5          THE COURT:  All right.  Members of the jury, I'm going

6    to give you your evening break.  Please remember the

7    instructions.  Be ready to come back at 8:30.

8        (Jury not present.)

9          THE COURT:  I don't know if that was a stall or not,

10   but do get a little bit more organized in the morning.

11         MS. WILLIAMS:  Your Honor, I need to ask him to add up

12   a bunch of things.

13         THE COURT:  I have been known in my lifetime to stall

14   at 6:00.  This is the last witness?

15         MR. CARRUTH:  It is, your Honor.

16         THE COURT:  So the scenario will be a few more

17   questions, and then, the jury will come in and go back out?

18   I'm just trying to avoid that, but that looks like that's what

19   the scenario's going to be.

20         MR. T. MILLS:  I don't anticipate a long detailed

21   motion.  I'll put one on the record.

22         THE COURT:  I don't either.  I always recommend you

23   file it, but do what you wish.  8:30 in the morning.

24       (Proceedings adjourned.)

25