FILED

1



NOV 21 2000

CLERK. U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TEXAS
2                AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                       ) Austin, Texas
                             )
5   GARY PAUL KARR           ) May 25, 2000

6

7                   VOLUME 9 of 12
                 TRIAL ON THE MERITS
8        BEFORE THE HONORABLE SAM SPARKS

    APPEARANCES:
9

10  For the United States:      Mr. Gerald C. Carruth
                                Mr. Daniel H. Mills
11                              Assistant U.S. Attorneys
                                816 Congress Avenue, Ste. 1000
12                              Austin, Texas 78701

13

14

15  For the Defendant:          Mr. Thomas W. Mills, Jr.
                                Ms. Christi N. Williams
16                              Mills & Presby
                                5910 North Central Expressway,
17                              Ste. 900
                                Dallas, Texas 75206-5141
18

19

20  Court Reporter:             Lily Iva Reznik, RPR, CRR
                                United States Courthouse
21                              200 West 8th Street
                                Austin, Texas 78701
22                              Ph: (512)916-5564

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.



*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS (AUSTIN)*

ORIGINAL

103

2

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| **I N D E X** | | | | |
| Witnesses: | | | | |
| Edmond Martin | | 5 | | |
| John L. Hart | 29 | | | |
| Bonnie J. Davis | 39 | 47 | 56 | 57 |
| Gary G. Albrecht | 58 | 66 | | |

| | Page |
|---|---|
| Proceedings adjourned | 78 |

*LILY I. REZNIK*
*UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS (AUSTIN)*

3

```
 1                          E X H I B I T S

 2                                        Offered      Admitted

 3      Government's

 4      #W77-29 Photo                       74           75

 5      #W77-30 Photo                       75           75

 6      #W79-6 Photo                        75           75

 7      #W79-7 Photo                        75           75

 8      #W92-1 Yahoo! E-mail Records        25           25

 9

10

11      Defendant's

12      #D42 Drug Emporium Receipt           5            5

13      #D43 U.S. Tax Court Documents        9            9

14      #D44 Request to Interpol            22           22

15      #D45 Blockbuster Video Affidavit    27           27

16

17

18

19

20

21

22

23

24

25
```

1    THE COURT:  All right.  Counsel.  Anything further

2  before I bring the jury in?

3    MR. CARRUTH:  I'm sorry, your Honor.  No, I have

4  nothing further.

5    MR. T. MILLS:  No, Judge.

6    THE COURT:  All right.  Bring the jury in.

7    (Jury present.)

8    THE COURT:  Okay.  This is a courtroom, not a chat

9  parlor.  Members of the jury, since we last met, has anybody

10  attempted to talk to you about this case?

11    THE JURORS:  No.

12    THE COURT:  And have you talked to anybody about the

13  case?

14    THE JURORS:  No.

15    THE COURT:  And have you learned anything at all about

16  the case outside the presence of each other and the courtroom?

17    THE JURORS:  No.

18    THE COURT:  Now, I'm advised by Mr. Mace that one of

19  you had car problems yesterday.  When you have a car problem

20  of any nature -- and I should have covered this -- don't

21  hesitate.  Come right back over here.  We have people here 24

22  hours a day.  Just tell them who you are, and they'll give you

23  assistance right quick.

24    And I'm sorry that you got delayed for a while.  We

25  were down here, trying to make your stay as efficient and as

5

Martin - Cross

1    enjoyable as possible.  Don't hesitate to ask for assistance

2    if you need assistance at any time.  Give somebody something

3    to do.  You know, federal employees are always accused of not

4    doing much.  You're learning differently today, but we still

5    want to -- any time to be able to assist you like that, we

6    will do so.  So don't hesitate.

7        All right.  Ms. Williams, the witness is yours.  Mr.

8    Martin, you're still under oath.

9                    CROSS-EXAMINATION(Resumed)

10   BY MS. WILLIAMS:

11   Q.  We talked yesterday about a receipt from Drug Emporium,

12   and over the evening, you provided me with the original.  And

13   I hand you what's been marked as Defendant's Exhibit 42.  Is

14   that the receipt you handed me this morning?

15   A.  Yes, ma'am.

16   Q.  Offer Defendant's 42.

17       THE COURT:  Received.

18   Q.  (BY MS. WILLIAMS) Does that receipt indicate that, in

19   fact, what Jon Murray purchased on August the 26th of 1995 was

20   some prescription medication and what appears to be some other

21   items from Drug Emporium that aren't identified for Madalyn

22   Murray O'Hair?

23   A.  Well, a prescription does say.  I don't know what the

24   other items were.  Prescription for Madalyn Murray O'Hair.

25   Q.  What does the memo on the check indicate?

*Martin - Cross*

1   A.   MMOH.

2   Q.   Indicating Madalyn Murray O'Hair?

3   A.   Yes.

4   Q.   All right. We don't know what the other items are that are

5   indicated on that receipt, correct?

6   A.   That's true.

7   Q.   What price was the prescription?

8   A.   Prescription was $96.59.

9   Q.   And was there another large item indicated on the receipt?

10  A.   Looks like one item for $61.39.

11  Q.   And you don't have any idea what that is, correct?

12  A.   No, name.

13  Q.   You recall the pharmacist testifying about the approximate

14  price of a blood testing machine?

15  A.   Yes.

16  Q.   And in your recollection, is that within the range of that

17  -- that price range that he testified about?

18  A.   It is.

19  Q.   During your investigation, did you interview a man by the

20  name of David Travis?

21  A.   I did.

22  Q.   And could you tell the members of the jury briefly who he

23  is?

24  A.   He is a former employee of the American Atheist, and he is

25  currently employed by the Internal Revenue Service.

*Martin - Cross*

1   Q.   When you interviewed him, did he indicate to you that he

2   had some concerns about money being missing from the Atheist

3   Organization?

4   A.   He did.

5   Q.   Did he indicate to you that he had witnessed several

6   instances of cash coming into the Atheist Organization through

7   a donation of some kind that didn't end up on the books of the

8   Atheist Organization for which he was responsible?

9   A.   I reviewed the memo, but I didn't get everything done.

10  I'm not sure he said that or not in the memo.  If you have the

11  memo, I'd like to look at it.

12  Q.   Do you recall a letter that he had prepared to be sent to

13  the Austin Police Department that, to my understanding, wasn't

14  ever sent that talked about some allegations of cash missing?

15  A.   Again, if I could see the letter, I'll let you know, sure.

16  Q.   I think this is your file.  You may be able to find it

17  more quickly than I.

18  A.   Okay.

19  Q.   To my recollection, it's a two-page letter, addressed to

20  the Chief of Police of Austin Police Department?

21  A.   Oh, okay.  I was looking at that --

22  Q.   I don't think it's -- I don't remember it being in your

23  notes.

24  A.   Referring to the $492 in cash and which belonged to the

25  organization?

*Martin - Cross*

1  Q.  I think there are several instances if you'll read on in

2  the letter.

3  A.  Well, various topics in the letter.  Evidently, unless I

4  sit here and read it all, I can't recall everything that's in

5  here.

6  Q.  Does that refresh your recollection, though, that Mr.

7  Travis had told you about some instances he had witnessed

8  where money had come into the organization and then, wasn't

9  recorded on the books?

10 A.  In accordance with his information, yes.

11 Q.  Right.  That's all I'm asking.  Did you do anything in the

12 course of your money laundering investigation to determine

13 whether or not those type allegations were true?

14 A.  No.

15 Q.  When you were investigating the money laundering

16 allegations?

17 A.  Yes.

18 Q.  Can you put a time period on when that was?

19 A.  The entire time.

20 Q.  Did you review Defendant's Exhibit No. 43?

21 A.  Upon receipt of this, about two weeks ago, a week ago, I

22 looked at it briefly.

23 Q.  All right.  And that was the first time that you knew of

24 that document?

25 A.  First time we had requested the document, yes.

*Martin - Cross*

1   Q.   So when you initially were investigating the theft of

2   $600,000 by Jon Murray, you didn't go back and look at the tax

3   investigation that had been ongoing?

4   A.   No.

5   Q.   I'll offer Defendant's Exhibit 43.

6        MR. CARRUTH:  No objection, your Honor.

7   Q.   (BY MS. WILLIAMS) All right.  Tell the members of the jury

8   what that is.

9   A.   It's a certification of documents from the United States

10  Tax Court in Washington that includes a order of dismissal and

11  decision, a docket sheet, a petition.  Looks like the Revenue

12  agent's report, assessment of the tax liability.  And this

13  particularly relates to Robin Murray O'Hair.  Then, an answer

14  attached to that.  Those four documents.

15  Q.   All right.  Let me turn your attention to the pages that

16  I've marked with a green question mark flag.  And review that,

17  if you would, and then, look at the second page that I've

18  marked with a question mark flag.

19  A.   No.

20  Q.   All right.  That document indicates that the Internal

21  Revenue Service was alleging that Robin Murray O'Hair had

22  deposited into her personal bank account or into the joint

23  bank account she shared with her brother and her grandmother

24  certain items of bequests to the American Atheist

25  Organization; is that correct?

*Martin - Cross*

1   A.   That's what that indicates, yes.

2   Q.   What are some of the amounts of the bequests that the

3   Internal Revenue Service alleged had gone into the personal

4   bank account of Robin Murray O'Hair?

5   A.   There was a deposit of $14,000, which was split between a

6   money market account and a CD.

7   Q.   All right.  And?

8   A.   There was a deposit of $3800 in Travelers Cheques.

9   Q.   That the IRS alleged that they couldn't find the source

10  of, right?

11  A.   That's what it says here.

12  Q.   And?

13  A.   That's back in -- all in 1986, by the way.

14  Q.   Okay.  And?

15  A.   In April of 1987, $5600 cash currency deposit.

16  Q.   And?

17  A.   And in May of '87, $2,800 deposit to a check which a

18  portion apparently went to a CD.

19  Q.   What was that check addressed to?  Where was it -- what

20  was the notation?

21  A.   Check from Boyd Development Company.

22  Q.   And what's the next one?

23  A.   $4,915.

24  Q.   And where did that come from?

25  A.   Apparently, it was a Alios, A-L-I-O-S, Berkowez,

*Martin - Cross*

1   B-E-R-K-O-W-E-Z.

2   Q.  Does it say estate of?

3   A.  The estate of, yes.

4   Q.  All right.  So someone had apparently bequeathed some

5   money to the Atheist Organization, but that money ended up in

6   the personal bank account -- one of the personal bank accounts

7   of Robin Murray O'Hair, correct?

8   A.  Yes.

9   Q.  What's the next one?

10  A.  $294 of currency.

11  Q.  And the next one?

12  A.  On -- this doesn't make any sense.  On February 29th, I'm

13  sorry, it's 88, bad copy, $22,423.

14  Q.  All right.  And where did this $22,000 in round numbers

15  come from?

