FILED

NOV 2 1 2000

1

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2              AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 99-CR-274 SS
                             )
4   v.                       ) Austin, Texas
                             )
5   GARY PAUL KARR           ) May 30, 2000

6
                      VOLUME 10 of 12
7                   TRIAL ON THE MERITS
             BEFORE THE HONORABLE SAM SPARKS
8
    APPEARANCES:
9
    For the United States:      Mr. Gerald C. Carruth
10                              Mr. Daniel H. Mills
                                Assistant U.S. Attorneys
11                              816 Congress Avenue, Ste. 1000
                                Austin, Texas 78701
12

13

14
    For the Defendant:          Mr. Thomas W. Mills, Jr.
15                              Ms. Christi N. Williams
                                Mills & Presby
16                              5910 North Central Expressway,
                                Ste. 900
17                              Dallas, Texas 75206-5141

18

19
    Court Reporter:             Lily Iva Reznik, RPR, CRR
20                              United States Courthouse
                                200 West 8th Street
21                              Austin, Texas 78701
                                Ph: (512)916-5564
22

23

24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

LILY I. REZNIK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS (AUSTIN)

ORIGINAL

1                              I N D E X

2                                                              Page

3    Government's Closing Statements                           31

4    Defendant's Closing Statements                            47

5    Government's Closing Statements                           71

6    Proceedings Adjourned                                     84

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  Counsel, from the draft that was finally

2    put together last Thursday, over the weekend or this morning

3    early, you called and there are a couple of typographical

4    changes that my staff has already put in.  If you'll turn to

5    page 11, on the definition of "decoy," the word entire should

6    be "entice," and it is in there.  So the definition of decoy

7    is, to decoy means to entice or lure, and I made that

8    correction.

9         And this morning, y'all have called my attention, on

10   page 14, that the word "further" should be "furtherance" in

11   the fourth paragraph, and that change has been made.  And

12   then, on page 16, and the top of the page on "Third," where

13   the next to the last line read, "transfer of approximately

14   $600,000 by, through and" will be changed to "and/or to a

15   financial institution."

16        And then, in the verdict form itself, on the front

17   page, on the first paragraph, after Count 3, I'm adding one

18   word to that paragraph so that it would read:  "Do you find

19   beyond a reasonable doubt that the offense charged in Count 3

20   resulted in the death of another person."  I'm adding the word

21   "person."

22        Let the record reflect that the lawyers read the

23   charge.  All right.  With that, are there any additional

24   instructions or additions?

25        MR. CARRUTH:  Nothing further from the government,

```
1   your Honor.

2         MR. T. MILLS:  None from the defense.

3         THE COURT:  I think we're still shy a couple of

4   jurors, so we'll just stand at ease until we find out.

5      (Jury present.)

6         THE COURT:  All right.  Now, I want honest answers.

7   How many of you stayed up till 1:15 in the morning to make

8   sure that Texas won that second game against Arizona State?  I

9   didn't either.  I'm surprised to see it.

10         Members of the jury, since we left you on Thursday or

11   you left us on Thursday, has anybody attempted to talk to you

12   about this case?

13         THE JURORS:  No.

14         THE COURT:  Have you talked to anyone about this case?

15         THE JURORS:  No.

16         THE COURT:  And have you learned anything at all about

17   the case outside the presence of each other and this

18   courtroom?

19         THE JURORS:  No.

20         THE COURT:  All right.  Thank you.  Let the record

21   reflect that all answers were negative to all questions by all

22   jurors.

23         Members of the jury, I'm about to read you the legal

24   instructions in this case.  You're not required to memorize

25   them because I will give you -- after I put this mic down -- I
```

1   will give you these legal instructions in writing.  You will

2   have them with you when you deliberate.  Notwithstanding the

3   fact I have a little voice, I'm required to read the

4   instructions so that then the lawyers who have a copy of the

5   instructions have the right to use those instructions in their

6   closing remarks.

7        Members of the jury, you have heard all of the

8   evidence in the case.  I will now instruct you on the rules of

9   law that you must follow and apply in arriving at your

10   decision in the case.  After I read these instructions, the

11   lawyers have the right to make their final presentation and

12   thereafter, you will begin deliberation.

13        In any jury trial, there are, in effect, two judges.

14   The Court is one of the judges and you are the other.  It is

15   my duty to preside over the trial and to determine what

16   evidence is relevant under the law for your consideration.  It

17   is also my duty at the end of the trial to instruct you on the

18   law applicable to this case.

19        You, as jurors, are the judges of the facts.  But in

20   determining what actually happened, that is, in reaching your

21   decision as to the facts, it is your sworn duty to follow all

22   of the rules of law as I explain them to you.

23        You have no right to disregard or give special

24   attention to any one instruction or to question the wisdom or

25   the correctness of any rule I may state to you.  You must not

1    substitute or follow your own notion or opinion as to what the

2    law is or ought to be.  It is your duty to apply the law as I

3    explain it to you, regardless of the consequences.

4        It is also your duty to base your verdict solely upon

5    the evidence, without prejudice or sympathy.  That was the

6    promise you made and the oath that you took before being

7    accepted by the parties as jurors, and they have the right to

8    expect nothing less.

9        The indictment or formal charge against the defendant

10   is not evidence of guilt.  Indeed, the defendant is presumed

11   by the law to be innocent.  You must presume that the

12   defendant is innocent throughout your deliberations until such

13   time, if ever, you as a jury are satisfied that the government

14   has proved him guilty beyond a reasonable doubt.  Unless you

15   are satisfied beyond a reasonable doubt that the defendant is

16   guilty, the presumption alone is sufficient to find the

17   defendant not guilty.

18       In other words, the law does not require the defendant

19   to prove his innocence or produce any evidence at all.  The

20   government has the burden of proving the defendant guilty

21   beyond a reasonable doubt, and if it fails to do so, you must

22   acquit the defendant.

23       While the government's burden of proof is a strict or

24   heavy burden, it is not necessary that the defendant's guilt

25   be proved beyond all doubt.  It is only required that the

1    government's proof exclude any reasonable doubt concerning the

2    defendant's guilt.

3        A reasonable doubt is a doubt based upon reason and

4    common sense, after careful and impartial consideration of all

5    the evidence in the case.  Proof beyond a reasonable doubt,

6    therefore, is proof of such a convincing character that you

7    would be willing to rely and act upon it without hesitation in

8    the most important of your own affairs.

9        I caution you, members of the jury, that you are here

10   to determine the guilt or innocence of the defendant from the

11   evidence in this case.  You are not called upon to return a

12   verdict as to the guilt or innocence of any other person or

13   persons other than the defendant in this case.  Moreover the

14   defendant is not on trial for any act or conduct or offense

15   not alleged in the indictment.

16       You must determine the facts -- in determining the

17   facts, you must consider only the evidence presented during

18   the trial, including the sworn testimony of the witnesses and

19   exhibits admitted into evidence.

20       Remember that any statements, objections, or arguments

21   made by the lawyers are not evidence.  The function of the

22   lawyers is to point out those things that are most significant

23   or helpful to their side of the case and, in doing so, to call

24   your attention to certain facts or inferences that might

25   otherwise escape your notice.  In the final analysis, however,

1    it is your own recollection and interpretation of the evidence

2    that controls in the case.  What the lawyers say is not

3    binding on you.

4         Do not assume for anything that I may have done or

5    said during this trial that I have any opinion concerning any

6    of the issues in this case.  Except for the instructions to

7    you on the law, you should disregard anything I may have said

8    during the trial in arriving at your own findings as to the

9    facts.

10        While you should consider only the evidence in the

11   case, you are permitted to draw such reasonable inferences

12   from the testimony and the exhibits as you feel are justified

13   in the light of common experience.  In other words, you may

14   make deductions and reach conclusions that reason and common

15   sense lead you to draw from the facts that have been

16   established by the testimony and the evidence in the case.

17        It is reasonable to infer that a person ordinarily

18   intends the natural and probable consequences of his knowing

19   acts.  You may draw the inference that the accused intended

20   all of the consequences which one standing in like

21   circumstances and possessing like knowledge should reasonably

22   have expected to result from any intentional act or conscious

23   omission.  Any such inference drawn is entitled to be

24   considered by you in determining whether or not the government

25   has proved beyond a reasonable doubt that the defendant

1    possessed the required criminal intent.

2          In considering the evidence, you should not be

3    concerned whether the evidence is direct evidence or

4    circumstantial evidence.  Direct evidence is the testimony of

5    one who asserts actual knowledge of a fact, such as an

6    eyewitness.  Circumstantial evidence is proof of a chain of

7    facts or circumstances indicating that the defendant is either

8    guilty or not guilty.  The law makes no distinction between

9    the weight you may give to either direct or circumstantial

10   evidence.  It requires only that you weigh all of the evidence

11   and convinced -- and be convinced of the defendant's guilt

12   beyond a reasonable doubt before he can be convicted.

13         I remind you that it is your job to decide whether the

14   government has proved the defendant, Gary Paul Karr, is guilty

15   beyond a reasonable doubt.  In making a determination on the

16   innocence or guilt of the defendant, you must consider all of

17   the evidence admitted for or against the defendant.  This does

18   not mean, however, that you must accept all of the evidence as

19   true or accurate.

20         You are the sole judges of the credibility or the

21   believability of each witness and the weight to be given each

22   witness' testimony.  An important part of your job will be

23   making judgments about the testimony of the witnesses who

24   testified in the case.  You should decide whether you believe

25   what each person had to say, and how important that testimony

was.  In making that decision, I suggest that you ask yourself a few questions.  Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the government or the defense?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Did the witness' testimony differ from the testimony of other witnesses?  These are a few of the considerations that may help you to determine the accuracy of what each witness said.

In evaluating the identification testimony of a witness, you should consider all the factors already mentioned concerning your assessment of the credibility of any witness in general, and you should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified.  You may consider, in that regard, such matters as the length of time the witness had to observe the person in question, the prevailing conditions at the time in terms of visibility or distance and the like, and whether the witness had known or observed the person at earlier times. You may also consider the circumstances surrounding the identification itself, including, for example, the manner in which the defendant was presented to the witness for

1    identification, and the length of time that elapsed between

2    the incident in question and the next opportunity the witness

3    had to observe the defendant.

4         During the trial, you've heard the testimony of

5    several forensic scientists who expressed opinions concerning

6    DNA analysis and other evaluations.  The rules of evidence

7    provide that if scientific, technical, or other specialized

8    knowledge might assist the jury in understanding the evidence

9    or in determining a fact in issue, a witness qualified as an

10   expert by knowledge, skill, experience, training, or education

11   may testify and state an opinion concerning such matters.

12   Merely because an expert witness has expressed an opinion does

13   not mean, however, that you must accept the opinion.  As with

14   any other witness, it is up to you to decide whether you

15   believe the testimony and choose to rely upon it.  Part of

16   that decision will depend on your judgment about whether the

17   witness' background or training and experience is sufficient

18   for the witness to give the expert opinion you heard.  You

19   must also decide whether the witness' opinion were based on

20   sound reasons, judgment and information.

21        A defendant in a criminal case has a right secured by

22   the Constitution of the United States to either testify as a

23   witness in the case or decline to do so.  In this case, the

24   defendant has chosen to exercise his constitutional rights not

25   to testify.  You may not discuss or consider the defendant's

1   decision not to testify in any manner when deliberating and in

2   arriving at your verdict.  No inference of any kind may be

3   drawn from the fact that the defendant decided to exercise his

4   privilege under the Constitution and not testify.

5         In making up your mind and reaching a verdict, do not

6   make any decisions simply because there were more witnesses on

7   one side than the other.  Do not reach a conclusion on a

8   particular point just because there were more witnesses

9   testifying for one side on that point.  Your job is to think

10   about the testimony of each witness you heard and decide how

11   much of what each witness had to say -- how much you believe

12   of what each witness had to say.  You will always bear in

13   mind, however, that the law never imposes upon a defendant in

14   a criminal trial the burden or duty of calling any witnesses

15   or producing any evidence.

16         If a defendant is found guilty, it will be my duty to

17   decide what the punishment will be.  You should not be

18   concerned with punishment in any way.  It should not enter

19   into your consideration or discussion.

20         And now that I've instructed you on your general

21   duties and the guidelines to follow in reaching a verdict, I

22   will instruct you on the law particular to this case.

23         The term knowingly, as used in these instructions,

24   means that an act was done voluntarily and intentionally and

25   not because of accident or mistake.

