```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   UNITED STATES OF AMERICA,          ) AU:99-CR-00274(1)-LY
                                        )
 4       Plaintiff,                     )
                                        )
 5   V.                                 ) AUSTIN, TEXAS
                                        )
 6   GARY PAUL KARR,                    )
                                        )
 7       Defendant.                     ) MARCH 12, 2021

 8          *********************************************
               TRANSCRIPT OF RESENTENCING HEARING
 9             BEFORE THE HONORABLE LEE YEAKEL
            *********************************************
10
     APPEARANCES:
11
     FOR THE PLAINTIFF:    DANIEL D. GUESS
12                         MATT HARDING
                           UNITED STATES ATTORNEY'S OFFICE
13                         903 SAN JACINTO BOULEVARD, SUITE 334
                           AUSTIN, TEXAS 78701
14
     FOR THE DEFENDANT:    HORATIO R. ALDREDGE
15                         FEDERAL PUBLIC DEFENDER'S OFFICE
                           504 LAVACA STREET, SUITE 960
16                         AUSTIN, TEXAS 78701

17                         CHRISTIE WILLIAMS
                           LAW OFFICE OF CHRISTIE WILLIAMS
18                         1112 SOUTH ROCK STREET
                           GEORGETOWN, TEXAS 78626
19
     COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
20                         501 WEST 5TH STREET, SUITE 4152
                           AUSTIN, TEXAS 78701
21                         (512) 391-8791

22

23

24   Proceedings recorded by computerized stenography, transcript

25   produced by computer.
```

1                    **EXAMINATION INDEX**

2

EDMOND MARTIN
3        DIRECT BY MR. HARDING . . . . . . . . . . . . . . .    6
         CROSS BY MS. WILLIAMS . . . . . . . . . . . . . .   59

4

5

6

7                    **EXHIBIT INDEX**

8                                                       OFFD/ADM
   Government
9    1-2                                                4    5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 09:10:58 | 1 | (Open court) |
| 09:10:58 | 2 | THE COURT:  We're here today for a sentencing hearing |
| 09:11:00 | 3 | in Cause Number 99-CR-274, *United States v. Gary Paul Karr*. |
| 09:11:07 | 4 | Let me get announcements by the parties, beginning |
| 09:11:11 | 5 | for the government. |
| 09:11:13 | 6 | MR. HARDING:  Good morning, Your Honor.  Matt Harding |
| 09:11:14 | 7 | and Dan Guess for the United States. |
| 09:11:15 | 8 | MR. ALDREDGE:  Good morning, Your Honor. |
| 09:11:16 | 9 | Horatio Aldredge and Christie Williams for Mr. Karr. |
| 09:11:19 | 10 | THE COURT:  All right.  Are you-all ready to proceed? |
| 09:11:22 | 11 | MR. HARDING:  Yes, Your Honor. |
| 09:11:23 | 12 | MR. ALDREDGE:  Yes, Your Honor. |
| 09:11:23 | 13 | THE COURT:  Okay.  As you know, we're in the middle |
| 09:11:27 | 14 | of the plague, and so we will comply with the distancing |
| 09:11:37 | 15 | guidelines that are in effect for this building, which is |
| 09:11:41 | 16 | basically six feet apart -- it looks like we're in pretty good |
| 09:11:45 | 17 | shape right now -- and the mask rules, because we're not out of |
| 09:11:49 | 18 | the woods yet in this thing. |
| 09:11:52 | 19 | So, because we'll be masked, everybody who speaks, I |
| 09:11:56 | 20 | want you to make sure you speak very clearly and slowly and |
| 09:11:59 | 21 | annunciate, because there's a little bit of adjustment we've |
| 09:12:03 | 22 | got to make.  And the lawyers don't have to come to the front |
| 09:12:09 | 23 | podium.  You can speak at the podium at your respective tables |
| 09:12:13 | 24 | there.  And so that's what we will do. |
| 09:12:19 | 25 | I don't know if you-all have discussed how you want |

09:12:23  1  to proceed with this.  Of course, the burden is on the

09:12:27  2  government at sentencing.  So, Mr. Harding, I presume you're

09:12:31  3  ready to proceed?

09:12:32  4           MR. HARDING:  We are, Your Honor.

09:12:33  5           THE COURT:  All right.  I apologize to everybody for

09:12:35  6  the delay.  My computer on the bench decided to die this

09:12:41  7  morning, which we have many more computer deaths than one might

09:12:45  8  think.  I know I'm the old person and the outlier, but I liked

09:12:51  9  all of this better when all we had were legal pads and pens to

09:12:54 10  deal with everything, and we actually handed pieces of paper

09:12:57 11  around.  So, in that regard, I appreciate the binders that I've

09:13:01 12  received from you-all with the things we're going to consider

09:13:04 13  this morning.

09:13:04 14           So, that having been said, Mr. Harding, the

09:13:08 15  government may proceed.

09:13:10 16           MR. HARDING:  Thank you, Your Honor.  To begin with,

09:13:12 17  for record purposes, we would offer for purposes of this

09:13:14 18  hearing all of the attachments to the government's sentencing

09:13:17 19  memorandum as well as Government's Exhibits 1 and 2, previously

09:13:22 20  tendered to counsel and in the Court's binder, Exhibit 1 being

09:13:28 21  a PowerPoint presentation -- or in this case, actually, a PDF

09:13:31 22  presentation that we'd like to go over with Agent Martin, and

09:13:34 23  Exhibit 2, which is some redacted e-mails between former AUSA

09:13:40 24  Jerry Carruth and some jurors in this case.

09:13:45 25           MS. WILLIAMS:  Judge, I object to the testimony of --

| | | |
|---|---|---|
| 09:13:48 | 1 | the vast majority of the testimony of Mr. Martin and the vast |
| 09:13:52 | 2 | majority of this PowerPoint or PDF presentation as being |
| 09:13:59 | 3 | duplicative of the evidence at the trial which has already been |
| 09:14:02 | 4 | covered at the government's sentencing memorandum, as we |
| 09:14:05 | 5 | discussed in our conference. |
| 09:14:08 | 6 | THE COURT:  Well, it may be duplicative of what was |
| 09:14:12 | 7 | presented at the trial and perhaps at the first sentencing |
| 09:14:14 | 8 | hearing, but I was not the trial judge in this case, and I was |
| 09:14:17 | 9 | not the sentencing judge in this case.  And so I find it |
| 09:14:23 | 10 | harmless that it's duplicative.  I think if this case goes back |
| 09:14:28 | 11 | to the Circuit or gets appealed in any manner, it will make for |
| 09:14:33 | 12 | a cleaner record if that appellate court is looking at what I |
| 09:14:37 | 13 | looked at at this time in reaching my decision, without having |
| 09:14:42 | 14 | to go back and paw through other things.  So the objection is |
| 09:14:47 | 15 | overruled. |
| 09:14:48 | 16 | Government's Exhibits 1 and 2 are admitted, and the |
| 09:14:51 | 17 | Court will also accept and review all of the attachments to all |
| 09:14:59 | 18 | of the pleadings and memoranda that have been filed in |
| 09:15:02 | 19 | anticipation of this hearing that are before the Court, and I |
| 09:15:05 | 20 | will consider them for the purposes of whatever ruling I make. |
| 09:15:10 | 21 | MR. HARDING:  Thank you, Judge.  The government will |
| 09:15:12 | 22 | call Ed Martin at this time. |
| 09:15:14 | 23 | (Witness sworn) |
| 09:17:32 | 24 | MR. HARDING:  May I proceed, Your Honor? |
| 09:17:33 | 25 | THE COURT:  You may.  Until we get to the next |

09:17:40   1    interruption.

09:17:40   2              MR. HARDING:  Mr. Martin --

09:17:43   3              MR. ALDREDGE:  Your Honor, I apologize.  I need to

09:17:43   4    have a quick discussion with my client.

09:17:44   5              THE COURT:  All right.

09:17:45   6          (Counsel confers with defendant)

09:18:33   7              MR. ALDREDGE:  Thank you, Your Honor.

09:18:34   8              THE COURT:  Now, Mr. Harding.

09:18:35   9              MR. HARDING:  Thank you.

09:18:36   10                         **EDMOND MARTIN,**

09:18:36   11   having been first duly sworn, testified as follows:

09:18:36   12                     **DIRECT EXAMINATION**

09:18:36   13   **BY MR. HARDING:**

09:18:36   14   Q.  Mr. Martin, could you please briefly introduce yourself to

09:18:39   15   the court, tell them what you do now, what you did back in 1995

09:18:44   16   and 2000, and describe briefly your role in the investigation

09:18:49   17   of this case.

09:18:50   18   A.  Yes, sir.  My name is Edmond Martin.  I was an IRS special

09:18:54   19   agent for 26 years --

09:18:58   20              And I need to turn my phone off.  Excuse me.

09:19:01   21              I was a special agent for 26 years.  I retired in

09:19:09   22   2001.  And I was, along with Donna Cowling, the case agents on

09:19:15   23   the Madalyn Murray O'Hair investigation, trying to find out --

09:19:20   24   follow the money and determine what happened to the $600,000.

09:19:23   25   And we did that.

MARTIN - DIRECT                                                    7

09:19:24   1            And since 2001 I have established a company, Sage

09:19:31   2   Investigations, a private investigating and forensic accounting

09:19:36   3   firm.  And that's what I've been doing since then.

09:19:40   4   Q.   And, in fact, you've done a little bit of work or

09:19:43   5   consultation with both the Federal Public Defender's office as

09:19:47   6   well as Ms. Williams; is that correct?

09:19:50   7   A.   Correct.

09:19:50   8   Q.   Okay.  You've had chance to review the government's

09:19:53   9   sentencing memorandum in this case.  Is that fair to say?

09:19:55  10   A.   Yes.

09:19:56  11   Q.   As well as the PowerPoint that's depicted in Exhibit 1 for

09:19:59  12   this hearing?

09:20:00  13   A.   Yes.

09:20:01  14   Q.   Fair to say the -- neither one of those contains all of

09:20:05  15   the facts in this case, right?

09:20:06  16   A.   No.

09:20:06  17   Q.   But, to the extent that they describe evidence in this

09:20:09  18   case, is that evidence fairly depicted, to the best of your

09:20:12  19   knowledge?

09:20:13  20   A.   Yes.

09:20:13  21   Q.   Okay.  If we could turn to page -- or one of the

09:20:17  22   PowerPoint in Government's Exhibit 1, I just want you to

09:20:21  23   briefly, if you could, we're going to go group by group here,

09:20:26  24   can you first give the Judge just a very, very brief overall

09:20:29  25   picture of the scheme in this case?  And we'll start with the

09:20:34  1  scheme, and then we'll go to the people.

09:20:35  2  A.    Well, the scheme in this case was basically by Mr. Waters

09:20:42  3  and Mr. Karr and Dan Fry was to capture and abduct the --

09:20:49  4  Madalyn Murray O'Hair, Robin Murray O'Hair, and Jon Garth

09:20:54  5  Murray, and to obtain from them what they thought was about

09:20:58  6  $1.2 million dollars which was in New Zealand and to bring that

09:21:02  7  money into the United States and take possession of it.

09:21:04  8  Q.    Okay.  And you described the victims in this case,

09:21:07  9  Madalyn Murray O'Hair, Robin Murray O'Hair, and Jon Garth

09:21:11  10  Murray.  I'll just refer to them collectively as "the O'Hairs,"

09:21:16  11  if that's all right?

09:21:17  12  A.    Correct.

09:21:17  13  Q.    Fair to say the O'Hairs, in terms of their family

09:21:21  14  relationship, the actual relationship between them, it's a

09:21:24  15  little bit convoluted?

09:21:26  16  A.    It is.  But they were a very close family.  I mean, they

09:21:28  17  traveled together, lived together, worked together.

09:21:30  18  Q.    But can you describe for the Court the relationship, as in

09:21:33  19  mother, son, daughter between those three?

09:21:36  20  A.    Correct.  Madalyn was the mother, Robin was the daughter

09:21:42  21  of Bill Murray, which she was adopted by Madalyn, and

09:21:46  22  Jon Murray was the son of Madalyn Murray O'Hair.

09:21:50  23  Q.    And Bill Murray is another son of Madalyn Murray O'Hair,

09:21:54  24  correct?

09:21:54  25  A.    Yes.

MARTIN - DIRECT                                                    9

09:21:55  1   Q.   So Robin was biologically Madalyn's granddaughter but, by

09:22:00  2   adoption, her daughter?

09:22:02  3   A.   Correct.

09:22:02  4   Q.   Turning to the perpetrators in this case, you mentioned

09:22:04  5   David Waters, Gary Paul Karr, and Danny Fry?

09:22:07  6   A.   Correct.

09:22:08  7   Q.   Could you describe briefly the roles or the role and

09:22:11  8   relationship between those people?  And starting with

09:22:13  9   David Waters, what was his role in this scheme?

09:22:16  10  A.   In this particular instance, David Waters I would consider

09:22:19  11  would be the mastermind of it all, controlled the initial

09:22:23  12  thought of where they were going to do -- what they were going

09:22:25  13  to do.  He was employed by Madalyn Murray O'Hair at one time

09:22:30  14  and the American Atheists, so he knew the ins and outs because

09:22:34  15  of being an office manager.

09:22:36  16       Gary Karr was --

09:22:38  17  Q.   Before we go to Mr. Karr --

09:22:41  18  A.   Sure.

09:22:41  19  Q.   -- Mr. Martin ...

09:22:41  20  A.   I'm sorry.

09:22:43  21  Q.   You mentioned this, but David Waters -- you mentioned

09:22:45  22  earlier that they were trying to get a bunch of money,

09:22:48  23  $1.2 million from New Zealand.  It's your understanding from

09:22:52  24  the evidence in this case, that Mr. Waters came up with that

09:22:55  25  plan and knew of that money because of his former employment

MARTIN - DIRECT                                    10

09:22:58  1  with the O'Hairs; is that right?

09:23:01  2  A.    That's correct.

09:23:01  3  Q.    All right.  I'm sorry.  If you'll go on to Mr. Karr's role

09:23:04  4  in this offense.

09:23:05  5  A.    So Mr. Karr was a bit player.  He -- he had been released

09:23:09  6  from prison where he served 20 years and a few months and was

09:23:14  7  released in April of 1995.  And he came to Austin, got involved

09:23:20  8  in the case, and, you know, I'm sure we'll explain all that.

09:23:25  9         So he was involved with Mr. Waters.  I think he and

09:23:29 10  waters were friends, in that they both served in prison

09:23:35 11  together and they knew one another.  And then Danny Fry was a

09:23:38 12  friend of David Waters that was from -- he was from Florida,

09:23:45 13  Naples, Florida.  And he was, you know, a standard -- he was a

09:23:50 14  person, but he got himself involved in this situation.

09:23:52 15  Q.    So a couple of questions, first about Mr. Karr.  You said

09:23:55 16  that Mr. Karr and Mr. Waters befriended one another while they

09:24:00 17  were still in prison together.  Based on the evidence in this

09:24:03 18  case, did that friendship persist not only throughout this

09:24:07 19  scheme but also beyond?

09:24:08 20  A.    Yes, they did.

09:24:09 21  Q.    Okay.  Would you -- and you mentioned Danny Fry.  And

09:24:15 22  Danny Fry, would you consider him to be on par in terms of an

09:24:20 23  equal partner with Mr. Karr and Mr. Waters or something less?

09:24:22 24  A.    Something less.

09:24:24 25  Q.    Can you remember how -- why David Waters explained he

09:24:30  1   involved Danny Fry at all during his interview?

09:24:32  2   A.   He needed a third person to basically take care of things.

09:24:37  3   They couldn't always be there to be with the O'Hairs, and Danny

09:24:43  4   provided that service.

09:24:45  5   Q.   And Mr. Waters considered -- according to his statement,

09:24:48  6   considered Mr. Fry expendable?

09:24:51  7   A.   Expendable, yes, sir.  That was one problem, yes.

09:24:56  8   Q.   Of course, Mr. Fry, as we know, although a perpetrator of

09:24:59  9   this offense, was also eventually murdered as part of it as

09:25:02 10   well; is that correct?

09:25:03 11   A.   Yes, sir.  He was murdered.

09:25:05 12   Q.   Moving on to the final two folks on the list here on

09:25:07 13   page 1, who is Gerald "Chico" Osborne, and how is he involved

09:25:11 14   in this case?

09:25:11 15   A.   Mr. Osborne was also a friend of David Waters.  He has an

09:25:15 16   extensive criminal record also, and he was one person that

09:25:20 17   David called on to allow the renting of a public storage unit

09:25:29 18   on Lamar.

09:25:30 19   Q.   Okay.  We'll talk about that later?

09:25:31 20   A.   Yes.

09:25:32 21   Q.   But in terms of -- although it may be suspected he had

09:25:34 22   more involvement, in terms of his known involvement and what he

09:25:37 23   was charged with, it was limited to that storage unit; is that

09:25:40 24   correct?

09:25:40 25   A.   That's correct.

09:25:41   1   Q.   Patti Jo Steffens, first of all, who is Patti Joe Steffens

09:25:46   2   in terms of relationship to these other folks?

09:25:49   3   A.   She initially was Ron Waters', who is David Waters'

09:25:50   4   brother, girlfriend.  And then she moved to Texas with

09:25:53   5   David Waters back in the '90s -- early '90s.  And, basically,

09:25:57   6   she and David lived together for a number of years.

09:26:00   7   Q.   And so, in fact, during the period of time in this case,

09:26:03   8   they were living together.  Is that fair to say?

09:26:06   9   A.   That's correct.

09:26:06   10   Q.   At an apartment in Austin?

09:26:07   11   A.   Yes, sir.  In the Central Park Apartments, across from

09:26:11   12   DPS.

09:26:12   13            MR. HARDING:  Okay.  If we could move to the next

09:26:13   14   page, please.

09:26:14   15   Q.   It's hard to see on the screen, but I think you can see it

09:26:17   16   on your screen better.  Can you identify for the Court who

09:26:21   17   these folks are in slide 2?

09:26:22   18   A.   Yes.  The center person is Madalyn Murray O'Hair.  The

09:26:26   19   gentleman on the right, or left in my case, would be Jon Garth

09:26:30   20   Murray.  And then Robin was in pink.  She was a young woman at

09:26:34   21   the time.

09:26:35   22            MR. HARDING:  All right.  If we could move to the

09:26:37   23   next slide, please.

09:26:40   24   Q.   Who is depicted here in slide 3?

09:26:42   25   A.   This is David Waters.

09:26:44  1  Q.   And you can see at the bottom there's a description of

09:26:47  2  criminal history.  Is it fair so say, without going into

09:26:51  3  detail, Mr. Waters has a criminal history that included

09:26:54  4  violence and other serious felonies?

09:26:57  5  A.   Yes.  He committed murder once.

09:26:59  6  Q.   And is suspected of other murders, correct?

09:27:01  7  A.   Yes.

09:27:01  8  Q.   Including murders in this case?

09:27:03  9  A.   Yes.

09:27:03  10  Q.   Moving on to slide 4, can you describe briefly what's

09:27:07  11  depicted here in slide 4?

09:27:09  12  A.   That's Mr. Waters shooting his Browning Hi-Power at the

09:27:13  13  Hill Country Range out off of Hamilton Pool Road.  And he is

09:27:18  14  wearing his 1995 Pecan Street Festival shirt.  That's how we

09:27:24  15  were able to date this particular photograph.

09:27:26  16  Q.   And we're jumping ahead a little bit, but, in part, this

09:27:29  17  photograph is what led to or contributed to Mr. Waters being

09:27:33  18  charged with a firearms offense -- or federal firearms offense?

09:27:35  19  A.   That's correct.  And to pleading to that charge.

09:27:38  20       MR. HARDING:  Okay.  Moving on.

09:27:38  21  Q.   Who is depicted here in this slide?

09:27:40  22  A.   There is Mr. Karr, Gary Karr.

09:27:43  23  Q.   And, again, Mr. Karr's criminal history is contained in

09:27:45  24  the PSR, so I don't want to belabor it.  But is it fair to say

09:27:49  25  his criminal history involves violent conduct allegations and

09:27:53  1   convictions for rape and kidnapping?

09:27:54  2   A.   Yes.

09:27:55  3   Q.   Okay.  Next page, who is depicted here, sir?

09:27:59  4   A.   This is Danny Fry.

09:28:01  5   Q.   And I want to point out or direct your attention to the

09:28:07  6   criminal history listed at the bottom of Mr. Fry's photograph

09:28:10  7   here.  Is there a -- there's a big difference between his

09:28:13  8   criminal history, Mr. Fry's criminal history, and the criminal

09:28:16  9   history of Mr. Waters and Mr. Karr.  Is that fair to say?

09:28:18  10  A.   Correct.

09:28:19  11  Q.   He was not -- at least as far as we know, he has no

09:28:22  12  history of violence?

09:28:24  13  A.   Nothing that I knew of, no.

09:28:29  14          MR. HARDING:  Moving to the next slide, please.

09:28:31  15  Q.   Who is depicted here in this photograph sir?

09:28:33  16  A.   This lady in blue here is Patti Steffens, David Waters'

09:28:38  17  girlfriend.

09:28:39  18          MR. HARDING:  All right.  Next slide, please.

09:28:41  19  Q.   There's four individuals, but you've already identified

09:28:43  20  the two on the right.  Who are the two on the left?

09:28:46  21  A.   The two on the left, the gentleman -- the tall gentleman

09:28:48  22  is Gerald Osborne, and he is known as "Chico" also.  And I

09:28:55  23  think that that's Chico's wife or girlfriend.

09:28:59  24  Q.   But had no relation to this case that we're aware of?

09:29:01  25  A.   No.  None, whatsoever.

MARTIN - DIRECT                                                    15

09:29:02   1            MR. HARDING:  Okay.  Moving to slide 9, please.

09:29:05   2    Q.   So you described the overall scheme was to take the

09:29:09   3    O'Hairs away from their home, take them to a location, and

09:29:13   4    separate them from their wealth.  Is that a fair summary?

09:29:15   5    A.   Yes.

09:29:16   6    Q.   First of all, focusing on Mr. Karr's actions around this

09:29:24   7    period of time, did Mr. Karr rent a passenger van on

09:29:29   8    August 26th of 1995?

09:29:31   9    A.   Yes, sir, he did.

09:29:32  10    Q.   Did he use his own name in renting that van?

09:29:35  11    A.   Yes.  He -- but he rented it in cash.

09:29:39  12    Q.   Turning to August 27th, can you describe for the Court

09:29:43  13    briefly, in particular in relation to the disappearance of the

09:29:46  14    O'Hairs, what happened on the 27th of August 1995?

09:29:50  15    A.   On Sunday, August 27th, the O'Hairs were working at the

09:29:55  16    atheist headquarters.  And using a ruse, they came to being --

09:30:01  17    David -- I'm sorry.  Gary Karr and Danny Fry came to the door

09:30:08  18    with a delivery of a package.  When they did, they pulled guns

09:30:11  19    on these folks and entered, and then David Waters subsequently

09:30:15  20    came in.

09:30:16  21    Q.   And fair to say that a lot of the details about this event

09:30:19  22    that you're recounting now come from David Waters' statement.

09:30:25  23    Is that fair to say?

09:30:25  24    A.   Yes.

09:30:25  25    Q.   There's a lot of circumstantial evidence around it, but in

MARTIN - DIRECT                                          16

09:30:27   1   terms of the details, the only firsthand account we have is

09:30:28   2   from David Waters, right?

09:30:30   3   A.   Correct.

09:30:30   4   Q.   You mentioned a ruse they used to approach.  That was a

09:30:34   5   ruse that Mr. Waters described where they used the van rented

09:30:38   6   by Mr. Karr, posted sort of a fake logo on it, and pretended to

09:30:45   7   be couriers; is that correct?

09:30:47   8   A.   Correct.

09:30:47   9   Q.   At some point during their time there -- "there" being at

09:30:53   10  the Austin Atheist Headquarters, Mr. Waters described somebody

09:30:57   11  trying to gain access to the building while they were in there

09:31:00   12  with the O'Hairs.  Is that fair to say?

09:31:03   13  A.   Correct.  There were some workers there.

09:31:04   14  Q.   And Mr. Alvarado, Willis Alvarado, testified during the

09:31:07   15  trial that, in fact, he did see a van that appeared to be a

09:31:10   16  rental van to him at the premises at that time?

09:31:13   17  A.   Correct.