16  A.  From estate of Finley Hall.

17  Q.  All right.  $224,000?

18  A.  No, no.

19  Q.  22,000?

20  A.  22,000.

21  Q.  Is that the last one?

22  A.  Yes.

23  Q.  If you had been investigated for tax fraud for putting

24  corporation money into your personal bank account, are you

25  with me so far?

Martin - Cross

1   A.   I'm here, yes, ma'am.

2   Q.   All right.  And if the IRS had caught you and if you

3   wanted to continue to deposit corporation money for your own

4   use, would you continue to put it in the same bank account

5   where the IRS had caught you?

6   A.   First of all, this was not fraud, this was civil

7   adjustment.  There were no fraud adjustments here.

8   Q.   All right.  If --

9        THE COURT:  She's asking you a question:  Would you

10  use another account or assuming that you're doing all that

11  stuff?

12  A.   I assume they would use another account, yes.

13  Q.   (BY MS. WILLIAMS) It would make sense, wouldn't it?

14  A.   It could using just plain basic common sense, yes.

15  Q.   During your money laundering investigation, did you go

16  back and analyze these accounts that you've talked about in

17  this trial to determine whether or not you could find the

18  source of all the deposits?

19  A.   No, ma'am.

20  Q.   All right.  You didn't do that for any year, did you?

21  A.   No.

22  Q.   Let me hand you Government's Exhibit W157.  It's already

23  in evidence.

24  A.   Yes, ma'am.

25  Q.   All right.  That's the tax return of the United

Martin - Cross

1   Secularists of America, the Form 990 for 1995 --

2   A.   Yes, ma'am.

3   Q.   -- correct?  Tell the members of the jury how much money

4   the United Secularists reported -- and I think it's the first

5   yellow tab there -- in as gifts, grants and contributions --

6   is that where bequests would go to your knowledge?

7   A.   To my knowledge, yes.

8   Q.   All right.  In 1991?

9   A.   $576,000 -- 1991, $330,012.

10  Q.   All right.  And in 1992?

11  A.   $99,992.

12  Q.   And in 1993?

13  A.   $134,601.

14  Q.   And in 1994?

15  A.   $11,640.

16  Q.   Let me ask you to turn to the second yellow tab there and

17  where it -- where the IRS form asks for the organization to

18  account for where they got these amounts.  What does it say?

19  A.   Are you referring to the "No single contributor gave 5,000

20  or more during a year"?

21  Q.   It says "No single contributor gave $5,000 or more," but

22  what does it say above that?

23  A.   Not open to public inspection.

24  Q.   All right.  So, in other words, the United Secularists of

25  America were telling the IRS, "We're not going to tell you who

*Martin - Cross*

1   gave us this money," right?

2   A.  Well, they're stating not open to public inspection.

3   Q.  We're not going to tell you who gave us this money?

4   A.  It's not stated here, no.

5   Q.  All right.  So if you were a person who gave a bequest in

6   one of these years, it would be no way to tell whether that

7   bequest actually made it to the United Secularists of America,

8   right?

9   A.  From this form, no.

10  Q.  From what they reported to the Internal Revenue Service?

11  A.  From this form, no.

12  Q.  All right.  Now, do you notice that there's a pretty big

13  discrepancy between the years?

14  A.  Yes, ma'am, there is.

15  Q.  All right.  And if -- I think you brought your calculator

16  at my request, didn't you?

17  A.  Yes, ma'am.

18  Q.  All right.  If you calculate the difference between how

19  much they reported in 1994 and how much they reported in the

20  lowest other year, 1992, what's the difference?

21  A.  About $88,000.

22  Q.  $88,000 less than they had reported in the prior three

23  years was reported in 1994?

24  A.  At that time, correct.

25  Q.  And if you take the highest number, 1991, and subtract how

*Martin - Cross*

1    much they reported in 1994, what number do you get in round

2    figures?

3    A.   About $319,000.

4    Q.   When you received these documents and you looked at them

5    as a fraud investigator, did that concern you at all?

6    A.   No, ma'am.

7    Q.   Isn't it true that when you began to consult with the

8    United States Attorney's Office and you changed the focus of

9    your investigation that as Mr. Carruth referred to in his

10   opening statement, you looked at this case as a puzzle?

11   A.   Yes, ma'am.

12   Q.   And isn't it true that instead of taking the pieces of the

13   puzzle and putting them together and see what picture you got,

14   that what you did instead was you had a picture in your mind

15   and you took the pieces that fit the picture and you put those

16   pieces in the picture?

17   A.   I can't answer that.  I didn't do -- well, I tried to

18   remain objective in the whole investigation.

19   Q.   All right.  If you found a piece of the puzzle that didn't

20   fit what you thought the outcome should be, you just put it to

21   the side; isn't that true?

22   A.   No, ma'am.

23   Q.   Do you remember me yesterday asking you about these -- the

24   dogs disappearing, the two cocker spaniels from the enclosure

25   at the Atheist Headquarter?  Do you remember me asking?

Martin - Cross

1   A.   Yes, ma'am, I remember that.

2   Q.   All right.  That piece of the puzzle doesn't really fit a

3   kidnapping, doesn't it?

4   A.   No, it doesn't.

5   Q.   Put that one to the side.

6   A.   Well, yes, there was no way to investigate them.

7   Q.   You heard Detective Bjorklund testify that there was a Jon

8   Murray registered at the Interstate Inn in October.  That

9   didn't fit your theory of the case, correct?

10  A.   No, ma'am, because of the person Jon Murray in that

11  instance received a trucker's discount.  So in that case, it

12  was probably not Jon Murray, our Jon Murray.

13  Q.   All right.  So you put that to the side?

14  A.   Yes.

15  Q.   Because it didn't fit the picture, right?

16  A.   Because it was not part of the investigation.

17  Q.   Do you allow for the possibility at all that some amount

18  of money was deposited into a bank account by the Murray

19  O'Hairs during the year 1994?

20  A.   I'm sure that money was deposited.  They operated a number

21  of bank accounts.

22  Q.   Do you allow for the possibility that this decrease in

23  gifts and contributions in 1994 was deposited into a bank

24  account you didn't find?

25  A.   That's possible.

Martin - Cross

1    Q.   During your three-year investigation, you've gotten many

2    reports of people seeing Madalyn, Jon and Robin?

3    A.   We did not receive many reports.  The APD, from the

4    records that we've seen, received a lot of reports.

5    Q.   All right.  Did you make it a part of your investigation

6    to investigate any of those reports?

7    A.   Some of those were reviewed.  Most of them were reviewed

8    by the APD and as my understanding, they still continue to

9    receive reports.

10   Q.   And as the case agent who's been on this case the longest,

11   did you make it a part of your investigation to look at any of

12   those?

13   A.   To look at any of the ones that APD had?

14   Q.   Well, to look at any reports that came into your knowledge

15   of sightings.

16   A.   The information that we received from APD at the time we

17   looked at and most of the instances APD had done something to

18   those.  And follow-up to that, I requested Interpol to make

19   inquiries.

20   Q.   All right.  And I want to come back to Interpol in just a

21   minute.

22   A.   All right.

23   Q.   Didn't you determine during your investigation that Jon

24   Murray had been in secret contact with a man named Don

25   Sanders?

*Martin - Cross*

1  A.  I don't know if it was secret contact, but there is

2  documentation that indicates Mr. Sanders, he had lots of

3  correspondence.

4  Q.  And didn't -- in reviewing the correspondence, didn't it

5  appear to you that they used codes?

6  A.  There are some codes, if I remember right, yes.

7  Q.  Didn't it appear to you that one or both of them was very

8  concerned with when faxes would go back and forth and whether

9  or not they should talk on their home phones?

10  A.  I think that might be in there, yes.

11  Q.  Did that not indicate to you that this correspondence or

12  this communication was intended to be kept secret?

13  A.  Yeah, appeared to be concerned about, maybe, leaks of

14  information concerning the Kassala Library.

15  Q.  And in regard to that library, didn't you determine that

16  Jon Murray, Don Sanders and Conrad Goeringer were conspiring

17  together to hide assets because of a trial?

18  A.  They were concerned about the library in the trial, yes.

19  Q.  My question was, did it appear to you that they were

20  conspiring to hide assets because of this Truth Seeker trial?

21  A.  Well, they were talking together, conspiring, I don't know

22  that.  That kind of gives a criminal intent to it.  I don't

23  know necessarily they were conspiring.

24  Q.  Were they putting the library in Houston?

25  A.  Yes, ma'am, as far as I know.

19

Martin - Cross

1  Q.  Were they trying to keep the fact that they were putting

2  the library in Houston a secret?

3  A.  From some people, yes.

4  Q.  Specifically from the plaintiffs in the Truth Seeker

5  trial?

6  A.  They were concerned that the Truth Seekers may acquire the

7  library and burn it, yes.

8  Q.  In reviewing that correspondence, didn't you determine

9  that in addition to whatever was going on with the library

10 that Mr. Murray was requesting Mr. Sanders to help him

11 liquidate the O'Hairs' art collection?

12 A.  There was some in there, yes.

13 Q.  And in some of that correspondence, didn't Mr. Murray even

14 characterize his quest to liquidate the art collection as

15 desperate?

16 A.  At this point in time, if you can refer me to a document,

17 I can tell you whether I said "desperate."  I don't remember

18 that I said "desperate."

19 Q.  You don't remember that?

20 A.  No.

21 Q.  During that correspondence, didn't Mr. Murray indicate

22 that they were selling the grandfather clock from their home?

23 A.  I cannot recall that.

24 Q.  The piano from their home?

25 A.  I think I remember the piano.

*Martin - Cross*

1   Q.  During that correspondence, didn't Mr. Murray indicate

2   that he could rent a storage unit under the name John Murray,

3   J-O-H-N, Murray, because there are lots of Jon Murrays in the

4   phone book?

5   A.  That's correct.

6   Q.  During that correspondence, didn't you obtain information

7   that Jon Murray was talking about selling all three of their

8   vehicles?

9   A.  I don't know if he said all three, but there was

10  conversation, or at least communication, about a 300 SEL or

11  something to that effect.

12  Q.  Don't you remember that during this period of time, they

13  apparently, according to the correspondence, sold Ms. O'Hair's

14  Mercedes?

15  A.  Yes.

16  Q.  And how did they do that?

17  A.  I'm not familiar.  If you'll show me the document, I'll

18  look and tell you.

19  Q.  Do you recall that they discussed using the car lot?

20  A.  A car what?

21  Q.  A car lot, car dealer.

22  A.  Yes, they were talking about consignment of the vehicle,

23  it looks like.

24  Q.  And in the correspondence that I've just handed you, do

25  you see references to both Robin's Porsche and John's

*Martin - Cross*

1  Mercedes --

2  A.  Yes, ma'am.

3  Q.  -- possibly being sold?

4  A.  Yes, this is in 1993, May 12th.

5  Q.  Did you, in fully investigating this case, go back and

6  look at the bank accounts of the Murray O'Hairs to see whether

7  or not you could find the proceeds of any of these sales in

8  the bank accounts you knew about?