1      The term willfully, as used in these instructions,
2  means that an act was committed voluntarily and purposely, and
3  with the specific intent to do something the law forbids; that
4  is to say, with bad purpose either to disobey or disregard the
5  law.
6      The term commerce includes travel, trade,
7  transportation and communication.
8      The term interstate commerce means commerce or travel
9  between one state, territory or possession of the United
10  States and another state, territory or possession of the
11  United States including the District of Columbia.
12      The term foreign commerce means commerce or travels
13  between any part of the United States, including its
14  territorial waters, and any other country, including its
15  territorial Waters.
16      You will note that each count in the indictment
17  charges that an offense was committed, quote, on or about, end
18  quote, a certain date.  The proof need not establish with
19  certainty the exact date of the alleged offense.  It is
20  sufficient if the evidence in the case establishes beyond a
21  reasonable doubt that the offense was committed on a date
22  reasonably near the date alleged.
23      I instruct you that Austin, Texas and San Antonio,
24  Texas lie within the Western District of Texas.
25      A separate crime is charged in each count of the

1    indictment.  Each count and the evidence pertaining to it

2    should be considered separately.  The fact that you may find

3    the defendant guilty or not guilty as to one of the crimes

4    charged should not control your verdict as to any other,

5    unless stated otherwise in the instructions for any particular

6    count.

7         The guilt of the defendant in a criminal case may be

8    established without proof that the defendant personally did

9    every act constituting the alleged offense.  The law

10   recognizes that, ordinarily, anything a person can do for

11   himself may also be accomplished by that person through the

12   direction of another person as his or her agent, or by acting

13   in concert with, or under the direction of, another person or

14   persons in a joint enterprise or effort.

15        If another person is acting under the direction of the

16   defendant or if the defendant joins another person and

17   performs acts with the intent to commit a crime, then the law

18   holds the defendant responsible for the acts and conduct of

19   such other persons just as though the defendant had committed

20   the acts or engaged in such conduct.

21        Before any defendant may be held criminally

22   responsible for the acts of others, it is necessary that the

23   accused deliberately associated himself in some way with the

24   crime and participated in it with the intent to bring about

25   the crime.

1        Of course, the mere presence at the scene of a crime

2   and knowledge that a crime is being committed are not

3   sufficient to establish that the defendant either directed or

4   aided and abetted the crime unless you find beyond a

5   reasonable doubt that the defendant was a participant and not

6   merely a knowing spectator.

7        In other words, you may not find the defendant guilty

8   unless you find beyond a reasonable doubt that every element

9   of the offense, as defined in these instructions, was

10  committed by some person or persons, and that the defendant

11  voluntarily participated in its commission with the intent to

12  violate the law.

13       A conspiracy is an agreement between two or more

14  persons to join together to accomplish some unlawful purpose.

15  It is kind of a partnership in crime in which each member

16  becomes the agent of every other member.

17       One may become a member of a conspiracy without

18  knowing all of the details of the unlawful scheme or the

19  identities of all of the other alleged conspirators.  If a

20  defendant understands the unlawful nature of a plan or scheme

21  and knowingly and intentionally joins in that plan or scheme

22  on one occasion, that is sufficient to convict him for

23  conspiracy even though the defendant had not participated

24  before and even though the defendant played only a minor part.

25       The government need not prove that the alleged

1    conspirators entered into any formal agreement, nor that they

2    directly stated between themselves all the details of the

3    scheme.  Similarly, the government need not prove that all of

4    the details of the scheme alleged in the indictment were

5    actually agreed upon or carried out.  Nor must it prove that

6    all of the persons alleged to have been members of the

7    conspiracy were such, or that the alleged conspirators

8    actually succeeded in accomplishing their unlawful objectives.

9         Mere presence at the scene of an event, even with the

10   knowledge that the crime is being committed, or the mere fact

11   that certain persons may have associated with each other, and

12   may have assembled together and discussed common aims and

13   interest, does not necessarily establish proof of the

14   existence of a conspiracy.  Also, a person who has no

15   knowledge of a conspiracy, but who happens to act in a way

16   which advances some purpose of a conspiracy, does not thereby

17   become a conspirator.

18        You must determine whether the conspiracy charged in

19   the indictment in Counts 1, 2 and 4 existed, and if it did,

20   whether the defendant was a member of it.  If you find the

21   conspiracy charged did not exist, then you must return a not

22   guilty verdict, even though you find that some other

23   conspiracy existed.  If you find that the defendant was not a

24   member of the conspiracy charged in the indictment, then you

25   must find the defendant not guilty, even though the defendant

1  may have been a member of some other conspiracy.

2        In determining whether the defendant was a member of

3  the alleged conspiracy, you should consider only that

4  evidence, if any, pertaining to his own acts and statements.

5  He is not responsible for the acts or declaration of the other

6  alleged participants until it is established beyond a

7  reasonable doubt, first, that a conspiracy existed, and

8  second, from the evidence of his own acts and statements, that

9  the defendant was one of its members.

10       It does not matter that some of the people who may

11  have been involved in the alleged offense are not on trial.

12  There is no requirement that all members of a conspiracy be

13  charged and prosecuted, or tried together in one proceeding.

14  Nor is there any requirement that the names of other

15  unindicted coconspirators be alleged in the indictment, so

16  long as the government can prove the defendant conspired with

17  one or more of the other conspirators.

18       You are instructed that your verdict must be

19  unanimous.  For you to find the defendant guilty of any of the

20  counts charged in the indictment, you must unanimously find

21  beyond a reasonable doubt from the evidence each element of

22  the crime charged in that count.  If you do not so find, you

23  must find the defendant not guilty on that count.

24       Count 1.  Title 18, United States Code, Section

25  1201(c), makes it a crime for anyone to conspire with somebody

1   else to kidnap another person and then transport that person

2   in interstate commerce.

3          For you to find the defendant guilty of this crime, as

4   charged in Count 1 of the indictment, you must be convinced

5   that the government has proved each of the following beyond a

6   reasonable doubt:

7          First, that two or more persons knowingly and

8   willfully made an agreement to unlawfully seize, confine,

9   inveigle, decoy, kidnap, abduct, or carry away and hold for

10  ransom, reward or some benefit, including financial gain, one

11  or more of the individuals named in the indictment;

12          Second, that the defendant knew the unlawful purpose

13  of the agreement and joined in it willfully, that is, with

14  intent to further the unlawful purpose; and

15          Third, that one of the conspirators during the

16  existence of the conspiracy knowingly committed at least one

17  of the overt acts described in the indictment, in order to

18  accomplish some object or purpose of the conspiracy.

19          In order for the defendant to be found guilty of

20  kidnapping, the government must prove each of the following

21  beyond a reasonable doubt:

22          First, that the defendant knowingly acting contrary to

23  law, seized, confined, inveigled, decoyed, kidnapped, abducted

24  or carried away and held another person, as charged;

25          Second, that the defendant held such person for

1　ransom, reward or some benefit, including financial gain, that

2　the defendant intended to derive from the kidnapping; and

3　　　　Third, that the defendant intentionally transported

4　such person or caused such person to be transported in

5　interstate commerce while so kidnapped, confined, and

6　inveigled.

7　　　　To kidnap a person means to unlawfully hold, keep,

8　detain, and confine the person against that person's will.

9　Involuntariness or coercion in connection with a victim's

10　detention is an essential part of the offense.

11　　　　To inveigle a person means to lure, or entice, or lead

12　the person astray by false representations or promises, or

13　other deceitful means.

14　　　　To decoy means to entice or lure by means of some

15　fraud, trick, or temptation.

16　　　　The term ransom, reward, or some benefit includes

17　motives of personal monetary gain as well as motives which do

18　not involve financial gain, such a benefit -- since a benefit

19　is any legal or illegal object of the kidnapping which the

20　perpetrator might consider of sufficient motive to induce him

21　to undertake it.

22　　　　The government need not prove the defendant knew that

23　he was crossing a state line with the victim.  So long as the

24　defendant crossed the state line while intentionally

25　transporting the victim, or caused the victim to be

1  transported in interstate commerce, the third element has been

2  satisfied.

3  　　　　Count 2.  Title 18, United States Code, Section 1951,

4  makes it a crime for anyone to conspire with someone else to

5  commit robbery or extortion, and in doing so, to interfere

6  with or affect commerce.

7  　　　　Robbery means the unlawful taking or obtaining of

8  personal property from the person of another, against his

9  will, by means of actual or threatened force, or violence, or

10  fear of injury, immediate or future, to his person or

11  property, or property in his custody or possession, or the

12  person or property of a relative or member of the family or of

13  anyone in his company at the time of the taking or obtaining.

14  　　　　Extortion means the obtaining of or attempting to

15  obtain property from another, with that person's consent,

16  induced by wrongful use of actual or threatened force,

17  violence, or fear.

18  　　　　For you to find the defendant guilty of this crime, as

19  charged in Count 2 of the indictment, you must be convinced

20  that the government has proved each of the following beyond a

21  reasonable doubt:

22  　　　　First, that two or more persons knowingly and

23  willfully made an agreement to commit robbery or extortion

24  affecting commerce, as charged in the indictment;

25  　　　　Second, that the defendant knew the unlawful purpose

1    of the agreement and joined in it willfully, that is, with

2    intent to further the unlawful purpose; and

3           Third, that one of the conspirators during the

4    existence of the conspiracy knowingly committed at least one

5    of the overt acts described in the indictment, in order to

6    accomplish some object or purpose of the conspiracy.

7           In order for the defendant to be found guilty of

8    robbery or extortion affecting commerce, the government must

9    prove each of the following beyond a reasonable doubt:

10          First, that the defendant wrongfully took or obtained

11   personal property from another, as charged;

12          Second, that the defendant knowingly and willfully

13   took the property from such person by means of robbery or

14   extortion; and

15          Third, that the defendant's conduct interfered with

16   and -- or affected commerce, or the movement or articles or

17   commodities in interstate or foreign commerce.  The government

18   is not required to prove that the defendant knew his conduct

19   would interfere with or affect interstate commerce.  It is not

20   necessary for the government to show that the defendant

21   actually intended or anticipated an effect on interstate

22   commerce by his actions or that commerce was actually

23   affected.  All that is necessary is that the natural and

24   probable consequences of the acts the defendant took would be

25   to affect interstate commerce.  If you decide that there would

1   be any affect at all on interstate commerce, then that is

2   enough to satisfy this element.  The effect can be minimal.

3        The term property includes money and other tangible

4   and intangible things of value.

5        The term fear includes fear of economic loss or

6   damage, as well as fear of physical harm.  It is not necessary

7   that the government prove that the fear was a consequence of a

8   direct threat; it is sufficient for the government to show the

9   victim's fear was reasonable under the circumstances.

10       The actual -- the use of actual or threatened force is

11  wrongful if its purpose is to cause the victim to give

12  property to somebody who has no legitimate claim to the

13  property.

14       Count 3.  Title 18, United States Code, Section

15  1952(a)(2), makes it a crime for anyone to travel in

16  interstate commerce, or to use any facility in interstate

17  commerce, with the intent to commit any crime of violence to

18  further any unlawful activity.

19       For you to find the defendant guilty of this crime, as

20  charged in Count 3 of the indictment, you must be convinced

21  the government has proved each of the following beyond a

22  reasonable doubt:

23       First, that the defendant knowingly traveled in

24  interstate commerce or used any facility in interstate

25  commerce as alleged;

1    Second, that the defendant engaged in the interstate

2  travel or the use of interstate facility with intent to commit

3  a crime of violence; and

4    Third, that the defendant thereafter knowingly and

5  willfully committed a criminal of violence in further -- to

6  further an unlawful activity.

7    The term, quote, facility in interstate commerce, end

8  quote, includes means of transportation and communication.

9    The term, quote, crime of violence, end quote,

10  includes the offenses of kidnapping and robbery, both of which

11  have been defined for you in these instructions.

12    The term unlawful activity includes the offense of

13  extortion which has been defined for you in these

14  instructions.

15    You are instructed that a conspirator is responsible

16  for offenses committed by another conspirator if the

17  conspirator was a member of the conspiracy when the offense

18  was committed in furtherance of, or as a foreseeable

19  consequence of, the conspiracy.  Therefore, if you find the

20  defendant guilty of the conspiracy charged in Count 1 and/or

21  Count 2, and if you find beyond a reasonable doubt that during

22  the time the defendant was a member of the conspiracy, another

23  conspirator committed any one or more of the elements of the

24  offense charged in Count 3 in furtherance of or as a

25  foreseeable consequence of that conspiracy, then you may find

1    the defendant guilty of Count 3, even though the defendant may

2    not have participated in any or all of the acts committed by

3    another conspirator which constitute the offense described in

4    Count 3.

5         If you find the defendant guilty of Count 3 and not

6    otherwise, then answer the following question:  Quote, do you

7    find beyond a reasonable doubt that the offense charged in

8    Count 3 resulted in the death of another person?  In answering

9    this question, you are instructed you must agree unanimously

10   as to which individual or individuals were killed, if any.