09:31:13   18  Q.   So once the O'Hairs are taken from their place of work,

09:31:21   19  what happens next?

09:31:22   20  A.   They are taken -- well, what happens next is that

09:31:25   21  Robin Murray O'Hair arrives, because she wasn't there

09:31:32   22  initially.  When she arrives, they deal with her at this point.

09:31:35   23  And also then Mr. Karr takes -- takes Robin's Porsche and parks

09:31:44   24  it in the short-term parking lot at Mueller Airport at the

09:31:48   25  time.

MARTIN - DIRECT                                        17

09:31:48   1   Q.   And according to Mr. Karr's own statement given to police,

09:31:51   2   that was intended to give the impression she had left Austin

09:31:55   3   via the airport?

09:31:56   4   A.   Correct.

09:31:57   5   Q.   There's a brief stay at a motel in Buda.  Is that fair to

09:32:04   6   say?

09:32:04   7   A.   Yes.

09:32:04   8            MR. HARDING:  But if we go to the next slide, please.

09:32:07   9   Q.   Can you describe for the Court the Warren -- the role the

09:32:11  10   Warren Inn played in this case, Mr. Martin?

09:32:13  11   A.   Yes.  The Warren Inn is where the O'Hairs and Waters and

09:32:17  12   Karr and Fry were housed, and I think it was room 11 there on

09:32:22  13   the second floor of the Warren Inn village section, yes.

09:32:26  14   Q.   And did Mr. Waters have some previous knowledge of this

09:32:29  15   location?

09:32:30  16   A.   Yes.  When he first moved to Austin -- to Texas, that's

09:32:35  17   where he and Patti Steffens stayed back in the early 90s.

09:32:40  18   Q.   Okay.  And fair to say the bulk of the acts that we're

09:32:43  19   going to describe here take place during the late months of

09:32:46  20   August, the month of September, and the early days of October

09:32:50  21   here in the Warren Inn?

09:32:52  22   A.   Yes.

09:32:53  23   Q.   You mentioned the apartment was a second floor apartment?

09:32:58  24   A.   Yes.

09:32:59  25   Q.   Without getting too far ahead of ourselves, at some point

09:33:05   1   the O'Hairs are moved to La Quinta Inn; is that correct?

09:33:09   2   A.   Later on at the end of September, yes.

09:33:11   3   Q.   And did David Waters explain why he wanted -- let me start

09:33:14   4   over.

09:33:15   5        What floor of -- were the rooms at the La Quinta?

09:33:19   6   A.   The La Quinta was on the very first floor.

09:33:21   7        MS. WILLIAMS:   Excuse me, Your Honor.  I object to

09:33:23   8   the -- to this witness.  I've just realized that this witness

09:33:27   9   is interspersing trial testimony with a statement that was

09:33:33  10   given by David Waters in I think the year 2001.

09:33:38  11        David -- this statement of David Waters was never

09:33:43  12   subject to cross-examination by the defense, was never -- has

09:33:47  13   never been given in written form to the defense.  And

09:33:50  14   David Waters is no longer alive, cannot -- cannot be here to --

09:33:55  15   to bolster or rebut this statement.  And I think that it's a

09:34:01  16   violation of due process.  I think it's a violation of the

09:34:05  17   right to trial by jury.  It's a violation of the confrontation

09:34:10  18   clause for this witness to now testify about a statement that

09:34:15  19   has never been subject to cross-examination.  We don't know

09:34:19  20   whether it's fully the truth, fully a lie, or some mixture of

09:34:24  21   the two.

09:34:25  22        THE COURT:   Mr. Harding?

09:34:25  23        MR. HARDING:   Your Honor, first off Mr. Martin is the

09:34:30  24   person who took the statement from David Waters in 2001.  Every

09:34:35  25   piece of evidence that we have related to that statement was

09:34:38  1    provided to counsel, including over ten hours of audiotape.

09:34:41  2           As for the question of confrontation, as we mentioned

09:34:44  3    in our sentencing memo, there is no confrontation right at a

09:34:49  4    sentencing.  It's routine for the Court to consider materials

09:34:52  5    outside of what would normally be allowed at a trial.  That's

09:34:55  6    done all the time.  In fact, presentence reports wouldn't be

09:34:58  7    possible without that rule.

09:34:59  8           And under the statutory and under the guidelines,

09:35:03  9    this Court is to consider all evidence when arriving at a

09:35:06  10   sentence, not simply evidence that was adduced at trial.

09:35:10  11   Certainly, the defense wants you to consider all the good

09:35:12  12   things Mr. Karr has done since trial.  It's only fair that this

09:35:14  13   Court hears all of the evidence that has been developed since

09:35:18  14   the time of trial in arriving at his sentence.

09:35:20  15           THE COURT:  It's your objection.  You can have the

09:35:22  16   last word.

09:35:22  17           MS. WILLIAMS:  Judge, first of all, all of the

09:35:26  18   evidence that's been provided to us doesn't include all of the

09:35:30  19   statement because, apparently, at least one of the tapes is

09:35:33  20   missing.  Is that true?

09:35:34  21           MR. HARDING:  As we mentioned in our sentencing memo,

09:35:38  22   that is correct.  Disc 8 was missing and was omitted.

09:35:39  23           MS. WILLIAMS:  So we don't know what was said in that

09:35:42  24   tape.  But, nevertheless, Judge, this is highly irregular.

09:35:45  25   Notwithstanding what Mr. Harding says, we do certainly consider

09:35:52   1   presentence reports.  We don't generally consider statements of

09:35:54   2   a person taken under these circumstances who has been dead for

09:36:00   3   16 years.

09:36:01   4            THE COURT:  All right.  The objection is overruled.

09:36:02   5            But, Mr. Harding, what I want you to do as best you

09:36:05   6   can is break it up with your questions of Mr. Martin so the

09:36:17   7   record will be clear as to what he learned in the 2001

09:36:19   8   statement and what was learned previously that was adduced at

09:36:25   9   either trial or the first sentencing hearing in this case.

09:36:28  10            MR. HARDING:  Yes, sir.

09:36:29  11            MS. WILLIAMS:  And certainly, Judge, I don't have any

09:36:31  12   objection to Mr. Harding leading to try to get to that point

09:36:34  13   more quickly.

09:36:35  14            THE COURT:  Thank you.

09:36:37  15   Q.  (BY MR. HARDING) So, again, this -- I'll confine -- I'll

09:36:40  16   direct you to David Waters' statement in 2001.

09:36:44  17            What did Mr. Waters say about why he wanted to move

09:36:46  18   from a second floor room to a first floor room?

09:36:49  19   A.   It would be better to move bodies from a second -- from a

09:36:57  20   first floor, the way the situation was at this La Quinta, than

09:37:03  21   it would be to move the bodies at the Warren Inn.

09:37:06  22   Q.   And as part of that -- this is part of the trial record,

09:37:09  23   and certainly you can see from the photographs -- the O'Hairs

09:37:12  24   were large people?

09:37:13  25   A.   Yes.

09:37:13   1   Q.   And Madalyn Murray O'Hair, as was introduced at trial, had

09:37:17   2   a variety of mobility issues, including occasionally using a

09:37:21   3   wheelchair.  Is that fair to say?

09:37:23   4   A.   Correct.

09:37:23   5   Q.   And so that was Mr. Waters' concern that he made in his

09:37:26   6   statement about the second floor of the Warren Inn?

09:37:29   7   A.   That was his thought, yes.

09:37:31   8   Q.   Okay.  If we could move to the -- sorry.  Before we move

09:37:34   9   on, whose name was the rental of the Warren in?

09:37:39   10  A.   The rental was in the name of David Waters and Gary Karr.

09:37:44   11  Q.   Okay.  No alias.  Gary Karr's real name as part of that

09:37:48   12  rental?

09:37:49   13  A.   Yes, sir.

09:37:49   14  Q.   And Danny Fry made -- as was introduced at trial, evidence

09:37:54   15  of many phone calls that Danny Fry made not only identifying

09:37:58   16  his location as the Warren Inn, but also toll records show he

09:38:02   17  made many phone calls for phones at and near the Warren Inn; is

09:38:06   18  that correct?

09:38:07   19  A.   Correct.

09:38:07   20  Q.   Okay.  So you mentioned as part of this scheme the --

09:38:16   21  Mr. Waters, Mr. Karr, Mr. Fry are trying to get money from the

09:38:19   22  O'Hairs.  As it happens, is it fair to -- fair to sort of break

09:38:24   23  it up into a large $600,000 transaction sort of towards the end

09:38:32   24  and then a variety of other transactions throughout the period

09:38:35   25  of time?

| | | |
|---|---|---|
| 09:38:36 | 1 | A.   Correct. |
| 09:38:36 | 2 | Q.   So I want to forget about the $600,000 transaction to |
| 09:38:40 | 3 | start with and focus only on other items purchased, wire |
| 09:38:45 | 4 | transfers, cashed checks, and so on prior to that.  Okay? |
| 09:38:49 | 5 | A.   Correct. |
| 09:38:50 | 6 | Q.   Can you describe -- we'll go over it in some detail, but |
| 09:38:55 | 7 | describe in brief what happened once the O'Hairs are taken to |
| 09:38:59 | 8 | the Warren Inn in terms of money being taken from them? |
| 09:39:03 | 9 | A.   Yes.  Funds were -- were removed from bank accounts by |
| 09:39:06 | 10 | checks, I guess, and transfers -- not transfers, but actually |
| 09:39:09 | 11 | to convert it to cash, advances on credit cards.  In that case |
| 09:39:15 | 12 | Jon Murray sold his only asset that he ever owned was a |
| 09:39:21 | 13 | Mercedes.  And he sold that for less than its market value.  So |
| 09:39:28 | 14 | a lot of their personal finance well-being was -- was taken and |
| 09:39:36 | 15 | converted to cash. |
| 09:39:37 | 16 | Q.   And in some cases, for instance, the sale of John's |
| 09:39:42 | 17 | Mercedes-Benz, that was sold at a substantial monetary loss -- |
| 09:39:44 | 18 | A.   Yes, sir. |
| 09:39:45 | 19 | Q.   -- compared to market value? |
| 09:39:47 | 20 | A.   Yes, sir. |
| 09:39:48 | 21 | Q.   In terms of the three Rolex watches that are described |
| 09:39:51 | 22 | here on this slide, who wound up with those Rolex watches. |
| 09:39:53 | 23 | A.   Mr. Karr wound up with the watches. |
| 09:39:56 | 24 | Q.   And the 30-day period in September, considering cash |
| 09:40:02 | 25 | advances, cashed checks, and other items, we're estimating |

09:40:05  1   approximately $90,000 taken from the O'Hairs during that period

09:40:09  2   of time.  Is that fair to say?

09:40:11  3   A.   That's correct.  That's what I was able to find.

09:40:14  4   Q.   And this is all based on trial testimony?

09:40:16  5   A.   Yes, sir.  And based on evidence.

09:40:19  6        MR. HARDING:  Go to the next slide, please.

09:40:19  7   Q.   So, having taken the money from the O'Hairs, what did

09:40:22  8   Mr. Waters, Mr. Karr, and Mr. Fry do with it?

09:40:26  9   A.   Well, they sent some of that money back to their family

09:40:29 10   and friends.  Mr. Waters purchased a Cadillac for cash.  He

09:40:33 11   also purchased a diamond -- just a solitary diamond for $6,000

09:40:41 12   with an American Express credit card.  And they proceeded to

09:40:46 13   buy and obtain clothing, accessories, Armani suits, $100

09:40:55 14   ties -- expensive clothing to start with.

09:40:59 15   Q.   And this is all based on trial testimony?

09:41:01 16   A.   Yes.

09:41:01 17   Q.   The diamond that was purchased for $6600, who wound up

09:41:06 18   with that?

09:41:07 19   A.   Mr. Karr wound up with that later.

09:41:10 20   Q.   Okay.  And that's according not only to the trial

09:41:12 21   testimony, but also his own statement?

09:41:13 22   A.   Yes.

09:41:17 23   Q.   Okay.  Let's turn to look at a quick breakdown of the

09:41:20 24   money that Mr. Karr personally got --

09:41:25 25        MR. HARDING:  Go on to the next slide, please.

MARTIN - DIRECT                                                    24

09:41:25  1   Q.   -- during this period of time.

09:41:26  2        It's pretty hard to see on the projector, but there's

09:41:30  3   two highlighted portions of this slide.  Fair to say they

09:41:33  4   describe wire transfer -- excuse me -- MoneyGram purchases in

09:41:36  5   the amount of approximately $6,300, purchased by Gary Karr for

09:41:41  6   Charlene Karr?

09:41:42  7   A.   That's correct.

09:41:43  8   Q.   And this is still in August of 1995, correct?

09:41:45  9   A.   August 29th, yes.

09:41:47  10  Q.   So before we even hit September, he's already cleared

09:41:51  11  $6300 and change?

09:41:53  12  A.   Yes.

09:41:53  13        MR. HARDING:  If we could move to the next slide,

09:41:56  14  please.

09:41:57  15  Q.   Then we see September 1st, a payment of $1500 to his

09:42:00  16  Discover Card.  Importantly, Mr. Karr's employer at the time

09:42:11  17  testified at trial, correct?

09:42:12  18  A.   Correct.

09:42:12  19  Q.   And he described that, although Mr. Karr had worked up

09:42:16  20  to -- essentially up to the time he came to Texas, he didn't

09:42:19  21  return to employment until October of 1995; is that correct?

09:42:24  22  A.   Correct.

09:42:24  23  Q.   During this period of time -- I'm sorry.  Did I interrupt

09:42:28  24  you?

09:42:28  25  A.   No, sir.

09:42:29  1   Q.   During this period of time, he's not working for

09:42:32  2   Art Miller in Florida?

09:42:34  3   A.   He's not.  That's right.

09:42:35  4   Q.   And Patti Joe Steffens testified she's not aware he had

09:42:39  5   any job beyond whatever he was doing with the O'Hairs during

09:42:43  6   this time, correct?

09:42:44  7   A.   Correct.

09:42:44  8   Q.   Okay.  So $1500 paid on a credit card on September 1st.

09:42:50  9   September 16th we have $852, again, purchased by Gary Karr for

09:42:56  10  a family member?

09:42:58  11  A.   Correct.

09:42:59  12  Q.   Going to the next slide, or the bottom of this slide, I

09:43:03  13  should say, we have another balance payment on his Discover

09:43:07  14  Card in the amount of $200.

09:43:08  15            MR. HARDING:  Next slide, please.

09:43:11  16  Q.   Again, now we're in October of 1995.  We have Western

09:43:16  17  Union wire transfers by Patti Steffens on behalf of Gary Karr,

09:43:22  18  according to her testimony, in the amount of over $2,000.  Or I

09:43:26  19  believe she testified she thought the principal was $2,000 and

09:43:30  20  the other was a fee.

09:43:31  21            And then this $15,000 figure on October 3rd of 1995,

09:43:38  22  can you describe that for the Court and what that represents.

09:43:40  23  A.   Well, that's combination of the watches and the clothing

09:43:44  24  and everything that Mr. Karr, when he -- when he leaves Austin

09:43:53  25  to go back to Florida.

09:43:54   1   Q.   And that's an estimate that Charlene Karr made of what she
09:43:57   2   believed the value of those items to be, approximately,
09:44:00   3   correct?
09:44:00   4   A.   Correct.
09:44:01   5   Q.   Finally, we have the payment of the Four Seasons Hotel as
09:44:06   6   well as the Rolex watches that Mr. Karr obtained, correct?
09:44:10   7   A.   Correct.
09:44:11   8   Q.   So considering only the cash, we're at probably over
09:44:17   9   $10,000, correct?
09:44:21   10  A.   Correct.
09:44:21   11  Q.   In Mr. Karr's statement to police, he claims David Waters
09:44:25   12  paid him no more than $6,000 for this whole thing?
09:44:28   13  A.   Correct.
09:44:28   14  Q.   And he further stated that, as of October 2nd, he still
09:44:33   15  had several thousand dollars on his person?
09:44:34   16  A.   Correct.
09:44:35   17  Q.   Does that appear to you to be consistent with the
09:44:38   18  financial investigation that you conducted in this case?
09:44:42   19  A.   Pretty much.  I mean, you couldn't see everything, but
09:44:44   20  yes.
09:44:44   21  Q.   Sorry.  My question is:  Do you believe he was accurately
09:44:49   22  reporting the amount of money he received?
09:44:51   23  A.   No.  No, he wasn't.  He received much more than he was
09:44:54   24  saying.  He was minimizing.
09:44:56   25  Q.   Now I want to turn away from, sort of, the other extortion

09:44:59  1  and robbery from the O'Hairs and turn to the $600,000

09:45:03  2  transaction.

09:45:03  3  A.   Correct.

09:45:04  4  Q.   Would you agree with me this was sort of the crux of this

09:45:08  5  case and sort of a turning point in the fate of the O'Hairs?

09:45:11  6  A.   Correct.

09:45:12  7  Q.   Okay.  Can you describe just in very basic detail what

09:45:20  8  Mr. Waters was trying to get his hands on, where it was

09:45:23  9  located, and how he intended to convert it.

09:45:26  10  A.   Yes.  The O'Hairs had sent money to New Zealand,

09:45:30  11  anticipating they may be moving to New Zealand, and those funds

09:45:35  12  came from the United Secularists of America.  And then what was

09:45:39  13  happening is that money was being returned to the

09:45:42  14  United States.  It took a while to get here.  The banking

09:45:46  15  system in New Zealand is different than the banking system in

09:45:49  16  the United States, but it ultimately got here.

09:45:52  17         And, when it did, the money came to the National

09:45:56  18  Westminster Bank of New Jersey.  Initially they tried to

09:45:59  19  transfer that money.  There's a lot of phone calls back and

09:46:02  20  forth trying to get the transfer of that money to San Antonio.

09:46:05  21  But the -- the bank would not allow that, and so there had to

09:46:08  22  be actual presence of the person that has -- that is on the

09:46:13  23  account, which caused Mr. Murray -- Mr. Jon Garth Murray to go

09:46:18  24  to New Jersey.

09:46:19  25  Q.   And who went with Mr. Murray to New Jersey?

| | | |
|---|---|---|
| 09:46:21 | 1 | A.   Mr. Karr did. |
| 09:46:22 | 2 | Q.   Did Mr. Karr use his real name during that trip? |
| 09:46:26 | 3 | A.   No.  He used an alias. |
| 09:46:28 | 4 | Q.   Conrad Johnson? |
| 09:46:29 | 5 | A.   Yes. |
| 09:46:30 | 6 | Q.   There was trial testimony that the plane tickets were |
| 09:46:34 | 7 | purchased sort of at the last minute, right? |
| 09:46:36 | 8 | A.   Correct. |
| 09:46:36 | 9 | Q.   And, in fact, on the same day that they took the trip? |
| 09:46:39 | 10 | A.   That's correct. |
| 09:46:40 | 11 | Q.   The cost of that was over $1,000 per ticket, correct? |
| 09:46:45 | 12 | A.   Correct. |
| 09:46:45 | 13 | Q.   While Mr. Murray is in New York -- New Jersey with |
| 09:46:51 | 14 | Mr. Karr, does he withdraw a substantial amount of money? |
| 09:46:55 | 15 | A.   He did.  He withdrew another $12,000 from another -- a |
| 09:47:00 | 16 | branch of the bank while they were in New Jersey and fixing to |
| 09:47:04 | 17 | leave. |
| 09:47:05 | 18 | Q.   Based on the evidence we know, Mr. Murray and Mr. Karr |
| 09:47:08 | 19 | were the only ones in New Jersey at that time of this group? |
| 09:47:11 | 20 | A.   Correct. |
| 09:47:12 | 21 | Q.   Mr. Waters stated in 2001 he never saw a dollar one of |
| 09:47:18 | 22 | that money, did he? |
| 09:47:19 | 23 | A.   Correct. |
| 09:47:19 | 24 | Q.   He didn't realize that Mr. Karr had obtained that money |
| 09:47:22 | 25 | from Mr. Murray? |

09:47:23  1   A.   That's what he said.

09:47:26  2   Q.   So the 22nd, Mr. Murray and Mr. Karr go to New Jersey and

09:47:34  3   effectuate this funds transfer to Cory Ticknor; is that right?

09:47:37  4   A.   That's correct.

09:47:38  5   Q.   Can you describe for the Court who Cory Ticknor was?

09:47:41  6   A.   Cory Ticknor is a former San Antonio police officer who

09:47:44  7   operates Cory Ticknor Fine Jewelers and Coinage.  And he was

09:47:49  8   able to convert a wire transfer which he received to gold

09:47:56  9   bullion coins for Mr. -- Mr. Murray.

09:47:59  10  Q.   And according to trial testimony as well as Mr. Waters'

09:48:03  11  statement, once Mr. Ticknor has this money, he starts putting

09:48:08  12  together -- he starts converting it and buying up gold coins

09:48:13  13  eventually to release to Jon Murray, correct?

09:48:15  14  A.   Correct.  On September 25th he actually executes the

09:48:19  15  purchase of the --

09:48:20  16  Q.   Okay.

09:48:20  17  A.   -- of the coins.

09:48:21  18  Q.   But as of September 22nd, Mr. Waters, Mr. Karr, and

09:48:30  19  Mr. Fry, they know that money is now in Mr. Ticknor's hand?

09:48:34  20  A.   Correct.

09:48:34  21  Q.   This transaction is going to happen?

09:48:36  22  A.   Absolutely.

09:48:38  23  Q.   So if we jump ahead to September 23rd, the day after --

09:48:41  24  the day Mr. Karr and Mr. Waters -- excuse me -- Mr. Karr and

09:48:45  25  Mr. Murray return from New Jersey, what does Patti Jo Steffens

MARTIN - DIRECT                                    30

09:48:48   1   do?

09:48:49   2   A.   She is instructed by David to go ahead and rent a storage

09:48:52   3   unit at Burnet Road Storage.

09:48:54   4   Q.   And according to not only trial testimony, but also

09:48:57   5   Mr. Waters' statement, the purpose -- what was the purpose of

09:49:00   6   renting that storage unit?

09:49:01   7   A.   That's where the gold ultimately would be stored.

09:49:04   8   Q.   At this Burnet Storage unit?

09:49:06   9   A.   At the Burnet Storage unit.  Yes, sir.

09:49:10   10             MR. HARDING:  Okay.  Go to the next slide.

09:49:11   11   Q.   On September 26th of 1995, you mentioned earlier that

09:49:15   12   Chico Osborne rented a storage unit as well; is that right?

09:49:19   13   A.   That's correct.

09:49:19   14   Q.   Can you describe how that came to pass and what was the

09:49:23   15   purpose -- well, describe how that came to pass, based on trial

09:49:29   16   testimony?

09:49:29   17   A.   Yes Chico Osborne lived in Lake Tawakoni, Texas, and he

09:49:36   18   was contacted to come to Austin, get some money from

09:49:41   19   Patti Steffens, and go rent a storage unit at Public Storage on

09:49:45   20   Lamar Avenue.  And that's what he did.

09:49:47   21   Q.   Based on David Waters' 2001 statement, what was the purpose

09:49:52   22   of renting this storage unit?

09:49:54   23   A.   It's where they were going to process the bodies.

09:49:56   24   Q.   So September 26th of 1995, at the latest, is when

09:50:03   25   David Waters says the O'Hairs are dead?

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

| | | |
|---|---|---|
| 09:50:06 | 1 | A.   Correct. |
| 09:50:07 | 2 | Q.   Based on trial testimony, was there any other apparent |
| 09:50:11 | 3 | purpose -- legitimate purpose for renting this storage unit? |
| 09:50:15 | 4 | A.   Nothing, no. |
| 09:50:16 | 5 | Q.   So if we then move to the 27th, we mentioned this earlier, |
| 09:50:22 | 6 | what happens importantly with the O'Hairs on the 27th? |
| 09:50:26 | 7 | A.   The O'Hairs were moved from the Warren Inn to the |
| 09:50:30 | 8 | La Quinta Inn in anticipation of picking up the gold coins. |
| 09:50:34 | 9 | Q.   And, again, David Waters stated the reason he wanted to |
| 09:50:39 | 10 | move them was because he doesn't want to move these bodies from |
| 09:50:41 | 11 | a second floor apartment? |
| 09:50:42 | 12 | A.   Sure.  Absolutely. |
| 09:50:43 | 13 | Q.   Something else also happens on the 27th with respect to |
| 09:50:47 | 14 | Mr. Karr, correct? |
| 09:50:48 | 15 | A.   Correct. |
| 09:50:48 | 16 | Q.   What is -- what happens on the 27th with respect to |
| 09:50:51 | 17 | Mr. Karr? |
| 09:50:52 | 18 | A.   Mr. Karr comes to Austin from San Antonio and rents a |
| 09:50:57 | 19 | cargo van, which means no seats, just an empty bay in the back. |
| 09:51:04 | 20 | And that's what happened. |
| 09:51:06 | 21 | Q.   So that's rented on the 27th? |
| 09:51:09 | 22 | A.   Correct. |
| 09:51:09 | 23 | Q.   When is it returned, if you recall? |
| 09:51:11 | 24 | A.   I think it was returned on the 30th. |
| 09:51:14 | 25 | Q.   So whatever was going to be done with that van happened |

09:51:19    1    between the 27th and 30th.  Is that fair to say?