9  A.  No, ma'am.

10  Q.  Wouldn't that have been able to give you a lot of

11  information about -- I mean, you knew that they had sold them

12  assets, correct, according to this correspondence?

13  A.  Yes.

14  Q.  If you went back and analyzed the bank accounts and found

15  that you didn't see a deposit that reflected the sale of these

16  assets, wouldn't that have given you some clue as to whether

17  or not you should look for other bank accounts?

18  A.  Yes, I assume it was.

19  Q.  All right.  Isn't it true, then, in reviewing this

20  correspondence, you determined that there was the possibility

21  that Mr. Sanders had assisted the Murray O'Hairs in obtaining

22  false identification?

23  A.  It did say something to that effect.

24  Q.  And didn't you put enough credence in what you read that

25  when you reported to Interpol to be on the look-out for Jon

22

*Martin - Cross*

1   Murray that that's what you told them?

2   A.   I believe so, yes.

3   Q.   Didn't you, in fact, report to Interpol that you believed

4   that the Murray O'Hairs had false passports?

5   A.   I may have.

6   Q.   Hand you what I've marked as Defendant's Exhibit 44.   Do

7   you recognize that?

8   A.   Yes, ma'am.

9   Q.   All right.   What is it?

10   A.   It is my request to Interpol, Department of Justice, Chief

11   Interpol U.S. NCB, Dave Norwak.

12   Q.   All right.   I'll offer Defendant's Exhibit 44.

13        MR. CARRUTH:   No objection, your Honor.

14        THE COURT:   44's received.

15   Q.   (BY MS. WILLIAMS) In this request, what's the date of the

16   request?

17   A.   December 30th, 1997.

18   Q.   In this request, don't you indicate, on page 3, that they

19   will be traveling under false United States passports?   Page

20   3, middle of the page, under Action Information Request.

21   A.   I did indicate that, yes.

22   Q.   All right.   And didn't you indicate -- continue on in that

23   sentence that you didn't know the name that they might be

24   using?

25   A.   That's right.

23

1  Q.  Look at the page a little and did you put in bold, "It is

2  alleged as of December 1997 that the three subjects moved to

3  Iceland or Greenland"?

4  A.  That was an allegation, yes.

5  Q.  All right.  Where did you get that information?

6  A.  At this time, I can't recall.

7  Q.  Do you recall the substance of it?

8  A.  Not at this time, I don't.

9  Q.  Would it have been from some of the reports that you

10  reviewed from the Austin Police Department?

11  A.  It's possible.

12  Q.  When you issued this request to Interpol, did you include

13  the full names of the Murray O'Hair family?

14  A.  Yes.

15  Q.  Did you include Robin Murray O'Hair's middle name?

16  A.  At that time, I didn't know her middle name.

17  Q.  Did you include Ms. O'Hair's middle name?

18  A.  At that time, I didn't know Ms. O'Hair's middle name.

19  Q.  Did you later determine what those names were?

20  A.  Later in the investigation, yes.

21  Q.  All right.  Did you later determine that there were

22  aliases that Ms. O'Hair had used in the past to run from the

23  United States?  Did you determine that there were other names?

24  A.  There were other names, yes.

25  Q.  Did you issue a later report to Interpol advising them of

*Martin - Cross*

1  those names?

2  A.  No, I did not.

3  Q.  Wouldn't that have assisted Interpol, possibly, in

4  determining whether or not they were in another country?

5  A.  They had no response from Interpol, so therefore, I felt

6  that there was no -- there was nothing there.  They were not

7  looking for her.

8  Q.  Isn't it possible that you didn't get any response because

9  you didn't give them the right information?

10  A.  Well, it's possible.

11  Q.  You included, again, on page 3, fourth full paragraph, the

12  information that Ms. O'Hair had in the past run from pending

13  criminal charges?

14  A.  Yes.

15  Q.  You indicated that she moved to Mexico?

16  A.  Yes.

17  Q.  And that she was extradited back to Texas?

18  A.  That's correct.

19  Q.  What country, specifically, did you ask Interpol to look

20  at?

21  A.  In Mexico, Canada and New Zealand.

22  Q.  Did you ever write a letter to Interpol and say, "Stop

23  looking, we don't need you to look anymore"?

24  A.  No, I did not.

25  Q.  You didn't?

*Martin - Cross*

1    A.  No.

2    Q.  Did you ask Interpol to look in Romania?

3    A.  No, I didn't.

4    Q.  If you had reviewed the Austin Police Department reports

5    in 1998, you could have asked them to look in Romania,

6    couldn't you?

7    A.  That is possible, but in 1998, I did not review the Austin

8    Police Department's files, and they didn't provide those to me

9    either.

10   Q.  I don't have anything further, your Honor.

11           MR. CARRUTH:  And the government has nothing further,

12   your Honor.  And we would re-offer at this time, Government

13   Exhibit W92-1.

14           MS. WILLIAMS:  To the portion that is now being

15   offered, I have no objection.

16           MR. CARRUTH:  Thank you, your Honor.

17           THE COURT:  Government 92-1 would you identify it, Mr.

18   Carruth, for the record?

19           MR. CARRUTH:  You want it identified?

20           THE COURT:  Yeah, just so they know what it is.

21           MR. CARRUTH:  It is an affidavit from Yahoo! recording

22   electronic mail or e-mail between --

23           THE COURT:  All right.

24           MR. CARRUTH:  -- the principals in this case.

25           THE COURT:  All right.  It's received.

1        MR. CARRUTH:  Thank you, your Honor.  At this time,

2   the United States will rest its case in chief.

3        THE COURT:  Members of the jury, I'm going to give you

4   a break, ten minutes.  Be ready to come back in about ten

5   minutes.

6      (Jury not present.)

7        THE COURT:  All right.  Counsel, I have reviewed the

8   Rule 29 motion.  Do you desire argument on it, Mr. Mills?

9        MR. T. MILLS:  No, sir, I think the grounds are -- I

10  attempted to make them succinct.

11       THE COURT:  They are very succinct.  And the motion is

12  overruled or carried.  Now, tell me what your plans are with

13  regard to presentation of evidence?

14       MR. T. MILLS:  Yes, sir.  We have four witnesses

15  present, and they're short.  I wouldn't be surprised if the

16  whole thing, including cross, took less than an hour or an

17  hour and a half.

18       THE COURT:  Well, let's see.  And then, I'll ask the

19  jury after the presentation of all the evidence.  So that will

20  be the game plan.  We'll see how much more evidence we have so

21  we can figure out how much time we're going to have, one, to

22  review and prepare the instructions and give the jury their

23  instructions.

24       All right.  So we will -- y'all take your break, and

25  we'll start in a few minutes.

1    MR. CARRUTH:  Your Honor, with the Court's permission,

2  we're re-offering in the presence of the jury the photographs

3  in lieu of the actual firearms themselves.

4    THE COURT:  Right.

5    MR. CARRUTH:  Just make that proffer so the jury --

6    THE COURT:  So the jury understands.

7    MR. CARRUTH:  And, also, the knives, the hunting

8  knives.

9    THE COURT:  That's right.

10    (Recess.)

11    THE COURT:  All right.  Are you ready to proceed, Mr.

12  Mills?

13    MR. T. MILLS:  Yes, sir.

14    THE COURT:  Rod, bring them in.

15    (Jury present.)

16    THE COURT:  Mr. Mills, you may call your first

17  witness.

18    MR. T. MILLS:  Thank you, your Honor.  My first

19  evidentiary matter, your Honor, is by agreement.  Defendant's

20  Exhibit No. 45, in response to a defense subpoena to

21  Blockbuster Video, in San Antonio, for records of Jon Murray

22  from September 1995.  I would like to offer Defendant's

23  Exhibit No. 45, which is an affidavit of custodian of records.

24    MR. CARRUTH:  No objection, your Honor.

25    THE COURT:  It's received.

1    MR. T. MILLS:  It's brief.  May I read it to the jury?

2    THE COURT:  You may.

3    MR. T. MILLS:  My name is Mark Peralt.  I'm over 18

4  years of age, of sound mind, and personally acquainted with

5  the facts stated in this affidavit.  I am manager of Systems

6  Development for Blockbuster, Inc.  The customer transaction

7  records are kept within the regular course of business of

8  Blockbuster, Inc. of which an employee or representative in

9  the regular course of their business made, recorded, noted, or

10  otherwise recorded the acts and events which are shown

11  therein.

12    The records are made by persons employed by

13  Blockbuster, Inc., who had knowledge of the events recorded,

14  and the record was made pursuant to their regular duties at or

15  near the time the transactions were made or the occurrence of

16  the matter recorded.

17    Generally, records of all customer transactions which

18  occur in our stores are kept on our corporate database system

19  for a period of 24 months after which they are purged from our

20  system.  Said transaction records are only available at the

21  store level for a period of 90 days from the date the

22  transaction occurs.

23    Further, affiant sayeth not, and it's signed before a

24  notary by Mark Peralt.

25    THE COURT:  45's received.

Hart - Direct

1      MR. T. MILLS:  Thank you.  I will get our next

2  witness.

3      THE COURT:  All right.

4    (Witness was sworn.)

5      THE COURT:  If you'll walk around this column, please,

6  sir, and have a seat right up here in the witness chair.  If

7  you'll tell us your full name, please, sir, and spell your

8  last name.

9      THE WITNESS:  My name is John Larry Hart.  My last

10  name is spelled, H-A-R-T.

11    JOHN LARRY HART, called by the Defendant, duly sworn.

12                     DIRECT EXAMINATION

13  BY MR. T. MILLS:

14  Q.  Where do you live, Mr. Heart?

15  A.  I live in New Port Richey, Florida; it's about 30 miles

16  north of the St. Petersburg on the Gulf of Mexico.

17  Q.  All right.  And how are you employed?

18  A.  I'm an attorney-at-law, licensed to practice in the state

19  of Florida and in the state of Colorado.

20  Q.  All right.  Are you married?

21  A.  I am.

22  Q.  And you have two daughters?

23  A.  I do.

24  Q.  Where did you graduate from college?

25  A.  I got my undergraduate degree from the University of

*Hart - Direct*

1   Florida in Gainsville, Florida, and received my law degree

2   from the University of Florida in Gainsville, Florida, with

3   honors in 1976.

4   Q.  And after graduating from law school, what kind of work

5   did you begin doing?

6   A.  I was a state prosecutor for just under six and a half

7   years in Pinellas, Pasco County, the district in Florida

8   populated by slightly over a million people.

9   Q.  All right.  And then, after being a state court -- state

10  prosecutor, what was your next employment?

11  A.  I was appointed to serve as an Assistant United States

12  Attorney in the Middle District of Florida, and I served in

13  that capacity for about slightly over two years and after, for

14  a short period of time, as a Special Assistant U.S. Attorney

15  to handle some appellate work in federal cases I had handled

16  as a federal prosecutor.

17  Q.  And then, did you go into private practice after that?

18  A.  I did.  It was in 1985.  I joined the law firm I am still

19  with, Carlson & Meisner.