11   Therefore, if you find that a specific individual or

12   individuals died as a result of the offense, you will answer

13   yes, and thereafter, specify which person or persons you have

14   found died as a result of the offense.  If you find the

15   defendant not guilty on Count 3 or if you fail to unanimously

16   find a specific person or persons died as a result of the

17   offense, then you will answer no.  Proceed to Count 4.

18        Count 4.  Title 18, United States Code, Section

19   1956(h) and 1957, make it a crime for anyone to conspire with

20   someone else to engage in a monetary transaction in property

21   derived of a specified unlawful activity with a value in

22   excess of $10,000.

23        For you to find the defendant guilty of this crime, as

24   charged in Count 4 of the indictment, you must be convinced

25   that the government has proved each of the following beyond a

reasonable doubt:

First, that two or more persons knowingly or willfully made an agreement to engage in a monetary transaction in criminally derived property affecting interstate commerce, as charged in the indictment;

Second, that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose;

And third, that one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

In order for the defendant to be found guilty of engaging in a monetary transaction in criminally derived property, the government must prove each of the following beyond a reasonable doubt:

First, that the defendant knowingly engaged in a monetary transaction in criminally derived property affecting interstate commerce, as charged;

Second, that the property involved in the monetary transaction was valued at more than $10,000;

Third, that the property was derived from the proceeds of a specified unlawful activity, that is, the defendant conspired to knowingly and willfully cause Jon Garth Murray to travel in interstate commerce for the purpose of facilitating

1  the transfer of approximately $600,000 by, through or to a

2  financial institution;

3       And fourth, that the defendant knew the property was

4  derived from the proceeds of the unlawful activity of

5  kidnapping, robbery and/or extortion.

6       The term monetary transaction means the deposit,

7  withdrawal, transfer or exchange, in or affecting interstate

8  commerce, of funds or a monetary instrument by, through, or to

9  a financial institution.

10      The term monetary instrument includes coins or

11  currency of the United States or of any other country,

12  traveler's checks, personal checks, bank checks, or money

13  orders.

14      The term financial institution includes an insured

15  bank, a commercial bank or trust company, a private banker, a

16  currency exchange, an operator of a credit card system, an

17  insurance company, a dealer in precious metals, stones, or

18  jewels, a pawnbroker, a travel agent, a licensed sender of

19  money, a telegraph company, or a business engaged in vehicle

20  sales.

21      The term property includes money and other tangible or

22  intangible things of value.

23      The term criminally derived property means any

24  property constituting, or derived from, the proceeds from a

25  criminal offense.

1    The term proceeds includes money, funds, monetary

2 instruments, or other property, whether real or personal.

3    The term specified unlawful activity means the crimes

4 of kidnapping, robbery and extortion, which are defined for

5 you in these instructions.

6    The government must prove only that the defendant knew

7 the property involved in the monetary transaction constituted,

8 or was derived from, directly or indirectly, proceeds obtained

9 from some criminal offense, but the defendant need not have

10 known the precise nature of the offense from which the funds

11 were derived.

12    It is not necessary for the government to show the

13 defendant actually intended or anticipated an effect on

14 interstate commerce by his actions or that commerce was

15 actually affected.  All that is necessary is that the natural

16 and probable consequences of the acts the defendant took would

17 be to affect interstate commerce.  If you decide that there

18 would be any effect at all on interstate commerce, then that

19 is enough to satisfy this element.  And the effect can be

20 minimum.

21    Count 5.  Title 18, United States Code, Section 2314,

22 makes it a crime for anyone to transport in interstate

23 commerce stolen property having a value of $5,000 or more, and

24 knowing it to have been stolen, converted, or taken by fraud.

25    For you to find the defendant guilty of this crime, as

1  charged in Count 5, you must be convinced that the government

2  has proved the following beyond a reasonable doubt:

3       First, that the defendant transported in interstate

4  commerce items of stolen property as described in the

5  indictment;

6       Second, that at the time of such transportation, the

7  defendant knew the property had been stolen, converted or

8  taken by fraud;

9       And third, that the items had a value of $5,000 or

10  more.

11       The term stolen includes all wrongful and dishonest

12  takings of property with the intent to deprive the owner of

13  the rights and benefits of ownership, temporarily or

14  permanently.

15       The term value means the face, par, or market value,

16  whichever is the greatest.

17       Any verdict must represent the considered judgment of

18  each juror.  In order to return a verdict, it is necessary

19  that each juror agree thereto.  In other words, your verdict

20  must be unanimous.

21       It is your duty as jurors to consult with one another

22  and to deliberate in an effort to reach agreement, if you can

23  do so without violence to your individual judgment.  Each of

24  you must decide the case for yourself, but only after an

25  impartial consideration of the evidence in the case with your

1   fellow jurors.  In the course of your deliberations, you may

2   choose to re-examine your own views and even change your mind

3   completely after discussing the evidence with the other

4   jurors.  However, do not surrender your honest conviction as

5   to the weight or the effect of the evidence solely because of

6   the opinion of your fellow jurors, or for the mere purpose of

7   returning a verdict.

8       Remember at all times, you are not partisans.  You are

9   judges, judges of the facts.  And your sole interest is to

10  seek the truth from the evidence in the case.

11      Upon retiring to the jury room, you should first

12  select one of your number to act as your presiding juror who

13  will preside over your deliberations and will be your

14  spokesperson here in court.

15      A verdict form has been prepared for your convenience.

16  You will take the verdict form to the jury room, and when you

17  have reached a unanimous agreement as to your verdict, you

18  will have the presiding juror fill it in, date it, and sign

19  it, and return to the courtroom.

20      If, during your deliberations, you should desire to

21  communicate with the Court, please reduce your message or

22  question to writing signed by the presiding juror and pass the

23  note to the Court Security Officer, who will bring it to my

24  attention.  I will either answer your question in writing or

25  bring you back to the courtroom for other verbal instructions.

1   If you send a written message or question to the Court,

2   however, do not volunteer any information as how the jury is

3   divided for a conviction or acquittal in any particular time.

4           Members of the jury, I never invite a question.

5   Sometimes the jurors have a question.  The procedure will be

6   for me to stop whatever I'm doing.  I will have the parties

7   back in the courtroom.  I will share with them that note.

8   They have the right to suggest how I answer the note, and

9   then, I generally will answer it and send it back in the

10  courtroom -- of the deliberating room.

11          The point is it takes time.  Never stop deliberating.

12  Many a jury has come in with a verdict and the question falls

13  to be meaningless before a question gets answered.  Always

14  continue to deliberate.

15          One last instruction and that is I think you can tell

16  from this, you will have the legal instructions I have just

17  read to you.  You will have the verdict which you are to fill

18  in when you have decided it, which is a two-page instrument

19  that the lawyers may comment on.

20          You will have a copy of the indictment that makes the

21  specific charge, and you will have all of the evidence that

22  has been admitted into evidence to deliberate on.  You will

23  have all of those things, along with your memory, as to what

24  the evidence was, and that will be what you determine and base

25  the verdict on.

1    What the lawyers are going to say in a minute can be

2    very important.  Listen to them.  It might kindle your

3    thinking process as to what the evidence may mean or not mean.

4    But what they say is not evidence and is not binding on you.

5        Mr. Mills.

6    GOVERNMENT'S CLOSING STATEMENTS

7        MR. D. MILLS:  Good morning, members of the jury.

8    What we're about to do and what you're going to do is very

9    serious business that we're undertaking here.  And I know as

10   you sat through the two weeks and I watched you take notes --

11   and I know you've taken your job seriously, and all of the

12   parties to this lawsuit appreciate that.

13       Like I said, the Judge said you'll have your

14   instructions.  One of the important things that are in those

15   instructions -- I think both defense counsel said it to you, I

16   say it to you now -- is use your common experiences and your

17   common sense if that's what you call it.  You have the

18   evidence which consists of the documents that are here, the

19   testimony of the witnesses with which to decide your verdict,

20   and your common experiences.

21       You don't set that aside when you come in here.  Use

22   it.  And I suggest it will be very helpful to you in analyzing

23   facts and things that occurred as to what you decide in your

24   ultimate verdict.

25       As the Judge said, the lawyers' recollection of

1   evidence may differ from yours, and what we wrote down and

2   what you wrote down may not be the same.  But I ask you to

3   remember in the opening statement of defense counsel as one

4   thing I want you to consider.  Defense counsel said what this

5   case is about was the collision of two strong-willed persons,

6   Madalyn Murray O'Hair and David Waters.

7          Defense counsel said in his opening statement to you,

8   it's logical that David Waters would be angry with Madalyn

9   Murray O'Hair after she wrote the news article about him in

10  the Atheist Newsletter.  And you have that and you can go and

11  read it.  But then, defense counsel suggests in his opening

12  statement to you that Waters, after he's been turned in by Ms.

13  O'Hair and prosecuted by the District Attorney's Office for

14  embezzling money, goes to her to help her flee the country.

15         Ask yourself if that's logical.  In your common

16  experience, would you do that?  Would you go to someone that

17  just embezzled from you and ask them to help you flee the

18  country?  Think about what he suggested to you in doing that.

19         You heard testimony about what Ms. O'Hair did.  She

20  attempted to get a restraining order.  She built a fence.

21  Does that make sense to you that David Waters is going to help

22  Ms. O'Hair flee the country?  You decide that and that will

23  help you decide a whole lot of this case.

24         Defense counsel suggested to you that Mr. Karr, the

25  defendant here, was motivated by Mr. Waters lying to him and

1   by fear.  And you heard that Mr. Karr and his statement to the

2   IRS agent and his statement to Mr. Miller, his friends that he

3   worked for in Florida, that he was going to Texas to be a

4   bodyguard for the O'Hairs.

5        Now, ask yourself, why does Mr. Waters have to

6   motivate this individual through fear and lying if they're

7   going to be a bodyguard?  Ask yourself another question:  You

8   heard testimony from several witnesses that the fee was going

9   to be about $30,000 for each of these individuals for their

10  efforts in bodyguarding these individuals.

11       Depending on how long you think the conspiracy went

12  on, if you believe there was one, they were given a thousand

13  dollars a day, if you just look at 30 days in September, maybe

14  a little less if you consider some of their activity in

15  October.  Is that reasonable?  Is that what bodyguards get

16  paid?  I suggest not to you, but you decide that from the

17  evidence.

18       Mr. Mills in his opening statement said the simplest

19  explanation is that the O'Hairs left the country to flee the

20  Internal Revenue Service.  Do any of you believe that?  That

21  will be a controlling issue for you.

22       You heard Mr. Etter, the tax attorney, come and

23  testify that Mrs. O'Hair didn't fear the IRS, she thrived on

24  fighting with the IRS.  William Murray, her son, said she

25  thrived on fighting.  She was -- used it as a method to raise

1   money.

2        Do you really believe that the 75-year-old woman fled

3   the Internal Revenue Service?  You remember what Mr. Etter

4   said, that she sent back the two-word letter to the Internal

5   Revenue Service with the expletive in it.  Does that sound

6   like someone who would flee the country to get away from the

7   IRS?

8        And you heard what Mr. Etter said and there's evidence

9   in the record here, the documents that show how minimal the

10  amount of assessment the Internal Revenue actually collected

11  from her.  I suggest the simple notion of a flee is just a

12  rabbit trail that they're trying to lead you down to get your

13  attention away from the real evidence of what happened, the

14  killing of the O'Hairs by this man over here and others.

15       Is it logical?  Use your common sense, that if a

16  70-year-old woman left -- and I'm directing this statement to

17  you because of the person affiliated with the Baptist Church

18  -- would you flee to Romania, if you were going, when you were

19  old and you were sick?  Would you leave this country when you

20  needed medical care and go to Romania?  Is that something you

21  would do?

22       And you've heard evidence about how close Ms. O'Hair

23  was to her son and to her granddaughter -- adopted daughter.

24  They weren't present.  The recollection of other people is

25  they pretty much were all together.  I'm not here to suggest

1    to you that the man came from the church and he lied up here.

2    I suggest to you that his recollection is not real good of

3    what he saw.