09:51:21    2    A.   Correct.

09:51:23    3    Q.   I want to jump back briefly to the first van rental.  In

09:51:31    4    renting the van, Mr. Karr gave Patti Joe Steffens' and

09:51:35    5    David Waters' phone number to the rental agent, correct --

09:51:39    6    A.   Correct.

09:51:41    7    Q.   -- based on trial testimony?

09:51:42    8              In this case there was no phone number associated.

09:51:46    9              MR. HARDING:  If we could move to the next slide

09:51:50   10    please.  Have we covered this slide?  We can go to the next

09:51:54   11    slide, please.

09:51:55   12    Q.   So September 29th, 1995, what -- let's break it down.

09:52:03   13              What happens in the morning on September 29th, 1995

09:52:08   14    with respect to Jon Murray and the gold coins?

09:52:10   15    A.   Jon Murray goes to the Frost National Bank and meets with

09:52:17   16    Cory Ticknor and the bank vice-president and I think

09:52:21   17    Mr. Ticknor's security guard.  And they exchange and sign

09:52:26   18    paperwork exchanging the gold which Mr. Karr -- I mean,

09:52:32   19    Mr. Murray takes with him and leaves.

09:52:38   20    Q.   How did the folks present during that transaction describe

09:52:42   21    Jon Murray's appearance at that time?

09:52:44   22    A.   He was disheveled.  He looked like he slept in his

09:52:48   23    clothes.  He smelled.  So that's what it was.

09:52:51   24    Q.   And there was earlier trial testimony from folks who knew

09:52:54   25    the O'Hairs that Jon, in particular, and Robin were "neat

09:52:58  1   freaks."  Is that a fair assessment?

09:53:00  2   A.   Correct.

09:53:01  3            THE COURT:  Let me interrupt just a minute.

09:53:03  4            Mr. Martin, I'm not sure I understood.  Go back over

09:53:09  5   what occurred at Frost Bank.

09:53:14  6            THE WITNESS:  Yes, sir.  They entered a room, and the

09:53:18  7   gold was in a safe deposit box.  And the gold was brought out

09:53:22  8   of the safe deposit.

09:53:24  9            THE COURT:  How did the gold get to the safe deposit

09:53:28  10  box?

09:53:29  11           THE WITNESS:  Cory Ticknor would periodically make a

09:53:31  12  deposit to the safe deposit box.

09:53:33  13           THE COURT:  So Cory Ticknor got the wire transfer and

09:53:36  14  started buying gold bullion.  And, as he would get it, he would

09:53:39  15  take it to safety deposit box at Frost?

09:53:41  16           THE WITNESS:  Yes, sir.

09:53:42  17           THE COURT:  And then on September the 29th, 1995,

09:53:48  18  Mr. Murray and Mr. Karr and Mr. Waters went to Frost Bank?

09:53:56  19           THE WITNESS:  Mr. Murray and -- Mr. Murray went in

09:53:59  20  the bank, and Mr. Karr and Mr. Waters sat outside the bank.

09:54:03  21           MR. HARDING:  Your Honor, if I may break it down so

09:54:05  22  that the testimony is clear about where the evidence comes

09:54:08  23  from?

09:54:08  24           THE COURT:  That would be fine.  I just wanted to get

09:54:10  25  that sequence down.

09:54:11  1              THE WITNESS:  Sure.

09:54:12  2   Q.   (BY MR. HARDING) The evidence at trial, you would agree

09:54:14  3   with me, was that Mr. Murray was alone in the bank, he was

09:54:19  4   alone upon leaving the bank.  Neither Mr. Ticknor nor the

09:54:24  5   security guard noticed other people sort of hovering over or

09:54:27  6   watching.  Is that fair to say?

09:54:30  7   A.   That's correct.

09:54:30  8   Q.   The information that Mr. Waters and Mr. Karr accompanied

09:54:34  9   Mr. Murray to the bank comes from David Waters' 2001 statement?

09:54:39 10   A.   Correct.

09:54:39 11   Q.   Okay.

09:54:40 12              MR. HARDING:  Is that ...

09:54:41 13              MS. WILLIAMS:  Judge, if I could just ask two

09:54:44 14   questions about this to clarify?

09:54:46 15              THE COURT:  You may.

09:54:48 16              MS. WILLIAMS:  The security guard who was there was a

09:54:51 17   San Antonio police officer, correct?

09:54:53 18              THE WITNESS:  Correct.

09:54:54 19              MS. WILLIAMS:  In a San Antonio police officer

09:54:55 20   uniform?

09:54:55 21              THE WITNESS:  Yes.

09:54:56 22              MS. WILLIAMS:  With a gun and a police radio,

09:54:57 23   correct?

09:54:57 24              THE WITNESS:  Yes.

09:54:59 25              MS. WILLIAMS:  Thank you.

09:55:02  1    Q.    (BY MR. HARDING) On that point, Mr. -- Mr. Waters was

09:55:04  2    asked about that particular fact during his interview.  Did he

09:55:08  3    explain why he believed Jon Murray didn't do anything?

09:55:11  4    A.    Because his -- his mother and his niece were being held

09:55:16  5    captive at the La Quinta.

09:55:19  6    Q.    And, similarly, when asked why Jon Murray didn't do

09:55:22  7    something to call attention to himself in New Jersey, the same

09:55:27  8    explanation was given, correct?

09:55:29  9    A.    Correct.

09:55:29  10   Q.    Okay.  So Jon Murray, disheveled, smells bad, he gets some

09:55:40  11   gold coins from Cory Ticknor on that day.  Does he get all

09:55:44  12   600,000?

09:55:45  13   A.    No, sir, he did not.

09:55:46  14   Q.    Why not?

09:55:47  15   A.    It had not arrived yet.  It arrived the following Monday.

09:55:51  16   Q.    But Mr. Murray elected or was forced to go get it before

09:55:58  17   it was all there.  Is that a fair characterization?

09:56:01  18   A.    Whatever means -- whatever other reason why they went,

09:56:06  19   they went to get it, and apparently the money was not there.  I

09:56:08  20   don't know if they had any conversation about how much was

09:56:11  21   actually there.

09:56:12  22   Q.    Okay.  So now Jon Murray has the gold coins.  At some

09:56:18  23   point does he transfer custody of those to David Waters and

09:56:21  24   Gary Karr -- or David Waters, anyway.

09:56:22  25   A.    Yes, sir.

MARTIN - DIRECT                                         36

09:56:23  1  Q.   And we know that in part because the testimony of Patti Jo

09:56:28  2  Steffens is:  David Waters says that he has a half-million

09:56:32  3  dollars in gold coins in the Burnet Storage unit; is that

09:56:37  4  right?

09:56:37  5  A.   Correct.

09:56:37  6  Q.   Okay.  So now that the -- now that Mr. Karr and Mr. Waters

09:56:41  7  and Mr. Fry have the gold and after everyone returns to the

09:56:47  8  La Quinta, what happens next?

09:56:51  9  A.   Well ...

09:56:51 10  Q.   Let me pause.  What did the Mr. Waters say happened next

09:56:54 11  in 2001?

09:56:55 12  A.   They entered the room, and -- in two separate rooms.  The

09:57:02 13  first room was where Jon Murray was kept, and the second room

09:57:07 14  was where Madalyn and Robin were kept, and they proceeded to

09:57:11 15  kill Mr. Murray O'Hair.

09:57:13 16  Q.   And Mr. Murray was restrained at this time, according to

09:57:17 17  Mr. Waters?

09:57:18 18  A.   He was what?  I'm sorry.

09:57:19 19  Q.   Restrained?

09:57:20 20  A.   Yes.  He was restrained.

09:57:22 21  Q.   Can you describe for the Court, according to Mr. Waters,

09:57:24 22  how he, Mr. Karr, and Mr. Fry killed Jon Murray.

09:57:29 23  A.   They -- they strangled him with a belt, or they tried to

09:57:33 24  strangle him with a belt, and then they also put a plastic bag

09:57:36 25  over his head and suffocated him.

| | | |
|---|---|---|
| 09:57:38 | 1 | Q.   Okay.  Did they indicate -- did Mr. Waters indicate that |
| 09:57:41 | 2 | Jon Murray, a big man, fought hard? |
| 09:57:43 | 3 | A.   Yes.  In fact, yes, he struck his head apparently on |
| 09:57:47 | 4 | the -- the night table that's in between the beds, and he |
| 09:57:52 | 5 | flailed, I'm sure.  Adrenaline kicked in. |
| 09:57:55 | 6 | Q.   Well, I don't want you to imagine what happened.  I want |
| 09:57:58 | 7 | Mr. Waters claimed -- |
| 09:57:59 | 8 | A.   Correct. |
| 09:57:59 | 9 | Q.   -- there was a hard fight? |
| 09:58:00 | 10 | A.   Exactly. |
| 09:58:01 | 11 | Q.   But, ultimately, the three men were able to overcome him |
| 09:58:05 | 12 | and kill him? |
| 09:58:05 | 13 | A.   Yes. |
| 09:58:06 | 14 | Q.   After Jon Murray was dead, according to Mr. Waters, what |
| 09:58:08 | 15 | happened with respect to Madalyn Murray O'Hair and Robin Murray |
| 09:58:12 | 16 | O'Hair? |
| 09:58:12 | 17 | A.   They went into the other room, and Gary Karr killed -- |
| 09:58:18 | 18 | strangled Robin, and he and David Waters and Danny Fry |
| 09:58:25 | 19 | strangled Madalyn Murray O'Hair. |
| 09:58:27 | 20 | Q.   And according to Mr. Waters, he and Danny Fry used the |
| 09:58:31 | 21 | same belt to strangle Madalyn? |
| 09:58:34 | 22 | A.   Yes. |
| 09:58:34 | 23 | Q.   And, again, fair to say Madalyn was shouting and |
| 09:58:38 | 24 | struggling, according to Mr. Waters? |
| 09:58:40 | 25 | A.   Yes. |

MARTIN - DIRECT                                                    38

09:58:40   1   Q.   Mr. Karr, strangling Robin, according to Mr. Waters, did

09:58:46   2   that also entail a struggle?

09:58:49   3   A.   Yes, it did.

09:58:50   4   Q.   At one point did Mr. Waters grow concerned at how -- how

09:58:55   5   much there was a struggle that the neighbors might hear it?

09:58:57   6   A.   Correct.

09:58:58   7   Q.   Because Robin was kicking against the neighboring wall.

09:59:02   8   Is that what he said?

09:59:03   9   A.   Correct.

09:59:05  10         MR. HARDING:   Okay.   Next slide, please.

09:59:13  11   Q.   So that's according to trial testimony and according to

09:59:16  12   David Waters' statement.   That all occurs on September 29th?

09:59:20  13   A.   Correct.

09:59:21  14   Q.   What happens -- and now this is all going to be based on

09:59:25  15   David Waters' statement and inferences from trial testimony.

09:59:29  16   But primarily in terms of firsthand accounting from

09:59:32  17   David Waters, how do the O'Hairs' bodies wind up in the

09:59:41  18   Chico Osborne Public Storage unit?

09:59:44  19   A.   Okay.   They moved the bodies from the La Quinta out the

09:59:47  20   back side of La Quinta that evening, and then they brought the

09:59:52  21   bodies to the Central Texas -- Central Park Apartments, left it

09:59:57  22   in their van that Mr. Waters -- I mean, Mr. Karr had rented,

10:00:01  23   and overnight the bodies were there in the parking lot.

10:00:05  24   Q.   They weren't -- were they covered?

10:00:08  25   A.   Covered?

MARTIN - DIRECT                                                    39

10:00:09   1   Q.   Wrapped up in something?

10:00:10   2   A.   Yes.

10:00:11   3   Q.   Not just bodies in the van?

10:00:13   4   A.   Right.  They were just covered up.

10:00:15   5   Q.   The following day, according to rental unit access records

10:00:22   6   as well as the statement of David Waters, what happens with the

10:00:25   7   Public Storage unit rented by Chico Osborne?

10:00:29   8   A.   The bodies were taken there and dismembered.  There were

10:00:34   9   ins and outs at the time.  You can see from the following that

10:00:40   10  there was time that the van was returned to Capps Rental Van.

10:00:47   11  And then somebody entered back into the -- the Public Storage

10:00:52   12  unit, and they stayed there for a while.  Sometimes they were

10:00:56   13  there for an hour or more.

10:00:58   14  Q.   And according to both the government's theory of the case

10:01:01   15  at trial, but also the statement of Mr. Waters, the purpose of

10:01:06   16  that second van rented by Gary Karr was to move the body to

10:01:11   17  that storage unit?

10:01:12   18  A.   Correct.

10:01:13   19  Q.   And, in fact, on the 30th, as I think you mentioned, that

10:01:16   20  van was returned?

10:01:17   21  A.   It is returned, yes.

10:01:18   22  Q.   Its purpose has been served.

10:01:21   23       Focusing only -- I believe only on the testimony or

10:01:25   24  statement of David Waters in 2001, can you describe who cut up

10:01:31   25  the bodies and why.

| | | |
|---|---|---|
| 10:01:32 | 1 | A.    Yes.  To easily transport the bodies, they dismembered the |
| 10:01:39 | 2 | bodies, removed the legs, put them in a barrel so they could be |
| 10:01:43 | 3 | transported without any kind of concern.  And that was done by |
| 10:01:47 | 4 | Mr. Fry and Mr. Karr. |
| 10:01:49 | 5 | Q.    And why did Mr. Karr wind up doing this -- what |
| 10:01:54 | 6 | transaction or conversation occurred between Mr. Waters and |
| 10:01:58 | 7 | Mr. Karr that led to that outcome? |
| 10:02:00 | 8 | A.    There was money involved as far as, if you do this work, |
| 10:02:04 | 9 | then you'll get more money out of it. |
| 10:02:07 | 10 | Q.    David waters said -- |
| 10:02:09 | 11 | A.    Yes. |
| 10:02:09 | 12 | Q.    Or according to David Waters -- |
| 10:02:11 | 13 | A.    Yes. |
| 10:02:11 | 14 | Q.    -- Gary Karr said he would do it for $25,000? |
| 10:02:14 | 15 | A.    Yes. |
| 10:02:15 | 16 | Q.    In terms of the barrels -- you said they were placed in |
| 10:02:19 | 17 | barrels.  Again, based on the statement of David Waters, these |
| 10:02:22 | 18 | are barrels that Mr. Karr and Mr. Fry obtained at some time |
| 10:02:26 | 19 | unknown to Mr. Waters? |
| 10:02:29 | 20 | A.    Yes.  He just showed up with the barrels at once. |
| 10:02:33 | 21 | Q.    And Mr. Waters, according to his statement, wasn't |
| 10:02:36 | 22 | tremendously pleased with that because the barrels weren't in |
| 10:02:39 | 23 | great shape and they weren't airtight.  And he just was |
| 10:02:42 | 24 | concerned that there was going to be a smell and concerns of |
| 10:02:45 | 25 | that sort? |

| | | |
|---|---|---|
| 10:02:45 | 1 | A.   Leakage, yes.  Uh-uh. |

A.   Leakage, yes.  Uh-uh.

Q.   After -- and so we're going to convert back to trial testimony at this point.  Patti Jo Steffens testifies that there's about a 30-day period when -- let me take a step back.

Danny Fry had been living with David Waters since about July.  Is that fair to say?

A.   Correct.

Q.   And Mr. Karr arrived in Austin and was staying with Mr. Waters shortly -- in the end of August?

A.   At the end of August.

Q.   So Patti Jo Steffens describes a period of time, about 30 days, beginning with the disappearance of the O'Hairs, when they're not around much?

A.   Correct.

Q.   I believe she testified she saw them occasionally, once or twice, during that period of time.  But, for the most part, they're gone?

A.   Correct.

Q.   And the first time she sees them after that 30-day period all together, can you describe how she described Mr. Waters' Mr. Karr's and Mr. Fry's appearance and demeanor?

A.   Mr. Fry and Mr. Karr -- I'm sorry Mr. Waters and Mr. Karr were amicable, friendly, and Danny Fry seemed to be on the outs.  David Waters was a bit short with him, apparently.

Q.   And she testified that David -- Danny Fry looked, and I

10:04:08  1  quote, horror-stricken; is that right?

10:04:10  2  A.   Correct.

10:04:10  3  Q.   This is consistent with what Mr. Waters said about

10:04:14  4  Danny Fry's reaction; is that right?

10:04:17  5  A.   Yes.

10:04:18  6  Q.   In his 2001 statement?

10:04:20  7  A.   Yes.

10:04:20  8  Q.   Can you describe for the Court what Mr. Waters said in

10:04:23  9  2001 about how Danny Fry reacted and what actions he and

10:04:28 10  Mr. Karr took?

10:04:29 11  A.   I'm sorry.  At this point I don't recall.

10:04:30 12  Q.   Okay.  Did he describe that Mr. Fry was squeamish and not

10:04:36 13  happy about what had happened?

10:04:38 14  A.   Sure.  Yes.

10:04:38 15  Q.   Did that give -- according to Mr. Waters, did that give

10:04:43 16  him and Mr. Karr concern about Danny Fry's overall involvement

10:04:47 17  now?

10:04:47 18  A.   Yes, it did.

10:04:49 19  Q.   What -- what decision did they reach at that time

10:04:52 20  regarding Danny Fry?

10:04:53 21  A.   Danny Fry had to go.

10:04:56 22  Q.   By "had to go," you mean they had to kill him?

10:04:58 23  A.   They had to kill him, yes.

10:05:03 24  Q.   Let's -- if we could jump ahead, let's talk about the last

10:05:09 25  day of Danny Fry's life, as far as the trial testimony and the

10:05:12   1   statement of David Waters go.

10:05:14   2          He described a phone call that Mr. Fry made on

10:05:19   3   September 30th of 1995?

10:05:21   4   A.   Yes.  His daughter was having her 16th birthday party,

10:05:27   5   Sweet 16 birthday, and he called her and told her, in effect,

10:05:31   6   that he was coming home and was going to take her on a big

10:05:33   7   shopping spree, and that he would be leaving.

10:05:38   8   Q.   So, according to this phone call -- this is her testimony

10:05:40   9   at trial by the way -- he's saying he's going to be coming home

10:05:46  10   around this period of time?

10:05:48  11   A.   Correct.

10:05:48  12   Q.   Had he previously sent a letter to his brother through his

10:05:52  13   girlfriend or wife regarding this scheme?

10:05:56  14   A.   Yes, he did.

10:05:57  15   Q.   And in this letter did he say something to the effect of,

10:06:02  16   "If I'm found dead, David Waters did it"?

10:06:05  17   A.   In effect.

10:06:06  18   Q.   That's a summary based on a recollection from Bob Fry.  Is

10:06:10  19   that fair to say?

10:06:11  20   A.   That's correct.

10:06:12  21   Q.   Okay.  After this phone call on September 30th, does

10:06:17  22   Danny Fry make his way home?

10:06:20  23   A.   No.

10:06:20  24   Q.   According to David Waters' statement in 2001, what happens

10:06:29  25   with Danny Fry?  What is his eventual fate, and how does he

10:06:35   1   reach it?

10:06:35   2   A.    They drove him up to the Dallas area looking for a place

10:06:39   3   to put the bodies.   That's their scheme.   And in the process

10:06:44   4   came up a place, apparently off the Trinity River, walked him

10:06:47   5   into it, and, as he proceeded in front of them, David Waters

10:06:51   6   moved Mr. Karr over, took to his nine-millimeter, and shot

10:06:55   7   Mr. Fry in the back of the head and killed him.

10:06:57   8   Q.    So a couple of things here.   First of all, you said sort

10:06:59   9   of their scheme was this.   Do you mean that -- what do you mean

10:07:04  10   by that was their scheme, that they were going to look for a

10:07:06  11   place to hide the bodies?

10:07:09  12   A.    That was the ruse that they -- they were in his Camaro.   I

10:07:12  13   mean, it's a small car.   And that's how they got him into the

10:07:15  14   car, to go and make this decision as to where they're going to

10:07:19  15   bury the bodies.

10:07:20  16   Q.    So Danny Fry is being told we need to find a place to hide

10:07:24  17   these bodies, but Mr. Karr and Mr. Waters have an ulterior

10:07:28  18   motive.   Is that what you're saying?

10:07:30  19   A.    Correct.

10:07:30  20   Q.    Secondly, you mentioned that they take Mr. Fry out to a

10:07:33  21   remote location, they send him on ahead.   Mr. Waters kind of

10:07:38  22   moves Mr. Karr aside and then shoots Danny Fry.   Is that your

10:07:41  23   testimony?

10:07:42  24   A.    Correct.

10:07:42  25   Q.    In fairness, Mr. Waters didn't always say that?

| | | |
|---|---|---|
| 10:07:49 | 1 | A.   Right. |
| 10:07:49 | 2 | Q.   His first version of events was that Mr. Karr killed |
| 10:07:52 | 3 | Mr. Fry; is that right? |
| 10:07:53 | 4 | A.   That's correct. |
| 10:07:53 | 5 | Q.   And he explained one of the reasons he sort of made that |
| 10:07:57 | 6 | up was because he was resentful of Mr. Karr claiming he had no |
| 10:08:02 | 7 | knowledge of any of this to the police? |
| 10:08:03 | 8 | A.   Correct. |
| 10:08:04 | 9 | Q.   And, again, in fairness, Mr. Waters' statement, there are |
| 10:08:09 | 10 | inconsistencies in it? |
| 10:08:11 | 11 | A.   Inconsistent, yes. |
| 10:08:12 | 12 | Q.   It's not 100 percent consistent all the time? |
| 10:08:15 | 13 | A.   Correct. |
| 10:08:16 | 14 | Q.   He admitted that he made some things up? |
| 10:08:18 | 15 | A.   Correct. |
| 10:08:19 | 16 | Q.   His timelines sometimes, you know, were not 100 percent. |
| 10:08:23 | 17 | He had to be, you know, oriented to certain other events.  He |
| 10:08:26 | 18 | didn't have a perfect memory of everything that happened.  Is |
| 10:08:30 | 19 | that fair? |
| 10:08:31 | 20 | A.   That's correct. |
| 10:08:32 | 21 | Q.   Okay.  According to -- according to Mr. Fry, in 2001 -- |
| 10:08:42 | 22 | excuse me.  According to Mr. Waters, in 2001, what happened |
| 10:08:46 | 23 | after Mr. Waters shot Danny Fry? |
| 10:08:49 | 24 | A.   They left the scene at that point in time thinking that -- |
| 10:08:55 | 25 | it was apparently at night.  And so they left the scene at that |

10:08:58  1   point in time, thinking that somebody might have heard the

10:09:00  2   shot.  And so then they came back later, and then they

10:09:03  3   dismembered Mr. Fry.

10:09:04  4   Q.   When you say "they," did Mr. Waters identify who actually

10:09:09  5   did the dismembering?

10:09:11  6   A.   Well, he was there with Mr. Karr, but Mr. Karr did the

10:09:14  7   dismembering.

10:09:15  8   Q.   And in terms of dismembering, it was Mr. Fry's head and

10:09:19  9   hands were removed; is that right?

10:09:21  10  A.   Correct.

10:09:22  11  Q.   And the purpose of that was?

10:09:24  12  A.   So that the bodies couldn't be identified.

10:09:26  13  Q.   According to Mr. Waters' statement, what happens with the

10:09:30  14  body, and what happens with the head and hands?

10:09:33  15  A.   The body was stripped and laid -- just laid there on the

10:09:37  16  ground, and the head and hands were put into a bag and put in

10:09:44  17  the back -- in the back, I guess, wheel well the Camaro.