20  Q.  All right.  In 1996, did you have an occasion to have an

21  interview with Gary Karr?

22  A.  I did.

23  Q.  All right.  And do you recognize Mr. Karr?

24  A.  Yes, he looks very familiar to me.  I think he weighs a

25  bit more.

*Hart - Direct*

1   Q.  All right.  Your Honor, I'm going to ask the witness about

2   conversations that would be privileged.  Mr. Karr has

3   previously waived that privilege so that he may testify.  I

4   don't know if I need to do anything more formally than that

5   for the record.

6          THE COURT:  Ask your question and we'll find out.

7          MR. CARRUTH:  Your Honor, we'd object to that as

8   self-serving hearsay.

9          THE COURT:  We'll see.  I don't -- both of you think I

10  know what the future is, and I don't.  I appreciate the

11  compliment, but I don't.  I have this ball up here and every

12  time I look at it, everything's upside down.  Let's proceed

13  with questions and object when you think it's necessary.

14         MR. CARRUTH:  Thank you, your Honor.

15  Q.  (BY MR. T. MILLS) Did you have -- can you tell us the date

16  that you had a meeting with Mr. Karr?

17  A.  I'd have to look at my notes.

18  Q.  All right.

19  A.  My sheet.  I'm referring to a two-page client information

20  sheet that I have.  My own notes and the sheet itself reflects

21  our meeting occurred on February 6th of 1996, in my office in

22  New Port Richey, Florida.

23  Q.  All right.  Do you recall or do your notes reflect about

24  how long the meeting was?

25  A.  Yes.

*Hart – Direct*

1  Q.  How long was that?

2  A.  Slightly over two hours.  I put two plus hours.

3  Q.  All right.  Now, in the abstract, the rules regarding

4  attorneys would allow an individual to come to you and confess

5  to a crime, and that would be privileged between you and --

6        MR. CARRUTH:  I object to leading and suggestive, your

7  Honor, questioning by Mr. Mills.

8        THE COURT:  It's also a question of law.  Rephrase

9  your question.

10        MR. T. MILLS:  Yes, sir.

11  Q.  (BY MR. T. MILLS) Would you state whether or not

12  conversations between an attorney and client are privileged?

13  A.  Certainly in Florida, under the circumstances under which

14  I met with Mr. Karr, they would have been privileged.

15  Q.  All right.  Would you explain what privileged means?

16  A.  Well, that means they would not be revealed to any other

17  person.  They would remain confidential between Mr. Karr and

18  myself.

19  Q.  All right.  In the conversation that you had with Mr.

20  Karr, did Mr. Karr state anything to you that was

21  incriminating to him?

22        MR. CARRUTH:  Objection to leading and suggestive,

23  your Honor.

24        THE COURT:  It is leading.

25        MR. CARRUTH:  And I object to anything Mr. Karr stated

33

Hart - Direct

1   to this attorney because it would be hearsay, and it would be

2   self-serving hearsay.

3          THE COURT:  All right.  Members of the jury, I'm going

4   to let you take a short break.  I want to make sure you get

5   plenty of exercise today.

6       (Jury not present.)

7          THE COURT:  Counsel, y'all know, you know, y'all are

8   four feet from that jury, and when you say something that I

9   can hear, like "It's obviously hearsay," "I'll go get a case,"

10  every one of those jurors are hearing that.  So let's don't

11  have any more.

12         MR. D. MILLS:  I'm sorry, your Honor.

13         THE COURT:  All right.  What is the theory of trying

14  to get self-serving hearsay under the record under an

15  admission?  Do you have any case law that would allow this?

16         MR. T. MILLS:  Well, I wasn't going to get -- attempt

17  to get the words from Mr. Karr, I was going to attempt to get

18  the conclusions that this witness drew from the conversation,

19  and it doesn't seem like that is eliciting the hearsay.

20         THE COURT:  Let's find out how you're going to do it,

21  and we'll see if it's admissible.

22         MR. T. MILLS:  All right.  I was also thinking -- and

23  I have discussed this case on so many occasions with Mr.

24  Carruth that I may be wrong -- that in his opening statement

25  that he said that Mr. Karr talked with the lawyer and that

1    there was a recording made.  And so I was going to address

2    that issue.

3          MR. CARRUTH:  May I respond to that?  It was Charlene

4    Karr who said that she believed there was a recording made

5    based on what Mr. Karr told her in his statement, given to Mr.

6    Martin.  The defendant, Gary Karr, stated that he went to a

7    lawyer and that the lawyer gave him some advice.

8          THE COURT:  That's a fact.  You can ask that --

9          MR. CARRUTH:  But this is a lay witness, and he's

10   asking him to state an opinion of conclusion.  He's not an

11   expert.

12         THE COURT:  He hasn't asked him anything yet.  And I

13   assume he's going to ask if there was a recording, and that's

14   a fact.

15         MR. CARRUTH:  It is, your Honor, but in his

16   representation to the Court, he said he wanted him to kind of

17   paraphrase what he said or give his opinion and that he's not

18   competent to give an opinion.

19         THE COURT:  Let's hear it.

20         MR. T. MILLS:  All right.

21   Q.  (BY MR. T. MILLS) Well, first of all, let me address a

22   couple of issues.  Did you take very many notes?

23   A.  I took no notes of the substance of the conversation.

24   Q.  All right.  Did you make a recording of the conversation?

25   A.  I did not.

*Hart - Direct*

1    THE COURT:  If so, he would not be competent.  But go

2  ahead.

3  Q.  (BY MR. T. MILLS) This is -- who is Chuck Phillips?

4  A.  Chuck Phillips is an associate in my office.  He works in

5  the New Port Richey office.  Our office really has two

6  locations.

7  Q.  All right.

8  A.  The New Port Richey is a smaller office with three

9  lawyers.  Chuck works in that office with me.

10  Q.  Is he a criminal defense lawyer?

11  A.  He is not.

12  Q.  Do you have any knowledge about Mr. Karr ever meeting --

13  having a conversation with Chuck Phillips?

14  A.  He did not.

15  Q.  All right.  In your conversation -- after you had an

16  interview with Mr. Karr, did you discuss your professional

17  opinion about different options that he had?

18  A.  I did.

19  Q.  And did you advise Mr. Karr that in your professional

20  opinion that he had personal criminal responsibility?

21    MR. CARRUTH:  It's a leading question, your Honor, and

22  it suggests the answer that he desires.

23    THE COURT:  Well, I understand that, but we're here

24  trying to find out what the evidence is, so I can get a grip

25  on what's admissible or not.  Question is what advice did you

1    give Mr. Karr.

2    A.  I did not advise him that based on what I was aware of

3    that he had criminal responsibility.

4    Q.  (BY MR. T. MILLS)  All right.

5    A.  I never indicated that to him.

6    Q.  All right.  Did you talk with him in person or by

7    telephone after the first day?

8    A.  I spoke with him the very next day for approximately three

9    quarters of an hour.  I made note of the date and the amount

10   of time I spent with him.  And we did speak again, so we've

11   cleared up a couple of things that were up in the air.  I

12   think he had some follow-up questions that he wanted to run by

13   me.

14   Q.  All right.  Did you have any different advice to give him

15   after speaking with him the next day?

16   A.  No, I didn't.

17   Q.  While I would be attempting not to ask leading questions,

18   that would be the substance that I would like to elicit from

19   this witness.

20        THE COURT:  Okay.  Mr. Hart, I'm going to ask you to

21   stand out in the hall.

22        THE WITNESS:  Oh, certainly.

23        MR. CARRUTH:  Your Honor, under Rule 704 of the

24   Federal Rules of Evidence, he's attempting to elicit testimony

25   as to an opinion on an ultimate issue which is to be decided

*Hart - Direct*

1    by this jury.  That is the guilt or innocence of Mr. Karr.

2            THE COURT:  This gentleman's opinion is not relevant,

3    period.  But I don't know what it's being offered for.

4            MR. T. MILLS:  Well, it's being offered to rebut

5    testimony that implied that he went to a lawyer and confessed

6    to criminal wrongdoing.

7            THE COURT:  Well, the objection will be sustained.

8    That's just self-serving hearsay testimony.  It's not

9    admissible under neither theory.

10           MR. T. MILLS:  All right.  That's fine.  Then, I'll

11   call my next witness.

12           THE COURT:  Okay.  And you have a bill?  You have the

13   bill already --

14           MR. T. MILLS:  I think that it's in the record.

15           MR. CARRUTH:  May the jury be instructed to disregard

16   any testimony by this last witness?

17           THE COURT:  No.  It's a fact he went to him and talked

18   to him.  That's a fact.  We don't need an instruction of any

19   nature.

20           MR. T. MILLS:  All right.  Excuse me.  I would like --

21   I would like to call the witness and ask these questions:  Did

22   you meet with Mr. Karr?  Was there a tape recording made?  Did

23   Mr. Karr ever deliver to him or mail to him a letter because

24   there's some testimony about a letter before he went to Texas,

25   and then stop.

*Hart - Direct*

1      THE COURT:  Those are facts that you can inquire.

2      MR. T. MILLS:  All right, sir.  Bring Mr. Hart back.

3  And bring the jury in.

4      (Jury present.)

5      THE COURT:  Mr. Mills, you may continue, sir.

6      MR. T. MILLS:  Yes, sir.

7  Q.  (BY MR. T. MILLS) Would you explain who attorney Chuck

8  Phillips is?

9  A.  Chuck Phillips is an associate in my office.  The New Port

10  Richey office, where I work from, has three attorneys

11  including me.  Chuck Phillips handles personal injury cases in

12  that office.

13  Q.  Either before your meeting with Mr. Karr or at any time,

14  did Mr. Karr ever send you a letter?

15  A.  No, not that I know of.

16  Q.  Did you make a recording of your meeting with Mr. Karr?

17  A.  I did not.

18  Q.  That's all the questions that I have.

19      MR. CARRUTH:  No questions, your Honor.

20      THE COURT:  May this witness be excused?

21      MR. CARRUTH:  Yes, your Honor.

22      MR. T. MILLS:  Yes.

23      THE COURT:  You may be excused.  Call your next

24  witness.  If you'll come right here, please, ma'am, and be

25  sworn.

*Davis - Direct*

1    (Witness was sworn.)

2         THE COURT:  All right.  If you'll follow the Security

3    Officer through the maze of exhibits and have a seat in the

4    witness box.  Now, I'd like for you to tell us your full name

5    and spell your last name, please.

6         THE WITNESS:  Bonnie Jean Taylor Davis, D-A-V-I-S.

7         BONNIE J. DAVIS, called by the Defendant, duly sworn.

8                    DIRECT EXAMINATION

9    BY MR. T. MILLS:

10   Q.  Ms. Davis, where do you live?

11   A.  San Antonio, Texas.

12   Q.  All right.  And how are you employed?

13   A.  I'm self-employed.  I own Bonnie Jean's Cocktail Glass.

14   Q.  All right.  I'm going to try to move that mic a little

15   closer to you because you have a real soft voice.  Tell me,

16   again, you have a what?