4         And you could recall how far away from you were you,

5    he says about here.  When defense counsel stood right here, if

6    you remember this, with photographs of Ms. O'Hair, he says,

7    well, "I can't see them.  Bring them up here."  And remember,

8    I asked him, too, was the light better in here than in there?

9    And he said yes.

10        And I suggest that you probably had a similar

11   experience in your life as he did.  You've probably seen

12   people someplace walking along and you think, God, I think I

13   know that person over there.  But you don't have enough belief

14   in that to walk up and say, aren't you so and so?

15        Here's a man who studied atheism.  He says he knows

16   she's missing, he doesn't mind intruding upon her privacy

17   because he told you he was going to go get his camera and come

18   back the next evening and take the picture, but all he had to

19   do is say, "I'm so and so.  Aren't you Madalyn Murray O'Hair?"

20   Real simple thing.

21        But I suggest his reservation says to you he wasn't

22   sure who he saw.  He thought he saw someone that looked like

23   that lady, but he didn't see her.  There wasn't anyone there

24   -- there.  Remember, she had no cane, no walker.

25        Mr. Mills said in his opening statement, in your

1    recollection, talked about hands and feet sticking out, and he

2    says that's inconsistent with barrels being used.  If as he

3    said in his opening statement that the O'Hairs fled the

4    country to avoid the Internal Revenue Service, why is he

5    concerned whether their hands and feet in the barrels were

6    sticking out?  That makes no sense.

7         If they fled, you have no concern with whether they're

8    deceased.  These inconsistent defenses that are being

9    presented, is that done to assist you in determining what

10   happened or is that done to confuse you?  And I say you

11   consider that when you deliberate, too.  Use your common sense

12   about that.

13        As the Judge said, you'll get to take the jury charge

14   back with you.  Page 2 has the word reasonable doubt.  It has

15   some nice lawyer talk in there about not -- proof of such

16   convincing character that you would be willing to rely and act

17   upon it without hesitation in the most important affairs of

18   your life.

19        You have a lot of important affairs just like the rest

20   of us do.  I suggest that in all your dealings, you hesitate

21   before you act because you reason things out.  And I'll give

22   you some suggestions as to when you do that.  When you change

23   jobs, you generally have some reservation in your gut about,

24   am I making the right decision here to go change jobs?

25        Those of you who have gotten married, you probably had

1   a hesitation before you got married.  If you move your
2   children to a different school, if you buy a new house, you
3   always know you have little hesitations before you go do those
4   things, and your hesitations are caused because you reasoned,
5   you thought this through, and then, you act.

6       And I suggest that beyond a reasonable doubt is
7   nothing more than those type of occasions that you've had.
8   You thought things through, you've analyzed it, and you made a
9   decision that you think is appropriate based upon all you
10  know.  And that's what reasonable doubt is and nothing more
11  than that.

12      On page 3, you will see, it said, use your common
13  sense, which we've discussed.  On page 4, it gives you some
14  information about credibility and believability of the
15  witness.  And I suggest you look at those in there because
16  they tell you about the witnesses.  Do you believe them to be
17  honest?  Did they impress you as honest?  Did they have any
18  particular reason not to tell the truth?  Did they have a
19  personal interest in the litigation?  Do they have a
20  relationship with either side in this lawsuit?  Did they seem
21  to have a good memory?

22      All those are things that you should use in coming to
23  conclusion about who you believe in this particular case.  On
24  page 7, there's another important instruction that I suggest
25  you remember.  Lawyers call it the law of parties.  And what

1   it says, the law recognizes that ordinarily, anything a person

2   can do for himself may also be accomplished by that person

3   through the direction of another person as his or her agent,

4   or by acting in concert or under the direction of that person.

5          Defense counsel says Mr. Waters manipulated Mr. Karr

6   through lying and deception.  Mr. Karr is acting as a party in

7   that case.  Anything that one person can do could be done

8   through the actions of another.  And don't forget that

9   particular instruction on page 7.  I suggest you read it and

10  keep it in mind, because parties do act for the benefit of

11  each other.

12         Page 8, it talks about a conspiracy, and it says a

13  conspiracy is an agreement between two or more persons.  It

14  doesn't have to be reduced to writing, which it generally

15  never is.  You infer from other people are they acting in

16  concert with each other?  Do their acts seem to go towards

17  furthering whatever activity is that they've undertaken?

18         And that is important and it relates to several

19  counts.  It relates to Counts 1, 2 and 4 of this indictment.

20  There are three different conspiracies set out in this

21  indictment.  It also says that if a defendant understands the

22  unlawful nature of a plan or scheme and knowingly and

23  intentionally joins in that plan or scheme on one occasion,

24  that is sufficient to convict him for conspiracy even though

25  the defendant had not participated before, and even though the

1    defendant played only a minor part.

2         This defendant flew to New Jersey as he told -- as Mr.

3    Miller said.  He told Mr. Miller he flew, and he said one

4    thing he regretted was using his own name.  Ask yourself if

5    you believe Mr. Miller, why does this defendant lie to Mr.

6    Miller about using his own name?  You've heard that the ticket

7    was used Conrad Johnson.

8         Why use an assumed name?  Is he further in the

9    conspiracy?  Did they get $600,000 from going to New Jersey?

10   That's for you to decide.  Did this man go to Bob Fry's house

11   to retrieve this confidential letter?  That's for you to

12   decide.  But if he did and you believe that was in furtherance

13   of the conspiracy, even though he's playing a minor role, he

14   is guilty of all the acts of the conspiracy.

15        And there is another instruction on page 14 that is

16   called a Pinkerton charge, what the lawyers call it.  And I'll

17   come to it a little bit or discuss it, or I'll do it right

18   now, I guess.  If you join a conspiracy and you decide that

19   this man is in a conspiracy with Mr. Waters, Mr. Fry, with Mr.

20   Osborne, if you believe, he has to perform only some minor

21   role and he is responsible under the law for everything that

22   the conspirators did that was reasonably foreseeable in that

23   conspiracy.

24        The death of the O'Hairs, the death of Mr. Fry, if

25   those are reasonably foreseeable things and you find him in

1    that conspiracy, he doesn't have to be the one to actually do

2    the killing.  Did he do something in furtherance?  And I

3    suggest there's plenty of evidence that he did that because

4    you know he went to New Jersey with Jon Garth Murray, you know

5    he went to Mr. Fry's house to retrieve the confidential

6    letter, and ask yourself why did he do that.

7         Count 1 talks about conspiring to kidnap another

8    person and then, transport in interstate commerce.  The trip

9    to New Jersey with Mr. Murray is what that is about.  It says

10   to kidnap means to uphold, keep, detain and confine the person

11   against the person's will.  Remember what the detective at the

12   gold exchange said about Mr. Murray, how his clothes were

13   unkept, how he smelled.

14        Do you think Mr. Murray was being kept against his

15   will?  I suggest that some evidence that tells you he is.

16   Count 2, robbery and extortion by actual or threatened force

17   or violence.  Read the words.  Read the definition.  Read

18   extortion.  It says means, the obtaining of or attempting to

19   obtain property from another with that person's consent,

20   induced by wrongful use or actual threatened force.

21        That's what happened.  Went to New Jersey, he was

22   holding his mother and his sister.  That's how the money got

23   removed.  It's real simple.  Count 3 is a critical count.

24   Traveled in interstate commerce with the intent to commit any

25   crime of violence or to further unlawful activity.

1  Traveled in interstate commerce or used any facility

2  in interstate commerce.  You know they flew on an airplane to

3  New Jersey.  That's clearly interstate commerce.  Or used any

4  facility in interstate commerce.  Using the telephones to make

5  phone calls is sufficient.  The wire transfer from the bank in

6  New Jersey to the jeweler's account in San Antonio is using

7  the facility in interstate commerce.  Don't get hung up on

8  those particular terms.

9  Crime of violence as a definition say includes

10  kidnapping and robbery.  You get some special instructions on

11  the bottom of 4.  And the verdict form also has it if you find

12  this person guilty of that particular count, then do you find

13  beyond a reasonable doubt that the offense resulted in the

14  death of another?

15  The three O'Hairs or Mr. Fry.  If you find that this

16  conspiracy resulted in the death of those three individuals,

17  then you answer that special question as to that particular

18  issue.  And I suggest you know the answer to that question.

19  Count 4 is money laundering.  This involves the

20  $600,000, too.  The transfer of the money from New Jersey back

21  to Texas.  You can read the instruction, and it also has

22  foreign commerce because the money came from New Zealand to

23  the bank in New Jersey.  You can read definitions there, too,

24  about monetary transaction means deposit, withdrawal or

25  transfer.  It also says a monetary instrument is a bank check

1  which is a wire transfer.

2       Count 5 talks about traveling in interstate commerce

3  with stolen property having a value of $5,000 or more.  The

4  evidence that relates to that, members of the jury, involves

5  the watches, the Rolex watches that Mr. Karr wanted to give to

6  Charlene Karr.  It also includes that diamond that he sold to

7  his friend in Chicago for about $3400.  There's a check in

8  evidence showing that.

9       You heard the jeweler testify that the one watch was

10 worth more than $5,000, the man's Rolex watch.  That's what

11 that count is about.  Back to is the evidence logical as to

12 various theories that have been put up here?  I'll come back

13 again and say, is it logical for a 75-year-old woman to leave

14 the country?

15      I suggest in your common sense, you know that no one

16 70 years old, that's in poor health, is going to Romania.

17 That just does not make sense.  You may differ if you think it

18 does.  I suggest logic tells you otherwise.  Is it logical to

19 ask the angry David Waters to help you flee the country?  The

20 individual that just embezzled from you?

21      Is it logical to flee the country after the gold was

22 stolen?  What assets did they have to take with them?  There

23 was another $100,000 of gold ready for them on Monday, which I

24 believe was the 2nd of October, if I could keep my dates

25 straight.  They had other assets they could have converted

1    into gold.  Why didn't they do that?  Why, if you were fleeing

2    the country, would you leave after the gold was stolen?

3        Maybe you believe the three individuals that came and

4    testified that the gold was stolen that they stole it to split

5    it up with the defense -- or with the defendants.  I suggest

6    to you the answer of the one individual that testified when

7    defense counsel asked him, do you have any invoices and he

8    said, "No, you can go over and ask all the people at the bar,

9    they all know who I am."  One tells you the answer to that

10   deal.  There was no conspiracy by those three.  They took the

11   money.

12       And once the money was gone, why would the O'Hairs

13   leave if that was part of the plan to get assets to get out of

14   the country?  Is it logical to flee?  You heard Ms. Murray's

15   son come and testify that Mrs. Murray made a good living out

16   of what she did, raising money, getting in arguments with

17   people, filing lawsuits.

18       She managed to generate large sums of money.  She

19   said, I believe, and you may recall differently, millions of

20   dollars a year.  If someone has been living off of millions of

21   dollars a year or a million dollars a year, is it logical to

22   believe that they're going to flee the country with $500,000?

23   And once you fled, there's no more ways to raise money.  No

24   more fund-raising.

25       You're going to live off of $500,000 for the rest of

1   your life, the three of them.  I suggest that the logic to the

2   answer to that question tells you that they were killed.  What

3   evidence of death do we have?  We have the confession of this

4   defendant.  It's in writing.  It's in evidence given to this

5   man.

6        He drew a map as to how to get to this location to

7   this hunting preserve.  You have the taped conversation of

8   this defendant with his ex-wife, neither of which knew was

9   being recorded.  He may have known because of where he was in

10  the facility in prison that he was being recorded.  Listen to

11  the tape, it's in evidence.  You could have the tape recorder.

12       He talks about going to look at the area with Waters.

13  How Waters got out of the car.  He stayed in the car.  He

14  talks about something being uncovered or the floods uncovered

15  something, I think is the way he says it in there.  He also

16  said, "Well, when it's over, it's over."

17       Ask yourself what he's talking about.  He's caught.

18  When it's over, it's over is what I suggest he means to you.

19  He says the area where the -- where it is buried is out in the

20  middle of nowhere, a hunting preserve.  You say where are the

21  bodies?  Defense counsel says where are the bodies?

22       You heard the Texas Ranger and you heard the rancher,

23  they gave you an explanation.  Hogs will eat them, coyotes

24  will carry off the bones, floods have come through the area

25  and washed the bodies away.  They'll never be found is what I

1    suggest the evidence tells you.

2            You don't have to agree with that.  That's your

3    decision.  That's what you get to do sitting in that box over

4    there.  What about Art Miller, this defendant's friend?  He

5    tells you that at one point in time, Mr. Karr was giving him

6    all kinds of different stories.  And then, he says I want you

7    to go back with me to Texas.  I want to take the gun along

8    with me, but there's something going on.  Mr. Waters has said

9    that the floods or the rains have uncovered parts of the

10   bodies.