10:09:49  18  Q.   And, ultimately, that's transported back to the Public

10:09:53  19  Storage unit as well?

10:09:54  20  A.   It was then taken back to the Public Storage unit and then

10:10:02  21  put in the barrels with the O'Hairs' remains.

10:10:05  22  Q.   Looking at slide 24, can you describe for the Court what

10:10:09  23  we're looking at in slide 24?

10:10:11  24  A.   Yeah.  This is the wooded area in which the bodies -- the

10:10:15  25  body of Danny Fry was found.  It's a tributary to the Trinity

| | | |
|---|---|---|
| 10:10:21 | 1 | River, and that's where someone responded and told Dallas |
| 10:10:27 | 2 | County Sheriff's Office that there was a body there. |
| 10:10:30 | 3 | Q.   And that body was found on October 2nd, 1995; is that |
| 10:10:34 | 4 | right? |
| 10:10:34 | 5 | A.   Yes. |
| 10:10:35 | 6 |      MR. HARDING:  Go to the slide 25, please. |
| 10:10:37 | 7 | Q.   What are we looking at in slide 25, particularly towards |
| 10:10:40 | 8 | to top of the screen? |
| 10:10:41 | 9 | A.   Yes.  That's a rendition or picture of Danny Fry's body |
| 10:10:46 | 10 | without a head, and the hands -- you can't see the hands |
| 10:10:49 | 11 | either.  But that's what happened there. |
| 10:10:51 | 12 |      MR. HARDING:  Go to the next slide, please. |
| 10:10:53 | 13 | A.   Yes. |
| 10:10:54 | 14 | Q.   This was an exhibit that was not admitted at trial because |
| 10:10:58 | 15 | the defense objected that it was too prejudicial, and |
| 10:11:00 | 16 | Judge Sparks agreed.  But what is depicted in what's shown here |
| 10:11:04 | 17 | as, sort of, Government's Exhibit 24, not actually admitted, on |
| 10:11:08 | 18 | slide 26? |
| 10:11:09 | 19 | A.   That's the head and hand -- head- and handless body of |
| 10:11:14 | 20 | Danny Fry. |
| 10:11:16 | 21 |      MR. HARDING:  All right.  Go to the next slide, |
| 10:11:18 | 22 | please. |
| 10:11:18 | 23 | Q.   So, if I understand your testimony correctly, at this |
| 10:11:21 | 24 | point the storage unit has not only the O'Hairs' remains in it |
| 10:11:31 | 25 | that were cut up by Mr. Karr and Mr. Fry, but also Mr. Fry's |

| | | |
|---|---|---|
| 10:11:37 | 1 | head and hands? |
| 10:11:37 | 2 | A.   Yes. |
| 10:11:37 | 3 | Q.   At this point, what does Mr. Karr do with respect to a |
| 10:11:38 | 4 | third van? |
| 10:11:39 | 5 | A.   Do? |
| 10:11:40 | 6 | Q.   A third van. |
| 10:11:41 | 7 | A.   Oh, a third van.  He rents a third van. |
| 10:11:43 | 8 | Q.   And that was on October 2nd -- |
| 10:11:45 | 9 | A.   Yes. |
| 10:11:46 | 10 | Q.   -- the same day that Danny Fry's body is found; is that |
| 10:11:49 | 11 | right? |
| 10:11:49 | 12 | A.   Yes.  Correct. |
| 10:11:50 | 13 | Q.   Again, in his own name? |
| 10:11:52 | 14 | A.   Yes. |
| 10:11:52 | 15 | Q.   Was this a cargo van or passenger van? |
| 10:11:54 | 16 | A.   Another cargo van. |
| 10:11:55 | 17 | Q.   This van that was rented on October 2nd is returned on |
| 10:11:59 | 18 | October 3rd, right? |
| 10:12:00 | 19 | A.   Correct. |
| 10:12:06 | 20 | Q.   The body of Danny Fry that was discovered on October 2nd |
| 10:12:10 | 21 | headless and handless, was it immediately identified? |
| 10:12:13 | 22 | A.   No.  It was not identified until a year later. |
| 10:12:16 | 23 | Q.   Okay.  In fact, the DNA analysis was in 1999; is that |
| 10:12:19 | 24 | correct? |
| 10:12:21 | 25 | A.   Yes. |

MARTIN - DIRECT                                49

10:12:22   1   Q.   So that's almost four years later?

10:12:23   2   A.   Uh-huh.

10:12:23   3   Q.   Shortly before Mr. Karr's trial?

10:12:25   4   A.   Correct.

10:12:25   5   Q.   So, according to Mr. Waters' statement in 2001, a portion

10:12:39   6   of Mr. Karr's statement to police, and subsequently discovered

10:12:44   7   evidence, what happens during the trip between the Public

10:12:49   8   Storage unit and Camp Wood, Texas?

10:12:54   9   A.   Mr. Karr accompanied Mr. Waters to Camp Wood to -- they

10:13:00  10   loaded the barrels from Public Storage and drove to Camp Wood

10:13:05  11   from Austin.

10:13:10  12   Q.   And can you describe for the Court -- we'll see some

10:13:14  13   photographs in a minute.  But what kind of property is

10:13:16  14   Camp Wood?  What is the character and sort of description of

10:13:19  15   Camp Wood, Texas?

10:13:20  16           THE COURT:  Let me interject a question here also.

10:13:23  17           THE WITNESS:  Sure.

10:13:23  18           THE COURT:  Where is Camp Wood?  What county is it in

10:13:26  19   and --

10:13:26  20           THE WITNESS:  Uvalde.

10:13:26  21           THE COURT:  -- and how would you get there?

10:13:26  22           THE WITNESS:  Uvalde County, sir.

10:13:26  23           THE COURT:  No.  Don't interrupt.  Let me finish,

10:13:28  24   please.

10:13:28  25           How would you get there?  Just describe what you

MARTIN - DIRECT                                                    50

10:13:31   1   would do.

10:13:32   2            THE WITNESS:  Okay.  Well, there are two ways of

10:13:35   3   getting there.  You can go I-35 through Uvalde to get there, or

10:13:38   4   you can go through Hill Country -- Bandera, Leakey, that

10:13:41   5   area -- and go through it there and get there.

10:13:43   6            THE COURT:  So it's outside Uvalde?

10:13:45   7            THE WITNESS:  Yes, sir.

10:13:46   8            THE COURT:  Okay.

10:13:46   9   Q.   (BY MR. HARDING) And I don't remember offhand, but it's a

10:13:48  10   couple of hundred miles?  Is that too far?

10:13:52  11   A.   It would be a couple of hundred miles.  It's on -- the

10:13:55  12   property is at the Real-Uvalde County line, right there on the

10:14:01  13   river.

10:14:02  14   Q.   Okay.  So could you describe what the property is that

10:14:05  15   we're talking about?

10:14:06  16   A.   Yes.  It's about 5,000 acres of land.  At the time we

10:14:10  17   thought it was a -- a friend's ranch, but it wound up being --

10:14:13  18   the bodies were actually on another ranch.  But they were all

10:14:17  19   related.

10:14:17  20   Q.   Is this a rural -- very rural area?

10:14:23  21   A.   Yes.  Very rural.  Caliche rock, sheep country is what it

10:14:29  22   was.

10:14:30  23   Q.   Not a lot of artificial lighting at night or anything like

10:14:32  24   that?  very dark at night?

10:14:34  25   A.   Very dark at night.

10:14:35  1   Q.   So, according to some trial testimony, some of Mr. Waters

10:14:41  2   statement, and some subsequently discovered evidence by law

10:14:44  3   enforcement, what happens out there at Camp Wood with Mr. Karr

10:14:49  4   and Mr. Waters?

10:14:50  5   A.   Okay.  They drove to Camp Wood.  They entered this

10:14:56  6   property in which they had the key -- the combination to the

10:14:59  7   lock at the front gate.  And they drove into the property and

10:15:05  8   got past three gates.  And they found a spot, which it's very

10:15:12  9   difficult to dig in, but they found a spot to dig in to create

10:15:17  10  a grave site.

10:15:18  11  Q.   And in terms of going to this location and finding this

10:15:24  12  location, Patti Jo Steffens helped David Waters find it or sort

10:15:28  13  of brokered the introduction that allowed them to find it; is

10:15:32  14  that correct?

10:15:32  15  A.   Yes.  She was attending bar at the Poodle Dog Lounge

10:15:35  16  across from the Burnet Storage.  And she had a person that she

10:15:39  17  knew there, and that person let her have access to the

10:15:42  18  property.

10:15:44  19        MR. HARDING:  If we could jump ahead to slide 31

10:15:47  20  quickly.

10:15:47  21  A.   Yes.

10:15:48  22  Q.   What are we looking at here in slide 31?

10:15:51  23  A.   Slide 31 is an aerial view.  After we did search warrants

10:15:55  24  in Chicago, Austin, and Walled Lake, we went to -- came back to

10:16:06  25  Austin.  The FBI took us up in a plane, and that's a picture

| | | |
|---|---|---|
| 10:16:10 | 1 | from the plane what was described in Mr. Karr's map that he had |
| 10:16:16 | 2 | drawn for us. |
| 10:16:16 | 3 | Q.   So Mr. Karr drew a map -- Mr. Karr was interviewed in 1999 |
| 10:16:23 | 4 | or 2000, is that right, prior to his trial? |
| 10:16:26 | 5 | A.   '99, yes. |
| 10:16:27 | 6 | Q.   And he, in addition to giving a statement, he drew a map |
| 10:16:30 | 7 | purporting to be where the bodies were? |
| 10:16:33 | 8 | A.   Correct. |
| 10:16:33 | 9 | Q.   And could you describe -- I think you may just have, but |
| 10:16:38 | 10 | can you describe how accurate that map was in comparison to |
| 10:16:42 | 11 | where the bodies were ultimately found? |
| 10:16:44 | 12 | A.   It was very, very, very appropriate.  This yellowed-in |
| 10:16:49 | 13 | section, you can see like a circle here on the left of the |
| 10:16:51 | 14 | roadway, that's a caliche mound, and that mound of caliche was |
| 10:16:56 | 15 | used, of course, to resurface the roads.  But at the same time, |
| 10:17:00 | 16 | that mound was very significant to where we found the bodies |
| 10:17:02 | 17 | ultimately when we did. |
| 10:17:05 | 18 |          MR. HARDING:  And if we could go to the next slide, |
| 10:17:06 | 19 | please. |
| 10:17:06 | 20 |          MR. ALDREDGE:  Your Honor, may we take a quick |
| 10:17:08 | 21 | five-minute break? |
| 10:17:09 | 22 |          THE COURT:  Well, I was going to break at 10:30 |
| 10:17:12 | 23 | anyway, so we'll go ahead and take that break a little early |
| 10:17:15 | 24 | and be in recess for 15 minutes. |
| 10:17:17 | 25 |     (Recess) |

10:40:35    1      (Open court)

10:40:35    2           THE COURT:  Mr. Harding, you may continue your

10:40:36    3  direct-examination of the witness.

10:40:40    4           MR. HARDING:  Thank you, Your Honor.

10:40:44    5  Q.   Mr. Martin, we've been talking about a statement given by

10:40:48    6  David Waters in 2001 throughout this testimony, correct?

10:40:51    7  A.   Correct.

10:40:52    8  Q.   Can you describe for the Court the circumstances under

10:40:54    9  which Mr. Waters made that statement.

10:40:58   10  A.   Yes.  It was a decision by Mr. Waters to enter a plea.  We

10:41:06   11  were going to -- he had been indicted in October.  We were

10:41:10   12  going to go to trial in January of 2001.  And during that

10:41:17   13  period of time, through negotiations, he decided that he would

10:41:20   14  plea, and we debriefed him.

10:41:22   15  Q.   So let's talk about -- because I know Mr. Waters had a

10:41:28   16  bunch of charges at the time.  Let's talk about what he pled to

10:41:32   17  for his role in this case.

10:41:33   18  A.   Yes, sir.

10:41:34   19  Q.   What was his plea agreement there?

10:41:36   20  A.   His plea on what particular count?

10:41:38   21  Q.   I'm sorry.  With respect to this case only, what was

10:41:44   22  Mr. Waters' agreed sentence or plea agreement?

10:41:46   23  A.   It was that he plead to 20 years on -- I think it was the

10:41:51   24  Hobbs Act.  I'm not sure exactly.

10:41:53   25  Q.   Sure.  But, ultimately, Mr. Waters was going to do

10:41:57   1   20 years for this case?

10:41:58   2   A.   Yes.  And that was to be stacked on the other things that

10:42:00   3   he had in his previous past.

10:42:02   4   Q.   Right.  Which is what I wanted to talk about.  You

10:42:03   5   mentioned earlier he had a gun case -- a federal gun case?

10:42:06   6   A.   Yes.

10:42:06   7   Q.   Do you recall what his sentence was in that case?

10:42:09   8   A.   Eight years.

10:42:11   9   Q.   And that was going to be consecutive to the 20 in this

10:42:14  10   case, is your understanding?

10:42:15  11   A.   Yes.

10:42:16  12   Q.   Mr. Waters was also facing a substantial state sentence at

10:42:19  13   the time; is that correct?

10:42:20  14   A.   Correct.

10:42:21  15   Q.   What was that sentence?

10:42:22  16   A.   Based on the three strikes rule, he was to get 60 years in

10:42:26  17   state prison.

10:42:26  18   Q.   Sixty, as in six-zero?

10:42:28  19   A.   Yes, sir.

10:42:28  20   Q.   And your understanding, again, was that that was going to

10:42:31  21   be -- or I should say the federal sentences were going to run

10:42:35  22   consecutive to that 60-year state sentence?

10:42:37  23   A.   Yes.  The state was going to be after he served his time

10:42:41  24   in federal prison.

10:42:41  25   Q.   I'm sorry.  He would start in federal prison and then go

| | | |
|---|---|---|
| 10:42:44 | 1 | to the state? |
| 10:42:45 | 2 | A.   Yes.  That was part of the reason:  He wanted to get out |
| 10:42:48 | 3 | of the state system and get into the federal system. |
| 10:42:50 | 4 | Q.   So any way you slice it, Mr. Waters is going to -- his |
| 10:42:54 | 5 | aggregate sentence was going to be pretty substantial? |
| 10:42:57 | 6 | A.   Substantial. |
| 10:42:58 | 7 | Q.   But, again, with respect to this case, he agreed to |
| 10:43:01 | 8 | 20 years and a debrief; is that right? |
| 10:43:04 | 9 | A.   Yes.  And a disclosure of where the bodies were buried. |
| 10:43:08 | 10 | Q.   Okay.  And so we've referred to various parts of the |
| 10:43:12 | 11 | conversation throughout this testimony, which I believe is |
| 10:43:15 | 12 | attachment 5 to the sentencing memorandum.  Fair to say that's |
| 10:43:21 | 13 | maybe a 12-hour conversation you had with Mr. Waters, |
| 10:43:25 | 14 | thereabouts? |
| 10:43:25 | 15 | A.   It's probably over that. |
| 10:43:27 | 16 | Q.   Okay. |
| 10:43:27 | 17 | A.   It's two days. |
| 10:43:28 | 18 | Q.   During the period of time he's giving a statement he also |
| 10:43:32 | 19 | takes investigators to the burial site; is that correct? |
| 10:43:35 | 20 | A.   Yes.  After that. |
| 10:43:36 | 21 | Q.   After the statement was over? |
| 10:43:38 | 22 | A.   Yes. |
| 10:43:38 | 23 | Q.   Okay.  Can you describe the circumstances or describe what |
| 10:43:43 | 24 | happened when you got there and what you did. |
| 10:43:45 | 25 | A.   Yeah.  The -- Mr. Waters was, of course, in custody at the |

```
10:43:49   1    time.  And two Bureau agents had him in tow, and we went to the

10:43:54   2    property.

10:43:54   3                THE COURT:  Stop just a minute here.  I want to back

10:43:57   4    up a little bit, because when I read everything that we have

10:44:00   5    here, I believe, if I looked at all of this correctly -- and I

10:44:06   6    did go over all of it -- there had been a search for the bodies

10:44:09   7    based on the statements that Mr. Karr had given, but the bodies

10:44:13   8    were not found.  Let's go to those initial searches, then we

10:44:18   9    have the interjection of Mr. Waters' statement, and then that

10:44:21   10   search.

10:44:21   11               MR. HARDING:  Yes, sir.

10:44:22   12   Q.  So, as described earlier, Mr. Karr during his statement to

10:44:26   13   law enforcement, drew a map for you-all purporting to show

10:44:32   14   where the bodies were, correct?

10:44:33   15   A.  Correct.

10:44:33   16   Q.  And, ultimately, as events proved out, it was a very

10:44:37   17   accurate map?

10:44:38   18   A.  Very accurate.

10:44:39   19   Q.  Nevertheless, describe for the Court the attempts that

10:44:42   20   were made to search for the bodies and the results?

10:44:44   21   A.  Yes.  We executed a search warrant on what we thought was

10:44:47   22   this property and wound up being not the property.  So

10:44:50   23   Mr. Carruth and I went and talked to the landowner and got a

10:44:53   24   consent searched, so we searched this property.

10:44:55   25               We used ground search radar, we used cadaver dogs,
```

10:45:01  1  and that was Easter Sunday, I think, of 1999.  And we didn't

10:45:05  2  find anything at that point in time.

10:45:07  3  Q.   This was a multi-day search?

10:45:08  4  A.   Multi-day search, yes.

10:45:10  5  Q.   Was there a second subsequent search between that first

10:45:13  6  one and the one that occurred after Mr. Waters' statement?

10:45:16  7  A.   There were two others instances that we went there, and

10:45:20  8  then finally the one that Mr. Waters took us to where the

10:45:23  9  bodies were buried and tried to identify.

10:45:27  10       MR. HARDING:  Could we move to the next slide,

10:45:28  11  please.

10:45:29  12  Q.   That would be January 27th of 2001; is that correct?

10:45:31  13  A.   Correct.

10:45:32  14  Q.   What's depicted here in this slide?

10:45:35  15  A.   This is the general area to show where the bodies -- or

10:45:38  16  the area in which the bodies were buried.  And the cadaver dog

10:45:44  17  that we had with us went over this area after Mr. Karr --

10:45:47  18  Mr. Waters identified the general area, and come to find out

10:45:51  19  this -- this information or these -- this spot here was

10:45:54  20  directly across or a little bit across from this caliche mound

10:45:58  21  that we were talking about.  So this is where the bodies were

10:46:01  22  buried.  The cadaver dog hit on a spot, the FBI probed the

10:46:07  23  spot, and next thing you know we're digging up and we find a

10:46:10  24  femur.

10:46:12  25       MR. HARDING:  This is slide 32 for the record.  If we

MARTIN - DIRECT                                                    58

10:46:15   1   could move to slide 33, please.

10:46:17   2   Q.    Describe what we're looking at in slide 33, sir.

10:46:20   3   A.    Yes.  This is the site of the bodies and the removal of

10:46:24   4   the body parts.  This is -- I think that part right there would

10:46:28   5   be Dr. Glass removing Madalyn Murray O'Hair's skull.

10:46:35   6            MR. HARDING:  And if we could move to the next slide,

10:46:37   7   please.

10:46:38   8   Q.    What are we looking at in slide 34?

10:46:40   9   A.    Yes.  This is Madalyn Murray O'Hair laying in the grave.

10:46:44   10  And the reason why I know that is because -- you can't see it

10:46:46   11  on the screen, but before where this head is down here, the

10:46:49   12  white portion, there is a hip replacement that I was able to

10:46:53   13  identify at Brackenridge Hospital as her having.  So that's how

10:46:59   14  we identified Madalyn Murray O'Hair.

10:47:01   15  Q.    And, ultimately, the O'Hairs were identified not only

10:47:05   16  through distinguishing marks like that, but dental records and

10:47:08   17  things of that nature, correct?

10:47:10   18  A.    Correct, yes.

10:47:10   19            MR. HARDING:  If we could move o the next slide.

10:47:11   20  Q.    What are we looking at here in slide 35, I believe it is?

10:47:13   21  A.    That's the skull and remains of Danny Fry.

10:47:16   22  Q.    Also.  Found in the same burial spot as the O'Hairs?

10:47:21   23  A.    Yes.

10:47:21   24  Q.    Consistent with the information given to you by

10:47:24   25  David Waters?

```
10:47:25   1   A.    Correct.

10:47:26   2   Q.    And then slide 36, same thing, correct?

10:47:29   3   A.    Correct.

10:47:40   4             MR. HARDING:  Mr. Martin, thank you very much.

10:47:42   5   Judge, we will pass the witness.

10:47:43   6             THE COURT:  Cross-examination?

10:47:45   7             MS. WILLIAMS:  Judge, is it okay if I use this

10:47:46   8   podium?  I can't see Mr. Martin from that podium.

10:47:49   9             THE COURT:  You can come to that podium so you can

10:47:52  10   see him.

10:47:53  11             MS. WILLIAMS:  All right.

10:47:55  12                      CROSS-EXAMINATION

10:47:55  13   BY MS. WILLIAMS:

10:47:55  14   Q.    Mr. Martin, you know me.  We've done there before,

10:47:57  15   correct --

10:47:57  16   A.    Correct.

10:47:58  17   Q.    -- at the trial?

10:48:00  18             Let me -- I just want to clear up an inconsistency to

10:48:05  19   start with.  This map that you testified that Gary Karr drew,

10:48:09  20   that's not actually correct, is it?  Mr. Karr didn't draw the

10:48:13  21   map.

10:48:13  22   A.    No.  My understanding is Mr. Karr drew the map.

10:48:16  23   Q.    Were you there?

10:48:17  24   A.    No.  Mr. --

10:48:19  25   Q.    Do you --
```

MARTIN - CROSS                                    60

10:48:19   1              THE COURT:  No.  Let him finish his answer before you

10:48:20   2   ask the next question.

10:48:22   3   Q.   (BY MS. WILLIAMS) Okay.  This is a yes-or-no question.

10:48:23   4   Were you there?

10:48:24   5   A.   No.  Not at the time.

10:48:25   6   Q.   Okay.  Do you recall the testimony at trial -- you sat

10:48:28   7   through the trial testimony, did you not?

10:48:31   8   A.   Do I recall what at the testimony?  I'm sorry.

10:48:32   9   Q.   You sat through the trial testimony, did you not?

10:48:34  10   A.   Oh, yes.  Yes, ma'am.

10:48:36  11   Q.   You recall the testimony at trial, there was some

10:48:38  12   confusion because I thought that Mr. Karr drew the map.  But,

10:48:41  13   in fact, Detective Bjorklund, who was there at the time that he

10:48:45  14   was questioned, actually drew the map.  Do you not remember

10:48:48  15   that?

10:48:48  16   A.   No, I don't.

10:48:49  17   Q.   All right.  Do you take issue with my recollection of the

10:48:52  18   facts?

10:48:53  19   A.   If that's what the transcript says, that's all I can say.

10:48:58  20   Q.   Okay.  You never offered to take Gary Karr to look for the

10:49:04  21   bodies, did you?

10:49:05  22   A.   No.

10:49:06  23   Q.   I want to talk a little bit about this statement that

10:49:09  24   you've testified about, Mr. Waters' statement.  I think you

10:49:13  25   just told us that it lasted two days -- more than 12 hours,

MARTIN - CROSS                                            61

| | | |
|---|---|---|
| 10:49:20 | 1 | correct? |
| 10:49:20 | 2 | A.    Correct. |
| 10:49:21 | 3 | Q.    You've told us that David Waters was resentful of |
| 10:49:25 | 4 | Gary Karr? |
| 10:49:28 | 5 | A.    That's what he said, yes. |
| 10:49:29 | 6 | Q.    And resentful of Patti Jo Steffens? |
| 10:49:31 | 7 | A.    Yes. |
| 10:49:31 | 8 | Q.    He was angry about statements that they had made leading |
| 10:49:35 | 9 | up to and during this trial? |
| 10:49:38 | 10 | A.    I don't recall that. |
| 10:49:40 | 11 | Q.    All right.  You also told us that there were |
| 10:49:48 | 12 | inconsistencies in this statement, do you recall? |
| 10:49:49 | 13 | A.    Yes. |
| 10:49:50 | 14 | Q.    Did you detail those inconsistencies for anyone? |
| 10:49:53 | 15 | A.    No.  We were not able to get to those inconsistencies. |
| 10:49:58 | 16 | Q.    What does that mean? |
| 10:49:59 | 17 | A.    That means at the -- at the end of the second day, |
| 10:50:02 | 18 | Mr. Waters decides he does not want to talk anymore. |
| 10:50:06 | 19 | Q.    Okay.  Well, have you listened to the tapes since then? |
| 10:50:09 | 20 | A.    Yes. |
| 10:50:10 | 21 | Q.    Did you at that time make note of the inconsistencies of |
| 10:50:15 | 22 | the statement of David Waters? |
| 10:50:16 | 23 | A.    No, I did not. |
| 10:50:18 | 24 | Q.    All right.  At the time that David Waters gave this |
| 10:50:24 | 25 | statement, he was facing, I think we just heard, eight years in |

10:50:27  1  federal custody plus sixty years in state custody?