17   A.  I own Bonnie Jean's Cocktails.

18   Q.  All right.

19   A.  San Antonio.

20   Q.  All right.  And what's the location of Bonnie Jean's

21   Cocktails?

22   A.  5118 Fredericksburg Road.

23   Q.  Do you know where the Warren Inn is?

24   A.  Yes, sir.

25   Q.  And Warren Village?

*Davis - Direct*

1   A.  Yes, sir.

2   Q.  All right.  Would you explain to the jury where the Warren

3   Inn and Warren Village is relative to your cocktail

4   establishment?

5   A.  Yes, it's an establishment just right across the street.

6   We're a strip center and we're the strip center here, and

7   then, the Warren Inn is right here at the end of the strip

8   center.

9   Q.  Would you approximate how far it is in terms of yards?

10  A.  200 yards, maybe.

11  Q.  All right.  If you chose to walk there, would it be a long

12  walk?

13  A.  No, no.  Basically on the sidewalk, the end of the little

14  strip center.

15  Q.  All right.  And did you own Bonnie Jean's in 1995?

16  A.  Yes, sir.

17  Q.  How long have you owned it?

18  A.  It will be ten years October the 1st.

19  Q.  All right.  In September of 1995, were you at Bonnie

20  Jean's?

21  A.  Yes, sir.

22  Q.  And did you -- anyone come to Bonnie Jean's in the

23  afternoon?

24  A.  Yes, sir.

25  Q.  And will you tell the jury who came?  How many -- what

*Davis - Direct*

1    they looked like?

2    A.   Three people and it was early afternoon, it was about

3    3:00, and it was unusual for a little white-haired lady to

4    come in on a walker.  That was one thing that I saw.  And

5    then, there was a gentleman and a younger woman.

6    Q.   Did you ask them their names?

7    A.   No.

8    Q.   Did you hear any of them use names?

9    A.   No, sir.

10   Q.   Do you remember what they had to eat or drink?

11   A.   Yes, sir.

12   Q.   Will you tell the jury what they had?

13   A.   Yes, sir.  The two ladies had a Coke, and the gentleman

14   had a Budweiser beer.

15   Q.   What did the gentleman look like?

16   A.   It was about 6 feet, maybe 200 -- 210 pounds, thick, dark

17   hair, kind of a straight across -- I don't know if it was

18   bangs or if it was just combed that way, but it was real

19   thick, black hair.

20   Q.   All right.  And what did the younger woman look like?

21   A.   She was kind of plain and chunky -- not fat, but chunky.

22   Q.   All right.  And what did the older woman look like?

23   A.   She looked like an older lady.  She was pretty large as

24   far as wide and she was hunched over on -- because she had the

25   walker. She had short, white hair, just short, white haircut.

*Davis - Direct*

1   Q.   Did you believe that you knew any of the people -- not

2   knew personally, but recognized any of the people?

3   A.   No, huh-uh.

4   Q.   All right.   Did you have any other -- did you serve them

5   their drinks?

6   A.   Yes, sir.

7   Q.   You said you did?

8   A.   Yes.

9   Q.   All right.   Did you have any other contact with the older

10  woman?

11  A.   Yes, I helped her to the rest room.   We have one handicap

12  rest room, and it's basically for men.   So I just went back

13  there and helped her back there.   She went inside and I went

14  about my business.

15  Q.   And then, she came out by herself?

16  A.   Yes.

17  Q.   Well, by helping her, what do you mean?   Did you get --

18  A.   I just kind of walked her back there because it goes

19  around a curve and it's towards the back of the club.   So I

20  showed her where it was at.

21  Q.   All right.   How close did you get to her?

22  A.   Oh, just right next to her.

23  Q.   What was the lighting like in Bonnie Jean's?

24  A.   It's fairly light during the day because I have my whole

25  front of the building -- it was windows, so it's fairly light

Davis - Direct

1    during the day.

2    Q.  All right.  In the afternoon, was it -- was there a lot of

3    -- was there any smoke in the air?

4    A.  Probably just mine.  I was the only one smoking.  It was

5    just myself and the three people.  We were the only ones in

6    the club.

7    Q.  All right.

8    A.  We had just opened.  We open at 1:00, and it was about

9    3:00 in the afternoon.

10   Q.  About how long were these three people there?

11   A.  I'd say approximately a half an hour.

12   Q.  Did they say anything to you other than asking you for

13   something to drink?

14   A.  No.

15   Q.  Let me show you what's been marked as Government's Exhibit

16   W58-4, and see if you recognize anyone in this photograph.

17   A.  Yes, I do, those two.

18   Q.  Say what?  Say it again?

19   A.  Well, this one was there for sure.

20   Q.  You pointed to the man?

21   A.  The man.  And that lady -- that lady's too old.  The other

22   lady was younger.

23   Q.  All right.  Let me show you what's been marked as W58-1.

24   Do you recognize that person?

25   A.  Yes, I do.

*Davis - Direct*

1  Q.  And who was that?

2  A.  That's the gentleman that was with the lady.

3  Q.  All right.  And let me show you two pictures, W58-3,

4  W58-2, and see if you recognize anyone in either of those

5  pictures.

6  A.  Yes, I do.  Actually, both of those.

7  Q.  Will you --

8  A.  She looks like the girl that was with him.

9  Q.  You're pointing to this person where my finger is?

10  A.  Yes, sir.

11  Q.  And what about this person?

12  A.  Yes, that was the lady.

13  Q.  All right.  And what about this lady?

14  A.  It was the same lady.  She seemed much heavier than the --

15  Q.  Do you have any recollection of there being anyone else in

16  the Bonnie Jean's with these three people?

17  A.  No, sir.

18  Q.  Do I understand -- describe again what the windows are

19  like that face out into the parking lot in the strip shopping

20  center.

21  A.  Yes, sir.  My club is a 40-by-60, and it's 40 feet across

22  the front of the building and it's all windows, and we have

23  mini blinds.

24  Q.  Well, were you able to see if there was someone that might

25  have been standing right outside while the three people were

*Davis - Direct*

1   inside as though waiting for them?

2   A.   Yes, we can see out.

3   Q.   Did you see anyone?

4   A.   No.

5   Q.   Did you see how these three people got to Bonnie Jean's in

6   terms of walking or coming in a car?

7   A.   No, I didn't.  I didn't even pay attention to it.  We have

8   too many people that live at the Warren Inn, they walk a lot.

9   And then, we have other apartments all around us.  Quite a few

10  of our customers walk.

11  Q.   What did you observe the three people do while they were

12  there?

13  A.   They just sat there and talked amongst each other and

14  drank their drinks and that was it.

15  Q.   Did their behavior -- anything about their behavior alarm

16  you?

17  A.   No, not at all.

18  Q.   Did anything you observed about their behavior make you

19  think that they were having any kind of a problem?

20  A.   No.

21  Q.   After that afternoon, was there an occasion when someone

22  -- a man came to Bonnie Jean's and asked questions --

23  A.   Yes, sir, there was.

24  Q.   -- of you?  And do you know the exact date that that

25  happened?

46

*Davis - Direct*

1    A.   No, I sure don't.

2    Q.   All right.  Did the person show you a business card?

3    A.   No.

4    Q.   Did the person show you any identification?

5    A.   No.

6    Q.   Did the person -- was the person in uniform?

7    A.   No.

8    Q.   Did the person show you a badge?

9    A.   No.

10   Q.   Was the person, to your knowledge, armed?

11   A.   Not to my knowledge, no.

12   Q.   What did the person look like?

13   A.   He was probably about close to 50, gray hair, probably

14   five-eight, five-nine.

15   Q.   All right.

16   A.   210, maybe.  He was a little overweight.

17   Q.   In September of 1995, do you know if you knew the name

18   Madalyn Murray O'Hair?

19   A.   Oh, yes, I knew the name.

20   Q.   Do you know how you knew the name?

21   A.   Yes, my mother is very Christian, and when I was a little

22   kid, we were going to school and it was a big thing of the

23   prayer being taken out of school.  She was part of it.

24   Q.   Okay.

25   A.   But that's really about all I knew about her.

*Davis - Cross*

1    Q.  All right.  In September 1995, before the afternoon when

2    three people came in, did you know what Madalyn Murray O'Hair

3    looked like?

4    A.  No.

5    Q.  I've shown you these pictures.  Do you feel -- how certain

6    or uncertain or doubtful -- or how would you describe whether

7    or not you really believe that the people in those pictures

8    were the three who you saw that day?

9    A.  Absolutely.  I'm positive.

10   Q.  I'll pass the witness.

11                        CROSS-EXAMINATION

12   BY MR. D. MILLS:

13   Q.  Ms. Davis, for the record for the jury's benefit, first

14   time you met me was yesterday, correct?

15   A.  Yes, sir.

16   Q.  And we've talked outside for a little while about your

17   knowledge of this matter; is that correct?

18   A.  Yes, sir.

19   Q.  This is W100-3, parenthetical 2.  It's been admitted.  Do

20   you see the photograph of the man there?

21   A.  Yes, sir.

22   Q.  Did you ever see that man during the late summer of 1995

23   in your bar?

24   A.  Not that I recall, no.

25   Q.  Okay.  And this is W100-3, parenthetical 1.  Do you see

*Davis - Cross*

1    this photograph of this man?

2    A.   Uh-huh.

3    Q.   Did you ever see that person in the --

4    A.   No, sir.

5    Q.   Do you see anyone here in the courtroom today that looks

6    like this individual in this photograph right now?

7    A.   No.

8    Q.   And W103-3, there's another photograph of an individual on

9    there.   Did you ever see that man during the summer of 1995?

10   And when I say summer, I mean from June through, say,

11   September, October.   I don't know whether you call summer, but

12   we'll use those months.   Did you ever see that individual?

13   A.   I can't be positive, but he does look familiar.

14   Q.   He looks familiar?

15   A.   Yes.

16   Q.   Do you recall if during that time frame that someone made

17   arrangements with you to leave a Mercedes Benz automobile

18   parked in your parking lot for purposes of selling that

19   automobile?

20   A.   Not to my knowledge.

21   Q.   No one ever came and asked your permission as you recall?

22   A.   No.

23   Q.   And W50-1 is a picture of Jon Murray.   You don't know him

24   as Jon Murray, do you?

25   A.   No.

1  Q.  But you identified him as being the person that you're

2  talking about that was in your club?

3  A.  Yes, sir.

4  Q.  And W50 -- it's either 3 or 4 is a photograph and there,

5  you identify the man but not the woman; is that correct?

6  A.  Uh-huh.

7  Q.  And then, you identified W58-2?

8  A.  Yes, sir.

9  Q.  And you identified W58-3?

10  A.  Yes, sir.

11  Q.  And you identified both of the women as being the women

12  that were there?

13  A.  Yes, sir.

14  Q.  So the woman in 58-4 -- the woman in 58-4 does not appear

15  to be the same woman to you as the one in 58-3; is that

16  correct?