11           Maybe you remember Mr. Miller testifying that, maybe

12   you don't.  It's Mr. Miller.  That's not the government's

13   friend.  That's his friend that came in here and testified to

14   that.  And I don't think there's any reason for you to doubt

15   what he said.  What about Patti Jo Steffens?  Looked into a

16   knapsack or a gym bag, if you call it, saw a turquoise-colored

17   towel her dad had given her, three pairs of bloody tennis

18   shoes.

19           She also saw Mr. Waters with Danny Fry's T-shirt

20   that's in evidence, polishing his shoes, and one portion of it

21   had blood on it.  What does that evidence tell you about what

22   occurred?  What about Danny Fry?  You heard testimony from

23   Lisa Jones and the telephone records that are in evidence how

24   his behavior changed during the month of September.

25           Short telephone calls instead of long telephone calls.

1  Didn't have time to get back and go to his daughter's 16th

2  birthday, who he loved very, very dearly.  Then, he writes a

3  letter to Lisa Jones, confidential, do not open, give to my

4  brother, Bob.  Brother comes in.  You saw him testify.  He

5  said he became concerned.

6       Ask yourself if the O'Hairs have fled the country to

7  avoid the IRS.  Why does this defendant and Mr. Waters make a

8  trip to Florida?  And remember how Mr. Waters, according to

9  Mr. Fry's testimony, tricked him.  Bob Fry calls first.  Do

10  you know where my brother is?  No.  He left with some people.

11  He was drunk.  That was a Thursday, if that's what your

12  recollection -- that's my recollection of when that phone call

13  occurred.

14       Saturday morning, he calls again and asks, "Have you

15  heard any more from my brother?"  And this time, he tells

16  Waters that I have this letter.  It's -- it says, marked

17  confidential.  Waters calls him back on Sunday morning, one

18  day later, he was in Austin when he called on Saturday.

19       Sunday morning, Waters calls back and says, "Hey, I

20  found some stuff here.  There's a letter, looks like to you,

21  the name Bob.  You're the only Bob that I have on it.  Only

22  Bob that I know," excuse me.  "Give me your address."  He gave

23  him his address, and by sundown that night, this defendant and

24  Mr. Waters were in Mr. Fry's house, threatening him, telling

25  him, "Oh, there was a big score in Texas.  You better destroy

1    that letter.  The people involved in this are worse than the

2    Mafia".

3         If the O'Hairs fled the country, why are they going to

4    retrieve this letter?  What are they concerned about?  And

5    remember what Mr. Fry said about Mr. Waters talking about

6    Danny Fry, saying Danny Fry drank too much and he had a big

7    mouth.

8         If you were involved in a crime of the magnitude that

9    these people were involved in, would it be in your best

10   interest to silence one of your coconspirators by killing

11   them?  I think you think that you know the answer to that

12   question, also.  That's all.

13        THE COURT:  Ms. Williams.

14        MS. WILLIAMS:  May it please the Court.

15        THE COURT:  Yes, ma'am.

16   DEFENDANT'S CLOSING STATEMENTS

17        MS. WILLIAMS:  It's interesting to me that at this

18   point in the case, Mr. Mills is standing up here and talking

19   to you about how the defense theory doesn't make any sense.

20   And it may be tempting for you to say to yourselves, why

21   didn't the defense answer the questions that I'm about to talk

22   about?

23        Remember, don't forget that the burden of proof stays

24   over here.  It is absolutely their responsibility to prove

25   every allegation they made to you beyond any reasonable doubt.

1    It doesn't come over here.  Mr. Mills and I, on behalf of Gary

2    Karr, don't have any burden.

3         So ask yourself:  Why at this point in the case is Dan

4    Mills standing up in front of you, talking about how their

5    theory makes more sense than our theory?  Why are there more

6    questions than answers?  I want to talk about money.  Why did

7    Ed Martin spend so much time, so many years investigating this

8    case and know so little about the O'Hairs' finances?

9         What happened to that money -- remember my questions

10   to Agent Martin?  What happened to that money that the

11   donations in 1994 went down to $11,000?  What happened to the

12   difference?  What bank account did that go in?  How long could

13   the O'Hairs live on the amount of money, whatever it is, that

14   they took from the Atheist Organization?

15        How many witnesses did you hear from?  How much

16   evidence did you hear about the O'Hairs taking money from

17   Atheist Organizations to use for their own personal lives?

18   Think about Denise Cushman.  Remember her testifying about how

19   many times she had been asked to lie about shredding financial

20   documents, about faxes that she wasn't supposed to see?  That

21   remember those faxes between Don Sanders and Jon Murray?  And

22   those are in evidence if you want to look at them.

23        Facts about selling grandfather clocks, about selling

24   off art collections, about selling Madalyn Murray O'Hair's

25   Mercedes.  Talking at that point about selling John's

1    Mercedes, about selling Robin's Porsche.  Where did that money

2    go?  There is no telling how much money the O'Hairs had put

3    away that these folks just didn't find.

4         What happened to the $100,000 bequest that Don Sanders

5    gave to the Atheist Organization?  Where did it go?  I want to

6    talk briefly about these coins.  I asked Agent Martin about

7    this number that he grabbed out of the air.  This $440,000.

8    Remember Officer Gary Albrecht?  Remember the testimony that

9    he gave about how there were these two briefcases of coins and

10   they were on this metal luggage cart?

11        I submit to you that it's just as logical that they

12   split that money in two, $250,000 went to the O'Hairs and

13   $250,000 went to David Waters, Danny Fry and Gary Karr for

14   their services to the O'Hairs in helping them get out of the

15   country.

16        If that $250,000 -- the money that went to David

17   Waters and Danny Fry and Gary Karr, if that $250,000 is the

18   money that those boys stole out of that storage unit, you know

19   what?  If you take -- if you do what I asked Agent Martin, did

20   you do this and he didn't, but if you take Government's

21   Exhibit 74-1, 75-1 and 76-1, you take those jewelry store

22   tickets and you add them all up, I submit to you it adds up to

23   $175,000.  You take $175,000 and you add 75, you add Mr.

24   Cardenas' stash, his part of it that he took to Tennessee and

25   pawned -- they didn't go to Tennessee and get those records --

1    if you add those numbers up, it adds to $250,000.

2          Did the government's theory add up that well?  I don't

3    think so.  And I'll talk to you briefly about science.  Not

4    one time in this case did science support the government's

5    theory.  Not one time.  There's no blood on the knives.

6    There's no blood on the sheathe.  There's no blood on the bow

7    saw.  There's no bleach in that spray bottle.  There's no

8    bleach in the storage unit.

9          You've got this mitochondrial DNA.  Could be a great

10   tool.  In this case, it doesn't tell you much.  It tells you

11   whatever was in there was just as consistent with one out of

12   every four Caucasians you see walking around on the streets of

13   Austin as it is with anyone else.

14         Is it any wonder that by the end of this case, when

15   these folks see the report that says that they could submit

16   these knives and this bow saw to the Southwest Institute of

17   Forensic Sciences to find out whether or not, in fact, those

18   tools are consistent with the injuries to Danny Fry, is it any

19   wonder they didn't do that?

20         A couple of other questions.  Where does Madalyn

21   O'Hair's prior flight to Mexico under an assumed name to flee

22   prosecution in Baltimore fit into the government's theory?

23   Where does fake IDs fit into the government's theory?  What

24   about this Solheim guy that the Dallas Sheriff's Department

25   was so concerned about?

1          This guy who was living at David Waters' apartment

2     here in Austin and then, moved into the Warren Inn right after

3     David Waters left and then, came back and lived at David

4     Waters' apartment, and then, boy, when the police start

5     looking for him, he goes back to Sweden or Norway, whatever

6     country he's from?  What about him?  Where does he fit into

7     the government's theory?

8          I want to talk to you about a couple of key witnesses.

9     Jason Cross.  Jason Cross talked to you about things he said

10    Gary Karr told him, and he said some very important things.

11    Some things, undoubtedly, you're going to hear about from Mr.

12    Carruth.  I want to ask you this.  Jason Cross said, I started

13    talking to Gary Karr in April.  He began to trust me.  He

14    began to tell me these things.  I began to write them down.

15         I began to take these notes because I thought I could

16    help him.  I wanted to make sure that when I talked to

17    somebody about it, I remember the details.  I wanted to make

18    sure that I didn't leave anything out.  I wanted to make sure

19    they believe me.

20         If you're going to believe Jason Cross, you have to

21    believe he was telling the truth when he told you those

22    things.  You have to believe that he was telling you the truth

23    when he said he started talking to Gary in April and he

24    started taking these notes.  And he did that because he wanted

25    to be believed.

1          Do you know what?  The truth is that Jason Cross

2    talked to the FBI first.  He talked to the FBI before he

3    started taking these notes.  And he started taking these notes

4    with the huge expectation of getting something in return.  You

5    want to know how I can stand up here and say that?  Because if

6    you look at page 1 of Jason Cross' notes, Government Exhibit

7    97-1, page 1, No. 8, Gary said you have nothing on him.

8          Gary said you have nothing on him.  If he's taking

9    these notes for his own identification, for his own memory,

10   why wouldn't he write Gary said the FBI, Gary said the police,

11   Gary said whoever Jason Cross is going to be talking to, and

12   he doesn't know who it is, yet, why would he write that?

13         Fact is he talked to the FBI first.  He found out what

14   the FBI's theory was and he wrote down notes that he felt fit

15   their theory.  He wrote down notes that he thought would meet

16   their expectations.  He wanted something in return.

17         Patti Jo Steffens.  Key witness for the government.

18   Clearly emotional.  Clearly had everybody listening to her.

19   Clearly wanted you to believe.  And up to this point, you

20   haven't really heard any reason other than she wants the FBI

21   to believe her because she's gotten this immunity.  She only

22   gets the immunity if the government believes she's telling the

23   truth.

24         She wanted you to believe how afraid she was of David

25   Waters, how horrible she felt at the time that all these

1    things were happening.  Government Exhibit W92-1, it's an

2    e-mail that you haven't heard about from Patti Jo

3    Steffens-Chavez, already married, to David Waters.

4            October the 19th, 1998, right before she started

5    talking to the FBI, right before she started making her deal,

6    listen to this e-mail and then, try to reconcile that with the

7    woman that you saw on the stand.  "David, as much as I try

8    never to consider the facts of our relationship, the pain and

9    humiliation I usually felt at the concept you were using me

10   for your own comfort, I must say that even now, you continue

11   to take the advantage.  I looked around your apartment, and I

12   see that you kept all the nice things we supposedly had

13   together, the table, the bed, the art work, all the kitchen

14   stuff that I bought, and the pans my mom bought, the

15   microwave."

16           "It's not just a matter of the possessions, it's a

17   matter of principle.  I paid and paid and paid.  Then, because

18   you're more vicious than me, you kept everything.  You liked

19   to minimize the fact that I continued to pay for your

20   irresponsible use of my credit.  I can see you're doing

21   perfectly well without me, even better than you have for

22   ages."

23           "You never loved me.  You don't love me today.  It's

24   insulting and painful and will scar me forever.  Just don't

25   pretend that you ever cared about me."

1    I submit to you, ladies and gentlemen, that what you

2 saw up there on that witness stand is a woman getting revenge,

3 a woman scorned, a woman wanting David Waters to pay for what

4 he did to her, a woman more concerned about the microwave than

5 she ever was about David.

6    You know, it's great for the government to have a

7 theory when they're investigating the case.  It's great for

8 them to have a theory when they stand up in front of you and

9 give their opening statement.  It's wonderful for them to have

10 a theory of how they think the witnesses are going to -- what

11 the witnesses are going to say and how they're all going to

12 fit together.

13    But by the time Dan Mills and Jerry Carruth stand up,

14 here in front of you, in final argument, you have a right to

15 expect them to have way more than a theory.  You have the

16 right to expect them to tell you absolutely, conclusively what

17 happened, and they haven't done that.  They haven't met their

18 burden.

19    THE COURT:  Mr. Mills, I'm going to give the jury a

20 break.  Members of the jury, I'm going to give you a

21 ten-minute break.  Stretch, use the facilities.  During the

22 break, I also want you to order lunch.  We have some menus for

23 you.  We will send that lunch out so that you will have it.

24 Try to get it in ten minutes

25    (recess.)

1          THE COURT:  You may proceed, Mr. Mills.

2          MR. T. MILLS:  May it please the Court.

3          THE COURT:  Sure.

4          MR. T. MILLS:  Members of the jury that was in 1997.

5    That was in 1997 that the Internal Revenue Service

6    investigating the case decided that a 78-year-old woman could

7    be running.  She had talked about running.  She had spent her

8    life doing things with false passports and running.  It was

9    her method of dealing with governmental pressures.