10:50:31  2  A.   Correct.

10:50:31  3  Q.   Now, to be fair, sixty years in state custody on a theft

10:50:35  4  charge is probably six years.   Agreed?

10:50:40  5  A.   I don't know those numbers.

10:50:41  6  Q.   Isn't it true that one of David Waters' main motivations

10:50:49  7  for agreeing to a plea in federal court and agreeing to debrief

10:50:53  8  with you and other agents was his desire to get out of state

10:50:57  9  custody?

10:50:57  10  A.   Correct.

10:50:58  11  Q.   And that was part of the plea bargain?

10:51:00  12  A.   That's what I understood.

10:51:01  13  Q.   All right.   So, in addition to what you told Mr. Harding,

10:51:08  14  the agreement was a twenty-year sentence, he would debrief, and

10:51:12  15  he would do his time in federal custody first?

10:51:16  16  A.   That's my understanding, yes.

10:51:18  17  Q.   All right.   Did the debrief take place after the plea?

10:51:27  18  A.   After the what?

10:51:28  19  Q.   After the plea.

10:51:30  20  A.   I'm not sure the timing.   I'm just not sure what the

10:51:37  21  timing was.

10:51:37  22  Q.   All right.   At the time that he gave his statement, he

10:51:41  23  also admitted to a murder that took place in Illinois; is that

10:51:46  24  correct?

10:51:46  25  A.   He was questioned about it.   I don't know if he -- I don't

10:51:49   1   recall if he actually said that he had done it.

10:51:52   2   Q.   You don't recall?

10:51:53   3   A.   I don't recall it.

10:51:54   4   Q.   With regard to David Waters' statements about how the

10:52:09   5   O'Hairs were killed or who killed them or who dismembered them,

10:52:15   6   there is no way to corroborate that, correct?

10:52:18   7   A.   No.  I mean, the only two parties would have been there --

10:52:23   8   everybody else is dead -- would be Mr. Karr and Mr. Waters.

10:52:26   9   Q.   That's correct.  And so he can say whatever he wants to at

10:52:29  10   that point?

10:52:29  11   A.   Right.  But I think there were circumstantial things that

10:52:33  12   allowed these to fit what was happening.

10:52:35  13   Q.   Well, there were certain things about where things

10:52:39  14   happened that could be corroborated, correct?

10:52:41  15   A.   Correct.  And we did.

10:52:42  16   Q.   There were certain -- but as to who did what, there is no

10:52:47  17   way to corroborate that?

10:52:48  18   A.   No.

10:52:49  19   Q.   As to his -- what you've testified today as to Waters'

10:53:01  20   statement about how and where Danny Fry was killed, that's

10:53:06  21   absolutely incorrect, though, isn't it?

10:53:11  22   A.   Absolutely incorrect?  I don't think so.

10:53:12  23   Q.   Well, do you not recall that the Dallas Sheriff's

10:53:16  24   Department did an extensive investigation into the death of

10:53:19  25   Danny Fry?

MARTIN - CROSS                                             64

10:53:20   1   A.   I did not have access to that.  That wasn't something that

10:53:24   2   meant anything to me at that point in time.

10:53:26   3   Q.   Did you -- after David Waters' statement, did you go back

10:53:29   4   and try to corroborate whether or not that part of it could

10:53:32   5   have been true?

10:53:33   6   A.   No, I did not.

10:53:34   7   Q.   Do you recall that Detective Bjorklund testified that

10:53:37   8   there were no bullets, no casings, no bullet fragments found at

10:53:43   9   that location, despite an extensive search?

10:53:47  10   A.   I think he did say that, yes.

10:53:49  11   Q.   Do you recall that there was no blood evidence there?

10:53:51  12   A.   There was no blood evidence, which is odd.

10:53:54  13   Q.   So it's absolutely impossible for Danny Fry to have been

10:53:59  14   shot and dismembered at the location where his body was found,

10:54:02  15   correct?

10:54:03  16            MR. HARDING:  I'll object to argumentative, Judge.

10:54:06  17            THE COURT:  Overruled.

10:54:07  18            You may answer the question.

10:54:08  19   A.   I have no way of knowing.  All I can say is that there is

10:54:12  20   an absence of blood.  As far as a shell casing, I don't know

10:54:16  21   anything about that.  Obviously, there was a bullet in the back

10:54:19  22   of the head because the bullet hole was coming out the front of

10:54:22  23   the head -- the skull.  We have it.

10:54:23  24   Q.   And you don't think that would create any blood evidence?

10:54:26  25   A.   I would think it would.

MARTIN - CROSS                                          65

10:54:27   1   Q.   And wouldn't you think that dismembering the head and the
10:54:32   2   hands of someone, even after they were dead, would create blood
10:54:35   3   evidence?
10:54:35   4   A.   I would think it would.
10:54:36   5   Q.   But there wasn't any there, was there?
10:54:38   6   A.   As far as I would told, there was not.  I did not look at
10:54:41   7   any reports, so I don't know about that.
10:54:43   8   Q.   There was trial testimony about that, do you recall?
10:54:45   9   A.   I mean, the trial was a long time ago, ma'am.
10:54:47  10   Q.   It was a long time ago, wasn't it?
10:54:49  11   A.   I don't know.  Yeah.
10:55:03  12   Q.   Both David Waters and Gary Karr were arrested March 25th
10:55:07  13   of 1999, correct?
10:55:08  14   A.   Yes.
10:55:08  15   Q.   And after that time the government, of which you were a
10:55:13  16   part of that team, made the decision to first indict and try
10:55:17  17   Gary Karr?
10:55:18  18   A.   Correct.
10:55:18  19   Q.   You've already testified that there was no opportunity --
10:55:22  20   Gary Karr was never given an opportunity to show you where the
10:55:25  21   bodies were, correct, to take you there?
10:55:29  22   A.   That's correct.
10:55:29  23   Q.   David Waters had a previous probation in the state case
10:55:37  24   that had to do with the O'Hairs?
10:55:39  25   A.   Yes.

```
10:55:40   1   Q.   And then prior to his federal sentencing, he was sentenced

10:55:43   2   in that case on a revocation to sixty years?

10:55:46   3   A.   Yes.

10:55:46   4   Q.   But the victims of that case was -- the victim in that

10:55:49   5   case was Madalyn Murray O'Hair?

10:55:52   6   A.   Yes.

10:55:52   7   Q.   And the Atheist Organization?

10:55:54   8   A.   Right.

10:55:54   9   Q.   David Waters was the mastermind of this plot, no doubt?

10:55:58  10   A.   No doubt, yes.

10:55:59  11   Q.   You've testified today that Gary Karr was a bit player,

10:56:04  12   correct?

10:56:04  13   A.   Well, he was his right-hand man.

10:56:06  14   Q.   Did you not just testify under oath about 30 minutes ago

10:56:10  15   that Gary Karr was a bit player?

10:56:13  16   A.   Well, that word was a slip.

10:56:14  17   Q.   Did you use that word?

10:56:15  18   A.   I used the word.

10:56:16  19   Q.   All right.  So the government decided to try the little

10:56:21  20   fish to get to the big fish, right?

10:56:24  21   A.   I would say -- I wouldn't say a little fish.  I'll say a

10:56:29  22   person who is involved as deeply as the person.  It's just that

10:56:33  23   they're not in charge.

10:56:35  24   Q.   Well, he wasn't the mastermind, correct?

10:56:38  25   A.   Yeah.  But average --
```

MARTIN - CROSS                          67

10:56:39   1   Q.   Right?

10:56:40   2   A.   Yes, ma'am.

10:56:41   3   Q.   All right.

10:56:41   4          THE COURT:  Don't interrupt one another.  Let him

10:56:44   5   finish --

10:56:44   6          MS. WILLIAMS:  Yes, sir.

10:56:44   7          THE COURT:  -- and then you can start your next

10:56:45   8   question, Ms. Williams.

10:56:47   9   A.   What I was going to say is every general needs people to

10:56:50  10   help him, and that's what you have here.

10:56:52  11   Q.   Fair enough.

10:56:55  12          The government didn't like the result of Gary Karr's

10:56:57  13   trial?

10:56:58  14   A.   I have no -- I have no idea where that comes from.  Was

10:57:02  15   that a question or a statement.

10:57:03  16   Q.   That was a question.

10:57:05  17   A.   The government didn't have any opinion.  We had -- we won

10:57:09  18   the case.  Mr. Waters -- I mean, Mr. Karr was sentenced, and

10:57:13  19   that was it.  We proceeded to then pursue Mr. Waters.

10:57:19  20   Q.   So after -- in 2001 the government made a deal with

10:57:25  21   David Waters that, if he'd showed you the bodies, admit to

10:57:30  22   these four murders, you would agree to transfer him to state --

10:57:33  23   to federal custody from state custody and give him twenty

10:57:37  24   years?

10:57:37  25   A.   That's what the government agreed to, as far as I know.

10:57:40   1   Q.   All right.  Do you recall that David Waters also was

10:57:56   2   implicated in two other previous murders, including one of

10:57:59   3   his -- an ex-wife?

10:58:01   4   A.   I remember seeing an article about that, yes.

10:58:03   5   Q.   There was no questions about that at the debrief?

10:58:05   6   A.   No.  It was not a major concern at that point in time.  We

10:58:09   7   were concerned about the Madalyn Murray O'Hair case.

10:58:13   8   Q.   I want to go back just to one detail of this statement.

10:58:21   9   You've testified that David Waters was inconsistent and that

10:58:24  10   there were lots of times when you would have to discuss things

10:58:32  11   that you knew of that were facts with him and kind of bring him

10:58:36  12   back to what -- what you thought reality was?

10:58:38  13   A.   Yes.  That's part of what we had to do.

10:58:41  14   Q.   And one of those -- was one of those the fact that the

10:58:45  15   trial testimony had shown that the van that had been rented

10:58:51  16   couldn't have been driven to Dallas to deposit the body of

10:58:56  17   Danny Fry because the mileage didn't permit that.  Do you

10:59:00  18   remember that?

10:59:02  19   A.   All I can say about that is that my understanding is they

10:59:05  20   went in the Camaro, not in the van.

10:59:07  21   Q.   That's correct.  That's where I wanted to get.  Whose

10:59:11  22   Camaro was it?

10:59:12  23   A.   David Waters'.

10:59:12  24   Q.   Okay.  Did he first tell you that they went in a van?

10:59:15  25   A.   I don't recall.  I don't think -- he may have, but we knew

10:59:19   1   that he went in the Camaro.

10:59:20   2   Q.   How did you know he went in the Camaro?

10:59:22   3   A.   Because he later told us that when they cut the head and

10:59:26   4   hands of Danny Fry off, they put the head and hands in the back

10:59:29   5   seat of the Camaro and that they were concerned that they'd get

10:59:32   6   stopped by the police because they may have had a flat tire and

10:59:36   7   somebody would see what was in there.

10:59:38   8   Q.   And that somehow in your mind corroborated that it was the

10:59:41   9   Camaro?

10:59:42  10   A.   Yes.  And also at that point in time, the second van had

10:59:54  11   been returned and the third van was -- the third van was rented

11:00:07  12   on the 2nd of October, which is after Danny Fry was dead.

11:00:13  13                MS. WILLIAMS:  I don't have anything further.

11:00:14  14                MR. HARDING:  Nothing further from the government,

11:00:16  15   Judge.

11:00:17  16                THE COURT:  All right.  You may step down.

11:00:23  17                THE WITNESS:  Thank you.  And I think we've got an

11:00:28  18   open door for you, Mr. Martin.  You don't have to test your

11:00:31  19   agility.

11:00:32  20                THE COURT:  Mr. Harding, other witnesses for the

11:00:34  21   government?

11:00:34  22                MR. HARDING:  No, Your Honor.

11:00:35  23                THE COURT:  Does the defense have any witnesses to

11:00:37  24   present?

11:00:40  25                MR. ALDREDGE:  No, Your Honor.

| 11:00:41 | 1 | THE COURT: All right. Are you ready to argue? |
| 11:00:47 | 2 | MR. HARDING: Yes, Your Honor. |
| 11:00:48 | 3 | THE COURT: All right. Let me run through a few |
| 11:00:51 | 4 | preliminary things, then. As the record previously reflected, |
| 11:00:59 | 5 | we're here today for a resentencing in this case. The |
| 11:01:02 | 6 | defendant, Gary Paul Karr, was originally sentenced on |
| 11:01:07 | 7 | August the 17th, 2000 by Judge Sparks after having been found |
| 11:01:13 | 8 | guilty on counts two, three, four, and five of a five-count |
| 11:01:19 | 9 | indictment. He was acquitted on count one. That sentence was |
| 11:01:24 | 10 | vacated by Judge Sparks as to counts two and three on which the |
| 11:01:32 | 11 | defendant had been sentenced to life imprisonment on each of |
| 11:01:36 | 12 | those counts. He was sentenced to 115 months on counts four |
| 11:01:41 | 13 | and five, those sentences to run concurrently. |
| 11:01:48 | 14 | After Judge Sparks vacated the sentences on counts |
| 11:01:53 | 15 | two and three, he retired from the bench -- although I believe |
| 11:02:00 | 16 | his official term is "inactive senior status," and I'm not |
| 11:02:06 | 17 | really certain what that means. But I think if you want to put |
| 11:02:09 | 18 | too fine a point on it, it wasn't actually retirement -- and |
| 11:02:13 | 19 | the case found its way to me, and that's how I have ended up |
| 11:02:19 | 20 | conducting this resentencing hearing. |
| 11:02:23 | 21 | Let me ask Mr. Karr, and he can answer from there: |
| 11:02:30 | 22 | Mr. Karr, have you had sufficient time to review the revised |
| 11:02:36 | 23 | presentence investigation report, the last revision being |
| 11:02:40 | 24 | March the 2nd of 2021, in this case with your lawyers? |
| 11:02:51 | 25 | THE DEFENDANT: Yes. |

| | | |
|---|---|---|
| 11:02:53 | 1 | THE COURT:  Do you understand that under the |
| 11:02:56 | 2 | guidelines established by the United States Sentencing |
| 11:02:59 | 3 | Commission, which are advisory to this Court, the probation |
| 11:03:02 | 4 | department has computed your total offense level as 43 and your |
| 11:03:09 | 5 | criminal history category as five.  And so with regard to |
| 11:03:17 | 6 | counts two and three, that means that I could sentence you to |
| 11:03:22 | 7 | 480 months confinement in the Bureau of Prisons, if I determine |
| 11:03:27 | 8 | that a guideline sentence was an appropriate sentence to |
| 11:03:29 | 9 | impose, a term of supervised release of three years on each of |
| 11:03:36 | 10 | counts two and three, a fine of $1,183,132, restitution in the |
| 11:03:45 | 11 | amount of $541,266.79, and a special assessment of $50 for |
| 11:03:58 | 12 | count two and $50 for count three, for a total special |
| 11:04:01 | 13 | assessment of $100? |
| 11:04:03 | 14 | THE DEFENDANT:  Yes, Your Honor.  I understand that. |
| 11:04:24 | 15 | But I paid the assessment. |
| 11:04:26 | 16 | THE COURT:  I understand.  Whatever the credits are, |
| 11:04:29 | 17 | the credits are. |
| 11:04:31 | 18 | THE DEFENDANT:  Yes, sir. |
| 11:04:32 | 19 | THE COURT:  But we're resentencing on both of the |
| 11:04:34 | 20 | counts.  So do you also understand that under the statute under |
| 11:04:39 | 21 | which you were convicted on counts one and two, I could |
| 11:04:43 | 22 | sentence you to 20 years confinement in the Bureau of Prisons |
| 11:04:47 | 23 | on count two, 20 years confinement in the Bureau of Prisons on |
| 11:04:50 | 24 | count three, a term of supervised release of three years on |
| 11:04:55 | 25 | each of counts two and three, a fine of $1,183,132, restitution |

11:05:05  1    in the amount of $541,266.79, and, again, a special assessment

11:05:12  2    of $50 per count for a total special assessment of $100, which

11:05:17  3    I do understand you've already paid.  But do you understand I

11:05:20  4    could sentence you to those items?

11:05:22  5                   THE DEFENDANT:  Yes, sir.

11:05:23  6                   THE COURT:  Does the government have objection to the

11:05:25  7    presentence investigation report?

11:05:26  8                   MR. HARDING:  No, Your Honor.

11:05:28  9                   THE COURT:  Does the defendant have objection to the

11:05:30  10   presentence investigation report?

11:05:34  11                  MR. ALDREDGE:  Yes, Your Honor.

11:05:35  12                  THE COURT:  All right.  Mr. Aldredge, do you desire

11:05:37  13   to be heard on your objections?

11:05:43  14                  MR. ALDREDGE:  I do, Your Honor.  Your Honor,

11:05:46  15   briefly.  Ms. Williams will make argument on the facts.

11:05:54  16                  We have objected to the cross-reference that's

11:05:57  17   suggested by the PSR on the basis of both factual insufficiency

11:06:02  18   and that it's in violation of the United States Constitution.

11:06:06  19                  While the constitutional objection is foreclosed, we

11:06:10  20   raise it for possible future review.  I would note, Your Honor,

11:06:15  21   as we pointed out in our amended sentencing memorandum, there

11:06:20  22   are a number of circuit judges around the country that have

11:06:24  23   expressed their dissatisfaction and disagreement with the rule

11:06:29  24   of *Watts v. United States*.  There are at least three current

11:06:35  25   Supreme Court Justices that have likewise expressed their

11:06:40  1    displeasure with that rule, including Justice Thomas, and then

11:06:47  2    Judges Kavanaugh and Gorsuch when they were circuit judges.

11:06:54  3              THE COURT:  And *Watts* states what?

11:06:58  4              MR. ALDREDGE:  Well, *Watts* states that -- it was a

11:07:00  5    divided court that held taking acquitted conduct into account

11:07:04  6    at sentencing did not offend the double jeopardy clause of the

11:07:08  7    Fifth Amendment.  That was the issue there.  Nonetheless, since

11:07:15  8    then, numerous courts of appeals have assumed that *Watts*

11:07:19  9    controls the outcome of both Fifth and Sixth Amendment

11:07:23  10   challenges to the use of acquitted conduct at sentencing.

11:07:26  11             And according to numerous circuit judges and a

11:07:35  12   dissent from denial of cert. in 2014 in *Jones v. United States*,

11:07:41  13   Justice Scalia, writing for himself and Justices Thomas and

11:07:47  14   Ginsburg, said:  No.  That, in fact, *Watts* was limited to the

11:07:49  15   double jeopardy clause of the Fifth Amendment; that it in fact

11:07:54  16   did not control the outcome of the issue of whether it would

11:07:59  17   violate the due process clause of the Fifth Amendment or the

11:08:03  18   Sixth Amendment right to jury trial.  And we have cited the

11:08:08  19   *Jones v. United States* cert. petition denial.

11:08:13  20             I would point out, Your Honor, that there was a case

11:08:16  21   in the 2019 term in the Supreme Court, *Asaro v. United States*

11:08:23  22   *of America*.  The cert. denial was at 140 S.C. 1104 in 2020.

11:08:31  23   It's Number 19-107 under the Supreme Court docket.

11:08:35  24             That petition was filed in July of '19 and spent

11:08:39  25   seven months at the Supreme Court, as the Supreme Court asked

| 11:08:42 | 1 | for briefing and there were numerous amicus briefs filed.  And |

11:08:42  1  for briefing and there were numerous amicus briefs filed.  And

11:08:48  2  then, ultimately, seven months later, in February of '20, the

11:08:52  3  court denied cert.

11:08:53  4        I can tell you that, as we indicated in our amended

11:08:59  5  sentencing memorandum, there has been a push in the

11:09:04  6  United States Congress to pass a bill prohibiting the

11:09:06  7  sentencing on acquitted conduct.  And, as a matter of fact,

11:09:11  8  last -- after I filed my sentencing memorandum, we found out

11:09:15  9  that -- it looks like this is an article from *Law 360* last

11:09:18  10  Friday.  Evidently, last Thursday on the 4th, Senators Durbin

11:09:25  11  and Grassley reintroduced the same bill they had introduced in

11:09:29  12  2019.  Again, it was a bill to bar judges from considering

11:09:34  13  acquitted conduct at sentencing.

11:09:36  14        So, while it is -- the issue is foreclosed, we

11:09:44  15  believe that it is a -- there is growing momentum among the

11:09:51  16  judiciary, among the Congress, to ban it.  We believe that it

11:09:57  17  is a suspect practice that shouldn't be followed in this case,

11:10:00  18  especially when it changes so dramatically the sentencing

11:10:05  19  guideline.  And so our position is that, while the legal

11:10:13  20  objection may be foreclosed, all of the concerns that have been

11:10:16  21  raised in the judiciary should inform this Court's analysis and

11:10:21  22  perspective about the accuracy and validity of the facts that

11:10:26  23  the government wants the Court to rely on and the factual

11:10:35  24  conclusions, given how remote they are, given that the Court

11:10:38  25  hasn't had the opportunity to see the witnesses, and given how

| | |
|---|---|
| 11:10:41 | 1 |
| 11:10:45 | 2 |
| 11:10:54 | 3 |
| 11:10:58 | 4 |
| 11:11:03 | 5 |
| 11:11:14 | 6 |
| 11:11:18 | 7 |
| 11:11:19 | 8 |
| 11:11:21 | 9 |
| 11:11:21 | 10 |
| 11:11:25 | 11 |
| 11:11:30 | 12 |
| 11:11:34 | 13 |
| 11:11:37 | 14 |
| 11:11:38 | 15 |
| 11:11:42 | 16 |
| 11:11:47 | 17 |
| 11:11:50 | 18 |
| 11:11:53 | 19 |
| 11:11:58 | 20 |
| 11:12:01 | 21 |
| 11:12:06 | 22 |
| 11:12:10 | 23 |
| 11:12:15 | 24 |
| 11:12:20 | 25 |

1  dramatically they raise the sentencing guidelines in this case.

2          Your Honor, it is simply the case that the government

3  wants you to second-guess the jury's verdict in this case.  And

4  there just isn't the information to do that.  You have the

5  self-serving, changing statements, in part lies, conflicted

6  statements that eventually came around to a version that the

7  government settled on.

8          THE COURT:  For right now be restricted to your

9  objections.

10          MR. ALDREDGE:  All right.  The objection is factual

11  sufficient -- insufficiency, and I've made my argument that it

12  violates the due process clause of the Fifth Amendment and the

13  Sixth Amendment right to a jury trial to apply the

14  cross-section of the case.

15          Now, there's also a factual insufficiency component

16  to it that I'll let Ms. Williams address.

17          THE COURT:  Now.  Because I want to take up the

18  objections now, and then we'll see where we're going with that.

19          MS. WILLIAMS:  So, Judge, I mean, I think I made

20  clear on my cross-examination, I mean, the government decided

21  to now go back to the well after the fact, without any

22  cross-examination, without any really determination about

23  corroboration or any idea of the truthfulness of Mr. Waters'

24  statement and has taken it now as the gospel truth.  Not the

25  trial testimony and not anything else, but whatever

11:12:23   1   David Waters said.

11:12:24   2              THE COURT:  Now, why is that an objection to the

11:12:28   3   presentence investigation report as opposed to an argument you

11:12:31   4   would make on what sentence I should impose?

11:12:34   5              MS. WILLIAMS:  Just that the -- the facts that is

11:12:38   6   legally insufficient to make determination for purposes of the

11:12:42   7   sentencing guidelines.

11:12:47   8              THE COURT:  Because they are now at this sentencing

11:12:53   9   hearing putting on evidence from a subsequent interview of

11:12:56   10  Mr. Waters that occurred after the trial and sentencing the

11:13:01   11  first time?