17  A.  No, doesn't look the same.  If you hold them close, they

18  might.  That doesn't look the same.

19  Q.  Doesn't appear to be the same.

20  A.  No.

21  Q.  Now, defense counsel said that you -- in his first

22  question, in September of 1995, did you have occasion to see

23  three people come into your bar?  Do you recall that question?

24  A.  Yes, sir.

25  Q.  And isn't it true that you don't know precisely when in

*Davis - Cross*

1  the summer they came, whether it was June, July, August,

2  September or October?

3  A.  Yes, sir.

4  Q.  You did you tell me yesterday that your recollection of

5  their appearance in your bar was during the months when it was

6  hot?

7  A.  Yes, sir.

8  Q.  And did I ask you, is the month of July hot in San

9  Antonio?

10  A.  Yes, sir.

11  Q.  And what did you respond?

12  A.  Yes, it is.

13  Q.  So to be more accurate, would you say the time frame in

14  which you saw these three people could have been anywhere

15  from, say, July through the end of October of 1995?

16  A.  I wouldn't say as far as October, no.

17  Q.  So, maybe, the end of September?

18  A.  Maybe, yeah.

19  Q.  So July --

20  A.  July, August --

21  Q.  -- or September?

22  A.  -- or maybe early September.

23  Q.  Somewhere in that time frame?

24  A.  Yes.

25  Q.  But nothing -- and did I ask you yesterday in terms of

51

*Davis - Cross*

1  trying to refresh your memory, did it occur around a holiday,

2  such as the 4th of July, or Labor Day?

3  A.  Yes.

4  Q.  And none of those events that --

5  A.  Nothing.

6  Q.  -- that we tend to celebrate holidays on helped trigger

7  your recollection, did they?

8  A.  No, sir.

9  Q.  Okay.  The older lady that was there, you assisted her

10  initially when she went to the rest room, correct?

11  A.  Yes, sir.

12  Q.  Did she have a walker?

13  A.  Yes.

14  Q.  And it's the kind of walker that's metal and that you see

15  some people walking around with it, you use two hands to hold?

16  A.  Yes.

17  Q.  And it's kind of got a little frame and you walk in it; is

18  that correct?

19  A.  Yes.

20  Q.  You say the front of your establishment has a lot of glass

21  in it; is that correct?

22  A.  Yes, sir.

23  Q.  And I asked you yesterday whether you knew if someone was

24  standing outside the door of your establishment that could

25  have been watching these three people on the inside; is that

*Davis - Cross*

1   correct?

2   A.   Yes.

3   Q.   And your response was?

4   A.   No.

5   Q.   And tell the jury why that you didn't think that was

6   possible without you noticing them?

7   A.   Well, anybody could park a car out there.  I don't look

8   out the windows all the time.

9   Q.   So what you're saying is if someone had been standing

10  right by the door, you would have noticed them if they were

11  watching?

12  A.   I would have seen that, yes.

13  Q.   But if someone was sitting in an automobile outside your

14  parking lot watching your entrance, you wouldn't have noticed

15  that?

16  A.   No, sir.

17  Q.   This individual, this man who came to ask you about these

18  individuals, did he bring some photographs with him?

19  A.   Yes, he did.

20  Q.   Were they similar to those photographs or do you recall?

21  A.   No.  Actually, there was one of the younger lady and the

22  older lady on a couch.  And then, there was one of all three

23  of them together.

24  Q.   And you don't recall when this man came relative to when

25  these individuals were in the bar that you recall seeing?

*Davis - Cross*

1  A.  I would say two or three weeks.

2  Q.  I'll show you what's been admitted as Government's W8-1A,

3  and does that appear to be --

4  A.  It's smaller.  I need to put my glasses on.

5  Q.  All right.

6  A.  I haven't seen any of these photos at all.

7  Q.  That's not the photos that you saw?

8  A.  No.

9  Q.  Okay.  And this man, he didn't identify himself to you as

10  particularly what agency he was with?

11  A.  No, I really didn't pay attention.

12  Q.  Do you recognize any of those individuals in those photos

13  that I showed you, W -- what's the number again?

14  A.  W8-1A.

15  Q.  Okay.  Do you recognize those people?

16  A.  All but the gentleman with the beard.

17  Q.  Okay.  And that's the people you believe were in your

18  establishment?

19  A.  Yes.

20  Q.  Sometime in that time frame we're talking about?

21  A.  Uh-huh.

22  Q.  Is it true you've been interviewed by a lot of people

23  since this matter had become more public or notorious, if you

24  want to call it that?

25  A.  Yes.

*Davis - Cross*

1   Q.   And you've been interviewed by Dateline; is that correct?

2   A.   Yes.

3   Q.   20/20?

4   A.   No.  America's Most Wanted.

5   Q.   Okay.  And Vanity Fair?

6   A.   Uh-huh, yes.

7   Q.   And the Dallas County Sheriff's Office?

8   A.   Yes.

9   Q.   And when did these interviews or these visits with you

10  occur, here in the last 18 months or sometime --

11  A.   Some of them.  It's been since, I would say, '96, '97.

12  Q.   Okay.  And on those occasions, were those people showing

13  you photographs of these individuals that you're now

14  identifying?  Did all of them have photographs?

15  A.   No.  There was the agents from Dallas and the first

16  gentleman that said he was a detective, private detective.

17  Q.   So the news media organizations or the magazine Vanity

18  Fair -- I think that's a lady's magazine -- if that's correct,

19  they didn't have any photographs to show you?

20  A.   No, huh-uh.

21  Q.   And the other people, did they show you photographic

22  arrays where there would be a series of six photos and ask you

23  to pick one of the six, or did they just bring you a

24  photograph and say, have you ever seen this person, and just

25  show you a single isolated photograph?

55

Davis - Cross

1   A.   They just showed me the photographs.

2   Q.   This lady that you helped to the rest room that is

3   purportedly Madalyn Murray O'Hair, would you say she's kind of

4   grandmotherly looking?   Would that be a fair characteristic?

5   A.   Yes.

6   Q.   And I don't mean to be ugly, but would you say her dress

7   was somewhat dowdy?   Would that be a description that you

8   might use?   Or does that word anything to you?

9   A.   It was big and it was bright.   It wasn't dowdy.

10  Q.   Okay.   Something that would stand out that you would

11  notice?

12  A.   Yes.

13  Q.   The lighting in your establishment, is it as bright as it

14  is in here?

15  A.   No.

16  Q.   Half as bright?

17  A.   No.

18  Q.   Less than half --

19  A.   About a quarter.   The sunlight still comes in.   We don't

20  have a lot of lighting.

21  Q.   Do the windows face the west on your side of the building?

22  A.   Yes.

23  Q.   Okay.   When Ms. O'Hair was going to the rest room, did you

24  go assist her immediately when she got up from the table, or

25  was she already half-way towards the rest room area when you

56

*Davis - Redirect*

1   decided to help her?

2   A.   Oh, I was at the table serving when she asked where it

3   was.

4   Q.   So you just basically showed her?

5   A.   Yes.

6   Q.   She followed you.  You didn't have to physically assist

7   her?

8   A.   Right.

9   Q.   Okay.  Do you know what the word, in terms of a dress, a

10  mumu is?

11  A.   Yes, I do.

12  Q.   And how would you characterize the use of that term

13  relative to the clothing that the older lady was wearing?

14  A.   I could say that's what you would call it.

15  Q.   I believe that's all, your Honor.

16                   RE-DIRECT EXAMINATION

17  BY MR. T. MILLS:

18  Q.   When you saw the older lady, when you think back about

19  what she looks like, do you think that older, whiter,

20  gray-haired, elderly, grandmotherly looking people would all

21  look like the lady that was in your establishment?

22  A.   No.

23  Q.   That's all the questions I have.

24

25

57

*Davis – Recross*

### RE-CROSS EXAMINATION

BY MR. D. MILLS:

Q.  Would you agree that older women -- older men begin to
look like grandfathers or grandmothers, and they can have
similar appearances, when you look at them, that you're able
to confuse them from one to another if you don't see them in a
bright-wielded area?  Do you understand my question?

A.  Yeah, but -- no.  I think you could tell the difference.

Q.  Okay.  Do you think they're distinctive enough to tell the
difference that you wouldn't just generalize that this is an
older, matronly looking person?

A.  Yes, I think distinctive enough, yes.

Q.  Okay.  Even in a dimly lit area?

A.  As far as our bar, yes.

Q.  Okay.  Thank you.

        MR. T. MILLS:  No more questions.

        THE COURT:  May this witness be excused?

        MR. T. MILLS:  Yes, sir.

        MR. D. MILLS:  Yes, your Honor.

        THE COURT:  You may be excused.  Call your next
witness.

        MR. T. MILLS:  Yes, your Honor.  I believe we have one
other witness.

        MS. WILLIAMS:  Call Gary Albrecht.

        THE COURT:  Be sworn, please, sir.

58

*Albrecht - Direct*

1    (Witness was sworn.)

2         THE COURT:  Follow the Security Officer, please, sir.

3    Sir, if you'll tell us your full name and spell your last

4    name.

5         THE WITNESS:  My name's Gary Garth Albrecht.  Last

6    name is A-L-B-R-E-C-H-T.

7    GARY G. ALBRECHT, called by the Defendant, duly sworn.

8                     DIRECT EXAMINATION

9    BY MS. WILLIAMS:

10   Q.  Sir, where do you live?

11   A.  In San Antonio, Texas.

12   Q.  And how are you employed?

13   A.  I'm a San Antonio Police Officer.

14   Q.  And what do you do for the San Antonio Police Department?

15   A.  I work patrol.

16   Q.  How long have you worked there?

17   A.  Fifteen years.

18   Q.  All right.  Is that the sum of your law enforcement

19   experience or have you worked elsewhere?

20   A.  I've been there -- I also work in Leon Valley as an

21   officer.

22   Q.  How long have you been a police officer?

23   A.  Totally, about 18 years.

24   Q.  Do you know a man by the name of Corey Ticknor?

25   A.  Yes, I do.

*Albrecht - Direct*

1   Q.   Tell the members of the jury how you know him.

2   A.   I worked security for him when he was a manager at a -- it

3   was another jewelry store.  That he has his own jewelry store

4   now, and I worked the security for him there.

5   Q.   How long have you known him?

6   A.   About ten years.

7   Q.   And during those ten years, you have provided off-duty

8   security for Mr. Ticknor?

9   A.   Yes, I have.

10  Q.   Do you recall working for Mr. Ticknor back in September of

11  1995?

12  A.   Yes, ma'am.

13  Q.   Was that an unusual event?

14  A.   It was different due to the fact that the transfer of

15  gold.  I have never been involved with that before.

16  Q.   All right.  That was a new experience?

17  A.   That was new for me, yes.

18  Q.   Where did you go on that day and meet Mr. Ticknor?

19  A.   I met Mr. Ticknor at his store, first, and then, we went

20  -- from there, we went to the Frost Bank.