10          She went to visit the man who almost looked like a

11   hermit, Mr. Via, the humorous witness who won't cut his beard

12   until there's a woman in the White House.  And during that

13   month before they left, it was discussed that Madalyn was

14   going to not stay as head of the Atheist Organizations

15   nationally.  She had just about positioned herself from the

16   testimony of numerous people, including the bookkeepers at the

17   Atheist -- American Atheists Organization, positioned herself

18   financially with money that was never accounted for, not by

19   the IRS, not by the receiver, not by the bankruptcy court.

20   They never looked.

21          On October the 1st, 1995, the laws were going to

22   change to where you had to present photo ID when you left the

23   Continental United States.  Actually, when you made any kind

24   of an airplane flight in commerce.  It's consistent with the

25   facts that towards the end of August, the O'Hairs had begun

1    the process of moving money from New Zealand to the United

2    States.

3           And it's consistent with the facts that Madalyn, the

4    dominant figure that she was, informed the kids that they were

5    going to be leaving.  Jon even went so far as to get the cars

6    fixed.  Madalyn had one thing that David Waters couldn't

7    control, no matter how much anger David Waters may have had in

8    her.

9           She had the ability to control his probated sentence.

10   She had the ability to control the prosecutor's actions over

11   him.  And it is not far-fetched to think that she would go to

12   a crook.  Even her own son, William, testified she enjoyed

13   flaunting authority by hiring ex-convicts.  Nothing unusual

14   about that.

15          But David Waters didn't have one thing that was needed

16   for the O'Hairs to make a getaway without leaving a credit

17   card trail.  David Waters didn't have a credit card.  Patti Jo

18   Steffens, whatever mentality she is, didn't produce a credit

19   card.  Danny Fry didn't have a credit card.  Chico Osborne,

20   whoever he is, in this case, an alleged coconspirator, no

21   evidence he had a credit card.

22          But Gary Paul Karr had credit.  And so he came to

23   Texas.  You know, the prosecution started out the case, and

24   they have consistently talked about the theme of the

25   prosecution being the revenge and greed of David Waters.  And

1    from time to time, I've kind of reminded myself that we don't

2    represent David Waters.  We represent this alleged underling,

3    Gary Karr.

4         Mr. Karr's theme and the defense theme of this case is

5    from the Boy Scout Handbook:  You can't make a strong

6    structure with weak wood.  The prosecution did not make the

7    facts.  The prosecution inherited the facts from their agents.

8    The prosecution will not lose and the United States will not

9    lose if it is determined by a jury that there is reasonable

10   doubt as to what happened in this case.

11        The prosecution cannot be faulted and they are very

12   talented.  If they have weak facts that they are expected to

13   make a strong conclusion with because it cannot be done, you

14   cannot take a pile of defective materials and bind them

15   together somehow and come up with a solid product.  I don't

16   know what law that is, but it's common sense, like my friend

17   Dan Mills talked to you about.

18        It is common sense, common enough to where if you're

19   making a house in the woods, if you want the final product to

20   be strong enough to withstand wind, you can't use sticks that

21   are broken; you would use strong materials to expect a strong

22   conclusion.

23        After the trial, whenever that will be -- and you'll

24   have to decide how long that will be because in evidence, you

25   will have a videotape the prosecution introduced into evidence

1    that you're welcome to watch the defense believes that is

2    helpful to the defense.

3         David Waters' book, manuscript is in evidence.  I

4    don't how long it will take y'all to read that.  Don't know if

5    you would choose to, but it's there.  But someday, somebody's

6    going to ask you about the O'Hairs, and they're going to say,

7    okay, you were there, you got to hear every minute, every

8    second of the testimony in that case.  We weren't there.  Even

9    the reporters, even the press, they're not there all the time.

10   Nobody's there but us and you.  What really happened to the

11   O'Hairs?

12        And I say the O'Hairs and Murray, Jon Murray, what

13   really happened?  Are they in Romania?  Are they buried near a

14   housing project?  Are they in some woods?  Are they washed

15   from the woods to a creek to the Gulf of Mexico and are now

16   floating in the Red Sea?

17        I don't know what you're going to say.  I don't know

18   how you're going to know beyond a reasonable doubt.  The

19   reasonable doubt definition talks about would you hesitate to

20   act in the most important of your own life?  Would you

21   basically believe that the evidence is so reliable that you

22   can act upon it?

23        Reliability is a very, very important key word.  I

24   made a little bit of a joke about the -- about my daughter's

25   connect-the-dots book, and the fact that the prosecution was

1    tending to take an isolated fact and make a lizard foot there,

2    and my point was on a very simple corny basis, we don't know

3    what that means.  You can't know beyond a reasonable doubt

4    what that's supposed to be.

5         It's asking you to do something that's impossible.

6    It's impossible.  Let me give you an example.  Government's

7    Exhibit W79-8 is a shovel.  It's got dirt on it.  I guess what

8    you're supposed to believe is that it was used to dig a big

9    hole and either put some barrels in it or to put the bodies of

10   three large humans in it and then, cover it up.

11        Now, of the how many law enforcement people were out

12   there in the Hill Country?  50?  30?  80?  Soil samples were

13   taken.  I don't know why soil samples were taken.  I haven't

14   been a law enforcement officer myself, but I would somehow

15   think it would be to see if the soil matched some other soil.

16        Well, there was no test done.  The reason was because

17   Dan -- Jeff, Ron or Jeff Waters, the brother, had dug some

18   tomatoes with this.  Well, tomatoes, I guess, must account for

19   every bit of that wood.  So what we want you to believe,

20   ladies and gentlemen, is that I guess either Gary or somebody

21   went out there in the rocky terrain of West Texas, where a

22   goat can live, and dug a hole big enough to where they buried

23   everybody.

24        And that's not reasonable for you to assume because,

25   then, they brought on the tractor man, the owner of the land,

1    and he said, well, that's pretty hard.  You might be able to

2    find a little pocket of soil there, but really, there was a

3    tractor out there.  And the key had been left on sometime in

4    1995, and so, maybe Gary, or David Waters, or Danny Fry, or

5    somebody went out there -- and it had a big scoop blade on it,

6    so they must have scooped a big pit and then, put either

7    barrels or bodies in there.  And then, they backed off and

8    they piled the dirt on.

9         So being the -- trying to be the clever lawyer that

10   lawyers try to be, I said, well, was there any fresh dirt out

11   there?  No.  Well, then, what is this?  What's this saw blade

12   -- saw deal?  There's a saw so they must have sawed them up.

13   Really?  Well, where's the evidence of that?  Where does that

14   come from?  Where is the proof that that's done?

15        They must have put them in barrels because sometime in

16   1995, the owner of the storage unit saw three men, one had

17   long, brown hair, that's supposed to be him.  Photographs just

18   as gray -- looks just like him.  Medium-length, gray hair.

19   They saw some barrels out there, so they must be in barrels.

20   Well, if they're in barrels, then why would they be thinking

21   that the hogs ate them because they were -- their hands were

22   sticking up?

23        I don't know what happened to them.  If I had to get a

24   scale, one of those old fashioned scales with the -- you see

25   them in antique stores.  And I put, oh, let's see, Jason

1  Cross, the brain-damaged bank robber, Brian Chase, who in his

2  statement said that Mr. -- that the O'Hairs were in New

3  Zealand.  What's that about?

4       And then, the guy who hired the hit man to kill the

5  rival international drug smuggler.  And I put them on that --

6  I put all three of them there, and then, I put the assistant

7  to the Southern Baptist Convention, who sat as far as from me

8  to the Court Reporter, and knew the woman's face from having

9  written his doctoral thesis on atheism.  And then, I added on

10 there, just to kind of make it fair, oh, Bonnie Jean -- Bonnie

11 Jean Davis, who opens this cocktail place down the street from

12 the Warren Inn and served them Cokes and a beer.

13      And I would not -- I believe that the weight of the

14 credible testimony would be on people who have seen her alive.

15 You know, the IRS begins a case after years of the civil --

16 IRS tried to tag them for back taxes for unreported income for

17 having money put in places where they're not accounting for it

18 properly.

19      And they have brought up innuendos that there has been

20 violence.  There might have been.  I'll address that in a

21 minute as far as what David Waters might have done, but the

22 odds are that the O'Hairs did what they said they were going

23 to do.

24      Would it be fair -- let me ask you this:  Would it be

25 fair having the Austin Police Department missing persons file,

1   which we got -- the defense got a short while ago, opened it

2   up, looked at sightings.  There was testimony that the Austin

3   Police Department missing person's file is an active file and

4   have Mr. IRS Agent or Ms. FBI Agent take a look at it, which

5   they didn't, from the evidence, never, and see that a

6   reputable man saw her, telephone, teletype, fax, e-mail,

7   whatever you do in the '90s, and say to the consulate or the

8   FBI office in Romania:

9        "Seems to be a pretty reliable fella over here, lives

10  in Atlanta, Georgia, says he's seen her, would you check the

11  country out and see if you see her or any of the neighboring

12  eastern European countries?"

13       Would that be fair to have them check it out before

14  this man gets accused of killing them if they're dead?  Would

15  that kind of make sense that you would be entitled to have

16  them report back to you, "We can't substantiate anything.

17  There is no evidence that this lady was ever here.  We've

18  interviewed the minister and he's a nut.  We found out he's

19  psychotic.  We found out he's a heretic.  We found out

20  something."

21       Nothing.  You get nothing.  And it's not a

22  technicality.  It is the backbone of the American

23  jurisprudential criminal justice system.  If the prosecution

24  brings the charge, they have to prove it.  We don't mind

25  putting on some evidence and we did bring out some evidence

1    through cross-examination before we called our witnesses, but

2    we don't have to prove beyond a reasonable doubt that he did

3    or did not do anything.

4         The prosecution has the burden and the facts aren't

5    there.  I made some notes.  You know those great big charts,

6    there are about six of them that Mr. Martin put together about

7    the sequence of events.  I know you can't see it, but it will

8    help me remember some things.

9         Well, I cut them apart because I wanted to see what

10   wasn't there.  Well, there's some interesting things.  Ms.

11   Williams brought out on cross-examination that Mr. Martin --

12   if there's a fact that doesn't fit the theory, it's not put in

13   the case.  For example, in June of 1995, Jon Murray flew to

14   Florida and went to VCN Vital Records.

15        Now, do you remember hearing anything about that?  No,

16   because you didn't.  We don't know what that was.  Jon got his

17   mom's medicine right at the time that was consistent with them

18   leaving.  While they're supposedly kidnapped -- now, keep in

19   mind, Count 1 of this case is that Gary Karr is supposed to be

20   a kidnapper.  What a kidnapping.  John's renting from

21   Blockbuster.

22        Now, you tell me the last time you've read a book, the

23   last time you've seen a movie, the last time you've seen a TV

24   show where the victims are watching the Blockbuster movies on

25   their check-out card.  It's inconsistent with common sense.

1    When's the last time that you saw the kidnappers let Ms.

2    O'Hair and her son walk around the complex of the Warren Inn?

3           Oh, I bet they did.  They just said that if you run

4    away or call the police, we'll kill Robin.  Now, you know, I

5    want y'all to think about this.  Your loved ones, two of your

6    loved ones and you are kidnapped, and you're allowed to walk

7    around.  You're allowed to fly to New Jersey.  You're allowed

8    to go to the bank by yourself, be at a locked room with a

9    policeman, with a gun, with a radio, and you don't say, "Man,

10   I've been kidnapped.  But you've got to get a task force.

11   You've got to get one of those teams, the SWAT team so that

12   they can bust in and save my mom and my sister.  You've got to

13   do that because, otherwise, they're going to kill them."

14          Who wouldn't do that?  Oh, well, their theory is Jon

15   wouldn't do it because he's just a momma's boy, he's just a

16   passive guy.  He's president of the dad'gum national

17   organization.  You saw him on the video screen.  Anybody who

18   prays is insane.  The Pope must be stopped.  Anyone who

19   believes in a deity should be locked up.  That's no passive

20   man.  That's a man that is filled with hate, that is filled

21   with Godlessness and has enough energy to call the police when

22   he's in a locked room with them.

23          Oh, but when he went to New Jersey, he stayed in an

24   expensive hotel.  Why it was a castle.  No, it wasn't.  It was

25   $145 a night hotel.  It was two months before that he stayed

1 at the Four Seasons, which cost twice as much.  Their theory

2 is bologna.  Not because their fault is, but because they're

3 going to build a structure to sell you with facts that aren't

4 strong.  They're weak.  They're defective.  They're flawed.