11:13:02   12             MS. WILLIAMS:  That's correct.  After the trial; that

11:13:04   13  it was not attempted to be corroborated; and that Mr. Waters --

11:13:08   14  I mean, it can't be corroborated because Mr. Waters has been

11:13:11   15  dead -- I think I said 16, but I think, accurately, it's 18

11:13:14   16  years.

11:13:15   17             THE COURT:  Thank you.  Anything further?

11:13:18   18             MS. WILLIAMS:  No, Judge.

11:13:19   19             THE COURT:  Mr. Harding, the government's argument as

11:13:21   20  to the objections?  And all I'm dealing with right now is the

11:13:25   21  objections.

11:13:26   22             MR. ALDREDGE:  Your Honor, if I may, I'm sorry.

11:13:29   23  agent Martin did -- Mr. Martin doesn't recall from the

11:13:35   24  documents that the government's provided us in discovery that

11:13:39   25  Mr. Waters admitted to a -- subsequent to the two-day interview

11:13:46  1   admitted to another murder in Illinois.  And that's part of the

11:13:50  2   discovery that the government has provided us.  In addition to

11:13:54  3   which he was suspected in two other murders, including two

11:13:58  4   women, one of whom was an ex-wife of his.

11:14:01  5          So I just -- I put that out there.  The government

11:14:03  6   doesn't object to my proffering that.  It was in the discovery

11:14:09  7   the government provided us for resentencing, and it goes to the

11:14:12  8   credibility of the secondhand testimony from Mr. Waters.

11:14:17  9          THE COURT:  All right.  Thank you.  Now Mr. Harding.

11:14:20 10          MR. HARDING:  Judge, this is a little bit tricky

11:14:23 11   because they've brought in facts, and, of course, I would argue

11:14:28 12   there's a larger argument, the facts.  But I'll try to limit it

11:14:31 13   to just the objections.

11:14:32 14          With respect on the legal objection Mr. Aldredge

11:14:35 15   concedes is foreclosed, in addition to the cases that he cited,

11:14:42 16   *United States v. Grace*, which is a 2016 Fifth Circuit case.

11:14:47 17   It's an unpublished case.  It's 640 F. App'x 298.  They address

11:14:53 18   a very similar challenge.  And just citing to the denial of

11:14:58 19   cert. in *Jones* and things of that nature.

11:15:00 20          But they point out that *United States v. Melancon*,

11:15:03 21   which is 662 F.3d 708, from 713 to 714, Fifth Circuit 2011,

11:15:13 22   controls and controls the notion that *Watts* still applies and

11:15:18 23   controls the issue and forecloses that argument.

11:15:21 24          With respect to just the general principle of the

11:15:26 25   facts of Mr. Waters' statement shouldn't be considered by this

| | | |
|---|---|---|
| 11:15:29 | 1 | Court at all, which I believe is what Ms. Williams is |
| 11:15:33 | 2 | essentially arguing, that flies in the face of 18 USC 3661.  It |
| 11:15:39 | 3 | flies in the face of the sentencing guidelines, Section 1B1.4. |
| 11:15:44 | 4 | Thirteen -- excuse me -- 3661 states in part that no limitation |
| 11:15:48 | 5 | may be placed on the information concerning the background, |
| 11:15:51 | 6 | character, and conduct of a person convicted of an offense |
| 11:15:57 | 7 | which a court of the United States may receive and consider for |
| 11:15:59 | 8 | the purpose of imposing an appropriate sentence. |
| 11:16:01 | 9 | Obviously, Your Honor is in the position of having to |
| 11:16:04 | 10 | weigh the credibility.  And you may well decide that |
| 11:16:09 | 11 | Mr. Waters' statement isn't credible.  But that doesn't mean -- |
| 11:16:12 | 12 | I believe the law requires you to at least consider it.  And I |
| 11:16:16 | 13 | believe that's sufficient to defeat the legal and factual |
| 11:16:21 | 14 | objections raised by the defense. |
| 11:16:23 | 15 | THE COURT:  Mr. Aldredge, Ms. Williams, your |
| 11:16:25 | 16 | objections.  Do you want to respond? |
| 11:16:29 | 17 | MR. ALDREDGE:  Your Honor, what we have said and, in |
| 11:16:33 | 18 | particular, what Ms. Williams has said, is that we're not |
| 11:16:38 | 19 | denying any admissibility at sentencing of really any |
| 11:16:43 | 20 | information, including Mr. Martin's summary of the Waters |
| 11:16:48 | 21 | statement. |
| 11:16:49 | 22 | What we're saying is that it's insufficient to meet |
| 11:16:54 | 23 | the government's burden to support the cross-reference to the |
| 11:16:57 | 24 | murder guideline; that it is not sufficient to overcome what |
| 11:17:04 | 25 | should be the presumption of reliability of the jury's verdict |

| | | |
|---|---|---|
| 11:17:08 | 1 | in this case.  So that's the objection. |
| 11:17:10 | 2 | THE COURT:  All right.  Mr. Harding, I'll hear from |
| 11:17:12 | 3 | you on that, and then you-all will still get the last word.  I |
| 11:17:16 | 4 | want this fully developed. |
| 11:17:17 | 5 | MR. HARDING:  Judge, I have plenty of lengthy |
| 11:17:19 | 6 | argument about why the cross-reference should apply.  And if |
| 11:17:21 | 7 | you want to hear that now, it will also encompass what I think |
| 11:17:24 | 8 | the appropriate sentence is in Mr. Karr's case. |
| 11:17:26 | 9 | THE COURT:  Since it's linked to the objections, I |
| 11:17:30 | 10 | want to deal with the objections now. |
| 11:17:31 | 11 | MR. HARDING:  Okay. |
| 11:17:31 | 12 | THE COURT:  And I will hear from you on that |
| 11:17:33 | 13 | regardless of how lengthy it is. |
| 11:17:35 | 14 | MR. HARDING:  Sure.  I'll try to keep it brief. |
| 11:17:38 | 15 | Contrary to what the defense is suggesting, we are not merely |
| 11:17:41 | 16 | relying on the statement of Mr. Waters to prove up the |
| 11:17:45 | 17 | cross-reference to the murder guideline. |
| 11:17:49 | 18 | It is undisputed that the O'Hairs have -- were taken |
| 11:17:53 | 19 | to the Warren Inn for a period of over a month and had over |
| 11:17:58 | 20 | six -- almost 700,000 -- well, almost $700,000 taken from them, |
| 11:18:03 | 21 | and that money wound up in the pockets of Mr. Karr, Mr. Waters, |
| 11:18:07 | 22 | Mr. Fry, their loved ones, and, ultimately, some coin thiefs |
| 11:18:13 | 23 | who ended up stealing all the coins out of the storage unit. |
| 11:18:17 | 24 | THE COURT:  Let me ask an aside from maybe you or |
| 11:18:20 | 25 | Agent Martin.  Were those people ever apprehended? |

```
11:18:24   1              MR. HARDING:  They were, and they testified at trial.
11:18:26   2              THE COURT:  Okay.
11:18:27   3              MR. HARDING:  And they testified -- and Ms. Williams
11:18:29   4   will remember this more than I do.  But they testified -- and
11:18:31   5   Mr. Martin would -- they disbursed something in the
11:18:35   6   neighborhood of $400,000 or more than that.  They said they
11:18:39   7   basically sold off the coins over time.
11:18:42   8              But they testified, and that's in fact one of the
11:18:45   9   reasons we know that the coins wound up in that Burnet Road
11:18:48  10   Storage unit, beyond the statements of Mr. Waters, is that
11:18:52  11   these kids -- I think they were kids -- all came in and
11:18:54  12   testified we kind of just -- we were in the business of
11:18:57  13   knocking over storage units.  We mad a master code.  An, lo and
11:19:01  14   behold, one day we hit the mother lode and we took 500 grand in
11:19:03  15   coins.
11:19:03  16              THE COURT:  Couldn't believe their good fortune.
11:19:08  17              MR. HARDING:  Yeah.  They sure did.
11:19:10  18              But that being said, Judge, the question before the
11:19:12  19   Court in terms of applying the cross-reference is:  There are
11:19:16  20   two theories of liability by which Mr. Karr will be held --
11:19:20  21   should be held accountable under the guidelines for the murders
11:19:23  22   of the O'Hairs and Danny Fry.
11:19:25  23              One is whether if he personally was involved in some
11:19:29  24   way.  His personal involvement doesn't meant that he had to be
11:19:33  25   doing the killing.  But if he aided, abetted, counseled and so
```

11:19:36  1    on, the language from 1B1.3, if he was involved in a direct

11:19:41  2    way, whether or not he actually killed anyone, he's responsible

11:19:45  3    for his acts in bringing those -- that result about.

11:19:49  4          And there's plenty of circumstantial evidence that he

11:19:52  5    was directly involved.  First, as Agent Martin testified to, he

11:19:58  6    and Mr. Waters were friends.  They were friends in prison

11:20:03  7    before this happened.  They were friends while this happened.

11:20:06  8    He was living with Mr. Waters during this period of time.  They

11:20:10  9    remained friends and associated after this ended.

11:20:13  10          The trial transcript shows Ron Waters, David's

11:20:16  11   brother, describing in 1999 that David Waters was hanging out

11:20:20  12   with Gary Karr at their house.  They had an ongoing

11:20:23  13   relationship of trust.  It wasn't just "they kind of know each

11:20:27  14   other."

11:20:28  15          They also both have extremely violent criminal

11:20:32  16   histories.  If you look at Mr. Karr's criminal history, it is

11:20:39  17   almost -- you couldn't think of a better person, if you're

11:20:43  18   David Waters, to help you with this scheme.  In 1966 he's

11:20:47  19   convicted of raping a 14-year-old girl.  He's discharged from

11:20:54  20   prison in 1969.

11:20:56  21          Less than two years later, he has committed a string

11:20:59  22   of three robberies, the first of which was a robbery where he

11:21:04  23   bound and restrained a victim with an associate.  The second

11:21:08  24   one, again, he and an associate enter a drugstore, they

11:21:15  25   restrain someone, they steal their money and drugs.  In October

11:21:18  1  of 1971, the same thing.  He enters a drugstore.  This time

11:21:22  2  he's got a gun.  He restrains the victim and takes money and

11:21:27  3  drugs.  He gets two years on that charge.  He's released from

11:21:33  4  that charge in 1973.  That -- May of 1973.

11:21:38  5         By July of 1974, he's committed an armed robbery.  He

11:21:46  6  is brandishing a shotgun with an accomplice.  He steals over

11:21:51  7  $30,000 worth of jewelry and flees.

11:21:54  8         In 1974, in September, he and another individual rob

11:22:04  9  and, an allegation, raped a person at gunpoint.  And then

11:22:09  10  there's an aggravated kidnapping related to the same conduct.

11:22:17  11  Ultimately, Mr. Karr gets 30 to 50 years of imprisonment for

11:22:21  12  that conduct.  He's released from custody in April of 1995, and

11:22:26  13  by August 1995 he's involved in this scheme.

11:22:30  14         If you're David Waters, you can't think of -- you

11:22:34  15  couldn't pick a better person to help you commit these crimes.

11:22:37  16  He's got all of the experience in the world that you want.  And

11:22:41  17  that position of trust that he had -- that David Waters had in

11:22:46  18  Mr. Karr is reflected in his involvement in this case.  It's

11:22:50  19  Mr. Karr who rents all the vans: the first van to take the

11:22:54  20  O'Hairs from the Atheist Headquarters, ultimately down to the

11:23:00  21  Warren Inn; the second van after they have been killed to take

11:23:04  22  their bodies to the Public Storage unit; the third van to take

11:23:08  23  their cut up bodies and the remains of Danny Fry down to Camp

11:23:12  24  Wood, Texas.

11:23:13  25         Without Gary Karr, none of those things can be done.

```
11:23:17   1            Perhaps even more telling is that David Waters
11:23:21   2   trusted Gary Karr to go to New Jersey by himself with
11:23:25   3   Jon Murray at a time when Jon Murray is going to get $600,000
11:23:30   4   out of a bank.  There is nothing stopping Gary Karr from making
11:23:35   5   Jon Murray give him $600,000 and walking away.
11:23:39   6            David Waters trusted Gary Karr to do that because he
11:23:47   7   knew, like we know, that Gary Karr was going to be in very
11:23:50   8   serious trouble if he ever got caught.  His criminal history
11:23:54   9   was the same as David Waters'.  If they ever get caught as a
11:23:58  10   result of this scheme, they're both going away forever.  So he
11:24:01  11   trusted him to do what was right by the scheme, and that's
11:24:04  12   actually what Mr. Karr did.
11:24:07  13            If we're going to talk about the value of Mr. Waters'
11:24:11  14   statement versus the value of Mr. Karr's statement, well, let's
11:24:14  15   take a look at Mr. Karr's statement to police and how it is
11:24:20  16   demonstratively false in a number of particulars.
11:24:22  17            First of all, or simply unbelievable, he claims that
11:24:26  18   in late September or early October, David Waters comes to him
11:24:32  19   and says, I need you to rent a van for me, and I'll pay you
11:24:36  20   70 grand to help me out with something that Mr. Karr understood
11:24:39  21   to be illegal.  And Mr. Karr said, Oh, I'm not doing that.  But
11:24:43  22   what he didn't say was, Oh, and you can't use this van either.
11:24:47  23            Apparently, Mr. Karr said:  You want to pay me
11:24:50  24   70 grand to do something illegal with a van I've rented, knock
11:24:54  25   yourself out.  Simply unbelievable if he's not involved in the
```

11:24:58  1  scheme, which he clearly was.  And this is the van, by the way,
11:25:02  2  the third van, which was used to transport the already cut up
11:25:05  3  bodies of the O'Hairs to Camp Wood, Texas.
11:25:11  4          Mr. Karr also made claims that he did a lot of things
11:25:13  5  because he was afraid of David Waters.  Anything that he did
11:25:16  6  that was suspect or bad was because he was afraid of
11:25:19  7  David Waters.  But anytime David Waters told him to do
11:25:24  8  something illegal, he wasn't afraid enough to say no,
11:25:27  9  apparently.  So he was afraid when it was convenient for him,
11:25:28  10  and he wasn't afraid when it was convenient for him as well.
11:25:31  11          Mr. Karr says in his statement he saw Danny Fry on
11:25:34  12  October 2nd.  Well, we know Danny Fry was dead by October 2nd.
11:25:43  13  In fact, in his statement he said:  I remember it was October
11:25:44  14  2nd because it's the day I rented that last van.
11:25:47  15          Well, we know from Patti Jo Steffens, from
11:25:50  16  Danny Fry's family, and from David Waters' statement, Danny Fry
11:25:57  17  was never seen again after September 30th.  He wasn't heard
11:26:02  18  from again.  He was never seen again.  He was gone.  And
11:26:05  19  Patti Jo Steffens described, when the three men came back from
11:26:09  20  cutting up the O'Hairs' bodies, that Danny Fry looked
11:26:13  21  horror-stricken, he looked sick, and David Waters and Gary Karr
11:26:18  22  were buddies with each over, they were laughing with each
11:26:21  23  other, but they were hateful towards Danny Fry.
11:26:27  24          At some point Patti Jo Steffens packs up Danny Fry's
11:26:33  25  belongings because, if you'll recall, Danny Fry was going to go

| | | |
|---|---|---|
| 11:26:35 | 1 | home for his daughter's 16th birthday.  And he asked |
| 11:26:38 | 2 | Patti Jo Steffens, Will you pack some of my belongings so I can |
| 11:26:41 | 3 | go back?  And she said, Yes, I will.  She did that.  She left |
| 11:26:45 | 4 | while all three men were still at the house.  When she returns, |
| 11:26:49 | 5 | they're all gone, and Danny Fry's items had been unpacked or |
| 11:26:52 | 6 | thrown away. |
| 11:26:53 | 7 | When they returned -- the next time she see |
| 11:26:56 | 8 | Mr. Waters and Mr. Karr together, they're laughing. |
| 11:27:01 | 9 | David Waters is making -- or excuse me.  Mr. Karr is making fun |
| 11:27:05 | 10 | of David Waters for not being able to read a map.  And they |
| 11:27:10 | 11 | claim that Danny Fry has gone off with some guy, just |
| 11:27:13 | 12 | disappeared.  In contrast to his statement to the police, which |
| 11:27:14 | 13 | was:  I saw him on October 2nd.  Completely inconsistent with |
| 11:27:18 | 14 | all the other evidence in this case. |
| 11:27:22 | 15 | We didn't mention it too much in Mr. Martin's |
| 11:27:24 | 16 | testimony, but it's in the record and it's in the sentencing |
| 11:27:28 | 17 | memorandum.  Danny Fry knows that there's a chance that |
| 11:27:33 | 18 | David Waters is going to kill him.  So he sends a letter to his |
| 11:27:36 | 19 | brother Bob in Florida and says:  If I wind up dead, |
| 11:27:40 | 20 | David Waters did it.  And, by the way, I was involved in a |
| 11:27:44 | 21 | scheme I shouldn't have been involved in.  I regret it.  But if |
| 11:27:47 | 22 | you find -- if you look at David Waters' criminal history, |
| 11:27:51 | 23 | you'll have no trouble linking him to this offense. |
| 11:27:54 | 24 | Well, sometime after the events -- after the O'Hairs |
| 11:27:57 | 25 | are murdered and buried, Gary Karr goes with David Waters to |

11:28:01  1  Bob Fry's house, and Bob Fry testifies they threatened him for

11:28:05  2  between a half hour and an hour an half about that letter:

11:28:09  3  Where is it.  Give it to us.  We need it.  We work for some big

11:28:14  4  people who will cause real problems if you don't give us that

11:28:17  5  letter.

11:28:18  6        David Waters -- so Mr. Karr in his statement said

11:28:22  7  David Waters went there with a gun and was going to kill

11:28:26  8  Bob Fry, but I told him to stop, and so we left.  Again, he is

11:28:31  9  so terrified of David Waters that he'll go with him to Florida

11:28:34 10  to threaten some guy, but when it comes right down to it, he's

11:28:37 11  not so afraid of a man with a gun he is supposedly afraid of to

11:28:42 12  say, You can't do this.  We're leaving now.  Completely

11:28:45 13  unbelievable.

11:28:50 14        He also claims he went with David Waters to the

11:28:54 15  burial site at one time at night.  You recall Mr. Martin's

11:28:58 16  testimony.  That is a dark, rural place with not much

11:29:02 17  artificial light.  According to Mr. Karr's own statement, they

11:29:05 18  went there at night one time.  He never got out of the car.  He

11:29:10 19  has never -- he didn't get out of the car.  He didn't do

11:29:13 20  anything with the grave.  He never went near the grave.

11:29:17 21  David Waters did something, returned to the car, and they left.

11:29:23 22        Nevertheless, using information from Mr. Karr, either

11:29:25 23  he drew a map or he narrated a map to an officer that turned

11:29:30 24  out to be within 50 feet of where the bodies were actually

11:29:34 25  located.  Is it believable that a man who's been to that

```
11:29:36   1   location one time in the middle of the night where it was pitch

11:29:39   2   black could remember that and draw an accurate map?  I would

11:29:43   3   suggest to the Court the answer is no, unless he had previously

11:29:46   4   been there to help bury the bodies, which is consistent with

11:29:51   5   other evidence in this case I'll mention in a moment.

11:29:53   6        Perhaps most telling -- or there's two more telling

11:29:55   7   pieces.  Patti Jo Steffens testified that after these three men

11:30:00   8   returned from cutting up the O'Hairs -- she didn't mention

11:30:03   9   cutting up the O'Hairs, of course.  She mentions the timeline

11:30:08  10   that we know to be associated with that fact -- she comes home

11:30:11  11   and sees in the entryway of her apartment a bag full of bloody

11:30:17  12   shoes.

11:30:17  13        And she describes them -- the transcript is hard to

11:30:19  14   parse because it seems like she must have made a hand gesture.

11:30:22  15   But she says it looks like the wearers of those shoes were

11:30:27  16   standing in a puddle of blood when they were wearing them.

11:30:30  17        On cross-examination the defense tried to get Patti

11:30:33  18   Joe Steffens to say:  Listen, you remember Gary Karr was a

11:30:36  19   tennis player.  He only wore particular, actual tennis shoes --

11:30:41  20   not sneakers, but actual tennis shoes that tennis players wear,

11:30:47  21   right?  And she said, Yes, that's right.  And they asked, Well,

11:30:48  22   that's not the kind of shoe you saw in that bag, right?  And

11:30:50  23   said, Yes.  That was the kind of shoe I saw in the bag, the

11:30:52  24   kind of shoe that Gary Karr wore.

11:30:55  25        How else does blood get on a shoe of a type that
```

| | |
|---|---|
| 11:30:58 | 1 |
| 11:31:03 | 2 |
| 11:31:07 | 3 |
| 11:31:10 | 4 |
| 11:31:14 | 5 |

Gary Karr wears if he's not involved?  Possibly it's someone

else's shoe.  That's an inference you could draw if you want

to.  The more natural inference I would suggest to the Court is

he was there cutting up the bodies, consistent with and

corroborating what David Waters said.

            Finally, on just the issue of circumstantial evidence

that was admitted at trial, was Mr. Karr's statement, again,

saying:  Look, David Waters told me what to do.  I did whatever

he said without question.  You know, if you're looking for

someone to blame, blame him, was essentially his statement --

completely self-serving.

            And he said:  I never told the police anything about

this because I went to a lawyer, and that lawyer told me I have

criminal liability.  Don't say a word to anyone.  Well, that

lawyer testified at trial.  And, when asked -- well, excuse me.

A proffer of his testimony was given at trial.  He wasn't

allowed to testify about much.  But he proffered:  Yes, I spoke

to Gary Karr on two occasions on two different days and I never

told him based on our conversation that he had any criminal

liability.

            So, clearly, Mr. Karr had different reason for not

telling the police what had happened.  And the reason is not

difficult to discern:  He had more involvement than he claimed.

            Reading his statement as a whole, it is completely

unbelievable that a man who claims he was very concerned about

11:32:29  1   going back to prison told David Waters I'll help you with this

11:32:33  2   scheme, but only if I don't do anything illegal, he asked zero

11:32:36  3   questions at any time during this entire scheme, and he just

11:32:42  4   completely did what David Waters said.  According to Mr. Karr's

11:32:45  5   own statement, he went to New Jersey with Jon Murray to act as

11:32:48  6   security, didn't know where Jon Murray went, didn't know what

11:32:52  7   Jon Murray was doing, had no idea that Jon Murray got any kind

11:32:56  8   of money.  If you believe that he was acting as security, you

11:32:59  9   have to question why he did zero things consistent with acting

11:33:03  10  as security.

11:33:05  11         So that is evidence from the trial transcript that

11:33:09  12  has nothing to do with David Waters or any of the other folks

11:33:13  13  who testified.

11:33:18  14         Some folks who did testify at trial, in addition to

11:33:22  15  that evidence, that puts Mr. Karr directly involved was

11:33:28  16  Jason Cross and Aaron Morris.  These are folks that he was

11:33:31  17  incarcerated with prior to his trial and during -- well, prior

11:33:37  18  to his trial.  And they both put him directly involved in the

11:33:41  19  killing of Danny and the dismemberment and burying of the

11:33:46  20  O'Hairs.