21  Q.   Where did you go once you got to the Frost Bank?

22  A.   Once we got there, we went in and went to the depository

23  downstairs.  There was a safety deposit area.

24  Q.   Did Mr. Ticknor have a conference room reserved?

25  A.   Yes.

*Albrecht - Direct*

1  Q.  Did you go to the conference room?

2  A.  Yes, I did.

3  Q.  How were you dressed that day?

4  A.  In uniform.

5  Q.  All right.  And what all equipment did you have with you

6  while you were in full uniform?

7  A.  Weapon-wise or --

8  Q.  Did you have a --

9  A.  Yes.  And my radio, full uniform.

10  Q.  Even though you were off-duty, you still carried your

11  police radio?

12  A.  Yes.

13  Q.  Was it on?

14  A.  No.

15  Q.  All right.  What do you have to do to turn it on?

16  A.  Just turn the little knob on the top.

17  Q.  Where do you carry your police radio?

18  A.  On my left side.

19  Q.  Is that where it was that day?

20  A.  Yes, ma'am.

21  Q.  Is it on a belt just with a little slot for the police

22  radio?

23  A.  On the holder, yes, so it's clearly visible, yes.

24  Q.  As is your weapon?

25  A.  Yes.

*Albrecht - Direct*

1   Q.  Is there anything about going into a bank that makes you

2   have to check your weapon in?

3   A.  No.

4   Q.  So you took your --

5   A.  Not in the San Antonio office, no.

6   Q.  Sorry.  You took your weapon on into the bank?

7   A.  Yes, I did.

8   Q.  At some point, did another man meet you and Mr. Ticknor at

9   the bank?

10  A.  Yes, ma'am.

11  Q.  Do you remember his name?

12  A.  I believe it was Jon Murray.

13  Q.  And when he got there, did you notice anything unusual

14  about him?

15  A.  Nothing unusual, no.

16  Q.  Did he arrive alone?

17  A.  Yes, he did.

18  Q.  Were you already in the bank when he got there?

19  A.  We had met him upstair -- or in the parking lot

20  originally, and that's where Mr. Ticknor asked him for his ID,

21  and then, we advised him to park down below.  There is another

22  level, asked him to park in the back area, so when he left and

23  everything, there would be -- he wouldn't be out in the public

24  parking lot so much.

25  Q.  All right.  There's a big front parking lot and a smaller

*Albrecht - Direct*

1  back parking lot?

2  A.  Right.

3  Q.  When you -- well, what was your function there that day?

4  A.  To mainly work as a security, you know, transfer of large

5  amounts of gold or jewelry, or whatever.  I, you know, try to

6  stay close by and make sure nothing -- no one's able to get at

7  them or get at whatever they're transferring.

8  Q.  When you met Mr. Murray in the parking lot, did you

9  observe this?

10  A.  Yes, I did.

11  Q.  Did you see anything unusual?

12  A.  No, ma'am.

13  Q.  Didn't see anybody watching him?

14  A.  I believe there was only -- at that time, there was only

15  one other car in the upper parking lot, and there was no one

16  in it and there was no one in the area.  I observed fairly

17  closely due to the fact of the large amount of gold being

18  transferred.

19  Q.  All right.  And that was your job there that day?

20  A.  Yes, ma'am.

21  Q.  You had Mr. Murray park in another parking lot?

22  A.  Yes, ma'am.

23  Q.  Did he go by himself?

24  A.  He drove down to there and walked out and met us as we

25  went into the bank, I believe.

*Albrecht - Direct*

1    Q.  Did you watch him --

2    A.  Yes.

3    Q.  -- drive around?

4    A.  Yes, I did.

5    Q.  Did you see anybody following him?

6    A.  No, ma'am.

7    Q.  What happened after you got into the bank?

8    A.  Well, he brought in a couple of suitcases on a little

9    dolly, like a dolly you pull luggage with.  He had -- he

10   brought those with him to transfer the gold in these, like,

11   little briefcases.

12   Q.  Let me ask you a question about that.  Are you talking

13   about the kind of a suitcase where a handle pulls out of the

14   suitcase?  Or are you talking about a separate detached dolly

15   that you put suitcases on?

16   A.  That was a wire frame like you put luggage on, if I

17   remember correctly.

18   Q.  A metal-framed dolly with suitcases on it?

19   A.  It was more briefcases than they are suitcases, yes.

20   Q.  Okay.  More than one briefcase?

21   A.  I believe he had two.

22   Q.  When he got into the bank, what happened?

23   A.  When we entered the upstairs portion and we went to the

24   elevators and went downstairs -- and that's where the safety

25   deposit area is -- myself and Mr. Ticknor went in.  I believe

*Albrecht - Direct*

1    Mr. Murray stood right there by the door.  When we went in,

2    removed the gold from the safety deposit box, and from there,

3    we went into -- went upstairs again to a conference room.

4    Q.   And when you went in the conference room, what happened?

5    A.   Well, I stood by the doorway at the end of the table while

6    they brought out all the gold.  And Mr. Ticknor proceeded to

7    count the gold up.  Mr. Murray was going to try to attempt to

8    count the gold with him but, apparently, wasn't real familiar

9    with counting gold.

10           And Mr. Ticknor was showing him that they're in a

11   plastic vile that have certain amounts of gold in each one.

12   So you just dump them out, you're able to count them very

13   easily.  So he just -- they counted the gold together.

14   Q.   Did Mr. Murray seem interested in the different kinds of

15   gold?

16   A.   I believe so, yes.

17   Q.   And during the period of time that you were with him, were

18   you within the distance that I am from Mr. Carruth here in the

19   blue jacket?

20   A.   Within arm distance of both of them just about all times.

21   Q.   At any point while you were in the conference room, did

22   Mr. Murray do anything that indicated to you that he was in

23   distress?

24   A.   Not at all.

25   Q.   Did he do anything that made you suspicious?

*Albrecht - Direct*

1   A.   No, ma'am.

2   Q.   Did he do or say or act in any way that alerted your

3   senses as a police officer?

4   A.   No, ma'am.

5   Q.   How long a period of time were you with Mr. Murray from

6   the time you met him until the time he left?

7   A.   It may have been a total of, maybe, an hour at the very

8   most.

9   Q.   After the gold was counted, what happened?

10  A.   He tucked them in his -- the briefcase that he had.  And,

11  of course, like I said, the briefcase don't support that much

12  gold.  The gold weighs an awful lot.  So Mr. Ticknor also

13  assisted him in putting them on a dolly, and we went out the

14  back way so he could go to -- get easier access to his car

15  that way.

16  Q.   Did you walk with him to his car?

17  A.   Yes, I did.

18  Q.   What were you doing while you were walking from the bank

19  to Mr. Murray's car?

20  A.   I walked alongside them first, you know, trying to

21  observe, make sure there's nobody in the area.  And then, I

22  opened the door, making sure no one's around the cars, and

23  then, assisted them -- he went in, opened up the trunk of his

24  car and Mr. Ticknor assisted him putting the gold in the trunk

25  of the car.

*Albrecht - Cross*

1  Q.  Did you stand there and watch Mr. Murray drive away?

2  A.  Yes, I did.

3  Q.  All right.  At any time from the time you left the bank

4  until the time Mr. Murray drove out of your sight, did you see

5  anything at all that made you suspicious?

6  A.  No, ma'am.  He drove out the back way of the bank, going

7  towards IH-10 there.

8  Q.  Did you see anybody following him?

9  A.  No, ma'am.

10  Q.  Did you see anybody watching him?

11  A.  No, ma'am.

12  Q.  Did you see anything at all that alerted your senses as a

13  police officer?

14  A.  No, ma'am.

15  Q.  Nothing further.

16                    CROSS-EXAMINATION

17  BY MR. CARRUTH:

18  Q.  Mr. Albrecht, during your service with the San Antonio

19  Police Department, have you been a patrol officer that entire

20  time?

21  A.  Yes, sir, I have.

22  Q.  Have you ever been a detective investigator or someone

23  required to work undercover?

24  A.  I worked undercover.  Not as a detective investigator, no.

25  Q.  In what capacity did you work undercover?

*Albrecht - Cross*

1   A.   As an officer.

2   Q.   Well, could you be more specific, please?

3   A.   Well, I've worked special crimes, I've worked some sex

4   crimes on the side.  I've also worked as --

5   Q.   Have you ever done any undercover surveillance is what I'm

6   getting at?

7   A.   Yes, I have.

8   Q.   And what type of vehicle did you normally use when you did

9   an undercover surveillance where you didn't want to be seen?

10  A.   I've used everything from Ford Broncos to -- every -- just

11  several different types of vehicles, sir.

12  Q.   Have you ever used a van?

13  A.   No, sir, I have not.

14  Q.   Have you known of any police agencies that have vans that

15  are especially equipped with electronics equipment to watch

16  suspects?

17  A.   Yeah, I --

18  Q.   Does the San Antonio Police Department have such vehicles

19  to your knowledge?

20  A.   I have never seen their van.

21  Q.   Okay.  Have you ever investigated any kidnapping cases?

22  A.   No, sir.

23  Q.   So you don't --

24  A.   Not personally, no, sir.

25  Q.   -- so you don't know anything about how kidnapped victims

*Albrecht - Cross*

1   may behave of your own personal knowledge of your law

2   enforcement experience?

3   A.   No, sir, not directly.

4   Q.   If someone was holding one of your loved ones hostage at

5   gunpoint in handcuffs, away from a location, you might not

6   seem odd to a policeman if you thought they might endanger

7   your loved one, would you?

8   A.   You're asking my personal opinion if I would do this?

9   Q.   Yes, sir.

10   A.   I wouldn't know, sir.  I'd have to --

11   Q.   Probably none of us would until we're faced in that

12   position.

13   A.   Yes, sir.

14   Q.   Now, do you recall talking to a couple of homicide

15   investigators from the Dallas County Sheriff's Department

16   about back on March the 3rd of last year?

17   A.   I knew that someone came over to Corey's and spoke to him

18   over there, but I don't recall their names or anything.

19   Q.   Okay.  And do you recall telling these detectives --

20   counsel asked you a while ago whether you know noticed

21   anything unusual about Mr. Murray.  Anything unusual about his

22   clothes?

23   A.   He was unkept, unshaven, his hair was messed up.  Other

24   than, you know -- but why I'd say that unusual -- I, you know,

25   as a businessman, maybe directly, I'd say maybe he was just

*Albrecht - Cross*

1   unkept.

2   Q.  Do you remember telling the detectives from Dallas County

3   that the appearance of Jon Murray was as though he had not

4   bathed for an extended period of time?

5   A.  Yes, he -- did appear that he had, you know --

6   Q.  Did you detect body odor?

7   A.  Yes, sir, he did have body odor.

8   Q.  Okay.  You have told him that John Murray's clothes were

9   solid as though he had worn them for several days.  What do

10  you mean by solid?

11  A.  They were wrinkled.  You know, wrinkles were pressed in as

12  you lay up against them.