5        The last part of this case, the last part of September

6 where there's supposed to be a murder of three people, three

7 murders, and cutting people up or not, depending on which

8 theory they argue, and putting them in barrels or not,

9 depending on which theory they argue, and then, putting them

10 in a subdivision near a housing development or not, depending

11 on which theory they argue, or putting them in the Hill

12 Country or not, depending on which theory they argue.

13        Well, where was old Gary during this period of time?

14 Where was our client, Gary Paul Karr?  Well, we can learn that

15 from his ex-wife, Charlene, she saw him in Florida.  He was in

16 Florida half of September.  Well, all right.  That takes care

17 of half of September.  Well, all right.  Ms. Karr, when was he

18 gone?  How long was he here?  Or how about Ms. Steffens?

19 What's your recollection?

20        Three or four days.  All right.  No problem.  I

21 realize this was 1995.  Which days?  Don't know.  September

22 the 23rd, September the 23rd, it's not on this chart.  I made

23 a mistake.  Patti Steffens says that David Waters had her wash

24 dirt out from under his wheel well, tire guards.  What's that

25 about?  That's not even when they're supposed to have gone to

1  West Texas.

2       Everybody's alive and well, waiting for coins to

3  arrive.  September the 28th, gold is -- money is transferred

4  to San Antonio, Frost Bank.  Really?  Where is Mr. Karr that

5  day?  Is he in town?  Is he in Austin?  Is he in San Antonio?

6  Well, gosh, we don't know.  It's not his fault.  He doesn't

7  have the evidence, and he can argue till the cows come home.

8       But the facts aren't there because he doesn't know

9  either.  What about the 29th?  Last call from Jon Murray.

10  Whoa, that automatically means he's dead.  No, it doesn't.  It

11  means he didn't use the cell phone anymore because they're

12  skipping town.  They got a bunch of money.  The coin thieves,

13  these kids from San Antonio, they didn't account for all the

14  money.  And besides that, they got other money that wasn't

15  accounted for.

16       But nevertheless, where is Gary?  Well, you know what?

17  We don't know.  It's not his fault.  We just don't know.

18  Well, then, let's look at the big day, September 30th, Gary

19  Karr rented -- what did he do?  No.  He was at Patti Steffens

20  late in the afternoon, and then, the men left and weren't

21  there that night.

22       Well, what happened on the 30th?  Is that when the

23  people were supposed to be killed, if they were killed?  Jon

24  Murray's Towncar turned in.  Maybe that was because Jon Murray

25  was leaving town.  But if not, what did happen?  You're going

1   to take the blood from three large people?  I think there's

2   testimony it's about five quarts of blood per body.  Fifteen

3   quarts of blood and some guy's going to come in with this

4   goofy insect sprayer and make it to where there's no evidence

5   of blood?

6        Did you hear Patti talk about how he had a fire hose

7   that he was washing it down with?  You're going to wash out 15

8   quarts of blood to where the FBI can't find it with that?  I

9   don't think y'all are going to buy that.  I don't think it

10  makes sense.  I don't think it's reliable.  I don't think it

11  is proof beyond a reasonable doubt.

12       But Gary Karr, who played tennis and wore tennis

13  shoes, the kind with the smooth soles that you play tennis

14  with.  Patti Jo Steffens said that on that day, she saw a sack

15  and it had some tennis shoes on them.  Were they the kind of

16  tennis shoes you'd ever seen Gary Karr wear?  No, they were

17  different.

18       He wore tennis shoes.  Does that mean that they're

19  dead?  I don't have any explanation for that.  I don't even

20  know to what extent the testimony's truthful.  But just think

21  about it.  Just think about it because that could be really

22  significant.

23       If there were -- if there were some men, whether it

24  was Mr. Waters, or Mr. Fry, or Mr. Osborne, standing

25  ankle-deep in blood, in a storage shed, do you think that our

1    FBI could find a little evidence of some blood on the cement?

2    I do, too.

3        I want to point out a couple of things.  Robin was

4    upset.  Several people testified to her voice on the

5    telephone.  Well, from other testimony, there's no reason to

6    think that her action was inconsistent with how she would feel

7    if she was leaving her home for another destination.  And

8    there is certainly no evidence to suggest that it would be

9    inconsistent with her leaving the dogs that she cared for.

10       And coincidence, of all coincidences, the two cocker

11   spaniels were later missing from the fenced-in area.  Danny

12   Fry was, by all accounts, a drunk and unreliable and now he's

13   dead, and the only evidence we have is that on October 1st or

14   2nd that David Waters said that he was leaving for Arkansas

15   and was drunk, and then, I think, on October 2nd, his body was

16   found a little bit northwest of Dallas.

17       There is no evidence that Gary Karr was involved with

18   the death of Danny Fry.  There is zero inference that Gary

19   Karr was involved with the death of Danny Fry.  There is no

20   hint of evidence from any witness that he was involved with

21   his death.

22       The accusations in the charge all have several words

23   in them that are very important.  Mr. Karr is accused in Count

24   1, 2, 3, 4, 5 with kidnapping either by forcibly holding them

25   or tricking them.  He's accused of extorting money from them.

He's accused of moving money, watches, diamonds in interstate
commerce.  He's accused of traveling in interstate commerce
with stolen property.

Every one of those counts he's not guilty of because
every one of those counts say knowingly, meaning
intentionally, voluntarily.  Several of them say willfully,
which means is a higher burden, intent to break the criminal
law, and every one of those counts have failed to prove that
his actions were intending to be breaking the law.

For example, he's accused of flying to New Jersey and
that's supposed to be a kidnapping.  Well, it's inconsistent
with the kidnapping is all I can say, the bottom line.  You
have before you -- you haven't read it yet, and I don't have
time to read it to you -- his written statement.  He was
interviewed by law enforcement officers.

He had the right to a lawyer, he had the right to say
the same two words that Madalyn O'Hair said to the IRS.  He
had the right to do anything, but he voluntarily let them in
his house.  And he signed a statement.  At the end of each
statement, he basically said this is to the best of my
recollection.

And in his statements he said, "I went there to help
David Waters move the O'Hairs.  They wanted to leave the IRS.
They were afraid they were going to get in criminal trouble.
I told David Waters that I was on parole and that I wanted

1    nothing to do with anything that would be violating the law."

2    Mere presence at the scene of the crime is not enough to

3    convict someone if there was a crime.

4         This is squeezed down.  It's -- the one you'll have is

5    on two pages.  The defense contends that there is reasonable

6    doubt -- oh, I don't have it up.  The defense contends that

7    there is reasonable doubt about the five accusations.  And the

8    defense contends that the proper verdict would be not guilty,

9    which means there has not been proof beyond a reasonable doubt

10   that a crime was committed.

11        Did you kill a certain person would be not applicable

12   because he is not guilty of causing a death of anybody.  Oh, I

13   forgot this.  This was introduced into evidence by the

14   prosecution, and it's supposed to be relevant to this case.

15   The Poor Man's James Bond.  It was found in David Waters'

16   house.  And I was looking through it, and I noticed that there

17   was a chapter on how to make bombs.

18        Well, maybe they were blown up, but, you know, there's

19   no evidence of that.  What's this?  There's a chapter in here

20   on how to make a big fire, on how to make a silencer, on how

21   to make fire crackers.  Maybe -- there's no evidence.  A

22   couple of thousand years ago, a man that had a lot more sense

23   than I do said that you cannot build a house that needs a

24   solid foundation on sand for pretty common sense reasons.

25        He may have been speaking a little bit in a different

1    context, but the principle remains the same.  You have to

2    build it on rock.  You have to build it on something solid.

3    You have to build it with materials that make sense.

4         Mr. Carruth is going to very eloquently -- and I enjoy

5    listening to him -- discuss the facts the most positive way

6    that the prosecution can present them.  But the bottom line is

7    that this case can be put to bed with several words, the

8    proof, the wood, the structure just isn't here.  Maybe some

9    jury will get to fry David Waters.  Maybe that will be

10   different.  I don't know.

11        Maybe the O'Hairs will be found.  Thank you for your

12   time.  I know that it's intense and I know that your job is

13   almost -- well, I don't want to say it's just getting started,

14   but a very important part of it is.  And we appreciate it very

15   much.

16        THE COURT:  Mr. Carruth.

17   GOVERNMENT'S CLOSING STATEMENTS

18        MR. CARRUTH:  Thank you, your Honor.  May it please

19   the Court.  Counsel for the defense.

20        Members of the jury, let's get one thing straight

21   before we start.  This is not a murder case.  Mr. Karr has not

22   been indicted and has not been tried for murder or for

23   conspiracy to commit murder.  He was not accused of causing

24   the death of any person.  He is charged in five counts with

25   conspiracy to kidnap, with conspiracy to commit robbery or

1    extortion affecting interstate commerce, with traveling in

2    interstate commerce to commit a crime of violence to further

3    an unlawful activity, with conspiracy to engage in a monetary

4    transaction in criminally derived property, and with the

5    interstate transportation of stolen property.

6           The only reason that the death of any person becomes

7    relevant in this case is because one of the counts, Count 3,

8    provides that if you find Mr. Karr guilty of traveling in

9    interstate commerce, as you know he did, to commit a crime of

10   violence to further an unlawful activity, then, Judge Sparks

11   has asked you to answer a special issue as to whether or not

12   the offense resulted in the death of another person, not

13   whether Mr. Karr killed somebody else or whether he hired

14   someone to kill somebody else.  It's just did someone die as a

15   result of the offense, because this may affect the punishment

16   imposed, if there should be a conviction in this case.  And

17   that's all you're asked to determine.  This is not a murder

18   case.

19          So when the defense gets up there and criticizes an

20   Internal Revenue Criminal Investigation Division agent for

21   what he did or didn't do, he's not a homicide investigator.

22   This is not a homicide or murder case.  So don't be dissuaded

23   by what the defense has told you.

24          Keep in mind what the charge tells you on the law of

25   conspiracy in acting together with another person to commit a

1   criminal offense.  And I would commit to your reading four

2   pieces of evidence which are very significant.  One has been

3   alluded to by Mr. Mills for the defense and that is the

4   voluntary statement of Mr. Karr, the defendant.  There were

5   actually two of them.  One's an eight-page statement, the

6   other's a two-page supplement.

7          So you have ten pages of a confession or statement, as

8   you want to call it, and there in evidence is W -- Exhibit

9   W100-1 and 2.  Please, before you start your deliberations

10  today, sit down and read that statement because in that

11  statement, Mr. Karr admits many of the elements of the crime

12  charged against him in the indictment on which Judge Sparks

13  has instructed you.

14         He admits renting the three vans, he admits taking

15  Robin's Porsche to the Austin Airport and abandoning it in an

16  airport parking lot to make it appear they have flown out of

17  town.  And what he says in this statement will help you and,

18  also, what he does not say is very important in considering

19  your deliberations because he tends to minimize his role in

20  the offense and to blame David Waters or someone else when it

21  really gets tough.

22         For example, he claims to have no knowledge about a

23  second warehouse at the Public Storage in Austin, and he says

24  he's never -- does not know Gerald Osborne or Chico.  Well,

25  then, why is he talking about Chico to the inmates?  And by

1  the way, that's the second important piece of evidence I want

2  you to review are the 15 pages of handwritten notes of inmate

3  Jason Cross, which are in evidence as Government Exhibit

4  W97-1.

5       Now, the defense can get up here all they want to and

6  lambast these inmate witnesses.  But when they do that and

7  when they demean them and when they're critical of them, I

8  want you to remember one thing:  We did not pick these

9  witnesses.  These are Mr. Karr's friends and associates.  He

10  associated himself with them when he was incarcerated and

11  chose to reveal certain confidences to them.

12       What did somebody say about birds of a feather?  They

13  flock together.  You also need to read the July 1995 edition

14  of the Atheist Newsletter.  There are two copies of that in

15  evidence.  One is W9-1, which was introduced by Henry Morgan

16  who told you his name was formerly Henry Schmuck, and the

17  other one is W77-52, it came in through Mr. Parelli, the FBI

18  agent who told you that it was found during the search of

19  David Waters' apartment.

20       So we know as to reasonably conclude on common sense

21  that Mr. Waters read that.  And once you read that July 1995

22  Atheist Newsletter, you will learn that Mrs. O'Hair was in

23  fear of her life from David Waters.  She tells you in there

24  about how she found out about his criminal past after he stole

25  money from her and after he was prosecuted.