11:33:47  21         According to these folks, Karr told them -- Mr. Karr

11:33:50  22  told them:  I killed Danny Fry, or I was -- me and Waters

11:33:54  23  killed Danny Fry.  I helped cut up the O'Hairs, and we buried

11:34:00  24  them.  That's direct -- direct evidence of Karr's own

11:34:03  25  statements.  Again, the defense tried to call into question

```
11:34:06   1   their credibility.  That's a question for this Court.  But that
11:34:08   2   is direct evidence of Mr. Karr's own statements of his
11:34:12   3   involvement.
11:34:16   4          Then there are folks who -- that's all, again, just
11:34:19   5   during the trial.  Speaking of evidence about after the trial,
11:34:24   6   we've got Inmate 1 and Inmate 2, who are both folks who are
11:34:32   7   incarcerated with Mr. Karr in the Bureau of Prisons.  The
11:34:34   8   statements given by Inmate 1 and Inmate 2, they vary and
11:34:37   9   they're inconsistent with each other.  There's no question
11:34:39  10   about that.  Although one of the inmates made a point to say
11:34:43  11   that Mr. Karr's statements were inconsistent and generally
11:34:48  12   self-serving.
11:34:48  13          Through various ways, Inmate 2 said more, but,
11:34:54  14   essentially, both of them indicate that Karr told them he
11:34:57  15   killed the O'Hairs.  Either he did it by himself or he did it
11:35:01  16   with David Waters or Danny Fry.  Again, it varied.  But those
11:35:06  17   are statements purportedly by Mr. Karr to those inmates with
11:35:10  18   his direct involvement in their murder.
11:35:10  19          Finally, there's David Waters' statement.  You've
11:35:13  20   heard enough about it.  You don't need to hear any more about
11:35:15  21   it.  But the only thing I'll point out is, if we're going to
11:35:20  22   weigh statements, Mr. Karr's statement is far more unbelievable
11:35:24  23   than Mr. Waters' statement.
11:35:26  24          Mr. Karr claims he told -- he claims -- this is in
11:35:31  25   the trial testimony and in his own statement.  He probably told
```

11:35:34   1   five different people five different reasons why he was coming

11:35:37   2   to Texas, how much he expected to get paid, when he would be

11:35:40   3   coming back.  He told his employer two different stories.  When

11:35:44   4   his employer confronted him about the first one, his own

11:35:48   5   statements are completely inconsistent with themselves, first

11:35:52   6   of all, they're inconsistent with the other evidence.  For

11:35:54   7   instance, as we point out in our sentencing memo -- and the

11:35:57   8   defense suggests we're trying to poke holes in their theory.

11:36:00   9   We're not trying to poke holes in their theory.  They don't

11:36:03   10   have to have a theory at all.  We know their theory is false.

11:36:06   11   Their theory at trial was the O'Hairs are still alive.  One of

11:36:10   12   the witnesses they called claimed to have seen them in Bulgaria

11:36:11   13   or Romania or something.  We know that's false.  What I'm

11:36:15   14   pointing out is Mr. Karr's statements are completely at odds

11:36:18   15   with the evidence.

11:36:20   16        The fact that Mr. Karr's story is I got involved

11:36:24   17   because the O'Hairs had to flee the country from the IRS.  We

11:36:28   18   know for a fact that's not true.  They were on the verge of

11:36:31   19   settling all of their outstanding liabilities with the IRS for

11:36:35   20   just over $100,000.  And, as you'll recall, the O'Hairs left

11:36:40   21   $100,000 -- they didn't claim $100,000 in gold coins.  There's

11:36:45   22   no reason for them to leave the country for an IRS debt based

11:36:50   23   on money that they left behind anyway.

11:36:56   24        There's plenty of other inconsistencies in

11:36:59   25   Gary Karr's story.  He claims he didn't know about the gold.

| | | |
|---|---|---|
| 11:37:02 | 1 | Patti Jo Steffens testified they had a conversation about the |
| 11:37:06 | 2 | gold right in front of her.  There's plenty of other reasons to |
| 11:37:08 | 3 | doubt Mr. Karr's statement. |
| 11:37:10 | 4 | But all that taken together, the circumstantial |
| 11:37:14 | 5 | evidence at trial, Mr. Karr's unbelievable statement, the |
| 11:37:18 | 6 | testimony of the other people involved, Patti Jo Steffens |
| 11:37:20 | 7 | seeing bloody tennis shoes, it all says -- it all points to |
| 11:37:25 | 8 | Mr. Karr having direct involvement in their murder.  I'm going |
| 11:37:30 | 9 | on far more than I should, but that's theory of liability one, |
| 11:37:33 | 10 | where he's directly involved. |
| 11:37:35 | 11 | Theory of liability two is that it was reasonably |
| 11:37:37 | 12 | foreseeable to him even though someone else did it.  And I |
| 11:37:41 | 13 | won't go on -- that's under one 1B1.3(a)(1)(B).  The only |
| 11:37:48 | 14 | points I'll make about that are:  We've cited in our sentencing |
| 11:37:53 | 15 | memorandum robbery, extortion, kidnapping, they are all crimes |
| 11:37:57 | 16 | that, by their nature, involve the risk of violence and in some |
| 11:38:01 | 17 | cases murder.  And those cases are cited in there. |
| 11:38:05 | 18 | Every case has to be based on its facts, of course. |
| 11:38:08 | 19 | But if you look at the facts of Mr. Karr's own prior robberies |
| 11:38:15 | 20 | and kidnappings, they involve the use of weapons, they involve |
| 11:38:18 | 21 | sexual assault, they involve allegations of violence.  There is |
| 11:38:21 | 22 | nothing about these crimes that would be surprising or |
| 11:38:24 | 23 | unfamiliar to Mr. Karr. |
| 11:38:27 | 24 | And, finally, the most compelling reason why it is |
| 11:38:31 | 25 | reasonably foreseeable to Mr. Karr that the O'Hairs are going |

11:38:35  1   to be murdered and that Danny Fry is going to be murdered is

11:38:38  2   because that is the only way he could ever hope to stay out of

11:38:41  3   prison.

11:38:43  4          At some point along the way, whether it was from the

11:38:46  5   beginning or sometime later, they decided to take money from

11:38:50  6   the O'Hairs by force, threat of force, and against their will.

11:38:55  7   That's established by the jury's verdict beyond a reasonable

11:38:58  8   doubt.  And so Mr. Karr knows:  I've been down many times.  I

11:39:06  9   just got out of prison for a fifteen-year term or whatever it

11:39:09  10  was.  If I get convicted again, I am going away forever, which

11:39:15  11  turned out be correct under the law at the time.

11:39:17  12         David Waters knows the same thing.  And so when you

11:39:20  13  look at the links between David Waters and Gary Karr and the

11:39:24  14  abduction of the O'Hairs, there's no way he can let them go.

11:39:29  15  He rented the vans in his own name.  The hotel is rented in his

11:39:33  16  name.  If the O'Hairs are let go, the first thing they're going

11:39:36  17  to say is "David Waters kidnapped me with some guy I don't

11:39:40  18  know."  And they're going to look at the records for the hotel,

11:39:42  19  and they're going to find Gary Karr's name.

11:39:44  20         "Oh, they took us around in some vans."  They're

11:39:47  21  going the find the van rental records and find Gary Karr's

11:39:52  22  name.

11:39:53  23         "Oh, well, Danny Fry made a bunch of phone calls from

11:39:54  24  the Warren Inn."  Well, suddenly Danny Fry is involved.  When

11:39:58  25  Mr. Karr rented the first van, he gave David Waters' phone

11:40:02  1    number.

11:40:03  2          There's a million links between Gary Karr and

11:40:06  3    Danny Waters and this crime.  And if he lets the O'Hairs go,

11:40:09  4    he's going to prison.  And so whether or not Mr. Karr -- maybe

11:40:13  5    Mr. Karr, out of the milk of human kindness, says I don't care.

11:40:17  6    I'm willing to take that risk.  But it's still reasonably

11:40:19  7    foreseeable to him that David Waters won't take that risk.

11:40:23  8          And so whether or not he was involved or just turned

11:40:25  9    a blind eye while David Waters did something is irrelevant

11:40:30  10   under the guidelines.  He is still legally culpable for this

11:40:34  11   crime.  And, Judge, we ask you to listen to Judge Sparks and

11:40:38  12   his statement during the first sentencing where he said:  "If

11:40:39  13   ever there was a life case, this one qualifies."

11:40:42  14         We ask that you impose a sentence of 595 months,

11:40:45  15   Judge, and that's all I've got to say, thankfully.

11:40:48  16         THE COURT:  At this time take we're going to take a

11:40:49  17   noon break.  I have something I need to get to over the noon

11:40:52  18   hour.  And then we'll come back and finish this up this

11:40:56  19   afternoon.  Court will be in recess until two o'clock.

11:40:59  20      (Recess)

13:23:57  21      (Open court)

13:23:57  22         THE COURT:  Before you finish the argument on the

14:04:40  23   objections, are you finished with your total argument?  I'm

14:04:43  24   still just interested in the objections.  So, Ms. Williams,

14:04:47  25   Mr. Aldredge, if you want to say anything more on the

14:04:52  1    objections, I will entertain you now.

14:05:03  2            MR. ALDREDGE:  Yes, Your Honor.  Thank you.

14:05:05  3            So there are just a couple of factual corrections I

14:05:09  4    wanted to make on Mr. Harding's summary.  First of all, the

14:05:15  5    trial testimony was that David Waters threatened Bob Fry,

14:05:22  6    Danny Fry's brother, in Florida.  The testimony was that, from

14:05:33  7    some source, that Mr. Karr was there.  However, the testimony

14:05:35  8    was also that Bob Fry never actually laid eyes on Mr. Karr.  So

14:05:41  9    it wasn't confirmed by Mr. Fry.

14:05:46  10           Secondly, I wanted to remind that Mr. Harding made a

14:05:50  11   statement that -- that Mr. Waters and Mr. Karr had similar

14:05:56  12   criminal histories.  I think that is a misstatement.

14:05:59  13   Mr. Waters is a convicted -- was a convicted and admitted

14:06:05  14   murderer.  One conviction, five admissions, and two suspected

14:06:11  15   murders that he was involved with.  Mr. Karr doesn't have

14:06:15  16   homicide of any kind in his background.

14:06:18  17           Also, one other factual correction about the criminal

14:06:22  18   history is that Mr. Harding indicated that Mr. Karr has a

14:06:28  19   conviction for rape.  In fact, he does not.  There's a 19 --

14:06:34  20   1966 -- in paragraph 67 of the PSR a 1966 conviction for

14:06:41  21   indecent liberties with a child.

14:06:43  22           So with those factual corrections, Your Honor, what

14:06:48  23   you heard essentially was closing argument.  And we're here

14:06:51  24   because the government doesn't like the jury verdict, and

14:06:54  25   that's ultimately what this boils down to.  The government

14:06:58   1   wants you to now at resentencing ignore the jury's verdict.

14:07:03   2          The verdict that came after a mountain of the most

14:07:09   3   lurid and violent kind of evidence: bloody shoes, supposed

14:07:15   4   confessions to jailhouse witnesses, and on and on and on.  But

14:07:19   5   the jury rejected it.  There's nothing new that the government

14:07:25   6   has presented in support of the cross-reference, at least

14:07:29   7   nothing that you should rely on, no live witnesses, none

14:07:31   8   subject to observation and cross-examination.  There's no

14:07:35   9   reason that these supposed new jailhouse witnesses couldn't

14:07:39  10   have been brought here.  No sworn testimony, nothing, again,

14:07:42  11   that should change anything about the balance of the evidence.

14:07:46  12          The government held all the cards in this case and

14:07:49  13   got to choose who to try, when to try them, and what order to

14:07:52  14   try them in.  And they shouldn't get another bite at the apple.

14:07:57  15   They want to say that the jury's verdict didn't make sense.

14:07:59  16          And, you know, just as a matter of pointing out and

14:08:04  17   not to go down the rabbit hole of rearguing the whole case and

14:08:08  18   what the evidence was at trial, but just to give you five quick

14:08:12  19   examples of why the jury's verdict made sense:

14:08:19  20          First of all, Jon Murray has opportunities to get

14:08:21  21   the -- to make an outcry, to get the authorities involved at

14:08:25  22   any number of airports and banks, including in New Jersey and

14:08:30  23   in San Antonio at the Frost Bank with an armed San Antonio

14:08:34  24   police officer there, unrealistic.

14:08:37  25          Three people flailing in a hotel room surrounded on

14:08:42  1   top and on the sides by other hotel rooms, pounding the wall,

14:08:48  2   yelling as they're apparently slowly murdered, unrealistic.

14:08:53  3         No DNA found in a storage unit where three people

14:08:58  4   were apparently cut up into little bits, allegedly.  No

14:09:04  5   complaints or blood or bleach pouring into other neighboring

14:09:11  6   storage units, again, no DNA found, unrealistic.

14:09:15  7         Bodies in shoddy barrels that apparently were not

14:09:18  8   sealed well and were described as sort of decrepit barrels for

14:09:23  9   five to six days not generating an overwhelming stench to

14:09:28  10  arouse a complaint or the suspicion of anyone around there,

14:09:33  11  unrealistic.

14:09:34  12        Finally, Your Honor, Danny Fry, according to

14:09:37  13  David Waters, was killed at a site in Dallas.  That is not only

14:09:42  14  unrealistic, it an outright lie.

14:09:46  15        The government had -- they seem to have forgotten

14:09:51  16  that they asked and were granted a Pinkerton instruction in

14:09:55  17  count three.  A Pinkerton criminal liability, as the Court well

14:10:00  18  knows, is by far the broadest form of criminal liability that

14:10:04  19  there is.  It is far broader than 1B1.3 of the guidelines.  It

14:10:11  20  is the prosecutor's darling.  And they seem to have forgotten

14:10:17  21  that.  The jury was instructed on that.  The jury had every

14:10:20  22  opportunity under any kind of theory to hold Mr. Karr liable

14:10:23  23  for the deaths of the O'Hairs, but they rejected that.

14:10:28  24        And, Your Honor, the rest of what I have has to do

14:10:38  25  with sentencing.  But that's our position.  The government

14:10:43  1    hasn't given you any reason to ignore the jury's verdict.  We'd

14:10:48  2    ask that the Court grant our objection and deny the

14:10:50  3    cross-reference to the murder guideline.

14:10:51  4            THE COURT:  Well, in spite of the fact that we've

14:10:54  5    wandered around a little bit, I'm coming back to the

14:10:57  6    objections, and that's all I'm ruling on right now, are the

14:10:59  7    objections, and then we'll get into the rest of what we have

14:11:02  8    here.

14:11:02  9            Initially, the objection regarding the constitutional

14:11:10  10   objection is overruled or is denied because *Watts* does control

14:11:18  11   in this case, and we are not at the point yet to where, even

14:11:24  12   though there appears to be movement and concern in Congress

14:11:29  13   about acquitted conduct being considered by the court, that is

14:11:34  14   not yet the law.  And I gave up a long time ago trying to

14:11:41  15   predict whatever the Supreme Court will do or whatever the

14:11:44  16   Congress of the United States would do at any given moment.  If

14:11:50  17   they change the law, then we might all be back here again at

14:11:54  18   some point.  But I overrule the constitutional objections based

14:11:59  19   primarily on *Watts*.

14:12:01  20           With regard to the other objection involving the

14:12:05  21   cross-reference to section B3.1(c)(1), I think it is important

14:12:14  22   and it's been argued to read exactly what it says.  1.B1.3(a)

14:12:23  23   reads:  "Chapters Two (offense conduct)" -- and I'm reading

14:12:28  24   from the more current guidelines manual, but it has not changed

14:12:33  25   in any appreciable respect from the guidelines manual that was

14:12:36  1   in effect at the time of sentencing.

14:12:39  2           "Unless otherwise specified, the base level where the

14:12:44  3   guideline specifies more than one base level offense, specific

14:12:49  4   offense characteristics and cross-references in chapter two,

14:12:53  5   and adjustments in chapter three shall be determined on the

14:12:56  6   basis of the following:

14:12:58  7           All acts and omissions committed, aided, abetted,

14:13:02  8   counseled, commanded, induced, procured, or willfully caused by

14:13:07  9   the defendant; and

14:13:07  10          in the case of a jointly undertaken criminal activity

14:13:11  11  (a criminal plan, scheme, endeavor, or enterprise undertaken by

14:13:15  12  the defendant in concert with others, whether or not charged as

14:13:20  13  a conspiracy), all acts and omissions of others that were --

14:13:23  14          within the scope of the jointly undertaken criminal

14:13:26  15  activity, in furtherance of that criminal activity, and

14:13:32  16  reasonably foreseeable in connection with that criminal

14:13:34  17  activity;

14:13:35  18          that occurred during the commission of the offense of

14:13:38  19  conviction, in preparation for that offense, or in the course

14:13:42  20  of attempting to avoid detection or responsibility for that

14:13:46  21  offense."

14:13:47  22          I find that the probation department has correctly

14:13:53  23  included that as part of the base level offense.  I find, based

14:13:58  24  on the evidence that I have heard here today and on what is

14:14:03  25  contained in the presentence investigation report, and if I

14:14:12   1   were not to consider any of the post-trial or post-first

14:14:17   2   sentencing information, that that is satisfied and has been

14:14:23   3   satisfied.

14:14:25   4         I find that just what was known then is enough to

14:14:31   5   bring Mr. Karr within that provision of the guidelines.

14:14:40   6   Standing alone, it is the Court's opinion that accompanying or

14:14:49   7   going with Jon Garth Murray to New Jersey to deal with the wire

14:14:54   8   transfer clearly puts him involved with the others.

14:15:02   9         I think the passage of time is important here, as the

14:15:10   10   evidence has reflected.  Again, pre-the new evidence -- this

14:15:20   11   all occurred between August and October of 1995 -- I think, at

14:15:24   12   a minimum, the longer this went on with Mr. Karr and the

14:15:35   13   others, Mr. Waters in particular, dealing with the O'Hairs -- I

14:15:45   14   refer to all three of them as "the O'Hairs" -- keeping them

14:15:49   15   hostage while they took various types of money made it

14:15:56   16   reasonably foreseeable to anyone involved in this enterprise

14:15:59   17   that the longer it went on, the more likely it was that

14:16:03   18   somebody was going to get killed, and probably all of them

14:16:07   19   would be murdered in this, because they just knew too much

14:16:11   20   about it and had seen too much.

14:16:13   21         So, just on the evidence that was previously known,

14:16:23   22   which begins on page 5 of the presentence investigation report,

14:16:24   23   there is more than enough here in my opinion to justify the

14:16:29   24   cross-reference.

14:16:30   25         Plus -- and we will talk more about Mr. Waters'

14:16:37   1   statement I'm sure later -- the statement that Agent Martin

14:16:42   2   took from Mr. Waters after the original sentencing in this case

14:16:53   3   I find to be, for want of a better word, an intervening cause

14:16:56   4   here or intervening information.  That is in information that

14:17:02   5   the jury did not have that the Court now has.

14:17:04   6          So everything the defendant argues about the jury

14:17:11   7   didn't get to evaluate that statement, there was no

14:17:13   8   cross-examination on the basis of the statement, that is all

14:17:16   9   true, but also cuts another way.  And it mitigates against my

14:17:29  10   thinking that the government is just unhappy with the jury

14:17:31  11   verdict that I presume the defendant refers to as the acquittal

14:17:36  12   on count one.  This is additional information.  I am charged

14:17:47  13   with considering that information that has been argued here,

14:17:52  14   and I do consider that information that came from Mr. Waters.

14:18:01  15          MR. ALDREDGE:  Your Honor, if I may?  I'm sorry.  I

14:18:03  16   thought I heard this earlier, but this is the second time the

14:18:05  17   Court has mentioned only an acquittal on count one.  There was

14:18:09  18   also an acquittal on the death resulting in count three.

14:18:13  19          THE COURT:  All right.  I take that into account.  I

14:18:19  20   misspoke.  I should have mentioned both of those.  But that

14:18:26  21   does not affect my reasoning that I have information in front

14:18:28  22   of me on those deaths that the jury did not have.  And I

14:18:34  23   consider that, and we will talk about that further, I feel

14:18:40  24   certain, later when we have argument on the sentence that this

14:18:45  25   Court should impose as a whole.

14:18:52  1          But I take seriously my charge, and I realize that it

14:18:56  2   is not the favorite thing of lawyers in this case.  It is

14:19:04  3   pretty wide open on what I can consider at sentencing.  I

14:19:09  4   obviously have a lesser standard that I follow -- it's

14:19:20  5   preponderance of the evidence -- in determining what I can do

14:19:22  6   at sentencing.  And I do take into account the later statement

14:19:27  7   of Waters.

14:19:28  8          And so that even then added what we had before.

14:19:40  9   Mr. Waters' statement clearly satisfies the cross-reference

14:19:45  10  provision of 2B3.1.  So the objection -- that objection is

14:19:56  11  likewise overruled.

14:19:57  12         Those rulings having been made, the Court finds that

14:20:02  13  the probation department has gotten it right in their

14:20:09  14  computations -- in the department's computation.  I've

14:20:14  15  overruled all of the objections, and I find the correct total

14:20:16  16  offense level in this case is 43, the correct criminal history

14:20:21  17  category is five, and the correct guideline provision would be

14:20:26  18  a term of incarceration of 480 months.

14:20:37  19         That ruling having been said and that ruling having

14:20:39  20  been made, Mr. Aldredge, Ms. Williams, do you know of any legal

14:20:43  21  reason why the Court should not proceed with sentencing at this

14:20:46  22  time?

14:20:46  23         MR. ALDREDGE:  No, Your Honor.

14:20:47  24         THE COURT:  Mr. Harding, does the government know of

14:20:49  25  any legal reason why the Court should not proceed with

14:20:52  1   sentencing at this time?

14:20:53  2          MR. HARDING:  No, Your Honor.

14:20:55  3          THE COURT:  All right.  Before I hear from you-all

14:20:58  4   further, I would like Agent Martin to come forward and retake

14:21:02  5   the stand, please.  I have a couple of questions that I want to

14:21:08  6   ask him before we get into the rest of the argument.

14:21:18  7      (Agent Martin takes the stand)

14:21:18  8          THE COURT:  Agent Martin, you'll recall you're still

14:21:20  9   around oath.

14:21:20 10          THE WITNESS:  Yes, sir.

14:21:21 11          THE COURT:  Now, what I wanted to ask you is I think

14:21:23 12   your testimony was that you spent the better part of two days

14:21:27 13   taking the statement from Mr. Waters; is that correct?

14:21:31 14          THE WITNESS:  Yes, sir.

14:21:32 15          THE COURT:  And you had opportunity, I presume,

14:21:36 16   during that entire time to observe him and watch him and look

14:21:40 17   at him and make some evaluation of his credibility; is that

14:21:43 18   correct?

14:21:44 19          THE WITNESS:  Yes, sir.

14:21:44 20          THE COURT:  And, up to that point in time, how long

14:21:50 21   had you been a criminal investigator for the Internal Revenue

14:21:56 22   Service?

14:21:57 23          THE WITNESS:  Probably 23 years.

14:21:59 24          THE COURT:  Had you had occasion to interview people

14:22:03 25   throughout that 23 years?

14:22:04   1          THE WITNESS:  Yes, sir.

14:22:05   2          THE COURT:  All right.  Based on your personal

14:22:07   3   observations of Mr. Waters, and you indicated that he did

14:22:15   4   contradict himself from time to time, what was your feeling as

14:22:21   5   to his demeanor and his truthfulness?  How did he present

14:22:25   6   himself.  What was your reaction to him?

14:22:27   7          THE WITNESS:  For the most part, I think what he was

14:22:33   8   trying to do was give us information.  As far as -- I think it

14:22:37   9   was more like he was corroborating what I already knew.  There

14:22:41  10   were some things that we were going to go back over,

14:22:45  11   specifically, things that I thought he was contradicting

14:22:49  12   himself in.  But we never got that opportunity.

14:22:53  13          THE COURT:  As to the general parameters of what he

14:22:57  14   said he observed with regard to the holding of -- as I said,

14:23:05  15   I'll refer to all of them as "the O'Hairs" -- the O'Hairs and

14:23:09  16   their murders, did you find him credible?

14:23:12  17          THE WITNESS:  Yes, sir, I did.

14:23:13  18          THE COURT:  All right.  I have no further questions,

14:23:14  19   but I will allow the lawyers to ask questions of this witness

14:23:19  20   now that I have interjected myself into this.

14:23:21  21          Ms. Williams, you may begin.

14:23:24  22          MS. WILLIAMS:  Agent Martin, in your 23 years of

14:23:26  23   investigation up to that time, had you ever had the opportunity

14:23:29  24   to interview anyone about anything other than money?