13  Q.  And you also stated that his face did not look as if it

14  had been cleaned or shaven for the past few days?

15  A.  Yes, sir.

16  Q.  Is that the way you normally see most businessmen come

17  into the bank, especially one doing a gold transaction of this

18  magnitude?

19  A.  I've never seen a gold transaction of this magnitude.  I

20  didn't know if this guy is eccentric.

21  Q.  Have you ever been involved in a financial transaction of

22  half a million dollars before?

23  A.  Yes, I have.

24  Q.  Normally the people that come in and conduct that, do they

25  normally appear as Mr. Murray did on that date?

*Albrecht - Cross*

1   A.  Not -- if you're going to compare, no, maybe not.

2   Q.  Kind of unusual, wasn't it?

3   A.  I guess it would be a little unusual, yes.

4   Q.  Now, do you also remember when those detectives from

5   Dallas County interviewed you that you stated that you could

6   not remember what type of car it was that Mr. Murray was

7   driving and you wouldn't remember what color his car was?

8   A.  I don't remember telling him I couldn't remember exactly

9   what it was, no.

10  Q.  Okay.  So what color was it?

11  A.  I think it was blue or a light-bluish color.

12  Q.  But you can't be sure?

13  A.  I'm not exactly positive, no, sir.

14  Q.  And you agree your memory would have been better over a

15  year ago, March 3rd, 1999, than it is today, as is true with

16  most of us?

17  A.  Most likely, yes, sir.

18  Q.  Okay.  Now, did you look around the parking lot after you

19  loaded the car?

20  A.  Yes, I did.

21  Q.  How long did you remain in the parking lot before going

22  back into the air conditioned bank?

23  A.  I would say probably about four to six minutes, probably,

24  before -- he'd already entered the freeway.

25  Q.  And were there any other vehicles in the area either on

*Albrecht - Cross*

1    the street or in the bank parking lot?

2    A.   Nothing in the parking area at all.

3    Q.   So his was the only vehicle in the entire Frost National

4    Bank parking lot that day?

5    A.   Down in the lower section, there was -- like I said, upper

6    section there was one other car or two other cars when we

7    arrived.

8    Q.   Was there only one way for him to go to get out of there?

9    A.   No, sir.  There's two.

10   Q.   And did he come in the same way he went out?

11   A.   No, sir.  He left a different direction.

12   Q.   Okay.  So you saw him actually come in and enter the

13   premises?

14   A.   Yes, I did.

15   Q.   Okay.

16   A.   He came from the upper lot and left from the lower lot.

17   Q.   Did you look in any of the other vehicles that were up on

18   the street, or parked on the curb, or anywhere where they

19   could see him coming out?

20   A.   I didn't go down and search streets down below, no, sir.

21   Q.   So it's possible that someone could have been waiting for

22   him, and if there's two exits, there could have been people

23   waiting at both exits, couldn't there be, sir?

24   A.   There was nobody at the exits or the entrance when we came

25   in.

*Albrecht - Cross*

1  Q.  And when you conducted surveillance that you didn't want

2  somebody to know you were there, you normally stayed out of

3  sight so they wouldn't see you, didn't you, sir?

4  A.  If that's what -- yeah, if that's the way I could do it if

5  I was alone, but I came in with Mr. Ticknor.

6  Q.  No.  You misunderstand my question, sir.  If you, as a

7  police officer, had wanted to conduct a surveillance of Mr.

8  Murray on this occasion, you know, suppose he was your agent,

9  getting that gold for you.

10 A.  Uh-huh.

11 Q.  Would you have not acted in such a manner as to conceal

12 yourself from a security -- bank guard, such as yourself, or

13 anyone else?

14 A.  Conceal myself?

15 Q.  Yes, sir.

16 A.  No, sir, I wouldn't conceal myself.

17 Q.  So if you were going to commit a crime, you would just

18 stand out and say, here I am to commit the crime?  You

19 wouldn't take any precautions?

20 A.  Are you asking me -- you're asking me as a security for

21 them, as a security for them, I'd want to be present, want to

22 be visible.

23 Q.  Would it surprise you to note when Mr. Corey Ticknor

24 testified earlier in this case, he said there were several

25 cars in the bank parking lot?

73

*Albrecht - Cross*

1      MS. WILLIAMS:  Objection, your Honor, to comparison of

2  testimony.

3      THE COURT:  The question asked, I'll sustain the

4  objection.

5  Q.  (BY MR. CARRUTH) You're not saying you remember whether

6  there were other cars in the bank parking lot, sir, are you,

7  if you can't remember the color of Mr. Murray's car?

8  A.  I said there was other vehicles in the top lot, yes,

9  sir --

10  Q.  Okay.

11  A.  -- but they were empty.

12  Q.  What time of day did this transaction occur, sir?  When

13  did it begin and what time did it end?

14  A.  I believe it was in the morning time.  I'm not exactly

15  sure the exact time, no, sir.

16  Q.  And what time did it conclude?  What time did you load the

17  gold?  Was it before or after lunch?

18  A.  I believe everything was before lunch, sir.

19  Q.  Before lunch.  You're certain about that?

20  A.  No, sir, I'm not.

21  Q.  And do you recall what day of the week this was?

22  A.  No, sir, I don't.

23  Q.  And at least you didn't see anything that caused you any

24  alarm on this occasion?

25  A.  No, sir, I did not.

74

*Albrecht - Cross*

1   Q.  And you noticed that Mr. Murray appeared as if he had not

2   bathed, or shaved, or taken any precautions on his personal

3   hygiene for a few days, correct?

4   A.  Yes, sir.

5   Q.  And you don't remember the color of his car or any other

6   type vehicles in the bank parking lot?

7          MS. WILLIAMS:  Object to repetitious.

8          MR. CARRUTH:  Kind of a summary, your Honor.

9          THE COURT:  It's a repeated summary and the objection

10  is sustained.

11  Q.  (BY MR. CARRUTH) Okay.  Thank you, sir. No further

12  questions.

13         MS. WILLIAMS:  Nothing further, your Honor.

14         THE COURT:  May this witness be excused?

15         MR. CARRUTH:  Yes, your Honor.

16         THE COURT:  You may be excused.

17         MR. T. MILLS:  Your Honor, and, ladies and gentlemen

18  of the jury, the defense rests.

19         MR. CARRUTH:  At this time, your Honor, the government

20  would seek to introduce photographs of the weapons that has

21  heretofore been previously offered and admitted into evidence

22  before the presentation of this case to the jury.  And the

23  photographs bear the same exhibit numbers as the weapons

24  themselves, and would include Government's Exhibits W77-29, a

25  photograph of the black handle knife with a sheathe, W77-30, a

1   photograph of the turquoise and silver knife with sheathe,

2   Government Exhibit W79-6, the Dan Wesson .357 Magnum Revolver,

3   and Government Exhibit W79-7, the Nine-Millimeter Browning

4   Pistol contained in its case.

5         We would offer those at this time, your Honor, in lieu

6   of the actual weapons themselves.

7         MR. T. MILLS:  We, I guess, have the same objection

8   that we had to the weapons themselves.

9         THE COURT:  But you don't --

10        MR. T. MILLS:  Subject to that ruling, we don't mind

11   these pictures being substituted for the real things.

12        THE COURT:  Members of the jury, it is my custom and

13   practice not to submit certain things to the jury, and that's

14   why the government has pictures.  I don't like weapons

15   submitted to the jury.  I don't sometimes like 400 pounds of

16   cocaine submitted to the jury.  So pictures are in lieu of the

17   exhibits that you've seen demonstrated in the courtroom, and I

18   will permit it.

19        And the same substantive objections that were made

20   carried and are still overruled.

21        MR. CARRUTH:  Thank you, your Honor.  At this time,

22   the United States will close.

23        MR. T. MILLS:  The defense would close.

24        THE COURT:  Ladies and gentlemen of the jury, we go to

25   law school three years to learn that language.  What it means

1    to you is that you heard all of the evidence.  It remains my

2    responsibility to draw up the legal instructions that will

3    guide you in the deliberation and arriving of your verdict.

4    That will take a little time.

5            And then, it is my obligation to give that to the

6    lawyers so that they can review it, make any objections they

7    wish, because they're entitled to use those instructions when

8    they make their final summations to you.  And the lawyers have

9    requested, and reasonably with this evidence, an hour a piece

10   to make their final conclusions to you.

11           So I want you to go into the jury room and decide one

12   of two alternatives:  It may be possible to conclude the

13   arguments today, but I'm sure it will go to at least 6:00.  If

14   that occurs, I will want you to deliberate tomorrow, or I can

15   recess you under the instructions, and you can come back

16   Tuesday and you will hear the arguments and deliberate on

17   Tuesday.

18           It's up to you.  I want you to make that decision, so

19   I'm going to put you in the jury room.  Y'all hash that out,

20   and then, when you come back, you can tell me what you wish.

21   There's no obligation either way.  I know that I have told you

22   you're not going to work tomorrow, and that may be that --

23   that may be the domino from the standpoint you may have other

24   things that you've committed to doing.  If so, that's

25   perfectly fine.

1       But because the evidence has ceased earlier than

2   anticipated, I want to give you the option.  The only thing

3   that concerns me -- and I will tell you -- is that, of course,

4   then, you have Friday, Saturday, Sunday, and Monday is a

5   holiday.  So we will not begin this case again until Tuesday,

6   if that is your option.  You'll have to follow those

7   instructions over the holiday weekend.

8       Okay.  So you know what you wish to do.  Y'all go back

9   and decide what you wish.

10      (Jury not present.)

11      THE COURT:  All right, counsel.  I'm running copies of

12  the drafts of the instructions notwithstanding what the jury's

13  election will be.  We will work out the instructions this

14  afternoon.  So I'll get you copies.  So y'all can stand at

15  ease until they come back.

16      (Jury present.)

17      THE COURT:  Y'all arrive at a consensus?

18      THE JUROR:  Yes, we did.

19      THE COURT:  What is that?

20      THE JUROR:  We'd like to start deliberation Tuesday

21  morning.

22      THE COURT:  All right.  That will be fine.  So I'm

23  going to allow you to return to your normal lives at this

24  point in time until 9:00.  9:00, we'll give you a little extra

25  time to sleep after that Monday holiday when you're going to

1    be out there doing all that shopping and everything.  Very,

2    very important, members of the jury, to follow the

3    instructions.

4          I'll be asking you the same questions.  Have a nice

5    weekend, but do not talk to anybody about this case, let

6    anybody talk to you about the case.  Don't run down to the

7    library and try to look up the law or anything else.  Go

8    about, enjoy your weekend, please.  Be here promptly before

9    9:00 so we can start at 9:00.

10      (Jury not present.)

11      THE COURT:  All right, counsel.  My law clerk's going

12   to give you two copies of the draft of the legal instructions.

13   I'd like to see you back at 1:30.  1:30 this afternoon.

14      (Proceedings adjourned.)

15

16

17

18

19

20

21

22

23

24

25