1    And how he -- she erected a security fence around the

2 headquarters and how she sought a restraining order from a

3 local state judge.  And, ladies and gentlemen, once you read

4 that newsletter, that will remove forever any doubt you may

5 have about whether Mrs. O'Hair would ever voluntarily go

6 anywhere with Mr. Waters.  That newsletter's very important.

7    And then, if you still have any doubt at all, much

8 less a reasonable doubt, I urge you to listen to the tape

9 recording one more time of Mr. Karr and his ex-wife, Charlene,

10 which is in evidence as Government Exhibit W16-1.  How can Mr.

11 Mills, for the defense, in good conscience, stand up here and

12 even suggest to you that the O'Hairs are alive and fled the

13 country when Mr. Karr, the defendant, was heard arguing on

14 that tape with his wife about where he told her the bodies

15 were buried?

16    That's inconceivable.  It's inconsistent.  The defense

17 can't have it both ways.  They want you to say the O'Hairs

18 fled the country, but if they didn't, Mr. Karr didn't have

19 anything to do with their demise.  He can't have it both ways.

20 The evidence does not support either of those theories.

21    The evidence supports the theory that Mr. Karr

22 knowingly participated with Mr. Waters, Mr. Fry and other

23 persons in a conspiracy to abduct the O'Hairs, to hold them

24 against their will, and to extort money from them, to rob

25 them, and ultimately, he ends up with the three Rolex watches.

1    What, they don't tell time in Romania?

2           He admits in his statement that he got those three

3    Rolex watches after he and Charlene had checked out of the

4    Four Seasons Hotel.  That David Waters said, "Here, these

5    belong to the O'Hairs, but they didn't want them anymore.  Get

6    rid of them."  And he transports them in interstate commerce

7    back to Florida and then, to Chicago, where he gave one to his

8    wife, and that's all in evidence.

9           There's a lot of evidence and a lot of exhibits for

10   you to review, but if you'll just take the flowcharts that

11   Agent Martin testified about, follow the time line, follow the

12   flow of the money.  Remember, in opening statements a couple

13   of weeks ago, I told you if you followed the money in this

14   case, you could figure out what happened?

15          The O'Hairs didn't get into this money to flee the

16   country.  The conspirators, including Mr. Karr and Mr. Waters

17   and others, ended up with the money.  The testimony that you

18   have heard during the past two weeks tells about three men,

19   none of whom had a full-time employment, who come to Austin

20   for different reasons.

21          Mr. Fry tells his fiance, Lisa Jones, that David

22   Waters has offered him a big deal in the construction

23   business.  Mr. Karr tells his ex-wife, Charlene, that he's

24   going to Texas to play in a big card game, okay?  Neither one

25   of them say up front that they're going to do a security guard

1    job for the O'Hairs.

2           Now, why would they lie?  Why would they lie?  Why

3    would they tell different stories?  Why would Mr. Karr tell

4    different stories to Art Miller?  When Art Miller told him he

5    didn't believe the gambling story, then he relayed to him that

6    he was actually hired as a bodyguard.  And then, when Mr.

7    Miller heard the story, he felt so bad about Mr. Karr because

8    he was his friend and employer and he suggested he see an

9    attorney.

10          And if you'll read in that statement of Mr. Karr,

11   he'll tell you what that attorney told him.  And I'll let you

12   find that out for yourself.  But we have three men who come to

13   stay with David Waters in his apartment.  They don't have any

14   jobs.  You heard the testimony.  Mr. Waters was not employed,

15   Mr. Fry was not employed, Mr. Karr was not employed except for

16   helping Mr. Miller fix up his house.

17          And, yet, all of a sudden, after coming to Texas, all

18   of these three men are wire transferring or giving thousands

19   of dollars in cash to their women.  Where did they get the

20   money?  Where did he get a $6,000 diamond?  Where did he get

21   the three Rolex watches?

22          And in his instruction, Judge Sparks has told you that

23   in order to find the defendant guilty of conspiracy, it does

24   not matter whether you believe and find from the evidence that

25   they took them by force, at gunpoint, or whether they

1   inveigled or lured the O'Hairs.

2        Come on, go with us, we'll help you leave the country,

3   sure.  And then, they took advantage of them and took their

4   money.  Regardless, it doesn't matter for a conspiracy.  A

5   conspiracy is a partnership in crime in which each conspirator

6   becomes the agent of the other conspirator.  And we don't

7   allege that Mr. Karr acted alone in this case.  That's why

8   he's charged with conspiracy.

9        And if you follow the money and follow the time line,

10  you will see exactly what happened in this case.  Now, Ms.

11  Williams said that science failed the government in this case.

12  It is amazing, ladies and gentlemen, and this is Government

13  Exhibit W64-6, based upon the evidence, this was a piece of

14  angle iron that was on the floor of the storage unit where Mr.

15  Karr admitted to a roommate in jail that he and Danny Fry and

16  David Waters cut up the bodies of the O'Hairs.

17        It is amazing after that thing was sprayed with Clorox

18  that any evidence at all was found.  And yet, if you look on

19  the back of this angle iron, you'll see where the chemist

20  found the blood, the DNA.  And what was the testimony you

21  heard?  Bleach degrades DNA.  That's why they used it.  It's

22  amazing that we found any blood at all in that storage unit.

23  And it is consistent with two of the three O'Hair family

24  members.

25        Ms. Steffens told you about seeing a bow saw and a

1  shovel in the trunk of David Waters' Cadillac during the Pecan
2  Street Festival in 1995.  A Cadillac he had purchased a week
3  or two before for $13,000 cash.  Where did he get the money?
4  Follow the money.  It came from the O'Hairs.

5  Now, bear in mind, this is not a murder case.  We're
6  not here to prove the exact manner and means by which the
7  O'Hairs or Danny Fry were killed.  But we do know that Danny
8  Fry's lifeless body was found on the banks of the Trinity
9  River in East Dallas County, Texas, just barely four hours
10 after Mr. Karr rented that third van.  And just enough miles
11 on that van on the round trip to make it up from Austin to
12 Dallas, where Mr. Fry's headless, handless corpse was found at
13 about 2:30 in the afternoon.

14 If this is a legitimate enterprise to help the O'Hairs
15 flee the country and to be bodyguards, why does Mr. Fry have
16 to end up as a headless, handless corpse?  Answer that
17 question.  And you'll find the defendant guilty as charged on
18 all counts in the indictment.

19 And what about the little things, like, your common
20 sense, as counsel has suggested you use and I concur?  Does
21 your common sense tell you that you're going to spend $1100 to
22 fix the air conditioning on your car if you plan to abandon it
23 at the airport a couple of days later, to make it look like
24 you've gone out of town?  Does common sense tell you that
25 you're going to flee the country to avoid the IRS when your

1    tax lawyer has already negotiated a settlement with the IRS,

2    allowing you to keep your nonprofit tax exempt status and to

3    pay off your indebtedness in installments?

4          And sure, there may have been, at one time, a plan by

5    the O'Hairs to flee to New Zealand.  They looked into it

6    certainly, we know that from the evidence.  That was back in

7    1993, when they were involved in the Truth Seeker trial.  But

8    they don't have any reason to flee because of that because

9    they were -- they won the Truth Seeker trial.

10          But David Waters, as a result of having worked there

11   as the office manager, knew about this plan.  He helped

12   catalog and pack the books to move the multi-million-dollar

13   Atheist Library, and he said, "This is a chance for me to

14   separate the O'Hairs from their money."

15          And after that July '95 newsletter came out, you heard

16   Patti Jo Steffens say he decided to get even and he fantasized

17   about hurting Madalyn and torturing her and snipping off her

18   tows, and the evidence suggested he did just that.  And that

19   this defendant knowingly and willfully joined in that

20   conspiracy, and he did it for money.  He did it because he was

21   greedy.  And Mr. Waters did it because he wanted revenge.

22          That's why he didn't appear to be too upset when the

23   half-million dollars turned up missing from the storage unit.

24   He was fairly nonchalant because, in addition to that, they

25   got nearly $90,000 from the O'Hairs by liquidating their

1    assets in their bank accounts and selling their cars.  And Mr.

2    Karr was a part of this conspiracy from the get-go.

3         Now, there's a lot of evidence in this case.  I could

4    stand up here and talk to you for hours, but I'm not going to

5    do that because you have the evidence.  You have the law that

6    Judge Sparks gave you, and you can take it all back and

7    resolve it to your own satisfaction.  But I assure you, ladies

8    and gentlemen, that the evidence is more than sufficient for

9    you to find the defendant, Mr. Karr, guilty under all five

10   counts of the indictment.

11        In fact, the circumstantial evidence in this case is

12   overwhelming.  The guilt -- the evidence of his guilt is

13   overwhelming.  And the Judge tells you that you do not have to

14   distinguish between circumstantial and direct evidence.  You

15   can weigh it the same in the scales of justice.

16        My final plea to you in this case, ladies and

17   gentlemen of the jury, will be the final words that were ever

18   spoken to Ellen Johnson by a very distraught Robin Murray

19   O'Hair, when she said, "I know you'll do the right thing."

20   Thank you.

21        THE COURT:  All right, members of the jury, I'm going

22   to put you into the jury room.  But at this point in time, I

23   want Ms. Rosy Amaro, Mr. Gary Leasman, and Ms. Susan Williams,

24   do y'all have anything in the jury room?  All right.  I'll

25   have you accompany the Security Guard, Mr. Mace.  Get your

1  materials and come back to the courtroom.  We'll all stand at

2  ease.

3        Okay.  If y'all will just have a seat, the three of

4  you, right there, behind Mr. Mills in those three seats that

5  are there.  And if the two of you will come.

6        THE JUROR:  Here's the notebook.

7        THE COURT:  Okay.  Well, that's fine.

8        THE CLERK:  Each of you raise your right hand, please.

9  Do you and each of you solemnly swear or affirm that you'll

10 keep this jury during their retirement in a convenient place,

11 removed from the presence of others, and that you will not

12 without leave of court allow anyone to speak to them and that

13 you will not without leave of court communicate with them

14 yourself except to ascertain whether or not they have reached

15 a verdict, and to attend to their desire for necessities?

16 That you will well and faithfully discharge your duties as

17 Bailiffs of this court, so help you God?

18        THE COURT SECURITY OFFICERS:  I will.

19        THE COURT:  All right, members of the jury, I'm going

20 to reverse my instructions to you of the last three weeks and

21 tell you now is the time to deliberate.  Remember, no

22 deliberations unless all twelve of you are present.  If you

23 take a break to stretch, that's up to you, but no

24 deliberations until all twelve.  Take a bathroom break, talk

25 about anything else until you're back together where you can

1    deliberate the evidence.

2           All right.  All rise for the jury.

3        (Jury retires to deliberate.)

4           THE COURT:  Ms. Amaro, Ms. Williams and Mr. Leasman,

5    y'all have a difficult job still ahead of you.  You'll be

6    alternate jurors.  We cannot try a case that takes as long and

7    as much of your expense to the taxpayer as this one without

8    alternate jurors.  But you're not going to be discharged.  I'm

9    going to place you in the custody of the Security Agent.

10          Y'all will get to stay here.  You can go get your

11   lunch, but the hard part is you cannot discuss this case among

12   yourselves.  You follow the instructions that I've given to

13   you.  I hope you've got some reading material, if not, maybe

14   the Bailiff can get you some reading material, but the

15   important thing is relax.  I want you -- you're going to be

16   here in a private room here in the courthouse, but do not

17   discuss the case under any circumstances.  Do you understand

18   that?

19          THE JURORS:  Yes.

20          THE COURT:  All right.  If y'all will rise.

21       (Jurors exited.)

22          THE COURT:  Counsel, I have arranged for lunch to be

23   served during the deliberations.  So the next time that I will

24   interview -- or interrupt the jury will be between 5:00 and

25   6:00.  If they continue to deliberate at that time, I will ask

1    them if they wish to continue deliberating or if they wish to

2    return tomorrow under the agreement that y'all have made that

3    they can go home this evening.

4         Other than that, the communication will be up to the

5    jury.  If there are any communications or questions that I

6    want you to be available so that Ms. Sims can get you very

7    quickly.  Now, Mr. Mills, you indicated to the jury that they

8    could listen to the tape on a tape recorder, so have it handy.

9    I expect that will be the next thing.

10        If you wish to check on all the exhibits or you

11   haven't done that already, now is the last time.  They'll be

12   going to the jury room along with the indictment, the legal

13   instructions and the verdict form.  All right.  We're in

14   recess.

15       (Proceedings adjourned.)

16

17

18

19

20

21

22

23

24

25