14:23:35  25          THE WITNESS:  Mainly money.

```
14:23:36    1              MS. WILLIAMS:  That's all the questions I have,

14:23:38    2    Judge.

14:23:38    3              THE COURT:  Mr. Harding?

14:23:39    4              MR. HARDING:  No, Your Honor.

14:23:40    5              THE COURT:  All right.  You may step down.  Thank

14:23:43    6    you, Agent Martin.

14:23:44    7              Mr. Karr, Ms. Williams, Mr. Aldredge, if any of you

14:23:55    8    have anything you would like to say to the Court before the

14:23:58    9    Court pronounces sentence, I will hear from you at this time

14:24:02   10    and I will take whatever you have to say into account in

14:24:04   11    determining the appropriate sentence to impose in this case.

14:24:13   12              MR. ALDREDGE:  Your Honor, we're asking that the

14:24:15   13    Court consider a variance below the 480-month guideline range.

14:24:20   14    You know, Mr. Harding said that at time of the original

14:24:27   15    sentencing hearing that there was some indication about an

14:24:31   16    upper departure for underrepresented criminal history.  At that

14:24:35   17    time it didn't score because it was 20-plus years old.  Well,

14:24:39   18    now that criminal history is 40-plus years old.

14:24:43   19              It is not reflective of who Mr. Karr is.  He has

14:24:52   20    had -- I remind the Court that he has had an immaculate,

14:24:56   21    exemplary Bureau of Prisons record.  He has a -- he has a

14:25:01   22    plan -- a release plan.  He has his daughter that he could go

14:25:06   23    live with.  He still has his 98-year-old mother that -- that he

14:25:11   24    hopes to see.

14:25:12   25              And our position is that -- that a sentence of
```

| | | |
|---|---|---|
| 14:25:17 | 1 | 480 months can't be squared without creating -- can't be |
| 14:25:25 | 2 | squared with what Mr. Waters ended up with without creating |
| 14:25:29 | 3 | unwarranted sentencing disparity. |
| 14:25:31 | 4 | Our request is that the Court consider no greater |
| 14:25:33 | 5 | than a 327-month sentence that would run concurrently with |
| 14:25:38 | 6 | counts four and five.  Again, other than avoiding unwarranted |
| 14:25:42 | 7 | sentencing disparity, because it would already be significantly |
| 14:25:49 | 8 | greater than what David Waters got, but also it would be an |
| 14:25:53 | 9 | appropriate sentence and would meet the sentencing goals of |
| 14:25:58 | 10 | 3553(a) because of his age, because of his health -- he's got |
| 14:26:02 | 11 | hepatitis C, hearing loss, neurodegenerative disease -- and, |
| 14:26:08 | 12 | again, because of his exemplary record in prison and because of |
| 14:26:11 | 13 | the rehabilitation that he has demonstrated. |
| 14:26:14 | 14 | So our request, Your Honor, is that the Court impose |
| 14:26:17 | 15 | no greater than a 327-month sentence in this case. |
| 14:26:26 | 16 | THE COURT:  Ms. Williams, anything do you have |
| 14:26:27 | 17 | anything you'd like to say? |
| 14:26:28 | 18 | MS. WILLIAMS:  No, Your Honor. |
| 14:26:29 | 19 | THE COURT:  Mr. Karr, do you have anything you would |
| 14:26:31 | 20 | personally like to say before sentence is imposed. |
| 14:26:34 | 21 | THE DEFENDANT:  No, sir. |
| 14:26:38 | 22 | THE COURT:  Mr. Harding, I'll hear from the |
| 14:26:39 | 23 | government at this time. |
| 14:26:40 | 24 | MR. HARDING:  Thank you, Your Honor.  You've heard |
| 14:26:42 | 25 | plenty from me, so I'll keep it as brief as I can. |

| | | |
|---|---|---|
| 14:26:45 | 1 | THE COURT: I've heard that before. |
| 14:26:46 | 2 | MR. HARDING: As brief as I can, Judge. We -- the |
| 14:26:50 | 3 | government believes that there's nothing about this case that |
| 14:26:55 | 4 | would bring it outside the ambit of the guidelines. The |
| 14:26:59 | 5 | O'Hairs were held against their will, we believe, and the Court |
| 14:27:04 | 6 | has found. They were separated from their money by threats of |
| 14:27:10 | 7 | force and actual force. Ultimately, they were murdered by |
| 14:27:13 | 8 | Mr. Karr and his associates. |
| 14:27:17 | 9 | It's hard to imagine a crime that would be more |
| 14:27:19 | 10 | serious than that, even standing alone. But built on a full |
| 14:27:26 | 11 | lifetime of criminal behavior of a similar sort by Mr. Karr, it |
| 14:27:30 | 12 | only aggravates the situation. Nobody is denying that he's |
| 14:27:33 | 13 | older now than he was when he was convicted. Nobody is denying |
| 14:27:36 | 14 | that has health problems. |
| 14:27:38 | 15 | But those things are not enough to overcome not only |
| 14:27:43 | 16 | the danger that Mr. Karr poses. As we pointed out in our |
| 14:27:46 | 17 | sentencing memorandum, it does not require an Olympic athlete |
| 14:27:51 | 18 | to carry a gun. And use of gun is Mr. Karr's M.O., for lack of |
| 14:27:55 | 19 | a better word. Looking back at his criminal history, he |
| 14:27:58 | 20 | carries weapons to get his way. He makes people do what he |
| 14:28:01 | 21 | wants them to do by threatening them with firearms. And |
| 14:28:04 | 22 | there's nothing about his current state that will prevent that. |
| 14:28:07 | 23 | More to the point, Judge, this was just a heinous |
| 14:28:11 | 24 | crime. No matter how old he is, his family can still visit |
| 14:28:20 | 25 | him, they can still write to him, they can still have |

14:28:23  1    communication with him, and that is not true of any of the

14:28:25  2    O'Hairs.  They were all killed.

14:28:27  3          Bill Murray, who is the son of Madalyn Murray O'Hair,

14:28:30  4    who wanted to write a victim impact statement, he's been too

14:28:34  5    sick to write one.  Our victim witness coordinator has been in

14:28:37  6    touch with him.  He'll never speak to any of his family again,

14:28:40  7    of Madalyn, Robin, and Jon.  So when we're considering who to

14:28:44  8    be sympathetic with here, Judge, I suggest to you it's not

14:28:47  9    Mr. Karr, it's the O'Hairs whose lives he helped end.

14:28:51  10         So we ask for a guideline sentence, Judge.

14:28:56  11         THE COURT:  Does probation have anything further

14:28:57  12   before sentence is imposed?

14:28:58  13         PROBATION OFFICER:  No, Your Honor.

14:28:59  14         THE COURT:  Is there anyone here present in the

14:29:00  15   courtroom, anyone in the audience that would like to say

14:29:02  16   anything about this case before the Court imposes sentence?  If

14:29:05  17   so, please come forward.

14:29:06  18      (No response)

14:29:08  19         THE COURT:  Seeing none, Mr. Karr, Mr. Aldredge,

14:29:13  20   Ms. Williams, do any or all of you or any combination of you

14:29:16  21   have anything you would like to say either in addition to what

14:29:19  22   you've already said or in response to anything that's been said

14:29:22  23   by anyone else?

14:29:24  24         MS. WILLIAMS:  Nothing further, Your Honor.

14:29:25  25         MR. ALDREDGE:  Nothing further.

| | | |
|---|---|---|
| 14:29:26 | 1 | THE COURT:  Mr. Karr? |
| 14:29:26 | 2 | THE DEFENDANT:  No, sir. |
| 14:29:27 | 3 | THE COURT:  The Court has read and reviewed the |
| 14:29:30 | 4 | presentence investigation report prepared by the probation |
| 14:29:34 | 5 | department in this case.  And after considering the objections |
| 14:29:39 | 6 | that have been made by the defendant and overruling them, I |
| 14:29:43 | 7 | accept and adopt that report, and I find the correct total |
| 14:29:46 | 8 | offense level to be 43, the defendant's correct criminal |
| 14:29:49 | 9 | history category to be five, and the correct guideline sentence |
| 14:29:55 | 10 | to be a term of incarceration of 480 months. |
| 14:30:01 | 11 | In addition, the Court observes there is no plea |
| 14:30:07 | 12 | agreement in this case, that the defendant was tried to a jury, |
| 14:30:10 | 13 | and we have discussed the jury's findings in this case.  I have |
| 14:30:19 | 14 | considered carefully the defendant's original sentencing |
| 14:30:21 | 15 | memorandum and the amended sentencing memorandum. |
| 14:30:25 | 16 | I have carefully reviewed and considered the |
| 14:30:27 | 17 | government's sentencing memorandum, including all of the |
| 14:30:32 | 18 | attachments to that memorandum, including the lengthy |
| 14:30:37 | 19 | transcripts and the disc that was included.  I have carefully |
| 14:30:42 | 20 | reviewed a letter that I received from the defendant's |
| 14:30:47 | 21 | daughter, and I have reviewed the exhibits that I admitted into |
| 14:30:52 | 22 | evidence today.  And I have previously indicated that I had |
| 14:30:57 | 23 | reviewed the attachments to the government's sentencing |
| 14:31:02 | 24 | memorandum, but I have also reviewed and considered all |
| 14:31:05 | 25 | attachments to any memorandum or pleading that we've had in |

14:31:16    1    this case.  I have further reviewed the original presentence

14:31:19    2    investigation report and the original sentence of the

14:31:21    3    sentencing court.

14:31:23    4           I take all of this into account in determining what I

14:31:27    5    think would be a sentence that is sufficient but not greater

14:31:30    6    than necessary to punish this defendant for the crime as

14:31:36    7    provided in Title 18 United States Code, Section 3553.  And I

14:31:44    8    want to make a few observations here, and I'll try not to be

14:31:49    9    redundant.

14:31:49   10           But I repeat what I said about the cross-reference

14:31:54   11    provision that the probation department included.  I think that

14:32:00   12    is well taken.  As I said before, I have information before me

14:32:07   13    that the jury did not have before it, and so I do not look on

14:32:13   14    this as a situation where the government just doesn't like the

14:32:17   15    jury verdict.  I find that the provision, as I said in

14:32:23   16    overruling the objections to the presentence investigation

14:32:30   17    report, the provision in Sentencing Guideline 1B1.3, is well

14:32:39   18    taken and that I take into account all of the relevant conduct

14:32:44   19    here.

14:32:47   20           I think this is just about as serious a crime as I

14:32:51   21    have ever seen in this court.  It's certainly, if not the most

14:32:58   22    serious, it's right up there.  The government quoted what

14:33:03   23    Judge Sparks said when he did the original sentencing in this

14:33:06   24    case.  The severity and the seriousness and the horror of this

14:33:16   25    crime has not changed in the 26 years, more or less, since it

14:33:19    1    was committed and in the 21 years, more or less, since the

14:33:23    2    original sentence was imposed in this case.

14:33:27    3            In trying to determine what I think would be that

14:33:32    4    sentence that is sufficient but not greater than necessary, I

14:33:37    5    have looked very carefully at the nature and circumstances of

14:33:41    6    the offense and considered a sentence that would reflect its

14:33:46    7    seriousness.

14:33:47    8            Coupled with that is the history and characteristics

14:33:52    9    of the defendant, which is well described in the presentence

14:33:55   10    investigation report and which has been described in this

14:34:00   11    courtroom and in the sentencing memoranda that I have reviewed.

14:34:05   12            I'm asked to consider how he has behaved as a

14:34:12   13    prisoner since he has been incarcerated, and I know that I can

14:34:16   14    do that.  It always bothers me a little bit, though -- because

14:34:21   15    I'm asked and have been asked to do that in other cases -- it

14:34:25   16    almost, when a defendant is allowed to be resentenced or there

14:34:31   17    is an order to resentence the defendant and I look at his

14:34:38   18    prison history, it comes close to putting this Court in the

14:34:43   19    position of being a parole commission and determining whether

14:34:49   20    or not his actions would justify a lesser sentence, which

14:34:55   21    smacks pretty close of parole, but we don't have parole in the

14:35:01   22    federal system.  So that always concerns me a little bit.  I've

14:35:05   23    had it argued to me both ways on resentencing here because of

14:35:11   24    the positive record the defendant has had in prison and, in

14:35:15   25    another case that I heard, because of a negative record the

14:35:21    1    defendant has.

14:35:23    2            So, although I look at that, it is not something that

14:35:25    3    I place a whole lot of store in in determining how to apply the

14:35:32    4    factors in Title 18 of the United States Code, Section 3553.

14:35:38    5    And I go back to the fact that the nature of this case, the

14:35:47    6    circumstances of this offense, its seriousness has not changed

14:35:52    7    in the years since the crime was committed.

14:36:00    8            Possibly there is not as great a need to protect the

14:36:07    9    public from further crimes by this defendant as there was in

14:36:11   10    2000, but I find that pretty much is a factor of the passage of

14:36:17   11    time between then and now.  I think I still must place great

14:36:26   12    store in a sentence that would afford adequate deterrence to

14:36:30   13    criminal conduct.  And the way that is worded in Section 3553

14:36:36   14    is it doesn't say adequate deterrence to criminal conduct by

14:36:41   15    this defendant.  It says adequate deterrence to criminal

14:36:44   16    conduct.

14:36:45   17            Those of you who appear regularly when I'm doing

14:36:48   18    sentencings will hear me say I read that to be adequate

14:36:55   19    deterrence criminal conduct by the defendant and others.  The

14:36:58   20    others are what worry me here.  And I think, as I believe

14:37:04   21    Judge Sparks felt, that a strong sentence should be imposed

14:37:10   22    here because it just violates the bounds of any civil society

14:37:19   23    to not pursue a strong penalty against people who hold hostage

14:37:27   24    and murder three other people.

14:37:32   25            I find the testimony of retired Special Agent Martin

14:37:38  1   to be credible, and I have consider it as such.  I observed his

14:37:48  2   demeanor as he was testifying and particularly here when I

14:37:51  3   called him back to the stand.  I realize that Mr. Waters may

14:37:56  4   have contradicted himself in some parts just like Mr. Karr

14:38:02  5   contradicted himself in some parts of what he testified to.

14:38:08  6        But I find that what Mr. Waters told Special Agent

14:38:16  7   Martin to be credible because it all fits and comes together to

14:38:23  8   me with regard to the facts that were known and were produced

14:38:29  9   at trial and spoken about at trial.  Clearly, there is some

14:38:36  10  corroboration, sketchy though it may be, in that Mr. Waters

14:38:41  11  knew exactly how to go to where the bodies were found and got

14:38:45  12  them there and closed the gap between what Mr. Karr had told

14:38:52  13  them.

14:38:53  14       I realize there is an unanswered question with regard

14:38:59  15  to whether murder of the other accomplice occurred in Dallas

14:39:13  16  County or not in Dallas County.  But I don't worry about that

14:39:18  17  too terribly much because the gravamen of this crime was the

14:39:23  18  taking of the O'Hairs, the holding them hostage, and the taking

14:39:29  19  of their money and other valuable items and holding them for a

14:39:34  20  period of time, which as I said in discussing the situation

14:39:39  21  regarding the objections, the passage of time, every day that

14:39:47  22  went by, made it more and more likely that the end result would

14:39:54  23  be what the end result was.

14:39:57  24       And whether Mr. Waters was 100 percent correct or

14:40:03  25  truthful in what he told Special Agent Martin, it fits together

114

14:40:09  1   with what was learned before then.  He was somebody who was

14:40:15  2   there, and I find that to be credible and consistent with the

14:40:28  3   rest of the testimony.

14:40:28  4         I address the situation with regard to avoiding

14:40:38  5   unwarranted sentencing disparities that's in Section 3553, and

14:40:40  6   it is something that I always consider carefully.  But there's

14:40:47  7   always going to be some nature of disparity.  I might not, had

14:40:53  8   I been the investigator or the prosecutor, cut the same plea

14:40:59  9   deal with Mr. Waters that was cut in this case.  But the fact

14:41:05  10  of the matter is that it was cut.

14:41:09  11        I don't find, just because -- well, I find that the

14:41:15  12  government makes different arrangements with different

14:41:19  13  defendants involved in the same offense from time to time, that

14:41:24  14  the Court must look carefully at that to avoid unwarranted

14:41:27  15  sentencing disparities, but let me note that an operative word

14:41:32  16  is "unwarranted."  Sometimes the disparity is warranted, and

14:41:37  17  sometimes the disparity is warranted in order to obtain

14:41:41  18  additional information.

14:41:45  19        Whether or not Mr. Waters received too good a deal I

14:41:51  20  do not pass on because the fact of at the matter is it turned

14:41:56  21  out to be life in prison because he died when he was in custody

14:42:00  22  before he was released from any of the sentences, whether the

14:42:04  23  state sentence was going to be much below sixty years or

14:42:09  24  whether it was not.

14:42:11  25        As I said, in ruling on the objections, I take very

14:42:17  1  seriously the fact that there virtually is no limitation on

14:42:22  2  what the Court considers at sentencing under Title 18,

14:42:27  3  Section 3661, and so I've tried to examine everything here.

14:42:32  4       What I keep coming back to is, even though Mr. Karr I

14:42:38  5  think has been extremely well represented by the lawyers who

14:42:42  6  have been appointed to represent him, the crime, as I said

14:42:46  7  before, is as serious today as it was the day it was committed

14:42:51  8  and was as serious today as it was the day of the original

14:42:57  9  sentence.

14:42:58 10       So when I take everything into account, in spite of

14:43:06 11  good lawyering on both sides here, I do find that a guideline

14:43:10 12  sentence would be an appropriate sentence to impose in this

14:43:12 13  case, tailored to meet the facts and circumstances of this

14:43:16 14  defendant's background and the offense for which he has been

14:43:19 15  convicted; that a guideline sentence adequately accounts for

14:43:23 16  all of the factors in Title 18 of the United States Code,

14:43:29 17  Section 3553, all of which I have carefully considered but have

14:43:36 18  not specifically mentioned every one of those factors; and that

14:43:40 19  a guideline sentence would be a reasonable sentence to impose

14:43:42 20  in this case.

14:43:45 21       Therefore, pursuant to the Sentencing Reform Act

14:43:48 22  of 1984, it is the judgment of this Court that you,

14:43:51 23  Gary Paul Karr, are hereby committed to the custody of the

14:43:54 24  Bureau of Prisons for a term of 240 months on count one --

14:44:00 25  pardon me -- on count two and 240 months on count three, to be

14:44:05  1  served consecutive to each other and consecutive to the

14:44:11  2  sentence previously imposed as to counts four and five, for a

14:44:18  3  total sentence of 595 months.  That takes into account the two

14:44:26  4  240-month sentences for 480 months and the 115-month term that

14:44:36  5  was previously imposed on counts four and five.

14:44:39  6       Upon release from imprisonment, you shall be placed

14:44:41  7  on supervised release for a term of three years on counts two

14:44:43  8  and three, to be served concurrently.

14:44:48  9       Within 72 hours of release from the custody of the

14:44:50  10  Bureau of Prisons, you shall report in person to the probation

14:44:54  11  office in the district to which you are released.

14:44:56  12       While on supervised release, you shall not commit

14:44:58  13  another federal, state, or local crime, and you shall comply

14:45:01  14  with the mandatory and standard conditions adopted by this

14:45:04  15  Court on November 28th, 2016, which include, in part:

14:45:11  16       You shall apply all moneys received from income tax

14:45:14  17  refunds, lottery winnings, judgments, and other anticipated or

14:45:19  18  unexpected financial gains to any court-ordered financial

14:45:23  19  obligation that has not be paid.

14:45:27  20       Second, you shall participate in a mental health

14:45:29  21  treatment program and follow the rules and regulations of that

14:45:32  22  program.  A probation officer, in consultation with a treatment

14:45:39  23  provider, may supervise your participation in the program.  You

14:45:43  24  shall pay the costs of that treatment to the extent you are

14:45:45  25  financially able.  You shall take all mental health medications

14:45:48  1  that may be prescribed by any physician who is treating you.

14:45:55  2          It is further ordered that you shall make restitution

14:45:57  3  in the amount of $543,665.42 as follows:

14:46:03  4          To the United Secularists of America, Inc., $512,000;

14:46:08  5  the estate of Madalyn Murray O'Hair, $2,500; the estate of

14:46:14  6  Jon Garth Murray, $26,665.42; the estate of Robin Murray

14:46:21  7  O'Hair, $2,500.

14:46:25  8          If you are not able to pay this indebtedness or

14:46:29  9  haven't paid it, you shall cooperate fully with the Office of

14:46:31 10  the United States Attorney, the Bureau of Prisons, and the

14:46:35 11  United States Probation Office to make payment in full as soon

14:46:40 12  as possible, including during any period of incarceration.

14:46:44 13          Any unpaid balance at the commencement of a term of

14:46:47 14  supervised release may be paid on a schedule of monthly

14:46:52 15  installment, to be established by the United States Probation

14:46:55 16  Office and approved by this Court.

14:46:57 17          I find that you do not have the ability to pay

14:47:01 18  interest on the monetary penalties that I have ordered in

14:47:04 19  restitution, so I will waive the interest requirement in this

14:47:07 20  case.

14:47:08 21          I find that you do not have the ability to pay a

14:47:11 22  fine; I will waive the fine in this case.

14:47:13 23          I believe we have established in this hearing that

14:47:16 24  the special mandatory assessment of $100, which is $50 per

14:47:21 25  count, has now been paid in full.

14:47:24      1          Since you have been in custody since

14:47:26      2    March 15th, 2000, voluntary surrender is not an issue.

14:47:33      3          Mr. Karr, at this time I am handing to the clerk of

14:47:35      4    this court the presentence investigation report prepared by the

14:47:39      5    probation department in this case and to which we have referred

14:47:44      6    during this proceeding.  I'm ordering that that report be

14:47:47      7    sealed.  That means that no one may come to the district

14:47:49      8    clerk's office and read about you or any member of your family

14:47:53      9    or any of the facts and circumstances surrounding the offense

14:47:56     10    for which you have been convicted and sentenced today which may

14:48:00     11    be contained in that report.

14:48:02     12          However, I wish to advise you that if there is

14:48:04     13    an appeal from the sentence that I have just imposed, both you

14:48:07     14    and the government may use your copies of the presentence

14:48:09     15    investigation report for purposes of appeal, and in that event

14:48:11     16    the presentence investigation report will become part of the

14:48:12     17    record on appeal.  Do you understand that?

14:48:14     18          THE DEFENDANT:  Yes, sir.

14:48:21     19          THE COURT:  You have a right to appeal the sentence

14:48:23     20    that I have just imposed, and in a moment I will be passing to

14:48:28     21    you and your lawyers letters that more fully explain that.

14:48:32     22          However, I wish to tell you at this time that if for

14:48:34     23    any reason you desire to appeal the sentence that I have just

14:48:37     24    imposed or if for any reason you feel you have a right to

14:48:39     25    appeal that sentence, you may only do so if you first file with

| | | |
|---|---|---|
| 14:48:43 | 1 | the clerk of this court within 14 days a written Notice of |
| 14:48:47 | 2 | Appeal.  That's a written document called a "Notice of Appeal." |
| 14:48:51 | 3 | If you do not file such a written Notice of Appeal |
| 14:48:53 | 4 | with the clerk of this court within 14 days, you can never |
| 14:48:56 | 5 | appeal the sentence that I have just imposed, and you will |
| 14:48:59 | 6 | forever waive your right to appeal that sentence.  Do you |
| 14:49:02 | 7 | understand that? |
| 14:49:02 | 8 | THE DEFENDANT:  Yes, sir. |
| 14:49:05 | 9 | THE COURT:  Then at this time I am passing those |
| 14:49:08 | 10 | letters to the clerk of this court. |
| 14:49:09 | 11 | Is there anything further to come before the court in |
| 14:49:13 | 12 | this case at this time? |
| 14:49:15 | 13 | MR. HARDING:  Nothing from the government, Judge. |
| 14:49:17 | 14 | MR. ALDREDGE:  No, Your Honor. |
| 14:49:19 | 15 | MS. WILLIAMS:  No, Your Honor. |
| 14:49:19 | 16 | THE COURT:  At this time the Court dismisses any |
| 14:49:21 | 17 | pending motions on which the Court has not ruled.  You are |
| 14:49:24 | 18 | excused.  Good luck to you, Mr. Karr. |
| 14:49:27 | 19 | (End of transcript) |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

1   **UNITED STATES DISTRICT COURT      )**

2   **WESTERN DISTRICT OF TEXAS         )**

3        I, Arlinda Rodriguez, Official Court Reporter, United

4   States District Court, Western District of Texas, do certify

5   that the foregoing is a correct transcript from the record of

6   proceedings in the above-entitled matter.

7        I certify that the transcript fees and format comply with

8   those prescribed by the Court and Judicial Conference of the

9   United States.

10       WITNESS MY OFFICIAL HAND this the 12th day of April 2021.

11

12                                  /S/ Arlinda Rodriguez
                                    Arlinda Rodriguez, Texas CSR 7753
13                                  Expiration Date:  10/31/2021
                                    Official Court Reporter
14                                  United States District Court
                                    Austin Division
15                                  501 West 5th Street, Suite 4152
                                    Austin, Texas 78701
16                                  (512) 391-8791

17

18

19

20

21

22

23

24

25